## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

                Plaintiff/Counterclaim Defendant,

       v.

                                 Civil Action No. 05-292 (JJF)

TATUNG COMPANY;
TATUNG COMPANY OF AMERICA, INC.;
CHUNGHWA PICTURE TUBES, LTD.;
AND VIEWSONIC CORPORATION,

                Defendants/Counterclaim Plaintiffs.

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION

THE BAYARD FIRM
Richard D. Kirk (#922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
(302) 655-5000

Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:
Gaspare J. Bono
Matthew T. Bailey
Andrew J. Park
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500 (Telephone)

November 1, 2005

# TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDINGS ........................................................1

SUMMARY OF ARGUMENT ................................................................................2

STATEMENT OF FACTS ....................................................................................4

    A.    LG.Philips and its LCD Technology .........................................................4

    B.    LG.Philips and its Reputation as an Industry Innovator ...........................5

    C.    LG.Philips' Technology and the Patent-in-Suit.........................................6

    D.    Delaware Customers' Purchases of Defendants' LCD Products................7

ARGUMENT ....................................................................................................8

I.    LPL IS LIKELY TO SUCCEED ON THE MERITS..............................................9

    A.    LPL Likely Will Succeed in Proving Infringement....................................9

        1.    The Court Should Construe LPL's Claim Terms In
            Accordance with Their Ordinary and Accustomed Meaning ........10

        2.    A Comparison of LPL's Claims to Defendants' Devices
            Demonstrates That LPL Likely Will Prove Infringement .............11

            a.    An Industry Expert Has Determined that
                Defendants' Devices Literally Infringe the '121
                Patent..................................................................12

            b.    The Defendants' Devices Literally Infringe the '121
                Patent..................................................................13

                (1)    The Defendants' Devices Literally Infringe
                      Claim 1 of the '121 Patent ..........................13

                (2)    The Defendants' Devices Literally Infringe
                      Claim 2 of the '121 Patent ..........................14

                (3)    The Defendants' Devices Literally Infringe
                      Claim 5 of the '121 Patent ..........................16

                (4)    The Defendants' Devices Literally Infringe
                      Claim 6 of the '121 Patent ..........................17

                (5)    The Defendants' Devices Literally Infringe
                      Claim 7 of the '121 Patent ..........................17

                (6)    The Defendants' Devices Literally Infringe
                      Claim 8 of the '121 Patent ..........................17

                (7)    The Defendants' Devices Literally Infringe
                      Claim 9 of the '121 Patent ..........................19

**TABLE OF CONTENTS**
(continued)

Page

(8)    The Defendants' Devices Literally Infringe Claim 14 of the '121 Patent ...................................19

c.    In the Alternative, the Defendants' Devices Infringe the '121 Patent Under The Doctrine of Equivalents.........20

B.    LPL Likely Will Withstand Any Challenge to the Validity of the '121 Patent ................................................................................21

II.    LPL WILL CONTINUE TO SUFFER IRREPARABLE HARM UNLESS THE COURT ENJOINS FURTHER INFRINGEMENT......................................22

A.    LPL Is Entitled to a Presumption of Irreparable Harm Because it Has Demonstrated Clear Likely Success on the Merits...........................22

B.    An Injunction Will Protect LPL's Reputation in the LCD Industry and Deter Other Infringers........................................................................25

1.    Defendants' Infringing Conduct Undermines LPL's Paramount Reputation and Goodwill in the LCD Industry ...........25

2.    An Injunction Is Necessary To Deter Additional Widespread Infringement That Is Likely To Occur......................27

III.    THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN FAVOR OF INJUNCTIVE RELIEF.............................................................................................28

IV.    ENJOINING DEFENDANTS' CONTINUED INFRINGEMENT PROMOTES THE PUBLIC INTEREST .............................................................31

CONCLUSION.....................................................................................................................33

# TABLE OF AUTHORITIES

Page

## CASES

*3M Unitek Corp. v. Ormco Co.*,
    96 F. Supp. 2d 1042 (C.D. Cal. 2000) ...................................................27

*A&E Products Group v. California Supply, Inc.*,
    28 U.S.P.Q.2d 1041 (C.D. Cal. 1993)......................................................8

*Allied Tub & Conduit Corp. v. John Maneely Co.*,
    125 F. Supp. 2d 987 (D. Ariz. 2000) .....................................................23

*Bayer AG v. Elan Pharmaceutical Research Corp*,
    212 F.3d 1241 (Fed. Cir. 2000)...............................................................9

*Bio-Technology General Corp. v. Genentech, Inc.*,
    80 F.3d 1553 (Fed. Cir. 1996).................................................................27

*Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*,
    320 F.3d 1339 (Fed. Cir. 2003)..............................................................20

*Canon Computer Systems, Inc. v. Nu-Kote International, Inc.*,
    134 F.3d 1085 (Fed. Cir. 1998)..............................................................22

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002)..............................................................10

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*,
    28 U.S.P.Q.2d 1362 (D. Del. 1993) ............................................... *passim*

*CVI/Beta Ventures, Inc. v. Custom Optical Frames, Inc.*,
    893 F. Supp. 508 (D. Md. 1995)................................................25, 27, 28

*Cybor Corp. v. FAS Technologies, Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998)...............................................................9

*Decade Industries v. Wood Technology, Inc.*,
    100 F. Supp. 2d 979 (D. Minn. 2000).................................................30, 32

*Dreamlite Holdings, Ltd. v. Kraser*,
    705 F. Supp. 98 (E.D.N.Y. 1988) .........................................................23

*E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.*,
    706 F. Supp. 1135 (D. Del. 1989)...........................................23, 24, 32

i

# TABLE OF AUTHORITIES
(Continued)

**Page**

*Eagle Comtronics, Inc. v. Arrow Communications Laboratories, Inc.*,
    305 F.3d 1303 (Fed. Cir. 2002)................................................................20

*Glasstech, Inc. v. Ab Kyro Oy*,
    635 F. Supp. 465 (N.D. Ohio 1986)....................................................29, 30

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*,
    339 U.S. 605 (1950)...........................................................................20

*GTE Sylvania Inc. v. Consumer Product Safety Commission*,
    404 F. Supp. 352 (D. Del. 1975)............................................................26

*H.H. Robertson, Co. v. United Steel Deck, Inc.*,
    820 F.2d 384 (Fed. Cir. 1987)...........................................................27, 31

*Hybritech Inc. v. Abbott Laboratories*,
    4 U.S.P.Q.2d 1001 (C.D. Cal. 1987)....................................................23, 28

*Hybritech Inc. v. Abbott Laboratories*,
    849 F.2d 1446 (Fed. Cir. 1988)....................................................... *passim*

*Impax Laboratories, Inc. v. Aventis Pharmaceuticals, Inc.*,
    235 F. Supp. 2d 390 (D. Del. 2002)................................................8, 9, 22, 24

*Insituform Technologies, Inc. v. Cat Contracting, Inc.*,
    161 F.3d 688 (Fed. Cir. 1998)..............................................................10

*Jacobson v. Cox Paving Co.*,
    19 U.S.P.Q.2d 1641 (D. Ariz. 1991)........................................................22

*Johnson & Johnson Consumer Products, Inc. v. Ormco Corp.*,
    Civ. A. Nos. 87-341-JJF & 87-547-JJF, 1988 WL 155634
    (D. Del. Sept. 29, 1988) ............................................................. *passim*

*Johnson Worldwide Associates, Inc. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999)..............................................................10

*Mas-Hamilton Group v. LaGard, Inc.*,
    156 F.3d 1206 (Fed. Cir. 1998)............................................................11

*Moen, Inc. v. Foremost International Trading, Inc.*,
    19 F. Supp. 2d 854 (N.D. Ill. 1998) ........................................................31

## TABLE OF AUTHORITIES
(Continued)

Page

*Monsanto Co. v. Scruggs,*
   249 F. Supp. 2d 746 (N.D. Miss. 2001)............................................................26, 32

*Oakley, Inc. v. Sunglass Hut International,*
   316 F.3d 1331 (Fed. Cir. 2003)............................................................11, 12, 13, 14

*Oney v. Ratliff,*
   182 F.3d 893 (Fed. Cir. 1999)............................................................................21

*Phillips v. AWH Corp.*
   415 F. 3d 1303 (Fed. Cir. 2005)..........................................................................10

*Polymer Technologies, Inc. v. Bridwell,*
   103 F.3d 970 (Fed. Cir. 1996)........................................................................22, 23

*Progressive Games, Inc. v. Shuffle Master, Inc.,*
   69 F. Supp. 2d 1276 (D. Nev. 1999)......................................................................29

*Purdue Pharma L.P. v. Boehringer Ingelheim GmbH,*
   237 F.3d 1359 (Fed. Cir. 2001)......................................................................21, 22

*Saes Getters, S.p.A. v. Ergenics, Inc.,*
   816 F. Supp. 979 (D.N.J. 1992)...........................................................................23

*Seal-Flex, Inc. v. Athletic Track & Court Construction,*
   172 F.3d 836 (Fed. Cir. 1999)............................................................................11

*Smash, L.L.C. v. New England Pottery Co., Inc.,*
   No. Civ. 01-601 (DWF/SRN), 2001 WL 1240849 (D. Minn. Oct. 15, 2001).......23

*Smith International, Inc. v. Hughes Tool Co.,*
   718 F.2d 1573 (Fed. Cir. 1983)................................................................. *passim*

*Solarex Corp. v. Advanced Photovoltaic Systems, Inc.,*
   34 U.S.P.Q.2d 1234 (D. Del. 1995).............................................................. *passim*

*Structural Rubber Products Co. v. Park Rubber Co.,*
   749 F.2d 707 (Fed. Cir. 1984)............................................................................21

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.,*
   279 F.3d 1357 (Fed. Cir. 2002).......................................................................8, 10

## TABLE OF AUTHORITIES
(Continued)

**Page**

*Texas Digital Systems, Inc. v. Telegenix, Inc.,*
    308 F.3d 1193 (Fed. Cir. 2002)...........................................................................10

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,*
    520 U.S. 17 (1997).........................................................................................11, 20

*Wesley Jessen Corp. v. Bausch & Lomb, Inc.,*
    209 F. Supp. 2d 348 (D. Del. 2002)....................................................................24

*Yenzer v. Agrotors, Inc.,*
    764 F. Supp. 974 (M.D. Pa. 1991).......................................................................28

## STATUTES & REGULATIONS

35 U.S.C. § 282 (2005)..........................................................................................21

35 U.S.C. § 283 (2005)............................................................................................8

## OTHER

I. Kayton, *Kayton On Patents* (1979) ...................................................................25

## NATURE AND STAGE OF THE PROCEEDINGS

Plaintiff LG.Philips LCD Co., Ltd. ("LPL") respectfully moves the Court for a

preliminary injunction precluding Defendants Tatung Co. ("Tatung"), Tatung Company

of America, Inc. ("Tatung America"), Chunghwa Picture Tubes, LTD. ("CPT"), and

ViewSonic Corporation ("ViewSonic") (collectively the "Defendants") from infringing

LPL's patent, U.S. Patent No. 6,738,121 ("the '121 Patent").  The '121 Patent relates to

liquid crystal displays ("LCDs"), particularly LCDs with tape carrier packages.

LCDs are used to produce images for many of today's computer monitors,

televisions, and other popular flat screen products.  Generally, an LCD with an active

matrix driving system uses thin film transistors ("TFTs") as switching devices to display

a moving picture.  LCDs display a picture corresponding to video signals on a pixel

matrix having pixels arranged at each intersection between gate and data lines.  Each

pixel includes a liquid crystal cell for controlling a transmitted light quantity in

accordance with a voltage level of a data signal from a data line.  The TFT is installed at

an intersection between the gate line and the data line to switch a data signal to be

transferred to the liquid crystal cell in response to a scanning signal from the gate line.

(Declaration of Jong Hwan Kim dated October 24, 2005 ("Kim Decl.") ¶ 22.)

An LCD requires a number of driving integrated circuits ("D-IC") connected to

the data lines and the gate lines to apply data signals and scanning signals to the data

lines and the gate lines, respectively.  (*Id.* ¶ 22.)  The D-ICs are installed between the

printed circuit board ("PCB") and the liquid crystal panel to apply the data signals and

the scanning signals to the data lines and the gate lines of the liquid crystal panel in

response to a control signal applied by the PCB.  The D-ICs are mounted on a tape carrier

package that is connected to both a lower glass substrate of the liquid crystal panel and the PCB. (*Id.*)

Conventional tape carrier packages cause a problem with brightness variations in the areas where the tape carrier packages are adhered to the liquid crystal panel. Using the tape carrier package of the '121 Patent, the brightness variations are reduced or eliminated. (*Id.* ¶ 24.)

The focus of LPL's preliminary injunction motion is on flat screen computer monitors, because Defendants are making, selling, offering to sell, and importing flat screen computer monitors that infringe LPL's patented technology.

This is a significant case because LPL's technology is of growing significance in the computer industry, as flat panel display monitors, including those that use LCDs to produce visual images, increasingly displace the larger and heavier computer monitors that utilize older cathode ray tube ("CRT") technology. (*Id.* ¶ 25.) LPL's technology of the '121 Patent reduces the brightness difference on the screen of the monitor and therefore increases the picture quality. (*Id.*.) Consequently, LPL's technology of the '121 Patent is an important innovation. LPL seeks an injunction to protect its patent rights to this innovative technology.

## SUMMARY OF ARGUMENT

LPL's motion for preliminary injunction should be granted because: (i) LPL has a significant likelihood of success on the merits of this case, given the validity of the '121 Patent and the clear infringement by Defendants; (ii) LPL has already suffered and will continue to suffer irreparable harm unless the Court enjoins Defendants; (iii) the balance of hardships weighs heavily in favor of injunctive relief; and (iv) enjoining Defendants' continued infringement would promote the public interest.

1.      LPL is likely to succeed on the merits of this case.  LPL has submitted a detailed expert analysis by Mr. William K. Bohannon confirming that the Defendants' products contain each and every limitation set forth in at least claims 1, 2, 5-9 and 14 of the '121 Patent.  In addition, there is a statutory presumption that the '121 Patent is valid, and the Defendants have the burden to produce evidence to overcome this presumption.

2.      LPL is entitled to a presumption of irreparable harm and has demonstrated additional irreparable harm.  Based on its clear showing of likely success on the merits, LPL is entitled to a presumption that it is suffering irreparable harm.  Defendants' continued infringement inherently undermines LPL's valuable patent rights, including the right to control and exclude others from using its technology.  LPL has also suffered damage to its reputation and goodwill, and unless an injunction is entered, additional widespread infringement is likely and would further undermine LPL's patent rights, reputation and goodwill.

3.      The balance of hardships weighs heavily in LPL's favor.  LPL will suffer substantial hardship if Defendants are permitted to continue to infringe.  Defendants, on the other hand, will face minimal hardship from an injunction because Defendants can substitute other products that do not infringe.  Particularly, the Defendants can substitute LCD without the tape carrier packages that infringe the '121 Patent.  In addition, Defendants can make and sell any of their other products that do not infringe.  Accordingly, the balance of hardships tips in favor of LPL.

4.      An injunction would serve the public interest.  The public has a significant interest in upholding the legal rights of patent holders like LPL.  An injunction also will promote the public's interest in new technology by promoting further research and

innovation efforts.  This Court should therefore grant injunctive relief to advance the public interest.

## STATEMENT OF FACTS

### A.    LG.Philips and its LCD Technology

LPL, a Korean company, manufactures thin-film-transistor liquid crystal displays ("TFT-LCDs").  (Kim Decl. ¶ 2.)  LCDs are a type of flat panel display used to generate images in many popular flat screen products.  (*Id.* ¶ 3.)  A LCD, or LCD panel, includes upper and lower glass substrates, a color filter layer on the upper substrate, and liquid crystal between the substrates.  The special properties of the liquid crystal are manipulated by using electrical signals to create images.  (*Id.*)

In most LCD products, the images are created using a backlight unit.  The backlight unit diffuses and directs light toward the LCD panel.  The LCD panel and backlight unit are assembled as an LCD module.  (*Id.*)  In turn, the LCD module and other components, including one or more frames, form a flat panel display device.  The flat panel display device is then mounted to the housing of the LCD computer monitor or other LCD product.  (*Id.*)

LPL is a leading supplier in the global LCD industry.  As such, LPL's LCDs are used in many LCD flat screen products.  (*Id.* ¶¶ 2, 5.)  LPL is one of the world's foremost large-area (10" or larger) LCD manufacturer.  (*Id.* ¶ 6.)  Several well-known companies, including Gateway, IBM, Compaq, Apple, Sony, NEC, and Dell, use LPL's LCDs to make many of their flat panel display products.  (*Id.* ¶ 5.)

The use of LCDs in flat screen computer monitors and televisions is relatively new.  Traditionally, computer monitors have used cathode ray tubes ("CRT") to create images for viewing.  (*Id.* ¶ 4.)  A CRT uses a tube that is large and heavy compared to an

607389v1

4

LCD module, which is thin and light. As a result, computer monitors containing CRTs are bulky and heavy compared to LCD monitors. (*Id*.) LCD computer monitors and other LCD products are becoming very popular with consumers. Compared to CRT products, LCD display products are light, thin, easy to move, take up relatively little space, and generally provide better image quality than CRT products. (*Id*.)

### B. LG.Philips and its Reputation as an Industry Innovator

LPL is recognized as a world leader in LCD technology and innovation, and LPL regularly creates new products and pioneers innovations related to LCDs. (*Id*. ¶¶ 2, 5-18.) LPL has a substantial intellectual property staff and files approximately 400 patent applications each year with the U.S. Patent and Trademark Office. (*Id*. ¶¶ 17-18.) LPL holds approximately 785 U.S. patents. (*Id*. ¶ 17.)

LPL has set industry records for technology and production. For example, LPL was the first LCD company to utilize fifth-generation technology and the first company to develop and mass produce several new types of LCDs.[1] (*Id*. ¶¶ 7-8.) In addition, LPL was the first company to produce and ship 2 million large-area LCDs in one month. (*Id*. ¶ 11.) Further, LPL set an industry milestone for desktop monitor LCDs, shipping more than 10 million within an eleven-month period. (*Id*.) LPL won the prestigious 2003 SID/Information Display Magazine Display of the Year Gold Award recognizing product innovation and excellence. (*Id*. ¶ 10.) LPL's customers also recognize and value LPL's technological achievements. In 2002, 2003, and 2004, LPL was recognized as the leading LCD supplier in overall customer satisfaction based on market surveys conducted

---

[1] In the LCD industry, "fifth-generation" refers to the size of the glass sheets from which LCDs are made. Fifth-generation glass sheets measure approximately 1.0 or 1.1 meters by 1.2 or 1.3 meters, an increase over the size of fourth-generation LCD glass. (Kim Decl. ¶ 8.)

by DisplaySearch, a leading research firm in the LCD industry.  (*Id.* ¶ 12.)  In the 2003

survey, moreover, LPL received the highest score for excellence in technology.  (*Id.*)

LPL's success depends on its reputation as an innovator and on its R&D programs.

(*Id.* ¶ 13.)  LPL employs more than 645 scientists and other personnel devoted to the

pursuit of new technology.  (*Id.* ¶ 15.)  Annually, LPL invests more than $200 million in

its R&D campaign.  (*Id.*)  To conduct its research activities, LPL uses state-of the art

facilities.  (*Id.* ¶ 14.)  LPL plans to build a new, sixth-generation LCD production facility

at a cost of just under $2 billion dollars.[2]  (*Id.* ¶ 16.)  LPL has signed a memorandum of

agreement to establish a 3.3 million-square-meter industrial cluster, including R&D

facilities, in Paju, Kyonggi Province, Korea.  (*Id.*)  LPL's significant R&D efforts have

generated numerous technical innovations.  LPL's innovations include, for example,

implementing super high aperture (SHA) ratio LCS structures, pioneering the use of wet

etching technology, developing touchscreen sensor technology, creating a new backlight

unit to boost contrast in portable computers, and inventing tape carrier packages such as

the technology that is at issue in this case.  (*Id.* ¶ 19.)

C.    **LG.Philips' Technology and the Patent-in-Suit**

This case concerns LPL's innovations relating to how driving integrated circuits

are mounted on a liquid crystal panel of an LCD, such as in flat screen computer

monitors.  Particularly, the driving integrated circuits are mounted on a tape carrier

package that is connected to the printed circuit board and liquid crystal panel of the LCD.

Using LPL's technology, the tape carrier package is mounted on the liquid crystal panel

in such a way that does not cause a brightness variation in the LCD.  In one embodiment

---

[2]  Sixth-generation LCD glass sheets measure approximately 1.5 meters by 1.8 meters.  (Kim Decl. ¶ 16.)

of LPL's invention, for example, a tape carrier package mounted with a driving integrated circuit is connected to the liquid crystal display panel, then bent around the backlight of the LCD, and then connected to the printed circuit board on the rear side of the backlight. The tape carrier package has at least one bending part in which a portion of the base film has been removed to enable the tape carrier package to bend. In addition, the tape carrier package of the '121 Patent has at least one dummy bending part, in which a portion of the base film is removed, but not bent. The dummy bending part serves to distribute a stress caused by thermal expansion applied to the liquid crystal panel when the tape carrier package is bonded to the liquid crystal panel with high heat and pressure. In prior art LCDs, this stress causes a deformation in the glass substrate of the liquid crystal panel resulting in brightness differences in the LCD.

The '121 Patent of LPL protects this valuable technology. The United States Patent and Trademark Office ("PTO") issued the '121 Patent on May 18, 2004. This patent contains claims covering LCDs containing tape carrier packages and the tape carrier package itself. A true and correct copy of the '121 Patent is attached as Exhibit A to LPL's complaint and Exhibit 2 to the Declaration of William K. Bohannon dated October 31, 2005 ("Bohannon Decl."). LPL owns the '121 Patent, and LPL has not granted any license on the '121 Patent. (Kim Decl. ¶ 25.)

### D.    Delaware Customers' Purchases of Defendants' LCD Products

Infringing Tatung, CPT, and ViewSonic products are being sold to consumers in Delaware. Specifically, for example, a customer in Delaware has purchased at least the ViewSonic VE710S LCD computer monitor and the Tatung LCD monitor (L17AMTN). Both the ViewSonic and Tatung monitors have an LCD module manufactured by CPT. LPL retained an outside expert, Mr. William K. Bohannon, to analyze LPL's patent and

Defendants' products.  Mr. Bohannon performed his analysis, confirming that

Defendants' products infringe the '121 Patent.  (Bohannon Decl. ¶ 15.)  LPL seeks a

preliminary injunction to prohibit Defendants from continuing to infringe the '121 Patent.

## ARGUMENT

This Court has statutory authority to "grant injunctions in accordance with the

principles of equity to prevent the violation of any right secured by patent, on such terms

as the court deems reasonable."  35 U.S.C. § 283 (2005); *see also Smith Int'l, Inc. v.

Hughes Tool Co.*, 718 F.2d 1573, 1577 (Fed. Cir. 1983).  Courts issue injunctions in

patent cases based on the patent holder's showing on four factors: (1) a reasonable

likelihood of success on the merits; (2) irreparable harm in the absence of an injunction;

(3) a balance of hardships in favor of the patent holder; and (4) an injunction's favorable

impact on the public interest.  *See Tate Access Floors, Inc. v. Interface Architectural Res.,

Inc.*, 279 F.3d 1357, 1362 (Fed. Cir. 2002); *Impax Labs., Inc. v. Aventis Pharm., Inc.*, 235

F. Supp. 2d 390, 392 (D. Del. 2002).  The court weighs all of the factors against one

another and against the form and magnitude of relief requested, so that no single factor is

dispositive.  *Impax Labs.*, 235 F. Supp. 2d at 392 (quoting *Hybritech Inc. v. Abbott Labs.*,

849 F.2d 1446, 1451 (Fed. Cir. 1988)).  The relative weakness of one factor, therefore,

may be overcome by the strength of other factors.  *See A&E Prods. Group v. Cal. Supply,

Inc.*, 28 U.S.P.Q.2d 1041, 1046 (C.D. Cal. 1993).  Thus, the Court's consideration of a

preliminary injunction in this case involves balancing the same factors it would consider

in a case that does not involve patent rights, and the standards applied in patent injunction

cases are no more stringent than in other areas of the law.  *See Johnson & Johnson

Consumer Prods., Inc. v. Ormco Corp.*, Civ. A. Nos. 87-341-JJF & 87-547-JJF, 1988 WL

155634, at *3 (D. Del. Sept. 29, 1988).

607389v1

8

Although the same factors are to be considered in patent cases as in other cases, in a patent case there is a special presumption that can assist the patent holder in enjoining infringement. If the patent holder makes a clear showing of likely success on the merits, there is a presumption of irreparable harm. *Impax Labs.,* 235 F. Supp. 2d at 395; *Johnson & Johnson*, 1988 WL 155634, at *3. However, the presumption of irreparable harm is not essential to issue an injunction. Rather, the patent holder can obtain an injunction by establishing a reasonable likelihood of success and making a separate showing of irreparable harm. *Id.*; *see also Smith Int'l*, 718 F.2d at 1581 n.7 (stronger showing of irreparable harm can compensate for a "less forceful" showing of validity and infringement).

LPL has satisfied the test for a preliminary injunction in this case. As set forth below, the presumption of irreparable harm applies, because LPL has made a clear showing of the validity and infringement of its patents. Even without such a presumption, LPL has established each necessary element and, therefore, LPL respectfully requests that the Court exercise its broad discretion to enter a preliminary injunction against Defendants, precluding their infringing conduct.

## I.    LPL IS LIKELY TO SUCCEED ON THE MERITS

### A.    LPL Likely Will Succeed in Proving Infringement

The Court should first conclude that LPL is likely to succeed in showing infringement and validity of its patents. Determining whether an accused device infringes a patent claim requires a two-step analysis. *Bayer AG v. Elan Pharm. Research Corp.*, 212 F.3d 1241, 1247 (Fed. Cir. 2000). The first step involves construing the claim. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454-56 (Fed. Cir. 1998). The second step involves comparing the claim, as construed, to the accused device.

*Insituform Techs., Inc. v. Cat Contracting, Inc.*, 161 F.3d 688, 692 (Fed. Cir. 1998); *see also Tate Access,* 279 F.3d at 1365.  As set forth below, both parts of the analysis demonstrate that LPL is likely to succeed on the merits.

### 1.    The Court Should Construe LPL's Claim Terms In Accordance with Their Ordinary and Accustomed Meaning

In conducting the first part of the infringement analysis (claim construction), the Court should give LPL's patent claim terms their ordinary and accustomed meaning.  *See Texas Digital Sys., Inc. v. Telegenix, Inc.,* 308 F.3d 1193, 1202 (Fed. Cir. 2002), *cert. denied*, 538 U.S. 1058 (2003) ("unless compelled otherwise, a court will give a claim term the full range of its ordinary meaning as understood by persons skilled in the relevant art"); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002) (Federal Circuit generally indulges a "heavy presumption" in favor of "ordinary and customary meaning").  A court must interpret a claim term in accordance with its ordinary and accustomed meaning, unless the patentee has chosen to be her own lexicographer or the claim term is so unclear that the scope of the claim cannot be ascertained from the language used. *Johnson Worldwide Assoc., Inc. v. Zebco Corp.*, 175 F.3d 985, 989-90 (Fed. Cir. 1999).  The Federal Circuit has stated that the specification is always highly relevant to claim construction and is the single best guide to the meaning of a claim term. *Phillips v. AWH Corp.*, 415 F. 3d 1303 (Fed. Cir. 2005).  In this case, the ordinary and accustomed meaning provided by the specification of the '121 Patent should control, and the claim terms are sufficiently clear to one of ordinary skill in the art.

The infringement analysis set forth below properly relies, therefore, on the ordinary and accustomed meaning of the relevant claim terms, including the terms "liquid

607389v1

crystal display device," "liquid crystal panel," "printed circuit board," "tape carrier package," "base film," "output pad part," "bending part," "input pad part," and "dummy bending part." In particular, the ordinary and accustomed meaning of "dummy bending part" is a portion of the tape carrier package in which the base film is removed, but not folded. *See, e.g.*, the '121 Patent, col. 3:56-61.

### 2. A Comparison of LPL's Claims to Defendants' Devices Demonstrates That LPL Likely Will Prove Infringement

A comparison of LPL's claims to Defendants' devices demonstrates that LPL likely will prove infringement. In order to prove infringement, LPL must show that the accused device meets each claim limitation, either literally or under the doctrine of equivalents. *Seal-Flex, Inc. v. Athletic Track & Court Const.*, 172 F.3d 836, 842 (Fed. Cir. 1999). Literal infringement requires that the accused device contain each limitation of the asserted claim. *Mas-Hamilton Group v. LaGard, Inc.*, 156 F.3d 1206, 1211 (Fed. Cir. 1998). If the accused device does not literally infringe the asserted claim, it may still infringe under the doctrine of equivalents. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 39-41 (1997). Under that doctrine, an element in the accused device is equivalent to a claim limitation if the differences between the two are insubstantial. *Id.* at 39-41.

Although LPL need only show that each claim limitation in any <u>single</u> claim is likely present in the accused devices to prove infringement, *see e.g., Oakley, Inc. v. Sunglass Hut Int'l,* 316 F.3d 1331, 1344 (Fed. Cir. 2003), LPL exceeds this burden by showing that Defendants' monitors do contain the limitations of <u>eight</u> claims in the '121 Patent. LPL first establishes that Defendants' devices literally infringe the '121 Patent.

Alternatively, LPL demonstrates that Defendants' devices infringe under the doctrine of equivalents.

**a.    An Industry Expert Has Determined that Defendants' Devices Literally Infringe the '121 Patent**

An industry expert, Mr. William Bohannon, has determined that Defendants' devices literally infringe the '121 Patent.  Mr. Bohannon has more than 25 years of experience working in the electronics industry, and he is an expert in the field of display technology, including flat panel display (e.g., LCD) technology.  (Bohannon Decl. ¶¶ 4, 8.)  Mr. Bohannon is the Chief Scientist for Manx Research, Inc., where he conducts detailed technical evaluations for display products, including LCD display products.  (*Id.* at ¶ 5.)  Mr. Bohannon previously worked as a Chief Scientist at Proxima, Inc., where he tracked advancements in LCD and other display technologies, evaluated current and future production LCDs, and developed and tested new LCD products.  (*Id.* ¶ 6.)  Mr. Bohannon also directed Proxima's patent prosecution activities.  (*Id.*)  He is well-versed in patent principles and infringement analysis.  (*Id.* ¶¶ 6, 7.)

Mr. Bohannon analyzed the specification and the claims of the '121 Patent.  (*Id.* ¶ 8.)  Then he focused on the limitations in claims 1, 2, 5-9, and 14, in view of the specification.  (*Id.* ¶ 9.)  In addition, Mr. Bohannon reviewed the file history of the '121 Patent, including the prior publications cited in the file history.  (*Id.* ¶ 10.)  He then compared each limitation in each of these claims to a Tatung flat panel computer monitor (model L17AMTN), and a ViewSonic flat panel computer monitor (model VE710S).  (*Id.* ¶ 11.)  These products are collectively referred to herein as "the Defendants' devices."  More specifically, Mr. Bohannon disassembled each of the Defendants' devices and examined the structural configuration and mounting technique employed in each of the

Defendants' devices. (*Id.* ¶ 12.)   Based on an examination of the Defendants' devices,

Mr. Bohannon concluded that all of the limitations in claims 1, 2, 5-9, and 14 of the '121

Patent are present in each of the Defendants' devices. (*Id.* ¶¶ 21, 28.)

Set forth below are the details of Mr. Bohannon's analysis demonstrating literal

infringement of the '121 Patent.

### b.  The Defendants' Devices Literally Infringe the '121 Patent

#### (1)  The Defendants' Devices Literally Infringe Claim 1 of the '121 Patent

The Defendants' devices literally infringe claim 1 of the '121 Patent.  Claim 1

defines a liquid crystal display device as follows:

> 1. A liquid crystal display device, comprising:
> a liquid crystal panel;
> a printed circuit board; and
> a tape carrier package connected to the liquid crystal panel and the printed circuit board, the tape carrier package comprising:
> a base film mounted with an integrated circuit chip for applying a signal to the liquid crystal panel;
> an output pad part extending from the integrated circuit chip and having terminals connected to the liquid crystal panel;
> a dummy bending part in which a portion of the base film is removed in a direction perpendicular to the terminals of the output pad part for reducing a thermal expansion force and a thermal contraction force generated when thermal-pressing the output pad part onto the liquid crystal panel;
> a first bending part in which a second portion of the base film existing at a bent position between the dummy bending part and the integrated circuit chip is removed; and
> an input pad part extending from the integrated circuit chip and having terminals connected to the printed circuit board,
> wherein the dummy bending part is formed at a position, close to any one of the output pad part or the input pad part, where the tape carrier package is not folded.

607389v1

('121 Patent, col. 6:31-58.)

Mr. Bohannon concluded that the LCD in each of the Defendants' devices contained a liquid crystal panel and a printed circuit board. (Bohannon Decl. at Tables II & III.) In addition, Mr. Bohannon concluded the Defendants' devices also had a tape carrier package that included a base film mounted with an integrated circuit chip for applying a signal to the liquid crystal panel, an output pad part extending from the integrated circuit chip and having terminals connected to the liquid crystal panel, a dummy bending part in which a portion of the base film is removed in a direction perpendicular to the terminals of the output pad part for reducing a thermal expansion force and a thermal contraction force generated when thermal-pressing the output pad part onto the liquid crystal panel, a first bending part in which a second portion of the base film existing at a bent position between the dummy bending part and the integrated circuit chip is removed, and an input pad part extending from the integrated circuit chip and having terminals connected to the printed circuit board. (*Id.*) Mr. Bohannon noted that the dummy bending part is formed at a position close to the output pad part where the tape carrier package is not folded. (*Id.*)

**(2)    The Defendants' Devices Literally Infringe
Claim 2 of the '121 Patent**

The Defendants' devices also literally infringe claim 2 of the '121 Patent. Claim 2 recites the following:

> 2. A liquid crystal display device, comprising:
> a liquid crystal panel;
> a printed circuit board; and
> a tape carrier package connected to the liquid crystal panel and the printed circuit board, the tape carrier package comprising:
> a base film mounted with an integrated circuit chip for applying a signal to the liquid crystal panel;

an output pad part extending from the integrated circuit chip and having terminals connected to the liquid crystal panel;

a dummy bending part in which a portion of the base film is removed in a direction perpendicular to the terminals of the output pad part for reducing a thermal expansion force and a thermal contraction force generated when thermal-pressing the output pad part onto the liquid crystal panel;

a first bending part in which a second portion of the base film existing at a bent position between the dummy bending part and the integrated circuit chip is removed;

an input pad part extending from the integrated circuit chip and having terminals connected to the printed circuit board; and

a second bending part in which a third portion of the base film existing at a bent position between the input pad part and the integrated circuit chip is removed.

('121 Patent at cols. 1:7:60-2:20.)

Mr. Bohannon concluded that the LCD in each of the Defendants' devices contained a liquid crystal panel and a printed circuit board. (Bohannon Decl. at Tables II & III.) In addition, Mr. Bohannon concluded the Defendants' devices also had a tape carrier package that included a base film mounted with an integrated circuit chip for applying a signal to the liquid crystal panel, an output pad part extending from the integrated circuit chip and having terminals connected to the liquid crystal panel, a dummy bending part in which a portion of the base film is removed in a direction perpendicular to the terminals of the output pad part for reducing a thermal expansion force and a thermal contraction force generated when thermal-pressing the output pad part onto the liquid crystal panel, a first bending part in which a second portion of the base film existing at a bent position between the dummy bending part and the integrated circuit chip is removed, and an input pad part extending from the integrated circuit chip and having terminals connected to the printed circuit board. (*Id.*) Mr. Bohannon noted

that the tape carrier package of the Defendants' devices further includes a second bending

part in which a third portion of the base film existing at a bent position between the input

pad part and the integrated circuit chip is removed.  (*Id.*)

### (3)    The Defendants' Devices Literally Infringe Claim 5 of the '121 Patent

The Defendants' devices also literally infringe claim 5 of the '121 Patent.  Claim

5 recites the following:

> 5. A tape carrier package, comprising:
> a pad part for connection to a liquid crystal panel;
> a base film mounted with an integrated circuit chip
> for applying a signal to the liquid crystal panel; and
> a dummy bending part for distributing a stress
> applied to the liquid crystal panel according to a thermal
> expansion of the pad part by removing a portion of the base
> film between the pad part and the integrated circuit chip,
> wherein the dummy bending part is formed at a
> position, close to the pad part, where the tape carrier
> package is not folded.

('121 Patent at col. 7:31-43.)

Mr. Bohannon concluded that the LCD in each of the Defendants' devices

contained a tape carrier package that includes a pad part for connection to a liquid crystal

panel, and a base film mounted with an integrated circuit chip for applying a signal to the

liquid crystal panel.  (Bohannon Decl. at Tables II & III.)  In addition, Mr. Bohannon

concluded the Defendants' devices also had a dummy bending part for distributing a

stress applied to the liquid crystal panel according to a thermal expansion of the pad part

by removing a portion of the base film between the pad part and the integrated circuit

chip.  (*Id.*)  Mr. Bohannon noted that the dummy bending part is formed at a position

close to the pad part where the tape carrier package is not folded.  (*Id.*)

(4)    **The Defendants' Devices Literally Infringe
Claim 6 of the '121 Patent**

The Defendants' devices also literally infringe claim 6 of the '121 Patent.  Claim

6 recites the following:

> 6.  The tape carrier package according to claim 5,
> further comprising a first bending part in which a second
> portion of the base film is removed at the bent position
> between the dummy bending part and the integrated circuit
> chip.

('121 Patent at col. 7:44-47).

Mr. Bohannon concluded that the Defendants' devices include a first bending part

in which a second portion of the base film is removed at the bent position between the

dummy bending part and the integrated circuit chip.  (Bohannon Decl. at Tables II & III.)

(5)    **The Defendants' Devices Literally Infringe
Claim 7 of the '121 Patent**

The Defendants' devices also literally infringe claim 7 of the '121 Patent, which

states:

> 7.  The tape carrier package according to claim 6,
> further comprising a second pad part for connection to a
> printed circuit board.

('121 Patent at col. 7:44-48.)

Mr. Bohannon concluded that the Defendants' devices include a second pad part

for connection to a printed circuit board.  (Bohannon Decl. at Tables II & III.)

(6)    **The Defendants' Devices Literally Infringe
Claim 8  of the '121 Patent**

The Defendants' devices literally infringe claim 8 of the '121 Patent.  Claim 8

recites the following:

607389v1

17

8. A tape carrier package, comprising:
a pad part for connection to a liquid crystal panel;
a base film mounted with an integrated circuit chip
for applying a signal to the liquid crystal panel;
a dummy bending part for distributing a stress
applied to the liquid crystal panel according to a thermal
expansion of the pad part by removing a portion of the base
film between the pad part and the integrated circuit chip;
a first bending part in which a second portion of the
base film is removed at a bent position between the dummy
bending part and the integrated circuit chip;
a second pad part for connection to a printed circuit
board; and
a second bending part in which a third portion of the
base film is removed at a bent position between the second
pad and the integrated circuit chip.

('121 Patent at cols. 7:51-8:8.)

Mr. Bohannon noted that in each of the Defendants' devices, the tape carrier

package included a pad part for connection to a liquid crystal panel and a base film

mounted with an integrated circuit chip for applying a signal to the liquid crystal panel.

(Bohannon Decl. at Tables II & III.)  The tape carrier package further included a dummy

bending part for distributing a stress applied to the liquid crystal panel according to a

thermal expansion of the pad part by removing a portion of the base film between the pad

part and the integrated circuit chip.  (*Id.*)  In addition, Mr. Bohannon concluded that the

Defendants' devices also included a first bending part in which a second portion of the

base film is removed at a bent position between the dummy bending part and the

integrated circuit chip, a second pad part for connection to a printed circuit board, and a

second bending part in which a third portion of the base film is removed at a bent

position between the second pad and the integrated circuit chip.  (*Id.*)

(7)    **The Defendants' Devices Literally Infringe Claim 9 of the '121 Patent**

The Defendants' devices literally infringe claim 9 of the '121 Patent.  Claim 9

recites the following:

> 9.  The tape carrier package according to claim 5, further comprising a second pad part for connection to a printed circuit board.

('718 Patent at col. 10:51-57.)

Mr. Bohannon concluded that the Defendants' devices include a second pad part

for connection to a printed circuit board.  (Bohannon Decl. at Tables II & III.).

(8)    **The Defendants' Devices Literally Infringe Claim 14 of the '121 Patent**

The Defendants' devices literally infringe claim 14 of the '121 Patent.  Claim 14

recites the following:

> 14. A tape carrier package, comprising:
> a base film mounted with an integrated circuit chip for applying a signal to a liquid crystal panel;
> a pad part extending from the integrated circuit chip to be connected to the liquid crystal panel;
> at least one bending part in which a portion of the base film is removed at an area where the tape carrier package is folded; and
> at least one dummy bending part, in which a second portion of the base film is removed at a portion where the tape carrier package is not folded, thereby reducing a thermal expansion force and a thermal contraction force of the base film parallel to a longitudinal direction of the integrated circuit chip.

('121 Patent at col. 8:41-54.)

Mr. Bohannon concluded that the LCD in each of the Defendants' devices

contained a tape carrier package that includes a base film mounted with an integrated

circuit chip for applying a signal to a liquid crystal panel, and a pad part for connection to

607389v1

19

the liquid crystal panel. (Bohannon Decl. at Tables II & III.) In addition, Mr. Bohannon

concluded the Defendants' devices also had at least one bending part in which a portion

of the base film is removed at an area where the tape carrier package is folded and at least

one dummy bending part, in which a second portion of the base film is removed at a

portion where the tape carrier package is not folded, thereby reducing a thermal

expansion force and a thermal contraction force of the base film parallel to a longitudinal

direction of the integrated circuit chip.

> **c.    In the Alternative, the Defendants' Devices Infringe the '121 Patent Under The Doctrine of Equivalents**

Assuming *arguendo* that the Court finds that the Defendants' devices do not

literally infringe any of claims 1, 2, 5-9 and 14 of the '121 Patent, this Court should hold

that the Defendants' devices infringe under the doctrine of equivalents. *See Boehringer*

*Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1351 (Fed. Cir.

2003). As the Federal Circuit held in *Boehringer Ingelheim*, "[u]nder the doctrine of

equivalents, a claim limitation not literally met may be satisfied by an element of the

accused product if the differences between the two are 'insubstantial' to one of ordinary

skill in the art." *Id.* (citing *Warner-Jenkinson*, 520 U.S. at 40); *see also Eagle*

*Comtronics, Inc. v. Arrow Communication Labs., Inc.*, 305 F.3d 1303, 1315 (Fed. Cir.

2002) *cert. denied*, 537 U.S. 1172 (2003). The difference between the element of the

accused product and the claim limitation is insubstantial if the accused device performs

"substantially the same function in substantially the same way to obtain the same result"

as the claim limitation. *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605,

608 (1950) (quotation omitted).

Any differences the Defendants may try to assert between their products and claims 1, 2, 5-9, and 14 in the '121 Patent would be insubstantial to one of ordinary skill in the art. Any such differences would be insubstantial because the Defendants' devices perform substantially the same function in substantially the same way with the substantially the same result. (Bohannon Decl. ¶ 15.) The Defendants' devices exhibit all of the advantages set forth in the '121 Patent, and, at a minimum, Defendants' devices infringe under the doctrine of equivalents.

## B.    LPL Likely Will Withstand Any Challenge to the Validity of the '121 Patent

Section 282 of the Patent Act provides that a patent shall be presumed valid. *See* 35 U.S.C. § 282 (2005); *see also Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 714 (Fed. Cir. 1984) (finding presumption of validity also garners a presumption of novelty and nonobviousness). Accordingly, the Defendants bear the ultimate burden of proof at trial of proving invalidity, and must do so by clear and convincing evidence. *Purdue Pharma L.P. v. Boehringer Ingelheim GmbH*, 237 F.3d 1359, 1365 (Fed. Cir. 2001) (citing *Oney v. Ratliff*, 182 F.3d 893, 895 (Fed. Cir. 1999)). The burdens and presumptions that will apply at trial to determine patent validity also benefit LPL on this motion. To establish likely success on the merits, LPL only needs to show that "its infringement claim will *likely withstand* [defendant's] challenges to the validity and enforceability of the … patent[s]." *Purdue Pharma*, 237 F.3d at 1363 (emphasis added) (quotation omitted). Unless and until Defendants raise a substantial challenge to validity, therefore, LPL may rely on the presumption of validity to establish its likelihood of success. *See id.* at 1365 ("Every patent is presumed valid, so if [accused infringer] fails to identify any persuasive evidence of invalidity, the very existence of the

patent satisfies [patentee's] burden on validity"); *Canon Computer Sys., Inc. v. Nu-Kote Int'l, Inc.,* 134 F.3d 1085, 1088 (Fed. Cir. 1998) (same). If Defendants produce evidence to raise a substantial question regarding validity, LPL still can establish likely success on the merits by showing that Defendants' invalidity arguments lack substantial merit.[3] *See Purdue Pharma*, 237 F.3d at 1363.

## II.   LPL WILL CONTINUE TO SUFFER IRREPARABLE HARM UNLESS THE COURT ENJOINS FURTHER INFRINGEMENT

### A.   LPL Is Entitled to a Presumption of Irreparable Harm Because it Has Demonstrated Clear Likely Success on the Merits

The analysis set forth above in section I clearly establishes that LPL is likely to succeed on the merits of its patent infringement claims. As a matter of law, therefore, LPL is entitled to a presumption that it is suffering irreparable harm. *See Polymer Techs., Inc. v. Bridwell*, 103 F.3d 970, 973 (Fed. Cir. 1996). "Where validity and continuing infringement have been clearly established . . . *immediate irreparable harm is presumed.* To hold otherwise would be contrary to the public policy underlying the patent laws." *Jacobson v. Cox Paving Co.*, 19 U.S.P.Q.2d 1641, 1653 (D. Ariz. 1991) (emphasis in original), *aff'd*, 949 F.2d 404 (Fed. Cir. 1991) (unpublished op.). This Court should apply the presumption of irreparable harm in this case, as it has in numerous other cases. *See, e.g.*, *Impax Labs.*, 235 F. Supp. 2d at 396; *Solarex Corp v. Advanced Photovoltaic Sys., Inc.,* 34 U.S.P.Q.2d 1234, 1240 (D. Del. 1995); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 28 U.S.P.Q.2d 1362, 1370 (D. Del. 1993); *E.I. du Pont de Nemours & Co. v. Polaroid Graphics Imaging, Inc.*, 706 F. Supp. 1135, 1144 (D. Del.

---

[3] To the extent that Defendants assert invalidity arguments in their opposition to LPL's motion, therefore, LPL will address such arguments in its reply brief.

1989), *aff'd*, 887 F.2d 1095 (Fed. Cir. 1989) (unpublished op.); *Johnson & Johnson*, 1988
WL 155634, at *7.

In addition, this Court should follow other courts that have concluded that the
presumption is sufficient, in and of itself, to satisfy the irreparable harm prong of the
preliminary injunction analysis.[4]   That is because the merits showing necessary to
establish the presumption is inextricably tied to damage to the patent holder's intellectual
property rights.  The premise of the presumption is that infringement of a valid patent
necessarily causes irreparable harm, because the essence of the patent is the right to
exclude others from making, using, or selling the patented invention without the patent
holder's consent.  *See Polymer Techs.,* 103 F.3d at 976; *Smith Int'l,* 718 F.2d at 1577; *see
also E.I. du Pont*, 706 F. Supp. at 1146 (patent owners enjoy "the right to prevent others
from practicing what they have invented"); *Hybritech Inc. v. Abbott Labs.*, 4 U.S.P.Q.2d
1001, 1014 (C.D. Cal. 1987) (patent holder is entitled to the exclusive right "to obtain
concessions that others cannot, to establish licensing relationships and generally to
exploit the commercial benefit of monopoly power") ("*Hybritech I*"), *aff'd*, 849 F.2d
1446 (Fed. Cir. 1988) ("*Hybritech II*").  Indeed, the "bargain at the heart of our patent
system" is that the patent holder "contributes to the public by disclosing its novel ideas"
in exchange for the right to "exclude others from practicing that idea for the period of its
patent." *Wesley Jessen Corp. v. Bausch & Lomb, Inc.*, 209 F. Supp. 348, 403 n.12 (D.

---

[4] *See, e.g., Smith Int'l*, 718 F.2d at 1581; *E.I. du Pont*, 706 F. Supp. at 1144-45; *Allied Tube & Conduit
Corp. v. John Maneely Co.,* 125 F. Supp. 987, 1007 (D. Ariz. 2000); *Smash, L.L.C. v. New England
Pottery Co.,* No. Civ. 01-601 (DWF/SRN), 2001 WL 1240849, at *6 (D. Minn. Oct. 15, 2001); *Saes
Getters, S.p.A. v. Ergenics, Inc.,* 816 F. Supp. 979, 986 (D.N.J. 1992), *aff'd*, 989 F.2d 1201 (Fed. Cir. 1993)
(unpublished op.); *Dreamlite Holdings Ltd. v. Kraser*, 705 F. Supp. 98, 102 (E.D.N.Y. 1988), *aff'd*, 878
F.2d 1446 (Fed. Cir. 1989) (unpublished op.).

Del. 2002), *aff'd*, No. 02-1468, 2003 WL 681706 (Fed. Cir. Feb. 12, 2003) (unpublished op.).  If others are not so excluded, the patent holder is irreparably harmed; "because the principal value of a patent is its statutory right to exclude, the nature of the patent grant weighs against holding that monetary damages will always suffice to make the patentee whole." *Hybritech II*, 849 F.2d at 1456-57.  In addition, because patent rights last only for a limited time period, "the mere passage of time creates irremediable harm." *Critikon*, 28 U.S.P.Q.2d at 1370.

Because likelihood of success on the merits has been clearly shown, and irreparable harm has been established through the presumption, the Court should issue the requested preliminary injunction.  When the patentee makes a strong showing of likely success, as LPL has done in this case, this Court routinely grants injunctive relief to prevent further infringement.  *See Impax Labs.*, 235 F. Supp. 2d at 397 (granting preliminary injunction to prevent generic drug manufacturer from selling likely infringing drug); *Solarex Corp.*, 34 U.S.P.Q.2d at 1235 (granting preliminary injunction against manufacture, use, or sale of likely infringing solar panels); *Critikon*, 28 U.S.P.Q.2d at 1363 (granting preliminary injunction against making, using, or selling likely infringing safety catheters); *E. I. du Pont*, 706 F. Supp. at 1146 (granting preliminary injunction against likely infringement of color proofing process); *Johnson & Johnson*, 1988 WL 155634, at * 1 (granting preliminary injunction against sale of likely infringing orthodontic brackets).  The Court should follow those prior decisions and issue a preliminary injunction here to prevent ongoing irreparable harm to LPL's core patent rights:

> Without this injunctive power of the courts, the right to
> exclude granted by the patent would be diminished, and the

> express purpose of the Constitution and Congress, to
> promote the progress of the useful arts, would be seriously
> undermined. The patent owner would lack much of the
> 'leverage,' afforded by the right to exclude, to enjoy the
> full value of his invention in the market place. Without the
> right to obtain an injunction, the right to exclude granted to
> the patentee would have only a fraction of the value it was
> intended to have, and would no longer be as great an
> incentive to engage in the toils of scientific and
> technological research.

*Smith Int'l*, 718 F.2d at 1577-78 (quoting I. Kayton, *Kayton On Patents* 17-20 (1979));
*see also Hybritech II*, 849 F.2d at 1457.

### B.     An Injunction Will Protect LPL's Reputation in the LCD Industry and Deter Other Infringers

Because of the presumption of irreparable harm in this case, LPL is entitled to an

injunction without making an additional showing of irreparable harm. *See CVI/Beta*

*Ventures, Inc. v. Custom Optical Frames, Inc.*, 893 F. Supp. 508, 515 (D. Md. 1995)

(although presumption is rebuttable, "it alone will suffice, unless the record evidence

outweighs it, to permit the court, in its discretion, to find irreparable harm"), *aff'd*, 92

F.3d 1203 (Fed. Cir. 1996) (unpublished op.). The specific circumstances of this case,

however, further support an injunction. LPL's business is built on innovation. An

injunction is needed to protect LPL's invaluable reputation in the industry and its

relationships with those who depend on LPL's technology. Further, an injunction will

discourage additional widespread infringement that would further violate LPL's patent

rights and harm its reputation.

### 1.     Defendants' Infringing Conduct Undermines LPL's Paramount Reputation and Goodwill in the LCD Industry

Defendants' infringing conduct is undermining LPL's paramount reputation and

goodwill in the LCD industry. LPL is recognized worldwide as a leading innovator in the

field of LCDs and related technology. *See* Statement of Facts *supra* § B. Defendants'

607389v1

25

infringing conduct disparages LPL's reputation by falsely conveying to the industry that the patents do not represent new technology or innovation. (Kim Decl. ¶ 34.) Defendants' infringement of the patents also invites speculation regarding the validity and enforceability of the '121 Patent, such that LPL's customers and others could incorrectly perceive LPL's patents as vulnerable and unprotected. (*Id.* ¶ 33.)

Defendants' infringement also damages irreparably LPL's relationships with customers and licensees. LPL's customers and licensees need confidence that LPL is not offering them products and technology that are subject to infringement. (*Id.* ¶ 35.) Defendants' infringement erodes such confidence and calls into question the validity and enforceability of all of LPL's patents. (*Id.*) In addition, LPL's innovations enhance LPL's ability to compete in the hotly competitive LCD industry. In the same way that LPL's LCD innovations can make its LCDs more marketable, LPL's innovations can provide bargaining chips in negotiations with customers. Infringement deprives LPL of this bargaining power. Unless Defendants are enjoined from infringing, therefore, LPL will be unable to realize the full value of its right to control and fully enjoy the benefits of its patented technology. (*Id.* ¶¶ 32-36.)

An injunction is warranted to protect LPL from this irreparable harm. Harm to reputation and loss of goodwill is irreparable, because damages from that harm are inherently difficult to measure. *See Monsanto Co. v. Scruggs*, 249 F. Supp. 2d 746, 757-58 (N.D. Miss. 2001) (damages for loss of goodwill are "difficult to discern" or compute). This Court and other courts have widely recognized "the irreparable nature of injury to commercial reputations." *GTE Sylvania Inc. v. Consumer Prod. Safety Comm'n*, 404 F. Supp. 352, 373 (D. Del. 1975). Numerous courts have concluded,

therefore, that injunctive relief is warranted to prevent infringement from damaging a patent holder's reputation and goodwill. *See, e.g., Bio-Tech. Gen. Corp. v. Genentech, Inc.*, 80 F.3d 1553, 1566 (Fed. Cir. 1996); C*VI/Beta Ventures, Inc.*, 893 F. Supp. at 524; *Johnson & Johnson*, 1988 WL 155634, at *7. This Court should reach the same conclusion here, consistent with other courts that have ordered injunctive relief to prevent harm to a reputation for innovation. *See, e.g., 3M Unitek Corp. v. Ormco Co.*, 96 F. Supp. 2d 1042, 1051 (C.D. Cal. 2000) ("If defendant is allowed to free ride on plaintiffs' innovation and technological achievements it will permanently injure plaintiffs' reputation and goodwill within the orthodontic community."), *appeal dismissed*, 243 F.3d 559 (Fed. Cir. 2000) (unpublished op.).

### 2. An Injunction Is Necessary To Deter Additional Widespread Infringement That Is Likely To Occur

Immediate injunctive relief also is necessary to prevent copycat infringement of LPL's patents relating to LCDs and tape carrier packages by companies other than Defendants. As the Federal Circuit has observed, other infringers may be tempted to infringe simply by the "notoriously lengthy course of patent litigation." *H.H. Robertson Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed. Cir. 1987). As this Court aptly has stated, the failure to enjoin clear infringement dilutes the rights of patent holders and encourages potential infringers "to play the odds." *Critikon*, 28 U.S.P.Q.2d at 1370. In this case, moreover, widespread additional infringement by other companies is particularly likely based on the prior infringement of LPL's technology and the likelihood that potential infringers similarly will copy LPL's technology.

LPL has previously brought suit in this District and in the Central District of California against Tatung and its affiliates and ViewSonic for their on-going

infringement of other LPL patents. (*E.g.*, LG.Philips LCD Co., Ltd. v. Tatung Co., et al., CV 04-343-JJF (D. Del); LG.Philips LCD Co., Ltd. v. Tatung Co., et al., CV 02-6775 CBM (C.D. Ca.).)  Moreover, it is believed that the infringement of the '121 Patent is widespread.  As noted above, LCD monitors with conventional tape carrier packages have brightness variations and a resulting decreased picture quality.  The innovation of the '121 Patent alleviates this crucial problem.  An injunction would both prevent the continuing infringement by Defendants and would likely deter other would-be infringers from seeking to gain at LPL's expense in the highly competitive LCD industry.

By their very nature, moreover, the '121 Patent is vulnerable to massive infringement, because infringers would not need to invest heavily in new equipment or products to copy the technology.  Infringers could copy LPL's technology by adjusting existing production and manufacturing operations.  (Kim Decl. ¶ 38.)  This threat of further infringement establishes additional irreparable harm warranting an injunction. *See, e.g., CVI/Beta Ventures*, 893 F. Supp. at 524; *Yenzer v. Agrotors, Inc.*, 764 F. Supp. 974, 984 (M.D. Pa. 1991); *Hybritech I*, 4 U.S.P.Q.2d at 1015 (upon entry of injunction, "other patent infringers are likely to back off or obtain licenses").

### III.    THE BALANCE OF HARDSHIPS WEIGHS HEAVILY IN FAVOR OF INJUNCTIVE RELIEF

LPL need not prove that the balance of hardships tips in its favor to obtain a preliminary injunction. *See, e.g., Hybritech II*, 849 F.2d at 1457-58 (upholding injunction where neither party had a clear advantage with respect to balance of hardships).  Nonetheless, the balance of hardships does support issuance of an injunction here.  On LPL's side of the equation, the hardships are severe if an injunction does not issue.  Where, as here, infringing activity erodes a patent holder's reputation and

goodwill, the hardship is substantial and weighs in favor of injunctive relief. *See*

*Critikon*, 28 U.S.P.Q.2d at 1371 (patentee's hardships included the "potential harm that

will result to its reputation and goodwill as an innovator"); *Progressive Games, Inc. v.*

*Shuffle Master, Inc.*, 69 F. Supp. 2d 1276, 1287 (D. Nev. 1999) (relevant factors in

hardship analysis include, for example, "the effect on the patentee's market share,

business reputation, and goodwill"); *Solarex Corp.*, 34 U.S.P.Q.2d at 1240 (patentee's

hardships included its inability "to enforce its apparently valid patent"); *see also*

*Glasstech, Inc. v. Ab Kyro Oy*, 635 F. Supp. 465, 468 (N.D. Ohio 1986) (patentee's

hardships included "the possibility of more infringers").

By contrast, on Defendants' side of the equation, there would be minimal

hardship from an injunction for three reasons. First, the Defendants can substitute non-

infringing products in their businesses. The availability of non-infringing technology and

methods for LCD displays allows Defendants to continue their various lines of business,

including with respect to LCD monitors.

Second, an injunction would not be a substantial hardship for Defendants, because

market research information indicates that the infringing monitor models do not represent

a significant part of any Defendant's LCD monitor business. With respect to Defendant

ViewSonic, for example, 19" monitors accounted for only 9.3% of all ViewSonic LCD

desktop monitor shipments for Q2 '03.[5]  (*Id.* ¶ 42 & Ex. 8.) The preliminary results for

Q3 '03 similarly suggest that 19" monitors make up only 9.3% ViewSonic's monitor

---

[5] This market research applies to all 19" monitors and, therefore, it is possible that some portion of these monitors do not infringe LPL's patents. If so, the minimal business impact from an injunction would decrease even further.

shipments, so that more than 90% of ViewSonic's monitors may not infringe assuming that other monitors use other LCD technology. (*Id*. ¶ 42 & Ex. 8)[6]

ViewSonic's website also features dozens of different computer monitors in addition to the single infringing ViewSonic VE710S monitor. (Kim Decl. ¶ 43.) Tatung likewise offers several monitor models other than the infringing Tatung L17AMTN monitor. (*Id*. ¶ 41.) Defendants, therefore, presumably can make and sell other models in the same product lines as the infringing models even if an injunction issues.[7]

Third, an injunction would not be a substantial hardship for Defendants because they claim to deal in many types of products that presumably do not use LPL's technology. Tatung, for example, features on its website multiple product lines including, in addition to LCD and other monitors and televisions, various computers, wireless products, DVD players, projectors, air conditioners, household appliances, and industrial products. (*Id*. ¶ 40.) Similarly, ViewSonic claims to offer LCD displays, LCD televisions, CRT monitors, projectors, plasma televisions, pocket PCs, digital media centers, HDTV displays, and accessories. (*Id.* ¶ 42.) The Defendants' other product offerings will further lessen the impact of an injunction.

Because Defendants will not suffer significant business disruption from an injunction, the balance of hardships easily tips in LPL's favor. *See Decade Indus. v. Wood Tech., Inc.*, 100 F. Supp. 2d 979, 983 (D. Minn. 2000) (injunction "will not in the

---

[6] Similar shipment information regarding Tatung is not listed in the referenced DisplaySearch market report.

[7] LPL has not examined the Defendants' various other LCD products and, therefore, reserves all rights and remedies regarding such products. To the extent Defendants' other products infringe, of course, Defendants should be enjoined from making, offering, selling, or importing such infringing products.

607389v1

least prevent [infringer] from marketing non-infringing products"); *Moen, Inc. v. Foremost Int'l Trading, Inc.*, 19 F. Supp. 2d 854, 857 (N.D. Ill. 1998) (injunction would "only affect[] one of [infringer's] many faucet products"). Moreover, even if Defendants are unable to make or sell non-infringing products, the injunction should nevertheless be granted because the balance of hardships still tips decidedly in LPL's favor as a result of the irreparable harm caused by Defendants. *See Johnson & Johnson*, 1988 WL 155634, at *11 (granting injunction despite recognition that infringer "has no substitute product and that it cannot even produce [its products] while the injunction is in place").

## IV.    ENJOINING DEFENDANTS' CONTINUED INFRINGEMENT PROMOTES THE PUBLIC INTEREST

The Court also should hold that the final preliminary injunction factor - the public interest - supports injunctive relief in this case.[8] The public benefits when courts uphold the legal rights of patent holders like LPL. *See Smith Int'l*, 718 F.2d at 1581 ("public policy favors protection of the rights secured by the valid patents"); *Solarex Corp.*, 34 U.S.P.Q.2d at 1241 ("The public has an interest in upholding and preserving patent rights."). Enjoining Defendants from continuing to infringe, therefore, serves the public's substantial interest in protecting patent rights. *See, e.g., H.H. Robertson*, 820 F.2d at 391 (no abuse of discretion by district court, which stated that "the 'protection of patents furthers a strong public policy . . . advanced by granting preliminary injunctive relief'" to prevent flagrant violations of patentees' rights); *Johnson & Johnson*, 1988 WL

---

[8] The Federal Circuit has instructed that, typically, "the focus of the district court's public interest analysis should be whether there exists some critical public interest that would be injured by the grant of preliminary relief." *Hybritech II*, 849 F.2d at 1458. The use of rear mount technology by Defendants is not essential to the public welfare and, therefore, an injunction would not jeopardize the public good.

607389v1

31

155634, at *7 ("the public has a strong interest in preventing infringement of valid patents").

Protecting LPL's rights also advances the public's interest in obtaining access to new technologies. As this Court previously has stated, an injunction will promote the public good by encouraging LPL to engage and invest in further research and development:

> One of the bases of intellectual property law is to give inventors an incentive to practice their talents by allowing them to reap the benefits of their labor. One of these benefits is the right to prevent others from practicing what they have invented. Otherwise, if inventors cannot depend on their patents to exclude others, we fear that research and development budgets in the science and technology based industries would shrink, resulting in the public no longer benefiting from the labors of these talented people.

*E.I. du Pont*, 706 F. Supp. at 1146; *see also Monsanto*, 249 F. Supp. 2d at 760-61 ("It is not in the public's best interest to have patented technology pirated in that such would discourage future investment in innovative technology."); *Decade Indus.*, 100 F. Supp. 2d at 983 (injunction would serve public interest by, among other things, "protecting and promoting innovation").

In this case, injunctive relief will serve the public interest by advancing new technologies through innovation.

## CONCLUSION

For the foregoing reasons, this Court should enter a preliminary injunction

prohibiting Defendants from infringing the '121 Patent.

November 1, 2005

THE BAYARD FIRM


/s/ Richard D. Kirk (rk0922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE  19899-5130
(302) 655-5000
rkirk@bayardfirm.com

Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:

Gaspare J. Bono
Matthew T. Bailey
Andrew J. Park
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, D.C. 20006
(202) 496-7500