# EXHIBIT E

LEXSEE 2002 US DIST LEXIS 20694

**CASH TODAY OF TEXAS, INC., et al., Plaintiffs, v. JEROME N. GREENBERG, et al., Defendants.**

C.A. No. 02-MC-77-GMS

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

*2002 U.S. Dist. LEXIS 20694*

**October 23, 2002, Decided**

**DISPOSITION:** [*1] Motion to quash subpoena duces tecum DENIED.

**COUNSEL:** For EASY MONEY HOLDING CORPORATION, defendant: Thomas P. Preston, Reed Smith LLP, Wilmington, DE.

**JUDGES:** Gregory M. Sleet, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** Gregory M. Sleet

**OPINION:**

## MEMORANDUM AND ORDER

### I. INTRODUCTION

This matter stems from litigation currently pending in the United States District Court for the Northern District of Texas n1 ("the litigation") between the plaintiffs, Cash Today of Texas, Inc. ("Cash Today"), *et al* (collectively "the plaintiffs") and the defendants, Easy Money Holding Corporation ("Easy Money"), *et al.* (collectively "the defendants"). The litigation arises from the dissolution of a joint venture between Cash Today and Easy Money. County Bank of Rehobeth Beach, Delaware ("County Bank") is a lender with a past business relationship with one of Easy Money's affiliates and present business relationship with Cash Today. Easy Money has issued and served upon County Bank a subpoena *duces tecum* ("the subpoena") for production of certain documents. County Bank moves to quash the subpoena (D.I. 1). For the following reasons, the court will deny County Bank's motion. [*2]

---

n1 Civil Case No. 401-CV-0794-A

### II. BACKGROUND

The litigation pending in the district court in Texas is a civil racketeering action arising from alleged conduct following the dissolution of a joint venture between Easy Money and Cash Today. Both companies provide short-term credit to individuals through a variety of mechanisms, including what is frequently referred to as a "payday loan." The defendants and the plaintiffs typically act as "servicers" to provide such loans to consumers pursuant to agreements with lenders. County Bank is one such lender. For some period of time, County Bank maintained a servicing relationship with one of Easy Money's affiliates, Tidewater Services, until approximately March 2001, when County Bank terminated the relationship. n2 At some later point, n3 County Bank entered into a servicing relationship with Cash Today. Easy Money has issued and served upon County Bank the subpoena, which seeks the production of documents relating to transactions and communications between [*3] County Bank and Cash Today and other defendants.

---

n2 In October 2001, Easy Money instituted a suit against County Bank and others, alleging a variety of wrongs stemming from this termination. That litigation, Civil Action No. 01-Z-1959 in the United States District Court for the District of Colorado, currently is proceeding through discovery.

n3 The precise date seems to be contested.

### III. DISCUSSION

County Bank objects to the subpoena for several

Case 1:05-cv-00292-JJF   Document 140-4   Filed 03/10/2006   Page 3 of 16

Page 3
2002 U.S. Dist. LEXIS 20694, *

reasons. It claims: (1) the requested information is not relevant to the litigation; (2) the requested information constitutes confidential information and trade secrets; (3) the subpoena requires the disclosure of statutorily-protected nonpublic personal financial data of borrowers; and (4) the subpoena is unduly burdensome. The court will address these objections in turn.

A. Relevance of the Requested Information

County Bank objects to the subpoena as requesting information that is not relevant to the litigation, pursuant to Federal Rule of Civil [*4] Procedure 26. n4 Rule 26 allows for discovery of "any matter, not privileged, that is relevant to the claim or defense of any party." *FED. R. CIV. P. 26(b)(1)*. Relevance for discovery purposes is given very broad meaning. *Allen v. Howmedica Leibinger, Inc., 190 F.R.D. 518, 521 (W.D. Tenn. 1999)* This is especially true because determinations of relevance for discovery purposes are made well in advance of trial. *FED. R. CIV. P. 26* advisory committee note. Those facts which, for whatever reason, are not to be considered in determining the ultimate issues may be eliminated in due course. *Hercules Powder Co. v. Rohm & Haas Co., 3 F.R.D. 302, 304 (D. Del. 1943)* Therefore, only if "it is palpable that the evidence sought can have no possible bearing upon the issues" should a court deny discovery by quashing a subpoena. *Id.* Once an objection is raised as to relevancy, the party seeking discovery bears the burden of demonstrating the relevance of the sought information to the issues in litigation. *Andritz Sprout-Bauer v. Beazer East, 174 F.R.D. 609, 631 (E.D. Pa. 1997)*

---

n4 Although Rule 26 refers specifically to depositions, subpoenas are governed by the same standards. *See Syposs v. United States, 181 F.R.D. 224, 226 (W.D.N.Y. 1998)* ("The reach of a subpoena issued pursuant to *FED. R. CIV. P. 45* is subject to the general relevancy standard applicable to discovery under *FED. R. CIV. P. 26(b)(1)*."); *Mannington Mills, Inc. v. Armstrong World Indus., 206 F.R.D. 525, 529 (D. Del. 2002)* (detailing relationship between Rules 26 and 45).

[*5]

In the instant case, Easy Money seeks the disclosure of documents relating to transactions between County Bank and Cash Today and certain of Cash Today's business entities. County Bank contends these documents are irrelevant because its relationship with the plaintiffs began in the Fall of 2001, while the litigation between the plaintiffs and the defendants focuses on acts allegedly committed in the Spring of 2000. However, Easy Money asserts the information is nonetheless relevant to certain claims and affirmative defenses of the litigation, including Cash Today's mitigation of damages. Easy Money claims that these damages may have continued to accrue after the joint venture was severed in the Spring of 2000, well through the time when County Bank concedes it began a business relationship with the plaintiffs. Further, Easy Money alleges that Cash Today may have kept funds that were rightfully the property of the defendants; that Cash Today deposited these funds to County Bank accounts; and that County Bank may act as an alter ego of Cash Today.

Even a cursory review of these allegations, detailed in the defendants' pleadings, reveals the requisite connection between the sought information [*6] and the litigation. The subpoenaed documents may provide information regarding damages resulting from Cash Today's alleged breach of contracts, as well as the extent of the plaintiffs' mitigation of damages. Certainly, the evidence sought may have some "possible bearing upon the issues" in the pending litigation. *Hercules Powder Co., 3 F.R.D. at 304* The plaintiffs' objection that the information sought is not relevant is not justified.

B. Disclosure of Confidential Information and Trade Secrets

County Bank objects that the subpoena would require the disclosure of confidential information and trade secrets to its competitors. In some contexts, trade secrets are protected from discovery. "It is well established," however, "that trade secrets are not absolutely privileged from discovery in litigation." *Coca Cola Bottling Co. v. The Coca Cola Co., 107 F.R.D. 288, 292 (D. Del. 1985)* To avoid discovery of a trade secret, the party must demonstrate by competent evidence that the information sought is a trade secret and that disclosure of the secret might be harmful. *Id.* (citing *Centurion Industries, Inc. v. Warren Steurer & Associates, 665 F.2d 323, 325 (10th Cir. 1981),* [*7] 8 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE: CIVIL § 2043, at 301 (1970)). Information may be deemed a trade secret if it "derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure and use [and] is the subject of efforts . to maintain its secrecy." *DEL. CODE ANN. tit. 6, § 2001(4)(a)(2001); see also Procter & Gamble Co. v. Nabisco Brands, Inc., et al., 111 F.R.D. 326 (D. Del. 1986)* In determining if disclosure would be harmful, the court must consider "not the injury that

Case 1:05-cv-00292-JJF   Document 140-4   Filed 03/10/2006   Page 4 of 16

Page 4
2002 U.S. Dist. LEXIS 20694, *

would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order." *Coca Cola Bottling Co., 107 F.R.D. at 293.* Disclosure to a competitor is presumed more harmful than disclosure to a non-competitor. *Id.*

If it is established that the sought information constitutes trade secrets and that disclosure would be harmful, the burden shifts to the party seeking discovery to establish that disclosure of the trade secret is relevant and necessary to the litigation. [*8] *Id. at 292.* Relevance is established, as discussed above, when the sought information is relevant, in broad terms, to the subject matter of the litigation. *Id.* Disclosure of the evidence is considered necessary when the information is required "for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." *Id. at 293.* If relevancy and need have been established, the court must balance the need for the information with the harm that would be caused if disclosure is ordered. *Id.* This balance tilts in favor of disclosure. *Coca Cola Bottling Co., 107 F.R.D. at 293.* Indeed, "discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary." *Id.* (citing a survey of relevant case law).

In the instant case, County Bank offers an affidavit by its vice president, David Gillan, to establish that the subpoenaed evidence constitutes confidential information and trade secrets. Mr. Gillan states:

> County Bank is one of the pioneers in [its] field, and has expended considerable resources developing and implementing [*9] its proprietary means for carrying out [its] business, and developing a qualified network of servicers. County Bank also takes measures to safeguard its proprietary information, including entering into confidentiality agreements with those loan servicers that wish to enter into business with County Bank. More importantly, County Bank takes significant measures to safeguard the personal and confidential financial data of its borrowers. These measures include the use of computer passwords and instructions to servicers and employees.

Aff. of David Gillan P 5, County Bank's Opening Brief, Exhibit E. It is not completely clear from this evidence, the only evidence offered by County Bank to support its position, that the documents sought contain confidential and trade secret material. For example, it has not established that its contracts with loan servicers and other "proprietary information" possess "independent economic value ... from not being generally known." *DEL. CODE ANN. tit. 6, § 2001(4)(a)(2001).* County Bank has not sustained its burden of showing that the requested information constitutes trade secrets. Nonetheless, the subpoenaed information may well be confidential [*10] in nature. Certainly, County Bank seems to treat its contracts with its loan servicers as confidential. Although the issue is not entirely clear, n5 the court, in any event, does not regard a finding of confidentiality as controlling, for the reasons set out below.

---

n5 For example, it appears that some of the same types of documents that County Bank now asserts are confidential were submitted in the Colorado litigation between Easy Money and County Bank, without any designation of confidentiality or trade secret protection.

---

Even assuming the information is confidential in nature, County Bank also must show that harm will flow from disclosure of such information. It does not meet this burden. County Bank asserts merely that "there are very real threats to the integrity of County Bank's confidential operating systems lurking within this Subpoena" and that "this information would be very useful to Easy Money." County Bank's Opening Brief at 7. Nowhere in its briefing does County Bank elaborate about these "threats" [*11] supposedly inherent in the subpoena. n6 County Bank claims that Easy Money is a competitor (a claim rejected by Easy Money), and the court can well imagine harms that might flow from disclosure of confidential information to a competitor. It is not the court's role to fathom arguments on County Bank's behalf, however, and "blanket and generalized" assertions of confidentiality, absent allegations regarding specific harm, are not sufficient to sustain a motion to quash. *United States v. International Business Machines Corp., 81 F.R.D. 628, 630 (S.D.N.Y. 1979)* (assertions that information is "confidential and sensitive" and that disclosure would cause "severe and irreparable injury" not sufficient); *see also In re Rogatory, 144 F.R.D. 272, 276 (E.D. Pa. 1992)* ("The mere fact that documents discuss trade secrets does not make them per se undiscoverable ..."). Indeed, the party moving to quash "must show, with specificity, that disclosure will work a clearly defined and serious injury to the moving party."

Case 1:05-cv-00292-JJF   Document 140-4   Filed 03/10/2006   Page 5 of 16

Page 5
2002 U.S. Dist. LEXIS 20694, *

*Composition Roofers Union Local 30 Welfare Trust Fund v. Graveley Roofing Enterprises, Inc., 160 F.R.D. 70, 72 (E.D. Pa. 1995).* County [*12] Bank simply has not done so. For these reasons, County Bank's objection that the subpoena requires the disclosure of confidential or trade secret material is insufficient to support a motion to quash.

> n6 This is especially striking given County Bank's failure to file a reply brief.

Nonetheless, the court is mindful of County Bank's concern about the disclosure of sensitive or confidential information. For this reason, the court orders the parties to extend the protective order currently in place between the parties to encompass any information gathered pursuant to the subpoena.

C. Disclosure of Non-Public Financial Information of Borrowers

County Bank objects to the subpoena as requiring the production of confidential personal financial information of its borrowers, in contravention of 12 C.F.R. § 332. Section 332.10 limits the disclosure by banks and other financial institutions of nonpublic personal information to nonaffiliated third parties absent a consumer "opt out" notice. *12 C.F.R. § 332.10* [*13]. Section 332.15(a)(7) of the same title, however, expressly allows for disclosure of nonpublic personal information "to comply with a properly authorized ... subpoena or summons." *12 C.F.R. § 332.15(a)(7)(ii)*. Disclosure for purposes of the instant subpoena clearly is exempted from the opt-out requirements designed to protect consumer financial information. County Bank's objection to the subpoena per 12 C.F.R. § 332 is unfounded.

D. Burden of Complying

Finally, County Bank objects to the subpoena as unduly burdensome. *Federal Rule of Civil Procedure 45* directs a court to quash or modify a subpoena "if it ... subjects a person to undue burden." *FED. R. CIV. P. 45(c)(3)(A)(iv)*. In determining if compliance with the subpoena would create an undue burden, the court should consider not only the potential burden to the producing party, but the necessity of the information for the party seeking production, and whether the information can be obtained from other, more convenient sources. *Allen, 190 F.R.D. at 525*. In this undue burden inquiry, nonparties are afforded "special protection." *Exxon Shipping Co. v. United States Dept. of Interior, 34 F.3d 774, 779 (9th Cir. 1994)* [*14]

In the instant case, the subpoena as issued would appear to create a substantial burden on County Bank, a nonparty to the litigation. The subpoena may require the production of over 20,000 individual loan files, as well as certain other documents. The burden of locating and copying such documents would fall on County Bank's staff of five people. Were the inquiry to end here, the court may well have found an undue burden. The defendants, however, in keeping with their statutory mandate "to take reasonable steps to avoid imposing undue burden or expense on a person subject to [a] subpoena," *FED. R. CIV. P. 45(c)(1)*, have proposed conditions that would dramatically lessen the burden on County Bank. For example, Easy Money has offered: (1) to accept computer disks or reports summarizing the relevant documents; and (2) to conduct an on-site, supervised inspection of the relevant documents and to copy them at its own expense. Subject to these sorts of terms, the burden of complying with the subpoena is substantially reduced such that the burden is not "undue."

In this undue burden inquiry, the court also is mindful of the apparent necessity of the information and the absence of alternative [*15] sources. The subpoenaed information relates to the defenses and counterclaims of the defendants. The records of the financial transactions between County Bank and Cash Today may provide the defendants with evidence of Cash Today's failure to mitigate damages, or the damages resulting from any breach of contract on Cash Today's part. To paraphrase Judge Hand, then, unless County Bank is required to respond to the subpoena, the defendants will be unable to learn whether the plaintiffs have done them a wrong. *Grasselli Chemical Co. v. National Aniline & Chemical Co., 282 F. 379, 381 (S.D.N.Y. 1920)*. In addition, it does not appear, and the parties have not alleged, that such information can be provided by any other source. For these reasons, the court finds that whatever burden County Bank will encounter in complying with the subpoena is necessary and, as tempered by certain conditions discussed above, not undue.

III. CONCLUSION

For the aforementioned reasons, IT IS HEREBY ORDERED that:

> 1. County Bank's motion to quash the subpoena *duces tecum* (D.I. 1) is DENIED.

2002 U.S. Dist. LEXIS 20694, *

2. Counsel for County Bank and the defendants shall confer and, within 20 days [*16] of the date of this order, extend the protective order currently existing in the litigation to incorporate the information contemplated by the subpoena

Gregory M. Sleet

UNITED STATES DISTRICT JUDGE

Dated: October 23, 2002

1994 Del. Ch. LEXIS 124, *

LEXSEE 1994 DEL. CH. LEXIS 124

**ID BIOMEDICAL CORPORATION, Plaintiff, v. TM TECHNOLOGIES, INC., Defendant.**

C.A. No. 13269

COURT OF CHANCERY OF DELAWARE, NEW CASTLE

*1994 Del. Ch. LEXIS 124*

July 18, 1994, Submitted
July 20, 1994, Decided

**DISPOSITION:** [*1]
IDB's Motion to Compel Production of Documents is granted.

**COUNSEL:**

Edward P. Welch, Randolph K. Herndon, Paul L. Regan of Skadden, Arps, Slate, Meagher & Flom, P.O. Box 636, Wilmington, DE 19899. Attorneys for Plaintiff.

David D. McMasters of Seed & Berry, 6300 Columbia Center, Seattle, Washington 98104-7092. Of Counsel.

Josy W. Ingersoll of Young, Conaway, Stargatt & Taylor, P.O. Box 391, Rodney Square North, Wilmington, DE 19899. Attorney for Defendant.

John Regan of Hale & Door, 60 State Street, Boston, MA 02109. Of Counsel.

**JUDGES:** STEELE

**OPINIONBY:** MYRON T. STEELE

**OPINION:** UPON PLAINTIFF'S MOTION TO VACATE HIGHLY CONFIDENTIAL & CONFIDENTIAL DESIGNATIONS AND TO COMPEL PRODUCTION OF DOCUMENTS

STEELE, V.C.

**MEMORANDUM OPINION**

Pending before the Court is plaintiff's Motion to Vacate Highly Confidential and Confidential Designations and to Compel Production of Documents. For the reasons discussed below, the Motion to Vacate must be denied and the Motion to Compel must be granted.

I

This action stems from a dispute arising out of a Letter Agreement entered into by the parties on June 16, 1993. The parties are both small research and development companies involved in the specialized and technical field [*2] of DNA testing. Pursuant to the collaborative Letter Agreement, defendant TM Technologies, Inc. ("TMT") agreed to use its technology and expertise to develop improvements in plaintiff ID Biomedical Corporation's ("IDB") technology. Specifically, TMT attempted to improve IDB's Cycling Probe Reaction (CPR), a DNA-based diagnostic system that can be used for testing a multitude of diseases, including tuberculosis and other bacterial diseases that may affect AIDS patients.

In August 1993, TMT apparently developed improvements to the CPR system. IDB alleges it is entitled to all improvements to its CPR system under the terms of the Agreement. IDB alleges Doctors Lane and Benight of TMT told Dr. Duck of IDB in August 1993 the improvement belonged to IDB. In November 1993, TMT as a corporate entity claimed the property as its own.

TMT has three pending patent applications. One of the applications is for the improvements made to the CPR system. One of the applications is for the S1/S2 system, a system TMT claims it developed separately and independently from its work on IDB's CPR system. The third patent application does not appear to be directly at issue for the pending motion.

IDB filed [*3] suit on November 23, 1993. The Complaint contains four Counts. Count I alleges breach of contract. Count II alleges misappropriation of trade secrets. Count III alleges a claim based on shop rights. Count IV alleges a claim for unjust enrichment.

Discovery in this action is governed by a two-tiered

Protective Order. Access to information produced by the other party depends on how the producing party designates the information. If the information is designated "Highly Confidential", only the following groups have access to the information: (1) outside legal counsel and staff; (2) independent expert witnesses; (3) the Court and its personnel; (4) any other person as to whom the designating party agrees in writing; (5) persons employed by or affiliated with the producing party; and (6) court reporters employed in connection with the present action.

If the information is designated "Confidential", the following groups of people have access to the information: (1) outside legal counsel and staff; (2) such officers, directors, employees, expert witnesses, or consultants of the parties, including inside legal counsel, as may be necessary to provide assistance in this action; (3) the Court [*4] and its personnel; (4) any other person as to whom the designating party agrees in writing; (5) persons employed by or affiliated with the producing party; and (6) court reporters employed in connection with the present case

Then Vice Chancellor Hartnett issued two short letter rulings relating to the Protective Order. On December 22, 1993, Vice Chancellor Hartnett held the proposed Protective Order should not provide in-house representatives with access to discovery produced by an opposing party. Plaintiff requested a clarification and on February 28, 1994, Vice Chancellor Hartnett held he found no basis for IDB's claim in-house counsel should be given access to information designated "Highly Confidential".

II

The current dispute centers around information designated "Highly Confidential" by TMT. IDB argues TMT has abused its use of the "Highly Confidential" designation regarding certain categories of documents and deposition testimony. IDB wants access to the designated information for its in-house scientists, allegedly to allow IDB to evaluate the case to determine how litigation or settlement negotiations should proceed. IDB accuses TMT of intentionally attempting to disrupt [*5] IDB's trial preparation and communications between IDB and its counsel

TMT responds by arguing it has used the "Highly Confidential" designation only for information that is truly Highly Confidential. TMT also suggests IDB wants access to the Highly Confidential information for its in-house experts so those experts can analyze the technology of TMT and attempt to copy it for the use and benefit of IDB

In its opening brief in support of the pending motion, IDB described a number of discrete categories of information it believed were designated improperly as "Highly Confidential" by TMT. TMT withdrew some designations of "Highly Confidential" and agreed to give IDB's President, IDB's in-house counsel, and a potential additional third party expert access to "Highly Confidential" documents and deposition testimony. TMT's concessions did not moot the pending motion because IDB filed a Reply Brief seeking to vacate certain "Highly Confidential" designations so the disputed information could be viewed by IDB's in-house scientists

**APPLICABLE LAW**

III

Application of the discovery rules is subject to the exercise of this Court's sound discretion. *Mann v. Oppenheimer & Co.*, Del Supr., 517 A 2d 1056, 1061 (1986), [*6] citing *Dann v. Chrysler Corp.*, Del Ch, 39 Del Ch 437, 166 A 2d 431, 432 (1960). Where designations of confidentiality have been made pursuant to a protective order, the burden is on the designating party to show good cause why its designations should be sustained if the non-designating party objects. See *Procter & Gamble Co. v. Nabisco Brands, Inc.*, D Del, 111 F.R.D. 326 (1986); *International Business Machines Corp. v. Comdisco, Inc.*, Del. Super., C A No 91-C-07-199-NC Goldstein, J. (Apr 13, 1992); Ct Ch R 26(c)(7).

A designating party satisfies its burden by showing "disclosure of the information would work a 'clearly defined and serious injury.'" *Comdisco, Inc.* at 2, quoting *Procter & Gamble*, 111 F R D at 329. The injury must be shown with specificity. *Procter & Gamble*, 111 F.R.D at 330. A sufficient showing of competitive disadvantage satisfies a party's burden of demonstrating good cause why confidential designations should not be vacated. *Comdisco, Inc.* at 3, citing *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, E D Pa, 529 F Supp 866, 890 (1981) [*7]

**MOTION TO VACATE HIGHLY CONFIDENTIAL AND CONFIDENTIAL DESIGNATIONS**

IV

IDB lists a number of discrete categories of information it claims are designated improperly as "Highly Confidential". These categories are set forth below.

**A. "CHEMICAL POTENTIAL"**

TMT concedes the concept of "chemical potential" is widely known and is not protected information in and of itself. However, TMT designates as "Highly Confidential" documents and deposition testimony related to this concept. TMT argues this information is "Highly Confidential" because it is intermingled with the details of TMT's technology, which are protectible. It is not the concept of chemical potential, *per se*, that deserves "Highly Confidential" status - it is TMT's application of the concept in its technology.

IDB argues information relating to the concept of chemical potential should not be designated "Highly Confidential" because TMT has already told IDB the relatively simple concept led to the improvement of the CPR system and because the concept is disclosed in the scientific literature.

### B. "DUPLEX FORMATION"

IDB asserts TMT's "Highly Confidential" designations of information relating to the principle of [*8] duplex formation are improper. IDB relies on the same grounds of objection as for the chemical potential designations: (1) TMT has admitted the principle of duplex formation is well-known and is related to the well-known principle of chemical potential and (2) while performing under the Agreement, TMT discussed with IDB many times the principle that certain enzymes can build duplexes. IDB also alleges TMT representatives told IDB representatives on prior occasions the principle of duplex formation had been used to generate the improvement to the CPR system.

TMT takes the same position on duplex formation designations as it does for chemical potential designations - the principles may be well-known but TMT's application of those principles in its secret and confidential technology is the product of its employees' "genius" and unknown to others so "Highly Confidential" designations are proper.

### C. INFORMATION RELATING TO CONCENTRATIONS OF REACTANTS

IDB alleges TMT improperly designated as "Highly Confidential" virtually all testimony relating to the effect of altering concentrations of reactants in testing systems such as CPR despite the alleged fact TMT admits its technology does [*9] not have the capability of predicting the effect of altering concentrations of reactants, such as probes and enzymes.

TMT responds by arguing the idea of altering the relative concentrations of the reaction components is novel and proprietary, as are the results obtained from these experiments. These experiments are embodied in the three patent applications.

### D. KINASING

Kinasing is a procedure described as using hot radioactive materials in order to identify and track certain reactants. TMT designates information relating to this procedure as "Highly Confidential". TMT maintains testimony relating to kinasing is designated "Highly Confidential" because it is intermingled with other "Highly Confidential" testimony.

IDB argues this information should not even be designated "Confidential" because it is a procedure described in a published textbook called *Laboratory Notebook of Molecular Cloning,* by Maniatis.

V

The Court finds TMT has satisfied its burden of showing good cause why its "Highly Confidential" designations concerning the concepts of chemical potential, duplex formation, concentration of reactants, and kinasing should be sustained. TMT has a valid and legitimate [*10] concern over protection of its confidential and proprietary information and scientific know-how. TMT and IDB are potential, if not actual, competitors in the same specialized field of DNA testing. If TMT's technology falls into a rival's hands TMT will suffer serious competitive disadvantage. The Court does not suggest IDB intentionally seeks the information to use competitively for its advantage and to TMT's marketing detriment - the focus of the Court's concern rests on possible inadvertent (and perhaps unconscious) use of TMT's technology if the designated information become known to IDB's in-house scientists who work on similar technology every day.

The Court concludes IDB's objections to TMT's "Highly Confidential" designations of deposition testimony and documents relating to the concepts of chemical potential, duplex formation, concentration of reactants, and kinasing are without merit. Although the above concepts may be well-known, TMT's particular applications of these concepts are not well-known and are thus, properly protected under the agreed-upon terms of the Protective Order.

IDB is not left without a remedy by this Court's holding. If IDB desires general information [*11] about these well-known concepts, it may consult the scientific treatises that discuss the concepts. IDB may also speak with its own employees concerning the alleged statements about the particular concepts made by TMT representatives to IDB representatives - the Protective Order would not prohibit this contact between IDB and

its in-house representatives because the alleged conversations took place before the lawsuit was filed. Although IDB employees' versions of the conversations may be different than the versions provided by TMT's representatives during deposition testimony, IDB can highlight the discrepancies at trial during direct and cross-examination. Finally, IDB's attorneys and previously designated personnel under the Order or by agreement of the parties may consult its outside expert to explain the deposition testimony concerning the above concepts.

TMT has shown, to this Court's satisfaction, the designated information concerning the above four concepts continues to merit the protection afforded by the Protective Order. IDB has failed to demonstrate an overriding need for access to the sought-after information for its in-house scientists.

VI

Relying on *Cincinnati Bell* [*12] *Cellular Systems Co. v. Ameritech Mobile Phone Service*, Del. Ch., C.A. No. 13389-NC Chandler, V.C. (June 30, 1994), IDB argues limiting access to "Highly Confidential" information to outside experts only is unfair and inadequate. IDB notes its President and in-house counsel, although recently granted access to designated "Highly Confidential" information, are not technical people so they cannot explain effectively the designated "Highly Confidential" information. IDB's reliance upon *Cincinnati Bell* is misplaced because *Cincinnati Bell* is both factually and legally distinguishable from the present action.

In *Cincinnati Bell,* the Court addressed defendant's motion for a protective order regarding certain financial, marketing, strategic, and technological information of businesses affiliated with the defendant. The parties agreed the documents sought were trade secrets so the Court applied the standards used to determine if trade secrets were discoverable.

In *Cincinnati Bell,* the Court found the circumstances of the case did not warrant the protection of an 'Attorneys Eyes Only' designation on the documents at issue *Id* at 3. Critical to the [*13] Court's decision were plaintiff's representations only one employee and her staff would view the documents and the viewing employee had no authority to use the information. The *Cincinnati Bell* Court also noted "outside experts retained by plaintiff might not be as valuable to plaintiff as its employee and her staff, in light of their prior involvement in the litigation." *Id* at 5.

*Cincinnati Bell* obviously is distinguishable from the present action. Here, a protective order governs discovery. The parties do not agree that the disputed information qualifies for trade secret protection. IDB wants access to the disputed information for its in-house scientists - access which puts TMT's technology at risk because IDB's scientists would have the information in their heads and would be able to use the information to IDB's competitive benefit and TMT's corresponding competitive detriment. Finally, there has been no evidence suggesting that IDB's outside expert is unable to explain the information designated "Highly Confidential." Although it may be more costly for an outside expert to evaluate and explain information to a litigant, this type of expense is a cost of litigation [*14] rather than a justification for vacating valid "Highly Confidential" designations made pursuant to a stipulated protective order.

VII

PRE-LAWSUIT DISCUSSIONS WITH PLAINTIFF

IDB objects that TMT designated as "Highly Confidential" information disclosed in certain pre-lawsuit discussions held by the parties.

A. February 1993 Presentation

IDB alleges during a February, 1993 presentation to IDB, TMT identified certain equations as part of its technology but has now designated those equations "Highly Confidential".

B. August 20 Presentation

IDB asserts during an August 20, 1993 presentation, TMT provided a discussion of its technology in a document but TMT now designates almost all portions of deposition testimony discussing the technology described in this presentation as "Highly Confidential".

C. Fall 1993 Discussions

Discussions in the Fall or 1993 allegedly related to the scientific mechanism by which an enzyme causes duplex formation in the CPR system. IDB complains TMT even designated an equation written by **IDB's Peter Duck** and testimony relating to it as "Highly Confidential".

TMT argues in response it has not classified deposition testimony as "Highly [*15] Confidential" where the deposition testimony merely reiterates the substance of prior discussions with IDB. Rather, the parts classified as "Highly Confidential" represent additional knowledge acquired by TMT in the course of developing its allegedly independent S1/S2 technology.

The Court concludes IDB can refer to its own notes

and information regarding the alleged already-provided information. The Protective Order would not bar them from studying and discussing their own notes and information concerning these pre-lawsuit discussions. For example, IDB complains that an equation written by its own scientist has been designated "Highly Confidential". IDB can simply obtain the equation from Dr. Duck. IDB's objections to information from prior discussions being designated "Highly Confidential" are without merit.

VIII

PATENT APPLICATIONS FOR THE IMPROVEMENT TO THE CPR SYSTEM AND FOR S1/S2 TECHNOLOGY

IDB maintains it is entitled to full access to information contained in TMT's patent application related to the improvement in the CPR system and to information contained in TMT's patent application related to S1/S2 technology.

Section 7 Of the Letter Agreement provides:

> Upon removal [*16] of the conditions contained in this Letter Agreement. IDB shall receive from TMT **options** to acquire:
>
> (a) an exclusive, non-royalty bearing license for the use of the Licensed Technology in diagnostic tests for tuberculosis;
>
> (b) an exclusive, royalty bearing license for the use of the Licensed Technology in diagnostic tests for all other mycobacterial diseases; and
>
> c) a non-exclusive, royalty bearing license for the use of the Licensed Technology in diagnostic tests for all other human respiratory diseases.
>
> The term of the options shall extend to 180 days following the completion of the work set out in the Plan. The terms of the licenses shall be as set forth in Exhibit I.

IDB argues because TMT admitted the patent application relating to the improvement to CPR is "Licensed Technology", as defined by the Agreement IDB is, at worst, a licensee pursuant to the Agreement, and therefore has an absolute right of access to information contained in the patent application, regardless of the outcome of the litigation. IDB also argues because TMT admitted the only improvement to CPR relates to the well-known concepts of chemical potential and duplex formation, the information in [*17] the patent application should not be designated as "Highly Confidential."

IDB argues because the S1/S2 Patent Application includes the improvement to the CPR system, IDB is a licensee of the technology contained in the S1/S2 patent application and therefore its in-house representatives are entitled to access to the information contained in the application. IDB also argues because some of the information contained in the S1/S2 Patent Application has been disclosed to the public, the information cannot be designated as "Highly Confidential".

TMT responds IDB is not a licensee because plaintiff refused a license to the technology when offered. TMT also contends the S1/S2 technology was developed wholly apart from the work done under the Agreement It would be prejudicial to TMT to reveal its new amplification procedures to plaintiff's in-house scientists. TMT relies on *Ideal Toy Corp. v. Tyco Indus., Inc., D Del., 478 F Supp 1191, 1193 (1979)* ("If the need to examine is less than the interest served in protecting secrecy, or if confidentiality could not be effectively protected by other means, disclosure should not be ordered").

IX

The plain language [*18] of Section 7 of the Letter Agreement requires the conclusion IDB currently is not a licensee. IDB must exercise options received from TMT before becoming a licensee under the Letter Agreement. IDB never exercised an option under the agreement. IDB's argument of automatic and full access to the information contained in the patent applications by virtue of its alleged licensee status therefore lacks merit.

The Court finds TMT has designated properly the information contained in the patent applications as "Highly Confidential". This information would constitute the proprietary information of TMT and deserves the protection afforded by the stipulated Protective Order to prevent the harmful disclosure of the information to one of TMT's competitors. IDB can use its outside expert to evaluate and explain the information contained in the patent applications. IDB's President and inside counsel also have access to the information. IDB is not prejudiced by the fact their in-house scientists do not have access to the information contained in the patent applications.

In light of the above findings, IDB's Motion to

Vacate Highly Confidential and Confidential Designations is denied.

### MOTION TO [*19] COMPEL PRODUCTION OF DOCUMENTS

X

IDB argues TMT unilaterally and improperly limited the scope of its document production to documents within the time period of June 16, 1993 (date of Letter Agreement) to November 23, 1993, the date of filing of the lawsuit. IDB argues certain pre-Agreement experimental data and certain post-lawsuit documents are discoverable. It contends pre-Agreement data may corroborate or discredit the existence of TMT's purported independent technology. Further, post-lawsuit documents relating to the S1/S2 patent application are discoverable because they directly relate to the origin of S1/S2, to which plaintiff claims ownership rights under the Agreement. Complaint P 25, 30.

TMT argues the experimental data sought by IDB for experiments conducted by TMT prior to June 16, 1993, is not discoverable because it is remote in time and is summarized, in any event, in the June 17, 1993, Patent Application (TMT's third patent application). TMT also argues obtaining the laboratory data would create undue hardship on TMT and two universities (where the information sought apparently is stored). Further, TMT maintains post-lawsuit documents relating to S1/S2 technology are [*20] irrelevant and thus, not discoverable, because they were generated independently of the work performed pursuant to the Letter Agreement.

XI

The Court concludes IDB's Motion to Compel Production of Documents must be granted. The pre-Agreement documents are discoverable because they may lead to admissible evidence concerning whether TMT used its own technology to develop the S1/S2 system. It is not sufficient the patent applications summarize the results - the raw data potentially could lead to the discovery of admissible evidence not contained within the patent applications.

Pursuant to the allegations of the Complaint, ownership rights of the S1/S2 technology are at issue in this suit. TMT has not moved to dismiss any of IDB's claims relating to S1/S2 technology, although TMT submitted portions of the deposition transcript of IDB's President purporting to show IDB knew nothing about S1/S2 technology prior to filing the lawsuit. TMT cannot argue at this point post-lawsuit documents relating to S1/S2 technology are irrelevant or could not lead to the discovery of admissible evidence.

Disclosure of the above documents remains subject to the Protective Order.

XII

IDB's Motion to Vacate [*21] Certain Highly Confidential and Confidential Designations is *denied* for the above reasons.

IDB's Motion to Compel Production of Documents is *granted.*

### IT IS SO ORDERED.

Myron T. Steele

Vice Chancellor

4 of 6 DOCUMENTS

**INTERNATIONAL BUSINESS MACHINES CORPORATION, a New York corporation, IBM CREDIT CORPORATION, a Delaware corporation, and GREENWICH LIBERTY 1985 LIMITED PARTNERSHIP, a Delaware limited partnership, Plaintiffs, v. COMDISCO, INC., a Delaware corporation, Defendant.**

C. A. No. 91-C-07-199

SUPERIOR COURT OF DELAWARE, NEW CASTLE

*1992 Del. Super. LEXIS 171*

**April 3, 1992, Submitted**
**April 13, 1992, Decided**

**DISPOSITION:** [*1] COMDISCO'S MOTION TO VACATE CONFIDENTIAL DESIGNATIONS DENIED.

COMDISCO'S SUPPLEMENTAL MOTION TO VACATE CONFIDENTIAL DESIGNATIONS DENIED.

**COUNSEL:**

R. Franklin Balotti, Esq., John A. Parkins, Jr., Esq., Anne C. Foster, Esq., of Richards, Layton & Finger, Wilmington, Delaware, Attorneys for Plaintiffs.

A. Gilchrist Sparks, III, Esq., Donald F. Parsons, Jr., Esq., Donald E. Reid, Esq., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware, Attorneys for Defendants.

**JUDGES:** GOLDSTEIN

**OPINIONBY:** CARL GOLDSTEIN

**OPINION:**

OPINION AND ORDER

GOLDSTEIN, Judge

This case arises out of a series of transactions involving a highly sophisticated computer system being leased by plaintiffs to a third party. The defendant is alleged to have committed a number of torts with respect to the leased machine. The case is currently in the discovery phase, and defendant has filed a motion to vacate the confidential designation of approximately 310 documents produced by plaintiffs and labelled as confidential pursuant to an umbrella protective order. Comdisco has also filed a supplemental motion to vacate the confidential designation of 9 more documents. For the following reasons, these motions are DENIED.

As anticipated, millions of [*2] documents have been produced during the discovery process in this case. To promote full and expedited discovery the parties entered into a stipulated umbrella protective order. Pursuant to this order the parties may designate "confidential" any document which they produce and in good faith believe to be confidential, and thereby restrict the access of non-parties to these documents and restrict the use to which the documents may be put. Paragraph one of the Protective Order provides that the following may be considered "Confidential Material": "All materials containing information related to: Trade Secrets; Proprietary Technical Information; Business and Marketing Plans and Strategies; Customer Lists and Information; Competitive Analysis; Costs of Goods and Services; Pricing of Goods and Services; Personnel; Product Development & Planning; Financial Results, Plans and Projections."

Paragraph 16 of the Protective Order provides in essence that any party objecting to a designation of confidential may move for an order vacating the designation. The paragraph further provides that "the party who labelled the material or testimony confidential shall, pursuant to Superior Court Civil Rule [*3] 26(c), bear the burden of showing good cause why such designation should remain." n1

---

n1 Paragraph 16 was amended to provide as indicated above. See Supplemental Protective Order and Letter Opinion, IBM v. Comdisco, Del. Super., C.A. No. 91C-07-199, Goldstein, J.

1992 Del. Super. LEXIS 171, *

(March 3, 1992). Originally P16 provided that the person objecting to the confidential designation had to bear the burden of establishing why the designation should be lifted.

As noted earlier, Comdisco filed two motions seeking to vacate the confidential designation of approximately 319 documents produced by plaintiffs. Accordingly it is plaintiffs' burden under Superior Court Civil Rule 26(c) to show good cause why the confidential designation should remain. n2 Plaintiffs must therefore show that "disclosure of the information would work a 'clearly defined and serious injury.'" *Proctor & Gamble v. Nabisco Brands, Inc., 111 F.R.D. 326, 329 (D.Del. 1986)* (quoting Publiker Industries, *Inc. v. Cohen, 733 F.2d 1059, 1071 (3d Cir. 1984))* [*4] See also *Zenith Radio Corp. v. Matsushita Electric Industrial Co., 529 F.Supp. 866, 891 (E.D. Pa. 1981)* Plaintiffs must provide more than "broad allegations of harm," and the harm alleged "must be significant, not a mere trifle." *Cippollone v. Liggett Group, Inc., 785 F.2d 1108, 1121 (3d Cir. 1986)*

> n2 Superior Court Civil Rule 26(c) provides in pertinent part:
>
> (c) Protective Orders. Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the Court may make any order which justice requires to protect a party or person from annoyance, (sic) embarrassment, oppression, or undue burden or expense, including one or more of the following: . . . (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way;

One type of harm cognizable under Rule 26(c) is competitive disadvantage. *Zenith Radio Corp. v. Matsushita Electric Industrial Co., 529 F.Supp. at 890* [*5] With regard to the allegations of harm necessary for plaintiffs to sustain their burden of showing competitive disadvantage, it must be recognized that "frequently the injury that would flow from disclosure is patent, either from consideration of the documents alone or against the court's understanding of the background facts. The court's common sense is a helpful guide." *Zenith Radio, supra, at 891.* See also *Nestle Foods Corp. v. Aetna Cas. and Sur. Co., 129 F.R.D. 483, 484 (D.N.J. 1990)*

It should be noted that Comdisco's motions seek the lifting of the confidential designation on these documents solely in order to provide them to the Department of Justice; Comdisco maintains that the documents in issue provide proof that plaintiffs have violated the 1956 consent decree entered into between the United States and IBM, see *United States v. IBM, No. 72-344 (S.D.N.Y. 1956)*, and that the documents should be provided to the Justice Department so that they may fulfill their obligation to monitor compliance with the consent decree. n3

> n3 In the original Motion to Vacate Confidential Designations, Comdisco stated that the Department of Justice
>
> suggested that the computer Dealers & Lessors Association ("CDLA"), to which Comdisco belongs, submit information relating to IBM's compliance with the Consent Decree, which it did. On September 6, 1991, the Department of Justice requested additional information. The CDLA, in turn asked its members to submit any available information regarding IBM's practices relating to the consent decree.
>
> Motion to Vacate Confidential Designations, 2/6/92, at P4. The letter dated September 6, 1991, from the Department of Justice was attached to Comdisco's motion as an exhibit, and is attached to this opinion as "Appendix A"

[*6]

In response to Comdisco's motions, plaintiffs submitted briefs and two affidavits from J.E. Coleman, Director of Inventory Management and Remarketing for plaintiff IBM Credit Corporation (a wholly-owned subsidiary of plaintiff IBM). n4 Mr. Coleman asserts in the second affidavit that the documents in issue fall into two general categories. The first group (nine documents of the approximately 319 documents at issue) includes internal IBM Credit reports, presentations and memoranda relating to and containing information about business and marketing plans and strategies, costs and pricing, and general business plans and projections. The second group of documents, the affiant asserted, includes documents which are provided to specific customers regarding specific transactions, and which relate primarily to the joint efforts of IBM Credit and its customers to remove the customers' then-current computer systems and acquire replacement systems. Mr. Coleman claimed that the documents in the second category contain information regarding customer relations and marketing and pricing matters, such as customer identities, price guarantees, and terms and

conditions of brokerage arrangements for [*7] IBM Credit's sale of the customers' used equipment.

> n4 The first affidavit was less detailed than the second. The second affidavit was submitted pursuant to the Court's Letter Opinion and Supplemental Protective Order shifting the burden of proof under the umbrella protective order to the party defending the objected-to confidential designation. See fn. 1, supra.

According to the affidavits, then, all the documents which Comdisco seeks to provide to the Department of Justice clearly fall into the categories of protected information as delineated by P1 of the stipulated Protective Order. For example, the contested documents are said to contain information regarding business and marketing plans and strategies, customer information, and costs and pricing of goods and services. The sample documents provided to the Court by Comdisco attached as exhibits to the original motion confirm this.

Mr. Coleman further stated that IBM Credit treats these types of documents as confidential, and that one of his job responsibilities [*8] is to maintain the confidentiality of such documents. Moreover, he states, such information in the hands of competitors would provide them with an unfair competitive advantage; I must agree that in this case the injury that would flow from disclosure is patent. See *Zenith Radio Corp. v. Matsushita Electric Industrial Co., supra, at 891*.

*Nestle Foods Corp. v. Aetna Cas. and Sur. Co., supra*, cited by Comdisco, is distinguishable. In Nestle Foods the court found, based on the defendants' "actions and inability to identify any specific harm," that potential commercial disadvantage had not been sufficiently shown to justify granting defendants' motion for a protective order. *Nestle Foods, 129 F.R.D. at 484*. The court reached this conclusion based in part on the observation that the "defendants have been quite open in sharing the allegedly confidential information with their competitors." Id. Mr. Coleman's affidavits, on the other hand, aver that IBM Credit has kept the documents at issue here confidential.

Nestle Foods is distinguishable on other grounds as well, including that the parties in that case had not stipulated [*9] to a protective order as have the parties in this case, *id. at 485, n. 4*; some of the documents at issue in that case were seven to thirty years old, *id. at 485*, and the defendants there submitted only briefs, not affidavits, *id. at 485*.

I find, therefore, that plaintiffs have sufficiently shown good cause to warrant the confidential designations remaining.

Finally, since Comdisco requests that the designations be lifted solely so the documents may be provided to the Justice Department, no harm arises from the documents remaining confidential, particularly since the Justice Department may issue a Civil Investigative Demand directly to plaintiffs. See *15 U.S.C. § 1312*. Thus in balancing the potential harm to plaintiffs against the interest of the Justice Department in receiving these documents as a result of the discovery process in this lawsuit, I find the scales are tipped in plaintiffs' favor. See *Ramada Inns, Inc. v. Drinkhall, Del. Super., 490 A.2d 593, 599 (1985)* (In determining whether a protective order should be issued, "the Court should apply a 'balancing test' giving consideration to [*10] the magnitude and imminence of harm to the litigants supporting secrecy against the interests of the government and public in disclosure of matters relevant to matters before the courts." (citations omitted)).

For all the foregoing reasons, Comdisco's motions to vacate confidential designations are DENIED.

IT IS SO ORDERED.

Carl Goldstein, Judge

APPENDIX A

U. S. Department of Justice

Antitrust Division

Judiciary Center Building
333 Fourth Street, N.W.
Washington, DC 20001

September 6, 1991

Alan J. Weinschel, Esq.
Weil, Gotshal & Manges
767 Fifth Avenue
New York, New York 10153

Dear Mr. Weinschel:

Thank you for your recent submission enclosing the April 1991 report by Sanford C. Bernstein & Co. regarding the future of the mainframe computer industry. We have been reviewing that submission along with the memorandum that you forwarded to the Department on May 24, 1991, concerning IBM's practices in the secondary market, as well as the submission enclosing the Delaware Chancery Court's jurisdictional ruling in the

IBM lawsuit against Comdisco. In the course of our review, we have discovered that additional information would be helpful to our consideration of CDLA's complaint. We [*11] would appreciate it if you would provide us with the additional information that is requested below.

As a preliminary matter, we would like to know whether your client, Computer Dealers and Lessors Association ("CDLA"), would object to our forwarding your May 24, 1991, memorandum to IBM. In that memorandum, you set forth in detail certain alleged IBM practices which you contend violate the 1956 Consent Decree entered in United States v. IBM. We believe that it would facilitate our review of CDLA's complaint if we were able to ask IBM to review the complaint and to respond to it. I would appreciate it if you could respond to this particular request in writing within 5 days of receipt of this letter.

It would also be helpful if you could provide us with the following information regarding three allegations set forth in the May 24, 1991, memorandum. With respect to the Section IV allegation that appears on page 26 of the memorandum -- that IBM offers leases on terms that are less economically advantageous to IBM than a sale would be -- please provide the basis for the allegation, and the details of that allegation. We could better evaluate the complaint if we knew, for example, how [*12] many additional inducements IBM offers with a lease than with a sale, what those inducements are, and the basis for CDLA's belief.

With respect to the Section IV allegation that IBM is offering its salespeople bonus compensation for leases of machines, but not for sales of machines if those sales are not financed through ICC (page 27 of the memorandum), please inform us as to when this alleged practice is believed to have begun. In addition, as you have described the bonus plan, IBM compensates salespeople equally for all transactions that are handled through ICC, whether those transactions are leases through ICC, or sales that are financed through ICC. The distinction that the compensation plan makes, therefore, is apparently between sales that are independently financed, and those that are financed through ICC, not between sales and leases of IBM machines. Please indicate whether this is an accurate characterization of the bonus plan and, if so, how such a distinction would violate the decree.

Finally, regarding the allegation that IBM has been selling used machines without first processing those machines according to the guidelines set forth in Section V, please provide us with [*13] a copy of the trade-in lists, for the 18 months ended June, 1990, that document the statement (made on page 29 of the memorandum) that only four 3090 systems have appeared on those lists during that 18 month period. We would also like to know how often CDLA members request trade-in lists from IBM, and how often IBM furnishes those lists to CDLA after CDLA members request them.

We thank you for your attention to this matter, and look forward to receiving your reply.

Sincerely,

Constance K. Robinson
Chief
Communications & Finance
Section