# UNREPORTED CASES

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 115594 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
MEDTRONIC AVE, INC., Plaintiff,
v.
ADVANCED CARDIOVASCULAR SYSTEMS,
INC., Defendant.
Nos. Civ. 98-0080-SLR, Civ. 98-0314-SLR, Civ.
98-0316-SLR.

Jan. 13, 2004.

Karen Jacobs Louden, Philip Henry Bangle, Morris,
Nichols, Arsht & Tunnell, Wilmington, DE, Patricia
Smink Rogowski, Connolly, Bove, Lodge & Hutz,
Wilmington, DE, for Plaintiff.
Frederick L. Cottrell, III, Richards, Layton & Finger,
Wilmington, DE, for Defendant.

MEMORANDUM ORDER

ROBINSON, J.
*1 IT IS ORDERED that Medtronic AVE's motion
for a protective order allowing redaction of limited
information from manufacturing process documents
(D.I.224) is denied.

1. Medtronic AVE ("Medtronic") filed suit against
Advanced Cardiovascular Systems, Inc. ("ACS") on
December 18, 1998 alleging patent infringement of
U.S. Patent Nos. 5,292,331 and 5,674,278 (the
"Boneau patents"), breach of contract, trade secret
misappropriation, unfair competition, restoration of
property wrongfully acquired, conversion,
declaratory relief, and equitable claimss. (See D.I. 1)
Specifically, Medtronic alleges that ACS infringes
the Boneau patents by manufacturing, using, selling,
offering for sale, and importing its Multi-Link stents
in the United States. (Id. at ¶ 2) Medtronic also
contends that ACS wrongfully acquired and is
misusing its stent technology to develop and to patent
balloon expandable stents. [FN1] In this regard,
Medtronic seeks a declaratory judgment that its
Micro Stent II and GFX Stent Delivery Systems do
not infringe ACS's patents relating to balloon
expandable stents. On March 30, 1998, ACS
answered the complaint denying Medtronic's
allegation and asserting a variety of affirmative
defenses including the "first-to-file" rule.

noninfringement, estoppel, invalidity, statute of
limitations, laches, and federal preemption. (See D.I.
8) ACS amended its answer on June 15, 1998 to add
an additional affirmative defense of inequitable
conduct (D.I. 24 at ¶ ¶ 113, 114) and to assert
invaldity counterclaims as to the Boneau patents.
(D.I. 24 at ¶ ¶ 5, 6) Medtronic denied ACS's
invalidity allegations on July 6, 1998 (see D.I. 26)
and, on this same day, moved to strike ACS's
affirmative defenses and counterclaims. (See D.I. 27)
The court denied Medtronic's motion on September
30, 1999. (See D.I. 63)

FN1. AVE holds U.S. Patent Nos.
5,421,955; 5,514,154; and 5,603,721
relating to balloon expandable stents. (Id. at
¶ 3)

2. On August 2, 2000, the court issued a protective
order to prevent disclosure of confidential,
proprietary, or trade secret information relating to the
subject matter of the litigation. (D.I.189) This order
limits review of documents designated as "highly
confidential" to legal counsel and independent
experts only. (Id.) On July 28, 2000, pursuant to this
order, ACS produced, without redaction, confidential
information about its manufacturing process. (D.I.
228 at 3) Shortly thereafter in teleconference with the
court on August 7, 2000, ACS requested Medtronic
to provide all documents that Medtronic had
previously redacted or withheld relating to: (1)
Medtronic's process of manufacturing stent products
accused of infringement and for stent products
allegedly made in accordance with the Boneau
patents; and (2) information that Medtronic redacted
relating to "other" matters which Medtronic
identified as privileged, or trade secret, or "possibly
irrelevant." (See D.I. 194) The court indicated that
redactions having to do with the manufacturing
process should be disclosed. (Id. at 33, ll. 11-17) By
September 2000, however, Medtronic had not
provided the redacted information to ACS, thereby
leading ACS to schedule a second teleconference
with the court on September 6, 2000. (See D.I. 219)
The court ordered Medtronic to supply the documents
in unredated form noting the portions to be redacted
for the court's in camera review and to provide an
explanation of the reasons for redaction to ACS. (Id.
at 11, ll. 18-21) Medtronic responded by filing the
instant motion with the court and providing a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 115594 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 2

representation of the types of documents, as opposed to the actual documents as ordered.

*2 3. Federal Rule of Civil Procedure 26(c) provides various means for the federal courts to protect parties and witnesses during the discovery process. The rule requires parties to confer in good faith to resolve any dispute; and if not successful, any party may apply to the court for relief concerning the dispute. Rule 26(c)(7) provides, in pertinent part:
For good cause shown, ... the court ... may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following ... that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way.

Fed.R.Civ.P. 26(c)(7) (2003).

Nevertheless, "[i]t is well established that trade secrets are not absolutely privileged from discovery in litigation." *Coca Cola Bottling Co. of Shreveport, Inc. v. Coca Cola Co.*, 107 F.R.D. 288, 292 (D.Del.1985). To avoid such discovery, a party must demonstrate by competent evidence that the information sought is a trade secret and that disclosure of the secret might be harmful. *Id.* (citing *Centurion Industries, Inc. v. Warren Steurer & Associates*, 665 F.2d 323, 325 (10th Cir.1981); 8 Wright & Miller, Federal Practice & Procedure: Civil § 2043 (1970)). In determining if disclosure would be harmful, the court must consider "not the injury that would be caused by public disclosure, but the injury that would result from disclosure under an appropriate protective order." *Id.* at 293. To this end, the party seeking the protective order must articulate the injury with specificity. *Pansy v. Borough of Stroudsburg*, 23 F.3d 772, 786 (3d Cir.1994) (quoting *Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059, 1071 (3d Cir.1984)). "Broad allegations of harm, unsubstantiated by specific examples or articulated reasoning, do not satisfy the Rule 26(c) test." *Id.* (quoting *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1121 (3d Cir.1986)). Moreover, disclosure to a competitor is presumed more harmful than disclosure to a non-competitor. *Coca Cola Bottling Co.*, 107 F.R.D. at 293 (citing *United States v. United Fruit Co.*, 410 F.2d 553, 556 (5th Cir.); 2 R. Milgrim, Trade Secrets § 7.06[1][b] (1984)).

If it is established that the sought information constitutes trade secrets and that disclosure would be harmful, then the burden shifts to the party seeking discovery to establish that disclosure of the trade secret is relevant and necessary to the litigation. *Id.* at 292. Relevance is established when the sought information is relevant, in broad terms, to the subject matter of the litigation. *Id.* Disclosure of the evidence is considered necessary when the information is required "for the movant to prepare its case for trial, which includes proving its theories and rebutting its opponent's theories." *Id.* at 293. If relevancy and need are established, then the court must balance the need for the information with the harm that would be caused if disclosure is ordered. *Id.* This balance typically tilts in favor of disclosure. *Id.* The Supreme Court has recognized that "orders forbidding any disclosure of trade secrets or confidential information are rare." Id. (quoting *Fed. Open Mkt. Comm. v. Merrill*, 443 U.S. 340, 362 n. 24, 99 S.Ct. 2800, 61 L.Ed.2d 587 (1979). Indeed, "discovery is virtually always ordered once the movant has established that the secret information is relevant and necessary." *Id.* (citing a survey of relevant case law).

*3 4. The court finds that Medtronic has not shown that it would suffer a particularized injury from disclosure of the manufacturing process information under the protective order currently in place between the parties. Medtronic instead alleges that it fears being placed at a competitive disadvantage by disclosure to its competitor ACS. While the court has previously recognized that disclosure to a competitor is likely more harmful than disclosure to a noncompetitor, disclosure to limited persons as in the instant case is not the same as disclosure to Medtronic personnel. The court, therefore, concludes that Medtronic's interests will not be in jeopardy by providing the redacted information to Medtronic's legal counsel and independent experts.

Assuming, *arguendo*, that disclosure would be harmful, the court, nevertheless, finds that the manufacturing process documents are relevant and necessary to enable ACS to prepare for trial. ACS must be able to understand Medtronic's manufacturing details, especially the annealing, welding, and electropolishing steps, to access whether the products produced by these processes fall within the scope of its balloon expandable stent patents. In this regard, Medtronic's manufacturing processes directly bear upon the properties of its finished products. The court notes that Medtronic's experts, in fact, offered this very argument in litigation against Cordis to support discovery of the details around Cordis's manufacturing processes. (*See* D.I. 229, ex. K at ¶ 12) Medtronic cannot now ignore the protective order it agreed to abide by earlier in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 115594 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

litigation and from which it gleened discovery about ACS's manufacturing processes. Accordingly, the court denies Medtronic's motion for a protective order allowing redaction of limited information from manufacturing process documents.

D.Del.,2004.
Medtronic Ave, Inc. v. Advanced Cardiovascular Systems, Inc.
Not Reported in F.Supp.2d, 2004 WL 115594 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2867838 (Trial Motion, Memorandum and Affidavit) Medtronic's Reply Post-Trial Brief on Acs's Inequitable Conduct before the U.S. Patent and Trademark Office (Oct. 07, 2005)
• 2005 WL 2867837 (Trial Motion, Memorandum and Affidavit) ACS's Post-Trial Brief in Response to Medtronic's Allegations of Inequitable Conduct (Sep. 19, 2005)
• 2005 WL 2385616 (Trial Motion, Memorandum and Affidavit) Medtronic's Opening Post-Trial Brief on Acs's Inequitable Conduct Before the U.S. Patent and Trademark Office (Jul. 28, 2005)
• 2005 WL 2385720 (Trial Motion, Memorandum and Affidavit) Medtronic's Reply Brief in Support of its Motioin for Judgment as A Matter of Law (Jul. 18, 2005)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
ENZO LIFE SCIENCES, INC.,
Plaintiff/Counterclaim Defendant,
v.
DIGENE CORPORATION, Defendant/Counterclaim
Plaintiff
v.
ENZO BIOCHEM, INC., Additional Counterclaim
Defendant.
**No. Civ.A. 02-212-JJF.**

June 10, 2003.

Josy W. Ingersoll, and Sara Beth Reyburn of Young, Conaway, Stargatt & Taylor, L.L.P., Wilmington, Delaware, for Plaintiff, Enzo Life Sciences, Inc. and Additional Counterclaim Defendant, Enzo Biochem, Inc., Richard L. DeLucia, Jeffrey M. Butler, and Paul M. Richter, Jr., of Kenyon & Kenyon, New York, New York, of counsel.
Richard D. Kirk, of Morris, James, Hitchens & Williams L.L.P., Wilmington, Delaware, for Defendant, Digene Corporation. Mark R. Labgold, Ph.D., Kevin M. Bell, Laura A. Donnelly, of Patton Boggs L.L.P., McLean, Virginia. Richard J. Oparil, of Patton Boggs L.L.P., Washington, DC, of counsel.

OPINION
FARNAN, J.
*1 A teleconference was held in this case on Wednesday, June 4, 2003, to discuss the pending motions. During the teleconference, the Court ruled on several motions. Specifically, for the reasons discussed below, the Court: 1) denied Enzo Biochem, Inc.'s ("Enzo Biochem") Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144); (2) granted in part and denied in part Enzo Biochem's and Enzo Life Sciences Inc.'s ("Enzo Life Sciences") Joint Motion to Bifurcate Trial on Digene's Business Tort Claims (Counterclaims III-V) and Stay Discovery on Them (D.I.145); 3) denied Digene Corporation's ("Digene") Motions for Protective Orders (D.I.104, 113); and 5) denied Enzo Life Sciences' Motion to Compel (D.I.94).

*I. Factual Background*

This is a patent infringement action brought by Plaintiff Enzo Life Sciences against defendant Digene involving U.S. Patent No. 6,221,581B1 (the "'581 Patent"), issued on April 24, 2001. Both Enzo Life Sciences and Digene are companies involved in the development, manufacture and distribution of proprietary RNA and DNA testing systems. The '581 Patent concerns hybrid capture technology used in diagnostic medical applications.

Plaintiff, Enzo Life Sciences has alleged that Digene is infringing claims 16-26, 30-40, 44-53, 73-87, 91-100 and 104-107 of the '581 Patent by making, selling and offering for sale its "Hybrid Capture" diagnostic products. This action began on March 15, 2002 when Digene filed a Summons and Complaint for Declaratory Judgment. Enzo Life Sciences filed a separate lawsuit for patent infringement on March 20, 2002. During a May 2, 2002 status conference, the Court suggested that the parties stipulate to a dismissal of Digene's declaratory judgment Complaint, without prejudice and proceed with Enzo Life Sciences' patent infringement complaint. The Court further explained that Digene would be permitted to bring other claims against any Enzo entity, including Enzo Biochem, as permissive counterclaims. Thereafter, the parties filed a Stipulated Proposed Scheduling Order dismissing Digene's declaratory judgment action without prejudice, and the parties agreed to proceed with all pending and all related claims in Enzo Life Sciences' patent infringement action. Additionally, Digene filed Counterclaims against Enzo Life Sciences and Enzo Biochem.

On June 28, 2002, Enzo Life Sciences, Inc. and Enzo Biochem, Inc. moved to dismiss Digene's Counterclaims. On March 31, 2003, the Court denied the motion to dismiss Digene's Counterclaims. (D.I.124). Fact discovery closed on February 24, 2003 and the parties are currently conducting expert discovery which is scheduled to close on June 20, 2003.

*II. Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144)*

*A. Parties' Contentions*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Enzo Biochem contends that the expert report of Dr. Stephen Jizmagian should be stricken in its entirety. Specifically, it contends that Digene's counterclaims III-V should be limited to those that were actually pled in the case, namely those that are based upon the two, 2001 press releases by Enzo Biochem regarding the '581 Patent. Enzo Biochem points out that Digene, in its counterclaims, alleging causes of action under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations (Count V), listed two press releases as the factual basis for such claims. However, at this juncture, Enzo Biochem argues that Dr. Jizmagian's expert report concerning damages as to these claims does not mention the press releases, but rather details alleged instances that are not asserted in Digene's counterclaims. For instance, Enzo, points out that the report states that Dr. Jizmagian was told by Digene that Enzo Biochem somehow prevented Digene from obtaining one million dollars in capital through Goldman Sachs in 2000. As a result, Enzo argues that Digene's new claim, as suggested by the expert report, is not that Enzo Biochem interfered with customers seeking to purchase the Hybrid Capture product, but that Enzo Biochem somehow interfered with Digene's ability to raise capital through Goldman Sachs, which allegedly led to lost sales. Based on these facts, Enzo Biochem claims that it is improper for Digene to amend its counterclaims through Dr. Jizmagian's expert report, and therefore, the report should be stricken in its entirety.

*2 In response, Digene asserts that its responses to Enzo Biochem's interrogatories plainly set forth the factual basis for its damages claims, where Digene listed all parties that it had contracts and/or agreements with from as early as 1992 that were terminated. See Ex. 1 to Kirk Decl. Further, in regard to the time period of damages, Digene contends that it affirmatively stated that Biochem's actions before or at the time the case was filed resulted in direct harm to Digene, where in an interrogatory response they stated:

As a direct result of Biochem's actions Digene was forced to respond to, participate in or otherwise conduct extensive due diligence, including requests from potential funding entities as well as requests from potential joint venturers. Such requests include but are not limited to requests made when Digene completed its IPO and subsequent follow-on private placement transaction and includes potential follow-

on public offering and potential strategic partners such as requests from Cytyc, Affymetrix, Applera Corporation and Roche.

Ex. 1 to Kirk Decl. Further, Digene argues that all of the documents relied on by Dr. Jizmagian were produced during discovery, with the bulk of the disclosures, consisting of four hundred boxes of documents, produced as early as October 2002. Moreover, Digene argues that Enzo Biochem failed to pursue available discovery, because it did not take any depositions until the last week of extended fact discovery and points to the fact that during Ms. Seyfried's, Digene's Vice President of Business Development, deposition, she mentioned that the financing opportunities which were adversely affected by Enzo's actions included Goldman Sachs. See Ex. 6 to Kirk Decl. at 176-180. Digene contends that based on the fact that the Court determined that it properly pled the allegations in its Business Tort Counterclaims in its Memorandum Opinion regarding the motion to dismiss (D.I.124), and the fact that Digene provided all necessary discovery, Enzo's motion to strike should be denied.

B. *Discussion*

The Motion to Strike will be denied because the Court concludes that Digene pled the necessary elements and provided the relevant discovery.

First, in its Memorandum Opinion denying Enzo's Motion to Dismiss, the Court stated that: 1) the alleged factual basis for the counterclaims were the press releases, and 2) that in the context of interference with business relationships Biochem's alleged actions constitute attempts to induce third parties, namely customers buying Digene's Hybrid Capture[8] products, not to enter into or continue their business relations with Digene. (D.I. 124 at 2-3, 12). However, after finding that Digene had properly pled these counterclaims for purposes of a motion to dismiss, the Court qualified its conclusions and noted that "there are discovery mechanisms, such as interrogatories, for ascertaining more details regarding the allegations of the complaint." (D.I. 124 at 14).

*3 Here, Digene's Counterclaims involve claims under: 1) § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Count III); 2) Unfair Competition under the Delaware Deceptive Trade Practices Act, 6 Del. C. § 2531 et seq. (Count IV); and 3) Tortious Interference With Prospective Business Relations

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

(Count V). Although Digene listed two press releases as the factual basis for such counterclaims in its Complaint, all that it was required to do in its Complaint, under notice pleading, was to provide a short and plain statement showing that they are entitled to relief. Fed.R.Civ.P. 8(a)(2). The Court, in its Opinion regarding Enzo's Motion to Dismiss Digene's Counterclaims determined that Digene had fulfilled this requirement. (D.I.124). After this, and in line with the Court's suggestion, the parties conducted fact discovery to ascertain more details regarding the factual allegations of the Complaint. Although Digene did not give Enzo a factual roadmap for all of its allegations, it disclosed all the documents relied upon by Dr. Jizmagian in his report, disclosed potential contractual relationships and financial opportunities affected, including Goldman Sachs, and the relevant time periods, through discovery mechanisms such as interrogatories and depositions. In this case, Digene pled all relevant causes of action, and the parties were supposed to parse out the facts underlying those allegations through discovery. The Court concludes that the facts outlined by Enzo as not disclosed, were in fact disclosed through discovery, and were facts; not new causes of action as Enzo contends. Further, because Dr. Jazmagian's report does not discuss any new causes of action, and the dispute is not raised in the context of a Pretrial Order, the cases relied on by Enzo are inapposite. *See, e.g., Wilson v. Muckula, 303 F.3d 1207, 1216 (10 th Cir.2003)* (finding insufficient support in the amended complaint and ambiguous pretrial order to support a *claim* for negligent infliction of emotional distress); *Sound Video Unlimited, Inc. v. Video Shack, Inc., 700 F.Supp. 127, 148-149 (S.D N.Y.1998)* (dealing with time period for calculation of damages in the context of a dispute over a proposed pretrial order). Based on the following: 1) the Court has already determined that Digene has properly pled all the causes of action alleged in their Business Tort Counterclaims; 2) no new causes of action are raised by Dr. Jizmagian's report; and 3) all documents relied upon by Dr. Jizmagian have been provided to Enzo through discovery mechanisms such as interrogatories, depositions and document production, the Motion to Strike will be denied.

### III. *Enzo Biochem and Enzo Life Science's Joint Motion to Bifurcate and Stay Discovery (D.I.145)*

#### A. *Parties' Contentions*

Enzo Biochem and Enzo Life Sciences (collectively "Enzo") contend that whether or not Dr. Jizmagian's report is stricken, further discovery on Digene's Counterclaims should be stayed and any trial on them should be bifurcated from the patent infringement claims. First, Enzo contends that trial of these Counterclaims and any further discovery would be simplified if not mooted upon a finding of invalidity or infringement of the '581 Patent. Further, Enzo claims that the issues raise by Counts III-V of Digene's Counterclaims are prime for bifurcation because many of the issues to be tried on the Counterclaims have little or no evidentiary overlap with the issues to be tried in the patent infringement action. For instance, Enzo points out that in the patent infringement trial, evidence regarding the amount of Digene's sales will be at issue, whereas these topics will not be raised in the context of the Counterclaims. Instead, Enzo argues, the Counterclaim trial will deal with issues related to Digene's relationship with third parties and how Digene contends that Enzo harmed these relationships. Enzo also contends that bifurcation is called for because of the complexities involved with having a trial involving not only the issues of infringement and validity but also the issues involved in the Counterclaims. Finally, Enzo argues that if Dr. Jizmagian's expert report is not stricken, bifurcating the Business Tort Counterclaims and staying discovery on them is even more appropriate and urgent. Specifically, it argues that it should not be denied a speedy trial on the issue of patent infringement, while additional discovery is taken regarding Dr. Jizmagian's expert report. For example, Enzo points out that it would need to seek discovery regarding the financing of Goldman Sachs and would have to serve subpoenas on Goldman Sachs and its intellectual property counsel to determine why the funds were unavailable to Digene.

*4 In response, Digene contends that Enzo's request for bifurcation is neither warranted nor proper given the facts of the case. First, Digene contends that there is significant evidentiary overlap between the Counterclaims and the patent claims. For example, Digene's validity defenses which contend that Enzo's amended claims (1) are not supported by the specifications; (2) claim subject matter that Enzo did not invent; and (3) encompass prior art known to both Enzo an Digene, are the facts that Enzo intends to rely on for its willful infringement, are the same facts which Digene will rely on in support of its validity arguments and in turn are the same facts which Digene relies on in its Counterclaims. Therefore, Digene argues, bifurcation is not warranted because it would require the Court and the jury to hear the same

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

facts as many as three times. Further, Digene argues that recent discovery has shown the interrelated nature of the Counterclaims, where documents received in the past two weeks from Johnson & Johnson demonstrate that the claims of the '581 Patent are not supported by the patent specification and that those limited embodiments which were disclosed in the patent specification were derived from another party. Digene argues that these documents further demonstrate the bad faith and anti-competitive nature of Enzo's acts which preceded the filing of this action and form a basis for Digene's Counterclaims. Finally, Digene argues that Enzo's request to stay further discovery on the Business Tort Counterclaims is untimely, where Enzo has been given unfettered access to Counterclaim discovery and has failed to pursue such discovery as evidenced by its failure to take any depositions until the last week of an already extended fact discovery.

### B. Discussion

The Court concludes that the Counterclaim and patent issues will be bifurcated in order to avoid jury confusion on complex legal issues. Federal Rule of Civil Procedure 42(b) ("Rule 42(b)") governs the bifurcation of trials and, in relevant part, provides:

The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy, may order a separate trial of any claim ... or of any separate issue or ... issues, always preserving inviolate the right of trial by jury as declared by the Seventh Amendment to the Constitution or as given by a statute of the United States.

Fed.R.Civ.P. 42(b).

Under Rule 42(b), "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." Gardco Mfg., Inc. v. Herst Lighting Co., 820 F.2d 1209, 1212 (Fed.Cir.1987); see also 9 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2388 (2d ed. 2002) ("Ultimately the question of separate trials under Rule 42(b) should be, and is, a matter left to the discretion of the trial court...."). Courts, when exercising their broad discretion to bifurcate issues for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice, conserve judicial resources, and enhance juror comprehension of the issues presented in the case. Union Carbide Corp. v. Montell N.V., 28 F.Supp.2d 833, 837 (S.D.N.Y.1998). "In deciding

whether one trial or separate trials will best serve [the above factors] ... the major consideration is directed toward the choice most likely to result in a just final disposition of the litigation." In re Innotron Diagnostics, 800 F.2d 1077, 1084 (Fed.Cir.1986); see also Wright & Miller, supra, § 2388.

*5 In the context of patent cases, "[e]xperienced judges use bifurcation and trifurcation both to simplify the issues in patent cases and to maintain manageability of the volume and complexity of the evidence presented to a jury." Thomas L. Creel & Robert P. Taylor, Bifurcation, Trifurcation, Opinions of Counsel, Privilege and Prejudice, 424 PLI/Pat 823, 826 (1995); see also Manual for Complex Litigation (Third) § 33.62 (1995) (advising trial judges to bifurcate or trifurcate overly complex patent trials). In fact, bifurcation of complex patent trials has become common. Steven S. Gensler, Bifurcation Unbound, 75 Wash. L.Rev. 705, 725 (2000) ("Bifurcation is also common in patent litigation...."); Creel & Taylor, supra, at 825 ("Bifurcation or even trifurcation is common in patent cases.").

Typically, courts bifurcate patent cases into liability and damage trials. Swofford v. B & W, Inc., 336 F.2d 406 (5th Cir.1964), cert. denied, 379 U.S. 962 (1965) (bifurcating patent case into liability and damage trials). Courts also bifurcate complex patent cases in such a way to prevent jury confusion. Smith v. Alyeska Pipeline Service Co., 538 F.Supp. 977, 984 (D.Del.1982) (finding "that one trial of both issues [i.e., liability and damages] would tend to clutter the record and to confuse the jury."). This reasoning is also applicable to cases involving both patent and non-patent claims.

Bifurcation is an important discretionary tool that district courts can use to ensure that the cases are resolved in a just manner by juries that understand the complex issues before them.

Many scholars have endorsed bifurcation in complex cases as a method of improving juror comprehension. Specifically, bifurcation might enhance jury decision making in two ways: (1) by presenting the evidence in a manner that is easier for the jurors to understand, and (2) by limiting the number of legal issues the jury must address at any particular time.

Gensler, supra, at 751.

In this case, the bifurcation of issues would prevent jury confusion, in that it would enable a jury to concentrate on one complex body of law at a time.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Also, in order to enhance jury comprehension and avoid prejudice, the Court will separate the issues into three sequential phases for trial in the following manner: 1) infringement; 2) validity; and 3) Business Tort Counterclaims. Although the Court recognizes that there is some evidentiary overlap, the parties will not be prejudiced by separate trials and the procedure will produce an efficient and fair disposition of the parties' claims.

The issue of staying discovery on the Counterclaims, however, is a more difficult question. The discovery phase in this case has already been extended and the Court is concerned that a stay of discovery on the Business Tort Counterclaims will prevent a fair and efficient resolution to the Counterclaims. Although the Court recognizes that the Counterclaims may be mooted or simplified depending on the outcome of the patent issues, this must be weighed against the importance of judicial efficiency and fairness. After weighing the relevant factors, the Court will deny the motion to stay because the Court finds that the interest in efficiently moving on with the resolution of the Counterclaims outweighs Enzo's concerns. Additionally, the Court concludes that the interest of fairness is served by a further extension of fact discovery as to those claims. Thus, the Motion to Bifurcate and Stay discovery will be granted in part and denied in part.

IV. *Digene's Protective Orders* (D.I.104, 113)

*6 Digene has filed two Protective Orders in the instant case. The first, D.I. 104, asks the Court for a Protective Order to preclude Enzo from disclosing Digene's confidential or outside counsel only information to Enzo's proposed expert Dr. James Wetmur. The Court concludes that Digene has not met its burden of proof with regard to this issue and also concludes that the Stipulated Protective Order is sufficient at this time. Therefore, Digene's Motion for a Protective Order (D.I.104), will be denied.

The second motion requests a Protective Order precluding Enzo Life Sciences from taking Digene's Deposition pursuant to Rule 30(b)(6) because it is unnecessarily duplicative and unduly burdensome. After reviewing the parties' arguments, the Court finds that the deposition notice was not unreasonably duplicative or unduly burdensome, and therefore, Digene's Motion for a Protective Order (D.I.113) will be denied.

An appropriate Order will be entered.

## ORDER

NOW THEREFORE, For The Reasons discussed in the Opinion issued this date, IT IS HEREBY ORDERED this 10th day of June 2003, that:

1) Enzo Biochem's Motion to Strike the Expert Report of Stephen Jizmagian (D.I.144) is *DENIED;*

2) Enzo Biochem's and Enzo Life Sciences' Joint Motion to Bifurcate and Stay Discovery (D.I.145) is *GRANTED* as to Bifurcation of issues but *DENIED* as to the Stay of Discovery on the Business Tort Counterclaims;

3) Fact Discovery as to the Business Tort Counterclaims shall be extended so as to be completed by August 15, 2003;

4) Digene's Motion for Protective Order (D.I.104) is *DENIED;*

5) Digene's Motion for Protective Order (D.I.113) is *DENIED;*

6) Plaintiff's Motion to Compel Digene to Produce a 30(b)(6) Deponent is *DENIED* as moot because the Parties have resolved the issue;

7) As discussed at the teleconference on Wednesday, June 4, 2003, Enzo counsel is permitted to show their clients an unredacted version of Dr. Jizmagian's expert report;

8) The parties shall submit a letter with a Proposed Agreed Upon Trial Date for February or March, 2004;

9) A Pretrial Conference will be held on Thursday, November 6, 2003 at 2:30 p.m., in Courtroom No. 4B on the 4th Floor, Boggs Federal Building, Wilmington, Delaware.

D.Del.,2003.
Enzo Life Sciences, Inc. v. Digene Corp.
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:02CV00212 (Docket) (Mar. 20, 2002)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 21402512 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy
Slip Copy, 2006 WL 47374 (E.D.Pa.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents
Only the Westlaw citation is currently available.

United States District Court,E.D. Pennsylvania.
AFP ADVANCED FOOD PRODUCTS LLC,
Plaintiff
v.
SNYDER'S OF HANOVER MANUFACTURING,
INC, Defendant.
No. Civ.A. 05-3006.

Jan. 6, 2006.

Anthony S. Volpe, Randolph J. Huis, Volpe &
Koenig PC, Philadelphia, PA, for Plaintiff.
James H. Laughlin, Jr., John P. Moran, Thomas S.
Valente, Holland & Knight LLP, Washington, DC,
Marnie E. Simon, Stevens & Lee, Philadelphia, PA,
for Defendant.

*MEMORANDUM*

STENGEL, J.

**\*1** Defendant Snyder's of Hanover Manufacturing,
Inc., ("Snyder's") filed for a protective order pursuant
to Fed.R.Civ.P. 26(c) seeking, among other things, an
order preventing the plaintiff's attorneys litigating
this case from prosecuting new patents for the
plaintiff regarding similar art. Both Snyder's and the
plaintiff, AFP Advanced Foods Products ("AFP")
agree on the necessity of a protective order generally,
but disagree over two specific provisions.

## I. BACKGROUND of CASE

AFP brings this patent infringement case seeking a
temporary injunction against Snyder's. AFP avers that
Snyder's is willfully infringing upon their valid patent
(# 6,873,675 filed on May 17, 2005 and named
"Acidified Imitation Cheese Sauce and Pudding
Compositions and Method for Producing Such
Compositions") through its production and sale of
"Eatsmart Salsa Con Queso." Snyder's counterclaims
requesting a declaratory judgment that the AFP
patent ("675") is invalid and unenforceable.

## II. STANDARD for PROTECTIVE ORDERS

"Under Federal Rule of Civil Procedure 26(c), a court

"for good cause shown" may, in certain
circumstances, enter a protective order in the context
of discovery." *Shingara v. Skiles*, 420 F.3d 301, 305-
06 (3d Cir.2005). Fed.R.Civ.P. 26(c) places the
burden of persuasion on the party seeking the
protective order to prove the good cause. *Cipollone v.
Ligget Group*, 785 F.2d 1108, 1114 (3d Cir.1986).
The party seeking the protective order must show that
disclosure of the information sought to be protected
would result in a "clearly defined, specific and
serious injury." *Shingara* at 306 (citing *Pansy v.
Borough of Stroudsburg*, 23 F.3d 772, 786-87 (3d
Cir.1994)). "Broad allegations of harm are not
specific to establish good cause." *Id.* Generally a
Court will balance the interests of seven, non-
exclusive, factors before issuing a protective order.
*Id.* Those factors include:
1) whether disclosure will violate any privacy
interests;
2) whether the information is being sought for a
legitimate purpose or for an improper purpose;
3) whether disclosure of the information will cause a
party embarrassment;
4) whether confidentiality is being sought over
information important to public health and safety;
5) whether the sharing of information among litigants
will promote fairness and efficiency;
6) whether a party benefitting from the order of
confidentiality is a public entity or official; and
7) whether the case involves issues important to the
public.

*Id.* (citing *Glenmede Trust Co. v. Thompson*, 56 F.3d
476, 483 (3d Cir.1995), and *Pansy*, 23 F.3d 787-91).

## III. DISCUSSION

### *A. Contested Language*

The language at issue in this motion for protective
order appears in section 1.(f) and section 3. of
Snyder's proposed order. Under section 1.(f) Snyder's
defines "CONFIDENTIAL-ATTORNEY'S EYES
ONLY" as *"personnel information* or sensitive
CONFIDENTIAL information that the Designating
Party in good faith believes will *harm its competitive
position* if the information becomes known to a party
other that the Designating Party." (Underlines added
to highlight the contested language.) While section 3

Page 2

Slip Copy
Slip Copy, 2006 WL 47374 (E.D.Pa.)
(Cite as: Slip Copy)

states:

**\*2** Information designated "CONFIDENTIAL-ATTORNEYS' EYES ONLY" may only be used for purposes of this litigation, and may only be disclosed to persons falling within the categories specified in Paragraphs 2(a), (b), (c) and (d)(ii)-(vi) of this Order, *who are not currently engaged and shall not engage during the course of this litigation and for a period of two (2) years following final disposition of this litigation (whether by judgment including exhaustion of all appeals, settlement, or otherwise) in the preparation or prosecution of patent application(s) related to low protein containing products, including but not limited to, cheese dips, including direct supervision or assistance thereof, on behalf of any party or any of their corporate parents, predecessors in interest, successors in interest, subsidiaries, joint ventures, affiliates, or any other entities partially or wholly under their control or ownership, and only in accordance with the procedures established under this court.*

The remaining language in the proposed order is uncontested by the parties.

### B. Should the Two-Year Ban be Granted?

Through its motion for protective order, Snyder's is seeking to prevent AFP's attorneys from using information they will acquire during discovery of this case in their subsequent legal practice. Snyder's is not alleging any ethical violations of established rules of confidentiality, but is worried about the inadvertent use of discovered material. AFP argues that the entire underlined language in section three (3) should be stricken.

Many courts have addressed similar issues. *See Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 50 U.S.P.Q.2d 1783 (D.Nev.1998), *Interactive Coupon Marketing Group, Inc. v. H.O.T.! Coupons, LLC*, 1999 U.S. Dist. LEXIS 12437, No. 98 C 7408, 1999 WL 618969, at \*2 (N.D.Ill. Aug.9, 1999), *Motorola, Inc. v. Interdigital Technology Corp.*, No. 03-488-LON, 1994 U.S. Dist. LEXIS 20714 (D.Del. Dec. 19, 1994), *Commissariat A L'Energie Atomique v. Dell Computer Corp.*, 2004 U.S. Dist. LEXIS 12782 (D.Del. May 25, 2004), *In re Papst Licensing*, 2000 U.S. Dist. LEXIS 6374, \*11 (E.D.La. May 4, 2000), and *Chan v. Intuit, Inc.*, 218 F.R.D. 659 (N.D.Ca.2003). None of their decisions is precedential nor has any applied the Third Circuit's standard for issuing a protective order in *Shingara.*

The threat of inadvertently using information obtained through discovery is not to be taken lightly. Inadvertence, like the thief-in-the-night, is no respecter of its victims. Inadvertent or accidental disclosure may or may not be predictable. To the extent that it may be predicted, and cannot be adequately forestalled in the design of a protective order, it may be a factor in the access decision.

*U.S. Steel Corp. v. United States*, 730 F.2d 1465, 1468 (Fed.Cir.1984) (deciding whether in-house patent attorneys should be given access to confidential information through discovery in patent infringement cases). However, that threat, standing alone, under *Shingara* and *U.S. Steel*, is not enough to justify a protective order barring AFP's attorneys from prosecuting similar patents for two years. As further explained in *U.S. Steel*, the decision to deny access to discovered materials shall be done on a case-by-case, and lawyer-by-lawyer basis. *Id.* In this case, there is no reason for the court to believe that AFP's attorneys will not strictly follow the adopted order and refrain from using, either inadvertently or intentionally, Confidential Attorney's Eyes Only information for the sole purpose of this litigation. Barring AFP's attorneys from prosecuting similar patents for two years following this suit, without some tangible reason or good cause other than the general threat of inadvertent misuse of discovered materials, is the exact type of overly broad and generalized fear rejected in *Shingara, U.S. Steel*, and *In re Sibia Neurosciences, Inc.*, Doc. No. 525, 1997 U.S.App. Lexis 31828 (Fed.Cir. Oct. 22, 1997) (unpublished). If, however, the misuse of discovered material becomes an issue during the course of this litigation, the protective order, pursuant to section 17, may be amended accordingly.

### C. Should the Language in Section 1.(f) be Altered?

**\*3** To the extent that it remains pertinent after this Court's ruling on the language above, I will adopt Snyder's original language regarding section 1. (f). The language suggested by AFP, "it or its employees or agents" instead of Snyder's proposed "its competitive position," appears overly broad. Limiting the distinction to the Designating Parties' competitive position, at this point in the litigation, is more in line with Snyder's showing of good cause that its competitive position is what's at stake, not the more broad "it or its employees or agents."

### IV. CONCLUSION

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Based upon the Third Circuit's strict requirement on the moving party to show good cause before a protective order is issued, and given that the basis of Snyder's perceived threat is the possible inadvertent use of information, I believe the two-year ban is burdensome and unnecessary. At this point in the litigation, there is no reason for the Court to believe that the information sought through discovery is for anything other than the specific and legitimate purpose of litigating this case. An appropriate order adopting Snyder's proposed protective order without the two-year ban follows.

*ORDER*

AND NOW, this day of January, 2006, upon consideration of the defendant's motion for a protective order (Docket # 14) and the plaintiff's objections (Docket # 16), it is hereby ORDERED that the motion is granted in part and denied in part. The request for a protective order is granted; AFP's objections are granted as well and portions of Snyder's of Hanover's proposed protective order will be removed. The protective order approved by the Court will be ordered today as a separate docket entry.

PROTECTIVE ORDER:

1. Definitions:

(a) "Discovery Material" means any and all documents, testimony, deposition transcripts, deposition exhibits, interrogatory responses, admissions, and any other information produced or otherwise provided by a party or non-party to another party or non-party in connection with discovery in this litigation.

(b) "Designating Party" means any person or entity, whether a party to this lawsuit or not, who has designated documents or information as either "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" under this Order.

(c) "Producing Party" means any person or entity, whether a party to this lawsuit or not, who has produced documents or provided information in this litigation or from whom documents or information have been requested.

(d) "Receiving Party" means any party who has received documents or information in this litigation.

(e) "CONFIDENTIAL" information means information that the Producing Party in good faith believes to be "confidential research, development, or commercial information" within the meaning of Fed.R.Civ.P. 26(c), including, but not limited to, financial information, security measures, nonpublic technical information, ongoing research and development projects, unpublished patent applications and file wrappers, patent license agreements, or other non-public information.

*4 (f) "CONFIDENTIAL-ATTORNEYS' EYES ONLY" information means personnel information or sensitive CONFIDENTIAL information that the Designating Party in good faith believes will harm its competitive position if the information becomes known to a party other than the Designating Party.

(g) "Confidential Discovery Material" means any Discovery Material that is designated as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY," in accordance with the procedures set forth below, including but not limited to:
(i) Information furnished pursuant to Rule 26 of the Federal Rules of Civil Procedure.
(ii) Information furnished or set forth in response to any discovery request made under Fed.R.Civ.P. 31, 33, or 36, provided that, prior to disclosure to the Receiving Party, the information or responses are plainly marked or otherwise identified by the Designating Party on each page as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY."
(iii) Information set forth in documents made available for inspection by the Producing Party voluntarily or under Fed.R.Civ.P. 33(d) or 34 and that are identified at the time of inspection as containing or comprising "Confidential Discovery Material." The party producing information for inspection need not designate the information by stamping or labeling it as "CONFIDENTIAL" or "CONFIDENTIAL-ATTORNEYS' EYES ONLY" until copies are delivered to the inspecting party in response to the inspecting party requesting copies of the information. Making documents and things available for inspection shall not constitute a waiver of any claim of confidentiality, attorney-client privilege, or work-product immunity.
(iv) Information set forth in any copies of documents produced to the discovering party voluntarily or under Fed.R.Civ.P. 33(d) or 34, provided that, prior to delivery of the copies to the Receiving Party, the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

Page 1

C
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
TELULAR CORPORATION, Plaintiff,
v.
VOX2, INC. Defendant.
No. 00 C 6144.

June 4, 2001.

MEMORANDUM OPINION AND ORDER
NOLAN, Magistrate J.
*1 This is a patent infringement action brought by
Telular Corporation ("Telular") against Vox2, Inc.
("Vox2"). The '096 patent at issue relates to an
interface device that allows standard telephones to
control the operation of a cellular transceiver. This
matter is before the Court on Telular's Motion for
Expedited Determination of Expert. Telular requests
that the Court enter an order granting its expert,
Kevin O' Brien ("O'Brien"), access to material
designated "Confidential" and "Confidential-
Attorneys' Only" under the protective order entered
in this case. Vox2 objects to O'Brien having access to
such material because it believes that O'Brien cannot
avoid using the confidential information he will learn
from his work as an expert in this case in his current
job.

ANALYSIS

Telular and Vox2 executed a protective order
governing disclosure of confidential information
obtained in discovery. Paragraphs 4(c) and 5(b) of the
protective order provide that confidential information
may be provided to experts who are independent of
and not employed by the parties or a competitor of
either party in the field to which the subject matter of
this action pertains and who are retained for purposes
of this action. Thus, when determining whether to
allow O'Brien access to Vox2's confidential
information, the Court must balance Telular's interest
in selecting the expert most beneficial to its case with
Vox2's interest in protecting its trade secrets from
disclosure to its competitors. *Advanced
Semiconductor Materials America Inc. v. Applied
Materials Inc.*, 43 U.S.P.Q.2d 1381, 1384

(N.D.Cal.1996).

O'Brien has a bachelor's degree in electrical
engineering (B.S.E.E.) from Villanova University.
O'Brien is currently the Director of Sales for Digi-Tel
Communications, LLC ("Digi-Tel"). Digi-Tel sells
cellular telephones, cellular telephone accessory
products, and cellular telephone network service
plans. As Director of Sales for Digi-Tel, O'Brien
manages all sales efforts of the company as well as
develops indirect market channels for wireless
products, landline telephone equipment, and satellite
TV equipment. O'Brien is also involved in
developing Digi-Tel's business-to-business Internet
based sales channel and opening new distribution
locations. O'Brien has been Director of Sales for
Digi-Tel since 1997.

Vox2 argues that it is inevitable that O'Brien will
misuse Vox2's confidential information in his
position as Sales Director of Digi-Tel. The cases
relied on by Vox2 in support of its inevitable
disclosure argument are easily distinguishable from
the present circumstances. For example, in *Pepsico,
Inc. v. William E. Redmond, Jr.*, 54 F.3d 1262 (7th
Cir.1995), Pepsico sought a preliminary injunction
preventing a former Pepsico employee, Redmond,
from assuming his duties at Quaker, a fierce
competitor of Pepsico's in the beverage-industry.
While employed at Pepsico, Redmond held a
relatively high-level position and had access to inside
information and trade secrets. Pepsico presented
substantial evidence that Redmond possessed
extensive and intimate knowledge about Pepsi-Cola
North America division's ("PCNA") strategic goals in
sports drinks and new age drinks. The district court
concluded that "unless Redmond possessed an
uncanny ability to compartmentalize information, he
would necessarily be making decisions about
Gatorade and Snapple by relying on his knowledge of
PCNA trade secrets." *Id.* at 1269. The district court
also concluded that Redmond's lack of forthrightness
on several occasions before accepting his job with
Quaker and in his testimony before the district court
demonstrated that he could not be trusted to protect
Pepsico's trade secrets. The Seventh Circuit upheld
the district court's order enjoining Redmond from
assuming his duties at Quaker and preventing him
from forever disclosing PCNA trade secrets and
confidential information.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 2
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**\*2** Vox2 has not demonstrated that O'Brien will inevitably use Vox2 trade secrets in the performance of his job as Sales Director for Digi-Tel. Digi-Tel is not a competitor of Vox2 unlike Pepsico's direct competition with Quaker. Vox2 is the developer and manufacturer of the Vox.Link, a cellular accessory product, which it markets through distributors. Digi-Tel distributes cellular telephones and cellular accessories manufactured by various companies and sells the services of companies that provide cellular service plans. Digi-Tel does not develop or manufacture cellphone cellular accessories and does not sell the Vox.Link or any cellphone interface. Vox2 asserts that a danger exists that Digi-Tel may sell a cellular interface that competes with the Vox.Link in the future and then O'Brien would be working for a competitor of Vox2. Vox2's fear that Digi-Tel may possibly sell a competitor's cellular interface at some time in the future does not outweigh Telular's right to utilize the expert of its choice. Furthermore, unlike Redmond's lack of forthrightness in the *Pepsico* case which led the district court to believe a real threat of trade secret disclosure existed, the Court has no reason to question O'Brien's candor in agreeing to be bound by the protective order and to only use confidential material disclosed to him in the present litigation.

In *Safe Flight Instrument Corp. v. Sundstrand Data Control, Inc ., 682 F.Supp. 20 (D.Del.1988),* another case cited by Vox2, the plaintiff requested that its president, Mr. Greene, be allowed access to the defendant's confidential information. The plaintiff and defendant corporations were direct competitors in the market for avionics equipment. The court described Greene as a preeminent aeronautic engineer who had received more than sixty advanced patents. Green actively plied aeronautic engineering. The district court precluded Greene from reviewing defendant's confidential documents because it believed he would be unable to separate the information he learned from defendant's documents from his own ideas.

*Safe Flight Instrument Corp.* is also distinguishable from the instant case. There is significantly less risk of disclosure of confidential information by O'Brien because he is not actively working or consulting as an electrical engineer in the telecommunications industry. Unlike Greene in *Safe Flight Instrument Corp.,* O'Brien is not the president of a competing company who is currently doing research in the relevant technical area. Rather, O'Brien is the sales director of a company that does not compete with Vox2 or its distributors. O'Brien is not employed as

an electrical engineer and is no longer active in design and analysis of radio communications systems. Given Vox2's failure to show how its confidential information is applicable to O'Brien's job as sales director of a company that does not compete with Vox2 and its failure to demonstrate that O'Brien will inevitably misuse confidential information gained during this litigation in his job as sales director, the Court finds Vox2's case authority and inevitable disclosure argument unpersuasive.

**\*3** The Court must also consider Telular's need for this particular expert. Telular asserts that O'Brien is indispensable to Telular's presentation of its case. O'Brien explains in paragraph 8 of his declaration that he has been a testifying expert in other patent litigations involving the '096 patent at issue in this litigation or its continuation patents. *See DNIC Brokerage v. Morrison & Dempsey Communications, Serrano v. Telular Corporation,* and *Alliance Corporation v. Telular Corporation.* Vox2 correctly points out that Telular fails to provide an affidavit from O'Brien or other evidence supporting Telular's further assertions regarding O'Brien. Because the Court finds that the likelihood of harm occurring to Vox2 as a result of disclosure of confidential information to O'Brien is minimal, Telular's failure to support its argument that O'Brien is uniquely qualified to serve as an expert in this case with additional evidence does not tip the scale in favor of denying Telular the right to use its chosen expert.

Vox2 argues that O'Brien's relationship with AT & T and others is a separate and independent basis for prohibiting the disclosure of Vox2's confidential information to him. Vox2 claims that it had a growing business relationship with AT & T until Telular intervened by sending a letter to AT & T that contained numerous material false statements. Vox2 is preparing or has filed unfair competition and tortious interference counterclaims against Telular based on its actions with respect to AT & T. Vox2 maintains that its business relationship with AT & T will be directly at issue in its counterclaims. Digi-Tel is a distributor of AT & T wireless products and services. Digi-Tel sells a variety of cellular phones that are activated and placed in service on the AT & T wireless network. O'Brien declares that he has never had direct contact with AT & T except as is required to activate a phone with cellular service and that his contact is limited to AT & T's customer service representatives. O'Brien has also received e-mails from the AT & T indirect channel marketing department.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                  Page 3
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

According to Vox2, a conflict exists because O'Brien will presumably assist Telular in defending against the counterclaims and at the same time continue his business relationship with AT & T. Vox2 fails to explain how O'Brien's limited relationship with AT & T and Telular's conduct with respect to Vox2's relationship with AT & T create a conflict which provides a valid basis for disqualifying O'Brien as an expert. Moreover, AT & T is not a competitor of Telular or Vox2. Thus, by distributing AT & T products and services, O'Brien is not employed by a competitor of either party.

Finally, Vox2 faults O'Brien for failing to state with certainty that he will not in the near future compete directly with Vox2. Vox2 has not demonstrated that there is a substantial likelihood that O'Brien will be competing with Vox2 in the near future. Vox2's unsubstantiated fear that O'Brien may compete with Vox2 in the future is not sufficient to demonstrate a risk of competitive injury to Vox2 that outweighs Telular's right to the expert of its choice.

CONCLUSION

*4 Because O'Brien is not employed by either of the parties or a competitor of either of the parties in the field to which the subject matter of this action pertains and the likelihood of disclosure of Vox2's confidential information to its competitors should O'Brien be allowed access to the materials is minimal, Telular's Motion for Expedited Determination of Expert is GRANTED. O'Brien will be allowed access to materials designated "Confidential" or "Confidential-Attorneys' Only" under the protective order in this case with the exception of Vox2's marketing and distribution channel information. O'Brien will be bound by the protective order entered in this case and will be subject to the contempt should he violate this order. The confidential materials disclosed to O'Brien will only be used for purposes of this litigation and for no other purposes.

N.D.Ill.,2001.
Telular Corp. v. Vox2, Inc.
Not Reported in F.Supp.2d, 2001 WL 641188 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 2002 WL 32693515 (Trial Motion, Memorandum and Affidavit) Plaintiff Telular Corporation's Reply Memorandum in Support of Motion for

Reconsideration of Order Granting Motion to Strike and Adopting Magistrate's Report and Recommendation (May. 14, 2002)
• 2002 WL 32693510 (Trial Motion, Memorandum and Affidavit) Defendant Vox2, Inc.'s Memorandum in Opposition to Telular Corporation's Motion for Reconsideration of Order Granting Motion to Strike and Adopting Magistrate's Report and Recommendation (Apr. 19, 2002)
• 2002 WL 32693500 (Trial Motion, Memorandum and Affidavit) Plaintiff Telular Corporation's Response to Vox2's Motion to Strike (Mar. 28, 2002)
• 2002 WL 32693493 (Trial Motion, Memorandum and Affidavit) Defendant Vox2 Inc.'s Reply to Plaintiff Telular Corporation's Objections to the Report and Recommendation of Magistrate Judge Nolan (Mar. 01, 2002)
• 2000 WL 34443836 (Trial Pleading) Complaint (Oct. 05, 2000)
• 1:00cv06144 (Docket) (Oct. 05, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

H
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, W.D. Wisconsin.
PROMEGA CORPORATION, Plaintiff,
v.
APPLERA CORPORATION and Lifecodes
Corporation, and its Subsidiaries Cellmark
Diagnostics, Inc. and Genomics International
Corporation, Defendants.
No. 01-C-244-C.

June 7, 2002.

J. Donald Best, for Plaintiff.
James R. Cole, Quarles & Brady, Madison, WI,
Edward R. Reines, Weil, Gotshal & Manges, LLP,
Redwood Shores, CA, for Defendants.

OPINION and ORDER

CRABB, J.
*1 In this civil action for patent infringement, two
motions filed by plaintiff Promega Corporation are
before the court. In the first, plaintiff asks the court to
reconsider those portions of its January 2, 2002 claim
construction opinion and order in which it construed
claims 1 through 5 and 16 of plaintiff's United States
Patent No. 5,843,660 (the '660 patent). In the second,
plaintiff seeks an order blocking the disclosure of its
trade secrets to one of defendants' experts. For the
reasons discussed below, plaintiff's motion for
reconsideration will be granted and its motion for an
order blocking disclosure to defendants' expert will
be denied.

I. MOTION FOR RECONSIDERATION

The '660 patent discloses a method for the
simultaneous amplification of multiple, specific
regions of human DNA, or "short tandem repeat
loci," in order to facilitate the analysis of
distinguishing genetic characteristics. More
background on this technology can be found in the
court's January 2, 2002 claim construction opinion
and order. Claim I of the '660 patent reads as follows,
with significant language emphasized:
1. A method of simultaneously determining the
alleles present in at least four short tandem repeat loci

from one or more DNA samples, comprising:
(a) obtaining at least one DNA sample to be
analyzed,
(b) selecting a set of at least four short tandem repeat
loci of the DNA sample to be analyzed which can be
amplified together, wherein the at least four loci *in
the set* are selected from the group of loci consisting
of: D3S1539, D4S2369, D5S818, D7S820, D9S930,
D10S1239, D13S317, D14S118, D14S548,
D14S562, D16S490, D16S539, D16S753,
D17S1298, D17S1299, D19S253, D20S481,
D22S683, HUMCSF1PO, HUMTPOX, HUMTH01,
HUMF13A01, HUMBFXIII, HUMLIPOL,
HUMvWFA31;
(c) co-amplifying the loci in the set in a multiplex
amplification reaction, wherein the product of the
reaction is a mixture of amplified alleles from each of
the co-amplified loci in the set; and
(d) evaluating the amplified alleles in the mixture to
determine the alleles present at each of the loci
analyzed in the set within the DNA sample.

In the January 2, 2002 claim construction opinion and
order, I stated that claim 1 "covers only sets of short
tandem repeat loci in which all the loci in the
[multiplex amplification] reaction, whether four or
more, are selected from the group of loci listed in
step (b)." January 2, 2002 Op. and Order, dkt. # 40, at
15. According to this interpretation of the claim, a
multiplex reaction that includes four or more loci
chosen from the list (or "*Markush* group") in step (b)
but that also includes at least one unlisted loci would
not infringe the claim. In reaching this understanding
of the claim's scope, I relied upon an amendment
made to the claim in March 1998. Before the
amendment, step (b) of claim 1 read as follows:(b)
selecting a set of at least four short tandem repeat loci
of the DNA sample to be analyzed which can be
amplified together, wherein at least four of the loci in
the set are selected from the group of loci consisting
of:
*2 D3S1539, D4S2369, D5S818, D7S820, D9S930,
D10S1239, D13S317, D14S118, D14S548,
D14S562, D16S490, D16S539, D16S753,
D17S1298, D17S1299, D19S253, D20S481,
D22S683, HUMCSF1PO, HUMTPOX, HUMTH01,
HUMF13A01, HUMBFXIII, HUMLIPOL,
HUMvWFA31;

The amendment, which the examiner indicated was
made "to place [the claim] in condition for

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

allowance," required that "[i]n claim 1, (b), line 2, - the has been inserted after 'wherein' and 'of the' after 'four' has been deleted." After the March 1998 amendment, claim 1 reads as follows, with the inserted language underlined and the deletion bracketed and stricken.(b) selecting a set of at least four short tandem repeat loci of the DNA sample to be analyzed which can be amplified together, wherein *the* at least four [of the] loci in the set are selected from the group of loci consisting of:
D3S1539, D4S2369, D5S818, D7S820, D9S930, D10S1239, D13S317, D14S118, D14S548, D14S562, D16S490, D16S539, D16S753, D17S1298, D17S1299, D19S253, D20S481, D22S683, HUMCSF1PO, HUMTPOX, HUMTH01, HUMF13A01, HUMBFXIII, HUMLIPOL, HUMvWFA31;

(Emphasis added). Thus, while the pre-amendment claim 1(b) required "at least four of the loci in the set" to be chosen from the listed group, after the March 1998 amendment the same section required "*the* at least four loci in the set" to be chosen from the listed group. Relying on this prosecution history, I reasoned that the pre-amendment language contemplated the inclusion of unidentified loci as long as a minimum of four loci were selected from the identified list, but that the post-amendment language required all the loci, whether four or more, to be selected from the list.

I am convinced that this reasoning is unsound for several reasons. First, I stated that "claim 1 covers only sets of short tandem repeat loci in which all the loci in the [multiplex] reaction, whether four or more, are selected from the group of loci listed in step (b)." Plaintiff argues that this statement incorrectly conflates the terms "set" and "multiplex reaction." According to plaintiff, the court "erroneously read the claim term 'set' to mean 'multiplex reaction' " and "[t]his misunderstanding of the claim resulted in the Court limiting the *multiplex reaction* of limitation (c) to only the loci specified in limitation (b) rather than limiting the *'sets'* or combination of loci required by limitation (b)." (Emphasis added). In other words, the court effectively rewrote a critical portion of claim 1(b) to read "wherein the at least four loci in the set *multiplex reaction* are selected from the group consisting of...."

Plaintiff is correct. I conflated the term "set" with "multiplex reaction" incorrectly in some passages of the January 2, 2002 claim construction opinion and order. Claim 1, step (b) involves selecting a set of at least four loci and requires that "the at least four loci *in the set*" be chosen from the group of loci listed in step (b). The examiner's amendment does not address the loci that are included in the *multiplex reaction* described in step (c). I agree with plaintiff that if anything must be chosen exclusively from the list of loci in step (b), it is the content of the set rather than the multiplex reaction. Defendants disagree, arguing that the claim limits the content of the multiplex reaction of step (c) to only the set selected in step (b). Defendants' most persuasive argument on this score is grounded in the language of step (c), which provides that "*the*" end product of the multiplexing reaction is "a mixture of amplified alleles from each of the co-amplified loci in the set." Defendants argue that this language suggests that the sole product of the reaction must be a mixture of *only* the loci in the set selected in step (b) and that unidentified loci are logically excluded from the reaction. Although this proposition has surface appeal, a second argument advanced by plaintiff refutes it.

**\*3** Plaintiff maintains that the court's claim construction is untenable because under it, a competing product could infringe dependent claims 3 through 5 without infringing independent claim 1, from which claims 3 through 5 depend. This is because claims 3 through 5 each contain sets that incorporate a locus, HUMFESFPS, that is not listed in claim 1. For instance, claim 3 contains the following set of loci: "D16S539, D7S820, D13S317, D5S818, HUMF13A01, HUMFESFPS." Each of these loci is also listed in independent claim 1, *except* HUMFESFPS. Under the court's January 2, 2002 claim construction, selection and evaluation of this precise set without including other unidentified loci in the multiplex reaction would clearly infringe claim 3. Patent law provides that because claim 3 depends from claim 1, claim 1 must also be infringed. "A claim in dependent form shall be construed to incorporate by reference all the limitations of the claim to which it refers." 35 U.S.C. § 112, ¶ 4. Therefore, "[o]ne who does not infringe an independent claim cannot infringe a claim dependent on (and thus containing all the limitations of) that claim." *Wahpeton Canvas Co., Inc. v. Frontier, Inc.*, 870 F.2d 1546, 1552 n. 9 (Fed.Cir.1989). However, the January 2, 2002 claim construction can be read in such a way that claim 1 would not be infringed. This is because (1) the January 2, 2002 opinion and order allows a competitor to avoid infringement by adding to the multiplex reaction an additional locus not identified in step (b) of a claim and (2) the HUMFESFPS locus is not identified in the list of loci identified in step (b) of claim 1. Because HUMFESFPS is not identified in step (b) of claim 1,

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

its presence in the set "D16S539, D7S820, D13S317, D5S818, HUMF13A01, HUMFESFPS" serves to render the resulting reaction non-infringing with respect to independent claim 1, although the use of that set would infringe dependent claim 3. The same analysis applies to dependent claims 4 and 5, which include the HUMFESFPS locus in a listed set.

According to plaintiff, this anomaly is a result of faulty claim construction. The presence of HUMFESFPS in dependent claims 3 through 5 can be explained, consistently with well-established patent law, only by a construction of claims 1 through 5 (and the similarly structured claim 16) that recognizes that infringement cannot be avoided simply by including unlisted loci in the multiplex reaction described in step (c). For instance, according to plaintiff's proposed interpretation, a multiplex reaction containing the set "D16S539, D7S820, D13S317, D5S818, HUMF13A01, HUMFESFPS" will infringe claim 3 but will also infringe claim 1. Even though HUMFESFPS is not listed in step (b) of claim 1, all of the limitations of claim 1 are met because a set of at least four loci identified in claim 1 (D16S539, D7S820, D13S317, D5S818, HUMF13A01) is present in the multiplex reaction. The fact that a locus not identified in claim 1, HUMFESFPS, is also present in the multiplex reaction does not mean that claim 1 is not infringed. Thus, a competing product that infringes dependent claim 3 will also infringe independent claim 1. *See Wahpeton,* 870 F.2d at 1552 n. 9 ("One may infringe an independent claim and not infringe a claim dependent on that claim. The reverse is not true."). In response, defendants argue that "it is clear that the presence of HUMFESFPS in the dependent claims [3]-5 is an oversight" that "the examiner did not notice." It is possible that this is true, but the possibility of examiner oversight is too weak a reed upon which to rest the court's earlier claim construction in light of the indisputable presence of the HUMFESFPS locus in claims 3 through 5. *See Semiconductor Energy Lab Co. v. Samsung Electronics Co., 204 F.3d 1368, 1377 (Fed.Cir.2000)* (examiner is presumed to have done his job correctly). Accordingly, I conclude that in claims 1 through 5 and 16 of the '660 patent, the multiplex reaction of limitation (c) is open to additional unlisted loci or sets of loci, provided that at least one of the sets derived from limitation (b) of these claims is present in the reaction.

*4 Plaintiff goes on to argue that not only is the multiplex reaction of step (c) open, the sets selected in step (b) are themselves open to additional unlisted

loci. As discussed above, I concluded in the January 2 order that a March 1998 examiner's amendment undermined this argument. I reasoned that the amendment effectively closed the sets by rewriting pre-amendment claim 1(b)'s requirement that "at least four of the loci in the set" be chosen from the listed group to require that *"the* at least four loci in the set" be chosen from the listed group. I agreed with defendants that the significance of this change in wording was to require that all the loci in a set, whether four or more, be selected from the *Markush* group in step (b). Plaintiff argues that this was error because the amendment was not substantive, but was made instead to conform the claim to standard patent claim drafting procedure, which requires that an element of a claim be preceded by a definite article, such as "the," each time it is referred to after its initial appearance in a claim. According to plaintiff, the amendment merely moved the incorrectly positioned definite article "the" from the middle of an element ("at least four of *the* loci") into its proper position in front of that element ("*the* at least four loci.")

I cannot say that plaintiff's explanation is entirely implausible. Accordingly, both plaintiff and defendants have advanced reasonable explanations for the examiner's amendment, although predictably, the competing explanations have significantly divergent repercussions for the scope of the disputed claims. Although in the court's original claim construction order I accepted defendants' theory about the meaning and significance of the examiner's amendment, I agree with plaintiff that it was error to significantly narrow the scope of its claims on the basis of that amendment, unaccompanied as it was by any explanation by the examiner or clear statement from the applicants regarding the amendment's significance. Although "explicit statements made by a patent applicant during prosecution to distinguish a claimed invention over prior art may serve to narrow the scope of a claim," *Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed.Cir.1998),* plaintiff made no explicit statement during prosecution that can be read to limit the scope of its claims in the manner I suggested in the original claim construction order.

Indeed, the only explicit statement in the prosecution history on this topic favors plaintiff's proposed construction. On May 13, 1997, during the prosecution of claim 1, plaintiff agreed to an amendment deleting the HUMFESFPS locus from that claim's *Markush* group. However, in remarks accompanying that amendment, plaintiff noted that

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

"the amendments to claim 1 do not change the fact that the claimed method encompasses the co-amplification and evaluation of sets of short tandem repeat loci which include the deleted locus, provided at least four of the loci in the set ... are selected from the remaining group of loci listed in claim 1." There is no clear evidence in the subsequent prosecution history suggesting that the examiner objected to this assertion or that the applicants disavowed explicitly the broad claim scope that it suggests. Therefore, I conclude now that the subsequent March 1998 examiner's amendment is too ambiguous to support an inference that the sets referred to in the disputed claims were limited in the fashion suggested by the court's original claim construction. Accordingly, I will adopt plaintiff's proposed claim construction that *5 Claims 1 through 5 and 16 of the '660 Patent require the presence of at least one of the sets identified in the *Markush* groups stated in limitation (b) of those claims but do not exclude the presence of other STR loci in the multiplex reaction required by limitation (c) of those claims.

## II. MOTION TO PREVENT DISCLOSURE OF PLAINTIFF'S TRADE SECRETS

Plaintiff seeks an order blocking disclosure of its trade secrets to Dr. Richard Gibbs, one of defendants' experts. On September 24, 2001, the parties agreed to a protective order governing the disclosure of confidential information, including trade secrets, during the course of this litigation. The protective order allows the parties to designate as confidential proprietary information entitled to protection under Fed.R.Civ.P. 26(c)(7). Particularly sensitive confidential information can be further designated "attorneys' eyes only." Before information so designated can be disclosed to an expert such as Dr. Gibbs, the party wishing to make the disclosure must obtain a signed "undertaking" in which the expert acknowledges having read the protective order and promises to be bound by it. In addition to the signed undertaking, the party wishing to disclose information to an expert must disclose to opposing counsel the expert's name, address, employer, job description, information regarding the expert's relationship to the parties and consulting activities over the past three years. Provision is also made for obtaining additional information about the expert if necessary. If, despite the signed undertaking, a party still objects to disclosing its confidential information to a particular expert, it may move for a court order blocking disclosure to that expert or allowing

disclosure only under certain conditions. Plaintiff has moved for such an order regarding Dr. Gibbs.

Plaintiff objects to disclosing protected information to Dr. Gibbs because he is the president of one company and sits on the scientific advisory boards or consults informally with six other companies that compete or may compete with plaintiff in the future in markets for various technologies. In addition, plaintiff argues that the parties' resolution of an earlier disclosure dispute under the protective order in this case set the standard for resolving such skirmishes. In the earlier dispute, defendants objected to the disclosure of certain protected information to Dr. Randall L. Dimond, plaintiff's vice president and chief technical officer. Although the parties filed briefs with the court on that issue, they resolved the dispute without court intervention when plaintiff agreed to a series of restrictions in addition to those imposed by the protective order. These included a time-limited restriction on Dr. Dimond's participation in plaintiff's new product development and patent prosecution involving STR multiplexes and a requirement that, for a period of years following the end of this litigation, plaintiff provide defendants' counsel with certain scientific information and specifications concerning any new or modified STR multiplex products that plaintiff planned to release. Plaintiff argues that this court should either force defendants to hire another expert or impose upon Dr. Gibbs conditions identical to those that plaintiff agreed to apply to its vice president and chief technical officer, Dr. Dimond.

*6 As an initial matter, it is difficult to regard the latter of these alternatives as a sincere effort by plaintiff to break the current impasse. This alternative would require seven companies that are not connected to this lawsuit in any way (but for whom Dr. Gibbs consults to varying degrees) to provide plaintiff with detailed information on various of their new or modified products before their release for a period of years, regardless whether or to what extent Dr. Gibbs consulted on those products. When plaintiff made such a sweeping request, it must have realized that it would be rejected. Understandably, defendants assert that a requirement that Dr. Gibbs comply with the same restrictions embodied in the earlier disclosure agreement involving Dr. Dimond is an unjustifiable "one-size-fits-all" solution. I agree. Plaintiff's arguments notwithstanding, the issue of disclosing protected information to Dr. Gibbs is not on all fours with the earlier dispute regarding disclosure of such information to Dr. Dimond. This is because unlike Dr. Gibbs, Dr. Dimond is an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

employee of plaintiff, a company that competes directly with defendant Applera in the market for STR multiplex products. And Dr. Dimond is not just any employee - he is plaintiff's vice president and chief technical officer and presumably involved in a host of plaintiff's competitive decision making processes regarding its products. On the other hand, Dr. Gibbs is an independent expert who is not employed by defendants and does not consult for them.

The protective order itself recognizes the difference between an employee of a party, such as Dr. Dimond, and an independent expert, such as Dr. Gibbs. Under the protective order, disclosure of "attorneys' eyes only" information to an employee of a party is subject to more stringent standards than disclosure of such material to an independent expert who is not an employee or officer of any party. *Compare* Protective Order ¶ 9 *and* ¶ 11. Nevertheless, plaintiff contends that "its risk of trade secret misappropriation by Dr. Gibbs is exponentially greater than Applera's claimed risk with Dr. Dimond, given Dr. Gibbs's involvement with" the seven companies identified by plaintiff. Br. in Supp. of Promega's Mot. for an Order that Disclosure Not Be Made to Dr. Richard Gibbs, dkt. # 48, at 15. This argument is unpersuasive because it is founded upon the false premise that Dr. Gibbs performs the same functions that Dr. Dimond performs for those seven companies that Dr. Dimond performs for plaintiff. Dr. Gibbs does not act as vice president and chief technical officer for each of the seven companies about which plaintiff is concerned. Indeed, for six of the seven he either provides informal advice or attends periodic meetings in his capacity as a member of the companies' scientific advisory boards. The suggestion that these services are analogous to those provided to plaintiff by Dr. Dimond is disingenuous. Accordingly, I am not convinced that the restrictions applied to Dr. Dimond set a standard that must also apply to Dr. Gibbs.

*7 The question remains whether some lesser set of restrictions can be crafted that will allow disclosure of relevant information to Dr. Gibbs while taking into account plaintiff's understandable concern for the continued confidentiality of its trade secrets. The parties propose differing standards for making this determination. According to plaintiff, the party seeking to block disclosure "must show that (1) the interest for which protection is sought is an actual trade secret or other confidential business information protected under [Fed.R.Civ.P. 26(c)(7) ], and that (2) there is good cause for the protective order." *Andrew Corporation v. Rossi,* 180 F.R.D.

338, 340 (N.D.Ill.1998). "To establish good cause ... the courts have generally required 'specific examples of articulated reasoning' as opposed to 'stereotyped and conclusory statements.' " *Id.* at 341 (party seeking to block disclosure must "prove that disclosure will result in a 'clearly defined and very serious injury' to its business") (citations omitted). In response, defendants argue that the court must weigh their interest in selecting the expert most beneficial to their case with plaintiff's interest in protecting its information from disclosure to competitors. *Advanced Semiconductor Materials America, Inc. v. Applied Materials, Inc.,* 1996 U.S. Dist. LEXIS 21459 at *8, 43 U.S.P.Q.2d (BNA) 1381, 1384 (N.D.Cal.1996); *Telular Corp. v. Vox2, Inc.,* 2001 U.S. Dist. LEXIS 7472 at *3 (N .D. Ill.2001). Under either standard, I conclude that it is appropriate to deny plaintiff's motion.

Defendants have demonstrated that they have a significant interest in employing Dr. Gibbs as an expert in this case. Dr. Gibbs is a professor of molecular and human genetics at Baylor College of Medicine in Houston, Texas, and the director of the Baylor College of Medicine Human Genome Sequencing Center. He has served as the chairman of the Joint Genome Institute Advisory Committee and on the National Institutes of Health Genome Study Section for the Center for Scientific Review. He has extensive experience developing multiplex PCR technologies and, as defendants note, is the co-author of at least eight articles that are cited prior art to plaintiff's patents-in-suit.

Defendants have agreed to apply a set of restrictions to Dr. Gibbs in order to insure the integrity of plaintiff's trade secrets. First and foremost, Dr. Gibbs has agreed to be bound by the standing protective order in this case and, thus, not to "directly or indirectly utilize or disclose" plaintiff's confidential information "except for the purpose of this action only and in accordance with any further order issued by the Court." Protective Order, dkt. # 14, at ¶ 14. Violation of the order risks contempt sanctions. Second, although plaintiff expresses concern regarding the entire batch of some 360,000 documents it has produced to defendants in this case, defendants seek to disclose to Dr. Gibbs only "information solely relating to the research and development of Promega's STR multiplex products, which primarily consist of laboratory notebooks and related scientific documents dating from the mid-1990s and earlier." Deft. Applera's Opp'n to Promega's Mot. Regarding Disclosure to Professor Richard Gibbs, dkt. # 51, at 4. As plaintiff itself

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

Page 6

pointed out when seeking the disclosure to Dr. Dimond of defendants' confidential information, "laboratory notebooks dated more than three years ago are less likely to contain highly confidential, trade secret or proprietary information." Decl. of Joelle C. Luedtke in Supp. of Applera's Opp'n to Promega's Mot. Regarding Disclosure to Professor Richard Gibbs, dkt. # 53, at Ex. D. To insure that his access to confidential information is limited accordingly, defendants' trial counsel has agreed to keep a record of the information disclosed to Dr. Gibbs. Third, Dr. Gibbs has agreed to "refrain from consulting or having any other involvement concerning the development or modification of genetic identity products involving PCR-based STR multiplexing designed for use in forensic, paternity or bone marrow transplant monitoring applications, until two years after the termination of this litigation." *Id.* at 6. Finally, Dr. Gibbs will "inform in writing each of the companies for which he consults about the restrictions on his consulting activities." *Id.*

*8 Plaintiff deems these safeguards unsatisfactory. Plaintiff asserts that it is not practical to limit Dr. Gibbs's review to information related to the research and development of its STR multiplex products because of the "intertwined nature of scientific information" in plaintiff's document production. According to plaintiff, at least the following seven technologies "are used in conjunction with STRs and are included in the Promega confidential documents" produced to defendants: DNA purification; DNA quantitation; DNA sequencing; human DNA quantitation; DNA fragment analysis; single nucleotide polymorphism ("SNP") analysis; and application process integration and automation. Dimond Decl., dkt. # 50, at ¶ ¶ 7-8. Plaintiff argues that the intertwined nature of this information, along with Dr. Gibbs's relationship with seven companies that have some connection to one or more of these technologies, should serve to disqualify him as an expert in this case because he will be unable to "compartmentalize knowledge gained from reviewing Promega's confidential documents and [therefore her] companies for which he consults will inevitably benefit from the confidential knowledge gained by [him]."

The sweeping nature of plaintiff's argument serves to undermine it. Were the court to adopt plaintiff's approach, defendants would face a monumental task in locating a well-qualified expert. Although defendants seek to disclose to Dr. Gibbs only "information solely relating to the research and development of Promega's STR multiplex products,"

plaintiff's approach assumes that such disclosure also implicates seven other distinct technologies. Further, plaintiff maintains that scientific advisory board members have a "profound influence on the strategic decisions of [a] company" and that the role of informal adviser is "not ... necessarily of less significance" than that of a scientific advisory board member. *Id* . at ¶ ¶ 14-15. Thus, the logic of plaintiff's argument dictates that any potential expert who sits on a scientific advisory board or informally advises any company involved in STR multiplexing, DNA purification, DNA quantitation, DNA sequencing, human DNA quantitation, DNA fragment analysis, SNP analysis or application process integration or automation that may compete with plaintiff would be unacceptable because Dr. Gibbs cannot compartmentalize the knowledge he will gain as defendants' expert.

In *Advanced Semiconductor*, 1196 U.S. LEXIS 21459, at *8, the defendant objected to the disclosure of confidential information to the plaintiff's expert under the terms of a protective order because the expert would "inevitably misuse [the] information if he consults for [the defendant's] competitors in the future because the information will be in his head." *Id.* The court rejected this argument, noting that "this cannot be the standard to be applied. If it was, then a litigant could successfully object to any active industry consultant in any high technology litigation, thereby giving it power of veto over its adversary's choice of experts." *Id.* Plaintiff's expansive theory regarding the disqualification of experts would give it a similar veto power. Although plaintiff maintains that "[s]urely Applera can hire another expert," I do not share this optimism given plaintiff's intransigent position regarding Dr. Gibbs.

*9 I have examined plaintiff's specific objections regarding the seven companies with which Dr. Gibbs has some affiliation. Plaintiff does not raise any substantial concerns regarding the two companies that Dr. Gibbs advises informally (Picoscript and Genpharmix). Plaintiff's arguments regarding two other companies (Exelixis and Genemachines) deal exclusively with technologies other than the development of STR multiplex products. Plaintiff's bare assertion that these various other technologies are hopelessly intertwined with the technology underlying its STR multiplexing products is insufficient to demonstrate good cause for its proposed order blocking disclosure to Dr. Gibbs. Plaintiff's arguments regarding two different companies (Pyrosequencing and Stratgene) are either speculative ("Stratagene appears to be pursuing" the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 32359938 (W.D.Wis.)
(Cite as: Not Reported in F.Supp.2d)

use of STRs; certain Pyrosequencing technologies
"are likely to compete" with plaintiff's) or involve
technologies or markets other than those associated
with STR multiplexing products.

The seventh company, SeqWright, merits more
attention because Dr. Gibbs is its president and
founder. Plaintiff objects because "SeqWright
performs STR and SNP analysis" and, in particular, it
"promotes its ability to perform multiplex STR
analysis and devise custom multiplex STR analysis
and SNP analysis." However, SeqWright does not
sell STR multiplexing products. Decl. of Dr. Richard
Gibbs, dkt. # 52, at ¶ 6. (It is significant that none of
the seven companies identified by plaintiff sell STR
multiplexing products. *Id.* at ¶ ¶ 6-12.) As
defendants point out, plaintiff has not explained how
this fact squares with its argument that SeqWright
competes with it in the market for the sale of STR
multiplexing products, as opposed to the market for
STR analysis services. Moreover, SeqWright has not
performed STR analysis for any customer for over
two years. *Id.* at ¶ 6. Dr. Gibbs will not have access
to plaintiff's non-public information relating to the
synthesis of fluorescently labeled dye primers, which
is an area of potential competition between
SeqWright and plaintiff. When I add to this Dr.
Gibbs's willingness to abide by the protective order
and forgo any participation in the development or
modification of genetic identity products involving
PCR-based STR multiplexing designed for use in
forensic, paternity or bone marrow transplant
monitoring applications, until two years after the
termination of this litigation, I am convinced that
plaintiff has failed to demonstrate that its motion to
block disclosure to Dr. Gibbs is supported by good
cause.

Accordingly, I conclude that defendants' interest in
selecting Dr. Gibbs as their expert, in conjunction
with the safeguards defendants have proposed,
outweighs plaintiff's speculative fear that it will
suffer competitive injury as a result of disclosing to
Dr. Gibbs limited information related to the research
and development of its STR multiplex products.

## ORDER

*10 IT IS ORDERED that

1. Claims 1 through 5 and 16 of U.S. Patent No.
5,843,660 are construed to require the presence of at
least one of the sets identified in the *Markush* groups
stated in limitation (b) of those claims but do not

exclude the presence of other STR loci in the
multiplex reaction required by limitation (c) of those
claims; and

2. Plaintiff's motion for an order that disclosure of its
trade secrets not be made to Dr. Richard Gibbs is
DENIED. Dr. Gibbs is allowed access to
"confidential" and "attorneys' eyes only" information
relating solely to the research and development of
plaintiff's STR multiplex products. Defendants' trial
counsel are directed to keep a record of the
information disclosed to Dr. Gibbs. Access to this
information is contingent upon the understanding that
Dr. Gibbs (1) is bound by the protective order in this
case; (2) will refrain from consulting or having any
other involvement concerning the development or
modification of genetic identity products involving
PCR-based STR multiplexing designed for use in
forensic, paternity or bone marrow transplant
monitoring applications until two years after the
termination of this litigation; and (3) will inform in
writing each of the companies for which he consults
about these restrictions on his consulting activities.

W.D.Wis.,2002.
Promega Corp. v. Applera Corp.
Not Reported in F.Supp.2d, 2002 WL 32359938
(W.D.Wis.)

Briefs and Other Related Documents (Back to top)

• 3:01C00244 (Docket) (Apr. 24, 2001)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.