EXHIBIT 8

Westlaw.

Not Reported in F.Supp.                                                Page 1

Not Reported in F.Supp., 1991 WL 171689 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, District of Columbia.
SMITH WILSON COMPANY, et al., Plaintiffs,
v.
TRADING AND DEVELOPMENT
ESTABLISHMENT, et al., Defendants.
**Civ. A. No. 90-1125(CRR).**

Aug. 20, 1991.

*ORDER*
CHARLES R. RICHEY, District Judge.
*1 The Court is in receipt of Defendants'
Unopposed Motion to Continue Trial in the
above-captioned case. According to the
Defendants, "a continuance is necessary in order * *
to conduct discovery critical to the case."
*Defendants' Motion* at 3. Apparently, the
Defendants will retain new legal counsel if the
Court grants the continuance.

As counsel well knows, this Court established a
firm discovery cut-off after consulting with counsel
for both sides in open court. *See Smith-Wilson
Company v. Trading and Development
Establishment,* No. 90-1125, Order (D.D.C. May
13, 1991) ("Due to the protracted nature of this
case, the Court warned counsel that the discovery
cut-off date is firm, and that no extensions will be
granted"). In fact, counsel had no objection to the
August 16, 1991 cut-off. Plaintiff's counsel
advised that no further discovery was needed.
Defense counsel stated that four depositions would
need to be taken.

Defense counsel's suggestion that the retention of a
new team of lawyers necessitates an extension of
the discovery deadline stretches the bounds of
credibility. First, defense counsel tried to extricate
herself from the above-captioned case in March of
1991. This request was denied without prejudice

due to a pending motion for summary judgment,
and counsel was advised that she could renew her
motion to withdraw after the summary judgment
briefing schedule was completed. *See
Smith-Wilson Company v. Trading and
Development Establishment,* Civ. 90-1125, Order
(D.D.C. March 6, 1991). Rather than promptly
obtaining replacement counsel, defense counsel has
waited until the eleventh hour-again at a time when
there is a pending deadline. Second, defense
counsel was advised of the pending deadlines in
May of 1991. Rather than completing the four
depositions which she anticipated in the three
intervening months, defense counsel has,
apparently, accomplished nothing.

The Court believes that granting yet another
continuance in this case is not in the interests of
justice. It is the Court's responsibility to efficiently
and fairly manage the docket. In this instance,
granting a continuance would prejudice the
Plaintiff, which has waited long enough for some
resolution of this case. Moreover, granting the
continuance would seriously hamper the Court's
ability to dispense justice to the numerous other
parties competing for time slots on the court
calendar. Should the Defendants not abide by the
Court's May 13, 1991 Pretrial Order, the Court will
impose all appropriate sanctions and costs. *See,
e.g.,* Fed.R.Civ.P. 16(f) (sanctions for failure to
comply with pretrial order); Fed.R.Civ.P.
37(b)(2)(B), (C), (D) (all remedies herein available
as incorporated by Fed.R.Civ.P. 16); *Link v.
Wabash R. Co.,* 370 U.S. 626, 630-632 (1962)
(Court's inherent power to dismiss cases for failure
to prosecute).

Accordingly, it is, by this Court, this 19th day of
August, 1991,

ORDERED that the Defendants' Motion for
Continuance shall be, and hereby is, DENIED; and
it is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1991 WL 171689 (D.D.C.)
**(Cite as: Not Reported in F.Supp.)**

**\*2** FURTHER ORDERED that the parties and all counsel shall comply with the Court's Pre-trial Order of May 13, 1991, or shall face any and all appropriate sanctions.

D.D.C.,1991.
Smith Wilson Co. v. Trading and Development Establishment
Not Reported in F.Supp., 1991 WL 171689 (D.D.C.)

Briefs and Other Related Documents (Back to top)

• 1:90cv01125 (Docket) (May. 14, 1990)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                              Page 1

Slip Copy, 2006 WL 155255 (D.Del.)
**(Cite as: Slip Copy)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
CORNING INCORPORATED, et al., Plaintiffs,
v.
SRU BIOSYSTEMS, et al., Defendants.
**No. Civ.A. 03-633-JJF.**

Jan. 20, 2006.

Richard L. Horwitz, and David E. Moore, of Potter
Anderson & Corroon LLP, Wilmington, Delaware,
Larry L. Shatzer, Andrew E. Rawlins, Kenneth E.
Krosin, and George C. Best, of Foley & Lardner,
Washington, D.C., for Plaintiffs, of counsel.
Steven J. Balick, and John G. Day, of Ashby &
Geddes, Wilmington, Delaware, John J. McDonnell
, Daniel A. Boehnen, Matthew J. Sampson, Richard
A. Machonkin, Patrick G. Gattari, of McDonnell
Boehnen Hulbert & Berghoff LLP, Chicago,
Illinois, for Defendants, of counsel.

*MEMORANDUM OPINION*

FARNAN, J.
*1 Pending before the Court is a Request For
Reconsideration Of November 15, 2005
Memorandum Opinion And Order (D.I.299) filed
by Defendants, SRU Biosystems, LLC, SRU
Biosystems, Inc. and SRU Biosystems Holdings,
LLC (collectively, "SRU"). Corning Incorporated
and Artificial Sensing Instruments ASI AG
(collectively, "Corning") have filed an Opposition
to SRU's request. For the reasons discussed, the
Court will deny SRU's Request For Reconsideration.

I. THE PARTIES' CONTENTIONS

By its Motion, SRU requests the Court to
reconsider its November 15, 2005 decision on three
grounds. Specifically, SRU contends that (1) the

Court overlooked testimony of Corning's own
witness in concluding that the '843 patent was not
invalid for lack of written description; (2) the Court
erroneously excluded the '248 patent which SRU
maintains is relevant to this action; and (3) the
Court should consider whether the '843 patent is
invalid as indefinite as a result of an intervening
development in the law, i.e. the Federal Circuit's
recent decision in *IPXL Holdings, L.L.C. v.
Amazon.com, Inc.,* 430 F.3d 1377 (Fed.Cir.2005).

In response, Corning contends that the Court should
deny reargument, because SRU restates arguments
that have already been made by SRU in its prior
submissions and rejected by the Court. Corning also
contends SRU's request to reconsider the Court's
exclusion of the '248 patent is untimely. As for the
Federal Circuit's recent decision in *IPXL,* Corning
contends that SRU waived any argument related to
indefiniteness by failing to raise an indefinite
argument at any point prior to the instant Request
For Reconsideration.

II. STANDARD OF REVIEW

A motion for reconsideration under Delaware Local
Rule 7.1.5 which is timely filed and challenges the
correctness of a previously entered ordered is
considered the "functional equivalent" of a motion
to alter or amend judgment pursuant to Federal Rule
of Civil Procedure 59(e). [FN1] *In re
DaimlerChrysler AG Securities Litigation,* 200
F.Supp.2d 439, 441 (D.Del.2002) (citations
omitted). The purpose of a motion for
reconsideration filed pursuant to Rule 59(e) is "to
correct manifest errors of law or fact or to present
newly discovered evidence." *Max's Seafood Café v.
Quinteros,* 176 F.3d 669, 677 (3d Cir.1999).
Motions for reargument or reconsideration should
be granted sparingly and may not be used to rehash
arguments which have already been briefed by the
parties and considered and decided by the Court.
*Karr v. Castle,* 768 F.Supp. 1087, 1090

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                            Page 2

Slip Copy, 2006 WL 155255 (D.Del.)
**(Cite as: Slip Copy)**

(D.Del.1991); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990). Thus, a court may only grant reconsideration if there is: (1) a change in the controlling law; (2) newly available evidence; or (3) the need to correct a clear error of law or fact to prevent manifest injustice. *Max's Seafood,* 176 F.3d at 677. With this standard in mind, the Court will address SRU's Request For Reconsideration.

> FN1. Because SRU's motion is made under Del. L.R. 7.1.5, Corning couches its discussion of the standard of review solely in terms of that which is required for reargument. Reargument, like reconsideration, is granted sparingly, but the grounds justifying reargument differ slightly from that which is required for reconsideration. Specifically, reargument is only appropriate where: (1) the court has patently misunderstood a party, (2) the court has made an error not of reasoning, but of apprehension, and (3) the court has made a decision outside the scope of the issues presented to the court by the parties. Though brought under Del. L.R. 7.1.5, the Court believes SRU is seeking reconsideration as evidenced both by the relief it requests and its use of the term " reconsideration" throughout its briefing. However, under either the standard for reargument or the standard for reconsideration, the Court concludes that SRU is not entitled to relief.

### III. DISCUSSION

*A. Whether SRU Is Entitled To Reconsideration Of The Court's Decision To Exclude The '248 Patent*

**\*2** SRU requests the Court to reconsider its decision excluding from evidence the '248 patent. SRU contends that the '248 patent is a continuation of the '843 patent, and thus, relevant to demonstrate that the '843 patent fails to satisfy the written description requirement.

SRU raised these arguments previously, and they have already been considered by the Court. In addition, the Court's decision excluding the '248 patent from evidence was issued on September 27, 2005, with a Memorandum Opinion explaining the Court's decision on October 5, 2005. Thus, SRU was required to raise any motion to reconsider or reargue that decision by October 20, 2005, at the latest. Accordingly, the Court declines to grant reconsideration of its decision to exclude the '248 patent.

*B. Whether SRU Is Entitled To Reconsideration Of The Court's Decision That SRU Failed To Establish Invalidity Of The '843 Patent Based On Lack Of Written Description*

SRU also requests reconsideration of the Court's decision regarding the invalidity of the '843 patent based on the lack of written description. SRU contends that one of ordinary skill in the art would know that the evanescent field can actually extend into the sample more than one wavelength. SRU contends that the testimony of Corning's Dr. Pollock supports its position, and therefore, the Court erred in concluding that the specification teaches that the evanescent wave penetrates less than one wavelength into the sample and that the chemoresponsive layer within the evanescent field must therefore be less than one wavelength thick.

SRU's arguments concerning the written description requirement have already been raised in its previous briefing and considered by the Court. SRU has not demonstrated that reconsideration of these arguments is warranted.

In a letter requesting oral argument on its request for reconsideration, SRU contends that Corning has changed its position regarding what the '843 patent discloses. Specifically, SRU contends that Corning has "now admitted that the '843 patent discloses that 'the thickness of the chemo-responsive layer can be more than the evanescent filed." ' (D.I.312) (citing D.I. 306 at 9). However, it appears to the Court that Corning has always recognized that the '843 patent describes other sensors, such as sensors that work on absorption principles, and that in those types of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 3

Slip Copy, 2006 WL 155255 (D.Del.)
**(Cite as: Slip Copy)**

sensors the thickness of the chemo-responsive layer can be more than the thickness of the evanescent field. D.I. 279 at 25-26; D.I. 275 at PFF 436. However, Corning has also argued that in sensors using adsorption principles, the chemo-responsive layer must be less than the evanescent field, and the Court's discussion of this issue is in the context of an adsorption layer. As such, the Court is not persuaded that it overlooked SRU's arguments or the testimony of Dr. Pollock as it pertains to this issue, and therefore, the Court is not persuaded that reconsideration of the Court's written description decision is warranted.

*C. Whether SRU Is Entitled To Reconsideration In Light Of The Federal Circuit's Decision In IPXL Holdings, L.L.C. Relating To Indefiniteness*

\*3 SRU also contends that reconsideration is appropriate so that the Court can consider whether the '843 patent is invalid for indefiniteness in light of the Federal Circuit's recent decision in *IPXL Holdings, L.L.C. v. Amazon.com, Inc.,* 430 F.3d 1377 (Fed.Cir.2005). In *IPXL,* the Federal Circuit concluded that an invention is invalid for indefiniteness if it is a combination of two statutory classes of the invention. However, SRU did not raise an indefiniteness defense in response to Corning's Interrogatories requesting SRU's defenses, in the Joint Proposed Pretrial Order, at trial or in any of its original post-trial submissions. Although SRU contends that the *IPXL* decision was reached by the Federal Circuit as a matter of first impression, the Court notes that this type of indefiniteness argument was available to SRU well before the trial in this case, despite the lack of available Federal Circuit precedent on point. Specifically, the U.S. Patent & Trademark Office concluded in a published decision fifteen years ago that a patent claim is invalid if it is a combination of two statutory classes of invention. *See Ex parte Lyell,* 17 U.S.P.Q.2d 1548, 1552 (Bd. Pat.App. & Inter.1990). Further, the United States District Court for the Eastern District of Virginia reached the same conclusion in the *IPXL* case more than a year ago and before the trial in this case. In addition, SRU has not offered any reasons for its failure to pursue this argument earlier. Accordingly,

the Court concludes that SRU's argument related to indefiniteness has been waived, and therefore, it is not the proper subject of a motion for reargument. *See e.g., Davis v. Mountaire Farms, Inc.,* 2005 WL 180054, \*1 (D.Del. Jul. 29, 2005) (declining to address newly raised argument and recognizing that such an argument is "not properly the subject of a motion for reargument").

CONCLUSION

For the reasons discussed, the Court will deny SRU's Request For Reconsideration Of November 15, 2005 Memorandum Opinion And Order.

An appropriate Order will be entered.

*ORDER*

At Wilmington, this *20* day of January 2006, for the reasons set forth in the Memorandum Opinion issued this date;

IT IS HEREBY ORDERED that SRU's Request For Reconsideration Of November 15, 2005 Memorandum Opinion And Order (D.I.299) is *DENIED.*

D.Del.,2006.
Corning Inc. v. SRU Biosystems
Slip Copy, 2006 WL 155255 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03cv00633 (Docket) (Jul. 10, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Page 1

Not Reported in F.Supp.2d, 2002 WL 1467370 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
Harold LEONARD, Plaintiff,
v.
UNIVERSITY OF DELAWARE, a corporation of
the State of Delaware, Paul Mettler, and Mary
Martin, Defendants.
No. CIV.A. 96-360-GMS.

July 9, 2002.

ORDER

SLEET, District J.

I. INTRODUCTION

*1 On July 2, 1996, Harold Leonard ("Leonard")
filed the above-captioned action against the
University of Delaware ("the University"), Paul
Mettler, and Mary Martin (collectively "the
defendants") for violating his constitutional right to
due process and for breaching a prior settlement
agreement. The parties reached a settlement on
November 21, 2001. On May 24, 2002, the court
granted the defendants' motion to enforce this
settlement. In that order, the court also awarded the
defendants reasonable attorneys' fees incurred in
preparing the motion to enforce the settlement
agreement.

Presently before the court is the defendants' fee
petition and motion to deduct the fees from the
settlement amount. For the following reasons, the
court will award the defendants reasonable
attorneys' fees. The court will further grant the
defendants' motion to deduct the fees from the
settlement amount.

II. DISCUSSION

A. Reasonableness of Fees

The defendants request fees and expenses in the
amount of $6,900.87. Leonard objects to the
reasonableness of these fees because the fee
petition: (1) lacks an affidavit establishing a normal
billing rate; (2) lacks appropriate documentation as
to the hours expended and the hourly rate; and (3)
lacks evidence supporting the reasonableness and
necessity of the expenses for which reimbursement
is sought. [FN1]

> FN1. The court is also in receipt of the
> Leonard's letter dated June 19, 2002,
> which he filed without the assistance of his
> counsel. The letter contains arguments
> solely to the effect that the court should
> not have enforced the settlement
> agreement and that an award of attorneys'
> fees was inappropriate in this case. The
> letter does not contest the amount of
> attorneys' fees enumerated in the fee
> petition presently pending before the court.
> Thus, to the extent that the letter is a
> motion for reconsideration of the court's
> May 24, 2002 Memorandum and Order, it
> will be disregarded as untimely. *See* Local
> Rule 7.1.5.

With regard to Leonard's first concern, the court is
unpersuaded that the lack of an affidavit renders the
fee petition invalid. As the defendants correctly
note, the court awarded attorneys' fees as a sanction
against Leonard because he acted vexatiously and in
bad faith. As such, the court is eminently capable of
determining whether the requested fees are a
reasonable sanction without the aid of an affidavit.

As to Leonard's second concern, the defendants
themselves have already remedied the fee petition's
alleged defect. Accordingly, the defendants have
now provided the court, and Leonard, with a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 2

Not Reported in F.Supp.2d, 2002 WL 1467370 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

detailed description of the time expended and the hourly rate utilized for each task. After reviewing this information, the court finds that an award of attorneys' fees in the amount of $5,837.75 is reasonable, and will suffice as an appropriate sanction against Leonard.

The defendants additionally request that the court award them $1,063.12 in costs and expenses. The court declines to do so as it has concluded that the above-determined award of attorneys' fees is an adequate sanction on these facts.

### B. Deduction of Fees From the Settlement Agreement

The defendants further ask that the court authorize them to deduct the amount of attorneys' fees awarded to them from the amount owed to Leonard under the settlement agreement. Indeed, the defendants submit that such protection is their best, and perhaps only, chance of recovering the awarded attorneys' fees. Given the tortured history of this case, and specifically the behavior that led the court to sanctioning Leonard, the court will grant this request. In so ordering, the court concludes that this outcome is a fair and prudent manner of safeguarding the funds in dispute.

### III. CONCLUSION

*2 For the foregoing reasons, IT IS HEREBY ORDERED that:
1. The Defendants' fee petition (D.I.251) is approved in the amount of $5,837.75.
2. The Defendants shall deduct this amount from the $6,900.87 currently held in escrow and promptly remit the remainder of the amount held in escrow to the Plaintiff.

D.Del.,2002.
Leonard v. University of Delaware
Not Reported in F.Supp.2d, 2002 WL 1467370 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:96cv00360 (Docket) (Jul. 02, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                             Page 1

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
David T. SPRINGER, M.D., Plaintiff,
v.
Renata J. HENRY, individually and, in her official
capacity as Director of the Division of Alcoholism,
Drug Abuse and Mental Health of the Department
of Health and Social Services of the State of
Delaware and Gregg C. Sylvester, M.D., in his
official capacity as Secretary of the Department of
Health and Social Services of the State of Delaware,
Defendants.
**No. C.A. 00-885 GMS.**

Sept. 16, 2004.

Thomas S. Neuberger and Stephen J. Neuberger of
The Neuberger Firm, P.A., Wilmington, Delaware
for the plaintiff.
Phebe S. Young and Marc P. Niedzielski of the
Department of Justice, Civil Division, Wilmington,
Delaware for the defendant.

*MEMORANDUM OPINION*

SLEET, J.

I. INTRODUCTION

*1 Presently before the court are the parties motions
for post-trial relief. Following a four-day jury trial,
in which the jury concluded that the defendant,
Renata Henry ("Henry"), the director of Delaware's
Division of Alcoholism, Drug Abuse and Mental
Health, retaliated against the plaintiff, Dr. David T.
Springer ("Springer"), for expressions of protected
speech, in violation of the First Amendment to the
United States Constitution. The plaintiff was
awarded damages accordingly. The defendant now
challenge the verdict and moves for a new trial. The
plaintiff seeks reinstatement and attorneys' fees,

interest, and costs. For the reasons stated below, the
court will grant in part the defendants' motion
challenging the damages award. The verdict will
otherwise stand. The judgment for a new trial will
be denied. Likewise, the plaintiff's motion for
reinstatement will be denied. The court will grant
the plaintiff's motion for fees, interest, and costs
based on the adjusted award.

II. BACKGROUND

A. Procedural History

The plaintiff Springer filed a complaint on October
6, 2000, seeking compensatory and punitive
damages, as well as injunctive relief for "retaliatory
violations of the free speech and petition clauses of
the First Amendment of the U.S. Constitution."
(D.I.1). Springer named Renata Henry, individually
and in her official capacity as Director of the
Division of Alcoholism, Drug Abuse and Mental
Health ("DADAMH") of the Delaware Department
of Health and Social Services ("DDHSS"), Dr.
Gregg Sylvester, in his official capacity as Secretary
of the DDHSS, and the DDHSS as defendants.
(D.I.1). In his complaint, Springer requested,
among other relief, compensatory damages, punitive
damages, attorneys' fees and costs, and
reinstatement. (D.I.1). On June 19, 2001, the parties
stipulated to dismiss the DDHSS and "all claims for
monetary damages against the two individual
defendants in their official capacities, if any such
claims were implicit in the Complaint." [FN1]
(D.I.24).

> FN1. Effectively, this dismissed Dr.
> Sylvester from the action. Since he is no
> longer Secretary, he has no authority to
> reinstate Dr. Springer to his former
> position. As such, the remaining injunctive
> claim for reinstatement against Sylvester is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 2

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

     moot. Thus, in spite of the parties use of both the singular and plural tenses when referring to the defendant(s), it seems clear that only one defendant remains in this action-Renata J. Henry.

The defendant Henry moved for summary judgment on November 9, 2001, arguing that Springer's speech was not protected; that, in the alternative, it was disruptive; that his termination was inevitable given his failure to submit a bid; that, regardless, Springer has not suffered any damages; and, finally, that Henry was entitled to qualified immunity. [FN2] (D.I.47). Springer cross-moved for partial summary judgment on November 19, 2001, arguing that his speech was protected under the First Amendment, and that Henry was not entitled to qualified immunity. On March 11, 2002, the court denied Henry's motion for summary judgment and granted Springer's cross-motion for partial summary judgment. (D.I.47). The court concluded that Springer's speech was protected and that Henry was not entitled to qualified immunity. (D.I.47). Specifically, the court identified the memorandum dated November 23, 1999, and a report filed with the Governing Body on March 21, 2000, as protected speech. (D.I.47, pp. 3-4). The issues that remained to be decided by a jury at trial were whether Henry terminated Springer because of his exercise of protected speech, and, whether as a result of his termination, Springer suffered any damages. On March 18, 2002, Henry and Sylvester appealed the Order. However, their appeal was dismissed on November 29, 2002.

     FN2. Dr. Sylvester was part of the Motion for Summary Judgment, however, given the above stipulated dismissal, his involvement is irrelevant to the recitation of facts.

*2 The case proceeded to trial on March 29, 2004, and took place over the course of four days. The jury returned a verdict in favor of Springer. He was awarded $998,895 in damages, but was not reinstated to his position at the DPC. (D.I.98). The parties submitted post-trial motions, which the court presently considers.

B. Factual Background

1. Springer's Contract

Springer began working for the DPC as a part-time independent contractor physician in 1991. [FN3] (B0339). [FN4] He worked under annual contracts that were automatically renewed for nine years until June of 2000. (B0343). From 1991 to 2000, Springer's contracts specified that the contract term was for one year and could be terminated without cause upon fifteen days notice. The contract terms did not guarantee renewal. Nevertheless, until 2000, Springer's contract was renewed each year.

     FN3. In 1991, DPC was known as Delaware State Hospital. Nevertheless, Delaware State Hospital and DPC are the same entity.

     FN4. B followed by a number refer to the pages in the plaintiff's four volume post-trial motions appendix.

In 1991 Springer's billing rate was eighty dollars per hour. At some point it raised to ninety and at the time of his termination, his rate was ninety-three dollars per hour. (B0371). His contracts stated that he would work 30 hours per week for 50 weeks, for a total of 1500 hours per year. (B0341). At ninety three dollars per hour, Springer's annual pay from the DPC was $139,500. (B0340). When he began, his duties included being the Assistant Residency Training Director. In 1993 he was promoted to the position of Residency Training Director. (B0348). In addition, Springer served as a member of the Credentials Committee [FN5] from 1993 to 2000. (B0386). He was also the Chairman of the Medical Staff Executive Committee ("Executive Committee" ) from 1999 to 2000. (B0387).

     FN5. The Credentials Committee is a committee composed of physicians who conduct peer review of physician performance and the qualifications of physicians who apply for jobs or contracts.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 3

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

(B0386).

2. Events Leading up to Springer's Termination

In 1996, the Delaware General Assembly amended the Delaware Procurement Act, 29 Del. C. ch. 69, to provide that all contracts for professional services exceeding $50,000 per year must be subject to public bidding. (B0830). The provision went unenforced at the DPC until early 2000, when Dr. Sylvester, Secretary of the DDHSS, instructed his division directors to comply with the Act and require public bidding on professional service contracts.

DADAMH, a subdivision of DDHSS, oversaw the administration of the Delaware Psychiatric Center (hereinafter the "DPC" or "hospital"). The defendant Renata Henry was hired as the Director of DADAMH in 1999. [FN6] (B0740). Her boss, Dr. Sylvester, began his term as the Secretary of DDHSS in October of 1997 and served in that capacity until January of 2001. [FN7] (B0222-0225).

> FN6. Although she served as director of DADAMH, Ms. Henry is not a physician.

> FN7. He started as Acting Cabinet Secretary of the DDHSS in October 1997, and was sworn in as the official Secretary in January 1998, under Governor Carper. (B0222-225)

On October 21, 1999, the DPC psychiatric residents drafted a memo to then Governor Carper, Dr. Sylvester, Dr. Springer, and other hospital staff, articulating their concerns regarding the egregious conditions of the DPC. (B1154-1157; PX1 [FN8]). They also sent the memo to the News Journal and the Department of Public Safety. (B1157). In the memo, the residents cited problems such as under-staffing, overcrowding, low morale, poor security, inadequate treatment, and overall unsafe conditions for the staff as well as the patients. *Id.* The residents expressed a concern that the residency program was suffering as a result. *Id.* The memo received media attention and was the subject of a series of editorials. (B1158).

FN8. PX = Plaintiff Exhibit

*3 On November 23, 1999, a number of the DPC Medical Staff Executive Committee officers echoed the residents' attempt to expose the conditions. They drafted a memo entitled "Critical Issues in the Care of the Mentally Ill in Delaware." (B1158; PX7). Springer was the President of the Committee at the time the letter was drafted. The memo was addressed to the Governor, the DPC Governing Board, and Henry. (B1158). The memo generally reiterated many of the same concerns expressed by the residents, in particular, the decline of the residency program. The executive Committee invited the DPC Governing Body to schedule a series of emergency meetings with it to discuss hiring teaching psychiatrists to save the residency program. (B1158-59). In a prior ruling, the court already determined that this memo constituted speech protected under the First Amendment. (D .I. 47).

On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted another memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action. (B1162-63).

At some point following the initial memo by the residents, the Delaware News Journal ran several highly critical articles about the DPC. In December 1999, the federal Healthcare Financing Administration (FHA) threatened to withdraw 6.5 to 7 million dollars in federal funding to the DPC. (B0234-37; B0297). Given the growing notoriety of the conditions at the hospital and the threat from the FHA to withdraw funding, Henry felt pressured to effect immediate improvements. (B0747-48;

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 4

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

B0268). In response to the pressure, she requested temporary credentialing for a particular physician applicant. At trial, she testified that the DPC needed the physician applicant in order to meet the federal requirements concerning the ratio of psychiatrists to patients. (B0747). At first, Springer objected to credentialing the physician applicant. Henry was frustrated with Springer because she felt he was obstructing the credentialing process. (B0274; B0301).

On January 7, 2000, Springer was approached by Mr. Giarow Shimono ("Shimono"), the hospital director at the time, about credentialing the physician applicant on an emergency basis. (B0431). Springer told Shimono about his concerns regarding the physician applicant. Springer testified that Shimono wanted to put the physician applicant on duty anyway. Springer had no authority himself to issue emergency credentials. (B0432-33). Springer informed Shimono that he had documents to support his concerns about the physician applicant. (B0434; B0438). He kept the documents at his home office. (B0435). The documents, drafted in 1997, included an email to "Dr. Smoyer or the credentials committee," a memo addressed to the credentials committee, and "one was just a memo to [Springer's] own file." (B0435). Henry asked Springer to produce the documents. (B0435). In response, Springer wrote a letter to Henry dated January 7, 2000, advising her to consult with an attorney about whether Springer was permitted to disseminate the "peer review material." (B0436-37). As it turned out, the Attorney General's office concluded that Henry was allowed to view the materials. (B0438). Springer accordingly produced them. (B0438).

*4 On January 26, 2000, Springer drafted a report in preparation for a meeting with the Governing Body scheduled for January 29, 2000. (B1164-74). He did not, however, present the report until March 21, 2000. (B1152; B1164-74). In the report, Springer alleged that the tension between the administrators and the medical staff was causing physicians to practice below their "minimal ethical standards." He threatened to notify regulatory agencies of the conditions in order for them "to intervene and demand improvements." (B1164). As

well, he accused the administration of granting temporary privileges to a psychiatrist in violation of medical staff bylaws. (B1165). He said the administration's action was prompted by an unannounced site visit from Medicare. (B1165). The court determined by way of summary judgment that this memo constituted speech protected under the First Amendment. (D.I.47).

The Credentialing Committee met twice with regard to this particular applicant, on April 27 and May 2, 2000. *Id.* At the first meeting on April 27, three members of the Credentialing Committee voted to grant partial privileges to the physician applicant, two members, including Springer, voted not to grant privileges. (B0408-10). On May 2, 2000, the Executive Committee met to consider the recommendation of the Credentialing Committee. (B0405-06). The Executive Committee elected to grant the physician applicant partial privileges. (B0413). Springer testified that Henry refused to sign the physician applicant's credentialing unless he was given full unrestricted privileges. (B0413).

On May 12, 2000, Henry sent Springer a letter informing him that his contract with DADAMH would not be renewed. (B1175). The letter indicated that DADAMH would be publishing requests for proposals and invited Springer to respond. (B1175). Springer testified that he did not receive the letter until May 15, 2000. (B0424). The deadline to submit a proposal was May 17, 2000. (B1176). The request for proposals had been public since April 10, 2000, and the deadline to ask questions about the bid was April 19, 2000, by 4:30 p.m. (B0429; B0774). Springer was only on notice of the request as of his receipt of Henry's letter on May 15. (B0424). Springer asked Melody Lasana, DADAMH's Contract Manager, for an extension of the deadline. (B1176). His request was denied. (B1176).

### 3. Post-Termination

Springer asserts that the non-renewal of his contract was based on his comments to the Governor. Henry testified that the reason Springer was not automatically renewed was because "not only were

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Page 5

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

we under the gun at the hospital, but we also had just had a series of rulings in reference to how the department was doing contracts and indicating that we were out of compliance as we continued to renew, renew, renew, renew year after year after year without putting things out to bid. And this was department-wide as well as in the division that I stepped in to run." BO816. She stated that she was unable to ask all of the independent contractor physicians to rebid in a single year. She testified that she chose Springer because to her knowledge there were no other physicians that had been there as long as he had without ever having been asked to rebid. (B0817).

*5 Springer alleges that he suffered losses as a result of his termination and has been unable to find employment comparable to the work he did as Residency Training Director. Accordingly, he filed the present action against the defendant on October 6, 2000. (D.I.1).

At the conclusion of the trial, the jury returned the following verdict. When asked if Springer proved by a preponderance of the evidence whether his protected activity was a substantial or motivating factor in the decision not to renew his contract, the jury answered, "Yes." (B1585). In particular, the jury found that plaintiff's exhibits two through five were the instances of protected activity that motivated the decision not to renew his contract. (B1586). Exhibits two and five were Springer's memorandum dated November 23, 1999, and the report he prepared in preparation for the meeting with the Governing Body on March 21, 2000. Exhibits one, three, and four were, respectively, a memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999.

When asked if Henry proved by a preponderance of the evidence that "regardless of [Springer's] exercise of his First Amendment rights, that she would not or could not have renewed his contract in July 2000," the jury answered, "No." Id. When asked if Springer suffered any actual injury from

not being offered a new contract, the jury answered, "Yes." (B1587). The jury found Springer suffered damages in the amount of $285,464 up to present, and $588,431 into the future. Id. The jury also found that Springer suffered $100,000 in non-economic damages. Id. Finally, when asked if the defendant acted recklessly, intentionally or maliciously with regard to Springer, the jury answered, "Yes." (B1589; D.I. 92). Accordingly, the jury awarded Springer $25,000 in punitive damages. The court entered the Judgment on April 5, 2004, "for damages plaintiff suffered which were proximately caused by not being offered a new contract ... in the amount of [$285,464]; [$588,431] for future damages; and finding in favor of plaintiff for non-economic damages in the amount of [$100,000]; and on the additional verdict form awarding plaintiff punitive damages in the amount of [$25,000]." The parties filed post-trial motions which the court now considers.

### III. STANDARD OF REVIEW

#### A. Renewed Motion for Judgment as a Matter of Law

Pursuant to Federal Rule of Civil Procedure 50, a court may render judgment as a matter of law (JMOL) after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Walter v. Holiday Inns, Inc.*, 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). If the court denies a motion for JMOL during trial, the motion may be renewed within ten days of entry of judgment in the case. Fed. R. Civ. P. 50(b). To prevail on a renewed motion for JMOL following a jury trial, a party " 'must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings. " ' *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed.Cir.1998) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed.Cir.1984)). " 'Substantial' evidence is such relevant evidence from the record taken as a whole

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

as might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp.,* 732 F.2d. at 893. In assessing the sufficiency of the evidence, the court must draw all reasonable inferences from the evidence in the light most favorable to the non-moving party. *Id.; Richardson-Vicks Inc. v. UpJohn Co.,* 122 F.3d 1476, 1479 (Fed.Cir.1997). The appropriate inquiry is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did. *Dawn Equip. Co. v. Kentucky Farms, Inc.,* 140 F.3d 1009, 1014 (Fed.Cir.1998). The court may not determine the credibility of the witnesses nor "substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer Corp.,* 732 F.2d at 893.

### B. Motion for a New Trial

*\*6* The court may grant a new trial pursuant to Federal Rule of Civil Procedure 59 "for any of the reasons for which new trials have heretofore been granted in actions of law in the courts of the United States." Fed. R. Civ. P. 59(a). A court should grant a new trial in a jury case, however, only if "the verdict was against the weight of the evidence ... [and] a miscarriage of justice would result if the verdict were to stand." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1352 (3d Cir.1991). In making this determination, the trial judge should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts. *Lind v. Schenley Industries, Inc.,* 278 F.2d 79, 89 (3d Cir.), *cert. denied,* 364 U.S. 835 (1960).

### IV. DISCUSSION

### A. HENRY'S MOTIONS

The defendant argues that she is entitled to judgment as a matter of law under Rule 50 on the issue of qualified immunity, on damages, and on the plaintiff's substantive claim of retaliation. In the alternative, the defendant argues that she should be granted a new trial under Rule 59 because she was

denied a fair trial. She bases this claim on the following alleged errors: (1) that the court failed to make essential rulings of law on the protected nature of Dr. Springer's communications and on the existence of qualified immunity, and to charge the jury in accordance therewith; (2) that the court excluded critical evidence; and (3) that the plaintiff's counsel's made racially inflammatory comments during his rebuttal.

### 1. Henry's Motion for Judgment as a Matter of Law

### a. Whether Henry is entitled to qualified immunity

As noted in the plaintiff's opposition brief, the court already ruled that Henry was not entitled to qualified immunity as a matter of law. (D.I. 47, Memorandum and Order ("the court finds that Ms. Henry is not entitled to qualified immunity")). As such, the court construes defendant's motion as an untimely motion for reconsideration of its previous summary judgment ruling.

As a general rule, motions for reconsideration should be granted only "sparingly." *Karr v. Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In this district, these types of motions are granted only if it appears that the court has patently misunderstood a party, has made a decision outside the adversarial issues presented by the parties, or has made an error not of reasoning, but of apprehension. *See, e.g., Shering Corp. v. Amgen, Inc.,* 25 F.Supp.2d 293, 295 (D.Del.1998); *Brambles USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240 (D.Del.1990) (citing *Above the Belt, Inc. v. Mel Bonhannan Roofing, Inc.,* 99 F.R.D. 99 (E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090 (citing same). Moreover, even if the court has committed one of these errors, there is no need to grant a motion for reconsideration if it would not alter the court's initial decision. *See Pirelli Cable Corp. v. Ciena Corp.,* 988 F.Supp. 424, 455 (D.Del.1998). Finally, motions for reconsideration "should not be used to rehash arguments already briefed." *TI Group Automotive Systems, (North America), Inc. v. VDO North America L.L.C.,* 2002 U.S. Dist. LEXIS 1018, 2002 WL 87472 (D.Del.2002) (citation omitted); *see also*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 7

*Quaker Alloy Casting v. Gulfco Industries, Inc.,*
123 F.R.D. 282, 288 (N.D.Ill.1988) ("This Court's
opinions are not intended as mere first drafts,
subject to revision and reconsideration at a litigant's
pleasure."). The defendant is merely rehashing
exhausted arguments. No additional evidence was
introduced at trial to change the court's
understanding of the issue. Henry is not entitled to
qualified immunity for the reasons stated in the
court's Memorandum and Order dated March 11,
2002. [FN9]

> FN9. The court stated:
> Henry is not entitled to qualified immunity.
> Although state officials may be sued in
> federal court, their liability may be limited
> by the doctrine of qualified immunity,
> which permits officials to avoid liability
> for actions performed in the course of their
> official duties. The Supreme Court
> recently affirmed the two part test for
> qualified immunity. First, the court must
> determine whether the facts alleged, taken
> in the light most favorable to the plaintiff,
> are sufficient to show that the defendant
> violated a constitutional right. *See Saucier
> v. Katz,* 121 S.Ct. 2151, 2155-56 (2001).
> Second, if a constitutional violation can be
> demonstrated on the facts alleged, the
> court must next consider whether the right
> was clearly established at the time of the
> alleged violation. *See id.* at 2156. In
> *Saucier,* the court further clarified that the
> right must be established in a "
> particularized" sense, meaning that "the
> contours of the right must be sufficiently
> clear that a reasonable official would
> understand that what he is doing violates
> that right." *See id.* Additionally, the court
> noted that although the court must decide
> whether the facts alleged-not proved-by
> the plaintiff amount to a constitutional
> violation, even where there may be a
> material issue of fact, if the law did not put
> the officer on notice that his conduct was
> unlawful, summary judgment may be
> permissible. *See id.* at 2156-57.
> The parties here contest only whether

Springer's rights were clearly established at
the time he was terminated. A right is
clearly established where "it would be
clear to a reasonable officer that his
conduct was unlawful in the situation he
confronted ." *See id.* at 2156. More
specifically, a right is clearly established
where case law speaks "with obvious
clarity to the specific conduct in question."
*United States v. Lanier,* 520 U.S. 259, 271
(1997).
Relevant Supreme Court precedent
establishes that "independent government
contractors cannot be terminated for
exercising their First Amendment rights."
*Board of Comm. Wabaunsee v. Umbehr,*
518 U.S. 668, 686 (1996). *See also
O'Hare Truck Service, Inc. v. City of
Northlake,* 518 U.S. 712, 721 (1996)
(noting same). Thus, the Supreme Court
has recognized on at least two occasions
that an independent contractor-such as Dr.
Springer-has a constitutional right to free
speech. Therefore, it cannot be more clear
that this right was clearly established.
The defendant assert that this court should
be persuaded by *Hauge v. Brandywine
School District,* 131 F.Supp.2d 573 (D.Del
2001). In that case, the court held that the
right to be free from retaliation was not
clearly established because due to the "
fact-intensive nature of the *Pickering*
balancing test," the officials were not on
notice that their conduct violated the First
Amendment. *Id.* at 584. The court will not
follow *Hauge* for two reasons. First, the
court is persuaded by the plaintiff's
contention that *Hauge,* although it may
have been correctly decided on the record
before that court, is unique. Although the
*Hauge* court granted qualified immunity
based on the fact-intensive balancing
required by the *Pickering* test, neither the
plaintiff nor the defendant have presented
any authority to permit this court to
conclude that the *Pickering* balancing test
must always lead to a denial of qualified
immunity. If the court were to accept the
defendant' position, qualified immunity

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 8

could never be denied in First Amendment retaliation cases. This is an extreme result, one the *Hauge* court probably did not intend and one that this court will not sanction.

Second, this case is factually distinguishable from *Hauge*. *Hauge* involved a school district administrator who brought allegations of fraud against the school district. *See id.* at 577-578. This case involves a physician who spoke on the various problems confronting hospital administration. Under facts very similar to those in this case, courts have found that the right to speak was clearly established. *See Schneiner,* 152 F.Supp.2d at 493 (" There is no doubt that the plaintiff [physician's] rights under both the First Amendment and the Fourteenth Amendment [to comment on health care at the hospital] were clearly established at the time the plaintiff was disciplined."). Thus, considering the facts before this court, this court also finds that Springer's right was clearly established at the time he spoke.

Finally, the defendant contend that the plaintiff's right was not clearly established because under the new bidding process, his contract was not certain to be renewed. As Springer notes, however, independent contractors are entitled to First Amendment protection where there is a *pre-existing* contractual relationship. *See Umbehr,* 518 U.S. at 685 (noting that holding establishing right to First Amendment speech was limited to independent contractors with "preexisting commercial relationship" with government). Springer had been under contract with the DPC since 1991. Thus, it is clear that he had a pre-existing commercial relationship. The court therefore rejects the defendant' argument on this issue.

For these reasons, the court finds that Ms. Henry is not entitled to qualified immunity. D.I. 47, pp. 11-13.

*7 Therefore, the court concludes that there is no

reason to disturb the verdict on the basis that Henry was entitled to qualified immunity.

**b. Whether Springer suffered any damages**

Henry argues that Springer is not entitled to any damages, be they economic damages for past economic loss to date of trial and/or projected future losses, general damages for harm to reputation, and/or punitive damages.

**I. Economic damages**

The jury awarded Springer economic damages to compensate Springer for past and future economic losses. Defendant argues that Springer is not entitled to economic damages for two reasons. First, she asserts that it was incorrect to assume that Springer's contract would have been renewed until his projected retirement date. Second, Henry argues that Dr. Andrisani's testimony alone was insufficient to support the award. (D.I.126, pp. 19-20). She contends that the "sole evidence in support of plaintiff's claim for economic damages was the opinion testimony of John Andrisani, Ph.D." (D.I.126, p. 19).

Whether Springer's contract would have been renewed but for his memos was a question of fact properly before the jury. The court cannot conclude that the evidence was insufficient to support a finding that the DPC would have continued its practice of automatically renewing Springer's contract had it not drafted and disseminated the controversial memos.

Likewise, the court cannot conclude that Dr. Andrisani's testimony was insufficient to support the jury's award of economic damages. The only evidence the defendant presented to contradict Dr. Andrisani's testimony was their own expert, Dr. Link. The issue came down to a battle of experts. It is within the province of the jury to determine which expert is more credible. *See Lansdale v. Philadelphia Electric Co.,* 692 F.2d 307, 313 (3d Cir.1982) ("The battle of the experts was waged in the trial court before the jury. The jury resolved the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                          Page 9

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

factual dispute. What Lansdale lost, fairly and squarely, at the hands of a jury cannot be retrieved by converting a factual controversy into an issue of law. *Id.*" ). Upon review of the experts' testimony, the court concludes there was sufficient evidence to believe Dr. Andrisani's calculation of loss. [FN10]

> FN10. Henry raises no challenge to the qualifications of Springer's expert or the methodology that he employed in calculating the plaintiff's damages. Moreover, the court could discern no colorable issue in this regard.

### ii. General damages

The jury awarded Springer non-economic damages in the amount of $100,000 for harm to his reputation. Henry contends that there is no evidence in the record to support a finding of harm to Springer's reputation.

The court agrees with the defendant that a reasonable jury could not have concluded based on the evidence in the record that Springer has suffered any loss to his reputation. Springer cites to the fact that Henry discussed her frustrations regarding Springer's conduct with Dr. Sylvester, a preeminent physician in the community, as the cause of the damage to his reputation. However, at trial, Dr. Sylvester testified that he had no reason to doubt that Springer is "committed to quality healthcare for patients" and that he is a "skilled clinician." (B0237). Even drawing all reasonable inferences from the evidence in a light most favorable to the plaintiff, a reasonable jury could not have arrived at the conclusion that Springer's reputation suffered.

### iii. Punitive damages

*8 The jury awarded Springer $25,000 in punitive damages. Henry contends that the record is insufficient to support a punitive award. Although the court may not have reached the same decision had this been a bench trial, it is not in a position to " substitute its choice for that of the jury between conflicting elements of the evidence." *Perkin-Elmer*

*Corp.,* 732 F.2d at 893. Therefore, the punitive award will stand.

Punitive damages are appropriate when "the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade,* 461 U.S. 30, 56 (1983). The record contains evidence to support a finding that Henry acted with, if not evil intent, then reckless indifference to Springer's federally protected rights. The trial record contains evidence that Henry was upset about Springer's memos. She felt that they preached "blatant mistruths." (B0746). Despite the pressure she was under to enforce the bidding process, Springer was the only independent contractor psychiatrist asked to submit a proposal that year. The timing of the non-renewal of his contract could be viewed as suspect given that it occurred in relatively close proximity to the drafting of his controversial memoranda. As well, Henry notified Springer only five days, at best, before the proposal deadline despite the fact that the position had been advertised for over a month. Springer testified he received her letter only two days before the proposal deadline. As such, the court will not upset the punitive award. A reasonable jury could have concluded that Henry was motivated by evil intent or reckless indifference.

In conclusion, the court reduces the damages award by $100,000. There is insufficient evidence in the record for a reasonable jury to conclude that Springer's reputation has been damaged. The remaining damages, economic and punitive, are preserved.

### c. Whether, as a matter of law, the evidence is sufficient to support a finding of retaliation

In order to establish that his contract was not renewed in retaliation for exercising his First Amendment rights, Springer first had to demonstrate that his speech was protected. *See Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997). Next, he had to establish that his protected speech was a substantial or motivating factor behind the alleged retaliation. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                      Page 10

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*id.* Finally, if Springer established these two
elements, the burden would then shift to the
defendant to demonstrate that the same action
would have been taken if the speech had not
occurred. *Id.; see also Carter v. Del. State Univ.,*
2002 U.S. Dist. LEXIS 4721, at *5 (D.Del. Mar.
21, 2002).

Here, the court decided as a matter of law that
Springer's memorandum dated November 23, 1999,
and the report he prepared in preparation for the
meeting with the Governing Body on March 21,
2000, constituted protected speech. (D.I.47). The
jury determined that those materials, as well as the
memo from the Executive Committee dated
December 2, 1999, and the memo from Springer to
the Governing Body outlining a proposed agenda
for a future meeting dated December 16, 1999,
constituted instances of protected activity that were
a substantial or motivating factor in the decision to
not renew Springer's contract. (B1585; D.I. 90).
The jury also found that Henry failed to prove that
regardless of Springer's protected speech, she would
not or could not have renewed Springer's contract.

*9 Henry argues that "[p]laintiff's entire case
regarding the substantive claim of First Amendment
retaliation is based on the temporal relationship
between his protected writings ... and Renata
Henry's May 12, 2000 courtesy letter." (D.I.126, p.
22). She contends that the temporal relationship is
not close enough according to the Supreme Court.
*Id.* (citing *Clark County Sch. Dist. V. Breeden,* 532
U.S. 268 (2001)).

The court rejects this argument because, viewing
the record as a whole, there was evidence other than
the proximity in time of Springer's speech and
Henry's non-renewal letter to suggest that the
protected writings were the substantial and/or
motivating factor in Henry's decision not to renew
Springer's contract. The record indicates that Henry
felt that Springer's conduct was insubordinate and
disruptive. She felt he was obstructive to the
credentialing process. This evidence viewed in
conjunction with the temporal element, is
substantial enough for a reasonable jury to conclude
that Springer's protected speech was a motivating
factor in Henry's decision not to renew his contract.

As well, a reasonable jury could have concluded
that Henry failed to prove that she would not or
could not have renewed Springer's contract
regardless of his exercise of protected speech.

### 2. Henry's Motion for a New Trial or, in the Alternative, Motion to Amend the Judgment or Other Relief

As stated above, a new trial may be granted where "
the verdict is contrary to the great weight of the
evidence." *Roebuck v. Drexel Univ.,* 852 F.2d 715,
735 (3d Cir.1988). For the reasons that follow, the
court concludes that Henry is not entitled to a new
trial.

### a. Whether the court failed to make required findings on the protected nature of Springer's communications and on the existence of qualified immunity, and thus failed to properly charge the jury on these issues; and, whether the court erred in refusing to permit Henry to testify about her belief as to the falsity of Springer's statements and in excluding other critical evidence

### (I) The protected nature of Springer's communications

With regard to plaintiff's exhibits two and five, at
the pre-trial stage of the case, the court determined
as a matter of law that these memoranda constituted
protected speech. The court will not revisit this
issue. As discussed above in relation to the Henry's
motion for renewed judgment as a matter of law on
whether she is entitled to qualified immunity, no
additional evidence was presented at trial that
would alter the court's prior ruling. In addition to
those two exhibits, the defendant objects to the
characterization of plaintiff's exhibits numbers one,
three, and four as protected speech as reflected in
the jury verdict form. Henry also argues that the
court's failure to instruct the jury on which portions
of the documents were protected is cause for a new
trial.

Exhibits one, three, and four were, respectively, a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 11

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

memo from the DPC resident physicians dated October 21, 1999, a memo drafted by the Executive Committee, of which Springer was a signatory, dated December 2, 1999, and a memo from Springer to the Governing Body dated December 16, 1999. Even if the court were to determine that these exhibits did not constitute protected speech, the error is harmless.

*10 The Third Circuit has outlined a two-part test to determine whether a public employee's speech is protected. First, the speech must pertain to a matter of public concern. *See Azzaro v. County of Allegheny*, 110 F.3d 968, 976 (3d Cir.1997). Second, the court must balance the government's interest in effective administration against the employee's free speech rights. *See id.* This is commonly referred to as the *Pickering* balancing test. *See Pickering v. Board of Ed. of Tp. High School*, 391 U.S. 563, 568 (1968) ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.").

Whether speech addresses a matter of public concern is an issue for the court to decide. *See Waters v. Churchill*, 511 U.S. 661, 668 (1994). To ascertain whether speech addresses a matter of public concern, the court must consider whether the speech can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Pro v. Donatucci*, 81 F.3d 1283, 1288 (3d Cir.1996) (citations omitted). In making this determination, the court can consider the "content, form, and context of a given statement." *Connick v. Myers*, 461 U.S. 138, 147-48 (1983).

It is a fair statement that the jury verdict form suggested to the jury that all of plaintiff's exhibits one through five were instances of protected activity under the First Amendment. *See* Jury Verdict Form, ¶ 1 (asking "Do you find that plaintiff has proven by a preponderance of the evidence that his protected activity under the First Amendment *reflected in Plaintiff's Exhibits 1, 2, 3, 4, and 5* was a substantial or motivating factor in

the decision to not renew or offer [plaintiff] a new contract?" (emphasis added). The jury concluded that the memo drafted by the residents dated October 21, 1999, was not an instance of protected activity that was a substantial or motivating factor in the decision to not renew Springer's contract, therefore, its appearance in the jury verdict form is immaterial to the present motion. (B1586, D.I.90). To the contrary, the jury concluded that exhibits two through five were protected speech that was a substantial and motivating factor.

Exhibits two and five are discussed above. Exhibits three and four involve the following. On December 2, 1999, a number of Executive Committee Officers, including Springer, drafted a memo addressed "To Whom It May Concern." (B1160). The memo expressed the Executive Committee's frustration with the lack of initiative on the administration's part to remedy the issues previously raised. (B1160). The signatories proposed a list of actions that "may begin us on the road to protecting and preserving patient care and safety." (B1160). On December 16, 1999, Springer individually addressed the DPC Governing Body Members in a memo entitled "Proposed Agenda for December 22, 1999 Governing Body Meeting." (B1162). In this memo, on behalf of the medical staff, Springer outlined a proposed plan of action. (B1162-63).

*11 The content of Springer's speech in plaintiff's exhibits three and four clearly addressed a matter of public concern. Speech may be characterized as a matter of political or social concern if the speech reveals "actual or potential wrongdoing." *See Holder v. City of Allentown*, 987 F.2d 188, 195 (3d Cir.1993). Health care issues are matters of public concern when addressed by medical professionals. *See Schneiner v. New York City Health and Hospitals*, 157 F.Supp.2d 487, 495-96 (S.D.N.Y.2001) (finding speech protected where physician wrote to Mayor Giuliani's office regarding problems at municipal hospital; *Kattar v. Three Rivers Area Hospital Auth.*, 52 F.Supp.2d 789, 799 (W.D.Mich.1999) ("In several cases, courts have held that statements by health care providers regarding patient care involved matters of public concern.") (collecting cases).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 12

Springer was a health care provider who commented on the state of health care at the DPC facility. All of his statements concerned perceived deficiencies at the facility. Moreover, many of problems Springer, along with other members of the Executive Board, addressed involved danger to the lives of patients or the surrounding community (i.e. suicides and escapes). Thus, he raised concerns of a grave nature that would be relevant to the medical community, the community surrounding the DPC facility, the families of DPC patients, and the Delaware taxpayers who financed the operation. The court therefore concludes that the content of plaintiff's exhibits three and four addressed issues that would be of concern to many groups of Delaware residents.

Henry has asserted in prior communications with the court that Springer's comments were disruptive to the DPC's operation and that Springer intended them to be disruptive. Indeed, plaintiff's exhibits three and four contain proposed solutions to the existing problems at the DPC. Therefore, the court is hard-pressed to believe that Springer intended to aggravate the conditions at the hospital. It is apparent that he was motivated by a desire to improve conditions at the DPC and was frustrated that, in his view, he was encountering resistance. Upon review of the record, there is no evidence that would permit the court to reasonably conclude that Springer's comments had any disruptive effect.

Consistent with the court's prior rulings, exhibits three and four were appropriately presented to the jury as instances of protected activity. Therefore, the court will not grant the defendant a new trial on this ground.

### (ii) Qualified immunity

Again, in their motion for a new trial, Henry challenges the courts determination that she was not entitled to qualified immunity. Henry contends that given her allegations that Springer's memos contained falsehoods, the court should reconsider whether she reasonably failed to recognize the protected nature of Springer's speech. Alternatively, Henry argues, the court should have permitted her

to testify about her belief that the memos contained untruths and instructed the jury on this point.

*12 In fact, the court did permit Henry to testify that she felt that some of Springer's statements were lies. However, the court did not permit the defense to present evidence as to the substance of the particular statements. Such testimony was irrelevant to the issues on trial. Regardless, although Henry testified that she felt that parts of the memos were not true, she also stated that "there are some parts ... I was not upset about because it was clear that they were known." B0745. As such, the jury was free to conclude that the memos were at least in part accurate, undisputed accounts of the conditions at the DPC. Furthermore, given Henry's testimony, even if the court were to reconsider its prior ruling on qualified immunity with the defendant's present arguments in mind, the outcome would not change. Certainly, Henry should have understood that by taking the actions which have been previously discussed, in light of Springer's memos, she was violating his clearly established right to free speech.

Henry also argues that certain rulings by the court impeded her ability to present evidence on whether Springer's speech obstructed DPC policy implementation and whether she could have reasonably believed under the circumstances that Springer was not exercising a clearly established right. Again, these issues were briefed and decided at the pre-trial stage of the proceedings. They will not be revisited at this time.

Henry also seeks to overturn the court's exclusion of proposed defense exhibits four, three, and six. Whereas, exhibit four was a compilation of sixteen letters terminating employment relationships with people unrelated to Springer or this case, the court concluded they were irrelevant. Whereas, proposed exhibits three and six were deemed to be settlement proposals, demand letters, and/or products of compromise negotiations, the court excluded them pursuant to Federal Rule of Evidence 408. (D.I.81).

The court has already addressed these arguments and affirms its evidentiary rulings related to these issues. Accordingly, Henry's motion for a new trial on the basis of her challenge to the court's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

Page 13

evidentiary rulings as discussed above is denied.

### b. Whether Springer's counsel's remarks during closing argument were racially inflammatory and require a new trial

Preliminarily, it should be noted that Henry is an African-American female and Springer is a white male. This fact would have been evident to all those who viewed the parties during the trial proceedings, including the jury. It should also be noted that race was never raised as an issue in this case by either party.

During closing arguments, plaintiff's counsel made a number of remarks that defendant' allege were racially inflammatory. For example, plaintiff's counsel repeatedly analogized the defendant' defense to an octopus emitting "black ink." Furthermore, plaintiff's counsel referred to his client as a forty-five year old white male. In his brief, plaintiff's counsel submits that the "black ink" analogy is a common theme. He cites to several cases in which it has been used.

*13 The court agrees with the defendant that plaintiff's counsel's choice of analogies and language was notable given the respective races of the parties. However, the court cannot conclude that counsel's remarks affected the jury's impartiality and, thereby, provoked a verdict in Springer's favor. The court is satisfied that the octopus and black ink analogy is common enough and did not likely confuse the issues for the jury. The court also concludes that counsel's remark that his client is a forty-five-year-old white male was innocuous when considered in the context in which it was uttered. Counsel was discussing the experts' testimony regarding the probability that Springer would maintain sixty-hour work weeks in the future. (B0980). Counsel may have been making a statistical reference, *i.e.*, the statistical probability that a forty-five year old white male would continue to work a sixty-hour week until the age of retirement. Although, given the context of the remark and the manner of its delivery, it is not unreasonable for the defendant to question whether counsel was attempting to appeal to some perceived

or hoped for bigotry on the jury, and although the court agrees that counsel's choice of language was unfortunate, in light of the overall setting of the trial and the character of the evidence the court cannot conclude that the verdict was against the weight of the evidence. It would not be a miscarriage of justice to let the verdict stand. *Williamson,* 926 F.2d at 1352.

### B. SPRINGER'S MOTIONS

#### 1. Springer's Motion for Reinstatement to the Position of Residency Training Director at the Delaware Psychiatric Center

Springer moves for an injunction ordering his reinstatement to the position of Residency Training Director at the DPC. Reinstatement is not a feasible remedy in a case in which the desired position is no longer available at the time of judgment. *Max v. Sinclair Int'l,* 766 F.2d 788, 796 (3d Cir.1985), *cert. denied,* 474 U.S. 1057 (1986). For the following reasons, the court denies Springer's motion.

Springer was hired by the DPC as an independent contractor physician. None of his contracts delegated to him the position of Residency Training Director. While employed at the DPC, one of his duties involved serving as the Residency Training Director. Although Springer served in that capacity from 1993 up until his termination, the record is completely devoid of evidence that he would have continued in that capacity had his contract been renewed. In fact, the evidence infers the opposite conclusion. The evidence calls into doubt the continuing vitality of the residency training program altogether. The evidence also indicates that since the former Medical Director left, the residency program has been completely revamped. (B0760-763). Thus, it is quite probable that Springer's participation in the program would have been entirely redefined if he were even to have remained involved. Plaintiff's counsel acknowledged as much in a sidebar conference. When questioned by the court as to why he was proceeding with what appeared to be an irrelevant

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 14

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

line of questioning, he responded:
*14 MR. T. NEUBERGER: I am seeking reinstatement. I know I am going to have this problem. I thought [the present Residency Training Director] was Dr. Rosenbaum. He is an innocent third party. I am trying to build up a record as far as who is in the position. And we would have to address it posttrial briefing, whether or not you would bump him. Now I have been totally surprised and told there is somebody else in the position as well as they have had a reorganization. I am floundering around a little bit, in all honesty, trying to figure out how that affects the injunctive issues in my case.... Just for the sake of the record, I think what has happened here is that it's too late in the day for me to be challenging the bona fides of a reorganization. And I will just probably leave the record as is in my case, and may just in the end fail on reinstatement and it's just an issue of what money damages are. We will just have to see.

(B0763-764).

In essence, Springer is asking the court to draft a provision into his hypothetical future contracts that never before existed. As such, the court denies Springer's motion for reinstatement.

### 2. Springer's Motion for Attorneys' Fees, Interest, and Costs

Springer asks for attorneys fees in the amount of $224,972.50 plus $27,748 for time expended on post-trial motions. He asks for costs and expenses in the amount of $6,988.59. He also seeks an award of attorneys' fees for the services of a contract attorney in the amount of $25,000. Finally, he seeks an award of post-judgment interest on those amounts from the date of the jury verdict on April 1, 2004, and an award of pre-judgment interest on the liquidated and unliquidated damages award between July 1, 2000 and April 1, 2004.

#### a. Attorneys' fees

Springer moves for attorneys' fees, interest, and costs pursuant to 42 U.S.C § 1988 and Rule 54.

(D.I.103). Section 1988 permits the court, in its discretion, to award reasonable attorneys fees. Although the statute gives a district court discretion to award attorneys' fees, the Third Circuit has stated that a court *should* award attorneys fees to a prevailing party absent special circumstances. *Truesdell v. Philadelphia Hous. Auth.,* 290 F.3d 159, 163 (3d Cir.2002). Henry challenges the request for attorneys' fees on two grounds. First, she argues that Springer was not a prevailing party. Second, Henry contends that the amount sought is excessive.

Springer may recover fees under this section if (1) he is the "prevailing party," and (2) the attorneys' fees are reasonable. *Farrar v. Hobby,* 506 U.S. 103 (1992). A party is a prevailing party if he or she succeeds "on any significant issue in litigation which achieves some of the benefit [the party] sought in bringing the suit." *Hensley v. Eckerhart,* 461 U.S. 424, 433 (1983). Reasonable fees are measured by the "lodestar" calculation which multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Hensley,* 461 U.S. at 433. A court may adjust the lodestar figure when appropriate under the circumstances. *Blum v. Stenson,* 465 U.S. 886, 897 (1984).

#### (1) Springer is the prevailing party

*15 Specifically, the Henry argues that Springer is not a prevailing party because the Court of Appeals declined to affirm this court's March 11, 2002, decision that she was not entitled to qualified immunity. Henry mis-characterizes the procedural event. Rather, the Third Circuit dismissed the *defendant's* interlocutory appeal. Henry also argues that to the extent the court grants the defendant relief pursuant to her post-trial motions, Springer would not be the prevailing party. The court has granted partial relief to the defendant by determining that as a matter of law Springer is not entitled to non-economic damages for his alleged reputation injuries. However, Springer still succeeded on significant issues in his case and has achieved much of the benefit he sought in bringing the suit. *Hensley,* 461 U.S. at 433. Therefore, he is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the prevailing party.

### (ii) The requested attorneys' fees are reasonable

Springer must also establish that the attorneys fees are reasonable. Here, his counsel submits that under the lodestar calculation he should be awarded attorneys' fees in the amount of $224,972.50. In addition, he seeks $27,748 for time spent on post-trial motions. The defendant generally objects to the requested amount on the grounds that the fees sought are excessive. She also raises a general objection to "a third party payment of attorneys fees in the amount of $100,000" but fails to expand upon that objection. Finally, Henry questions the plaintiff's calculation of the fees of the contract attorney, John M. LaRosa.

Although Springer bears the burden of proving that the requested fees are reasonable, the defendant must "present specific evidence challenging the reasonableness of the requested rates or the time expended." *Central Delaware Branch of NAACP v. Dover*, 123 F.R.D. 85, 88 (D.Del.1988) (citing *Blum*, 461 U.S. at 892). "[They] cannot rely upon conclusory denials of the applicant's prima facie proofs." *Id.*

Henry declined to object to the lodestar calculation other than to state that it is excessive. She contends that it was unreasonable for Springer's counsel to charge rates comparable to those of the Philadelphia market given that the case was not litigated in Philadelphia and that his counsel is not admitted to practice in Pennsylvania. However, Springer's counsel has submitted his own declarations as well as the declarations of other attorneys attesting to the reasonableness of the rates.

The court concludes that the plaintiff has satisfied the prima facie burden of proving the requested attorneys fees are reasonable. The defendant has declined to present any evidence that would contradict such a determination. With regard to the alleged miscalculation of the attorneys fees related to the work done by attorney John M. LaRosa, the court recognizes that there is an inconsistency between the invoices and the figure stated in the

plaintiff's opening brief in support of his motion for attorneys' fees. (D.I. 113, p. 14; D.I. 113, Exhibit F). The plaintiff explains that the figure proposed in the opening brief represents Mr. LaRosa's current rate. Springer argues that under *Lanni v. New Jersey*, 259 F.3d 146, 149 (3d Cir.2001), the reasonable fee is the rate at the time of the petition rather than the rate at the time the services were performed. The defendant declined to address this issue in light of *Lanni*, nor has she presented any opposing case law. The plaintiff's motion for attorneys fees will be granted as requested.

*16 It should also be noted that the court accepts plaintiff's counsel's supplemental fee request. It was filed on June 16, 2004. (D.I.125). Henry has not submitted any objection to the request. The court infers that Henry's silence on the matter indicates her acquiescence with the figure.

### b. Costs

Springer asks for costs and expenses in the amount of $6,988.59. Springer provided a detailed account of costs. Again, the defendant raises merely a conclusory objection. She states, "plaintiff is seeking expenses not recoverable under statutory costs." Henry failed to state her objections with any specificity. Nor did she did present any evidence to contradict the requested amount. The court will grant the plaintiff's motion for costs.

### c. Prejudgment Interest

Springer seeks prejudgment interest on liquidated and unliquidated compensatory damages. It is within the court's discretion to award prejudgment interest. *Savarese v. Agriss*, 883 F.2d 1194, 1207 (3d Cir.1989).

Henry argues that Springer is not entitled to prejudgment interest because his "damages are unliquidated and could not be calculated prior to the jury's decision." As the plaintiff points out, only the non-economic damages in the amount of $100,000 are unliquidated. In view of the court's decision to grant in part the defendant's motion for renewed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 16

Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

JMOL, the plaintiff will not be awarded non-economic damages. Therefore, the defendant's argument regarding the unliquidated nature of the damages is moot.

Henry further argues that "[i]t would be unjust to assign prejudgment interest ... where plaintiff's expert witness Paul Andrisani's testimony to the jury included interest into the numbers presented." (D.I.121, p. 8). As the plaintiff points out in his reply brief, Dr. Andrisani did, in fact, provide a damages calculation that *excluded* interest and those figures were argued to the jury. (B0676-677; B0914).Thus, the court will grant the plaintiff's motion for prejudgment interest.

The plaintiff asks for a prejudgment interest rate " equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system." *See* 28 U.S.C. § 1961; (D.I.113, p. 26). Springer claims he is entitled to an award of prejudgment interest from the date of the expiration of his contract on July 1, 2000, through the entry of judgment on April 1, 2004, compounded semi-annually. Henry has raised no objection to the measure of prejudgment interest. Therefore, the court will grant the plaintiff's request. Prejudgment interest shall be calculated accordingly.

## V. CONCLUSION

For the reasons stated above, Henry's motion for judgment as a matter of law shall be granted in part. The court concludes as a matter of law that Springer is not entitled to $100,000 in non-economic damages. The remaining damages award shall stand. All other defense post-trial motions will be denied. Likewise, Springer's motion for reinstatement will be denied. The court will grant Springer's motion for attorneys fees, interest and costs.

## ORDER

*17 For the reasons stated in the corresponding Opinion, IT IS HEREBY ORDERED that:

1. Henry's motion for judgment as a matter of law and/or judgment notwithstanding the verdict is GRANTED IN PART, Springer is not entitled to $100,000 in non-economic damages.
2. Henry's motion for a new trial is DENIED.
3. Springer's motion for reinstatement (D.I.102) is DENIED.
4. Springer's motion for attorneys' fees, interest and costs is GRANTED:
a. Attorneys' fees will be awarded in the amount of $224,972.50. Supplemental attorneys fees will also be awarded in the amount of $27,804.
b. Attorneys fees will be awarded for the services of contract attorney John LaRosa in the amount of $25,000.
c. Costs will be awarded in the amount of $6,988.59.
d. Prejudgment interest shall be awarded on the liquidated damages at the rate equal to the weekly average one year constant maturity treasury yield, as published by the Board of Governors of the Federal Reserve system between July 1, 2000, through April 1, 2004, compounded semi-annually.
e. Springer shall not be awarded prejudgment interest on the unliquidated damages, to wit, the $100,000 non-economic damages.
f. Post-judgment interest shall be awarded on all amounts with the exception of the $100,000 non-economic damages.

D.Del.,2004.
Springer v. Henry
Not Reported in F.Supp.2d, 2004 WL 2127172 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2004 WL 1065681 (Verdict and Settlement Summary) (Apr. 01, 2004)
• 1:00CV00885 (Docket) (Oct. 06, 2000)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.