Westlaw.

Not Reported in F.Supp.2d                                                                Page 1

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

**H**

Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
John V. RYAN, Jr., Plaintiff,
v.
ASBESTOS WORKERS UNION LOCAL 42
PENSION FUND, et al., Defendants.
No. Civ.A. 97-604-GMS.

Aug. 25, 2000.

John M. Stull, of the Law Offices of John M. Stull,
Wilmington, Delaware, for Plaintiff.
Francis J. Trzuskowski, of Trzuskowski, Kipp,
Kelleher & Pearce, Wilmington, Delaware, for
Defendants.

*MEMORANDUM OPINION*

SLEET, J.

## I. INTRODUCTION.

*1 On April 4, 2000, this court granted summary
judgment in favor of John Ryan, finding that the
administrators of his pension plan retroactively
reduced the level of his accrued benefits in violation
of Section 204(g) of the Employee Retirement
Income Security Act ("ERISA"). *See* 29 U.S.C. §
1054(g) (1994). The defendants have now asked the
court to reconsider its ruling. In particular, they
claim that Ryan's benefits are early retirement
benefits that are not subject to Section 204(g).
Although the defendants had ample opportunity to
raise this argument below, they did not. In fact, they
consistently argued that Ryan's benefits were
accrued benefits, making no mention of the
possibility that they could also be early retirement
benefits. Thus, the defendants are attempting to use
their motion for reconsideration to an advance
argument that was inexcusably omitted from their
earlier papers. On this reason alone, their motion
should be denied. Furthermore, even if the court
considered the defendants' new argument, it fails on

the merits. For these reasons, the court will deny the
motion for reconsideration.

## II. STANDARD OF REVIEW.

As a general rule, motions for reconsideration
should be granted only "sparingly." *See Karr v.
Castle,* 768 F.Supp. 1087, 1090 (D.Del.1991). In
fact, these types of motions are only granted if it
appears that the court has patently misunderstood a
party, made a decision outside the adversarial issues
presented by the parties, or made an error not of
reasoning but of apprehension. *See, e.g., Brambles
USA, Inc. v. Blocker,* 735 F.Supp. 1239, 1240
(D.Del.1990) (citing *Above the Belt, Inc. v. Mel
Bohannan Roofing, Inc.,* 99 F.R.D. 99, 101
(E.D.Va.1983)); *see also Karr,* 768 F.Supp. at 1090
(citing same).

In addition, the Third Circuit has explained that a
district court should also grant a motion for
reconsideration which alters, amends, or offers
relief from a judgment when: (1) there has been an
intervening change in the controlling law; (2) there
is newly discovered evidence which was not
available to the moving party at the time of the
judgment; or (3) there is a need to correct a legal or
factual error which has resulted in a manifest
injustice. *See Max's Seafood Cafe by Lou-Ann, Inc.
v. Quinteros,* 176 F.3d 669, 677 (3d Cir.1999)
(relying on *North River Ins. Co. v. CIGNA
Reinsurance Co.,* 52 F.3d 1194, 1218 (3d Cir.1995)
).

Nevertheless, as the *Brambles* court made clear,
motions for reconsideration "should not be used as
a means to argue new facts or issues that
inexcusably were not presented to the court in the
matter previously decided." 735 F.Supp. at 1240. In
these situations, such a motion should be denied
because any other ruling would effectively
encourage parties to engage in an endless debate
with the court and, thus, delay the ultimate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
(Cite as: Not Reported in F.Supp.2d)

resolution of the litigation. *See Oglesby v. Penn Mut. Life Ins. Co.,* 877 F.Supp. 872, 892 (D.Del.1994) (noting that motions for reconsideration "should not be abused to allow for a never-ending polemic between the litigants and the [c]ourt"); *Brambles,* 735 F.Supp. at 1240 ("[T]he procedural mechanism provided by the rule should not be undermined to allow for endless debate between the parties and the [c]ourt.").

## III. BACKGROUND.

*2 As the court explained when it granted summary judgment, Ryan is a former member of a union of asbestos workers and a participant in that union's pension plan. *See Ryan v. Asbestos Workers Union Local 42 Pension Fund,* No. 97-604, slip op. at 2 (D.Del. Apr. 4, 2000). Between 1955 and 1996, he earned a total of twenty-five years worth of vesting credit while working for the union over two different time periods. Between 1955 and 1969, Ryan earned fourteen years worth of vesting credit. For the next thirteen years, between 1970 and 1982, Ryan worked outside the industry and, thus, experienced a "break in service." Toward the end of this thirteen-year period, Ryan returned to work for the union. Although he did not work long enough to earn any vesting credit in 1983, he did earn another eleven years of vesting credit for his service between 1984 and 1996. *Id.* at 2-3.

Ryan then retired, applying for benefits under the pension plan because he had earned a total of twenty-five years of vesting credit since beginning work in 1955. While the administrators of the pension plan paid Ryan's benefits, they did so at two different levels pursuant to an earlier amendment to the plan.

This amendment created a two-tier benefit scheme. *Id.* at 3. Specifically, it provided that any participant who leaves the plan only to later return may receive two different levels of pension benefits depending upon the length of that person's absence. Even though the amendment itself was adopted in 1983, it was deemed effective in 1981. In addition, by its very terms, the amendment applies only to those participants who experience more than a ten-year

break in service before returning to the plan. It thus applied to Ryan who had experienced a thirteen-year break at the time that the amendment was adopted.

Because of this two-tier benefit scheme, Ryan now receives one level of benefits calculated at a rate of $8.50 per month for his first fourteen years of vesting service and another level of benefits calculated at a rate of $69.00 per month for his last eleven years of vesting service. As a result, Ryan received a monthly pension of approximately $885. Ryan appealed this decision, arguing that the higher rate of $69.00 per month should apply to all of his years of service. Under this rate, Ryan contended, he was entitled to receive a minimum monthly pension of $1,725 (in addition to other supplemental benefits recently provided to all retired plan participants). Citing to the amendment which created two tiers of pension benefits, the administrators disagreed.

This lawsuit followed. In his complaint, Ryan alleged that the defendants had violated the Rule of Parity by paying him two different levels of pension benefits.

On November 6, 1998, the defendants moved to dismiss the complaint. In their motion, they argued that Ryan was misapplying the Rule of Parity, which only operates to determine whether an employee has become "vested" in the plan (*i.e.,* earned the non-forfeitable right to receive benefits under the plan). *See, e.g., Shawley v. Bethlehem Steel Corp.,* 989 F.2d 652, 656 (3d Cir.1993) (explaining that, under the Rule of Parity, "an employee will not necessarily sacrifice credited service if rehired after a break in service. Credited service will count toward pension benefits if, on the date of rehire, the employee's years of credited service are longer than the period of layoff."). The defendants pointed out that Ryan had already become vested in the plan, which was why he was receiving his benefits. Although Ryan might take issue with the level or amount of these benefits, the defendants continued, the Rule of Parity does not affect or determine their computation. As the defendants made plain in one of their briefs, "[t]he Rule of Parity has nothing whatsoever to do with

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

the pension benefit to be received, or not received, by a participant." Therefore, the defendants contended, to the extent that Ryan was attempting to recover for a violation of the Rule of Parity, his complaint failed to state a claim upon which relief could be granted.

\*3 To emphasize this point, the defendants quoted at length from several circuit court decisions which explained this distinction. Specifically, the defendants argued that:
Under ERISA, the concepts of accrued benefits and vested (i.e.non-forfeitable) rights are quite distinct....
ERISA's statutory definition of "accrued benefits" imparts a specific meaning to the word accrued, connoting a set periodic increase or accumulation. Section 3(23) states that an accrued benefit is an individual's benefit "expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A)....
An accrued benefit, then, represents the interest in a retirement benefit that a participant earns each year, and a plan must state a method or formula for determining a participant's annual accrual rate. This requirement enables a worker to mark his or her progress toward the full pension benefit due at retirement.
... The concepts of accrued on the one hand, and vested or "nonforfeitable," on the other, are related, but not the same. A participant becomes fully vested when he gains a nonforfeitable right to receive his entire accrued benefit. Vesting provisions do not affect the amount of the accrued benefit, but rather govern whether all or a portion of the accrued benefit is nonforfeitable. Accrual provisions provide a formula for calculating the amount of the normal retirement benefit which an employee has earned at any given time.

*See Ashenbaugh v. Crucible Inc.1975 Salaried Retirement Plan,* 854 F.2d 1516, 1523-24 (3d Cir.1988) (relying on, *inter alia, Hoover v. Cumberland, M.D. Area Teamsters Pension Fund,* 756 F.2d 977, 981-84 (3d Cir.1985)) (quoted by the defendants in their papers).

The defendants continued by distinguish[ing] the "vesting" of pension rights from the "accrued benefits" that flow from participation

in a pension plan.... [T]he "vesting schedule" specifies the time at which an employee obtains his nonforfeitable right to a particular percentage of his accrued benefit. It does not provide any formula or schedule for determining the amount of the accrued benefit. Thus, "vesting" governs when an employee has a right to a pension; "accrued benefit" is used in calculating the amount of the benefit to which the employee is entitled.
... ERISA protects the right to obtain a pension by requiring plans to satisfy specified vesting requirements, but does not guarantee the amount of pension benefits that an employee will receive.
[The defendant's] pension plan, like the great majority of private pension plans, provides that an employee's right to a pension vests upon completion of ten years of service, regardless of whether the employment terminates before the employee reaches retirement age. Once an employee participates in a pension plan, all of his or her years of service, whether completed before or after participation begins, count statutorily toward the ten years of vesting credit essential.
\*4 As this brief analysis indicates, vesting is tied to length of employment, but the amount of accrued benefits depends upon participation in the plan. One conceivably can earn credit toward vesting without accumulating any pension benefits....

*See Holt v. Winpisinger,* 811 F.2d 1532, 1536-37 (D.C.Cir.1987) (citations and footnotes omitted) (also quoted by the defendants in their papers).

In subsequent submissions to the court, the defendants continued to point out this difference, noting that "there is a distinction between accrued benefits and vesting service." As the defendants argued,
a participant, once vested, cannot be denied those accrued benefits which the participant has earned. What [Ryan] fails to accept is that he earned and is receiving ... all benefits which he is due....
... He is receiving the benefits he accrued based on having ceased to be an active participant once in 1969 and once in 1996.
... [Ryan] is receiving 100 percent of the benefits he accrued. He did not forfeit any benefits. When he left the plan in 1969, his vested accrued benefit rate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

was $8.50, which he is receiving. When he left the plan in 1996, his vested accrued benefit rate was $69.00, which he is also receiving. He has lost no benefits or credited service.

In short, the defendants argued, Ryan's "accrued vested benefit was not impermissibly decreased" by the amendment at issue.

The defendants reiterated these arguments in opposition to Ryan's motion for summary judgment. In particular, they claimed that:
Because [Ryan] was vested in his accrued benefits when he left the plan in 1969, the Rule of Parity is not applicable to him. [Ryan] became a vested participant in the plan on two separate occasions, the second time after being out of the plan for 14 years. [Ryan] is receiving all benefits which he accrued during two separate vesting periods.

The defendants elaborated upon these points by repeating their earlier arguments. Specifically, they noted that:
There is a distinction between "accrued benefits" and "vested" or "non-forfeitable" rights.... An accrued benefit is the pension benefit which a participant will, at the time of retirement, receive if the benefit becomes non-forfeitable by reason of vesting.... An employee's accrued benefit at any particular point in time is equal to what a fully vested employee would be entitled to receive if employment ceased at that point....
Under the facts of this case, [Ryan] was fully vested when he left the plan in 1969. He also had 14 years of service benefit accrual. Accordingly, when he left the plan in 1969, he was not a "non-vested participant in employer derived accrued benefits[. Instead,] he was a vested participant in employer derived accrued benefits. Thus, his benefits were not forfeitable, and the Rule of Parity is inapplicable. Even if he never returned to the asbestos trade, he was entitled to a pension at age 65 based on his accrued benefits.

*5 Thus, the defendants argued, "while the Rule of Parity requires that a participant not lose years of

service credited toward vesting under certain circumstances, the Rule does not require that a participant's benefit upon retirement be paid in an amount greater than the amount of benefits accrued by the participant under [the] pension plan."

On March 3, 1999, after the parties completed briefing on their dispositive motions, the court asked them to address the additional issue of whether the amendment challenged by Ryan violated Section 204(g) of ERISA, 29 U.S.C. § 1054(g), by reducing the level of his accrued benefits retroactively.

In response, the defendants again pointed out that the complaint alleged that the plan amendment, as it was applied to Ryan, violated the Rule of Parity. The defendants also explained that the Rule of Parity does not factor into the computation of accrued benefits. As the defendants stated,
there is a difference between accrued benefits and vested benefits. An accrued benefit is the individual's benefit expressed in the form of an annual benefit commencing at normal retirement age. It represents the interest in a retirement benefit that the participant earns each year. This requirement allows the participant to track his progress toward the full benefit that would be due at retirement.

The defendants then argued that the amendment, as it was applied to Ryan,
took no accrued benefits ... from him. He was entitled to, and is presently receiving, his pension as provided under the formula which was in effect at the time he left participation ... in 1969. Furthermore, he was given the opportunity to earn accrued benefits for the period 1984 through 1996. When ... Ryan returned to work in covered employment after 13 years, he earned an accrued benefit under the terms of the plan then in effect.
...
... In this case, [Ryan] received the full benefit he is entitled to receive for the accrued benefit earned between 1955 and 1969 and ... is receiving the full benefit of the accrued benefit earned for the period between 1954 and 1966.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

After considering the supplemental briefing on this subject, the court elected to hear oral argument. Ultimately, the court granted summary judgment in favor of Ryan.

In essence, the court concluded that the amendment to the plan, as it was applied to Ryan, retroactively reduced the level of his pension benefits in violation of Section 204(g) by effectively freezing these benefits at two different levels. *See Ryan, supra,* at 5-7. The court also held that, to the extent that they relied on this amendment to pay Ryan two different benefit levels, the administrators abused their discretion because, at the time that the amendment was adopted, Ryan had already experienced more than a ten-year break in service. *Id.* at 7. He, however, had not received any notice that this type of extended absence might result in the payment of different benefit levels upon retirement. *Id.* In addition, even if the amendment was intended to " reward[ ] long-term employees and establish[ ] a cut-off date of ten years for stacking employment periods," these goals were not achieved by applying the amendment to Ryan since he had already experienced a thirteen-year break at the time the amendment was adopted. *Id.* Thus, it appeared as if the amendment was actually being used to punish Ryan for his lengthy absence from the union. *Id.* at 8. As the court explained, "[w]hile this tactic might encourage current or future plan participants to avoid breaks in service of more than ten years, it is difficult to understand how long-term employees (especially those like Ryan) are actually 'reward[ed]' by the provision." *Id.* at 7-8.

## IV. DISCUSSION.

*\*6* The defendants have asked the court to reconsider this ruling. In particular, they argue that because Ryan retired at age sixty instead of sixty-five, the benefits which he is now receiving are actually early retirement benefits that are not covered by Section 204(g). The defendants also claim that the court erred when it concluded that the administrators "abused their discretion" when they applied the amendment to Ryan. According to the defendants, the proper standard is whether the administrators acted "arbitrarily or capriciously."

Both of these arguments are losing ones. The court, therefore, will not reconsider its prior ruling.

### A. The Nature of Ryan's Benefits: Accrued Benefits vs. Early Retirement Benefits.

As the Third Circuit has explained,
Section 204(g) of ERISA prohibits an employer from decreasing a participant's accrued benefits by plan amendment. Prior to 1984, no protection was given to early retirement benefits because they were not considered to be accrued benefits. In 1984, however, Congress amended [Section] 204(g) to provide protection for early retirement benefits.
After 1984, a plan sponsor could prospectively eliminate an early retirement benefit by amendment, but under [Section] 204(g) the amendment could not adversely affect the early retirement benefit of a plan participant who satisfied the pre-amendment conditions for the benefit either before or after the amendment. Thus, if [the defendant] had adopted such an amendment, it would have had to allow those employees who remained in its employ after the amendment to "grow into" the benefit by providing post-amendment service....

*See Dade v. North American Philips Corp.,* 68 F.3d 1558, 1562 (3d Cir.1995) (citing, *inter alia, Bencivenga v. Western Pennsylvania Teamsters & Employers Pension Fund,* 763 F.2d 574, 577 (3d Cir.1985)) (additional citations and footnotes omitted).

Citing *Bencivenga,* the defendants argue that Ryan's pension benefits are early retirement benefits since he retired when he was sixty years old instead of at sixty-five, which is the normal retirement age under both ERISA and the plan. 763 F.2d at 577-78 (holding that "early retirement benefits are not accrued benefits under ERISA").

The main problem with this argument is that the defendants never previously advanced it. The record shows that, throughout their prior submissions, the defendants consistently claimed that Ryan's pension benefits were accrued benefits which were not effected by the Rule of Parity because he was already a vested participant in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 6

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

plan. [FN1] When the court invited the parties to submit supplemental briefing on the issue of " whether the amendment at issue here may have impermissibly reduced the level of Ryan's pension benefits in violation of Section 204(g) of ERISA," the defendants reiterated this earlier argument. Specifically, they claimed that the plan amendment " took no accrued benefits" from Ryan because he was "receiv[ing] the full benefit he is entitled to receive for the accrued benefit earned between 1955 and 1969 and ... the full benefit of the accrued benefit earned for the period between 1954 and 1966."

> FN1. Given these representations, the court believes that a strong argument can be made for judicially estopping the defendants from now claiming that Ryan's benefits are not actually accrued benefits but, instead, early retirement benefits which fall outside ERISA's protection. *See Krouse v. American Sterilizer Co.,* 126 F.3d 494, 501 (3d Cir.1997) (explaining that a court may, in its discretion, use its inherent power to estop a litigant from asserting a position which is inconsistent with one that was taken earlier in litigation); *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.,* 81 F.3d 355, 358(3d Cir.1996) ("Absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory and then seek an inconsistent advantage by pursuing an incompatible theory."). However, given the defendants' waiver of their early retirement argument, the court will decline to consider the estoppel issue.

*7 Nowhere did the defendants argue that these benefits were early retirement benefits. They did not raise this issue in their response to the court's request for supplemental briefing on the impact of Section 204(g). Nor did the defendants make this claim in any of the months leading up to hearing on the pending cross-motions. The defendants did not raise this issue during oral argument. Nor did they file supplemental papers after the hearing to

advance this argument.

Instead, the defendants waited until *after* this court issued its decision on summary judgment to raise this issue. This tactic is unacceptable. Motions for reconsideration "should not be used as a means to argue new facts or issues that inexcusably were not presented to the court in the matter previously decided." *See Brambles,* 735 F.Supp. at 1240. In addition, a defendant cannot obtain relief from judgment for failing to argue the import of evidence which was not only available but also known at the time of the court's ruling. *See Moolenaar v. Government of Virgin Islands,* 822 F.2d 1342, 1347 (3d Cir.1987) ("A party that has not presented known facts helpful to its case ... 'when it had the chance cannot ordinarily avail itself of Rule 60(b) after an adverse judgment has been handed down." ' ) (quoting *Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 577 (D.C.Cir.1980)); *accord Teal v. Eagle Fleet, Inc.,* 933 F.2d 341, 347 (5th Cir.1991) (affirming the denial of the plaintiff's Rule 60(b) motion because they "did not even attempt to explain why their new evidence could not have been brought as part of [an earlier] motion" and because " all of the evidence [which the plaintiffs cited] was available at the time the[y] filed their first motion"); *Kansas City Area Transp. Authority v. Missouri,* 640 F.2d 173, 175 (8th Cir.1981) (same); *cf. Retired Chicago Police Ass'n v. City of Chicago,* 76 F.3d 856, 867 (7th Cir.1996) ("A Rule 59(e) motion cannot be used to present evidence that could and should have been presented prior to entry of final judgment.") (relying on *Green v. Whiteco Indus., Inc.,* 17 F.3d 199, 202 n. 5 (7th Cir.1994)).

As their motion for reconsideration makes clear, at the time that the court was considering the prior cross-motions, the defendants were fully aware that Ryan was sixty years old when he applied for his pension benefits. In fact, in order to support their current claim concerning Ryan's age, the defendants have cited to the summary judgment record. Thus, the defendants cannot legitimately claim that they were unaware that Ryan was sixty years old when he applied for his benefits or that this information was not available to them before the court issued its ruling.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Furthermore, the defendants have offered no excuse for their failure to raise this issue prior to the court's decision. One possible explanation is that defense counsel overlooked this argument. However, the failure of an attorney to appreciate a legal argument based on facts that are known to him at the time that the matter is under consideration is not a sufficient basis for granting a motion for reconsideration or, for that matter, relief from judgment. *See Servants of Paraclete v. Does,* 204 F.3d 1005, 1012 (10th Cir.2000) ("[A] motion for reconsideration and a successive Rule 60(b) motion ... are inappropriate vehicles to reargue an issue previously addressed by the court when the motion merely advances new arguments or supporting facts which were available at the time of the original motion."); *United States v. B & W Inv. Properties, Inc.,* 1995 WL 124118, at 3 (N.D. Ill. Mar 20, 1995) ("Generally, a party's failure to present all the facts known to him that might have been useful to the court is not grounds for Rule 60(b) relief. Rule 60(b) is furthermore not the proper device for raising new arguments that were or could have been argued previously .") (citation omitted); *see also Landrau-Romero v. Banco Popular De Puerto Rico,* 212 F.3d 607, 612 (1st Cir.2000) ("[N]ew legal arguments advanced or advance may not be presented via Rule 59(e); rather, motions under that rule must either clearly establish a manifest error of law or present newly discovered evidence."); *accord Divane v. Krull Elec. Co., Inc.,* 194 F.3d 845, 850 (7th Cir.1999) (explaining that a Rule 59(e) motion "should not be used to allow a party to introduce new evidence or advance new arguments that it should have brought before the district court"); *Pacific Ins. Co. v. American Nat'l Fire Ins. Co.,* 148 F.3d 396, 404 (4th Cir.1998) (" Rule 59(e) may not be used to raise new arguments or present novel legal theories that could have been raised prior to judgment.").

**\*8** In effect, the defendants are attempting to litigate this matter in a piecemeal fashion by using their motion for reconsideration as a vehicle for raising a new argument based on previously known facts. The court will not permit this practice. On this ground alone, their motion for reconsideration should be denied. *Cf. Oglesby,* 877 F.Supp. at 892 (noting that motions for reconsideration "should not be abused to allow for a never-ending polemic

between the litigants and the [c]ourt"); *Brambles,* 735 F.Supp. at 1240 ("[T]he procedural mechanism provided by the rule should not be undermined to allow for endless debate between the parties and the [c]ourt.").

However, even if the court were to consider the defendants' argument, it fails on the merits. *See Max's Seafood Cafe,* 176 F.3d at 677 (noting that a court can entertain a motion for reconsideration to correct a legal or factual error which has resulted in a manifest injustice) (relying on *North River,* 52 F.3d at 1218); *cf. Hatco Corp. v. W.R. Grace & Co. Conn.,* 849 F.Supp. 987, 990 (D.N.J.1994) (" [T]here is a strong policy against entertaining reconsideration motions based on evidence that was readily available at the time that the original motion was heard, but, for whatever reasons, was not presented to the Court. As a result, the court may, in its discretion, refuse to consider such evidence.") (relying on *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.,* 680 F.Supp. 159, 162-62 (D.N.J.1988) ).

According to the defendants, consistent with ERISA, the "normal retirement age" under the plan at issue in this case is sixty-five. Because Ryan was sixty when he retired, the defendants claim, he retired early. By definition, thus say the defendants, he is receiving early retirement benefits. Citing the Third Circuit's decision in *Bencivenga,* the defendants point out that "early retirement benefits are not considered 'accrued benefits' under ERISA." 763 F.2d at 577, 578. Therefore, the defendants conclude, Ryan's pension benefits could be reduced by the plan amendment without violating Section 204(g).

The problem with this argument is that the first page of the summary plan description or SPD plainly states that the plan provides employees with " [n]ormal retirement at age 65 ... or at any earlier age [as long as the employee has accrued] 25 years of credited service." In fact, the SPD specifically defines the "normal retirement date" as "the date [an employee] complete[s] 25 years of credited service." The SPD also states that "[i]f you are a participant and have reached your normal retirement date, you may retire and become eligible

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                              Page 8

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

for a normal retirement pension." This summary description is entirely consistent with the language of the plan itself, which explains that the "normal retirement date" is "the earlier of the date an employee (participant) has attained normal retirement age [*i.e.*, sixty-five] or the date an employee (participant) has accrued twenty-five (25) years of credited service ."

\*9 In this case, Ryan completed his twenty-fifth year of credited service in 1996. Thus, under the express terms of the plan, he was entitled to retire and begin receiving his pension benefits. [FN2] Consequently, the defendants' argument that these benefits were somehow "early retirement benefits" is unavailing.

> FN2. In addition, the SPD expressly states that the plan allows for "[e]arly retirement if [an employee is] age 55 or older and ... ha[s] 10 but less than 25 years of credited service." In other words, the SPD explains, "[i]f you are a participant between 55 and 65 years old with 10 but less than 25 years of credited service and you want to retire before age 65, you may do so and become eligible for an early retirement pension." As the language of the plan itself states the "early retirement date" means "the date a participant, having completed ten (10) years but less than twenty-five (25) years of credited service, attains his fifty-fifth (55th) birthday." Given this language, it would not appear that Ryan could have even qualified for early retirement benefits since he had already completed twenty-five years of credited service at the time of his retirement.

The defendants next contend that Ryan's pension benefits could be reduced without violating Section 204(g) because the plan amendment that resulted in this reduction was adopted in 1983, one year before Congress amended Section 204(g) to cover early retirement benefits. *See Dade,* 68 F.3d at 1562 (" Prior to 1984, no protection was given to early retirement benefits because they were not considered to be accrued benefits. In 1984,

however, Congress amended [Section] 204(g) to provide protection for early retirement benefits.").

However, as the court has explained, Ryan was not receiving early retirement benefits because he had completed twenty-five years of credited service and was, thus, entitled to receive his normal level of retirement benefits. Since its adoption in 1974, Section 204(g) has prohibited the retroactive reduction of these types of benefits. *See, e.g., Nichols v. Board of Trustees of Asbestos Workers Local 24 Pension Plan,* 835 F.2d 881, 890 & n. 76 (D.C.Cir.1987) (citing Pub.L. No. 93-406, tit. I, § 204(g), 88 Stat. 829, 862 (1974) (codified at 29 U.S.C. § 1054(g))). Thus, contrary to the defendants' assertions, Section 204(g) does apply to the plan amendment which is at issue in this case.

For all of these reasons, this portion of the defendants' motion for reconsideration will be denied.

### B. The Appropriate Standard of Review: Abuse of Discretion vs. Arbitrary and Capricious.

Finally, the defendants claim that the court erred when it concluded that the administrators "abused their discretion" when they applied the plan amendment to Ryan. According to the defendants, the proper standard is whether the administrators acted "arbitrarily or capriciously."

However, as countless courts have noted, these standards are essentially identical. *See, e.g., Meditrust Fin. Servs. Corp. v. Sterling Chemicals, Inc.,* 168 F.3d 211, 215 n. 6 (5th Cir.1999) ("[O]ur sister circuits also have folded the 'arbitrary and capricious' standard into the 'abuse of discretion' standard ....") (citing, *inter alia, Abnathya v. Hoffmann-La Roche, Inc.,* 2 F.3d 40, 41 (3d Cir.1993)); *see also Foley v. International Bhd. of Elec. Workers Local Union 98 Pension Fund,* 91 F.Supp.2d 797, 804 & n. 9 (E.D.Pa.2000) ("Where an administrator has been given discretion, its decisions are reviewed under an 'abuse of discretion ' or 'arbitrary and capricious' standard ... [which are] essentially the same ... standard."); *System Council T-3 of Intn'l Bhd. of Elec. Workers v.*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 9

Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

*American Tel. & Tel. Co.,* 905 F.Supp. 198, 203-04 (D.N.J.1995) ("When a plan grants discretion to the plan administrators, their determination will be disturbed only if it is arbitrary and capricious or constitutes an abuse of discretion.").

*10 As this court explained when it granted summary judgment in favor of Ryan:
[T]he amendment, as it was applied to Ryan, operated in an impermissible manner to reduce his pension benefits retroactively. Furthermore, to the extent that the trustees relied on this amendment to afford Ryan two different levels of benefits, they abused their discretion....
...
While the trustees attempt to defend their actions by claiming that the plan amendment was intended to " reward[ ] long-term employees and establish[ ] a cut-off date of ten years for stacking employment periods," these goals do not appear to be valid under Section 302(c)(8). *See* 29 U.S.C. § 1082(c)(8) ("No amendment ... shall be approved by the Secretary [of the Treasury] unless he determines that such amendment is necessary because of substantial business hardship...."). In addition, even if they were appropriate goals to consider, it is not at all clear how they were achieved by applying the amendment to Ryan. Certainly, the amendment itself could not have encouraged Ryan to return to the union before experiencing a ten-year break in service because, at the time that the amendment was adopted, he had already incurred a thirteen-year break. In fact, in 1979 when Ryan experienced the tenth year of his thirteen-year break in service, the amendment does not appear to have even been contemplated. In this light, it would almost seem that applying the amendment to Ryan effectively punished him for his thirteen-year break in service. While this tactic might encourage current or future plan participants to avoid breaks in service of more than ten years, it is difficult to understand how long-term employees (especially those like Ryan) are actually "reward[ed]" by the provision.
By applying the amendment to an employee who had already experienced a thirteen-year break in service, the defendants were effectively freezing Ryan's benefits for his first fourteen years of service in an impermissibly retroactive manner. In this respect, the amendment violated Section 204(g),

and the defendants abused their discretion in relying on it. *See, e.g., Moench v. Robertson,* 62 F.3d 553, 566-67 (3d Cir.1995) (asking, *inter alia,* "whether the interpretation is consistent with the goals of the plan" and "whether [the interpretation] conflicts with the substantive or procedural requirements of the ERISA statute").

*See Ryan, supra,* at 5-7.

This language should have made it clear that the court found the plan administrators to have abused their discretion by acting unreasonably, or in an arbitrary and capricious manner, when they applied the amendment to Ryan. However, so that there will be no mistake in the future as to the nature of the court's decision on this point, the court's prior ruling will be amended to reflect this holding.

### V. CONCLUSION.

Because the defendants are attempting to use their motion for reconsideration to raise a new legal argument based on evidence that was known to them previously, the court will deny their motion. In addition, even if the court considered this new argument, it fails on the merits since Ryan's benefits are not early retirement benefits as the defendants contend. Finally, the court will amend its earlier summary judgment ruling so that there will be no mistake concerning this court's conclusion that the administrators acted unreasonably or in an arbitrary and capricious manner by applying the plan amendment to Ryan in order to reduce the level of his pension benefits. The court will issue an order to this effect in conjunction with this opinion.

D.Del.,2000.
Ryan v. Asbestos Workers Union Local 42 Pension Fund
Not Reported in F.Supp.2d, 2000 WL 1239958 (D.Del.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1

Not Reported in F.Supp.2d, 2002 WL 31898162 (D.Minn.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Only the Westlaw citation is currently available.
United States District Court,D. Minnesota.
MINNESOTA SUPPLY COMPANY, Plaintiff,
v.
THE RAYMOND CORPORATION, Defendant.
No. Civ. 99-832 JRTFLN.

Dec. 27, 2002.

Gary W. Leydig, Worker & Power, Chicago, IL,
and David M. Jaffee, Leonard Street and Deinard,
Minneapolis, MN, for plaintiff.
John Edward Connelly, Faegre & Benson,
Minneapolis, MN, and James B. Niehaus, Frantz
Ward, Cleveland, OH, for defendant.

ORDER AFFIRMING ORDERS OF THE
MAGISTRATE JUDGE

TUNHEIM, J.
*1 Plaintiff Minnesota Supply Corporation ("
Minnesota Supply") filed this action alleging that
The Raymond Corporation ("Raymond") violated
the Minnesota Heavy and Utility Equipment
Manufacturers and Dealers Act by terminating,
without cause, the parties' dealership agreement.
Discovery has been underway since late 2000, and
the case is now ready for trial. Plaintiff has
appealed three orders of United States Magistrate
Judge Franklin L. Noel. [FN1]

> FN1. The Orders are dated March 6, 2002,
> April 4, 2002, and October 25, 2002.

"The standard of review applicable to an appeal of
a magistrate judge's order on a nondispositive issue
is extremely deferential." *Reko v. Creative
Promotions, Inc.,* 70 F.Supp.2d 1005, 1007
(D.Minn.1999). The district court will reverse an
order of a Magistrate Judge only if the order is
clearly erroneous or contrary to law. 28 U.S.C. §

636(b)(1)(A); Fed.R.Civ.P. 72(a); D. Minn. LR
72.1(b)(2); *Chakeles v. Commissioner of Internal
Revenue,* 79 F.3d 726, 728 (8th Cir.1996). Upon
review of the parties' submissions and the files,
records, and proceedings, the Court affirms the
orders of the Magistrate Judge.

ANALYSIS

I. Appeal from the March 6 and April 4 Orders

In the first challenged order, the Magistrate Judge
denied plaintiff's motion to disqualify defendant's
expert witness, or in the alternative to compel
production of documents. [FN2] The Magistrate
Judge found that the plaintiff's request was informal
and untimely. March 6, 2002 Order at 5. This denial
prompted plaintiff to seek relief from the discovery
cut-off date in order to obtain information about the
defendant's expert. The Magistrate Judge denied
that request in an order dated April 4, 2002.

> FN2. The Magistrate Judge also ruled on a
> motion for costs and fees, but that issue
> was not appealed.

The discovery cut-off date for this case was October
1, 2001. The expert disclosure and report deadline
was December 1, 2001. *See* Scheduling Order dated
November 9, 2000 at 1-2. In addition, the
scheduling order specified that "[t]he schedule may
be modified only upon formal motion and a
showing of good cause as required by Local Rule
16.3." *Id.* (emphasis added).

In a December 11, 2001 letter to defendant, plaintiff
requested, *inter alia,* copies of all reports prepared
by expert witness Albert A. Vondra for all the other
cases in which he testified at trial or by deposition
within the past four years. [FN3] This request was not
only untimely, but it also was not a formal motion

Not Reported in F.Supp.2d, 2002 WL 31898162 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

to modify the scheduling order. The Magistrate Judge is authorized to compel parties to adhere to the established scheduling order. *See* Fed.R.Civ.P. 16(f) ("[i]f a party or a party's attorney fails to obey a scheduling or pretrial order ... the judge, upon motion or the judge's own initiative, may make such orders with regard thereto as are just." (Emphasis added).). The Magistrate Judge's conclusion that the plaintiff's motions were untimely and/or impermissibly informal is not clearly erroneous or contrary to law. Further, contrary to plaintiff's assertion, the Magistrate Judge was authorized to raise those concerns *sua sponte.* Fed.R.Civ.P. 16(f).

> FN3. Vondra is a certified public accountant, and it is anticipated that he will testify as to damages.

**\*2** Additionally, plaintiff has not shown good cause for its failure to comply with the dates set forth in the scheduling order. Under Rule 16(b) of the Federal Rules of Civil Procedure, "[a] schedule shall not be modified except upon a showing of good cause and by leave of the court." Plaintiff argues that it did not know who defendant's expert would be, and therefore could not request the documents until after December 1. However, it was clear from the scheduling order that the parties would need to make requests for expert materials prior to discovery cut-off. In fact, plaintiff served discovery requests seeking expert materials before the cut-off date. Those requests did not mention the past expert reports which plaintiff now seeks.

For the foregoing reasons, the Court is not left " with the definite and firm conviction that a mistake has been committed." *Chakeles,* 79 F.3d at 728. The Magistrate Judge's orders of March 6 and April 4 are not clearly erroneous or contrary to law. As such, the orders are affirmed.

### II. The October 25 Order

Plaintiff also appeals an order dated October 25, 2002 in which the Magistrate Judge granted defendant's motion for a protective order that prohibited plaintiff from serving or enforcing

subpoenas to non-parties and quashed several subpoenas.

On August 13, 2002, plaintiff issued Rule 45 subpoenas on 3M Corporation and two of its employees, and also on Associated Material Handling (Minnesota), Inc., and one of its employees. Along with the subpoenas were requests for documents. Defendant moved for a protective order, arguing that the subpoenas were an improper attempt to circumvent the scheduling order and discovery cut-off date of October 1, 2001. The magistrate agreed, and quashed the subpoenas in an order dated October 25.

Plaintiff appealed the order, but did not set forth specific grounds for the objection. *See* Local Rule 72.1(b)(2) (requiring that an appealing party "shall file ... written notice of appeal which shall specifically designate the order or part thereof appealed from and the basis for the objection thereto." The rule requires that "[a]ny party appealing from a Magistrate Judge's order shall file a brief."). Instead, plaintiff referenced its original brief filed in response to defendant's motion for a protective order (dated October 1, 2002, (" opposition brief")). In the opposition brief, plaintiff submitted a five-prong argument in defense of its subpoenas.

The Court has reviewed all arguments raised in the initial opposition brief. After careful consideration, the Court finds that the Magistrate Judge's decision to quash the subpoenas was not clearly erroneous or contrary to law. Therefore, the order of October 25 is affirmed.

### ORDER

Based on the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. The Magistrate Judge's Order of March 6, 2002 denying Plaintiff's Motion to Disqualify Defendant's Expert Witness, or in the Alternative to Compel Production of Documents [Docket No. 78] is AFFIRMED.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

`Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31898162 (D.Minn.)
**(Cite as: Not Reported in F.Supp.2d)**

*3 2. The Magistrate Judge's Order of April 4, 2002 denying Plaintiff's Motion Seeking Relief from the Discovery Cut-off Date [Docket No. 85] is AFFIRMED.

3. The Magistrate Judge's Order of October 25, 2002 quashing the trial subpoenas issued by Minnesota Supply on or about August 9, 2002 [Docket No. 113] is AFFIRMED.

D.Minn.,2002.
Minnesota Supply Co. v. Raymond Corp.
Not Reported in F.Supp.2d, 2002 WL 31898162 (D.Minn.)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                           Page 1

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, D. Delaware.
David G. FINCH, Plaintiff,
v.
HERCULES INCORPORATED, Defendant.
No. Civ. A. 92-251 MMS.

Dec. 22, 1995.

Richard G. Elliott, Jr., and Helen M. Richards, of
Richards, Layton & Finger, Wilmington, DE, for
plaintiff.
Sheldon N. Sandler, and Bhavana Boggs, of Young,
Conaway, Stargatt & Taylor, Wilmington, DE, for
defendant.

*MEMORANDUM OPINION*
MURRAY M. SCHWARTZ, Senior District Judge.

### I. INTRODUCTION

*1 Plaintiff David G. Finch ("Finch") has filed suit
against his former employer, defendant Hercules,
Incorporated ("Hercules" or "corporation"),
alleging he was discriminated against based on his
age in violation of the Age Discrimination in
Employment Act ("ADEA"), 29 U.S.C. §§ 621-34.
After over three years of adamantine posturing by
both parties, the case is finally poised for trial.
Before the Court are plaintiff's and defendant's
cross-motions in limine seeking the exclusion of
various evidence and witnesses in the upcoming
trial.

For the reasons set forth below, the Court will grant
in part and deny in part both motions in limine.

### II. FACTUAL BACKGROUND

For its fifth recitation of this saga, the Court gleans

the following facts, for the most part, from the
parties' joint Pretrial Stipulation, Docket Item ("D.I.
") 204. Finch is presently age 63 and was born on
July 22, 1932. He started his tenure at Hercules in
1962 as a Systems Analyst, progressing up the
company hierarchy to the helm of the Audit
Department, a position he held for eleven years
until Hercules terminated him in February 1991. At
that time, Finch was titled as General Auditor and
reported to the corporation's Chief Financial
Officer, Arden B. Engebretsen ("Engebretsen").
When terminated, Finch was 58 years old and
earning an annual salary of $102,608.

Finch's termination in 1991 is characterized by
Hercules as part of a reduction-in-force ("RIF"),
which had its genesis in late 1990. The 1991 RIF,
which eliminated 402 employees, was merely one in
a series of staff reductions in an overall program of
restructuring that Hercules had commenced in the
mid-1980s. To assist with the RIF process, Hercules
hired Thomas S. Litras Consultants ("Litras"),
which recommended a forced ranking/paired
comparison process to select the individuals to be
terminated. [FN1] In its proposal for ranking
employees, Litras recommended that the
corporation consider "performance, education,
versatility, flexibility, and continuous service. Age
[[was] to be the last factor considered, and then
*only if a 'tie-breaker' was required.* If there was a
tie, Hercules was to retain the older employee."
*Finch v. Hercules, Inc.,* 865 F. Supp. 1104,
1112-13 (D. Del. 1994) (emphasis in original;
internal citations omitted). It was agreed that
Hercules' preexisting performance appraisal system
was inadequate to support the required
decisionmaking.

In December, 1990, before any employee had been
selected for termination, the Hercules Board of
Directors appointed Thomas L. Gossage ("Gossage"
) as the corporation's new Chief Executive Officer ("
CEO"). Coincident with these events, Hercules'
Chief Financial Officer ("CFO") Engebretsen also

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 2

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

retired, positioning Finch, at least on paper, as directly reporting to the neophyte CEO Gossage. Gossage subsequently gave George MacKenzie (" MacKenzie"), the corporation's Controller, responsibility for Finch's Audit Department.

MacKenzie undertook the forced-ranking of seven managers from the Audit and Controller's Departments. He ranked Finch near the bottom of the list at sixth place. On January 26, 1991, MacKenzie obtained approval for the elimination of the position of General Auditor and, therefore, Finch (as well as the employee who was listed in last place). MacKenzie broke the news to Finch on February 4, 1991; Finch was terminated effective February 28, 1991.

**\*2** Later in 1991, the successor Chief Financial Officer reinstated the position of General Auditor, but did not interview Finch in the process. Instead, Hercules hired Curtis Tomlin, age 38, for Finch's former position. In response to this entire series of events, armed with his Equal Employment Opportunity Commission right-to-sue letter, Finch brought this action on May 5, 1992. At this point, it is uncertain whether this case will be treated under a "mixed motive" analysis, *see Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989); *Griffiths v. CIGNA*, 988 F.2d 457 (3d Cir.), *cert. denied*, 114 S.Ct. 186 (1993), or a "pretext" mode of analysis, *see McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Miller v. CIGNA*, 47 F.3d 586 (3d Cir. 1995). [FN2]

### III. CROSS-MOTIONS IN LIMINE

Finch has moved in limine for a ruling on the admissibility of various evidence and testimony that Hercules proposes to put forth at trial. Hercules has likewise cross-moved in limine.

#### A. Plaintiff's Motion in Limine

##### 1. Evidence Not Considered by MacKenzie When Force-Ranking Finch

As part of its defense to plaintiff's allegations of age discrimination, Hercules seeks to introduce at trial three types of documentary evidence. First, defendant offers an Indirect Productivity Improvement ("IPI") study performed by outside consultants in 1989 as evidence that Hercules needed a more proactive, involved audit department. *See* D.I. 119 at 486. This IPI study was not factored into any of the adverse employment decisions affecting plaintiff. Second, Hercules seeks to introduce evidence generated contemporaneously with the RIF process. During the latter part of January, 1991, Hercules reviewed the performance of all corporate staff groups for purposes of determining the amount of incentive bonuses (" Management Incentive Compensation Plan" or " MICP") for senior staff employees. Plaintiff asserts, and defendant does not contest, that the results of this MICP evaluation were not known until *after* Hercules decided to terminate Finch. Finally, Hercules seeks to admit Performance Appraisal Reports prepared by Finch for two of his employees.

Plaintiff argues that none of this evidence surfaced until the discovery phase of this litigation; MacKenzie did not consider any of it in his decision to terminate Finch. As such, plaintiff argues, the above documents should be inadmissible as " after-acquired" evidence under *McKennon v. Nashville Banner Publishing Co.*, 115 S.Ct. 879 (1995), and its progeny. The Third Circuit Court of Appeals has characterized after-acquired evidence as "evidence of the employee's ... misconduct or dishonesty which the employer did not know about at the time it acted adversely to the employee ..., but which it discovered at some point prior to, or more typically, during subsequent legal proceedings; the employer then tries to capitalize on the evidence to diminish or preclude entirely its liability for otherwise unlawful employment discrimination." *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d at 1222. The evidence of which plaintiff complains does not involve any misconduct or dishonesty by Finch that would serve as a *post hoc* justification for Hercules terminating him; it therefore does not quite fit the Third Circuit's paradigm as being after-acquired. Nevertheless, "to be admissible in either a mixed motives or pretext case, evidence must be relevant to the proofs or rebuttals of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

defendant's discriminatory motivation." *Finch v. Hercules, Inc.*, 865 F.Supp. at 1110 n.3 (D. Del. 1994) (citing *St. Mary's Honor Ctr. v. Hicks*, 113 S.Ct. 2742 (1993)). *See also Mardell*, 31 F.3d at 1229 (employee must show that age was a substantial factor motivating the adverse employment decision at the time it was made). The person involved in the forced-ranking of plaintiff, MacKenzie, was not aware of either the IPI study or the MICP evaluation until after the decision to terminate Finch had been made. Consequently, this evidence could not have affected Hercules' motivation in either the forced-ranking process or the ultimate decision to terminate Finch.

*3 Hercules counters that the above evidence is not after-acquired evidence, and that the results of the IPI study and the MICP reports are not being introduced as a basis for MacKenzie's termination decision. Rather, defendant seeks to rebut Finch's assertion that his performance as auditor was " consistently excellent." *See* Complaint, D.I. 1 at ¶ 8. Hercules would introduce the evidence to show MacKenzie's decision was not "mistaken and unreasonable," but rather was consistent with the vast majority of other high ranking officials' opinions at Hercules. Answer Brief, D.I. 226 at 3. Plaintiff rejoins by citing Fed. R. Evid. 403 and arguing that the dangers of confusing and misleading the jury and the resultant prejudice substantially outweigh any probative value of this evidence.

The Court agrees that any limited probative utility of the IPI and MICP evidence would be substantially outweighed by the undue prejudice to plaintiff. Because MacKenzie did not consider and did not know of unflattering statistics, they are not probative of his decisionmaking process. Hercules should not be allowed to present, after the fact, further justification for its actions if that justification was completely uncontemplated at the relevant time. At issue is whether a discriminatory animus motivated Hercules in the employment decisions it made adverse to plaintiff at the time those decisions were made. *Fuentes v. Perkasie*, 32 F.3d 759, 765 (3d Cir. 1994); *Mardell*, 31 F.3d at 1229. Accordingly, for purposes of liability, a jury will deliberate as to whether Hercules was so

motivated on the information it availed itself of at the time. [FN3] Admission of the MICP or IPI evidence would serve only to feed the jury facts that are extraneous to its task, yet once presented, would be difficult to "unlearn." Consequently, the Court finds any marginal relevance this evidence may have is substantially outweighed by the dangers of confusion and prejudice.

The Courts views differently, however, the third type of evidence Hercules proffers, *i.e.,* Performance Appraisal Reports authored by Finch as products of his evaluating two subordinate employees. Hercules argues that Finch has: expressed disbelief in his low ranking by MacKenzie and has claimed that it could only be due to a discriminatory motive, because his supervisor gave him good evaluations. Ironically, Finch himself ranked two of his employees, Droney and Mekine, at the bottom of the forced rankings after having given them good evaluations.

Defendant's Answer Brief, D.I. 226 at 4. Although Finch contends that "Finch's ranking was not based on performance," D.I. 231 at 2, MacKenzie has testified at deposition that his forced ranking of Finch *was* based on performance. D.I. 121 at B-106. The evidence in question is directly relevant to the fact-finder's consideration of whether Hercules employee evaluations necessarily correlate to forced-ranking decisions or an employee's prior performance. Therefore, the Court will allow this evidence to be admitted at trial.

### 2. Evidence of Finch's Reputation

*4 Plaintiff next argues that Hercules will try to introduce at trial evidence of Finch's general reputation at Hercules. During discovery, one Hercules employee testified that "[Finch] was not well regarded in Hercules other than by his prior boss." D.I. 119 at A374. Another employee provided a sworn statement that "The general perception within Hercules was that Mr. Finch was a lackluster performer ...." D.I. 212 at 11, citing D.I. 135 at 8. [FN4] Finch argues that such testimony concerning the general view of unidentified persons in Hercules management should be excluded as

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 4

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

hearsay as it is inherently unreliable, prejudicial, and not susceptible to cross-examination. Finch concedes, however, that a witness's testimony as to his or her own personally-held beliefs is susceptible to cross-examination. D.I. 231 at 8. Finally, Finch contends that such testimony is also barred under Fed. R. Evid. 701. Hercules counters by arguing that Finch misunderstands both the type of testimony it seeks to offer as well as the applicable law; it argues that this evidence is "exactly the type of testimony permissible under Rule 701." D.I. 226 at 6.

Fed. R. Evid. 701 allows the introduction of lay opinion testimony if the witness' testimony is " limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Hercules maintains that both of the rule's requirements are easily met. First, as fulfillment of part (a), it argues that its witnesses are Hercules managers who have had the opportunity to interact with Finch and observe his performance; thus, they have first-hand knowledge about management's perceptions regarding Finch's performance. For part (b), Hercules contends that the managers' testimony will assist the jury to understand Finch's low rank resulting from the RIF process. It also argues that this testimony is crucial for an understanding of whether it was unreasonable for MacKenzie to conclude that Finch was an unsatisfactory performer and therefore terminate him.

If, as Hercules represents, its witnesses' testimony will be based on each witness's own perception of Finch, the testimony is not hearsay and is admissible. Plaintiff will be able to cross-examine these witnesses as to the reasons why they formulated their opinions and whether their opinions are rationally based. Although MacKenzie was the actual manager who decided plaintiff's fate, other managers were privy to the same or similar information possessed by MacKenzie regarding plaintiff's performance, assuming Hercules lays the proper foundation under Rule 701(a). Their testimony may corroborate or undermine MacKenzie's decision; either way, this type of testimony is crucial to the fact-finder's consideration

of whether Hercules' proffered explanation of its decision to terminate Finch is worthy of credence.

However, because the testimony of the individual managers will be admissible, Hercules will not be allowed to elicit testimony of Finch's general reputation among the Hercules management. The Court agrees with plaintiff that under these circumstances, the probative value of general reputation testimony will be substantially outweighed by the resultant prejudice to plaintiff. It will be unnecessary to ask each manager about how management in general regarded Finch because each manager will have the opportunity to testify about his or her personal and fact-based opinion of plaintiff. The jury will thus be able to draw its own conclusion as to Finch's reputation by weighing each manager's testimony. Based on this evidence, plus evidence presented by MacKenzie, the jury may or may not infer that it would be reasonable that MacKenzie held these same beliefs.

### 3. Finch's Membership and Participation in the Mormon Church

*5 Plaintiff plans to call at trial Arden Engebretsen, Hercules' former Chief Financial Officer and the administrator to whom plaintiff directly reported. Engebretsen and Finch were members of the same church, the Church of Jesus Christ of Latter-Day Saints, also known as the Mormon Church. During 1977-1980, Finch was a bishop of his and Engebretsen's Mormon congregation; Finch's duties as bishop included counseling members of the congregation, including young adults and teens. In his role as lay bishop, Finch counseled one or more of Engebretsen's children. Hercules argues that evidence of Finch's church-based relationship with Engebretsen is relevant to show that Engebretsen, who was responsible for evaluating Finch's performance, may have been and may still be biased in favor of Finch. Finch agrees that the following evidence is admissible: "that Engebretsen and Finch attend the same church and that, in connection with Finch's church activities, he counseled Engebretsen's children some fifteen years ago." [FN5] D.I. 231 at 12. Finch, however, objects to Hercules placing before the jury any specific reference to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Finch's denomination, as it is his understanding that the Mormon sect is generally unpopular and not well understood in the eastern United States. As such, Finch argues, all reference to the Mormon Church should be excluded as unduly prejudicial under Rule 403.

Fed. R. Evid. 610 states that "[e]vidence of the beliefs or opinions of a witness on matters of religion is not admissible for the purpose of showing that by reason of their nature the witness' credibility is impaired or enhanced." The rule's advisory committee notes add that while the rule forecloses inquiry into the religious beliefs or opinions of a witness for purposes of showing the witness's character for truthfulness, "an inquiry for the purpose of showing interest or bias because of them is not within the prohibition." The Court agrees that evidence of Finch attending the same church as his supervisor and counseling his supervisor's children is relevant and admissible to show possible bias on the part of Engebretsen. However, Engebretsen's bias, if there is bias, would flow from the nature of the relationship between these two men as members of the same religious community, independent of the specific denomination that community happens to be. Evidence of Finch's and Engebretsen's specific denomination is irrelevant to the substantive issues in this case; even if it were relevant, its probative value is substantially outweighed by the danger of undue prejudice to the plaintiff. While the Court does not necessarily find that the Mormon religion is unpopular in the District of Delaware, the Court does acknowledge the possibility that this evidence will only serve to distract the jury or take on an inflated and unwarranted significance. The Court therefore holds that evidence of Finch's and Engebretsen's membership in the Mormon church is inadmissible.

### 4. Exclusion of Hercules Witnesses

*6 Plaintiff also moves to exclude or at least limit the testimony of certain Hercules' witnesses as listed in the Pretrial Stipulation. The grounds for exclusion are several.

### a. Curtis "C.T." Tomlin

. Hercules proposes to call Curtis Tomlin, a Harvard-educated, African-American, Certified Public Accountant who, at age 38, was hired in December 1991 as the corporation's new General Auditor. According to defendant, Tomlin was hired when R. Keith Elliott, Hercules' newly appointed Chief Financial Officer, decided to reinstate the General Auditor position. D.I. 226 at 34. Hercules seeks to introduce evidence of Tomlin's credentials and qualifications as probative of Hercules' non-discriminatory motive in re-filling Finch's former position; Finch was not interviewed or considered for rehire. Hercules also would have Tomlin testify regarding the environment in the Audit Department following Finch's eleven years at the department's helm. Tomlin would paint an unflattering portrait of Finch's legacy by charactering the Audit Department as "dispirited and reactive," one which Tomlin "needed to take considerable steps to improve." D.I. 241 at 30.

Finch argues that he is not alleging that Hercules discriminated against him based on his age when it refused to interview or rehire him in December 1991. Plaintiff argues that the only relevant evidence are Tomlin's hire date, his age, and the position for which he was hired. In his Complaint, Finch chose to allege these very facts as bearing on his age discrimination claim.

The Court agrees that Tomlin's age, date of hire, and position are germane to this action. Plaintiff has argued that the replacement of the 58-year-old Finch by this younger individual is probative of Hercules' discriminatory animus. But, if Finch wishes to offer these facts, Hercules will be allowed to offer proof of Tomlin's credentials as evidence of a legitimate motive underlying its actions. The Court is troubled by Hercules' assumption that the condition in which Tomlin found the Audit Department, eleven months after Finch was terminated, is directly attributable to Finch. During this interim period, the Audit Department was headed by one or more temporary managers who may or may not have contributed to the departmental environment into which Tomlin was thrust. However, it is simply impossible to

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

determine in advance of trial whether this testimony would be substantially more prejudicial than probative. Accordingly, any ruling on this issue prior to trial would be premature. The Court will entertain argument on this issue during trial, out of the hearing of the jury, just prior to or at the time Tomlin takes the witness stand.

### b. Witnesses Identified By Hercules in the Pretrial Stipulation

In the Pretrial Stipulation, Hercules identified for the first time as trial witnesses several of its present and former employees: David S. Hollingsworth, predecessor CEO to Gossage; Fred L. Buckner, former President; James J. Anthony, Manager of Administration in the Audit Department; William Godfrey, Manager of Computer Audits from 1980 to 1987, Sue A. Murray, who ran the Audit Department on an interim basis after Finch was terminated; and Harry Gordon, who was the Director of Executive Resources in Hercules' Human Resources Department. [FN6]

*7 Plaintiff protests that these witnesses should have been disclosed as responsive to the following series of interrogatories:
4. Was elimination of the position of General Auditor the sole reason for terminating Mr. Finch? [Hercules' Answer: No]
5. If the answer to Interrogatory 5 was no, please state in detail:
a. each additional reason for terminating Mr. Finch; [Hercules' Answer: In connection with the downsizing, and in compliance with the mandates of Hercules' Policy Compliance Committee's requirements, the Financial Managers falling under the supervision of the Controller's Department were ranked. Mr. Finch's performance caused him to be ranked among the two lowest ranked financial managers in a group of seven, and these two employees were terminated.]
b. description of each document which refers to the additional reason;
c. *the name of each person who has knowledge of the additional reasons;*
d. whether any of the additional reasons were communicated to Mr. Finch, and if so, by whom."

D.I. 227, Exh. C (emphasis added). Plaintiff contends that Hercules was noncompliant with its answers to his discovery requests, specifically question 5c, and that consequently, he never had an opportunity to depose the above witnesses. Fed. R. Civ. P. 26(a)(5) allows parties to propound written interrogatories as a part of the discovery process; the rules also provide a harsh penalty for noncompliance with this discovery mechanism. "A party that without substantial justification fails to disclose information required by Rule 26(a) ... shall not, unless such failure is harmless, be permitted to use as evidence at a trial ... any witness ... not so disclosed." Fed. R. Civ. P. 37(c)(1). Finch requests these witnesses to be excluded from trial. Plaintiff's Opening Brief, D.I. 212 at 31.

Hercules counters that plaintiff's interrogatories were narrowly focused and, specifically, number 5c was merely "asking for the names of persons who had knowledge of any additional reasons, aside from the position elimination, why Finch was one of those chosen to be RIFed, *i.e.,* knowledge of what those additional reasons were." D.I. 226 at 20. In response to this interrogatory, Hercules identified individuals whom it contends knew *why* Finch was terminated, *i.e.,* that Finch's performance was considered as a factor. The Court agrees that this was a reasonable interpretation of interrogatory 5c, viewed standing alone and especially within the context of the surrounding questions. The interrogatories focus on Hercules' proffered reasons underlying its termination of plaintiff and individuals who were able to proffer those reasons.

In contrast, Hercules now seeks to offer the witnesses in question to testify about the quality (or lack thereof) of Finch's performance; it argues these witnesses did not know that Finch's performance was factored into the forced-ranking and termination decisions. Therefore, defendant argues, a listing of these witnesses was not required by plaintiff's interrogatories. Hercules has tendered a brief description of each of the witnesses in question. James J. Anthony served as Manager of Administration in the Audit Department and reported directly to plaintiff. He would be able to testify about the nature and quality of Finch's performance and present his view as to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 7

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

functioning of the Audit Department. He was not, however, involved in the decision to terminate Finch.

*8 Sue A. Murray was one of several "interim" managers who ran the Audit Department after Finch was terminated. At trial, she would testify that it was clear that her function in this capacity would be strictly on an interim basis, and that she was granted unencumbered access to the Audit Committee, a Committee of the Hercules Board of Directors. Hercules seeks to rebut plaintiff's assertion that Hercules engaged in "subterfuge" when terminating Finch and eliminating his position on an interim basis. *See* D.I. 204 at 30-31. Hercules would also elicit Murray's testimony regarding problems she encountered when running the Audit Department allegedly stemming from plaintiff's "poor management." D.I. 226 at 34.

Fred Buckner was Hercules' President and Chief Operating Officer during the years antedating the 1991 RIF. Buckner served as the leader of Hercules' President's Team and was also a member of the corporation's Executive Team. These two groups evaluated the performance of different departments within the corporation, D.I. 227, Exh. O at 57; they were also responsible for the MICP evaluation, *supra,* section 1, which has been ruled admissible only if there is bifurcation of liability and damages. Hercules also argues that plaintiff has listed as one of his trial exhibits a document authored by Buckner and that Buckner should be allowed to testify about the document.

William Godfrey worked with Finch from 1980-1987 as Manager of Computer Audits. Hercules states that Godfrey will attest to plaintiff's unique relationship with CFO Engebretsen and his family during that time frame. Godfrey will also testify about Finch's personal activities purportedly occurring during the work day, including sleeping, church business, and reading the newspaper.

David Hollingsworth was Hercules' CEO prior to Gossage. Hercules does not currently plan to call this witness during its case in chief, but wishes to reserve its right to do so if necessary.

The current record shows that none of the above witnesses were positioned to know that Finch's performance played a role in the ultimate decision to terminate him. With one qualification, the Court will allow these witnesses to present their testimony, as outlined by Hercules, at the upcoming trial. If there is no bifurcation, Buckner will not be allowed to testify about the MICP evaluation or any other similar evidence which was not considered in the decision to terminate Finch.

Plaintiff objects to an additional trial witness identified by Hercules, Harry Gordon, who from the mid-1980s until July, 1991, was Hercules' Human Resources Director of Executive Resources. Plaintiff argues that Hercules affirmatively misled him during discovery as to the scope of this witness's knowledge of and involvement with Finch's termination. Hercules initially identified Gordon as an individual who participated in the development of standards or criteria for evaluating employees during or in preparation for its 1991 RIF. However, Hercules later narrowed its characterization of Gordon's expertise in this area by describing Gordon as one who attended a meeting at which the RIF policy was discussed, but who played no role in developing standards or criteria for evaluating employees.

*9 In November, 1992, Finch also asked to discover any Hercules documents related to the "replacement potential of all corporate financial positions" and for "promotability lists" prepared by Human Resources. D.I. 232 at C40. Hercules responded that there were none available at that time. In May, 1995, Finch renewed this same request for documents. Hercules responded by asserting it had just discovered an old notebook of Gordon's in a desk containing notes of business meetings Gordon attended in 1988. Gordon's notes quote Engebretsen, who was Hercules' CFO and Finch's direct supervisor, as declaring the corporation as needing "an accounting guru" and "Need Chief Auditor - repl Finch." D.I. 210, Exh F. at 5. After contacting Gordon, who had retired in July 1991, further probing revealed a 1985 file memo documenting a conversation between Gordon and MacKenzie. MacKenzie is said to have commented that plaintiff was "insecure" and was an "8:00-4:45

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                      Page 8

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

carpooler." *Id.* at 3. Hercules forwarded these and other of Gordon's documents to plaintiff's counsel in June and July of this year. It now seeks to call Gordon as a witness to testify how plaintiff was not highly regarded by his superiors.

Plaintiff argues that he has been prejudiced in his ability to prepare adequately for Gordon's trial testimony and that Hercules should not be allowed to profit from its abuse of the discovery process. Plaintiff therefore seeks to exclude this witness from testifying at trial.

The exclusion of otherwise admissible testimony because of a party's failure to meet a timing requirement is a harsh measure to be avoided where possible. *Central Maine Power Co. v. Foster Wheeler Corp.,* 115 F.R.D. 295, 297 (D. Me. 1987). However, sometimes, such exclusion is necessary; fidelity to the constraints of Scheduling Orders and deadlines is critical to the Court's case management responsibilities. *Tomlin v. Holecek,* 158 F.R.D. 132, 135 (D. Minn. 1994) (citing *Jochims v. Isuzu Motors, Ltd.,* 144 F.R.D. 350, 356 (S.D. Iowa 1992)). Accordingly, the "flouting of discovery deadlines causes substantial harm to the judicial system." *Id.* As a sanction for failure to comply with a timing requirement set by the Scheduling Order in this case, the Court is authorized to exclude evidence proffered by the disobedient party. *United States v. 68.94 Acres of Land,* 918 F.2d 389, 396 (3d Cir. 1990). However, the Court also acknowledges that unreasonable adherence to such deadlines, without regard to whether a party was justified for its actions, runs counter to the dominant interest in the trial process, *i.e.,* ascertaining the truth. These competing considerations are properly resolved by the Court in exercising its discretion. *DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193, 1201 (3d Cir. 1978).

When considering whether to exclude testimony, courts generally look to the following: "the ability of the party to have discovered the witnesses earlier, validity of the excuse offered by the party, willfulness of the party's failure to comply with the court's order, the party's intent to mislead or confuse his adversary, and the importance of the excluded testimony." *Stewart v. Walbridge, Aldinger Co.,*

162 F.R.D. 29, 31 (D. Del. 1995) (citing *Meyers v. Pennypack Woods Home Ownership Ass'n,* 559 F.2d 894, 904 (3d Cir. 1977), *overruled on other grounds, Goodman v. Lukens Steel,* 777 F.2d 113 (3d Cir. 1985), *aff'd,* 482 U.S. 656 (1987)). Based on these considerations, the court must weigh (1) the prejudice or surprise to the party against whom the excluded witnesses would have testified, (2) the party's ability to cure the prejudice, (3) the extent to which calling undisclosed witness would disrupt the trial process, and (4) bad faith or wilfulness in failing to comply with the court's order. *Meyers,* 559 F.2d at 904-05.

\*10 At this point, on the eve of trial, the Court is inclined to exclude this witness. Defendant has not offered any compelling justification for why the documents were not produced when first requested during discovery. Hercules enjoyed access to both the documents and was able to reach Gordon for more information (even though he retired three years ago), and should have done as much as part of its duty to diligently produce evidence requested by its opponent. Plaintiff has been both surprised and prejudiced in not being able to depose this witness and prepare accordingly for trial. It would be unfair to plaintiff to have his case preparation impacted and disrupted at this late date. Additionally, there is no evidence that MacKenzie relied on any of this evidence when force-ranking or terminating Finch. On balance, consideration of the above factors weigh in favor of excluding this witness from trial.

#### B. Defendant's Motion in Limine

##### 1. Evidence of Hercules Financial Earnings After the 1991 RIF

Hercules seeks to preclude at trial evidence of the earnings and financial status of both the corporation and several of its top executives. Plaintiff argues that Hercules has placed its financial condition at issue when its CEO Gossage declared the purpose of the 1991 RIF was to cut indirect costs and put the company back on the path towards being "lean." Plaintiff's Answer Brief, D.I. 228 at 27. Plaintiff also "vigorously disputes Hercules' justification for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.