Not Reported in F.Supp.

Page 9

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

the RIF" and "believes the RIF, as applied to him, was totally pretextual ...." *Id.* at 27. Specifically, Finch argues that there are substantial reasons to dispute whether Hercules' fiscal health was in serious jeopardy and whether Hercules' proffered economic justification for the RIF is worthy of credence.

Hercules argues that this evidence is not probative of whether the corporation discriminated against plaintiff based on his age. Rather, it asserts, evidence of Hercules' financial wealth would serve to prejudice the jury against defendant and its senior officers by portraying them as "avaricious fat cats who can afford to pay a sizable judgment." D.I. 209 at 2. The Court agrees. First, plaintiff seeks to introduce evidence of Hercules' earnings and argue that the RIF was not economically justified. According to plaintiff, Hercules' annual net earnings/losses were as follows: 1989, the corporation lost $81 million; in 1990, following a RIF, it enjoyed a net income of $96 million; in 1991, it similarly gained $95 million. In addition, plaintiff seeks to introduce the salaries and bonuses of both Hollingsworth and Gossage, Hercules's two most recent Chief Executive Officers. Their salaries ranged from the high six to low seven figures; plaintiff seeks to draw the inference that because Hercules was willing and able to afford such high-priced talent, it must not have been in such economic dire straits as to justify the 1991 RIF.

These figures would seem staggering to those uninformed about the operation of a large, Fortune 500 corporation such as defendant's. Were plaintiff allowed to introduce such evidence, defendant would no doubt find itself required to define in great detail the meaning of these numbers and how they compare with other similarly situated businesses and top executives. Hercules would also likely seek to illustrate the economic projections and reasoning behind the multiple RIF's and whether, in hindsight, the prospective RIF planning correlated to the eventual financial results. In addition, the corporation would explain whether other forces impacted these financial statistics, such as availability and cost of raw materials, market demand, and the economic climate both national and international.

*11 Corporations implementing a RIF generally have an explicit plan to reduce expenses by eliminating jobs. *Hardin v. Hussman Corp.,* 45 F.3d 262, 264 (8th Cir. 1995). Such corporations usually provide decisionmakers with objective criteria by which to decide which jobs to eliminate. *Id.* At trial, plaintiff will have every opportunity to explore Hercules' stated reasons and criteria for terminating him pursuant to the RIF. However, the Court finds there is no requirement for a corporation to be in financial distress before embarking on such a RIF. *Id; Bashara v. Black Hills Corp.,* 26 F.3d 820, 824-25 (8th Cir. 1994). Therefore, the Court is not inclined to allow a mini-trial on the issue of whether Hercules' RIF was an exercise in sound business judgment. The presentation of Hercules' financial history in the years after the 1991 RIF would consume much trial time and serve only to distract attention from the pivotal issue in this case: whether Hercules discriminated against Finch based on his age when it terminated him. Accordingly, the Court holds that the prejudice to defendant resulting from admission of evidence of earnings of Hercules and its senior executives after the would substantially outweigh any probative value this evidence would have.

### 2. Statements by CEO Gossage

Plaintiff proposes to introduce before the jury the following: (1) a newspaper article appearing in the Wilmington *News Journal* containing comments attributed to CEO Gossage; (2) an article published on February 1, 1991 in *Horizons,* an internal Hercules publication; (3) remarks by Gossage to a Hercules executive named William Hosker in January, 1992; (4) remarks allegedly made by Gossage to another Hercules executive named Doyle Miller, and subsequently repeated by Miller to Hosker.

#### a. The *News Journal* Article and the *Horizons* Article

Plaintiff seeks to admit a Wilmington *News Journal* article entitled, "Hercules will cut 450 jobs," which quotes Gossage as saying, "The young people in the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 10

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

company want us to bring Hercules back to where it ought to be again .... Older people will see friends impacted and will feel bad about it. But we'll get this behind us." D.I. 119 at A539. In his deposition, Gossage testified that if not a direct quote, the article was a "similar quote" to something he said and at least captured the spirit of what he said. D.I. 121 at B71. The article was published on January 9, 1991, right as final approval was given for the RIF to get underway. D.I. 229 at B65, 68.

Subsequently, *Horizons,* Hercules' internal corporate newsletter, published an article styled in a question and answer format, entitled "Gossage answers employees' questions." In the article, Gossage was asked to amplify his statement published in *The News Journal,* and was quoted as saying:
What I said was that younger employees want to know when the company will get up and turn itself around, and I acknowledged that to those with long service to the company, it was painful to watch what was going on. I'd say it again.

*12 D.I. 121 at B288. Gossage allegedly made these remarks during a presentation at the Hercules Men's Club.

Hercules argues that Gossage's comments should not be admitted at trial for several reasons. First, it contends they are irrelevant and characterizes them as merely "observations about the reaction of Hercules' employees to the voluntary phase of the RIF, and generalities about evolutionary changes in expectations about the permanency of employment in the corporate world." D.I. 209 at 10. Second, it characterizes Gossage's remarks as "stray remarks" that are not indicative of age bias. Under the so-called "stray remark" doctrine, such remarks " made by non-decisionmakers or by decisionmakers unrelated to the decisionmaking process are rarely given great weight" and are not direct evidence of discrimination. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 779 (3d Cir. 1994) (citing *Ezold v. Wolf, Block, Schorr and Solis-Cohen,* 983 F.2d 509, 545 (3d Cir. 1992), *cert. denied,* 114 S.Ct. 88 (1993)). Hercules maintains that Gossage had "very little to do with the 1991 RIF." D.I. 209 at 14.

The Court disagrees with both of Hercules' assertions. Fed. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. " The rule, therefore, sets a low threshold for relevancy, *In re Paoli R.R. Yard PCB Litigation,* 35 F.3d 717, 783 (3d Cir. 1994), *cert. denied,* 115 S.Ct. 1253 (1995); evidence is irrelevant "only when it has no tendency to prove [a consequential] fact," *Spain v. Gallegos,* 26 F.3d 439, 452 (3d Cir. 1994) (citing *Blancha v. Raymark Indus.,* 972 F.2d 507, 514 (3d Cir. 1992)).

Gossage's statements in *The News Journal* and in the *Horizons* newsletter easily satisfy this lenient relevancy standard. In this disparate treatment case, plaintiff seeks to prove a discriminatory motive on the part of Hercules; he may meet his burden either by presenting direct or indirect evidence of unlawful age discrimination. *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1214 (3d Cir.1988), *cert. denied,* 490 U.S. 1098 (1989). As to Hercules' second contention, the Court finds that Gossage, as the corporation's CEO and leader, was well positioned to set the tone for the 1991 RIF. His highly public statement explaining the RIF to *The News Journal* demonstrates Gossage's intent to exhibit strong leadership at the corporate helm. Consequently, "because discriminatory comments by an executive connected with the decisionmaking process will often be plaintiff's strongest circumstantial evidence of discrimination, they are highly relevant." *Abrams v. Lightolier, Inc.,* 50 F.3d 1204, (3d Cir. 1995). Here, Gossage explicitly distinguished between older and younger employees and how he perceived the younger employees, as opposed to the older ones, as those who wanted to bring the corporation back to a better condition; it is for the jury to weigh the competing inferences generated by these remarks. *See Siegel v. Alpha Wire Corp.,* 894 F.2d 50, 54-55 (3d Cir.), *cert. denied,* 496 U.S. 906 (1990) (reversing district court for holding that the defendant's use of the phrase "old dogs won't hunt" was not sufficiently probative to be admissible). As the Third Circuit Court of Appeals has observed:
*13 [w]hen a major company executive speaks, "

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 11

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

everybody listens" in the corporate hierarchy, and when an executive's comments prove to be disadvantageous to a company's subsequent litigation posture, it cannot compartmentalize this executive as if he had nothing more to do with company policy than the janitor or watchman.

*Lockhart v. Westinghouse Credit Corp.,* 879 F.2d 43, 54 (3d Cir. 1989). Thus, it is possible that MacKenzie and other Hercules personnel were influenced by Gossage's characterizations of older versus younger employees; drawing or not drawing this inference will also be within the province of the fact-finder at trial. The Court holds this evidence to be relevant to plaintiff's proof of the corporation's anti-age animus.

Hercules adds that even if the remarks are relevant, plaintiff attempts to exploit them "out of context and without any basis in fact." D.I. 209 at 11. Thus, defendant argues, these comments, are misleading and inflammatory, and, if admitted, would be more prejudicial than probative. The Federal Rules of Evidence set forth the standard for this discretionary balancing: "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury ...." Fed. R. Evid. 403. Thus, to exclude Gossage's remarks under Rule 403, their probative value must be "substantially" outweighed by their potential for prejudice. The Court finds such prejudice lacking here. It is axiomatic that all evidence adverse to a party is prejudicial; under the rule, the prejudice should rise to a level tantamount to being unfair. *Dollar v. Long Mfg., N.C. Inc.,* 561 F.2d 613, 618 (5th Cir. 1977), *cert. denied,* 435 U.S. 996 (1978). At trial, Hercules will be afforded ample opportunity to provide context and explanation for Gossage's remarks. Accordingly, the Court does not find Rule 403 to be a basis for excluding this evidence.

In its Reply Brief, D.I. 233, Hercules does make a final persuasive argument for exclusion of the *Horizons* article: it correctly identifies the article as hearsay under Fed. R. Evid. 802. Hercules argues that if the basis of the article was Gossage's Men's Club speech, then plaintiff must introduce

admissible evidence of the speech, and not a hearsay article about the speech published later. The Court agrees that the Horizons article, even though arguably relevant, must be excluded as inadmissible hearsay.

Finally, Hercules argues that *The News Journal* article should be excluded because to do otherwise would have a chilling effect on free decisionmaking and encroach on an executive's right to speak about Hercules' future. As legal theory for this argument, Hercules relies on the First Amendment to the United States Constitution. The Court finds that this assertion emotes more heat than light, as there is no state actor involved in this case against whom the First Amendment could be invoked. Consequently, the Court finds this argument wholly without merit, warranting no further analysis.

b. Remarks Attributed to Gossage by Hosker

*14 Plaintiff also seeks to call William E. Hosker, who is the retired head of Hercules' Resins Group. In 1992, approximately one year after Finch's termination, Gossage led a reorganization of the corporation. In the reorganization, Hercules established three new groups: Chemical Specialties, Food and Functional Products, and the Hercules Materials Company. D.I. 229 at B43. According to Hosker, Gossage expressed his intent to have in place at the head of each group, positioned immediately below him in the corporate hierarchy, individuals who would be part of a cadre of qualified CEO candidates who would be in their early 50s by the time Gossage retired. Hosker claims Gossage made it clear that Hosker would be passed over because Hosker was already 54 years old. D.I. 58 at 20-21. According to Hosker, Gossage explained that "someone in their late 50s typically looks, expends their energies in preparing their retirement ....[while] younger people have perhaps more energy and a longer period of time in which they can perform their duties." *Id.* at 27.

In its opinion on Hercules' summary judgment motion, the Court refused to consider this evidence. *See Finch v. Hercules,* 865 F. Supp. at 1125. For purposes of admissibility at trial, the Court reaches

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                              Page 12

**Not Reported in F.Supp., 1995 WL 785100 (D.Del.)**
**(Cite as: Not Reported in F.Supp.)**

a similar result. While this statement on its face may raise an inference of age discrimination, the issue Gossage's statement was addressing, CEO succession planning, is a far cry from the issue in the instant case. The hiring and promotion of individuals to the position of Chief Executive Officer is treated differently under the ADEA. Under the statute's executive and policy making exception, 29 U.S.C. § 631(c)(1), a company has a right to require its CEO to retire at age 65. [FN7] At summary judgment, the Court held that "[a]ge bias in [such] promotion decisions simply does not make age bias in termination decisions more likely. Further, to the extent this portion of Hosker's testimony is minimally relevant, ... its probative value is substantially outweighed by the danger of unfair prejudice." *Finch v. Hercules*, 865 F.Supp. at 1125. These same considerations apply with full force at this stage of the litigation.

Hosker would also testify about a June 1992 meeting conducted by C. Doyle Miller, Hosker's direct superior. At that meeting, Miller discussed the results of the Management and Organization Review for Hosker's Chemical Specialties Group. While doing so, Miller relayed certain comments that Gossage had allegedly made to him; Hosker dictated a memo to his file that referenced these remarks. Hosker's memo states *inter alia*, that:
The only negative criticism received by Miller was Gossage's statement that the Chemical Company had not aggressively or creatively addressed "tired warriors," who, though contributing to the corporation, were blocking the movement of young, aggressive people, upon whom the future of the company had to be built.

D.I. 229 at B12. As a backdrop to this statement, plaintiff explains that "Gossage planned to get younger employees into the pipeline so that they could rise through developmental positions into the more senior positions and provide the Board with a choice of candidates to replace him when he retired. " D.I. 228 at 13. Plaintiff quotes Gossage as testifying that "there has been, since I took over the [CEO] position, an ongoing effort between the Board and myself on a regular basis to talk about my eventual retirement and the candidates who might replace me and what development plans are

in place to prepare them for that eventuality." D.I. 229 at B34.

**\*15** Hercules correctly notes that this testimony was before the Court at summary judgment as well, and the Court declined to make a definitive ruling pending further illumination of this testimony. In its opinion, the Court requested clarification (1) as to the timing of these statements relative to Finch's termination, (2) whether Gossage actually used the words "tired warriors," (3) if he did use the term, what meaning did he ascribe to the phrase, and (4) whether this remark was targeted specifically to the Chemical Specialties Group. *Finch v. Hercules*, 865 F.Supp at 1125. The record shows that this remark allegedly occurred approximately 16 months following the 1991 RIF and Finch's termination. Miller denies ever using the phrase in any meetings he conducted or hearing Gossage use the phrase. D.I. 210 at Exh. G. The record is silent as to whether Gossage himself admits or denies making this statement and what it meant. Miller's memo defines the remark as directed specifically at his Chemical Specialties Group. D.I. 229 at B12. As such, Hercules argues that it is unrelated to the termination of Finch.

The Court finds the issue of admissibility of this evidence a closer question. Standing alone, the temporal remoteness of the statement is not troubling; it could very well indicate an ongoing corporate anti-age bias. Courts have found on numerous occasions remote statements admissible as circumstantial evidence of age discrimination. *Abrams*, 50 F.3d at 1214 (citing *Lockhart*, 879 F.2d at 54; *Roebuck v. Drexel Univ.*, 852 F.2d 715, 733 (3d Cir. 1988)). However, the hearsay nature of Hosker's memo and the circumstances surrounding the document's generation call into question the document's reliability. At summary judgment, the Court voiced concern about the stratified nature of the statements at issue here: Gossage to Miller to Hosker to Hosker's memo to file. The Court is willing to assume *arguendo* that Gossage and Miller both made this alleged remark in their capacities as corporate agents acting within the scope of their agency or employment. *Finch v. Hercules*, 865 F. Supp. at 1126 and n.21. It is at the next level of hearsay, *i.e.*, Hosker's hearing the remark and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                      Page 13

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

reducing to writing that is troubling.

Plaintiff has argued that it can show that Hosker's memorandum would satisfy the requirements for the business records exception to the hearsay rule, Fed. R. Evid. 803(6). However, even if this document could be admitted under this rule, the inquiry into the admissibility of this evidence does not end here. Hosker may have been motivated to make this record for considerations other than the ordinary course of business. Just a few months earlier, in January 1992, Hosker was passed over for promotion and has testified that he is of the opinion he was discriminated on the basis of his age. D.I. 158, Exh. 1 at 31, 34. He candidly expressed that as result, he felt disadvantaged, and retained an attorney to look into the matter. *Id.* at 31. In June, 1992, when Hosker recorded his impression of the meeting conducted by Miller, he wrote
**\*16** Upon questioning Doyle as to the definition of " tired, old warriors," I used the phrase "white, old males," and was admonished that while perhaps that was an equivalent connotation, we must refrain from language that speaks to age discrimination. My point was that, in fact, Tom Gossage and Doyle Miller are urging management to find a mechanism to move old people out of key jobs to make way for younger personnel. To further clarify, I asked Doyle for a profile of a typical "tired, old warrior." His words were, "Someone who may be 54 years old, contributing to the corporation and planning to work until age 65. These types of individuals are blocking the ability to move people through."

D.I. 229 at B12. Hosker's memo clearly records Hosker's sentiments as to the meaning of the phrase "tired warriors." Hosker unabashedly interjected the word "old" into the phrase and recorded his own interpretation of the remark, an interpretation consistent with his previous impression that Gossage was discriminating against older managers such as himself. As someone who had already felt wronged by Gossage's conduct, Hosker seized the opportunity to memorialize in writing his subjective impression of what he considered further evidence of age discrimination by his employer. The memo does not set forth an objective explanation of what meaning Gossage attributed to the remark; "tired warriors," standing alone, may or may not implicate

considerations of age. *See EEOC v. Clay Indus.,* 955 F.2d 936, 942 (4th Cir. 1992) (analogous phrase, "dead wood" referred to employee evaluations regardless of age). Considering Hosker's jaundiced eye towards Gossage, the Court views this memo as reflective of Hosker's subjective opinion regarding Gossage's alleged remark. As such, the memo's potential for prejudice in misleading and confusing the jury substantially outweighs it probative value.

Although Hosker's memo will not be admissible at trial, the Court will allow Hosker to testify that he heard Miller relay Gossage's alleged "tired warriors" comment at the May 29, 1992 presentation. Plaintiff will still be afforded opportunity to expose this remark to the jury, and defendant may vigorously cross-examine and present its opposing evidence regarding the nature or even the existence of this remark. In so doing, however, the potential prejudice to Hercules by the extra layer of hearsay, Hosker's memo, will be eliminated.

### 3. Exclusion of Plaintiff's Witnesses

In the Pretrial Stipulation, plaintiff lists five witnesses whom he has never before identified as having information about the subject matter of this case. These witnesses are Maynard Turk, Alexander Searl, James Hunter, Chris Witham, and Gary Dunn. Similar to plaintiff's motion in limine to exclude witnesses, defendant seeks a ruling that these witnesses not be allowed to testify because they should have been, but were not, disclosed during discovery.

In its First Set of Interrogatories, Hercules asked plaintiff to "[i]dentify all persons that you know or believe have information regarding the subject matter of this action, and describe the information." D.I. 210, Exh. K. Plaintiff did not include any of these witnesses in his answer. Under Fed. R. Civ. P. 37(c)(1), the Court may permit witnesses not disclosed during discovery if the failure to disclose the identities was harmless, or if there was " substantial justification" for the non-disclosure.

**\*17** Plaintiff claims that its failure to disclose these

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 14

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

witnesses' identity was substantially justified because he had no idea, until summary judgment, that Hercules intended to proffer evidence on why it terminated Finch, *i.e.,* justification based on plaintiff's record of performance. D.I. 228 at 32-33. The Court does not find this argument at all convincing. At deposition, MacKenzie explicitly testified that he based his forced ranking of Finch on Finch's performance. D.I. 121 at B-106. Hercules claims that its subsequent termination of Finch was influenced at least in part by the results of the forced-ranking; it could not have been clearer that plaintiff's performance would be at issue. The Court finds that plaintiff should have disclosed the names of these witnesses in response to the above interrogatory and that plaintiff's purported reasons for his nondisclosure do not rise to a level of being substantially justified.

Similarly, the Court does not find the nondisclosure to be harmless; the *Meyers v. Pennypack* considerations outlined above in section 4b, *supra,* with respect to plaintiff's motion to exclude defendant's witnesses now apply in this converse situation. Defendant has been surprised and prejudiced in not being able to depose these witnesses and prepare accordingly for trial. Because it is the eve of trial, with two closely intervening holidays, the Court is unwilling to disrupt defendant's trial preparation with having to notice five deponents and coordinate schedules. It would be unfair to penalize defendant and in effect reward plaintiff's noncompliance. Consequently, these witnesses will not be allowed to testify at trial.

#### 4. Plaintiff's Rebuttal Evidence Regarding his Bonus and Plaintiff's Trial Exhibits

Additionally, plaintiff listed in the Pretrial Stipulation evidence that Hercules asserts as involving the calculation of Finch's bonus; plaintiff argues that this evidence is relevant to his rebuttal case. Because this is rebuttal evidence, plaintiff does not wish to reveal his reasons for offering these documents for fear of exposing his trial strategy. The Court will defer ruling on this evidence until trial because the current record is not fully developed sufficiently to warrant a considered

decision.

Similarly, defendant has delineated a laundry list of exhibits it seeks to exclude from trial. In his answering brief, plaintiff has provided brief descriptions of the exhibits and his arguments as to why they should be admissible. The Court has not actually viewed the exhibits nor had the benefit of oral explanation or argument on these exhibits. Out of fairness to both parties and a desire to fully appreciate this evidence, the Court will defer its ruling until such time, either at or before trial, that the parties may be heard more completely on these issues.

#### 5. Defendant's Additional Motion in Limine

On November 29, 1995, defendant filed an additional motion in limine, D.I. 243, seeking a substantive ruling on the issue of the relevant time frame for calculation of plaintiff's damages. Defendant's Reply Brief was filed on December 20, 1995. A review of the briefs makes clear the relief defendant seeks is merits relief masquerading as a motion in limine. The proffered record is not appropriate for consideration of merits relief. Because trial will commence on January 8, 1996, and there is inadequate time to both put this matter in the correct procedural posture, and determine the same, the Court is not inclined to consider any application for merits relief. If it should become necessary, since the matter goes to the appropriate amount of damages, it can be treated by post-trial motion.

#### IV. CONCLUSION

*18 For the above discussed reasons, the Court will grant in part and deny in part Plaintiff's Motion in Limine, D.I. 211, and do the same as to Defendant's Motion in Limine, D.I. 209. Defendant's Motion in Limine, D.I. 243, is denied. An appropriate order will issue.

> FN1. When force-ranking employees, " evaluators are instructed to identify the '

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                Page 15

Not Reported in F.Supp., 1995 WL 785100 (D.Del.)
(Cite as: Not Reported in F.Supp.)

best employee' and the 'worst' employee with regard to a particular factor, and then the second best and the second worst, and so on down the line." *Finch v. Hercules, Inc.*, 865 F. Supp. 1104, 1111 n.4 (D. Del. 1994) (quoting N. Thompson Powers, *Reductions in Force Under the Age Discrimination in Employment Act*, 2 Lab. Law. 197, 216-217 (1986)). *See generally* this Court's previous opinion, *supra*, for a more extensive treatment of the factual details in this action.

FN2. For a complete summary of how these analyses differ, *see generally, Finch v. Hercules*, 865 F.Supp. at 1118-1119; *Mardell v. Harleysville Life Ins. Co.*, 31 F.3d at 1225 n.6 (3d Cir. 1994), *opinion vacated on other grounds*, 115 S.Ct. 1397 (1995).

FN3. When this issue first surfaced, the court suggested bifurcation of the liability and damages phases of the trial. At that time, Hercules declined the offer. If Hercules wishes bifurcation it should promptly file a motion requesting the same. Under *Mardell*, after-acquired evidence is not admissible in the liability stage of a cause of action brought under the ADEA. *Mardell*, 31 F.3d at 1239; *see also Mardell v. Harleysville Life Ins. Co.*, 65 F.3d 1072, 1073 n.1 (3d Cir. 1995). The evidence the Court holds inadmissible here, *i.e.*, the MICP and IPI evidence, would be admissible in a damages phase of trial were the issue of damages bifurcated from the liability phase of trial.

FN4. The above cited affidavit has been ordered stricken. However, Finch referenced it in his brief as a harbinger of possible prejudicial testimony.

FN5. In plaintiff's opening brief, he argued that evidence pertaining to Finch's counseling of Engebretsen's children should be excluded for several reasons. First, he contended that the evidence is both irrelevant and too remote in time to be admissible in the upcoming trial. Second, he declared that this evidence should be excluded based on the clergy-communicant privilege. D.I. 212 at 25-26. However, the defendant argued in its answering brief that this evidence is relevant to show that bias on the part of Engebretsen. Hercules also argued that the clergy-communicant privilege does not shield the identity of the communicants or the fact that the communication took place. D.I. 226 at 15-16. Because plaintiff has since conceded that evidence of plaintiff's counseling the Engebretsen children *is* admissible, the Court will not address this issue.

FN6. In his Opening Brief, plaintiff also initially objected to a witness named Patrick Donohue. However, based on Hercules' description of Donohue's proposed testimony, plaintiff subsequently withdrew his objection. D.I. 231 at 16.

FN7. At the pretrial conference in this matter, counsel for Hercules for the first time verified that the company does in fact have such a retirement policy for its CEO. However, this evidence was not known nor necessary to the Court's decision at summary judgment; the Court likewise need not consider it here.

D.Del.,1995.
Finch v. Hercules Inc.
Not Reported in F.Supp., 1995 WL 785100 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:92cv00251 (Docket) (May. 05, 1992)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2004 WL 2009366 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
Edwin GONZALEZ, Donna Ann Minor, Kara
Pietrowicz and Alberina Ziemba, Plaintiffs,
v.
COMCAST CORPORATION, a Pennsylvania
corporation, Comcast Cablevision of Willow
Grove, a Pennsylvania corporation, Comcast Cable
Communications, Inc., a Delaware corporation,
Suzane Keenan, Allen R. Peddrick, Richard
Germano, James Sullivan, E. Mark Connell, Dina
Galeotafiore, Al Calhoun, Steve Trevison, Philip
Annone, John McGowan, Vincent Johnson, and
Michael A. Doyle, Defendants.
**No. Civ.A. 03-445-KAJ.**

Aug. 25, 2004.

Victor F. Battaglia, Sr., Biggs & Battaglia,
Wilmington, DE, for Plaintiffs.
William M. Kelleher, Ballard, Spahr, Andrews &
Ingersoll, LLP, Wilmington, DE, for Defendants.

### MEMORANDUM ORDER

JORDAN, J.
**\*1** On June 10, 2004, the plaintiffs filed a Motion
for Leave to File a Second Amended Complaint
pursuant to Rule 15 of the Federal Rules of Civil
Procedure. (Docket Item ["D.I."] 165; the "Motion."
) The plaintiffs seek to add Melanie Penna as a
defendant (*id.* at 3) and to assert three additional
claims based on Delaware state law, including
claims for fraud and deceit (*id.* at 33-34), *prima
facie* tort (*id.* at 34-35), and civil conspiracy (*id.* at
35-37).

Rule 16 of the Federal Rules of Civil Procedure
provides that a pretrial scheduling order "shall not
be modified except upon a showing of *good cause*
and by leave of the district judge...." Fed.R.Civ.P.

16(b) (emphasis added). A scheduling order was
issued in this case on August 19, 2003 and required
that all motions to join other parties and to amend
or supplement the pleadings be filed on or before
December 1, 2003. (D.I. 31 at 2.) The plaintiffs'
Motion was filed on June 10, 2004, over seven
months after that deadline. To grant the plaintiffs'
Motion would also require substantial changes in
other deadlines set forth in the scheduling order,
including the trial date. Therefore, under Rule 16,
the plaintiffs are required to show good cause why
their Motion should be granted and such changes
made.

The plaintiffs make several arguments in support of
their Motion. None of them, however, establishes or
even attempts to establish the good cause required
for modifying the deadlines in the scheduling order.
"Properly construed, 'good cause' means that
scheduling deadlines cannot be met despite a party's
diligent efforts." *Dilmar Oil Co. V. Federated Mut.
Ins. Co.*, 986 F.Supp. 959, 980 (D.S.C.1997), *aff'd*
129 F.3d 116 (4th Cir.1997) (citing 6A Charles
Alan Wright, Arthur R. Miller, and Mary Kay Kane,
Federal Practice and Procedure § 1522.1 at 230-31
(2d ed.1990)). Instead of focusing on why, despite
diligent effort, plaintiffs could not have asserted
their motion at an earlier time, within the scheduling
order guidelines, the plaintiffs focus on why they
believe the defendants will not be unduly prejudiced
if their Motion is granted (D.I. 173 at 1-7) and why
adding three more state law claims is not futile (D.I.
173 at 7-9). These arguments do not establish good
cause, as defined above, for this remarkably late
motion for leave to amend.

The untimeliness of the plaintiffs' Motion is also
emphasized by the fact that I have already ruled on
a summary judgment motion made by the
defendants. (D.I.185.) Granting the plaintiffs'
Motion, which was filed after the discovery
deadline and only three months before the joint
proposed final pretrial order is due on September
22, 2004 (D.I. 188 at 1) would indeed be unduly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 2

Not Reported in F.Supp.2d, 2004 WL 2009366 (D.Del.)
**(Cite as: Not Reported in F.Supp.2d)**


prejudicial to the defendants.

Accordingly, IT IS HEREBY ORDERED that the plaintiffs' Motion (D.I.165) is DENIED.

D.Del.,2004.
Gonzalez v. Comcast Corp.
Not Reported in F.Supp.2d, 2004 WL 2009366 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:03CV00445 (Docket) (May. 01, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 1

Not Reported in F.Supp., 1991 WL 285621 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.
Benjamin KINBERG, Individually and d/b/a Benj.
Kinberg & Associates, Plaintiffs,
v.
COLORFORMS, Defendant.
Nos. 89 Civ. 1156 (PKL), 89 Civ. 1292 (PKL).

Dec. 31, 1991.

*MEMORANDUM ORDER*
LEISURE, District Judge,
*1 Plaintiffs Benjamin Kinberg and Benj. Kinberg
& Associates now move the Court, pursuant to
Local Rule 3(j), to reconsider its Memorandum
Order, dated August 26, 1991 ("August 26 Order"),
which adopted the April 10, 1991 Report and
Recommendation issued by United States
Magistrate Judge James C. Francis IV ("April 10
Report"), which denied the parties' cross-motions
for summary judgment. Plaintiffs also raise
objections, pursuant to Fed.R.Civ.P. 72(b) and 28
U.S.C. § 636(b)(1), to Judge Francis' September 10,
1991 Report and Recommendation ("September 10
Report"), which denied plaintiffs' supplemental
summary judgment motion. Defendant opposes
plaintiffs' motions, and moves the Court to impose
sanctions on plaintiffs. For the following reasons,
the parties' various motions are denied in their
entirety.

## BACKGROUND

These consolidated actions are for patent
infringement, breach of contract and unfair
competition. The dispute between plaintiffs, an
individual and corporate toy inventor, and
defendant, a toy manufacturer, focuses on the right
to manufacture and distribute a luminescent or
iridescent slate that produces a glowing effect when

written on. The case was referred to Judge Francis
on May 2, 1989, pursuant to Fed.R.Civ.P. 72(b) and
28 U.S.C. § 636, and the parties' cross-motions for
summary judgment were heard by Judge Francis in
the first instance. On April 10, 1991, Judge
Francis issued a Report and Recommendation,
finding that disputed issues of material fact
precluded the grant of summary judgment. Both
parties filed objections to the April 10 Report
pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. §
636(b)(1). On August 26, 1991, the Court, after a
*de novo* review of the April 10 Report, adopted
Judge Francis' holding that "the substantive issues
in this case cannot be resolved on the current record.
"

Plaintiffs raise three arguments in their motion to
reconsider the August 26 Order. First, plaintiffs
claim that both this Judge and Judge Francis
overlooked an admission by Joshua L. Kislevitz ("
Kislevitz"), defendant's managing agent, that the
patents were infringed. Second, plaintiffs assert
that their summary judgment motion was
improperly denied under *Graver Tank & Mfg. Co.
v. Linde Air Products Co.*, 339 U.S. 605 (1950).
Finally, plaintiffs contend that the previous rulings
were erroneous because the Court should have
disregarded the validity of their patent when ruling
on the summary judgment motion.

Plaintiffs also raise objections to Judge Francis'
September 10 Report, which denied their
September 9, 1991 motion for summary judgment
because it was filed almost a full year after the
November 30, 1990 deadline for dispositive
motions. Plaintiffs object to this Report because
they claim that evidence discovered after the
October 31, 1990 discovery deadline entitles them
to summary judgment. Specifically, plaintiffs
assert that they have found a 20 year old sample of
the patented product that raises an "on sale" bar
pursuant to 35 U.S.C. § 102(b).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 285621 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

## DISCUSSION

### A. *Motion for Reargument*

*2 The standards governing motions for reargument are clear. "The only proper ground on which a party may move to reargue an unambiguous order is that the court overlooked 'matters or controlling decisions' which, had they been considered, might reasonably have altered the result reached by the Court." *Schonberger v. Serchuk*, 742 F.Supp. 108, 119 (S.D.N.Y.1990) (Leisure, J.) (quoting *Adams v. United States*, 686 F.Supp. 417, 418 (S.D.N.Y.1988) (quoting Local Civil Rule 3(j))); *see also Moll v. U.S. Life Title Ins. Co.,* 700 F.Supp. 1284, 1286 (S.D.N.Y.1988) (Leisure, J.); *Bozsi Ltd. Partnership v. Lynott,* 676 F.Supp. 505, 509 (S.D.N.Y.1987).

As this Court has held, "[t]he concerns reflected by these standards are sound. The provision for reargument is not designed to allow wasteful repetition of argument already briefed, considered and decided." *Schonberger, supra,* 742 F.Supp. at 119; *see also Ruiz v. Commissioner of Dept. of Transp.,* 687 F.Supp. 888, 890 (S.D.N.Y.) ("The standard for granting a motion for reargument is strict in order to dissuade repetitive arguments on issues that have already been considered fully by the Court."), *aff'd,* 858 F.2d 898 (2d Cir.1988). A party making a motion for reargument may not, under Local Rule 3(j), advance new facts, issues or arguments not previously presented to the court. *See Weissman v. Fruchtman,* 124 F.R.D. 559, 560 (S.D.N.Y.1989) (Leisure, J.); *Ruiz, supra,* 687 F.Supp. at 890; *Morgan Guar. Trust Co. v. Garrett Corp.,* 625 F.Supp. 752, 756 (S.D.N.Y.1986).

### 1. *Deposition of Mr. Kislevitz*

Plaintiffs first argue that Kislevitz admitted in a deposition that Colorforms infringed plaintiffs' patents, and that both the Court and the Magistrate disregarded this admission. *See* Plaintiffs' Memorandum for Reconsideration of the Court's Memorandum Order Dated August 26, 1991 (" Reargument Motion"), at 2. However, the Court's

examination of Kislevitz' testimony reveals that it is only a description of the materials that Colorforms uses and the devices that it manufactures. *See* Deposition of Joshua L. Kislevitz, taken on Sept. 21, 1990, at 77-81, 83-85. Despite plaintiffs' assertion, Kislevitz' testimony is not an admission of infringement, and does not provide a proper basis for a grant of summary judgment.

### 2. *Reargument under Graver Tank*

Plaintiffs next argue that Judge Francis improperly applied the test of infringement set forth in *Graver Tank, supra,* 339 U.S. at 608. However, plaintiffs' contention borders on the frivolous. In *Graver Tank,* the Court, applying the doctrine of equivalents, found that " 'if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same.... A finding of equivalence is a determination of fact." *Id.* at 608-09.

Even a cursory reading of Judge Francis' April 11 Report reveals that plaintiffs' summary judgment motion was denied based on the existence of disputed issues of material fact, including the obviousness of the invention, the temporal priority of the competing patents and the construction of the parties' contracts. Given *Graver Tank's* holding that patent infringement is an issue of fact, plaintiffs' reliance thereon is misplaced at best.

### 3. *Disregarding the Validity of Plaintiffs' Patent*

*3 Plaintiffs next claim that Judge Francis and this Court were in error in considering the validity of their patents. *See* Reargument Motion, at 5 ("on a motion for summary judgment in a patent infringement action for a determination of infringement, the issue of validity of Plaintiff's patent should be disregarded."). However, plaintiffs' motion reveals a fundamental misunderstanding of the cases on which they rely.

Although a properly registered patent is presumed to be valid, it is beyond cavil that invalidity is a defense in an action for patent infringement. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 285621 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

35 U.S.C. § 282. Moreover, the cases cited by plaintiffs are not contrary to this result. Both *Rubinstein v. Silex Co.,* 73 F.Supp. 336, 338 (S.D.N.Y.1947), and *Aileen Mills Co. v. Ojay Mills, Inc.,* 188 F.Supp. 138, 144 (S.D.N.Y.1960), granted *defendant's* summary judgment motion because the allegedly infringing product was different from the patented product. Plaintiffs' attempt to distort these cases to support the proposition that the validity of a patent is irrelevant in an action for infringement is mere sophistry. Plaintiffs' reargument motion is denied in its entirety.

### B. *Plaintiffs' Objections to September 10 Report*

On September 6, 1991, plaintiffs filed a supplemental motion for partial summary judgment, relying on evidence they claim was discovered subsequent to the October 30, 1990 discovery deadline and the November 30, 1990 deadline for the filing of dispositive motions. However, Judge Francis summarily denied the motion, finding it to be "so untimely as to be frivolous." September 10 Report, at 2. On September 19, 1991, plaintiffs filed objections to Judge Francis' Report, asserting that the motion is timely because new evidence was discovered that raises an "on sale" bar pursuant to 35 U.S.C. § 102(b). Plaintiffs also claim that their Motion to Extend the Time to File a Pretrial Order was "tantamount to requesting the Court to modify .. . the cut-off date for filing depository [sic] motions." Plaintiff Kinberg's Combined Objections to Magistrate's Report to the Court Dated September 10, 1991 and Memorandum in Support Thereof (" Kinberg Objections"), at 8. Having undertaken a *de novo* review of the September 10 Report, pursuant to Fed.R.Civ.P. 72(b) and 28 U.S.C. § 636(b)(1), the Court hereby rejects plaintiffs' objections.

The Court's analysis begins with the language of Fed.R.Civ.P. 16(b)(2), which empowers a court or Magistrate to "enter a scheduling order that limits the time ... to file and hear motions." This Rule has the salutary effect of permitting the trial judge "to maintain control of his docket and to assure the expeditious advancement of cases." *Kaplan v. Axelrod,* 1989 WL 11427, at *2, 1989 U.S.Dist.

LEXIS 1000, at *5 (S.D.N.Y.1989) (quoting *Kennedy v. City of Cleveland,* 797 F.2d 297, 300 (6th Cir.1986), *cert. denied,* 479 U.S. 1103 (1987)). In fact, the Sixth Circuit has commented that

*4 Although Fed.R.Civ.P. 56(b) states that a defendant may move for summary judgment "at any time," we do not believe that this precludes the district court from controlling the proceedings before it, at least not to the extent of requiring it to consider dispositive motions on the eve of trial.

*Kennedy, supra,* 797 F.2d at 301 n. 6.

The failure to meet a deadline established pursuant to Fed.R.Civ.P. 16(b)(2) is thus a proper basis for denying a summary judgment motion. *See, e.g., Dedge v. Kendrick,* 849 F.2d 1398, 1398 (11th Cir.1988) (denying summary judgment motion filed 5 weeks after Rule 16(b)(2) deadline for dispositive motions); *cf. U.S. Dominator, Inc. v. Factory Ship Robert E. Resoff,* 768 F.2d 1099, 1104 (9th Cir.1985) (denying summary judgment motion filed 10 months after pretrial order deadline for dispositive motions).

In the case at bar, Judge Francis set a discovery deadline of October 31, 1990 and a deadline for dispositive motions of November 30, 1990. Nevertheless, after their first summary judgment motion was denied based on the existence of a plethora of disputed issues of material fact, plaintiffs submitted yet another summary judgment motion on September 6, 1991. This motion was filed over 9 months after the cutoff date for dispositive motions, and is denied as untimely. [FN1]

Although the Court has the power to modify a scheduling order upon a showing of "good cause," *see* Fed.R.Civ.P. 16(b), no such showing has been made in the instant case. While the discovery deadline in this case was October 30, 1990, the evidence upon which plaintiffs now rely-a toy produced under a 1972 contract of sale involving plaintiffs-was allegedly discovered in July 1991. *See* Kinberg Objections, at 9. Moreover, a prompt investigation of all contracts of sale relating to the patent at issue in this suit should have been undertaken by plaintiffs' attorney at the outset of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp., 1991 WL 285621 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.)

this litigation. *See Daval Steel Prods. v. M/V Fakredine,* No. 91-7705, slip op. at 483 (2d Cir. Dec. 3, 1991) ("It is intended that [discovery should] proceed at the initiative of the parties, free from the time-consuming and costly process of court intervention."). It is therefore clear that expeditious discovery of this purportedly new evidence, by thorough investigation of relevant records, was plaintiffs' responsibility. Plaintiffs' discovery, more than two years after they initiated this litigation, of a toy manufactured under a contract to which they were parties, is patently insufficient to establish good cause for extension of the deadline for dispositive motions established by Judge Francis.

The Court next turns to consider defendant's request for sanctions. It is clear to the Court that this litigation has been characterized by excessive motion practice. However, because of the differences in the various types of sanctions available under the Federal Rules of Civil Procedure, a motion for and an award of sanctions cannot be based on a blanket request for such relief. *See Carberry v. International Brotherhood of Teamsters,* No. 91-6100, slip op. at 281-291 (2d Cir. Nov. 8, 1991) (distinguishing sanctions pursuant to Rule 11, 28 U.S.C. § 1927 and court's inherent power). Defendant has not specified whether it is seeking sanctions under Fed.R.Civ.P. 11, 16(f), 37 or 28 U.S.C. § 1927. The Court therefore denies defendant's sanctions motion.

## CONCLUSION

*5 For the foregoing reasons, plaintiffs' motion for reargument of the Court's August 26 Order is denied. Plaintiffs' objections to Judge Francis' September 10 Report are rejected, and their September 9 summary judgment motion is denied. Defendant's motion for sanctions is also denied.

SO ORDERED

> FN1. Further support for this result can be drawn from the fact that this case has been trial ready since the Court signed the

Pretrial Order on November 7, 1991. In the words of the Sixth Circuit, the Court is loathe "to consider dispositive motions on the eve of trial." *Kennedy, supra,* 797 F.2d at 301 n. 6.

S.D.N.Y.,1991.
Kinberg v. Colorforms
Not Reported in F.Supp., 1991 WL 285621 (S.D.N.Y.)

Briefs and Other Related Documents (Back to top)

• 1:89cv01292 (Docket) (Feb. 23, 1989)
• 1:89cv01156 (Docket) (Feb. 16, 1989)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 1

Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,N.D. Illinois, Eastern
Division.
ABBOTT LABORATORIES, an Illinois
corporation Plaintiff,
v.
TORPHARM, INC., a Canadian corporation,
Apotex, Inc., a Canadian corporation, and Apotex
Corp., a Delaware corporation, Defendants.
No. 97 C 7515.

Oct. 29, 2003.

Thomas David Brooks, Sperling & Slater, Daniel E.
Reidy, James R. Daly, Robert C. Micheletto, Jones
Day, Chicago, IL, for Plaintiff.
Christine J. Siwik, Winston & Strawn LLP, Charles
R. Krikorian, Welsh & Katz, Ltd., Hugh L. Moore,
Richard Philip Beem, Scott B. Feder, Keith D. Parr,
Paul J. Molino, William Andrew Rakoczy, Deanne
M. Mazzochi, Lord, Bissell & Brook LLP, Chicago,
IL, for Defendants.

*MEMORANDUM OPINION AND ORDER*

NOLAN, Magistrate J.
*1 Plaintiff Abbott Laboratories ("Abbott") sues
Defendants TorPharm, Inc., Apotex, Inc., and
Apotex Corporation ("TorPharm") for patent
infringement. TorPharm seeks to market a generic
version of Abbott's DEPAKOTE®, an anti-seizure
medication. TorPharm now moves to amend the
final pretrial order (the "FPTO") entered on
September 13, 2000 to add new documentary
evidence and expert witnesses and to reopen
discovery on the new evidence and witnesses for an
appropriate amount of time. For the following
reasons, TorPharm's motion is denied.

*BACKGROUND*

This case has been pending for six years. The
complaint was filed on October 24, 1997.
Substantial discovery occurred. The parties
exchanged tens of thousands of documents,
propounded and responded to numerous sets of
interrogatories, and conducted approximately 30
depositions. Fact discovery closed on February 24,
2000 after two extensions. [FN1] Expert discovery
was completed shortly thereafter. TorPharm did not
seek an additional extension of the discovery
deadlines to retain new experts or conduct further
testing.

> FN1. *See* March 1, 1999 minute order
> (setting close of fact discovery for June 25,
> 1999); May 21, 1999 minute order
> (extending fact discovery deadline until
> November 16, 1999); and July 14, 1999
> minute order (extending fact discovery
> deadline until February 24, 2000).

During discovery, Abbott designated two experts to
testify at trial, and TorPharm designated three
experts. Each expert issued a report and was
deposed. Abbott's experts determined the physical
and chemical properties of TorPharm's product
through scientific testing and analysis. Abbott's
experts opined that TorPharm's proposed product is
an oligomer with a 1:1 molar ratio of sodium
valproate and valproic acid. TorPharm retained
three expert witnesses to rebut the testimony of
Abbott's experts. TorPharm did not ask its experts
to perform any scientific testing. Instead, TorPharm
had its experts challenge certain aspects of the tests
performed by Abbott's experts and opine that
Abbott's proof was not sufficient to demonstrate
that TorPharm's product is an oligomer. TorPharm's
experts did not offer any opinion relating to the tests
performed by Abbott's experts demonstrating the
1:1 molar ratio of TorPharm's product.

Abbott filed for summary judgment on April 7,
2000, arguing, among other things, that there was

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

no genuine dispute of material fact that TorPharm's proposed product infringed Abbott's patents. A comprehensive pretrial order was entered on September 13, 2000. On March 30, 2001, Judge Norgle ruled that Abbott's patents were infringed and not invalid and unenforceable and granted summary judgment in favor of Abbott. The summary judgment proceedings considered the description of TorPharm's product found in its proposed package insert. TorPharm appealed. On August 13, 2002, the Federal Circuit Court of Appeals affirmed the district court's finding that the patents are not invalid and unenforceable. The case was remanded for further proceedings consistent with the Federal Circuit's finding that a dispute of material fact exists with respect to the oligomeric structure of TorPharm's product.

By letter dated May 31, 2001, the Food and Drug Administration ("FDA") notified TorPharm that:
*2 We have completed review of this abbreviated application and have concluded that, based on the information you have presented to date, the drug is safe and effective for use as recommended in the submitted labeling. Therefore, the application is tentatively approved.

Abbott's Memorandum, Ex. L at 1. On December 6, 2002, TorPharm submitted to FDA a proposed amendment to the ANDA in which TorPharm sought revised labeling for its proposed product. On March 21, 2003, FDA rejected the proposed labeling changes contained in TorPharm's December 6, 2002 submission. On June 20, 2003, TorPharm submitted another set of revised labeling to FDA. FDA has not responded to TorPharm's June 20, 2003 proposed amendment.

TorPharm now seeks permission to modify the pretrial order in order to introduce into evidence the December 2, 2002 and June 20, 2003 amendments to its Abbreviated New Drug Application ("ANDA" ) for divalproex sodium, as well as the testimony of the experts upon whose findings the amendments are based. Abbott requests that the Court deny the motion because TorPharm has not met the " stringent standard" necessary to amend the final pretrial order. Alternatively, Abbott requests the Court to defer consideration of whether to admit

some or all of the evidence relating to TorPharm's proposed changes to its ANDA until FDA determines whether to accept those changes.

TorPharm claims that the ANDA amendments and the new evidence contained in the ANDA amendments are highly relevant to the oligomeric structure issue on remand. TorPharm believes that the chemical depiction of divalproex sodium used in its original ANDA is incorrect. TorPharm's ANDA amendments seek to change the chemical depiction of divalproex sodium. TorPharm states that its ANDA amendments include tests demonstrating that its divalproex sodium lacks the purported oligomeric structure that might be suggested by the formula depicted in its proposed package insert. TorPharm's ANDA amendments contain the expert reports of three chemistry professors. TorPharm states that it asked each of these experts to conduct tests to determine whether the molecular structure of divalproex sodium is or is not oligomeric. The experts concluded:
- that TorPharm's divalproex sodium product "is not a distinct equimolar compound ... resulting from a ' reaction,' but is simply a solution of sodium valproate in valproic acid, with the 1 to 1 ratio having been arbitrarily selected." (6/1/03 Expert Report of McClelland);
- that the combination of sodium valproate and valproic acid gives "only a solid mixture of the two components [ ] which can be equimolar or of different compositions." (11/6/02 Expert Report of Prof. Olah);
- that "divalproex sodium cannot be an oligomer or a 'coordination compound' (in other words a defined chemical compound) as claimed by Abbott [ ]" and that Abbott's labeling of divalproex sodium is "incorrect and misleading." (11/6/02 Expert Report of Prof. Olah);
*3 - that divalproex sodium is not an oligomer, but rather is a complex crystalline product, and that " [t]he existence of an ordered complex with mole ratio 1:1 may not be interpreted as the existence of oligomers comprised of valproic acid and sodium valporate in mole ratio 1:1." (6/4/03 Expert Report of Cima).

TorPharm maintains that based on the above expert conclusions, it is likely that TorPharm will be able

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

to establish to FDA and at trial that the chemical depiction of TorPharm's divalproex sodium is incorrect and that TorPharm's product is not an oligomer.

## DISCUSSION

The parties agree that Federal Rule of Civil Procedure 16 governs the resolution of TorPharm's motion. Rule 16(e) provides that a pretrial order can be "modified only to prevent manifest injustice." The Seventh Circuit has noted that "all the circuits that have reached this issue agree that a trial court may properly exclude evidence or theories not raised in a pretrial order absent an abuse of discretion." *Gorlikowksi v. Tolbert,* 52 F.3d 1439, 1444 n. 3 (7th Cir.1995). A trial court should consider the following four factors in determining whether to permit a party to modify a pretrial order: (1) the prejudice or surprise to the opposing party; (2) the ability of the opposing party to cure the prejudice; (3) the extent to which allowing the amendment of the pretrial order would disrupt the orderly and efficient trial of the case; and (4) any bad faith in the moving party failing to adhere to its pretrial representation. *Smith v. Rowe,* 761 F.2d 360, 365 (7th Cir.1985). [FN2] Upon consideration of the above factors and the history of this case, the Court finds that TorPharm has not demonstrated that amendment of the pretrial order is necessary to prevent manifest injustice. [FN3]

> FN2. The parties further agree that the question of whether TorPharm should be allowed to amend the pretrial order to add new documentary evidence and expert witnesses is a procedural matter not unique to patent law, and therefore this court applies regional circuit law.

> FN3. The Hatch-Waxman Act does not mandate admission of TorPharm's requested ANDA amendments and the scientific evidence submitted in the two amendments. Drug manufacturers are bound to sell only those products that comport with the ANDA's description of

the drug. *Abbott Labs. v. TorPharm,* 300 F.3d 1367, 1373 (Fed.Cir.2002). Thus, the primary focus in litigation under the Hatch-Waxman Act is whether the product that is likely to be sold upon FDA approval of the ANDA would infringe any valid patent. *Bayer AG v. Elan Pharm. Research Corp.,* 212 F.3d 1241, 1249 (Fed.Cir.2000). Because the rejected December 2002 amendment and the currently unapproved June 20, 2003 submission do not aid an analysis of whether the final product to be marketed by TorPharm will infringe, the version of TorPharm's ANDA that was approved in 2001 should be the focus of the inquiry at trial. If FDA decides to accept TorPharm's June 20, 2003 proposed amendment and approve the ANDA in a different form, then TorPharm may, if it wishes, file an appropriate motion at that time.

With respect to the evidence contained in its ANDA amendments, TorPharm argues that such evidence goes to the issue of the molecular structure of the drug product that TorPharm is likely to market and is admissible at trial, regardless of whether the FDA changes the chemical depiction. TorPharm similarly points out that even if FDA does not agree with TorPharm's scientific evidence, the Federal Circuit has acknowledged that the trier of fact may consider evidence that may contradict clear representations of the ANDA. The question of whether the evidence contained in TorPharm's unapproved ANDA amendments should be included in the pretrial order is determined by the principles and policies underlying Rule 16. The Federal Circuit has not held that evidence contradicting representations in the ANDA is automatically admissible regardless of whether it was produced in a timely manner.

As to the first factor, TorPharm states that it timely produced both of the ANDA amendments to Abbott and Abbott cannot be surprised by evidence which it has well in advance of trial. TorPharm argues that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

the absence of prejudice or surprise in this case is demonstrated by the facts concerning the timing of TorPharm's motion to modify the pretrial order and Abbott's awareness of the evidence and TorPharm's intention to introduce the evidence at trial. TorPharm emphasizes that it first raised the issue of an incorrect chemical depiction in draft labeling submitted with a major amendment to the ANDA on January 12, 2000, which was before fact and expert discovery closed and months before Abbott filed its motion for summary judgment. TorPharm points out that Abbott was aware from the time of oral argument in the Federal Circuit that TorPharm intended to "continue its efforts in the FDA to change the incorrect chemical depiction." TorPharm Reply at 6. Finally, TorPharm states that Abbott's claim of surprise and prejudice is undermined by the fact that in a January 13, 2002 Revised Status Report filed in this case, the parties indicated that: " TorPharm has informed Abbott of its intention to attempt to introduce at trial certain evidence that was first disclosed to Abbott in December 2002. Abbott objects, and will respond appropriately."

*4 TorPharm has not shown that it exercised diligence in pursuing the evidence upon which it bases its motion. TorPharm did not seek to include this evidence in the record until after discovery had been closed for more than three years, the pretrial order had been on file for almost three years, summary judgment had been ruled on, and the Federal Circuit had remanded the matter for trial on one factual issue. TorPharm neglects to satisfactorily explain why this new evidence could not have been developed and made part of this case in a timely manner. TorPharm does not address why its experts could not have conducted tests to determine whether the molecular structure of divalproex sodium is or is not an oligomer during the discovery period. In fact, one of the reports from Dr. Robert McClelland contained in TorPharm's December 6, 2002 ANDA amendment is dated May 9, 1998, but this report was never disclosed to Abbott during discovery. Given the late stage in this litigation, TorPharm's delay in seeking to include additional documentary evidence and expert witnesses in the record has not been justified.

TorPharm also argues that there is more than

sufficient time for the parties to conduct additional discovery prior to trial. TorPharm ignores the fact that Abbott would be seriously prejudiced if TorPharm's proposed amendment is allowed by having to conduct significant and costly additional discovery. Abbott would need substantial discovery to explore and counter TorPharm's new scientific evidence. Abbott contends that if TorPharm is allowed to amend the final pretrial order to add new expert witnesses and their reports, the parties would be "thrust back into full-blown discovery." The Court agrees. If the proposed amendment is allowed, Abbott would have to depose TorPharm's new experts about their testing and retain one or more experts to evaluate TorPharm's testing and to prepare a rebuttal. TorPharm would want to discover Abbott's experts' opinions and depose Abbott's expert(s). Each side would then seek to introduce this new evidence at trial, requiring another substantial amendment to the pretrial order. Abbott would be prejudiced by having to conduct significant additional discovery after litigating this matter for more than six years, through summary judgment and appeal.[FN4]

> FN4. TorPharm claims that the hardship that would be imposed on TorPharm from the denial of its motion would be severe because TorPharm would be forced to defend the issue of infringement based on what the scientific evidence filed in TorPharm's ANDA amendments shows is an incorrect chemical depiction for its product. The Court finds that any prejudice to TorPharm from proceeding to trial on the basis of the ANDA as approved by FDA in 2001 is minimal. Because the approved version of the ANDA is controlling unless and until the FDA agrees to change it, no harm would result from denying TorPharm's request to amend the pretrial order to introduce evidence the FDA has not accepted.

Regarding the second factor, TorPharm argues that Abbott can cure any prejudice by discovering the opinions of the new witnesses set forth in the two ANDA amendments. This argument assumes that

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.2d)

the district court would allow Abbott time to depose TorPharm's new expert witnesses, conduct related document discovery, and retain its own experts to prepare reports to rebut TorPharm's new evidence. The time for discovery expired long ago. This Court does not believe that after years of substantial discovery, a ruling on summary judgment, and a ruling on appeal, discovery should be reopened at this advanced stage of the litigation for the purpose of discovering information that could have been made a part of the case years ago. *Scopia Mortgage Corp. v. Greentree Mortgage Corp.,* 184 F.R.D. 526, 531 (D.N.J.Nov.17, 1998) (stating that [t]o suggest that every attempt to reopen discovery and to add subjects to the Joint Final Pretrial Order can be accommodated by again enlarging the pretrial period is to suggest that the end of the litigation process is of no practical consequence to the adversary and to the court's schedule. After four years, enough is enough.").

*5 Moreover, allowing Abbott to take additional discovery will not completely cure the prejudice caused by an amendment to the pretrial order at this late date. A critical part of the prejudice to Abbott will be the substantial time and expense required to conduct discovery about the new scientific evidence. Granting Abbott additional preparation time to undertake the work necessary to discover and rebut TorPharm's evidence would result in substantial litigation costs and delay in moving Abbott's claims to trial.

Although no trial date has been set, allowing TorPharm to amend the pretrial order and introduce new expert witnesses and scientific testing will disrupt the progress of this action toward trial. This action has been pending since 1997. The parties have developed a detailed record, discovery extensions were sought and granted, and discovery has been closed for three and a half years. This case has been remanded for trial on the limited issue of the whether TorPharm's proposed product is an oligomer, and reopening expert discovery will significantly delay a trial on this issue.

Finally, although there is no evidence of bad faith on the part of defense counsel in seeking to amend the pretrial order at this point in the proceedings,

the Court sees TorPharm's assertion of new evidence as an attempt to avoid certain rulings by Judge Norgle and the Federal Circuit. Judge Norgle and the Federal Circuit relied in part on the representations TorPharm made in the ANDA about the physical and chemical characteristics of its product. The Federal Circuit confirmed Judge Norgle's ruling that TorPharm is bound by the representations made in the proposed package insert found in its ANDA submission. TorPharm admits that the depiction of divalproex sodium contained in its originally filed ANDA "can be read in a way that implies an oligomeric structure." *See* 8/26/2003 Transcript of Proceedings at 4. Thus, TorPharm seeks to introduce its new scientific evidence to show that the chemical depiction of its divalproex sodium contained in the package insert in its originally filed ANDA is incorrect and TorPharm's product is not an oligomer.

TorPharm's actions also amount to a last-minute attempt to bolster its record in this case. For whatever reason, TorPharm made a strategic decision to rely on no expert testing to controvert Abbott's infringement claims. T. Barton Dep. at 51; R. Jacobson Dep. at 51-55; and D. Hercules Dep. at 33-35; *see also Abbott Labs.,* 300 F.3d at 1375 (stating 'TorPharm provided no testimony, expert or otherwise, stating that the composition of the mixture at this step in the product is preserved in the final formulation ....'" and "Nor did TorPharm provide any evidence, such as an analysis of its final product, that would substantiate TorPharm's interpretation of the scale-up instructions, or would contradict the plain representation of a 1:1 molar ratio found in its proposed package insert."); *Abbott Labs. v. TorPharm, Inc.,* 156 F.Supp.2d 738, 746 (N.D.Ill.2001) (stating "Torpharm submits no tests of its own, but presents opinion evidence to attempt to refute Abbott's testing;" "Torpharm criticizes Abbott for not performing x-ray diffraction analysis, but then neither did Torpharm;" and "Abbott conducted multiple tests on Torpharm's biobatch, which show that Torpharm's proposed product has the same repeating units claimed in the patents. Torpharm offers no evidence to rebut this finding." ). Having offered no scientific testing of its own, TorPharm cannot belatedly introduce new expert testing and analysis showing that TorPharm's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

product is not an oligomer and does not contain a 1:1 molar ratio or the unit formula contained in Abbott's patents.

## CONCLUSION

*6 For all of the above reasons, the Court finds that manifest injustice will not result if TorPharm is not allowed to amend the FPTO. TorPharm's motion is denied.

N.D.Ill.,2003.
Abbott Laboratories v. TorPharm, Inc.
Not Reported in F.Supp.2d, 2003 WL 22462611 (N.D.Ill.)

Briefs and Other Related Documents (Back to top)

• 1:97cv07515 (Docket) (Oct. 24, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy

Slip Copy, 2006 WL 278868 (E.D.Tex.)
(Cite as: Slip Copy)

Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,E.D. Texas, Marshall
Division.
Eckhard U. ALT, MD Plaintiff
v.
MEDTRONIC, INC., a Minnesota Corp. Defendant
No. 2:04-CV-370.

Feb. 1, 2006.

Robert Christopher Bunt of Parker & Bunt, P.C.
Tlyer, TX, Sidney Calvin Capshaw, III of Brown
McCarroll Longview, TX, Otis W. Carroll, Jr. of
Ireland, Carroll & Kelley, P.C. Tyler, TX, David J.
Healey and Ana Elena Kadala of Weil Gotshal &
Manges, Houston, TX, Franklin Jones, Jr. of Jones
& Jones, Marshall, TX, Thomas John Ward, Jr.
Longview TX, for Plaintiff.
Samuel Franklin Baxter, Marshall, TX, for
Defendant.

MEMORANDUM OPINION AND ORDER
DAVIS, J.
*1 Defendant, Medtronic, Inc. ("Medtronic"), has
filed a Motion for Leave to Amend its Preliminary
Invalidity Contentions (Docket No. 94). For the
reasons set forth below, the Court GRANTS
Medtronic's motion.

BACKGROUND

Dr. Eckhard Alt ("Alt") filed suit against Medtronic
on October 15, 2004 alleging infringement of four
patents, U.S. Patent Nos. 5,014,700 ("the '4,700
patent"), 5,031,615 ("the '615 patent"), 6,076,014 ("
the '014 patent"), and 6,249,700 ("the '9,700 patent
"). Pursuant to the Court's Docket Control Order,
Alt timely filed his Preliminary Infringement
Contentions on February 28, 2005. Similarly,
Medtronic timely filed its Preliminary Invalidity

Contentions on March 30, 2005 identifying roughly
thirty prior art references. On September 23, 2005,
Medtronic's counsel sent a letter to Alt's counsel
notifying Alt of six additional prior art references
discovered by Medtronic relating to the '014 and '9,
700 patents:
· U.S. Patent Number 5,193,550: "Method and
apparatus for discriminating among normal and
pathological tachyarrhythmias." Filed: November
30, 1990; Issued: March 16, 1993;
· Yee, R., et al.; "Initial Clinical Experience with
the Pacemaker-Cardioverter-Defibrillator," THE
CANADIAN JOURNAL OF CARDIOLOGY, Vol.
6, No. 4, May 1990;
· Bonnet, C.A., et al., "Long-Term Efficacy of
Antitachycardia Pacemaker and Implantable
Defibrillator Combination," PACE, Vol. 14, No. 5,
Pt. I, May 1991;
· Saksena, S., "The Implantable
Cardioverter-Defibrillator: Future Directions,"
Chapter 48 in IMPLANTABLE
CARDIOVERTER-DEFIBRILLATORS: A
COMPREHENSIVE TEXTBOOK, (N.A. Mark
Estes III, ed., 1994);
· Saksena, S., "New Generations of Implantable
Pacemaker Defibrillators for Ventricular and Atrial
Tachyarrhythmias," ARCHIVES DES MALADIES
DU COEUR ET DES VAISSEAUX, Vol. 89,
February 1996; and
· June 30, 1997, Business Wire Press Release, "
Guidant announces first implants of VENTAK AV
II DR defibrillation system in Europe."

Medtronic's letter stated: "In light of the upcoming
deadline for the parties to serve their P.R. 3-6 final
contentions, we believe there is no need to amend
and/or supplement Medtronic's P.R. 3-3 Preliminary
Infringement Contentions with the foregoing
information. If you disagree with this approach,
please let us know in writing within five (5) days
hereof." Additionally, on October 12, 2005,
Medtronic's counsel sent Alt's counsel a letter
supplementing the September 23, 2005 letter and
identifying two additional prior art references:· U.S.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 278868 (E.D.Tex.)
**(Cite as: Slip Copy)**

Patent Number 5,792,183: "Combination Pacemaker and Defibrillator Having Dynamic Ventricular Refractory Period." Filed January 27, 1997; Issued: August 11, 1998; and
• U.S. Patent Number 6,128,529: "Device and Method Providing Pacing and Anti-Tachyarrhythmia Therapies." Filed January 29, 1997; Issued: October 3, 2000.

The October 12th letter also indicated that Medtronic did not intend on providing the additional prior art before serving its Final Invalidity Contentions. Alt did not respond in writing to either of Medtronic's letters. On October 21, 2005, Alt's counsel informed Medtronic's counsel that it would object to Medtronic adding the new prior art references in its Final Invalidity Contentions and that Alt would oppose a motion for leave to amend Medtronic's Preliminary Invalidity Contentions. Medtronic filed its motion on November 11, 2005 requesting leave to amend its Preliminary Invalidity Contentions pursuant to Patent Rule 3-7 to add the eight additional prior art references mentioned above. Alt claims that Medtronic has not shown the requisite good cause necessary to amend its Preliminary Invalidity Contentions.

## APPLICABLE LAW

*2 Federal Rule of Civil Procedure 16(b) requires a showing of good cause to modify dates set forth in the Court's scheduling order. Fed.R.Civ.P. 16(b) (providing in part, "a schedule [scheduling order] shall not be modified except upon a showing of good cause and by leave of the district court...."). Patent Rules are considered part of the Court's scheduling order; therefore, a party seeking relief must obtain "the Court's leave on a good cause showing to modify the Patent Rule's deadlines." *STMicroelectronics, Inc. v. Motorola, Inc.*, 307 F.Supp.2d 845, 849 (E.D.Tex.2004). "Patent Rule 3-7 incorporates Rule 16(b)'s good cause standard by stating 'amendment or modification of the Preliminary or Final Infringement Contentions or the Preliminary or Final Invalidity Contentions ... may be made only by order of the Court, which shall be entered only upon a showing of good cause.

" ' *Id.* (quoting P.R. 3-7). "The 'good cause standard requires the party seeking relief to show that the deadlines cannot reasonably be met despite the diligence of the party needing the extension." ' *Id.* at 850 (quoting *S & W Enters., L.L.C. v. Southrust Bank of Ala., NA*, 315 F.3d 533, 535 (5th Cir.2003)). A trial court has broad discretion in allowing scheduling order modifications. *Id.* The Court should consider four factors when determining whether to allow a scheduling order modification: (1) the explanation for the failure to meet the deadline; (2) the importance of the thing that would be excluded; (3) potential prejudice in allowing the thing that would be excluded; and (4) the availability of a continuance to cure such prejudice. *Id.* (citing *S & W Enter., L.L.C.*, 315 F.3d at 535-36).

## ANALYSIS

### *Medtronic's Explanation for Its Failure to Meet the Deadline*

Medtronic argues that its inability to identify the additional prior art references before filing its Preliminary Invalidity Contentions was not unreasonable. Medtronic claims that it only had five months from the date the suit was filed and one month from the date Alt filed its Preliminary Infringement Contentions to identify prior art to include in its Preliminary Invalidity Contentions. Medtronic argues that Alt's infringement claims were very broad and unclear during the first four months of the lawsuit and that it was not until Medtronic received Alt's Amended Preliminary Infringement Contentions, *Markman* briefing, and Technology Tutorials in June through August of 2005 that Medtronic could confidently focus its prior art searches to only those devices using accelerometer-based activity sensors. Alt argues that the accelerometer has clearly been at issue from the beginning of the case in that claim two of the '4, 700 patent indicates that the detecting means includes an "accelerometer." Alt also contends that accelerometer-based products have clearly been at issue throughout Alt's history of trying "to get paid" for his inventions. Medtronic responds that Alt's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 278868 (E.D.Tex.)
(Cite as: Slip Copy)

interpretation of accelerometer was much broader early in the case and included devices that measured vibrations. Medtronic's piezoelectric crystal activity sensor measures vibrations and is found in many of its devices. Consequently, more of Medtronic's pacemaker and defibrillator products were at issue in the case. Medtronic claims that it was not until June 12, 2005 that Alt eliminated Medtronic's devices with piezoelectric crystal activity sensors from the accused products in the case. Furthermore, Medtronic argues that Alt initially identified the corresponding structure of "means for detecting movements" as "activity sensor 3 or its equivalent" before narrowing its focus to "accelerometer" in its Opening *Markman* Brief filed on July 29, 2005.

*3 Furthermore, Medtronic claims it did not learn that Alt intended to rely on a conception date that pre-dated the effective filing dates for all of the patents-in-suit until April 6, 2005. Medtronic contends that this change required it to expand its prior art searches by nearly four years in the case of the '014 patent, whose filing date is August 1, 1997 and claimed invention date is October 7, 1993. Medtronic claims learning of the 1993 conception date required it to broaden its research to find prior art references that predated the 1993 conception date as opposed to a 1997 conception date. Alt claims that even if Medtronic was unaware of the 1993 conception date during its early searching, it had no effect on the range of years Medtronic searched. Alt also argues that Medtronic was not disadvantaged by not knowing Alt's alleged conception date in searching for prior art because " the earlier, the better" as far as prior art is concerned. Medtronic argues that prior art closely related in time to the conception date is usually the most similar and, therefore, the most relevant as it applies to invalidity.

Medtronic claims to have diligently collected and read books and articles on cardiac pacing and arrhythmia treatment and detection before turning certain articles over to its invalidity experts in August and September of 2005. The four articles referenced in the September 23, 2005 letter above are the product of this process. Alt argues that Medtronic was not diligent in researching articles and had previous insight into Alt's infringement

claims. Alt basis this conclusion on the fact that Medtronic admits that its own in-house counsel investigated the asserted patent claims in 1999 and 2003 and in some cases as far back as 1990. Medtronic points out that the in-house analysis Alt refers to related to infringement and did not concentrate on invalidity issues related to Alt's patents. Medtronic claims it did not have a reason to research prior art until the present suit was filed.

Medtronic also claims it continued to interview current and former Medtronic employees with possible knowledge of facts relevant to the lawsuit after filing its Preliminary Invalidity Contentions. In September 2005, while interviewing Ed Duffin, a Medtronic Employee, Medtronic learned that Cardiac Pacemakers, Inc. ("CPI") had released a rate responsive implantable cardioverter defibrillator ("ICD") called the Ventak AV II DR. Upon further research, Medtronic's counsel discovered a press release indicating that the Ventak device used an accelerometer as its activity sensor. Consequently, Medtronic discovered two Ventak-related patents, U.S. Patent Nos. 5,792,183 and 6,128,529. Medtronic then concluded that the Ventak patents and device were potential prior art to both the '014 and '9,700 patents-in-suit. Additionally, Medtronic's interviews with Mr. Duffin led it to conclude that U.S. Patent No. 5,193,550 ("the '550 patent"), a Medtronic patent, was also potential prior art to '014 and '9,700 patents-in-suit.

*4 Alt claims that Medtronic's was not diligent in asking for information from its own employees once the suit was filed, evidenced by the fact that Medtronic waited until September to interview " Medtronic technical people." Alt claims that the Ventak product should not have been a "new discovery" to Medtronic because the product was made by one of Medtronic's direct competitors and was first used in Europe in 1997. Medtronic responds that its delay in discovering the Ventak product and patents was due to Alt's failure to identify the Ventak products in answers to interrogatories requesting information on all licensees using Alt's patents and prior infringement assertions relating to the patents-in-suit.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 278868 (E.D.Tex.)
(Cite as: Slip Copy)

Medtronic has shown that it was diligent in its attempts to discover relevant prior art before and after the filing of its Preliminary Invalidity Contentions. Alt apparently had a broader definition of activity sensor at the beginning of the case, which directed Medtronic's research to a larger spectrum of devices than are presently at issue in the case. Medtronic's discovery of more relevant prior art after narrowing a key issue in this complex and document intensive case is not surprising. Alt's argument that Medtronic's prior art search related to the '014 patent was not effected by its delayed knowledge of the 1993 conception date is not persuasive. Upon learning of Alt's 1993 conception date, Medtronic needed to find prior art predating the 1993 conception date. The closer in time prior art is to the conception date the more relevant the prior art is likely to be in terms of invalidity. In complex litigation such as the present case, each party relies heavily on the discovery responses of the opposing party to help guide future research. A party that fails to disclose information in a discovery response has little room to complain of the requesting party's timeliness when the requesting party later discovers the same information through the requesting party's own research. Thus, it appears Alt hindered Medtronic's ability to meet the March 30 deadline. Furthermore, the fact that Ventak was made by a competitor of Medtronic does not ensure that Medtronic actually had knowledge of the product prior to this lawsuit. In the context of the circumstances described above, it is not unreasonable that Medtronic could not meet the March 30, 2005 Preliminary Invalidity Contentions deadline with regards to the additional prior art references.

### The Importance of the Additional Prior Art References

Medtronic argues that the Ventak patents and press release are particularly important to this case in that they show a prior invention of an ICD using an accelerometer by someone other than the alleged inventor, as well as prior knowledge of such a product within the United States. Both of these determinations could potentially have a strong impact on Alt's claims related to

accelerometer-based devices. Medtronic claims that the '550 patent is important in that it evidences Medtronic's independent and earlier invention of the technology that Alt claims in the '014 and '9,700 patents. Such evidence supports Medtronic's claim that it was not knowingly and willfully infringing by copying Alt's technology. Finally, Medtronic claims that the four articles demonstrate that rate-responsive capabilities in an ICD were known to the medical world before Alt's alleged invention. Medtronic contends that these prior art references are very important to its ability to mount a defense to Alt's infringement claims and that Medtronic would suffer significant prejudice in the event it was not allowed to present these references. The Court is persuaded by Medtronic's arguments.

### The Potential Prejudice to Alt in Allowing the Additional Prior Art References

*5 Medtronic claims that Alt would not suffer any potential prejudice by the addition of the eight prior art references. Medtronic argues that Alt had notice of Medtronic's intentions to claim invalidity of its patents and of the additional prior art references since September 23 and October 12, 2005. Alt argues that he will be prejudiced by not being able to account for these references in his claim construction briefing and *Markman* arguments. Alt relies on language from the Court's Order of October 28, 2005 denying Alt's motion to amend its infringement contentions that states, "Considering that the claim construction briefing and the *Markman* hearing have already concluded, a continuance is not likely to remedy any potential prejudice that [the party opposing the motion to amend] might suffer." The present situation is distinguishable from that addressed by the Court in Alt's motion to amend its Preliminary Infringement Contentions. In Alt's motion, he requested leave to amend his Preliminary Infringement Contentions to add a new claim. The addition of prior art references post *Markman* do not have the same implications upon *Markman* briefing and arguments as the addition of a patent claim. Alt's position requires a *per se* rule that invalidity contentions cannot be amended after *Markman*. The Court is unwilling to adopt such a rule. Furthermore, Alt

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy

Slip Copy, 2006 WL 278868 (E.D.Tex.)
(Cite as: Slip Copy)

does not identify any particular arguments or additional claims that he would have asserted in response to the additional prior art references.

Alt also claims that he will be prejudiced because Medtronic has not yet disclosed its Rule 3-3 analysis of the prior art references and the initial expert report deadline was December 30, 2005 with a discovery deadline of February 10, 2006. Expert witness reports are now due on January 31, 2006 and the discovery deadline is now February 28, 2006. There is a potential that Alt could suffer prejudice in regards to these dates at this point in time. However, the fact that Alt has been aware of Medtronic's intent to add the additional prior art references since at least October 12 diminishes the likelihood that he would suffer prejudice. Alt had the opportunity to inform Medtronic that he objected to the addition of the prior art references in response to the letters sent by Medtronic in September and October of 2005. Alt did not take this opportunity. Alt chose to lay behind the log, and the Court does not consider Alt blameless for any prejudice he might suffer from the addition of the references. Additionally, any prejudice that Alt might suffer could be cured by a continuance, as discussed below.

*Availability of a Continuance to Cure Such Prejudice*

The Court is not convinced that Alt will suffer prejudice as a result of Medtronic's amending its Preliminary Invalidity Contentions. However, in the event that Alt does suffer any prejudice, it would likely arise in connection with the discovery deadline or Alt's ability to prepare expert witness reports. If the Court finds that Alt suffers such prejudice, it can easily be cured with an appropriate continuance of these deadlines.

CONCLUSION

*6 Medtronic has met the good cause standard required to amend its Preliminary Invalidity Contentions to add the eight additional prior art references listed above. Accordingly, the Court

GRANTS Medtronic's Motion for Leave to Amend its Preliminary Invalidity Contentions.

E.D.Tex.,2006.
Alt v. Medtronic, Inc.
Slip Copy, 2006 WL 278868 (E.D.Tex.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 2666875 (Trial Motion, Memorandum and Affidavit) Dr. Eckhard U. Alt's Reply Brief on Claim Construction (Aug. 25, 2005)
• 2005 WL 2667150 (Trial Motion, Memorandum and Affidavit) Dr. Eckhard U. Alt's Reply Brief on Claim Construction (Aug. 24, 2005)
• 2005 WL 2666767 (Trial Motion, Memorandum and Affidavit) Defendant's Responsive Brief on Claim Construction (Aug. 15, 2005)
• 2004 WL 3175971 (Trial Motion, Memorandum and Affidavit) Eckhard U. Alt's Reply to Medtronic, Inc.'s Counterclaims (Dec. 28, 2004)
• 2004 WL 3175968 (Trial Pleading) Medtronic, Inc.'s Answer and Counterclaim (Dec. 08, 2004)
• 2004 WL 3175746 (Trial Pleading) Original Complaint for Patent Infringement (Oct. 15, 2004)
• 2:04cv00370 (Docket) (Oct. 15, 2004)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.