# RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

MATTHEW W. KING

DIRECT DIAL NUMBER
302-651-7881
King@RLF.COM

March 24, 2006

**VIA ELECTRONIC MAIL**
The Honorable Joseph J. Farnan, Jr.
United States District Court
District of Delaware
844 King Street
Wilmington, DE   19801

Re:    **L.G. Philips LCD Co. Ltd. v. Tatung Company et. al.
C.A. No. 05-292 (JJF)**

Dear Judge Farnan:

Pursuant to the Court's Order of March 21, 2006, Defendants Chunghwa Picture Tubes, Ltd., Tatung Company, Tatung Company of America, Inc., and Viewsonic Corporation (collectively, "CPT") hereby submit for construction eight terms from U.S. Patent Nos. 5,019,002 ("the '002 patent") and 6,738,121 B2 ("the '121 patent"). CPT stands on its briefs and *Markman* hearing presentation, which are briefly summarized with the list of terms below.

As an initial matter, CPT notes that at the *Markman* hearing, Plaintiff LG.Philips LCD Co., Ltd. ("LPL") inappropriately and indiscriminately charged CPT with improperly citing extrinsic evidence, reading limitations into the claims from the specification and violating the claim differentiation doctrine.

Contrary to LPL's accusations about CPT's use of extrinsic evidence, CPT's briefs and *Markman* presentation appropriately rely on expert declarations and dictionary cites to illuminate the meaning of the claim terms to one of ordinary skill in the art. *See Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380 (Fed. Cir. 2005) ("[E]xtrinsic evidence can be useful in claim construction and technical dictionaries may provide help to a court to better understand the underlying technology and the way in which one of skill in the art might use the claim terms.") (citations omitted); *Biagro Western Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1302 (Fed. Cir. 2005) (explaining that expert testimony may be useful in claim construction). Such extrinsic evidence is necessary here because the intrinsic evidence does not provide sufficient guidance as to the meaning of certain terms (e.g., "scribe lines") and because the patentee uses certain terms idiosyncratically (e.g., "resistance"). *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005).

LPL's accusation that CPT improperly imports limitations from the specification fares no better. The appropriateness of looking to the specification for guidance in claim construction, as

The Honorable Joseph J. Farnan, Jr.
March 24, 2006
Page 2

CPT does in its briefs, is axiomatic. *See id.* at 1315 ("The specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.").

And finally, in its broad-brush accusation that CPT has violated the doctrine of claim differentiation in nearly every one of its proposed claim constructions, LPL ignores the limitations on the doctrine. *See Kraft Foods, Inc. v. International Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000) ("claim differentiation only creates a presumption that each claim in a patent has a different scope; it is not a hard and fast rule of construction."); *Multiform Desiccants, Inc. v. Medzam Ltd.*, 133 F.3d 1473, 1480 (Fed. Cir. 1998) ("the doctrine of claim differentiation can not broaden claims beyond their correct scope, determined in light of the specification and the prosecution history and any relevant extrinsic evidence.").

CPT's list of terms, with summaries of its arguments, follows:

### The '002 Patent

1.    "Resistance"

*CPT'S PROPOSED CONSTRUCTION:* "A resistance is a circuit element that has a specified resistance value designed to restrict the flow of current. A resistance does not include switching elements such as transistors and diodes."

*SUMMARY OF* Argument (*see* CPT Open Br. at 9-12, 14-15; Reply Br. at 1-3, 7-8; Slides at 26-38, 43-47):

"Resistance" in the claim language "via a resistance" connotes a device or component, instead of its ordinary meaning as a physical property. First, LPL does not dispute this point – it also construes "resistance" as a "component." Second, in the specification, "resistance" is used synonymously with "resistor," and is represented by " ⏦ ", the universal symbol for resistor in electronic schematics. Third, in the prosecution history, the inventors refer to a prior art "resistor" or "resistance element" as "resistance." And finally, the cited prior art, which is part of the intrinsic record, uses "resistor" and "resistance element" synonymously and interchangeably. Thus, a "resistance" is a component that has a specified resistance value, as indicated by the definition of "resistor."

"Resistance" should not include "switching elements." Unlike a resistor, which provides a constant and specified resistance to current flow, a switching element switches between low and high conductance states (*i.e.,* high and low resistance states) to open or close a pathway, like a switch. One of ordinary skill in the art would not understand a resistance element or component to include switching elements. The intrinsic evidence is in accord; the patent never says "resistance" can be anything other than a resistor. In fact, the claim language and the specification show a clear dichotomy between "resistance" and "shunt switching element." "Resistance" is used exclusively for the coupling between row and column to the outer ring. 8:18-39. In contrast, "transistor" and "switching element" are used for the coupling between the inner ring and rows and columns. 7:61-68. At various points in both the specification and

2

claims, the terms "resistance" and "switching element" are used in the same sentence to connote different electronic components. Because the infringement analysis hinges in part on whether "resistance" covers transistors or diodes, the Court's construction of "resistance" should clarify this issue.

LPL defines "resistance" as "a component used to cause voltage drop during current flow." This definition is overbroad, as it encompasses any and all circuit components, including but not limited to transistors, diodes, capacitors, wires and other components because they all cause a voltage drop. Thus, using LPL's proposed definition, there are no objective criteria for determining whether an accused device contains such a "resistance." Instead, LPL injects a purely subjective analysis that turns on whether or not the user intends to cause a voltage drop by using a particular component. This is an impermissible claim construction methodology under Federal Circuit law.

Furthermore, LPL's construction contradicts the description of the preferred embodiment in the specification, which indicates that the function of "resistance" is to limit current, instead of causing a voltage drop.

2.    "Corner Pad"

*CPT'S PROPOSED CONSTRUCTION:* "A pad of metal or other conductive material that is located at the corner of an outer guard ring, and electrically connected with the outer ring."

*SUMMARY* of Argument (*see* CPT Opening Br. at 15, 16; Reply Br. at 3-5; Slides at 49-51, 58-60):

"Corner pad" is not a term of art, and has no defined ordinary meaning. Thus, the definition of the term must be found in the intrinsic record. The patent describes three features of the "corner pad:" (1) it is connected to the outer ring by conductor lines; (2) it may be grounded; and (3) it is used for scribe line alignment. Because the feature of aligning the scribe lines is specifically claimed (*e.g.*, in claim 7) as part of the corner pad function, the feature should not be part of the definition of the term. Nor should the grounding feature be part of the definition because it is not necessarily required. Electrical connection to the outer ring, however, should be included in the definition of "corner pad" because the patent describes it as a general feature of the corner pad. 8:8-11. There is no evidence supporting the existence of any "corner pad" that does not have electrical connections to the outer ring.

By defining the corner pad as "a reference mark for cutting," LPL essentially equates "scribe lines" to "cutting lines," without any support. Nor does LPL explain why the alignment feature of the corner pad is included in its definition but the electrical connection to the outer ring is not.

Furthermore, LPL's construction does not in any way reflect the meaning of the words "corner" and "pad." LPL has already conceded one of ordinary skill in the art would understand "pad" to mean a conductive area. *See* LPL Reply at 15.

Finally, it should be noted that LPL defines "corner pad" purely by its function without any structural limitations, thereby rendering the term indefinite.

### 3.    "Removing Said Guard Ring and Row and Column Interconnections"

*CPT'S PROPOSED* Construction: "Electrically disconnecting the interconnections between rows and between columns and electrically disconnecting rows and columns from the outer guard ring."

*SUMMARY OF* Argument (*see* CPT Opening Br. at 12-13; Reply Br. at 3-4; Slides at 53-54):

The meaning of "removing," in the context of removing an electronic component from a circuit, could mean either physically removing the component from the circuit or breaking its electrical connections with the circuit. To be consistent with the specification, where the scribe lines are used to "disconnect" the jumpers interconnecting the gate and source lines, the construction of "removing" must be "electrically disconnecting," as proposed by CPT.

LPL's construction is vague and ambiguous and is inconsistent with the specification. Although its construction "physically disconnecting" could mean electrically disconnecting, LPL argues that "removing" requires physical removal of the outer guard ring and the row and column interconnections, *i.e.*, cutting off the edge of the class substrates. To avoid potential jury confusion, the Court should adopt CPT's construction on this term.

### 4.    "Pickup Pad"

*CPT'S* Proposed Construction: "A conductive pad electrically connected to the outer guard ring and the row and column interconnections, and used for aligning the front plane and backplane."

*SUMMARY OF* Argument (*see* CPT Open Br. at 13-14; Reply Br. at 4-5; Slides at 61-64):

"Pickup pad" is not a term of art, and has no defined ordinary meaning. The definition of the term must be found in the intrinsic record. The specification describes two features of the "pickup pad:" (1) the alignment function for the front and back planes; and (2) the electrical connections to the outer guard ring and to the row and column interconnections. A person of ordinary skill in the art would understand "pickup pad" to contain these two features based on the description in the specification. There is no evidence, intrinsic or extrinsic, for a pickup pad without either of the two features. The specification is indeed dispositive in this regard because the term has no ordinary meaning (and LPL has not contended otherwise).

CPT's definition is consistent with the doctrine of claim differentiation. Although "forming a corner on said pad to align the front plane and back plane" is specifically claimed by, *e.g.*, claim 5, the "corner" is merely a specific embodiment for the general function of aligning the front and back planes. Similarly, claim 7 further limits "pickup pad" by providing specific

The Honorable Joseph J. Farnan, Jr.
March 24, 2006
Page 5

embodiment wherein a pickup pad is "coupled to said resistance via a shunt switching element." Thus, CPT's definition neither imports limitation from embodiments nor violates the doctrine of claim differentiation.

LPL's definition finds no support in the intrinsic record. Nowhere is the electrical connection between the front and back planes even mentioned in the specification. LPL has not supplied any evidence to support its assertion that "pickup pad" is used for electrical connection between the front and back plane.

\*    \*    \*

Aside from submitting the above four terms of the '002 patent for construction, CPT also asks this Court to render a decision on the status of claim 18 of the '002 patent. *See* CPT Br. at 17-18; Reply at 9; Slides at 73-76. Claim 18 is indefinite because there are two or more reasonable ways to correct its drafting error. Contrary to LPL's baseless assertion, there is no evidence in the prosecution history that the Examiner even noticed claim 18's indefiniteness, let alone determined claim 18 should have depended from claim 12 instead of other claims.

## The '121 Patent

### 1.    "Tape Carrier Package"

*CPT'S PROPOSED* Construction: "An assembly used to connect the driving integrated circuit (D-IC) to the liquid crystal display (LCD) and the printed circuit board (PCB), having a base film, adhesive layer and metal layer"

*SUMMARY OF* Argument (see CPT Open Br. at 21-23; Reply Br. at 9-11; Slides at 6-13):

The only construction of "tape carrier package" (TCP) suggested in the specification is an assembly having a base film, adhesive layer and metal layer. *See, e.g.,* FIGS. 3, 9, 11; col. 2, lns. 4-7 ("As shown in FIG. 2 and FIG. 3, an adhesive 25 is coated on a base film 24 of the TCP 10, and a lead part 26 is adhered thereon."). No other definition is suggested anywhere in the specification. At the *Markman* hearing, LPL pointed out that the figures in the specification show the TCP with a solder resistor attached; however, this has no bearing on the fact that the TCP includes a base film, adhesive layer and metal layer everywhere in the specification.

LPL's proposed definition of "tape carrier package" en compasses any " apparatus to connect an integrated circuit chip to the liquid crystal panel and a printed circuit board." This leads to a result that even LPL admits is not correct (LPL acknowledges that "chip on glass" and "chip on board" configurations are not included in the definition of "tape carrier package"). *See* Plaintiff LG.Philips LCD Co., Ltd.'s Response Brief in Support of Its Proposed Claim Constructions at 21.

## 2.    "Bending Part"

*CPT'S PROPOSED* Construction: "Area of the TCP where a portion of base film is removed where the TCP is to be folded"

*SUMMARY OF ARGUMENT* (see CPT Open Br. at 25-27; Reply Br. at 11-12; Slides at 17-23):

In contrast to CPT's proposed definition of "bending part," LPL's proposed definition ("a bendable part of the tape carrier package where the base film is removed") is inconsistent with the stated purpose of the invention. The '121 patent is directed to a supposed improvement to the prior art "bending-type TAB system, [in which] a PCB 5 is folded to the rear side of a liquid crystal panel 2 by bending a tape carrier package (TCP) 10 mounted with a D-IC 8 and connected between a lower glass substrate 3 of the liquid crystal panel 2 and the PCB 6." Col. 1, ln. 55 – col. 2, ln. 3. Thus, the invention is intended to be used with a TCP that is bent for the purpose of <u>folding</u> the PCB behind the LCD.

Furthermore, the specification and prosecution history consistently refer to "bending parts" in conjunction with the folded area of the TCP. *See, e.g.,* col. 3, lns. 54-56 ("at least one bending part in which the base film at a portion where the tape carrier package is folded is removed"); col. 3, ln. 66 – col. 4, ln. 2 (same); *ex.* 11, Reply to Office Action dated July 22, 2003 at 12 (distinguishing the invention over the prior art by arguing that the bending portion of the TCP was where the TCP was folded). In contrast to this clear usage in the specification and prosecution history, according to LPL's proposed definition, a "bending part" is <u>any</u> area of the TCP where the base film is removed.

And finally, as explained in more detail below, LPL's proposed definition problematically encompasses dummy bending parts, which the specification clearly distinguishes from bending parts. *See, e.g.,* col. 3, ln. 41 – col. 4, ln. 17.

## 3.    "Bent Position"

*CPT'S PROPOSED* Construction: "Location on the TCP where the TCP is folded"

*SUMMARY OF* Argument (see CPT Open Br. at 27-28; Reply Br. at 12-14; Slides at 14-16):

The claims of the *PATENT* that contain the term "bent position" use it to describe the location of the bending parts. See claims 1, 2, 4, 6-12. As explained above and in CPT's briefs, bending parts are always described in the specification as being where the TCP is folded.

LPL's proposed definition of "bent position" encompasses any location on the TCP that does not lie absolutely flat, regardless of how slight the curvature of the TCP in that location. This is *INCONSISTENT* with the specification, which always describes "bent position" as a location within the folded area of the TCP. *See, e.g.,* col. 1, ln. 57 – col. 2, ln. 1 ("as shown in FIG. 1A . . . a PCB 6 is folded to the rear side of a liquid crystal panel 2 by bending a tape carrier

The Honorable Joseph J. Farnan, Jr.
March 24, 2006
Page 7

package (TCP) 10 . . . The TCP 10 is easily bent with the aid of these bending parts 10a and 10b.").

4.    **"Dummy Bending Part"**

    *CPT'S PROPOSED* Construction*:* "Area on TCP where a portion of the base film is removed between either the input or the output pad part and the D-IC where the TCP is not folded"

    *SUMMARY OF ARGUMENT* (see CPT Open Br. at 28-31; Reply Br. at 14-15; Slides at 24-27):

    LPL's proposed definition of "dummy bending part" ("a bendable part of the tape carrier package where *THE* base film is removed, which has a function other than bending") is unclear and may be read to include dummy bending parts that are also bending parts. In other words, LPL's proposed definition does not make clear whether it requires a dummy bending part to have only a function other than bending, or whether the dummy bending part may have the function of bending in addition to another function.

    The specification clearly distinguishes dummy bending parts from bending parts, and thus, the appropriate construction of dummy bending part is one that precludes a dummy bending part from *BEING* a bending part. Furthermore, in the prosecution history, the inventors consistently referred to dummy bending parts as being outside the folded area of the TCP. For example, the inventors distinguished their invention over the prior art Tajima reference by stating that "in Tajima, the base film 1 is removed only where the tape carrier package is folded." Ex. 11, Reply to Office Action dated July 22, 2003 at 12. The inventors argued that the '121 patent's dummy bending parts, in contrast, were outside the folded area. *Id.*

            Respectfully,

            Matthew W. King

MXK/kjb
cc:    Christine A. Dudzik, Esq. (via telecopy)
       Richard D. Kirk, Esq. (via hand delivery)
       Gaspare J. Bono, Esq. (via telecopy)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 24, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing, and hand delivered to the following:

> Richard D. Kirk
> The Bayard Firm
> 222 Delaware Avenue, Suite 900
> P.O. Box 25130
> Wilmington, DE 19899

I hereby certify that on March 24, 2006, I sent the foregoing document by Electronic Mail, to the following non-registered participants:

> Gaspare J. Bono
> Matthew T. Bailey
> Andrew J. Park
> Adrian Mollo
> McKenna Long & Aldridge LLP
> 1900 K Street, NW
> Washington, DC 20006

> Matthew W. King (#4566)
> king@rlf.com
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899