222 DELAWARE AVENUE, SUITE 900
P.O. BOX 25130
WILMINGTON, DE 19899
ZIP CODE FOR DELIVERIES: 19801

# THE BAYARD FIRM
A   T   T   O   R   N   E   Y   S

⊞ MERITAS LAW FIRMS WORLDWIDE
www.bayardfirm.com
302-655-5000
(FAX) 302-658-6395
WRITER'S DIRECT ACCESS

(302) 429-4208
rkirk@bayardfirm.com

FILED ELECTRONICALLY

March 31, 2006

The Honorable Joseph J. Farnan, Jr.
United States District Court
844 North King Street
Wilmington, DE  19801

RE:    *LG.Philips LCD Co., Ltd. v. Tatung Company of Amercia, et al.*
C.A. No. 05-292-JJF

Dear Judge Farnan:

Pursuant to the Court's Order entered March 21, 2006, Plaintiff LG.Philips LCD Co., Ltd. ("LPL") submits this letter in reply to the March 24, 2006 letter ("Defendants' Letter") of Defendants Tatung Co. ("Tatung"), Tatung Company of America, Inc. ("Tatung America"), Chunghwa Picture Tubes, Ltd. ("CPT"), and ViewSonic Corporation ("ViewSonic") (collectively, "Defendants").

Before addressing the specific claim terms, LPL will first address Defendants' *newly* proffered arguments attempting to rebut what LPL established in its briefs and at the *Markman* hearing, in particular that Defendants' proposed constructions improperly rely on extrinsic evidence, read limitations of the specification into the claims, and violate the doctrine of claim differentiation.

Contrary to Defendants' assertion that primary reliance on extrinsic evidence is proper in construing, *e.g.*, "scribe lines" and "resistance," the *Phillips* court expressly rejected the *Texas Digital* methodology "in which the specification should be consulted only after a determination is made, whether based on a dictionary, treatise, or other source, as to the ordinary meaning or meanings of the claim term in dispute." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1320 (Fed. Cir. 2005). Indeed, in the *Aquatex* case cited by Defendants, the Federal Circuit consulted the intrinsic record *before* examining the technical dictionaries. *Aquatex Indus., Inc. v. Techniche Solutions*, 419 F.3d 1374, 1380-82 (Fed. Cir. 2005). Nevertheless, in construing the terms "scribe lines" and "resistance," Defendants improperly *first* consulted The American Heritage Dictionary and the IEEE Dictionary, respectively, *before* consulting the specification. D.I. 137 at 9, 16.

THE BAYARD FIRM

The Honorable Joseph J. Farnan, Jr.
March 31, 2006
Page 2

Defendants' claim construction therefore violates a principle canon of claim construction and should be rejected. [1]

LPL, of course, does not disagree that claims "must be read in view of the specification, of which they are part." *Phillips*, 415 F.3d at 1315 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). D.I. 135 at 10. Indeed, LPL consulted the specifications of the patents-in-suit in determining each of its proposed constructions. Rather, it is Defendants' practice of reading limitations from the specifications into the claims, *e.g.*, in construing "interconnecting;" "resistance;" "corner pad;" "bending part;" "dummy bending part;" "tape carrier package;" and "bent position," where such limitations do not appear in the claims themselves, that should be rejected. *See Phillips*, 415 F.3d at 1323 ("although the specification often describes very specific embodiments of the invention, we have repeatedly warned against confining the claims to those embodiments"); *see also Nazomi Communications, Inc. v. ARM Holdings, PLC*, 403 F.3d 1364, 1369 (Fed. Cir. 2005) (noting that claims may embrace "different subject matter than is illustrated in the specific embodiments in the specification").

In addition, contrary to Defendants' assertion, LPL did not "broad-brush" Defendants' violation of the doctrine of claim differentiation. Rather, LPL particularly pointed out the specific terms and definitions that violated this doctrine in Defendants' proposed constructions of, for example, "outer electrostatic discharge guard ring;" "bending part;" "dummy bending part;" and "bent position." *See, e.g.*, D.I. 143 at 9, 24-29. In each of these cases, without any attempt to rebut the presumption of claim differentiation, Defendants improperly attempt to read narrow limitations into broad claims, and construe different words or phrases used in separate claim limitations to have the same meaning and scope. Such practice violates this important doctrine and should be rejected.

Turning to Defendants' list of terms, LPL replies as follows:

## The '002 Patent

(1)    "resistance"

LPL maintains its position that the proper construction of the term "resistance" is

**any component used to cause a voltage drop during current flow.**

---

[1] Although maintaining their construction of "resistance," Defendants no longer cite to the IEEE Dictionary. Defendants' Letter at 2-3. Defendants did not even attempt to contradict LPL's arguments that: (1) extrinsic evidence may not be "used to contradict claim meaning that is unambiguous in light of the intrinsic evidence," *Phillips*, 415 F.3d at 1317, 1324; or (2) the declarations of Dr. Webster Howard, D.I. 138, and Mr. David Holmes, D.I. 139, exceed the bounds of providing technical background and improperly parrot the legal arguments contained in Defendants' briefs, arguments that also contradict the intrinsic record. D.I. 143 at 4-5.

THE BAYARD FIRM

As explained in LPL's *Markman* briefs, LPL's *Markman* presentation, and letter to the Court of March 24, 2006 ("LPL's Letter"), all of the intrinsic sources of claim construction support this ordinary meaning. D.I. 135 at 13-14, LPL's Letter at p. 3. Most compelling is, of course, the specification's explicit disclosure that "[t]he line **210** is connected to the other set of gate or source lines by a shunt line **224**, a shunt transistor **226** and a large resistance **228**, such as 100 K ohms (illustrated schematically)." D.I. 135, Ex. A, the '002 Patent, at col. 8, ll. 23-26; *see also* D.I. 143 at 10-13. Further, Defendants' contention that "via resistance" in the claim language deviates from the term's ordinary meaning is plainly wrong. Resistance is an opposition to an electric current, which is a characteristic of any component used to cause a voltage drop during current flow. Thus, the use of resistance in the patent is consistent with its ordinary meaning.

In addition, despite Defendants' repeated allegations to the contrary, "used to cause a voltage drop during current flow" is not subjective, but functional. It has been explicitly held that the purpose of the invention may be examined as an appropriate basis for interpreting a claim term. *See Apple Computer, Inc. v. Articulate Sys., Inc.*, 234 F.3d 14, 25 (Fed. Cir. 2000) ("[T]he claim must be interpreted in light of the teachings of the . . . purpose of the invention . . . .").

The prosecution history is also consistent with this construction; as such, any reliance on extrinsic evidence is improper. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996); *see also Phillips*, 415 F.3d at 1324.

Defendants' proposed construction is that "[a] resistance, as it is used in the claims, means a resistor, which is an electric circuit element that has a specified resistance to the flow of electrical current. A resistance does not include switching elements such as transistors and diodes." As LPL has previously asserted, this proposed construction improperly relies on the single embodiment illustrated schematically in figure 7. D.I. 143 at 10-13. Indeed Defendants' Letter, once again, refers to this *single* embodiment as sole support for Defendants' proposed construction. Defendants' Letter at p. 2.

Importantly, the second sentence of Defendants' proposed construction, *i.e.*, "A resistance does not include switching elements such as transistors and diodes," is a negative limitation having no basis whatsoever in the intrinsic record. Moreover, it is a thinly-veiled attempt to have the Court improperly decide infringement rather than construe claims in accordance with the intrinsic record. *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc). Indeed, Defendants admit as much by stating that "[b]ecause the infringement analysis hinges in part on whether 'resistance' covers transistors or diodes, the Court's construction of 'resistance' should clarify this issue." Defendants' Letter at p. 3. Further, it is well settled that claims should not be construed so as to exclude the accused device. *See Neomagic Corp. v. Trident Microsystems, Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) (noting that "[i]t goes without

saying that whether the accused device supplies a constant voltage or not is irrelevant to the proper interpretation of the claim term 'power supply'").

Accordingly, for all the reasons enunciated in LPL's *Markman* briefs and presentation, as well as in LPL's letters, this Court should adopt LPL's proposed construction of "resistance" to be **any component used to cause a voltage drop during current flow.**

(2)    "corner pad"

LPL maintains its position that, in its proper context, the meaning of the term "corner pad" does not require construction. To the extent construction of the term "corner pad" is necessary, however, the plain and ordinary meaning to one of ordinary skill in the art should apply, and "corner pad" should be construed as

**a reference mark for cutting.**

Both the claims and the specification support that the corner pad provides the alignment for the scribe lines. *See* D.I. 135, Ex. A, col. 8, ll. 11-15 & claims 7 and 18. For example, the specification discloses that "[t]he L-shaped corner pad **208** can be grounded and also provides the alignment for the scribe lines **204** and **206** . . . ." *Id.* The scribe lines are the cutting lines used to physically remove the outer electrostatic discharge guard ring. *Id.* at col. 8, ll. 11-15. The corner pad is simply the reference mark for the scribe lines. The prosecution history is also consistent with this construction; as such, any reliance on extrinsic evidence is improper. *See Vitronics Corp.*, 90 F.3d at 1583; *see also Phillips*, 415 F.3d at 1324.

In contrast, Defendants' proposed construction of "a pad of metal or other conductive materials that is located at the corner of an outer guard ring, and electrically connected with the outer ring" improperly imports "purported" limitations from the specification into the claims.

First, the specification discloses, in a preferred embodiment, that "[a] corner pad **208** is *connected* to each other corner pad (not illustrated) by respective outer conductive lines **210** and **212** of the guard ring **200.**" D.I. 135, Ex. A, col. 8, ll. 9-11 (emphasis added). Such disclosure, however, does not require the corner pad to be "electrically connected with the outer ring" as proposed by Defendants. There is no evidence in the intrinsic record requiring such electrical connection. Defendants' argument that "[t]here is no evidence supporting the existence of any 'corner pad' that does not have electrical connections to the outer ring" misses the point.

Second, because the corner pad is not required to be grounded, *i.e.,* "corner pad **208** *can* be grounded" (emphasis added), the corner pad need not be limited to "a pad of metal or other conductive materials" as proposed by Defendants. Indeed, the only requirement of the corner pad is that it "provides the alignment for the scribe lines **204**

THE BAYARD FIRM

and **206**," so that the outer electrostatic discharge guard ring can be physically disconnected.

Accordingly, for all the reasons enunciated in LPL's *Markman* briefs and presentation, as well as in LPL's letters, this Court should adopt LPL's proposed construction of "corner pad" to be **a reference mark for cutting**.

(3)    "removing said [outer] guard ring and row and column interconnections"

LPL maintains that, in its proper context, the meaning of the phrase "removing said outer guard ring and row and column interconnections" is straightforward and does not require construction. The meaning of the term "removing" is plain on its face and does not require construction. To the extent any construction is necessary, the plain and ordinary meaning of this term should apply and "removing said outer guard ring and row and column interconnections" should be construed as

**physically disconnecting said guard ring and row and column interconnections**.

As LPL demonstrated in its tutorial, the corner pad is used to align the scribe lines for breaking the glass and physically removing the outer electrostatic discharge guard ring from the lower glass substrate. There is nothing ambiguous about the physical disconnection of the outer guard ring. Importantly, nothing in the intrinsic record supports deviating from the plain and ordinary meaning of "removing." The prosecution history is also consistent with this construction; as such, any reliance on extrinsic evidence is improper. *See Vitronics Corp.*, 90 F.3d at 1583; *see also Phillips*, 415 F.3d at 1324.

Nevertheless, Defendants propose the following construction: "electrically disconnecting the interconnections between rows *and* between columns *and* disconnecting rows and columns from the outer guard ring." Defendants have therefore construed the "removing" limitation to require three separate steps, namely: (1) electrically disconnecting the interconnections between rows; (2) electrically disconnecting the interconnections between columns; and (3) electrically disconnecting rows and columns from the outer guard ring. According to Defendants and their construction, if the row interconnections, the column interconnections and the outer guard ring are removed in a single step, this limitation of the claim would not be met. Not surprisingly, Defendants point to no intrinsic evidence whatsoever to support this very narrow construction. Defendants' proposed construction should be rejected.

Accordingly, for all the reasons enunciated in LPL's *Markman* briefs, presentation, and Letter, this Court should adopt LPL's proposed construction of "removing said outer guard ring and row and column interconnections prior to completion of the display" to be **physically disconnecting said guard ring and row and column interconnections**.

THE BAYARD FIRM

The Honorable Joseph J. Farnan, Jr.
March 31, 2006
Page 6

(4)    "pickup pad"

In the context of the intrinsic record, the term "pickup pad" should be construed as

**a conductive area used to electrically connect the back plane to the front plane.**

The specification, *e.g.*, Figure 7, is consistent with LPL's construction. For example, the term "pickup pad" is disclosed in the specification for electrically connecting the back plane to the front plane:

> A backplane pickup contact pad **216** also is provided, which includes a corner **218** for aligning the backplane with the front plane. The pad **216** includes a shunt line **220** which is connected to one set of source or gate lines via a shunt transistor **222** along the edge to be scribed and removed along the line **206**. . . . There will be at least one corner backplane pickup pad **216** and preferably there will be two or three, each with their associated shunt transistors.

D.I. 135, Ex. A, the '002 Patent, at col. 8, ll. 18-39; *see also* Fig. 7. One of ordinary skill in the art would understand the term "pad" in this context to be a conductive area. The pickup pad "picks up" or transfers the voltage between the back plane and the front plane, thereby electrically connecting the back plane to the front plane. *See STMicroelectronics, Inc. v. Motorola, Inc.*, 327 F. Supp. 2d 687, 698 (E.D. Tex. 2004) ("Although the term is perhaps not simple, the individual words in the term have agreed or common meanings that are not in need of further construction."). The prosecution history is also consistent with this construction; as such, any reliance on extrinsic evidence is improper. *See Vitronics Corp.*, 90 F.3d at 1583; *see also Phillips*, 415 F.3d at 1324.

In contrast, Defendants' proposed construction of "pickup pad" as "a pad located at the corner region of a backplane for aligning the frontplane and backplane" contradicts the description of the preferred embodiment in the specification, which indicates that the frontplane and backplane are aligned using "corner **218**," not the pickup pad. *See* D.I. 135, Ex. A, col. 8, ll. 18-20 ("a corner **218** for aligning the backplane with the front plane"). Further, Defendants' proposed construction does violate the doctrine of claim differentiation by reading the "to align the front plane and back plane of the display" limitation of claim 5 into claim 3, thereby making the limitation superfluous. In addition, Defendants' argument that "claim 7 further limits 'pickup pad' by providing specific embodiment wherein a pickup pad is 'coupled to said resistance via a shunt switching element" has no support whatsoever.

Accordingly, for all the foregoing reasons, this Court should adopt LPL's proposed construction of "pickup pad" to be **a conductive area used to electrically connect the back plane to the front plane.**

THE BAYARD FIRM

The Honorable Joseph J. Farnan, Jr.
March 31, 2006
Page 7

\*      \*      \*

In addition, LPL maintains that it is apparent from the face of the patent that Claim 18 depends from claim 12, rather than as stated from claim 10, and that view is not contradicted by the prosecution history. First, the language of claim 18 is identical to that of claim 7, which depends from claim 1. Indeed, a review of the patent claims indicates a parallel drafting structure between claims 2-7 and claims 13-18. This parallel structure makes clear to one of ordinary skill that claim 18 should depend from claim 12, not claim 10. During prosecution, the Examiner acknowledged this understanding of the scope of claim 18, by objecting to both claims 7 and 18 "as being dependent on a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." D.I. 135, Ex. F, Office Action mailed March 31, 1989, at pp. 3-4.

Despite Defendants' allegations, LPL did not assert that the Examiner noticed the error in dependency. Indeed, if he had, this issue would be moot. In sum, because the error in dependency is "apparent from the face of the patent, and that view is not contradicted by the prosecution history," claim 18 is not indefinite. *See Hoffer v. Microsoft Corp*, 405 F.3d 1326, 1331 (Fed. Cir. 2005) (reversing the district court's finding that an error in dependency invalidated the dependent claim).

## B.    The '121 Patent

### (1)    "tape carrier package"

LPL maintains that the term "tape carrier package" is simple and clear, and does not require construction. If a construction of this term must be made, however, it should be in accordance with its ordinary meaning of:

**an apparatus to connect an integrated circuit chip to the liquid crystal panel and the printed circuit board.**

The intrinsic record is consistent with this ordinary meaning. *See, e.g.*, D.I. 135, Ex. B, the '121 Patent, at claim 1, col. 2, ll. 1-3. In fact, the "Field of the Invention" section of the specification explicitly discloses: "This invention relates to an *apparatus* for mounting an integrated circuit on a liquid crystal display, and more particularly to a tape carrier package." *Id.* at col. 1, ll. 13-15 (emphasis added). Thus, LPL's construction of the term "tape carrier package" is supported by the intrinsic record.

Defendants' construction of "tape carrier package" to mean "an assembly used to connect a driving integrated circuit (D-IC) to the liquid crystal display (LCD) and the printed circuit board (PCB) having a base film, adhesive and metal layer," is contrived to narrow the scope of this simple and straightforward claim term by limiting the term to preferred embodiments, *e.g.*, Figs. 1A, 9 and 10. The intrinsic record, however,

contradicts construing "tape carrier package" to be limited to "a base film, adhesive and metal layer." In fact, the claim language itself uses the open-ended term "comprising," reciting:

> a tape carrier package connected to the liquid crystal panel and the printed circuit board, the tape carrier package *comprising*: . . .

Ex. B, the '121 Patent, claim 1 (emphasis added); *see Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1348 (Fed. Cir. 2001) ("In the parlance of patent law, the transition 'comprising' creates a presumption that the recited elements are only a part of the device, that the claim does not exclude additional, unrecited elements."); *see also Free Motion Fitness, Inc. v. Cybex Int'l, Inc.*, 423 F.3d 1343, 1347 (Fed. Cir. 2005).

Accordingly, for all of the foregoing reasons, this Court should adopt LPL's proposed construction of "tape carrier package" to be **an apparatus to connect an integrated circuit chip to the liquid crystal panel and the printed circuit board.**

### (2)    "bending part"

LPL maintains its position that the proper construction of "bending part" is

**a bendable part of the tape carrier package where the base film is removed.**

The intrinsic record clearly supports this ordinary meaning. D.I. 135 at 26-27; D.I. 143 at 24-26. Indeed, the language of claim 1 recites: "a first bending part in which a second portion of *the base film* existing at *a bent position* between the dummy bending part and the integrated circuit chip *is removed*." D.I. 135, Ex. B, the '121 Patent, at claim 1 (emphasis added). Further, the specification discloses that: (a) "[t]he TCP between the PCB **6** and the D-IC **38** is *easily bent* by the first bending part **30a**; and (b) "[t]he TCP between the liquid crystal panel 2 and the D-IC **38** is *easily bent* by the second bending part **30b**." *Id.* at col. 5, ll. 15-17, 22-24 (emphasis added). As the intrinsic record is unambiguous, reliance on extrinsic evidence is improper. *See Vitronics Corp.*, 90 F.3d at 1583; *see also Phillips*, 415 F.3d at 1324.

Defendants' proposed construction of "*area* of tape carrier package where a portion of the base film is removed *where* the tape carrier package is *to be folded*" narrows the scope of this simple and straightforward claim term because the ordinary meaning of "bent" is not the same as "folded." In addition, Defendants' proposed construction improperly limits the term to a preferred embodiment, violates the doctrine of claim differentiation, and improperly relies on extrinsic evidence. D.I. 143 at 24-26; LPL's Letter at p. 4.

THE BAYARD FIRM

Defendants' argument that LPL's construction is "inconsistent with the stated purpose of the invention" is not credible. The stated purpose of the invention is "a tape carrier package with a dummy bending part that is capable of reducing a difference in brightness in a screen," not "a TCP that is <u>bent</u> for the purpose of <u>folding</u> the PCB behind the LCD," as self-servingly argued by Defendants. *See* D.I. 135, Ex. B, the '121 Patent, at col. 1, ll. 14-16. For example, the specification does not consistently refer to a bending part "in conjunction with the folded area of the TCP," as alleged by Defendants. *See, e.g.,* D.I. 135, Ex. B, the '121 Patent, at col. 5, ll. 15-17, 22-24 ("The TCP between the PCB **6** and the D-IC **38** is easily bent by the first bending part **30a** . . . . The TCP between the liquid crystal panel **2** and the D-IC **38** is easily bent by the second bending part **30b**."). Despite their rhetoric, Defendants are unable to cite to anything in the intrinsic record that contradicts LPL's proposed construction of "bending part" as a bendable part of the tape carrier package where the base film is removed.

Accordingly, for all the foregoing reasons, this Court should adopt LPL's proposed construction of "bending part" to be **a bendable part of the tape carrier package where the base film is removed**.

(3)    "bent position"

LPL maintains that the meaning of the term "bent position" is plain on its face and does not require construction. To the extent any construction is necessary, the plain and ordinary meaning of this term should apply and "bent position" should be construed as

**position that is not flat.**

There is nothing in the intrinsic record that warrants deviating from this ordinary meaning. As discussed above, despite Defendants' repeated allegations to the contrary, bending parts are not always described in the specification as being where the TCP is folded. *See, e.g.,* D.I. 135, Ex. B, the '121 Patent, at col. 5, ll. 15-17, 22-24 ("The TCP between the PCB **6** and the D-IC **38** is easily bent by the first bending part **30a** . . . . The TCP between the liquid crystal panel **2** and the D-IC **38** is easily bent by the second bending part **30b**.") Further, even if the specification only described such a single embodiment, which it does not, it is indisputable that the claims should not be so limited. *See Phillips*, 415 F.3d at 1323 ("In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."). The prosecution history is likewise consistent with this construction; as such, any reliance on extrinsic evidence is improper. *See Vitronics Corp.*, 90 F.3d at 1583; *see also Phillips*, 415 F.3d at 1324.

As discussed in LPL's *Markman* briefs and presentation, Defendants' proposed construction of "bent position" to mean "location on the tape carrier package where the tape carrier package is folded," limits the term to a preferred embodiment, improperly relies on extrinsic evidence, and violates the doctrine of claim differentiation.

THE BAYARD FIRM

The ordinary meaning of "bent" is not the same as "folded," and the intrinsic record does not support equating the meaning of "bent" and "folded." The doctrine of claim differentiation would be violated by Defendants' proposed construction because: (1) Claim 1 recites that bending part exists at a "bent position," and later in the same claim uses the term "folded;" and (2) Claim 14 recites bending part "at an area" where "folded," whereas Claim 1 recites bending part "at a bent position."

Accordingly, this Court should adopt LPL's proposed construction of "bent position" to be **position that is not flat**.

(4)    "dummy bending part"

LPL maintains its position that the proper construction of "dummy bending part" is

**a bendable part of the tape carrier package where the base film is removed, which has a function other than bending.**

The intrinsic record makes clear the difference between the "dummy" bending part and the bending part: a "dummy bending part" has a function other than bending, while a "bending part" is the bendable part of the tape carrier package to be bent. D.I. 135 at 27-29. Contrary to Defendants' assertion, it is not unclear whether LPL's construction requires "a dummy bending part to have only a function other than bending, or whether the dummy bending part may have the function of bending in addition to another function." Defendants' Letter at p. 7 (emphasis in original). Indeed, either case is possible and supported by the intrinsic record. As long as the dummy bending part has a function other than bending, Defendants have not cited to anything in the intrinsic record that would preclude the dummy bending part from bending. Significantly, although Defendants argue that the prosecution history requires that a dummy bending part be outside the folded area, they can point to no intrinsic evidence whatsoever requiring that a dummy bending part not be bent. Defendants' Letter at p. 7. As the intrinsic record is unambiguous, reliance on extrinsic evidence is improper. *See Vitronics Corp.*, 90 F.3d at 1583; *see also Phillips*, 415 F.3d at 1324.

As previously explained, Defendants' proposed construction of "area on TCP where a portion of the base film is removed *between either the input or output pad part and the driving integrated circuit* where the tape carrier package *is not folded*," violates the doctrine of claim differentiation, limits the term to a preferred embodiment, and improperly relies on extrinsic evidence. D.I. 143 at 27-29.

In particular, Defendants' proposed construction of "dummy bending part" violates the doctrine of claim differentiation because: (1) Claim 1 recites "at a position, close to any one of the output pad part or the input pad part, where the tape carrier package is not folded" as a separate limitation, whereas Claims 2, 3, 4, 8 and 13 do not include the limitation "not folded;" and (2) Claims 5-13 recite that the dummy bending

THE BAYARD FIRM

The Honorable Joseph J. Farnan, Jr.
March 31, 2006
Page 11

part is "between the pad part and the integrated circuit chip," whereas Claim 1 does not include the limitation "between the pad part and the integrated circuit chip."

Accordingly, for all the foregoing reasons, this Court should adopt LPL's proposed construction of "dummy bending part" to be **a bendable part of the tape carrier package where the base film is removed, which has a function other than bending**.

Respectfully submitted,

/s/ Richard D. Kirk (rk0922)

RDK/slh
cc:    Clerk of the Court (by hand)
       All counsel as shown on the attached certificate

621952v1

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on March 31, 2006, he electronically filed

the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Robert W. Whetzel, Esq.
Matthew W. King, Esq.
Richards, Layton & Finger
One Rodney Sqare
P.O. Box 551
Wilmington, DE 19899


The undersigned counsel further certifies that copies of the foregoing document

were sent on March 31, 2006 by email and to the above counsel to the following non-

registered participants, and will be sent by hand to the above counsel and by first class

mail to the following counsel:

Christine A. Dudzik, Esq.            Teresa M. Corbin, Esq.
Thomas W. Jenkins, Esq.             Glenn W. Rhodes, Esq.
Howrey LLP                          Howrey LLP
321 North Clark Street              525 Market Street
Suite 3400                          Suite 3600
Chicago, IL 60610                   San Francisco, CA 94105


/s/ Richard D. Kirk (rk0922)
Richard D. Kirk