# Exhibit 1

 **LG.PHILIPS LCD**

LG Philips LCD
533,Hogae-dong, Dongan-gu, Anyang-shi,
Kyongki-do, 430-080   R.O.Korea
TEL : 82-31-450-7443 FAX: 82-31-429-4588

*VIA FACSIMILE*

To : **Cheng-Yuan. Lin**
     **President**                                          February 8, 2002
     **Chunghwa Picture Tubes.,LTD**
     **1127 Hopin Rd., Padeh City, Taoyuan, Taiwan, R.O.C**
     Fax : 886-3-377-3189
     Tel  : 886-3-367-5151

Dear Mr. President

LG.Philips LCD Co., Ltd. ("LG.Philips") is an industry leader in the liquid crystal display
(LCD) technology. One reason for this is the amount of investment that LG.Philips has
made to develop the necessary technology to manufacture the highest quality LCD
products. LG.Philips is proud of the accomplishments made in the technology behind
our LCD products.

LG.Philips has also placed high priority on worldwide intellectual property, which is
synonymous with high technology. It is our belief that the LCD technology patents
owned by LG.Philips are wide-ranging and valuable. As examples, you may wish to
review U.S. Patent Nos. 4,624,737; 5019002; 5856816; 4885616; 5825449; 5,835,139;
5,926,237; 6,002,457. We believe that these patents, although only exemplary, cover a
wide ranging. A portfolio of patents including these exemplary patents is currently
available for license from LG.Philips.

Should your company wish to discuss the above-identified patents or the relevance of
the LGP patent portfolio to any specific products of your company, we would be happy
to visit your company on any one day between March 14 and March 15.

I look forward to receiving either your response to my suggestion or your suggestion,
desirably no later than February 26, 2002.

Sincerely yours,

Jeong-Hwan Lee
Vice President
Intellectual Property Center
Tel : 82-31-450-7479
Fax : 82-31-429-4588
jhlee@lgphilips-lcd.com

LPL0000217

# Exhibit 2

**LG.PHILIPS LCD**

**LG Philips LCD**
533,Hogae-dong, Dongan-gu, Anyang-shi,
Kyongki-do, 430-080  R.O.Korea
TEL : 82-31-450-7443 FAX: 82-31-429-4588

*VIA FACSIMILE*

To : Cheng-Yuan. Lin
President
Chunghwa Picture Tubes.,LTD
1127 Hopin Rd., Padeh City, Taoyuan, Taiwan, R.O.C
Fax : 886-3-377-3189
Tel : 886-3-367-5151

February 27, 2002

Dear Mr. President

On February 8, we wrote you and asked for a meeting to discuss the unauthorized use
of technology owned by LG.Philips LCD Co., Ltd. ("LGP") by Chungwa Picture Tubes,
Inc. ("CPT").  In that letter, we asked for a meeting to discuss this issue of patent
infringement with CPT.  CPT has not responded to our letter.

We are concerned that CPT's lack of a response indicates a lack of interest on the part
of CPT to attempt to resolve this issue through amicable negotiations.  We will be in
Taiwan in March and would be available to meet with CPT on March 14 or 15.  Please
let us know if CPT has any interest in discussing this matter with LGP.

Please recognize that LGP will take legal action to protect its property rights, as
necessary, in the event amicable negotiations cannot resolve this matter.  We hope to
hear from CPT soon so that we can confirm a meeting date to discuss this serious issue,
desirably no later than March 1, 2002.

Sincerely yours,

Jeong-Hwan Lee
Vice President
Intellectual Property Center
Tel : 82-31-450-7479
Fax : 82-31-429-4588
jhlee@lgphilips-lcd.com

LPL0000216

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

Plaintiff,

v.

TATUNG COMPANY;
TATUNG COMPANY OF AMERICA, INC.;
CHUNGHWA PICTURE TUBES, LTD.;
AND VIEWSONIC CORPORATION,

Defendants.

Civil Action No. 05-292 (JJF)

### PLAINTIFF'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANTS' FIRST AND SECOND SETS OF INTERROGATORIES

Plaintiff LG.Philips LCD Co., Ltd. ("LPL"), by counsel and pursuant to Fed. R. Civ. P.

33, hereby supplements certain answers to Defendants Tatung Company ("Tatung"), Tatung

Company of America, Inc. ("Tatung America"), Chunghwa Picture Tubes, Ltd. ("CPT"), and

ViewSonic Corporation ("ViewSonic") (collectively referred to herein as "Defendants") First Set

of Interrogatories and Second Set of Interrogatories.

### PRELIMINARY STATEMENT AND INCORPORATION OF OBJECTIONS

1.    LPL makes the supplemental objections and answers herein (collectively

"Answers") based solely on its current knowledge, understanding, and belief as to the facts and

the information available to it as of the date of the Answers.  Additional discovery and

investigation may lead to additions to, changes in, or modifications of these Answers.  LPL

reserves the right to produce subsequently discovered information and to introduce such

subsequently discovered information at the time of any hearing or trial in this action.

618911v1

2.      LPL does not waive any objection made in these Answers, nor any claim of privilege, whether expressly asserted or not, by providing any information or identifying any document or thing in the Answers. Any inadvertent disclosure of information or inadvertent identification or production of any document shall not constitute waiver of any applicable privilege.

3.      LPL incorporates by reference all of the General Objections set forth in LPL's prior objections and answers to interrogatories dated January 17, 2006 and February 6, 2006, to the same extent as previously asserted, and to be deemed included within each of the individual Objections and Answers to these Interrogatories. All Answers are made subject to each and without waiving any of such objections. LPL's specific Objections are not intended to preclude, override, or withdraw any of the General Objections to that Interrogatory.

## INTERROGATORIES

### INTERROGATORY NO. 1

Identify and describe in detail all acts constituting the conception, actual reduction to practice, and constructive reduction to practice for each asserted claim of each of the patents-in-suit, including the inventor or inventors responsible for such conception, all persons who participated in or witnessed such acts, and all documents that refer or relate to such acts and all persons having knowledge of the event concerning these acts.

### OBJECTIONS AND ANSWER

LPL objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects because Defendants mischaracterize as one interrogatory multiple interrogatories on separate subjects; in responding, LPL counts this interrogatory as multiple interrogatories. LPL further objects to this

613911v1

2

as vague, ambiguous, overly broad, and unduly burdensome in that it calls for "all communications ... which in any way refer or relate to the patents-in-suit or which refer or relate to matters or issues raised in this lawsuit." Subject to and without waiving these objections and the general objections, LPL states as follows:

LPL will produce non-privileged, relevant documents, if any, reflecting communications that reference the Patents-in-Suit.

### INTERROGATORY NO. 4

Identify when LPL first learned of facts causing them to believe, suspect or become aware, that each of the Defendants infringed one or more claims of the patents-in-suit, stating the facts that were discovered, the date of the discovery, and the persons involved in the discovery.

### SUPPLEMENTAL OBJECTIONS AND ANSWER

LPL objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine. LPL also objects because mere belief or suspicion of infringement is not relevant and facts regarding belief or suspicion are not reasonably calculated to lead to the discovery of admissible evidence. LPL also objects to this Interrogatory as vague and ambiguous, including, for example, with respect to the terms "believe, suspect or become aware." Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

It is presently believed that LPL first suspected that Defendants may be infringing one or more claims of the '121 Patent no earlier than mid-2004.

With respect to the '002 Patent, LPL sent a February 8, 2002 letter to CPT referring to the '002 Patent, at which time LPL suspected that CPT might be infringing. It is presently believed that LPL first suspected that Tatung and Tatung America may be infringing one or more

claims of the '002 Patent no earlier than mid-2004.  It is also presently believed that LPL first

suspected that ViewSonic may be infringing one or more claims of the '002 Patent no earlier

than April 2005.

Mr. Won-Jun Choi was involved in LPL's infringement analysis regarding the '121

patent.  Mr. Young-Woo Cho was involved in LPL's infringement analysis regarding the '002

patent.  LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and

if additional information becomes available, or otherwise.

### INTERROGATORY NO. 5

If LPL intends to rely upon any secondary considerations of non-obviousness (e.g.,

commercial success, failure of others, copying, or long-felt need) to support the patentability of

any claim of any of the patents-in-suit, identify, for each applicable claim, the facts or documents

upon which LPL relies or intends to rely for proof of such secondary considerations of

patentability, and identify all persons having knowledge thereof.

### OBJECTIONS AND ANSWER

LPL objects to this interrogatory to the extent that it seeks information protected by the

attorney-client privilege or the work product doctrine.  LPL also objects to this Interrogatory

because LPL is unaware of any prior art that would rebut the presumption of validity of the

patents-in-suit and require LPL to show secondary considerations of obviousness to support

patentability of any claims of any of the patents-in-suit, making this Interrogatory premature and

unduly burdensome.  LPL is awaiting discovery from Defendants and reserves the right to

supplement this Interrogatory answer, if appropriate, when and if additional information

becomes available, or otherwise.

618911v1

6

discovery from Defendants to identify the full scope of infringing products.  LPL also objects to this Interrogatory as unduly burdensome and not relevant or reasonably calculated to lead to the discovery of admissible evidence because LPL is not seeking lost profits damages.  Subject to and without waiving these objections and the general objections, LPL states as follows:

LPL is not seeking lost profits damages in this case.  LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

### INTERROGATORY NO. 15

Describe in detail LPL's efforts to comply with the marking provisions of 35 U.S.C. § 287 for each LPL product that embodies or is covered by any claim of any patent-in-suit, including but not limited to the identify of such product and the date(s) that marking commenced for each such product.

### OBJECTIONS AND ANSWER

LPL objects to this interrogatory to the extent that it seeks information protected by the attorney-client privilege or the work product doctrine.  LPL further objects to this interrogatory as irrelevant, burdensome, and not reasonably calculated to lead to the discovery of admissible evidence to the extent that defendants seek information related to marking and patents other than the Patents-in-Suit.  Subject to and without waiving these objections and the general objections, and based upon the information presently available, LPL states as follows:

LPL is not aware of products that are marked with the numbers of the Patents-in-Suit. LPL reserves the right to supplement this Interrogatory answer, if appropriate, when and if additional information becomes available, or otherwise.

618911v1

18

## VERIFICATION

The facts stated in the foregoing interrogatory answers are true to the best of my

information, knowledge, and belief.

_Young Woo Cho_

_Manager_ (Title)

LG.Philips LCD Co., Ltd.

Subscribed and sworn to before me this ____
day of February, 2006.

_____

Notary Public

42

# Exhibit 4

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

LG. PHILIPS LCD CO., LTD.,                    )
                                              )
       Plaintiff,                           )    C. A. No. 05-292 (JJF)
                                              )
     v.                                     )
                                              )
TATUNG COMPANY;                               )
TATUNG COMPANY OF AMERICA, INC.;              )
CHUNGHWA PICTURE TUBES, LTD.;                 )
AND VIEWSONIC CORPORATION,                    )

       Defendants.

## DEFENDANT TATUNG COMPANY'S SUPPLEMENTAL
## RESPONSE TO PLAINTIFF'S AMENDED FIRST SET OF INTERROGATORIES

Defendant, Tatung Company ("Tatung"), by its attorneys and pursuant to Rule 33 of the Federal Rules of Civil Procedure hereby responds to Plaintiff's Amended First Set of Interrogatories dated December 14, 2005. Tatung reserves the right to amend and supplement the following responses as discovery continues in this action.

### GENERAL OBJECTIONS

The following General Objections are applicable to each interrogatory and are incorporated into each response to each request as set out below.

1.    Tatung objects to Plaintiff's interrogatories to the extent they seek to impose requirements or obligations on Tatung in addition to or different from those imposed by the Federal Rules of Civil Procedure and by the Local Rules of this Court. In responding to each interrogatory, Tatung is providing such information as is required and proper under the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.    Tatung objects to Plaintiff's interrogatories to the extent they seek information and/or documents protected by the attorney-client privilege and/or work product immunity.

Nothing contained in these responses is intended to, or in any way shall be deemed a waiver of such applicable privilege or immunity.

3.      Tatung's responses are not to be construed as waiving any rights, privileges or objections available to Tatung.  Furthermore, Tatung's response shall not be deemed as an admission of relevance, materiality, or admissibility in evidence of any information provided in responding to Plaintiff's interrogatories.

4.      Tatung objects to Plaintiff's interrogatories as being unduly burdensome to the extent they ask Tatung to identify documents where they may, in any event, be produced pursuant to Fed.R.Civ.P. 33(d) or otherwise.

5.      Tatung objects to any interrogatory which requests the identification of "all" documents on the ground that it is overly broad and burdensome.  In response to such a request, Tatung, unless otherwise noted, will produce such responsive documents as can be located following a good faith comprehensive search of the relevant files in accordance with the requirements of Fed.R.Civ.P. 33.

6.      Tatung specifically objects to Plaintiff's definition of "LCD display product" to the extent it covers all devices regardless of brand name to include devices other than CPT, Tatung or Tatung brand products not incorporating CPT LCD panels as being overly broad and unduly burdensome.

**RESPONSES**

**INTERROGATORY NO. 1:**

State the date that you first became aware of the Patents-in-Suit and describe in detail the circumstances surrounding your first knowledge of the Patents-in-Suit, including, but not limited to, identifying the person employed by you who first learned of the Patents-in-Suit and from what source, explaining the manner in which that person learned of the Patents-in-Suit, and identifying all documents that reflect when and how you learned of the Patents-in-Suit.

2

**RESPONSE:**

Subject to its General Objections, Tatung first became aware of the patents-in-suit on or about May 13, 2005 wherein Eric Lee, former manager of Tatung's Legal Department received the complaint in this litigation and copies of the patents-in-suit.

**INTERROGATORY NO. 2:**

If you contend that any claim of the Patents-in-Suit is invalid for any reason (including, for example, under 35 U.S.C. §§101, 102, 103 and 112), then as to each such claim and patent, set forth in detail the entire basis for your contention, including stating all relevant facts, identifying all documents on which you rely to support your contention, and identifying all persons with information or knowledge relevant to your contention, summarizing each person's knowledge.

**RESPONSE:**

Tatung objects to this interrogatory to the extent it seeks information or documents protected by the attorney-client privilege and/or work product doctrine, and also to the extent it calls for a legal conclusion. Tatung further objects to this interrogatory as being premature at this stage of the case given that fact discovery is on going and depositions have not begun, and further, there has been no Markman determination as to the scope and the meaning of the asserted claims of the patents-in-suit. This request is also premature as Tatung's investigation into prior art and the validity and infringement of the patents-in-suit is on going. Tatung also objects to this interrogatory as being premature to the extent that it seeks expert discovery before the period for expert discovery has begun.

Tatung reserves the right to supplement and/or change its responses to this interrogatory in light of fact and expert discovery and/or when the Court's claim construction has been issued.

Subject to the foregoing General and Specific Objections, as presently advised, the patents-in-suit are invalid for the following reasons.

3

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on February 28, 2006 copies of the

foregoing document were served via e-mail and U.S. first class mail to the following:

Richard D. Kirk
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
Facsimile: (302) 658-6395

Gaspare J. Bono
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
Facsimile: (202) 496-7756

Christine A. Dudzik

# Exhibit 5

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LG. PHILIPS LCD CO., LTD., | ) |
| | ) |
| Plaintiff, | )   C. A. No. 05-292 (JJF) |
| | ) |
| v. | ) |
| | ) |
| TATUNG COMPANY; | ) |
| TATUNG COMPANY OF AMERICA, INC.; | ) |
| CHUNGHWA PICTURE TUBES, LTD.; | ) |
| AND VIEWSONIC CORPORATION, | ) |
| | |

Defendants.

### DEFENDANT TATUNG COMPANY OF AMERICA INC.'S SUPPLEMENTAL
### RESPONSE TO PLAINTIFF'S AMENDED FIRST SET OF INTERROGATORIES

Defendant, Tatung Company of America, Inc. ("Tatung USA"), by its attorneys and pursuant to Rule 33 of the Federal Rules of Civil Procedure hereby responds to Plaintiff's Amended First Set of Interrogatories dated December 14, 2005. Tatung USA reserves the right to amend and supplement the following responses as discovery continues in this action.

### GENERAL OBJECTIONS

The following General Objections are applicable to each interrogatory and are incorporated into each response to each request as set out below.

1.      Tatung USA objects to Plaintiff's interrogatories to the extent they seek to impose requirements or obligations on Tatung USA in addition to or different from those imposed by the Federal Rules of Civil Procedure and by the Local Rules of this Court. In responding to each interrogatory, Tatung USA is providing such information as is required and proper under the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.      Tatung USA objects to Plaintiff's interrogatories to the extent they seek information and/or documents protected by the attorney-client privilege and/or work product

immunity. Nothing contained in these responses is intended to, or in any way shall be deemed a waiver of such applicable privilege or immunity.

3.    Tatung USA's responses are not to be construed as waiving any rights, privileges or objections available to Tatung USA. Furthermore, Tatung USA's response shall not be deemed as an admission of relevance, materiality, or admissibility in evidence of any information provided in responding to Plaintiff's interrogatories.

4.    Tatung USA objects to Plaintiff's interrogatories as being unduly burdensome to the extent they ask Tatung USA to identify documents where they may, in any event, be produced pursuant to Fed.R.Civ.P. 33(d) or otherwise.

5.    Tatung USA objects to any interrogatory which requests the identification of "all" documents on the ground that it is overly broad and burdensome. In response to such a request, Tatung USA, unless otherwise noted, will produce such responsive documents as can be located following a good faith comprehensive search of the relevant files in accordance with the requirements of Fed.R.Civ.P. 33.

6.    Tatung USA specifically objects to Plaintiff's definition of "LCD display product" to the extent it covers all devices regardless of brand name to include devices other than CPT, Tatung USA or Tatung USA brand products not incorporating CPT LCD panels as being overly broad and unduly burdensome.

**RESPONSES**

**INTERROGATORY NO. 1:**

State the date that you first became aware of the Patents-in-Suit and describe in detail the circumstances surrounding your first knowledge of the Patents-in-Suit, including, but not limited to, identifying the person employed by you who first learned of the Patents-in-Suit and from what source, explaining the manner in which that person learned of the Patents-in-Suit, and identifying all documents that reflect when and how you learned of the Patents-in-Suit.

2

**RESPONSE:**

Subject to its General Objections, Tatung USA first became aware of the patents-in-suit on or about May 13, 2005 wherein Eric Lee, former manager of Tatung USA's Legal Department received the complaint in this litigation and copies of the patents-in-suit.

**INTERROGATORY NO. 2:**

If you contend that any claim of the Patents-in-Suit is invalid for any reason (including, for example, under 35 U.S.C. §§101, 102, 103 and 112), then as to each such claim and patent, set forth in detail the entire basis for your contention, including stating all relevant facts, identifying all documents on which you rely to support your contention, and identifying all persons with information or knowledge relevant to your contention, summarizing each person's knowledge.

**RESPONSE:**

Tatung USA objects to this interrogatory to the extent it seeks information or documents protected by the attorney-client privilege and/or work product doctrine, and also to the extent it calls for a legal conclusion. Tatung USA further objects to this interrogatory as being premature at this stage of the case given that fact discovery is ongoing and depositions have not begun, and further, there has been no Markman determination as to the scope and the meaning of the asserted claims of the patents-in-suit. This request is also premature as Tatung USA's investigation into prior art and the validity and infringement of the patents-in-suit is on going. Tatung USA also objects to this interrogatory as being premature to the extent that it seeks expert discovery before the period for expert discovery has begun.

Tatung USA reserves the right to supplement and/or change its responses to this interrogatory in light of fact and expert discovery and/or when the Court's claim construction has been issued.

Subject to the foregoing General and Specific Objections, as presently advised, the patents-in-suit are invalid for the following reasons.

3

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on February 28, 2006 copies of the

foregoing document were served via e-mail and U.S. first class mail to the following:

Richard D. Kirk                          Gaspare J. Bono
The Bayard Firm                          McKenna Long & Aldridge LLP
222 Delaware Avenue, Suite 900           1900 K Street, N.W.
P.O. Box 25130                           Washington, D.C. 20006
Wilmington, DE 19899-5130                Facsimile: (202) 496-7756
Facsimile: (302) 658-6395


_____
Christine A. Dudzik

26

# Exhibit 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG. PHILIPS LCD CO., LTD.,                )
                                          )
           Plaintiff,                     )    C. A. No. 05-292 (JJF)
                                          )
     v.                                   )
                                          )
TATUNG COMPANY;                           )
TATUNG COMPANY OF AMERICA, INC.;          )
CHUNGHWA PICTURE TUBES, LTD.;             )
AND VIEWSONIC CORPORATION,                )
                                          )
           Defendants.

## DEFENDANT VIEWSONIC CORPORATION'S SUPPLEMENTAL RESPONSE TO PLAINTIFF'S AMENDED FIRST SET OF INTERROGATORIES

Defendant, ViewSonic Corporation ("ViewSonic"), by its attorneys and pursuant to Rule 33 of the Federal Rules of Civil Procedure hereby responds to Plaintiff's Amended First Set of Interrogatories dated December 14, 2005.    ViewSonic reserves the right to amend and supplement the following responses as discovery continues in this action.

### GENERAL OBJECTIONS

The following General Objections are applicable to each interrogatory and are incorporated into each response to each request as set out below.

1.      ViewSonic objects to Plaintiff's interrogatories to the extent they seek to impose requirements or obligations on ViewSonic in addition to or different from those imposed by the Federal Rules of Civil Procedure and by the Local Rules of this Court.  In responding to each interrogatory, ViewSonic is providing such information as is required and proper under the Federal Rules of Civil Procedure and the Local Rules of this Court.

2.      ViewSonic objects to Plaintiff's interrogatories to the extent they seek information and/or documents protected by the attorney-client privilege and/or work product

immunity. Nothing contained in these responses is intended to, or in any way shall be deemed a waiver of such applicable privilege or immunity.

3.      ViewSonic's responses are not to be construed as waiving any rights, privileges or objections available to ViewSonic. Furthermore, ViewSonic's response shall not be deemed as an admission of relevance, materiality, or admissibility in evidence of any information provided in responding to Plaintiff's interrogatories.

4.      ViewSonic objects to Plaintiff's interrogatories as being unduly burdensome to the extent they ask ViewSonic to identify documents where they may, in any event, be produced pursuant to Fed.R.Civ.P. 33(d) or otherwise.

5.      ViewSonic objects to any interrogatory which requests the identification of "all" documents on the ground that it is overly broad and burdensome. In response to such a request, ViewSonic, unless otherwise noted, will produce such responsive documents as can be located following a good faith comprehensive search of the relevant files in accordance with the requirements of Fed.R.Civ.P. 33.

6.      ViewSonic specifically objects to Plaintiff's definition of "LCD display product" to the extent it covers all devices regardless of brand name to include devices other than CPT, Tatung or ViewSonic brand products not incorporating CPT LCD panels as being overly broad and unduly burdensome.

**RESPONSES**

**INTERROGATORY NO. 1:**

State the date that you first became aware of the Patents-in-Suit and describe in detail the circumstances surrounding your first knowledge of the Patents-in-Suit, including, but not limited to, identifying the person employed by you who first learned of the Patents-in-Suit and from what source, explaining the manner in which that person learned of the Patents-in-Suit, and identifying all documents that reflect when and how you learned of the Patents-in-Suit.

**RESPONSE:**

Subject to its General Objections, ViewSonic first became aware of the patents-in-suit on or about May 18, 2005 wherein officials at ViewSonic received the complaint in this litigation

2

and copies of the patents-in-suit from its agent for service in Delaware on May 17, 2005 at 9:10

a.m. EST which was later sent to officials at ViewSonic the following day.

**INTERROGATORY NO. 2:**

If you contend that any claim of the Patents-in-Suit is invalid for any reason (including, for example, under 35 U.S.C. §§101, 102, 103 and 112), then as to each such claim and patent, set forth in detail the entire basis for your contention, including stating all relevant facts, identifying all documents on which you rely to support your contention, and identifying all persons with information or knowledge relevant to your contention, summarizing each person's knowledge.

**RESPONSE:**

ViewSonic objects to this interrogatory to the extent it seeks information or documents

protected by the attorney-client privilege and/or work product doctrine, and also to the extent it

calls for a legal conclusion. ViewSonic further objects to this interrogatory as being premature at

this stage of the case given that fact discovery is ongoing and depositions have not begun, and

further, there has been no Markman determination as to the scope and the meaning of the

asserted claims of the patents-in-suit. This request is also premature as ViewSonic's

investigation into prior art and the validity and infringement of the patents-in-suit is on going.

ViewSonic also objects to this interrogatory as being premature to the extent that it seeks expert

discovery before the period for expert discovery has begun.

ViewSonic reserves the right to supplement and/or change its responses to this

interrogatory in light of fact and expert discovery and/or when the Court's claim construction has

been issued.

Subject to the foregoing General and Specific Objections, as presently advised, the

patents-in-suit are invalid for the following reasons.

A.    The '121 Patent

Upon information and belief, and as presently advised based on the information available

at this date, the '121 patent is invalid under 35 U.S.C. § 102(b) because the invention as claimed

was offered for sale or sold in the United States before March 23, 2000, the critical date for

3

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that on February 28, 2006 copies of the

foregoing document were served via e-mail and U.S. first class mail to the following:

Richard D. Kirk
The Bayard Firm
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
Facsimile: (302) 658-6395

Gaspare J. Bono
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
Facsimile: (202) 496-7756

Christine A. Dudzik

26

# Exhibit 7

# United States Patent [19]

## Holmberg

[11] **Patent Number:** **5,019,002**

[45] **Date of Patent:** **May 28, 1991**

[54] **METHOD OF MANUFACTURING FLAT PANEL BACKPLANES INCLUDING ELECTROSTATIC DISCHARGE PREVENTION AND DISPLAYS MADE THEREBY**

[75] Inventor: **Scott H. Holmberg**, San Ramon, Calif.

[73] Assignee: **Honeywell, Inc.**, Minneapolis, Minn.

[21] Appl. No.: **218,312**

[22] Filed: **Jul. 12, 1988**

[51] Int. Cl.⁵ .............................................. H01L 45/00
[52] U.S. Cl. ..................................... 445/24; 357/23.13; 437/56
[58] Field of Search .................. 445/24, 3; 357/23.13, 357/4; 437/4, 8, 56

[56]            **References Cited**

### U.S. PATENT DOCUMENTS

4,455,739   6/1984   Hynecek ............................ 427/8 X
4,586,242   5/1986   Harrison .................................. 437/8
4,714,949  12/1987   Simmons et al. ................. 357/23.13
4,736,271   4/1988   Mack et al. ...................... 357/23.13
4,803,536   2/1989   Tuan .................................. 357/23.13

*Primary Examiner*—Kenneth J. Ramsey
*Attorney, Agent, or Firm*—Leydig, Voit & Mayer

[57]              **ABSTRACT**

Flat panel displays are provided including protection from electrostatic discharge (ESD) during manufacture and thereafter. At least one ESD guard ring is provided to protect the active elements of the display from the potential discharge between the row and column lines. An internal ESD guard ring is coupled to the row and column lines via shunt transistors. An external ESD guard ring is coupled to the row and column lines via a resistance. Both of the guard rings can be provided; however, the external guard ring is removed prior to completion of the display.

**36 Claims, 5 Drawing Sheets**



U.S. Patent     May 28, 1991     Sheet 1 of 5     5,019,002



FIG. 1



FIG. 2

FIG. 3





*FIG. 4*

FIG. 5





*FIG. 6*



FIG. 7

5,019,002

1

# METHOD OF MANUFACTURING FLAT PANEL BACKPLANES INCLUDING ELECTROSTATIC DISCHARGE PREVENTION AND DISPLAYS MADE THEREBY

## BACKGROUND OF THE INVENTION

The present invention pertains to improved flat panel displays and methods of making the displays with protection from electrostatic discharges. More particularly, the present invention is directed to methods of increasing the manufacturing yields of flat panel display backplanes and the displays made therefrom by improving handling characteristics.

In recent years there has been growing interest in flat panel displays, such as those which employ liquid crystals, electrochromic or electroluminescence, as replacements for conventional cathode ray tubes (CRT). The flat panel displays promise lighter weight, less bulk and substantially lower power consumption than CRT's. Also, as a consequence of their mode of operation, CRT's nearly always suffer from some distortion. The CRT functions by projecting an electron beam onto a phosphor-coated screen. The beam will cause the spot on which it is focused to glow with an intensity proportional to the intensity of the beam. The display is created by the constantly moving beam causing different spots on the screen to glow with different intensities. Because the electron beam travels a further distance from its stationary source to the edge of the screen than it does to the middle, the beam strikes various points on the screen at different angles with resulting variation in spot size and shape (i.e. distortion).

Flat panel displays are manufactured to be substantially free of such distortion. In the manufacture of flat panel displays the circuit elements are deposited and patterned, generally by photolithography, on a substrate, such as glass. The elements are deposited and etched in stages to build a device having a matrix of perpendicular rows and columns of circuit control lines with a pixel contact and control element between the control line rows and columns. The pixel contact has a medium thereon which is a substance that either glows (active) or changes its response to ambient light (passive) when a threshold voltage is applied across the medium control element. The medium can be a liquid crystal, electroluminescent or electrochromic materials such as zinc sulfide, a gas plasma of, for example, neon and argon, a dichroic dye, or such other appropriate material or device as will luminesce or otherwise change optical properties in response to the application of voltage thereto. Light is generated or other optical changes occur in the medium in response to the proper voltage applied thereto. Each optically active medium is generally referred to as a picture element or "pixel".

The circuitry for a flat panel display is generally designed such that the flat panel timeshares, or multiplexes, digital circuits to feed signals to one row and column control line of the pixels at a time. Generally one driving circuit is used for each row or column control line. In this way a subthreshold voltage can be fed to an entire row containing hundreds of thousands of pixels, keeping them all dark or inactive. Then a small additional voltage can be supplied selectively to particular columns to cause selected pixels to light up or change optical properties. The pixels can be made to glow brighter by applying a larger voltage or current of a longer pulse of voltage or current. Utilizing liquid

2

crystal displays (LCD's) with twisted nematic active material, the display is substantially transparent when not activated and becomes light absorbing when activated. Thus, the image is created on the display by sequentially activating the pixels, row by row, across the display. The geometric distortion described above with respect to CRT's is not a factor in flat panel displays since each pixel sees essentially the same voltage or current.

One of the major problems that arises with respect to the prior art method of manufacture of backplanes for active matrix displays (e.g. those employing thin film transistors at each pixel) is that they generally suffer production yield problems similar to those of integrated circuits. That is, the yields of backplanes produced are generally not 100% and the yield (percentage of backplanes with no defects) can be 0% in a worst case. High quality displays will not tolerate any defective pixel transistors or other components. Also, larger size displays are generally more desirable than smaller size displays. Thus, a manufacturer is faced with the dilemma of preferring to manufacture larger displays, but having to discard the entire product if even one pixel is defective. In other words, the manufacturer suffers a radically increased manufacturing cost per unit resulting from decreasing usable product yield.

One solution to the low yield problem is disclosed in U.S. Ser. No. 948,224, filed Dec. 31, 1986, now U.S. Pat. No. 4,676,761 entitled "Method of Manufacturing Flat Panel Backplanes Including Improved Testing and Yields Thereof and Displays Made Thereby", which is owned by the assignee of the present application and is incorporated herein by reference.

These problems of increased cost and decreased yield are improved in the present invention by providing methods of manufacturing display backplanes and the resulting displays with electrostatic discharge protection which provide protection against fatal defects during and after manufacture of the displays.

## SUMMARY OF THE INVENTION

There is provided improved methods of manufacturing backplanes and the resulting flat panel displays to increase the manufacturing yield, decrease manufacturing costs and substantially eliminate fatal display defects caused by electrostatic discharge during manufacture and thereafter.

These improvements are accomplished by forming at least one electrostatic discharge (ESD) guard ring around the active elements of the display. An internal ESD guard ring can be formed, which provides a discharge path for static potential applied across the row and column line of the display. This prevents the potential from discharging between the row and column lines through an active element causing a short and resulting in a defect in the display during manufacture or thereafter. An external ESD guard ring can be formed, which provides protection during manufacture of the displays, however, the external ESD guard ring is removed at the end of the display manufacturing process. The displays also can include both the internal and external ESD guard ring to provide protection during manufacture and thereafter.

5,019,002

<table>
<tr><td>3</td><td>4</td></tr>
</table>

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a plan view schematic representation of an active matrix display backplane made by a prior art method;

FIG. 2 is a cross-section of one transistor of the prior art backplane which could be utilized with the present invention;

FIG. 3 is a cross-section of one transistor which could be utilized with the present invention;

FIG. 4 is a plan view schematic representation of one prior embodiment of a subpixel matrix display;

FIG. 5 is a plan view schematic representation of a matrix display illustrating one embodiment of an internal ESD guard ring of the present invention;

FIG. 6 is an enlarged plan view of a portion of one embodiment of a subpixel matrix display illustrating the internal ESD guard ring in accordance with the present invention; and

FIG. 7 is a partial plan view of one embodiment of an exterior ESD guard ring of the present invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring now more particularly to FIG. 1, there is shown a schematic representation of an active matrix flat panel display device 10 made in accordance with conventional photolithographic techniques. One such device 10 and the manufacture thereof is more fully described in Application of Amorphous Silicon Field Effect Transistors in Addressable Liquid Crystal Display Panels, A. J. Snell, et al., *Applied Physics*, No. 24, p. 357, 1981. The device 10 includes a substrate 12, sets of contact pads 14 and 16, sets of control or bus lines 18 and 20, and, in this particular example of the prior art, 35 transistors 22 and pixel back contacts 24.

The substrate 12 commonly employed in these devices is formed from glass. The control lines 18 and 20 are organized into a matrix of rows 18 and columns 20. The control line rows 18 in this device 10 serve as gate 40 electrodes and the control line columns 20 as source connections. One contact pad 14 is connected to one end of each of the row control lines 18. One contact pad 16 is connected to one end of each of the column control lines 20. The display drive control (not shown) is connected to the sets of pads 14 and 16.

At each matrix crossover point 26, where a row line 18 and a column line 20 cross, a switching element, transistor 22 is formed to connect the row line 18 and column line 20 to the pixel back contacts 24. The active 50 medium is deposited at least on the contacts 24 which will optically change properties in response to the combined voltages or currents in the respective crossover point 26 formed by the row 18 and column 20. The active medium at a given crossover point 26 will appear 55 as a square or dot in the overall checkerboard type matrix of the display 10. The actual size of the transistors 22 and the contacts 24 are not now drawn to scale, but are shown schematically for illustration only.

It should be noted that theoretically there is no limit 60 on the number of rows 18 and columns 20 that can be employed, only a portion of which are illustrated in FIG. 1. Therefore, there is also no theoretical limit on the outside dimensions of such a device 10. However, the present state of the lithographic art places a practi- 65 cal limit on the outside dimensions of these devices. The present alignment techniques generally allow high resolution display devices to be manufactured approxi-

mately five inches on a side 28, although improved techniques of up to fourteen inches on a side has been demonstrated.

The problem encountered by the prior art method of manufacture is that if the array of device 10 contains any defective pixel transistors 22 or other circuit elements causing a pixel to be inoperative, it must be discarded.

Referring in detail to FIG. 2, several problems occur when the switching element, transistor 22 is manufactured. The substrate 12 is a substantial portion of the backplane cost and hence an inexpensive soda-lime glass is generally utilized. It has been demonstrated by liquid crystal display manufacturers that the high sodium concentration can poison the liquid crystal materially diffusing through the overlying ITO layer and hence an $SiO_2$ suppression layer 30 is generally formed on the substrate 12. There are some high quality low sodium types of substrates available, which would not need the suppression layer 30. An ITO layer 32 is formed and etched to provide an ITO free area on which the gate 18 is deposited. Following the deposition of the gate 18, a gate insulator layer 34 is deposited. Although a smooth uniform coverage of the gate 18 by the insulator 34 is illustrated, in production the gate 18 has or can have sharp edges which lead to pin holes or thinning of the insulator 34 at the gate edges. The source and drain metals can short to the gate 18. The thinning or pin holes produce transistors 22, which if operative, do not have uniform operating characteristics and hence the backplane is worthless.

One attempt to solve this problem, is to make the gate 18 very thin, but the resistivity is then too high to make the large arrays necessary for the backplane. A second attempt to solve the problem, is to make the gate insulator 34 very thick, but this decreases the gain of the transistor 22 and is also self defeating.

An amorphous silicon layer 36 is then deposited, with the source 20 and a drain 38 deposited thereover. A passivating layer (not shown) would be deposited over the completed structure to complete the transistor 22. During operation the activation of the source 20 and the gate 18 couples power through the silicon alloy 36 to the drain and hence to the contact pad 24 formed by the ITO layer 32.

During manufacture of the device 10, electrostatic discharge can occur when a high static electric potential is coupled across at least one pair of the gate lines 18 and the source lines 20. The discharge frequently will result in a short 39 through the insulator 34 or a short 39' through the insulator 34 and the silicon layer 36 in the transistor 22, between the adjacent crossover points of the lines 18 and 20 as can be seen in FIG. 2. This will cause at least one row and one intersecting column of the display pixels to be defective and in the type of display device 10, generally the defect will be a fatal one (clearly visible) and hence the device will be discarded. The device 10 does not provide any redundancy or subpixels and hence the defect cannot easily be isolated.

Referring now to FIG. 3, there is shown a schematic representation of one embodiment of a transistor 40 which can be utilized with the present invention. The transistor is more fully disclosed in U.S. Pat. Nos. 4,545,112 and 4,736,229, which are incorporated herein by reference.

A glass substrate 42 includes a barrier $SiO_2$ layer 44 thereon. As above mentioned, a low sodium glass sub-

5,019,002

5

strate, such as Corning 7059 glass, could be utilized, and hence the barrier layer 44 can be eliminated. The detailed deposition steps are described in the above-referenced patent and application. An ITO layer 46 is deposited and then a refractory metal layer 48 is deposited on the ITO layer 46.

The layers 46 and 48 are etched to form a gate electrode 50. A gate insulator 52 and a semiconductor material 54 are sequentially deposited over the gate 50. The material 54 preferably is an amorphous silicon alloy. To avoid the possibility of any gate to source or drain shorts at gate edges 56, a dielectric 58 is deposited over the gate 55, the gate insulator 52 and the semiconductor 54. The dielectric 58 is deposited to a sufficient thickness to ensure that no shorts or thin spots are formed between the edges 56 of the gate 50 and a source 60 and a drain 62 deposited thereover.

The dielectric 58 is etched away only on a substantially planar central region 64 of the semiconductor layer 54. This insures uniform operating characteristics for the transistors 40 in the backplane array. A passivating layer 66 is deposited over the whole structure to complete the structure of the transistor 40.

During all of the transistor processing steps, the refractory metal layer 48 remains over a pixel contact pad 68 upon which the active material of the pixel is deposited. As a final step, the active medium (not shown) is added to the backplane to complete the display, the refractory metal is etched off of the pixel pad 68 leaving the ITO layer 46 exposed after all the processing has been completed.

The gate to source or drain shorts referred to above in discussing the dielectric 58, refer to physical shorts caused by thin spots or actual metal particles or filaments. The electrostatic discharges caused during manufacturing and thereafter will be deterred by the dielectric 58, but will not be eliminated. The potential can be high enough to again form a short 69 through the gate insulator 52 and the semiconductor material 54 in the transistor 40, between the source 60 and the gate 50. Depending upon the display structure, at least one pixel or one subpixel (FIG. 4) will be defective.

Referring now to FIG. 4, a subpixel matrix display of the above-referenced application, U.S. Ser. No. 948,224, is designated generally by the reference numeral 70. The subpixel matrix display 70 is illustrated as having each pixel subdivided into four subpixels, but the pixels could be subdivided into numerous other configurations such as two subpixels, two by four or six subpixels or in three subpixels for color applications. Each pixel 72 is subdivided into four subpixels 74, 76, 78 and 30 (only one pixel 72 is so numbered for illustration). As previously stated, the number of pixels is merely shown for illustration purposes and the display 70 could contain any desired number and configuration, square or rectangular.

A column (source) line or bus 82 connects the subpixels 74 and 78 and all other column subpixel pairs in one-half of each of the pixels to a column or source contact pad 84 at one edge of the display 70. A second column (source) line or bus 86 connects the subpixels 76 and 80 and all other column subpixel pairs in the second half of each of the pixels to the column or source contact pad 84. The bus lines 82 and 86 are interconnected (shorted) at or before the pad 84 and are interconnected (shorted) at the opposite ends by a line or short 88.

6

A row (gate) line or bus 90 connects the subpixels 74 and 76 and all other row subpixel pairs in one-half of each of the pixels to a row (gate) pad 92. A second row (gate) line or bus 94 connects the subpixels 78 and 80 and all other row subpixel pairs in one-half of each of the pixels to the row pad 92. The bus lines 90 and 94 are interconnected (shorted) at or before the pad 92 and are interconnected (shorted) at the opposite ends by a line or short 96.

In a like manner, each of the other subpixel pairs are connected in columns to respective column (source) pads 98 and 100, etc. The pads 84, 98 and 100 are illustrated as being an opposite sides of the display to provide additional connecting space for the pads, however, they also could all be on one side in the display 10. Each of the other subpixel pairs also are connected in rows to respective row (gate) pads 102 and 104, etc.

The pixel 72 then is divided into four subpixels 74, 76, 78 and 80 which allows for one of the subpixels to be defective, such as the subpixel 74, without causing a fatal defect, since the remaining three subpixels 76, 78 and 80 remain operative. In prior devices, the pixel 72 would be totally defective and hence the display 70 would be inoperable.

Further, one often fatal display defect is caused by a defect or open in one of the row or column bus lines which would cause the whole row or column to be out, again resulting in an inoperative display 70. With the respective subpixels pairs of row and column bus lines interconnected, however, an open in a bus line will at most cause one subpixel to be inoperative. An open in one or more of the bus lines between the subpixels will result in no defects, since the current is supplied from the opposite shorted end of the row or column bus line. Thus, the display 70 in effect has redundant row and column bus lines.

To avoid the fatal defect of the multiple open lines, as also disclosed in U.S. Ser. No. 948,224, the redundant row and column bus lines can be further interconnected at each subpixel. Each pair of the column bus lines 82 and 86 are additionally interconnected between each of the subpixels 74, 78, etc. by respective lines or shorts. In a like manner, each pair of the row bus lines 90 and 94 are interconnected between each of the subpixels 74, 76, etc. by respective lines or shorts. Further, although both the row bus lines and the column bus lines can be interconnected between each subpixel, only one of the row or the column bus line sets might be shorted to limit the loss of active pixel display area.

The short 69 in one of the active devices in the display 70 can be eliminated by opening the row or column line between the short and the line. This results in only one subpixel, such as the subpixel 74 being defective and due to the small size of the subpixel, is not a fatal defect (i.e. not readily visual). The rest of the corresponding column and row subpixels would be operable due to the redundant and interconnected row and column bus lines.

Referring now to FIG. 5, a matrix display incorporating one embodiment of an internal ESD guard ring of the present invention is designated generally by the reference numeral 110. The matrix display 110 is illustrated having four pixels 112, 114, 116 and 118. The pixels, however, can be subdivided into numerous subpixel configurations such as two or four subpixels, two by four or six subpixels or in three subpixels for color display applications. Also, as previously stated for the

5,019,002

7

subpixel matrix display 70, the number of pixels can be of any number and configuration, square or rectangular.

A column (source) line or bus 120 connects the pixels 112 and 116 and all other pixels in the same column to a source contact pad 122 at one edge of the display 110. A source line 124 connects the pixels 114 and 118 to a source contact pad 126. In a like manner, a pair of row (gate) lines 128 and 130 connect respective pairs of pixels 112, 114 and 116, 118 in each row to respective gate pads 132 and 134.

Each pixel 112, 114, 116 and 118 includes a respective active element, such as transistors 136, 138, 140 and 142 which couple the pixels to the respective source lines 120 or 124 and gate lines 128 or 130. To prevent a large electrostatic potential discharging through one of the transistors 136, 138, 140 and 142, an internal ESD guard ring 144 is formed around the pixels 112, 114, 116 and 118. The guard ring 144 is illustrated as a closed ring, but could also be an open L or C-shaped line if the gate and source pads all are on one respective side of the display 110.

The ESD guard ring 144 also is coupled via respective transistors 146, 148, 150 and 152 to, the source and gate lines. The guard ring 144 will be coupled to the end of each source and gate line, so if the source and gate lines include pads at their opposite ends (not illustrated), then the guard ring 144 will include a further respective set of transistors 154, 156, 158 and 160.

The ESD guard ring 144 preferably is formed from a low resistance metal, such as an aluminum alloy. The transistors 146 through 160 can include a floating gate (not illustrated), no gate, or can include an oxide below to form a spark gap.

In operation, with the guard ring 144, a potential placed upon the source pads 122 will not short one of the transistors 136 or 140. Instead, the transistor 146 will turn on followed by the transistor 150, shorting the potential from the pad 122, via the line 120, the transistor 146, the guard ring 144, the transistor 150 and the line 128 to the pad 132. Thus, the guard ring 144 will not allow high potentials across the pads 122, 126, 132 and 134. The guard ring 144 preferably is formed concurrently with the display elements and is not removed, providing continuous protection even following manufacture of the display 110.

A specific subpixel display incorporating an internal guard ring of the invention is best illustrated in FIG. 6 and is designated generally by the reference numeral 162. The display 162 includes a plurality of pixels, each having four subpixels in a similar fashion to the display 70 illustrated in FIG. 4. Only one pixel 164 is illustrated in detail and includes four subpixels 166, 168, 170 and 172. A source line 174 includes a shorting line 176 which is connected to a pair of source lines 178 and 180, coupled to each of the subpixels by a respective transistor structure 182, 184, 186 and 188, which are not described in detail. The transistors 182, 184, 186 and 188 also couple the subpixels 166, 168, 170 and 172 to a gate line 190.

An internal ESD guard ring 192 is coupled via a transistor structure 194 to the source line 174 and via a transistor structure 196 to the gate line 190. The guard ring 192 and transistors 194 and 196 operate as before described to short any potential to ground. The low value of the normal operating voltages does not turn on the transistors 194 and 196, which do not effect the normal display operation.

8

The ESD preventive structure can also include an outer ESD guard ring 200, best illustrated in FIG. 7. Only one corner portion 202 of the display and guard ring 200 is illustrated. While the display is being manufactured, the outer guard ring 200 is connected to all of one of the source and gate pads (not illustrated), which pads are serially connected together via jumpers outside of scribe lines 204 and 206. A corner pad 208 is connected to each other corner pad (not illustrated) by respective outer conductive lines 210 and 212 of the guard ring 200. The L-shaped corner pad 208 can be grounded and also provides the alignment for the scribe lines 204 and 206, which are utilized to disconnect the source and gate jumpers and the guard ring 200 after the structure is completed. The corner portion 202 includes a triangular pad 214 which provides alignment for diagonal corner displays, when utilized.

A backplane pickup contact pad 216 also is provided, which includes a corner 218 for aligning the backplane with the front plane. The pad 216 includes a shunt line 220 which is connected to one set of source or gate lines via a shunt transistor 222 along the edge to be scribed and removed along the line 206. The line 210 is connected to the other set of gate or source lines by a shunt line 224, a shunt transistor 226 and a large resistance 228, such as 100 K ohms (illustrated schematically). The outer ESD guard ring 200 provides ESD protection only during manufacture of the display and is removed prior to completion of the display. The resistance 228 provides an ESD short for high electrostatic potentials, which can be incurred during manufacturing of the display which can be connected anywhere between the line 210 and the other set of gate or source lines. The resistance 228 minimizes the discharge current surge and the shunt transistors 222 and 226 act as before described. There will be at least one corner backplane pickup pad 216 and preferably there will be two or three, each with their associated shunt transistors.

The outer guard rings 210 and 212 preferably are formed at the same time as the first of the gate or source lines. The inner guard ring 44 and the associated shunt transistors of both guard rings preferably are formed concurrently with the other display structures. The scribe lines 204 and 206 can be prescribed, but left intact until the back and front planes are mated and then removed to provide the gate and source contacts for the printed circuit board connections.

Modification and variations of the present invention are possible in light of the above teachings. The transistors 22 or other types of two or three terminal switching devices can be utilized with the invention. The amorphous silicon alloy semiconductor material 54, could be any of numerous types of materials such as CdSe or GaAs materials. The ESD guard rings can be utilized separately or together with all types of active element matrix displays and not just those illustrated. The shunt transistors 146, 194 and 222, etc. also can be formed as other active switching elements, such as diodes. It is therefore to be understood that within the scope of the appended claims, the invention may be practiced otherwise than as specifically described.

What is claimed and desired to be secured by Letters Patent of the United States is:

1. A method of manufacturing active matrix display backplanes and displays therefrom, comprising:

    providing a substrate;

    forming a pattern of pixels on said substrate;

5,019,002

9

forming a plurality of row and column intersecting pixel activation lines, interconnecting substantially all of said row lines to one another and substantially all of said column lines to one another;

forming an outer electrostatic discharge guard ring on said substrate coupled to said interconnected row and column lines via a resistance to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays; and

removing said outer guard ring and row and column interconnections prior to completion of the display.

2. The method as defined in claim 1 including coupling one plurality of said interconnected row and column lines to said outer guard ring via said resistance.

3. The method as defined in claim 2 including forming at least one pickup pad coupled to said resistance via a shunt switching element.

4. The method as defined in claim 3 including coupling said pickup pad to the other plurality of said interconnected row and column lines via another shunt switching element.

5. The method as defined in claim 3 including forming a corner on said pad to align the front plane and back plane of the display.

6. The method as defined in claim 3 including forming a plurality of pickup pads, each one on a separate corner of the display.

7. The method as defined in claim 1 including forming a corner pad on at least one corner of the display and aligning scribe lines with said corner pad for removing said outer guard ring and row and column intersections.

8. The method as defined in claim 1 including forming an inner electrostatic discharge guard ring on said substrate coupled to said row and column lines via shunt switching elements to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays and thereafter.

9. The method as defined in claim 8 including forming separate shunt switching elements between said inner guard ring and each row and column line.

10. A method of manufacturing active matrix display backplanes and displays therefrom, comprising:

providing a substrate;

forming a pattern of pixels on said substrate;

forming a plurality of row and column intersecting pixel activation lines; and

forming an inner electrostatic discharge guard ring on said substrate coupled to said row and column lines via shunt switching elements to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays and thereafter.

11. The method as defined in claim 10 including forming separate shunt switching elements between said inner guard ring and each row and column line.

12. The method as defined in claim 10 including interconnecting substantially all of said row lines to one another and substantially all of said column lines to one another and forming an outer electrostatic discharge guard ring on said substrate coupled to said interconnected row and column lines via a resistance to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays; and

10

removing said outer guard ring and row and column interconnections prior to completion of the display.

13. The method as defined in claim 12 including coupling one plurality of said interconnected row and column lines to said outer guard ring via said resistance.

14. The method as defined in claim 13 including forming at least one pickup pad coupled to said resistance via a shunt switching element.

15. The method as defined in claim 14 including coupling said pickup pad to the other plurality of said interconnected row and column lines via another shunt switching element.

16. The method as defined in claim 14 including forming a corner on said pad to align the front plane and back plane of the display.

17. The method as defined in claim 10 including forming a plurality of pickup pads, each one on a separate corner of the display.

18. The method as defined in claim 10 including forming a corner pad on at least one corner of the display and aligning scribe lines with said corner pad for removing said outer guard ring and row and column intersections.

19. An active matrix display backplane, comprising:

a substrate;

a pattern of pixels formed on said substrate;

a plurality of row and column intersecting pixel activation lines, substantially all of said row lines interconnected to one another and substantially all of said column lines interconnected to one another; and

an outer removable electrostatic discharge guard ring formed on said substrate coupled to said interconnected row and column lines via a resistance to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays.

20. The backplane as defined in claim 19 including one plurality of said interconnected row and column lines coupled to said outer guard ring via said resistance.

21. The backplane as defined in claim 20 including at least one pickup pad coupled to said resistance via a shunt switching element.

22. The backplane as defined in claim 21 including said pickup pad coupled to the other plurality of said interconnected row and column lines via another shunt switching element.

23. The backplane as defined in claim 21 including a corner formed on said pad to align the front plane and back plane of the display.

24. The backplane as defined in claim 21 including a plurality of pickup pads, each one formed on a separate corner of the display.

25. The backplane as defined in claim 19 including a corner pad formed on at least one corner of the display and having scribe lines aligned with said corner pad for removing said outer guard ring and row and column intersections.

26. The backplane as defined in claim 19 including an inner electrostatic discharge guard ring formed on said substrate coupled to said row and column lines via shunt switching elements to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays and thereafter.

27. The backplane as defined in claim 26 including separate shunt switching elements formed between said inner guard ring and each row and column line.

5,019,002

11

28. An active matrix display backplane, comprising:
a substrate;
a pattern of pixels formed on said substrate;
a plurality of row and column intersecting pixel activation lines; and
an inner electrostatic discharge guard ring formed on said substrate coupled to said row and column lines via shunt switching elements to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays and thereafter.

29. The backplane as defined in claim 28 including separate shunt switching elements formed between said inner guard ring and each row and column line.

30. The backplane as defined in claim 28 including substantially all of said row lines interconnected to one another and substantially all of said column lines interconnected to one another and an outer electrostatic discharge guard ring formed on said substrate coupled to said interconnected row and column lines via a resistance to provide protection from electrostatic dis-

12

charges between said row and column activation lines during manufacture of the displays.

31. The backplane as defined in claim 30 including one plurality of said interconnected row and column lines coupled to said outer guard ring via said resistance.

32. The backplane as defined in claim 31 including at least one pickup pad coupled to said resistance via a shunt switching element.

33. The backplane as defined in claim 32 including said pickup pad coupled to the other plurality of said interconnected row and column lines via another shunt switching element.

34. The backplane as defined in claim 32 including a corner formed on said pad to align the front plane and back plane of the display.

35. The backplane as defined in claim 28 including a plurality of pickup pads, each one formed on a separate corner of the display.

36. The backplane as defined in claim 28 including a corner pad formed on at least one corner of the display and having scribe lines aligned with said corner pad for removing said outer guard ring and row and column intersections.

*   *   *   *   *

# UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

**PATENT NO.** : 5,019,002

**DATED** : May 28, 1991

**INVENTOR(S)** : Scott H. Holmberg

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Col. 2, lines 30-31, change "4,676,761" to --4,820,222--;

Col. 4, line 15, change "materially" to --material by--;

Col. 5, line 53, change "30" to --80--;
line 59, change "a1l" to --all--;

Col. 7, line 23, delete the third comma;

Col. 8, line 41, change "firs:" to --first--.

Signed and Sealed this

Twenty-third Day of February, 1993

*Attest:*

STEPHEN G. KUNIN

*Attesting Officer*         *Acting Commissioner of Patents and Trademarks*