UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LG.PHILIPS LCD CO., LTD., | |
| Plaintiff, | |
| v. | Civil Action No. 05-292 (JJF) |
| TATUNG COMPANY; TATUNG COMPANY OF AMERICA, INC.; CHUNGHWA PICTURE TUBES, LTD.; AND VIEWSONIC CORPORATION, | |
| Defendants. | |

## JOINT PROPOSED PRE TRIAL ORDER

On July 6, 2006 at 12:30 p.m., counsel for Plaintiff LG.Philips LCD, Co., Ltd. ("LPL" or "Plaintiff") and counsel for Tatung Company ("Tatung Co."), Tatung Company of America, Inc. ("Tatung Co. of America"), Chunghwa Picture Tubes, Ltd. ("CPT"), and ViewSonic Corporation (collectively "Defendants") shall attend the pretrial conference before this Court. The trial is scheduled to commence on July 17, 2006. In accordance with Local Rule 16.4(d), the parties conferred and hereby submit the following as their Joint Proposed Pretrial Order:

I.    **COUNSEL FOR THE PARTIES**

Counsel for Plaintiff LG.Philips LCD Co., Ltd.

| | |
|---|---|
| Gaspare J. Bono | Richard D. Kirk |
| Song K. Jung | Ashley B. Stitzer |
| Matthew T. Bailey | The Bayard Firm |
| Cass W. Christenson | 222 Delaware Avenue, 9th Floor |
| Tyler Goodwyn | P.O. Box 25130 |
| Michael Angert | Wilmington, DE 19899-5130 |
| Timothy K. Halloran | (302) 655-5000 |
| McKenna Long & Aldridge LLP | |
| 1900 K Street, N.W. | |
| Washington, D.C.  20006 | |
| (202) 496-7500 | |

Counsel for Tatung Company, Tatung Company of America, Inc., Chunghwa Picture Tubes, Ltd., and ViewSonic Corporation

| | |
|---|---|
| Glenn W. Rhodes | Robert W. Whetzel |
| Teresa M. Corbin | Matthew W. King |
| Julie S. Gabler | Steven J. Fineman |
| Robert Kramer | Richards, Layton & Finger, P.A. |
| Steven Yovits | One Rodney Square |
| J. James Li | Wilmington, DE 19801 |
| Heather H. Fan | (302) 651-7700 |
| Howrey LLP | |
| 525 Market St., Suite 3600 | |
| San Francisco, CA  94105 | |
| 415-848-4900 | |

II.    **NATURE OF THE ACTION**

This is a patent infringement case involving United States Letters Patent No. 5,019,002, entitled "Method of Manufacturing Flat Panel Backplanes including Electrostatic Discharge Prevention and Displays Made Thereby" ("the '002 Patent" or the "Patent in Suit").[1]  The '002

---

[1] LPL's original complaint also alleged infringement by the Defendants of U.S. Patent No. 6,738,121, entitled "Tape Carrier Package with Dummy Bending Part and Liquid Crystal Display Employing the Same" (the "'121 Patent").  (D.I. 1.)  On May 1, 2006, LPL withdrew its claims for patent infringement of the '121 Patent.  (D.I. Nos. 179, 180.)

Patent is owned by LPL and relates to a way of protecting against damage from electrostatic discharge during the manufacture of flat panel displays called thin-film-transistor liquid crystal displays ("TFT-LCDs" or "LCDs"). LCDs are used to make popular consumer products including laptop computers, LCD computer monitors, and LCD televisions ("LCD Display Products").

LPL alleges that each of the Defendants infringe the '002 Patent, by virtue of their importation, use, sale, and offer for sale in and to the United States of either or both of (a) CPT's LCD Modules that are made by the patented process claimed in the '002 Patent or (b) LCD Display Products that contain infringing CPT modules. (D.I. 1.) In addition, LPL alleges that Defendants actively induce and encourage others to import, use, sell, and offer for sale in and to the United States infringing LCD modules and LCD Display Products. LPL also alleges that the Defendants' infringement has been and remains willful and that this is an exceptional case. LPL seeks injunctive relief and damages that it has sustained as a result of Defendants' acts of infringement, including at least compensatory damages and a reasonable royalty, enhanced damages as a result of Defendants' willful infringement, pre-judgment and post-judgment interest, and costs and reasonable attorneys' fees. (D.I. 1.)

Defendants deny that they have infringed or induced infringement of the '002 Patent (to the extent the '002 Patent is valid), or that infringement (if any) has been and is willful. Defendants contend that LPL cannot seek a reasonable royalty and have offered no evidence of what would be a reasonable royalty. Defendants deny that this is an exceptional case entitling LPL to attorneys' fees. Defendants also deny that the '002 patent is valid. Defendants counterclaimed against LPL for a declaration of non-infringement and invalidity of the '002 Patent. (D.I. Nos. 12, 14, and 16.) Defendants allege that this is an exceptional case and seek a

declaration that Defendants have not infringed the '002 Patent, that the '002 Patent is invalid, and damages in the form of reasonable attorneys' fees and the costs of this action. (D.I. Nos. 12, 14, and 16.)

## III.    BASIS FOR FEDERAL JURISDICTION

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Patent Laws of the United States, including 35 U.S.C. § 271, *et seq.* The parties agree that personal jurisdiction and venue in this Court are proper pursuant to 28 U.S.C. § 1391 (b), (c), and (d) and § 1400(b).

## IV.    STATEMENT OF FACTS THAT ARE ADMITTED AND REQUIRE NO PROOF

### A.    The Parties

1.    Plaintiff LG.Philips LCD Co., Ltd. is a corporation organized under the laws of the Republic of Korea, having a place of business located in Seoul, Korea, that specializes in manufacturing LCDs.

2.    Defendant Tatung Co. is a Taiwanese corporation, having a place of business in Taipei, Taiwan.

3.    Tatung Co. of America is a California corporation, having a place of business in Long Beach, California.

4.    Chunghwa Picture Tube, Ltd. is a Taiwanese corporation, having a place of business in Taoyuan, Taiwan.

5.    CPT manufactures LCD panels and modules which are used to make certain LCD Display Products.

6.    CPT's LCD panels are incorporated into LCD modules.

7.    Defendant ViewSonic Corporation is a Delaware corporation, having a place of business in Walnut, California.

**B.    Background Regarding U.S. Patent No. 5,019,002**

1.    In simplified terms, an active matrix "LCD panel" includes upper and lower glass substrates, a color filter layer on the the front glass substrate and thin film transistor ("TFT") array on the back glass substrate, and liquid crystal between the glass substrates.

2.    The Patent Application issued as the '002 Patent on May 28, 1991.

**V.    ISSUES OF FACT WHICH REMAIN TO BE LITIGATED**

**A.    LPL's Issues of Fact**

**The Parties**

1.    Whether Tatung Co. is a CPT stockholder, and CPT has "significant" related party transactions with Tatung Co..

2.    Whether Tatung Co. has several overseas subsidiaries in the U.S. and North America, including TSTI and TMX, which facilitate delivery of LCD Display Products from Tatung Co.'s overseas facilities and assists Tatung Co. customers in distributing LCD Display Products throughout the U.S.

3.    Whether, as an OEM (an original equipment manufacturer), Tatung Co. makes and supplies LCD Display Products to brand name customers such as ViewSonic Corporation, Wal-Mart, Hewlett- Packard ("HP"), Radio Shack and eMachines.

4.    Whether Tatung Co. has used and continues to use CPT modules in several of its LCD Display Products.

5.    Whether Defendant Tatung Co. of America is a subsidiary of Tatung Co..

6.    Whether Tatung Co. of America imports, markets, and sells LCD Display Products in the United States.

7.      Whether Tatung Co. of America has used and continues to use CPT modules in several of its LCD Display Products.

8.      Whether Defendant Chunghwa Picture Tubes, Ltd. is a subsidiary of Tatung Co..

9.      Whether CPT supplies LCD modules for customers and brands including, for example, Tatung Co., ViewSonic Corporation, HP, Dell Corp. ("Dell"), IBM, and Gateway (occasionally referred to by the Parties as "Brands").

10.     Whether ViewSonic Corporation markets and sells a variety of LCD Display Products and other products, including LCD computer monitors, LCD televisions, CRT monitors, projectors, plasma televisions, pocket PCs, digital media centers, and HDTV displays.

11.     Whether ViewSonic Corporation has used and continues to use in the United States CPT modules in several of its LCD Display Products.

**Defendants' Knowledge of the '002 Patent**

1.      Whether LPL sent a letter, dated February 8, 2002, to Cheng-Yuan Lin, President of CPT, concerning CPT's interest in obtaining a license from LPL for, among others, the '002 Patent.

2.      Whether CPT received this letter in February 2002.

3.      Whether, on February 27, 2002, LPL sent a follow-up letter to Mr. Lin, repeating LPL's request to meet with CPT regarding its infringement of LPL's patents.

4.      Whether CPT received this letter in February 2002.

5.      Whether, since February, 2002, CPT has continued to make its LCD modules by using inner and outer guard rings and has continued to sell and offer to sell those LCD modules in the United States.

6.      Whether, since February, 2002, CPT has done nothing to prevent any of CPT's customers or Brands that use CPT's LCD modules, from selling, offering to sell and importing LCD Display Products containing CPT's LCD modules in or into the United States.

7.      Whether CPT has taken any steps to determine whether its LCD modules infringe the '002 Patent, nor has CPT changed the way that it makes LCD modules in response to the '002 Patent.

8.      Whether CPT generally performs any patent searches prior to designing, manufacturing, or selling its LCD modules.

9.      Whether Defendants Tatung Co., Tatung Co. of America, and ViewSonic Corporation received actual notice of the '002 Patent no later than May 13, 2005, when LPL filed and served its complaint in this action.  (D.I. 1.)

10.      Whether, since May 13, 2005, Defendants Tatung Co., Tatung Co. of America, and ViewSonic Corporation have continuously made, imported, sold and offered to sell LCD Display Products containing CPT modules.

11.      Whether Defendants Tatung Co., Tatung Co. of America, and ViewSonic Corporation have taken any steps to determine whether their LCD Display Products using CPT's modules infringe the '002 Patent nor have they made any changes to their products in response to the '002 Patent.

**Background on the Asserted '002 Patent Claims and Related ESD Guard Ring Technology**

1.      In July 1988, Scott H. Holmberg, the named inventor of the '002 Patent, filed a patent application for "Method of Manufacturing Flat Panel Backplanes including Electrostatic Discharge Prevention and Displays Made Thereby" (the "Patent Application").

2.      In September 1988, Mr. Holmberg assigned the Patent Application to Alphasil, Inc., and in April 1989, Alphasil, Inc. assigned the Patent Application to Honeywell, Inc.

3.      The Patent Application issued as the '002 Patent on May 28, 1991.

4.      In October 1995, Honeywell, Inc. assigned the '002 Patent to LG Electronics, Inc.

5.      In September 1999, LG Electronics, Inc. assigned the '002 Patent to LPL.

6.      LPL is the sole owner of the '002 Patent.

7.      Whether one of the major problems that arises with respect to the manufacture of the TFT glass substrate is that they generally suffer from production yield problems.

8.      Whether a key detractor from the successful manufacture of TFT glass substrates is electrostatic discharge ("ESD"), which essentially destroys the TFT.

9.      Whether larger size LCD modules are generally more desirable than smaller size displays.

10.     Whether larger size LCD modules are used to make larger size LCD Display Products including monitors and televisions.

11.     Whether LCD manufacturers spend more, and charge more, for larger sized LCD modules.

12.     Whether electrostatic discharge is a significant problem for LCD manufacturers because a low cost position is a critical competitive advantage given the increasing standardization of LCD Display Products, increasing size of LCD Display Products, and intense price competition in the market for LCD Display Products.

13.    Whether the '002 Patent discloses a process that employs guard rings to protect the TFT substrate from electrostatic discharge during manufacture.

14.    Whether the methods claimed in the '002 Patent involve forming at least one ESD guard ring around the active elements of the display.

15.    Whether the '002 Patent teaches the use of an inner guard ring, an external (or outer) guard ring, or both.

16.    Whether each of these ESD guard ring claims is intended to protect against electrostatic discharge damage and thereby increasing manufacturing yields and reducing manufacturing costs.

**Infringement Allegations**

1.    Whether CPT makes LCD products using the methods claimed in any of the asserted claims of the '002 Patent, either literally or under the doctrine of equivalents.

2.    Whether CPT directly infringes the '002 Patent by importing, using, selling, or offering for sale LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

3.    Whether CPT has actively induced infringement of the '002 Patent by encouraging others to use, sell, import, or offer for sale LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

4.    Whether Tatung Co. directly infringes the '002 Patent by importing, using, selling, or offering for sale LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

5.    Whether Tatung Co. has actively induced infringement of the '002 Patent by encouraging others to use, sell, import, or offer for sale CPT LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

6.    Whether Tatung Co. of America directly infringes the '002 Patent by importing, using, selling, or offering for sale LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

7.    Whether Tatung Co. of America has actively induced infringement of the '002 Patent by encouraging others to use, sell, import, or offer for sale LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

8.    Whether ViewSonic Corporation directly infringes the '002 Patent by importing, using, selling, or offering for sale LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

9.    Whether ViewSonic Corporation has actively induced infringement of the '002 Patent by encouraging others to use, sell, import, or offer for sale LCD Display Products incorporating CPT LCD modules made using the methods claimed in any of the asserted claims of the '002 Patent.

10.    Further details regarding the factual issues concerning whether CPT makes LCD products using the methods claimed in any of the asserted claims of the '002 Patent, either literally or under the doctrine of equivalents, can be found in the Expert Report of Dr. Elliott Schlam, and the deposition testimony of Dr. Schlam, which are incorporated by reference.

**CPT's Modules[2]**

1.    Whether CPT has been manufacturing TFT arrays since 1999.

2.    Whether CPT manufactures TFT arrays of various sizes, and whether CPT's TFT arrays are used as the back glass substrate for an LCD panel.

3.    Whether CPT uses a method of manufacturing active matrix TFT arrays that consists in part of providing a glass substrate and forming a pattern of pixels on that substrate.

4.    Whether CPT's LCD modules are used to make LCD Display Products, including LCD televisions, LCD monitors, open frame LCD products, and cell phones sold under popular brand names including Dell, HP, and ViewSonic Corporation.

5.    Whether CPT uses both external and internal ESD guard rings when manufacturing its TFT arrays.

6.    Whether CPT's manufacturing method further consists of using gate lines (also referred to as row lines) and source lines (also referred to as column lines) forming a plurality of gate and source intersecting pixel activation lines on the TFT glass substrate.

7.    For its LCD panels manufactured using outer guard rings, whether CPT's manufacturing method further uses an outer electrostatic discharge guard ring on that TFT glass substrate coupled to the intersecting pixel activation lines via a resistance to provide protection from ESD between said gate and source (also referred to as row and column) activation lines during manufacture of the display.

---

[2] The Defendants have informed LPL that they do not believe the following paragraphs accurately represent the steps in Claim 1 of the '002 Patent.

8.    For its LCD panels manufactured using outer guard rings, whether CPT removes the outer guard ring and row and column interconnections prior to completion of the display.

9.    For its LCD panels manufactured using inner guard rings, whether CPT's manufacturing method uses an inner electrostatic discharge guard ring on that TFT glass substrate coupled to said row and column lines via shunt switching elements to provide protection from electrostatic discharges between said row and column activation lines during manufacture of the displays and thereafter.

10.    Whether CPT manufactures or has manufactured at least the following modules using inner ESD guard rings: 018QCA01; 018QQA02; 022QA; 040WQA; 055WA; 070VA; 070WA01; 070WA03; 070WB01; 090VA01; 090VA01; 090WA; 090WAB01; 121 WA; 140WA; 141WB; 150PA; 150XA; 150XC; 150XG; 150XH01; 150XH05; 150XP; 154WA -E; 154WB - F; 17EA0203; 17EA07; 170EA07Q; 190EA01; 190EA03; 190EA05; 201 VA; 260WA01; 300WA; 370WA01; and 370WA02.

11.    Whether CPT manufactures or has manufactured at least the following modules using both inner and outer ESD guard rings: 140WA; 141XD05; 150PA; 150XA; 150XC; 150XG; 150XH01; 150XH05; 150XP; 154WA -E; 154WB - F; 154WB04; 17EA0203; 17EA07; 171 WA; 190EA01; 190EA03; 190EA05; 201 VA; 201 WA01; 201 WA03; 260WA01; 300WA; 320WA; 320WA01; 370WA01; and 370WA02.

12.    Whether CPT manufactures or has manufactured at least the following modules using outer ESD guard rings: 130VA; 140WA; 140PA01; 141 PB01; 141XB; 141XC; 141XF; 141XD01; 141XD05; 141XD12; 141XD13; 150PA; 150PB; 150XA; 150XC; 150XE; 150XG; 150XH01; 150XH05; 150XP; 154WA -E; 154WB - F; 154WB04; 17EA0203; 17EA07;

170ES01; 171 WA; 181 EA; 181 XA; 190EA01; 190EA03; 190EA05; 201 VA; 201 WA01; 201 WA03; 260WA01; 300WA; 320WA; 320WA01; 320WA01; 320WA01; 370WA01; 370WA01; and 370WA02.

13.    Whether CPT's LCD modules are materially changed by subsequent processes after their manufacture.

14.    Whether CPT's LCD modules are trivial or non-essential components of the LCD Display Products into which they are incorporated, including but not limited to the LCD Display Products imported, used, sold, and offered for sale by customers and brands such as Tatung Co. Co. and ViewSonic Corporation.

### Defendants' Importation and Sale of LCD Modules and LCD Display Products

1.    Whether CPT is aware that customers and Brands that use its LCD modules sell LCD Display Products with CPT modules throughout the U.S. market and the world.

2.    Whether the U.S. market is a significant market for LCD Display Products, such as computer monitors and televisions.

3.    Whether CPT uses information collected by its OEMs and customers to study the U.S. market.

4.    Whether CPT maintains offices and employees in the United States to attend to the needs and requirements of its customers.

5.    Whether CPT takes no action to prevent its LCD modules from being introduced into the United States market.

6.    Whether CPT imports, sells, and/or offers its own CPT LCD modules for sale in the U.S.

7.      Whether the general process by which CPT's LCD modules arrive in the U.S. involves three parties: CPT as the LCD Module supplier; finished product Original Equipment Manufacturers or "OEMs"; and Brands that have operations in the United States, such as HP, Dell, ViewSonic Corporation, Tatung Co., Tatung Co. of America, Compaq, Gateway, IBM, and Apple (occasionally referred to by the Parties as "Brands").

8.      Whether several Brands, including, for example, Dell, HP, ViewSonic Corporation, and Sony, are customers of CPT.

9.      Whether these brands have ordered LCD modules from CPT, either or both directly or through OEMs.

10.      Whether before an OEM orders CPT modules for a Brand's LCD products, the Brand must approve the use of those modules.

11.      Whether CPT communicates directly with Brands regarding specifications and approval to use CPT modules.

12.      Whether OEMs purchase LCDs from CPT for use in LCD products. CPT's OEM customers ship LCD products with CPT modules directly to the U.S., including Brands such as ViewSonic Corporation in California.

13.      Whether CPT is aware that Brands including HP, Dell, ViewSonic Corporation, Gateway, and Tatung Co. import, sell, and offer for sale in the United States LCD products containing CPT LCD modules.

14.      Whether CPT encourages third parties, including but not limited to Tatung Company, Tatung Co. of America, and ViewSonic Corporation, to purchase, use, import, sell, and/or offer for sale LCD products containing CPT LCD modules.

15.     Whether CPT representatives visit the U.S. offices of Brands, such as Dell, HP, ViewSonic Corporation, Gateway, and IBM, in order to promote CPT's products and coordinate its product lines with those being offered or developed by the Brands.

16.     Whether CPT representatives meet with and send module samples to Brands in an effort to encourage the Brands to design their products around modules built by CPT.

17.     Whether CPT also provides product samples to OEMs and Brands for pre-production testing and approval.

18.     Whether CPT representatives visit the U.S. offices of Brands such as HP, ViewSonic Corporation, and Dell, in order to convince them to purchase more CPT LCD modules.

19.     Whether CPT provides product road maps, product pricing, production capacity, and market trend information to OEMs and Brands such as ViewSonic Corporation, Dell, and HP. CPT provides information to OEMs and Brands in meetings and during monthly teleconferences. Some of CPT's meetings with Brands are held in the U.S.

20.     Whether CPT meets with both OEM and Brand representatives to discuss product planning and product specifications.

21.     Whether CPT works with OEMs to identify business opportunities with U.S. based companies.

22.     Whether CPT has strategic alliances with OEMs (such as Jean, TPV, Tatung Co., Quanta, Compal, and Lite-On) and U.S. based brands (including HP, Gateway, and ViewSonic Corporation) to create mutually beneficial business opportunities for all of them.

23.    Whether CPT provides technical support both to the Brands and to the Brands' customers if problems arise with CPT's Modules.

24.    Whether CPT's customers demand that CPT guarantee a high yield rate, so that CPT can provide its customers with the promised quantities of LCD modules.

25.    Whether, at the request of its U.S. Brand customers, CPT has established service and repair centers in the United States for CPT modules and LCD Display Products containing CPT modules.

26.    Whether CPT has contracted with third parties to provide these repair and warranty services, and whether CPT regularly ships LCD modules and components to these third parties.  CPT also visits and audits these U.S. repair companies.

27.    Whether CPT designs and manufactures LCD modules to meet the specifications requested by Brands such as ViewSonic Corporation.

28.    Whether Tatung Company, Tatung Company of America, and ViewSonic Corporation use CPT LCD modules in products such as LCD televisions and LCD monitors.

29.    Whether Tatung Co. is aware that third parties, including, but not limited to Tatung Co. of America, ViewSonic Corporation, HP, and Compaq, import, sell, and offer for sale in the United States Tatung Co. LCD Display Products containing CPT LCD modules.

30.    Whether Tatung Co. actively encourages third parties, including but not limited to Tatung Co. of America, ViewSonic Corporation, HP, and Compaq, to import, sell, and offer for sale LCD Display Products containing CPT LCD modules.

31.    Whether Tatung Co. provides a warranty to customers that purchase LCD Display Products using CPT modules.

32. Whether Tatung Co. is an OEM for Brands such as HP and ViewSonic Corporation and supplies those Brands with Displays containing CPT LCD modules.

33. Whether Tatung Co. of America is Tatung Co.'s sales representative in the United States.

34. Whether Tatung Co. of America uses sales representatives to sell LCD products throughout the United States.

35. Whether about 95% of Tatung Co. of America's sales are sales in the United States.

36. Whether Tatung Co. of America imports, sells, and offers for sale in the United States LCD Display Products containing LCD modules manufactured by CPT.

37. Whether Tatung Co. actively encourages third parties to use, sell, and offer for sale in the United States LCD Display Products containing CPT LCD modules.

38. Whether ViewSonic Corporation imports, sells, and offers for sale in the United States LCD Display Products containing LCD modules manufactured by CPT.

39. Whether the U.S. is a major market for ViewSonic Corporation's LCD products. ViewSonic Corporation's LCD products, including LCD products using CPT modules, are sold in major U.S. retail chains such as Best Buy, Circuit City and CompUSA.

40. Whether ViewSonic Corporation actively encourages third parties to use, sell, and offer for sale in the United States ViewSonic Corporation LCD products containing CPT LCD modules.

## Factors Pertinent to Reasonable Royalty Analysis

1. Whether LPL and CPT each manufacture and sell LCD products. LPL and CPT are direct competitors.

2.     Whether LPL uses the technology of the '002 Patent in its in-house production of LCD panels.

3.     Whether North America accounts for over 30 percent of all worldwide LCD product purchases.

4.     Whether the United States is the largest market within North America.

5.     Whether the U.S. accounts for approximately 31% of sales of LCD Display Products.

6.     Whether the '002 Patent discloses a process that employs guard rings to protect the TFT substrate from electrostatic discharge during manufacture.

7.     Whether this technology increases manufacturing yields and, thereby, reduces costs in the manufacture of TFT arrays.

8.     Whether serious competition in the LCD industry allows profitability for only the most efficient and productive manufacturers.

9.     Whether LCD module customers demand steady product supply and meeting supply requirements is essential to LCD companies such as LPL and CPT.

10.     Whether the inability to use the technology of the '002 Patent would result in a relative decrease in manufacturing yields and an increase in manufacturing costs, and whether such result might preclude market entry and may limit the ability to offer competitive prices while maintaining profitability.

11.     Whether, in any hypothetical negotiation between LPL and CPT, any license of the '002 Patent to CPT would be expected to be non-exclusive, worldwide, and not restricted in terms of territory.

12.    Whether LPL and CPT would negotiate license fees based partly on manufacturing cost savings, or yield savings and benefits.

13.    Whether for each of the past six years, CPT's costs of goods sold has been at least $4,304,391 NT (1999), $10,625,880 NT (2000), $18,730,341 NT (2001), $28,289,073 NT (2002), $42,864,740 NT (2003), $61,198,246 NT (2004), and $75,973,291 NT (2005).

### Damages Issues

14.    The amount of compensatory damages that Defendants should pay.

15.    Whether Defendants' infringement has been willful, and whether Defendants' conduct makes this an exceptional case.

16.    Amount of pre/post judgment interest

17.    The amount of enhanced damages that Defendants should pay.

**B.    Defendants' Issues of Fact**

1.    LPL filed a motion for preliminary injunction in this case, indicating that CPT allegedly infringed LPL's U.S. Patent No. 6,738,121 ("the `121 patent").

2.    In its preliminary injunction motion, LPL indicated that it was being so irreparably harmed by CPT's alleged infringement of the `121 patent that the Court must immediately enjoin CPT from making its products.

3.    Discovery revealed that LPL had violated the Patent Statute's "statutory bar" by selling products embodying the `121 patent more than one year prior to applying for the `121 patent (i.e., before the critical date).

4.    LPL knew about its pre-critical date sales but attempted to enforce the `121 patent against Defendants anyway.

5.    When Defendants brought LPL's pre-critical date sales to the attention of the Court in April 2006, the Court instructed LPL to consider withdrawing the `121 patent from the present suit.

6.    On May 1, 2006, after Defendants had spent hundreds of thousands of dollars defending themselves against LPL's allegations of infringement of the `121 patent, LPL dropped the `121 patent from the case.

7.    LPL pursued a claim against Defendants of alleged infringement of the `121 patent for the purpose of disrupting Defendants' businesses.

8.    LPL did not provide CPT notice of the `002 patent until it filed suit in May 2005.

9.    LPL sent a letter to CPT on February 8, 2002, mentioning a list of patents as "exemplary" of "[a] portfolio of patents . . . available for license from LG.Philips."

10.    The February 8, 2002 letter did not allege that CPT infringed any patent, nor did it mention any CPT products.

11.    The February 8, 2002 letter stated that representatives of LPL would visit CPT if CPT wished to discuss "the relevance of the LGP patent portfolio to any specific products of [CPT]."

12.    The February 8, 2002 letter did not provide notice of the '002 patent or the '121 patent.

13.    LPL sent a letter to CPT on July 5, 2002, requesting that CPT study LPL's patents and decide whether CPT believed it would be appropriate to take a license to them.

14.    The July 5, 2002 letter did not allege that CPT infringed any patent, nor did it mention any CPT products.

15.     The July 5, 2002 letter did not mention the '002 patent or the '121 patent.

16.     The July 5, 2002 letter did not provide notice of the '002 patent or the '121 patent.

17.     LPL sent a letter to CPT on July 30, 2002, attaching a list of 447 patents and describing them as "[a] list of patents available for licensing."

18.     The July 30, 2002 letter did not allege that CPT infringed any particular patent, nor did it mention any CPT products.

19.     The July 30, 2002 letter did not provide notice of the '002 patent or the '121 patent.

20.     In the summer of 2002, LPL personnel met with CPT personnel in Taiwan.

21.     At the 2002 meeting between LPL and CPT, LPL showed CPT claim charts for certain LPL patents, but those claim charts did not include the '002 patent or the '121 patent.

22.     The '002 patent and the '121 patent were not mentioned or discussed at the 2002 meeting between LPL and CPT.

23.     LPL never provided claim charts that included the '002 patent or the '121 patent to Defendants before filing the present suit.

24.     LPL never provided any notice of any kind to Tatung Co., Tatung Co. of America, Inc. or ViewSonic Corporation before filing the present suit.

25.     LPL never stated to Defendants in any letter or meeting what benefits licensing any of LPL's patents would confer upon Defenants.

26.    LPL purchased the '002 patent, along with six other patents, from Honeywell.

27.    LPL only paid $1.2 million for the entire seven-patent portfolio.

28.    Foreign patents and published applications for foreign patents are prior art to a U.S. patent if the foreign patents and/or published applications for foreign patents are published before the filing date of the U.S. patent.

29.    The `002 patent issued on May 28, 1991.

30.    Prior to May 28, 1991, the application for the `002 patent had never been made public.

31.    The United States Patent and Trademark Office did not begin publishing patent applications until well after May 28, 1991.

32.    LPL does not mark any of its products with the `002 patent number.

33.    No LPL licensee marks any products with the `002 patent number.

34.    Whether any of the asserted claims of the `002 patent are invalid as anticipated by the prior art and therefore are invalid.

35.    Whether any of the asserted claims of the `002 patent are invalid as obvious in view of the prior art and therefore are invalid.

36.    Whether the inner guard ring claim 10 is anticipated by the Yudasaka reference and separately anticipated by the Oritsuke reference.

37.    Whether any of claims 2-6, 7, 9, 13-18 of the '002 patent are invalid for failure to meet the requirements of 35 USC section 112.

38.    Further details regarding the factual issues concerning the invalidity and/or non-infringement of the asserted claims of the `002 patent can be found in the expert report of Dr. Webster Howard and his deposition testimony, which is incorporated by reference herein.

39.    Further details regarding the factual issues concerning damages can be found in the expert report of Mr. Michael Wagner and his deposition testimony, which is incorporated by reference herein.

40.    Whether the invention claimed in the `002 patent is entitled to a reduction to practice date earlier than the filing date of the application for the `002 patent.

41.    Whether LPL is entitled to a commencement date earlier than the filing date of this action for purposes of any damages calculation.

42.    Whether LPL's conduct makes this an exceptional case entitling CPT, Tatung Co., Tatung Co. of America and ViewSonic Corporation to attorneys' fees and costs.

43.    Whether any correspondence or communication between LPL and any defendant prior to May 13, 2005 identified any product of any defendant that LPL claimed infringed any claim of the '002 patent.

44.    Whether any correspondence or communication between LPL and any defendant prior to May 13, 2005 identified any specific claim of the '002 patent that LPL asserted was infringed by any of defendants' products.

45.    Whether any correspondence or communication from LPL prior to June 16, 2006 identified any CPT product that LPL claimed infringed specific claims of the '002 patent.

46.    Whether LPL has asserted patents against defendants that LPL knew or should have known were invalid or unenforceable.

47.    Whether LPL has made material misstatements to the U.S. Patent and Trademark Office to obtain the issuance of one or more U.S. patents.

48.    Whether under the totality of the circumstances defendants' conduct after receiving proper notice of the '002 patent has been reasonable.

49.    Whether LPL has improperly asserted patents against companies incorporating CPT modules into their products in order to coerce such companies to discontinue use of CPT products.

50.    Whether LPL pursued litigation against CPT and users of CPT modules in bad faith.

51.    CPT did not copy any subject matter disclosed in the '002 patent.

52.    CPT did not copy any guard ring technology from any LPL product.

53.    Whether the appropriate royalty base is worldwide sales or U.S. sales.

54.    Whether the U.S. PTO is dependent on the applicant and his attorneys' duty of candor.

55.    Whether LPL has filed meritless litigation as a competitive weapon against Defendants and others.

56.    Whether there is any basis for LPL's claimed yield rates that it attributes to the '002 patent.

## VI.    ISSUES OF LAW WHICH REMAIN TO BE LITIGATED

### A.    LPL's Issues of Law

1.    **Direct Infringement**.  The Jury must decide whether Defendants have directly infringed the '002 Patent.

A party directly infringes a patent when, without authority, the party "makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent."  U.S.C. § 271(a).  The moving party only needs to establish a single instance of either a sale, offer for sale, or importation of an infringing product in order to recover damages. *See, e.g., Catalina Lighting, Inc. v. Lamps Plus, Inc.*, 295 F.3d 1277, 1291 (Fed. Cir. 2002).

24

If the economic interests of a United States patent holder are directly affected by sale of an infringing product, then damages may be recovered. *In re Caveney*, 761 F.2d 671, 226 U.S.P.Q. 1 (Fed. Cir. 1985); *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1377 (Fed. Cir. 2005); *Beverly Hills Fan Co. v. Royal Sovereign Corp.*, 21 F.3d 1558, 1571 (Fed. Cir. 1994).

A person may directly infringe a patent without knowledge that what he is doing is an infringement of the patent. He may also infringe even though in good faith he believes that what he is doing is not an infringement of any patent. 35 U.S.C. § 271; *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17 (1997); *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1330 (Fed. Cir. 2001); *Seal-Flex, Inc. v. Athletic Track and Court Constr.*, 172 F.3d 836, 842 (Fed. Cir. 1999); *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993).

Circumstantial evidence is sufficient to prove direct infringement, *Moleculon Research Corp. v. CBS, Inc.*, 793 F.2d 1261, 1272 (Fed. Cir. 1986). Direct infringement can be shown by evidence of sales and the distribution of instruction manuals to customers,. *Id.*; *Golden Blount, Inc. v. Robert H. Peterson Co.*, No. Civ. A. 3-01-CVO127R, 2004 WL 1960098, at *8-9 (N.D. Tex. Sept. 2, 2004).

2.    **Inducing Infringement**. The Jury also must decide whether Defendants induced infringement of the '002 Patent.

Direct infringement is a prerequisite to liability for inducing infringement. *See Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 341-42 (1961); *Oxford Gene Tech. Ltd. v. Mergen Ltd*, 345 F. Supp, 2d 444, 463 (D. Del. 2004) (citing *Met-Coil Sys. Corp v. Korners Unlimited, Inc.*, 803 F.2d 684, 687 (Fed. Cir. 1986)).

A patent owner has the right to enjoin direct infringers and entities who take active steps to encourage direct infringement by another. *Oak Indus., Inc. v. Zenith Elec. Corp.*, 697 F. Supp. 988, 992 (N.D. Ill. 1988); *Water Tech. Corp. v. Calco, Ltd.*, 850 F.2d 660, 668 (Fed. Cir. 1988); *Haworth Inc. v. Herman Miller Inc.*, 37 U.S.P.Q.2d 1080, 1090, 1994 WL 875931 (W.D. Mich. 1994) (evidence that defendant "demonstrate[d] and recommend[ed] infringing configurations" of its product could support inducement liability).

A foreign company that infringes a patented process can be held liable for inducement of infringement if its product is sold in the United States. *See, e.g., Crystal Semiconductor Corp. v. Tritech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1351 (Fed. Cir. 2001) (finding that foreign company who sold a product to a company abroad, who subsequently imported the product into the United States for sale, could be held liable for induced infringement); *Budd Co. v. Complex Corp.*, 19 U.S.P.Q. 2d 1318 (E.D. Mich. 1990) (reasoning that under 35 U.S.C. § 271(g), a defendant may be held liable for active inducement of infringement in accord with § 271(b)).

Pursuant to 35 U.S.C. § 271(g), "[w]hoever without authority imports into the United States or offers to sell, sells, or uses within the United States a product which is made by a process patented in the United States shall be liable as an infringer" so long as (1) the product is not materially changed by a subsequent process and (2) the product is not a trivial and nonessential component of another product."

Domestic sellers of goods manufactured using an infringing process may also be liable for infringement, even where the goods are manufactured overseas. 35 U.S.C. § 271(g); *Shamrock Tech., Inc. v. Precision Micron Powders, Inc.*, 1991 U.S. Dist. LEXIS 13142, at *5 n.4 (E.D. N.Y. Aug. 8, 1991); *Pfizer, Inc. v. Aceto Corp.*, 853 F. Supp. 104, 105 (S.D. N.Y. 1994).

The Federal Circuit has identified numerous factors that may also support an inducement to infringe claim. Among them, intentional inducement may be established where evidence shows that the accused infringer: (1) visited the third party, making technical presentations regarding the infringing products; (2) provided substantial technical support to the third party, including coordinating shipment dates of the infringing products and correcting problems with the products; (3) offered product support to the third party, thereby enabling the purchase and use the accused product; (4) specifically encouraged the third party's potentially infringing activities; and/or (5) realized extensive sales of the infringing product. *See MEMC Elec. Materials, Inc., v. Mitsubishi Materials Silicon Corp.*, 420 F.3d 1369, 1379-80 (Fed. Cir. 2005) (factors 1-4 above); *Oxford Gene Tech.*, 345 F. Supp. 2d at 465 (factor 5 above); *see also SEB, S.A. v. Montgomery Ward & Co.*, 412 F. Supp. 2d 336, 343 (S.D.N.Y. 2006); *Translogic Tech., Inc. v. Hitachi, Ltd.*, 404 F. Supp. 2d 1250, 1252-53 (D. Or. 2005); *O2 Micro Int'l Ltd. v. Sumida Corp.*, 2006 WL 981987 at *2 (E.D. Tex. 2006).

      3.    **Willfulness of Infringement:** The Jury must decide whether Defendants willfully infringed LPL's '002 Patent.

The test for willful infringement is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed." *Hall v. Aqua Queen Mfg., Inc.*, 93 F.3d 1548, 1555 (Fed. Cir. 1996). Willfulness is to be measured as of the time that the infringer first knew about the patent. *See, e.g., Odetics, Inc v. Storage Technology Corp.* 185 F.3d 1259, 1276 (Fed. Cir. 1999); *Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1362-63 (Fed. Cir. 1998).

A finding that an infringer acted willfully may entitle the patent holder to increased damages. *See* 35 U.S.C. § 284. Several factors are relevant to determine willfulness. In the

District of Delaware, courts have considered this question by giving consideration to "(1) the infringer's deliberate copying of the ideas of another; (2) the infringer's knowledge of the patent rights of another; (3) any good faith belief of invalidity or noninfringement formed by the infringer after an investigation of the patent rights of another; (4) the infringer's behavior as a litigant." *E.I. DuPont De Nemours & Co. v. Monsanto Co.*, 903 F. Supp. 680, 740 at n.32 (D. Del. 1995).

In *Read Corp. v. Portec, Inc*, the Federal Circuit identified several factors that may be considered when determining whether infringement was willful: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action taken by defendant; (8) defendant's motivation for harm; (9) whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827 (Fed. Cir. 1992), *abrogated on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 975 (Fed. Cir. 1995).

4.    **Damages:** The Jury must determine the amount of compensatory damages Defendants should pay for their infringement of LPL's patent. At an absolute minimum, LPL is entitled to a reasonably royalty. 35 U.S.C. § 284(a).

A reasonable royalty may be determined from "hypothetical negotiations between willing licensor and willing licensee." *Fromson v. Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1574 (Fed. Cir. 1988); *see also Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp.

1116, 1120-22 (S.D.N.Y. 1970) (providing factors to consider in such hypothetical negotiations), *modified on other grounds*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971).

Costs savings are an appropriate basis for determining reasonable royalties because they represent the amount that a licensee would be willing to pay for a license and are objective evidence of a reasonable royalty. *Hanson v. Alpine Valley Ski Area Inc.*, 718 F.2d 1075, 219 U.S.P.Q. 679 (E.D. Mich. 1983) (finding that reasonable royalty may be based upon a portion of the annual cost savings attributable to the infringing patent); *Ziggity Sys., Inc. v. Val Watering Sys.*, 769 F. Supp. 752, 827-828 (E.D. Pa. 1990) ("[C]ost savings is a measure of the invention's value to defendants and evidence of what a reasonable royalty should be"); *see also A.C. Auckerman Co. v. R.L. Chaides Constr. Co.*, 29 U.S.P.Q.2d 1054, 1059 (N.D. Calif. 1993) ("In determining a reasonable royalty, the court may look to the savings that result from the patented device."); *Idacon Inc. v. Central Forest Prod. Inc.*, 3 U.S.P.Q.2d 1079, 1093 (E.D. Okla. 1986) ("Reliance upon estimated cost savings from the use of the infringing product is a well-settled method of determining a reasonable royalty."); *Smith Int'l, Inc. v. Huges Tool Co.*, 229 U.S.P.Q. 81, 96 (C.D. Calif. 1986), *appeal dismissed as moot*, 839 F.2d 663 (Fed. Cir. 1988) ("The cost savings resulting from the use of the infringing device may be considered as one element in constructing the reasonable royalty."); *Tights, Inc. v. Kayser-Roth Corp.*, 442 F. Supp. 159, 163 (M.D. N.C. 1977) (cost saving is a "highly reliable and significant factor in determining what a willing licensee would agree to pay a willing licensor.").

In cases where other approaches such as established royalties or lost profits would be difficult, cost savings may be considered a superior method of calculating reasonable royalties. *See Leesona v. United States*, 599 F.2d 958, 971 (1979), *cert. denied*, 444 U.S. 991 (1979).