# EXHIBIT L

THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).

Priority ⟋
Send ⟋
Enter ⟋
Closed ___
~~JS-6~~ JS-6 _NO_
JS-2/JS-3 ___
Scan Only___

FILED
CLERK. U S DISTRICT COURT

DEC 9 2005

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

SCANNED

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

ENTERED
CLERK. U.S. DISTRICT COURT

DEC 1 0 2005

CENTRAL DISTRICT OF CALIFORNIA
BY

| | |
|---|---|
| LG PHILIPS LCD CO., LTD.,<br>Plaintiff<br><br>v.<br><br>TATUNG CO. OF AMERICA,<br>TATUNG COMPANY and<br>CHUNGHWA PICTURE TUBES, LTD.,<br><br>Defendants. | No. CV 02-6775 CBM (JTLx)<br><br>Consolidated Cases:<br>No. CV 03-2866 CBM (JTLx)<br>No. CV 03-2884 CBM (JTLx)<br>No. CV 03-2885 CBM (JTLx)<br>No. CV 03-2886 CBM (JTLx)<br><br>**AMENDED ORDER RE:<br>CHUNGHWA PICTURE TUBES,<br>LTD.'S MOTION FOR SUMMARY<br>JUDGMENT TO DISMISS SIDE-<br>MOUNT PATENT<br>INFRINGEMENT CLAIMS FOR<br>LACK OF STANDING** |
| AND CONSOLIDATED CASES | |
| CHUNGWHA PICTURE TUBES, LTD.,<br><br>Counterclaimant and<br><br>Third-party Plaintiff,<br><br>v.<br><br>LG. PHILIPS LCD CO., LTD,<br><br>Counterdefendant,<br><br>AND LG ELECTRONICS, INC.,<br><br>Third-party Plaintiff | |

DOCKETED ON CM

DEC 1 0 2005

BY _____ 003

883

1    The matter before the Court is Defendant Chunghwa Picture Tubes Ltd.'s

2   Motion for Summary Judgment to Dismiss Plaintiff's Side-Mount Patent

3   Infringement Claims for Lack of Standing. The Court originally issued an order

4   addressing this motion on September 21, 2005. However, it has since come to the

5   Court's attention that LPL has asserted identical patent infringement claims

6   against the Defendants in consolidated Case. Nos. CV 03-2886, CV 03-2866, CV

7   03-2884 and CV 03-2885, ViewSonic Corporation, Jean Co., Lite-On Technology,

8   TPV Technology and Envision Peripherals, Inc., with respect to three of the four

9   side-mount patents at issue in this case. Moreover, all of the Complaints against

10   those Defendants were filed <u>before July 7, 2003</u> and, thus, were filed during the

11   time which the Court finds, for the reasons discussed below, that the side-mount

12   patents were unenforceable and LPL lacked standing to assert its claims of

13   infringement.

14    On December 1, 2005, the Court issued an Order to Show Cause ("OSC"),

15   ordering the Consolidated Defendants and LPL to show cause as to why the

16   Court's findings regarding LPL's lack of standing do not equally apply to the side-

17   mount patent infringement claims against the Consolidated Defendants and,

18   accordingly, why those claims should not also be dismissed at this time.

19    In their responses to the OSC's, all parties have represented that the Court's

20   findings regarding LPL's lack of standing to assert the side-mount patent

21   infringement claims against Defendant CPT *should* equally apply to the side-

22   mount patent infringement claims against the Defendants in the consolidated

23   cases. Accordingly, the Court amends its September 21, 2005 order to reflect the

24   Consolidated Defendants' joinder in the motion and, concomitantly, to reflect that

25   all findings of fact and conclusions of law made with respect to Defendant CPT

26   apply to the Consolidated Defendants.

27

28                                         - 2 -

# JURISDICTION

The Court has jurisdiction over this case pursuant to 28 U.S.C. §1331.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff L.G. Philips LCD Co., Ltd. ("LPL") filed this action on August 29, 2002, alleging that Defendants Tatung Co., Tatung Co. of America (collectively "Tatung"), and Chunghwa Picture Tubes ("CPT") infringed on its patents. As to Defendant CPT, LPL alleged infringement of six patents: two semiconductor patents and four side-mount patents. On October 1, 2003, LPL amended its complaint to assert that Tatung also infringed on three of the four side-mount patents. CPT and Tatung filed counterclaims for declaratory judgments of noninfringement and invalidity/inequitable conduct with respect to each of the side-mount patents. Trial on both the semiconductor and the side-mount patent claims is currently set for February 28, 2006.

On May 2, 2005, CPT filed the instant Motion for Summary Judgment to Dismiss Plaintiff's Side-Mount Patent Infringement Claims for Lack of Standing, in which Defendant Tatung subsequently joined. On May 9, 2005, LPL filed an Opposition.[1] CPT filed a Reply on May 16, 2005. Tatung filed a separate Reply on May 18, 2005.

On May 23, 2005, the Court heard oral argument in connection with the Motion. The Court granted leave to counsel to attempt to obtain the administrative record from the U.S. Patent and Trademark Office ("PTO") concerning 1971 amendments to 37 C.F.R. § 1.321 and to file supplemental briefs, pursuant to Fed. R. Civ. P. 56(f). The hearing was continued until August 15, 2005.

On June 27, 2005, the parties submitted a Joint Status Report informing the Court that a subpoena duces tecum was served upon the PTO requesting the

-3-

1   administrative record pertaining to 1971 rule-making; the PTO responded that it is

2   unable to locate any such record. Based on this information and the parties'

3   request, the Court vacated the August 15, 2005 hearing and the supplemental

4   briefing schedule pertaining thereto and deemed CPT's Motion for Summary

5   Judgment fully submitted on the record before the Court.

6                                    **STANDARD OF LAW**

7          Summary judgment against a party is appropriate when "the pleadings,

8   depositions, answers to interrogatories, and admissions on file, together with the

9   affidavits, if any, show that there is no genuine issue as to any material fact and

10  that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P.

11  56(c) (emphasis added). A party seeking summary judgment bears the initial

12  burden of informing the court of the basis for its motion and of identifying those

13  portions of the pleadings and discovery responses which demonstrate the absence

14  of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323

15  (1986). Where the nonmoving party will have the burden of proof at trial, the

16  movant can prevail merely by pointing out that there is an absence of evidence to

17  support the nonmoving party's case. *See id.* If the moving party meets its initial

18  burden, the nonmoving party must then set forth, by affidavit or as otherwise

19  provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

20  Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

21         In judging evidence at the summary judgment stage, the Court does not

22  make credibility determinations or weigh conflicting evidence and draws all

23  inferences in the light most favorable to the nonmoving party. *T.W. Elec. Svc.,*

24  *Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987). The

25  evidence presented by the parties must be admissible. Fed. R. Civ. P. 56(e).

26  Conclusory, speculative testimony in affidavits and moving papers is insufficient

27

28                                          - 4 -

1  to raise genuine issues of fact and defeat summary judgment. *See Thornhill Pub.*

2  *Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

3  **DISCUSSION**

4  **I. Findings of Undisputed Material Fact**

5  1.      On July 3, 1997, LG Electronics, Inc. ("LGE") filed patent application

6  Serial No. 888,164 (the '164 application) with the PTO. The '164 ultimately

7  issued as the '139 patent.

8  2.      On January 13, 1998, the five named LGE inventors of the '164 patent

9  assigned 100% of their ownership in the '164 application to LPL. This

10  assignment was recorded with the PTO by LGE.

11  3.      On September 1, 1998, LGE filed patent application Serial No. 09/145,357

12  (the '357 application), which was a continuation application based on the '164

13  application. The '357 application ultimately issued as U.S. Patent No. 5,926,237

14  (the '237 patent).

15  4.      On October 26, 1998, LGE filed patent application Serial No. 09-178,832

16  (the '832 application), which was a continuation application based on the '164

17  application. The '832 application ultimately issued as U.S. Patent No. 6,002,457

18  (the '457 patent).

19  5.      On October 26, 1998, LGE filed patent application Serial No. 09/178,711

20  (the '711 application), which was a continuation application based on the '164

21  application. The '711 application ultimately issued as U.S. Patent No. 6,020,942

22  (the '942 patent).

23  6.      On November 10, 1998, the '164 application issued as U.S. Patent No. 5,

24  835,139 (the '139 patent).

25  7.      On or around December 15, 1998, the PTO examiner conducted an

26  interview LGE's patent attorney, Mr. Song Jung, to discuss double-patenting

27

28                                          - 5 -

1  issues in connection with the pending claims of the '357 application.

2  8.    The summary of the interview with the PTO states that "the claims [of the

3  '357 application] seem to contain the same features as the parent application

4  ['164] which has been allowed."

5  9.    On or about December 17, 1998, LGE submitted a "Terminal Disclaimer to

6  Obviate A Double-Patenting Rejection" in the '357 application.  This terminal

7  disclaimer provides, in relevant part:

8          LG Electronics Inc. hereby disclaims the terminal part of a
         patent granted on the ['357] application, which would
9          extend beyond the expiration date of the full statutory term
         of [the '139 patent] . . . and hereby agree [sic] that any
10         patent so granted on the ['357] application shall be
         enforceable only for and during such period that the legal
11         title to said patent shall be the same as the legal title to [the
         '139 patent] this agreement to run with any patent granted
12         on the ['357] application and to be binding upon the
         grantor, its successors or assigns.
13
14 10.    On February 16, 1999, the examiner for the '357 application allowed the

15 claims, giving the following reasons:

16         [The] claims of the present invention claim the identical
         allowable subject matter disclosed in the allowed
17         application 08/888164.  Applicant has filed a terminal
         disclaimer to obviate a double patenting rejection.

18 11.    On February 12, 1999, LGE submitted a "Terminal Disclaimer to Obviate A

19 Double-Patenting Rejection" in the '832 application, which states in relevant part:

20         LG Electronics Inc. hereby disclaims the terminal part of a
         patent granted on the ['832] application, which would
21         extend beyond the expiration date of the full statutory term
         of [the '139 patent] . . . and hereby agree [sic] that any
22         patent so granted on the ['832] application shall be
         enforceable only for and during such period that the legal
23         title to said patent shall be the same as the legal title to [the
         '139 patent] this agreement to run with any patent granted
24         on the ['832] application and to be binding upon the
         grantor, its successors or assigns.

25 12.    On February 12, 1999 LGE also submitted a "Terminal Disclaimer to

26 Obviate A Double-Patenting Rejection" in the '711 application, which states in

27

28                                    - 6 -

relevant part:

> LG Electronics Inc. hereby disclaims the terminal part of a patent granted on the ['711] application, which would extend beyond the expiration date of the full statutory term of [the '139 patent] . . . and hereby agree [sic] that any patent so granted on the ['711] application shall be enforceable only for and during such period that the legal title to said patent shall be the same as the legal title to [the '139 patent] this agreement to run with any patent granted on the ['711] application and to be binding upon the grantor, its successors or assigns.

13.    After receipt of the Terminal Disclaimer in the '832 application, the PTO allowed the pending claims in the '832 application. The Notice of Allowance was sent to Mr. Jung on September 9, 1999. The patent examiner provided the following reasons for allowance:

> [The] present continuation application claims the allowable subject matter disclosed in the allowed ['164 application]. [LGE] has filed a terminal disclaimer to obviate an obviousness double patenting rejection.

14.    After receipt of the Terminal Disclaimer in the '711 application, the PTO allowed the pending claims in the '711 application. The Notice of Allowance was sent to Mr. Jung on September 9, 1999. The patent examiner provided the following reasons for allowance:

> [The] present application claims the allowable subject matter disclosed in the allowed ['164 application]. Applicant has filed a terminal disclaimer to obviate an obviousness double patenting rejection.

15.    On June 7, 1999, while the '357, '832 and '711 continuation applications were still pending, Mr. Jung submitted a fourth continuation application to the PTO, Serial No. 09/326,540 (the '540 application), which eventually issued as U.S. Patent No. 6, 373,537 (the '537 patent).

16.    On September 21, 1999, before the '832 and '711 continuation applications had issued as the '457 and '942 patents, LGE signed an agreement that assigned full or partial ownership in a large portfolio of patents and patent applications from

- 7 -

1  LGE to LPL. Mr. Jung, LGE's and LPL's patent attorney, recorded the LGE/LPL

2  assignment agreement at the PTO on September 29, 1999.

3  17.    Pursuant to the September 1999 assignment agreement, LGE assigned to

4  LPL and its successors 50% of the entire right, title and interest in the '139 patent,

5  including but not limited to the right to sue for past, present and future

6  infringement, and 100% of the entire right, title and interest in the '711, '832, '357,

7  and '540 continuation applications, including but not limited to the right to sue for

8  past, present, and future infringement.

9  18.    On July 20, 1999, the '357 application issued as the '237 patent.

10  19.    On October 12, 1999, LPL paid the issue fees for both the '832 and '711

11  applications. At the time LPL paid these issue fees, it was the new owner of 100%

12  of these applications.

13  20.    Besides filing the September 21, 1999 assignment agreement with the PTO,

14  neither LGE nor LPL took any other action to advise the examiner of the difference

15  in ownership between the '832 and '711 applications on the one hand and the '139

16  patent on the other hand.

17  21.    On December 14, 1999, the '832 application issued as the '457 patent.

18  22.    On February 1, 2000, the '711 application issued as the '942 patent.

19  23.    During the prosecution of the '540 continuation application, the PTO

20  examiner conducted an interview with LPL's patent attorney, Mr. Jung, and

21  requested that LPL file a terminal disclaimer to overcome a potential double

22  patenting rejection.

23  24.    As a result of the PTO examiner's request, on November 30, 2000, Mr. Jung

24  filed a Terminal Disclaimer in the '540 application, which states in relevant part:

25          LG. Philips LCD Co, Ltd. [h]ereby disclaims the terminal
            part of any patent granted on the ['540] application, which
26          would extend beyond the expiration date of the full
            statutory term as presently shortened by any terminal
27

- 8 -
28

1    disclaimer of Patent No. 5,835,129 [sic], and hereby agrees
     that any patent so granted on said ['540] application shall be
2    enforceable only for and during such period that the legal
     title to said patent shall be the same as the legal title to
3    United States Patent 5,835,129 [sic], this agreement to run
     with any patent granted on the ['540] application and to be
4    binding upon the grantor, its successors or assigns.

SCANNED

5    25.    The November 30, 2000 disclaimer mistakenly disclaimed the '540

6    application against U.S. Patent No. 5,835,129 (instead of 5,835,139), an unrelated

7    patent. That patent was never owned by LGE or LPL, but was owned by a

8    completely unrelated company.

9    26.    On April 16, 2002, the '540 application issued as the '537 patent.

10   27.    On August 29, 2002, LPL filed the instant lawsuit against Defendants CPT

11   and Tatung, initially alleging infringement of the '237, '457, '942 and '537 patents

12   (the "side-mount patents") only against CPT and not the other Defendants.

13   28.    On June 23, 2003, LGE executed an assignment that purportedly transferred

14   its 50% ownership in the '139 patent to LPL. This assignment was recorded by the

15   PTO on July 7, 2003.

16   29.    In the fall of 2003, LPL amended its Complaint to assert new claims of

17   infringement of the side-mount patents against the Tatung Defendants.

18   30.    On October 17, 2003, CPT served Interrogatory No. 9 on LPL, which

19   requested, "[f]or each of the patents-in-suit, identify the first date on which you

20   allege infringement damages against CPT began to accrue." LPL responded that "it

21   has not determined the date from which it will seek damages fro CPT's [alleged[

22   infringement of the side-mount patents."

23   31.    On December 5, 2003, CPT met and conferred with LPL's counsel regarding

24   LPL's response to this interrogatory. During the meet and confer, LPL stated that it

25   had not yet completed its analysis and declined to provide an estimate when it

26   would be providing a response regarding the date from which it would seek

27   damages for the side-mount patents. A year passed, and LPL did not provide its

28                                              -9-

1  supplemental response.

2  32.    On December 3, 2004, CPT wrote to LPL and asked for its supplemental

3  response to Interrogatory No. 9. Despite LPL's representations that it would

4  supplement its response, by the end of December 2004, LPL had still failed to

5  respond with the date from which it would seek damages for the side-mount

6  patents.

7  33.    On January 18, 2005, CPT and LPL filed a Joint Stipulation in support of

8  CPT's Motion to Compel LPL to Supplement its Response to Interrogatory No. 9.

9  34.    On January 25, 2005, CPT and LPL conducted a telephone hearing before

10  Magistrate Lum regarding, among other matters, CPT's Motion to Compel LPL to

11  Supplement its Response to Interrogatory No. 9. At the hearing, Magistrate Judge

12  Lum ordered LPL to provide the dates from which it contended it was entitled to

13  damages for the alleged infringement of the side-mount patents.

14  35.    LPL responded on January 28, 2005 that it was not seeking damages for any

15  alleged infringement of the side-mount patents prior to July 1, 2003—a date that is

16  nearly a year after LPL filed its Complaint against CPT in August 2002.

17  **II. Analysis**

18
19
20

    A.    **Whether the '237, '457, '942 and '537 Patents Were Unenforceable When This Lawsuit Was Filed Due to the Terminal Disclaimers**

21      The present suit was initiated by LPL in August 2002, several years after the

22  September 1999 assignment agreement between LGE and LPL (whereby LGE

23  assigned 50% of the '139 patent to LPL) but before the July 2003 assignment

24  agreement (whereby LGE transferred its remaining 50% interest in the '139 patent

25  to LPL). Thus, at the time this lawsuit was filed, LPL owned only 50% of the

26  rights in the '139 patent. However, pursuant to the September 1999 assignment,

27  LPL owned 100% of the '237, '457, '942 and '537 patents, which are all

28      - 10 -

1  continuations of the '139 patent. The '237, '457, '942 and '537 patents were each

2  issued subject to a terminal disclaimer stating that the patent "shall be enforceable

3  only for and during such period that the legal title to said patent shall be the same

4  as the legal title to [the '139 patent]."[1] The 1971 Manual of Patent Examining

5  Procedure ("MPEP") explains that when title is split between the terminally

6  disclaimed patent and the patent on which the disclaimer is based, the terminally

7  disclaimed patent becomes unenforceable.[2] This is consistent with 37 C.F.R.

8  §1.321(c), which states that a terminal disclaimer, when filed to obviate a judicially

9  created double patenting rejection, must "include a provision that any patent

10 granted on that application or any patent subject to the reexamination proceeding

11 shall be enforceable only for and during such period that said patent is commonly

12 owned with the application or patent which formed the basis for the rejection."

13 (This is called a "non-alienation provision").

14      LPL argues that the difference in legal title created by the September 1999

15 assignment order does not violate the non-alienation provision. The Court finds

16 this argument to be unpersuasive, as the MPEP §706.02 explains that two patents

17 are commonly owned if 100% of each patent is owned by the same entity or

18 entities. According to the MPEP, if a parent company owns 100% of subsidiary A

19

20 [1]    The purpose of the terminal disclaimer is to prevent a double patenting

21 rejection in a patent application or in a reexamination proceeding.

22 [2]    The 1969 edition of the MPEP stated that "terminal disclaimers should include

23 a provision that the patent shall expire immediately if it ceases to be commonly

24 owned with the other application or patent." While the MPEP does not have the force
   of law, "it is entitled to judicial notice as an official interpretation of statutes or

25 regulations as long as it is not in conflict therewith." *Molins PLC v. Textron, Inc.*, 48

26 F.3d 1172, 1180 n.10 (Fed. Cir. 1995). Furthermore, the MPEP has been held to
   describe procedures on which the public can rely. *In re Kaghan*, 55 C.C.P.A. 844,

27 387 F.2d 398, 401, 156 U.S.P.Q. (BNA) 2130, 2132 (1967).

28                                  - 11 -

1    but only 90% of subsidiary B, the inventions of A and B are not "commonly

2    owned" within the meaning of patent law.  MPEP §706.02(1)(2) (5th Ed. 2001).

3    Since LPL owned 100% of the '237, 457, '942 and '537 patents but only 50% of

4    the '139 patent at the time the lawsuit was filed, the '139 patent and the other

5    patents were not "commonly owned" at the time the lawsuit was filed.  Under the

6    terminal disclaimer, this meant that the '237, 457, '942 and '537 patents were

7    unenforceable at the time that the lawsuit was filed.  In fact, LPL asserts that "a

8    temporary lapse in enforceability" occurred from September 1999 to June 2003.

9
     **B.    Whether LPL Lacks Standing to Bring the Side-Mount Patent**
10       **Infringement Claims**

11       Article III of the U.S. Constitution limits the jurisdiction of federal courts to

12   actual "cases" or "controversies."  *Allen v. Wright*, 468 U.S. 737, 750-51, 82 L. Ed.

13   2d 556, 104 S.Ct. 3315 (1984).   In order to establish Article III standing, a plaintiff

14   must show: (1) "an invasion of a legally protected interest" that is "concrete and

15   particularlized" and "actual and imminent"; (2)  a causal connection between the

16   injury and the conduct that is the subject of the complaint; and (3) that the injury is

17   likely to be redressed by a favorable decision.  *Lujan v. Defenders of Wildlife*, 504

18   U.S. 555, 560-61, 119 L.Ed. 2d 351, 112 S. Ct. 2130 (1992).  These requirements

19   apply to patent cases in the same way that they apply to all federal cases.  *See, e.g.,*

20   *Paradise Cretaions v. U V Sales Inc.*, 315 F.3d 1304, 1308-10 (Fed. Cir. 2003)

21   (finding that a plaintiff lacked a "cognizable injury necessary to assert standing

22   under Article III of the Constitution" where it "held no enforceable rights

23   whatsoever in the patent at the time it filed suit").   Article III standing is assessed

24   at the time the original complaint was filed and cannot be cured retroactively.

25   *Keene Corp. v. United States*, 508 U.S. 200, 207, 124 L. Ed. 2d 118, 113 S. Ct.

26

27

28                                              - 12 -

1  2035 (1993); *accord Lujan*, 504 U.S. at 569 n.4 (1992).[3]

2      In the present case, LPL had no enforceable rights in the '237, '457, '942

3  and '537 patents at the time the lawsuit was filed because the '139 patent was no

4  longer commonly owned, as discussed above.  In *Paradise Creations, Inc.*, 315

5  F.3d at 1310, the Federal Circuit found that the appellant "lacked a cognizable

6  injury necessary to assert standing under Article III of the Constitution" because it

7  "held no enforceable rights whatsoever in the patent at the time it filed suit."   The

8  Court found that "such a defect in standing cannot be cured after the inception of

9  the lawsuit."  *Id.  See also Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d

10  1198, 1203 (Fed. Cir. 2005) (holding that "if the original plaintiff lacked Article III

11  initial standing, the suit must be dismissed, and the jurisdictional defect cannot be

12  cured by the addition of a party with standing . . . nor by the subsequent purchase

13  of an interest in the patents in suit") (citations omitted).  Therefore, LPL lacks

14  standing to allege infringement of '237, '457, '942 and '537 side-mount patents.[4]

15

16  [3]      Plaintiff LPL cites to *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d

17  1016 (Fed. Cir. 2001) for the proposition that the standing defect in this case can be
cured via amendment of the Complaint.  However, *Mentor* involved an issue of

18  prudential rather than Article III standing.  Prudential standing differs from Article

19  III standing in that it does not derive from the Constitution.  For example, the general
rule that the patentee should be joined in any infringement action is considered

20  prudential standing.  Defects in prudential standing, unlike Article III standing, can

21  be cured after the lawsuit is filed. *Mentor H/S, Inc.* 240 F.3d at 1018-19 (holding that
an exclusive licensee with less than all substantial rights in the patent did not have the

22  right to sue under the Patent Act at the inception of the lawsuit, but could cure the

23  defect by filing a motion to join the patentee as a plaintiff).  In *Mentor,* the plaintiff
had a cognizable injury at the inception of suit for the purpose of Article III standing

24  based on its exclusive license to the patent.  In the present case, however, LPL lacked

25  any cognizable injury at the time of suit because the side-mount patents were

26  unenforceable.

27  [4]      LPL's argument that it has standing based solely on patent ownership lacks

28                                              - 13 -

1

**C.    Whether the Claims Pertaining to the Side-Mount Patents Should**
2      **be Dismissed With or Without Prejudice**

3      "Ordinarily, dismissal for lack of standing is without prejudice." *Fieldturf,*

4  *Inc. v. Southwest Rec. Indus.*, 357 F.3d 1226, 1269 (Fed. Cir. 2004). "On occasion,

5  however, a dismissal with prejudice is appropriate, especially where 'it [is] plainly

6  unlikely that the plaintiff [will be] able to cure the standing problem.'" *Id.* (citations

7  omitted). LPL contends that the side-mount patents were only temporarily

8  unenforceable and that this problem was cured in July 2003 when LPL gained

9  100% interest in the '139 patent. In support of this argument, LPL relies on cases

10  where a licensee had insufficient rights to sue without the patent owner as a

11  plaintiff. In addition, LPL cites *Merck & Co., Inc. v. U.S. Int'l Trade Comm'n*, 774

12  F.2d 483 (Fed. Cir. 1985). *Merck* was an appeal that arose when the International

13  Trade Commission terminated an investigation on the grounds that the plaintiff,

14  Merck, had triggered the expiration provision of a patent's terminal disclaimer.

15  Since the patent at issue in *Merck* was issued before the 1971 amendment to 37

16  C.F.R. §1.321, the Federal Circuit applied the 1970 version of the regulation,

17  which stated that a patent would "expire immediately" if the patents were no longer

18  commonly owned. The court held that, if the patent "expired," it could not be

19  "revived" or "reactivated" by a retroactive assignment of the other patents. *Id.* at

20

21

22  merit. While 35 U.S.C. §281 does provide that "a patentee shall have remedy by civil
action for infringement of his patents," the requirements of Article III standing must
23  still be satisfied. LPL's argument that CPT's standing challenge improperly converts
an affirmative defense into a standing issue is also unpersuasive. In the typical
24  affirmative defense challenge, there is a justifiable dispute between the parties at the
25  time that the lawsuit was filed regarding whether the patents are valid and
enforceable. Here, the side-mount patents became unenforceable before the lawsuit
26  was filed as a result of LPL's and LGE's non-compliance with the non-alienation
27  provision of the terminal disclaimers.

28               - 14 -

1    485. However, the court commented that under the 1971 amendment, "disclaimers

2    need state only that the patent be unenforceable during the period it is not

3    commonly owned with the other patents recited in the disclaimer." *Id.* at 486. The

4    court described the 1971 amendment as a "less severe" standard. *Id.*

5        While these comments regarding the 1971 amendment were mere dicta, the

6    the plain language of the regulation supports LPL's interpretation. The fact that the

7    phrase "expire immediately" was replaced with a phrase describing when the

8    patents are "enforceable" does indicate that the amendment was intended to soften

9    the consequences of alienation. *See also* Chisum on Patents §9.04[5][a] (stating

10    that in 1971, the Patent Office amended Rule 1.321(b) "to require only that the

11    patent be 'unenforceable' during a period of separate ownership"). Moreover, the

12    language of the 1971 amendment indicates that the patent is enforceable during any

13    period of common ownership. *See United States v. Alvarez -Sanchez*, 511 U.S.

14    350, 356 (1994) ("Statutory interpretation begins with the plain meaning of the

15    statute's language"). The language of §1.321(c)(3) places no restrictions on

16    enforceability during a period of common ownership that follows a period of

17    separate ownership.

18        CPT, however, contends that violation of the non-alienation provision of the

19    terminal disclaimers renders the side-mount patents permanently unenforceable.

20    According to CPT, the notion that the side-mount patents are "temporarily

21    unenforceable" is unworkable, as this would mean that patents could vacillate

22    between periods of enforceability and unenforceability based on changes in

23    ownership, and the public would be left to speculate about whether, on any given

24    day, a patent was enforceable. While CPT's argument is also persuasive, CPT

25    offers no explanation for why the language of the regulation was amended if the

26    amendment still requires expiration of the patent. *C.f. Legacy Emmanuel Hosp. &*

27    *Health Ctr. v. Shalala*, 97 F.3d 1261, 1265 (9th Cir. 1996) ("The use of different

28    language by Congress creates a presumption that it intended the terms to have

- 15 -

1 different meanings.") (internal citations omitted). Moreover, unless CPT shows

2 that the Patent Office intended to protect the public from these types of vacillations

3 in enforceability—which it does not—the plain language of the statute governs.

4     In addition, CPT contends that the side-mount patents should be dismissed

5 with prejudice because of LPL's "unclean hands." A patent can be found invalid

6 (i.e. permanently unenforceable) if the patentee intentionally makes material

7 misrepresentations to the PTO office. CPT characterizes LPL's actions as active

8 concealment of the violation of the non-alienation provision from the PTO.

9 According to CPT, certain of the side-mount patents would never have issued if the

10 PTO had known of the violation of the non-alienation provision because they

11 would have barred as "obvious" applications of the '139 patent. The Court finds

12 this argument unpersuasive, as CPT provides no evidence to support it and the facts

13 regarding "obviousness" are disputed by LPL. There must be clear and convincing

14 evidence of intentional misrepresentation or withholding of material facts to form

15 the basis of an inequitable conduct charge. CPT simply fails to present such

16 evidence of intentional misrepresentation. Thus, the Court lacks any basis for

17 finding the side-mount patents invalid based on inequitable conduct.

18     Since LPL's argument that the patents were unenforceable only during the

19 period of separate ownership is most consistent with the plain language of the

20 statute, the action is dismissed without prejudice.

21
22
**D.   Joinder of Tatung Company and Tatung Company of America in CPT's Motion for Summary Judgment**

23     Tatung Company and Tatung Company of America filed a late, one-page

24 joinder in CPT's Motion for Summary Judgment. In its opposition to the joinder,

25 LPL notes that Tatung did not follow Local Rule 7-3, which required Tatung to

26 meet and confer with LPL prior to filing the motion. More importantly, LPL

27 argues that Tatung is not entitled to summary judgment since LPL did not assert

28 side-mount patent infringement claims against Tatung until October 1, 2003. At

1  that time, by virtue of the June 23, 2003 assignment, LPL owned 100% of the '139

2  patent and 100% of the four succeeding side-mount patents.  Since the Court does

3  not find that the patents became permanently unenforceable due to the prior

4  violation fo the non-alienation clause, LPL had standing at the time that it asserted

5  the side-mount infringement claims against Tatung.  Therefore, Tatung's motion for

6  summary judgment is denied.

7                                    **CONCLUSION**

8         Based on the foregoing, the Court GRANTS CPT's Motion for Summary

9  Judgment to Dismiss Side-Mount Patent Infringement Claims for Lack of Standing

10  with respect to Defendant CPT and the Defendants in Consolidated Case Nos. Case

11  Nos. CV 03-2886, CV 03-2866, CV 03-2884 and CV 03-2885, whom the Court

12  deems to have joined in the motion *ab initio*.  LPL's side-mount patent claims are

13  DISMISSED WITHOUT PREJUDICE with respect to Defendant CPT and the

14  Consolidated Defendants, ViewSonic Corporation, Jean Co., Lite-On Technology,

15  TPV Technology and Envision Peripherals, Inc.

16

17  **IT IS SO ORDERED**

18  **DATE:** December 16, 2005              _ce B Marshall_

19                                    **CONSUELO B. MARSHALL**

20                                    **UNITED STATES DISTRICT JUDGE**

21

22

23

24

25

26

27

28

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG. PHILIPS LCD CO. LTD.,           :        COPY
                                    :
          Plaintiff,                :
                                    : Civil Action
                                    : No. 05-292
v.                                  :
TATUNG COMPANY, TATUNG COMPANY OF   :
AMERICA, INC., CHUNGHWA PICTURE     :
TUBES LTD., and VIEWSONIC           :
CORPORATION,                        :
                                    :
          Defendants.               :
- - - - - - - - - - - - - - - - - -

              Wednesday, April 25, 2006
              9:00 a.m.
              Courtroom 4B

              844 King Street
              Wilmington, Delaware

BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
         United States District Court Judge


APPEARANCES:



              THE BAYARD FIRM
              BY:  RICHARD D. KIRK, ESQ.

                   -and-

              McKENNA LONG & ALDRIDGE
              BY:  GASPARE J. BONO, ESQ.
              BY:  CASS W. CHRISTENSON, ESQ.
              BY:  MATT BAILEY, ESQ.

                        Counsel for the Plaintiff

Hawkins Reporting Service
715 North King Street - Wilmington, Delaware 19801
(302) 658-6697   FAX (302) 658-8418

4

1           The documents that LPL finally

2      produced on March 17th showed that it had been

3      selling the '121 product, it actually sold

4      almost 7,000 units of the '121 product in the

5      U.S. before the critical date to LPL America,

6      it's U.S. subsidiary.

7           These documents also showed the

8      actual prices that LPL America had to pay for

9      these, so these were not simple internal

10     shipments, they were sales.  This was the first

11     confirmation of LPL pre-critical date sales that

12     we got.  Before that there were some slight

13     hints and unfortunately those hints also came at

14     the very end of discovery, either right on

15     February 21st or in a couple of cases a couple

16     of days in advance of that.

17          And those documents at the very

18     end of discovery where we first found out that

19     there was a '121 product at all, that there was

20     a '121 product that was being developed before

21     the critical date by several months and those

22     documents also told us for the first time that

23     Texas Instruments was helping to develop the

24     tape carrier package in that product and that TI

```
 1                    THE COURT:  Right.

 2                    MR. BONO:  -- that product which

 3        they're talking about used two different TCP

 4        packages, one was the TCP package that does not

 5        contain the invention, and some contained the

 6        invention.

 7                    THE COURT:  So let's focus on the

 8        ones that contained the invention.

 9                    MR. BONO:  Yes.

10                    THE COURT:  Have you learned in

11        your dealings with your client whether or not

12        the invention packet was on sale as understood

13        under the patent laws prior to the critical

14        date?

15                    MR. BONO:  I have been unable to

16        ascertain that fact from the client.

17                    THE COURT:  One way or the other?

18                    MR. BONO:  Yes, Your Honor.  We

19        know that the -- both packages were in the

20        product and the client has been unable to

21        identify for us which TCP was in which of those

22        modules prior to the critical date.  We know the

23        module number that's at issue was on sale prior

24        to the critical date, but we don't know whether
```

1    the modules that were sold prior to the date

2    contained the invention TCP.  That's what they

3    don't have information on, Your Honor.  I have

4    quizzed them repeatedly.

5              THE COURT:  Now, the defendants

6    contend that in addition to the client's

7    knowledge that your law firm has a relationship

8    on the prosecution side of intellectual property

9    with the client.

10             MR. BONO:  That's correct, Your

11   Honor.

12             THE COURT:  And what you're

13   telling me is even with that relationship,

14   you're unable to get this information about the

15   '121 patent products sold by the client?

16             MR. BONO:  Yes, Your Honor.  We

17   did not have at the time -- at the time I was

18   not involved in the patent prosecution, but at

19   the time of the patent prosecution we had no

20   knowledge about the product being sold prior to

21   the critical date.

22             THE COURT:  No, I hope you

23   wouldn't have.

24             MR. BONO:  Right.  The situation

```
 1    is --
 2                THE COURT:  What I'm interested in
 3    knowing is because of that relationship and
 4    because of that prosecution work, you haven't
 5    been able to shed any additional light on -- as
 6    attorneys your knowledge about the issue raised
 7    by defendant for purposes of this litigation.
 8                MR. BONO:  That's correct, Your
 9    Honor, I have investigated this and I have
10    spoken with the client about this issue, and
11    they are unable to say whether the particular
12    TCP which contains the invention was contained
13    in the modules sold prior to March 23, that were
14    sold in the U.S.
15                I have quizzed them repeatedly,
16    and they don't have documentation either in
17    their manufacturing facilities or anywhere else
18    which would say that the module number sold here
19    contained the particular TCP, that contained the
20    invention as opposed to that contained in the
21    TCP prior to the invention.  I have asked them
22    repeatedly.
23                THE COURT:  Now, your friends on
24    the other side say that you did know at some
```

1    point in February, or I'm sorry, I think I used

2    the date before the first week of March of this

3    year, and that after you got the knowledge, you

4    have in this case knowingly withheld it so that

5    they can't discover on it.

6            MR. BONO:  Your Honor, that is

7    absolutely false.  Absolutely false.

8            THE COURT:  Who would have been

9    responsible other than yourself for conducting

10   the inquiry into the '121 on-sale bar issue with

11   the client?

12           MR. BONO:  Mr. Christenson did

13   that with me as well.

14           THE COURT:  So it was the two of

15   you?

16           MR. BONO:  Yes, Your Honor.

17           THE COURT:  Now, are there other

18   lawyers in the case that have been recited to me

19   pending in other jurisdictions who have worked

20   on the client's litigation that might be

21   tangental in some measure to this case other

22   than you and Mr. Christenson?

23           MR. BONO:  I'm not sure that I

24   understand the question.

```
 1                    THE COURT:  Okay.  I'm going to
 2      recess and come back and give you my answers.
 3                    MR. BONO:  Can we correct one
 4      thing?
 5                    THE COURT:  Yes.
 6                    MR. BONO:  Counsel was incorrect
 7      on that was the reason for the postponement.
 8                    THE COURT:  Don't worry, whatever
 9      the reason was it's an '02 case going to trial
10      in 2006 in a district with a three, four or five
11      on a plaintiff's summation and a ten on the
12      defendants, it's like when I was out there last
13      June I heard how many cases go to trial in other
14      districts, I like to fall out of my chair.
15                    We will be in recess.
16                    (A brief recess was taken.)
17                    THE COURT:  All right.  Be seated,
18      please.  Okay.  Here is how we're going to
19      proceed.  Each side will designate one lawyer
20      and one lawyer only to deal with the ongoing
21      issues in this litigation.
22                    The first issue that we're going
23      to deal with presented by the parties is the
24      '121 patent.  And I'm going to order that
```

```
 1        counsel for the plaintiff make a determination

 2        whether or not they want to pursue infringement

 3        claims under that patent by Monday, May 1.  You

 4        can drop the patent from the case.

 5                    If I maintain the infringement

 6        claims under that patent, then I'm going to

 7        allow the defendants to have discovery against

 8        that patent on the issue of an on-sale bar

 9        through May 12th of 2006.  That discovery can

10        include document production from the subsidiary

11        of plaintiff as well as three 30(b)(6)

12        depositions of the plaintiff and one deposition

13        of counsel that prosecute the patent,

14        understanding that they're from the firm

15        involved in this litigation.

16                    If there is any additional

17        discovery to be taken, it will be discussed

18        after that discovery is complete, it will be

19        discussed at a discovery conference scheduled

20        for May 15th at 9:30 a.m. here in the courtroom.

21                    With regard to the damages

22        discovery, we're going to allow commencement of

23        that discovery immediately.  Any issues

24        concerning that discovery, plaintiffs shall
```