Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2001 WL 34133507 (C.D Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

substantial challenge to infringement " *Delta-X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 413 (Fed.Cir.1993)

**\*13** Defendant avers that Plaintiff bears the burden of demonstrating by "clear and convincing evidence" that, under these factors, damages should be enhanced. *Shatterproof Glass Corp. v. Libby-Owens Ford Co.*, 758 F.2d 613, 628 (Fed.Cir.1985). Defendant claims that Plaintiff Maxwell, has not and cannot, sustain such a burden

Furthermore, Defendant contends that in the Special Verdict, the jury found that Plaintiff was entitled to unspecified "additional damages" of 15 cents per pair of shoes, in addition to a "reasonable royalty" of 6 cents per pair. Defendant argues that there was no legally sufficient evidence to support this finding Plaintiff provided the jury with no evidence of the "actual commercial consequences" of ACI's alleged infringement and no evidence concerning the *Georgia-Pacific* factors cited by the Federal Circuit Plaintiff offered no evidence of any royalty she had received, except one which she very recently extracted from Vision Products as a result of threatened litigation, which was irrelevant and inadmissible. *Rude v. Wescott*, 130 U.S. 152, 163-167 (1986). Defendant contends that there was no relationship at all between the Vision Products license and any alleged infringement by ACI in 1989 or 1990 Furthermore, Defendant contends that the only expert witness that Maxwell designated to testify regarding reasonable royalty and the *Georgia-Pacific* factors was Donald A Gorowsky, but the Court properly excluded Gorowsky's testimony because his methodology and conclusions were unreliable.

Therefore, Defendant contends that Plaintiff offered no evidence from which the jury could determine that she had sustained any actual losses, or indeed, what those losses were Defendant argues that Plaintiff presented no evidence that the jury could use to come up with the increased amount of "additional damages" of 15 cents per pair ACI, therefore, renews its objection to, that portion of the jury's verdict. To the extent that the award of unspecified "additional damages" of 15 cents per pair is allowed to stand, this Court would, in effect, be rewarding Plaintiff with enhanced damages Therefore, Defendant posits that no further enhancement would be appropriate On this basis alone, Defendant argues that the Motion for Treble Damages should be denied.

i. The *Read* Factors

Plaintiff cites the *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir.1992) decision as listing three primary factors to be considered relating to the enhanced damages award, plus an additional six factors which may be appropriate for consideration. *Id.* at 826-827. Upon full consideration of the factors as set forth below, this Court finds that the record supports a finding of double damages, rather than treble damages as requested by Plaintiff

The first *Read* factor is "whether the infringer deliberately copied the ideas or design of another." *Id* at 827 (*citing Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed.Cir.1986) Copying for purposes of this first factor encompass copying the product itself, and does not require the infringer to have seen the patent claims first *See, Read*, 970 F.2d at 827, n. 7 ACI did not dispute that it copied the patented invention

**\*14** The second factor is "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed " *Read*, 970 F.2d at 827. At least by April 1987, ACI knew that Maxwell's system the subject of U.S. Patent No. 4,624,060. PTX 11 (Glance Decl Exh. 1) ACI provided no evidence that it conducted an investigation of the scope of the Patent, or formed a good faith basis for infringing. It produced no opinion of counsel, despite a duty to seek counsel This factor strongly supports multiple damages. *Ryco v. Ag-Bag*, 857 F.2d 1418, 1428-29 (Fed.Cir.1988).

The Federal Circuit has affirmed multiple damages awards even where the infringer presents an opinion of counsel as to patent invalidity or non-infringement, simply because the opinion was obtained too late or was deficient *Underwater Devices*, 717 F.2d 1380 at 1390-91 Plaintiff asserts that trebling is warranted here because no advice was produced

The third factor listed in *Read* and *Bott,* is "the infringer's behavior as a party to the litigation " 970 F.2d at 827 Improper behavior in litigation need not be shown to justify multiple damages *Jurgens v CBK Ltd.*, 80 F.3d 1556, 1570-71 (Fed Cir.1996) However, ACI's behavior here does not absolve it from multiplying damages Plaintiff contends that ACI concealed the extent of its infringement for ten years while infringing shoes were concealed in its lawyer's offices. Although ACI's own counsel called the shoes "white," ACI sought to fool the jury into

Not Reported in F.Supp.2d                                          Page 11
Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

believing they were not white. Glance Decl. Exh. 11.

ACI advanced a myriad of defenses, none of which were found to be meritorious. Many defenses, including several attacks on Maxwell's Patent, previously adjudicated as valid, were so frivolous ACI eventually withdrew them. ACI advanced defenses previously rejected in this case or the J. Baker case. Although ACI claimed there was a complete settlement as a defense, its claim was premised on the rejected notion that it only sold one order of infringing shoes.

ACI denied that it sold more than one infringing order totaling less than 5% of the 684,000 shoes the jury found to infringe. ACI's behavior in the litigation, coupled with its deliberate disregard of Maxwell's rights, supports a treble damages award.

The remaining factors listed by the *Read* case further support increasing the damages award. The fourth *Read* factor is "defendant's size and financial condition." 970 F.2d at 827 (*citing St. Regis Paper Co. v. Winchester Carton Corp.*, 410 F.Supp. 1304, 1309 (D.Mass.1976). In *St. Regis*, the court only awarded double damages, but stated that it would have trebled damages "if defendant were the giant and the plaintiff the small independent." The *Read* court quoted this same language when explaining this fourth factor in its enhanced damages test.

Plaintiff contends that this fourth factor supports a trebling of damages in the present case. Susan Maxwell is an individual who has had to fight for her rights for over 10 years. In contrast, ACI is the one of the nation's largest show agents PTX 325-1 (Glance Decl. Exh. 12). Its sales exceeded $344 million for the years in dispute, over 1,000 times the amount of the increased damages sought. As previously adjudicated, Maxwell as an individual who has had to litigate against the behemoths of the discount shoe industry. This case, as many as any, supports the notion that disparate financial conditions may support increasing the damages award. Such an increase in damages will not harm Defendant's non-infringing business. *See, Read,* 970 F.2d at 827.

**\*15** The fifth *Read* factor is the "closeness of the case." 970 F.2d at 827. Here, infringement and validity were admitted according to Plaintiff. The Court agrees that the documentary, corroborated proof of willfulness was strong. The invention was copied identically with knowledge of the patent and without any basis to believe this was proper. The case was not close on its merits.

The sixth factor is "duration of defendant's misconduct." *Id.* Here, Plaintiff argues that ACI's infringement continued for years after it received express notice of the Patent, at least from April 1987 until late 1990, and perhaps longer.

The seventh factor is "remedial action by the Defendant." *Id.* In this instance, Plaintiff avers that ACI's claimed remedial action was poorly documented and sporadic. It came years after it should have occurred, and only after being caught red-handed and at the insistence of customers who blamed ACI for infringement. Plaintiff argues that this factor does not mitigate the evidence supporting multiplying the damages.

The eighth *Read* factor is "defendant's motivation for harm." *Read,* 970 F.2d at 827. ACI's lies to Maxwell, concealment of its infringement, and virtually unique inability to accept a reasonable settlement agreement even 15 years after infringement began demonstrates a motivation to force Maxwell to fight for the relief she deserves, apparently out of greed and spite.

The final *Read* factor is "whether defendant attempted to conceal its misconduct." 970 F.2d at 827. In support of this factor, the *Read* court cited a case in which damages were enhanced, in part because "the defendants had failed to preserve its records and had failed to cooperated as it should at the trial on the issues of damages." 970 F.2d at 827 (*citing Russell Box Co. v. Grant Paper Box Co.*, 203 F.2d 177, 183, 97 U.S.P.Q. 19, 23 (1st Cir.), cert. denied, 346 U.S. 821 (1953). As previously discussed, Plaintiff avers that ACI concealed its infringement before and during 1990, and through trial in 2001. ACI changed its practice of identifying the tying system on the purchase orders ("tie w/insole loop") to a practice of concealing that actual system used ("tie"). The jury found 26 times as many wilfully infringing shoes as ACI admitted. ACI's concealment continued to the end, according to Plaintiff.

Under all circumstances, Plaintiff contends that enhanced damages, specifically treble damages, should be awarded. This Court agrees that enhanced damages should apply, however, this Court finds that double damages are sufficient and more than adequately compensate Plaintiff.

a.) The Jury's Factual Findings Demonstrate that ACI Willfully Infringed

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2001 WL 34133507 (C D.Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

Page 12

The jury found by clear and convincing evidence that ACI's infringement was willful (Special Verdict Answer No. 6. Glance Decl Exh 19.) The jury found by clear and convincing evidence that ACI's infringement was willful for all pairs of infringing shoes that were sold (Special Verdict Answer Nos 7 & 8; Glance Decl Exh 19 )

*16 Defendant, in its Opposition, argues that even if there was some evidence of infringement, there was no clear and convincing evidence to support the jury's findings that all infringing sales by ACI from July 1989 to December 1990, whether direct or induced, were willful The only evidence of infringement that was independent of Maxwell's inadmissible expert opinions related to small sales to Dollar General (PTX 315 and 316) and Countess Casual (PTX 20 and 24) in 1989, before ACI had actual knowledge of the patent until 1990 ACI's President, Steven Jackson, received a copy of the patent from Plaintiff in April 1990 (PTX 8), but was not aware of any claimed infringement until he received communications from Dollar General in late June 1990 (April 12, 2001 Tr at 94:22-95:4). The prior letters cited by Plaintiff (PTX 11 and 167) were mere tagging instructions from Target for Target shoes Although Maxwell sent the 1987 letter, her involvement was strictly as a Target employee. (April 5, 2001 Tr At 60:6-61:14) The instructions were ambiguous and, in any event, did not accurately describe what was patented, as designs not covered by the patent were also included (*Id* at 77:24-78:3; PTX 11 and 167.) ACI claims that Plaintiff gave conflicting and grossly over-broad interpretations of her patent to Target and retailers that she unsuccessfully approached for a license (April 10, 2001 Tr at 21:1-23:1, 27:17-19, 29:18- 31:9, 32:2-10, 32:24-33:12, 91:1-22, 145:3-12; April 12, 2001 Tr at 96:11-15, 97:6-99:15, 99:10-15) (PTX 167 at 113183 )

Moreover, Defendant asserts that shortly after ACI's Jackson received actual notice of the claimed patent infringement in June 1990, he contacted Plaintiff, arranged a meeting with her in early August 1990 to resolve the dispute, directed ACI's sales representatives and overseas agents to avoid the use of any type of loop connection "anywhere near the in-sole" and instructed ACI's order department to determine if there were any additional orders for Dollar General possibly involving the patented design. (April 12, 2001 Tr. at 95:5-15, 96:2-10, 157:16-158:1 ) Jackson also instructed ACI agents and personnel to develop and use an alternative, non-infringing system, which they did. (*Id* at 100:11- 21,

109:5-12 ) Defendant argues that Plaintiff did not offer any evidence controverting ACI's prompt action to avoid infringing the patent. Therefore, Defendant contends that at most, the longest period of willful infringement that Plaintiff could legitimately argue would be a minimal period of time, from April 1990 to August 1990.

Given the afore-mentioned facts, Defendant contends that the only possible basis on which the jury could have reached its verdict on willfulness was by following the allegedly erroneous instruction on "willful infringement" offered by Plaintiff, which stated that "[s]ince ACI failed to introduce any evidence of a legal opinion, you may infer that either no opinion was obtained or if an opinion was obtained it was not favorable to ACI and contrary to ACI's actions in using the claimed invention " The fact that Plaintiff had to invite the jury to make an unjustified inference from the absence of a legal opinion (ACI's Memorandum in support of Motion for Judgment as a Matter of Law at 10-12, filed on April 27, 2001) makes plain that her case was weak on this issue and that enhanced damages are not warranted, according to Defendant.

*17 This Court does not agree, and finds ample evidence in the record to support the jury's finding of willfulness Plaintiff replies that the trial record provides ample support of ACI's willfulness, such as the physical shoes, including PTX 273, proved literal, exact, carbon copying infringement of claims 1 and 3 as shown through Maxwell's testimony. ACI has not questioned Maxwell's infringement analysis Furthermore, courts recognize that a denial of increased damages is the exception and not the rule where willfulness is found As such, this Court finds that the record supports a finding of clear and convincing evidence of willfulness

b.) The Factual Record Supports the Fact that ACI Deliberately Copied Maxwell's Invention under the First *Read* Factor

Plaintiff contends that ACI deliberately copied Plaintiff's invention Plaintiff states that she filed her patent application in 1983 Glance Decl , Exh 26 Maxwell testified that she came up with the idea for her loop connection system while working at Target Stores in Minneapolis as a shoe buyer Target adopted Maxwell's system, and began using it on what has become tens of millions of pairs of shoes As Maxwell's employer and first licensee, Target was the only company authorized to use her patented system when her patent issued in November of 1986

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

Glance Decl. at Exh. 27.

ACI's President, Steve Jackson, testified that Target was one of ACI's largest customers. Jackson's primary responsibility at ACI in the mid to late 1980's was to manage the Target account. Maxwell instructed Jackson in writing on how to use her patent pending system. Maxwell personally instructed Jackson and ACI's factories on how to use her patent-pending system on Target shoes. Jackson attended meetings at Target about her system. Jackson admitted attending such meetings.

ACI continued to use Maxwell's system on infringing non-Target shoes after April 28, 1987, when Maxwell advised Steve Jackson and ACI in writing that her system was patented, that the patent number was 4,624,060, and the number must be used on loops in Target shoes. PTX 11; Glance Decl. Exhs. 1 and 2 at 113182-113184.

ACI ticketing instructions for Meldisco, McCrory, and others show copying of the system for pumps and other shoes without eyelets. Glance Decl., Exhs. 17 and 35. ACI claimed not to have sold pumps to Melville, but its 1989 Sales Analysis proved this claim false. Glance Decl. Exh. 28 at ACI 6002. Its purchase orders specified the infringing system, stating "TIE W/INSOLE LOOP." Glance Decl. Exh. 32 at ACI 8453. Maxwell's verdicts, judgments, and settlements with other infringers, including J. Baker, show that these ACI customers were infringing since the patent issued.

Plaintiff contends that there is no evidence that ACI even attempted to modify its use of Maxwell's patented system until August 1990. Until that time, it simply deliberately copied Maxwell's patented loop connection system and used it for retailers other than Target. In blatant disregard for Maxwell's rights, the only change ACI made was to delete Maxwell's patent number and trademark from the loops.

*18 In Opposition, ACI claims it did not deliberately copy Plaintiff's ideas or design. Plaintiff suggests that since she, while at Target, sent letters to ACI during the 1980's which showed her design, ACI must have copied the design for its own commercial advantage. However, ACI contends that after ACI received actual notice of the claimed patent infringement in 1990, it avoided use of the design and came up with non-infringing alternatives, and there is no evidence that ACI has used the design during the eleven years since then. (April 12, 2001 Tr. at 94:22-95:15, 96:2-10, 100:11-21, 109:5-12, 118:4-12, 122:3-11, 123:7-

14, 124:6-16.) This Court disagrees with Defendant's factual interpretation, and finds that the trial record supports a finding of deliberate infringement.

c.) After ACI Knew of Maxwell's Patent Protection, The Factual Record Supports that It Failed to Investigate the Scope of Her Patent or Form a Good Faith Belief that It Was Invalid or Not Infringed.

Plaintiff contends that ACI knew of Maxwell's Patent by at least April 28, 1987. PTX 11. (Glance Decl. Exh. 1). ACI knew Maxwell's patent was pending before then. Yet ACI did nothing to investigate the scope of her patent or form a good faith belief that it was invalid or not infringed, even though Maxwell and Target repeatedly advised ACI of the Patent from 1987 through 1990. PTX 329 (Glance Decl. Exh. 18; PTX 11 (Glance Decl. Exh. 1); PTX 167A (Glance Decl. Exh. 3); PTX 167 (Glance Decl. Exh. 2); PTX 131 (Glance Decl. Exh. 4); PTX 7 (Glance Decl. Exh. 5); PTX 8 (Glance Decl. Exh. 6); PTX 9 (Glance Decl. Exh. 7); PTX 74 (Glance Decl. Exh. 8); and PTX 10 (Glance Decl. Exh. 9).

ACI's privilege log indicates a number of communications with outside counsel relating to Maxwell's Patent starting on July 3, 1990. Glance Decl. Exh. 21. However, ACI disclosed no communications with anyone that related to validity or infringement of the Maxwell Patent or a good faith basis to infringe.

Where a party maintains privilege with respect to communications regarding the infringement of validity of a patent, the finder of fact may infer that the accused infringer either did not obtain advice, or that it obtained advice that was adverse to the accused infringer. *Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1572-73 (Fed.Cir.1988)* Here, Plaintiff argues that ACI did not assert patent invalidity at trial, nor did it deny at least that the Dollar General shoes literally infringed.

Jackson testified that ACI did not care much about connection systems. This testimony supports a finding that ACI acted in bad faith. Plaintiff contends that ACI cared enough about connections systems to copy Maxwell's advantageous design for its other customers. It cared enough about connection systems to follow Target's instructions to mark Maxwell's Patent number on Target shoes using the invention. Plaintiff posits that the only thing about the connections system that ACI did not care about was Maxwell's rights. This Court agrees that the factual

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2001 WL 34133507 (C D Cal )
**(Cite as: 2001 WL 34133507 (C.D.Cal.))**

Page 14

record support such a finding and provides additional justification for enhanced damages

d ) The Third *Read* Factor, ACI's Behavior as a Party to the Litigation, Demonstrated Concealment of the Full Scope of the Its Infringement Right to The End, as Supported by the Record

*19 Plaintiff avers that ACI never admitted selling more than one order of infringing shoes for 26,100 pairs Glance Decl at Exh 34 at 7 (Admission Request No 15) ACI did not maintain any separate records which would permit a determination of the extent of its infringing sales. ACI refused Maxwell's requests for total numbers of infringing shoes and asserted that it did not keep records that identified the connection system on first-cost shoes. Glance Decl , Exh 36 Except for the infringing pairs of shoes concealed until last September, ACI did not retain any pairs of shoes from 1989-1994 that would prove how the shoes were tied, even though Jackson testified that shoe samples were needed to ascertain infringement

Plaintiff was allegedly forced to analyze thousands of ACI records to ascertain the scope of ACI's infringement ACI never provided its own analysis of its infringement

ACI hid two pairs of infringing shoes that it provided to Dollar General in 1989 *See,* DTX 42 (physical exhibit--red pumps); PTX 327 (physical exhibit-- white skimmers); and Glance Decl Exhs 10 and 11 These shoes were kept in ACI's lawyer's offices until September 2000, five (5) years after this case was filed and well after the close of discovery ACI cannot claim ignorance of these shoes, as Jackson directed a sales agent to ship two pairs of Dollar General shoes to ACI's attorneys in 1990 Glance Decl Exh 30 That letter, too, was concealed from Maxwell throughout the discovery period based on an improper claim of privilege Only after the pairs of missing shoes were disclosed in September 2000 did ACI produce the letter

ACI's defense at trial was that one pair of these shoes, the skimmers identified as PTX 327 were not sold by ACI because they were "bone" colored instead of "white" as identified on the ACI purchase order. PTX 41 (Glance Decl Exh 16 at p ACI 008471) This white skimmers corresponded exactly to an ACI purchase order for Dollar General Moreover, ACI's own lawyers described the shoes as "white" no less than twelve (12) times when they first produced the shoes to Maxwell Glance Decl Exh 10

& 11

ACI initially alleged defenses of laches, estoppel, unclean hands, waiver, indemnification, contribution, patent invalidity under 35 U.S.C. Section 101, patent invalidity under 35 U.S.C. Section 102, patent invalidity under 35 U.S.C. Section 103, patent invalidity under 35 U.S.C. Section 112, and even that prior art was "intentionally withheld" from the patent office Glance Decl Exh 25 Plaintiff claims that none of these defenses had a scintilla of a factual basis Indeed, by the time this case went to the jury, ACI had dropped each and every one of these defenses

Moreover, ACI repeatedly advanced arguments throughout the pretrial and trial phases of the case, which had been rejected previously by the Court For example, Plaintiff argues that in June 1998, ACI moved to dismiss the case based on its claim that the Minnesota Court dismissed the case in October 1995, even though the Minnesota Court clearly corrected and Amended that Order only days later Glance Decl Exh 24 The Minnesota Court rejected this argument October 2, 1998. Glance Decl Exh 23 Nevertheless, ACI advanced this same frivolous argument at trial in this case Again, ACI lost ACI also repeatedly misled the Minnesota Court and this Court by claiming that all or virtually all of its business was "first cost" when in fact the majority of business at issue was "landed cost " ACI concealed both the nature and scope of its infringement from start to finish

*20 Defendant, in its Opposition, maintains that there was no evidence, however, demonstrating that the various forms and records maintained at ACI were somehow defective, unusual or different than what others in the industry use There was no evidence, according to Defendant, that ACI changed its record-keeping practices during the 1980's or 1990's, let alone in response to any letters or communications from Plaintiff Furthermore, Defendant contends that there was no evidence that any documents were ever destroyed by ACI

Plaintiff, in the Reply, responds that an infringer's failure to preserve its records justifies an increase in the damages and the award of attorneys' fees *Read,* 970 F.2d at 827 The failure to preserve records can constitute concealment and in part justify enhanced damages *Id*

In this instance, ACI does not dispute that it destroyed the production samples of shoe pairs that it

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

received with every order between July 1989 and 1994. It does not dispute that, by the Summer of 1990, it knew Maxwell would enforce her patent against ACI for infringement. ACI claims that the shoes themselves would have been the best, if not the only, way to ascertain infringement. ACI has no explanation for destroying this critical evidence other than its decision to conduct business as usual in the face of express, written legal claims that made the shoes highly relevant. Plaintiff claims and this Court agrees that this is precisely the type of destruction of evidence that supports an enhancement of the damages award, though not to the extent requested by Plaintiff. Additional evidence cited in Plaintiff's Reply papers further supports the finding of concealment, including facts surrounding ACI's poor record-keeping and the "losing" and finding ten years later of the incriminating white skimmers. In sum total, Plaintiff has provided clear and convincing evidence of concealment to support an enhancement of damages.

e.) The Fourth *Read* Factor, ACI's Comparative Size and Financial Condition

Furthermore, Plaintiff posits that ACI had much greater financial resources than Maxwell. Plaintiff avers that ACI is one of the major suppliers of shoes to discount stores. From 1989 through 1994, ACI supplied over 95 million pairs of shoes worth over $344 million. PTX 325--1 (Glance Decl. Exh. 12) Maxwell is an individual who, in the late 1980's and up until this suit was brought, had received virtually no revenue from any infringer and faced costly litigation against an entire industry. This is a previously adjudicated fact. *Maxwell v. J. Baker, Inc.,* 879 F.Supp. 1012, 1015 (D.Minn.1995) ("Maxwell sees herself as an individual who has taken on the giant shoe industry and in some ways this description rings true.") Compounding the financial pressure on Maxwell, the infringers were companies that she hoped would be customers for her shoe business. ACI took fully advantage of the financial disparity facing Maxwell to try to verdict a case which involved damages that ACI could pay out of pocket change.

*21 Defendant avers that contrary to Plaintiff's contention, ACI's size and financial condition do not show that enhanced damages are appropriate. Jackson testified about ACI, as a family-owned business, with eighteen to twenty employees, one office, and a modest 16,000 square foot warehouse facility. (April 12, 2001 Tr. at 72:16-20, 73:22-74:4) Plaintiff's reference to ACI's $344 million in sales is misleading since that figure applies to a six-year period and does

not reflect the company's costs or actual profits. Jackson's testimony regarding the modest profit margins and commissions earned on shoe sales was undisputed, according to Defendant (*Id.* at 78:19-79:11).

Defendant argues that Maxwell, on the other hand, is a multi-millionaire, who has created a lucrative career out of litigating and threatening to litigate over her patent. Defendant further argues that without offering any evidence to support such relief, Plaintiff received, in addition to the "reasonable royalty rate" of 6 cents per pair, an additional award of 15 cents per pair in unspecified "additional damages," for a total of 21 cents per pair.

Plaintiff replies that at the time ACI's infringement commenced, Maxwell worked as a buyer for Target. She was a salaried employee, and was not a multi-millionaire. Maxwell claims that it was only after fourteen years of arduous litigation to enforce her rights that she has finally been able to recover a portion of the profits shoe companies made by stealing her invention. As such, this Court finds that ACI is in a position to pay enhanced damages to compensate for its willful infringement.

f.) ACI Eventually Admitted Validity and Infringement Demonstrating that The Case is not Close on the Merits, Under the Fifth *Read* Factor

ACI withdrew its challenge to validity of Maxwell's Patent. This is a substantial concession, as patent validity is often an issue in patent cases. J. Baker, one of ACI's customers, vigorously disputed the validity of Maxwell's Patent in the first lawsuit. Nevertheless, Maxwell prevailed and her patent was adjudicated as not invalid, a finding affirmed on appeal by the Court of Appeals for the Federal Circuit. *Maxwell v. J.Baker, Inc.* 86 F.3d 1098 (Fed.Cir.1996) Thus, the case is not a "close" case as to validity.

Plaintiff further contends that the case is not a close case as to infringement. For example, Plaintiff avers that ACI admitted that the red pumps Maxwell purchased at Dollar General infringed. PTX 273. ACI admitted this infringement when confronted with the shoes in 1990. Its system was identical to the system found infringing in the *Maxwell v. J. Baker* lawsuit, involving one of ACI's biggest customers. This finding was affirmed on appeal. The testimony at trial proved that ACI's shoes were literally infringed. ACI did not challenge this testimony.

Defendant contends that the jury's rejection of

Not Reported in F.Supp 2d
Not Reported in F.Supp. 2d, 2001 WL 34133507 (C.D Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

Plaintiff's requested relief demonstrates that the issues were closely decided. While Plaintiff had argued that ACI sold 1,215,584 pairs of infringing shoes from July 1989 to December 1994, the jury apparently rejected Plaintiff's contentions for the years 1991- 1994 and excluded all alleged sales in that time period. Similarly, Plaintiff asked the jury to award her a royalty of 50 cents per pair of infringing shoes, but she received a "reasonable royalty" of just 6 cents per pair. Thus, the jury rejected much of Plaintiff's case, awarding her a small fraction of what she claimed she was entitled to, according to Defendant.

*22 Defendant, in its Opposition, posits that the case was close. Though Plaintiff sets forth the jury's finding that ACI infringed the patent with respect to 684,723 pairs of shoes, the evidence submitted by Plaintiff in support of its claims was either weak, non-existent or inadmissible.

For example, on the issue of infringement, Defendant argues that the sole basis for the jury's finding of infringement for 684,723 pairs of shoes was Plaintiff's "expert report," as demonstrated by the fact that the report's summary page (PTX 325-1) lists exactly that same number of shoes sold by ACI from July 1989 to December 1990 (i.e. 266, 391 pairs of shoes in 1989, and 418,332 pairs of shoes in 1990, for a total of 684,723 pairs) and no other evidence was offered to support that precise number. The "expert report," however, was the product of sheer speculation by Plaintiff based on inadmissible hearsay and improper conclusions, both as to the number of shoes allegedly sold with loops and as to the percentage of shoes allegedly with her patented design. Plaintiff, herself, admitted that her report was based on supposition, on hearsay from unidentified persons concerning alleged sales of looped shoes, and alleged observations in retail stores by friends and family. In essence, Defendant contends that Plaintiff took the total number of shoe sales by ACI for different time periods and simply guessed at the percentage of infringing shoes for each period. Defendant argues that the sales figures set forth in the "expert report" were erroneous and unreliable. On cross-examination, Defendant contends that Maxwell was confronted with evidence that she had included hundreds of thousands of shoes which did not infringe her patent from L. & S. Shoe City and Countess Casual. The orders for these retailers alone totaled more than 208,500 pairs of non-infringing shoes in 1989 and 1990. Defendant contends that, over ACI's objections, this Court allowed Plaintiff's "expert" opinions to be presented to the jury.

On the issue of inducement, with respect to cost transactions, there was no legally sufficient evidence to support the jury's finding that ACI induced retailers to sell 253,347 pairs of infringing shoes, or indeed, any other number of shoes. To prove that ACI "actively induced" a retailer to sell infringing shoes, Plaintiff had the burden of proving that ACI "knowingly took active steps to induce infringement" by another person or entity, and that ACI "specifically intended that its actions would induce actual infringement ..." *See,* Jury Instructions ("Inducement of Infringement" and "Specific intent to induce infringement"); *L.A. Gear, Inc. v. E.S. Originals,* 859 F.Supp. 1294, 1300 (C.D.Cal.1994). Defendant contends that Plaintiff introduced no evidence that ACI took any steps to induce infringement by any particular retailer involving any particular shoe, much less 253,347 pairs in 1989-1990 (Special Verdict, Question 2). Defendant further contends that there was no evidence offered regarding the relationship between ACI and an particular retailer in any first cost transaction (except a single agency agreement with Meijers), and not a single pair of allegedly infringing shoes sold by a retailer was linked to a first cost transaction involving ACI. Defendant also contends that no evidence was introduced that ACI played a role in any retailer's decision about what type of tying system to use. Maxwell's own testimony on the subject was an unqualified opinion and hearsay. Furthermore, even if it had been admissible, Maxwell's testimony was irrelevant because it was general and did not describe any particular retailer or sale. (April 11, 2001 Tr at 148:20-149:23 ) The only other evidence Defendant contends was offered by Plaintiff was a purchase order from Woolworth in 1989 (PTX 33), but it called for a "loop in sock" which is not an infringing method. (Findings of Fact and Conclusions of Law re Defendant's Motion for Partial Summary Judgment (June 28, 2000) at 3). Therefore, Defendant contends that the evidence of inducement was non-existent.

*23 Plaintiff responds in her Reply, that the jury's finding of infringing sales in an amount over 26 times what ACI admitted proves that the numbers do not make this a close case. This Court agrees that the evidence established beyond all doubt that the number of infringing shoes far exceeded the 26,100 pairs ACI claimed. The evidence supporting the jury's verdict was ample, as shown in Maxwell's Opposition Brief to ACI's JMOL Motion and discussed above in detail. The facts and law support the jury's verdict based on admissible, clear and convincing evidence.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp 2d
Not Reported in F Supp 2d, 2001 WL 34133507 (C D Cal )
(Cite as: 2001 WL 34133507 (C.D.Cal.))

Furthermore, Plaintiff also responds that the 21 cent royalty award is compensatory and not punitive Plaintiff asserts that a patentee should be awarded damages to adequately compensate for the infringement 35 U.S.C. § 284. The jury, in this instance, awarded Maxwell damages to compensate her for Defendant's infringement in a total amount of 21 cents per pair, including a 6 cent reasonable royalty and an additional 15 cent per pair compensatory royalty As further demonstrated in Maxwell's Opposition Brief to JMOL, Plaintiff maintains that this award is well-founded in the law and the evidence as a purely compensatory royalty This Court agrees as set forth in detail above

g ) The Record Supports a Finding that ACI Waited Several Years to Take Remedial Action, under the Sixth and Seventh *Read* Factors

Plaintiff contends that ACI admitted that it did nothing to stop infringing until at least August 1990, despite the repeated written notices of the Patent starting in 1987 and warnings that a patent was pending for years before that PTX 329 (Glance Decl Exh 18). Moreover, it produced no evidence that it quantified the number of shoes it had sold using Maxwell's system before or after 1990 It did not maintain any separate records which would permit a determination of the extent of its infringing sales either before or after 1990

The purported remedial action in August 1990 was taken after ACI had been fingered as the responsible party for infringing shoes Maxwell purchased at a Dollar General Store. Dollar General told ACI to talk to Maxwell to fix the problem ACI took limited, undocumented action virtually at gunpoint after three and a half years of deliberate infringement. Even then, its records actually got less descriptive about which connection system it was using.

Defendant, in its Opposition, sets forth three additional factors under *Read*. which include: (i) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good faith belief that it was invalid or that it was not infringed," (ii) whether the infringer took "remedial action" and (iii) the "duration of defendant's misconduct " *Read*, 970 F.2d at 827 ACI claims that its first actual knowledge of the claimed patent infringement occurred in the summer of 1990, when Jackson received a copy of the patent from Plaintiff (PTX 8) and notice of claimed infringement in late June 1990 Thereafter, ACI took action,

including investigating her claim of possible infringement, contacting Maxwell to attempt to negotiate a settlement, stopping a pending order for Dollar General, ordering sales representatives and overseas agents to avoid the use of the Maxwell patented loop, and developing an alternative non-infringing loop method (April 12, 2001 Tr at 94:22-95:15, 96:2-10, 100:11-21, 109:5-12, 118:4-12, 122:3-11, 123:7-14, 124:6-16 ) Thus, ACI claims it performed a reasonable investigation and took specific steps to avoid future infringement It also attempted to address the effects of past violations by seeking to reach a settlement with Maxwell These undisputed actions, according to ACI, show that ACI was acting in good faith Plaintiff argues that ACI should have taken action in 1987, when letters referencing Maxwell's design were sent (PTX 11 and 167) However, Defendant contends that those letters were merely tagging instructions sent by Target for Target shoes, and in any event, did not clearly and accurately describe what was patented or suggest that ACI was engaging in any improper actions.

**\*24** Furthermore, Defendant posits that Plaintiff's contention that ACI's conduct was somehow improper because of its failure to offer a legal opinion is similarly wrong *See. Delta-X Corp. v. Baker Hughes Production Tools, Inc.*, 984 F.2d 410, 414 (Fed.Cir.1993) ("failure to obtain legal advice does not mandate a finding of willfulness or bad faith") While the Court permitted the jury to make an adverse inference based on the absence of a legal opinion, that does not mean that ACI's overall investigation and other actions were insufficient or unreasonable under all of the circumstances Defendant cites the *American Original Corp. v. Jenkins Food Corp.,* 774 F.2d 459, 465 (Fed.Cir.1985), for the proposition that the Federal Circuit has long held that the significance of not obtaining a legal opinion depends upon all of the surrounding circumstances, including for example, whether the defendant took other responsive actions. In this instance, Defendant contends that ACI had no actual knowledge and simply ensured that non-infringing alternative designs were used Therefore, Defendant argues that ACI's failure to obtain a legal opinion was not an improper course of conduct and did not justify an inference of willfulness

h.) ACI Attempted to Infringe with Impunity under the Eighth *Read* Factor

A defendant's "motivation for harm" is also a *Read* factor. *See, Read,* 970 F.2d at 827. Plaintiff contends that ACI ignored Maxwell's communications about

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)

(Cite as: 2001 WL 34133507 (C.D.Cal.))

her patented system and copied the system for its customers other than Target. Even after it was caught red-handed, ACI repeatedly misrepresented that only one order from Dollar General used Maxwell's patented system. PTX 14, 16 (Glance Decl. Exh. 13 & 14.) This and other evidence provides an ample basis to conclude that ACI's motivations were greed and disrespect for the rights of Maxwell as an individual with very limited resources. ACI is a relatively large company which dared Maxwell to pursue her rights. ACI knew that forcing Maxwell to sue and try this case would strain Maxwell's resources and potentially let ACI off the hook without ever having to pay for its wrongful disregard of Maxwell's rights.

ACI maintains that it had no motive to harm Plaintiff. Defendant argues that there is no evidence whatsoever that ACI had any motive to harm Maxwell, especially given the fact that Plaintiff was not and is not a competitor of ACI's. Moreover, ACI testified that the method of tying was of no particular significance to it, and it did not obtain a commercial advantage by using Maxwell's design. Furthermore, Defendant asserts that upon receiving actual notice of the patent, ACI did in fact create an alternative and ceased to use Plaintiff's design. (April 12, 2001 Tr at 94:22-95:15, 96:2-10, 100:11-21, 118:4-12, 122:3-11, 123:7-16, 124:6-16.)

Plaintiff replies that ACI's concealment, lies and duration of infringement all evidence an intent to harm. According to Plaintiff, ACI and Maxwell were competitors. Furthermore, in the late 80's Maxwell worked as a vendor, giving ACI further motivation to harm Maxwell. McDonald Decl., Exh. 5 at 27:4-28:22. In addition, ACI did not take corrective action upon receiving actual notice of the patent for over three years. As such, this Court finds that the weight of the evidence properly supports Plaintiff's claim for enhanced damages.

i ) The Factual Record Supports Plaintiff's Contention that ACI Attempted to Conceal its Misconduct, Admitting to Only a Small Fraction of Infringing Sales under the Ninth *Read* Factor

**\*25** Despite a lengthy notice of infringement, ACI failed to keep records adequate to distinguish its infringing and non-infringing sales. Glance Decl. Exh. 36. Moreover, ACI continued to conceal its action and keep poor records after Maxwell's April 1990 and June 1990 letters PTX 8 (Glance Decl. Exh. 6) and PTX 9 (Glance Decl Exh. 7) Even when caught, Plaintiff claims that ACI lied to Maxwell

about the Dollar General order being its only infringing order. PTX 14 (Glance Decl. Exh. 13). When Maxwell challenged that assertion, ACI indignantly repeated its lie in a September letter. PTX 16 (Glance Decl. Exh. 14.)

ACI's records indicate more concealment. Before Maxwell confronted ACI with the shoes she purchased from Dollar General, at least some of ACI's purchase orders gave specific loop locations instructing agents to "tie w/ insole loop." i.e., select pages of PTX 22 (Glance Decl. Exh. 32). After August 1990, when ACI had been caught infringing, its purchase orders merely indicated that the agents were to "tie" the shoes without specifying where the loop should go. PTX 25 (Glance Decl Exh. 33). Thus, ACI left no paper trail that would adequately distinguish its infringing and non-infringing shoe sales. It sought to use this concealment to its full advantage, contending until the end that the red pumps were its only infringing shoes.

As such, based on the evidence presented at trial on the issue of willfulness and under the *Read* factors as enunciated by Plaintiff, this Court denies Plaintiff's request for treble damages, but instead, awards Plaintiff double the compensatory damages.

b  Reasonable Attorneys' Fees Are Awarded to Plaintiff Maxwell

i Plaintiff is Entitled to Attorneys' Fees Under 35 U.S.C. § 285 [FN2] in an Amount According to Proof

> FN2. This Court bases its award of Attorneys' Fees on 35 U.S.C. § 285; therefore, this Court finds it unnecessary to conduct an analysis under Federal Rule of Civil Procedure 37(c)(2) for Defendant's "unjustified failure, in response to Requests for Admissions, to admit selling more than 26,100 pairs of shoes that infringed the '060 Patent," according to Plaintiff, which Defendant addresses only in a footnote

The Court may award reasonable attorneys' fees to the prevailing party in exceptional patent cases. 35 U.S.C. § 285. An express finding of willful infringement is a sufficient and appropriate basis for classifying a case as exceptional and awarding attorney fees. *Mahurkar v. C.R.Bard, Inc.* 79 F.3d 1572 (Fed.Cir.1996); *see also, Modine Mfg. Co. v. Allen Group, Inc.,* 917 F.2d 538, 543 (Fed.Cir.1990); *Avia Group Int'l., Inc. v. L.A. Gear California, Inc.,*

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)
(Cite as: 2001 WL 34133507 (C.D.Cal.))

853 F.2d 1557 (Fed.Cir.1988); *see also, Bott v. Four Star Corp.,* 807 F.2d 1567, 1574, 1 U.S.P.Q.2d 1210, 1215 (Fed.Cir.1986) ("In view of the finding of willful infringement, the discretionary award of attorney fees was entirely proper.")

Indeed, Plaintiff contends that if willful infringement is found, a trial court's refusal to award attorney fees cannot stand without an appropriate explanation. *S.C. Johnson & Son v. Carter-Wallace, Inc.,* 781 F.2d 198, 201 (Fed.Cir.1986)

Furthermore, Plaintiff states that the jury's finding of willful infringement is strongly supported by the evidence and more than adequate to support a conclusion that the present case is exceptional This Court agrees Furthermore, the evidence cited above regarding other *Read* factors demonstrates that the present case is exceptional.

*26 As a further policy consideration, Plaintiff requests the Court award Plaintiff's attorneys' fees to deter Defendant and other infringers' conduct. Plaintiff contends that ACI knew that attorney fees were probably Plaintiff's greatest obstacle to enforcing her rights ACI knew substantial fees would have to be expended to refute ACI's untenable position as to the extent of its infringement.

Defendant, in its Opposition, counters [FN3] that Plaintiff has not satisfied the requisite showing that this is an "exceptional" case, that an attorneys' fees award is necessary to avoid "gross injustice," or that ACI somehow engaged in "bad faith" during the litigation As with requests for enhanced damages, the Federal Circuit has routinely rejected motions for attorneys' fees where--as here--Defendant contends the issues are closely decided. *See Cybor Corp.,* 138 F.3d at 1460-61 (affirming denial of attorneys' fees) Defendant maintains that Plaintiff's case was weak at best, and based entirely on unreliable and inadmissible evidence

> FN3. Defendant, as a preliminary matter, requests that Plaintiff's Motion be denied because it was not filed within the ten-day deadline set before the Court (April 27, 2001 instead of May 4, 2001) However, Plaintiff correctly responds that FRCP 54(b) provides that a motion for attorneys' fees should be filed 14 days after entry of judgment, and judgment has not yet been entered In addition, Plaintiff filed her Motion on May 3, 2001 and not May 4, 2001. Therefore, Plaintiff's Motion is timely

Furthermore, pursuant to FRCP 54(d)(2)(B), Plaintiff is expressly required to specify the grounds entitling the moving party to the award and to state the amount or provide a fair estimate, which Plaintiff has failed to do. Defendant requests that this Court deny attorneys' fees to Plaintiff on this basis. However, the Court declines to do so, given the fact that Plaintiff will not receive any attorneys' fees until she submits proper documentary evidence, including billings and affidavits in support thereof

Moreover, Defendant asserts that given that Plaintiff has already received a damages award from the jury far in excess of any "reasonable royalty" (the jury added 15 cents per pair of shoes in unspecified "additional damages" to the reasonable royalty of 6 cents per pair), it would not be a "gross injustice" to deny a further enhancement Thus, Plaintiff has not come close to satisfying her burden for the requested punitive relief of an attorneys' fees award

This Court disagrees with Defendant and awards Plaintiff attorneys' fees and costs according to proof Accordingly, given the factual record and in consideration of the totality of the circumstances, this Court finds that an award of attorneys' fees is just and proper At the present time, the record is insufficient to support the amount of attorneys' fees to be awarded to Plaintiff. Therefore, this Court orders Plaintiff to file all appropriate time records and costs to support her account of attorneys' fees and costs within 20 days. Defendant shall have 20 days to respond Thereafter, the Court will set the matter for further hearing.

c Plaintiff Maxwell is Entitled to Prejudgment Interest in the Amount of $59,896 97

Upon a finding of infringement, the court shall award interest and costs according to 35 U.S.C. Section 284 Prejudgment interest is granted as a matter of course for the prevailing plaintiff *See. General Motors Corp. v. Devex Corp.,* 461 U.S. 648, 655-656 (1983) Prejudgment interest is ordinarily awarded under Section 284 to afford the patent owner complete compensation for patent infringement *See. Bio-Rad Laboratories v. Nicolet Instruments Corp.,* 807 F.2d 964, 967 (Fed.Cir.1986) Such interest is usually awarded from the date of infringement to the date of judgment. *See, Nickson Indus. v. Rol Mfg.,* 847 F.2d 795, 800 (Fed.Cir.1988).

The Court has substantial discretion to determine the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

interest rate in patent infringement cases. *Gyromat Corp. v. Champion Spark Plug Corp.*, 735 F.2d 549, 556-57 (Fed.Cir.1984) (*citing Datascope Corp. v. SMEW, Inc.*, 879 F.2d 820, 829 (Fed.Cir.1989). Though the Court grants Plaintiff's request for prejudgment interest, the Court disagrees with Plaintiff's assertion that the prime rate is an appropriate interest rate in this patent infringement case, citing to *Studiengesellschaft Kohle, m.b.H. v. Dart Industries, Inc.*, 862 F.2d 1564, 1579 (Fed.Cir.1988) According to Plaintiff's calculations, based on the average weighted quarterly prime rate from October 1, 1989, the interest due Maxwell is $173,363 *See,* Declaration of Donald A. Gorowsky at ¶ 8.

*27 Defendant counters that while prejudgment interest should ordinarily be awarded, nothing in the law requires such an award whenever infringement is found. *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 556-57 (Fed.Cir.1984). In this regard, Defendant asserts that federal courts have held that an award of interest can be reduced or even denied altogether in appropriate circumstances, including where the patent owner has unduly delayed prosecuting the lawsuit. *See, General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656-57 (1983).

Furthermore, Defendant avers that Plaintiff's request for interest on the jury's damages award ($143,791.83) at the rate of 8% (the prime rate as of April 15, 2001), compounded annually, for a total of $173,363 in interest is excessive. Plaintiff's proposed rate of interest, the prime rate, is unjustifiably high, given that there was no evidence that she was required to borrow money at or near that rate during the period of infringement. *See, Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed.Cir.1997) (affirming district court's award of interest at the U.S. Treasury bill rate to "adequately compensate plaintiff for the lost use of its royalties," the Federal Circuit found that there was no evidence that plaintiff borrowed money at a higher rate, what that rate was, or that there was a causal connection between any borrowing and the loss of the use of the money awarded as a result of defendant's infringement ); *Hoechst Celanese Corp. v. BP Chemicals Ltd.*, 846 F.Supp. 542, 551 (S.D.Tex.1994) ("In making this determination, the Court is mindful that the purpose of pre-judgment interest is solely to compensate the patentee for the lost use of the royalty income he should have been paid.... Accordingly, the Court finds the T-bill rate to be the appropriate standard.") Defendant contends that Plaintiff is not entitled to such an award under the facts of this case, because

she unduly delayed prosecuting this lawsuit and stayed the lawsuit from 1995 to 1998. This Court disagrees. Delay alone is insufficient to support the denial of prejudgment interest, especially where (as here) the patentee engaged in other litigation enforcing the patent during the period of the purported delay. *See. Kaufman v. Berlyn Corp.*, 914 F.2d 1473, 1485-86 (Fed.Cir.1990). Furthermore, ACI has already yielded its defenses, including laches, estoppel, or waiver.

Defendant, once again, asserts that Plaintiff is receiving 15 cents per pair of shoes in "additional damages." In addition, given that Plaintiff has already been compensated above any "reasonable royalty rate," there is no reason for the Court to award compound interest according to Defendant's reasoning. Therefore, the amount of simple interest using the U.S. Treasury bill rate (4.07% as of April 15, 2001) for the royalty amounts and time periods suggested by Defendant's expert (Decl. Donald A. Gorowsky, ¶ 9) would be $59,896.97. ACI's contention that a portion of the royalty awarded includes a punitive component, and thus Plaintiff is not entitled to interest, is irrelevant to this inquiry.

*28 This Court agrees with Defendant that any interest that Plaintiff receives should only compensate Plaintiff for the lost use of the actual damages, and that the U.S. Treasury bill rate, would be the more appropriate rate. *See, Studiengesellschaft Kohle*, 862 F.2d 1564, 1579-80 (Fed.Cir.1988). Accordingly, this Court grants Plaintiff's Motion for Prejudgment Interest at the U.S Treasury bill rate in the amount of $59,896.97.

d. Plaintiff Maxwell is Entitled to A Permanent Injunction

Finally, this Court grants Plaintiff's request seeking to enjoin ACI or Angel-etts from future infringement. 35 U.S.C. § 283. It is the general rule than an injunction will issue when infringement has been adjudged, absent a sound reason for denying it. *W.L. Gore & Associates, Inc. v. Garlock, Inc.*, 842 F.2d 1275, 1281 (Fed.Cir.1988). In this instance, Defendant has provided no sound justification or reason for denying the grant of such a permanent injunction to deter any future infringement by ACI or Angel-etts.

Defendant, in its Opposition, avers that a sound reason for denial of the injunction exists. ACI has demonstrated that since August 1990, it has ceased using Plaintiff's design and has instead used non-

Not Reported in F.Supp.2d                                                Page 21
Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)
**(Cite as: 2001 WL 34133507 (C.D.Cal.))**

infringing alternatives (April 12, 2001 Tr. at 100:11-21, 109:5-12, 118:4-12, 123:7-14). Defendant contends that there is no evidence that ACI has used the design during the ten years since that time. Defendant avers that the requested relief is simply unnecessary at this point, and that nothing prevents Plaintiff from seeking injunctive relief in the future should she believe it necessary to do so.

However, this Court does not find it just to require Plaintiff to have to undergo another litigation should Defendant choose to infringe again. Therefore, despite Defendant's assertions of non-infringement in the last ten years, this Court finds that there is no sound reason to deny a permanent injunction under the circumstances, given that willful infringement has been found. As such, this Court grants Plaintiff's Motion for a Permanent Injunction.

III. Conclusion

For the foregoing reasons, the Court:
   1. Denies Defendant's Motion for Judgment as a Matter of Law, or in the Alternative, for New Trial.
   2. Grants in part and denies in part, Plaintiff's

Motion for Judgment, Treble Damages, Attorney's Fees, Prejudgment Interest, and Injunctive Relief.

Specifically, the Court grants Plaintiff's Motion for Judgment, Attorney's Fees, Prejudgment Interest and Injunctive Relief.

In granting Plaintiff's Motion for Attorney's Fees, the Court orders Plaintiff to submit billings with proper affidavits in order for the Court to ascertain reasonable fees once Plaintiff has submitted such evidence to the Court. Pursuant to <u>Federal Rule of Civil Procedure 54(d)(2)</u>, Plaintiff is ordered to file papers itemizing reasonable fees and costs within 20 days of entry of judgment.

The Court denies Plaintiff's Motion for Treble Damages, and instead, awards Plaintiff double damages as set forth below.

**\*29** In awarding the amount of double damages, the Court sets forth the following calculations:
   (1) Total Number of Infringing Pairs of Shoes:

```
Landed Transactions:          431,375

First Cost Transactions:    + 253,348
                              684,723
```

(2) Total Amount of compensatory damages per pair of shoes:

```
    Reasonable royalty for ACI's infringing activity:    $ .06

    Amount of additional damage per pair of shoes:     + $ .15
                                                         ------

The total amount of damages per pair of shoes:           $ .21
                                                         ------
```

(3) Calculation of Double Damages:

```
                        684,723

                        x $ .21

Total Compensatory damages:  $143,791.83
                             $143,723
```

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)
**(Cite as: 2001 WL 34133507 (C.D.Cal.))**

Page 22

                                        x 2

Double Damages:              $287,583.66


   (4) Calculation of Total Judgment:

      Double Damages:                          $287,583.66

      Prejudgment Interest (U.S. Treasury bill rate):   + $ 59,896.97

Total:                                      $347,480.63


  Accordingly, Defendant ACI or Angel-etts is ordered to pay *$347,480.63* plus attorneys' fees and costs to satisfy the Judgment in this case. [FN4] Plaintiff is ordered to prepare and lodge a Proposed Judgment in accordance with this Order within ten (10) days.

      FN4. The amount of Attorneys' Fees will be affixed once Plaintiff has submitted the relevant billings and affidavits to the Court.

  IT IS SO ORDERED.

  Not Reported in F.Supp.2d, 2001 WL 34133507 (C.D.Cal.)

    **Motions, Pleadings and Filings (Back to top)**

  • 2001 WL 34768696 (Trial Motion, Memorandum and Affidavit) Defendant ACI International, Inc.'s Notice of Motion and Motion for Judgment as a Matter of Law, or in the Alternative, for New Trial; Memorandum of Points and Authorities in Support (Apr. 27, 2001)

  END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                                    Page 1

Slip Copy, 2006 WL 118438 (N D Cal )
(Cite as: Slip Copy)

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available
United States District Court,N D California
NIKKO MATERIALS USA, INC d/b/a Gould
Electronics, Inc , an Arizona Corporation, Plaintiffs,
v.
R E SERVICE CO , INC , a California corporation,
Defendant.
**No. C 03-2549 SBA.**

Jan 13, 2006

ORDER
ARMSTRONG, J.

[Docket No. 457]

*1 This matter comes before the Court on Plaintiff
Nikko Materials USA, Inc.'s ("Plaintiff" or "NIKKO
") Motion for an Exceptional Case and Attorney's
Fees [Docket No 457]. Having read and considered
the arguments presented by the parties in the papers
submitted to the Court, the Court finds this matter
appropriate for resolution without a hearing. The
Court hereby GRANTS NIKKO's Motion for an
Exceptional Case and Attorney's Fees [Docket No
457]

*BACKGROUND*

Plaintiff NIKKO is a New Hampshire corporation
that designs, develops, manufactures, and sells
products for use in the printed circuit board
industry. NIKKO has obtained numerous patents in
the United States and abroad relating to the
manufacture and design of printed circuit boards

Johnson & Johnston Associates, Inc ("JJA") and
Defendant R E Service Co , Inc ('RES") have
engaged in protracted litigation over three patent
infringement actions The first action between the

parties commenced on October 6, 1992, when RES
sued JJA for a declaratory judgment alleging that
JJA's U S Patent No 5,153,050 ("the '050 Patent")
was invalid, unenforceable and not infringed JJA
counterclaimed that RES was willfully infringing
the '050 Patent through the manufacture and sale of
its AC3 and AC2 products In June 1994, a jury
found that the '050 Patent was valid and that RES
had indeed infringed it. Accordingly, on July 26,
1994, the Court entered a final judgment that the
'050 Patent was not invalid and that it was infringed
by RES' AC3 and AC2 products

In late 1996, RES began to sell its SC2 and SC3
products As a result, on January 21, 1997, JJA
initiated a second infringement action against RES
alleging that RES' SC2 and SC3 products infringed
the '050 Patent. Meanwhile, JJA was issued U S
Patent No 5,674,596 ("the '596 Patent") [FN1] on
October 7, 1997

FN1 The '050 Patent is parent to the '596
Patent.

On October 9, 1998, RES was prevented from
producing and selling its SC2 and SC3 products
when the Court issued an injunction following the
second trial During the next three-and a-half years,
between October 1998 and March 2002, RES
ceased to produce and sell its SC2 and SC3
products in compliance with the injunction

On March 28, 2002, however, the Federal Circuit
overturned the judgment in the second litigation and
RES subsequently resumed production and sales of
its SC2 and SC3 products

On May 29, 2003, JJA commenced a third action
against RES, seeking relief for willful infringement
of U S Patent Nos. 5,674,596 (the " '596 Patent")
and 5,942,315 (the " '315 Patent"), both now owned
by NIKKO [FN2] The patents are directed to a
laminate (copper foil/metal substrate and copper

© 2006 Thomson/West No Claim to Orig U S Govt Works

Slip Copy                                                                              Page 2

Slip Copy, 2006 WL 118438 (N D Cal )
(Cite as: Slip Copy)

foil/steel substrate) used in making printed circuit boards ("PCB") that greatly decreases the number of defects and rejects in the PCB manufacturing process. In the complaint, NIKKO requested an award of actual damages, an enhancement of damages pursuant to 35 U S C. § 284 due to RES' willful infringement, an award of attorney's fees under 35 U S C. § 285, and a permanent injunction against RES' continued sales

> FN2. The remainder of this Order will refer to the Plaintiff exclusively as " NIKKO."

*2 RES' Answer asserted twenty-five distinct affirmative defenses against NIKKO, including, *inter alia*, the defenses of non-infringement, laches, unenforceability, unclean hands, and invalidity

On August 11, 2003, RES filed a counterclaim in which it asserted that NIKKO "is now selling, has sold and/or is offering for sale ... one or more products" that infringe upon the claims of four RES patents, including U.S. Patent Nos. 6,129,998 (the " '998 Patent"), 6,129,990 (the " '990 Patent"), 6,130,000 (the " '000 Patent"), and 6,235,404 (the " '404 Patent")

On September 9, 2003, NIKKO filed its Reply to RES' Counterclaims, raising, among other things, the affirmative defenses of non-infringement, invalidity, and prosecution history estoppel

On October 1, 2003, the parties exchanged their initial disclosures pursuant to Rule 26(a)(1) of the Federal Rules of Civil Procedure *See* Poppe Decl. at Exs E, F. In its Initial Disclosures, RES identified five categories of documents and tangible things in its possession *See* Poppe Decl. at Ex. F. With respect to damages, RES stated in its Initial Disclosures that it anticipated seeking damages for lost profits, reasonable royalties, costs of suit, and prejudgment interest, as well as seeking attorney's fees under 35 U S C. § 285 and treble damages for willful and wanton acts of infringement as provided by 35 U S C. § 284

On October 30, 2003, the parties exchanged

Disclosures of Asserted Claims and Preliminary Infringement Contentions pursuant to Patent Local Rule 3-1 RES' disclosure alleged that an unnamed copper-steel laminate product manufactured by NIKKO infringed claims 1-10 of the '990 Patent, claims 2-4, 7-9, and 12-13 of the '998 Patent, claims 1-9 of the '000 Patent, and claims 1-2 of the '404 Patent. *See* Poppe Decl. at Ex. G. RES' disclosure did not identify a specific accused instrument and did not describe where each element of each asserted claim was allegedly found in that accused instrument. *See id*

On November 7, 2003, counsel for NIKKO wrote a letter to RES's counsel asking that the deficiencies in RES' disclosures be rectified. *See* Poppe Decl. at Ex. H. On November 14, 2003, counsel for RES wrote a letter to NIKKO's counsel stating that RES did not know the name of NIKKO's accused product or its model number and that "exemplars of the Accused Instrumentality were seen by RES at the Hadco plant in New Hampshire." *See id* at Ex. I RES never supplemented its Preliminary Infringement Contentions

RES subsequently served written discovery requests on NIKKO directed at RES' counterclaim for patent infringement. Specifically, RES served Interrogatory Nos. 14-21, Requests for Documents Nos. 26-41, and Requests to Admit Nos. 1-15 and 18-21. *See id* at Ex. S. NIKKO duly responded in writing *Id* NIKKO also produced approximately 5,500 pages of documents directed at RES' counterclaims

Although RES also served notices for the depositions of four former employees of NIKKO, RES eventually cancelled the depositions before they took place *See id* at Exs. J, K. RES did not, in fact, take a single deposition of any fact witness Further, RES did not identify any expert-in-chief and did not produce any export report in support of its counterclaims for infringement. Although RES did designate a rebuttal expert, Paul DeFrense, and proferred a rebuttal expert report, RES later withdrew Mr DuFrense as its rebuttal expert *See id* at Ex. L

*3 On January 5, 2004, NIKKO served its

© 2006 Thomson/West  No Claim to Orig. U S. Govt Works

Slip Copy                                                                                         Page 3

Slip Copy, 2006 WL 118438 (N.D.Cal.)
**(Cite as: Slip Copy)**

Preliminary Infringement Contentions on RES. *See* Poppe Decl. at Ex. W at 2.

On March 12, 2004, NIKKO first raised its affirmative defense of unenforceability in its Objections and Response to RES' First Set of Interrogatories. *See* Poppe Decl. at Ex. X at No. 15.

On March 17, 2004, NIKKO served the following requests for production of documents and things on RES:
- *Request for Production No. 38.* All documents relating to the alleged infringement by [NIKKO] of one or more claims of the RES patents;
- *Request for Production No. 42.* All documents relating to any of the [NIKKO] Accused Products, including but no limited to any information that provided a basis for RES' decision to charge [NIKKO] with patent infringement; and
- *Request for Production No. 44.* All documents relating to any tests, analyses, studies, experiments, reviews, or other efforts conducted by or on behalf of RES to determine, or which otherwise shows, whether any product, device, technology, or system of [NIKKO] or any third party infringes on any claim of any of the RES patents.

*See* Poppe Decl. at Ex. M. RES did not produce any documents in response to these requests.

On April 5, 2004, NIKKO served RES with a Second Set of Requests for Admission. *See id.* at Ex. N. NIKKO asked RES to admit that it had not tested the metal substrate sheet in any of the accused NIKKO products for hardness, surface finish, or coefficient of thermal expansion. *See id.* at Ex. N at Nos. 43, 44, 45. On May 5, 2004, RES denied each of NIKKO's requests, thereby indicating that the accused products had been so tested. *See* Poppe Decl. at Ex. O at Nos. 43, 44, and 45. Yet, RES did not produce any documents reflecting that any such tests were performed on the NIKKO accused products.

Moreover, in a Second Set of Interrogatories also served on April 5, 2004, NIKKO asked that "[f]or each of the RES patents, [RES] describe any investigation made by or an behalf of RES prior to filing of its counterclaims in this action regarding

whether the claim is infringed by [NIKKO] . ." *See* Poppe Decl. at Ex. P at No. 25. On June 11, 2004, RES responded:
In late 2001, when visiting Hadco Corp., Derry, NH, Mark Frater viewed [the] product that infringes the RES patents. Mr. Frater asked for and received permission from Ann Parkhearst, the purchasing manager, to handle, examine, and take apart a sample of the material marked JJA CSC. Upon close visual and tactile examination, Mr. Frater was able to determine that the product in question infringed upon the RES patents.

*See* Poppe Decl. at Ex. Q at No. 25.

However, at his deposition, RES' 30(b)(6) designee, Mark Frater, the President, Chief Executive Officer, and sole owner of RES, testified that his only familiarity with the accused NIKKO product was from "grabbing," "holding up," and "looking at" a single sample of CSC in late 2001 and "mov[ing] it like this a little bit." *See* Poppe Decl. at Ex. R at 6:12-7:8, 70:24-71:21. Mr. Frater admitted that he did not know the hardness, surface finish, or coefficient of thermal expansion of the steel in the accused NIKKO products, and had made no attempt to measure those properties. *Id.* at Ex. R at 72:19-75:7. He also testified that he "didn't particularly pay much attention to the adhesive" and did not "know how it was applied." *Id.* at Ex. R at 72:11-14, 73:2-5. Subsequently, in response to written discovery requests, RES made clear that it would rely *solely* on Mr. Frater's testimony to show infringement. *See* Poppe Decl. at Ex. T at 25.

\*4 In his deposition, Mr. Frater also testified that information disclosed in an Information Disclosure Statement ("IDS") submitted to the United States Patent and Trademark Office ("PTO") during prosecution of the '990, '998, '000, and '404 Patents was false due to the fact that surface finish of stainless steel and carbon steel substrates of the SC2 and SC3 products sold before April 10, 1997 was less than 17 RMS instead of greater than 17 RMS as disclosed in the IDS. *See* Poppe Decl. at Ex. BB at 113:29-116:2, 183:23-186:15. Moreover, Mr. Frater also admitted that he failed to disclose that some of the SC2 and SC3 products sold before April 10, 1997 used a stainless steel substrate

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                    Page 4

Slip Copy, 2006 WL 118438 (N.D Cal.)
**(Cite as: Slip Copy)**

having a surface finish of 8 RMS *Id* Additionally, Mr. Frater's testimony revealed that RES had no documents or information that indicated what types of steel substrates were used in the SC2 and SC3 products sold before April 10, 1997 *See* Poppe Decl. at Ex. R at 66:17-68:19; Ex. BB at 175:8-179:17. Subsequently, NIKKO served deposition subpoenas on several RES steel suppliers identified by Mr Frater in his deposition in order to determine the precise metallurgical characteristics of the steel substrate used by RES in its SC2 and SC3 products sold more than one year prior to the applicable filing date of the patents, April 10, 1997. *See* Poppe Decl. at Ex Y

NIKKO thereafter filed an Amended Reply to include the additional affirmative defense, and corresponding counterclaim, of unenforceability NIKKO also served RES with Final Invalidity Contentions to disclose additional prior art defenses uncovered during discovery *See id* at Ex Z. Further, NIKKO served a supplemental set of interrogatory responses on RES to reflect this new information *See* Poppe Decl. at Ex. AA

Additionally, during the discovery phase, NIKKO retained a technical expert, Gregg Frazier, and a patent law expert, Thomas Smegal, to assist with the defense of RES' counterclaims *See* Poppe Decl. at Ex. EE. NIKKO also deposed other RES witnesses, including John O'Bannion and Michael Mantelle

The parties also exchanged sales information on their respective accused products, and reached an agreement that damages would be calculated as a reasonable royalty of 7 5 of sales. *See* Isackson Decl. at ¶ 10. Thus, based on this information, RES was aware, or should have been aware, that its infringement claim was worth no more than $8,565.23, excluding prejudgment interest and any enhanced damages. *Id* RES also was on notice of the fact that no samples of NIKKO's accused CSC products manufactured in the United States still existed, that NIKKO had ceased manufacturing its CSC products in the United States in 2002, and that NIKKO had no plans to begin manufacturing a steel substrate laminate in the United States in the foreseeable future *See* Poppe Decl. at ¶ 2

In October 2004, NIKKO forwarded a two-part settlement proposal to RES. *See* Isackson Decl. at Ex. C. Part 1 addressed resolving only the RES patent dispute and Part II addressed the entire case. *Id* In Part I, NIKKO offered to give RES a credit of $8,565.23, the stipulated amount of damages RES would have been entitled to based on NIKKO's sales of its accused CSC product, to be applied to any amount RES would be required to pay NIKKO in resolution of NIKKO's patent claims. *See id* NIKKO also offered not to manufacture or sell in the United States for five years any copper-steel laminates containing steel with the metallurgical properties required by the RES patent claims *Id* In exchange, RES was asked to agree to: (1) dismiss with prejudice its counterclaims against NIKKO, and (2) not bring a claim for patent infringement of any of the four patents for five years *Id* RES rejected the offer.

**\*5** On January 7, 2005, NIKKO filed three motions for summary judgment. In those motions, NIKKO argued: (1) that certain asserted claims of the '315 Patent and '596 Patent were infringed and not invalid; (2) that RES' defenses of inequitable conduct and unclean hands were without merit; and (3) that the accused NIKKO products did not infringe any of the asserted RES patents RES filed one motion for summary judgment by which it sought a ruling that its SC3 products did not infringe the asserted claims of NIKKO's patents

On February 4, 2005, the Court granted summary judgment to NIKKO on RES' invalidity, inequitable conduct, and unclean hands defenses The Court also granted summary judgment in NIKKO's favor on RES' defenses of inequitable conduct and unclean hands

After the Court granted RES' request for a Rule 56(f) continuance on the third of NIKKO's motions for summary judgment, the Court granted summary judgment in NIKKO's favor on the issue of non-infringement of the '990, '998, '000, and '404 Patents The Court expressly found that RES had presented *no* tangible evidence to support its allegations of infringement.

A jury trial was held from March 28, 2005 to April

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                    Page 5

Slip Copy, 2006 WL 118438 (N.D.Cal.)
(Cite as: Slip Copy)

11, 2005 on NIKKO's claim that RES was willfully infringing upon claims 12, 13, and 14 of the '596 patent by making, using or selling the SC2 and SC3 products. Trial was also held on RES' affirmative defense of laches.

On April 8, 2005, RES moved to dismiss NIKKO's counterclaim for unenforceability on the grounds that the Court's dismissal of RES' own infringement counterclaims rendered NIKKO's counterclaim moot. The Court granted RES' motion.

On April 11, 2005, a unanimous jury found that RES made, used, offered to sell, and sold SC2 and SC3 products that infringed NIKKO's '596 Patent, and that RES' infringement was willful. Acting in an advisory capacity only, the jury also found that RES had failed to show by a preponderance of the evidence that NIKKO unreasonably delayed in filing suit for infringement of the '596 Patent.

Following trial, NIKKO filed the instant Motion for an Exceptional Case and Attorney's Fees.

### LEGAL STANDARD

Section 285 of the Patent Act provides that "[t]he court in exceptional circumstances may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The purpose of 35 U.S.C. § 285 is to provide discretion where it would be unjust that the prevailing party be left to bear the burden of its own counsel fees. *J.P. Stevens Co. v. Lex Tex Ltd.*, 822 F.2d 1047, 1051-52 (Fed.Cir.1987). The determination of whether a case is an "exceptional" one within the meaning of 35 U.S.C. § 285 is left solely for the trial judge. *Interspiro USA, Inc. v. Figgie Int'l Inc.*, 18 F.3d 927, 933 (Fed.Cir.1994). The purpose of 35 U.S.C. § 285 is to compensate the prevailing party for its monetary outlays in the prosecution or defense of a patent suit. *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed.Cir.1983). The Federal Circuit has interpreted 35 U.S.C. § 285 as including not only the recovery of attorney fees, but also the recovery of all reasonable expenses incurred in prosecuting the entire action. *Id.* Thus, upon finding a case exceptional, an award of all reasonable and

necessary expenses related to the litigation is properly within the scope of 35 U.S.C. § 285. *Id.* (affirming award of expenses). Such fees include all expenses that are not covered by the attorneys' hourly rates, routinely paid by counsel and billed to the client, and that are not expenses incurred for the convenience of counsel. *See, e.g., Bennett v. Department of Navy*, 699 F.2d 1140, 1145 (Fed.Cir.1983). These expenses may include costs ordinarily not recoverable under 28 U.S.C. § 1920 and Rule 54(d) of the Federal Rules of Civil Procedure, fees associated with non-attorneys such as paralegals, law clerks, and secretaries, and lodging expenses of counsel and witnesses. *Mathis v. Spears.* 857 F.2d 749, 757-59 (Fed.Cir.1988).

*6 The determination of an appropriate attorney fee award requires a three-step inquiry: (1) whether there is clear and convincing evidence that the case is exceptional; (2) if so, whether an award of attorney fees is warranted; and (3) whether the attorney fees sought are reasonable in amount. *Interspiro*, 18 F.3d at 933; *Machinery Corp. of Amer. v. Gullfiber AB*, 774 F.2d 467, 470 (Fed.Cir.1985). As to the first step, a finding of willful infringement is sufficient to justify classifying a matter as an "exceptional case," thereby granting the trial court discretion to award attorney fees. *Del Mar Avionics, Inc. v. Quinton Instrument Co.*, 836 F.2d 1320, 1329 (Fed.Cir.1987). Indeed, "[d]istrict courts have tended to award attorney fees when willful infringement has been proven, and [the Federal Circuit] has uniformly upheld such awards." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 200 (Fed.Cir.1986) (citations omitted).

Absent a finding of willful infringement, a finding of bad faith, litigation misconduct, or unprofessional behavior also may suffice to make a case exceptional. *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed.Cir.1996) (collecting cases). The Federal Circuit has noted that bad faith can include "attorney or client misconduct during litigation, or unnecessarily prolonging litigation." *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed.Cir.1996). Moreover, "where one continues his infringing activity, and fails to investigate and determine, in good faith, that he possesses

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                      Page 6

Slip Copy, 2006 WL 118438 (N.D.Cal.)
(Cite as: Slip Copy)

reasonable defenses to an accusation of patent infringement, the infringement is in bad faith." *Jurgens,* 80 F.3d at 1571. It is also bad faith when an infringer "merely copies a patented invention, or where he obtains incompetent, conclusory opinions of counsel only to use as a shield against a later charge of willful infringement, rather than in a good faith attempt to avoid infringing another's patent." *Jurgens,* 80 F.3d at 1571.

Finally, 35 U.S.C. § 285 limits the award of attorney fees to those fees that are reasonable. 35 U.S.C. § 285. A determination of reasonableness must be evidenced by the billing rate charged and the number of hours expended. *Lam, Inc. v. Johns-Mansville Corp.,* 718 F.2d 1056, 1068-69 (Fed.Cir.1983). In *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67, 70 (9th Cir.1975), *cert. denied,* 425 U.S. 951 (1976), the Ninth Circuit identified twelve factors for determining the reasonableness of attorney fees and costs requested by a litigant. The twelve *Kerr* factors are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Kerr,* 526 F.2d at 70. In determining an appropriate award of attorney fees and costs, a court need not always analyze each of the foregoing factors. *McGinnis v. Kentucky Fried Chicken,* 42 F.3d 1273, 1277 (9th Cir.1994). Indeed, many of the factors may address matters irrelevant in a particular case or issues about which very little needs to be said. *Id.*

## ANALYSIS

### A. Whether Case is Exceptional

*7 In its Motion for Exceptional Case and

Attorney's Fees, NIKKO argues that the Court should find this case exceptional due to the fact that: (1) RES was found to have willfully infringed NIKKO's '596 Patent; (2) RES was found to have willfully infringed NIKKO's patents in two prior cases; (3) RES failed to conduct an adequate pre-suit investigation of its infringement counterclaims and litigated its frivolous infringement counterclaims against NIKKO in bad faith; and (4) RES asserted numerous affirmative defenses in a vexatious manner.[FN3]

> FN3. NIKKO also argues that RES inequitable conduct before the PTO warrants a finding that this case is exceptional. However, as both parties concede, following the dismissal of RES' infringement claims from the lawsuit, the Court determined that it did not have jurisdiction to determine whether RES' patents were unenforceable due to inequitable conduct. Since the Court has determined that it lacks jurisdiction to consider this issue, evidence pertaining to NIKKO's unenforceability counterclaim will not be considered on this Motion.

In response, RES concedes that it was found to have willfully infringed NIKKO's patents in this case, as well as in the two previous cases between the parties. RES argues, however, that a finding of willful infringement does not "mandate" an exceptional case finding. RES further argues that the other reasons NIKKO offers in support of its exceptional case motion are unsupported by the facts. Namely, RES argues that: (1) this was a "simple case that was litigated with the utmost professionalism;" (2) RES' pre-filing investigation was "reasonable under the circumstances;" (3) RES pursued its counterclaims against NIKKO in good faith; and (4) RES asserted its affirmative defenses in good faith and in a reasonable manner.

The Court finds RES' arguments to be unpersuasive. First, as to the finding of willful infringement, Federal Circuit law "uniformly indicate[s] that the willfulness of the infringement by the accused infringer may be a sufficient basis in a particular

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                                                    Page 7

Slip Copy, 2006 WL 118438 (N.D.Cal.)
(Cite as: Slip Copy)

case for finding the case 'exceptional' for the purposes of awarding attorneys fees." *Golight, Inc v. Wal-Mart Stores, Inc.,* 355 F.3d 1327, 1340 (Fed.Cir.2004). Indeed, even the cases cited by RES support this proposition *See. e.g., Rohm & Haas Co v. Crystal Chem Co.,* 736 F.3d 688, 691 (Fed.Cir.1984) ("[c]ases awarding attorney fees to prevailing patentees have typically found ' exceptional' circumstances in willful and deliberate infringement by an infringer, *or* in the prolongation of litigation in bad faith ") (emphasis added) Further, as noted separately in this Court's Order granting NIKKO's Motion for Enhanced Damages, in this particular case, the question of willful infringement was *not* a close question

Additionally, NIKKO has effectively shown that RES engaged in numerous bad faith litigation tactics. For example, it is clear from the history of the case, and from certain admissions made by RES and its president, Mr. Frater, that RES pursued its infringement counterclaims until the eve of trial even though it had no reasonable basis to do so Indeed, it is undisputed that RES did not obtain a sample of NIKKO's accused product prior to filing its counterclaims. In fact, Mr Frater admitted in his deposition that his only familiarity with the accused NIKKO product was from "grabbing," "holding up," and "looking at" a single sample of CSC in late 2001 and "mov[ing] it like this a little bit." *See* Poppe Decl at Ex R at 6:12-7:8, 70:24-71:21. Mr. Frater further admitted that this "inspection" did not provide him with any knowledge regarding the hardness, surface finish, or coefficient of thermal expansion of the steel in the accused NIKKO products *Id* at Ex R at 72:19-75:7. Since these properties were critical elements of RES' patent claims, without such knowledge, it is clear that RES had no basis to initiate an infringement suit. Perhaps more egregious, however, is the fact that RES learned, in March 2004, that no samples of NIKKO's accused CSC products manufactured in the United States still existed, that NIKKO had ceased manufacturing its CSC products in the United States in 2002, and that NIKKO had no plans to begin manufacturing a steel substrate laminate in the United States in the foreseeable future. *See* Poppe Decl at ¶ 2 [FN4] Yet, despite the overwhelming lack of any competent evidence in

support of its claims, RES never conceded the baselessness of its claims, and due to its request for a continuance, postponed the resolution of this issue until the Pretrial Conference, one week before trial was set to commence Further, contrary to RES' current belief, the Court's ruling on the summary judgment was *expressly* premised on the fact that RES was utterly unable to produce *any* evidence in support of its infringement claims.

> FN4. RES also learned, based on the sales information NIKKO provided to it, that its infringement counterclaim was worth no more than $8,565.23, excluding prejudgment interest and any enhanced damages *See* Isackson Decl. at ¶ 10.

**\*8** Similarly, NIKKO was forced to defend against RES' affirmative defenses of inequitable conduct and unclean hands, two defenses that the Court ultimately found to be wholly unsupported by any facts. *See* Jan. 17, 2005 Order (noting that RES " failed to introduce any evidence from which a trier of fact could find inequitable conduct ") Additionally, RES admitted, during its summary judgment briefing, that it had *no* evidence to support any of its invalidity defenses other than the defense of anticipation Twenty other affirmative defenses asserted by RES were eventually abandoned or withdrawn. The two defenses that RES did fully litigate-anticipation and laches-were also found to be lacking in merit by this Court. Indeed, when RES' conduct is considered in the cumulative, coupled with the fact that RES has been found to have willfully infringed NIKKO's patents during three separate lawsuits, the scales are tipped very heavily in favor of an exceptional case finding Accordingly, the Court GRANTS NIKKO's request to have this case declared exceptional

B. Reasonableness of Requested Attorney's Fees

NIKKO next asks the Court to award it attorney's fees and expenses in the amount of $3,408,818.40 ($3,063,396.10 in fees, $345,426.71 in costs) [FN5] In support of its request, NIKKO has presented the Court with a declaration of counsel setting forth

© 2006 Thomson/West No Claim to Orig. U.S. Govt Works.

Slip Copy                                                                    Page 8

Slip Copy, 2006 WL 118438 (N D Cal.)
(Cite as: Slip Copy)

NIKKO's counsel's itemized billing statements. *See* Isackson Decl. at ¶ 5, Ex. A NIKKO has also supplied the Court with declarations from its Chief Financial Officer and Vice President, both of whom state that they have reviewed the billing records submitted by NIKKO's counsel and consider the fee request to be reasonable *See* Rich Decl. at ¶¶ 3-5; Burgess Decl. at ¶ 3. Further, NIKKO's counsel avers that it has endeavored to include only those items that are recoverable. Additionally, NIKKO has submitted an AIPILA survey, which NIKKO contends supports a finding that the median fees and costs incurred in a patent trial is $1.5 million. While NIKKO concedes that its requested fees are in excess of $1.5 million, it notes that this particular case actually involved *two* separate patent actions (one initiated by NIKKO and one initiated by RES) that involved a total of six patents and 37 asserted claims Accordingly, NIKKO requests that the Court find its request for attorneys fees reasonable.

> FN5  In its opening brief, NIKKO requested fees in the amount of $2,812,597.50. However, it reserved the right to supplement its proof as to the amount of fees with invoices from its counsel for work performed in April 2005, and any retained experts' and third party service providers' invoices for work related to trial This supplemental evidence was filed at the same time as NIKKO's reply brief

RES, on the other hand, argues that NIKKO's requested fees are unreasonable and "bear[ ] no relationship to the litigation." In support of its argument, RES contends that this litigation "was not particularly complex or time-consuming compared to most patent cases" and that the issues "presented by the case were limited . [and] were limited even further by the time of trial." In light of the fact that this case dragged on for nearly three years, due largely in part to RES' pursuit of its own frivolous counterclaims and affirmative defenses, the Court finds this characterization of the litigation disingenuous. Indeed, while the trial itself was relatively brief, many of the issues for trial were eliminated through summary judgment motions only a month before trial. The remaining issues were resolved only a week before trial was scheduled to commence

*9 RES's argument that NIKKO's fees should be substantially reduced by this Court is also unpersuasive. In its Opposition, RES presents three alternative bases for calculating the appropriate award of attorney's fees. None of these alternatives is a tenable basis for reducing NIKKO's requested fee award.

RES's first argument is that NIKKO should be limited to recovering only those fees and costs incurred in the handling of "the matters of which NIKKO complains-RES' counterclaim, RES' patents, and RES affirmative defenses." RES asserts that this calculation would result in fees in the amount of only $107,870 and costs in the amount of $17,783.32. *See* Nakamae Decl. at Ex. 1 This "alternative" method of calculating fees and costs, however, is completely illogical For instance, although the method awards NIKKO the fees and costs it expended on RES' claims, it fails to provide NIKKO with *any* compensation for prevailing on the heart of its own dispute with RES: the willful infringement of NIKKO's patent. RES offers no explanation as to why NIKKO should be penalized in such a manner and provides no authority in support of such a stunningly inequitable approach As such, the Court rejects this first alternative basis for awarding fees and costs

In RES's second suggested alternative, RES argues that NIKKO's total fees should be reduced by 25% because NIKKO had "an unnecessary number of attorneys working on the same matter" and another 10% because NIKKO's counsel was located in three different cities RES further argues that NIKKO should not be compensated for work performed on the following matters: (1) 65.3 hours that NIKKO billed for researching a preliminary injunction motion that was not filed; (2) 349.0 hours of attorney time and 15.75 hours of paralegal time that NIKKO billed for work performed on its invalidity counterclaim; (3) 9.0 hours that NIKKO billed for researching a doctrine of equivalents theory that it did not present at trial; and (4) 231.5 hours for "

© 2006 Thomson/West No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                Page 9

Slip Copy, 2006 WL 118438 (N.D.Cal.)
**(Cite as: Slip Copy)**

unidentified activities." RES then argues that the Court should allocate the fees between the following three actions: (1) NIKKO's patent infringement claims; (2) RES' counterclaims; and (3) NIKKO's counterclaims. RES submits that a reasonable allocation of the fees is: (1) 60% for work performed on NIKKO's patent infringement claims; (2) 20% for work performed on RES' counterclaims; and (3) 20% for work performed on NIKKO's counterclaims. After the fees are allocated, RES argues that the 60% allocation should be further reduced by 75% to account for NIKKO's dismissal of some of its patent claims on the eve of trial and that the 20% allocated to NIKKO's counterclaims should not be awarded at all [FN6] Additionally, RES argues that all of NIKKO's attorneys should be compensated at an average attorney rate of $200 per hour and a paralegal rate of $80 per hour. According to RES' calculations, the second alternative results in a total award of fees in the amount of $227,600 and costs in the amount of $43,508.52.

> FN6 RES, concedes, however, that NIKKO is entitled to the 20% of its fees allocated to defending against RES' counterclaims.

*10 As NIKKO aptly points out, RES' attack on the number of hours billed by NIKKO's counsel is based on RES' own speculation and conjecture and is wholly unsupported by any competent evidence. For example, although RES contends that an "excessive" amount of attorneys worked on the case, a review of NIKKO's billing statements reveals that the attorneys working on the case performed discrete tasks. There is no indication of any undue duplication of labor. Further, although the case was staffed in part with attorneys residing outside of California, there is no evidence that NIKKO's counsel billed for time spent traveling and not working. *See* Isackson Supp. Decl. at ¶ 2. Additionally, with respect to the work performed on the preliminary injunction and the invalidity counterclaims, NIKKO has persuasively shown that the work performed was a necessary and reasonable part of both NIKKO's affirmative case and its defense. *Accord Allen v. Bay Area Rapid Transit,*

2003 U.S. Dist. *LEXIS* 24917, *20 (N.D.Cal.2003) ("An unsuccessful motion is not an unsuccessful claim. Under the rule proposed by defendants, a plaintiff who prevailed at trial would be entitled to recover the costs of trying certain claims, but not, *e.g.*, the costs of filing and arguing an unsuccessful motion for summary judgment on those claims. Such a rule would undermine the purpose for which federal fee-shifting provisions were enacted[.]"). Moreover, with respect to RES' allegation that some of NIKKO's time entries pertain to "unidentified activities," having reviewed the same records, the Court finds that the billing statements are sufficiently clear. NIKKO has effectively shown that these time entries relate to NIKKO's efforts to review the records from the prior litigations.

The Court also finds that RES' proposed fee allocations and related reductions are unwarranted. RES has not provided the Court with *any* relevant authorities in support of its proposed reductions, which—in sum-have the total effect of reducing NIKKO's requested fees from roughly $3 million to $200,000. Additionally, the Court rejects RES' argument that NIKKO's attorneys should be compensated at a blended hourly rate of $200. Due to the highly technical nature of this case, which required NIKKO to obtain counsel with expertise beyond that of the average member of the bar, the Court finds that the rates charged by NIKKO's counsel are reasonable and appropriate.

Finally, the Court finds that RES' third proposed alternative, that NIKKO should be denied all of its requested fees and costs, is completely unsubstantiated and unwarranted.

As a result, the Court finds that, given the length of the underlying proceedings, and the complexity and number of the issues involved, NIKKO has shown that an award of fees and costs in the amount of $3,408,818.40 is reasonable. NIKKO's Motion is therefore GRANTED in its entirety.

### *CONCLUSION*

IT IS HEREBY ORDERED THAT NIKKO's Motion for Exceptional Case and Attorney's Fees is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy                                                                  Page 10

Slip Copy, 2006 WL 118438 (N D Cal )
**(Cite as: Slip Copy)**

GRANTED [Docket No. 457] NIKKO is hereby awarded attorney's fees in the amount of $3,063,396 10 and costs in the amount of $345,426 71

**\*11 IT IS SO ORDERED.**

N.D Cal ,2006.
Nikko Materials USA, Inc v R E. Service Co , Inc
Slip Copy, 2006 WL 118438 (N D Cal )

Briefs and Other Related Documents (Back to top)

• 2006 WL 1587260 () Declaration of Gregory L Lucas in Support of R E. Service Co , Inc 's Opposition to Nikko's Motion to Correct the Judgment Pursuant to Fed.R. Civ P. 60(a) or in the Alternative to Alter or Amend the Judgment Pursuant to Fed R. Civ P 59(e) (Feb. 14, 2006) Original Image of this Document (PDF)
• 2005 WL 3782741 () Declaration of Robert L Shipp in Support of Defendant and Counter-Claimant R E. Service Company, Inc's Opposition Brief re Jja/Nikko's Motion for Summary Judgment under Frcp 56 Re: Res' Counterclaims (Mar. 22, 2005) Original Image of this Document (PDF)
• 2004 WL 3804655 () Rebuttal Expert Report of Paul Dufrense (Dec 2, 2004) Original Image of this Document (PDF)
• 2004 WL 3704490 () Expert Witness Report of Thomas F. Smegal, Jr. (Nov 15, 2004) Original Image of this Document (PDF)
• 2004 WL 3704491 () Rebuttal Expert Witness Report of Thomas F. Smegal, Jr (Nov. 15, 2004) Original Image of this Document (PDF)
• 2004 WL 2159499 (Trial Motion, Memorandum and Affidavit) Plaintiff Johnson & Johnston Associates' Claim Construction Brief (May 17, 2004) Original Image of this Document (PDF)
• 2004 WL 2159513 (Trial Motion, Memorandum and Affidavit) Plaintiff Johnson & Johnston Associates' Reply Claim Construction Brief (May 17, 2004) Original Image of this Document (PDF)
• 2004 WL 2159504 (Trial Motion, Memorandum and Affidavit) R E. Service Co , Inc 's Reply in Support of Opening Claim Construction Brief for R E. Service Co 's Patents (Apr. 20, 2004) Original Image of this Document (PDF)

• 2003 WL 23794315 (Trial Motion, Memorandum and Affidavit) Defendant's Reply to Plaintiff's Counterclaims (Sep. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 23794300 (Trial Pleading) Plaintiff Johnson & Johnston Associates, Inc 's Reply to Defendant's ""Cross-Complaint" (Counterclaims) for Damages and Injunctive Relief (Sep. 9, 2003) Original Image of this Document (PDF)
• 2003 WL 23794276 (Trial Pleading) Defendant's Answer to Complaint for Damages and Injunctive Relief (Aug 11, 2003) Original Image of this Document (PDF)
• 2003 WL 23794288 (Trial Pleading) Cross-Complaint for Damages and Injunctive Relief (May 29, 2003) Original Image of this Document (PDF)
• 2003 WL 23794349 (Trial Pleading) Defendant's Answer to First Amended Complaint for Damages and Injunctive Relief (May 29, 2003) Original Image of this Document (PDF)
• 2003 WL 24270358 () Rebuttal Expert Report of Paul Dufresne (May 29, 2003) Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West No Claim to Orig U S Govt Works.

Westlaw.

Not Reported in F.Supp.                                    Page 1

Not Reported in F.Supp., 1990 WL 146385 (D.Del.), 17 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.)**

▷
Briefs and Other Related Documents

United States District Court, D. Delaware.
SCRIPPS CLINIC AND RESEARCH
FOUNDATION, and Rorer Group, Inc., Plaintiffs,
v.
BAXTER TRAVENOL LABORATORIES, INC.,
and Travenol Laboratories, Inc., Defendants.
**CIV. A. No. 87-140-CMW.**

July 31, 1990.

Gregory A. Inskip, of Potter, Anderson & Corroon, Wilmington, Del., of counsel: Eugene Moroz, and William S. Feiler, of Morgan & Finnegan, New York City, for plaintiffs.
Allen M. Terrell, Jr., and Robert W. Whetzel, of Richards, Layton & Finger, Wilmington, Del., of counsel: Granger Cook, Jr., and Dean A. Monco, of Cook & Egan, Ltd., Chicago, Ill., and Paul C. Flattery, and Robert E. Hartenberger, of Baxter Travenol Laboratories, Inc., Deerfield, Ill., for defendants.

*ORDER*
CALEB M. WRIGHT, Senior District Judge.
*1 WHEREAS:

1. On February 8, 1990, the Court granted defendants' motion for attorney fees based on a finding of exceptionality under 35 U.S.C. § 285. *See Scripps Clinic and Research Foundation v. Baxter Travenol Laboratories, Inc.*, 729 F.Supp. 1473 (D.Del 1990).

2. In accordance with the Court's ruling, defendants have submitted schedules of their attorney fees and costs to plaintiffs in an attempt to agree informally on an appropriate amount, but the parties have been unable to so agree.

3. Defendants have now submitted a petition and supplement for $1,065,138.28 in attorney fees and costs, as well as a record detailing their fees and costs.

4. 35 U.S.C.A. § 285 (West 1984) provides that, in "exceptional" patent cases, the court may award reasonable attorney fees to the prevailing party.

5. The purpose of § 285, in a proper case and in the discretion of the trial judge, is to compensate the prevailing party for its monetary outlays in the prosecution or defense of the suit. *Central Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed.Cir 1983). In other words, the purpose of the award is to compensate the prevailing party for costs it would not have incurred but for the conduct of the losing party. *Codex Corp. v. Milgo Electronic Corp.*, 541 F.Supp. 1198, 1201 (D.Mass 1982), *aff'd*, 717 F.2d 622 (1st Cir 1983), *cert. denied*, 466 U.S. 931 (1984).

6. In addition to attorney fees, an award under § 285 should include expenses; that is, those sums that the prevailing party incurred in preparation for the suit. *Central Soya*, 723 F.2d at 1578; *see Lam. Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1069 (Fed.Cir 1983) (§ 285 permits prevailing party to recover disbursements).

7. Defendants have requested $104,312.00 in attorney fees for their in-house counsel.

8. Plaintiffs raise four objections to in-house counsel fees: a. the documentation provided is insufficient; b. the amount includes fees for work done on the related California actions; c. the services of in-house counsel were not performed in the role of a litigator, but rather in the role of a client; and d. in-house counsel's presence at depositions represents overstaffing by defendants.

9. An attorney fee award in a patent action may include an award for the value of services rendered by in-house counsel. *See Scott Paper Co. v. Moore*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp                                                    Page 2

Not Reported in F.Supp., 1990 WL 146385 (D.Del.), 17 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.)**

*Business Forms. Inc.,* 604 F.Supp. 835, 837 (D.Del 1984)

10 A party may recover in-house counsel fees only when sufficient documentation is provided; contemporaneous time records are not necessary, as long as the records are reasonably accurate and substantially reconstruct the time spent. *PPG Industries v. Celanese Polymer Specialties Co.,* 840 F.2d 1565, 1570 (Fed.Cir 1988).

11. If insufficient documentation is provided, a court may reduce the fees requested. *Id*

12 Fees for in-house counsel are appropriate only when counsel is performing legal work that would otherwise be provided by outside counsel; time spent by in-house counsel in the role of a client, such as time spent keeping abreast of the progress of the litigation and advising outside counsel of the client's views as to litigation strategy, is not compensable in a fee award *Procter & Gamble Co v. Weyerhaeuser Co.,* 711 F.Supp 904, 906-07 (N.D.Ill.1989)

*2 13. The court will allow defendants to recover $34,828.50 for in-house counsel fees, which represents 50 percent of the fees requested for Mr. Hartenberger Mr Hartenberger clearly did some work on this matter in a litigation role Mr Hartenberger's affidavits state that he reviewed documents, prepared deposition questions, and conducted prior art searches However, the court will decrease the amount requested for in-house counsel fees, for two reasons First, the court finds the documentation provided by defendants to be fairly inadequate Defendants have submitted records indicating that work was done on particular days, but the records do not show the nature of the work done *See Lindy Bros. Builders, Inc. v American Radiator & Standard Sanitary Corp.,* 487 F.2d 161, 167 (3d Cir 1973) (in non-patent case, fee information should at least indicate the number of hours devoted to various general activities, such as discovery) The necessity for detailed records is even greater in a case such as this, where plaintiffs contend that in-house counsel did not actually perform litigation functions Defendants state that they had maintained detailed time records, that

those records were destroyed under defendants' document retention policy, and that defendants should not be penalized for that policy. However, neither should plaintiffs be penalized for that policy, especially since the policy was completely within defendants' control. Mr Hartenberger's affidavit is helpful in determining the types of tasks he did, but it is not a complete substitute for detailed time records. As to the other in-house counsel, the court will disallow any fees for their services since no supporting affidavits from them have been provided. A second reason why the court will decrease the amount of fees requested is that it is clear that in-house counsel performed some work in a non-litigation role For example, Mr Hartenberger's affidavit states that he approved invoices for services rendered in connection with this suit.[FN1]

14 Defendants also request $20,067.40 in fees and expenses for Bernard, Rothwell & Brown, a law firm.

15. Plaintiffs oppose the entire request on three grounds First, plaintiffs contend that there is insufficient documentation Second, plaintiffs contend that the work done by the law firm duplicated work done by others retained by defendants Third, plaintiffs allege that the law firm monitored the California cases, and that this time is not recoverable

16. The court will allow defendants to recover the Bernard, Rothwell fees and expenses in their entirety. The court finds the documentation to be sufficient The invoices list the categories of work done, and the affidavit of Mr Hartenberger indicates that the work was done by Mr E Anthony Figg. Further, the court is not convinced that the work done by the firm was duplicative. Finally, defendants should be able to recover for time spent on monitoring the California actions, since defendants stood to learn much about the patentee's position in this case from monitoring the patentee's position in the California cases. *See Codex Corp. v Milgo Electronic Corp.,* 541 F.Supp. 1198, 1205 (D Mass 1982) (plaintiffs entitled to recover for time spent monitoring other actions involving same patents; such monitoring could help plaintiffs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                Page 3

Not Reported in F.Supp , 1990 WL 146385 (D Del ), 17 U S P Q 2d 1046
**(Cite as: Not Reported in F.Supp.)**

locate useful evidence and legal theories), *aff'd,* 717 F 2d 622 (1st Cir 1983), *cert. denied.* 466 U S. 931 (1984).

**\*3  17**  Defendants seek $92,142 12 for fees and expenses for Biomega, a technical services firm that was retained primarily to conduct prior art literature searches and to provide technical assistance.

18  Plaintiffs object to the Biomega fees on the ground that Biomega's charges represent work that exceeded the bounds of reasonable effort  In addition, plaintiffs specifically object to allowing any Biomega fees incurred after the Harris dissertation was found.

19.  The court will allow defendants to receive Biomega's expenses in their entirety. Defendants have pointed out the complex nature of the patent-in-suit, as well as the value of the litigation to defendants in terms of the potential market for the product. The court cannot say that the amount of time devoted to this case by Biomega or the efforts exerted after the Harris dissertation was found were unreasonable.[FN2]

20.  Defendants seek $635,537 28 in attorney fees and expenses paid to defendants' principal trial counsel, Cook, Egan, McFarron & Manzo

21.  Plaintiffs seek to reduce the request by $139,234 41, on four grounds  Plaintiffs allege that the documentation is insufficient; that time spent conferring with California defense counsel and reviewing papers from the California cases is nonrecoverable; that time spent on the case subsequent to the January, 1989 agreement to stay discovery is nonrecoverable; and that the fees incurred for depositions are unreasonable because depositions were overstaffed and because one witness was deposed an excessive number of times.

22  The court will allow defendants to recover some of the $139,234 41 in dispute  First, the court finds the documentation to be exceedingly detailed, and certainly more than sufficient  Second, defendants should be allowed to recover for some work done after the stay  The discovery stay did not mean that all action in the case had to cease; for example, it

still behooved defense counsel to maintain some contact with California counsel in order to keep abreast of the progress of the California cases. Third, as stated previously, the court cannot find that the depositions were overstaffed. With respect to the excessive depositions taken of Dr Fulcher, defendants assert that Dr. Fulcher was *the* crucial witness in the case, since she was a co-inventor of the invention. In addition, defendants contend that Dr. Fulcher's deposition was difficult because she was extremely cautious and evasive  The court does not find that the depositions taken of Dr Fulcher were excessive

23.  However, the court must decrease the amount requested for the fees relating to contact with California counsel  Defendants admit that the Cook firm worked directly on some aspects of the California cases, including assisting California counsel in preparing the motion to have the California cases declared exceptional and to award attorney fees; preparing Dr Harris' final declaration (November 1988); preparing for and attending a hearing before Judge Schwarzer (December 1988); and preparing for and attending oral argument in the appeal of the California cases (January 1990)  Defendants should not be able to recover expenses incurred in directly assisting the California defendants, even if this court relied indirectly on that assistance in granting a judgment of invalidity based on collateral estoppel[FN3]  While the California cases and this action may be identical twins, they are certainly not joined at the hip, as defendants contend  It is not possible to determine precisely how much time was spent legitimately learning about the California actions and how much time was spent contributing to them  The court will therefore decrease the fees incurred in connection with the California actions by 50 percent

**\*4  24**  The court will award defendants $95,277 19 of the $139,234 41 in dispute, as follows: $57,721 69, which is the amount of fees spent on work not relating to the California cases (including deposition fees), and $37,555 50, which represents half of the fees related to the California actions  The court will disallow entirely $6,401 72 of the fees, which represents time apparently devoted to

© 2006 Thomson/West. No Claim to Orig  U S  Govt  Works

Not Reported in F.Supp.                                                                              Page 4

Not Reported in F.Supp., 1990 WL 146385 (D Del.), 17 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.)**

unrelated matters.

25. Defendants seek $2,422.29 in fees paid to Dr.
Howard Reisner, who was retained as a technical
expert. Plaintiffs object on three grounds: that
defendants did not rely on Dr. Reisner's work in this
litigation; that defendants have documented only
$2,042.04 of the expenses; and that, at the very
least, $676.14 should be deducted because of an
unjustified trip to Chicago.

26. The court will allow $1,365.90 for Dr. Reisner's
services. As defendants point out, the fact that Dr.
Reisner's services became unnecessary because of
the posture of this case does not make his services
nonrecoverable. However, plaintiffs correctly note
that only $2,042.04 has been documented. The
court has also deducted $676.14; while the court
might not have initially questioned this amount,
plaintiffs have raised its propriety, and defendants
have not responded with an explanation.

27. Defendants have requested $16,832.61 for
travel expenses, mostly incurred by in-house
counsel. Plaintiffs object on the grounds that
defendants should be limited to reimbursement for
one attorney at depositions; defendants have
provided inadequate documentation; and, in several
instances, defendants have requested expenses
incurred on matters other than the instant litigation.

28. The court will allow defendants to recover
$6,374.74 for travel expenses, as follows: the court
awards $5,709.76 for travel expenses to
depositions, including a sufficiently documented La
Jolla hotel stay; and $664.98, which represents half
the expenses for a 1988 California trip-while part of
the trip was devoted to depositions in this case, the
other part was apparently spent on attending a
hearing in the California cases. The court has
denied the remaining $9,792.90 in expenses, which
the court found to be inadequately documented or
incurred at least in part on unrelated matters.

29. Defendants request $1,435.00 for the fees and
expenses of Dr. Robert Harris, a scientist who
authored the reference relied on by Judge
Schwarzer in invalidating certain claims of the
patent in suit. Plaintiffs object on the ground that

much of his time was spent providing direct
assistance to the California defendants.

30. The court will allow defendants to recover
$717.50, which is 50 percent of the requested fees.
The documentation indicates that at least some of
Dr. Harris' time was spent on preparing his
declaration for the California cases. While the
court cannot determine the precise number of hours
devoted to the California cases, the court believes
that a 50 percent reduction is reasonable.

31. Defendants have requested $21,022.57 for court
reporting, printing, and photocopying expenses.
Plaintiffs object to these expenses on the grounds
that the court should exercise its discretion against
awarding those expenses that would otherwise not
be taxable as costs, and that $3,818.35 of the
expenses were unreasonably spent on airfare and
hotel accommodations for a court reporter from
Chicago who recorded depositions in San Diego.

*5 32. The court will award $17,204.22 of the
expenses. Defendants should be able to recover
their court reporting, printing, and photocopying
expenses in an exceptional case. *See Mathis v.
Spears*, 857 F.2d 749, 758 (Fed.Cir.1988) (statutory
provisions concerning taxation of costs are not
applicable to awards under § 285). The court will
disallow the $3,818.35 for the court reporter's
airfare. Defendants contend that they were
informed of a court reporter shortage in San Diego,
and that the Chicago reporter billed at a lower rate
than reporters in nearby Los Angeles. However,
defendants have not indicated in a precise enough
manner the amount of savings realized by using the
Chicago reporter.

33. In a supplement to their petition, defendants
have requested $26,952.98 in attorney fees and
expenses incurred in preparing the fee petition.
Plaintiffs request that the court pay the additional
fees. Plaintiffs contend that they made a
reasonable offer to defendants concerning the
amount of fees, and that, had defendants accepted
their offer, defendants would not have had to
prepare the petition. Plaintiffs thus ask that, if the
court awards an amount less than or equal to
plaintiffs' offer, the court should deny the additional

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Page 5

Not Reported in F Supp , 1990 WL 146385 (D.Del.), 17 U S P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.)**

fees because defendants should have agreed to the offer.

34  The court will award defendants the $26,952 98 in fees and expenses incurred in preparing this petition  Expenses incurred in preparing a fee application may be included in a fee award  *Scott Paper Co v Moore Business Forms. Inc*. 604 F Supp. 835, 838 (D.Del 1984). The court does not agree with plaintiffs' contention that defendants should not be able to recover expenses incurred in pursuing their fee petition merely because defendants did not believe plaintiffs' offer was reasonable and the court later found otherwise. Even if the court agreed with plaintiffs' contention, plaintiffs have not indicated what their offer was. Assuming that their offer was the amount conceded in their brief-$536,184 32-the court has awarded far in excess of that amount.

35. Defendants have requested $19,343 99 in fees for their local counsel, Richards, Layton & Finger, and plaintiffs have not contested that amount.

36  Defendants have requested $125,070 04 in prejudgment interest on the fee award  Plaintiffs object to an award of prejudgment interest on the ground that the court should exercise its discretion against such an award.

37  An award of attorney fees under § 285 may include prejudgment interest  *Mathis v Spears*, 857 F 2d 749, 761, 761 n 12 (Fed Cir 1988) (court analogizes an award of prejudgment interest on a damage award under § 284 with an award of prejudgment interest on a fee award under § 285; where the ostensible basis for a suit was acquired through inequitable conduct, the defendant was clearly injured, and the "damages" caused by that injury obviously include the attorney fees and expenses the defendant was forced to pay). The question of whether prejudgment interest should be awarded is in the trial court's discretion, based on all of the facts and circumstances  *Id , see Procter & Gamble Co v Weyerhaeuser Co*, 711 F Supp. 904, 908 (N D Ill 1989) (award of prejudgment interest on § 285 award is permissible, not mandatory)

*6 38  The court will award prejudgment interest on the fee award  Defendants would not have had to incur their fees and expenses had plaintiffs not engaged in intentional and bad faith misconduct before the Patent Office. Defendants should be able to recover in an interest award the additional money they would have earned absent such misconduct  However, since the amount of interest requested by defendants is now inappropriate based on the court's fee award, defendants are entitled to prejudgment interest only on the amount of fees awarded in this order.

This 31st day of July, 1990, the Court having considered the parties' briefs, and having heard oral argument, IT IS HEREBY ORDERED:

1  That defendants are awarded $810,577 41 in fees and expenses, as well as prejudgment and postjudgment interest on that amount;

2  That plaintiffs need not make payment of the award until the appeals of the California cases are decided; and

3  That Baxter's Motion for Review and Reversal of Clerk's Denial of Costs is denied.

> FN1  The court is not persuaded by plaintiffs' argument that the fees should also be decreased based on overstaffing  Plaintiffs contend that defendants had two or three attorneys at depositions, one or two of whom were in-house counsel. However, the court cannot say that having two or three attorneys at depositions is unreasonable  Defendants point out that plaintiffs sent two attorneys and a paralegal to all depositions of Baxter personnel.

> FN2  The court notes that an expense is not unreasonable merely because the losing party would have chosen not to incur it  Were that the case, prevailing parties would recover almost none of their expenses.

© 2006 Thomson/West  No Claim to Orig  U S Govt  Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1990 WL 146385 (D.Del.), 17 U.S.P.Q.2d 1046
**(Cite as: Not Reported in F.Supp.)**

FN3. The court notes, however, that any expenses incurred in direct defense of this suit are recoverable even though the benefits of those expenses may have been shared with the California defendants.

D.Del.,1990
Scripps Clinic and Research Foundation, Inc. v. Baxter Travenol Laboratories, Inc.
Not Reported in F.Supp., 1990 WL 146385 (D.Del.), 17 U.S.P.Q.2d 1046

Briefs and Other Related Documents (Back to top)

• 1:87cv00140 (Docket) (Mar. 20, 1987)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.