# Tab E

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court, E.D. Pennsylvania.
COMARK COMMUNICATIONS, INC.
v.
HARRIS CORPORATION
No. Civ.A. 95-2123.

July 17, 1997.

### MEMORANDUM AND ORDER

BECHTLE, Judge.

*1 Presently before the court are Defendant Harris Corporation's ("Harris") renewed motion for judgment as a matter of law and for a new trial under Rules 50(b) and 59, and Plaintiff Comark Communications, Inc.'s ("Comark") motions for a permanent injunction, prejudgment interest, increased damages, and attorney fees. The parties have filed briefs opposing their adversary's motions.

For the reasons set forth below, the court will deny Harris' motion. The court will grant Comark's motions for increased damages, attorney fees, and prejudgment interest. The court will grant in part and deny in part Comark's motion for a permanent injunction.

### I. BACKGROUND

This patent infringement case involves a system and method for an aural carrier corrector, a device that is designed to eliminate distortion of the aural signal caused by the visual signal in common amplification television transmitters. Comark claimed that Harris willfully infringed United States Patent No. 5,198,904 (the "'904 patent" or "Comark patent") by making and selling the Sigma line of transmitters (the "accused device" or "Harris device") in the United States beginning in 1993.[FN1] Harris denied infringement and alleged that the '904 patent was invalid. A jury returned a verdict in favor of Comark and awarded it $7.7 million in compensatory damages.

> FN1. This court has subject matter jurisdiction over the claim because it arises under the federal patent laws. 28 U.S.C. §§ 1331, 1338.

The evidence presented to the jury in this case can be summarized as follows. In 1988, Comark was among the first companies to manufacture high-power UHF television transmitters [FN2] that operated in common amplification mode. [FN3] In late 1990, Comark had sold such a transmitter to WSNS, a Chicago television station. While installing and testing this transmitter, it became apparent that the signal was unacceptable because it produced H sync spurs that distorted the aural signal. The consultant hired by WSNS, an engineer named Dane E. Ericksen ("Ericksen"), believed that this distortion violated two Federal Communications Commission ("FCC") regulations. First, the primary H sync-spur occurred at a frequency that is reserved for transmission of the Broadcast Television System Committee ("BTSC") stereo pilot, which indicates to television sets that the aural signal is being broadcast in stereo. Second, the H sync spurs could increase the overall modulation of the aural carrier to a level that exceeds strict limitations on the total amount of aural carrier modulation.

> FN2. The parties stipulated that the term "high-power UHF transmitters" referred to such transmitters of 30 kilowatts and above. (Tr. 3/18/97 at 151.)
>
> FN3. A common amplification transmitter modulates both the audio and video signals to a higher frequency suitable for broadcast. This type of transmitter is considered to be an improvement on an "externally diplexed" transmitter that separately modulates the audio and video signals.

After weeks of trying to correct this problem, Comark Vice President Raymond Kiesel ("Kiesel"), and Hong Anh Ta ("Ta") found a solution in November 1990. Their answer was to build an electronic circuit that uses a sample of the transmitter's video signal to "predistort" or "precorrect" the aural signal in the opposite way from the way that the aural signal is distorted during common amplification. On February 25, 1991, Kiesel and Ta filed a patent application for the invention. On March 30, 1993, the United States

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp. Page 2
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Patent and Trademark Office ("PTO") issued the '904 patent.

*2 In 1992, Harris, Comark's main competitor in the industry, began developing a common amplification transmitter called the Sigma transmitter. In 1993, Dennis Culling ("Culling"), an engineer based in Cambridge, England, designed an aural carrier corrector that was featured in the Sigma transmitters. On May 23, 1995, the PTO issued United States Patent No. 5,418,578 (the "Harris patent"), which claims Culling's invention.

On April 11, 1995, Comark commenced this civil action by filing a complaint alleging that Harris willfully infringed the '904 patent. On June 12, 1995, Harris filed an Answer in which it denied liability and asserted that the patent was invalid. On October 18 and 21, 1996, the court held a hearing to construe the asserted claims of the '904 patent pursuant to *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). About four months later, the court entered a Memorandum and Order containing its findings of fact and conclusions of law regarding the interpretation of the disputed claims of the patent. *Comark Communications, Inc. v. Harris Corp.*, No. 95-2123, 1997 WL 87260 (E.D.Pa. Feb.24, 1997).

The court called the case for trial on March 5, 1997. On April 14, 1997, after nineteen days of testimony and argument, the jury began deliberations. On April 17, 1997, the jury informed the court that it had reached a unanimous verdict, and another judge of this court accepted a sealed verdict. The next morning, the jury unsealed the verdict and presented it in open court. The jury found that Harris had willfully infringed the '904 patent under the doctrine of equivalents, and it awarded Comark a total of $7.7 million in damages, itemized as $3.3 million for lost profits, $3 million for price erosion, and $1.4 million for reasonable royalties. The jury also found that Harris had not proven that either of the claims at issue were invalid under 35 U.S.C. § 102 (lack of novelty), 35 U.S.C. § 103 (obviousness), or 35 U.S.C. § 112 (failure to disclose the best mode). Judgment was entered on April 18, 1997.

On May 2, 1997, Harris filed a renewed motion for judgment as a matter of law and for a new trial under Federal Rules of Civil Procedure 50(b) and 59. On the same date, Comark moved for prejudgment interest, increased damages, attorney fees, and a permanent injunction. On May 16, 1997, Comark and Harris filed briefs in opposition to the motions.

The court now will separately address the merits of each motion.

### II. *HARRIS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW*

Harris seeks judgment as a matter of law on the issues of infringement, willfulness, and damages on the ground that there was insufficient evidence to support the jury's verdict on these issues. Comark argues that substantial evidence supports the jury's verdict and cites testimony and exhibits from the trial record.

#### A. *The Applicable Legal Standard*

A court may grant a motion for judgment as a matter of law in favor of a party if "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." Fed.R.Civ.P. 50(a). The United States Court of Appeals for the Third Circuit has set forth the standard for when a court may grant a renewed motion for judgment as a matter of law under Rule 50(b):
*3 'Such a motion should be granted only if, in viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability. In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of witnesses, or substitute its version of the facts for the jury's version.'

*McDaniels v. Flick*, 59 F.3d 446, 453 (3d Cir.1995), *cert. denied*, 516 U.S. 1146, 116 S.Ct. 1017, 134 L.Ed.2d 97 (1996) (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir.1993)) (citations omitted). A court may grant a Rule 50(b) motion only when, "without weighing the credibility of the evidence, there can be but one reasonable conclusion as to the proper judgment." 5A James W. Moore, *Federal Practice and Procedure* ¶ 50.07 [[2], at 50-76 (2d ed.) (footnote omitted). To prevail on such a motion, however, the moving party must have moved for judgment as a matter of law before the close of all the evidence. See Fed.R.Civ.P. 50(b).

#### B. *The Doctrine of Equivalents*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00292-JJF   Document 456-5   Filed 10/05/2006   Page 4 of 19

Not Reported in F.Supp.                                                                                                                         Page 3
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

A person or entity infringes a patent when, without authority, such person or entity "makes, uses, offers to sell, or sells any patented invention, within the United States" during the term of the patent. 35 U.S.C. § 271(a). The infringement analysis has two steps. *Carroll Touch, Inc. v. Electro-Mechanical Sys., Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993). First, the patent's claims must be construed to determine their proper scope and meaning. *Id.* The Supreme Court has held that such construction must be performed exclusively by the court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, ---- - ----, 116 S.Ct. 1384, 1395-96, 134 L.Ed.2d 577 (1996). Second, the factfinder must compare the properly construed claim to the accused device. *Carroll Touch*, 15 F.3d at 1576. A finding of infringement is warranted if the claim "covers" the accused device, that is, "if the [accused] device embodies every limitation of the claim, either literally or by an equivalent." *Id.*

A party who fails to prove a literal infringement claim may prove infringement under the doctrine of equivalents when the differences between the claimed invention and the accused device are insubstantial. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1218 (Fed.Cir.1995), *cert. denied*, 520 U.S. 1115, 117 S.Ct. 1243, 137 L.Ed.2d 326 (1997). The Supreme Court recently emphasized that the focus of the analysis under this doctrine must be on each separate element of the invention, rather than on the invention as a whole. *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, --- U.S. ----, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The Court stated:

Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.

*4 *Id.* at 1049.

In this case, Comark claimed that the two independent claims of the '904 patent-Claim 1 and Claim 14-were infringed by the Harris device literally and under the doctrine of equivalents. The jury returned verdicts in favor of Harris on the issue of literal infringement, and in favor of Comark on the issue of infringement under the doctrine of equivalents.

**1. Claim 1**

Claim 1 of the '904 patent recites:
An aural carrier correction system for a common amplification television transmitter which amplifies both an aural signal and a visual signal simultaneously, the transmitter including at least a IF vision modulator for receiving a video signal and for outputting the visual signal, the system comprising:
a video delay circuit for receiving and delaying the video signal to provide a delayed video signal;
a complimentary non-linear amplifier for receiving the delayed video signal and for separately and controllably generating a non-linear amplitude domain video signal and non-linear phase domain video signal; and
an amplitude and phase modulator for receiving the aural signal and for amplitude and phase modulating the aural signal using the non-linear amplitude domain video signal and the non-linear phase domain video signal, respectively, to generate a modified aural signal; and
an adder circuit for adding the modified aural signal to the visual signal outputted by the IF vision modulator to reduce unwanted noise appearing at specific frequencies in an output aural signal output from the transmitter.

(Ex. P-1, col. 6, lines 21-44.) The focus of Harris' argument is that the accused device does not contain a "video delay circuit ." (Def.'s Mem. at 5.) [FN4] The court defined the term as meaning "a circuit that provides to the complementary non-linear amplifier a video signal that is delayed in time." *Comark Communications, Inc. v. Harris Corp.*, No. 95-2123, 1997 WL 87260, at *10 (E.D.Pa. Feb.24, 1997). The court now must review the trial record to determine whether there was a legally sufficient evidentiary basis for a reasonable jury to find that the Harris device contained a "video delay circuit" under the doctrine of equivalents.

> FN4. Citations to "Def.'s Mem." refer to Harris' Corrected Brief in Support of its Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial Under Rules 50(b) and 59. Citations to "Pl.'s Mem." refer to Comark's brief in opposition to these motions.

The trial transcript reveals that Comark presented the testimony of two experts qualified in the field of

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 4

UHF television transmitter engineering, Kiesel and Dr. Raymond L. Pickholtz ("Pickholtz"). Both men testified that components of the Harris device satisfied one of the tests for infringement under the doctrine of equivalents, that is, it performed substantially the same function, in substantially the same way, to achieve substantially the same result as the video delay circuit claimed in Claim 1 of the '904 patent. (Tr. 3/7/97 at 30; Tr. 3/24/97 at 49-52.) Specifically, Kiesel and Pickholtz explained that two components of the accused device-the IF vision modulator and the detector-were the functional equivalent of the "video delay circuit" of the Comark patent. (Tr. 3/7/97 at 31; Tr. 3/24/97 at 51-52.)

*5 Harris does not mention this testimony in its memorandum of law. Instead, it reargues its trial theory and cites evidence supporting its position, but ignores the only relevant issue: whether there was substantial evidence supporting the jury's verdict of infringement under the doctrine of equivalents. Harris makes other arguments, some of which it presented in its closing argument at trial or at the *Markman* hearing, and other arguments that should have been made at either of those times, but were not. Nevertheless, the court will address each of Harris' arguments separately.

First, Harris argues that the accused device does not infringe the '904 patent because it does not have an IF vision modulator in addition to a video delay circuit. Harris notes that the only depiction of the Comark aural carrier corrector in the '904 patent shows that the video signal proceeds in two separate, parallel paths, one containing a video delay circuit and the other containing the IF vision modulator. The sole function of the video delay circuit, Harris argues, is to compensate for the delay caused by the IF vision modulator. Because any delay in the Harris device caused by the IF vision modulator is not intended to compensate for a parallel delay, Harris asserts that the jury's finding of infringement under the doctrine of equivalents "effectively and improperly eliminates the 'video delay circuit' claim limitation ." (Def.'s Mem. at 6-7) (citing *Warner-Jenkinson*, --- U.S. at --- -, ---- n. 8, 117 S.Ct. at 1049, 1058 n. 8.).

Harris' argument is unpersuasive. It is clear from the '904 patent's specification that the illustrations of the aural carrier corrector system are only "one embodiment of the delay circuit" and that there could be "numerous modifications and variations" of the invention consistent with the patent's teachings. (Ex. P-1, col. 3, lines 8-10; col. 6, lines 13-18.) The fact that the preferred embodiment of the system shows two parallel paths does not mean that the "video delay circuit" contains such a limitation. Indeed, the court construed that term as meaning 'a circuit that provides to the complementary non-linear amplifier a video signal that is delayed in time." There is no reference to "parallel paths" in this definition. Harris argued to the jury that, because there are two parallel paths in the '904 patent, and there was one path in the accused device, they should find in favor of Harris on the question of infringement. (*See* Tr. 4/14/97 at 157-58.) The jury rejected this argument with regard to the doctrine of equivalents. There is no basis to conclude that because the IF vision modulator and detector in the Harris device provides no delay in relation to another signal, that the video delay circuit limitation of the '904 patent is somehow "eliminated" under the principles articulated in *Warner-Jenkinson*.

Second, Harris notes that Claim 1 recites that the video delay circuit is part of the correction system and that the specification states that the correction system "provides for reducing unwanted noise in the aural signal *independently* of and in time with the video modulation." (Ex. P-1, col. 2, lines 33-35) (emphasis added). Harris also notes that the IF vision modulator in the accused device is not part of its correction system. Based on these facts, Harris argues that the finding that the IF vision modulator is part of the video delay circuit is "plainly inconsistent" with the requirement that the correction system is independent of the video modulation. (Def.'s Mem. at 7-8.)

*6 Harris again has avoided the pertinent issue. To repeat, the court has construed the term "video delay circuit" as meaning "a circuit that provides to the complementary non-linear amplifier a video signal that is delayed in time." There is no limitation in the definition concerning whether the components of the video delay circuit are to work independently of the video modulation or whether they are supposed to be contained in the correction system. This claim construction-style argument (which was not made during the two-day *Markman* hearing) does not support Harris' Rule 50(b) motion.

Third, Harris argues that the accused device has no need for a video delay circuit because its single-path alignment corrects the signal only after it goes through the IF vision modulator. Therefore, a reading of "IF vision modulator" that satisfies two elements-the IF vision modulator and part of the video delay circuit-is so broad that it effectively reads the video delay circuit out of the claim. (Def.'s Mem.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 5

at 8-9.) In support of this argument, Harris relies on *Warner-Jenkinson* and *General American Transportation Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 770-71 (Fed.Cir.1996), cert. denied, 520 U.S. 1155, 117 S.Ct. 1334, 137 L.Ed.2d 493 (1997).

Neither case supports Harris' position that it cannot be liable for infringement under the doctrine of equivalents because the IF vision modulator in the accused device satisfies one-and-a-half elements of Claim 1 of the '904 patent, rather than just one element. *Warner-Jenkinson* expressly disfavored the notion that the doctrine of equivalents should be given such broad play so as to expand the scope of the claims of the invention, but did not establish the rule that one feature of an accused device can never satisfy two elements of the patent under the doctrine of equivalents. *General American Transportation* also did not establish any such rule. In that case, the Federal Circuit reversed the construction of the claims because, *under the patent at issue,* the district court construed one element to cover two separate elements even though the patent taught that each element was to have distinct meanings. Accordingly, the court stated that "[t]he patent does not contemplate the [[element] performing double duty in this manner." 93 F.3d at 770. This was a narrow ruling on claim construction in a particular case and cannot be applied to the facts before the court.

Rather, the Federal Circuit has specifically stated that "[e]quivalency can also exist when separate claim limitations are combined into a single component of the accused device," such as when one element of the accused device fulfills two functions of the claimed invention. *Dolly, Inc. v. Spalding & Evenflo Cos., Inc.*, 16 F.3d 394, 398-99 (Fed.Cir.1994). In this case, Comark's evidence supports the notion that the IF vision modulator in the Harris device completely fulfills the function of the IF vision modulator in the '904 patent and also combines with the detector to fulfill the function of the "video delay circuit" in the '904 patent. A jury finding of infringement under the doctrine of equivalents under this theory is supported by the controlling law and substantial evidence at trial.

*7 Fourth, Harris argues that the use of the IF vision modulator as a delay was "dedicated to the public" because it was disclosed in the specification, but not claimed as a means for delaying the video signal. (Def.'s Mem. at 9-10.) This is another issue that appears to be more appropriate for a claim construction hearing because it involves the interpretation of the scope of Claim 1, but it was not raised at that time. The court will not entertain new arguments on the topic of claim construction now that the *Markman* hearing and the trial are completed.

Fifth, Harris argues that the Harris device, when compared with the system described in Claim 1 of the '904 patent, performs a different function, in a different way, to get a different result. (Def.'s Mem. at 11-13.) Harris offered its evidence on this point and these same arguments to the jury in its closing argument, all to no avail. The jury apparently disagreed with them and accepted the testimony of Comark's experts that the Harris device performed substantially the same function, in substantially the same way, to achieve substantially the same result as the system recited in Claim 1 of the '904 patent. As stated above, in light of the testimony of Kiesel and Pickholtz and their supporting exhibits, there was substantial evidence to support this finding.

## 2. Claim 14

Claim 14 of the '904 patent recites:
A method for reducing unwanted aural carrier modulation caused by a video signal in a common amplification television transmitter which amplifies both an aural signal and a visual signal simultaneously, the method comprising the steps of:
mixing an aural carrier with an amplitude modulated video signal to generate a commonly amplified television transmission signal;
demodulating the commonly amplified television transmission signal to provide a demodulated aural signal;
performing a spectral analysis of the demodulated aural signal to determine the presence and frequency of unwanted aural signal noise resulting from unwanted aural carrier modulation;
generating a non-linear amplitude domain video signal and a non-linear phase domain video signal which respectively having amplitude and phase components that are directly opposite to unwanted amplitude and phase components added to the aural signal by the video signal;
amplitude and phase modulating the aural signal using the non-linear amplitude domain video signal and the non-linear phase domain video signal, respectively, to generate a modified aural signal; and
adding the modified aural signal to the visual signal in the transmitter.

(Ex. P-1, col. 7, lines 46-50; col. 8, lines 1-22.) Harris argues only that the accused device does not

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 6

contain an equivalent to Step 3 of this set-up procedure, which requires the performance of "a spectral analysis of the demodulated aural signal to determine the presence and frequency" of aural signal noise. Harris asserts that the various devices used to perform a time analysis of noise-such as an oscilloscope, a spectrum analyzer in zero span mode, or a wave form monitor-were able only to determine the presence of noise and not its frequency. (Def.'s Mem. at 14-16.)

*8 The evidence at trial demonstrates that the jury heard substantial testimony from Kiesel and Pickholtz that these devices also can perform the equivalent of a spectral analysis to determine the frequency of unwanted noise on the aural signal. (Tr. 3/7/97 at 39, 59-60, 68-69, 71-73; Tr. 3/24/97 at 71-74, 79-80; Pickholtz Dep. at 18-22.) Harris does not address this testimony, but rather repeats the same arguments that it made at the *Markman* hearing. At that time, the court ruled that whether the measuring devices mentioned above could determine the frequency of unwanted noise was a question of fact for the jury. *Comark Communications, Inc. v. Harris Corp.*, No. 95-2123, 1997 WL 87260, at *8 (E.D.Pa. Feb.24, 1997). The jury apparently found that fact in favor of Comark, and this finding is supported by the substantial evidence cited above.

For the preceding reasons, the court will deny Harris' renewed judgment as a matter of law on the issue of infringement under the doctrine of equivalents.

### C. *Willfulness*

At trial, Comark presented two theories to support its claim that Harris' infringement of Claim 1 and Claim 14 of the '904 patent was willful. The first involved Harris' reliance on the opinion of its outside patent counsel, Robert B. Sundheim, Esquire ("Sundheim"), that the Harris device did not infringe any of the claims of the '904 patent. Comark argues that such reliance was unreasonable because Harris management withheld from Sundheim information that bore directly on the issue of infringement under the doctrine of equivalents. The second theory involved allegations that Harris deliberately copied Claim 1. Harris' motion argues that Comark did not offer clear and convincing evidence that its infringement was willful. (Def.'s Mem. 18-31.)

#### 1. Willfulness Generally

The issue of willfulness "rests on a determination of the infringer's state of mind," *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed.Cir.1996), and "includes elements of intent, reasonableness, and belief," *Pall Corp.*, 66 F.3d at 1221. Among the grounds for a willfulness finding are "[t]he extent to which the infringer disregarded the property rights of the patentee, the deliberateness of the tortious acts, or other manifestations of unethical or injurious commercial conduct." *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1583 (Fed.Cir.), cert denied, 519 U.S. 911, 117 S.Ct. 275, 136 L.Ed.2d 198 (1996). No hard-and-fast rules govern the willfulness determination, which should be made after evaluating all the relevant circumstances. *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 792 (Fed.Cir.1995) Willful infringement must be proven by clear and convincing evidence. *Pall Corp.*, 66 F.3d at 1221; *In re Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d 1527, 1543 (Fed.Cir.1992).

Two of the factors in determining whether a patent owner has proven willful infringement are whether the defendant has reasonably relied on a legal opinion by competent counsel and whether the defendant deliberately copied the invention claimed in the patent. As the following discussion demonstrates, Comark offered substantial evidence of willfulness relating to both factors.

#### 2. Reliance on Sundheim's Legal Opinion

*9 All persons and entities are charged with an affirmative duty to avoid infringement of the known patent rights of others, a duty that usually includes seeking and obtaining competent legal advice before engaging in an activity that could result in infringement. *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1056 (Fed.Cir.1994); *Ortho Pharmaceutical Corp. v. Smith*, 959 F.2d 936, 944 (Fed.Cir.1992); *Spindelfabrik Suessen-Schurr Stahlecker & Grill GmbH v. Schubert & Salzer Maschinenfabrik Aktiengesellschaft*, 829 F.2d 1075, 1084 (Fed.Cir.1987), cert denied, 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 987 (1988). Reliance on the legal opinion of a competent lawyer is evidence of good faith, but does not require a finding of nonwillfulness. See *Hayes Microcomputer Prods. Patent Litig.*, 982 F.2d at 1543. The relevant inquiry is the nature of the legal opinion and its effect on an infringer's actions. *Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178, 182 (Fed.Cir.1994). As the Federal circuit has stated:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 7

While an opinion of counsel letter is an important factor in determining the willfulness of infringement, its importance does not depend upon its legal correctness. Indeed, the question arises only where counsel was wrong. Rather, counsel's opinion must be thorough enough, as combined with other factors, to instill a belief in the infringer that a court might reasonably hold the patent is invalid, not infringed, or unenforceable. Thus, [the infringer's] intent and reasonable beliefs are the primary focus of a willful infringement inquiry.

Ortho Pharmaceutical Corp., 959 F.2d at 944 (citation omitted). The "most important consideration" is whether something in the legal opinion "would alert a client to reject the letter as an obviously bad opinion." Read Corp. v. Portec, Inc., 970 F.2d 816, 830 (Fed.Cir.1992).

On May 14, 1993, when Harris was in the later stages of designing the accused device, its management provided Sundheim with some pertinent information about the device and method and asked him for a legal opinion as to whether it infringed the '904 patent. (Ex. D-424; Tr. 3/25/97 at 147.) Harris also asked Sundheim to obtain additional information from Dave Danielsons (' 'Danielsons"), a Quincy, Illinois-based engineer who was not the most knowledgeable engineer about the topic. (See Tr. 3/25/97 at 142.) On July 7, 1993, Sundheim sent Harris' in-house patent counsel a five-page opinion letter concluding that the Harris device did not infringe any of the '904 patent's claims. (Ex. D-428.)

Sundheim concluded that the Harris device did not infringe Claim 1 because the '904 patent employs an unmodulated base band video signal and the Harris device uses a demodulated video signal, and that the two signals have different spectral characteristics. Id. at 3. Sundheim concluded that the Harris device did not infringe Claim 14 because its set-up method did not contain Step 3, which requires the "performance of a spectral analysis of the demodulated aural signal to determine the presence and frequency of unwanted aural signal noise...." Id. at 4-5. Based on Sundheim's opinion, Harris proceeded with the manufacture and sale of the accused device.

*10 Comark argues that Harris management's reliance on Sundheim's opinion was unreasonable because it knowingly withheld from him information that was important to an informed analysis of whether the Harris device infringed the Comark patent. (See Tr. 4/14/97 at 75.) The thrust of Comark's theory is that Harris did not direct Sundheim to gather information from Culling, the Cambridge, England-based engineer who invented the Harris device and was the most knowledgeable Harris engineer about the design of the device and the operation of the set-up procedure. Instead, Comark emphasizes, Harris management referred Sundheim to Danielsons, who was much less knowledgeable about the design and procedure of the device.

Because Harris did not tell Sundheim that Culling had information that could help his analysis, Sundheim did not know that the video delay circuit could be performed by combining an IF vision modulator with a detector. (Tr. 3/26/97 at 174.) He never was told that Culling's first intimation of the aural carrier-corrector had used an IF vision modulator coupled with a detector to provide a delayed video signal to the processor. Id. at 175. In addition, Harris management never informed Sundheim that if an IF vision modulator was coupled with a detector, the output signal had the same spectral characteristics as the signal in the processor of Harris' aural carrier corrector. Id. Sundheim also never knew that the alleged differences in spectral characteristics between a demodulated video signal and a base band video signal occur only at frequencies above 0.75 megahertz, and Comark and Harris systems use only the frequencies below 0.75 megahertz, where the spectral characteristics of the two video signals are substantially the same. (See Tr. 3/24/97 at 55-56.)

Comark argues that Sundheim's analysis of Claim 14 was similarly flawed because he was ignorant of the following sequence of events. On April 14, 1993, Harris's written set-up procedure indicated the use of a spectrum analyzer in zero span mode. (Tr. 4/2/97 at 8.) At about the same time, management's concerns about infringement of the '904 patent led it to suggest to engineers in Cambridge that they not use a spectrum analyzer. Id. at 11-12. An effort then was made to change the procedures to achieve the same results, but without the use of a spectrum analyzer. Id. at 14-15. On June 17, 1993, once the revised procedures were in place, Culling was concerned that they might fall within the scope of Claim 14. (Ex. P-22.) Sundheim did not know any of the above facts when he wrote his legal opinion. Moreover, in November 1993, after he concluded that Harris' device would not infringe the Comark patent, Harris reinstituted the use of the spectrum analyzer in zero span mode as part of the set-up procedure. (Tr. 4/2/97 at 60-61.)

The above factual summary, viewed in the light most

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 8

favorable to Comark, is substantial evidence that Culling was the most knowledgeable about the Comark and Harris aural carrier correctors and could have provided Sundheim with information about their similarities, differences, and equivalencies. This information may have led Sundheim to the conclusion that the Harris device would infringe either Claim 1 or Claim 14. There was substantial evidence that Harris management directed Sundheim to Danielsons, who was not part of the Cambridge group that developed the device. A reasonable jury could have concluded that Harris management intended to direct Sundheim only certain engineers, and to give him only certain pieces of information, so he would write an opinion letter that would permit Harris to proceed with the manufacture and sale of the accused device. There was substantial evidence, therefore, for a reasonable jury to conclude that Harris management knew Sundheim's opinion was based on inadequate facts and that his conclusion may have been different if it had been based on the best information available. *See Hamburger Color Co., Inc. v. Pan Chem Corp.*, Civ. Nos. 95-6751 & 95-2493, 1996 WL 537847, at *2 (E.D.Pa. Sept.17, 1996) ("Defendant cannot be permitted to rely upon an "advice-of-counsel" defense when it is clear that [[it] did not make full disclosure of the pertinent information to the attorney, and that attorney was laboring under a misapprehension of fact.").

### 3. Deliberate Copying of the Invention

*11 Another relevant factor in determining willfulness is whether the infringer deliberately or intentionally copied the ideas or design of another. *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1414 (Fed.Cir.1996); *Hayes Microcomputer Prods., Inc. Patent Litig.*, 982 F.2d at 1543. The party alleging infringement need not prove that the infringer "slavishly copied" the design or idea of the patent. *Stryker Corp.*, 96 F.3d at 1414.

From the evidence at trial, a reasonable jury could have accepted the following facts. On January 26, 1993, Harris spotted the problem of line sync spurs around the aural carrier. (Ex. P-190; Tr. 4/1/97 at 139-41.) On February 4, 1993, Harris engineers in Cambridge obtained a paper from the 1991 Society of Broadcast Engineers ("SBE") convention that described the BTSC signal problem and that Comark had solved the problem with the WSNS transmitter. (Ex. P-192; Tr. 4/1/97 at 141.) The paper, written by Ericksen, however, did not explain how Comark solved the problem. (*See* Ex. P-6.) On the same day,

Harris was looking for a paper from the same convention authored by Nathaniel S. Ostroff ("Ostroff"), Comark's President and Chief Executive Officer at the time. (Ex. P-192.) This paper explained the solution and contained a block diagram of Comark's aural carrier corrector. (Ex. P-5.) Ostroff's paper stated that Comark was applying for a patent on the corrector. *Id.* at 4.

Also on February 4, 1993, a patent attorney in England, a Mr. M. Waggett ("Waggett"), provided Gerrard with the results of a search for patents and applications by Thomson [FN5] in anticipation of litigation for trial. (Ex. P-308; Tr. 3/26/97 at 21.) On February 11, 1993, Culling conceived of the invention of the accused device. (Ex. P-53; Tr. 4/2/97 at 67-68.) In a letter dated February 16, 1993, Waggett reported to Gerrard confidential information regarding a search for Comark and Thomson patents and applications. (Ex. P-308; Tr. 3/26/97 at 22-23.)

FN5. Thomson is a French corporation that acquired Comark in 1986. (*See* Tr. 3/14/97 at 95-96.)

In light of this substantial evidence, a reasonable jury could have concluded that Harris "deliberately or intentionally" copied Comark's aural carrier corrector. *See Stryker Corp.*, 96 F.3d at 1414. A reasonable jury could have found that Harris, in an effort to compete with Comark (the only other company that had solved the BTSC noise problem), obtained the Comark design from the Comark patent application and/or the Ostroff paper after experiencing a BTSC signal noise problem. Within three weeks, Harris claims to have invented its aural carrier corrector. The jury could reasonably infer that the infringement occurred because Harris deliberately or intentionally copied the Comark design from either or both of the two documents.

Based on the above, it is clear that there was substantial evidence at trial from which a reasonable jury could conclude that Harris had no reasonable basis for believing that its actions did not infringe the '904 patent and that it deliberately disregarded Comark's rights in its patent. Accordingly, the court will deny Harris' renewed judgment as a matter of law on the issue of willfulness.

### D. Damages

*12 Harris argues only that no substantial evidence

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 9

exists to support the award of lost profits damages because "Comark offered no evidence as to what its actual profits would have been but for Harris," but relied on budgeted data. Harris does not challenge the jury's awards of price erosion and reasonable royalty damages. (Def.'s Mem. at 32-33.)

Comark correctly points out that its damages expert, Brian Blonder, relied on actual income statements for portions of his analysis. Even if Blonder relied exclusively on budgeted figures, Harris has not cited legal authority to support its contention that a damages verdict must be based on actual financial data. Harris had the opportunity to argue to the jury that Blonder's conclusions were entitled to little or no weight because they were based largely on budgeted and not actual data. Thus, the court will deny Harris' renewed motion for judgment as a matter of law on the issue of damages.

### E. *Summary*

For the reasons set forth above, the court finds that substantial evidence supports the jury's verdict on the issues of infringement under the doctrine of equivalents, willfulness, and damages. Accordingly, the court will deny Harris' renewed judgment as a matter of law.

### III. *HARRIS' ALTERNATIVE MOTION FOR A NEW TRIAL*

Harris seeks a new trial on the issues of infringement under the doctrine of equivalents, willful infringement, and damages, and its defenses of obviousness and anticipation. Harris argues that the jury verdicts are contrary to the weight of the evidence.

A court may grant a new trial "to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States...." Fed.R.Civ.P. 59(a). A new trial may be granted even when judgment as a matter of law is inappropriate. *Wagner by Wagner v. Fair Acres Geriatric Ctr.*, 49 F.3d 1002, 1017 (3d Cir.1995). "Even where there is 'substantial evidence' the trial judge may set aside a verdict for the reason that it is against the clear weight of the evidence, or that damages are excessive, or that substantial errors occurred in the admission or rejection of evidence."

*Keystone Floor Prods. Co. v. Beattie Mfg. Co.*, 432 F.Supp. 869, 877 (E.D.Pa.1977).

As to the issues of infringement, willfulness, and damages, Harris makes the same arguments in its motion for a new trial as it did in its renewed motion for judgment as a matter of law. The court will deny Harris' motion on those issues for the reasons set forth in Part II above.[FN6]

> FN6. Harris makes three arguments regarding the doctrine of equivalents that were not addressed in Part II because they are relevant to the issue of a new trial. Harris argues that (1) the jury did not give "due weight" to the Harris patent; (2) Comark's argument concerning "improvement patents' misled the jury; and (3) the jury was required to find in its favor on the issue of infringement under the doctrine of equivalents because the Harris patent explains that the system does not need a video delay circuit." (Def.'s Mem. at 10-11.)
>
> As for Harris' first and second arguments, there is no basis to conclude that the testimony and argument regarding the Harris patent was misleading or that the jury did not give it "due weight." As for the third contention, the PTO's issuance of the Harris patent carries a presumption that it is nonobvious, but it does not mean that the jury must find that the Harris device did not infringe the '904 patent under the doctrine of equivalents. The existence of a patent on an accused device is *relevant* to the jury's infringement analysis, but it does not *require* the jury to make a finding of noninfringement. *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1570 (Fed.Cir.1996); *Roton Barrier, Inc. v. Stanley Works*, 79 F.3d 1112, 1128 (Fed.Cir.1996) (Nies, J., additional views); *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1191-92 (Fed.Cir.1996).

As to its defenses of obviousness and anticipation, Harris argues that it is entitled to a new trial because the only expert opinions on these topics favor its position and were uncontested by Comark's experts. (Def.'s Mem. at 31-32.) The court disagrees. Comark was not required to offer expert testimony (or any evidence at all) because the '904 patent is presumed to be valid, and Harris had the burden of

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 10

proving that it was invalid by clear and convincing evidence. The court believes that a new trial on obviousness and anticipation is not warranted because the jury's finding is not against the weight of the evidence.

*13 As a general matter, both parties had a full and fair opportunity to present their entire case to the jury. A reasonable jury could have found in favor of Comark or Harris on all of the issues. The court cannot conclude that the evidence on any issue overwhelmingly favored Harris, that Harris' arguments were so persuasive that they compel a verdict in its favor, or that the jury's failure to return a more favorable verdict for Harris is an injustice. Accordingly, it will deny Harris' motion for a new trial because the jury's findings on all the issues were supported by the evidence and were not against the clear weight of the evidence.

### IV. COMARK'S MOTION FOR INCREASED DAMAGES AND ATTORNEY FEES

Comark requests treble damages under 35 U.S.C. § 284 and a finding that this is an "exceptional case" that would justify an award of attorney fees under 35 U.S.C. § 285, principally because the jury found that Harris' infringement of the '904 patent was willful. Harris argues that increased damages and attorney fees are inappropriate under the facts of this case.

#### A. *Increased Damages*

The patent statute authorizes the court, upon a finding of infringement, to "increase the damages up to three times the amount found or assessed." 35 U.S.C. § 284. The court's award may "reflect the interest of justice in adjusting the damages appropriate to the culpability of the acts of infringement." *National Presto Indus., Inc. v. West Bend Co.*, 76 F.3d 1185, 1194 (Fed.Cir.1996). In deciding whether to increase the damages, the "paramount determination" is "the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed.Cir.1992).

A jury finding that the defendant willfully infringed the patent supports, but does not require, an award of enhanced damages. *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed.Cir.1992). However, once the jury has found willfulness and the court has held that substantial evidence supports this finding, the court, in deciding whether to increase damages, is bound by the jury's finding of willfulness and may not reweigh the evidence on the topic. *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1572 (Fed.Cir.1996). In *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed.Cir.1992), the Federal Circuit listed nine factors that have been used to evaluate the degree of the infringer's culpability and thus assist in the decisions of whether to award increased damages and how much to increase the damages.

The most prominent factor supporting Comark's request for increased damages is the jury's finding of willful infringement of Claim 1 and Claim 14. The court has held that this finding is supported by substantial evidence that Harris intentionally copied the Comark design and/or unreasonably relied on the legal opinion of its outside counsel. The evidence supporting these theories are summarized in Part II of this Memorandum. The jury's finding compels the conclusion that Harris' decision to make and sell the accused device was in bad faith.

*14 On the other hand, the court stated in Part III above that Harris presented evidence at trial that would have justified a verdict in its favor on the infringement and willfulness issues. The evidence supporting Harris' position is summarized with citations to the record in its motion papers. Because the evidence on this issue was not one-sided, and the jury's decision could have gone either way, the court confidently can conclude that the case was close. This conclusion weighs against an award of increased damages to the extent sought by Comark.

The court has carefully weighed all the factors relevant to an award of increased damages, as well as the parties' arguments. Based on these factors, the court will reject Comark's request for treble damages because it cannot conclude that Harris has engaged in the highest degree of culpability in infringing the Comark patent. Rather, the court will double the damages in this case by $7.7 million to a total of $15.4 million.[FN7]

> FN7. The evidence at trial and the exhibits accompanying Comark's motion demonstrate that Harris' financial condition will not be impaired by a doubling of the jury's damage award. Harris is a profitable multinational corporation whose 1996 pre-tax income was $274.4 million. (Ex. P-744.) A letter to shareholders from its Chief Executive Officer that was downloaded

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 11

from the Internet states that the company "expects to have another year of good earnings growth in fiscal 1997." (Pl.'s Mem. Supp. Increased Damages & Att'y Fees Ex. D at 4.)

### B. *Attorney Fees*

The patent statute stated that "[t]he court in exceptional cases, may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. The analysis under this statute involves a two-step inquiry. First, the court must decide whether there is clear and convincing evidence that the case is exceptional. If it is, the court must decide whether to award attorney fees to the prevailing party. *See Interspiro USA, Inc. v. Figgie Int'l, Inc.*, 18 F.3d 927, 933 (Fed.Cir.1994); *J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1050 (Fed.Cir.1987). Willful infringement is one reason that a case may qualify as exceptional. *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed.Cir.1996); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1579 (Fed.Cir.1996). If the jury finds willful infringement, it does not follow that the trial court always must find that the case is exceptional. The court also should consider factors such as "the closeness of the case, the tactics of counsel [and] the conduct of the parties." *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 201 (Fed.Cir.1986).

The court finds that this is an exceptional case in light of the jury's finding that Harris willfully infringed Claims 1 and Claim 14 of the Comark patent-by deliberately copying the invention and/or by steering their outside patent counsel away from pertinent information so that he would write a legal opinion letter concluding there would be no infringement and thus attempt to provide legal cover for the sale of the accused device. These findings compel the conclusion that this case is "exceptional" within the meaning of 35 U.S.C. § 285.

The court also believes that Comark, the prevailing party, is entitled to attorney fees. Comark has not submitted a detailed description of its fees and expenses to the court, but it estimates that it spent $2.6 million to litigate its claim. (Pl.'s Mem. Supp. Increased Damages & Att'y Fees at 21.) The court will require Comark to file such a description within thirty days. [FN8] The court will not extend this deadline for any reason.

FN8. The court notes that Comark requested 60 days to file a detailed description of the fees and costs incurred in this litigation. (Pl.'s Mem. Supp. Increased Damages & Att'y Fees at 21.) Comark should not need two months to compile attorney fees and costs because (1) it knew more than two years ago that it would seek that money if it prevailed on the willfulness issue, (Compl. at 4), and (2) in this age of computers, it should be able to quickly generate a printout of billing records containing information to prove that such fees and costs reasonably related to the results achieved in this case.

### V. *COMARK'S MOTION FOR PREJUDGMENT INTEREST*

*15 Comark seeks $745,904 in prejudgment interest based on its internal borrowing rates for 1993 through 1997. Harris argues that the court should deny the entire request because the $7.7 million jury award has more than compensated Comark for its losses. If the court decides that Comark is entitled to prejudgment interest, Harris argues, the amount of interest should cover only the two years between the day Comark filed this lawsuit and the day judgment was entered, and should be based on simple interest calculated on Treasury bill rates.

The section governing damages in patent cases states: "Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. The underlying purpose of the statute "strongly suggests that prejudgment interest should ordinarily be awarded where necessary to afford the plaintiff full compensation for the infringement." *General Motors Corp. v. Devex Corp.*, 461 U.S. 648, 654, 103 S.Ct. 2058, 76 L.Ed.2d 211 (1983). Thus, a court should award prejudgment interest unless it has some justification for withholding such an award. *Id.* at 657.

### A. *Whether Comark is Entitled to Prejudgment Interest*

Harris argues that awarding prejudgment interest to Comark would be excessive when comparing the requested amount to the price Comark would charge customers for its aural carrier corrector or the costs

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 12

Comark would incur in manufacturing the device, for all the sixty-two transmitters at issue in this case. (Def.'s Mem. Opp. Prej. Interest at 1 n. 1.) A disparity in these figures, however, is irrelevant in the court's decision whether to grant an award of prejudgment interest. In this case, the jury found Harris liable to Comark for infringement and awarded $7.7 million in compensatory damages. This is money that Comark would have been able to use absent Harris' infringement, either to invest and earn *interest* or use to reduce its debt. (*See* Pl.'s Mem. Supp. Prej. Interest at 2-3.) Prejudgment interest, therefore, is required to fully compensate Comark for the money it lost because of Harris' infringement.

### B. *The Applicable Time Period*

The Federal Circuit has held that "interest compensates the patent owner for the use of its money between the date of injury and the date of judgment." *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1033 (Fed.Cir.1996), *cert. denied*, 519 U.S. 1112, 117 S.Ct. 951, 136 L.Ed.2d 838 (1997). However, "when the patent owner has been responsible for undue delay in prosecuting the lawsuit," a court may deny all or a portion of a request for prejudgment interest. *General Motors*, 461 U.S. at 657 (footnote omitted).

Harris states that it "alerted Comark to a written description of the Harris set up method" and the differences between it and the method claimed in the '904 patent in November 1993, and asked Comark to respond if it had concerns about infringement. (Ex. D-441.) Comark did not respond until it filed the Complaint in April 1995. Based on this "undue delay," Harris argues, the court should deny Comark's request in its entirety. (Def.'s Mem. Opp. Prej. Interest at 2.)

*16 The court disagrees. The fact that seventeen months passed between the Harris letter and the filing of this lawsuit does not, without more, mean that the delay was "undue." Harris must offer some evidence that Comark's delay was based on an improper reason. Because Harris has not done so, the court will award prejudgment interest for the time period between 1993 and April 18, 1997.

### C. *The Appropriate Rate*

The district court has wide discretion to determine the appropriate rate to calculate an award of prejudgment interest. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed.Cir.1991); *Kaufman Co., Inc. v. Lantech, Inc.*, 926 F.2d 1136, 1144 (Fed.Cir.1991). Indeed, the Federal Circuit has affirmed awards of prejudgment interest based on a wide variety of rates. *See, e.g., Laitram Corp. v. NEC Corp.*, 115 F.3d 947 (Fed.Cir.1997) (United States Treasury bill rate compounded annually); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1555 (Fed.Cir.), *cert. denied*, 516 U.S. 867, 116 S.Ct. 184, 133 L.Ed.2d 122 (1995) (compound rates); *Uniroyal*, 939 F.2d at 1545 (prime rate compounded daily); *Kaufman Co.*, 926 F.2d at 1144 (8.94 percent); *Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820, 829 (Fed.Cir.1989), *cert. denied*, 493 U.S. 1024, 110 S.Ct. 729, 107 L.Ed.2d 747 (1990) (Treasury bill rate compounded annually); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579 (Fed.Cir.1988) (prime rate compounded quarterly).

Comark asks the court to calculate prejudgment interest at its internal borrowing rate, or 3.94% for 1993, 5.05% for 1994, 6.87% for 1995, 6.17% for 1996, and 6.17% for 1997. (Pl.'s Mem. Supp. Prej. Interest at 3.) During this litigation, Harris' damages expert stated that he found "the interest rate approach used by [Comark] to be reasonable." (Ex. D-59 at 24.) Harris cannot now argue that the interest rate should be the lower Treasury bill rate. The court will calculate prejudgment interest at the rates proposed by Comark and order Harris to pay prejudgment interest in the amount of $745,904.

### VI. *COMARK'S MOTION FOR A PERMANENT INJUNCTION*

Because the jury concluded that the '904 patent is valid and was infringed by Harris' Sigma transmitters, Comark argues that it is entitled to a permanent injunction to prevent Harris' further infringement of the patent.

A district court presiding over a patent infringement case may grant an injunction "in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable." 35 U.S.C. § 283. Courts are not required to automatically enter a permanent injunction when the factfinder has found infringement. *Roche Prods., Inc. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 866 (Fed.Cir.), *cert. denied*, 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.  
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)  
**(Cite as: Not Reported in F.Supp.)**

Page 13

117 (1984). Rather, courts have broad discretion in deciding whether to grant an injunction and in determining the scope of an injunction. *Joy Techs. Inc. v. Flakt, Inc.*, 6 F.3d 770, 772 (Fed.Cir.1993). As a general rule, however, "an injunction will issue when infringement has been adjudged, absent a sound reason for denying it." *Richardson v. Suzuki Motor Co., Ltd.*, 868 F.2d 1226, 1247 (Fed.Cir.), *cert. denied*, 493 U.S. 853, 110 S.Ct. 154, 107 L.Ed.2d 112 (1989).

*17 In this case, there is no sound reason for denying a permanent injunction. The outcome of the jury verdict is that the '904 patent is valid and was infringed by the accused device. By virtue of the rulings set forth in this Memorandum and Order, that outcome does not change. The court believes that a permanent injunction will enable Comark to fully enforce its patent and exclude others from making, using, offering to sell, and selling the patented invention. Accordingly, the court will enter an Order of Permanent Injunction.

The parties have submitted proposed orders that differ with respect to several features. Harris argues that the court's Order should not cover transmitters that were included in Comark's damage award or that were sold outside the United States. Harris also suggests that the Order should be carefully worded so as to avoid enjoining Harris from engaging in lawful conduct. The court will address these arguments as follows.

First, Comark sought damages from Harris at trial only for sales of high-power, common amplification UHF transmitters containing aural carrier correctors that Harris sold before January 31, 1997, and that it identified on two stipulated sales charts, marked as Exhibits P-932 and P-965. (Pl.'s Mem.Supp. Permanent Injunction at 3; Def.'s Mem.Opp. Permanent Injunction at 2-3.) Comark does not seek injunctive relief as to the transmitters listed on these exhibits, and so the court's Order specifically will exclude these transmitters from its scope.

Second, the rulings of the Federal Circuit have been clear that a method claim such as Claim 14 of the '904 patent is infringed only when the method actually is practiced in the United States. This well-settled principle does not need to be written into an injunction to be given effect. The Order will be consistent with this rule.

Third, because a patent is presumed to be valid, 35 U.S.C. § 282, and the jury's verdict did not alter the validity of the '904 patent, the court will draft its Order so that it does not imply that the jury made a *finding* that the claims of the '904 patent are valid. The court, however, disagrees with Harris that the definition of the phrase "making, using, offering to sell, or selling," [FN9] should be modified. Comark's proposal defines the phrase as including "the manufacture, production, advertising, promotion, offering for sale, display, distribution and sale of any product or process embodying the invention of Claims 1 or 14 of the '904 patent...." Because this definition appears to cover activity that is covered under the phrase "making, using, offering to sell, or selling," and because Harris does not specify which parts of this definition are incorrect, the court will deny Harris' request.

> FN9. The court has added the phrase "offering to sell" in the Order of Permanent Injunction to follow the definition of infringement. *See* 35 U.S.C. § 271(a) ("Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent.").

Finally, the court will not order Harris to provide documentation sufficient to determine whether the "new advanced circuit" described in a Harris press release dated April 24, 1997, infringes the '904 patent. Harris has offered to promptly disclose to Comark "sufficient information to enable an evaluation of Harris' new correction circuit in terms of Comark's patent." (Def.'s Mem.Opp.Prelim.Inj. at 5.) The court expects Harris to comply with this representation in good faith. Harris need not provide documentation relating to this topic to the court at this time.

*18 Thus, the court will grant the request for a permanent injunction and will enter the Order attached to this Memorandum. The court will deny the request to order Harris to provide documentation concerning the "new advanced circuit" described in its press release.

### VII. *CONCLUSION*

For the reasons set forth above, the court finds that the jury's verdict was supported by substantial

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 14

evidence and was not against the clear weight of the weight of the evidence. Accordingly, the court will deny Harris' motions seeking judgment as a matter of law and a new trial.

In addition, the court will grant Comark's motion for increased damages and attorney fees. The court will double the jury's damages award of $7.7 million and amend the Judgment to reflect a total compensatory damages award in favor of Comark of $15.4 million. Because the court has found that this is an "exceptional" case warranting an award to Comark of attorney fees, the court will require Comark to submit to the court a detailed description of the fees and costs incurred in litigating this case within thirty days of the date of the Order accompanying this Memorandum.

The court also will grant Comark's motion for prejudgment interest in the amount of $745,904.00. As for Comark's motion for a permanent injunction, the court will grant the motion to the extent that it seeks to permanently enjoin Harris from making, using, and selling the patented invention and will deny the motion to the extent that it asks the court to order Harris to provide documentation regarding its "new advanced circuit" described in a press release.

Attached are an Order disposing of the pending motions and an Order of Permanent Injunction.

**ORDER**

AND NOW, TO WIT, this 17th day of July, 1997, upon consideration of Defendant's Renewed Motion for Judgment as a Matter of Law and Motion for a New Trial Under Rules 50(b) and 59, and Plaintiff's opposition thereto, IT IS ORDERED that said motions are DENIED.

Upon consideration of Plaintiff's Motion for Increased Damages Pursuant to 35 U.S.C. § 284 and for Attorney's Fees Pursuant to 35 U.S.C. § 285, and Defendant's opposition thereto, IT IS ORDERED that said motion is GRANTED, and

(1) The compensatory damages award of $7.7 million is DOUBLED. The Judgment entered April 18, 1997, is AMENDED to the extent that damages awarded in favor of Plaintiff and against Defendant are increased from $7.7 million to $15.4 million.

(2) Plaintiff shall file a petition detailing the reasonable attorney fees it seeks to recover in this case within thirty (30) days of the date of this Order.

Upon consideration of Plaintiff's Motion for Prejudgment Interest, and Defendant's opposition thereto, IT IS ORDERED that said motion is GRANTED. Defendant shall pay Plaintiff prejudgment interest in the amount of $745,904.00 within thirty (30) days of the date of this Order.

Upon consideration of Plaintiff's Motion for a Permanent Injunction, and Defendant's opposition thereto, IT IS ORDERED that said motion is GRANTED IN PART and DENIED IN PART. The court will enter the attached Order of Permanent Injunction.

**\*19 ORDER OF PERMANENT INJUNCTION**

AND NOW, TO WIT, this 17th day of July, 1997, in accordance with the jury's verdict in this action, the court concludes that Defendant Harris Corporation ("Harris") has infringed United States Patent No. 5,198,904 (the '904 patent"), and that the asserted claims of the '904 patent are valid. Based on this conclusion, IT IS ORDERED that Harris, its officers, agents, servants, employees, and attorneys, or a person or entity in active concert or participation with Harris, who receives actual notice of this Order by personal service or otherwise, shall be and are enjoined and restrained during the life of the '904 patent from making, using, offering to sell, or selling within the United States the aural carrier corrector that was found in this action to infringe Claim 1 of the '904 patent, or making using or selling Harris' method of setting-up and adjusting its aural carrier corrector that was found in this action to infringe Claim 14 of the '904 patent, or making, using, offering to sell, or selling within the United States any other product or process embodying the invention of Claim 1 or Claim 14 of the '904 patent.

The term "making, using, offering to sell, or selling" used herein shall include the manufacture, production, advertising, promotion, offering for sale, display, distribution and sale of any product embodying the invention of Claim 1 or Claim 14 of the '904 patent.

This Order does not apply to the Harris transmitters identified on Plaintiff's Trial Exhibits P-932 and P-965. These exhibits are subject to a confidentiality restriction by court Order. Persons who seek access to these exhibits should first attempt to obtain consent from Harris. If such consent is denied, such persons may apply to the court for relief from the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 15

restriction of confidentiality. Any such application should be appropriately noticed under the applicable law and rules.

E.D.Pa.,1997.
Comark Communications, Inc. v. Harris Corp.
Not Reported in F.Supp., 1997 WL 431000 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:95CV02123 (Docket) (Apr. 11, 1995)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab F

Westlaw.

Slip Copy
Slip Copy, 2006 WL 38918 (D.Del.)
(Cite as: Slip Copy)

Page 1

▷
Briefs and Other Related Documents
Only the Westlaw citation is currently available.
United States District Court,D. Delaware.
IMX, INC., Plaintiff,
v.
LENDINGTREE, LLC, Defendant.
No. Civ. 03-1067-SLR.

Jan. 6, 2006.

David Ellis Moore, Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE, for Plaintiff.
Jack B. Blumenfeld, Julia Heaney, Morris, Nichols, Arsht & Tunnell, Wilmington, DE, for Defendant.

MEMORANDUM ORDER

ROBINSON, J.
*1 At Wilmington this 6th day of January, 2006, having considered the issues raised by defendant at the December 19, 2005 pretrial conference;

IT IS ORDERED that plaintiff is precluded from seeking to draw an adverse inference or suggesting any adverse evidentiary presumption with respect to the nature of an opinion of counsel on infringement due to defendant's failure to obtain such an opinion, for the reasons that follow:

1. At the December 19, 2005 pretrial conference, defendant raised the following matter for consideration by the court: "Whether [plaintiff] may make any arguments or seek to draw inferences relating to the fact that the opinion of counsel obtained by defendant addressed the issue of invalidity of the patent-in-suit, but not the issue of infringement."

2. The holding of the Federal Circuit in _Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corporation, et al._, 383 F.3d 1337 (Fed.Cir.2004) (en banc), provides a clear answer to the question of whether inferences can be drawn as a result of the absence of an opinion from counsel. The Federal Circuit noted, "We now hold that no adverse inference that an opinion of counsel was or would have been unfavorable flows from an alleged infringer's failure to obtain or produce an exculpatory opinion of counsel. Precedent to the contrary is overruled." _Knorr-Bremse,_ 383 F.3d at 1341. Pursuant to this holding, plaintiff may not seek to draw the inference that, since the opinion by counsel obtained by defendant failed to discuss infringement, an opinion by counsel on infringement would have been unfavorable if obtained by defendant.

3. As the court in _Knorr-Bremse_ further explained, "Although there continues to be an affirmative duty of due care to avoid infringement of the known patent rights of others, the failure to obtain an exculpatory opinion of counsel shall no longer provide an adverse inference or evidentiary presumption that such an opinion would have been unfavorable." _Id._ at 1345 (internal citations omitted). Thus, plaintiff should be precluded from seeking to draw an adverse inference or suggesting any adverse evidentiary presumption as to the nature of an opinion on infringement.

4. As for the propriety of an argument relating to the fact that the opinion of counsel obtained by defendant addressed the issue of invalidity but not infringement, such evidence may be considered by the trier of fact when assessing willful infringement. Unchanged by _Knorr-Bremse_ is the standard that a determination of willfulness is made as a result of consideration of the totality of the circumstances. _Id._ at 1342-43. Several factors may be considered in the totality of the circumstances analysis used to evaluate willfulness, but no factor deserves per se treatment; each factor must be given the weight warranted by its strength in a particular case.[FN1] _Rolls-Royce, Ltd. v. GTE Valeron Corp.,_ 800 F.2d 1101, 1110 (Fed.Cir.1986); _Knorr-Bremse,_ 383 F.3d at 1347. As a result of the holding in _Knorr-Bremse,_ however, an adjustment is made to the factors used in the evaluation of the totality of the circumstances. _Knorr-Bremse,_ 383 F.3d at 1346 (vacating a judgment of willful infringement and remanding the case, noting that "[b]ecause elimination of the adverse inference as drawn by the district court is a material change in the totality of circumstances, a fresh weighing of the evidence is required to determine whether the defendants committed willful infringement."). In other words, while an evaluation of the factors in the totality of the circumstances must still be conducted to make a determination on the issue of willful infringement, such an evaluation must be made in the absence of the evidentiary contribution or presumptive weight of an adverse inference that any

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 38918 (D.Del.)
(Cite as: Slip Copy)

Page 2

opinion of counsel was or would have been unfavorable. *Id.* at 1341. The fact that no opinion of counsel on the issue of infringement was acquired by defendant may be considered by the trier of fact in its willful infringement analysis, but no inference may be drawn to suggest that such an opinion, had it been acquired, would have been unfavorable to defendant.

> FN1. The Federal Circuit has identified several factors that may be considered in determining whether infringement is willful: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) closeness of the case; (6) the duration of defendant's misconduct; (7) remedial action taken by defendant; (8) defendant's motivation for harm; and (9) whether defendant attempted to conceal its misconduct. *Read Corp. v. Portec, Inc.,* 970 F.2d 816, 827 (Fed.Cir.1992).

D.Del.,2006.
IMX, Inc. v. Lendingtree, LLC
Slip Copy, 2006 WL 38918 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1182408 (Trial Motion, Memorandum and Affidavit) Lendingtree's Reply Brief in Support of its Inequitable Conduct Defense and Counterclaim (Mar. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 1182409 (Trial Motion, Memorandum and Affidavit) Lendingtree, LLC's Reply Brief in Support of its Renewed Motion for Judgment as A Matter of Law Or, in the Alternative, for A New Trial (Mar. 20, 2006) Original Image of this Document (PDF)
• 2006 WL 1182406 (Trial Motion, Memorandum and Affidavit) IMX, Inc.'s Opposition to Lendingtree, LLC's Opening Brief in Support of Inequitable Conduct Defense and Counterclaim (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 1182407 (Trial Motion, Memorandum and Affidavit) Imx, Inc.'s Opposition to Lendingtree's Motion for Judgment as A Matter of Law (Mar. 8, 2006) Original Image of this Document (PDF)
• 2006 WL 809087 (Trial Motion, Memorandum and Affidavit) IMX, Inc.'s Reply Brief in Support of its Motion for Entry of A Permanent Injunction Re: U.S. Patent No. 5,995,947 (Feb. 28, 2006) Original Image of this Document (PDF)
• 2006 WL 809086 (Trial Motion, Memorandum and Affidavit) Opening Brief in Support of Defendant Lendingtree, LLC's Inequitable Conduct Defense and Counterclaim (Feb. 15, 2006) Original Image of this Document (PDF)
• 2006 WL 819609 (Trial Motion, Memorandum and Affidavit) Lendingtree, LLC's Opening Brief in Support of its Renewed Motion for Judgment as A Matter of Law or, in the Alternative, for A New Trial (Feb. 15, 2006) Original Image of this Document (PDF)
• 2005 WL 2603755 (Trial Motion, Memorandum and Affidavit) Imx, Inc.'s Response to Lendingtree Llc'S Citation of Subsequent Authority (Sep. 6, 2005) Original Image of this Document (PDF)
• 2005 WL 2603754 (Trial Motion, Memorandum and Affidavit) Defendant Lendingtree, LLC'S Citation of Subsqunct Authority Pursuant to L.R. 7.1.2(C) in Support of its Motion for Partial Summary Judgment Limiting Damages Pursuant to 35 U.S.C. | 287(a) (Aug. 30, 2005) Original Image of this Document with Appendix (PDF)
• 1:03cv01067 (Docket) (Nov. 24, 2003)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.