# EXHIBIT A

Because of the ESD

### Page 596

[1] problems, many TFTs were come up as dead. So in [2] order to resolve that ESD problems, we came up [3] with various ideas and we tried a lot of [4] different schemes.

[5] However, there was not much [6] success. In that we came across this patent and [7] we read it and we thought that indeed this is [8] the fundamental resolution for that pesky ESD [9] problems.

[10] Q: Now, after you reviewed the '002 [11] patent, did you undertake any steps at LGE with [12] respect to the technology shown in the '002 [13] patent?

[14] A: Yes, of course I did. As soon as [15] we read this patent we thought this is the [16] process that could resolve the ESD problems. [17] And we designed a process that utilized the [18] inner guard ring and outer guard ring that are [19] taught by this patent.

[20] When we applied the processes that [21] utilized inner guard ring and outer guard ring, [22] we were able to solve the ESD problems. So it [23] was a tremendous technology for us. And we have [24] conducted some tests comparing the processes

### Page 597

[1] that use inner guard ring and outer guard ring [2] versus the processes that do not use that [3] technology, and there was indeed a tremendous [4] difference, tremendous difference in yield [5] rates.

[6] Q: And as a result of those tests, [7] what yield rate increase did LGE achieve?

[8] MR. RHODES: Objection. Leading.

[9] THE COURT: The objection will be [10] sustained.

[11] BY MR. BONO:

[12] Q: What was the result of the testing [13] that LGE performed?

[14] A: Yes, we conducted tests comparing [15] the products that utilized inner guard ring and [16] outer guard ring, and the products that did not [17] utilize inner guard ring and outer guard ring [18] and we compared the survival rate of those two.

[19] Q: And what did that comparison show?

[20] A: Although there were some slight [21] differences between modules, in general there [22] were about ten percent increase, at least ten [23] percent.

[24] Q: Now, after you completed your

### Page 598

[1] position as an LCD engineer, what was the next [2] position that you had at LG Electronics?

[3] A: I became IP manager.

[4] Q: All right. And what were — what [5] became — strike that.

[6] What were your responsibilities as [7] IP manager when you assumed that position?

[8] A: Although I performed almost every [9] aspect of IP business, I was especially involved [10] in licensing, initiation and purchasing —[11] purchasing patents.

[12] Q: And during what period of time [13] were you IP manager?

[14] A: From 1994 until 2004, for 11 [15] years.

[16] Q: Now, were you involved in the [17] purchase of the '002 patent?

[18] A: Yes, of course.

[19] Q: And would you explain your [20] involvement with the purchase of the '002 [21] patent?

[22] A: Yes. I — as I have explained it [23] before, after we read this '002 patent, we [24] applied the technology and thereby solved the

### Page 599

[1] ESD problems.

[2] So as soon as I became IP manager, [3] the first test that I put myself into was effort [4] to purchase this particular patent.

[5] Q: And what — what did you do, Mr. [6] Lee, to purchase the '002 patent?

[7] A: We made a contact with Honeywell [8] in order to buy this patent in 1995. [9] Surprisingly, the Honeywell made an offer of [10] seven — a package of seven patents including [11] this particular patent for $1.2 million.

[12] I was overjoyed because my feeling [13] was that this patent must be used by almost [14] everyone in the industry, and everyone must use [15] this — this patent in this industry. And I [16] thought it had a great — almost difficult to [17] assess the greatest value in it.

[18] Although at that time, the size of [19] LCD market was not large, our belief was by [20] using this technology, the LCD market would [21] become one of the great ones.

[22] So we accepted $1.2 million offer [23] without complaint, and that's how we bought it.

[24] MR. BONO: Exhibit 41. Turn to

### Page 600

[1] the second page.

[2] BY MR. BONO:

[3] Q: Mr. Lee, let me show you what's [4] been marked as Exhibit 41.

[5] MR. BONO: May I approach the [6] witness, Your Honor, just to give him an exhibit [7] book?

[8] THE COURT: Yes, sure.

[9] BY MR. BONO:

[10] Q: And Mr. Lee, you have a copy of [12] the exhibits in those notebooks. And so if you [13] could turn to Exhibit 41, Tab 41, please.

[14] Now, Mr. Lee, is Plaintiff's [15] Exhibit 41 the purchase and sale agreement [16] between Honeywell and LG Electronics for the [17] purchase of those patents, including the '002 [18] patent?

[19] A: That is correct.

[20] Q: Can I ask you now to look at [21] exhibit — Plaintiff's Exhibit 2?

[22] Mr. Lee, I'm showing you now [23] Plaintiff's Exhibit 2. Is that the assignment [24] of the patent from Mr. Holmberg to Alphasil,

### Page 601

[1] Inc.?

[2] MR. RHODES: Objection; leading. [3] You've got to change it a little bit.

[4] MR. BONO: All right.

[5] BY MR. BONO:

[6] Q: Can you identify that document?

[7] A: This is assignment document [8] showing that the inventor, Mr. Scott Holmberg, [9] was assigning this patent to Alphasil company.

[10] Q: And was that assignment filed [11] with the United States Patent Office?

[12] A: That is correct.

[13] Q: Would you please now turn to [14] Plaintiff's Exhibit 139?

[15] MR. BONO: Your Honor, may I [16] approach to help him find it?

[17] THE COURT: Yes, you may.

[18] BY MR. BONO:

[19] Q: Now, Mr. Lee, can you please [20] identify this document?

[21] A: This is — this is an assignment [22] document that assigns the patent to Honeywell by [23] Alphasil.

[24] Q: And was this assignment filed with

### Page 602

[1] the United States Patent Office?

[2] A: That is correct.

[3] Q: Would you please turn to Exhibit [4] 140?

[5] A: Yes.

[6] Q: Can you identify this document?

[7] A: This is, again, an assignment [8] document by Honeywell assigning seven patents, [9] including '002 patent to LG Electronics.

[10] Q: And was that assignment filed [11] with the United States Patent Office?

[12] A: Yes, it is.
[13] Q: Okay. Please turn to Plaintiff's [14] Exhibit 141.
[15] A: Yes.
[16] Q: And would you please identify that [17] document?
[18] A: This is an assignment document by [19] LG Electronics to LG Philips LCD. And it [20] assigns 376 patents, including '002 patent.
[21] Q: And was this assignment filed with [22] the United States Patent Office?
[23] A: That is correct.
[24] Q: Now, Mr. Lee as part of your — is

Page 603

[1] part of your responsibilities as IP manager from [2] 1994 through 2004 the enforcement of patents?
[3] A: Yes, of course.
[4] Q: Now, has LG Philips enforced the [5] '002 patent with respect to other companies?
[6] A: Yes, of course. [7] Yes, of course. After we have [8] purchased this patent in 1995, we invested — we [9] conducted some investigation, and we noticed [10] that NEC was using this patent. And we notified [11] NEC in 1997 and informing them that they were [12] infringing our patent, and began negotiation.
[13] And after about six months, we [14] also notified Mitsubishi that they were [15] infringing '002 patent. And we began [16] negotiating with them as well.
[17] Q: Would you explain to the members [18] of the jury, who is NEC?
[19] A: Yes. NEC was one of the stronger [20] players at that time.
[21] NEC's LCD ranking was about fourth [22] in the world. Mitsubishi also was one of the [23] stronger players in that field. Their LCD [24] ranking in the world was, I think, about fifth.

Page 604

[1] Q: As a result of notifying NEC, what [2] was the result of your negotiations?
[3] A: With NEC, we signed cross [4] licensing contract.
[5] Q: And what was the — what was the [6] result of your negotiations with Mitsubishi?
[7] A: Although Mitsubishi was one of the [8] stronger in LCD market at that time, LCD —[9] excuse me, Mitsubishi was concentrating on [10] Japanese domestic market. And it was not [11] exporting LCD to the United States.
[12] So we did not have much leverage [13] to negotiate with them.
[14] Q: Now, I may have asked you this [15] before, I apologize. But my question is: When [16] did you first approach Mit-

subishi, in what year, [17] informing them that they were infringing the [18] '002 patent?
[19] A: It was either — it was either [20] late 1987 or early 1988. Oh, I'm sorry.
[21] I'm sorry. What I meant to say [22] was it was either in 1997 or 1998.
[23] Q: Okay. Thank you. [24] Have you negotiated licenses with

Page 605

[1] any other companies covering the '002 patent?
[2] A: Yes, of course. We did a [3] negotiation with Hitachi and Toshiba.
[4] At that time, Hitachi was one of [5] the strongest players. Sharp was the number [6] one, and Hitachi was the second.
[7] Q: Did Hitachi and Toshiba sign [8] license agreements with LG Philips?
[9] A: Yes. We did sign cross licensing [10] contract with Hitachi, as well as Toshiba.
[11] Q: Now, Mr. Lee, I would like to ask [12] you to turn your attention now to Plaintiff's [13] Exhibit 46.
[14] A: Thank you.
[15] Q: Now, Mr. Lee, would you identify [16] this document?
[17] A: Yes. This is a letter sent by LG [18] Philips LCD to Chung — Chunghwa Picture Tubes [19] in 1902. I meant to say 8th of February of [20] 2002.
[21] Q: Now, were you — were you the [22] person at LG Philips responsible for sending [23] this letter to Chunghwa Picture Tubes?
[24] A: Yes, I was.

Page 606

[1] Q: Okay. And what was the purpose of [2] sending this letter to Chunghwa Picture Tubes?
[3] A: This was to inform Chunghwa [4] Picture Tubes that they were infringing eight [5] patents of ours, including '002 patent.
[6] And, also, we proposed to meet [7] either March 13th or March 15th in order to [8] discuss — in order to discuss this matter for [9] two days on March 13th and March 15th.
[10] Q: Now, prior to sending this letter [11] to Chunghwa Picture Tubes, what had LG Philips [12] done prior to sending this letter?
[13] A: We — we took Chunghwa Picture [14] Tubes 14-inch LCD display for notebook and [15] 15-inch display for monitor, and reverse [16] engineered, and analyzed that — analyzed those [17] in order to see if they were infringing our [18] patents.
[19] Also, as we had been analyzing [20] Mitsubishi product for a long time before that, [21] we were aware that the CPT's design was almost [22] the same as

Mitsubishi design. So we were aware [23] that they were almost identical.
[24] THE INTERPRETER: Counsel, may the

Page 607

[1] interpreter ask for clarification to the [2] witness?
[3] MR. BONO: Yes. I have no problem [4] with that.
[5] THE WITNESS: They were exactly [6] identical with Mitsubishi design. And we were [7] able to confirm that through various different [8] processes.
[9] BY MR. BONO:
[10] Q: And as a result of that analysis, [11] what did it show LG Philips?
[12] A: In '002 patent, with respect to [13] inner guard ring and outer guard ring, after the [14] product is completed, the outer guard ring is to [15] be cut off from the glass.
[16] So it would be difficult to [17] confirm the existence of outer guard ring from [18] the product. However, one could discern the [19] remains of the outer guard ring. The — that [20] can be confirmed from the product.
[21] One can discern the connecting [22] part of the outer guard ring that remained [23] behind after it was being cut off.
[24] It was almost the same, exactly

Page 608

[1] the same as what we had confirmed when we [2] analyzed NEC product, as well as the result we [3] obtained when we analyzed Mitsubishi product.
[4] INTERPRETER PARK: If I may, [5] counsel, and if I may, Your Honor, I'd like to [6] make a correction to the previous statement by [7] the witness, please.
[8] Although it is difficult to see [9] the outer guard ring after glass is cut off, we [10] would be able to see the remaining portion, [11] which is the connection portion to the outer [12] guard ring after the glass is cut off.
[13] INTERPRETER KIM: I don't have any [14] objection. I don't see any difference, though.
[15] INTERPRETER PARK: I do.
[17] BY MR. BONO:
[18] Q: Okay. After you — after LG [19] Philips sent this February 8, 2002 letter to [20] Chunghwa Picture Tubes, did Chunghwa Picture [21] Tubes respond to this letter?
[22] A: No, they did not.
[23] Q: Can you please turn now to Exhibit [24] 142.

Page 609

[1] A: Yes.

[2] Q: Would you please identify this [3] document.

[4] A: This is a letter sent by LG [5] Philips LCD to Chunghwa Picture Tubes on [6] February 27th of 2002.

[7] Q: And what was the purpose of [8] sending this letter to Chunghwa Picture Tubes?

[9] A: Yes. Because although we have [10] sent a letter proposing to meet March 14th and [11] 15th in early February, there was no answer, so [12] we have sent this follow-up letter.

[13] And also we notified them that if [14] it were impossible to resolve this problem of [15] infringement in amicable way, then LG Philips [16] LCD did not have any other means then resorting [17] to legal procedures.

[18] Q: Can you now go to Exhibit 143. [19] Can you please identify what's been marked now [20] as Exhibit 143?

[21] A: Yes. This is a letter sent by [22] Chunghwa Picture Tubes to LG Philips LCD on [23] March 5th of 2002.

[24] Q: And did this letter respond to the

Page 610

[1] prior two letters?

[2] A: Yes. They acknowledged having [3] received the two previous letters that we sent [4] and agreed accepting our proposal to meet on [5] March 15th.

[6] Q: Can you please turn to Plaintiff's [7] Exhibit 144, Mr. Lee, and can you please [8] identify this letter?

[9] A: Yes. This is a letter sent by LG [10] Philips LCD to Chunghwa Picture Tubes on March [11] 7th of 2002.

[12] Q: And what was the purpose of [13] sending this letter to Chunghwa Picture Tubes?

[14] A: Yes. Surprisingly we did receive [15] a letter from Chunghwa Picture Tubes on March [16] 5th telling us that they would accept our [17] proposal to meet on March 15th. However, [18] surprisingly two days later on March 7th, we [19] received a new letter. In that letter they [20] informed us that it was impossible for them to [21] meet on March 15th and asked us to postpone that [22] meeting.

[23] So having received the second [24] letter within two days, we were fairly upset,

Page 611

[1] however, in order to resolve this matter through [2] amicable negotiation, we proposed to meet on [3] April 18th and April 19th.

[4] Q: Mr. Lee, let me now direct your [5] attention to Exhibit 145. And would you please [6] identify this letter?

[7] A: This is a letter sent by LG [8] Philips LCD to Chunghwa Picture Tubes on March [9] 26th of 2002.

[10] Q: And what was the reason for [11] sending this letter to Chunghwa Picture Tubes?

[12] A: Yes. By this time we have [13] received from them request to postpone to [14] meeting on March 15th and we notified them that [15] the meeting will be postponed to 18th of April, [16] however, we had not received — we have not [17] received any reply from them.

[18] Accordingly, we were quite upset [19] by this time because although we have agreed to [20] their request for postponing the meeting, and [21] yet CPT would not respond.

[22] So we informed them that if [23] Chunghwa Picture Tubes did not have any way to [24] resolve this matter through amicable

Page 612

[1] negotiation, then we don't have any other way [2] then resorting to a drastic measure.

[3] Q: Can you go to the next exhibit, [4] please, 146.

[5] Mr. Lee, let me direct your [6] attention now to Exhibit 146. Can you please [7] identify this letter?

[8] A: This is a letter sent by LG [9] Philips LCD to Chunghwa Picture Tubes on May 8th [10] of 2002.

[11] Q: And what was the reason why this [12] letter was sent?

[13] A: Even though we have sent several [14] letters to them, they still had not responded to [15] our letters. We have negotiated with quite a [16] few companies before CPT with respect to '002 [17] patent as well as other patents, and we never [18] had a company as difficult to meet as with CPT.

[19] Q: Did you — as a result of this [20] letter — or strike that.

[21] What was the result of you sending [22] this letter to Chunghwa Picture Tubes?

[23] A: In this letter we proposed to meet [24] on June 10th, and finally with received a reply

Page 613

[1] — June 11th, and finally we have received [2] reply.

[3] Q: And did there — strike that. [4] Was there then a meeting conducted [5] between LG Philips and Chunghwa Picture Tubes in [6] June of 2002?

[7] A: Yes.

[8] Q: Now, who conducted — strike that. [9] Where was that meeting?

[10] A: We met at the office of Chunghwa [11] Picture Tubes in Taiwan.

[12] Q: And who conducted that meeting on [13] behalf of LG Philips?

[14] A: I did.

[15] Q: And what did you tell Chunghwa [16] Picture Tubes during that meeting?

[17] A: I explained that Chunghwa Picture [18] Tubes was infringing eight patents that were [19] held by LG Philips LCD, including '002 patent. [20] And additionally we handed over our licensing [21] agreement and proposed the terms of our [22] licensing agreement.

[23] And finally we told them that we [24] would like to have the counterproposal and

Page 614

[1] response to our proposal from Chunghwa Picture [2] Tubes by 5th of July, and Chunghwa Picture Tubes [3] agreed to that.

[4] Q: During the meeting with Chunghwa [5] Picture Tubes, did you discuss specific — any [6] specific Chunghwa Picture Tubes products with [7] them during that meeting?

[8] A: Yes, I did. I explained the [9] 14-inch display for notebook and 15-inch display [10] for monitor, which we analyzed before.

[11] Q: Now, did you have a presentation [12] that — a written presentation that you [13] presented to Chunghwa Picture Tubes at that [14] meeting?

[15] A: Yes, there was.

[16] THE COURT: Mr. Bono, I think [17] before we — let us take our morning break, [18] fifteen minutes. We'll take a fifteen-minute [19] recess.

[20] (Jury leaving the courtroom at [21] 11:15 a.m.)

[22] THE COURT: All right. We'll be [23] in recess for fifteen minutes.

[24] (A brief recess was taken.)

Page 615

[1] THE COURT: All right. The jury [2] is on its way in.

[3] (Jury entering the courtroom at [4] 11:35 a.m.)

[5] THE COURT: All right. Be seated, [6] please.

[7] Mr. Bono.

[8] MR. BONO: Thank you, Your Honor.

[9] BY MR. BONO:

[10] Q: Mr. Lee, would you please turn now [11] to Exhibit 47.

[12] A: Yes.

[13] MR. BONO: May I approach the [14] witness, Your Honor?

[15] THE COURT: Yes, you may.

[16] MR. BONO: Thank you.

[17] THE WITNESS: Yes, I have it.

[18] BY MR. BONO:

[19] Q: Thank you. [20] Can you please identify Exhibit [21] 47?

[22] A: This material is one of the [23] materials that we used in the presentation and [24] explanation in the meeting between LG Philips,

---

Page 616

[1] LG Philips LCD and Chunghwa Picture Tubes on [2] 11th of June in 2002 at Chunghwa Picture Tubes' [3] office in Taipei, Taiwan.

[4] Q: Does Exhibit 47, which is a [5] multi-page document, does it show the particular [6] products that you discussed at that meeting with [7] Chunghwa Picture Tubes?

[8] A: Yes, that's correct. These are [9] the materials that came out of analysis we have [10] performed on 14-inch LCD for notebook computer [11] and 15-inch LCD for monitor.

[12] Q: And looking at page one of this [13] presentation, is that the monitor product of [14] Chunghwa Picture Tubes that you discussed?

[15] A: That is correct.

[16] Q: And let me show you what is page [17] 14 of the presentation. Does this show the [18] 14-inch product that you discussed at the [19] meeting?

[20] A: Yes, that's correct. This is the [21] 14-inch LCD for a notebook computer.

[22] Q: And looking at page 15, does this [23] show another 14-inch product of Chunghwa Picture [24] Tubes that you discussed at this meeting?

---

Page 617

[1] A: That is correct.

[2] Q: Mr. Lee, what did you discuss at [3] the meeting concerning the '002 patent?

[4] MR. BONO: May I approach the [5] witness, Your Honor?

[6] THE COURT: Yes.

[7] MR. BONO: Because it's not [8] numbered.

[9] THE WITNESS: Although the picture [10] is not that clear, if you look at this area, [11] this area that I'm pointing at, this shows the [12] remainder of the connecting part that remained [13] behind after the outer guard ring was cut off [14] when the product was completed

[15] MR. BONO: Your Honor — excuse [16] me.

[17] THE WITNESS: And therefore —

[18] MR. BONO: Excuse me. Your Honor, [19] I apologize. This picture is as you see very [20] unclear. I wonder if I could show the jury the [21] actual pages?

[22] THE COURT: Show Mr. Rhodes and [23] then we can put it up for publication.

[24] MR. RHODES: Okay. No objection.

---

Page 618

[1] THE COURT: Thank you. You can [2] publish it.

[3] MR. BONO: May I just hand this to [4] the jury, Your Honor?

[5] THE COURT: Sure.

[6] BY MR. BONO:

[7] Q: Mr. Lee —

[8] MR. BONO: May I approach the [9] witness?

[10] THE COURT: Are there multiple [11] copies?

[12] MR. BONO: No, there are just [13] three pages. I don't have multiple copies.

[14] THE COURT: Just explain that to [15] the jury.

[16] MR. BONO: I have handed you pages [17] 9 and 10 and 11 of the presentation which we are [18] now going to discuss.

[19] THE COURT: Thank you.

[20] MR. BONO: Your Honor, I'll [21] proceed.

[22] THE COURT: Sure.

[23] BY MR. BONO:

[24] Q: I'll ask the question, put us back

---

Page 619

[1] on track.

[2] Mr. Lee, what did you discuss at [3] the June meeting concerning the '002 patent?

[4] A: Yes. I showed this picture and [5] pointing out this area that I'm pointing at [6] right now showing that connecting part that was [7] cut off from outer guard ring and telling them [8] because of this remaining connecting part, the [9] Chunghwa Picture Tubes is using outer guard [10] ring, and thereby infringing '002 patent.

[11] Q: This is page 10 of the [12] presentation. And what did you tell Chunghwa at [13] the meeting concerning the '002 with respect to [14] this picture?

[15] MR. RHODES: Objection. Leading.

[16] MR. BONO: I'll rephrase the [17] question, Your Honor.

[18] Q: What else did you tell Chunghwa [19] Picture Tubes about the '002 patent at this [20] meeting?

[21] A: Likewise in this picture, the [22] parts that — the area that I'm pointing at [23] right now, I point to that area point and [24] explain that because of the connecting part that

---

Page 620

[1] shows here, that proves that Chunghwa Picture [2] Tube was using outer guard ring on this product [3] as well and infringing '002 patent.

[4] Q: Mr. Lee, can you now turn to [5] Plaintiff's Exhibit 50?

[6] A: Yes, I have it.

[7] Q: Can you please identify [8] Plaintiff's Exhibit 50?

[9] A: This is the licensing agreement [10] that we handed over to Chunghwa Picture Tube on [11] June 11th meeting.

[12] Q: Can you explain to the jury, in [13] general, what were the terms of the licensing [14] agreement that LG Philips proposed to Chunghwa [15] Picture Tubes at this meeting?

[16] A: Yes. This agreement offers all — [17] all patents that LG Philips has, including '002 [18] patent as a licensing worldwide — on worldwide [19] basis. And for that, we were requesting — we [20] were proposing 2.5-percent running royalty rate.

[21] This is a — on worldwide basis. [22] And if one is to designate a specific region or [23] specific country, that rate would go up.

[24] Q: Now, in a licensing negotiation,

---

Page 621

[1] which relates to only the '002 patent, if [2] Chunghwa Picture Tubes were saving $100, what [3] royalty would LG Philips want?

[4] A: In principle, because that's the [5] amount — amount of the cost that has been [6] saved, in principle, it would be fair that — [7] fair to get 100 percent of the saving.

[8] However, considering the effort [9] that Chunghwa Picture Tube have put into, to be [10] fair, I would say 50-percent split would be [11] fair.

[12] MR. BONO: Can we please turn to [13] Exhibit 147?

[14] BY MR. BONO:

[15] Q: Mr. Lee, can you please look at [16] Plaintiff's Exhibit 147? And please identify [17] that document.

[18] A: This is a letter sent by LG [19] Philips LCD to Chunghwa Picture Tube on July [20] 30th of 2002.

[21] This letter mentions the fact that [22] LG Philips LCD and Chunghwa Picture Tube has [23] agreed on June 11th meeting on certain matters.

[24] Chunghwa Picture Tube promised us

---

Page 622

[1] that they would come back to us with their own [2] counter proposal by the 5th of July. [3] Surprisingly, we received — just before this [4] letter on 22nd of July, we received a letter [5] from Chunghwa Picture Tube.

[24] having a meeting with CPT in June of 2002;

Page 649

[1] correct?

[2] A: That's correct.

[3] Q: Incidentally, you speak English, [4] don't you?

[5] A: Yes, a little bit.

[6] Q: And you read English; right?

[7] A: Yes, to a little extent.

[8] Q: In fact, when you prepared with [9] Mr. Bono for your deposition, you spoke to him [10] in English; right?

[11] A: On certain occasions I did, and [12] other — and on other occasions I used the [13] interpreter.

[14] Q: Now, during that meeting in June, [15] 2002 with CPT, you were speaking English with [16] them; is that correct?

[17] A: That is correct.

[18] Q: Now, at that meeting in June of [19] 2002 with CPT, that was a general introduction, [20] not a deep technical discussion; right?

[21] A: Yes. However, we had already [22] prepared claim charts and since they were aware [23] of the technical — and since they were aware of [24] the problems since February, we have provide

Page 650

[1] them with enough technical information by that [2] time.

[3] Q: But you'll agree that CPT was not [4] prepared to have a technical meeting and [5] technical discussions with you; right?

[6] A: I thought that since they have had [7] six months period — excuse me, four months [8] period, I thought that they would have [9] understood our technology sufficiently.

[10] Q: Well, let me direct you to your [11] deposition testimony from July 3rd, 2006, again, [12] page 122, lines 1 to 6.

[13] "ANSWER: And another thing was [14] that this was the first meeting, so I don't [15] believe that CPT was prepared to have a [16] technical meeting with technical discussions. [17] So rather than having any deep technical [18] discussions, I believe that we gave a general [19] introduction."

[20] A: That's correct.

[21] Q: Could we put PTX 46 up on the [22] screen.

[23] Now, Mr. Lee, we talked about this [24] letter this morning; right?

Page 651

[1] A: Yes, that's true.

[2] Q: Now, if you look at PTX 46, if [3] you'll just read through that for a moment, will [4] you please tell me where it says infringe or [5] infringement in that letter anywhere?

[6] A: Yes. In this letter we are simply [7] saying that we are willing to offer licenses for [8] all our technology.

[9] Q: In fact, in the second paragraph [10] it says as examples you may wish to review U.S. [11] patent numbers and it list eight patents; right?

[12] A: Yes, that's correct.

[13] Q: And if you look at the next [14] paragraph, it says, "Should your company wish to [15] discuss the above identified patents." Correct?

[16] A: That's correct.

[17] Q: And it says, "We will be happy to [18] visit your company on any one day between March [19] 14 and March 15." Right?

[20] A: That's correct.

[21] Q: And those were dates of your [22] choosing; correct?

[23] A: That's correct.

[24] Q: You didn't ask CPT for any

Page 652

[1] convenient dates for them; right?

[2] A: Yes, we didn't ask that, however, [3] we didn't hear the answer for this letter, [4] either.

[5] Q: You know what Chinese New Years [6] is, don't you?

[7] A: Yes, of course I do.

[8] Q: Now, can you put up PTX 142 for [9] me, please. And just put both letters on the [10] screen. And if you can enlarge PTX 142 a little [11] bit so we can read it.

[12] And I would like to refer your [13] attention to PTX 142 which is on the right-hand [14] side of the screen. And the first line it says, [15] "On February 8, we wrote to you and asked for a [16] meeting to discuss the unauthorized use of [17] technology owned by LG Philips LCD Company by [18] Chunghwa Picture Tubes."

[19] A: That's correct.

[20] Q: And that first sentence of that [21] letter is incorrect; right?

[22] A: Well, there may be a little bit of [23] difference of opinion regarding the expression [24] that is used, but I think largely the substance

Page 653

[1] is correct.

[2] Q: Well, let's look at the second [3] sentence of that paragraph. "In that letter, we [4] asked for a meeting to discuss the issue of [5] patent infringement with CPT."

[6] A: That's correct.

[7] Q: And that sentence isn't correct, [8] either, is it?

[9] A: Well, you may not say it is 100 [10] percent correct, but you say it's more or less [11] the same vein.

[12] MR. RHODES: And can you put — [13] Defendants' Exhibit 58, please?

[14] INTERPRETER PARK: If I may, if I [15] could make a correction to the last statement by [16] the witness.

[17] I wouldn't think that it is 100 [18] percent identical in meaning, but more or less, [19] I would think it is the same meaning.

[20] MR. RHODES: Put those back up.

[21] INTERPRETER KIM: I respectfully [22] disagree, but the Korean rendition is on the [23] record.

[24] BY MR. RHODES:

Page 654

[1] Q: The February 27th letter says, in [2] that letter, February 8th 2002, we asked for a [3] meeting to discuss this issue of patent [4] infringement with CPT.

[5] Which part of the February 8th [6] letter is identical to that sentence?

[7] A: Well, it may not be identical. It [8] is some softened out. And in large sense, I [9] think that's, more or less, the same substance [10] if you read, as example, you may wish to review.

[11] Q: Okay. So my understanding is that [12] may wish to review is identical with the issue [13] of patent infringement.

[14] That's your answer; is that [15] correct?

[16] A: Not true. It's not exactly [17] identical. However, in February 8th letter, we [18] asked him to reply by February 26th.

[19] If they had — if they had replied [20] by that time for that letter, then we would have [21] used different expression. Since they had not, [22] we sort of expended the expression to a stronger [23] connotation, because there was no reply.

[24] Although that was — the substance

Page 655

[1] was more or less the same, we made it stronger. [2] Since we have made it stronger.

[3] Q: Okay. And you've already said [4] that you know what Chinese New Year's is; right?

[5] A: That's correct.

[6] Q: Now, looking at both of those [7] letters, PTX 46 and PTX 142, neither one of [8] those letters identifies a single CPT product, [9] does it?

[10] A: True. However, on the February [11] 27th letter, we do mention unauthorized use of [12] technology. This refers to the general product [13] by CPT.

[14] Q: All right. But you will agree [15] that there's no specific CPT products identified [16] in either one of those letters; right?

[17] A: That's correct.

[18] Q: And there are no specific claims [19] of any of those patents set out in those [20] letters; right?

[21] A: That's correct.

[22] MR. RHODES: Go to Exhibit 58. [23] PTX 58.

[24] BY MR. RHODES:

Page 656

[1] Q: Now, this is a copy of the patent [2] license agreement draft proposal that you gave [3] to CPT at the June meeting; correct?

[4] A: That's correct.

[5] Q: And in that license agreement, you [6] were proposing a royalty rate of 2.5 percent; [7] right?

[8] A: That's correct.

[9] Q: And that was supposed to be a [10] licensing rate for the entire LPL portfolio [11] relating to LCDs; right?

[12] A: That's correct.

[13] Q: Now, when we were looking at the [14] February 8th letter earlier, PTX 46, did I [15] identify the patents that LPL wanted to license [16] to CPT?

[17] A: Which contract and which letter?

[18] Q: Well, let's go back. It's PTX 46. [19] Incidentally there was 447 or so [20] patents in LPL's portfolio at that time; isn't [21] that right?

[22] A: Yes, although I don't quite [23] remember the precise number. It sounds right.

[24] Q: I don't remember the precise

Page 657

[1] number, but it sounds right to me, too.

[2] Now, did you identify all the [3] patents in your portfolio in the February 8th [4] letter to CPT?

[5] A: Does the counsel mean this [6] particular letter?

[7] Q: Yes, this letter. Did you [8] identify it?

[9] A: No, just — we identified just [10] few.

[11] Q: All right. Let's go to PTX 142. [12] Now, did you provide CPT with the [13] list of the patent portfolio that you wanted [14] them to license in this — this letter?

[15] A: No, we did not.

[16] Q: And let's go to PTX 145. [17] And that is a March 26th, 2002 [18] letter to CPT. Now, again you didn't supply the [19] list of all the patents you wanted CPT to [20] license in this letter, either, did you?

[21] A: That's correct.

[22] Q: And let's go to PTX 146.

[23] A: However, they never required or [24] asked us for such information.

Page 658

[1] Q: And that's your testimony?

[2] A: That's my supplemental [3] explanation.

[4] Q: Okay. Let's go to PTX 146. [5] Now, you didn't supply the list of [6] patents in that letter, either, did you?

[7] A: That's correct.

[8] Q: And if we can go to DTX 120. [9] Now, we're up to May 17th, 2002.

[10] Did you supply the list of all the [11] 400-plus patents in this letter?

[12] A: We did not.

[13] Q: And if we can go to DTX 121. [14] Now, we're up to May 31st, 2002. [15] Did you supply the list of 400-plus patents to [16] CPT in this letter?

[17] A: We did not.

[18] Q: All right. Let's go to DTX 123. [19] Now we're up to July.

[20] Now, in this letter you state [21] that, We provided CPT our standard licenses [22] agreement during our June 11 meeting.

[23] Do you see that?

[24] A: Yes, I did.

Page 659

[1] Q: And you didn't supply the list of [2] 400-plus patents to CPT in this letter, either; [3] right?

[4] A: That's correct.

[5] Q: Then let's go to DTX 125. [6] Now, we're up to July 30th, 2002. [7] And the second paragraph, the last sentence, it [8] says a list of patents available for licensing [9] is attached to this letter.

[10] A: That's correct.

[11] Q: And if we go to Page 2 of that [12] exhibit. Is that a list of the LPL patents that [13] you wanted CPT to pay a 2.5-percent royalty for?

[14] A: That's correct.

[15] Q: And if we go to Page 2 of that [16] exhibit.

[17] And this is the last page of the [18] three-page document of DTX 124. And that's the [19] remainder of the patents that you wanted CPT to [20] license at that 2.5-percent royalty; correct?

[21] A: That's correct.

[22] Q: Okay. So starting in February of [23] 2002, when you first sent the letter to CPT, in [24] February, you didn't give them a list with all

Page 660

[1] the patents; correct?

[2] A: Correct.

[3] Q: And in March you didn't give them [4] a list, either; right?

[5] A: Correct.

[6] Q: Didn't give them one in April, [7] either; correct?

[8] A: Correct.

[9] Q: You didn't give them one in May?

[10] A: Correct.

[11] Q: And you gave them a proposed [12] license agreement in June; right?

[13] A: Correct.

[14] Q: And then on July 30th, you gave [15] them a list?

[16] A: Correct.

[17] MR. RHODES: Can we have DTX 124, [18] please?

[19] BY MR. RHODES:

[20] Q: Now, earlier you said they never [21] asked for one; correct?

[22] A: Yes. That's correct. [23] However, I meant in May.

[24] Q: Oh, I see. Now, if we look at

Page 661

[1] Paragraph 3 with respect to the license [2] agreement, We are concerned about the licensed [3] patents most. Thus, we need more information, [4] such as the Patent List, to estimate the value [5] of them.

[6] A: Yes. That's correct.

[7] Q: And they said, We need more [8] information and time for this matter. We would [9] like to extend the date you had stated on July [10] 5, 2002.

[11] Do you see that?

[12] A: That's correct.

[13] Q: And then on July 30th, you finally [14] gave them a list of 447 patents to analyze; [15] right?

[16] A: That's correct.

[17] Q: Now, if we could put DTX 48 up. [18] Actually don't put that up yet.

[19] Now, Mr. Lee, you gave them a list [20] at the end of July for a proposed licensing [21] agreement in 2002; correct?

[22] A: Correct.

[23] Q: And they asked for more time; [24] right?

Page 662

[1] A: Correct.

[2] Q: And that list was 447 odd patents; [3] right?

[4] A: Correct.

[5] Q: And less than a month later, you [6] sued CPT; right?

[7] A: Correct.

[8] Q: And you sued them in California; [9] right?

[10] A: That's correct.

[11] Q: And are you familiar with that [12] complaint?

[13] A: Yes, I do.

[14] MR. RHODES: Okay. Can you put [15] DTX 48 up now, please?

[16] BY MR. RHODES:

[17] Q: Now, you sued CPT in California in [18] August of 2002; correct.

[19] A.

[20] A: That's correct.

[21] Q: And then you sued CPT on the other [22] coast in Delaware in 2005; right?

[23] A: That's correct.

[24] Q: Now, in the complaint that you

Page 663

[1] filed against CPT in California in 2002, that [2] didn't involve the '002 patent; right?

[3] MR. BONO: Objection, Your Honor. [4] I believe Your Honor sustained our motion that [5] this case not deal with other litigation and [6] other patents.

[7] MR. RHODES: I believe that's [8] incorrect, we have been through that issue.

[9] THE COURT: I have allowed some [10] limited response, so I'll permit this question, [11] and then you feel free to object when you think [12] it goes beyond my ruling.

[13] MR. BONO: Thank you, Your Honor.

[14] THE WITNESS: That's correct.

[15] BY MR. RHODES:

[16] Q: And that case in California has [17] not gone to trial yet; right?

[18] A: Correct.

[19] Q: Now, if we could look at the [20] patents that are identified in DTX 048, and go [21] to the next page.

[22] MR. BONO: Objection, Your Honor. [23] I believe this has been ruled as not being [24] admissible in this proceeding, Your Honor.

Page 664

[1] MR. RHODES: Your Honor, you said [2] we could have some inquiry into what was going [3] on between —

[4] THE COURT: You can fill in what [5] went on during the intervening time period [6] without specifics about the litigation because [7] it's irrelevant to this litigation.

[8] MR. RHODES: Right. These will [9] only be identification of which patents were [10] sued on in 2002, that's it.

[11] THE COURT: I'll overrule the [12] objection.

[13] BY MR. RHODES:

[14] Q: All right. Now you have [15] identified in that complaint U.S. Patent Number [16] 4,624,737; correct?

[17] A: That's correct.

[18] Q: And the second patent was the [19] 5,825,449 patent; right?

[20] A: That's correct.

[21] Q: And the next one was the 6,373,537 [22] patent; right?

[23] A: Correct.

[24] Q: And the next one is the 6,020,942

Page 665

[1] patent?

[2] A: Correct.

[3] Q: And the next one is the — [4] unfortunately we have a little bit of writing [5] over that, but I'll do my best — 6,002,457.

[6] A: That's correct.

[7] Q: And the last one is the 5,926,237 [8] patent; right?

[9] A: Correct.

[10] Q: And we don't see the 5,019,002 [11] patent in that suit, do we?

[12] A: That's correct.

[13] Q: And the '002 is a very valuable [14] patent; correct?

[15] A: Correct.

[16] Q: Now, incidentally, you mentioned [17] this morning in your testimony about a notice [18] letter that went to Mitsubishi. Did I hear that [19] correctly?

[20] A: We did notify them, but it was not [21] in the form of letter.

[22] Q: If there was a letter, you would [23] have given that to your counsel; right?

[24] A: Does the counsel mean if there was

Page 666

[1] a letter sent by LPL to Mitsubishi?

[2] Q: Yes.

[3] A: I do believe we were sent a [4] separate letter, however, between LPL and [5] Mitsubishi there was a negotiation going on in [6] progress with respect to semiconductor patents, [7] and the '002 patent was inserted in that [8] negotiation, so as far as I remember or know, [9] it's been quite some time ago, since 1997, my [10] recollection is not that clear, but I don't [11] believe there was a separate letter.

[12] Q: Now, you know the inventor, the [13] named inventor on the '002 patent; correct?

[14] A: Yes, I do.

[15] Q: All right. And that was [16] Mr. Holmberg; correct?

[17] A: Correct.

[18] Q: Now, Mr. Holmberg never received [19] any money from LPL for the '002 invention; [20] correct?

[21] A: That's correct.

[22] Q: Can we go back to the PTX 46, [23] please.

[24] Now, one of the patents that's

Page 667

[1] listed there is 5,856,816. Do you see that?

[2] A: Yes, I do

[3] Q: Do you specifically remember [4] discussing the '816 patent with CPT at the June [5] 11th meeting, 2002?

[6] A: For that matter I don't believe I [7] have mentioned that — specifically mentioned [8] that.

[9] Q: Now, you testified this morning [10] that you did some comparisons between products [11] that have inner and outer guard rings and [12] products that have no guard rings; is that [13] correct?

[14] A: Yes, I did.

[15] Q: All right. And that's the only [16] comparison you did; right?

[17] A: Correct.

[18] Q: So you didn't compare products [19] that had one guard ring against products that [20] had no guard rings; right?

[21] A: Does counsel mean by one guard [22] ring, inner guard ring or outer guard ring.

[23] Q: We'll take them one by one. Did [24] you conduct any tests between a product that had

Page 668

[1] just an outer guard ring and no guard ring?

[2] A: No.

[3] Q: And you didn't compare a product [4] that just had an inner guard ring versus a [5] product that had no guard ring; right?

[6] A: Yes, that's correct, I have not.

[7] Q: So the only thing you tested as a [8] comparison was just a product that had both an [9] inner and outer guard ring versus a product that [10] had no guard ring?

[11] A: Yes. Of course the one that I did [12] personally was a product with two guard rings, [13] however, there was an experiment, there was an [14] experiment involving outer guard ring only, [15] although that did not have detailed results. I [16] do not quite remember detailed results of that [17] particular experiment.

[18] However, if I may offer my [19] somewhat fuzzy recollection, I believe about [20] half, more than — perhaps even more than half [21] of the result was

Case 1:05-cv-00292-JJF   Document 458-4   Filed 10/06/2006   Page 9 of 17

LG Philips LCD Co., LTD   v.                                    Trial Volume 3
Tatung Company, et al.                                           July 19, 2006

ules at [21] CPT? What is the first step in the sales [22] process? Would it be a purchase order from a [23] customer?
[24] A: No.

Page 695

[1] Q: Okay. What would it be?
[2] A: First you provide a quote to the [3] customer.
[4] Q: So CPT provides a quote?
[5] A: Yes.
[6] Q: Has CPT ever provided quotes to [7] Dell?
[8] A: Yes.
[9] Q: After CPT provides a price quote, [10] what is the next step in the sales process?
[11] A: Accept customer's consent.
[12] Q: So the customer either agrees to [13] the quote or there's negotiation on the price; [14] is that fair?
[15] A: Yes.
[16] Q: Before CPT provides a quote to the [17] OEM for a module, CPT may have provided a [18] reference price for that module to HP or Dell?
[19] A: Yes.
[20] Q: If an OEM is going to use a CPT [21] module for a brand product like HP, then HP has [22] to first approve the use of CPT's modules; [23] correct?
[24] THE WITNESS: Yes.

Page 696

[1] BY MR. CHRISTENSON:
[2] Q: And CPT communicates directly with [3] brands like HP to obtain approval for an OEM to [4] use CPT modules; correct?
[5] A: Yes.
[6] Q: Do any U.S. brands order modules [7] directly from CPT?
[8] A: Yes.
[9] Q: Which ones?
[10] A: Dell.
[11] Q: Mr. Kuan, you understand that you [12] are under oath and must testify truthfully [13] today?
[14] A: Yes.
[15] Q: Before we started this morning, [16] your counsel informed me that there are a few [17] things that you may want to clarify; is that [18] correct?
[19] A: Yes
[20] Q: And specifically you want to [21] clarify something regarding your testimony from [22] yesterday; is that right?
[23] A: Yes.
[24] Q: Did you discuss that testimony

Page 697

[1] with counsel?
[2] A: Yes.
[3] Q: Are you clarifying testimony that [4] you discussed with your counsel?
[5] A: Yes.
[6] Q: Please tell me what you would like [7] to clarify from your testimony yesterday.
[8] A: It's regarding DisplaySearch and [9] regarding information of the U.S. market [10] condition.
[11] Q: All right. Let's start with [12] display search.
[13] What would you like to clarify [14] concerning DisplaySearch?
[15] A: Because yesterday when I talked [16] about DisplaySearch, I indicated that it did not [17] include U.S. market, but after confirmation, I [18] discovered that it did include U.S. market [19] information.
[20] Q: And how did you confirm that?
[21] A: In the past, I did review a [22] DisplaySearch report.
[23] Q: Have CPT employees reviewed [24] DisplaySearch reports concerning the U.S.

Page 698

[1] market?
[2] A: Yes.
[3] Q: The U.S. market is an important [4] part of the global market; correct?
[5] THE WITNESS: Yes.
[6] Q: Is there anything else you would [7] like to clarify from yesterday concerning what [8] you called the U.S. market condition?
[9] A: Whether CPT is aware whether HP [10] has any sales in the United States.
[11] Q: Okay. What would you like to [12] clarify?
[13] A: Well, through many media reports, [14] HP does have sales in the United States.
[15] Q: How does CPT know that HP has [16] sales in the United States?
[17] THE WITNESS: Through these media [18] reports, CPT gained information — gained [19] knowledge that HP did sell in the United States.
[20] BY MR. CHRISTENSON:
[21] Q: Mr. Kuan, what else would you like [22] to clarify?
[23] A: Yesterday I was asked whether HP [24] had directly placed an order to CPT.

Page 699

[1] Q: All right. And what did you tell [2] me yesterday?
[3] A: I said no.
[4] Q: Okay. And was that answer [5] correct, sir?
[6] A: Are you referring to what I said [7] yesterday?
[8] Q: Yes. Was your testimony yesterday [9] correct?
[10] A: No.
[11] Q: Why not?
[12] A: That's why I wanted to clarify.
[13] Q: Right. What — what was incorrect [14] about your testimony?
[15] A: Purchase was made to CPT directly.
[16] Q: So HP has directly ordered LCD [17] modules from CPT?
[18] A: Yes.
[19] Q: More than once?
[20] A: Yes.
[21] Q: During what period of time has HP [22] directly ordered CPT modules?
[23] A: Prior to last year.
[24] Q: So during 2005, HP directly

Page 700

[1] ordered CPT modules; is that correct?
[2] A: Yes.
[3] Q: And when HP directly ordered [4] modules from CPT, did CPT supply those modules [5] for HP products?
[6] A: Yes.
[7] Q: At the time that HP was directly [8] ordering modules from CPT, CPT was aware that [9] HP's LCD products were sold in the United [10] States?
[11] THE WITNESS: It knew that HP has a [12] part of its product which sells in the United [13] States.
[14] Q: Since when has CPT known that HP [15] LCD products are sold in the United States?
[16] A: It's been a period of time, but [17] I'm unable to specify when.
[18] Q: For more than one year?
[19] A: Of course.
[20] Q: Okay. For several years?
[21] THE WITNESS: I don't know what you [22] mean by "several years".
[23] BY MR. CHRISTENSON:
[24] Q: Okay. For more than two years?

Page 701

[1] A: I think should be.
[2] Q: Perhaps we can — well, let me [3] give you an opportunity to answer a couple of [4] other questions on this same topic from [5] yesterday. Does CPT know that Dell's LCD [6] products are sold in the United States?
[7] A: Yes.
[8] Q: And has CPT known that for more [9] than two years?

Case 1:05-cv-00292-JJF    Document 458-4    Filed 10/06/2006    Page 10 of 17

LG Philips LCD Co., LTD  v.                                    Trial Volume 3
Tatung Company, et al.                                         July 19, 2006

[4] BY MR. CHRISTENSON:

[5] Q: Go ahead.

[6] A: We also discussed the [7] opportunities as well as the means for [8] introducing the CPT TFT LCD module products into [9] the U.S. brand customers.

[10] Q: What opportunities have you [11] discussed?

[12] A: We talked about the introduction [13] of — we talked about the opportunities of [14] introducing the CPT notebook LCD module products [15] into HP or Dell's future products.

[16] Q: When you say "future products", [17] are you referring to specific products that CPT [18] knows Dell or HP are planning?

[19] THE WITNESS: That's correct.

[20] Q: How did CPT learn about those new [21] products that Dell and HP are planning?

[22] A: Through the product managers of [23] Dell or HP.

[24] Q: Is it common for Dell product

Page 722

[1] managers to inform CPT about new products that [2] Dell is planning?

[3] THE WITNESS: According to my [4] personal experience, Dell and HP would notify [5] CPT. If CPT have some appropriate products, in [6] that case, they would notify CPT.

[7] In that case, they would notify — [8] they would notify CPT.

[9] Q: I just want to confirm that Dell [10] or HP often notified CPT of new Dell or HP [11] products if CPT has modules that might fit with [12] those products; correct?

[13] THE WITNESS: That's correct.

[14] BY MR. CHRISTENSON:

[15] Q: And likewise, CPT informs Dell and [16] HP of new module products that CPT is [17] developing; correct?

[18] A: Correct.

[19] Q: And as you — as you indicated [20] earlier, these communications allow CPT and U.S. [21] brands to identify opportunities to work [22] together on new projects; correct?

[23] A: That's correct. These [24] opportunities can be created.

Page 723

[1] Q: You also mentioned that you and [2] Brian Lee have discussed the means to introduce [3] LCD module products to U.S. brand customers. [4] What have — what have you discussed regarding [5] the means to introduce LCD module products to [6] U.S. brand customers?

[7] A: Mainly it would include some of [8] the requests and requirements proposed by Dell [9] and HP.

[10] Q: What type of requests and [11] requirements have Dell and HP proposed?

[12] A: Including the need from them of [13] the LCD product specifications, as well as their [14] target price, as well as they requested CPT to [15] provide a stable quantity for the follow-up [16] sales and subsequent sales. They also requested [17] some quality control

[18] Q: Let's take those each one at a [19] time. One thing you mentioned was the need for [20] LCD product specifications. Does CPT provide [21] LCD product specifications to Dell and HP for [22] proposed new projects?

[23] A: Yes

[24] Q: And is that for HP and Dell to

Page 724

[1] approve those specifications so that these CPT [2] modules can be used for their products?

[3] A: Not completely so.

[4] Q: Is that one reason why CPT [5] provides the specifications to Dell and HP?

[6] A: Correct.

[7] Q: What other reasons are there?

[8] A: For specifications catering to [9] both parties' different needs and requirements, [10] and possibly the areas that would need to be [11] modified. And for those areas, both parties [12] would have to go through meetings to engage in [13] discussions.

[14] Q: Are you referring to meetings [15] between CPT and its U.S. brand customers? [16] Correct?

[17] A: That's correct.

[18] Q: Would any of those — have any of [19] those type of meetings been held in the United [20] States?

[21] A: Yes.

[22] Q: With which U.S. brands has CPT had [23] meetings in the United States regarding LCD [24] module specifications?

Page 725

[1] A: Based on my personal experience, [2] and for those meetings that I have attended, [3] those meetings would have included Dell and HP.

[4] Q: I believe another — I believe [5] that target price is also something that you [6] mentioned you have discussed with Brian Lee [7] concerning the means to introduce new LCD module [8] products to U.S. brands. What do you mean by [9] target price?

[10] A: That would be the lowest price [11] requested by HP or Dell for CPT to provide the [12] TFT module.

[13] Q: So HP and Dell provide a target [14] price that they would like CPT to meet for new [15] HP and Dell products; is that correct?

[16] A: Correct.

[17] Q: Does CPT then negotiate pricing [18] with HP and Dell?

[19] A: Yes, some of the times.

[20] Q: Are you personally involved in [21] price negotiations with U.S. brand customers, [22] including Dell and HP?

[23] A: Yes, only limited to my personal [24] job responsibilities. Currently I have only

Page 726

[1] discussed pricing with HP.

[2] Q: Does CPT provide samples of new [3] LCD modules to U.S. brand customers, including [4] Dell and HP?

[5] THE WITNESS: Yes, in the event [6] that HP or Dell are interested in CPT's [7] products.

[8] BY MR. CHRISTENSON:

[9] Q: Has CPT provided samples of new [10] LCD modules to U.S. brand customers other than [11] Dell and HP?

[12] THE WITNESS: According to my personal [13] scope of knowledge, currently no.

[14] Q: Now, my question is, please [15] identify CPT's other U.S. brand customers. [16] Let's break this into a time frame. Let's start [17] with at this time, currently, who are CPT's U.S. [18] brand customers?

[19] A: Well, for the scope of the [20] notebook computers that I'm responsible for, [21] only HP and Dell are the ones.

[22] Q: Who are CPT's U.S. brand customers [23] for LCD monitor modules?

[24] A: HP, Dell.

Page 727

[1] Q: And?

[2] A: IBM.

[3] Q: ViewSonic?

[4] A: Yes. Gateway. I can only recall [5] these ones.

[6] BY MR. CHRISTENSON:

[7] Q: Earlier, Mr. Tsai, you referred to [8] current potential customers of CPT. Are you — [9] were you referring to prospective customers that [10] CPT would like to add to its customer list?

[11] THE WITNESS: Yes, there was such an [12] attempt.

[13] BY MR. CHRISTENSON:

[14] Q: Please tell me a little bit about [15] that. Which potential customers has CPT

[24] unit, so for the chart we were looking at a

**Page 1020**

[1] moment ago, this is where I went to find the [2] 50,723, rounded to 724 TFT business unit sales, [3] and you can see right below it is the TFT gross [4] profit loss amount. So you can see for 2003 the [5] source document of the financial statements.

[6] Down towards the bottom we have a [7] similar information for 2002 coming across.

[8] Q: If we could just go back to slide [9] one for a moment. If you could just show the [10] jury the 50,724,000 New Taiwanese dollars you [11] just referred to?

[12] A: Right here. So this would be the [13] business unit information here, and the [14] corresponding gross profit would be here.

[15] Q: Now, did you also look at and [16] analyze the TFT business unit itself?

[17] A: I did.

[18] Q: Why don't we go to slide two. Is [19] this a chart that you also had prepared?

[20] A: Yes, it is.

[21] Q: Now, could you please explain the [22] purpose of this chart?

[23] A: CPT had provided a schedule, a [24] financial statement in effect for only the TFT

**Page 1021**

[1] business unit, and it has some minor variations [2] to the annual report and that's pretty common, [3] it's not because somebody sat down and didn't [4] include or whatever, it's just from time to time [5] business sources and different business time [6] will have slightly different information.

[7] But I had a financial statement [8] for only the TFT business unit. And this is [9] certain of the information extracted from that [10] statement.

[11] So we see the net sales for 1999 [12] through the first quarter of 2006, so through [13] the first three months of 2006. And you can see [14] again that it's going up significantly. The [15] first year increase, which by a percent is very, [16] very large, may be somewhat misleading because [17] 1999 is the first year, so it may not be a full [18] year of production and sales and the like.

[19] But significant growth year to [20] year to year. And you can see as is common, the [21] percent growth rates if we were to put them in [22] would change year to year, you see that sales [23] from 2001 to 2002 went up by a hundred percent, [24] they approximately doubled. They certainly

**Page 1022**

[1] didn't double again to 2003 or to 2004. It's [2] one thing to increase my sales by about 17,000 [3] and double, I can add another 17,000, but from a [4] higher bases that doesn't double my sales. So [5] the rate of increase changes by the nature of [6] the numbers and by the nature of the market.

[7] And you can see that 2005 compared [8] to 2004 was not a strong increase year, so we [9] see some maturation that occurs in the [10] marketplace with competition or a slowdown for a [11] year in the marketplace, and see some maturation [12] within the company.

[13] We then looked at costs of goods [14] sold and then again year to year to year to year [15] to identify a measure of profitability. And to [16] get costs of goods sold, we would take net [17] sales — I'm sorry, to get — we take the net [18] sales minus costs of goods sold to get gross [19] profit.

[20] The costs of goods sold is the [21] accounting information from the financial [22] statement of all of the costs to produce the [23] product. So it has the individual components, [24] substrates, metals, it has the processing costs

**Page 1023**

[1] of the equipment and acid baths and what have [2] you, it has at least allocations of the costs of [3] the production equipment and the environmental [4] types of issues. It has the costs of the [5] people. So it tells us the costs that CPT has [6] assigned to the production of the goods that [7] were sold in that year. So we have a measure of [8] the costs.

[9] We looked at that as a percent of [10] sales and you can see it exceeded 100 percent in [11] 2001, causing a gross profit loss, or a gross [12] loss in effect.

[13] So we looked at the difference [14] between net sales and cost of sales to get some [15] identification of the profit generated year to [16] year to year, and that's profit not in a bottom [17] line sense, but that's the profit available with [18] which CPT would pay selling costs, general [19] costs, administrative costs, interest expense or [20] whatever their capital costs were, taxes before [21] they would have a bottom line net income.

[22] But this is a measure of the money [23] in New Taiwanese dollars available because of [24] the direct sale and production.

**Page 1024**

[1] And over time it ranges obviously [2] from a high of about 20 percent to a loss year. [3] And you can see that the last full year, 2005, [4] as we saw in the first chart was not a strong [5] profit year, so there is a diminution in the [6] spread, the markup between the costs of the [7] product and the sale of the product, so the [8] product — the business becomes less profitable. [9] And by percent there is some recovery in 2006 in [10] the first quarter, but certainly not to the [11] levels of historical years, years save 2001.

[12] Q: Is that indicative of the highly [13] competitive nature of this industry?

[14] A: It is.

[15] Q: Now, it appears to me that the [16] only loss year for the TFT business unit was [17] 2001?

[18] A: That's right.

[19] Q: And all other years, the business [20] unit certainly enjoyed a profit?

[21] A: Right. There are other producers [22] that had certainly less than strong years in [23] 2001 as well.

[24] Q: So for 2006 quarter one, as of

**Page 1025**

[1] quarter one, the costs of goods sold percent of [2] net sales is what?

[3] A: It's 93.1 percent leaving 6.9 [4] percent, so you can see the two of those total [5] 100 percent.

[6] Q: What was your source for this [7] information?

[8] A: It was a financial statement that [9] had been provided by CPT.

[10] Q: I would like to now turn to PX 81. [11] Are you referring to some financial information [12] that Chunghwa produced in discovery?

[13] A: That's my understanding of the [14] source of it, yes.

[15] Q: I would like to turn to page 16 of [16] this document. I would like to turn — if you [17] could highlight the first sentence in the second [18] to last paragraph.

[19] A: Exhibit M hereto is CPT's income [20] statement for its TFT business unit.

[21] Q: Showing costs and profit data for [22] the years 1999 through the first quarter of [23] 2006?

[24] A: That's correct.

**Page 1026**

[1] Q: And is that the exhibit on which [2] you relied?

[3] A: Yes, it is.

[4] Q: Why don't we turn to that exhibit, [5] Exhibit M, please, which is page 16 of this [6] document — excuse me, page 116 of this [7] document.

[8] Are you there, Mr. Cobb?

[9] A: Mine doesn't have a number, but I [10] think I have the same document.

[11] Q: The same title?

[12] A: It is the same title.

percent, [7] aren't they?

[8] A: Yes, sometimes as high as 95, but [9] kind of around 90 is what I understood.

[10] Q: But the '002 was used from the [11] get-go from LPL; correct?

[12] A: Yes, it was.

[13] Q: So they were using it back when [14] their yield rates were 30 or 35 percent; right?

[15] A: That's my understanding.

[16] Q: Okay. So you agree that since the [17] '002 had already been implemented by LPL, back [18] when the yield rates were 30 or 35 percent, [19] whatever it is, that explains the difference [20] between 30 or 35 percent and 90, 95 percent or [21] more, that's not the '002 patent; correct?

[22] A: Yes and no. There certainly are a [23] number of things that have occurred and [24] significant things that have occurred to enhance

Page 1133

[1] yield unrelated to the '002 patent.

[2] But I also understand that the [3] '002 patent and the impact on the yield becomes [4] more important as screen sizes grow. And I know [5] that since 1995, as a general proposition, [6] screen sizes have grown.

[7] So the important import of the [8] '002 patent has also increased somewhat.

[9] Q: But, again, there's no evidence to [10] support that the '002 patent actually increases [11] yield in larger screen products more than it [12] does in smaller screen products; correct?

[13] That's just the word of Mr. Cho [14] and Mr. Kim that you're relying on for that, [15] isn't it?

[16] A: I think that's consistent with [17] other discussions I've had. But as I said, [18] that's what I learned from at least the initial [19] phone call from Mr. Cho and Mr. Kim.

[20] Q: Well, the only evidence you cited [21] in support of that in your June 2nd report was [22] that single phone call with Mr. Kim and Mr. Cho; [23] correct?

[24] A: Right. Yes.

Page 1134

[1] Q: That's — that's the only [2] information you based that eight percent or [3] higher number for larger screen products on, [4] isn't it?

[5] A: Yes.

[6] Q: And, again, Mr. Cho and Mr. Kim, [7] they work in LPL's IP department managing [8] litigation and licensing, don't they?

[9] A: Yes.

[10] Q: Yes. They're not engineers in a [11] factory, are they?

[12] A: That's right. They have consulted [13] with engineers, but they're not engineers for [14] the factory.

[15] Q: They consulted with engineers that [16] you've never spoken to; correct?

[17] A: Yes, I have, after my deposition. [18] As I think we even discussed, I've talked to the [19] engineers.

[20] Q: Well, we didn't. We couldn't have [21] discussed that you did talk to them.

[22] A: No. We discussed that I either [23] was or may.

[24] Q: So since you were deposed in this

Page 1135

[1] case and since your report in this case, you [2] have now spoken to additional people at LPL's [3] factory; is that correct? Just yes or no.

[4] A: Yes.

[5] MS. GABLER: Your Honor, I would [6] move, under our prior orders, that he not be [7] allowed to answer any questions on that on [8] redirect.

[9] MS. BRZEZYNSKI: Your Honor, [10] Ms. Gabler has elicited this testimony. LPL has [11] not elicited this testimony.

[12] I should be free to go into [13] whatever I need to on redirect in putting on [14] this topic.

[15] THE COURT: Well, with redirect, [16] you'll ask your questions. I'm overrule the [17] objection.

[18] Q: Now, you haven't seen any evidence [19] that LPL had a belief in the yield rate [20] increases attributable to the '002 before filing [21] this lawsuit against CPT, have you?

[22] A: I'm sorry. Could you say that [23] again?

[24] Q: Sure. You haven't seen any

Page 1136

[1] evidence that LPL had a belief in the yield rate [2] increases attributable to the '002 before they [3] filed this lawsuit against CPT, have you?

[4] A: I haven't seen any documents that [5] show that.

[6] Q: And as a plaintiff in this case, [7] LPL has an incentive to overstate the yield rate [8] attributed to the single patent that they're [9] suing CPT on in this litigation, don't they?

[10] A: Assuming that they want the best [11] position, I assume that that's what they would [12] want in litigation as well.

[13] Q: Do you remember in your deposition [14] we also discussed chip on glass technology?

[15] A: Yes.

[16] Q: And back in your deposition I [17] asked — I had asked you whether or not you had [18] investigated whether or not chip on glass or COG [19] was a noninfringing alternative to the '002 [20] patent.

[21] Do you recall that?

[22] A: Generally.

[23] Q: And do you recall that you told me [24] that you had not considered that prior to your

Page 1137

[1] June 2nd report?

[2] A: I don't remember the words, but [3] yes.

[4] Q: And do you also recall that you [5] told me that you had not conducted any [6] investigation on that prior to your June 29th [7] deposition?

[8] A: I think so.

[9] Q: And you also didn't try to [10] establish in your damage model whether or not [11] any of CPT's products practiced chip on glass [12] technology, did you?

[13] A: That's true.

[14] Q: So if, in fact, some of CPT's [15] products practice chip on glass technology, your [16] damage model may be overstated for that reason, [17] also; right?

[18] A: No. You need a second part of [19] that. You would need to know that chip on glass [20] products did not infringe the '002 patent.

[21] Q: Right.

[22] A: But in the event that they didn't, [23] you're right.

[24] Q: Now, earlier in your testimony

Page 1138

[1] this morning, you put up some documents from [2] ViewSonic Corporation and Tatung Corporation. [3] Do you remember that?

[4] A: Yes.

[5] Q: Okay. Now, you haven't presented [6] any damage model to the jury to be awarded [7] against ViewSonic, have you?

[8] A: I have not.

[9] Q: And that's true for Tatung [10] Company, too, you haven't asked them to award [11] any damages against Tatung; right?

[12] A: It's true for Tatung and Tatung of [13] America as well.

[14] Q: You also talked about Dell this [15] morning. Do you recall that?

[16] A: Yes.

[17] Q: Okay. Now, Dell is not a [18] defendant in this case, are they?

[19] A: No, they're not.

[20] Q: And neither is Hewlett-Packard?

[21] A: No, they're not.

osition?

[3] A: Yes.

[4] Q: And were you here when we just [5] played Mr. Joo-Sup Kim's deposition?

[6] A: Yes.

[7] Q: What do you recall from their [8] testimony?

[9] A: Yes, I recall.

[10] Q: What do you recall from their [11] testimony?

[12] A: I — I know Ho Lee said Taiwan did [13] not invest in R & D, and Taiwan does not have [14] its own technology. And it also does not use [15] its own technology.

[16] Q: Now, Ms. Chang, have you seen this [17] before?

[18] A: Yes.

[19] Q: What is that?

[20] A: You will be able to see this [21] document from the U.S. PTO web site. This is [22] statistics and summary of all the patents filed [23] from other foreign countries and United States, [24] and granted in United States in 2004.

Page 1180

[1] Q: Now, what does this page show, Ms. [2] Chang?

[3] A: Can you shift it a little to the [4] right, please?

[5] Q: This way?

[6] A: Yes. Thank you. [7] Oh, yes I see it now.

[8] Q: What does this page show?

[9] A: One can tell from this page that [10] prior to 2004, the patents granted to Taiwan [11] were more than those granted to Korea.

[12] The patents granted to Taiwan were [13] at least over by 20,000 patents compared to that [14] in Korea.

[15] Q: And these were U.S. patents?

[16] A: Yes, because the information is [17] indicated in the U.S. PTO web site.

[18] MR. RHODES: Brian, can you turn [19] that off?

[20] BY MR. RHODES:

[21] Q: Does CPT have patents?

[22] A: Yes.

[23] Q: How many patents does CPT have?

[24] A: As of the end of June of this

Page 1181

[1] year, CPT holds at least 450 patents. In [2] addition, 1,800 patents are being applied for.

[3] MR. RHODES: Can we have PTX 46, [4] please?

[5] BY MR. RHODES:

[6] Q: Now, Ms. Chang, do you remember

[7] Mr. Ho Lee testifying about PTX 46, which is the [8] February 8th, 2002 letter that was sent to CPT [9] by LPL?

[10] MR. BONO: Objection. This [11] witness does not have appropriate personal [12] knowledge to testify on this subject under Rules [13] of Evidence 602.

[14] She only became employed by [15] Chunghwa Picture Tubes in June of 2004. And so [16] she lacks the personal knowledge to testify to [17] correspondence and/or discussions that occurred [18] between Chunghwa Picture Tubes and LG Philips in [19] 2002, because she was not even employed at the [20] company, so therein lacks personal knowledge.

[21] MR. RHODES: Your Honor, these are [22] business records. She's the custodian of those [23] records.

[24] It's not hearsay. I'm not here

Page 1182

[1] asking her for the truth of the matter asserted. [2] I'm asking her to testify about the contents of [3] the documents.

[4] They have deposed here repeatedly [5] on this issue, and I think she can testify.

[6] THE COURT: All right. If there [7] were discussions that she didn't participate in, [8] she can't testify about that. She is not going [9] to testify about any discussions.

[10] With that understanding, yes.

[11] MR. BONO: Your Honor, these [12] documents are already admitted in evidence and [13] they speak for themselves. She has no personal [14] knowledge to add anything to the evidence that's [15] already in the record.

[16] And the documents speak for [17] themselves. She wasn't at Chunghwa Picture [18] Tubes during that time period.

[19] She didn't join Chunghwa Picture [20] Tubes until June 2004. And there's no — [21] there's no probative evidence that she can [22] elicit based on her personal knowledge under [23] Rule 602 Federal Rules of Evidence. These [24] documents are already in evidence.

Page 1183

[1] THE COURT: But I'll overrule the [2] objection with the understanding that there's no [3] discussion information that she has

[4] MR. RHODES: I understand, Your [5] Honor.

[6] BY MR. RHODES:

[7] Q: So Ms. Chang, you remember Mr. Lee [8] testifying about PTX 46, the February 8th [9] letter; correct?

[10] A: Yes, I recall.

[11] Q: Now, Ms. Chang, what is Chinese [12] New Year's?

[13] A: It is the new year celebrated by [14] the Chinese people. It is somewhat equivalent [15] to the January 1st and Christmas time celebrated [16] by the Western people.

[17] So we will get a prolonged holiday [18] during that period of time.

[19] Q: Do you know when Chinese New [20] Year's occurred in 2002?

[21] A: I do. The Chinese New Year in [22] 2002 fell between February 9th through 17th of [23] 2002.

[24] MR. RHODES: Can we have PTX 121,

Page 1184

[1] please?

[2] BY MR. RHODES:

[3] Q: Now, Ms. Chang, since you're the [4] custodian of these records, can you tell me what [5] is your understanding of what this letter is [6] about?

[7] MR. BONO: Objection, Your Honor. [8] She has no personal knowledge to be able to [9] testify. The document speaks for itself.

[10] THE COURT: All right. I'll [11] overrule the objection.

[12] She can testify as to what she [13] understands as the custodian.

[14] THE WITNESS: Based on reading [15] from this letter, this letter is a letter sent by LPL [16] to CPT at the end of May 2002.

[17] BY MR. RHODES:

[18] Q: Now, in your records, do you have [19] an indication that CPT responded to this letter?

[20] A: I did. CPT responded by writing a [21] letter to LPL on June 4th, 2002.

[22] Q: In referring to DTX 122, this June [23] 7th, 2002 letter, what is this letter about?

[24] A: This letter is response provided

Page 1185

[1] by LPL, according to the June 4th letter that I [2] just testified to.

[3] Q: Okay. Now, do you have anything [4] in your records in the legal department that [5] indicates that LPL ever mentioned the Korean [6] patents again?

[7] A: Aside from the letter sent by LPL [8] at the end of May, the Korean patents were not [9] mentioned. They were no longer mentioned.

[10] MR. RHODES: And can we have DTX [11] 58, please?

[12] BY MR. RHODES:

[13] Q: Now, Ms. Chang, you heard Mr. Lee [14] testify that DTX 58 was the proposed license [15] agreement provided to LPL by CPT at the meeting [16] in June 2002. You heard that testimony?

[17] A: I heard that.

Case 1:05-cv-00292-JJF   Document 458-4   Filed 10/06/2006   Page 14 of 17

LG Philips LCD Co., LTD v.
Tatung Company, et al.
Trial Volume 5
July 21, 2006

[18] Q: And you also heard Mr. Lee state [19] that the license agreement was for LPL's entire [20] patent portfolio; is that also your [21] understanding?

[22] A: I heard that.

[23] Q: Now, in your review of the license [24] agreement, what patents are identified in the

---

**Page 1186**

[1] proposed license agreement?

[2] A: Can I ask that the question be [3] interpreted again? Can counsel repeat the [4] question?

[5] Q: Sure. In your review of this [6] license agreement, what patents are identified [7] in this agreement?

[8] A: No patents were specifically [9] mentioned in this license agreement.

[10] MR. RHODES: All right. Can we [11] have DTX 125, please?

[12] BY MR. RHODES:

[13] Q: Ms. Chang, have you seen this [14] document in your records before?

[15] A: Yes, I have seen it before.

[16] Q: What is this?

[17] A: CPT sent a letter to LPL at the [18] end of July requesting it to provide additional [19] information so CPT could evaluate and assess the [20] value of the patent.

[21] And with regard to this letter, it [22] represents the response to us from LPL.

[23] Q: Can we have page three. [24] And have you had an opportunity to

---

**Page 1187**

[1] count how many patents are listed there?

[2] A: Yes, I counted it. It includes [3] 447 patents.

[4] Q: Page one. [5] Now, in this letter, DTX 125, or [6] excuse me, let's go to DTX 124, I'm sorry.

[7] Now, in your review of the [8] records, have you had an opportunity to take a [9] look at this letter?

[10] A: Yes.

[11] Q: And is this a letter that you're [12] referring to, DTX 124, where CPT requested [13] information regarding the patents?

[14] A: Yes, that was the letter I [15] mentioned.

[16] Q: And what is your understanding [17] about why CPT was requesting this information [18] from LPL?

[19] THE INTERPRETER: Can I ask the [20] witness to repeat that part because there was [21] one part I could not hear?

[22] THE WITNESS: Because in June, LPL [23] had proposed an agreement, and that proposed [24] agreement the proposed royalty rate was 25

---

**Page 1188**

[1] percent. 2.5 percent. And it was a very large [2] number.

[3] In order for CPT to have to pay [4] such a large sum of their money, CPT would have [5] to write to obtain additional information to see [6] whether what they demanded would be reasonable [7] and whether it would be valuable enough.

[8] MR. RHODES: Your Honor, may I [9] have the witness step out of the witness box and [10] over to the demonstrative?

[11] THE COURT: Yes.

[12] BY MR. RHODES:

[13] Q: Ms. Chang, could you please tell [14] the jury what this stack of documents is?

[15] A: What's on the top here would be [16] the patents listed on the July 30th listing. [17] And then over here would be the 447 patents. [18] And over here there should be the references for [19] the 447 patents.

[20] Q: And I'm sorry, I was listening to [21] the interpreters and you at the same time. Did [22] you mention the file histories? I thought I [23] heard you mention file history.

[24] A: Yes, I was referring to these two

---

**Page 1189**

[1] stacks here, they represent the file history of [2] the 447 patents.

[3] Q: Okay. Now, what are file [4] histories?

[5] A: Do you want me to answer over [6] here?

[7] Q: Sure.

[8] THE INTERPRETER: May I ask the [9] witness to speak a little louder, please.

[10] THE WITNESS: The file history [11] would be the correspondence with U.S. PTO in the [12] course of applying for the patent. That means [13] when an applicant applies for a patent and U.S. [14] PTO will submit some questions to the applicant [15] to see whether the contents of the patents will [16] meet the patent requirement.

[17] Q: And what is prior art?

[18] A: Prior art would be the prior [19] technology. And that information would also be [20] included in the file history.

[21] Q: Okay. You can come back over here [22] now.

[23] Now, Ms. Chang, why do you need [24] all this paper in order to evaluate 400 patents?

---

**Page 1190**

[1] MR. BONO: Objection, Your Honor. [2] There is lack of personal foundation to testify [3] as to what Chunghwa Picture Tubes may or may not [4] have done in 2002.

[5] MR. RHODES: I'm not asking her [6] what CPT did, I'm asking her only what — [7] why you would need all this paper in order to [8] evaluate 400 patents.

[9] MR. BONO: And there is absolutely [10] no relevance in the case to this testimony.

[11] MR. RHODES: Absolutely there is [12] relevance, Your Honor.

[13] THE COURT: All right. I'm going [14] to overrule both relevancy objections. And [15] since it's not specific to what they might have [16] done in the time frame, it's generic testimony [17] about why you would evaluate a patent, I'm going [18] to allow it.

[19] THE WITNESS: Because one would [20] have to evaluate a patent of the value of a [21] patent portfolio. And one would need to go [22] through the file history as well as the [23] references mentioned in the file history in [24] order to have adequate understanding of the

---

**Page 1191**

[1] patent claims, and its validity.

[2] BY MR. RHODES:

[3] Q: Now, were you in the courtroom [4] when plaintiff's expert, Dr. Schlam, was [5] testifying?

[6] A: Yes.

[7] Q: Do you remember how long he said [8] it would take to evaluate this one patent, the [9] '002 patent?

[10] A: He testified for quite a long [11] time.

[12] Q: Now, after July 30th when LPL [13] notified or sent that list of patents to CPT, in [14] your records, what does it show us that the next [15] time that CPT heard anything about the '002 [16] patent?

[17] A: You mentioned '002 patent; right?

[18] Q: Yes, I did. [19] After July 30th, when was the next [20] time that CPT heard about the '002 patent?

[21] A: That would be May 13 of last year [22] when LPL filed a lawsuit against CPT in [23] Delaware.

[24] Q: And you were employed by CPT at

---

**Page 1192**

[1] that time; right?

[2] A: Yes.

[3] Q: Now, before LPL filed a lawsuit on [4] May 13, 2005, did LPL give any warning to CPT [5] that it was going to file the suit?

[6] A: No.

[7] Q: And before they filed the suit in [8] 2005, did they identify any products that they [9] thought infringed the '002 patent?

[10] MR. BONO: Objection. Objection, [11] Your Honor. She has insufficient personal [12] knowledge to be able to testify as to what went [13] on before she was employed at Chunghwa Picture [14] Tubes, and so she can only testify from June [15] 2004 forward, and the question is asking for all [16] time periods.

[17] MR. RHODES: I'll rephrase, Your [18] Honor.

[19] BY MR. RHODES:

[20] Q: Do you have anything in your [21] records since you are the custodian of the [22] records and the person responsible for this case [23] that LPL ever identified any products that they [24] thought infringed the '002 patent prior to May

Page 1193

[1] 13th, 2005?

[2] A: No.

[3] Q: And since you're the person [4] responsible for this case at CPT and the [5] custodian of the records, do you have anything [6] in your records that would indicate that LPL [7] ever identified any claims related to the '002 [8] patent that they thought CPT infringed?

[9] A: No.

[10] MR. RHODES: Now, can we have DTX [11] 48, please?

[12] BY MR. RHODES:

[13] Q: Now, Ms. Chang, have you seen DTX [14] 48?

[15] A: Yes.

[16] Q: And have you seen that as part of [17] your job responsibilities?

[18] A: Yes.

[19] Q: And have you read it?

[20] A: Yes.

[21] Q: Can you tell me what that is?

[22] A: This document represents the [23] complaint. This is a patent case filed by LPL [24] against CPT in California at the end of August

Page 1194

[1] 2002.

[2] Q: And that would have been about a [3] month after CPT received the July 30th, 2002 [4] letter?

[5] A: It should be less than one month.

[6] MR. RHODES: Okay. Can we go to [7] the next page, Brian?

[8] BY MR. RHODES:

[9] Q: Now, can you please identify for [10] us what patents were asserted in this complaint?

[11] A: Yes, I can do that. The first [12] patent would be 4,624,737.

[13] MR. RHODES: Next page.

[14] BY MR. RHODES:

[15] Q: What else?

[16] A: The second patent would be [17] 5,825,449.

[18] And the third one would be [19] 6,373,537.

[20] The fourth one was 6,020,942. [21] And the next one — well, I cannot [22] read it very clearly. I think possibly the [23] numbers would be 6,002,457.

[24] And the last one was 5,926,237.

Page 1195

[1] MR. RHODES: Next page.

[2] BY MR. RHODES:

[3] Q: And that's all the patents in [4] there?

[5] A: Yes.

[6] Q: Those six patents?

[7] A: Six patents.

[8] Q: Was the '002 patent listed in [9] there?

[10] A: No.

[11] Q: Now, according to your [12] understanding in working in the legal department [13] and being the person responsible for this case [14] after the complaint was filed in 2002, what is [15] your understanding as to what happened next?

[16] MR. BONO: Objection, Your Honor.

[17] THE COURT: Objection sustained.

[18] BY MR. RHODES:

[19] Q: Now, you became employed by CPT in [20] 2004; right?

[21] A: Correct.

[22] Q: And you started working on this [23] case in 2004?

[24] A: Yes.

Page 1196

[1] Q: And you were involved in the [2] litigation in connection with California; is [3] that correct?

[4] A: Correct.

[5] Q: Now, in 2005, did you learn [6] anything about what happened in the California [7] case?

[8] MR. BONO: Objection, Your Honor. [9] Your Honor has ruled that —

[10] THE COURT: He can ask this [11] question, but the next one I may reverse that.

[12] MR. BONO: My objection is on [13] hearsay. Your Honor ruled in our motion —

[14] THE COURT: I understand.

[15] MR. BONO: Objection.

[16] THE COURT: He's asking about [17] 2005. Right now it's a benign question. 2005 [18] basis of knowledge.

[19] MR. BONO: I'm sorry, Your Honor, [20] Maybe I was unclear with my objection. My [21] objection goes to the ruling, Your Honor.

[22] THE COURT: About asking about [23] California litigation, —

[24] MR. BONO: Yes.

Page 1197

[1] THE COURT: — because it has no [2] role in this litigation?

[3] MR. BONO: Yes, Your Honor.

[4] THE COURT: I understand. You can [5] answer the question that's pending.

[6] THE WITNESS: Well, that case has a [7] total of six patents with regard to four [8] patents, because in 2002, when LPL filed the [9] lawsuit, and four of them were ruled invalid and [10] unenforceable.

[11] So in 2005, by September, the [12] judge in the California Court ruled against the [13] lawsuit of these four patents.

[14] MR. BONO: Your Honor, I object [15] and move to strike.

[16] THE COURT: Objection; sustained.

[17] MR. RHODES: And Your Honor —

[18] MR. BONO: Can I finish?

[19] MR. RHODES: I know where he's [20] going. If I can ask the next question, you'll [21] see it's very fair and balanced, and it goes to [22] the state of mind of the company.

[23] But with the next question, I [24] think he'll be satisfied that this is a fair

Page 1198

[1] question.

[2] THE COURT: Why don't you come to [3] side-bar first. So at this point I'll sustain [4] the objection, and strike the answer.

[5] (Side-bar discussion.)

[6] MR. RHODES: Your Honor, I'm very [7] sensitive to this issue and I'm treating it as [8] fair as I possible can. This issue goes to the [9] state of the mind of the company and what they [10] were thinking about during the course of this [11] litigation.

[12] The next question is going to be [13] what happened next, and she's going to testify [14] that the judge allowed them to fix the problem [15] and refile the case, and that's it.

[16] MR. BONO: Your Honor, he is now [17] elicited prejudicial information that is not [18] correct. And the judge did not rule that the [19] patents were invalid in California. In fact, [20] they're still subject of the litigation in [21] California.

[22] And it was a prejudicial [23] statement, it's incorrect and it's false. And [24] she — and he did this on purpose to cast in the

Page 1199

[1] mind of the jury that there is some question of [2] validity as to those other

Case 1:05-cv-00292-JJF    Document 458-4    Filed 10/06/2006    Page 16 of 17

LG Philips LCD Co., LTD v.                                    Trial Volume 6
Tatung Company, et al.                                        July 24, 2006

lawyer I was against [8] said that he didn't want to argue the settlement [9] of other parties to the liability issue of my [10] plaintiff. And I asked to have all reference to [11] any settlement discussion excluded, but the [12] judge thought it was important immediately to [13] make a decision, and to allow him to talk about [14] it for purposes of aligning the parties, and the [15] testimony came in about settlement, it didn't [16] look so bad, but in the closing argument, what [17] the lawyer did was say, there was things done [18] wrong here and somebody is liable and some [19] people have already paid for that. It sounded [20] real close to me like a violation of 408. I [21] didn't get upset, I just objected. And there [22] are appellant courts even after the post trial [23] motions that will take care of all of this.

[24] What I'm trying to do is let you

Page 1348

[1] try the case the way you want unless you are in [2] a — unless you're offering something that's so [3] obvious that it's like you got to stop the [4] beating because it's occurring right in front of [5] them, but the kind of subtle issues you're [6] arguing, they're kind of by hypothesis or [7] speculation, you may not be doing anything [8] Mr. Bono is saying.

[9] So what I'm trying to convince [10] you, I'm not trying to dissuade you, I'm trying [11] to tell you what the ruling is again, what his [12] argument is, and what the penalty is if it's [13] later found out in the context of this whole [14] trial that you didn't get my order. Okay?

[15] We're going to bring the jury in.

[16] (Jury entering the courtroom at [17] 2:47 p.m.)

[18] THE COURT: All right. I think I [19] have fixed all the technical problems. I have a [20] vast background about this machinery and we [21] should be able to move on from here. And I [22] appreciate your patience as to do parties and [23] the counsel. Thank you very much.

[24] All right. You want to start it

Page 1349

[1] up again.

[2] MR. RHODES: Yes, Your Honor. [3] Thank you for your help.

[4] THE COURT: No problem.

[5] (Videotape Testimony.)

[6] A: With two contacts, you could test [7] if there is any shorts in the panel. You would [8] need other contacts to test for any opens in a [9] display.

[10] Q: And when — what do you mean by [11] "any shorts in the panel"?

[12] A: Any areas where you may have a [13] short, or a short, or a very low resistance [14] between the row line and the column line.

[15] Q: And what —

[16] A: That could be through the source, [17] you know, to the gate of the transistor or a [18] crossover point of the row line and the column [19] line.

[20] Q: And if you refer to the Exhibit [21] 105, which is the one with the two schematics, [22] if you look at the configuration on the lower [23] portion of the page, is it possible — if you [24] assume that the source lines are connected to

Page 1350

[1] the outer guard ring in the same method as the [2] gate lines are illustrated here, is it possible [3] to check for any shorts in the array using only [4] two contacts?

[5] THE WITNESS: I don't think there's [6] enough information there to — without seeing [7] the whole panel represented, I couldn't tell.

[8] THE WITNESS: I — you say a short, I [9] only see gate lines. Are you saying short — [10] gate to gate short? Column to gate short?

[11] I don't — there's not enough [12] information.

[13] Q: I'm using short in the same [14] context that you were using it in the answer [15] just above where you stated, " any areas where [16] you may have a short or low resistance between [17] the row line and the column line".

[18] A: Okay. But that's not represented [19] on this diagram.

[20] Q: What else would you have to know [21] to answer that question?

[22] A: We'd have to see how the columns [23] were hooked together. All I see here is row [24] lines.

Page 1351

[1] Q: Well, I — my question presumed [2] that the row lines were connected to the outer [3] guard ring in exactly the same way as the gate [4] lines are depicted here.

[5] A: There's no column lines here. I [6] don't know how you could test this to — and [7] determine if there's any shorts in the panel [8] without column lines and showing how they're [9] hooked together.

[10] Q: When you say how they're connected [11] together, you mean the source lines to the outer [12] guard ring?

[13] A: Yeah, and what their relation is, [14] how — how they're hooked together. Are they [15] hooked together?

[16] Q: So I'm asking you to assume that [17] the gate — the source lines are connected to [18] the outer guard ring in exactly the same way as [19] these gate lines are depicted, which is each [20] gate line and each source line is individually [21] connected to the outer guard ring through a [22] diode.

[23] A: The way you stated, you couldn't [24] test it.

Page 1352

[1] Q: And why is that?

[2] A: Because everything would be [3] shorted — or basically shorted out.

[4] Q: Meaning shorted to the — to the [5] outer guard ring?

[6] A: Yes.

[7] Q: So if you wanted to test any line, [8] gate line or any source line, you could only [9] test line by line, is that it?

[10] THE WITNESS: I would have to study [11] this, but I can't see how you could test it.

[12] THE WITNESS: Yeah I don't see how [13] you could test it.

[14] Q: Under that scenario, meaning each [15] gate line separately and each row line [16] separately?

[17] A: Right. What you just described, [18] you couldn't test it —

[19] Q: Well, in any event —

[20] A: — without probing every line, [21] because there would be a sneak path.

[22] Q: Right. In order to test it, you [23] would have to probe each line independently [24] using the configuration I described?

Page 1353

[1] A: Yes.

[2] Q: In Step 4, which states, "forming [3] an outer electrostatic discharge guard ring on [4] said substrate coupled with said interconnected [5] row and column lines via a resistance to provide [6] protection from electrostatic discharges between [7] said row and column activation lines during [8] manufacture of the displays".

[9] If we refer, again, to Exhibit 105 [10] and to the schematic that is on the upper [11] portion of the page, it has an outer [12] electrostatic discharge guard ring; correct?

[13] A: Okay. Which claim was that, [14] again?

[15] Q: We're in Claim 1, Step 4, which is [16] at the top of the page, Column 9.

[17] A: Okay.

[18] Q: Not in the first element, but on [19] that page, the second one that starts, " forming [20] an outer electrostatic discharge guard ring".

[21] A: Okay.

[22] Q: And I'm going to refer to that [23] whole element up to the point where it says, [24] "removing said outer guard ring"

the reason — he's talking [19] about the interconnection.

[20] Q: What part of the diagram is he [21] talking about?

[22] A: Oh, this part here. This Line A [23] is what he was referring to as the [24] interconnection.

Page 1484

[1] Q: The interconnection of what?

[2] A: In this case, all of the gate [3] lines. And he was asked: Is it all the gates [4] lines? And he said, yes.

[5] Q: Okay. And then what did he have [6] to say about the reason for function of the [7] interconnection?

[8] A: Well, he was asked: What's the [9] reason to connect all the gate lines on Line A?

[10] And he said that my understanding [11] is that there are two reasons: The first reason [12] is that if the electrostatic occurs, these lines [13] are there to distribute and discharge the said [14] electrostatic. And number two reason is that [15] this is for the purpose of testing, so that we [16] could apply a voltage to this line and use this [17] for testing purposes.

[18] Question: So for testing, if you [19] apply a voltage on one gate line, that voltage [20] will be applied to all the gate lines; correct?

[21] Answer: As far as I understand [22] that, yes. That is correct

[23] Q: Okay. Thank you. [24] If it was only — if the function

Page 1485

[1] of the interconnection was merely to provide a [2] conductive path for ESD protection, would there [3] be any need to have an interconnection at all?

[4] MR. GOODWYN: Objection; leading.

[5] THE WITNESS: No.

[6] THE COURT: I'm going to overrule [7] the objection. But you have to be careful not [8] to have the answer in the question.

[9] MS. CORBIN: Okay.

[10] THE WITNESS: No, because there are other things.

[11] Just as the earlier solutions that were shown, you [12] can short all the lines to the outer guard ring [13] directly.

[14] BY MS. CORBIN:

[15] Q: But if you do that, can you test [16] — can you perform this two-point bulk test?

[17] A: No, you can't. But you distribute [18] the charge that way.

[19] Q: And did Dr. Holmberg — what did [20] Dr. Holmberg say was the first thing he tried [21] when he was trying to provide electrostatic [22] discharge pro-

tection?

[23] A: Well, he said the first thing he [24] tried was just shorting everything together, but

Page 1486

[1] he wanted to be able to test.

[2] Q: And could he do that when he was [3] just shorting all the lines to the guard ring?

[4] A: No.

[5] Q: Does CPT interconnect [6] substantially all of its gate lines?

[7] A: No, they don't.

[8] Q: Does CPT interconnect [9] substantially all of its source lines?

[10] A: No, not at all.

[11] Q: Is CPT able to test any of its [12] products using the two-point bulk test that [13] you've described?

[14] A: No, CPT cannot

[15] Q: Why not?

[16] A: Because the lines are not [17] interconnected. There's not one point where you [18] can put the same voltage on all the lines.

[19] Q: How does CPT test its products?

[20] A: They test with a different [21] technique, line by line testing. You have to go [22] to each line with two points to determine [23] whether it's continuous.

[24] And you have to go to each line

Page 1487

[1] and, you know, each set of lines to check [2] crossover points.

[3] Q: And when you talk about each line, [4] for example, I don't think anybody's touched on [5] this. On an average display, they have a [6] 15-inch display.

[7] How many gate lines are there?

[8] A: Well, typically, in a 15-inch, you [9] would have 768 gate lines on an XGA display.

[10] Q: What about — how many source [11] lines?

[12] A: That would be 300 — 3,072.

[13] Q: So are you saying that CPT must [14] test each one of those several thousands of [15] lines in each individually?

[16] A: That's what I'm saying.

[17] Q: May I have Defendants' Exhibit 8, [18] please.

[19] Again, referring to Dr. Holmberg's [20] testimony from yesterday, during his testimony [21] he was referring to this figure, particularly [22] the one on the bottom. And do you recall what [23] he said about whether or not using this [24] configuration you would be able to perform the

Page 1488

[1] two point volt test?

[2] A: Yes, he was asked if you had this [3] configuration and then the same configuration on [4] the source lines, could you test. And he said [5] no, you couldn't.

[6] Q: Okay. Thank you. [7] Now, before we move on, I want to [8] talk to you about schematics and their usage. [9] How are schematics used in electrical [10] engineering fields?

[11] A: Oh, they're just used widely to [12] summarize the electrical characteristics of a [13] circuit.

[14] Q: And if you pick up any electrical [15] engineering semiconductor device textbook, would [16] you find schematics?

[17] A: Oh, absolutely.

[18] Q: Would that same thing be true of [19] reference books?

[20] A: Yes. Yeah. In textbooks, [21] reference books.

[22] Q: Did you find any use of schematics [23] in the prior art that we're going to be [24] discussing later today?

Page 1489

[1] A: Yes.

[2] Q: May we see slide 55, please. [3] And what do we see here and where [4] is this figure from?

[5] A: This is from an application by [6] Kawamura and he's shown here, for instance, a [7] layout for making diodes and then he illustrates [8] electrically what he's doing up here by this [9] schematic.

[10] Q: And what is shown — what is the [11] schematic up there on the top?

[12] A: It's two diodes, it's the same [13] pair of diodes that we see over and over again [14] in CPT's products.

[15] Q: Now, slide 56. During his [16] deposition, did Dr. Schlam himself make a [17] schematic?

[18] A: Yes, he did. He made this one [19] which we can blow up, in connection with the [20] CPT's diodes connecting a transfer pad to the [21] guard ring and they are the same design that's [22] used on the lines themselves. And so he labeled [23] — he showed them as pairs of diodes and he [24] labeled them as shunt switching elements. And

Page 1490

[1] he showed the guard ring here as composed of [2] three elements in his view. And then he [3] indicated where he associated the resistance.

[4] Q: Okay. Could we see slide 59, [5] please.

[6] Dr. Schlam during his testimony [7] indicated that there was something misleading [8] about using schematics to