## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| LG. PHILIPS LCD CO., LTD., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 05-292 (JJF) |
| | ) | |
| v. | ) | **DEMAND FOR JURY TRIAL** |
| | ) | |
| TATUNG COMPANY; | ) | |
| TATUNG COMPANY OF AMERICA, INC.; | ) | |
| CHUNGHWA PICTURE TUBES, LTD.; | ) | **REDACTED - PUBLIC VERSION** |
| AND VIEWSONIC CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' OPENING BRIEF IN SUPPORT OF THEIR MOTION FOR NEW TRIAL OR REMITTITUR ON THE JURY'S DAMAGES VERDICT

OF COUNSEL:
Teresa M. Corbin
Glenn W. Rhodes
Howrey LLP
525 Market Street, Suite 3600
San Francisco, California 94105
(415) 848-4900

Julie S. Gabler
Howrey LLP
550 South Hope Street, Suite 1100
Los Angeles, California 90071
(213) 892-1800

Dated: October 10, 2006

Robert W. Whetzel (#2288)
whetzel@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Matthew W. King (#4566)
king@rlf.com
Richards, Layton & Finger
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
Attorneys for Defendants/Counterclaimants
Tatung Company, Tatung Company of
America, Chunghwa Picture Tubes, Ltd, and
ViewSonic Corporation

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................ 1

NATURE AND STAGE OF THE PROCEEDING .................................................................. 2

SUMMARY OF ARGUMENT ......................................................................................... 3

STATEMENT OF FACTS ............................................................................................... 4

     A.    Cobb's Damages Report/Testimony. .............................................................. 4

     B.    LPL's Pre-Trial Communications With CPT About Its Patents. ............................ 6

ARGUMENT ............................................................................................................... 8

I.  LEGAL STANDARDS ............................................................................................... 8

     A.    Granting A Motion For New Trial Under Fed. R. Civ. P. 59. ............................... 8

     B.    Standard for Remittitur. .............................................................................. 10

II. THE DAMAGE AWARD CANNOT STAND BECAUSE IT IS BASED
     ON SPECULATION, NOT LEGALLY SUFFICIENT EVIDENCE .................................... 11

     A.    There Is No Factual Support For The Central Assumption Underlying The Jury's
          Damage Award: That The '002 Patent Is Responsible For A 5% Yield Increase. ..... 12

     B.    The Asserted Increase In Yield Is Not Based On Any Identified Scientific
          Methodology. ............................................................................................ 13

     C.    Mr. Cobb Did Not Consider Non-Infringing Products. ..................................... 16

     D.    At A Minimum, Defendants Are Entitled To A Remittitur. ................................ 17

III. THE JURY'S FINDING THAT LPL PROVIDED EFFECTIVE NOTICE
      OF INFRINGEMENT TO CPT AS OF FEBRUARY 27, 2002 IS INCORRECT
      AS A MATTER OF LAW ..................................................................................... 17

     A.    General Claims Of Infringement Are Insufficient Under The Notice Statute. ......... 19

     B.    Defendants Are Entitled To A New Trial Because Mr. Cobb Testified Beyond
          The Scope Of His Expert Report And Pre-Trial Disclosures. ............................. 21

C.    LPL's Exhibit Stuffing Entitles Defendants To A New Trial.........................24

IV. DEFENDANTS ARE ENTITLED TO A NEW TRIAL DUE TO
    MISCONDUCT DURING CLOSING ARGUMENT.........................................27

    A.    LPL's Counsel Prejudiced The Jury With Misstatements On The Law Of Patent
          Notice.........................................................................................27

    B.    LPL's Counsel Prejudiced The Jury With Misstatements On The Law Of
          Anticipation.................................................................................29

    C.    LPL's Counsel Prejudiced The Jury By Accusing The Defense Of Trying To Hide
          Evidence From The Jury.................................................................31

    D.    LPL's Counsel Improperly Gave His Personal View Of The Evidence....................34

    E.    LPL's Counsel Misled The Jury by Claiming That The Defense Did Not Call
          Certain Witnesses In Order To Hide Their Testimony From The Jury......................36

    F.    LPL's Counsel Misled The Jury Regarding The Parties' Graphic Evidence.............37

    G.    LPL's Counsel Misled The Jury Regarding The Relative Size Of Its Requested
          Damages Award.............................................................................38

CONCLUSION....................................................................................40

RLF1-3068861-1

## TABLE OF AUTHORITIES

### CASES

*American Bearing Co. v. Litton Indus.*,
729 F.2d 943 (3d Cir. 1984) ................................................................................8

*American Med. Sys., Inc. v. Medical Eng'g Corp.*,
6 F.3d 1523 (Fed. Cir. 1993) ..............................................................................18

*Amstead Indus., Inc. v. Buckeye Steel Casting Co.*,
24 F.3d 178 (Fed. Cir. 1994) .......................................................................*passim*

*Anastasio v. Schering Corp.*,
838 F.2d 701 (3d Cir. 1988) ..............................................................................10

*Becton Dickinson & Co. v. Tyco Healthcare Group LP*,
No. 02-1694-GMS, 2006 WL 890995 (D. Del. Mar. 31, 2006), *citing Lind v. Schenley
Indus., Inc.*, 278 F.2d 79 (3d Cir. 1960) ................................................................9

*Blanche Rd. Corp. v. Bensalem Township*,
57 F.3d 253 (3d Cir. 1995) ................................................................................28

*Brodbeck v. Nat'l Rifle Ass'n*,
No. 98-5361, 1999 WL 722815 (E.D. Pa. Sept. 14, 1999) ....................................8

*Cummins v. Lyle Indus.*,
93 F.3d 362 (7th Cir. 1996) .......................................................................*passim*

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) .........................................................................................13

*Deepsouth Packing Co.*,
406 U.S. at 527 ................................................................................................39

*Draper v. Airco, Inc.*,
580 F.2d 91 (3d Cir. 1978) ..............................................................28, 29, 33, 35

*Dreyer v. Arco Chem. Co.*,
801 F.2d 651 (3d Cir. 1986) ................................................................................8

*Ecolochem, Inc. v. S. Cal. Edison Co.*,
91 F.3d 169 (Fed. Cir. 1996) ............................................................................29

*Falkowski v. Johnson*,
148 F.R.D. 132 (D. Del. 1993) ....................................................................29, 33

iii

*Fineman v. Armstrong World Indus., Inc.,*
980 F.2d 171 (3d Cir. 1992)...................................................................9, 33, 35

*Forrest v. Beloit Corp.,*
424 F.3d 344 (3d Cir. 2005)..........................................................................9

*Gart v. Logitech, Inc.,*
254 F.3d 1334 (Fed. Cir. 2001).................................................................18, 19

*Gumbs v. Pueblo Int'l, Inc.,*
823 F.2d 768 (3d Cir. 1987).......................................................................10, 17

*Johns Hopkins Univ. v. CellPro, Inc.,*
152 F.3d 1342 (Fed. Cir. 1998)....................................................................39

*Lans v. Digital Equip. Corp.,*
252 F.3d 1320 (Fed. Cir. 2001)....................................................................27

*Lind v. Schenley Indus., Inc.,*
278 F.2d 79, 89 (3d Cir. 1960).......................................................................9

*Lindemann Maschienfabrik GmbH v. Am. Hoist & Derrick Co.,*
895 F.2d 1403 (Fed. Cir. 1990)....................................................................11

*Link v. Mercedes-Benz of N. Am., Inc.,*
788 F.2d 918 (3d Cir. 1986)...........................................................................8

*Miller v. Town of Milton,*
No. 03-876-SLR, 2006 WL 839407 (D. Del. Mar. 31, 2006) .........................8, 9

*Monsanto Co. v. Rohm & Haas Co.,*
312 F. Supp. 778 (E.D. Pa. 1970) ............................................................29, 31, 32

*Montgomery County v. Microvite Corp.,*
320 F.3d 440, 448 (3d Cir. 2003) ..............................................................13, 14

*Montgomery Ward & Co. v. Duncan,*
311 U.S. 243 (1940)........................................................................................8

*Mosaid Tech., Inc. v. Samsung Elec. Co.,*
362 F. Supp. 2d 526 (S.D.N.Y. 2005) .............................................................18, 19

*Olefins Trading, Inc. v. Han Yang Chem. Corp.,*
9 F.3d 282 (3d Cir. 1993) ..........................................................................................8

*Philips Elecs. N. Am. Corp. v. Contec Corp.,*
312 F. Supp. 2d 649 (D. Del. 2004) ................................................................*passim*

*Riles v. Shell Exploration & Prod. Co.,*
298 F.3d 1302 (Fed. Cir. 2002) ......................................................................*passim*

*Roebuck v. Drexel Univ.,*
852 F.2d 715 (3d Cir. 1988) .......................................................................................8

*In re Runion,*
989 F.2d 1201 (Fed. Cir. 1993) ................................................................................29

*S.R.I. Int'l, Inc. v. Advanced Tech. Labs.,*
127 F.3d 1462 (Fed. Cir. 1997) ..........................................................................18, 19

*Shockley v. Arcan, Inc.,*
248 F.3d 1349 (Fed. Cir. 2001) ................................................................................10

*Spence v. Bd. of Educ.,*
806 F.2d 1198 (3d Cir. 1986) ...................................................................................10

*Spruill v. Nat'l R.R. Passenger Corp.,*
No. 93-4706, 1995 WL 534273 (E.D. Pa. Sept. 5, 1995) ..................................10, 33

*Standard Havens Prods., Inc. v. Gecor Indus., Inc.,*
953 F.2d 1360 (Fed. Cir. 1991) ................................................................................29

*TA Instrs., Inc. v. Perkin-Elmer Corp.,*
277 F. Supp. 2d 367 (D. Del. 2003) ...........................................................................8

*Tyler Refrigeration v. Kysor Indus. Corp.,*
777 F.2d 687 (Fed. Cir. 1985) ..................................................................................29

*Uniboard Aktiebolag v. Acer Am. Corp.,*
118 F. Supp. 2d 19 (D.D.C. 2000) ............................................................................19

v

*Unisplay S.A. v. Am. Elec. Sign Co.*,
69 F.3d 512 (Fed. Cir. 1995) .................................................................................................11

## STATUTES AND OTHER AUTHORITIES

35 U.S.C. § 287 ...............................................................................................................18

Fed. R. Civ. P. 59(a) ........................................................................................................8

Fed. R. Civ. P. 61 ............................................................................................................8

Fed. R. Evid. 703 .......................................................................................................12, 13

D. Del. L.R. 83.6(d)(2) ....................................................................................................34

Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure, § 2807, at 52 (2d ed.
1995) ..............................................................................................................................10

RLF1-3068861-1

## INTRODUCTION

The trial of this case, concerning the infringement and validity of United States Patent No. 5,019,002 ("the '002 patent"), presented the jury with highly technical and complex issues of fact and equally complex application of the law to those facts. The jurors were asked to absorb testimony regarding the various known methods for reducing the damage caused by electrostatic discharge and the various methods for testing the effectiveness of these technologies, testimony concerning the communications between the parties concerning the '002 patent, testimony concerning the methodology and basis for expert opinions on yield rate increases attributable to the '002 patent, and then to apply the often highly technical and complex rules of patent law to this testimony. This already-daunting task was rendered impossible by LPL's disregard for the Court's pretrial rulings and warnings concerning the scope of expert testimony and the repeated misstatements both of law and evidence made during closing arguments. Both the quantity and severity of plaintiff's misstatements made a fair and unbiased application of the law to the facts impossible for this jury. Because plaintiff's distortions prejudiced the jury and deprived defendants of their right to a fair trial, defendants respectfully request a new trial pursuant to Federal Rule of Civil Procedure 59.

1

## NATURE AND STAGE OF THE PROCEEDING

At the pretrial conference on July 7, the Court issued a number of orders concerning conduct during trial that, if violated, would result in a mistrial. The Court renewed and extended these orders during various conferences with counsel during the trial. Despite these orders, LPL repeatedly engaged in litigation misconduct designed to prejudice the jury and unfairly influence the outcome of the case. At the close of the evidence and before the submission of the case to the jury, Defendants moved for JMOL pursuant to Federal Rule of Civil Procedure 50(a) on LPL's claim for damages. The case was submitted to the jury on July 27, 2006. The jury returned a verdict finding willful infringement under the doctrine of equivalents starting on February 27, 2002 and awarded LPL $52,477,000 in damages as a reasonable royalty.[1] The Court has not entered judgment on the jury's verdict.

---

[1] LPL only sought damages as a reasonable royalty. Lost profits damages were neither sought by LPL nor submitted to the jury.

2

## SUMMARY OF ARGUMENT

1. A new trial should be granted on the ground that the jury's damages award is not supported by legally sufficient evidence. Speculation, such as that engaged in by LPL's expert, Mr. Cobb, is not a sufficient basis to support a damages award. LPL presented no factual basis for the 5% yield increase it asked the jury to attribute to the '002 patent. If the Court is disinclined to grant a new trial, the Court should exercise its sound discretion to remit the verdict and enter an award no greater than $1,715,386.

2. A new trial should be granted on the ground that Mr. Cobb's testimony at trial was based almost entirely on information that was not disclosed prior to trial. LPL ignored the Court's pretrial cautions about offering undisclosed expert testimony. Defendants relied on the Court's pretrial rulings to the effect that expert testimony would be limited to the information disclosed in the expert reports. Defendants ask that the Court enforce its pretrial orders and grant a new trial, with LPL bearing the cost of the first trial. If the Court is disinclined to grant a new trial, the Court should exercise its sound discretion to remit the verdict and enter an award no greater than $1,715,386.

3. A new trial should be granted on the ground that LPL violated this Court's order limiting each side to 150 trial exhibits. LPL's use of additional exhibits over the limit imposed on both parties resulted in prejudice to defendants.

4. A new trial should be granted on the ground that LPL's counsel made repeated misstatements of both of law and evidence during closing arguments. Both the quantity and severity of plaintiff's misleading statements made a fair and unbiased application of the law to the facts impossible for this jury. Because plaintiff's distortions prejudiced the jury and deprived defendants of their right to a fair trial, defendants respectfully request a new trial pursuant to Federal Rule of Civil Procedure 59.

3

## STATEMENT OF FACTS

### A.    Cobb's Damages Report/Testimony.

Before trial, Defendants moved to exclude expert testimony offered by LPL's Report of Cobb & Associates, LTD., the non-obviousness opinion offered in the expert report of Dr. Elliot Schlam regarding validity of U.S. Patent No. 5,019,002, and any proffered subsequent testimony. (D.I. 306). The Court denied Defendants' motion. (D.I. 368). During trial, Defendants objected to Mr. Cobb's qualification as an expert on the issue of whether an invention would increase yield. Trial. Tr. 998:15-999:19.[2] Defendants' objection was overruled. Trial Tr. 1000:3-10.

As disclosed in Defendants' pre-trial discovery, the accuracy and admissibility of Mr. Cobb's damages model depended entirely on the accuracy of his assumptions concerning the yield increases attributable to the '002 patent. In constructing his damages model, Mr. Cobb determined the royalty base and then applied an assumed 5% yield increase (or cost savings) to that base and then assumed the parties would have evenly divided the benefits of the yield increase (cost savings). Ex. A (Cobb Report); Trial Tr. 997:24-998:14. Mr. Cobb did not rely on any documents, studies or empirical data to arrive at this conclusion that the '002 patent increased yield by 5%. Ex. B (Cobb Depo) at 42:5-43:23, 45:1-5, 58:8-12, 59:50-21, 59:20-60:8, 68:18-21, 70:15-21, 119:15-17, 143:23-144:4; Ex. C (Letter of 6/19/06 from Adrian Mollo to Steven Yovits). Instead, he based his entire opinion as disclosed pretrial on yield rate increases attributable to the '002 patent on one conversation with two employees

REDACTED

who had never worked in one of LPL's manufacturing facilities, called Fabs. Ex. B (Cobb Depo) at 12:23-13:17, 46:19-25, 47:2-5, 47:10-13, 67:16-20, 75:25-76:7, 76:18-22, 79:1-5; Trial Tr. 1109:22-1112:17. Not only did REDACTED    lack personal knowledge on which

---

[2] Excerpts of trial testimony are attached hereto as Exhibit F.

to base the unsubstantiated opinions Mr. Cobb subsequently parroted in his report, they also admitted that they did not even conduct a specific investigation of the yield rate attributable to the '002 patent. Ex. D (Cho Depo) at 46:6-53:3; Trial Tr. 1124:1-1125:3.

At trial, Mr. Cobb testified that his opinion was now based on conversations he had with and with two previously undisclosed LPL engineers REDACTED who allegedly worked in LPL Fabs at some point in time. Trial Tr. 1104:9-1105:20, 1133:9-1135:4, 1145:12-1147:4. Prior to the moment Mr. Cobb testified at trial that he was now relying on his post-deposition conversation with REDACTED neither Mr. Cobb nor LPL had ever identified these individuals to defendants in any manner. These conversations allegedly took place _after_ Mr. Cobb's expert report was served on June 2 and his deposition was taken on June 29 and were _not_ disclosed to defendants prior to trial.[3] Trial Tr. 1110:7-9, 1134:24-1135:4 Not only was Mr. Cobb's reliance on the opinions of REDACTED as to yield rates attributable to the '002 patent not disclosed prior to trial, the fact that those two individuals had any relevant knowledge pertaining to yield or any other issue in this case was also not disclosed. Ex. E (initial disclosures); Trial Tr. 1109:22-1110:6, 1110:21-1111:1.

Mr. Cobb has never seen any documents showing LPL's actual yield for _any period of time, for any product._ Trial Tr. 1114:18-22. Nor has he seen any documents showing any yield increase by any percentage, at any time, as a result of the '002 technology. _Id._ at 1114:23-1115:4. Mr. Cobb has not seen any evidence that LPL had a belief in the yield rates attributable to the '002 patent before they filed this lawsuit against CPT. _Id._ at 1135:24-1136:5. Neither Mr.

---

[3] Mr. Lee based his yield-rate analysis on a pilot line, not mass production. Mr. Lee had no specific data to support this conclusion. Trial Tr. 671:18-672:1.

5

Cobb, nor anyone at LPL relied on any documents before concluding that the '002 technology increases manufacturing yield by five percent. In sum, LPL does not have any "hard data, statistical studies, [or] inventory production reports" that support Mr. Cobb's assumption that the '002 technology increases manufacturing yield by five percent.

Mr. Cobb admitted that LPL has not engaged in a "before and after" analysis to determine whether the '002 technology has had any effect, positive, negative, or neutral, on yield. Trial Tr. at 1115:6-1116:16, 1117:8-1118:2 ("It's my understanding that at least since 1999, at all times LPL has produced using the technology of the '002 patent both inner and outer guard rings, so they don't have a before and after.").              corroborated Mr. Cobb's testimony. *Id.* at 1115:22-1116:3. Moreover, LPL has never manufactured any products that practiced only Claim 1 but not Claim 8 of the '002 patent. *Id.* at 1116:19-22.

### B.    LPL's Pre-Trial Communications With CPT About Its Patents.

On February 8, 2002, LPL sent its first communication to CPT about LCD patents. In this letter, LPL identified a few patents as "examples" of those in its portfolio, and invited CPT to consider licensing the entirety of the mostly undisclosed portfolio. Trial Tr. 650:21-651:16 (Ho Lee), 1183:7-10 (Belle Chang), PTX 46. This letter was sent to CPT during the Chinese New Year National Holiday (February 9-17, 2002), when CPT was closed for 10 days. Trial Tr. 1183:7-23 (Belle Chang). The February 8 letter did not state that LPL believed CPT was infringing any of LPL's patents, did not identify any CPT products, did not attach any of LPL's patents and did not identify any claims of any of LPL's patents allegedly infringed by one or more of CPT's products. Trial Tr. 650:21-651:23, 655:6-21, 657:2-10 (Ho Lee), PTX 46. On February 27, 2002, LPL sent a second letter to CPT, this time making the bald, unsubstantiated statement that LPL believed CPT was infringing some of LPL's patents. Trial Tr. 652:8-655:2 (Ho Lee), PTX 142. Like the prior letter, the February 27 letter to CPT did not identify any CPT

6

products, did not attach any of LPL's patents and did not identify any claims of any of LPL's patents allegedly infringed by one or more of CPT's products. Trial Tr. 655:6-21, 657:11-15 (Ho Lee), PTX 142. The February 8 and February 27 letters from LPL to CPT are the only two communications presented at trial that occurred on or before February 27, 2002 – the date the jury found that LPL had given CPT actual notice of its claim that CPT was infringing the '002 patent.

Neither the February 8 nor the February 27, 2002 letters were sent to Tatung, TUSA or ViewSonic. DTX 115 & 116. No evidence was presented at trial of any communications by LPL to Tatung, TUSA or ViewSonic concerning the '002 patent prior to February 27, 2002 – the date the jury found Tatung, TUSA and ViewSonic had actual notice of LPL's claims that each of them were infringing the '002 patent.

## ARGUMENT

### I.    LEGAL STANDARDS

#### A.    Granting A Motion For New Trial Under Fed. R. Civ. P. 59.

Federal Rule of Civil Procedure 59(a) provides that "a new trial may be granted ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." New trials are often granted where the jury's verdict was against the great weight of the evidence, the damages were excessive or erroneous evidentiary rulings substantially prejudiced a party. *See* Fed. R. Civ. P. 59(a) and 61; *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940); *Olefins Trading, Inc. v. Han Yang Chem Corp.*, 9 F.3d 282, 289-90 (3d Cir. 1993); *Link v. Mercedes-Benz of N. Am., Inc.*, 788 F.2d 918, 922 (3d Cir. 1986); *Am. Bearing Co., Inc. v. Litton Indus. Inc.*, 729 F.2d 943, 948 (3d Cir. 1984). New trials are also granted where the improper conduct of an attorney has unfairly influenced the jury. *Miller v. Town of Milton*, No. 03-876-SLR, 2006 WL 839407, at *1 (D. Del. Mar. 31, 2006); *see also Brodbeck v. Nat'l Rifle Ass'n*, No. 98-5361, 1999 WL 722815, *1 (E.D. Pa. Sept. 14, 1999) (listing reasons that new trials have been granted, including "prejudicial statements by counsel").

In evaluating a motion for new trial, the court can weigh all the evidence and need not evaluate it in the light most favorable to the verdict winner. *TA Instruments, Inc. v. Perkin-Elmer Corp.*, 277 F. Supp. 2d 367, 372 (D. Del. 2003). A new trial may be granted even where there exists that "minimum quantum of evidence" from which the jury might reasonably find in favor of the nonmoving party. *Roebuck v. Drexel Univ.*, 852 F.2d 715, 735-36 (3d Cir. 1988); *Dreyer v. Arco Chem. Co.*, 801 F.2d 651, 654 (3d Cir. 1986).

Where a Rule 59(a) motion is brought on the basis of misconduct during closing arguments a new trial is required when "the allegedly improper statements or conduct make it

8

'reasonably probable' that the verdict was influenced by the resulting prejudice." *Forrest v. Beloit Corp.*, 424 F.3d 344, 351 (3d Cir. 2005). This standard of "reasonable probability" can be met even where the court finds the jury verdict is supported by substantial evidence; "reasonable probability" is a lower threshold assessing the court's ability to conclude "with confidence" that the misconduct did not "unfairly influence and prejudice the jury." *Miller*, 2006 WL 839407, at *1.

A court deciding a motion for a new trial "should consider the overall setting of the trial, the character of the evidence, and the complexity or simplicity of the legal principles which the jury had to apply to the facts." *Becton Dickinson & Co. v. Tyco Healthcare Group LP*, No. 02-1694-GMS, 2006 WL 890995, at *2 (D. Del. Mar. 31, 2006), *citing Lind v. Schenley Indus., Inc.*, 278 F.2d 79, 89 (3d Cir. 1960). Even where individual instances of misconduct would not independently support a new trial, several instances considered together may do so. *See, e.g., Fineman v. Armstrong World Indus., Inc.*, 980 F.2d 171, 207 (3d Cir. 1992). Here, both the number and severity of LPL counsel's misstatements and distortions during closing argument combine to render it a reasonable probability that the jury's verdict was influenced by his misconduct.

In addition, although some of LPL counsel's closing argument distortions and misstatements were not immediately objected to by defendant, courts recognize that in this context, such continuous objections are not required, and need not be viewed as a waiver of the issue. *See, e.g., Fineman*, 980 F.2d at 207 n.26 (holding that district court did not abuse its discretion in considering improper closing statements despite lack of simultaneous objections as the defense "was not required to object to each and every objectionable remark because requiring such action would have unnecessarily created even more prejudice to [the defense] in the eyes of

9

the jury"); *Spruill v. Nat'l R.R. Passenger Corp.*, No. 93-4706, 1995 WL 534273, at *8 (E.D. Pa. Sept. 5, 1995) (holding that objection to every instance of misconduct during opposing counsel's closing argument not necessary to preserve issue), *citing Anastasio v. Schering Corp.*, 838 F.2d 701, 706 n.11 (3d Cir. 1988) (failure to object only one factor in determining prejudicial effect of comments). Here, the defense did object to several of LPL counsel's misstatements, and properly preserved the closing argument misconduct issue for consideration under Rule 59. Trial Tr. 2096:18-2101:10.

### B. Standard for Remittitur.

The use of remittitur is well established as a device employed when the trial judge finds that a damage award is clearly unsupported and/or excessive. *Spence v. Bd. of Educ.*, 806 F.2d 1198, 1201 (3d Cir. 1986). The court may remit a verdict where, in light of the evidence, the verdict is so unreasonably high that it would be unconscionable to permit it to stand. *See* 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE & PROCEDURE, § 2807, at 52 (2d ed. 1995); *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001). The remittitur should be no higher than the maximum amount of damages that the jury could reasonably find. *See Gumbs v. Pueblo Int'l, Inc.*, 823 F.2d 768, 772 (3d Cir. 1987).

10

## II.    THE DAMAGE AWARD CANNOT STAND BECAUSE IT IS BASED ON SPECULATION, NOT LEGALLY SUFFICIENT EVIDENCE.

LPL failed to carry its burden of establishing a sufficient factual basis to support the $52,447,000 damage award returned by the jury. *Unisplay, S.A. v. Am. Elec. Sign Co. Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995). ("Any rate determined by the trier of fact must be supported by relevant evidence in the record.") (footnote omitted). Specifically, LPL presented no documents supporting the yield rate increases it attributed to the '002 patent; no qualified expert testimony (or any lay witnesses testimony) establishing that the multitude of other ESD reducing technologies used in tandem with guard rings were not responsible, in whole or part, for the yield rate increases LPL attributed to the '002 patent; no evidence of any kind establishing the incremental benefits, if any, of using the two ring structure in Claim 8 as opposed to just the one ring structure in Claim 1; and no before and after analysis of the benefits, if any, of the use of the '002 patent. Instead, after admitting that he was not qualified to give an opinion on the source of yield increases, Mr. Cobb, LPL's damage expert, testified to the jury that it should accept his speculation and the speculations of five LPL employees – three of whom he did not consult prior to forming his opinions as disclosed in pre-trial discovery, and the other two had no personal knowledge whatsoever – that the '002 patent increased LPL's yields by at least five percent. Trial Tr. 998:15-999:19, 1104:9-1105:20, 1109:22-1111:17, 1114:18-1118:2,1123:22-1126:14, 1133:9-1135:4. Damages awards must be established by evidence, not speculation. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990) (emphasis added). LPL's failure to carry its burden of coming forth with sufficient evidence in support of the damages award necessitates either a new trial or a remittitur of no more than $1,715,386.

A.    **There Is No Factual Support For The Central Assumption Underlying The Jury's Damage Award: That The '002 Patent Is Responsible For A 5% Yield Increase.**

Proof of damages under a reasonable royalty theory "requires sound . . . factual predicates" and must be supported by record evidence. *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311-13 (Fed. Cir. 2002). A sound factual predicate cannot be established merely by relying on the unsubstantiated hearsay testimony of interested parties – particularly unidentified, undisclosed interested parties. *See, e.g., Cummins v. Lyle Indus.*, 93 F.3d 362, 366 (7th Cir. 1996) (upholding exclusion of plaintiff's expert in part because he relied exclusively on interviews with unidentified employees of manufacturer and those interviews amounted to *"unreliable hearsay* which would not be reasonably relied upon by experts in the particular field") (emphasis added), citing Fed. R. Evid. 703.

In *Cummins*, plaintiff's expert sought to offer an opinion concerning the adequacy of machinery warnings. *Id.* at 366. During an offer of proof, plaintiff's expert testified that he based his opinion on conversations with several representatives from the machine manufacturer. Plaintiffs' expert admitted, however, that he could not identify the persons with whom he had spoken and that he had not supplemented his discovery responses to include this additional information. *Id.*

Here, Mr. Cobb's June 2 expert report did not identify whom he had spoken to at LPL concerning yield. Ex. A (Cobb report) at 10 ("LPL reported"...). In his report, Mr. Cobb concealed the source of his yield rate opinions by stating only that "LPL reported" the information to him. *Id.* When asked about the source of this information at his June 29 deposition – taken just 18 days prior to the start of trial – Mr. Cobb testified that he had one conversation with REDACTED employees of LPL's IP Department, about yield and other issues that lasted less than one hour. Ex. B (Cobb Depo) at 12:23-13:17, 46:19-25, 47:2-5,

47:10-13, 67:16-20, 75:25-76:7, 76:18-22, 79:1-5; Trial Tr. 1109:22-1111:17.  Mr. Cobb acknowledged that REDACTED had no personal knowledge concerning yield rate issues since they had never worked in a Fab and had not conducted any sort of investigation.  Ex. B (Cobb Depo) at 12:23-13:17, 46:19-25, 47:2-5, 47:10-13, 67:16-20, 75:25-76:7, 76:18-22, 79:1-5; Trial Tr. 1124:1-1125:3.  Mr. Cobb also stated that he thought         had spoken to someone in LPL's Fabs about this issue but Mr. Cobb could not identify any specific persons. Mr. Cobb never supplemented his report to identify either the individuals         previously spoke with or the individuals Mr. Cobb himself spoke with in the days leading up to his trial testimony.  Exs. B (Cobb Depo) at 12:23-13:17, 46:19-25, 47:2-5, 47:10-13, 67:16-20, 75:25-76:7, 76:18-22, 79:1-5 & A (Cobb Report); Trial Tr. 1104:9-13.

On this record, Mr. Cobb's opinions and testimony on yield amount to nothing more than *unreliable hearsay* that would not be reasonably relied upon by experts in the field and thus cannot satisfy LPL's burden of establishing a sound factual predicate supported by record *evidence*.  *Riles*, 298 F.3d at 1311-13; *Cummins*, 93 F.3d at 366; Fed. R. Evid. 703; Trial Tr. 1836:11-1837:16.  Moreover, in the context of a hypothetical negotiation for a reasonable royalty analysis, LPL's complete lack of evidence in support of their claimed yield increases would have caused these claims to be viewed with speculation, rather than accepted as fact.

**B.    The Asserted Increase In Yield Is Not Based On Any Identified Scientific Methodology.**

Whether a theory or technique can be and has been tested is a "key question to be answered in determining whether a theory or technique is scientific knowledge that will assist the trier of fact."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 590 (1993).  As the *Third Circuit* held in *Montgomery County v. Microvite Corp.*, "the testimony of a witness, who is well-qualified by experience, still may be barred if it is not based on sound data." 320 F.3d 440, 448

(3d Cir. 2003). In *Microvite*, Defendants' expert relied on a document prepared by his clients' national sales director in which the director, who was not present for certain elections in April 1996, made a "reverse" "guestimate" regarding his voting machine product's function during those elections. *Id.* The expert could not identify the source or basis of some of the documents he relied upon and "admitted that he did not measure actual election use data to determine how long the machines were down." *Id.* On this record, the Third Circuit affirmed the district court's exclusion of the expert's proffered testimony on the grounds that the data underlying his opinion was so unreliable that no reasonable expert could base an opinion on it. *Microvite*, 320 F.3d at 449; *see also Cummins*, 93 F.3d at 366 ("[t]he Court found significant the fact that he had never tested his alternative designs and warnings or read any studies of such tests. The district court further noted that [the expert] does not have practical knowledge concerning the use of the alternative components in an industrial, machine-tool production environment.").

Here, Mr. Cobb admitted that his damages model *could be tested*, even though neither he nor his client, LPL, did any testing. (Trial Tr. 1127:6-1128:5). "CPT as well as LPL have an ability to take a line or a fab and to run – I defer to engineers – for a day or a week or a month, and manufacture without the technology of the '002 patent, and measure what the differences are. *So it's clearly verifiable.*" (Trial Tr. 1127:16-21). In fact, Mr. Cobb himself expressed concern that no one tested his damage model: "[o]ne of the things that concerns me is that verification has not been made. . . . [I]t is verifiable and it's something that could have been done." (Trial Tr. 1128:4-5).

LPL, however, never engaged in *any testing* to determine whether the '002 technology has had any effect, positive, negative, or neutral, on yield. (*Id.*, at 1115:6-1116:16,1117:8-1118:2). Mr. Cobb attempted to deflect criticism that neither he nor LPL had tested his theory

14

by suggesting that it was CPT's burden to test whether the '002 patent actually increased manufacturing yield, even though he understood that CPT maintains that it does not practice any claims of the '002 patent. (*Id.*, 1128:6-9). Mr. Cobb's position makes no sense. Mr. Cobb hypothesized that it would take "a hundred million dollars . . . a huge, huge amount of money" for *CPT* to redesign its fab to create an infringing product for the sole purpose of determining yield rate attributable to *LPL*'s '002 technology. This is *twice* what Mr. Cobb claimed would be the ceiling of any reasonable royalty rate negotiation between CPT and LPL. Few things are more absurd than asking CPT to spend twice its potential legal exposure to carry LPL's burden of testing LPL's own damage model.

Even though LPL conducted no testing to determine if the '002 patent had *any effect* on yield, and Mr. Cobb admitted that he was not qualified to render an expert opinion on yield, Mr. Cobb nonetheless testified that he was certain that no other factor: REDACTED REDACTED contributed *in any way* to LPL's five-percent yield rate. Trial Tr. 998:15-999:19, 1040:24-1043:19. Mr. Cobb's only basis for his assertion that LPL isolated any other yield-factor came from one conversation with two LPL employees. Trial Tr. 1040:24-1043:19. No explanation was provided as to how this was done, what precautions were taken, how the comparisons were made or any other necessary details. Despite the lack of credible analysis, Mr. Cobb satisfied himself that all other yield-factors were accounted for based on this single conversation. *Id.* Damages analysis under a reasonable royalty theory "requires sound . . . factual predicates" and must be supported by record evidence. *Riles*, 298 F.3d at 1311-13. This is not a sound factual predicate – especially for an opinion on manufacturing yields that the expert has admitted he is not qualified to render. Trial Tr. 998:10-999:10.

There is <u>no</u> record evidence to support Mr. Cobb's claim. Mr. Cobb relied on two LPL employees who were never disclosed pre-trial, and thus never available for cross-examination, for his conclusory opinion that despite the fact there are no records, no studies and no testing, LPL is sure that it has been able to isolate all other ESD reducing factors in reaching its conclusion that the '002 patent is responsible for at least a 5% increase in yield. This is speculation, not evidence. Because Mr. Cobb's conclusion flies in the face of Federal Circuit case law, no reasonable jury could have relied upon Mr. Cobb's statements.

### C.    Mr. Cobb Did Not Consider Non-Infringing Products.

As the Federal Circuit has repeatedly recognized, the construction of a proper, reliable and admissible patent damages analysis requires the consideration of non-infringing alternative methods. *See, e.g., Riles*, 298 F.3d at 1312 ("Under the constraints of the hypothetical negotiation, the market could not award [the patentee] a royalty for his method divorced of all relation to a potential non-infringing alternative method."). Consideration of non-infringing alternatives is necessary to avoid overstating the reasonable royalty because "the economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation." *Id.*

At trial, Dr. Howard testified that chip on glass ("COG") was a viable non-infringing alternative to the '002 technology and that the COG technology was known and available in 1999, at the time all parties agreed the hypothetical negotiation would have taken place. Trial Tr. 1581:18-1584:4. Dr. Howard's testimony was undisputed. Mr. Cobb also admitted that he did not consider COG or any other potentially non-infringing alternative when forming his opinions as to the likely outcome of a hypothetical negotiation between LPL and CPT. Trial Tr. 1136:13-1137:8.

16

On this record, consistent with Federal Circuit precedent, the jury's award of damages in the amount proffered by Mr. Cobb – an amount that admittedly did not take into account any non-infringing alternatives – cannot stand. *See, e.g., Riles,* 298 F.3d at 1312 (Federal Circuit affirmed the district court's denial of enhanced damages on the ground that the patentee's damage expert did not consider non-infringing alternatives). The jury's damages award must be vacated and a new trial must be ordered wherein only reliable, admissible expert testimony on damages may be presented to the jury.

### D.    At A Minimum, Defendants Are Entitled To A Remittitur.

Due to the excessiveness of the verdict, a remittitur to the maximum amount the jury could find is appropriate. *See Gumbs v. Pueblo Int'l, Inc.,* 823 F.2d 768, 772 (3d Cir. 1987). In the event that the Court denies Defendants' Motion for New Trial, the maximum amount of damages that the jury reasonably could have found based on the legally sufficient evidence admitted at trial is $1,715,386 or $1,709,903.[4] Trial Tr. 1891:5-20. Accordingly, depending upon the Court's ruling upon Defendants' Motion for New Trial, LPL is entitled to a remittitur of damages to no more than $1,709,903.

### III.    THE JURY'S FINDING THAT LPL PROVIDED EFFECTIVE NOTICE OF INFRINGEMENT TO CPT AS OF FEBRUARY 27, 2002 IS INCORRECT AS A MATTER OF LAW.

On July 27, the jury found that "LPL first provided CPT with effective notice that CPT allegedly infringed the '002 patent" on February 27, 2002.[5] (D.I. 405 (Special Verdict Form, Question 12.)) It is undisputed that LPL did not mark its products. Ex. H, Plaintiff's Response

---

[4] This amount is calculated by applying a .25% royalty rate to a royalty base of approximately $686M (infringement of claim 1 and claim 8) or approximately $684M (infringement of claim 1 only) based on an actual notice date of May 13, 2005.

[5] LPL did not ask the jury to award any damages against co-defendants Tatung Company, Tatung Company of America, or ViewSonic Corporation. Trial Tr. 1138:5-13. The jury was not asked to determine a date upon which LPL provided effective notice to these parties. (D.I. 405 (Special Verdict Form), Trial Tr. 2281:3-7).

to Defendants First and Second Sets of Interrogatories, No. 4. The evidence presented at trial demonstrated that there were only two communications between LPL and CPT on or before the notice date found by the jury – a letter dated February 8, 2002 and a second letter dated February 27, 2002. Trial Tr. 650:21-651:23, 652:8-655:2, 655:6-21, 657:2-15 (Ho Lee), 1183:7-23, 1187:7-10 (Belle Chang), PTX 46 & 142. The jury's finding that the February 8 and 27, 2002 letters, separately or in combination, were effective notice under 35 U.S.C. § 287(a) is wrong as a matter of law and necessitates a new trial[6].

Section 287(a) provides that "absent marking, a patentee may not recover damages without proof that "the infringer was notified of the infringement." *Amstead Indus. Inc. v. Buckeye Steel Casting Co.*, 24 F.3d 178, 186 (Fed. Cir. 1994). Marking is required where there is a tangible item to mark and the patent contains both method and apparatus claims. *Am. Med. Sys., Inc. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1538-39 (Fed. Cir. 1993). The Federal Circuit held that in *Dunlap v. Shofield*, 152 U.S. 244 (1894), the Supreme Court "established that notice must be an affirmative act on the part of the patentee which informs the defendant of his infringement." *Amstead Indus.*, 24 F.3d at 186. "The requirement of actual notice is designed to assure that the accused infringer knew of the adverse patent and the alleged infringement during the period in which its liability accrues." *Gart v. Logitech, Inc.*, 254 F.3d 1334, 1345 (Fed. Cir. 2001) (citing *S.R.I. Int'l, Inc. v. Advanced Tech. Labs.*, 127 F.3d 1462, 1470 (Fed. Cir. 1997)).

"If patentees choose to forego marking their products, the statute penalizes patentees by imposing the duty to provide actual notice to each person infringing the patents before they can

---

[6] 35 U.S.C. § 287(a) provides in relevant part that, "In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice."

collect damages." *Mosaid Tech. Inc. v. Samsung Elec. Co. Ltd.*, 362 F. Supp. 2d 526, 557 (S.D.N.Y. 2005). "This duty is more onerous than merely marking one's products because '[a]ctual notice requires the affirmative communication of a *specific charge of infringement* by *a specific accused product or device*.'" *Id.* (citing *Amstead Indus., Inc.*, 24 F.2d at 187). "In other words, patentees must do more than provide general advice not to infringe a patent." *Id*; *see also Uniboard Aktiebolag v. Acer Am. Corp.*, 118 F. Supp. 2d 19, 26 (D.D.C. 2000) ("It is not asking too much of a patentee who receives a monopoly grant under his patent for a 17-year period that he either mark his product or serve actual notice upon a claimed infringer if he seeks to recover damages.").

## A.    General Claims Of Infringement Are Insufficient Under The Notice Statute.

In order to satisfy the actual notice requirements of section 287, a patent holder must identify product models that allegedly infringe specific patents. *See, e.g., S.R.I. Int'l*, 127 F.3d at 1469 (identifying accused products by model number); *Gart*, 254 F.3d at 1345-46 (identifying accused products by commercial names). In *S.R.I. International,* the Federal Circuit found that the patent holder's letter, which identified Defendants' "products Models Ultramark 4 and 8" and claimed that these products may infringe "one or more claims" of the patent-at-issue, satisfied the notice statute. *Id.* In *Gart*, the Federal Circuit again found actual notice where the patent holder specifically identified Defendants' "TRACKMAN VISTA, TRACKMAN MARBLE, TRACKMAN MARBLE +, and TRACKMAN MARBLE FX" products as infringing its specific patents. *Gart*, 254 F.3d at 1345-46. In contrast to the letters in *S.R.I. International* that identified products by model number and those in *Gart* that identified products by their commercial names, LPL's letters do not refer to any CPT model numbers or commercial names of products. PTX 46 (offering to identify specific products in the future, but not doing so in the letter) & 142 (no mention of products).

19

Rather, LPL's two February letters mirror those that the Federal Circuit and this Court have found to be insufficient to establish notice under section 287. *See, e.g., Amstead Indus., Inc.*, 24 F.2d at 186; *Philips Elecs. N. Am. Corp. v. Contec Corp.*, 312 F. Supp. 2d 649, 652 (D. Del. 2004), *aff'd*, 177 Fed. Appx. 981 (Fed. Cir. 2006). In *Amstead Industries, Inc.*, the patent holder's letter stated that it had acquired a number of patents, that the former patent holder had actively enforced its patent rights, and that the current patent holder expected to continue to enforce its rights. 24 F.2d at 186. The letter then stated, "Accordingly, you should acquaint yourself with [the patent] and refrain from supplying or offering to supply component parts which would infringe or contribute to the infringement of the patent." *Id.* The Federal Circuit held that even though this letter mentioned infringement, it did not satisfy the statutory requirements because "[a]ctual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." *Id.* at 187. Because the letter merely notified defendant, and others in the industry, of the patent holder's ownership, with general advice not to infringe, it was insufficient under the notice statute. In fact, the court did not find sufficient notice until the patent holder specifically claimed that defendant's center plate infringed the '269 patent and attached a photo copy of the specific accused device. *Id.* at 186-87. Without specific charges of infringement against specific accused devices, a patent holder cannot enforce the rights granted by the patent monopoly.

More recently, this Court found that a letter enclosing two patents and asking for a meeting was not sufficient under section 287 to constitute actual notice. *Philips Elecs. N. Am. Corp.*, 312 F. Supp. 2d at 652. In *Philips*, the letter at issue enclosed copies of the two patents at issue and then stated that the patent holder "would like to arrange a meeting within the next few weeks to discuss these patents and our license terms." *Id.* The Court found that the letter did not

constitute actual notice because it contained neither "a specific charge of infringement" nor "a specific accused product or device." *Id.* (citing *Amstead*, 24 F.3d at 187). Here, LPL's February 8 letter is similar to the letter in *Philips* and suffers from the same deficiencies. PTX 46. LPL's February 8 letter identified several patents (but does not even enclose them as *Philips* did) and then invites a meeting. *Id.* Consistent with this Court's ruling in *Philips*, LPL's February 8 letter is insufficient. LPL's February 27 letter does not attach any patents or identify any CPT products as accused products. PTX 142. Since LPL's February 27 letter does not cure the deficiencies of its February 8 letter, these letters taken separately or together do not satisfy section 287.

The testimony of Mr. Ho Lee, LPL's witness, also reinforces the conclusion that the two February letters do not satisfy the requirements of section 287. Specifically, Mr. Lee testified that in the February 8 letter, LPL was "simply saying that we are willing to offer licenses for all our technology." (Trial Tr. 651:6-8, PTX 46). Mr. Lee conceded, as he must, that LPL did not identify any *specific CPT products* or any *specific CPT claims* in either the February 8 or the February 27, 2002 letters. (Trial Tr. 655:14-21). By LPL's own testimony, LPL did not, and could not, meet the statutory requirements necessary to establish a February 27, 2002 notice date. As a matter of law, therefore, no reasonable jury could have found that LPL provided notice on that date. On this basis, Defendants respectfully request that this Court order a new trial on this issue.

**B.    Defendants Are Entitled To A New Trial Because Mr. Cobb Testified Beyond The Scope Of His Expert Report And Pre-Trial Disclosures.**

Defendants moved *in limine* to preclude Mr. Cobb from testifying outside the scope of his expert report or deposition. (D.I. 291). At the pre-trial hearing, the Court denied

Defendants' motion because the Court's practice "is that that application is made post-trial." Pretrial Tr. 7:23-24.[7]  The Court continued:

> *If either party solicits testimony from an expert* in the form of opinion or otherwise, *that goes outside of what the reports and the disclosures were*, that can be briefed post-trial.  And depending -- normally it's filed by a party who is not prevailing. If I find there's been a violation of the rule and the pretrial order, *I'll simply order a new trial with the losing side on that motion paying for the first trial, and incidental costs to that first trial, including attorneys' fees*.  **So you have to be very careful in presenting opinion testimony that you don't go outside the expert report, because you could be vulnerable to the post-trial procedure of losing the verdict and being faced with the cost.**  And I assume it's substantial just looking around the room here.  So you want to avoid that at all costs.  So that's why I'm denying that.  I don't need any further briefing because I just don't have that practice.

Pretrial Tr. 8:1-23 (emphasis added).

Mr. Cobb testified that his assumption regarding an appropriate yield rate was "extremely important" to his damage model.  Trial Tr. 998:15-18.  So important, in fact, that he admitted that if his assumption regarding yield was inaccurate, then his whole damage model was inaccurate.  *Id.* at 998:19-22).  Yet, LPL never fully disclosed to Defendants the basis for Mr. Cobb's determination of this yield rate -- thereby precluding a fair opportunity to challenge the basis for this testimony.

First, *in his report*, Mr. Cobb claimed "LPL reported that the technology of the '002 technology increased manufacturing yields for production of LCD panels for notebook computers and desktop monitors by 3 to 5 percent REDACTED

and for production of LCD panels for televisions by 8 percent REDACTED

REDACTED     Ex. A (Cobb Report) at 10 and 25, 29.)

---

[7] Excerpts of pre-trial testimony are attached hereto as Exhibit G.

22

Then, *in his deposition* on June 29, 2006, Mr. Cobb revised his expert opinion to state that LPL believed the '002 patent improved CPT's yields from five to eight percent. Ex. B (Cobb Depo) at 11:1-8. He based this conclusion on one "general discussion" with two LPL representatives REDACTED . Mr. Cobb did not know if either gentleman *ever* worked at either the REDACTED Ex. B (Cobb Depo) at 12:23-13:17, 46:19-25, 47:2-5, 47:10-13, 67:16-20, 75:25-76:10, 76:13-22, 79:1-5.

Recognizing that its damages model was a house of cards built on unreliable, unsubstantiated multi-layered hearsay testimony from witnesses who lacked personal knowledge, LPL prepared Mr. Cobb to look for opportunities to make it appear that testimony concerning his undisclosed interviews with Messrs. REDACTED was solicited on cross-examination. To that end, in response to a series of questions concerning Messrs. REDACTED lack of personal knowledge about the yield information that they had conveyed to Mr. Cobb while he was preparing his expert report, Mr. Cobb testified that he had spoken to factory engineers REDACTED after his deposition. Trial Tr. 1133:20-1135:4. Defendants objected to this testimony and any additional testimony about work Mr. Cobb had performed after his expert deposition on the ground that none of this information had been disclosed pretrial, as required by the Court's orders. Trial Tr. 1135:5-17, 1145:12-1147:4. The Court overruled Defendants' objections and allowed Mr. Cobb to testify about information that was not disclosed pretrial that was designed to make his opinions appear more credible to the jury. *Id.*

Specifically, *on re-direct*, Mr. Cobb announced that he based his yield assumptions on the testimony of a REDACTED and that Mr. Cobb spoke to these gentleman *after submitting his expert report* and *after his deposition*. Trial Tr. 1133:9-1135:4,

23

1145:12-1147:4. Mr. Cobb's reliance on these two individuals was not disclosed until his trial testimony was well underway, and indeed these two individuals were never even disclosed by LPL as knowledgeable about any issues in this case. Ex. E (initial disclosures). Thus, Defendants had absolutely no advance warning – and no ability to cross-examine – the basis of the yield opinion Mr. Cobb offered at trial.

Defendants were entitled to rely on Mr. Cobb's report and deposition testimony as the sum and substance of his opinions, and to cross-examine on that basis. Defendants did not open the door to this testimony. LPL coached its expert to affirmatively inject enough of this information into his cross-examination so that LPL could then elicit this information on redirect.

Because LPL violated the pre-trial disclosure requirements and went beyond the scope of its expert report, Defendants are entitled to a new trial with LPL paying for the first trial, including attorneys' fees and incidental costs.

### C.    LPL's Exhibit Stuffing Entitles Defendants To A New Trial.

During the pre-trial conference held on July 7, 2006, the Court specified that each party would be limited to 150 exhibits during trial. (Pre-trial Conf. Tr. at 5.) On July 17, 2006, Defendants notified the Court that LPL had stuffed exhibits that were listed individually on their initial exhibit list, creating "composite" exhibits to keep within the 150 exhibit limit. (Trial Tr. at 4-8.) In response, the Court specifically prohibited exhibit compilations by stuffing stating that such action would lead to a mistrial[8]. Moreover, the Court provided an example distinguishing pages from a book as being a single exhibit from a compilation of documents,

---

[8] Trial Tr. at 28:15-21 ("If I find out during the course of the trial that there has been stuffing of individual exhibits, in other words, the marshaling of numerous exhibits into one exhibit number, then I'll either deal with it at trial, or it could be the cause of a *mistrial* after the verdict on a post-trial application.") (emphasis added).

24

which should be treated separately[9]. Finally, the Court stated that if LPL compiles exhibits to fit within the 150 exhibit limit and if they are "successful and prevail in trial, there will be a new trial." (*Id.* at 30:1-10.) Despite these specific instructions, LPL persisted in stuffing exhibits, particularly PTX 12 and PTX 13, which are compilations of 13 and 29 exhibits, respectively[10]. Defendants respectfully request that this Court, in accordance with its instruction, declare this case a mistrial and grant Defendants a new trial.

PTX 12 and 13 are compilations of mask files produced by Defendants. Mask files are electronic files that provide information about how layers of electronics are fabricated on a sheet of motherglass for a particular type of LCD module. Each layer could be printed out separately with the collection of layers for a single product together comprising the mask file for that product. No single mask file makes reference to, nor requires the context of, any other mask file. Each mask file is independent. There may, however, be more than one mask file that corresponds to a single product based on site of manufacture and changes in design specifications.

On July 4, 2006, three days before the pre-trial conference, LPL submitted an initial list of trial exhibits. This list included PTX 298 through PTX 354, which are mask files corresponding to 57 of Defendants' accused products, with one exhibit for each product. At the pre-trial conference, the Court limited the number of exhibits for each side to 150. In a letter to the Court dated July 14, 2006, LPL stated that it would only pursue infringement of Claim 1 and

---

[9] Trial Tr. at 29:2-3 ("What I'll do is if the exhibit list is crafted as Mr. Bono says, and for instance, Exhibit 20 is a book or a technical document, *not a compilation* of technical documents, your objection is going to be overruled.") (emphasis added).

[10] PTX 12 is a compilation of Exhibits 312, 315-319, 321, 322, 324, 327, 337, 339, and 340 as previously identified on LPL's initial exhibit list submitted July 4, 2006. PTX 13 is a compilation of Exhibits 313, 320, 323, 325, 326, 328-335, 337, 338, 341-354 as previously identified on LPL's initial exhibit list.

Claim 8 of the '002 patent reducing the number of accused products to 42. On July 15, 2006, LPL submitted their trial exhibit list wherein the mask files corresponding to Defendants' 42 accused products were compiled into two exhibits, PTX 12 and PTX 13.

When challenged that PTX 12 and 13 were compilations of individual exhibits, LPL characterized the individual mask files as pages from a book. Trial Tr. at 1933:20-22.[11] If LPL truly regarded each mask file as a page in a book, there was no logic in listing the individual mask files separately, without any context of the larger work, as LPL did in their initial list. The simple fact is that no individual mask file requires any other mask file for interpretation or context. Each mask file contains several layers (pages) that are relevant only to that individual file. Thus, each mask file is a book in and of itself. It is disingenuous to refer to individual mask files as pages in a book when, in fact, the collection of mask files is actually a library. LPL was clearly aware of this fact when it listed the mask files separately on its initial list and improperly created mask file compilations after the Court imposed a 150 exhibit limit.

Both sides were faced with some difficult decisions about what exhibits to cut in order to comply with the Court's limit of 150 trial exhibits. Defendants were prejudiced by LPL's circumvention of the Court's order – an order they obeyed. Not only were Defendants prejudiced by the sheer number of extra exhibits LPL used at trial, CPT was also prejudiced because LPL's exhibit stuffing made it harder for Defendants to determine which representative products LPL intended to focus on at trial.

---

[11] LPL's counsel also erroneously stated twice that Defendants made no stuffing objection to PTX 12 and PTX 13. (Trial Tr. at 1933:15-23.) In fact, Defendants specifically made stuffing objections during the first day of trial. (*Id.* at 4:5-5:2.) Moreover, the Court stated to Defendants, "You have a *continuing stuffing objection*. You don't have to do anything about it. It's going to come in at their peril if they are, in fact, stuffing." (*Id.* at 35:1-5.)

Defendants' exhibit list complied with the Court's limit of 150 while LPL's inflated list included 191 exhibits disguised as 150. LPL failed to heed the Court's warning as to the consequences of stuffing exhibits. To allow one party 41 more exhibits than the other is inherently unfair and Defendants respectfully request the Court, in accordance with its instruction, to grant a new trial.

## IV. DEFENDANTS ARE ENTITLED TO A NEW TRIAL DUE TO MISCONDUCT DURING CLOSING ARGUMENT.

### A. LPL's Counsel Prejudiced The Jury With Misstatements On The Law Of Patent Notice.

When a patentee fails to mark its patented product or device with notification of its patent protection, it is entitled to damages from an infringer only after statutory notice has been provided pursuant to 35 U.S.C. § 287. It is settled law that this required notice must consist of an affirmative communication by the patentee to the accused infringer of (1) a specific charge of infringement by (2) a specific accused product or device. *Amsted Indus. Inc.*, 24 F.3d at 187. This notice is a statutory requirement, and its necessity is not obviated even by an alleged infringer's actual notice of the subject patent. *Id.* "It is irrelevant . . . whether the defendant knew of the patent or knew of his own infringement. The correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge or understanding of the infringer." *Id.*; *see also Lans v. Digital Equip. Corp.*, 252 F.3d 1320, 1327 (Fed. Cir. 2001) ("the correct approach to determining notice under section 287 must focus on the action of the patentee, not the knowledge of the infringer").

In spite of this clear law, LPL counsel's closing arguments on section 287 notice were a blatant attempt to persuade the jury to ignore the law of statutory notice and instead focus on the legally irrelevant issue of what he believed the alleged infringer should have known.

LPL Counsel:     Now, they're going to argue to you that this doesn't constitute sufficient notice. *I don't know what kind of notice you need to give them, but they had to get the message* that we were telling them they were infringing the '002 patent.

Trial Tr. 2058:3-8 (emphasis added). Not stopping at this misstatement of law, LPL's counsel in fact admitted that a February 8, 2002 letter from plaintiff was not legally sufficient to constitute statutory notice by his statement that the letter lacked any allegation of infringement. In spite of this clear and acknowledged legal deficiency, however, counsel proceeded to tell the jury that the letter constituted legal notice of the patent:

LPL Counsel:     And this letter was the first letter to Chunghwa February 8, 2002. And it specifically referred to the '002 patent, and saying, and referring to it, and asking Chunghwa Picture Tubes, if they would like to meet. Of course, the letter was a gentle letter. *You don't in your first correspondence, right out of the bat accuse people of infringement.* You want to make it a fairly pleasant letter. And that's what this has done. *But it specifically put them on notice of the '002 patent.*

*Id.* at 2056:16-2057:5 (emphasis added). In addition to these misstatements of the law, LPL's counsel, throughout his comments on section 287 notice, ridiculed Defendants, suggesting that it is absurd that Defendants do not acknowledge the February 2002 letters as statutory notice to CPT of infringement. *Id.* at 2056:16-2058:8. Hence, not only was the jury misled as to the law, it was told that CPT's attempts to follow the law of notice under section 287 were absurd. The defense objected to these statements after the conclusion of LPL's closing argument. *Id.* at 2097:9-21.

The fact that the jury was later instructed as to what constitutes notice does not remove the reasonable probability that it was prejudiced by the misstatements. *See, e.g., Blanche Rd. Corp. v. Bensalem Twp*, 57 F.3d 253, 264 (3d Cir. 1995) (stating that cautionary instructions could not cure counsel's misconduct); *Draper v. Airco, Inc.*, 580 F.2d 91, 96-97 (3d Cir. 1978)

28

(holding that curative instruction insufficient to remove probability of prejudice where closing argument misstatements were "numerous and serious"); *Falkowski v. Johnson*, 148 F.R.D 132, 137 (D. Del. 1993). This is especially true where, as here, the instruction is not given to the jury on the same day as counsel's misstatements. *Draper*, 580 F.2d at 97. The technical rules of what constitutes legal notice of a competitor's patent are very different from a lay understanding of "notice," and this difference was exploited by plaintiff's counsel. As explained above, however, notice is determined solely by the patentee's actions, not by any actual or presumed knowledge of the alleged infringer. A jury composed of non-patent practitioners might have difficulty understanding and applying the decidedly non-lay statutory definition of "notice" in the best of circumstances. With plaintiff counsel's repeated urging that the jury apply a lay definition of "notice," indeed even arguing that the February 2002 letters constituted notice despite acknowledged deficiencies, it is more than merely "reasonable" that the jurors were prejudiced by the misstatements.

**B.    LPL's Counsel Prejudiced The Jury With Misstatements On The Law Of Anticipation.**

CPT argued that LPL's '002 patent was invalid as anticipated under 35 U.S.C. § 102. It is well settled law that "an anticipatory reference . . . need not duplicate word for word what is in the claims. Anticipation can occur when a claimed limitation is 'inherent' or otherwise *implicit* in the relevant reference." *Standard Havens Prods., Inc. v. Gencor Indus., Inc.*, 953 F.2d 1360, 1369 (Fed. Cir. 1991) (emphasis added), *citing Tyler Refrigeration v. Kysor Indus. Corp.*, 777 F.2d 687, 689 (Fed. Cir. 1985); *see also Ecolochem, Inc. v. S. Cal. Edison Co.*, 91 F.3d 169 (Fed. Cir. 1996) (same); *In re Runion*, 989 F.2d 1201 (Fed. Cir. 1993) (stating that "the crucial property or characteristic of the reference [must be] necessarily *implicit* in the reference's disclosure") (emphasis added); *Monsanto Co. v. Rohm & Haas Co.*, 312 F. Supp. 778, 796-97

29

(E.D. Pa. 1970) ("In our opinion this *implicit* description of [the disputed claim element] by the prior art is sufficiently clear and distinct to invalidate Monsanto's patent [as anticipated].") (emphasis added).

In spite of this clear precedent, LPL's counsel again used closing arguments to misstate and distort the legal requirements for patent anticipation and to urge the jury to evaluate anticipation with a legally erroneous standard:

> LPL Counsel:    What this all means is for Claim 1, they have to show you that one reference, one reference contains each and every element set forth in the claim. If one element is missing, there is no anticipation. It has to all be in one reference, and it has to -- and if anyone is missing, it's not anticipated. . . .
>
> What did Dr. Howard tell you in his testimony? I found this quite fascinating. When he was asked about removal of the guard ring, he said, *Well, it's implicit in Okawa. Not explicit. Well, if it's only implicit, it isn't clear and convincing.*

Trial Tr. 2070:6-13; 2074:9-15 (emphasis added). The defense objected to these misstatements after the conclusion of plaintiff's closing arguments. *Id.* at 2097:1-8.

In arguing to the jury that it should only consider what is explicitly disclosed in prior art references for determining anticipation, it is reasonably probable that plaintiff's counsel prejudiced the jury. His argument that each element must be explicit, and cannot be implicit, in the prior art reference is the polar opposite of the actual law on anticipation. Moreover, the jury was faced with the task of understanding and applying the complex law of both anticipation and obviousness, which is a confusing task in itself. LPL counsel's misstatements of law told the jury that the anticipation issue was easily disposed of because one of the '002 claim 1 elements was merely "implicit" in the prior art. As a matter of law, this would fulfill the requirement for anticipation; under LPL's misleading argument, however, this same fact precludes anticipation as a matter of law. A new trial is therefore required.

30

**C.    LPL's Counsel Prejudiced The Jury By Accusing The Defense Of Trying To Hide Evidence From The Jury.**

LPL's counsel engaged in further misconduct during his closing argument by citing to an objection made by defense counsel in order to claim that the defense was engaging in deception and trying to hide evidence from the jury. This unfair disparagement of the defense, based on nothing more than a routine objection to the admission of certain testimony, is highly prejudicial.

In his closing argument, defense counsel made the following statements:

> LPL Counsel:    Now, you recall when Mr. Cobb was testifying, and this is very telling, Ms. Gabler asked him a question on direct, did you talk to the engineers at the fabs at LG Philips, and he says yes. And what does she immediately say? She says I don't want anything asked on redirect about that conversation. And the Judge said well, wait until we get to it. And then my partner, Ms. Brzezynskik asked the question, they objected, the Judge overruled the objection and Mr. Cobb told you what these two LG Philips engineers at the fabs said to him . . . . That totally substantiated the prior information that had already been in the record. *Chunghwa did not want you to hear that testimony. They tried to keep it from you.*

Trial Tr. 2081:2-23 (emphasis added). The defense made an objection to this misconduct after plaintiff had concluded its closing argument. *Id.* at 2098:19-2099:12.

The defense's objection to admission of testimony reflects only a legitimate effort to comply with the Federal Rules of Evidence and this Court's rulings. The objection at issue, in fact, was made in light of the Court's pretrial ruling that experts would not be permitted to testify regarding information that was not included in their reports or deposition testimony. Pretrial Tr. 8:1-8:19.

LPL's counsel also accused defendants of trying to hide evidence because of an objection to the admission of a document (an objection that was sustained).

> LPL Counsel:    Now, you heard as the trial progressed, they didn't want you to see this document. They objected. And the judge sustained their objection. But what they forgot is we had the certified translations, which we then asked the witness about. You remember that. They

31

didn't want you to see this document, because they knew it would prove that they have coupling via resistance.

Trial Tr. 2041:23-2042:8.

In other portions of his closing arguments, counsel repeatedly impugned the integrity of defendants and/or defense counsel:

> LPL Counsel:    They showed you this [exhibit] *to trick you, to mislead you into thinking* that these row lines, and these column lines are not interconnected. . . . *And they try to trick you by saying,* you have to call that a semiconductor.

*Id.* at 2030:17-20; 2033:23-24 (emphasis added).

> LPL Counsel:    The defendants have sought to distract you from the core evidence of infringement by attempting to confuse you and distract you with peripheral issues . . . . You'll recall at the opening statement of the Defendants' counsel, they started their distraction in this case . . . .

*Id.* at 2012:8-22.

> LPL Counsel:    They also told you to *distract* your attention from the fact of whether they infringe, they told you they bought their technology from Mitsubishi ADI. They told you that in their opening statement as if that would again *distract* you by saying they didn't infringe, they just bought it from Mitsubishi.

*Id.* at 2013:12-18 (emphasis added).

> LPL Counsel:    They also claimed in their opening statement that LG Philips does not and did not enforce its '002 patent. Again, a *distraction technique.* And boy, from the evidence I've seen at trial for the last ten—seven days, they have done a *great job of trying to confuse you* as to the facts.

*Id.* at 2014:3-9 (emphasis added).

> LPL Counsel:    And they try *to trick you* by saying, you have to call that a semiconductor . . . Don't let *CPT fool you* into thinking that a semiconductor is something that does not conduct, that it's not really a conductor.

*Id.* at 2033:23-24; 2034:19-22 (emphasis added).

LPL Counsel:      Don't let them *snow* you, and I know that you won't let
                  them do it with their schematics, with their fancy
                  arguments, with their confusion, because they're good at it,
                  they're the best, but the documents are what they are, the
                  mask files are what they are, and the facts are without
                  doubt they interconnect with conductors, and they couple to
                  the guard ring via resistance and there is no doubt about it.

*Id.* at 2044:18-2045:2 (emphasis added).

These types of arguments are an overt appeal to the passions and prejudices of a jury,
rather than argument based on relevant evidence. *Draper*, 580 F.2d at 96. Such unfair attacks
on opposing counsel or their counsel have led courts to order new trials in the past. In *Fineman*,
980 F.2d at 207, for example, the Third Circuit affirmed the district court's grant of a new trial
where plaintiff's counsel made a "disparaging attack" on defense counsel during closing
argument. The court explained that "[i]t has long been a rule of this court that vituperative
references to opposing counsel will not be tolerated." *Id.* at 209; *see also Draper*, 580 F.2d at 95
(reversing denial of new trial in part because of plaintiff counsel's "several prejudicial,
vituperative and insulting references to opposing counsel"); *Falkowski*, 148 F.R.D. at 135
(granting new trial for attorney misconduct in part based on counsel's impugning defense
counsel on "irrelevant grounds," in stating that counsel has a "high tolerance for pain" as a result
of "representing people such as defendants in this case"). Indeed, one of the unfairly prejudicial
comments warranting a new trial in *Draper* was an implied accusation that the defense was
seeking to keep evidence from the jury by deliberately withholding requested documents. 580
F.2d at 96; *see also Spruill*, 1995 WL 534273, at *7 (granting new trial based on attorney
misconduct, including accusation to jury in closing argument that opposing counsel had withheld
evidence).

33

It is reasonably probable that the jury was influenced by LPL counsel's unfounded accusations that defense counsel had tried to improperly keep evidence from and "trick" the jury, and a new trial is needed to ensure a fair verdict.

### D.    LPL's Counsel Improperly Gave His Personal View Of The Evidence.

LPL's counsel committed further misconduct in his closing by repeatedly telling the jury his personal assessment of the witnesses and evidence. This Court follows the ABA's Model Rules of Professional Responsibility. D. Del. L.R. 83.6(d)(2). Model Rule 3.4, Fairness to Opposing Party and Counsel, provides that:

A lawyer shall not:

> . . . . (e) in trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, *or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant* or the guilt or innocence of the accused . . . .

In spite of this clear rule, LPL's counsel repeatedly injected his personal assessment of the witnesses and evidence into his closing arguments:

> LPL Counsel:    You heard the testimony of Dr. Schlam, our expert. *I think you would agree with me that his work was very thorough.*

(Trial Tr. 2015:15-17 (emphasis added).)

> LPL Counsel:    The reason I raise this is, *I believe that Chunghwa's products literally infringe* and that their argument that there is a semiconductor and in that conductive layer does not mean that they don't literally infringe.

(Trial Tr. 2035:10-14 (emphasis added).)

> LPL Counsel:    *Because I think it shows quite clearly that they have not met their burden to show it by clear and convincing evidence.* What did Dr. Howard tell you in his testimony? *I found this quite fascinating.*

(Trial Tr. 2074:6-10 (emphases added).)

34

LPL Counsel:    Do you think Mr. Ho Lee would have agreed to a number below 50 percent sharing so that there would have been equal sharing between the competitors?  *I don't think so.*  Do you think Chunghwa would have agreed to    more than 50 percent?  *I don't think so, either.  . . .This struck me*, and I think it would strike you *as simply a low ball negotiating tactic. . . .*Is there any way that you think LG Philips would have walked away from that negotiating table giving Chunghwa 93 percent of the cost savings?  *I don't think so.*

(Trial Tr. 2086:6-2087:15 (emphases added).)

LPL Counsel:    Plus, *I think it's quite telling* that who was the only witness that They tried to talk about this letter was Ms. Belle Chang.  And I have to say, that Ms. Chang strikes me as a very wonderful young person.

(Trial Tr. 2058:9-11 (emphasis added).)

LPL Counsel:    And *I found his testimony quite interesting*, as I'm sure you might have.

(Trial Tr. 2059:15-17 (emphasis added).)

LPL Counsel:    That was probably the most remarkable thing *I have heard  in  two weeks* and he says we don't know whether Dell, HP and ViewSonic, whether they sell in the U.S. . . . .  This was the second most remarkable thing I heard.

(Trial Tr. 2066:12-2067:2 (emphasis added).)

LPL Counsel:    And he answered *very truthfully.* The use of a resistance to couple connected lines in the definition, a specified resistance used to minimize the surge of electric current, that is not found in the prior art.  *I don't understand how they can present a lack of validity case to you in light of that admission.*

(Trial Tr. 2212:17-24 (emphases added).)

This misconduct was so pervasive and severe as to require a new trial.  *See Fineman,* 980 F.2d at 208-210 (new trial warranted in part because counsel gave personal opinion of the evidence to jury); *Draper*, 580 F.2d at 95-96 (same).

35

E.    **LPL's Counsel Misled The Jury by Claiming That The Defense Did Not Call Certain Witnesses In Order To Hide Their Testimony From The Jury.**

The jury was further misled by LPL counsel's remarks suggesting that the defense did not

call certain of LPL's foreign employees because it was trying to keep information from the jury:

LPL Counsel:    Another curious thing is they say Mr. Joo-Sup Kim was in the courtroom and we didn't call him as a witness. They told you that Mr. Youngwoo Cho was in this courtroom and we didn't call him. They told you Mr. Jong Kim was in this courtroom and we didn't call him. *They could have called him. They're sitting in this courtroom, all Mr. Rhodes had to say if he wanted to talk to them and cross-examine them, all he had to say was I want to call Mr. Joo-Sup Kim to the stand. They didn't do it.*

Trial Tr. 2202:2-12 (emphasis added). While this argument would sound reasonable to a jury, it

is in fact completely misleading. The defense, unlike plaintiff, could *not* have called these men

as witnesses. They are foreign nationals that the defense was unable to compel to travel to the

United States to testify. Although they made a surprise (to Defendants) appearance in the gallery

of the courtroom during trial, the defense was unable to simply call them to the stand. Under the

Court's pretrial orders, witnesses not included on the parties' witness lists would not be

permitted to testify; the Court made clear that any attempted addition of witnesses during trial

would not be taken favorably. When the three individuals made an appearance at trial, the

defense had already submitted its witness list, which had been prepared with the understanding

that these three witnesses could not be compelled to appear and would not be voluntarily

available. Additionally, Mr. John Kim was unavailable for most of the trial under the Court's

order excluding him from the courthouse. Hence, the jury was misled to believe that it was

simply a matter of the defense *choosing* not to call them during trial, when in fact calling them

was not an option for the defense.

These misleading statements to the jury again left them with the biased and unfounded

notion that the defense was trying to hide evidence from them. As discussed in the previous

section, this type of attack on defense counsel's motives and integrity is a pure appeal to the passions and prejudices of the jury, and is devoid of any legitimate evidentiary purpose.

**F.    LPL's Counsel Misled The Jury Regarding The Parties' Graphic Evidence.**

During closing arguments, LPL's counsel also misled the jury by claiming that the graphic materials presented by plaintiff's expert were CPT's mask drawings, when in fact they were drawings independently created by LPL. After stressing the importance of CPT's mask drawings, counsel led the jury to believe that its graphics were those same mask drawings, setting up a false dichotomy with Defendants' graphics, once again accusing the defense of trying to trick the jury. The jury was led to believe that plaintiff's graphics were the "real" mask drawings, when in reality plaintiff created its own graphics for trial just as it derided the defense for doing:

| | |
|---|---|
| LPL Counsel: | And you saw him [LPL's expert's] testimony, he studied, for example, the following: Mask files. These are the crown jewels as CPT admitted of their design and their products . . . . |
| | Dr. Schlam was very thorough. He explained to you, also, in detail, you'll recall this testimony, that the mask files depict a three-dimensional layering that must be explained to see what is actually in CPT's products. And he showed you the three-dimensional analysis that he had done, so you could appreciate how their products are made. This was in sharp contrast to CPT's presentation in this case, which was—for the most part, they used so-called schematics. You saw them presented throughout the case. These are, basically, stick drawings of the product's design. This doesn't tell you exactly what's in the products, how they're designed or how they're really made . . . . |
| | *You'll recall the mask files that he [LPL's expert] examined, those very complex mask files that tell you exactly what's in the product. Not the schematics that CPT's lawyer showed you all during this trial*, and not what I suspect they're going to show you during their closing. This is what's in the product, not the schematics . . . . |
| | *I just showed you what is the actual material, what is the actual depiction of Chunghwa's products based on their guard rings, that three-dimensional drawing.* You'll remember this. This is what |

37

counsel for CPT and the defendants have shown you throughout this trial. This is a marvelous drawing; however, it's much like a cartoon because it doesn't predict or show you what's actually in Chunghwa's product . . . . Dr. Schlam, in his statement, told you this is really misleading. This is really incomplete, *because they don't show you the connections that I just showed you from the mask files* between the diodes here, which are the actual interconnections between the row lines and the column lines. *They showed you this from the get-go of the trial to trick you, to mislead you* into thinking that these row lines, and these column lines are not interconnected. *They didn't show you the mask files. They show you their own drawings* . . . . Also they showed you this because they love schematics. They don't want to look at the mask files, because they actually show what's in their product. They show you this schematic . . . . This is useless . . . . .

[Referencing Mr. He's testimony] Showing you have to look at the mask files, not the stick drawings . . . . *And they try to trick you by saying,* you have to call that a semiconductor.

Trial Tr. 2016:1-2033:24 (emphases added).

Despite LPL counsel's leading the jury to believe that the demonstratives used by LPL were CPT's mask files, and that Defendants had avoided using them during the trial, in fact, *not one* of the 3-D images used by LPL at trial were produced by CPT, much less its product mask files. Every 3-D image was created by LPL itself. Moreover, LPL's 3-D drawings showed paths of electric current that were in no way faithful to CPT's mask files. It is reasonably probable that by falsely telling the jury that plaintiff's drawing were the actual mask files, LPL's counsel imbued the drawings with a false stamp of reliability, and that the jury was unfairly prejudiced to Defendants' detriment as a result. A new trial is therefore required to remove this prejudice.

### G.    LPL's Counsel Misled The Jury Regarding The Relative Size Of Its Requested Damages Award.

LPL's counsel misled the jury in his closing argument explanation of the royalty damages LPL was seeking. There is no dispute that any damages awarded to LPL must be limited to Defendants' U.S. sales, and involve a hypothetical license for only *one* of LPL's patents. LPL's

38

counsel sought to persuade the jury that the $52 million in damages sought by LPL was not disproportionately large. To do so, he juxtaposed a calculation of (1) what royalty damages calculated from a worldwide license would be ($196 million, or 2.5% of Defendants' worldwide sales of $7.8 billion), with (2) the $52 million sought by plaintiff in this case, claiming that using plaintiff's requested royalty rate would leave 80% of the value of LPL's patent portfolio remaining (i.e., the 446 U.S. LCD patents not at issue in this case). Trial Tr. 2090:17-23.

This line of argument was misleading because inherent in the argument was LPL's misstatement of law that LPL would be entitled to a worldwide royalty base on the 446 other United States LCD patents and not be limited, as it was (correctly) in this case, to a United States sales royalty base. This argument is contrary to the well settled law that United States patents cannot be enforced extraterritorially. *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 527 (1972) ("The statute [35 U.S.C. § 271] makes it clear that it is not an infringement to make or use a patented product outside of the United States. Our patent system makes no claim to extraterritorial effect."); *see also Johns Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1367 (Fed. Cir. 1998) (finding that damages for foreign acts belong in foreign courts; if defendant's "infringement has damaged [plaintiff's] ability to service foreign markets, [plaintiff] must rely on foreign patent protection."). All 447 of LPL's United States LCD patents are only enforceable as to United States sales, where, as here, the manufacturing takes place abroad. It was a misstatement of law to argue to the jury that LPL would have been entitled to royalties on CPT's worldwide sales for infringement of any of its United States patents. Trial Tr. 2090:17-23; *Deepsouth Packing Co.*, 406 U.S. at 527; *Johns Hopkins Univ.*, 152 F.3d at 1367. It is reasonably probable that this highly misleading argument unfairly prejudiced the jury in its calculation of damages, necessitating a new trial.

## CONCLUSION

For all of the foregoing reasons, Defendants have demonstrated that the jury's damages award is excessive, clearly erroneous, and against the great weight of the evidence and thus, Defendants are entitled to a new trial or to a remittitur.

Defendants have further demonstrated that they are entitled to a new trial based on erroneous evidentiary rulings that substantially prejudiced Defendants. The repeated and severe distortions and misstatements made by LPL's counsel during closing argument necessitate a new trial. Counsel's misconduct was highly prejudicial, at times misstating settled legal principles on key issues in the case. LPL's counsel even unfairly impugned the integrity of defense counsel, completely without a basis to do so, by stating to the jury that defense counsel was trying to trick them and hide evidence from them. The number and severity of these misstatements make it more than reasonably probable that the jury was unfairly biased and prejudiced against the defense in coming to their verdict. Defendants therefore respectfully request that the Court grant a new trial so that a jury can render a verdict untainted by the passion and prejudice urged on them by LPL during the trial now at issue.

OF COUNSEL:
Teresa M. Corbin
Glenn W. Rhodes
Howrey LLP
525 Market Street, Suite 3600
San Francisco, California 94105
(415) 848-4900

Julie S. Gabler
Howrey LLP
550 South Hope Street, Suite 1100
Los Angeles, California 90071
(213) 892-1800

Dated: October 10, 2006

Robert W. Whetzel (#2288)
whetzel@rlf.com
Steven J. Fineman (#4025)
fineman@rlf.com
Matthew W. King (#4566)
king@rlf.com
Richards, Layton & Finger
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(302) 651-7700
Attorneys for Defendants/Counterclaimants Tatung Company, Tatung Company of America, Chunghwa Picture Tubes, Ltd, and ViewSonic Corporation

40

RLF1-3068861-1

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 10, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing, and hand delivered to the following:

> Richard D. Kirk
> The Bayard Firm
> 222 Delaware Avenue, Suite 900
> P.O. Box 25130
> Wilmington, DE 19899

I hereby certify that on October 10, 2006, I sent the foregoing document by Electronic Mail, to the following non-registered participants:

> Gaspare J. Bono
> Matthew T. Bailey
> Andrew J. Park
> Adrian Mollo
> McKenna Long & Aldridge LLP
> 1900 K Street, NW
> Washington, DC 20006

Steven J. Fineman (#4025)
fineman@rlf.com
Richards, Layton & Finger
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 18, 2006, I electronically filed the foregoing document with the Clerk of Court using CM/ECF which will send notification of such filing, and hand delivered to the following:

> Richard D. Kirk
> The Bayard Firm
> 222 Delaware Avenue, Suite 900
> P.O. Box 25130
> Wilmington, DE 19899

I hereby certify that on October 18, 2006, I sent the foregoing document by Federal Express, to the following non-registered participants:

> Gaspare J. Bono
> Matthew T. Bailey
> Andrew J. Park
> Adrian Mollo
> McKenna Long & Aldridge LLP
> 1900 K Street, NW
> Washington, DC 20006

> Matthew W. King (#4566)
> King@rlf.com
> Richards, Layton & Finger
> One Rodney Square
> P.O. Box 551
> Wilmington, DE 19899