# EXHIBIT F

```
                    1
     IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF DELAWARE
LG PHILIPS LCD CO., LTD., ) VOLUME 1
    Plaintiff,            )
                          ) C.A. No. 05-292-JJF
    v.                    )
TATUNG COMPANY, TATUNG    )
  COMPANY OF AMERICA, INC.,)
CHUNGHWA PICTURE TUBES    )
LTD., and VIEWSONIC       )
CORPORATION,              )
    Defendant.            )
          Monday, July 17, 2006
          9:30 a.m.
          Courtroom 4B
          844 King Street
          Wilmington, Delaware
BEFORE: THE HONORABLE JOSEPH J. FARNAN, JR.
        United States District Court Judge
APPEARANCES:
    THE BAYARD FIRM
    BY: RICHARD D. KIRK, ESQ.
     -and-
    McKENNA, LONG & ALDRIDGE, LLP
    BY: GASPARE J. BONO, ESQ.
    BY: CASS W. CHRISTENSON, ESQ.
    BY: ADRIAN P.J. MOLLO, ESQ.
        Counsel for the Plaintiff
                    2
```

APPEARANCES CONTINUED:

```
    RICHARDS, LAYTON & FINGER
    BY: ROBERT W. WHETZEL, ESQ.

     -and-

    HOWREY LLP
    BY: GLENN W. RHODES, ESQ.
    BY: TERESA M. CORBIN, ESQ.
    BY: JULIE S. GABLER, ESQ.
    BY: STEVEN YOVITS, ESQ.
    BY: HEATHER H. FAN, ESQ.
    BY: SUZANNE B. DRENNON, ESQ.
        Counsel for the Defendants
```

Page 3

[1] THE CLERK: All rise.
[2] THE COURT: Be seated. Good
[3] morning.
[4]     [(Everyone said, Good morning,
[5] Your Honor.)
[6] THE COURT: All right. Good
[7] morning.
[8]     I have this letter from Mr.
[9] Whetzel alleging that there are violations of my
[10] orders designed to get the parties prepared for
[11] the trial to commence this morning.
[12]    And it goes in some detail about
[13] different matters of exhibit production, witness
[14] deposition, witness proposals and designations.
[15] It hasn't been marked with a docket item yet,
[16] because I just received it about 15 minutes ago.
[17]    Who wants to argue this letter on
[18] behalf of defendants?
[19] MS. GABLER: I do, Your Honor.
[20] THE COURT: All right. I'll give
[21] you five minutes to tell me what the problem is.
[22] MS. GABLER: Your Honor, there are
[23] several problems. Most importantly, their
[24] exhibit actually contains more than 400 exhibits

Page 4

[1] on it. And what they've done is earlier, as I
[2] think your aware, the parties had exchanged much
[3] larger lists and you had asked us to narrow them
[4] down to 150 at the pretrial conference.
[5]     And what LPL did, in essence, is
[6] take their hundreds and hundreds of exhibits and
[7] reshuffle them so that they could call them 135
[8] exhibits when, in fact, they have more than 400
[9] items on there.
[10]    So if you went document by
[11] document, their exhibit list is over 150 at
[12] plaintiff's Exhibit Number 24. That is,
[13] obviously, a major problem for us.
[14]    So we've had to, you know, make
[15] objections against a much larger list. We don't
[16] believe it's proper for plaintiffs to have
[17] characterized 400-plus documents as 150
[18] exhibits.
[19]    We're asking for one of two
[20] things. Either that Your Honor strike Exhibits
[21] 2, 12, 13, 18, 19, 20, 21, 22, 29, 30, 36, 46,
[22] 47 through 49, 72, 73, 75, 79, 87 through 90, 93
[23] through 96, 100, 101, 103, 104, 109, 111, 118
[24] through 121, 124, 127, 128 and 130, which is all

Trial Volume 1
July 17, 2006
Case 1:05-cv-00292-JJF    Document 468-3    Filed 10/18/2006    Page 3 of 18
LG Philips LCD Co., LTD v.
Tatung Company, et al.

Page 5

[1] the exhibits that contain more than one
[2] document.
[3]    Or alternatively, you cut their
[4] list at the actual first 150 documents, which
[5] would be midway through Exhibit 124. We ask
[6] that that be clarified as early as possible,
[7] because obviously your order on this will
[8] implicate how defendants do their list, which is
[9] due at 5:00 p.m. tonight.
[10]    And so in addition to that
[11] problem, plaintiffs also designated a number of
[12] documents listed in Section 1 on Page 1 of your
[13] letter that were late produced. And as you're
[14] aware, Your Honor has already ruled that late
[15] produced documents can not be used at trial, I
[16] think you have been clear on that.
[17] Plaintiffs — defendants are not intending to
[18] list any documents that were subject to Your
[19] Honor's ruling, plaintiffs have ignored Your
[20] Honor's ruling and listed a number of those
[21] documents anyway. So we on that basis request
[22] the Court strike Exhibits 1 through 3, 28
[23] through 31, 42, 85 through 87, and 126.
[24]    Additionally there are a number of

Page 6

[1] documents that refer to patents that are not in
[2] this litigation. As you'll recall, LPL moved
[3] and we opposed a motion limiting this case to
[4] just references to the '002 patent and yet
[5] despite the fact that Your Honor granted
[6] defendant's motion — I'm sorry, granted
[7] plaintiff's motion, plaintiff has proceeded to
[8] list a number of exhibits and designate
[9] deposition testimony that's contrary to your
[10] order, in specific Exhibits 45 and 46 on their
[11] list are letters that refer to patents other
[12] than the '002.
[13]    And if Your Honor will recall when
[14] we opposed their motion to exclude reference to
[15] other patents we made a proffer of what it is
[16] that we intended to offer, and we identified for
[17] Your Honor the fact that we didn't know how a
[18] willfulness case under the totality of the
[19] circumstances or defendant's exceptional case
[20] claims could go forward under this order because
[21] all of that evidence was intermixed and in order
[22] to tell what we understood to be LPL's notice
[23] story that was necessarily commingled with other
[24] patents and if that was going to happen that the

Page 7

[1] whole story had to be told, Your Honor, the
[2] totality of the circumstances, Your Honor ruled
[3] that that was all out, so LPL cannot offer
[4] letters and testimony that are inconsistent with
[5] your order, so in addition to Plaintiff's 45 and
[6] 46, they have also designated a bunch of
[7] testimony that they want to play in their case
[8] in chief including from Bell Chang and Pat Chang
[9] in which those deponents in Bell Chang's case
[10] testified about these letters that are their
[11] notice story that again we believe should be out
[12] based on your ruling on plaintiff's own motion.
[13]    And then in Pat Chang's testimony
[14] he directly testifies about the '121 patent and
[15] I think Your Honor has been clear about that at
[16] this point.
[17]    So we're very concerned that there
[18] is some sword and shield situation here.
[19] Plaintiffs sought and got a number of rulings
[20] from this Court on things that were going to be
[21] excluded because they didn't want us to do them
[22] and now they're turning around and trying to
[23] include them in their list and including them in
[24] their designations, and obviously we consider

Page 8

[1] that to be a problem.
[2]    THE COURT: All right.
[3]    MR. BONO: Thank you, Your Honor.
[4] Your Honor, I just had the letter
[5] that was delivered to Your Honor delivered to me
[6] at 9:25 this morning, so I really haven't had a
[7] chance to read it. But let me respond to three
[8] points that Ms. Gabler mentioned.
[9]    One, we diligently complied with
[10] Your Honor's order on strictly exhibits. What
[11] we did in terms, and it's mainly the technical
[12] documents, as we grouped documents together into
[13] a composite exhibit which we did not understand
[14] Your Honor to preclude, for example, if there
[15] was an STR file relating to one module, we put
[16] that in one exhibit because that's the way it's
[17] going to be used at the trial.
[18]    Counsel is really arguing that
[19] every piece of paper needs to be a separate
[20] exhibit and I don't think that's what Your Honor
[21] meant. Clearly there is no attempt to
[22] circumvent Your Honor's order, but we logically
[23] put in a composite exhibit the documents that
[24] related to each other as one exhibit and we're

Page 25

[1] MS. GABLER: Some of them predate
[2] the filing of this lawsuit for that matter.
[3] MR. BONO: May I explain, Your
[4] Honor?
[5] THE COURT: Yes.
[6] MR. BONO: This came up, these are
[7] of CPT financial results as I explained, they
[8] did come directly from their website and the
[9] circumstances of this was our damages expert
[10] referred to these websites with public documents
[11] in his report, and they asked us to produce the
[12] sites, website information that he had looked at
[13] and not just make general statements, so in
[14] response to their request we produced those
[15] documents, but these are all CPT produced
[16] documents.
[17]     I know of no article published by
[18] third parties, these are all their own reported
[19] financial results, that's why their letter —
[20] THE COURT: If they're all in that
[21] category, I'll overrule the objection and find
[22] there is no prejudice.
[23] MS. GABLER: Your Honor, the final
[24] category on late produced documents are the

Page 26

[1] photographs that they marked as Plaintiffs 28
[2] through 31, and these are photographs that
[3] apparently plaintiffs took of some of CPT's
[4] products, but those were never produced in the
[5] case either in conjunction with expert reports,
[6] prior expert depositions or in any manner. We
[7] became aware of them for the first time at 5:30
[8] on Saturday evening in the first draft of their
[9] exhibit list.
[10] MR. BONO: Your Honor, these are
[11] as you recall in this case, Your Honor ordered
[12] CPT to produce actual modules and I believe that
[13] they produced about thirty to thirty-five actual
[14] modules in discovery, and these are for purposes
[15] of presentation to the jury, you can't take
[16] apart every module given the time constraints.
[17] And so we took photos of the actual modules that
[18] CPT produced in discovery, and these are very
[19] narrowly tailored to the specific products that
[20] are going to be talked about by our expert.
[21]     That's what that is.
[22] THE COURT: And the photo, you
[23] represented that the photo has no modification
[24] to the actual — to the product that's produced?

Page 27

[1] MR. BONO: Yes, Your Honor.
[2] There's no modification whatsoever.
[3] MS. GABLER: Your Honor, if LG
[4] Philips wants to use some of these items as
[5] demonstratives, I don't think we have
[6] necessarily the same kind of objection to that.
[7] But the idea that they're submitting them as
[8] evidence that was never disclosed, and certainly
[9] wasn't disclosed in advance of expert reports,
[10] or expert depositions, we have a problem with
[11] having that on the exhibit list as something
[12] that then could go back to the jury room.
[13] THE COURT: Well, as I understand
[14] it, they're using those as demonstratives. So,
[15] and you actually have the product?
[16] MR. BONO: Oh, yes. We produced
[17] the actual product.
[18] THE COURT: I'll overrule the
[19] objection. You can use the picture for the
[20] jury's ease in understanding.
[21] MR. BONO: Thank you.
[22] THE COURT: All right.
[23] MS. GABLER: Okay. And then I
[24] have a couple other —

Page 28

[1] THE COURT: What else do you have,
[2] because we've got to get the jury up here.
[3] MS. GABLER: In relation to the
[4] number of exhibits, Mr. Bono, came up here and
[5] said —
[6] THE COURT: Well, here's what I'm
[7] going to do about the number of exhibits.
[8] Because how do I know?
[9]     What I'll do is if the exhibit
[10] list is crafted as Mr. Bono says, and for
[11] instance, Exhibit 20 is a book or a technical
[12] document, not a compilation of technical
[13] documents, your objection is going to be
[14] overruled.
[15]     If I find out during the course of
[16] the trial that there has been stuffing of
[17] individual exhibits, in other words, the
[18] marshaling of numerous exhibits into one exhibit
[19] number, then I'll either deal with it at trial,
[20] or it could be the cause of a mistrial after the
[21] verdict on a post-trial application.
[22]     But what I'm going to do, I'm
[23] going to accept his representation, caution him
[24] that it's not to be a stuffing exercise, that

Trial Volume 1
July 17, 2006
Case 1:05-cv-00292-JJF  Document 468-3  Filed 10/18/2006  Page 5 of 18
LG Philips LCD Co., LTD v.
Tatung Company, et al.

Page 29

[1] they should truly be an exhibit numbered as one
[2] exhibit. As you would number a book, you would
[3] number all 300 pages of the book.
[4] If it turns out to be different
[5] than that, then there will be a sanction.
[6] MS. GABLER: Your Honor, I can
[7] represent to you that the numbers I read into
[8] the record that are just above point four in the
[9] letter on Page 4, each and every one of those is
[10] not a situation where they have numbered a
[11] document that goes together or like your example
[12] like a book.
[13] That is not the case —
[14] THE COURT: Well, we'll see.
[15] MS. GABLER: — in any of those.
[16] But we are concerned, Your Honor, that if they
[17] then can pick and choose among what is now 400,
[18] more than 400 exhibits, that that is presenting
[19] us a problem, also.
[20] THE COURT: Well, if you're
[21] correct and it's truly 400 individual exhibits
[22] that have been randomly compiled to make it fit
[23] within the 150 exhibits list, —
[24] MS. GABLER: Right.

Page 30

[1] THE COURT: — and if you get an
[2] adverse verdict, you're probably going to get a
[3] new trial. If they're foolish enough to do
[4] that.
[5] But I'm not going to play with
[6] that this morning of commencement of the trial.
[7] And I put them on notice.
[8] If that's what's going on, if
[9] they're successful and prevail in trial, there
[10] will be a new trial. It's that simple.
[11] Mr. Bono, you'll be careful with
[12] that list and make sure it's not as your friends
[13] on the other side describe it.
[14] MR. BONO: Thank you, Your Honor.
[15] The list is as I've described it to the Court.
[16] We have properly compiled the composite
[17] exhibits.
[18] THE COURT: The only question is
[19] when do you start using it?
[20] MS. GABLER: It's the composite
[21] exhibits. So, for example, there are some where
[22] there are 69 separate exhibits for 69 separate
[23] products in one exhibit. And it's our position
[24] that those are 69 exhibits, not one exhibit.

Page 31

[1] THE COURT: I understand.
[2] MS. GABLER: Right.
[3] THE COURT: All right. Anything
[4] else?
[5] MS. GABLER: Yes. We have a
[6] couple other points of clarification.
[7] First, LPL has provided the
[8] witness list as they were required to do on the
[9] 15th, and ours will be coming in to Your Honor
[10] on time by 5:00 p.m. tonight. We wanted to
[11] clarify.
[12] Your Honor, at the pretrial, had
[13] talked about the fact that you couldn't call
[14] witnesses out of order, and we just want to
[15] clarify that if someone is listed on the list,
[16] they do actually have to be called; correct?
[17] THE COURT: If — I'm not
[18] understanding your question.
[19] MS. GABLER: Okay. They have
[20] listed out a number of witnesses on their list.
[21] So when we are putting in our list today, if
[22] they have somebody on their list that we want to
[23] conduct cross-examination on, for example that
[24] they're calling live, in reliance on the fact

Page 32

[1] that they have listed them on their list, we are
[2] not going to include —
[3] THE COURT: I've already discussed
[4] this. Don't you remember my whole example that
[5] you've got to go one, two, three, four, five?
[6] You can't skip.
[7] And if you run out of time, you
[8] run out of time at the end of the list. So
[9] that's how you prioritize your witnesses and all
[10] that.
[11] Now, you may not see the last five
[12] because they may run out of time. I don't know,
[13] but I thought I clarified that already.
[14] MS. GABLER: Okay. That was — I
[15] appreciate the clarification. And in terms of
[16] witnesses that are appearing by video, if their
[17] depositions are designated, you have to play the
[18] entire designation; right, whatever has been
[19] disclosed?
[20] THE COURT: Tell me why you
[21] wouldn't.
[22] MS. GABLER: We would not plan to.
[23] This, again, just goes to how we prepare our
[24] witness list.

Page 33

[1] In some instances, they have
[2] designated many hours of video testimony. So we
[3] just want to make sure that if they're playing
[4] that, if we counter — if the deposition
[5] designation is witness number four, and it has
[6] 27 hours of designation, I guess we're going to
[7] hear 27 hours of witness four. We won't get to
[8] any other witnesses.
[9]   MS. GABLER: Okay. Thank you.
[10] The final points this morning,
[11] we're not sure if LPL has a jury consultant with
[12] them today, but we do have one. And we didn't
[13] know whether or not Your Honor had any objection
[14] to the jury consultant sitting at counsel's
[15] table during jury selection.
[16]   THE COURT: No. You can do that.
[17]   MS. GABLER: And we would like
[18] Your Honor to rule that no mention of the
[19] presence of jury consultants, either ours or
[20] theirs, if they have one, can be made in front
[21] of the jury.
[22]   THE COURT: Why would anybody do
[23] that?
[24]   MS. GABLER: Just making sure.

Page 34

[1]   THE COURT: Okay. The jury can
[2] come to side-bar when we do the individual voir
[3] dire, so they can hear that. You have a jury
[4] consultant.
[5]   MR. BONO: No, Your Honor, not
[6] here today.
[7]   THE COURT: You're not going to
[8] talk about theirs, are you?
[9]   MR. BONO: No, Your Honor. I
[10] didn't know about it.
[11]   THE COURT: I'm not going to talk
[12] about it, either.
[13]   MS. GABLER: Okay. In the event
[14] that LPL tries to admit during the trial through
[15] a witness one of these stuffed exhibits, what
[16] objection would you like us to be making at the
[17] time that's happening to preserve the mistrial
[18] issue.
[19]   THE COURT: Well, on the issue of
[20] stuffing, you have a continuing objection. So
[21] there's no need to have to stand up and
[22] implicate yourself each time in front of the
[23] jury.
[24]   MS. GABLER: Okay.

Page 35

[1]   THE COURT: You have a continuing
[2] stuffing objection. You don't have to do
[3] anything about it.
[4]   It's going to come in at their
[5] peril if they are, in fact, stuffing.
[6]   MS. GABLER: Okay.
[7]   THE COURT: I think that's on the
[8] record. You have that objection.
[9]   MS. GABLER: Great. I think
[10] that's my new favorite objection. Thank you.
[11]   THE COURT: You're welcome. All
[12] right. Yes.
[13]   MR. BONO: I just have one issue,
[14] Your Honor.
[15]   THE COURT: Sure.
[16]   MR. BONO: We informed the Court
[17] on Friday in light of the trial management, that
[18] order, that we had withdrawn certain claims in
[19] the case and narrowed the case to Claims 1 and 8
[20] of the '002 patent, and we have served on the
[21] other side a covenant not to sue as to the other
[22] claims. And I noticed in some of their opening
[23] statement demonstratives like there was mention
[24] of other claims other than Claim 1 and 8.

Page 36

[1] And it's our position that there's
[2] no judicial claim before this Court.
[3]   THE COURT: If you're only trying
[4] 1 and 8, that's all they're going to talk about
[5] is 1 and 8.
[6]   MS. CORBIN: Your Honor, can I
[7] address this?
[8]   THE COURT: Are you going to use
[9] something other than Claim 1 and 8?
[10]   MS. CORBIN: Yes, Your Honor,
[11] because obviousness is an important issue in
[12] this case. And there are claims in this patent
[13] that are directed to inner claims alone, inner
[14] rings alone, outer rings alone. And then the
[15] combination of those rings.
[16]   And, for example, one of those
[17] claims, Claim 10, which was an independent claim
[18] that was an inner ring claim only has been
[19] admitted by their expert to be completely
[20] anticipated.
[21]   THE COURT: Well, I don't think
[22] Mr. Bono is arguing that in the presentation of
[23] invalidity claims, that you can't attack the
[24] claims of the patent. That's not what you are

[24] having a meeting with CPT in June of 2002;

Page 649

[1] correct?
[2] A: That's correct.
[3] Q: Incidentally, you speak English, [4] don't you?
[5] A: Yes, a little bit.
[6] Q: And you read English; right?
[7] A: Yes, to a little extent.
[8] Q: In fact, when you prepared with [9] Mr. Bono for your deposition, you spoke to him [10] in English; right?
[11] A: On certain occasions I did, and [12] other — and on other occasions I used the [13] interpreter.
[14] Q: Now, during that meeting in June, [15] 2002 with CPT, you were speaking English with [16] them; is that correct?
[17] A: That is correct.
[18] Q: Now, at that meeting in June of [19] 2002 with CPT, that was a general introduction, [20] not a deep technical discussion; right?
[21] A: Yes. However, we had already [22] prepared claim charts and since they were aware [23] of the technical — and since they were aware of [24] the problems since February, we have provide

Page 650

[1] them with enough technical information by that [2] time.
[3] Q: But you'll agree that CPT was not [4] prepared to have a technical meeting and [5] technical discussions with you; right?
[6] A: I thought that since they have had [7] six months period — excuse me, four months [8] period, I thought that they would have [9] understood our technology sufficiently.
[10] Q: Well, let me direct you to your [11] deposition testimony from July 3rd, 2006, again, [12] page 122, lines 1 to 6.
[13] "ANSWER: And another thing was [14] that this was the first meeting, so I don't [15] believe that CPT was prepared to have a [16] technical meeting with technical discussions. [17] So rather than having any deep technical [18] discussions, I believe that we gave a general [19] introduction."
[20] A: That's correct.
[21] Q: Could we put PTX 46 up on the [22] screen.
[23] Now, Mr. Lee, we talked about this [24] letter this morning; right?

Page 651

[1] A: Yes, that's true.
[2] Q: Now, if you look at PTX 46, if [3] you'll just read through that for a mom-

ent, will [4] you please tell me where it says infringe or [5] infringement in that letter anywhere?
[6] A: Yes. In this letter we are simply [7] saying that we are willing to offer licenses for [8] all our technology.
[9] Q: In fact, in the second paragraph [10] it says as examples you may wish to review U.S. [11] patent numbers and it list eight patents; right?
[12] A: Yes, that's correct.
[13] Q: And if you look at the next [14] paragraph, it says, "Should your company wish to [15] discuss the above identified patents." Correct?
[16] A: That's correct.
[17] Q: And it says, "We will be happy to [18] visit your company on any one day between March [19] 14 and March 15." Right?
[20] A: That's correct.
[21] Q: And those were dates of your [22] choosing; correct?
[23] A: That's correct.
[24] Q: You didn't ask CPT for any

Page 652

[1] convenient dates for them; right?
[2] A: Yes, we didn't ask that, however, [3] we didn't hear the answer for this letter, [4] either.
[5] Q: You know what Chinese New Years [6] is, don't you?
[7] A: Yes, of course I do.
[8] Q: Now, can you put up PTX 142 for [9] me, please. And just put both letters on the [10] screen. And if you can enlarge PTX 142 a little [11] bit so we can read it.
[12] And I would like to refer your [13] attention to PTX 142 which is on the right-hand [14] side of the screen. And the first line it says, [15] "On February 8, we wrote to you and asked for a [16] meeting to discuss the unauthorized use of [17] technology owned by LG Philips LCD Company by [18] Chunghwa Picture Tubes."
[19] A: That's correct.
[20] Q: And that first sentence of that [21] letter is incorrect; right?
[22] A: Well, there may be a little bit of [23] difference of opinion regarding the expression [24] that is used, but I think largely the substance

Page 653

[1] is correct.
[2] Q: Well, let's look at the second [3] sentence of that paragraph. "In that letter, we [4] asked for a meeting to discuss the issue of [5] patent infringement with CPT."
[6] A: That's correct.

[7] Q: And that sentence isn't correct, [8] either, is it?
[9] A: Well, you may not say it is 100 [10] percent correct, but you say it's more or less [11] the same vein.
[12] MR. RHODES: And can you put — [13] Defendants' Exhibit 58, please?
[14] INTERPRETER PARK: If I may, if I [15] could make a correction to the last statement by [16] the witness.
[17] I wouldn't think that it is 100 [18] percent identical in meaning, but more or less, [19] I would think it is the same meaning.
[20] MR. RHODES: Put those back up.
[21] INTERPRETER KIM: I respectfully [22] disagree, but the Korean rendition is on the [23] record.
[24] BY MR. RHODES:

Page 654

[1] Q: The February 27th letter says, in [2] that letter, February 8th 2002, we asked for a [3] meeting to discuss this issue of patent [4] infringement with CPT.
[5] Which part of the February 8th [6] letter is identical to that sentence?
[7] A: Well, it may not be identical. It [8] is some softened out. And in large sense, I [9] think that's, more or less, the same substance [10] if you read, as example, you may wish to review.
[11] Q: Okay. So my understanding is that [12] may wish to review is identical with the issue [13] of patent infringement.
[14] That's your answer; is that [15] correct?
[16] A: Not true. It's not exactly [17] identical. However, in February 8th letter, we [18] asked him to reply by February 26th.
[19] If they had — if they had replied [20] by that time for that letter, then we would have [21] used different expression. Since they had not, [22] we sort of expended the expression to a stronger [23] connotation, because there was no reply.
[24] Although that was — the substance

Page 655

[1] was more or less the same, we made it stronger. [2] Since we have made it stronger.
[3] Q: Okay. And you've already said [4] that you know what Chinese New Year's is; right?
[5] A: That's correct.
[6] Q: Now, looking at both of those [7] letters, PTX 46 and PTX 142, neither one of [8] those letters identifies a single CPT product, [9] does it?
[10] A: True. However, on the February [11] 27th letter, we do mention unauthorized use of [12] technology. This refers to the general product [13] by CPT.

[14] Q: All right. But you will agree [15] that there's no specific CPT products identified [16] in either one of those letters; right?

[17] A: That's correct.

[18] Q: And there are no specific claims [19] of any of those patents set out in those [20] letters; right?

[21] A: That's correct.

[22] MR. RHODES: Go to Exhibit 58. [23] PTX 58.

[24] BY MR. RHODES:

Page 656

[1] Q: Now, this is a copy of the patent [2] license agreement draft proposal that you gave [3] to CPT at the June meeting; correct?

[4] A: That's correct.

[5] Q: And in that license agreement, you [6] were proposing a royalty rate of 2.5 percent; [7] right?

[8] A: That's correct.

[9] Q: And that was supposed to be a [10] licensing rate for the entire LPL portfolio [11] relating to LCDs; right?

[12] A: That's correct.

[13] Q: Now, when we were looking at the [14] February 8th letter earlier, PTX 46, did I [15] identify the patents that LPL wanted to license [16] to CPT?

[17] A: Which contract and which letter?

[18] Q: Well, let's go back. It's PTX 46. [19] Incidentally there was 447 or so [20] patents in LPL's portfolio at that time; isn't [21] that right?

[22] A: Yes, although I don't quite [23] remember the precise number. It sounds right.

[24] Q: I don't remember the precise

Page 657

[1] number, but it sounds right to me, too.

[2] Now, did you identify all the [3] patents in your portfolio in the February 8th [4] letter to CPT?

[5] A: Does the counsel mean this [6] particular letter?

[7] Q: Yes, this letter. Did you [8] identify it?

[9] A: No, just — we identified just [10] few.

[11] Q: All right. Let's go to PTX 142. [12] Now, did you provide CPT with the [13] list of the patent portfolio that you wanted [14] them to license in this — this letter?

[15] A: No, we did not.

[16] Q: And let's go to PTX 145. [17] And that is a March 26th, 2002 [18] letter to CPT. Now, again you didn't supply the [19] list of all the patents you wanted CPT to [20] license in this letter, either, did you?

[21] A: That's correct.

[22] Q: And let's go to PTX 146.

[23] A: However, they never required or [24] asked us for such information.

Page 658

[1] Q: And that's your testimony?

[2] A: That's my supplemental [3] explanation.

[4] Q: Okay. Let's go to PTX 146. [5] Now, you didn't supply the list of [6] patents in that letter, either, did you?

[7] A: That's correct.

[8] Q: And if we can go to DTX 120. [9] Now, we're up to May 17th, 2002.

[10] Did you supply the list of all the [11] 400-plus patents in this letter?

[12] A: We did not.

[13] Q: And if we can go to DTX 121. [14] Now, we're up to May 31st, 2002. [15] Did you supply the list of 400-plus patents to [16] CPT in this letter?

[17] A: We did not.

[18] Q: All right. Let's go to DTX 123. [19] Now we're up to July.

[20] Now, in this letter you state [21] that, We provided CPT our standard licenses [22] agreement during our June 11 meeting.

[23] Do you see that?

[24] A: Yes, I did.

Page 659

[1] Q: And you didn't supply the list of [2] 400-plus patents to CPT in this letter, either; [3] right?

[4] A: That's correct.

[5] Q: Then let's go to DTX 125. [6] Now, we're up to July 30th, 2002. [7] And the second paragraph, the last sentence, it [8] says a list of patents available for licensing [9] is attached to this letter.

[10] A: That's correct.

[11] Q: And if we go to Page 2 of that [12] exhibit. Is that a list of the LPL patents that [13] you wanted CPT to pay a 2.5-percent royalty for?

[14] A: That's correct.

[15] Q: And if we go to Page 2 of that [16] exhibit.

[17] And this is the last page of the [18] three-page document of DTX 124. And that's the [19] remainder of the patents that you wanted CPT to [20] license at that 2.5-percent royalty; correct?

[21] A: That's correct.

[22] Q: Okay. So starting in February of [23] 2002, when you first sent the letter to CPT, in [24] February, you didn't give them a list with all

Page 660

[1] the patents; correct?

[2] A: Correct.

[3] Q: And in March you didn't give them [4] a list, either; right?

[5] A: Correct.

[6] Q: Didn't give them one in April, [7] either; correct?

[8] A: Correct.

[9] Q: You didn't give them one in May?

[10] A: Correct.

[11] Q: And you gave them a proposed [12] license agreement in June; right?

[13] A: Correct.

[14] Q: And then on July 30th, you gave [15] them a list?

[16] A: Correct.

[17] MR. RHODES: Can we have DTX 124, [18] please?

[19] BY MR. RHODES:

[20] Q: Now, earlier you said they never [21] asked for one; correct?

[22] A: Yes. That's correct. [23] However, I meant in May.

[24] Q: Oh, I see. Now, if we look at

Page 661

[1] Paragraph 3 with respect to the license [2] agreement, We are concerned about the licensed [3] patents most. Thus, we need more information, [4] such as the Patent List, to estimate the value [5] of them.

[6] A: Yes. That's correct.

[7] Q: And they said, We need more [8] information and time for this matter. We would [9] like to extend the date you had stated on July [10] 5, 2002.

[11] Do you see that?

[12] A: That's correct.

[13] Q: And then on July 30th, you finally [14] gave them a list of 447 patents to analyze; [15] right?

[16] A: That's correct.

[17] Q: Now, if we could put DTX 48 up. [18] Actually don't put that up yet.

[19] Now, Mr. Lee, you gave them a list [20] at the end of July for a proposed licensing [21] agreement in 2002; correct?

[22] A: Correct.

[23] Q: And they asked for more time; [24] right?

Page 662

[1] A: Correct.

[2] Q: And that list was 447 odd patents; [3] right?

[4] A: Correct.

[5] Q: And less than a month later, you [6] sued CPT; right?

[7] A: Correct.

[8] Q: And you sued them in California; [9] right?

confirmed. However, because [22] we always have used two guard rings, the data [23] for one outer guard ring only was not well kept.

[24] Q: So if that existed, that document

Page 669

[1] existed, you would have given that to your [2] counsel; right?

[3] A: There was no documented result. [4] It was a test that was performed in very early [5] day, like trying, try it at the factory level — [6] pilot factory level, so it was not something [7] that was conducted at a level of fab, so did not [8] keep a detailed result.

[9] Q: So you distinguish between [10] something that's done in the R & D versus [11] something that's done in a fab, don't you?

[12] A: Yes. However, I was speaking more [13] in terms of yield management. However, as far [14] as the pilot product, whether it was done on [15] R & D pilot level or whether it was made at [16] factory in mass production level, I don't think [17] there was a great difference as the design would [18] have been more or less the same.

[19] Q: So it's your testimony that yield [20] at the R & D level would be the same as yield at [21] the fab level; is that correct?

[22] A: Yes, although I cannot confirm [23] that using data since there was no data, but as [24] far as the functionality of the products are

Page 670

[1] concerned, they are the same, so I do believe [2] they would be more or less the same.

[3] Q: So there is no specific recorded [4] data; correct?

[5] INTERPRETER PARK: For the first [6] portion of the witness's answer, prior answer, [7] he said, "I cannot speak in terms of data, but [8] with respect to the functionality of the [9] products, I think they are the same."

[10] INTERPRETER KIM: No objection.

[11] BY MR. RHODES:

[12] Q: So again, there is no specific [13] recorded data; correct?

[14] A: That's correct.

[15] Q: In fact, you've reached the [16] conclusion that the increase in yield rate is at [17] a minimum ten percent; right?

[18] A: That's correct.

[19] Q: And that's based on an assumption; [20] right?

[21] A: Well, no. What I'm talking about [22] is in terms of products that were produced in [23] pilot line, not in mass production line like [24] several thousand or several tens of thousand,

Page 671

[1] but perhaps ten or more or less, and within that [2] scale, I am speaking in terms of result that we [3] have obtained within that scale.

[4] INTERPRETER PARK: If I may, I [5] would like to reinterpret the witness's prior [6] answer.

[7] "No, I'm talking about the [8] products that we made using the pilot line. Of [9] course we're not talking about mass production [10] lines where we are talking about thousands of [11] products, maybe tens of thousands of products, [12] we're not talking about that, but I'm talking [13] about the test results of the tests that we [14] conducted using some products that we used, [15] pilot line, about ten of them or more or less [16] about ten of them."

[17] BY MR. RHODES:

[18] Q: I'm sorry, I just want to make [19] sure I understand this correctly. You're [20] talking about a pilot line, not mass production, [21] that's what you said; correct?

[22] A: That's correct.

[23] Q: And you have no specific recorded [24] data that supports that; correct?

Page 672

[1] A: That's correct.

[2] Q: Now, you testified this morning [3] that you were involved in developing LCD [4] products at the beginning of your career at LG [5] Electronics; correct?

[6] A: That's correct.

[7] Q: Now, this also involved especially [8] going to countries such as Japan and the United [9] States where companies have developed LCDs to [10] learn the technology and to prepare for the [11] business of LCD development; correct?

[12] A: That's correct.

[13] Q: Now, LPL I think you said in your [14] deposition expends enormous resources in [15] reviewing patents; is that correct?

[16] A: That's correct.

[17] MR. RHODES: Your Honor, if I can [18] just have two minutes.

[19] THE COURT: Sure.

[20] MR. RHODES: Thank you. [21] Your Honor, at this time I would [22] like to move into evidence Defendants' Exhibits [23] 120, 121, 123, 125, 124, and 48.

[24] THE COURT: All right. They're

Page 673

[1] admitted subject to any objection they might [2] have.

[3] MR. RHODES: I have no further [4] questions.

[5] THE COURT: All right. Thank you.

[6] MR. BONO: I have no questions, [7] Your Honor.

[8] THE COURT: All right. The [9] witness may step down.

[10] MR. BONO: Your Honor, we're going [11] to begin showing some video depositions.

[12] THE COURT: We'll take a break. [13] That way, you can get set up.

[14] We'll take a 15 minute or [15] 20-minute break, so you can get set up for the [16] videotape deposition.

[17] (Jury leaving the courtroom at [18] 2:53 p.m.)

[19] THE COURT: All right. We'll be [20] in recess for 15 minutes.

[21] (A brief recess was taken.)

[22] THE CLERK: All rise.

[23] THE COURT: Jury's on its way in.

[24] (Jury entering the courtroom at

Page 674

[1] 3:18 p.m.)

[2] THE COURT: All right. Be seated, [3] please.

[4] Mr. Bono.

[5] MR. BONO: Thank you, Your Honor. [6] Mr. Christenson will present the next few [7] witnesses.

[8] THE COURT: All right.

[9] MR. CHRISTENSON: Your Honor, LG [10] Philips would like to present an excerpt from a [11] videotape deposition of Chunghwa Picture Tubes [12] for its next witness.

[13] Mr. Milton Kuan.

[14] THE COURT: All right.

[15] MR. CHRISTENSON: This is an [16] excerpt of Mr. Kuan's deposition. Mr. Kuan was [17] designated by Chunghwa to testify on behalf of [18] Chunghwa.

[19] (Beginning of videotape excerpt:)

[20] Q: Mr. Kuan, good morning.

[21] A: Good morning.

[22] Q: Please state your full name.

[23] A: Kuan Chien Ming.

[24] Q: So you use the English name Milton

Page 675

[1] Kuan; is that correct?

[2] A: Yes.

[3] Q: Where do you work?

[4] A: China Picture Tube.

[5] Q: And you understand that you are [6] testifying today as a representative of CPT?

[7] A: Yes.

[8] Q: So when you answer questions [9] today, you will be telling me not just what

# TRANSCRIPT PAGES 994 - 1152

# REDACTED

TRANSCRIPT PAGES 1180 - 1192

REDACTED

has some [14] level of resistance, everything has some level [15] of conductivity, except for superconductors [16] which have no resistance.

[17] Q: And does CPT utilize [18] superconductors in the diodes?

[19] A: No. No one was figured out how to [20] get superconductors into the displays, [21] unfortunately; maybe some day.

[22] Q: So just to illustrate that point [23] that the resistance is found in every substance, [24] can we just — can you just describe for us say

### Page 1577

[1] in the gate line, what is the resistance of the [2] gate lines that we have been talking about?

[3] A: The resistance of a typical gate [4] line is in the kiloohm range. Obviously it [5] depends on the size of the display and the [6] design and width of the lines, et cetera, the [7] thickness, but you know, my experience typically [8] they operate around a 10,000 ohm level for [9] reasons that we don't need to get into.

[10] Q: So the gate lines themselves would [11] have a 10,000 ohm level. How does that relate [12] to the .1 ohm resistance that you described in [13] the ITO jumpers?

[14] A: Well, that's obviously much [15] higher, 10,000 compared to a 10th of an ohm is a [16] pretty slight resistance, a thousand compared to [17] a tenth of an ohm.

[18] Q: The way in which the ITO jumpers [19] are used in CPT products where you have 10,000, [20] for example, of those in one outer guard ring, [21] what is the effect of that on current flow in [22] the event of electrostatic discharge?

[23] A: Well, it would have essentially no [24] effect. It would be a negligible affect in

### Page 1578

[1] comparison to these other resistors that are [2] present.

[3] Q: Could we see slide 111, please. [4] When people use ITO in the LCD [5] industry in the manner in which CPT has used [6] that, how does that comport with resistance as [7] defined by the Court?

[8] A: Well, I don't know of any case in [9] the LCD industry where ITO is used to minimize [10] the current from electrostatic discharge. ITO [11] is generally used to provide as much conductance [12] as possible.

[13] Q: I would like to see slide 120, [14] please.

[15] So based on the discussion that [16] we've just had, is it your opinion — strike [17] that.

[18] Do any of CPT's products contain [19] the resistance of step four of Claim 1?

[20] A: No, they don't.

[21] Q: And could you summarize for us the [22] reasons why you say that?

[23] A: Well, first of all, in terms of [24] this part four here, they don't have the three

### Page 1579

[1] distinct structures. The diodes don't [2] constitute a resistance under the Court's [3] definition because they don't have a specified [4] resistance. And both the diode and the ITO [5] actually serve to maximize current from ESD and [6] not minimize it.

[7] Q: And then if we could quickly look [8] at step five, which is removing said guard ring [9] and row and column interconnections prior to [10] completion of the display. In your view, do any [11] of CPT's manufacturing methodologies that [12] produce the accused products here do that step?

[13] A: They do not.

[14] Q: Why not?

[15] A: Because they don't have the [16] interconnections.

[17] Q: So in summary, then, in looking at [18] the totality of Claim 1, slide 121, can you [19] summarize for us why you opine that CPT's [20] products do not infringe Claim 1?

[21] A: Because they don't provide the [22] interconnecting as required by the definition. [23] And in this portion they don't have the [24] interconnection, therefore, they can't do

### Page 1580

[1] everything, but they also don't have a [2] resistance that conforms to the Court's [3] definition. And again, this is not valid [4] because there are no interconnections. So as a [5] result, none of these is met.

[6] Q: Okay. So I want to talk about [7] Claim 8 now. Is Claim 8 a dependent or [8] independent claim?

[9] A: Claim 8 is a dependent claim.

[10] Q: And what does it mean to be a [11] dependent claim?

[12] A: It means that it contains the [13] elements of the claim from which it depends.

[14] Q: Could I please have slide 121 [15] back, please.

[16] And what claim does Claim 8 depend [17] from?

[18] A: Claim 8 depends from Claim 1.

[19] Q: And so does it include all the [20] limitations that we have just gone through for [21] Claim 1?

[22] A: That's the meaning of it, it [23] includes all these limitations and then adds [24] additional ones.

### Page 1581

[1] Q: So what is your opinion with [2] respect to whether any of CPT's products that [3] are accused here infringe Claim 8?

[4] A: Well, if they don't infringe Claim [5] 1, they cannot infringe Claim 8. So that's very [6] simple.

[7] Q: What is your opinion about —

[8] A: So, therefore, they do not [9] infringe Claim 8.

[10] Q: So if I have understood, we have [11] gone through all the reasons why CPT does not [12] infringe Claim 1 or Claim 8, and I want to [13] switch gears here for a minute and ask you, [14] Dr. Howard, were you asked to consider whether [15] noninfringing alternatives exist to the '002 [16] patent?

[17] A: Yes, I was.

[18] Q: And can you tell us what are [19] noninfringing alternatives, what that term [20] means?

[21] A: Well, a noninfringing alternative [22] is a way of making the product that would not [23] infringe the '002 patent.

[24] Q: And are there any non-infringing

### Page 1582

[1] alternatives that you are aware of?

[2] A: Well, I mean, one of them is the [3] CPT structure, which I just said doesn't [4] infringe.

[5] Q: And in addition to that, are there [6] any other non-infringing methods of which you [7] are aware?

[8] A: Yes. I'm aware of other [9] alternatives.

[10] Q: And could you give us an example [11] of one of those?

[12] A: Well, one example is use of what's [13] called chip on glass technology.

[14] Q: And can you explain what that is?

[15] A: Yes. All these displays have to [16] be connected to the outside world eventually. [17] And typically that's done on the edge of the [18] panel with a flexible connector.

[19] And the flexible connector carries [20] on it a silicon chip that provides the voltages [21] to each of the lines to which it's connected in [22] accordance with the — what the computer is [23] sending out as a picture.

[24] And in chip on glass, those chips

### Page 1583

[1] that normally would be on the flex are placed [2] directly onto the glass. And so you have a [3] smaller number of connects that have to be made [4] to the glass

to send in the digital information [5] to the chips.

[6] Q: And why do you say that chip on [7] glass is a non-infringing alternative to the [8] methods of Claims 1 and 8 of the '002 patent?

[9] A: Because it doesn't fit itself well [10] to outer guard ring. And in looking at CPT's [11] products, for instance, that use, chip on glass, [12] they found that they didn't need to have an [13] outer guard ring.

[14] Q: So do the products that CPT makes [15] with the chip on glass methodology include an [16] outer guard ring?

[17] A: No, they do not.

[18] Q: And how many of CPT's products — [19] well, strike that.

[20] Which CPT products currently use [21] the chip on glass technology?

[22] A: Currently the smaller products use [23] it up to nine inch.

[24] Q: And from a technical point of

Page 1584

[1] view, are you aware of any reason why CPT could [2] not use the chip on glass technology to produce [3] the larger displays it manufactures?

[4] A: I'm not aware of any limitation in [5] that nature.

[6] Q: Okay. I want to move now and talk [7] about your opinion with respect to the validity [8] or invalidity of the '002 patent.

[9] THE COURT: Maybe we should break [10] for lunch. That way you don't get caught in the [11] middle of that. Would that be okay?

[12] MS. CORBIN: That would be great. [13] Thank you.

[14] THE COURT: We're going to recess [15] for lunch. We're going to take a little longer.

[16] I'll ask you to come back at 1:30.

[17] THE CLERK: All rise.

[18] (Jury leaving the courtroom at [19] 12:28 p.m.)

[20] THE COURT: All right. Be seated. [21] Can your technician put up a claim [22] construction order?

[23] MS. CORBIN: The actual order? I [24] think so. Do we have the claim construction

Page 1585

[1] order?

[2] I can do it on the elmo.

[3] THE COURT: Oh, that's fine.

[4] MS. CORBIN: Yes.

[5] THE COURT: That is — what's [6] that?

[7] MS. CORBIN: Sorry. It's just [8] what I

had set down here, so I could get it. [9] And I could put it on the screen.

[10] THE COURT: If you could do that. [11] Doctor, could you stay with us for five minutes?

[12] THE WITNESS: Sure.

[13] THE COURT: We're in recess for [14] lunch, so anybody who wants to leave is free to [15] leave and otherwise sit down, please.

[16] MS. CORBIN: Thanks.

[17] THE COURT: Doctor, have you seen [18] the claim construction order?

[19] THE WITNESS: Yes.

[20] THE COURT: Is it on your screen [21] there, too?

[22] THE WITNESS: Yes, it is.

[23] THE COURT: You can look at either [24] one. I just wanted to be sure. I didn't know.

Page 1586

[1] THE WITNESS: It is. It is.

[2] THE COURT: I don't know if it was [3] shown here. This is my claim interpretation, [4] how I interpreted the terms, claim language of [5] the patent.

[6] And you've had a chance to look at [7] this and digest it?

[8] THE WITNESS: Yes.

[9] THE COURT: Where did I go wrong? [10] Can you go down these terms that I defined and [11] tell me where I made an error, in your view? [12] And don't be reluctant.

[13] THE WITNESS: I am reluctant to try.

[14] THE COURT: Unless, you know, I [15] was right, which I can't imagine. So I have a [16] thick skin.

[17] I'd like to hear your views and [18] where it's wrong or correct.

[19] THE WITNESS: Well, can we scan down?

[20] MS. CORBIN: Scan down? These are [21] the ones on this page. You want to go to?

[22] I don't want to direct him. I [23] mean, I know you're not doing that, but —

[24] MS. CORBIN: He asked to see the

Page 1587

[1] other page.

[2] THE COURT: Is that what he said?

[3] MS. CORBIN: Yeah. I'm sorry.

[4] THE COURT: It's okay. I thought [5] maybe you thought I said that.

[6] MS. CORBIN: No.

[7] THE WITNESS: One of the [8] difficulties we run into here is that a circuit [9] component that has a specified resistance is a [10] lot like the definition of a resistor. A [11] resistor is a component

that has a specified [12] resistance.

[13] And that's —

[14] THE COURT: That's what I missed, [15] in your view?

[16] THE WITNESS: That is a — that's, I [17] think, the heart of some of our problems here, [18] because you appeared to exclude a resistor, but [19] the definition of resistor in some books is a [20] component with a specified resistance.

[21] THE COURT: Assuming I had been on [22] my game and caught that, what would I have [23] changed, then in my definitions?

[24] THE WITNESS: I think — you would

Page 1588

[1] have changed that to a resistor, because that's [2] the only suggestion we have in the patent.

[3] THE COURT: But how would I say [4] it? If you'd be good enough to just tell me in [5] a physicist language as opposed to a history and [6] government major's language, how you would say [7] that.

[8] THE WITNESS: Well, this is okay to [9] say it. The problem is, I believe, in the [10] opinion, you excluded the resistor

[11] And that's what I felt was, [12] frankly, inconsistent, Your Honor.

[13] THE COURT: Okay. So it's the [14] inconsistency?

[15] THE WITNESS: Hmm?

[16] THE COURT: It's something that [17] needs to be noted and added.

[18] THE WITNESS: Yeah. I think if the [19] opinion had not said that it excludes a [20] resistor, it wouldn't have caused so much [21] difficulty.

[22] THE COURT: Okay. Anything else?

[23] THE WITNESS: No, I think — I think [24] that covers it. You're putting me in a very

Page 1589

[1] awkward position.

[2] THE COURT: No. No.

[3] THE WITNESS: I assume I'm still [4] under oath.

[5] THE COURT: Well, I'm not, so [6] I just have some responsibilities.

[7] No, it's helpful, because I've [8] been listening to your testimony very carefully. [9] And I wanted to understand the — I thought [10] there was one simple crux of the problem, and [11] that's what you've hit on.

[12] And I understood that through your [13] testimony, I think. And the — I wanted to be [14] sure that I was understanding you correctly.

[15] THE WITNESS: From my background, [16] the only way to interpret what you said is it comes [17] down to

cost savings [22] are from the '002 patent?
[23] A: At least as of yet, he hasn't.
[24] Q: And those were the only two people

Page 1836

[1] Mr. Cobb indicated he said he had relied on in [2] putting together his damage model, and his [3] report, and for his deposition; correct?
[4] A: At that stage, that was the only [5] basis for his estimate of the cost savings.
[6] Q: All right. [7] Right. That's what you heard him [8] testify to on Friday; right?
[9] A: Yes, that was one of the things he [10] testified to.
[11] Q: Now, in your opinion, has Mr. Cobb [12] relied on the type of information that a damage [13] expert customarily relies upon to determine the [14] amount of cost savings attributable to, in this [15] instance the '002 patent?
[16] A: No.
[17] Q: Why not?
[18] A: Well, as a damage expert, I often [19] rely on information that isn't evidence, that is [20] not actually produced in Court to use as an [21] assumption or a fact in calculating my damages.
[22] But the normal types of [23] information that fit that category for someone [24] like me, who's a CPA, are written business

Page 1837

[1] records of the companies involved that weren't [2] prepared in anticipation of litigation, that are [3] just normal business records of the companies.
[4] Those are the types of things that [5] I normally rely upon. I do not rely upon the [6] oral representations of my client.
[7] They may ask me to assume those [8] things are true, but I tell my client, that You [9] must prove those things. I can't do that for [10] you as a CPA. I can't independently vouch for [11] that number or testify to that that is a proper [12] basis for the damage claim.
[13] And so in that situation, I would [14] ask my client to come in and give proper [15] evidence as to that key assumption. Otherwise, [16] my damage claim is useless to the jury.
[17] Q: Now, you mentioned that part of [18] the reason that you would not have relied on the [19] type of information Mr. Cobb relied on here is [20] because that you're a CPA, and that's [21] inconsistent with your practice as a CPA; is [22] that correct?
[23] A: It is inconsistent with my [24] practice and the standards of my profession.

Page 1838

[1] Our job is to attest to the accuracy of other [2] information.
[3] But to do that, we have to do a [4] lot of detailed testing and analysis, and we [5] don't rely upon what our clients tell us. We [6] have to do a lot of other work to corroborate [7] that information before we will say that is [8] reliable information.
[9] Q: Mr. Cobb is a CPA, too, isn't he?
[10] A: He is.
[11] Q: Now, have you seen any evidence [12] that the '002 patent, as opposed to the use of [13] guard rings, in general, through other, what's [14] been called prior art references, increase the [15] production yield or result in cost savings?
[16] A: I've seen no information as to the [17] amount that that increase would be.
[18] Q: For the '002 patent as opposed to [19] other guard ring technology; is that correct?
[20] A: Other guard ring technology or [21] other environmental factors that would reduce [22] electrostatic discharge.
[23] Q: And those would include things [24] that other witnesses have mentioned already like

Page 1839

[1] ion showers, and the clean room clothing, and [2] air filter systems, things like that?
[3] A: Yes. It increased humidity, [4] antistatic bracelets, all the other types of [5] things that are there to actually make [6] electrostatic discharge not even occur at all.
[7] So you wouldn't even need to have [8] something that would release it, because it's [9] never going to occur.
[10] Q: Right. And you're not testifying [11] that those other methods of controlling [12] electrostatic discharge are a hundred-percent [13] foolproof, are you?
[14] A: I don't have any information about [15] what causes reduced electrostatic discharge. I [16] have not seen any evidence on that in this case [17] for any particular factor.
[18] Q: If you had been hired by LPL in [19] this case, what information would you have asked [20] LPL to present at trial in order to support your [21] damage model?
[22] A: Well, actually I think it would be [23] the same thing that Mr. Cobb asked for. He [24] actually asked for this information and was told

Page 1840

[1] that it just didn't exist, so I would have done [2] the same thing he did, but then when I found [3] it didn't exist, I would say we have a problem and [4] then try to figure out how we would resolve it [5] by saying let's do a scientific test at least in [6] the laboratory to figure out what the potential [7] yield increase might be.
[8] Q: So in this case, what steps did [9] you take to determine the reasonable royalty [10] rate?
[11] A: Well, I had no information to [12] really know what the rate increase was, but I [13] have to come up with a number, so I used [14] basically the cost savings that Mr. Cobb had [15] introduced in his actual report as my starting [16] point. But then I used what's called the 25 [17] percent rule to develop the starting point for [18] the analysis at the hypothetical negotiation.
[19] Q: Can you explain the 25 percent [20] rule?
[21] A: Yes. It's a rule of thumb in the [22] licensing industry that everything else being [23] equal, not really understanding all the [24] intricacies of the unique factors of this

Page 1841

[1] situation, that in normal negotiation the reason [2] why you pay a royalty or license for a patent is [3] it's going to increase your profits and that [4] could be because you're going to have better [5] features, it's going to increase your price, or [6] maybe you reduce your costs like here.
[7] So anyway, you look at that cost [8] savings and that price increase and whatever it [9] is, you say that 25 percent of that will be paid [10] by the licensee to the patent owner, and the [11] licensee will keep the other 75 percent because [12] they're bearing all the risks of manufacturing [13] and marketing and trying to sell the product, so [14] that's a fair split of this incremental profit [15] that's generated by the invention.
[16] Q: Now, is 25 percent a hard and fast [17] number?
[18] A: No. And some people call it the [19] 15 to 35 percent rule, but it is not a hard [20] number, where you end up I think is the right [21] place to start the negotiation.
[22] Q: Do you use the 25 percent rule in [23] all of your work?
[24] A: I wouldn't say I use it in all of

Page 1842

[1] my work, but most of the time where I'm [2] calculating damages either for the patent owner [3] or the allege infringer, that's where I start my [4] hypothetical negotiation.
[5] Q: Now, what range of cost savings [6] did Mr. Cobb indicate that he was relying on in [7] his June 2nd expert report?

business.

Page 1889

[1] So those are all I think the key [2] factors that I thought about before arriving at [3] my final conclusion.

[4] Q: And was there also anything you [5] took into consideration from Mr. Holmberg's [6] testimony, the inventor of the '002, that was [7] shown to the jury yesterday or the day before?

[8] A: Well, I haven't done it when I [9] reached my conclusion, because I didn't have [10] that information. But I think that's consistent [11] with my view of a possible design around, [12] because this person knows what this invention [13] is. [14] And when he then started some [15] companies up to make products using LCD [16] technology, he didn't feel it was necessary to [17] have a license. So, obviously, he was doing [18] something else, and could make products in this [19] industry.

[20] Q: So although you believe Mr. [21] Holmberg's testimony is consistent, Mr. [22] Holmberg's testimony played no role in your [23] conclusions as to the reasonable royalty rate in [24] this case; is that correct?

Page 1890

[1] A: No, I wasn't aware of that [2] testimony until I saw it in Court the other day.

[3] MS. GABLER: Brian, if we could [4] have the next slide.

[5] BY MS. GABLER:

[6] Q: Mr. Wagner, can you explain this [7] slide to the jury?

[8] A: Yes. This is my ultimate [9] conclusion after explaining to you, and in very [10] brief form, all of my analysis. The starting [11] point, remember, was 0.9 percent of sales. But [12] based on weighing all of that information, and [13] coming up with my reasoned judgment, that I [14] think the rate would be lower to, approximately, [15] one-quarter of one percent or .25 percent of [16] sales.

[17] Q: And using that royalty rate, the [18] rate of 0.2 percent that you believe to be [19] reasonable, did you calculate actual damage [20] numbers to be awarded in the event the jury [21] finds the '002 patent is valid and has been [22] infringed by CPT?

[23] A: Yes, through April 30th, 2006.

[24] MS. GABLER: Brian, can we have

Page 1891

[1] the next slide, please?

[2] BY MS. GABLER:

[3] Q: Mr. Wagner, can you explain this [4] slide to the jury?

[5] A: Yes. This has the two different [6] royalty bases. I calculated the ones in the [7] first column where it says Claim 1 is actually [8] Claim 1, and it also includes Claim 1 and Claim [9] 8. And as I testified before, the royalty base [10] is, approximately, $686 dollars from May 13th, [11] 2005 through April 30th, 2006.

[12] Now, applying what I think is a [13] reasonable royalty rate, I believe the [14] appropriate amount of damages is $1,715,386.

[15] Q: And in the event that the jury [16] finds that only Claim 8 is both infringed and [17] valid, what damage number do you believe is [18] appropriate in this case?

[19] A: That the appropriate royalty base [20] under that set of facts would be, approximately, [21] 683 or $684 million, applying my .25-percent [22] royalty rate, the damages should be $1,709,903.

[23] Q: Okay. Now, your damage model, as [24] we've noted, only runs through April 30th, 2006;

Page 1892

[1] correct?

[2] A: That is correct.

[3] Q: And are you maintaining that LPL [4] would not be entitled to damages from May 1, [5] 2006 through the date of judgment in this case [6] in the event CPT is found to have infringed a [7] valid patent?

[8] A: No. I think that LPL is entitled [9] to this same royalty rate on its sales between [10] April 30th, 2006 and the date of judgment.

[11] Q: Okay. And how do you believe that [12] would properly be calculated?

[13] A: Well, in my experience, normally [14] there would be an accounting, and CPT would be [15] required to produce the same type of information [16] they produced to me already to make this [17] calculation. That calculation would be made, [18] and the additional royalty would be paid.

[19] Q: And, again, these damage numbers [20] that you have up there, $1,715,386, and $1, [21] 709,903, these numbers assume that at least one [22] of the claims is valid; correct?

[23] A: That is correct.

[24] Q: And that at least one is

Page 1893

[1] infringed; correct?

[2] A: That is also correct.

[3] Q: And that LPL has demonstrated and [4] the jury has found that CPT induced anybody who [5] sells products with CPT panels in it in the [6] United States to infringe the '002 patent other [7] than the three other defendants in this case?

[8] A: That is also correct.

[9] MS. GABLER: Thank you. I have no [10] further questions.

[12] MS. BRZEZYNSKI: May I approach, Your Honor?

[13] THE COURT: Sure.

[14] CROSS-EXAMINATION

[15] BY MS. BRZEZYNSKI:

[16] Q: Good afternoon, Mr. Wagner.

[17] A: Good afternoon.

[18] Q: Mr. Wagner, you were shown certain [19] February 2002 letters during your direct [20] examination. Do you recall that?

[21] A: I do.

[22] Q: But you have expressed no opinion, [23] correct, as to the date Chunghwa first received [24] notice from LG Philips; correct?

Page 1894

[1] A: That is correct. I am not [2] expressing an opinion on that subject.

[3] Q: Okay. In fact, you have also [4] calculated damages for the period from 2002 [5] through April 30th, 2006 correct?

[6] A: I did in my report.

[7] Q: Okay. Let's take a look at your [8] Supplemental Schedule 5B please.

[9] In fact, your total U.S. sales of [10] CPT's accused products during the period from [11] February of 2002 through April 30th of 2006 is [12] $2.215 billion; correct?

[13] A: That is correct based on my work.

[14] Q: And Mr. Cobb's total U.S. sales [15] for the period from February 2002 through April [16] 30th, 2006 is $2,353,965,954; is that correct?

[17] A: That's incorrect. [18] I'll help you. You said through April 30th.

[20] His actually goes through June [21] 30th.

[22] Q: You're right.

[23] A: His actually starts March 1st [24] where mine starts February 8th. There's a

Page 1895

[1] little bit of timing.

[2] If the time periods are the same, [3] our numbers would be almost exactly the same.

[4] Q: That's absolutely right. If the [5] time periods are the same, it's your position [6] that your numbers, your royalty base for U.S. [7] sales would be essentially the same?

[8] A: Yeah. I think Mr. Cobb and I can [9] agree as to the royalty base, if that's [10] necessary.

[11] Q: Okay. Great. [12] Then let's go on

[8] during testimony, no foundation to the admission [9] of Plaintiff's Exhibit 28.

[10] Plaintiff's Exhibit 127 is an [11] interoffice memo from Honeywell which is dated [12] April 7, 1988. No questions were asked on that [13] exhibit and no foundation was laid.

[14] With respect to Plaintiff's [15] Exhibit Number 130, this is a letter from Scott [16] Holmberg to Mr. Zele. The letter was referred [17] to in the segment of the deposition that was [18] played, one segment of Mr. Holmberg's [19] deposition. There was no foundation laid for [20] this letter. And attached to this exhibit is a [21] document that was not referred to at all. That [22] is another Honeywell memorandum.

[23] And I would point out that with [24] respect to the January 21st, 1998 letter, when

Page 1930

[1] it was referred to by Mr. Holmberg in his [2] deposition, it was referred to as a single page [3] document with the Bates stamp number LPL [4] 11013076, a single-page document.

[5] When it was submitted as [6] Plaintiff's Exhibit 130, it had an attachment to [7] it which is a second memorandum produced, or [8] prepared by its physical appearance from [9] Honeywell. There has been no foundation laid [10] for that document and no reference to it during [11] the course of any of the testimony.

[12] On July 21st, there are a number [13] of documents that were moved into evidence. The [14] following documents upon review were not [15] referred to during the course of testimony and [16] we object to those documents on the basis of [17] foundation, and those documents are previously [18] marked as Plaintiff's Exhibit Numbers 66, 67, 69 [19] through 73, 75 through 80, 83, 86 through 92, [20] 94, 99, 102, 104, 105, 111, 113, 114 through [21] 120, 133, 135, 137 and 138.

[22] One other comment with respect to [23] the letter, which has been marked as Plaintiff's [24] Trial Exhibit Number 130. I want to emphasize

Page 1931

[1] in particular on that document that, again, [2] although Mr. Holmberg referred to it as a letter [3] that he sent, that letter is inadmissible under [4] any possible theory.

[5] No foundation was laid for it. It [6] has no probative value.

[7] The letter and contents itself is [8] filled with questions for Mr. Holmberg and [9] qualifications about the accuracy of the [10] information contained therein. There was no [11] effort made during Mr. Holmberg's deposition to [12] lay a foundation for the admission of this [13] document.

[14] It's not relevant. If the Court [15] were to deem it to be relevant, it's [16] inadmissible as confusing. In my view, it's [17] complete hearsay, and there's no exception under [18] business rule, because this is a document that [19] was created by the date on it on January 21 of [20] 1998. And it recites and relates to events that [21] occurred ten years prior to the creation of the [22] document itself.

[23] THE COURT: All right. Thank you. [24] Ms. Corbin.

Page 1932

[1] MS. CORBIN: Your Honor, I just [2] have one more issue. And that is I believe that [3] plaintiff's going to put on its rebuttal case on [4] obviousness.

[5] And in Dr. Schlam's validity [6] report, there is reference to those documents [7] which were excluded by those late-produced [8] Honeywell documents. And I just want to be sure [9] that there isn't going to be any explicit or [10] implicit reference to those for support that the [11] invention was made prior to the filing dates.

[12] And there is one other element [13] that — where Dr. Schlam's testimony is that the [14] yield, and this has to do with secondary indicia [15] of nonobviousness necessary that the combination [16] of the outer ring and inner ring combined create [17] a greater yield than either of those would [18] alone.

[19] And part — during his deposition, [20] he said part of the basis of that opinion was [21] conversations he had with two individuals at [22] another LCD manufacturing company. And he would [23] not even reveal the names of those individuals.

[24] So since he was unwilling to be

Page 1933

[1] forth coming even with who those individuals [2] were, I don't believe he should be able to make [3] reference to that here.

[4] THE COURT: All right. Let's hear [5] plaintiff.

[6] MR. BONO: Your Honor, first of [7] all, let me address Exhibits 12 and 13, which I [8] guess we're getting hit now with an accusation [9] of stuffing.

[10] Your Honor, there were no [11] objections made on Defendants' objection list to [12] these two documents except for authenticity. [13] They had made the multiple document objection on [14] other documents, which we then corrected.

[15] So we understood that they were [16] not objecting to these on any multiple-document [17] basis. In any event, those documents are part [18] of the four CD files, which are exhibits, I [19] believe, 4 through 7 in the case.

[20] Those are the books. And these [21] are just printouts of some pages in the book as [22] Your Honor described.

[23] So they never objected. They [24] didn't have a basis to object. And there should

Page 1934

[1] be no problem with those documents.

[2] THE COURT: The objection will be [3] overruled as to Exhibit 12 and 13.

[4] MR. BONO: With respect to — let [5] me address the other series of documents that [6] they objected to. These are basically other STR [7] files, photos of modules, et cetera.

[8] Dr. Schlam did refer to them [9] generally in is testimony. And I think they [10] have been sufficiently identified for purposes [11] of admission.

[12] THE COURT: What exhibits are you [13] referring to in that? Are you referring to the [14] 8 and 28, or are you referring to Exhibit 66 [15] through 138 that were cited?

[16] MR. BONO: Certainly 8 and 28, [17] Your Honor. Let me look at 66.

[18] No. Those are — those have to do [19] with the witness.

[20] THE COURT: Something else. So [21] you're referring to 8 and 28, the mask file, [22] the date.

[23] MR. BONO: And the photos of the [24] one module, yes, Your Honor.

Page 1935

[1] THE COURT: I'll overrule the [2] objection.

[3] MR. BONO: With respect to the [4] other documents, 66, 69 through 73, and the [5] other categories of the other ones that counsel [6] mentioned, they are all documents produced by [7] the defendants in this case, which are their own [8] business records.

[9] They were referred to in several [10] respects by the deposition testimony we read in. [11] And I don't see that there's any basis for the [12] objection on the part of defendants.

[13] THE COURT: Okay. Deposition [14] testimony, the objection is overruled as to the [15] series of exhibits beginning at 66 and ending at [16] 138 cited by Mr. Sweeney.

[17] MR. BONO: And then lastly is [18] the —

[19] THE COURT: 127 and 130.

[20] MR. BONO: Yeah, with respect to [21] — with respect to 127, we'll withdraw the [22] exhibit, Your Honor.

[23] THE COURT: All right. The [24] ex-

[10] inducement of infringement. And the defendants [11] have not sufficiently contradicted that showing.

[12] Consequently, LG Philips submits [13] that no reasonable juror could find that the [14] defendants have either willfully infringed — I [15] apologize. No reasonable juror could find that [16] the defendants have not willfully infringed the [17] '002 patent or that they have not induced [18] infringement of the '002 patent.

[19] **THE COURT:** All right. Let the [20] record reflect those motions. Judgment is [21] reserved.

[22] With regard to any confidential [23] information that has been ruled during the trial [24] to be sealed, what we're going to do is anybody

Page 2010

[1] that's connected to a party will be excluded [2] from the entire closing argument.

[3] I'm not going to exclude through [4] the opening — through the closing, I'm sorry, [5] through closing argument anybody connected to a [6] party excluded entirely that was covered by the [7] protective order.

[8] With regard to others that may be [9] in the courtroom, except for media, when you get [10] to the point in closing argument that you want [11] to close the courtroom, you'll let me know. And [12] then when you finish that part of the argument, [13] you'll let me know and the marshal will bring [14] them back. Okay?

[15] Okay. We'll be in recess for five [16] minutes.

[17] **THE CLERK:** All rise.

[18] (A brief recess was taken.)

[19] **THE COURT:** All right. The jury [20] is on its way in.

[21] (Jury entering the courtroom at [22] 3:47 p.m.)

[23] **THE COURT:** All right. Be seated, [24] please.

Page 2011

[1] Mr. Bono.

[2] **MR. BONO:** Thank you, Your Honor. [3] Your Honor, I understand I can [4] reserve some time for a rebuttal in closing [5] statement?

[6] **THE COURT:** Yes, you may.

[7] **MR. BONO:** Thank you. I would [8] like to do that.

[9] Good afternoon, ladies and [10] gentlemen of the jury. I spoke with you about [11] six or seven days ago in opening statement and [12] said I would have a second opportunity to speak [13] with you in closing.

[14] My name is Gap Bono and, of [15] course, I represent the plaintiff, LG Philips [16] LCD. First of all, I would like to thank each [17] and every one of you for the time and effort you [18] have spent listening to the testimony, looking [19] at the exhibits, listening to the experts and, [20] of course, the toughest job of all, listening to [21] us lawyers talk on and on and on. I know this [22] has not been easy and it's some difficult [23] evidence that's been presented and I appreciate [24] your time and effort. And I know it's been a

Page 2012

[1] personal burden on each and every one of your [2] lives having to be here for the past ten days [3] and my client and I deeply appreciate that.

[4] The defendants infringe Claim 1 [5] and 8 of the '002 patent. And the evidence you [6] have seen has been overwhelming that they have [7] infringed.

[8] The defendants have sought to [9] distract you from the core evidence of [10] infringement by attempting to confuse you and [11] distract you with peripheral issues.

[12] But what this case is really about [13] is — I know there is a farmer's market that's [14] conducted every week out here on King Street, [15] and this case is no different than if CPT were [16] selling T-shirts or some other articles with LG [17] Philips' logo on them, they would have to pay a [18] royalty to LG Philips for doing such. That's [19] simply what this case is about.

[20] You'll recall at the opening [21] statement of the defendants' counsel, they [22] started their distraction in this case. They [23] said that LG Philips was a bully. There has [24] been no evidence in this trial that LG Philips

Page 2013

[1] is a bully. In fact, you saw evidence that LG [2] Philips presented and offer its entire patent [3] portfolio to Chunghwa to license.

[4] Defendants' counsel also said in [5] their opening that there was no copying on their [6] part. Again, that's another distraction.

[7] The Judge will instruct you in his [8] jury instructions that intent to infringe is — [9] does not matter, the sole question presented to [10] each and every one of you is do Chunghwa Picture [11] Tubes modules infringe, yes or no.

[12] They also told you to distract [13] your attention from the fact of whether they [14] infringe, they told you they bought their [15] technology from Mitsubishi ADI. They told you [16] that in their opening statement as if that would [17] again distract you by saying they didn't [18] infringe, they just bought it from Mitsubishi.

[19] As you have seen, Chunghwa Picture [20] Tubes did not check any U.S. patents when they [21] bought that technology. And counsel for [22] defendants told you in his opening statement [23] that at the time they bought the technology, [24] they manufactured the products intending to sell

Page 2014

[1] them worldwide, and yet they did no checking of [2] any U.S. patents.

[3] They also claimed in their opening [4] statement that LG Philips does not and did not [5] enforce its '002 patent. Again, a distraction [6] technique. And boy, from the evidence I've seen [7] at trial for the last ten — seven days, they [8] have done a great job of trying to confuse you [9] as to the facts.

[10] This was another technique. [11] However, as you saw the evidence, that was not [12] true. LG Philips enforced its '002 patent [13] against Toshiba and Mitsubishi, for example, the [14] fourth and fifth largest LCD makers at the time.

[15] They also mentioned to you the [16] other Taiwan manufacturers, AUO and CMO. Well, [17] I can assure you that AUO and CMO are looking at [18] this case and waiting for your decision. And as [19] I mentioned in my opening, there is no way LG [20] Philips has the resources to sue everybody at [21] the same time.

[22] They gave you another diversion, [23] Samsung, to distract you from their conduct. [24] And regardless of whether Samsung is complicated

Page 2015

[1] or not, it's irrelevant. The issue before you [2] is whether Chunghwa Picture Tubes and the [3] defendants infringed the patent.

[4] In my opening statement a few days [5] ago, I said that we would prove this case out of [6] the mouths of the defendants' own witnesses, and [7] using their own documents. And I believe this [8] is what you saw for the past six days. You [9] heard the testimony of defendants, both live and [10] on videotape depositions. You saw Chunghwa [11] Picture Tubes' own documents.

[12] The Judge will instruct you that [13] that is the evidence you should consider in your [14] deliberations.

[15] You heard the testimony of [16] Dr. Schlam, our expert. I think you would agree [17] with me that his work was very thorough. He [18] reviewed and analyzed virtually everything you [19] could look at. He reviewed documentation as you [20] saw when he went through his testimony in [21] excruciating detail. He looked at all forty-one [22] of CPT's products which contain both outer [23] guard ring and both an outer and

inner guard ring. [24] And there were forty-one products in total.

Page 2016

[1] And you saw his testimony, he [2] studied, for example, the following: Mask [3] files. These are the crown jewels as CPT [4] admitted of their design and their products.

[5] He studied the array specs. These [6] are documents that provide the particular [7] specifications.

[8] He studied reverse engineering [9] which were the actual photos blown up of their [10] actual products. He looked at the mother glass, [11] and you saw samples in the courtroom which [12] showed the actual substrates and the electronic [13] circuits on it.

[14] Dr. Schlam was very thorough. He [15] explained to you, also, in detail, you'll recall [16] this testimony, that the mask files depict a [17] three-dimensional layering that must be examined [18] to see what is actually in CPT's products.

[19] And he showed you the [20] three-dimensional analysis that he had done, so [21] you could appreciate how their products are [22] made. This was in sharp contrast to CPT's [23] presentation in this case, which was — for the [24] most part, they used so-called schematics. You

Page 2017

[1] saw them presented throughout their case.

[2] These are, basically, stick [3] drawings of the product's design. This doesn't [4] tell you exactly what's in the products, how [5] they're designed or how they're really made. [6] It's much like depicting the human body by [7] drawing a grade school stick picture of the [8] human form.

[9] It certainly looks like a person, [10] but it nowhere depicts what actually is the [11] essence and complications of the human body.

[12] You also heard evidence of who the [13] parties are in this case. You heard evidence [14] from Dr. Wagner or Mr. Wagner, defendants' own [15] damage expert, and he called LG Philips a [16] top-tier company.

[17] You saw the evidence, which was [18] unrebutted that they create innovative products, [19] and they've been first to market products for [20] the past decade. You saw the numerous awards [21] that LG Philips had received for both customer [22] satisfaction and technology. You heard the [23] testimony that LG Philips invested over $1 [24] billion in the past eight years on research and

Page 2018

[1] development.

[2] Now, unlike what they will tell [3] you, part of that $1 billion is not doing their [4] own investment, but also searching the world for [5] patents and inventions that they purchase from [6] others in order to build up their R & D in order [7] to produce innovative and new products for all [8] of us.

[9] Without doubt, they are a [10] technology leader. You heard the testimony. [11] They have over a thousand patents.

[12] Now, these are not my words. [13] These are the words of the defendants themselves [14] describing Chunghwa.

[15] Their own expert says Chunghwa is [16] a follower of technology. That's what he [17] testified to.

[18] You heard it right here. He also [19] said they're an imitator.

[20] And Sally Wang, ViewSonic, a [21] co-defendant in this case, you heard her say [22] Chunghwa produces me too products.

[23] Now, they accused LG Philips of [24] being a bully, but what did the evidence show

Page 2019

[1] you? LG Philips has licensed its products, its [2] patents to numerous companies.

[3] And then when LG Philips needed [4] licenses from somebody else's patents, it took [5] licenses from various companies.

[6] And you saw the pile of paper in [7] the corner of the courtroom. LG Philips was [8] willing to license Chunghwa, give them their [9] entire patent portfolio for a worldwide license. [10] Hardly the actions of a bully.

[11] Now, in opening statement, I spoke [12] with you about the five core issues you would [13] need to decide. And here we are seven days [14] later.

[15] And those issues are: [16] Infringement, inducement to infringe, willful [17] infringement, validity, and damages.

[18] And I'd like to take these issues, [19] go through these issues with you one by one.

[20] First infringement, the patent [21] statute says that, "Whoever, without authority, [22] imports, offers to sell, sells or uses within [23] the United States a product which is made by a [24] process patented in the United States shall be

Page 2020

[1] an infringer." And I've highlighted in yellow [2] the language a product which is made by a [3] process patented in the United States. This is [4] what we're talking about in this case.

[5] We know that Chunghwa models are [6] made by a process patented in the United States. [7] And we allege that their modules infringe Claim [8] 1 and Claim 8 of the '002 patent, both literally [9] and under the Doctrine of Equivalents.

[10] And Judge Farnan will instruct you [11] on the meaning of literal infringement and on [12] the test for Doctrine of Equivalents, because [13] infringement can be found either literally or [14] under the Doctrine of Equivalents under the law.

[15] Chunghwa's knowledge of the '002 [16] patent is immaterial to the issue of [17] infringement. Judge Farnan will instruct you [18] that Chunghwa's intent to infringe is [19] irrelevant.

[20] The sole fact for you to determine [21] is: Do their products infringe, yes or no?

[22] Now, you heard the testimony of [23] Dr. Schlam. And you'll recall how thorough he [24] was.

Page 2021

[1] He reviewed Chunghwa's [2] Court-ordered disclosure. He reviewed their [3] electronic mask files in detail for all 41 of [4] their products.

[5] He examined their products [6] themselves. He examined the mother glass [7] samples that they produced to us and sent to us [8] all the way from Taiwan in discovery.

[9] He reviewed their array design [10] specs. He looked at deposition testimony.

[11] He looked at reverse engineering [12] of their actual products, and of course, he [13] reviewed the Court's claim construction order.

[14] And you will recall that was the [15] Court-ordered disclosure that listed all their [16] products. You'll recall the mask files that he [17] examined, those very complex mask files that [18] tell you exactly what's in the product.

[19] Not the schematics that CPT's [20] lawyer showed you all during this trial, and not [21] what I suspect they're going to show you during [22] their closing. This is what's in the product, [23] not the schematics.

[24] Dr. Schlam also looked at the

Page 2022

[1] actual products themselves. He looked at the [2] mother glass.

[3] He looked at the array specs where [4] they actually put in their specifications for [5] what's in their products. He looked at the [6] reverse engineering, the actual pictures of the [7] products. You recall that.

[8] He also looked at the Court's [9] claim construction order which defines certain [10] terms that have to be used.

[11] Now, that brings us to Claim 1 of [12] the '002 patent. Now, Claim 1 has a lot of [13] terms, you know that, we have talked about that [14] all during this trial. All of