EXHIBIT F

that has been [15] basically admitted to and shown and is [16] undisputed except for two things, and I believe [17] I mentioned this in [18] my opening statement, but this case will boil [19] down to two terms, interconnecting and [20] resistance.

[21] And the only real questions in [22] this case are do Chunghwa products interconnect [23] their rows and column lines, and do Chunghwa [24] products couple the row and column lines via a

Page 2023

[1] resistance to the outer guard ring. That's the [2] only real issues in this case for Claim 1 that [3] you'll have to decide. The rest has been [4] admitted.

[5] Now, this is the — from the [6] example, this is the portion of the mask file [7] from Chunghwa's own records.

[8] Your Honor, I don't know if you [9] needed me to say that this was confidential.

[10] THE COURT: Yes, I do. Is this [11] confidential?

[12] MR. BONO: Yes.

[13] THE COURT: So those —

[14] MR. BONO: This will be a short [15] portion.

[16] THE COURT: Those other than the [17] media who are not under the protective order [18] will have to leave the courtroom for a few [19] minutes and you have to stay outside and then [20] the marshal will bring you back in.

[21] Thank you, Mr. Bono.

[22] MR. BONO: Thank you, Your Honor. [23] This is the beginning of the mask [24] files that Dr. Schlam reviewed with you. And

Page 2024

[1] this shows the row line, which are the lines [2] that come across the LCD and the beginning of [3] the outer guard ring, the red depicting gate [4] metal.

[5] Now, I want to point out one thing [6] to you which is very significant. Right here, [7] this is the row line and this is the guard ring. [8] And as you can see, the row line does not [9] directly connect with the guard ring. It's just [10] not there. There is no direct connection. And [11] I want you to keep that in mind as we go on. [12] Because fundamentally the schematics that CPT's [13] lawyer showed you give you the mistaken [14] impression that the row lines connect right to [15] the guard ring, every schematic they have shown [16] you in this case shows supposedly a direct [17] connection.

[18] And Dr. Schlam explained to you in [19] his testimony that those schematics and [20] presentations were misleading and incomplete. [21] And there you see it,

that it was incomplete and [22] a misrepresentation of their actual designs.

[23] Now, to show you how Dr. Schlam [24] had explained to you how the interconnection is

Page 2025

[1] made, he took away the guard ring because now we [2] want to address interconnection of row lines. [3] And he said the mask file shows the row lines. [4] And then he showed you the interconnecting [5] structure that connected the row lines in their [6] mask files. And he showed you that there was [7] this layer of source drain metal that connected [8] this way and then this light blue is a material [9] known as a semiconductor material, amorphous [10] silicon. And we'll talk about that a lot as we [11] progress today.

[12] Then he told you that they put [13] contact holes in the row line, and in the source [14] gate metal layer, and then they add ITO, a [15] material known as ITO which electrically [16] connects the row lines to the source gate metal [17] layer here which also has this, a little bit of [18] a sliver of amorphous silicon.

[19] And Dr. Schlam showed you that [20] when you have the row line, and you have the [21] source gate metal, and this little area here is [22] that amorphous silicon, and here is the ITO [23] layer, which you need to look at, not just with [24] stick drawings, schematics and all, you

Page 2026

[1] have to know how this is made and this all comes [2] out of the mask files that there is an [3] electric — it is electrically connected, row [4] line to row line to row line, and that the same [5] basic structure connects these, the column [6] lines, so that when you look at the mask files [7] and you understand the three-dimensional [8] depiction and what actually is going on, that [9] the row lines are electrically connected, and [10] then the same reason that the column lines are [11] electrically connected in the same fashion.

[12] Now, and he showed you that in his [13] 3-D animation.

[14] Now, the whole dispute in this [15] case, the whole dispute, and they have thrown a [16] lot of confusing facts at you, but the whole [17] dispute is this material right here, this [18] connection. And they say it's not electrically [19] connected with conductors, because we have a [20] connection here with a material that they [21] denominate as a semiconductor.

[22] And here they are playing a word [23] game with you, because they expect you to [24] believe that a conductor is a conductor and a

Page 2027

[1] semiconductor is some other animal. It's [2] different. It's different. It's like, you [3] know, paper and water. It's different. Well, [4] it isn't different because what it does is it [5] conducts electricity, it just is a different [6] material.

[7] And the difference is a [8] semiconductor is like a switch. We all know in [9] our houses, we have switches that turn lights on [10] and turn them off. And the power source comes [11] in from say the fuse box or the circuit breaker [12] box and it comes to that switch, and then it [13] goes on from that switch, it goes to the light. [14] And there is a switch. And when it's off, no [15] electricity flows to the light. But as soon as [16] you flick the switch on, electricity flows.

[17] Now, a semiconductor is no [18] different than that. That's what this is here. [19] This is nothing more than a switch. You heard [20] the testimony in the case, you heard it not from [21] just the experts, you heard it not from [22] Dr. Schlam, you heard it from Chunghwa's own [23] engineer, Mr. He.

[24] I don't have to argue about what

Page 2028

[1] my expert says, you don't have to decide whose [2] expert is right, is Dr. Schlam right, is [3] Dr. Howard right, of course they disagree. But [4] Mr. He testified right here in this Court, and [5] he described it, and he answered these questions [6] in describing what is that semiconductor. He [7] said in his trial testimony, "Like I stated [8] earlier, what I meant was I just described that [9] this diode is similar to a switch. It can be [10] turned on, it can be turned off.

[11] When it is turned off, then a [12] guard ring — then the guard ring will not be a [13] connector. The gate line will not be connected [14] to the outer guard ring.

[15] If that is a gate line, it will go [16] to the switch. Sometimes it will be turned on [17] and sometimes it will be turned off.

[18] And under the normal [19] circumstances, it is not being turned on. It is [20] not connected to the outer guard ring.

[21] And only when there is a presence [22] of a significant electric — electrostatic, [23] like you mentioned earlier, then this will be [24] turned on, and it will be connected to the outer guard

Page 2029

[1] ring.

[2] That's his own description of what [3] a semiconductor is. Nothing more than the [4] switch.

[5] And you can understand it this [6] way: A material that is a semiconductor needs a [7] certain level of voltage, so that it doesn't [8] start immediately transferring

current. But [9] once a certain voltage is achieved, then it [10] turns on and the current flows.

[11] The same thing is that switch in [12] all of our houses. That's all it is.

[13] And just what Mr. He said, their [14] own electrical engineer, when you need it to [15] prevent electrostatic discharge, the switch [16] turns on, and these are electrically connected.

[17] With conductors, because at that [18] moment, the semiconductor is acting as a [19] conductor. It doesn't mean it's not conducting, [20] it's acting as a conductor.

[21] Now, can I have the elmo, please? [22] I just showed you what is the [23] actual material, what is the actual depiction of [24] Chunghwa's products based on their guard rings,

### Page 2030

[1] that three-dimensional drawing.

[2] You'll remember this. This is [3] what counsel for CPT and defendants have shown [4] you throughout this trial. This is a marvelous [5] drawing; however, it's much like a cartoon [6] because it doesn't predict or show you what's [7] actually in Chunghwa's product.

[8] They show you these diodes. They [9] showed you this in opening statement.

[10] Dr. Schlam, in his statement, told [11] you this is really misleading. This is really [12] incomplete, because they don't show you the [13] connections that I just showed you from the mask [14] files between the diodes here, which are the [15] actual interconnections between the row lines [16] and the column lines.

[17] They showed you this from the get [18] go of this trial to trick you, to mislead you [19] into thinking that these row lines, and these [20] column lines are not interconnected. They [21] didn't show you the mask files. They show you [22] their own drawing.

[23] Now, remember I told you a few [24] minutes ago in the actual mask file, I showed

### Page 2031

[1] the red row lines and the red guard ring from [2] the mask file. We just had it up, and we had to [3] send people out of the courtroom.

[4] I told you, remember, that there's [5] no connection there. What do they show you [6] here? Isn't it amazing that these [7] column lines and these row lines seem to go right into the [8] guard ring? But the mask files show you that [9] it's not a direct connection.

[10] Again, this is not an accurate [11] depiction of their product. This is a stick [12] figure. This doesn't show you the human body.

[13] Also, they showed you this, [14]

because they love schematics. They don't want [15] to look at the mask files. Avoid these mask [16] files, because they actually show what's in [17] their product.

[18] They show you this schematic. [19] They've had this schematic in front of you [20] virtually every day in this trial.

[21] And, again, what does it show? It [22] shows the line going into the outer [23] loop. [23] That's not the case. I just [24] showed you the mask file.

### Page 2032

[1] There's a space. It is not [2] directly connected. This is useless.

[3] Now, you'll remember Mr. He, who I [4] mentioned earlier, and my partner Mr. Goodwyn on [5] cross after he was — I believe, he was shown [6] this in his direct testimony. You'll remember [7] that.

[8] Well, my partner, Mr. Goodwyn on [9] cross-examination showed him this. And this is [10] a picture from their actual mask file.

[11] And you'll recall his testimony [12] which was very, very telling. After he had just [13] said that there was no connection on direct, he [14] said there was no connection between the row [15] lines. You'll remember that Mr. Goodwyn asked [16] him, isn't there a connection between these row [17] lines like this? And he went like this [18] underneath this ITO layer.

[19] Isn't there a connection with [20] source gate metal right through here, so that [21] the row lines are connected?

[22] And Mr. He said, yes, you're [23] right. And he said, yes, underneath there, [24] although you can't see it, there is a connection

### Page 2033

[1] between the row lines and the column lines.

[2] And his testimony was the [3] following:

[4] "Question: This piece of source [5] drain metal is connected to this piece of source [6] drain metal right here underneath the ITO, that [7] is. And it's not shown; is that right?"

[8] And Mr. He said:

[9] "Answer: Assuming that this [10] yellow refers to the ST layer — when I look at [11] it, it looks like the ST layer. And under that [12] circumstance, they would be connected together."

[13] Those were his words. Showing you [14] have to look at the mask files, not the stick [15] drawings.

[16] Now, based upon Mr. He's [17] testimony, supported by Dr. Schlam, the evidence [18] is quite clear that the row lines and the column [19] lines are interconnected and they are [20] elec-

trically connected with conductors.

[21] And the only argument that CPT has [22] is that this layer of semiconductor is a switch. [23] And they try to trick you by saying, you have to [24] call that a semiconductor. It's not really a

### Page 2034

[1] conductor, it's a semiconductor. It's another [2] category.

[3] Well, Mr. He will tell you no, it [4] does conduct and it only needs a certain [5] voltage. This reminds me, I must say, let me [6] say this story, this reminds us, those of us who [7] remember George Carlin, the comedian, those of [8] you who might remember him, he has a wonderful [9] routine about going to a grocery store and [10] buying a meat product and the label says semi [11] boneless. And he says what does that mean, semi [12] boneless? We all know what that means, it still [13] has bones. It reminds me of a semiconductor, it [14] still conducts, it is still a conductor for the [15] circumstances it is designed to conduct, just [16] like Mr. He said, once you have a certain [17] voltage, the switch comes on and the current [18] flows through.

[19] Don't let CPT fool you into [20] thinking that a semiconductor is something that [21] does not conduct, that it's not really a [22] conductor. It is a special type of conductor, [23] no more, no less.

[24] Now, let's talk for a minute on

### Page 2035

[1] the Doctrine of Equivalents. The Court will [2] instruct you in the jury instructions that the [3] test to determine equivalents is whether the [4] interconnecting method used by Chunghwa to [5] manufacture its LCD modules performs [6] substantially the same function in substantially [7] the same way to produce substantially the same [8] result compared to the interconnecting element [9] claimed in the '002 patent.

[10] The reason I raise this is, I [11] believe that Chunghwa's products literally [12] infringe and that their argument that there is a [13] semiconductor and in that conductive layer does [14] not mean that they don't literally infringe. [15] But the law provides under the Doctrine of [16] Equivalents that you could conclude well, let's [17] take a look and see whether it's equivalent as [18] well because that would also mean infringement.

[19] And so the Court will instruct you [20] that there is a function, way and result test. [21] And you see Ms. Corbin has shown you her [22] three-legged stool a couple of times, and I'm [23] not quite that good of an artist, so I just [24] wrote the word, you have to answer the question

### Page 2036

[1] is this the way they do it? Function. Does the [2] equivalent perform substantially the same [3] function? Here the equivalent we're talking [4] about is that amorphous silicon switch. And [5] does it do that in substantially the same way [6] and as a result, does it achieve substantially [7] the same result?

[8] In the '002 patent in Claim 1 [9] calls for interconnecting, and the Court has [10] defined interconnecting as, you know, as [11] electrically connecting with conductors.

[12] And my good friends who represent [13] the defendants are arguing that the Court by [14] using the term conductors somehow meant to [15] exclude a type of conductor which is a [16] semiconductor, the switch conductor.

[17] And so we now say well, is the [18] switch conductor substantially equivalent under [19] the test.

[20] Now, let's examine what are under [21] the three-part test, what does it do? What is [22] the function of this method? The function of [23] interconnecting, what is the function? It is to [24] electrically connect to provide ESD protection.

### Page 2037

[1] We all know that. We have heard this now for [2] nine days.

[3] I just quoted to you Mr. He, CPT's [4] own engineer, who told you when ESD appears, the [5] switch turns on and the current flows through [6] that switch device. So it does provide ESD [7] protection, it is electrically connected when [8] that's needed.

[9] The way of doing it, the way of [10] interconnecting is to provide an electrical [11] conduction path. And you saw that very vividly [12] in Dr. Schlam's drawing, the whole purpose of [13] the structure is to provide an electrical [14] conduction path and the electricity flows when [15] it's needed for the ESD right through that [16] amorphous silicon switch.

[17] The result of interconnecting is [18] to disperse charge for ESD protection. That's [19] exactly what their structure does. It's exactly [20] what their method does by what we've shown you. [21] So clearly in addition to literally infringing, [22] it also infringes under the Doctrine of [23] Equivalents without any doubt whatsoever.

[24] Now, let's talk about the second

### Page 2038

[1] element. We have now covered interconnecting, [2] now we can go on to coupled via resistance, [3] which as I explained to you is the only other [4] item of dispute in this case.

[5] And once again, Dr. Schlam showed [6] you the mask files of — showing the coupling. [7] And he showed you based on their mask file, and [8] this again was the source drain metal, this pink [9] connection which we saw a little while ago, and [10] then he also showed you here again was that [11] semiconductor material, and then he showed you [12] that there is this additional layer of ITO by [13] which the coupling from the interconnecting row [14] lines are connected to the guard ring. And the [15] guard ring, of course, we showed you before was [16] the red, that red metal underneath that blue [17] which we showed you at the beginning.

[18] And Dr. Schlam took it apart and [19] showed you in 3-D how the coupling through the [20] resistance is done.

[21] And he showed you this [22] three-dimensional depiction based on their [23] mask files, not stick drawings, not schematics, not [24] lawyers' renditions, but exactly what's going on

### Page 2039

[1] there.

[2] Can you stop it right there? And [3] the coupling via resistance is right here. This [4] red is the guard ring. And it goes that way. [5] That's the guard ring. Very clearly.

[6] Here are the row lines. And you'd [7] also have column lines in the other direction. [8] Here's the row lines.

[9] Now, we know that they're not [10] directly connected, because I showed you that [11] from the first mask. Unlike what CPT's lawyers [12] tried to show you in their schematic.

[13] This layer is source drain metal [14] that goes across the rows, and they are [15] connected as I showed you before. But now let's [16] come over to the guard ring. Here is the guard [17] ring ring.

[18] And this has source drain metal on [15] top. And the connection from the source drain [20] metal goes up the ITO to this layer and down [21] here to make the connection with the guard ring.

[22] That is the coupling, and the [23] resistance is provided by the ITO material. [24] There's no direct connection other than through

### Page 2040

[1] this ITO from the guard ring to the [2] interconnected row and column lines, because the [3] row lines are previously interconnected with [4] this structure, and then you take that [5] interconnected structure, run it up over, and [6] down with ITO to the guard ring. And that's [7] exactly what the mask files show.

[8] You don't need to go through. You [9] don't need to look at schematics or anything [10] like that.

[11] Now, they dispute that. You've [12]

### Page 2041

[1] heard them over and over again.

[13] They say that this ITO is not [14] resistance. However, Mr. He, again, admitted [15] that the gate — the guard ring is connected, is [16] coupled through this. He said that in his [17] testimony.

[18] Now, how do we know? What [19] evidence do we have that this is resistance?

[20] We can look right at their own [21] documents. We don't have to go beyond anything [22] else.

[23] We can look right at Chunghwa's [24] documents. You'll recall that Mr. Goodwyn, when

### Page 2041

[1] he was talking to Chunghwa's Mr. He, [2] he showed him their array specification. And right here [3] in Chinese, of course, it says guard di kang. [4] And this is the official certified translation [5] of that item. And the translation of it is [6] guard resistance.

[7] Now, you'll recall during the [8] course of this trial — oh, one second. I'll [9] show you one other document. Another array [10] spec, right out of the Chunghwa files.

[11] And down here it has the words [12] guard di kang and guard di kang. And we have an [13] official translation, certified translation of [14] these items.

[15] And the translation says in-plane [16] guard resistance, out-of-plane guard resistance. [17] Forty-one, resistance.

[18] Their own documents, their own [19] documents show that there is a coupling to the [20] guard ring via resistance. These aren't our [21] words. These are their words right out of their [22] files.

[23] Now, you heard, as the trial [24] progressed, they didn't want you to see this

### Page 2042

[1] document. They objected. And the judge [2] sustained their objection.

[3] But what they forgot is we had the [4] certified translations, which we then asked the [5] witness about. You remember that.

[6] They didn't want you to see this [7] document, because they knew it would prove that [8] they have coupling via resistance. It's their [9] own document. It's their own words [10] We don't have to have the experts [11] argue about this. We don't need Dr. Howard to [12] come up with all of his fancy numbers and fancy [13] words. I mean, he is a very, very smart man.

[14] But I ask you to apply your [15] common sense to this case as the judge will [16] instruct you. You don't need to go any further [17] than their own documents.

[18] Now, they argue — Dr. Howard [19]

**Min-U-Script®**

---

argued, well, you know, ITO, it's a conductor. [20] It's a semiconductor. You know, it really [21] doesn't act like a resistor. A resistance.

[22] Well, again, we only have to look [23] at their own documents. Remember the 3-D I [24] showed you? Can we go back to that first — to

---

Page 2043

[1] that for a second, the slide?

[2] No. No, after that. [3] Yeah. Could you run the animation [4] and then stop it?

[5] Thank you. Okay. [6] This is perfect. Thank you. [7] Now, we know that this is source [8] — source drain metal, this layer here. This is [9] gate metal.

[10] Both of which are fairly good [11] conductors. They are connected via this ITO [12] layer. And in the patent, it says this is [13] coupled to the guard ring via a resistance.

[14] Well, now let's go back to the [15] document.

[16] Can I go forward? Okay. [17] This, again, is their own array [18] spec. And their own array spec tells us whether [19] it's a resistance or not. Their array spec says [20] here's the gate metal, right there.

[21] And it says its resistance is 5.8. [22] Then they show you the source metal and the [23] resistance is 18. And that makes sense. Metal [24] would be a fairly low resistance.

---

Page 2044

[1] Here's the ITO resistance. 221 to [2] 275. You can do the math. It's between 50 and [3] 20 times higher resistance than the metal it's [4] connecting.

[5] That's all the patent required. [6] Coupling via a resistance.

[7] And the ITO, no matter what [8] Dr. Howard wants to call it in this structure, [9] provides a resistance between the two metal [10] layers.

[11] The patent is — the patent [12] element is infringed. And their own documents [13] show it.

[14] So what have I shown you now? The [15] only two issues on Claim 1, interconnecting and [16] resistance. And out of their own mouths, out of [17] their own documents, you see without any doubt. [18] Don't let them snow you, and I know that you [19] won't let them do it with their schematics, with [20] their fancy arguments, with their confusion, [21] because they're good at it, they're the best, [22] but the documents are what they are, the mask [23] files are what they are, and the facts are [24] without doubt they interconnect with conductors,

---

Page 2045

[1] and they couple to the guard ring via resistance [2] and there is no doubt about it.

[3] Now, let's talk for a moment about [4] Dr. Howard. What did he say? His testimony was [5] quite good, but you had to listen closely to [6] what he said, because in his testimony he said [7] certain things, and one of the most telling [8] things of all from Dr. Howard was early on in [9] his testimony, and it was quite revealing, and [10] after he said this, I scratched my head and I [11] said, how can he now tell you that this patent [12] is invalid? I don't know how he can do it. [13] Well, he managed to do it.

[14] He can easily use certain words to [15] tell you it's invalid. He can tell you that Dr. [16] Holmberg didn't invent anything. He can tell [17] you that Honeywell sold LGE an invalid patent. [18] He can tell you that LGE transferred an invalid [19] patent. Right? And he can do it, and he sounds [20] pretty convincing.

[21] But he said in his testimony, and [22] this was a question from his own counsel in [23] direct, this was the question, and she went [24] through all this prior art early on and she

---

Page 2046

[1] said, "So given that, is there anything that you [2] find that's actually new or different in the [3] '002 patent that is not in the prior art?"

[4] "ANSWER: The use of a resistance [5] to couple connected lines in the definition, a [6] specified resistance used to minimize the surge [7] of electric current, that is not found in the [8] prior art."

[9] I don't know how he can come up [10] later and tell you invalidate this patent. He [11] just told you, the invention was new, he [12] identified exactly what it was, and his own [13] words, "that is not found in the prior art."

[14] He also admitted that there was [15] coupling, he only quibbled on the ITO for the [16] resistance.

[17] Now, you also have to examine [18] Dr. Howard's testimony not so much for what he [19] says, because he's quite adept at saying things, [20] you have to think about what he didn't say. And [21] I listened to his testimony very carefully, and [22] even though Mr. He, the actual engineer from CPT [23] got on the stand and told you exactly what was [24] in CPT's products, in all of Dr. Howard's

---

Page 2047

[1] testimony, I listened, did he ever talk about [2] Mr. He's testimony? Did he ever talk about what [3] Mr. He said, who said it was interconnect? Did [4] he ever even mention that? No, Dr. Howard [5] avoided Mr. He's testimony like the plague, [6] because he knew it killed his position.

[7] In all of his testimony, also, [8] Dr. Howard does not disagree that the lines

---

are [9] interconnected under the ITO layer as Mr. He [10] admitted. He never addressed that question. [11] Mr. He had just gotten on the stand and told you [12] that the row lines were interconnected through a [13] source drain metal under the ITO level. Did [14] Dr. Howard ever talk to you about that? Did he [15] ever explain that away? No. Because he [16] couldn't explain it away. He talked to you [17] about schematics, and talked to you about other [18] drawings. But he didn't talk to you about [19] Mr. He's testimony or what the actual mask files [20] shows.

[21] He also never disputed what [22] Dr. Schlam told you and what Dr. Schlam showed [23] you in the 3-D. He never disputed that the row [24] lines are coupled to the guard ring through the

---

Page 2048

[1] ITO, that structure I showed you. He never [2] disputed that.

[3] Now, he also didn't give you any [4] opinion on Claim 8 to claim that it didn't [5] infringe, he only said well, if Claim 1 doesn't [6] infringe, then Claim 8 doesn't infringe. He [7] basically conceded that if Claim 1 infringes, [8] Claim 8 also infringes because he does not [9] dispute that Chunghwa's products have an inner [10] guard ring coupled to the lines via shunt [11] switching element. He doesn't dispute that. He [12] never did. So his only position is Claim 1 is [13] not infringed so Claim 8 is not infringed, but [14] he never otherwise disputes Claim 8.

[15] And as you'll recall, defendants' [16] opening statement told you the same thing, if [17] Claim 1 is not infringed, Claim 8 cannot be [18] infringed. But they otherwise present no [19] defense on infringement of Claim 8.

[20] And as I have just shown you and [21] reviewed for you with the evidence, we have [22] proven by a preponderance of the evidence that [23] Chunghwa infringes Claim 1 out of their own [24] mouths with their own documents using their own

---

Page 2049

[1] mask files, therefore, they also infringe Claim [2] 8 because they have not put on any defense [3] otherwise to Claim 8. And that's what I just [4] told you because Claim 8 only requires a second [5] guard ring coupled through a shunt switching [6] element.

[7] Now, just a brief, brief recap, [8] you'll recall that Dr. Schlam reviewed for you [9] each and every one of the 481 CPT modules and he [10] reviewed the ones that had the outer guard ring. [11] He reviewed the ones that had both outer and [12] inner guard ring. He reviewed all of the [13] products that Chunghwa produces from these [14] modules. And it goes on and on. And he [15] reviewed all

of those.

[16] And the significance of that is, [17] it's those modules, those products that form the [18] basis for our damage claim that I'll talk to you [19] about in a little while.

[20] Now, is there direct infringement [21] of these products in the United States, which is [22] another question you need to answer. Are they [23] sold in the United States? Well, I'm going to [24] go through this very, very quickly with you

### Page 2050

[1] because the evidence is undisputed, it's [2] overwhelming, they don't really have anything to [3] say about it.

[4] You heard the testimony, and I'll [5] just review it with you very, very quickly. [6] First as to Chunghwa, do they import and sell in [7] the U.S. their LCD products which have their [8] infringing modules? No doubt about it, you [9] heard that again out of their own mouths. [10] Chunghwa imports and sells infringing modules to [11] the U.S., John Tsai told you that, they admitted [12] that in their interrogatory answer. Tatung [13] imports and sells modules to the U.S., Oliver [14] Shih told you that in deposition video from [15] Tatung. Tatung American sells and imports [16] products with infringing modules to the U.S., [17] Mike Lee of Tatung America told you that in his [18] video deposition. ViewSonic sells and imports [19] products with infringing modules to the U.S., [20] you heard that right from Mr. Volpe also today, [21] but Bonnie Uphold said that in her videotaped [22] deposition.

[23] So without doubt, there is direct [24] infringement because of importation and sales of

### Page 2051

[1] Chunghwa's products.

[2] Your Honor, I'm through the [3] confidential information.

[4] THE COURT: All right. Thank you. [5] Okay. All right. [6] Let me address the subject of [7] inducement.

[8] That's another one of the issues [9] you need to address. And the statute says [10] whoever actively induces infringement shall also [11] be liable as an infringer. So you need two [12] things, direct infringement and inducing conduct [13] by Chunghwa.

[14] And here again, the evidence is [15] overwhelming and undisputed. And the evidence [16] shows without doubt — you've heard it from all [17] of the videotape depositions. Remember, we [18] showed you, and we apologize for having to show [19] you videotapes, rather than people live, but [20] that was all we could do, because none of them [21] live in the area.

[22] You know that Chunghwa's the [23]

### Page 2052

[1] manufactures, including Tatung and other OEMs. [2] As a result of that alliance, sales are made and [3] imported into the United States to a variety of [4] U.S. companies.

[5] Two of them are defendants. [6] Tatung America and ViewSonic.

[7] And you heard the testimony from [8] several of CPT's witnesses, Tatung's witnesses [9] who are the other brands they sell to and entice [10] to purchase their products: Hewlett-Packard, [11] Dell, IBM, Gateway. They all do their — [12] Chunghwa does its best to get these companies to [13] purchase their products for sale in the United [14] States.

[15] And here it's just a sampling of [16] the testimony. And I'll go through this very [17] particularly, because there's really no dispute [18] on this.

[19] Chunghwa has offices and employees [20] in the U.S. to serve its customers. John Tsai [21] and Mike Lee both told you that in their [22] deposition testimony.

[23] Chunghwa even established a U.S. [24] representative Dundee Hsieh. You heard John

### Page 2053

[1] Tsai and Milton Kuan tell you about that.

[2] We know from Michael Wagner, their [3] expert, 30 to 35 percent of their modules enter [4] the U.S. We also know what Chunghwa does.

[5] And it's very, very clear what [6] they did. They regularly meet with leading U.S. [7] brands such as Hewlett-Packard, Dell and [8] ViewSonic. John Tsai tells you that.

[9] The evidence you will see that has [10] been admitted is they have trip reports that [11] show all the meetings with these companies. [12] Chunghwa has a document Chunghwa Business Travel [13] Report. It says Chunghwa's important strategy [14] is to penetrate the U.S. market.

[15] They also actively encourage U.S. [16] brands such as Dell, Hewlett-Packard, ViewSonic, [17] Gateway and Apple to purchase and use Chunghwa's [18] LCD modules. John Tsai told you that.

[19] Chunghwa promised to reimburse the [20] customers' legal expenses for patent [21] infringement claims. There's an indemnity [22] agreement with Tatung.

[23] For example, you remember Pat [24] Chang. Pat Chang was from Tatung.

### Page 2054

[1] And he basically said we just turn [2]

everything over to CPT to Chunghwa. We don't [3] pay attention to these patent infringement [4] claims. We leave it up to them. They can take [5] care of it.

[6] They also use authorized repair [7] centers in the U.S. There's repair agreements [8] with a couple of companies, Amkotron and [9] Selectron, both located in the U.S. to repair [10] their products, to service customers who buy [11] them.

[12] They provide samples to U.S. [13] brands for product development. They seek their [14] model — they seek to have their models designed [15] into customers products.

[16] These are smart people. They know [17] how to do business well.

[18] They do it well. They know how to [19] get their products used in the United States and [20] sold to U.S. customers.

[21] Chunghwa also communicates with [22] U.S. customers regarding pricing and supply. [23] You heard that again from John Tsai.

[24] They communicated with OEMs

### Page 2055

[1] regarding the needs of U.S. customers. And [2] quite telling, they distribute product road [3] maps.

[4] And what did Bonnie Uphold from [5] ViewSonic tell us? A co-defendant?

[6] Bonnie Uphold said, Yeah, they [7] give us product road maps, her words, for the [8] purpose of inducing customers to use Chunghwa [9] products.

[10] Tatung does the same thing. [11] Tatung, again, is the other foreign company.

[12] Tatung has subsidiaries in the [13] U.S. Mr. He, in his deposition, says, We [14] emphasize the U.S. market and U.S. customers. [15] And he also says the majority of LCD monitor [16] sales for Tatung are to U.S. customers.

[17] We also enter into manufacturing [18] agreements with U.S. companies, including [19] ViewSonic. They do repairs for U.S. companies, [20] including ViewSonic.

[21] This is all out of the mouths of [22] their own witnesses. Clearly, Tatung, just like [23] Chunghwa, had knowingly and actively induced [24] infringement through the sale of their products

### Page 2056

[1] in this country.

[2] Let's address for a moment the [3] subject of willful infringement. Now, you've [4] heard the testimony that defendants were on [5] notice of the '002 patent in 2002.

[6] You also heard the testimony from [7] several witnesses that they conducted no [8] investigation when they were put on notice of [9] the '002 patent. And I'm

going to show you that [10] they attempted to conceal their infringement [11] with a very — with the very testimony that you [12] heard in this courtroom.

[13] You remember the testimony of Mr. [14] Ho Lee who testified regarding correspondence he [15] sent to Chunghwa in 2002.

[16] Can I have the elmo, please? [17] You saw this letter, and you heard [18] the testimony. And this letter was the first [19] letter to Chunghwa February 8, 2002. And it [20] specifically referred to the '002 patent, and [21] saying, and referring to it, and asking Chunghwa [22] Picture Tubes, if they would like to meet.

[23] Of course, the letter was a gentle [24] letter. You don't, in your first

### Page 2057

[1] correspondence, right out of the bat accuse [2] people of infringement. You want to make it a [3] fairly pleasant letter. And that's what this [4] has done. But it specifically put them on [5] notice of the '002 patent.

[6] You heard the testimony. They [7] didn't respond.

[8] I understand they have a Chinese [9] New Year at some point in these three weeks, but [10] the Chinese New Year only lasts for a week. [11] Hardly an excuse for not responding, and hardly [12] an excuse for not responding for the three or [13] four months after this.

[14] So I think the Chinese New Year is [15] really a non-starter for them. It's, again, [16] part of their distraction technique in this [17] case.

[18] But the February 27th letter, [19] which followed only three weeks after the first [20] letter, makes it quite clear. We want to talk [21] to you about the unauthorized use of technology [22] owned by LG Philips.

[23] We ask for a meeting to discuss [24] the issue of patent infringement with CPT. If

### Page 2058

[1] you don't respond, we're going to take legal [2] action.

[3] Now, they're going to argue to you [4] that this doesn't constitute sufficient notice. [5] I don't know what kind of notice you need to [6] give them, but they had to get the message that [7] we were telling them they were infringing the [8] '002 patent.

[9] Plus, I think it's quite telling [10] that who was the only witness that they tried [11] to talk about this letter was Ms. Belle Chang. And [12] I have to say, Ms. Belle Chang strikes me as a [13] very wonderful young person. But as you know, [14] she didn't start at Chunghwa until 2004. She [15] had no personal knowledge of what went on in [16] 2002.

[17] And most telling of all, did they [18] present to you any witness in this courtroom to [19] talk to you about what happened, actually [20] happened in 2002 in response to this [21] correspondence? No.

[22] Mr. Ho Lee's testimony stands [23] unrefuted. They didn't put a witness on to say [24] anything he said was wrong, inconsistent,

### Page 2059

[1] inaccurate, and he explained to you the letters [2] and he explained to you the meeting he had with [3] them in June of '02 in which he went through [4] things in detail and he told them about specific [5] product examples, he pointed out that they had [6] outer guard rings. Did they put a witness on to [7] dispute this, but yet they're going to argue to [8] you this was insufficient notice, I think you [9] know better.

[10] And as I said, we accused them of [11] infringement, we pointed out specific products, [12] and they didn't produce any witnesses in this [13] trial.

[14] Now, you heard the testimony of [15] Mr. Chu from Chunghwa Picture Tubes. And I [16] found his testimony quite interesting, as I'm [17] sure you might have. He's telling you about [18] they had a problem with the Wujiang factory in [19] May/June of '02, and that he had to take steps [20] to correct that problem and that's when they [21] added the inner guard ring.

[22] He told you that up to that time, [23] that Chunghwa only used the outer guard ring. [24] And he told you that it was at that point that

### Page 2060

[1] they added the inner guard ring and had both an [2] outer and inner guard ring on their products. [3] And they came into this Court to tell you, this [4] is obvious, this is not a big deal, anybody [5] could do it, because we did it in a [6] week-and-a-half. It took us five or six weeks [7] to produce the product, Mr. Chu told you that. [8] But we did it in a week-and-a-half, my staff [9] just banged it out.

[10] Let's think about the facts for a [11] second to understand exactly what happened.

[12] February 8, '02, Chunghwa notified [13] by LG Philips about the '002 patent. You just [14] saw that letter. February 27, we told them [15] you're infringing this patent.

[16] Now, prior to this time, Mr. Chu [17] told you that they were only making products [18] with outer guard ring from 1998 to 2002. He [19] told you, we're only making outer guard ring.

[20] Then he told you and you saw the [21] documents that on April 15, 2002, the

Wujiang [22] plant started operation and that was in Mainland [23] China. And then he told you, because I asked [24] him, he learned of the ESD problem at Wujiang

### Page 2061

[1] which he said was a transportation problem, the [2] products were showing more ESD damage because [3] they were shipping them to Mainland China, et [4] cetera.

[5] And remember what he said, his [6] boss didn't tell him about the problem for one [7] or two months after Wujiang opened, that was his [8] testimony.

[9] So it was in the May 15-June 15 [10] time period when he first learned of the [11] problem. Well, we know on June 11, 2002, [12] Chunghwa meets with LG Philips. Mr. Ho Lee [13] meets with them, he presents the presentation. [14] He says we have been trying to get your [15] attention now since February and now we're very [16] glad we're able to meet with you, but you know [17] guys, here is your pictures, here is your [18] pictures and you know you're infringing several [19] of our patents and you're infringing the '002 [20] patent because you're using the guard ring and I [21] can see it right here where you have cut off the [22] guard ring, but the connections are still [23] showing. And he tells them that in no uncertain [24] terms on June 11.

### Page 2062

[1] By this time, Chunghwa has to have [2] looked at the '002 patent, we told them about [3] it. They presented no witness to you that says [4] we didn't look at the '002 patent. When LG [5] Philips presented that to us on February 8, they [6] only had to make a copy of this. It doesn't [7] take a whole lot to copy a U.S. patent, here it [8] is. Dr. Howard told you there is all these [9] internet searches. They probably printed this [10] out right after the February meeting, or the [11] February letter I should say.

[12] Mid July, Chunghwa begins [13] manufacturing LCD panels with both inner and [14] outer guard rings. Mr. Chu told you that. He [15] said it took us five to six weeks after I was [16] notified by my boss that we started production [17] with both rings. That would make it no earlier [18] than mid July. And at that point forward, [19] Chunghwa continues to manufacture its panels [20] with inner and outer guard rings.

[21] No wonder they didn't respond to [22] LG Philips. No wonder they didn't do any [23] analysis of the patent, they got the patent and [24] they were producing their products with both

### Page 2063

[1] inner and outer guard rings.

[2] Now, he tries to tell you that — [3] they

try to tell you that adding this second [4] guard ring was so obvious, anybody could figure [5] it out. Okay? But let's talk about the actual [6] facts.

[7] For four years, four years, 1998 [8] to 2002, they were only using the outer guard [9] ring. They didn't come up with the inner guard [10] ring, adding it to the outer guard ring for four [11] years, they only did this. They didn't add it [12] until after LG Philips pointed out in spades to [13] them you're infringing the '002 patent.

[14] So what they did is they looked at [15] the patent and that's why their engineers only [16] took a week-and-a-half to design it because they [17] were given it. It wasn't obvious, they didn't [18] do it for four years, they only did it after we [19] told them about the '002 patent and that's when [20] they started doing both inner and outer guard [21] rings.

[22] And that's why they did no [23] investigation or analysis of the patent, they [24] knew they were going to infringe it. You heard

                    Page 2064

[1] — you saw the testimony today that my [2] colleague, Mr. Christenson put on, what did they [3] tell their customers in an investor report in [4] August '02? We are going to increase our yield.

[5] Sure they were going to increase [6] their yield, they were adding the inner guard [7] ring to their outer guard ring after we told [8] them about the '002 patent. They didn't do any [9] investigation or analysis of the patent because [10] they knew what they were doing.

[11] And you heard the testimony of [12] each and every one of the defendants. Belle [13] Chang told you they did nothing. Pat Chang told [14] you Tatung did nothing. Mike Lee told you [15] Tatung America did nothing. Sally Wang told you [16] ViewSonic did nothing.

[17] There is no evidence in this case [18] that they took any due care to avoid [19] infringement of the patent. In fact, all of [20] the evidence you have heard points directly to [21] purposeful and willful infringement.

[22] Now, they attempted to conceal [23] their infringement, and this took a lot of [24] effort to prove this. And you saw this very

                    Page 2065

[1] testimony in this courtroom. You saw the [2] inconsistency, the evasion, the coverup right [3] out of the mouths of their own witnesses. And [4] it was sometimes hard to follow, but we put it [5] together for you.

[6] Initially ViewSonic repeatedly [7] denied meetings with Chunghwa in the U.S., [8] Bonnie Uphold swore up and down,

there were no [9] meetings. She told you that, and if there was a [10] meeting, I would know, she said. What's the [11] evidence show? The evidence shows in fact there [12] were meetings between Chunghwa and ViewSonic in [13] the United States.

[14] ViewSonic's second point denies [15] that Chunghwa provides pricing information, [16] Pearlyn Lim told you that. What's the evidence [17] show? The evidence shows pricing information [18] was provided by Chunghwa to ViewSonic.

[19] What else goes on? Chunghwa [20] denied any shipment of sample modules to the [21] U.S. for product development. Milton Kuan told [22] you that in his deposition, he didn't tell you [23] anything else when he got up today, that's [24] what he said in his deposition. What's the evidence

                    Page 2066

[1] show? Samples were, in fact, sent. Chunghwa [2] denied subscribing to the DisplaySearch. [3] DisplaySearch is that research organization that [4] publishes all of the data and sales of all these [5] companies all over the world. Mr. Kuan said we [6] don't subscribe to DisplaySearch. What did the [7] evidence show? The evidence shows they [8] subscribed for years.

[9] Chunghwa also denied knowing that [10] its customers, Dell, Hewlett Packard and [11] ViewSonic sell in the U.S. Milton Kuan said [12] that. That was probably the most remarkable [13] thing I have heard in two weeks that he says we [14] don't know whether Dell, HP and ViewSonic, [15] whether they sell in the U.S. You knew that he [16] wasn't telling you the truth when he said that. [17] And the evidence showed that Chunghwa knows [18] exactly that these customers sell in the U.S.

[19] Chunghwa also denied selling [20] modules directly to Hewlett Packard. Milton [21] Kuan again denied it. What did the evidence [22] show? Chunghwa sells directly to Hewlett [23] Packard. Chunghwa even pretended not to know [24] that its customers use Chunghwa modules in LCD

                    Page 2067

[1] monitors and TVs. This was the second most [2] remarkable thing I heard. They produce modules [3] that ended to be used for LCD modules and he [4] said no, no, in fact Mr. Milton Kuan said that [5] would be a speculation. Well, the evidence [6] showed they advertised their product, they gave [7] roadmaps to have these customers specifically to [8] have them use their product in their monitors and [9] TVs.

[10] Now, they gave you another [11]

distraction early on in this case and they've [12] tried to carry the theme, to avoid infringement, [13] to avoid you actually looking at their mask [14] files, to avoid you looking at their documents [15] which is the only thing you need to do, what did [16] they tell you in their opening statement? We [17] didn't use this technology. We bought it from [18] Mitsubishi in 1997. Remember they waved this [19] technology agreement. In fact, they brought a [20] witness in to tell you Mr. Yang, their first [21] witness, we bought this from Mitsubishi in '97. [22] Well, you heard Mr. Yang say to you in this [23] courtroom, they didn't do any research to see [24] whether they were going to infringe any U.S.

                    Page 2068

[1] patents.

[2] Yet, they knew at the time they [3] were going to be selling on a worldwide basis. [4] They said — and they didn't know that LG [5] Philips had already accused Mitsubishi of [6] infringing the '002 patent. They didn't know [7] that, and they told you. Mr. Yang said, Well, [8] we didn't know that.

[9] And interesting, if you look at [10] the Mitsubishi agreement, that's in evidence, [11] Mitsubishi did not provide Chunghwa with any [12] indemnity for patent — for patent infringement, [13] which you might find in these agreements.

[14] Chunghwa is on its own. [15] Mitsubishi unloaded this liability on Chunghwa. [16] They were already told by LG Philips, You're [17] infringing our patent. And Mitsubishi just [18] transferred it to Chunghwa and said, We have no [19] liability. You're on your own, fellows. Take [20] your own risk.

[21] And Chunghwa didn't do anything to [22] check out whether the technology infringed or [23] not, even though they knew they were going to be [24] selling worldwide and in the U.S. This is a

                    Page 2069

[1] total distraction.

[2] Now, let me address validity. And [3] I'm going to do this — you've heard a lot on [4] this.

[5] I'm going to do this fairly [6] quickly in the interest of time, because I know [7] you've heard a lot from everybody on this topic. [8] And the point I would like to point out is a [9] patent is presumed valid.

[10] That is a fundamental principle of [11] U.S. law. And the burden is on defendants to [12] show you by clear and convincing evidence that [13] the patent should be invalid.

[14] And I would submit to you that [15] they've made no such showing in this case. [16] They've given you a lot of

confusing evidence, [17] but they have failed to show you that any of [18] those prior references show by clear and [19] convincing evidence that the patent is [20] invalid.

[20] I want to skip ahead. I want to [21] point out that they — on Claim 1, they do not [22] allege Claim 1 is obvious. And they do not [23] allege Claim 8 is anticipated.

[24] So the only thing they allege that

---

Page 2070

[1] they can try to allege is Claim 1 is [2] anticipated, and Claim 8 is obvious. I said [3] anticipation must be proven by clear and [4] convincing evidence, and they do not allege [5] Claim 8 is anticipated.

[6] What this all means is for Claim [7] 1, they have to show you that one reference, one [8] reference contains each and every element set [9] forth in the claim. If one element is missing, [10] there is no anticipation.

[11] It has to all be in one reference, [12] and it has to — and if anyone is missing, it's [13] not anticipated. Now, they rely on the Kawamura [14] patent, which you've heard about.

[15] This is not prior art at all. [16] Mr. Holmberg's conception and reduction to [17] practice predates Kawamura. Plus, Kawamura [18] teaches only inner guard ring on — inside the [19] driver pads. It does not teach an outer guard [20] ring, and it does not teach removal.

[21] Now, let me talk about [22] Mr. Holmberg's conception and reduction to [23] practice. Because if you find that he conceived [24] and reduced his invention to practice before

---

Page 2071

[1] May 11, 1988, which is the date of Kawamura, [2] it's not prior art. You don't need to consider [3] it.

[4] The application for the '002 [5] patent was filed on July 12, which is in the [6] record. And Kawamura, as I said, is May 11. [7] But the evidence before you shows that Mr. [8] Holmberg conceived and reduced his invention to [9] practice before May 11. You heard his [10] testimony.

[11] He said it more than once in his [12] deposition. We didn't take his deposition. [13] The defendants took his deposition.

[14] They were asking him the [15] questions, and he said it more than once. They [16] asked him: When did you conceive of this? When [17] did you reduce it to practice?

[18] You heard his testimony in this [19] Court. He testified that he conceived of the [20] invention in the fourth quarter of 1987 and [21] reduced it to practice in the first quarter of [22] '88, long before the

---

Page 2072

[1] some kind of corroborative document for you to [2] find that Mr. Holmberg knows what he's talking [3] about.

[4] Well, in this record, there is a [5] corroborating document, not written by [6] Mr. Holmberg, written by a third-party scientist [7] at Honeywell. And you will see in the record [8] it's part of the evidence, a April 20, 1988 memo [9] written by a scientist at Honeywell that [10] independently corroborates that Mr. Holmberg [11] conceived and reduced his invention to practice [12] before May 11.

[13] He didn't write the memo. A [14] scientist at Honeywell who was doing tests on [15] the Alphasil product.

[16] So, clearly, Mr. Holmberg [17] conceived and reduced his invention to practice [18] before Kawamura. They talked to you about [19] Okawa.

[20] Well, Okawa teaches you the use of [21] insulators. It doesn't teach interconnecting [22] with conductors. And it doesn't teach removal, [23] either, despite their stretching.

[24] Now, Claim 8, they argue, is

---

Page 2073

[1] obvious. And as I mentioned before, there's no [2] evidence, no single reference discloses both [3] inner and outer guard rings.

[4] As I mentioned in my opening, they [5] searched the world. In fact, Dr. Howard [6] didn't even search himself.

[7] He admitted on the stand, [8] Chunghwa's lawyers did all the searching for [9] this stuff. And you can bet, you can just bet [10] that they searched everywhere they could look. [11] Because they're very good people, and they know [12] how to do that. They didn't find a single [13] reference that had both inner and outer guard [14] ring in the reference.

[15] And there's — as Dr. Schlam told [16] you, there was no motivation to combine an [17] inner and outer guard ring at the time. So [18] there's not really — it is not an obvious — [19] although, they will tell you in hindsight, that [20] it's obvious. Of course, everyone says, oh, that [21] looked obvious, you know, now that it's been [22] done.

[23] But Chunghwa Picture Tubes didn't [24] do it for four years. If it was so obvious, why

---

Page 2074

[1] didn't they do it? They didn't do it because it [2] wasn't obvious.

---

[3] Now, their burden is clear and [4] convincing evidence. And I want to just briefly [5] mention to you Dr. Howard's testimony on this. [6] Because I think it shows quite clearly that they [7] have not met their burden to show it by clear [8] and convincing evidence.

[9] What did Dr. Howard tell you in [10] his testimony? I found this quite fascinating. [11] When he was asked about removal of [12] the guard ring, he said, Well, it's implicit in [13] Okawa. Not explicit.

[14] Well, if it's only implicit, it [15] isn't clear and convincing. He also said that [16] he had to interpret the figures in the text in [17] order to reach his conclusion.

[18] Now, he's a man that's well beyond [19] a person of ordinary skill in the art. He's [20] somebody with super skills. And he had to [21] interpret and study the patent in order to take [22] his position.

[23] It wasn't clear and convincing. [24] And they failed to show that.

---

Page 2075

[1] He also said — he tries to say [2] that the guard ring in Kawamura is an outer [3] guard ring, because they need to say that. They [4] need to say that for their position. Otherwise, [5] if it's an inner guard ring, it's not — it's [6] not anticipatory evidence.

[7] Well, Kawamura, the guard ring, [8] and you've seen it in the figure, and I'm sure [9] they'll show it to you when they argue, is [10] inside the pads. It's in the — outside the [11] pads. They just want to call it — an outer [12] guard ring only has one guard ring and it's [13] inside the pads. It's not an outer guard ring. [14] Clearly, it doesn't meet the clear and [15] convincing standard.

[16] Now, in the law, there's certain [17] objective criteria that you can look at that [18] weighs against it being obvious. And the Court [19] will instruct you that you can look at certain [20] evidence of commercial success, long-felt need [21] or copying that would weigh against a finding of [22] obviousness.

[23] You've seen the record in this [24] case. The evidence is undisputed, LG Philips

---

Page 2076

[1] uses outer and inner guard rings in practically [2] all of its products. Chunghwa uses outer guard [3] rings or inner and outer guard rings in most of [4] its products.

[5] And in fact, Mr. Chiu told you [6] they used it now in virtually all of their [7] products after '02. We know from the record, [8] how many times did counsel ask Mr. Ho Lee [9] whether other LCD manufacturers used the '002 [10] technology? He believes most of them do.

[11] Clearly, there's been commercial [12]

---

success using this invention. You can also look [13] at whether there was a long-felt need.

[14] Mr. Ho Lee explained that to you [15] in his testimony. He said to you when he was an [16] LCD engineer, they had a problem. They had the [17] ESD problem and the LG engineers couldn't solve [18] the problem.

[19] He called it a pesky problem. And [20] he only could solve it when he came across the [21] '002 patent, and said, That's the solution. And [22] it was after that that LG Philips bought the [23] patent.

[24] You could look at evidence of

### Page 2077

[1] copying. I went into detail –– I'm not going to [2] belabor it here.

[3] Mr. Yang told you about opening [4] the Wujiang plant. And that occurred, and they [5] didn't make an outer — inner and outer guard [6] ring product until after LG Philips had given [7] them notice of the '002 patent.

[8] I'd ask you to use your own good [9] common sense and judgment to decide whether they [10] copied or not. And I will remind you copying is [11] not required for infringement. The Court will [12] tell you you do not have to copy.

[13] It's simply: Does your product [14] infringe the patent? But in terms of [15] willfulness, and in terms of obviousness, you [16] may look at that evidence.

[17] Now, finally, and I thank you for [18] your patience, I wanted to address the issue of [19] damages. The law says, as you've heard quite a [20] bit from our expert, Mr. Cobb, and also from [21] Mr. Wagner, that upon a finding of in- [22] fringement, the patent holder is entitled to damages to [23] compensation no less than a reasonable royalty.

[24] And we all know from the testimony

### Page 2078

[1] that you have to examine what would have been [2] the hypothetical nego- tiation between the [3] parties, and every one has agreed that the [4] hypothetical negotiation would have occurred in [5] 1999, the date that Chunghwa first started [6] infringing the '002 patent.

[7] Now, we know from everybody's [8] testimony, and Mr. Wagner agrees, the '002 [9] patent increases yield and decreases [10] manufacturing costs. And everybody agrees that [11] the cost sav- ings would be a basis to negotiate a [12] reasonable royalty.

[13] Now, they take issue with the [14] yield rate that Mr. Cobb used of five percent in [15] his damage analysis. And they've told you [16] several times that there are no documents that [17] show you this. There's no data.

[18] Well, I will say two things. [19] Everything in life is not documented. We all [20] know that.

[21] You have conversations, you do [22] things in life. There isn't a document to prove [23] everything.

[24] But more importantly, in this

### Page 2079

[1] case, documents did exist, but they existed long [2] ago and no longer exist. Let's remember this.

[3] Mr. Ho Lee testified that he did [4] testing when he came across the '002 patent in [5] 1992. Fourteen years ago.

[6] And he told you he applied this [7] technology to LCDs in their test center on their [8] pilot line and he achieved as he testified at [9] least a ten percent increase in yield. [10] Paragraph practice.

[11] Well, that was fourteen years ago, [12] and he also told you that they incor- porated that [13] into all of their products and that there [14] wouldn't be any dating the manufacturing [15] facilities because the invention was used from [16] the beginning, so the manufacturing facili- [17] ities have no documents.

[18] But you can't expect LG Philips to [19] have documents that are fourteen years old. [20] They have long been discarded. And that we [21] shouldn't be penalized with that. That's normal [22] course of business, that's the way things are.

[23] But Mr. Lee testified that there [24] — that he did the testing, they applied it to

### Page 2080

[1] their products and there was at least a ten [2] percent increase on their pilot lines.

[3] Mr. Holmberg, the inventor, you [4] heard his testimony, he actually did test [5] products again, he told you that, he did it in [6] 1988. That's eighteen years ago. And he said [7] when he did the testing, his testing showed a [8] five percent increase, that was his [9] recollection. But unfortunately, it's eighteen [10] years later, he no longer has any documents.

[11] LG's engineers who talked to [12] Mr. Cobb, Mr. Youngwoo Cho said that he had been [13] an LCD engineer for ten years, he's familiar [14] with the problem, he said his judgment was it [15] was at least an eight percent increase.

[16] Now, they criticize Mr. Cho for [17] not being a witness. Well, they took his [18] deposition for a whole day. They could have [19] asked him anything they wan- ted. They had every [20] opportunity to do that. It isn't as if we [21] didn't call him, we didn't need to call him.

[22] They had fifty witnesses on their [23] disclosure that they would say were potential [24] witnesses. They didn't call fifty witnesses at

### Page 2081

[1] this trial.

[2] Now, you recall when Mr. Cobb was [3] testifying, and this is very telling, Ms. Gabler [4] asked him a question on direct, did you talk to [5] the engineers at the fabs at LG Philips, and he [6] says yes. And what does she immediately say? [7] She says I don't want anything asked on [8] redirect about that conversation. And the Judge [9] said well, wait until we get to it.

[10] And then my partner, [11] Ms. Brzezynskik asked the question, they [12] objected, the Judge overruled the ob- jection and [13] Mr. Cobb told you what these two LG Philips [14] engineers at the fabs said to him. Mr. J.J. Kim [15] said, and he was at the Gumi facility, he said [16] it's at least a five percent increase in his [17] judgment.

[18] Tsung L. Park told Mr. Cobb there [19] is an eight percent increase. That totally [20] substantiated the prior information that had [21] already been in the record. Chunghwa did not [22] want you to hear that testimony. They tried to [23] keep it from you.

[24] Now, what does Chunghwa say in

### Page 2082

[1] defense? Do they come into this courtroom, did [2] you hear a witness say to you, no, no, no, our [3] yield increase is only one percent, our yield [4] increase is only two percent. Did you hear any [5] witness, he didn't bring anybody in to dispute [6] that, they don't dispute this, they say you [7] didn't show it good enough, you don't have [8] documents. Except Mr. Vincent Lu from Chunghwa [9] in his deposition says well, I don't know [10] exactly how much the increase is, but his word, [11] for sure use of guard ring technology increases [12] yield rate.

[13] We don't have an issue anymore as [14] to whether yield increases, they ad- mitted for [15] sure it increases, the only question is how [16] much.

[17] Well, Mr. Cobb looking at all of [18] this evidence used a conservative five per- cent [19] yield increase. And I would submit to you that [20] that's a very conservative number. It's [21] supported by all the testimony and Chunghwa has [22] not presented one witness to dispute it. They [23] had every opportunity to dispute it, not one [24] witness.

### Page 2083

[1] Now, we talked to you about this [2] earlier in my opening, we know and there is [3] virtually no dispute that Chunghwa's U.S. sales [4] of LCD pro- ducts between March 1, '02 and March [5] '06 in the U.S. totaled $2,353,964,000.

[6] You heard Mr. Wagner in our expert [7] report say Mr. Cobb and I agree on this,

that's [8] an accurate number. Now, Mr. Cobb calculated [9] using his conservative five percent yield [10] increase cost savings in the U.S. market of [11] $104,895,000. They don't dispute the five [12] percent with any testimony. Mr. Wagner doesn't [13] come in and come up with any evidence, he just [14] says I don't think there is enough, right, so [15] I'm going to use four percent. But he just [16] assumes that, he doesn't really come in and say [17] I know something different. [18] My client Chunghwa — did you hear [19] him say my client Chunghwa told me it's a [20] different percentage? You didn't hear that, did [21] you? It might even be higher, who knows. Maybe [22] Chunghwa's yield rate increases seven, eight [23] nine, ten percent. We don't know, they have [24] kept it silent.

### Page 2084

[1] So Mr. Cobb says okay, in a [2] royalty negotiation, what would be — what would [3] be the result of that? And he said 50 percent [4] would be a sharing thing so that a reasonable [5] royalty would be $52,447,000.

[6] Let's think about this. Let's [7] think about this hypothetical negotiation in [8] 1999. Let's think about it. Who would have [9] been the negotiator for LG Philips? Mr. Ho Lee. [10] He told you he was in the IP department at that [11] time, he was the chief negotiator. He would [12] have sat down at the negotiating table with [13] Chunghwa.

[14] What would have been his position? [15] His position you know would have been ten [16] percent yield increase, because he would have [17] said I did the testing, I did the testing seven [18] years ago, I got ten percent.

[19] What would Chunghwa's position be? [20] Well, we know what they would say, no, no, no, [21] it's not that much, it's one percent.

[22] Where do you think the [23] negotiations would have led? To, you know where [24] they would have led, five percent, that's where

### Page 2085

[1] — they would have come away from the table with [2] a five percent increase.

[3] Let's talk about the cost savings. [4] How would those negotiations have gone? You [5] don't need to hear from Mr. Cobb, you don't need [6] to hear from Mr. Wagner, you have all been in [7] negotiations, you have bought houses, cars, [8] other items, you know how negotiations go. What [9] would Mr. Lee have done? Mr. Lee would have [10] said, I want a hundred percent, it's my [11] technology, I want all the savings.

[12] What would Chunghwa have said? [13] You know what they would have

said. No, no no, [14] no, we'll give you one, two, three percent, [15] maybe we'll give you what Mr. Wagner wanted to [16] give us, seven percent, right. Where would that [17] have ended up? Where would the parties have [18] reached the point where LG Philips would not [19] have gone below and where Chunghwa would not [20] have gone above? Where would that have [21] happened?

[22] Well, they're competitors, they're [23] competitors, and if anybody walked away from [24] that table with an advantage, that person would

### Page 2086

[1] have a distinct competitive advantage. Why? [2] Because as Mr. Wagner told you, he told you it's [3] a very price sensitive market, it's high [4] competition, so LG Philips needed to have a [5] level playing field.

[6] Do you think Mr. Ho Lee would have [7] agreed to a number below 50 percent sharing so [8] that there would have been equal sharing between [9] the competitors? I don't think so.

[10] Do you think Chunghwa would have [11] agreed to more than 50 percent? I don't think [12] so, either. And Mr. Cobb told you that. Fifty [13] percent was really a ceiling for Chunghwa. [14] That's where that hypothetical negotiation would [15] have ended, and I think you know that's where it [16] would have ended.

[17] Now, what did Mr. Wagner try to [18] tell you? Boy, his analysis was quite good. I [19] really like Mr. Wagner, but what did he tell [20] you? He came up with a $5 million number.

[21] This struck me, and I think it [22] would strike you as simply a low ball [23] negotiating tactic. He's putting a number in [24] front of you for your deliberations so you can

### Page 2087

[1] say well, Chunghwa thinks they only should pay [2] five million, LG Philips says 50, we ought to [3] split it, let's start at a very, very low [4] number. It's a common negotiating tactic.

[5] But when you examine his number [6] and all of his charts and all this, what is he [7] telling you? He admitted that to you today, he [8] says his numbers amount to only seven percent of [9] cost savings. His five million when you compare [10] it, when you can compare it to the two [11] million — 2,353,000,000, it amounts to seven [12] percent. Is there any way that you think LG [13] Philips would have walked away from that [14] negotiating table giving Chunghwa 93 percent of [15] the cost savings? I don't think so.

[16] Now, they criticize Mr. Cobb [17] because they say — remember they threw up that [18] chart, they said LG

Philips offered [19] two-and-a-half percent royalty in the worldwide [20] license, and he gave you that chart that said [21] that Mr. Cobb's number works out to 2.2 percent, [22] and if LG Philips offered two-and-a-half percent [23] for the whole patent portfolio, that means there [24] is only .3 percent left for the whole rest of

### Page 2088

[1] the patents.

[2] Mr. Cobb's 2.2 percent, that can't [3] be right, that's too much. What did he tell [4] you, it would put them out of business. It [5] would put them out of business, that's what he [6] told you.

[7] Why don't we look at the real [8] numbers because Mr. Wagner was purposely trying [9] to deceive you, in fact, and he was mixing a [10] royalty rate for a worldwide sales base with a [11] royalty rate for a U.S. sales base. Because you [12] can't just look at the percentages, you have to [13] look at the base times the percentage, see what [14] the numbers give you.

[15] Now, we know from this case [16] Chunghwa's U.S. sales are about 30 percent, [17] 2,353,000,000, and the royalty that Mr. Cobb [18] used was 52,447,000.

[19] Now, if you do simple math, and [20] you convert Chunghwa's U.S. sales for the same [21] time period to worldwide sales, their worldwide [22] sales are $7,846,547,000. Just by simple math. [23] That means that if you leave the royalty of 52 [24] million on 30 percent, under Mr. Cobb's proposal

### Page 2089

[1] which is the law, we are not entitled to [2] royalties on sales outside the U.S., we [3] understand that, we make no claim for it, but [4] you would have to deal with the practicalities [5] of a reasonable royalty, there is no payment on [6] 70 percent of Chunghwa's sales. This sale in [7] the time period $5,492,583,000 of product [8] outside the United States. And when you just do [9] the math to figure out can they afford this, the [10] math works out to a .6 percent royalty if you [11] just look at worldwide sales.

[12] Now, with $7,846,000,000 in sales, [13] do you think a $52 million royalty is going to [14] put them out of business? I don't think so. You [15] heard their testimony. They paid $58 [16] million for this part of the technology, they [17] paid 29 million for this, I think they said they [18] spent like $3 billion to get into the LCD [19] business. That's what their testimony was.

[20] Mr. Wagner was overreaching with [21] his comment that it would put them out of [22] business. Not by a large — not by a long shot.

[23] Now, I wanted to show you just so [24] you don't get misled on his graph that he had on

[1] the two-and-a-half percent. Remember, he says [2] LG Philips proposed worldwide license should be [3] a cap, and I don't see how you could use [4] Mr. Cobb's number because there is no value left [5] for the remainder of the portfolio. Let's [6] examine that.

[7] The proposed worldwide license was [8] two-and-a-half percent, we talked about that the [9] royalty base on that would have been $7.8 [10] billion. That means the worldwide portfolio [11] royalty on LG Philips patents would have [12] amounted to $196,163,000, which is [13] two-and-a-half percent of their worldwide. That [14] is what LG Philips proposed to Chunghwa, that [15] was the amount of royalty they would have [16] received.

[17] Now, the '002 patent royalty that [18] we propose is 52 million. So the royalty for [19] the remaining portfolio is not this little .3 [20] percent that Mr. Wagner wanted you to think, the [21] remaining value is $143,716,675. Eighty percent [22] of the value is still in the rest of the [23] portfolio.

[24] I'll conclude by saying you've

[1] heard the evidence. You've seen the — you've [2] seen the infringement. You've seen their [3] willful conduct. You've seen their concealing [4] activity.

[5] You've seen the cost savings. [6] You've seen their sales.

[7] Mr. Cobb said the value should be [8] of a royalty of $52,447,000. It's a lot of [9] money. More money than we'll see.

[10] But is it a fair number based on [11] the facts here? Is it a fair number in the [12] business that we're talking about?

[13] I respectfully submit to you that [14] it is, and I ask you to return a verdict for [15] $52,447,000.

[16] Thank you very much for your time.

[17] THE COURT: All right. Members of [18] the jury, I think we'll recess for tonight, come [19] back, and have the defendants closing argument [20] tomorrow morning at nine o'clock.

[21] All right, we'll see you tomorrow [22] morning at nine o'clock.

[23] (Jury leaving the courtroom at [24] 5:27 p.m.)

[1] All right. We're going to recess [2] until tomorrow morning at nine o'clock.

[3] We have two jurors who have to [4] drive all the way downstate to Georgetown. [5] That's like two hours, two hours, 15 minutes.

[6] So we'll start up tomorrow with [7] the defendants' closing argument. Then we will [8] have rebuttal, and then the jury instructions.

[9] Okay. We'll be in recess until [10] nine o'clock tomorrow morning.

[11] THE CLERK: All rise.

[12] (Court was recessed at 5:25 p.m.)

State of Delaware          )
New Castle County          )
        CERTIFICATE OF REPORTER
    I, Heather M. Triozzi, Registered Professional Reporter, Certified Shorthand Reporter, and Notary Public, do hereby certify that the foregoing record, pages 1,755 to 2,093 inclusive, is a true and accurate transcript of my stenographic notes taken on July 26, 2006, in the above-captioned matter.
    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 26th day of July, 2006, at Wilmington.

        Heather M. Triozzi, RPR, CSR

2094

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG PHILIPS LCD CO., LTD., ) Volume 9
   Plaintiff,                    ) C.A. No. 05-292-JJF
v.                               )
TATUNG COMPANY, TATUNG )
COMPANY OF AMERICA, INC., )
CHUNGHWA PICTURE TUBES )
LTD., and VIEWSONIC          )
CORPORATION,                 )
   Defendants              )

Thursday, July 27, 2006
8:04 a.m.
Courtroom 4B
844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE JOSEPH J. FARNAN, JR.
United States District Court Judge

APPEARANCES:
   THE BAYARD FIRM
   BY: RICHARD D. KIRK, ESQ.
   -and-
   McKENNA, LONG & ALDRIDGE, LLP
   BY: GASPARE J. BONO, ESQ.
   BY: CASS W. CHRISTENSON, ESQ.
   BY: ADRIAN P.J. MOLLO, ESQ.
   BY: LORA BRZEZYNSKIK, ESQ.
   BY: TYLER GOODWYN, ESQ.
      Counsel for the Plaintiff

2095

APPEARANCES CONTINUED:
   RICHARDS, LAYTON & FINGER
   BY: ROBERT W. WHETZEL, ESQ.
   -and-
   HOWREY LLP
   BY: GLENN W. RHODES, ESQ.
   BY: TERESA M. CORBIN, ESQ.
   BY: JULIE S. GABLER, ESQ.
   BY: STEVEN YOVITS, ESQ.
   BY: HEATHER H. FAN, ESQ.
   BY: SUZANNE B. DRENNON, ESQ.
      Counsel for the Defendants

Page 2096

[1] THE CLERK: All rise.

[2] THE COURT: All right. Be seated, [3] please. Good morning.

[4] MR. BONO: Your Honor, I just saw [5] the special verdict form Your Honor handed out. [6] I think there's a typo.

[7] THE COURT: All right. You can [8] take it up with the clerk and then he'll get it [9] fixed.

[10] MR. BONO: All right.

[11] THE COURT: I don't have the [12] ability to —

[13] MR. BONO: Well, it just says [14] Claim 2 rather than Claim 8.

[15] THE COURT: Just show it to him, [16] and he'll get it fixed for you.

[17] Defendants have some motion?

[18] MS. GABLER: Not a motion exactly, [19] Your Honor. We want to put on the record some [20] objections we have to Mr. Bono's closing [21] yesterday. And we have a request for an [22] additional jury instruction based on his [23] closing.

[24] There were a few misstatements of

Page 2097

[1] law that happened yesterday. Mr. Bono, in [2] arguing about Dr. Howard's testimony, argued to [3] the jury that if

something was only implicit in [4] Okawa, that that isn't clear and convincing [5] evidence. However, Mr. Bono's argument [6] conflicts with the Novo Nordisk Pharmaceuticals [7] case 424 F 3d 1437 from Delaware, October 5th, [8] 2005.

[9] Mr. Bono also indicated that he [10] didn't know what the notice requirements were, [11] but they had to get the message that we were [12] telling them they were infringing the '002 [13] patent in reference to the February 8th and [14] February 27th letters.

[15] Again, what he argued to the jury [16] conflicts with Section 287(a) where actual [17] notice requires the affirmative communication of [18] a specific charge of infringement by a specific [19] accused product or device. That's also in [20] Amsted Industries, Inc. Versus Buckeye Steel [21] Casting Company, 24 F 3d 178, April 18th, 1994.

[22] And in addition, there were a [23] number of references, Mr. Bono made to issues [24] that were not properly before the jury,

Page 2098

[1] including commentary on defendants' initial [2] draft of their witness list that was submitted [3] back in June, I believe in the initial exchange [4] between the parties.

[5] He basically made to the jury the [6] same argument he had made to you earlier about [7] not having an instruction for adverse inference, [8] but now he has injected that issue, and his [9] version of that issue, which is very different, [10] into the jury.

[11] The only reason the defendants [12] were seeking that instruction is because they [13] put an expert witness on that had relied [14] entirely in his report and in his deposition on [15] two witnesses that they did not put on the [16] stand.

[17] THE COURT: All right. Anything [18] else?

[19] MS. GABLER: And then the final [20] issue is that he also made improper argument [21] about the import that should be given to [22] attorney objections during trial. That was in [23] reference to an objection that I had made during [24] Mr. Cobb's testimony where he did inject into

Page 2099

[1] the Court — excuse me — before the jury [2] information that he did not disclose in his [3] report, did not disclose in his deposition, but [4] then represented to the jury that it was, in [5] part, the basis for Mr. Cobb's opinion, [6] which as Your Honor knows, is inconsistent with [7] your pretrial rulings.

[8] In regard to this last point, we [9] ask

that Your Honor consider Preliminary [10] Instruction 1.5 from the Third Circuit Model [11] Jury Instructions. And I can pass a copy of [12] that up.

[13] THE COURT: I'll take a look at [14] it.

[15] As to the misstatement of law, [16] that's cured by the instructions given by the [17] Court that the jury is to pay attention to no [18] one other than my instructions about the law.

[19] As to the question of the evidence [20] in the case, that would be the subject of a [21] post trial motion if there was some overriding [22] prejudice that was demonstrated by the verdict.

[23] And as to this instruction, I'll [24] consider it.

Page 2100

[1] MS. GABLER: Basically we think [2] it's very important because the objection was [3] made at trial to try to exclude evidence that [4] was not properly disclosed as a basis for an [5] expert opinion and then he argued that we [6] were trying to hide that information from the jury.

[7] THE COURT: Don't the instructions [8] include this instruction?

[9] MS. GABLER: No, they do not. We [10] went back and took a look at what was in there [11] and we do not think this issue of how you [12] consider objections by lawyers and improper [13] argument about that, we didn't think that was [14] adequately covered.

[15] THE COURT: If it's in there, I [16] won't give this additional instruction. If it [17] is not in there, I will give it because it [18] should be in there that they should not pay [19] attention to objections by attorneys. And then [20] I have usually in the model instructions, at [21] least in my form instructions, I have this [22] already set out, so I'll see if it's in there, [23] if it's not, I'll give it, if it is in there, I [24] won't give it.

Page 2101

[1] MS. GABLER: Okay. Thank you, [2] Your Honor.

[3] THE COURT: Thank you. [4] Bring the jury in. [5] My law clerk tells me that in the [6] instructions for this case, my typical [7] instruction which I believe covers the [8] instruction offered by the defendants is [9] included.

[10] MS. GABLER: Thank you, Your [11] Honor.

[12] THE COURT: I hope you have [13] somebody who is going to work on these exhibits. [14] My case manager tells me that there are exhibit [15] problems.

[16] MR. BONO: I think we gave them [17] all of ours.

[18] THE CLERK: We're going through

[19] them, some of them, we have issues with them. [20] We are going to have to meet with a [21] representative out in the he'll once I finish [22] going through them.

· HE COURT: Pick somebody to go out there, that would be helpful so we can get

---

**Page 2102**

[1] that done.

[2] (Jury entering the courtroom at [3] 9:14 a.m.)

[4] MS. GABLER: Your Honor, do you [5] want that to happen now?

[6] THE COURT: Yes, that would be [7] helpful. She's working on it now.

[8] THE COURT: All right. Good [9] morning. Be seated, please.

[10] MS. CORBIN: Good morning. [11] Welcome back. We are at the conclusion of our [12] case and we do appreciate all your time and your [13] attention and we know it's a lot of hard work [14] and we have been throwing a lot of information [15] at you.

[16] Late yesterday, I believe I was [17] accused of confusing you of the facts. Well, if [18] pointing to the language in the claims and [19] pointing you to the words in the patent [20] specification that teach what the patent is [21] about, and if p··ting out to you generally [22] accep-· scientific principles that are in- ·d [23] in the technology at issue here, and pointing [24] out to you the Court's claim construction that's

---

**Page 2103**

·1] to be applied in this case in your determination [2] of infringement is confusing you with the facts, [3] then I am guilty as charged. But this is [4] precisely the material that you are going to [5] need when you go back in the jury room and you [6] have to reach the conclusions on the verdict [7] form and make the very important decisions that [8] you're about to make.

[9] I thought hard about what would be [10] helpful to you, and trying to distill and tell [11] you about what the evidence has shown here. And [12] the evidence has clearly shown that the CPT [13] product is materially different in four ways.

[14] Those four ways are [15] interconnecting. And as you've heard through [16] the evidence, CPT does not interconnect [17] substantially all of its row lines and [18] interconnect substantially all of its gate lines [19] together.

·· Two, testing. Testing is very [21] i ··tant here. LPL's counsel didn't w· ·o [22] talk about testing. Dr. Schlam didn't want to [23] read about testing. He didn't want to read the [24] entire spec-ification. They tried to dismiss the

---

**Page 2104**

[1] testing, but it's going to be a crucial aspect [2] of the explanation as the evidence has come in [3] as to why the CPT product and the structure of [4] that product is materially different than what [5] the patent teaches.

[6] Third, is the resistance. The [7] resistance, not the ordinary meaning of [8] resistance, but the resistance as that term was [9] defined by the Court.

[10] And yesterday Mr. Bono spoke with [11] you for nearly two hours, and he never once put [12] the Court's claim construction up or talked to [13] you about the claim construction of resist-ance. [14] And that was consistent with what he did with [15] most of the witnesses that he asked about [16] resistance that were on the stand.

[17] And it is very confusing, because [18] resistance is just a property. A property of [19] any material.

[20] And you've heard from the [21] witnesses that every substance, every substance [22] — Dr. Schlam said even my clothing has [23] resistance. So every substance has resistance, [24] if you're just talking about that inherent

---

**Page 2105**

[1] property of a material.

[2] But that's not the resistance that [3] we're talking about here that needs to be [4] applied to the analysis of whether or not CPT's [5] products infringe. And they have two separate [6] theories about where you might find this [7] resistance in the CPT product. And we'll be [8] talking about both of those, the diodes and the [9] ITO.

[10] And lastly, when you look at Step [11] 4, though, we are focusing in on interconnecting [12] and resistance, when you look at Step 4, Step 4 [13] the language of the claim itself calls out three [14] specific structures, three distinct structures, [15] and it calls them out in a specific [16] configuration.

[17] And you must find three distinct [18] structures, those three distinct structures in [19] CPT's product. And you must find that they have [20] the configuration, the relationship to one [21] another that Step 4 of Claim 1 demands that they [22] have in order to find infringement.

[23] Now, you only need to find one of [24] these to be true, that CPT's product is missing

---

**Page 2106**

[1] one of these elements in order to conclude that [2] CPT does not infringe. And it is plaintiff who [3] has the burden in this case to prove to you not [4] that we have one of these, but that we have each [5] and every element, that CPT's pro-ducts have [6] each and every element for

---

literal infringement [7] exactly as it's called out, because that defines [8] their property right, the property right that [9] they have.

[10] Now, let's step through these one [11] by one. But before we do that, I want to [12] address the accusations of LPL's counsel that we [13] misled you somehow by the use of schematics.

[14] Schematics are widely recognized [15] and used in the electronics industry, and we [16] will run through some of these. But you saw [17] them throughout the trial. You saw them in the [18] prior art, patent applications.

[19] You saw them in the '002 patent [20] itself. You saw that every one of the engineers [21] practically that was deposed illustrated their [22] points as to how their structures worked by [23] writing schematics.

[24] And we'll show you that the

---

**Page 2107**

[1] schematics were remarkably exactly like the [2] schematics that we were showing you throughout [3] the trial.

[4] If we could see — I'm sorry. [5] Howard 56.

[6] What is this figure? This shows [7] that during Dr. Schlam's own deposition, he was [8] shown a mask file, and he was asked to [9] illustrate the points he was making based on [10] that structure. That is a picture. That is the [11] actual product that you see from the mask file.

[12] And when he had to explain the [13] meaning of what he meant, he drew a schematic. [14] This is not uncommon. It is not misleading.

[15] That is the way that electrical [16] engineers communicate precisely with each other, [17] what the electrical pro-perties and [18] configurations of these electrical circuits are.

[19] And if we could see 154, please. [20] Now, we saw this during Dr. [21] Howard's testimony. And you heard from [22] Dr. Schlam that he was asked during his [23] deposition, and he did agree that the schematic [24] on the upper left was an accurate schematic of

---

**Page 2108**

[1] the mask file depiction on the lower part of the [2] page there on the left.

[3] And he also agreed that those two [4] schematics, this schematic on the right being [5] the schematic of the mask file from the right, [6] that those were elec-trically equivalent.

[7] And is it possible to get [8] Dr. Schlam's figure back up, so we can compare [9] it to this figure on the right?

[10] And you will see that where — [11] when Dr. Schlam drew his figure, it bore [12] remarkable resemblance. In fact, it's

oyalty of 2.2 [10] percent. That doesn't add up, either.

[11] And again, the thing on damages [12] doesn't add up. I believe you get it. When you get back in the jury room, re going [14] to have the documents that have been admitted [15] into evidence.

[16] In my experience, juries do a very [17] good job of looking at the facts. And I'm [18] pretty confident that when you get back there [19] and you look at this, basically we're getting up [20] here and giving you some tools that you can use [21] when you go back in the jury room so hat you [22] can evaluate the evidence, but you are the [23] people who are going to judge the facts. You [24] have such an important job.

Page 2198

[1] It really is your U.S. patent [2] system. And today you have an opportunity to [3] end a good message. You know, if you believe [4] that your U.S. patent system is being misused, [5] you can send that message today. You can tell [6] them no, you can't use our patent system this [7] way. You can't come over to our country and [8] take our patent system and use it n a way that [9] it was never intended to be used.

[10] CPT is doing nothing wrong. When started out with you several weeks I [12] talked about King Street out here and how every [13] day we walk down King Street and nobody asked us [14] to pay them anything or get their permission, or [15] blocks our way, we're free to use King Street. [16] It's in the public domain.

[17] CPT just like I'm guessing many [18] other competitors in the LCD market are using [19] things that are similar to what CPT is using, [20] and they're on King Street. They're just on [21] King Street. And they really are trying to [22] stifle competition by blocking their way. And [23] I'm trusting that you will not do the same [24] thing.

Page 2199

[1] It's really been an honor and a [2] privilege to have a moment to address you, and [3] thank you very much.

[4] MR. BONO: Good morning, ladies [5] and gentlemen.

[6] I know you have heard probably too [7] much about this case already, and I will try to [8] make my remarks as short as I possibly can. But [9] unfortunately in light of certain things counsel [10] for defendants have told you this morning, I [11] to make a few points.

[12] Number one, the only miscarriage [13] of justice that will happen today is if you [14] let them get away from the infringement that we have [15] shown you

by the evidence in this case.

[16] Now, my good friend, Mr. Rhodes, [17] talked to you rather emotionally for the last [18] fifteen minutes, and I understand his emotions. [19] But this case is not about the things he [20] mentioned. He sought to distract you from the [21] core evidence and the core questions that you [22] have to answer, which is did the defendants [23] infringe or not? Not his perception of who is a [24] bully and how the marketplace works.

Page 2200

[1] This case is not about Taiwan that [2] he tells you about. This case is about Chunghwa [3] Picture Tubes' infringement. This case is not [4] about AUO, it's not about CMO. Again, he's [5] trying to distract you from focusing on the [6] facts.

[7] This case is here before you in [8] Delaware. This case is not about what's going [9] on in California. The California case has [10] nothing to do with this case. This case has to [11] do with the '002 patent which is not involved in [12] the California action.

[13] He addressed with you this morning [14] what occurred in 2002. The letters that were [15] repeatedly sent to Chunghwa Picture Tubes, the [16] testimony of Mr. Ho Lee, and he has the audacity [17] to tell you that Mr. Ho Lee is not credible, [18] that what Mr. Ho Lee told you happened at the [19] June meeting supposedly didn't occur.

[20] Did you see any witness brought [21] into this courtroom by Chunghwa Picture Tubes to [22] dispute what Mr. Ho Lee told you? They had [23] every opportunity to bring people who actually [24] attended that meeting to this courtroom and tell

Page 2201

[1] you that they disagreed. They did not. I [2] suspect they didn't because they would have [3] confirmed what Mr. Ho Lee told you.

[4] Mr. Rhodes spoke with you this [5] morning about what happened in 2002 as if he was [6] there, as if he was a witness. There was no [7] testimony at all presented by Chunghwa Picture [8] Tubes about the 2002 letters, what they did at [9] that time, what occurred at the meeting, what [10] they understood the notice was.

[11] The Judge will instruct you [12] nothing that counsel says is evidence, so [13] nothing Mr. Rhodes told you this morning about [14] 2002 is evidence. And Chunghwa Picture Tubes [15] presented no evidence, no testimony in this [16] Court about what happened at that time. Mr. Ho [17] Lee's testimony stands undisputed.

[18] He does raise this one little [19] issue about Mr. Ho Lee misspoke about the SEL [20] license. That's an irrelevant fact, whether he [21] worked on that agreement totally himself or with [22] his boss. Don't be fooled by that.

[23] If they wanted to dispute Mr. Ho [24] Lee's testimony, they would have brought a

Page 2202

[1] witness. They didn't do it.

[2] Another curious thing is they say [3] Mr. Joo-Sup Kim was in this courtroom and we [4] didn't call him as a witness. They told you [5] that Mr. Youngwoo Cho was in this courtroom and [6] we didn't call him. They told you Mr. Jong Kim [7] was in this courtroom and we didn't call him. [8] They could have called them. They're sitting in [9] this courtroom, all Mr. Rhodes had to say if he [10] wanted to talk to them and cross-examine them, [11] all he had to say was I want to call Mr. Joo-Sup [12] Kim to the stand. They didn't do it.

[13] The thing he also ignores is they [14] took the depositions of each of these three [15] individuals prior to this trial for an entire [16] day each. They asked them everything they [17] wanted to ask them. The problem is there is no [18] testimony favorable to CPT that they would get [19] out of these witnesses. So that is a nonissue.

[20] The only person in this courtroom, [21] the only party who didn't bring witnesses that [22] would have been relevant was Chunghwa Picture [23] Tubes. They brought no witness for the 2002 [24] time period.

Page 2203

[1] He mentioned again they put Belle [2] Chang on the stand. Belle Chang joined CPT in [3] 2004. That's the only witness they brought. If [4] anybody failed to bring witnesses to this trial [5] that had knowledge, it was Chunghwa Picture [6] Tubes. You can draw your own inferences from [7] that.

[8] Let me address now the core of the [9] case which is infringement that Ms. Corbin spoke [10] with you about. I listened very intensely to [11] her comments and the one thing came through in [12] glowing light. Despite all of her arguments, [13] there still remains an undisputed fact, and that [14] fact is that when ESD is present in the arrays [15] during manufacture, the semiconductor material [16] in the diodes by their own admission conducts [17] charge, conducts current to disperse the charge [18] away from the TFTs.

[19] Now, we heard that from the [20] testimony I showed you yesterday. I'm not going [21] to repeat what I told you

July 27, 2006
Case 1:05-cv-00292-JJF    Document 468-4    Filed 10/18/2006    Page 16 of 17
Tatung Company, et al.

[14] Mr. Bono.

[15] MR. BONO: Thank you. [16] Ladies and gentlemen, I promise [17] you, just a [ ] le more minutes.

wanted to show you to remind you [ ] of what the defendants used during the [20] examination of their expert witness. They used [21] this document, and this document and about six [22] or seven others like this.

[23] Now, not only are these not mask [24] files, which are the actual depictions of their

### Page 2211

[1] products, those aren't even schematics. These [2] are nothing more than cartoon figures put [3] together by the lawyers to argue what they think [4] are in the products. And this is what they used [5] with Dr. Howard to get him to render his [6] opinions.

[7] Now, one of their arguments has [8] been repeatedly about the diode saying, it [9] doesn't conduct. Well, Dr. Howard answers that [10] question.

[11] And in his trial testimony, he [12] told you that these diodes do conduct. His [13] answer to a question was, Well, with the [14] electrostatic [15] discharge, when the electrostatic [15] discharge comes, when voltage builds up here, [16] this diode [ ] ns to conduct.

[ ] :t's say it's a positive voltage, [18] so th. positive voltage would be this diode [19] here. This diode begins to conduct through the [20] silicon.

[21] He told you that. The switch goes [22] on, and it conducts.

[23] Yet, they try to tell you this [24] morning, and through this case, that it doesn't.

### Page 2212

[1] It does, and Dr. Howard admitted it.

[2] Now, I would like to just turn [3] very briefly to the issue of validity, because [4] the defendants must be very concerned that [5] you're going to believe and find that they [6] infringe, because they talked so much about [7] validity.

[8] And I think you should start your [9] validity analysis by, again, remembering the [10] words of Dr. Howard himself. And what he told [11] you in his direct testimony in this Court, and I [12] read it to you yesterday.

[13] Ms. Corbin asked him this simple [14] question: So given that, is there anything you [15] find that's actually new or different in the [16] '002 patent that is not i [ ] e prior art?

[ ] d he answered very truthfully, [18] The use of a resistance to couple connected [19] lines in the definition, a specified resistance [20] used to minimize the surge of electric current, [21] that is

not found in the prior art.

[22] I don't understand how they can [23] present a lack of validity case to you in light [24] of that admission.

### Page 2213

[1] But let me show you something that [2] really emphasizes the lengths that they will go [3] to to convince you that even though Dr. Howard [4] told you that that element was new and not found [5] in any prior art. They talked to you about the [6] Kawamura reference. And here is the figure from [7] Kawamura.

[8] And you'll recall that Dr. Howard [9] spoke to you about portions of the wiring being [10] removed by etching. Do you remember that? And [11] he was saying that shows removal.

[12] Well, when you look at the Figure [13] 3 in the Kawamura patent, you see that this is [14] the guard ring. These spots, one, two, [15] three, four, five, six, seven, eight, those are [16] the spots that the written words talk about [17] removal by etching.

[18] And where are those spots? [19] They're not on the guard ring, are they? [20] They're on the interconnection line. The patent [21] is only talking about etching portions of the [22] interconnections. It has nothing whatsoever to [23] do with removing the guard ring, or even etching [24] the guard ring.

### Page 2214

[1] Dr. Howard just tries to read that [2] into it. It is not there. Kawamura has nothing [3] to do with removal of a guard ring. That shows [4] it absolutely and clearly.

[5] And without that element, that is [6] not prior art. That invalidates the patent [7] because the Judge will instruct you that you [8] have to have — every element has to be in a [9] prior art, and the removal requirement is not in [10] Kawamura.

[11] Let's turn to Okawa just for a [12] second. Can you please pull up page seven. And [13] you'll see in his testimony yesterday, [14] Dr. Howard again, he wants to find — oh, he's [15] desperate to find removal of a guard ring [16] because he knows without that, these prior art [17] don't even have the possibility of invalidating [18] this patent, Claim 1.

[19] So what he looks at, and you'll [20] recall his testimony, he referred to the [21] language during the manufacturing process, and [22] based solely on that language, he says, oh, that [23] means — that must mean that there must be a [24] removal after the manufacturing process.

### Page 2215

[1] Yet where he describes the effects [2]

of the invention, it doesn't say anything about [3] removal, it just says that ESD is protected [4] during the manufacturing process.

[5] Well, we all know that an inner [6] guard ring that stays with the product protects [7] against electrostatic discharge during the [8] manufacturing process. There is no statement [9] here or any words of removal. There isn't even [10] a hint. Certainly not clear and convincing [11] evidence that they have to show that this [12] indicates removal.

[13] And what did Dr. Howard say in his [14] trial testimony when asked about this? He says [15] in response to a question:

[16] "QUESTION: But with respect to [17] Figure 2, there is no discussion about removing [18] the guard ring, is there?

[19] "ANSWER: There is no discussion, [20] it's just — it just seems to be implicit in his [21] statements."

[22] I submit to you if that's the [23] basis of his opinion, it certainly is not clear [24] and convincing evidence for the defendants to

### Page 2216

[1] meet their burden. And I submit to you he's [2] pulling the removal requirement out of thin air.

[3] I appreciate your time this [4] morning and I appreciate very much the time and [5] effort you spent listening to this trial. We [6] now turn this case over to your deliberation and [7] your good judgment.

[8] And we ask that you find [9] infringement. We ask that you find inducement [10] of infringement, willful infringement, and that [11] you find the patents valid, and that you return [12] a judgment of $52,447,000, because that's the [13] right and just thing to do in this case.

[14] Thank you very much.

[15] MS. CORBIN: Your Honor, may I [16] have two minutes on validity?

[17] THE COURT: Yes.

[18] MS. CORBIN: I am glad Mr. Bono [19] mentioned that thing about what Dr. Howard said [20] on my questioning during his direct examination. [21] Because Dr. Howard, though plaintiff's counsel [22] would like to paint him otherwise, is very [23] intellectually honest. And what he said is when [24] you understand, under the Court's claim

### Page 2217

[1] construction, what resistance is, a specified [2] resistance, a fixed resistance that is used to [3] minimize the current surge, he did look in the [4] prior art, and he didn't see that.

[5] But that's not what CPT's products [6] do, and this is what I was talking about.

[11] The jury has answered as to Claim [12] 1, yes; as to Claim 8, yes.

[13] **Question 5:** Do you find by a [14] r onderance of the evidence that . has used, sold or offered for sale .ie United States or [16] imported into the United States any infringing [17] CPT LCD product or any completed LCD display [18] that contains an infringing CPT LCD product?

[19] The jury has answered: Yes.

[20] **Question 5B:** Do you find by a [21] preponderance of the evidence that CPT has [22] actively induced anyone to use, sell or offer [23] for sale in the United States or to import into [24] the United States any infringing CPT LCD product

1] or any completed LCD display that contains an [2] infringing CPT LCD pro-duct?

3] The jury has answered: Yes.

[4] **Question 6A:** Do you find by a [5] preponderance of the evidence that Tatung [6] Company has used, sold, or offered for sale in [7] the United States, or imported into the United [8] States any infringing CPT LCD product or any [9] completed LCD display that contains an [10] infringing CPT LCD product?

[1'' The jury has answered: Yes.

uestion 6B: Do you find by a [13] onderance of the evidence that Tatung [14] Company has actively induced anyone to use, [15] sell, or offer for sale in the United States, or [16] to import into the United States any infringing [17] CPT LCD product or any completed LCD display [18] that contains an infringing CPT LCD product?

19] The jury has answered: Yes.

[20] **Question 7:** Do you find by a [21] preponderance of the evidence that Tatung [22] Company of America has used, sold, or offered [23] for sale in the United States, or imported into [24] the United States any infringing CPT LCD product

[1] or any completed LCD display that contains an [2] infringing CPT LCD pro-duct?

[3] The jury has answered: Yes.

4] **Question 7B:** Do you find by a [5] preponderance of the evidence that Tatung [6] Company of America has actively induced anyone [7] to use, sell, or offer for sale in the United [8] States, or to import into the United States any [9] ging CPT LCD product or any c leted LCD [10] display that contains an infringing CPT LCD [11] product?

12] The jury has answered: Yes.

[13] **Question 8A:** Do you find by a [14]

preponderance of the evidence that ViewSonic [15] Corporation has used, sold, or offered for sale [16] in the United States, or imported into the [17] United States any infringing CPT LCD product, [18] or any completed LCD display that contains an [19] infringing CPT LCD product?

[20] The jury has answered: Yes.

[21] **Question 8B:** Do you find by a [22] preponderance of the evidence that ViewSonic [23] Corporation has actively induced anyone to use, [24] sell, or offer for sale in the United States, or

[1] to import into the United States any infringing [2] CPT LCD product or any completed LCD display [3] that contains an infringing CPT LCD product?

[4] The jury has answered: Yes.

[5] **Question 9:** Do you find by clear [6] and convincing evidence that any defendant's [7] infringement of the claims of the '002 patent [8] was willful?

[9] The jury with regard to Chunghwa [10] Picture Tubes has answered: Yes.

[11] With regard to Tatung Company, the [12] jury has answered: Yes.

[13] With regard to Tatung Company of a [14] America, the jury has answered: Yes.

[15] With regard to ViewSonic [16] Corporation, the jury has answered: Yes.

[17] **Question 10:** Do you find that [18] defendants have proven by clear and convincing [19] evidence that Claim 1 of the '002 patent is [20] invalid by anticipation?

[21] The jury has answered: No.

[22] **Question 11:** Do you find that [23] defendants have proven by clear and convincing [24] evidence that Claim 8 of the '002 patent is

[1] invalid for obviousness?

[2] The jury has answered: No.

[3] **Question 12:** On what date do you [4] find that LPL first provided CPT with effective [5] notice that CPT allegedly infringed the '002 [6] patent?

[7] The jury has answered: 02-27-02.

[8] **Question 13:** What sum of money [9] would fairly and adequately compensate LPL for [10] infringement?

[11] The jury has answered $52,477,000.
[12] All right. Are there any [13] applications on either side?

[14] Not for plaintiff?

[15] MR. BONO: No, none, Your Honor.

[16] THE COURT: Do you want the jury [17] polled?

[18] MR. RHODES: Yes, we would like [19] the jury polled.

[20] THE COURT: All right. Members of [21] the jury, when a party request upon the reading [22] of the verdict that the jury be polled, [23] essentially what they're asking is that the [24] Court inquire of each individual juror if it's

[1] your verdict personally, in other words, [2] individually have you voted for this verdict and [3] agreed with it as announced in court.

[4] So Juror Number 1, the verdict [5] that's been read in open court, is that your [6] verdict?

[7] JUROR NO. 1: Yes.

[8] THE COURT: Juror Number 2, is the [9] verdict that's been read in open court your [10] verdict?

[11] JUROR NO. 2: Yes.

[12] THE COURT: Juror Number 3, is the [13] verdict that's been read in open court your [14] verdict?

[15] JUROR NO. 3: Yes.

[16] THE COURT: Juror Number 4, is the [17] verdict that's been read in open court your [18] verdict?

[19] JUROR NO. 4: Yes.

[20] THE COURT: Juror Number 5, is [21] that verdict that's been read in open court your [22] verdict?

[23] JUROR NO. 5: Yes.

[24] THE COURT: Juror Number 6, is the

[1] verdict that's been read in open court your [2] verdict?

[3] JUROR NO. 6: Yes.

[4] THE COURT: Juror Number 7, is the [5] verdict that's been read in open court your [6] verdict?

[7] JUROR NO. 7: Yes.

[8] THE COURT: And I'll go to Juror [9] Number 8. Juror Number 8, is that verdict [10] that's been read in open court your verdict?

[11] JUROR NO. 8: Yes.

[12] THE COURT: Thank you. [13] Juror Number 9, is the verdict [14] that's been read in open court your verdict?

[15] JUROR NO. 9: Yes.

[16] THE COURT: All right. The jury [17] has been individually polled and all jurors have [18] indicated that the verdict is their individual [19] verdict.

[20] Members of the jury, on behalf of [21] myself as well as the parties and their [22] attorneys, I want to thank you for your service [23] in this case. It was an extended complex trial [24] and we appreciate your patience and your

[1] service.