# EXHIBIT A

[15] Q: And would the yield rate increase [16] by using an inner ESD guard ring?

[17] A: To compare to what when you say [18] "increase"?

[19] Q: Let's say no guard ring.

[20] A: Yes.

[21] Q: And would the field rate increase [22] if two guard rings were used?

[23] A: Should be.

[24] Q: Can you estimate how much would

---

Page 583

[1] the increase be?

[2] A: Cannot.

[3] Q: Is there any way that CPT could [4] tell what the increase in yield rate would be [5] from the use of guard rings?

[6] A: To my personal knowledge, I do not [7] know, but for sure it would increase.

[8] Q: Even though CPT knows that there [9] would be an increase in the yield rate from the [10] use of the guard ring, CPT doesn't know the [11] exact rate of the increase; is that correct.

[12] A: It can be put that way.

[13] Q: Can you describe the grinding [14] process to me.

[15] A: Grinding at the edges and shaping [16] at the corners there's a machine to remove the [17] outer short ring — oh, using the whetstone.

[18] Q: Is the entire outer guard ring [19] removed?

[20] A: Yes.

[21] Q: What would happen — well, is [22] there an inspection to determine whether the [23] entire outer guard ring has been removed?

[24] A: Yes.

---

Page 584

[1] Q: And what would happen if the [2] inspection revealed that a portion of the outer [3] guard ring remained?

[4] A: To regrind it.

[5] (End of videotape testimony.)

[6] MR. BONO: Your Honor, plaintiff [7] would now like to call Mr. Ho Lee as its next [8] witness. I'll get Mr. Lee.

[9] THE CLERK: Please state and spell [10] your full name for the record.

[11] THE WITNESS: My name is Ho Lee. [12] H-O, L-E-E.

[14] HO LEE, [15] the deponent herein, having first [16] been duly affirmed on oath, was [17] examined and testified as follows:

[18] THE CLERK: Could I have the [19] interpreters stand up, please. Please state and [20] spell your full names for the record.

---

[21] THE INTERPRETER: Chol W. Kim, [22] C-H-O-L, W, K-I-M, certified court interpreter.

[23] THE INTERPRETER: My name is Ann [24] Park, last name is spelled P-A-R-K. I'm also a

---

Page 585

[1] certified court interpreter.

[2] (Chol W. Kim and Ann Park were [3] both sworn by the clerk as court interpreters.)

[4] MR. BONO: Your Honor, would you [5] like a set of the exhibit notebooks for Your [6] Honor's use?

[7] THE COURT: You can hand them to [8] my law clerk, please.

[9] DIRECT EXAMINATION.

[10] BY MR. BONO:

[11] Q: Mr. Lee, good morning. Would you [12] please introduce yourself to the members of the [13] jury.

[14] A: My name is Ho Lee. I started [15] working for LG Electronics in 1983. For eleven [16] years starting from 1983 until 1993, I have [17] worked as a LCD engineer.

[18] Q: Mr. Lee, let me ask you this [19] question at this point. By whom are you [20] presently employed?

[21] A: Presently I am working for LG [22] Electronics.

[23] Q: What is your current position?

[24] A: I am the manager of IP.

---

Page 586

[1] Q: And how long have you had that [2] position?

[3] A: From 2002 until now. From 2005 [4] until now.

[5] Q: Prior to the current position that [6] you hold, what was your previous position?

[7] A: From 1994 until 2004, I have [8] worked at LG Philips as an IP manager.

[9] Q: Let me correct it. Did you begin [10] your employment with LG Philips in 1999?

[11] A: I'm sorry, counsel. You are [12] correct. From '90 — 1994 until 1999, I [13] was the IP manager for LG Electronics.

[14] Q: And starting in 1999, did you [15] become employed with LG Philips?

[16] MR. RHODES: Objection; leading.

[17] THE COURT: Objection is [18] overruled.

[19] THE WITNESS: Yes. That is correct. [20] We, that is, the LG Electronics, with Philips in [21] Netherlands established LG Philips in 1999. [22] That's when.

[23] So although this exactly same [24] work, the name was changed from LG

---

Electronics

Page 587

[1] to LG Philips in 1999.

[2] Q: Now, I'd like to talk a little bit [3] about LG Philips —

[4] THE INTERPRETER: If I may, [5] interpreter would like to correct the last [6] witness statement as it has been. It was [7] changed to LG Philips, LCD.

[9] BY MR. BONO:

[10] Q: Mr. Lee, I would like you to tell [11] the jury about what LG Philips produces and a [12] little bit about the company LG Philips?

[13] MR. RHODES: Objection. I think [14] this is cumulative evidence that was covered [15] yesterday, Your Honor.

[16] THE COURT: All right I'll [17] overrule the answer. You can ask the question.

[18] MR. BONO: Yes.

[19] THE WITNESS: As you can see here, [20] from 2002 until 2005, we have received customer [21] satisfaction award.

[22] Especially the Organization Code [23] Display Research is one of the most well-known [24] research organizations in LCD business. One of

---

Page 588

[1] the most fair organizations in LCD business.

[2] I'm meaning to say display [3] research. Display research.

[4] THE COURT: Mr. Bono, could I see [5] you for a minute?

[6] (Beginning of conference held at [7] side-bar.)

[8] THE COURT: This portion of the [9] trial is not sealed; correct?

[10] MR. BONO: Oh, I'm sorry. I [11] forgot to mention.

[12] We spoke this morning and none of [13] the testimony this morning is of a confidential [14] nature, so we agreed on that. I'm sorry I [15] didn't say that before.

[16] THE COURT: We just have some [17] people outside that want to come back in.

[18] MR. BONO: Oh, yes.

[19] MR. RHODES: No problem.

[20] MR. BONO: I forgot to mention it.

[21] THE COURT: No problem.

[22] MR. BONO: Thank you, Your Honor.

[23] (Conclusion of conference held at [24] side-bar.)

---

Page 589

[1] BY MR. BONO:

[2] Q: Has LG Philips received any [3] technology awards?

[4] A: Yes. If you could look at the [5]

**LG Philips LCD Co., LTD    v.**
**Tatung Company, et al.**

bottom of the display, there was an [6] award from [6] SID, which is the largest technology association [7] in this business.

[8] As acknowledged by this [9] association in 2003, we have developed a copper [10] bus line technology for the first time in the [11] world.

[12] Additionally, in 2004, we have [13] developed the most superior HDTV 55-inch LCD [14] screen.

[15] So presently you'd be able to buy [16] 47-inch LCD TV from Best Buy store. I can say [17] that from next year, you should be able to buy [18] 55-inch LCD HDTV from Best Buy store.

[19] Q: Now, Mr. Lee, has LG Philips [20] produced a number of products that were first to [21] reach the market?

[22] A: Yes. As you can see in this [23] display, in 1997 we have first developed [24] 14.1-inch display for the notebook.

_____
Page 590

[1] And the 18-inch display, as most [2] of the computer displays are now, was developed [3] almost first — for the first time by us in [4] 1998.

[5] Additionally, the — the products [6] like 22-inch TV, 42-inch TV or 55-inch TV, all [7] these products have been developed by us almost [8] on early basis.

[9] Q: Now, Mr. Lee, in order to develop [10] and produce those products for consumers to [11] purchase, has LG Philips invested in research [12] and development in order to improve and market [13] those products?

[14] A: Yes, absolutely. In order to [15] provide better products at a better price to the [16] consumers, we are investing a lot of resources [17] into R & D. Presently we have about 2,000 [18] engineers working in R & D, and the amount that [19] we have invested in R & D from 2002 to 2005 [20] reached about one billion dollars.

[21] Q: Now, Mr. Lee, let me now go to [22] your first employment with LG Electronics. When [23] did you first start working with LG Electronics?

[24] A: I began in 1983.

_____
Page 591

[1] Q: And what was your first position [2] with LG Electronics?

[3] A: From 1983 until 1993, I worked as [4] an LCD engineer.

[5] Q: Now, where, in what location did [6] you work at that time?

[7] A: That was at a factory in Gumi, [8] spelled G-U-M-I.

[9] Q: And did LGE at that time, is that [10] where they first started producing liquid [11] crystal displays?

[12] A: That is correct.

[13] Q: Prior to starting your employment [14] with LG Electronics, could you tell the jury [15] your education background.

[16] A: Yes. I was admitted into [17] Engineering College of Seoul National University [18] in 1974. I'm sorry, it was 1975. From that [19] university I majored in material engineering and [20] awarded a bachelors degree from the same [21] university.

[22] Q: And in what year did you receive [23] your bachelors degree?

[24] A: In 1979.

_____
Page 592

[1] Q: And do you have any postgraduate [2] degrees?

[3] A: Yes. From 2001 until 2002, I [4] completed MBA course at Helsinki University.

[5] Q: Now, after graduating and getting [6] your material engineering degree and prior to [7] starting at LG Electronics in 1983, what did you [8] do?

[9] A: I served — I served in military [10] service, in Korean military from 1980 until [11] 1982.

[12] Q: Now, during the time period 1983 [13] to 1993 when you were an LCD engineer at LG [14] Electronics, can you explain what your duties [15] and responsibilities were?

[16] A: At that time I designed LCD and as [17] the LCD technology was being developed on an [18] almost yearly basis, I need to keep up [19] developing. Also, I might add that the most [20] important aspect of LCD technology is yield, so [21] I worked to develop the process that could raise [22] the yield rate.

[23] Q: Now, what were the — in [24] connection with developing the LCD business for

_____
Page 593

[1] LGE, what types of things were you involved with [2] and responsible for?

[3] A: Well, I worked in LCD area from [4] the very beginning and at that time there were [5] not that many LCD engineers around, so I did [6] almost every aspect of that technology.

[7] If I may explain briefly, LCD has [8] two glasses and in between those two glasses [9] liquid crystals is injected.

[10] So one of the important matter is [11] that selecting what type of liquid crystal that [12] we would put in between the glasses and also in [13] order to align those liquid crystals that [14] technology of aligning the crystal is very [15] important. Through a process that we call [16] robbing, we align those crystals in orderly [17] manner.

[18] So I was involved in selecting the [19]

liquid crystal and developing also LCD displays, [20] and one of the most important aspect is how to [21] improve the imagine on the screen.

[22] Q: Now, are you finished? [23] Were you involved in setting up [24] the fab at Gumi to produce the LCD displays?

_____
Page 594

[1] A: Yes, I was. So as I have just [2] explained, those equipment that performs robbing [3] on the glass as well as the machineries and [4] equipment that inject liquid crystal in between [5] the glasses, selecting those —- I was involved [6] in selecting those.

[7] Additionally, LCD process is [8] similar to a semiconductor manufacturing process [9] in that the cleaning, the fight against dirt, [10] maintaining cleanliness is one of the most [11] important aspect of the technology.

[12] Q: Now, in addition to selecting the [13] machinery that was used at the fab at that time, [14] did you personally design some TFT arrays for [15] LGE?

[16] MR. RHODES: Objection. Leading.

[17] THE COURT: The objection is [18] sustained.

[19] BY MR. BONO:

[20] Q: Did you have any involvement in [21] designing TFT arrays for LG Electronics?

[22] A: Yes, of course. Although I cannot [23] be precise regarding the number of products, I [24] believe I have personally designed about five to

_____
Page 595

[1] ten different products.

[2] Q: Mr. Lee, I am showing now Exhibit [3] 1, which is the '002 patent.

[4] My question is: When did you [5] first become aware of the '002 patent?

[6] A: It was in around 1992. At that [7] time in manufacturing LCD, the greatest purpose, [8] the greatest objective that we had was raising [9] the yield rate, because at that time due to [10] various problems, it was very difficult to make [11] large size display.

[12] MR. RHODES: Your Honor, I'm going [13] to object to the narrative testimony.

[14] THE COURT: All right. The [15] objection will be overruled.

[16] THE WITNESS: As we have shown at [17] the very first presentation, depending on the [18] display, there are approximately 800,000 to over [19] four million TFT on any single LCD display. And [20] having them — having those great numbers of TFT [21] survive for the processes were very difficult as [22] that time period in early 1990. One of the [23] greatest problems among those various issues [24] were — was ESD problem.

# EXHIBIT B

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                        - - -

4   L.G. PHILIPS LCD CO., Ltd        :     CIVIL ACTION
                                     :
5                                    :
            Plaintiff                :
6                                    :
            vs.                      :
7                                    :
    TATUNG                           :
8                                    :
            Defendant               :     NO. 05-292 (JJF)
9
                              - - -
10
                                     Wilmington, Delaware
11                                   December 8, 2005
                                     1:30 o'clock, p.m.
12                                   Scheduling Conference

13                        - - -

14  BEFORE:  HONORABLE JOSEPH J. FARNAN, JR., U.S.D.C.J.

15                        - - -

16  APPEARANCES:

17          THE BAYARD FIRM
            BY:  RICHARD D. KIRK ESQ. and
18               ASHLEY STITZER, ESQ.

19                  -and-

20          McKENNA LONG & ALDRIDGE LLP
            BY:  GASPARE J. BONO, ESQ.,
21               MATTHEW T. BAILEY.
                 (Washington, DC)
22
                      Counsel for Plaintiff
23

24                                   Leonard A. Dibbs
                                     Official Court Reporter
25

2

APPEARANCES (Continued):
                    RICHARDS, LAYTON & FINGER
                 BY:   ROBERT W. WHETZEL, ESQ and
                       MATTHEW W. KING, ESQ

                            and
                 HOWREY LLP
                 BY:   CHRISTINE A. DUDZIK, ESQ and
                       GLENN W. RHODES, ESQ
                       (Chicago, IL)

                       (Counsel for Defendants)

                    P R O C E E D I N G S

          (Proceedings commenced at 1:34 p.m., and the
following occurred.)


          THE COURT:  All right.  Good afternoon.

          Be seated, please.

          We're here for the scheduling conference in the

case of 05-292, L.G. Philips vs. Tatung.

          I received your proposed order.  If you want to

announce your appearances, let's do that now.

          MR. KIRK:  Good afternoon, your Honor, Richard

Kirk from The Bayard Firm for the plaintiff.

          With me is my colleague from The Bayard Firm,

Ashley Stitzer.  My colleague from the Washington law firm of

McKenna Long & Aldridge, Gaspare Bono, who will be our

spokesman today.

          MR. WHETZEL:  For the defendants and with me

today is Matthew King of Richards, Layton & Finger.

3

1          With me also is trial counsel in the case,

2     Christine Dudzik, from the Howrey firm out of Chicago.

3          THE COURT: Good afternoon.

4          THE COURT:  All right.

5          All the dates that you have suggested are fine

6     with me.  We have the trial starting on July 17th.

7          I don't know if this was on when we talked last

8     time, but there's a bench trial that is on for a couple days

9     that week.  I'll either move it or somehow accommodate it if

10    it doesn't resolve, then we can start on Monday the 17th.

11         The other important date is your Markman hearing

12    that you have scheduled for March 6th, 2006.

13         And then a little unrelated to that date is your

14    expert reports by March 31st, which means that there will be

15    the hearing and then a decision.

16         I guess once your experts get that instruction,

17    which I can get them within a week or so, that will be pretty

18    close to being able to comply with the March 31st date.

19         If it has to be extended by a few days, that's

20    okay, too.

21         When I looked at the order everything was fine.

22    The only thing that I was going to talk with you about of

23    adding from my perspective was the -- you have February 3rd,

24    I think.  Where did I see that?  I saw February 3rd

25    somewhere.

4

1          MR. BONO:  Paragraph 3A, your Honor.

2          THE COURT:  3A.

3          You have -- Oh, there it is after your completion

4    of fact witnesses and document production, identification

5    of.

6          What I was going to suggest, although, I don't

7    think this is going to be necessary, but out of an abundance

8    of caution and rather than have you at least until that point

9    be concerned about a discovery dispute, just give you a

10   hearing, time and date.

11         Today is like the 8th.  A month would be like

12   January 8th.  If you are having trouble you'll be -- you'll

13   reconcilably be broken by that time and so maybe have you

14   come over, if you have a need to get some things resolved

15   sometime during the week of the 9th or 16th of January.

16         MS. DUDZIK:  Fine, I like that.

17         That is a good idea, instead of waiting.

18         THE COURT:  As you go along, fine.

19         If you are not going along, you'll know.  You

20   won't have to file something and wait for time.  It will all

21   come to a head in mid-January.  It's always about documents

22   where you fight, not depositions.

23         What's good for you, the week of the 9th or week

24   of the 16th?

25         MR. BONO:  The week of the 9th would work for

1    me.  The 16th, I have some problems.

2              I'm flexible the entire week of the 9th,

3    actually.

4              THE COURT:  So you want to come like a

5    Wednesday?  I know you're not from Wilmington.

6              Where do you come from?

7              MR. BONO:  I come up from Washington.

8              MS. DUDZIK: Chicago.

9              THE COURT:  You are the problem.

10             How about if we schedule it for 2:00 o'clock,

11   which allows you to fly in with all the problems having to

12   come from Chicago and still get out by eight or nine o'clock

13   at night?

14             MS. DUDZIK:  Yes.

15             THE COURT:  Washington, you can catch a ride with

16   the President.

17             Anybody coming up 95, you're in good shape.

18             I'll put it on for 2:00 o'clock, Wednesday, the

19   11th.

20             It would be helpful since I don't want to tie up

21   your associates on New Year's weekend, if they could prepare

22   something that you're disputing and get it here by close of

23   Monday the 9th.  That gives them that weekend after they

24   recuperate to work on that document and get it here by the

25   close of business on the 9th.

1          I'll read it and talk to you on the 11th to see

2    what your problems are.

3          Some disputes seem to keep coming up.  In the

4    document production dispute, it's helpful in your request

5    that you make it real clear what issue you want the documents

6    for and why you think those documents pertain.

7          Okay.

8          I think that's all I saw.

9          Anything on behalf of plaintiff?

10         MR. BONO:  I have one issue that may help cut

11   through the document production since we're on an expedited

12   schedule.

13         I haven't had a chance to talk to opposing

14   counsel about this.  I apologize.

15         There is a case that your Honor I think is

16   familiar with in California.  There's a dispute going on

17   between most if not all the same parties.

18         There has been a lot of discovery produced in

19   that case.  There's a Protective Order entered in that case,

20   which means documents exchanged between the parties can only

21   be used in that case.

22         Everybody, I thought -- it might be a good idea

23   if we could have a provision that says the documents -- many

24   of them will be the documents that are relevant in this case,

25   involve the same products and some of the same issues, some

1  of the sales information is the same, is that we just have a

2  stipulation that permits the discovery that has been produced

3  in that case to be shared in this case.

4         I'm not suggesting that anybody waive any rights

5  to relevancy or not.  That is something down the road.

6         I don't want to restart the wheel at the

7  beginning in terms of discovery.  I know much of what their

8  is would be helpful in this case.  It's already been produced

9  by both sides.

10         That case is heading for trial at the end of

11  February of next year.  I've done this in other cases where

12  you have similar cases.

13         THE COURT:  That case is going to trial February,

14  2006.

15         MR. BONO:  February 28th in California.

16         As I understand it in that case, the discovery is

17  basically completed.

18         I just want -- I'm suggesting that we provide

19  that the discovery in that case be shared in this case and

20  governed by a similar Protective Order in this case, of

21  course.

22         There won't be any loss of protection, any

23  confidentiality, just the use of that information.

24         MS. DUDZIK:  In principle, I don't dispute that

25  at all.  We can work on that.

1          The only issue I have is the documents that we're

2     going to be needing from the plaintiffs will require document

3     production.  I don't believe some of the documents that we

4     will want to request are not going to be in that production.

5     We can share whatever we can.

6          MR. BONO:  I wasn't suggesting that there be any

7     limitation.

8          Both sides need, in this case, additional

9     documents.

10          I certainly think there are a good number of

11     documents and discovery in that case that can be carried over

12     into this case without having to reinvent the wheel.

13          THE COURT:  With that understanding, it doesn't

14     restrict in any way discovery requests in this case.

15          You'll enter into a stipulation that anything

16     discovered in the California case is considered discovered

17     here pursuant to the same Protective Order.

18          MS. DUDZIK:  We'll work that out, your Honor.

19          THE COURT:  That will hopefully cut it down.

20          MS. DUDZIK:  There was another issue that we

21     haven't talked to counsel yet.

22          If we could -- both of the parties could talk

23     about narrowing our requests for documents.

24          Originally, your Honor had mentioned talking

25     about representative products and representative patent

9

1    claims.

2              THE COURT:  We're definitely doing that in this

3    case.

4              I thought I made that real clear to both sides.

5              If you can agree, good.  If you can't, then I

6    will impose the limits.  It's probably better if you can

7    agree.

8              MS. DUDZIK:  Especially with the products.

9              We can talk and maybe we'll be in a position by

10   what was the next meeting in front of your Honor?

11             THE COURT:  January 11th.

12             MR. BONO:  I've been working on that.  I'm not

13   able to limit the claims today or address particular

14   products.

15             I understand your Honor's suggestion.  I've been

16   giving that a substantial amount of thought.  I'm not in a

17   position to make yet a definitive proposal.

18             THE COURT:  That's good.

19             Work on it and get that on over.  That will

20   direct any knew discovery requests that get contested.

21             I'll need to have that by the time that I have to

22   schedule a discovery dispute conference.

23             We're going to have representative claims and

24   products.

25             Anything else on behalf of the plaintiffs?

10

1          MR. BONO:  The only other issue, your Honor, we

2    haven't addressed, is whether the trial is going to be a jury

3    or nonjury trial.

4          I understand the Court would have greater

5    flexibility if it was a nonjury trial?

6          I suspect the number of trial days needed would

7    be somewhat less if it was nonjury.

8          I haven't had the opportunity to discuss this

9    issue.

10          I think your Honor raised it the last time that

11    we were in front of the Court, that that is something the

12    parties ought to focus on.

13          Perhaps counsel should see if they agree on it

14    one way or the other.  If either party demands a jury trial,

15    that doesn't matter.

16          THE COURT:  I wish I remember what I said.

17          What I was thinking was that I didn't want you to

18    feel that the only way you could get this quick trial date

19    was if you waived your jury trial right.

20          I wanted you to feel comfortable that would be

21    preserved.

22          Remember, I have in my opening letter on cases,

23    if you want to get out of here in nine months or something,

24    and you're willing to waive a jury, we can work faster with

25    you and get that done.

1    In some cases they lend themselves to getting to

2  the Federal Circuit, particularly, more quickly.  That's

3  really where they want to be, whatever the issue in the

4  cases.

5    I'll leave that to you.  I'm okay either way.

6    I get a lot of rest during jury trials.

7    It's like sustained, overruled.  I don't want you

8  to feel compelled one way or another.  I want you to do what

9  your client thinks and you think is in their best interests.

10    I don't really understand the dispute.  It's kind

11  of interesting to me that you have these different disputes.

12    It's like sometimes you'll learn later that

13  somebody was trying to buy the other company.  Sometimes

14  you'll learn it's about the market and nothing to do with the

15  patents.

16    I don't understand what you're fighting about.  I

17  hope it has to do with the claims in the patent.  That's what

18  I'll be presiding over mostly.

19    The other side of that is you shouldn't be

20  ashamed to tell me what the real fight is and then suggest

21  things that might help you get closer to having it out or

22  resolved, depending on what I can do for you procedurally.

23    I offer you that broad opportunity to take up

24  what you want.

25    You're thinking now though about a jury trial,

1    right?

2            MR. BONO:  Yes, your Honor.

3            I've also be thinking about the possibility of a

4    nonjury trial.

5            That's why I raised the issue.  You had raised

6    that subject last time around.

7            THE COURT:  Sure.

8            The defendant is thinking about a jury trial.

9            MS. DUDZIK:  Right.

10           THE COURT:  You want confusion, I understand.

11   It's okay to say it.

12           You would be surprised, I'm sometimes much more

13   confused.  You can really screw up my records and get

14   yourself to the Court of Appeals.

15           I'm really open to whatever you want to do.

16           What I want to do is make sure that I've offered

17   you this and you accepted it.

18           We're going to trial in July.  That's the one

19   thing that is going to happen here.  Whatever we've got to

20   do, we'll do.

21           I don't want to mislead you in any way.  Nothing

22   is going to stop that from happening.

23           How about defendants?

24           MS. DUDZIK:  There is one issue that I raised

25   earlier with counsel that I just want to bring the Court's

1    attention.

2              We are still interested in streamlining this

3    case.  One of the ways we were contemplating was to

4    potentially file an early Summary Judgement Motion on the

5    on-sale bar.

6              We could do that and get a ruling quickly on

7    that.  We may be able to dispose of one of the patents in the

8    case.

9              That was our thought that potentially by the end

10   of January or so to have a Summary Judgement Motion ready to

11   go on that and inform the Court that we would like to be able

12   to present it early on, to see if that would work.

13            THE COURT:  Are the facts undisputed?

14            MS. DUDZIK:  I think they will be when we get

15   them together.  We'll know -- if there is going to be a big

16   dispute on it, we won't file a Summary Judgement Motion that

17   we don't think we're going to win.  Let's put it that way.

18            From what I've seen so far they are looking

19   pretty promising for us.  I want to alert the Court that that

20   is something that we are contemplating.  It's a way of

21   streamlining the case.

22            THE COURT:  And I have a high regard for true

23   Summary Judgement Motions and have actually been able to

24   dispose of them expeditiously.

25            As experienced practioners though, 98 percent are

1    junk.  They are used to educate the Court, narrow the issues

2    and all sorts of other things.

3            As a practioner from the bench, I give them very

4    little deference unless the parties say, Judge, there are

5    really no facts in dispute.  It will resolve a patent or

6    whatever.  If you tell me that's all in play, I'll bring you

7    in and we can get it out very quickly.

8            It's the ones that don't have those kinds of

9    predicates that can take forever.  If you want to present a

10   true, crisp legal issue only, I'll look at it.

11           MS. DUDZIK:  I think that would be the case.

12           It's an actual sale with a invoice, product and

13   it could be very clean.

14           THE COURT:  She's only playing with you, scare

15   you up a little bit.  They don't have the invoice yet.  They

16   are hoping to get one.

17           You wouldn't bring it unless you had that.

18           MS. DUDZIK:  Exactly.

19           Maybe we could talk about it further on the 9th

20   as to where we are on that.

21           THE COURT:  I'll be there when you tell me that's

22   what you have.  I'll be happy to get you a schedule that will

23   deal with it crisply, if it's crisply presented.

24           One of my areas of expertise is actually on-sale

25   bar.  You have researched that and brought it up.

1    My very first patent case was a case that had

2 been handled by every judge in the district.  The patent had

3 been found to have been infringed.  It was the Cole patent

4 for digital generation.  It had been held invalid on

5 anticipation grounds and then reversed and then brought

6 back.

7    I became a new judge.  I became a judge.  When I

8 became a judge, the case drops from Judge Stapleton to me.

9 And the only thing left -- I'm saying this facetiously,

10 pretty close to nothing facetiously was an on-sale bar to the

11 government.  They decided that since I was new that they

12 would confuse me.

13    It was just when jury trials were starting.  They

14 tried it from the bench.

15    When you've had any patent that has been upheld

16 that many times and held infringed that many times, they

17 start telling me on-sale bar which had never been heard of.

18    Because I had never done any patent law and how

19 you get -- they tried to sell it to the military.  I was so

20 new that I decided that it probably was and found on-sale

21 bar.  There was alleged attorney misconduct in which I didn't

22 find.

23    I always thought that.  The point of the whole

24 story is that's a hard thing to prove unless you've got the

25 invoice and delivery, otherwise it's always some other

1    explanation.

2           With that little bit of background and letting

3    you know that I'm an expert.  I'll be anxious to see the

4    motion.  RCA versus Data General is my on-sale bar case.

5           MR. BONO:  I feel compelled.  I don't think it's

6    a legal issue.

7           An on-sale bar defense is highly factual.

8           THE COURT:  That's what -- didn't I just tell her

9    that?

10           MR. BONO:  I feel compelled.

11           THE COURT:  I was trying to be very direct.  If

12    you have all that, it is factual.  That's why I'm an expert.

13    I understand all that.

14           Actually, the best parts of that case, and I hate

15    to tell stories.  This is so good though.

16           I was so new in'85 or'86.

17           '85, it happened in my first year.  It was the

18    first or second patent case.  All these people came to

19    testify.  The guy that started Data General.  Doctor Wang,

20    the guy from Wang computers.  He testified.

21           I was so inexperienced, and we had just had our

22    fifth child.  My wife had decided that it would be a great

23    thing, computers were just coming out and to get him a

24    computer.  Nobody knew what to buy.  PC's were just coming

25    out.  And so after he got done testifying, I said, Doctor

1    Wang, I have a question, but nothing to do with the case.  If

2    you had five children, what computer would you buy.  He said

3    what are their ages, Judge.

4            One computer, Apple 2E, all the educational

5    stuff.  It was a great piece of advise.  I went down to the

6    computer store on Kirkwood Highway.  I lived there at the

7    time.  When I walked in those days everybody wanted to sell

8    you a computer.  I have it on pretty good information that I

9    need to buy an Apple 2E here.

10           It was a real interesting case.

11           All those people that had been in the early

12   computer stuff had come to testify.  That means when he first

13   decided that this wasn't going to be a bad judgeship.  I

14   learned -- I had a guy who invented -- kind of invented the

15   laser on a CD.  It was the Time Warner case.  He came to

16   testify.  He sold all his rights, eighty or ninety, something

17   very small.

18           He came to testify.  He said I'm a man of

19   science.  He wanted to show records better.  It used the

20   bottom beam.  He put the laser on the disk spinning.  When

21   you heard him talking about it, it was fascinating.

22           I mean, if you have something good like that,

23   fine, otherwise, I sleep for the weekend.

24           Okay.

25           The serious thing is you did a lot of good work.

18

1    We have a nice discovery dispute date in place.

2                    You have discovery from the other cases?

3                    Is there anything else that we should talk

4    about?

5                    MR. BONO:  Nothing from us.

6                    MS. DUDZIK:  We're okay.

7                    THE COURT:  Okay.

8                    We'll see you then the next time, which will be

9    in January.

10                    We'll be on our way.

11                    Court stands in recess.

12                    (Proceedings concluded at 2:12 o'clock p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT C

**LG Philips LCD Co., LTD**
**Tatung Company, et al.**

1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG. PHILIPS LCD CO. LTD., :
    Plaintiff, :
    : Civil Action
    : No. 05-292
v. :
TATUNG COMPANY, TATUNG COMPANY OF :
AMERICA, INC., CHUNGHWA PICTURE :
TUBES LTD., and VIEWSONIC :
CORPORATION, :
    Defendants :
    Wednesday, February 8, 2006
    12:30 p.m.
    Courtroom 4B
    844 King Street
    Wilmington, Delaware

BEFORE: THE HONORABLE JOSEPH J. FARNAN, JR
    United States District Court Judge

APPEARANCES:
    THE BAYARD FIRM
    BY: RICHARD D. KIRK, ESQ
        -and-
    McKENNA LONG & ALDRIDGE
    BY: GASPARE J. BONO, ESQ
    BY: CASS W. CHRISTENSON, ESQ
        Counsel for the Plaintiff
2
APPEARANCES CONTINUED:
    RICHARDS, LAYTON & FINGER
    BY: MATTHEW W. KING, ESQ
        -and-
    HOWREY, LLP
    BY: JULIE S. GABLER, ESQ
    BY: J. JAMES LI, ESQ
        Counsel for the Defendant
3

[1] THE COURT: All right. Be seated, [2] please. You can step up.

[3] Okay. Do you want to announce [4] your appearance so the court reporter can get [5] them down.

[6] MR. KIRK: Good afternoon, Your [7] Honor. Richard Kirk from The Bayard Firm for [8] the plaintiff, LG. Philips LCD Company, Limited.

[9] With me today from the firm of [10] McKenna, Long & Aldridge in Washington are [11] Gaspare Bono and Cass Christenson.

[12] THE COURT: Good afternoon.

[13] MR. KING: Good afternoon, Your [14] Honor. Matt King with Richards, Layton & Finger [15] on behalf of the defendants. With me here today [16] from the Howrey firm are Julie Gabler and James [17] Li.

[18] THE COURT: Good afternoon.

[19] MR. KING: Your Honor, [20] unfortunately Christine Dudsac who is —

[21] THE COURT: I heard. Do you see [22] this thing over here, we don't have it working [23] correctly, I think partially because of the [24] white noise thing they installed, so I

Page 4

[1] apologize, we can't really do it well. [2] Hopefully we'll be technologically advanced in [3] about another sixty days.

[4] MS. GABLER: We should be fine. [5] And Christine obviously apologizes. There was [6] that issue with the UPS fire

at the Philadelphia [7] Airport this morning that caused her to be [8] unable to come in.

[9] THE COURT: I was reading that [10] during my trial on the AOL news, they showed a [11] picture of the fire of the cargo plane, right?

[12] MS. GABLER: Yes.

[13] THE COURT: It was amazing. Thank [14] you and welcome and thank you, Mr. King.

[15] All right. I took a look at your [16] letters and just a couple of notes that I made [17] that I thought if I address might be helpful. [18] The first item is that we have a July 17, 2006 [19] trial date, and which we will not lose or pass [20] or modify, or extend, shorten, it's July 17.

[21] If you look at the calendar, I [22] don't know if you're allowed to see those [23] anymore, but there is another bench trial [24] scheduled, but don't pay attention to that

Page 5

[1] because that's going to go later or earlier or [2] away, so you are the only trial in July, whether [3] it's a bench trial, a jury trial, it really [4] doesn't matter to me.

[5] So that brings me to my concern, [6] which I see that you have gotten a lot of the [7] matters resolved, but as is typical in these [8] type of cases, there is a little bit of tension [9] not between you, but with the kind of work you [10] have to get accomplished in the time frame, so [11] it looks to me like we've missed the early [12] February — what was it, February 3rd?

[13] MS. GABLER: Yes.

[14] THE COURT: To complete document [15] production, which is not a good thing in my [16] world.

[17] MS. GABLER: The defendants have [18] met the date, Your Honor. We completed our [19] production on Friday.

[20] THE COURT: Right. But if we all [21] don't meet it —

[22] MS. GABLER: Right, then we all [23] have a problem, yes.

[24] THE COURT: Exactly, we all have a

Page 6

[1] problem. So the first thing I want to address [2] is when you have a July 17th trial date, and I [3] understand all the translation issues and the [4] review issues and that we have to get, before we [5] go any further, all document production [6] resolved. And I know there is some implications [7] of interrogatory answers as it may pertain to, [8] you know, hopefully scheduled depositions, but [9] we really got to find out what is the drop dead [10] date because in this case with that July 17th [11] date, any doc-

ument found that should have been [12] produced is going to cost a lot of money for the [13] party that finds it. And any document that goes [14] against the party, any document found that helps [15] a party won't help you once we get by the drop [16] dead date. So this is an important matter which [17] I guess I need to hear from plaintiff on.

[18] MR. BONO: Yes, Your Honor.

[19] THE COURT: You can do it from [20] there.

[21] MR. BONO: Very well, Your Honor. [22] We appreciate the significance of the timing [23] here and we have worked very, very hard to try [24] to meet — I would like to meet the deadline. I

Page 7

[1] would like to say — we don't believe the [2] defendants have completed their document [3] production. We have done an initial review and [4] there are some items that appear to be deficient [5] which we would like to raise with the Court, so [6] although they did make a fairly large production [7] on Friday, we don't believe it is complete, [8] either.

[9] From our point of view, Your [10] Honor, I would propose the following to see if [11] this is acceptable to the Court. We are in the [12] process of finishing up our document review and [13] getting some few remaining documents, because [14] we have had several discussions with the other side [15] on trying to work out some issues.

[16] We will be prepared to produce [17] additional documents this Friday. We anticipate [18] being — producing some additional documents on [19] Monday, and we believe we can complete our [20] document production one week from today, next [21] Wednesday.

[22] And as I said, there are some [23] other issues with the defendants' production [24] which I believe they're going to — which I

Page 8

[1] would like to raise and I believe they're going [2] to need a little bit of time to go back and look [3] at that as well, so we believe we can complete [4] our production by I guess —

[5] THE COURT: So our date is [6] February 15?

[7] MR. BONO: Yes, Your Honor, if [8] that's all right with the Court.

[9] THE COURT: You know, I take the [10] view, my life isn't that stressful, believe it [11] or not. I mean, there is a lot of work here, [12] managing 300 and some cases, but I always feel [13] empathy for lawyers. So, you know, if you told [14] me February 22nd was your date, as long as it's [15] the date that you're going to drop dead on

Hearing
February 8, 2006

LG Philips LCD Co., LTD   v.
Tatung Company, et al.

[16] document production and you understand all the [17] consequences on both sides, that's okay.

[18] So you feel real comfortable with [19] February 15th, and I tell you what we are going [20] to do with your concern about their deficient [21] production.

[22] MR. BONO: I would feel more [23] comfortable with next Friday, but I think I can [24] meet Wednesday.

_____

Page 9

[1] THE COURT: We'll make it next [2] Friday. Actually you know what we'll do, we'll [3] give you a weekend to have all those associates [4] in there billing. This is like the bane of [5] their existence, and the thrill of partners [6] existence, Mr. King understands, all that extra [7] cash coming in. It's great, isn't it? So we'll [8] do — so we got Wednesday the 15th, so we have [9] Thursday the 16th, 17th, 18th, the 20th is a [10] federal holiday, so we'll give you that, so they [11] can bill double time if they do that, and we'll [12] make it the 21st of February.

[13] MR. BONO: Your Honor, I [14] appreciate the extra time from the Court. I [15] don't think that should affect — if the [16] defendants are going to talk about —

[17] THE COURT: Hold on a second, I [18] want to get to that problem. I'm going to get [19] you to yelling at each other after February [20] 21st. In other words, you're going to cleanse [21] your soles by February 21st of all that you [22] think you should have produced, you're going to [23] write all those neat letters back and forth [24] about you didn't do this, you didn't do that,

_____

Page 10

[1] we're not happy with that, then I'm going to see [2] you within a week of February 21st about [3] deficiencies.

[4] MR. BONO: That's very well, but [5] Your Honor, before we pick that date, I'm happy [6] with that, I don't want that to be — for the [7] defendants to bootstrap that into an excuse to [8] delay depositions.

[9] THE COURT: Well, it is. They've [10] already gotten that by having to get beyond [11] February 3rd or 2nd or whatever.

[12] MR. BONO: Your Honor, but in the [13] proposals we've exchanged proposed deposition [14] schedules among the parties.

[15] THE COURT: Well, if you agree.

[16] MR. BONO: I just want to say —

[17] THE COURT: It's okay.

[18] MR. BONO: — the way the [19] proposals — we have to have a conference call [20] tomorrow to firm up the schedule, but the [21] proposed dates are we

have offered our witnesses [22] starting March 8th, okay, March 8th, our [23] 30(b)(6) witnesses, and we have a couple of fact [24] witnesses that will also be scheduled right

_____

Page 11

[1] around that time.

[2] They have proposed that we can [3] start taking Tatung Company of America and [4] Viewsonic, which are the U.S. companies which [5] are going to have minimal technical information, [6] they're really only going to have some product [7] information, some sales information, and they [8] have proposed that those depositions start [9] during the weeks of February 21 and 28.

[10] And what I'm suggesting is the [11] completion of our document production which [12] really, really should not affect the scheduling [13] of the beginning of those depositions in those [14] weeks because they're basically U.S. and sales [15] companies.

[16] THE COURT: See, you're making it [17] too complicated for kind of an intellectual [18] deficient person like myself. Let me make it [19] clear to you, I don't care, so start taking [20] depositions as long as you all agree. But if [21] somebody objects, then the way my world works [22] since I manage the case attempting to make your [23] lives less stressful, you got to get beyond the [24] document production problems and then you can

_____

Page 12

[1] have at each other on depositions because what I [2] don't want to hear is in April or May that we [3] got to go back and depose somebody because this [4] just happened or that just happened because in [5] my world, that doesn't happen. In my world, [6] February 21 is when all documents should be [7] produced.

[8] I'm going to give you an [9] expeditious come back to Court, tell me your [10] problems about deficiencies, put everything on a [11] short leash for the further production or the [12] representation that there is no further [13] production, and typically in my world [14] depositions would begin.

[15] If you can get them to agree to [16] start the week of the 28th, that's fine, but if [17] I'm asked to delay depositions because the [18] document production isn't complete, then I do [19] it. Because the way I order things if you don't [20] have all your documents and the drop dead date [21] and all the disputes resolved, how can you go to [22] depositions? I don't know, but sometimes you [23] can.

[24] If you can agree to do that, go

_____

Page 13

[1] ahead and go. But if you can't agree to do [2] that, then it stops. But it doesn't get pushed [3] out until April, it gets pushed out from [4] February 28th to what's it, March 2nd or [5] something.

[6] MR. BONO: I appreciate, Your [7] Honor, under the Court's — I don't want to make [8] it —

[9] THE COURT: Stressful.

[10] MR. BONO: Under the Court's [11] current scheduling order, we have agreed and the [12] Court endorsed it that we would complete [13] 30(b)(6) depositions and fact depositions by [14] March 17th. And so —

[15] THE COURT: I don't mean to [16] interrupt you, but just let me ask this [17] question: What else did you agree to? February [18] 3rd was document production.

[19] MR. BONO: Your Honor, I [20] appreciate that.

[21] THE COURT: Okay.

[22] MR. BONO: If we could work out a [23] situation where that date moves back a week, I'm [24] not arguing about that.

_____

Page 14

[1] THE COURT: I know you're not.

[2] MR. BONO: I really —

[3] THE COURT: I just —

[4] MR. BONO: I'll be happy to work [5] it out.

[6] THE COURT: I just keep trying to [7] bring it back to how I view things. If there is [8] disputes and I have to work them out, because [9] that's the only way I can be consistently — I [10] hate the word — fair, but consistent, let's [11] just say even if I'm unfair, at least I'm [12] consistent, the only way I can do that is if I [13] have a perspective that certain things close, [14] other things begin, unless the parties agree.

[15] But see, you already have gone [16] past, not you personally, if they're deficient, [17] they have gone by it, too, you all have gone by [18] February 3rd, so ultimately you have gone past [19] my world dates.

[20] MR. BONO: I understand, Your [21] Honor.

[22] THE COURT: Okay.

[23] MR. BONO: I understand, and I'll [24] try to work it out with the other side.

_____

Page 15

[1] THE COURT: So you may go by March [2] 17th.

[3] MR. BONO: Very well, I don't have [4] an issue with that per se in working this out.

[5] THE COURT: Okay. Or you can [6] agree.

_____

[7] MS. GABLER: Your Honor, we would [8] prefer to hold the depositions sched- ule, we did [9] exchange dates.

[10] THE COURT: So you ought to be [11] able to make it.

[12] MS. GABLER: Counsel was correct, [13] that was in the process of moving it forward, [14] but it's definitely our posi- tion that we want [15] the document issues resolved before we proceed [16] with depositions.

[17] THE COURT: So the date is [18] Feb- ruary 21st, a Tuesday, by five o'clock, [19] Wilmington, Delaware time when every- thing has to [20] be produced, which means that if there is [21] deficiencies — and these are all documents in [22] the case; right?

[23] MS. GABLER: Yes. Can I flag one [24] issue in this area, Your Honor, before we go on?

Page 16

[1] THE COURT: Sure.

[2] MS. GABLER: It's maybe a point of [3] clarification with counsel. I know you are [4] translating documents right now to determine [5] whether or not certain things are relevant and [6] will be pro- duced, but you intend to produce them [7] as foreign language documents; is that correct?

[8] MR. BONO: Yes.

[9] MS. GABLER: Yes. Okay. So our [10] concern is that if their production is [11] continuing through the 21st, and I have asked [12] Mr. Bono to estimate how many pages or boxes of [13] documents he anticipates adding to his [14] production, currently it's about one-third of a [15] box which they produced, and he told me it was [16] closer to one box than ten boxes and was unable [17] to estimate beyond that, and has represented [18] that a substantial portion of these documents [19] are going to be foreign language documents, so [20] if that, in fact, is the case, we are going to [21] need more than seven or ten days to figure out [22] what we have to know if we have a dispute about [23] what's in their production. [24] They have the bulk of our

Page 17

[1] documents now and to the extent that they think [2] there are deficiencies, whatever additional [3] production we're making would be very small, so [4] basically they have this whole time period to [5] figure out if they have got issues with things [6] that we produced as foreign language documents, [7] but if we're now in a situation where we're [8] only going to have seven days to figure out what's in [9] possibly up to ten boxes of foreign language [10] documents, we'- re probably not going to be able [11] to

identify disputes by the 28th.

[12] MR. BONO: Your Honor, my best [13] estimate at this point is we're talking about a [14] box to a box-and-a-half, not ten boxes.

[15] THE COURT: In Korean?

[16] MR. BONO: I would say probably [17] three quarters of a box to a box would be in [18] Korean, yes. That's my best es- timate at this [19] point.

[20] THE COURT: Three quarters of a [21] box ought to be able to be translated in a week. [22] I have had cases where you had German and [23] Japanese.

[24] MS. GABLER: Right.

Page 18

[1] THE COURT: Actually answering [2] documents and they were able to do it.

[3] MR. BONO: Just so we know, I'm [4] not going to hold off the rest of the production [5] until the 21st, as soon as documents —

[6] THE COURT: As soon as you have [7] them you are going to produce them, you have a [8] drop dead date of the 21st.

[9] MR. BONO: I'm going to produce [10] some of these on a rolling basis as soon as [11] they're ready to be produced, so it will be not [12] be at the 21st when you get all these documents.

[13] MS. GABLER: Well, assuming that [14] that representation holds true and we receive [15] the bulk of them or all of them by the 15th, [16] we're obviously much more likely by the 28th to [17] have gotten them all translated and then [18] reviewed them to know if we have a dispute.

[19] THE COURT: You have to hire more [20] people. I mean, I hate to say that, but if [21] I assume you're already set up for the [22] translation?

[23] MS. GABLER: Yes, we do have an [24] firm, an outside firm.

Page 19

[1] THE COURT: This is just great for [2] the economy.

[3] MS. GABLER: It is. Isn't it [4] fabulous?

[5] THE COURT: I feel like —

[6] MS. GABLER: All of us who didn't [7] learn our parents' native languages are [8] regretting it now.

[9] THE COURT: That's fantastic. I'm [10] trying to learn my thousand words in Italian and [11] my mother and gran- dmother spoke Italian in the [12] house except when we were present. Isn't that [13] something? What were they think- ing.

[14] But anyway, you're going to file [15] your deficiency letters against each other on [16] the 28th and I'm going to see you on the 1st of [17] March, which is a

Wednesday, at 12:30.

[18] Actually, you know what I'll do? [19] I'm in a trial, I'll make it for 12:30. There [20] might be some minor adjustment based on the [21] nature of that trial, but we'll schedule for [22] March the 1st at 12:30 to get your answers on [23] your disputes that will be filed by the close of [24] business on the 28th.

Page 20

[1] MS. GABLER: Your Honor, can we [2] ask for another question?

[3] THE COURT: Sure.

[4] MS. GABLER: There are some [5] third-party subpoenas that have been issued and [6] those productions are pending and for the ones [7] we issued, we're pretty optimistic we are going [8] to get those documents in by the end of February [9] and will produce them. Is that February 21st [10] date going to be considered the drop dead as [11] applied to third parties, also?

[12] THE COURT: All the documents in [13] this case, all the documents in the case are [14] going to be here by February 21st or they're not [15] in the case.

[16] MS. GABLER: Okay.

[17] THE COURT: You know, as lawyers, [18] that whole third-party subpoena thing is a real [19] problem for judges to manage. So I have decided [20] over the last year to just make it part of [21] document production. If you don't get it, you [22] don't get it. Cases are finite pieces of [23] litigation for parties and they ought to be [24] cutoff dates. I mean, I'm sure if we allowed

Page 21

[1] discovery for ten years, there is something out [2] there that we would be able to find.

[3] MS. GABLER: No problem, I just [4] wanted to make sure that we were clear.

[5] THE COURT: We are all clear. Any [6] document that's in this case is the 21st.

[7] MS. GABLER: Okay.

[8] THE COURT: Nothing will be in [9] this case after that. So with all that notice [10] and warning and all the understanding no matter [11] how prejudicial, how beneficial, they just won't [12] be in the case. Everybody should be fully [13] alert.

[14] Now, so when I looked at that, I [15] said if we don't have document pro- duction, these [16] other matters, and a lot of what was in issue [17] had to do with that, the deposition matters I'm [18] just not going to take up yet. I'm just not [19] going to address them because I'm not through [20] the other part.

[21] There are the interrogatories and [22] answers issue. One of the disputes is are [23] interrogatories okay, I guess in the

first [24] instance over a 30(b)(6) response. You know,

---
Page 22

[1] again, in my world, yes, except if they're [2] inadequate.

[3] MR. BONO: Your Honor, let me [4] address that because that was a proposal made by [5] the defendants and as I indicated in the letter [6] to the Court, we would find that amenable and we [7] would agree because they have outlined certain [8] issues, they call contingent issues on the [9] issues of infringement, validity, [10] enforceability, prior art, the defendants have [11] taken the position that they believe they have [12] answered that by way of interrogatory and [13] therefore it should be off limits for 30(b)(6) [14] witnesses. I don't have a problem with that. [15] And we would agree to supplement our [16] interrogatory answers as long as the agreement [17] goes both ways.

[18] THE COURT: See, you have just hit [19] on it. That is the problem, they are able to be [20] supplemented. If you cut off that — if you cut [21] off interrogatories and their answers from [22] exposure to deposition, then you are left with [23] the remedy of supplementation.

[24] Now, if you both agree to that and

---
Page 23

[1] you're never going to come back to me, I'll go [2] along with that, but again, in my view, my [3] world, I have to cut off the management [4] problem of supplements, case management problem of [5] supplements. But if you agree to it, that's [6] okay with me.

[7] MS. GABLER: Our problem now, Your [8] Honor, is that defendants have provided their [9] contingents and prior art references, et cetera, [10] and plaintiff has not, and has not identified [11] which claims are going to be in dispute, has not [12] identified anything about what their disputed [13] terms are, which claims they're asserting, which [14] they're not, they still have not identified any [15] products other than the two listed in the [16] complaint that they even are contending —

[17] THE COURT: But they're saying [18] they're willing to do that; right?

[19] MR. BONO: Your Honor, now counsel [20] has gone on to a related — it's a little [21] different. I guess the initial proposal by the [22] defendants was as far as presenting each side's [23] contentions and positions with respect to these, [24] the issues of infringement, enforceability,

---
Page 24

[1] validity and prior art, they said we can't — [2] they have given us their

interrogatory answers [3] and they object to us taking 30(b)(6) witnesses [4] on those topics.

[5] And in order to try to cooperate [6] and move this case along, streamline [7] depositions, we are amenable to supplementing [8] our interrogatory answers because we had for the [9] most part objected to that, but we will give you [10] our positions and our contentions on those [11] topics like the defendants have done, we will do [12] it in interrogatory answers and then those [13] subjects will be off limits for 30(b)(6) [14] witnesses, because — and if that applies both [15] directions, we're happy to do that.

[16] MS. GABLER: I think as long as [17] we're talking about 30(b)(6) witnesses, yes, I [18] believe the parties are willing to do that, [19] although we are concerned about imposing a time [20] limit.

[21] THE COURT: Contention [22] interrogatories are party related, so obviously [23] they would be covered by 30(b)(6). Now, if [24] you're saying is we would like to ask individual

---
Page 25

[1] witnesses about parties answers to contention [2] interrogatories, that's where you might have a [3] problem.

[4] MR. BONO: Yes, Your Honor.

[5] THE COURT: So you can't do that.

[6] MS. GABLER: I would say there is [7] a category of questions that depending on how [8] we're talking about contentions and prior art, [9] for example, the inventors are all witnesses on [10] their side.

[11] THE COURT: You don't ask them [12] about the interrogatory answer, you can ask them [13] about prior art.

[14] MS. GABLER: But things that might [15] be part of the content of the interrogatory [16] answer, we wouldn't be asking them as phrased, [17] but if there is prior art in there.

[18] THE COURT: If they give you [19] twenty pieces of prior art, you can ask them [20] about prior art, but you can't ask them about [21] the party's answer to the interrogatories and [22] that's what you understand and that's what [23] you're concerned about.

[24] MR. BONO: Exactly.

---
Page 26

[1] THE COURT: I think you have it [2] right, plaintiff has it right, that if it's [3] interrogatories to a party for their [4] contentions, you get them, but you can't [5] examine [5] an individual witness. And you have given up [6] the one area you can do it in, the 30(b)(6) [7] area, because that's the party representative, [8] you have put that all over into interrogatories. [9] Now you'll have individual witnesses in and you [10] can ask them

questions about the subject matter, [11] but not about the specific interrogatory [12] responses.

[13] MS. GABLER: I don't think there [14] is any disagreement with that. There is one [15] other issue, though, with the interrogatories, [16] and that's in many of our interrogatories are [17] styled as what they knew at the time they filed [18] the complaint and, therefore, they have a Rule [19] 11 aspect to them.

[20] THE COURT: Is that still in [21] existence? There is a Rule 11? Come on.

[22] MS. GABLER: There is a Rule 11.

[23] THE COURT: Did you find that? [24] Who did that research? There is somebody that's

---
Page 27

[1] awfully good at your firm.

[2] MS. GABLER: Yes, there you go.

[3] THE COURT: I have been here [4] twenty-one years. I don't remember a Rule 11. [5] I mean, people talked about it years ago. Have [6] you ever been in a case where it actually [7] happened?

[8] MS. GABLER: No, I have not.

[9] THE COURT: There you go. So [10] don't worry about those implications, just get [11] the information so we can get to the trial with [12] the jury. That's the fun of this profession. [13] Have you heard of one?

[14] MR. LI: Yes, we have a claim [15] regarding an exceptional case, but that's [16] exceptional cases.

[17] THE COURT: I have heard [18] exceptional cases, but the Third Circuit doesn't [19] really look at it like everybody else in the [20] world does, but Rule 11 implications, don't [21] worry about those, because that's amazing that [22] rule is still there. Do you remember when that [23] was the hottest thing in the legal community? [24] What was it, about a decade ago?

---
Page 28

[1] MR. BONO: Two decades ago.

[2] THE COURT: That long ago? They [3] actually had us do reports on how many we did [4] and it got so embarrassing because there were [5] none to report that nobody knew what to do, so I [6] thought the rule went away, it floated off into [7] law school library lore or something. But [8] exceptional case, different story, facts on [9] that, that's the kind of information, but Rule [10] 11, don't be too concerned about that.

[11] The rule I found that's good is [12] a motion for a new trial in patent cases when you [13] don't pay attention to the orders of the Court [14] or you have a bad case to begin with and then [15] you try to play around with it at trial, give a [16] new

LG Philips LCD Co., LTD
Tatung Company, et al.

trial and assessing all the costs against [17] the losing party, that motion, that's a great [18] rule, very, very forceful.

[19] So you both understand what your [20] doing with that, and that's what you wanted to [21] get to, so you have a common understanding. [22] It's on the record, I understand it, everybody [23] here today understands it, and I think we can [24] move forward using inter-rogatory technique.

Page 29

[1] Depositions, I'm not going to [2] discuss that because I'm not ready to.

[3] MS. GABLER: Can we get a date on [4] the interrogatories?

[5] THE COURT: Well, I assume you [6] would need it before you started dep-ositions, so [7] I would assume it's going to be sometime around [8] the 21st of February to the 28th.

[9] MR. BONO: The 28th would be fine, [10] Your Honor.

[11] THE COURT: 28th. Because you'll [12] need them to be able to conduct your [13] depositions, so we'll make February 28th the [14] drop dead date on inter-rogatories.

[15] I gave you a date to come here, [16] March 1st. You don't have to use that if you [17] can work things out.

[18] Privilege, in this document [19] pro-duction, you all know, Mr. Kirk and Mr. King [20] can help you if you don't, how we do our [21] privilege logs in this district. It requires [22] you to be detailed. It requires you to have an [23] efficient privilege log.

[24] I'm going to try to shortcut it

Page 30

[1] for you how so we don't have a lot of back and [2] forth between you. If there are questions where [3] you challenge the assertion of a privilege, what [4] I think would be helpful is if each side in the [5] privilege log categorizes the nature of the [6] privilege. So in other words, section one would [7] be attor-ney/client, section two would be work [8] product, you know, whatever you have.

[9] And then if there is a challenge, [10] how I'm going to resolve it is in the categories [11] of the privilege log, sec-tion one or part one, [12] part two, I'll allow the challenging side to [13] make a random selection of a percentage num-ber [14] of documents that I'll review in camera rather [15] quickly and how that turns out will determine [16] how your privilege log — I mean how your [17] privilege assertion is going to fair in this [18] particular piece of litigation.

[19] So do your privilege logs [20] accord-ing to the detail we use here, except [21]

break them out in parts by the nature of the [22] privilege. If you have a dispute, all you have [23] to do, you know, I'm going to hear it in camera, [24] pick out what it is, the part that you think

Page 31

[1] that they have been insincere about and then all [2] I'll need to give you is the number of documents [3] that you're going to require them or I'm going [4] to require them to produce randomly so I can do [5] an in camera review.

[6] Are there any questions, Mr. Kirk [7] or Mr. King? Okay.

[8] And that will get us through I [9] think the bulk of what typically comes up in [10] document issue and get us ready for depositions [11] to start up in March.

[12] MS. GABLER: When do you want the [13] privilege log disputes flagged for Your Honor?

[14] THE COURT: That probably won't be [15] able to be done by March 1 unless you tell me [16] you can, because of trans-lation and everything [17] else, so I would be okay with it if the [18] objections or the challenges to the logs were [19] here a week later, by March 8, because I expect [20] to get them done in a week or so for you.

[21] MS. GABLER: And the logs [22] the-mselves on the 21st?

[23] THE COURT: Yes. Does that work [24] for both of you?

Page 32

[1] MR. BONO: Can we have just a few [2] extra days after the production to have a log [3] done, do you have a problem with that, maybe the [4] 24th, something like that?

[5] THE COURT: Logs will be exchanged [6] on the 24th. And any challenges by the 8th of [7] March. And then local counsel will E-mail me [8] that you need — if there is a challenge you [9] need the number to be produced of random [10] documents and if necessary a date for a hearing, [11] but you just put that in the E-mail under the [12] discovery dispute procedure and we'll get you [13] in. That's all the things, items that I have [14] listed.

[15] MR. BONO: Your Honor, in light of [16] Your Honor's ruling, I guess on the specifics of [17] the document issue, I think it would be best for [18] the parties to discuss it over the next week, I [19] have some points, but I'll discuss it with [20] counsel and she'll be discussing things with me [21] as we work over the next ten days.

[22] I do have one other thing, Your [23] Honor, in terms of scheduling. This was Markman [24] hearing, we did reach an agreement leading up to

Page 33

[1] the hearing consistent with the Cour-t's order [2] and I wanted to propose it to make sure Your [3] Honor was okay with it.

[4] Your Honor, and if I get the dates [5] wrong, let me know, Julie, but I think I have [6] it.

[7] MS. GABLER: Can I interrupt you [8] before you proceed with the dates?

[9] Given that we have now extended [10] out both interrogatory responses and document [11] requests, I think we would like to ask that we [12] move back the Markman date so that all of that [13] is done and those documents are available for [14] expert consideration before the Markman hearing.

[15] THE COURT: In this case, and I [16] don't have it with me, you have Mark-man, then [17] you have your expert reports due; right?

[18] MS. GABLER: Yes.

[19] MR. BONO: Yes, Your Honor.

[20] THE COURT: So go ahead. I know [21] what you're saying, an expert for the Markman [22] hearing.

[23] MS. GABLER: Well, right now under [24] the current schedule, the expert reports

Page 34

[1] actually trail the Markman hearing by about [2] three weeks in essence.

[3] THE COURT: My goal is to get you [4] to construction so your experts have it when [5] they do their opinions on the patent issues in [6] the case.

[7] MS. GABLER: Right. So that's the [8] right — we don't disagree with that order, but [9] the concern is that now that we've moved [10] document production and interrogatory dates [11] under the schedule that Mr. Bono would be [12] providing you in a moment, we would be having [13] opening briefs exchange before the date we just [14] agreed on for the privilege log and two days [15] after the drop dead date on the documents, and

[17] THE COURT: What was your hearing [18] date?

[19] MS. GABLER: March 6th, and you [20] have —

[21] THE COURT: I think I saw that [22] somewhere.

[23] MS. GABLER: And that all briefing [24] was done by March 1, so while we have a number

Page 35

[1] of dates in Mr. Bono's proposal about when we [2] were going to exchange disputed terms and [3] definitions and things like that, given that we [4] have

now moved these document interrogatory [5] dates by three weeks, I think that should be [6] accounted for in the Markman schedule, so those [7] are now pushed back so those items are done and [8] the interrogatory responses and the documents [9] have been produced before more than two days [10] before we're submitting opening briefs in [11] Markman.

[12] MR. BONO: Your Honor, I don't [13] have a disagreement with this, but obviously [14] it's the Court's schedule that is most [15] important.

[16] THE COURT: Here is what I'm going [17] to do. Except for — my concern is adult spring [18] break, and if any of you have children, [19] children's spring break. I think adult spring [20] break for me is March 9th, 10th, 11th, 12th, [21] 13th, 14th and 15th.

[22] MS. GABLER: For me it's the last [23] week of March.

[24] THE COURT: The last week of

Page 36

[1] March? So you have them committed to memory.

[2] MR. BONO: Your Honor, I just have [3] the Friday the 24th and Monday the 27th, which I [4] have blocked out my related children's spring [5] break.

[6] THE COURT: Okay. There you go. [7] So it's important to know that.

[8] MR. BONO: I'm visiting my [9] daughter for parents weekend.

[10] THE COURT: So let's take out the [11] 9th, 10th, 11th, 13th, 14th, 15th of March, that [12] takes out the 24th, and then the week of the [13] 27th.

[14] MS. GABLER: It's actually — [15] let's see here. Yes, that's right. Yes.

[16] THE COURT: That would be the last [17] week of March would be the 27th.

[18] MS. GABLER: Yes.

[19] THE COURT: And you pick any dates [20] you want for the Markman and the only thing [21] it's subject to is the time. In other [22] words, it may be late in the date, or early in [23] the day, but you can pick the date you want.

[24] MR. BONO: Your Honor, just

Page 37

[1] looking at everybody's schedule, what about [2] Monday the 20th, which would be a two-week [3] extension, does that work?

[4] THE COURT: That's fine with me.

[5] MR. BONO: That's way before.

[6] MS. GABLER: Can I —

[7] MR. BONO: There is no secrets [8] here. You can see my calendar.

[9] THE COURT: Here you go, now you

[10] get all the trade secrets out. Does he have the [11] hours that he's billing daily?

[12] MS. GABLER: No.

[13] MR. BONO: I didn't give her that.

[14] THE COURT: Just wondering.

[15] MS. GABLER: What I would actually [16] like to do, I couldn't have the — we can [17] certainly commit to presenting a joint [18] submission by the end of the week to Your Honor [19] about a date.

[20] THE COURT: We'll pick the 20th, [21] just to have a date as we leave here today, and [22] we'll put it on for four o'clock and if it's [23] inconvenient for her, you can change it by [24] agreement.

Page 38

[1] MR. BONO: That would be fine.

[2] MS. GABLER: So 3/20, 4:00 p.m. [3] right now.

[4] MR. BONO: 4:00 p.m.

[5] THE COURT: 4:00 p.m. I'm in a [6] bench trial with Forest Lab.

[7] MR. BONO: Your Honor, could the [8] Court —

[9] THE COURT: Mr. Kirk, is that [10] trial going to settle? I don't think it can.

[11] MR. KIRK: If I had to bet, I [12] would say it won't.

[13] THE COURT: So four o'clock.

[14] MR. BONO: Your Honor, since we [15] haven't talked to Ms. Dudsik, were there a [16] couple of other dates that would work for [17] Honor?

[18] THE COURT: Other than the ones [19] I've excluded, pick whatever one you want.

[20] MR. BONO: So if she doesn't do it [21] the 20th, the 21st would be acceptable to the [22] Court?

[23] THE COURT: Yes.

[24] MR. BONO: Thank you, Your Honor.

Page 39

[1] THE COURT: We'll go away with the [2] 20th at four o'clock. If she can't do the 20th, [3] you pick another date. The only thing you're [4] subjected to is the time of the day.

[5] MS. GABLER: Right, which will be [6] late in the day.

[7] THE COURT: Right, because I have [8] a lot of trials coming up.

[9] MS. GABLER: Do we already have a [10] clear understanding of amount of time per side?

[11] THE COURT: No, because I haven't [12] read your briefs. Do you think I do that [13] arbitrarily? I'm not sure if that was an insult [14] or not.

[15] MS. GABLER: It was not intended [16] to be.

[17] THE COURT: I really do, I take a [18]

quick look at the briefs and I don't restrict [19] the parties. If you want to have an expert, I [20] let you have an expert, but I set times, that's [21] the only way I can control, but I have to read [22] the briefs to see what the issues are and then I [23] give you have your allocation and I give you [24] your time.

Page 40

[1] Some people argue and put the [2] papers in, some folks bring a witness, but I'll [3] leave that to you. But I'll do it probably [4] — I see, I don't know what dates you're going to [5] have the briefs to me, but after I have a chance [6] to look at the briefs to see what you're [7] disputing and how detailed it is and what the [8] — I mean, this is — what is it, plasma screens?

[9] MR. BONO: Your Honor, it's LCD, [10] liquid crystal displays.

[11] THE COURT: So I'm pretty expert [12] in that.

[13] MR. BONO: I understand.

[14] THE COURT: I buy them.

[15] MR. BONO: That's right, we all [16] buy them.

[17] THE COURT: I love this war story. [18] When I was a very, very inexperienced judge, I [19] had a patent case with RCA about digital [20] generation on video screen and all these people [21] like the guy that started Data General, Dr. [22] Wang, came to testify, and I was new enough that [23] I didn't know what you weren't supposed to ask. [24] And with five children, we were buying our first

Page 41

[1] computer, so it was a bench trial so after [2] Dr. Wang testified since he appeared at the time [3] to be the most knowledgeable person about all [4] that stuff, I asked him, I said what computer [5] would you buy if you had five children. The [6] oldest was like in the fifth grade and, you [7] know, and he said, Judge, you have to have an [8] Apple 2E with the software and everything.

[9] So I went to the computer store, I [10] was the brightest store customer in the computer [11] store because they all wanted to help you back [12] in those days, this was like in '85 or '86, I [13] have pretty good authority what I'm buying here, [14] and you know what, that Apple 2E, my [15] grandchildren still are playing educational [16] software. It's that good. He's passed away, [17] Dr. Wang, but he obviously knew what was good [18] for that application. So as a customer [19] sometimes you can be pretty astute, I guess.

[20] Okay.

[21] MR. BONO: One other thing, the [22] scheduling on the Markman, assuming we do go on [23] the 20th, you had in your

scheduling order, [24] originally you had the final briefing being

---

Page 42

[1] concluded on March 1st, which was the Wednesday [2] before the hearing on the 6th. Should we decide [3] that, or agree that March 15th, which is the [4] Wednesday before the Markman would be all [5] briefing would be concluded by that date.

[6] THE COURT: That's fine.

[7] MR. BONO: And if that's fine, [8] Your Honor, I would like to let the Court know [9] what we have agreed to. We will adjust the [10] dates accordingly because it's just a matter of [11] moving the dates back two weeks, but what the [12] parties have agreed to is we picked a date for [13] an exchange of terms that each side is proposing [14] would be subject to construction in the Markman [15] proceeding, then we have picked a subsequent [16] date in which each side was going to exchange [17] proposed definitions of the terms they're [18] proposing, and then a time for a meet and confer [19] to try to work, see if we can narrow the terms [20] and the definitions, and then an opening brief [21] that was about a week before the final brief in [22] the Court's order.

[23] And we've generally agreed with [24] that. And I just wanted to make sure that this

---

Page 43

[1] would be okay with the Court.

[2] THE COURT: Absolutely.

[3] MR. BONO: We are all geared up to [4] have all the briefing concluded and in accord [5] with the order.

[6] THE COURT: Absolutely.    [7]    Defendant, anything else?

[8] MS. GABLER: No, we agreed, it was [9] a negotiated schedule and that's an accurate [10] representation of how we have laid that out. So [11] once we get the — whether it's the 20th or a [12] different date, I don't anticipate we'll have [13] any problem reaching agreement on that adjusted [14] schedule.

[15] THE COURT: Okay. What I'll ask [16] you to do is somebody prepare an order, or do [17] you want me to just so order the transcript?

[18] You're going to get the [19] transcript. I'll just so order the transcript.

[20] MR. BONO: That would be [21] sufficient.

[22] THE COURT: I will send an order [23] that so orders the transcript that has the dates [24] and all other matters.

---

Page 44

Thank you
(Hearing concluded at 1:20 p.m.)

State of Delaware )
New Castle County )
        CERTIFICATE OF REPORTER
    I, Dale C. Hawkins, Registered Merit Reporter and Notary Public, do hereby certify that the foregoing record, is a true and accurate transcript of my stenographic notes taken on February 8, 2006, in the above-captioned matter
    IN WITNESS WHEREOF, I have hereunto set my hand and seal this 9th day of February, 2006, at Wilmington
        Dale C. Hawkins, RMR
        Cert No 112-RPR

# EXHIBIT D



550 South Hope Street
Suite 1100
Los Angeles, CA 90071-2627
T 213.892.1800
F 213.892.2300
www.howrey.com

Direct Dial 213.892.2510

June 30, 2006

**_Via Facsimile and Federal Express_**

Cass W. Christenson, Esq.
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006

     Re:    _LG.Philips LCD Co., Ltd. v. Tatung Co., et al._ (C.A. No. 05-292 JJF)

Dear Cass:

    Further to my letter of June 26, 2006, we are producing Tatung America documents bates labeled TUS-D 00616-00859. TUS-D 00619-00854 amends the information provided in TUS-D 00001-00065, TUS-D 00069-00070 and TUS-D 000454-000615. Please note that these documents have been designated "Confidential Attorneys Only" under the protective order in the case. Following our investigation with Tatung Company, it is our understanding that Tatung America LCD television sales do not include CPT modules.

    If you have any questions, please do not hesitate to let me know.

                Very truly yours,

                Heather H. Fan

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

# EXHIBIT E

LG Philips LCD Co., LTD   v.
Tatung Company, et al.

Hearing
March 1, 2006

1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
LG. PHILIPS LCD CO. LTD., :
  Plaintiff, :
                : Civil Action
                : No. 05-292
v.              :
TATUNG COMPANY, TATUNG COMPANY OF :
AMERICA, INC., CHUNGHWA PICTURE :
TUBES LTD., and VIEWSONIC :
CORPORATION, :
  Defendants. :
      Wednesday, March 1, 2006
      12:30 p.m.
      Courtroom 4B
      844 King Street
      Wilmington, Delaware
BEFORE: THE HONORABLE JOSEPH J. FARNAN, JR.
    United States District Court Judge
APPEARANCES:
  THE BAYARD FIRM
  BY: RICHARD D. KIRK, ESQ.
    -and-
  McKENNA LONG & ALDRIDGE
  BY: GASPARE J. BONO, ESQ.
  BY: CASS W. CHRISTENSON, ESQ.
    Counsel for the Plaintiff
2
APPEARANCES CONTINUED:
  RICHARDS, LAYTON & FINGER
  BY: ROBERT W. WHETZEL, ESQ.
    -and-
  HOWREY, LLP
  BY: JULIE S. GABLER, ESQ.
    Counsel for the Defendant
3

[1] THE COURT: All right. Be seated, [2] please.

[3] Good afternoon.

[4] MR. BONO: Good afternoon.

[5] MS. GABLER: Good afternoon.

[6] THE COURT: I have taken a look at [7] the letters that were filed and we're going to [8] have to work through this quickly because I'm in [9] the middle of a trial.

[10] What I'm going to do is give you [11] some rulings and some remedies, and then in the [12] time frame I'll give you, you'll have the [13] opportunity to try to work out your differences [14] on a short time frame, but if you don't, we'll [15] have you back for the hearings.

[16] Now, what I'm going to do first is [17] any subpoena issued by any party for documents [18] that is — that was issued after February 21, [19] 2006 is quashed. And any requests for [20] production or any document provided after [21] February 21 is excluded.

[22] With regard to — we'll turn first [23] the letter from defendants, which es- [24] sentially when I read through it has a lot to do with

Page 4

[1] discovery requests largely with regard to the [2] question of damages.

[3] I'm going to stay for a short [4] period of time all damages discovery and with [5] regard to defendants' claims on the questions [6] that relate to validity, which are the questions [7] of commercial success and questions related to [8] the on sale issue, and questions related to the [9] prosecution, questions related to the public use [10] matter, all of the requests are going to on [11] those issues for granted for discovery.

[12] And the plaintiff will have until [13] March — it's a Friday, March 17, 2006 to [14] respond to that order. And the order is being [15] issued pursuant to Rule 37, but with no [16] sanctions at this time.

[17] And if there is any dispute [18] concerning the order, there will be a hearing on [19] March — this is a Wednesday, March 29th at 4:00 [20] o'clock, at which time defendants will have an [21] opportunity — and I'll set a time al- [22] location if the hearing becomes [23] necessary, it will be certain hours allocated to the prosecution of [24] the contempt, and certain time allocated to the

Page 5

[1] defense of the contempt will have an opportunity [2] to present its evidence that the Rule 37 order [3] on matters of invalidity as cited in the [4] defendants' letter in conjunction with this [5] hearing, February 28, 2006 letter, haven't [6] been complied with.

[7] Now, with regard to defendants' [8] request for documents related to declaration of [9] William K. Bohanan, the application is denied.

[10] Now, with regard to plaintiff, the [11] request for the mother glass samples is granted [12] as requested on page four of plaintiff's letter. [13] Specifically it's granted that defendants [14] produce one, mother glass samples for each of [15] CPT's LCD products, and two, the nineteen [16] product samples that have been withheld.

[17] Again, that order is pursuant to [18] Rule 37 and the production shall occur by March [19] 17, 2006. If it isn't produced, there will be a [20] hearing at which plaintiff can present its [21] evidence. The hearing will be held on March the [22] 30th, I'm trying to reduce your stress of [23] travel, so you'll be here in the afternoon on [24] the 29th, so I'm going to bring you on the

Page 6

[1] morning of the 30th at 9:30 a.m.

[2] And again, if that hearing is [3] necessary, I'll allocate time. In each case, I [4] should interpose this, letters or what we'll [5] call prehearing briefing presenting the proposed [6] evidence and the noncompliance facts will be due [7] on Friday, March the 24th, 2006.

[8] Again, the damages information or [9] discovery requested is separated and I'll deal [10] with that separately.

[11] The plaintiff's request for its [12] captioned Critical Discovery Related to Products [13] and Technical Issues is granted and ordered to [14] be produced by the March 17th, 2006 date.

[15] However, on this order, the [16] defendant can rather than respond by March 17th, [17] can before March 17th set forth detailed [18] objections to each — what do you call those [19] dots? Bullets. Bullets — to the bullet items, [20] you know, you just use the language after each [21] bullet as a caption and defendant can file [22] instead detailed objections to the requests and [23] then I'll consider those and then enter a [24] further order either granting or denying, and I

Page 7

[1] really think what I'm trying to do there is give [2] you more time to talk about that.

[3] Some of the items that are [4] detailed there appear to me simply to be [5] discoverable, I don't know why they haven't been [6] given over, and others appear to just be pushing [7] against the wall, and others a three-layer brick [8] wall, but I don't know enough from the papers I [9] have to make a final decision, but we'll put [10] that process in place and one way or the other [11] we'll get it resolved. It's kind of on the same [12] time frame as these other issues.

[13] And I think that takes cares of [14] what I'm interested in resolving that was [15] presented in the letters. And I'll give each an [16] opportunity to comment or ask me a question, and [17] you're already jumping out of your seat.

[18] MR. BONO: I just have two [19] clarifications, Your Honor. If they do file [20] objections, would we have an opportunity to [21] respond to them before Your Honor rules?

[22] THE COURT: I'm going to read [23] their objections first and then I'll tell you [24] what we're going to do, we're either going to go

Page 8

[1] to a hearing on those objections or we're going [2] to get together again.

[3] MR. BONO: Very good.

[4] THE COURT: But I want to give you [5] all a chance to talk more and if you can't work [6] it out, I want to see in detail what their [7] objections are to those requests and then I'll [8] decide, you know, whether we ought to go [9] immediately to a hearing or we ought to have [10] something further such as, you know, more [11] exposition on the matter.

[12] MR. BONO: Very well. Your Honor, [13] just a clarification, Your Honor has granted our [14] request for the mother glass on each product, [15] and to clarify, there are two mother glasses for [16] each

**Hearing**
**March 1, 2006**

product, and they are different whether one [17] is called the TFT side, one is called I think [18] the CF side, and we need both. And I didn't [19] want there to be any ambiguity in the Court's [20] granting it as to the mother glass for each [21] product.

[22] THE COURT: It's granted as [23] requested.

[24] MR. BONO: All right. We had

---

Page 9

[1] specified both sides.

[2] THE COURT: Right.

[3] MR. BONO: Thank you.

[4] THE COURT: It's granted as [5] requested.

[6] MS. GABLER: Your Honor, we would [7] actually like to be heard on that issue.

[8] THE COURT: I'm not going to hear [9] anything right now on it. I'm going to put you [10] all at risk to the hearing. In other words, [11] I'll hear you at the hearing. If you don't [12] produce, we're going to have a contempt hearing [13] and you can make those presentations then. [14] That's the vehicle for it.

[15] You know, we're kind of like in an [16] amorphous state here, one side says one thing, [17] the other side says the other, the mechanism for [18] truly getting those resolved is one of two [19] options, you go to a master, or I'm getting to [20] kind of like both sides here, so I'm going to [21] keep you with me, and I'm going to conduct the [22] hearing that the master would have conducted. [23] You'll have a chance, for instance, if you think [24] that's a nonsense request, don't produce, take

---

Page 10

[1] your chance at the hearing, it's going to be [2] ugly. If you prevail, it will be ugly.

[3] MS. GABLER: Okay.

[4] THE COURT: I think that — in [5] other words, in these discovery disputes the [6] older I get, the more I realize that we decide [7] them with no information. And it's a little bit [8] of gamesmanship in the Court.

[9] So if I have the time, I'm going [10] to conduct the hearings when I get it down to [11] discernible issues, or I'm going to send folks [12] to the magistrate. We don't have a magistrate [13] judge, but if we get the second one there, or to [14] a master, which is why I have kind of carved out [15] the damage.

[16] What you all are talking about is [17] damages discovery. You may have to go spend [18] thirty or forty-five days with a master and have [19] a lot of hearings and exchange of papers and [20] things like that, but what I want to get settled [21] is infringement and validity discovery, to

the [22] extent you're engaged in it now, and put you at [23] risk for your decisions.

[24] MS. GABLER: I understand that

---

Page 11

[1] point, Your Honor. In these letter briefs [2] obviously they were only one sided, each side [3] did not have an opportunity to rebut, and so we [4] do have some concerns about that.

[5] I would like to have one point of [6] clarification in terms of production. And [7] particularly in regard to the samples and the [8] mother glass, is an offer for inspection [9] considered production by Your Honor? Because in [10] some instances, for example, within those [11] samples, there are some of them where there is [12] only one available, so if we produce it to LPL, [13] that's it, we don't have one, we can't get [14] another one, this is the one that's available, [15] those are the reasons we offer them for [16] inspection.

[17] THE COURT: If that is true — [18] well, I was going to order all produced at the [19] Washington D.C. office, but I stayed out of that [20] in the one instance where that was a discussion [21] because I can't believe the lawyers can't figure [22] that out themselves.

[23] In other words, if I'm on his side [24] and if what you just told me is correct, I got

---

Page 12

[1] to agree to go inspect, don't I?

[2] MS. GABLER: I would think so.

[3] THE COURT: Otherwise —

[4] MS. GABLER: We haven't been able [5] to reach that agreement.

[6] THE COURT: Otherwise I'm either [7] in need of serious care or, you know, I ought to [8] be — my father drove a truck, I ought to be [9] driving a truck like my dad and he didn't have [10] all that stress every day, he just made sure he [11] made his four deliveries.

[12] So that's the kind of thing I'm [13] giving you an opportunity to talk with each [14] other about. But if someone is illogical or [15] irrational and that's your defense that they [16] wouldn't accept inspection and there is only one [17] of the items, you're going to be successful at [18] the hearing.

[19] Am I making sense here?

[20] MS. GABLER: You are making sense [21] as to the samples, it does really bring me back [22] to the mother glass issue that I really would [23] like Your Honor's indulgence to be heard.

[24] THE COURT: They want it, they

---

Page 13

[1] think they're entitled to it, why would

I know [2] more than the both of you about what ought to be [3] produced? And I only ought to decide if it [4] should be produced or not be produced in the [5] context of a penalty if I have a full [6] evidentiary expedition and I wouldn't get that [7] listening to you today. I have read the [8] letters. How many exchanges have both of you [9] had?

[10] MS. GABLER: Several.

[11] THE COURT: So I have this silly [12] notion that you can rely on experienced lawyers [13] to do the right thing and discovery all those [14] rules was intended to be a nonjudicial [15] intervention process. Wasn't that the thought? [16] But somehow it's become the game.

[17] So I want to do it on an [18] evidentiary record. And I'm not a harsh guy, [19] but if somebody didn't produce something that it [20] becomes clear after hearing witnesses that they [21] should have produced, they're going to pay a lot [22] of money for not having done it.

[23] I ordered somebody to pay for a [24] trial because they wouldn't listen to my orders

---

Page 14

[1] during the trial. Why should I get stressed [2] during the trial? If you want to keep violating [3] my orders during evidence, you wait to the end, [4] you brief it, if the transcript shows you didn't [5] do what you were supposed to do in the context [6] of my orders, you just pay for the next trial. [7] And you go appeal and whatever they do, they do.

[8] But we got to get this system back [9] to some response from lawyers to be rationale [10] and logical.

[11] But you understand there is only [12] one, she can't give it to you, you got to go [13] inspect it.

[14] MR. BONO: I'll try to work that [15] out, Your Honor. I thought a reasonable [16] compromise on that would be they would produce [17] it in the local counsel's office so we could [18] have reasonable access to it and they would [19] maintain possession of it as a reasonable [20] compromise. That would be my thought, but I'll [21] address that with counsel.

[22] MS. GABLER: Counsel, we discussed [23] that back and forth. Part of it is they're [24] disassembled and things we had to buy on the

---

Page 15

[1] open market, we had to buy online, so it's [2] putting it back together and risking damaging it [3] and shipping it is an issue in terms of where it [4] actually sits in Chicago versus bringing it to [5] Delaware. And I don't think it helps any of us [6] to have a sample damaged.

[7] THE COURT: Don't you all want to [8] get through this so we can get to trial? That's [9] the fun part.

[10] MR. BONO: I'll be happy to [11] discuss that. That's the first I have heard [12] that there is a damage question and they were [13] already disassembled. I was not apprised of [14] that information until a moment ago.

[15] THE COURT: So the more you talk, [16] the more you may work towards some solutions. I [17] have a feeling we're going to have a hearing at [18] least on some issues on each side and that's [19] fine, I'll allocate time, we can — you know, [20] very important people can tell you their whole [21] life in 185 pages. How long did it take for you [22] to tell me what's going on here, an [23] hour-and-a-half?

[24] So this — but what we're going to

Page 16

[1] do is we're going to get you to the trial and [2] we're going to try and be as fair as we can in [3] hearing your disputes so you have the evidence [4] that you want, but we really want to work to not [5] arguing over silly things, but to get you to a [6] trial.

[7] That takes care of your issues. [8] It doesn't take care of your issues because [9] yours are kind of reserved for the hearing if [10] it's essentially in the context of an objection, [11] which is fine.

[12] MS. GABLER: Right.

[13] THE COURT: And we'll hear them [14] then, if you don't work them out. Is there [15] anything you don't understand about the process [16] or the nature of the process, in other words, [17] what the orders are asking you to do?

[18] MR. BONO: I understand that.

[19] MS. GABLER: Yes, we understand [20] them.

[21] THE COURT: Okay. I'll put an [22] order in place that sets all these dates for [23] you. You have the transcript to refer to if [24] there is, you know, any detail you need. I'm

Page 17

[1] just going to put the dates in the order of what [2] you're supposed to do.

[3] MR. BONO: One final [4] clarification, Your Honor. There is just three [5] dates looming up in Your Honor's original [6] scheduling order that I believe are off the [7] table now in light of this ruling, which were [8] the deposition deadline that originally was [9] March 17, the expert report deadline, March 31, [10] and the expert deposition deadline of April 28. [11] I would assume that those dates are no longer [12] applicable and that we'll — there will be new [13] dates assigned at the appropriate time?

[14] THE COURT: They're going to get [15] pushed out proportionately to the [16] March 29 and [16] 30th dates, which isn't a whole lot of time. [17] It's basically about thirty days is what I [18] figured.

[19] MR. BONO: So we could assume [20] those are pushed out about thirty days at this [21] point?

[22] THE COURT: We are going to have [23] to get this discovery worked out first.

[24] MS. GABLER: The other date —

Page 18

[1] THE COURT: All the dates that [2] were key to the February 21st date essentially [3] will be pushed out to allow this process to [4] occur.

[5] MS. GABLER: Your Honor, just to [6] clarify, I believe all the dates that Mr. Bono [7] just read plus the one I raised were all [8] actually key to the February 3rd date, not the [9] February 21st date. None of the dates that [10] Mr. Bono just discussed were discussed at our [11] last hearing, instead we just indicated that [12] depositions would be pushed until document [13] issues had been resolved.

[14] THE COURT: So we're not going to [15] get resolution until let's say March 30th, so [16] that's the date that will be operable to push [17] out from. And it will be about the same amount [18] of time that it took to get the resolution, [19] which is the month of March, thirty days.

[20] MS. GABLER: Okay. Is Your Honor [21] willing to hear any argument this morning on the [22] third-party subpoena issue?

[23] THE COURT: What would I want to [24] hear?

Page 19

[1] MS. GABLER: Our concern, Your [2] Honor, is that we have several issues that we're [3] concerned with in that regard.

[4] First of all, in production that [5] they completed on the 21st and the documents [6] that they actually produced on the 21st, there [7] are indications of some LPL on sale panels that [8] were not produced and that we have now been able [9] to go ahead and buy one of those online and [10] indicated that that clearly was on sale and does [11] embodiment of the '121 patent in it.

[12] Not only did they not produce [13] sufficient documents, but also we now didn't go [14] out and try to subpoena any third parties who [15] would have been involved in those transactions [16] because we didn't have that information from LPL [17] until the last day of the document discovery.

[18] Additionally, in their documents, [19] it has been indicated that Texas Instruments is [20] a TCB supplier to LPL. That was not revealed in [21] their initial

disclosures or in any other [22] location. We again discovered that on the 21st. [23] We had no reason to subpoena Texas Instruments [24] prior to receiving those documents we never

Page 20

[1] subpoenaed them either. They lead us to believe [2] now that they would have relevant information.

[3] And finally, in terms of the [4] various other third-party subpoenas regarding [5] on sale documents, prior to our last hearing it [6] was not our understanding that the February 3rd [7] date applied to anybody but the parties, and we [8] were aggressively doing third-party discovery, [9] but I think it might have been a little unclear [10] in the various letter briefs that went back and [11] forth there that the on sale discovery that [12] we're pursuing those subpoenas is not the on [13] sale discovery that Ms. Dudzac had referenced [14] in earlier hearings, but there was an additional [15] panel, a new panel, a Sharp panel that we [16] discovered and have turned over, did turn over [17] at least one document and offered the panel for [18] inspection by February 21st.

[19] But we have received and been [20] producing many other documents that clearly [21] evidence that that panel was on sale and it does [22] appear to be the preferred embodiment of the [23] '121 that would invalidate that entire patent.

[24] The Federal Circuit is certainly

Page 21

[1] interested in prioritizing, in validating a [2] patent rather than having an invalid patent be [3] enforced in a litigation and then, you know, [4] potentially try to be enforced against others in [5] the future, so we really think there is a due [6] process here in regards to that limited area of [7] discovery.

[8] We plan to seek reconsideration of [9] Your Honor's ruling on that point, but we would [10] like you to consider not quashing those [11] subpoenas right now and letting us let those [12] subpoena productions go forward, let us be heard [13] on our motion for reconsideration, at that point [14] if you maintain your position, we can deal with [15] whatever is going to happen in terms of quashing [16] the subpoena, but in the meantime letting those [17] productions go forward so those aren't ruled [18] out.

[19] MR. BONO: Your Honor, just [20] briefly. Your Honor has now ruled no fewer than [21] three times on this issue. You ruled at the [22] hearing we had last time in front of Your Honor, [23] you ruled in your letter ruling last week, and [24] you ruled again this morning.

Page 22

[1] She's now asking for a fourth [2] reconsideration. I think it's — I think Your [3] Honor has made the position clear, especially [4] since Ms. Gabler had an understanding back in [5] February 3rd whether Your Honor's February 21 [6] deadline applied to third-party production.

[7] The only other point I would like [8] to make, Your Honor, is anytime you set a [9] deadline, there will always be documents you [10] could have achieved after that deadline, all [11] these arguements are simply the effect of [12] establishing any sort of deadline in the case, [13] so I would ask Your Honor to deny the request.

[14] THE COURT: All right. The motion [15] to quash — I mean the order to quash will [16] remain in place. Is this the three boxes that [17] you got or something? What was this, what was [18] the February 21 you got?

[19] MS. GABLER: On February 21, they [20] produced several, many, many boxes of documents, [21] but within that on February 21 there were three [22] boxes of documents that contained all of Korean [23] documents and within those documents were the [24] first indication that we had that the LPL TCP

Page 23

[1] were being provided by Texas Instruments, and of [2] the panel, the LPL panel that we now understand [3] has been — was sold prior to the critical date.

[4] THE COURT: That's what I [5] understood, it was in the three boxes.

[6] MS. GABLER: Yes, we did those [7] boxes. It's not three boxes of documents.

[8] THE COURT: No.

[9] MS. GABLER: It's more like an [10] inch-and-a-half.

[11] THE COURT: It's three boxes and [12] that's where it came from, that's what I [13] understood from reading. So the order to quash [14] will remain, and you certainly can file a formal [15] motion setting forth both why you believe [16] further discovery should be permitted and [17] specifically what discovery that is.

[18] And you can also argue, I mean, [19] any other issue you want. The due process issue [20] about if this case fails to get evidence that [21] could show a patent invalid, and it's fully [22] adjudicated and down the road there is a patent [23] running around that may be invalid for the kinds [24] of reasons you're talking about, I think that

Page 24

[1] happens a lot.

[2] I have had patent cases where two [3] other judges have heard them and then I remember [4] once I was presented with an on sale bar and [5] granted all of a sudden this patent, everybody [6] paid royalties, then you get into that whole did [7] they defraud the people or was it good faith, so [8] I'm not too interested in that for purposes of [9] your case, but I would be interested in hearing [10] your motion to reconsider and then if I agree [11] with you after hearing from the other side, [12] you'll brief it on the local rules, I will allow [13] you some limited opportunity to go get it.

[14] But you have to put it in a formal [15] motion.

[16] MS. GABLER: We will do that. [17] Thank you.

[18] THE COURT: All right. Anything [19] else?

[20] MR. BONO: No, Your Honor.

[21] THE COURT: Anything else?

[22] MS. GABLER: No, I believe that's [23] it, Your Honor.

[24] THE COURT: Okay. Thank you and

Page 25

[1] hopefully we won't see you at the end of March.

[2] By the way, the fact that I [3] separated out these disputes about damages [4] doesn't mean that I have stopped any of you from [5] talking about them to try and reach resolution, [6] but the complexity of that issue, my current [7] thinking is you may have to get more time than I [8] have available. But if you can work them out, [9] my order doesn't stop you from talking about it, [10] it just keeps them out of my purview for the [11] time being.

[12] MR. BONO: Very well, Your Honor. [13] Thank you.

[14] (Court recessed at 12:58 p.m.)

Page 26

State of Delaware    )
New Castle County    )

CERTIFICATE OF REPORTER

I, Dale C. Hawkins, Registered Merit Reporter and Notary Public, do hereby certify that the foregoing record is a true and accurate transcript of my stenographic notes taken on March 1, 2006, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of March, 2006, at Wilmington.

Dale C. Hawkins, RMR