# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

LG.PHILIPS LCD CO., LTD.,

          Plaintiff/Counterclaim Defendant,

    v.

TATUNG COMPANY;
TATUNG COMPANY OF AMERICA, INC.;
CHUNGHWA PICTURE TUBES, LTD.;
AND VIEWSONIC CORPORATION,

          Defendants/Counterclaim Plaintiffs.

Civil Action No. 05-292 (JJF)

## PLAINTIFF LG.PHILIPS LCD CO. LTD.'S PRE-HEARING SUBMISSION REGARDING THE COURT'S MARCH 1, 2006 DISCOVERY RULINGS

THE BAYARD FIRM
Richard D. Kirk (rk0922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com
Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:
Gaspare J. Bono
Matthew T. Bailey
Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

March 31, 2006

Plaintiff LG.Philips LCD Co., Ltd. ("LPL"), respectfully submits this pre-hearing submission regarding the Court's March 1, 2006 discovery rulings.[1] This submission summarizes the relevant facts concerning the parties' document production and discovery efforts in this case. LPL respectfully requests that the Court order Defendants to provide additional information and to reimburse LPL for its fees and costs related to the hearings.[2]

## INTRODUCTION

At the March 1, 2006 discovery hearing, the Court ordered the parties to produce certain specific documents and things by March 17, 2006. *See* Tr. of March 1, 2006 Hearing at 4-6 (Ex. 1) (D.I. 131). As set forth below, LPL has worked diligently and complied with the Court's Order by confirming that LPL's documents were produced. Additionally, LPL has provided several summaries of relevant information stored electronically in LPL's computer systems. LPL has specifically responded to *every* discovery issue raised by Defendants at the March 1 hearing and every issue raised by Defendants *after* the hearing before the March 17 deadline. LPL's counsel has explained to Defendants' counsel what documents do exist and what documents do not exist within LPL.

Further, LPL's counsel has conferred in good faith regarding Defendants' remaining concerns and provided *additional* information as requested, to the extent such information is reasonably available at LPL. Nevertheless, Defendants insist on forcing LPL and its counsel to

---

[1] The Court has scheduled evidentiary discovery hearings for April 5 and 6. Due to a family emergency today, however, LPL's counsel is requesting a short postponement of the hearing dates.

[2] "Defendants" in this case are Tatung Company ("Tatung"), Tatung Company of America, Inc. ("Tatung America"), Chunghwa Picture Tubes, Ltd. ("CPT"), and ViewSonic Corporation ("ViewSonic"). The two "Patents-in-Suit," U.S. Patent No. 6,738,121 ("the '121 Patent") and U.S. Patent No. 5,019,002 ("the '002 Patent"), relate to the design and manufacture of liquid crystal display ("LCD") modules. Generally, the '121 Patent relates to a Tape Carrier Package ("TCP"), and the '002 Patent relates to electrostatic discharge ("ESD") guard rings.

defend against an unnecessary discovery hearing. Defendants, moreover, have not cooperated regarding basic information that LPL needs.

For months, for example, LPL has requested basic information in the form of a list identifying which LCD modules and products use which types of TCPs, and a similar list regarding LCD modules and ESD guard ring information. This information is necessary to identify representative products and claims for trial as the Court has instructed counsel to do. Additionally, there is a discrepancy concerning Defendants' production of motherglass samples, as ordered by the Court, and mask work files, which Defendants admit are critical. Defendants have produced corresponding mask files and motherglass samples that do not match, indicating that LPL is still missing mask files and samples. LPL's counsel also has identified several examples of missing mask files that should be produced. The extent of Defendants' deficiency is unknown, however, in part because Defendants refuse to state the time period for which mask files were produced.

In addition, Defendants only recently identified as their most relevant technical documents more than 2,000 pages of "operational specifications" in Chinese that need to be further translated and analyzed. Yet, Defendants have not agreed to provide an index requested by LPL to confirm the sufficiency of these operational specifications. Although LPL has attempted to resolve these issues informally, Defendants insist on proceeding with the discovery hearings. LPL therefore respectfully requests that the Court:[3]

- order Defendants to provide a list, in English, of which LCD modules and products use which types of TCPs;

---

[3] LPL also objects to Defendants' attempt -- yet again -- to produce after the document discovery deadline new documents that this Court has ruled are excluded from the case, including, for example, documents subpoenaed from third-parties, prior art documents, and invoices. Defendants' production violates the Court's prior rulings quashing outstanding subpoenas and excluding untimely produced documents.

- order Defendants to provide a list, in English, of which LCD modules and products are manufactured using ESD guard rings;

- order Defendants to produce all outstanding motherglass, including samples that correspond to the mask (or .str) files that Defendants have produced;

- order Defendants to produce all outstanding mask works files and related information, including, but not limited to, as set forth in LPL's March 16, 2006 letter (Ex. 15), and a comprehensive index for Defendants' mask works files that indicates which file(s) relate to which product(s);

- order Defendants to produce a list or index that cross-references the "CLAA" numbers used to identify Defendants' modules with the "LSN" numbers used on CPT's Chinese operational specifications;

- allow LPL to raise any other deficiencies in Defendants' production concerning technical discovery needed as to TCPs and the '121 patent, and/or ESD guard rings and the '002 patent, pending translation and analysis; and

- reimburse LPL for all fees and costs incurred regarding the discovery hearings.

## I.    LPL HAS COMPLIED WITH THE COURT'S DISCOVERY RULINGS

### A.    LPL's Production of Discovery Ordered at the March 1 Hearing

During the March 1, 2006 discovery hearing, as set forth in the Court's subsequent March 2 order, the Court granted Defendants' "requests for production relating to validity, questions on commercial success, on-sale issues, prosecution, and public use." *See* March 2, 2006 Order at 1 (D.I. 132). The specific discovery granted and sought by Defendants is set forth in Section II of Defendants' pre-hearing letter to the Court. *See* Feb. 28, 2006 Letter from Matthew W. King to the Court at 9-14 (D.I. 129).[4]

Immediately after the March 1 hearing, LPL began its compliance efforts. LPL's counsel also sent Defendants' counsel a letter confirming that LPL would address each specific category

---

[4] The Court stayed damages-related discovery, including as sought in Defendants' February 28 letter, and denied Defendants' requests for documents related to one of LPL's experts. *See* Tr. of March 1, 2006 Hearing at 4-5 (Ex. 1) (D.I. 131).

of documents sought by Defendants in their February 28 letter. *See* March 7, 2006 Letter from Cass W. Christenson to Christine A. Dudzik (Ex. 2). The confirming letter by LPL's counsel tracked the relevant section of Defendants' February 28 letter to the Court nearly verbatim to ensure LPL's compliance with the Court's order. *Compare id., with* D.I. 129 at 9-14.

      LPL employees have worked diligently to ensure that, with respect to each category sought by Defendants, LPL had produced or would produce all responsive documents. *See* March 27, 2006 Letter from Cass W. Christenson to Julie S. Gabler and Christine A. Dudzik (discussing LPL's efforts to comply with each of Defendants' requests) (Ex. 3). After further review, LPL confirmed that it had already produced the responsive documents related to the Patents-in-Suit by February 21, the prior document production deadline. *See id.* at 1-4. With respect to a single category of documents that related not to the Patents-in-Suit but to an unrelated Korean Patent Application (No. 2001-0065166), LPL located and produced additional documents by March 17. *See id.* at 2.

      In order to cooperate fully, moreover, LPL did not merely produce all existing documents in its possession – LPL took the extra step of creating and producing certain charts and summaries to provide additional information. Indeed, with respect to Defendants' request for documents related to LPL's first sale or other public disclosure of the invention claimed in the '121 Patent, after confirming that any existing, responsive documents had already been produced, LPL generated and provided several additional charts and summaries based on information stored electronically in LPL's computer systems. The summaries that LPL produced included, for example, the following information related to sales, shipments, LPL products, and TCPs:

    1.     a summary of worldwide shipment information, by product / model, for the period of December 1, 1999 to March 31, 2000 (*see* LPLII 102292-102327);

    2.     a summary of U.S. shipment information, by product / model, for the period from December 1, 1999 to December 31, 2005 (*see* LPLII 102328-102753);

    3.     a list of all tape carrier packages (by part no. / supplier) that have used the '121 invention and the LPL products (by model) that have used each of those TCPs (*see* LPLII 102754-102758); and

    4.     a chart showing LPL's orders of TCP "Part 56" from Texas Instruments, including dates ordered and received (*see* LPLII 102785-102786); [5]

*Id.* at 4.

Upon completion of LPL's thorough review for any additional documents that might be responsive to Defendants' requests, and LPL's supplemental document production (including the summaries set forth above), LPL's counsel confirmed for Defendants' counsel that LPL had fully complied with the Court's discovery rulings and that, accordingly, "we do not believe there is any reason to conduct an evidentiary hearing next week concerning LPL's compliance." *Id.* at 1. LPL's counsel also invited Defendants' counsel to resolve informally any questions regarding compliance during a meet and confer teleconference. *Id.* at 6. On March 28, counsel had a teleconference to address discovery issues and LPL's counsel subsequently agreed to provide additional documents and information. For example, LPL's counsel agreed to Defendants' request that LPL supplement two shipment summaries to include a broader date range. [6]

---

[5] "Part 56" refers to the first example of a TCP used by LPL with the '121 invention. The LB121S1-A2 refers to the only LPL module that ever used any Part 56 TCPs.

[6] The summaries go back to December 1, 1999, which predates the first shipment of Part 56 to LPL. Defendants' counsel asked for further shipment information going back to August 1, 1999. LPL has agreed, and is producing this additional information.

Additionally, LPL's counsel have agreed to address and consider additional requests in an attempt to avoid disputes. These discussions are continuing.

**B.     LPL Also Responded to Defendants' Additional Discovery Requests**

After the March 1 hearing, by letter of March 7, Defendants' counsel requested additional documents and things from LPL not addressed at the March 1 hearing. *See* March 7, 2006 Letter from Julie S. Gabler to Cass. W. Christenson (Ex. 4). Defendants' counsel raised new discovery issues for the first time in the March 7 letter, including requests for samples of LPL products and TCPs. *See id.* at 2-3. Defendants had never previously requested such samples in any documents requests, letters, meet and confer discussions, communications with the Court, or discovery hearings. *See* March 9, 2006 Letter from Cass W. Christenson to Julie S. Gabler at 2 (Ex. 5).

Despite LPL's objection to Defendants' new requests, in the spirit of cooperation, LPL's counsel nevertheless investigated whether LPL had additional documents and things responsive to the March 7 letter. And, LPL employees worked diligently to ensure that any responsive documents and things were produced. LPL determined, however, that the requested samples for products sold before March 23, 2000 do not exist.

LPL's counsel confirmed in writing the results of LPL's supplemental search and production efforts. *See* Ex. 3 at 4-6. LPL's counsel specifically addressed every single category of documents and things sought by Defendants in their February 28 *and* March 7 letters, including documents relevant to commercial success and any alleged on-sale bar activity. LPL's counsel explained that LPL had produced LPL's responsive documents to the extent they exist. *Id.* Additionally, LPL's counsel noted that LPL had created and produced summary information

to supplement LPL's production and provide information that was the subject of documents that did not exist. *Id.* at 6.

Thus, LPL has complied fully with the Court's instructions at the March 1, 2006 hearing and the Court's March 2, 2006 order. LPL also has cooperated further and addressed discovery that was not ordered by the Court. LPL and its counsel have worked diligently to identify, collect, and produce any responsive documents for those categories of production ordered by the Court. LPL also has provided additional information by creating and producing several summaries responsive to Defendants' discovery requests. And, LPL responded to Defendants' letter requests, even where those requests sought new discovery not ordered by the Court or even previously requested. LPL has acted diligently and in good faith to comply with both the letter and spirit of the Court's instructions, and with Defendants' discovery requests.

### C.    Defendants' Insistence on Unnecessary Discovery Hearings

Attempting to avoid the need for evidentiary hearings, LPL's counsel arranged two meet and confer teleconferences with Defendants' counsel, on March 28 and 30. In light of LPL's documented, good faith efforts to comply with the Courts' discovery rulings and Defendants' discovery requests, LPL's counsel hoped to resolve any points of disagreement without involving the Court. Early during the first teleconference, however, Defendants' counsel would not accept LPL's representations and insisted on discovery hearings.

Defendants argue that LPL must produce documents and things that do not exist at LPL. Additionally, Defendants now contend that LPL should produce its entire computer database used to prepare summaries, even though this database is beyond the scope of discovery and was never even requested during discovery. Defendants have no basis to insist that LPL produce documents that either do not exist at LPL or that Defendants never requested during discovery.

The Court instructed the parties to work toward informal resolution of their differences and to have contempt hearings only as a last resort. *See, e.g.*, Ex. 1 at 8 (imploring the parties "to talk more and ... work it out"); *id.* at 16 ("we really want to work [on] not arguing over silly things, but to get you to a trial"); *id.* at 25 ("hopefully we won't see you at the end of March") (D.I. 131). Instead, Defendants make unreasonable demands for five discovery areas. In three areas, LPL has produced its responsive documents. The other two areas raise new issues and are outside the scope of Defendants' discovery requests or Rule 34. Therefore, the Court should deny any relief to Defendants.

**D.    Defendants Fail to Show Non-Compliance in the Five Disputed Areas**

By letter of March 29, 2006, Defendants' counsel identified five areas for which "CPT believes documents exist and should be produced." March 29, 2006 Letter from Christine A. Dudzik to Cass W. Christenson at 1 (Ex. 6). Those areas are: (1) documents relating to the development and first sale of an LPL LCD incorporating a TCP falling within the scope of the '121 Patent; (2) documents regarding LPL's analysis of Defendants' accused products; (3) LPL's database; (4) Honeywell documents; and (5) LG.Philips America documents. *See id.* at 1-2. All of this discovery either has been produced or is unwarranted.

**1.    LPL Cannot Produce Documents That Do Not Exist**

LPL cannot produce documents that it does not have, and LPL has produced its documents related to areas (1), (2), and (4) above. For example, with respect to Defendants' request for documents describing LPL's first sale or public use of the invention claimed in the '121 Patent, LPL produced its existing responsive documents and created additional responsive

summaries. *See* Ex. 3 at 3-4. Likewise, LPL has produced its documents related to Defendants' accused products and the acquisition of the '002 Patent from Honeywell. *See id.* at 2-3.[7]

### 2.    LPL's Detailed Summaries Comply Fully with Rule 34

Defendants' counsel acknowledges that the summaries created and provided by LPL provide useful and relevant information. As set forth below, however, Defendants refuse to produce similar summary of information requested by LPL. Defendants' position is contradictory, and LPL's summaries, which provide the relevant and responsive information from LPL's computer system, are entirely appropriate. Further, LPL's counsel has offered to consider supplementing the summaries to provide any specific additional information requested by Defendants. During the March 28 teleconference, however, Defendants' counsel refused to discuss this alternative and demanded production of LPL's entire database.

### 3.    Defendants' New Request for LPL's Entire Database is Unreasonable

Defendants' last-minute demand for LPL's database is unreasonable. LPL has not yet had sufficient time to determine the total number or size of the electronic files and systems implicated by Defendants' request for databases. What is clear, however, is that LPL's computer system from which it extracted relevant information contains a tremendous volume of business, financial, and technical information that has nothing to do with this case. LPL does not have a discrete database that is limited to relevant information that can be easily produced. Nor is there any showing of need for such a database, even if it existed.

---

[7] In the March 28 teleconference, Defendants' counsel repeatedly accused LPL of failing to produce the purchase agreement related to the '002 Patent, and contended that LPL had produced only the assignment of the '002 Patent found in the prosecution history. Defendants' counsel is mistaken. LPL produced not only the prosecution history, but also assignment and contract documents related to acquisition of the '002 Patent. *See, e.g.,* LPL II 1304-1313.

LPL's summaries contain the relevant information from LPL's computer systems. There is no suggestion that any of the summaries are inaccurate. Further, LPL's counsel repeatedly has offered to consider requests to add other information to the summaries upon reasonable request by Defendants' counsel.[8] Instead, Defendants' counsel demands that LPL produce its database. LPL respectfully requests that the Court deny this demand, including because: (1) Defendants have the relevant information in summary form and have not identified any missing information; (2) Defendants never discussed any need for database production until March 28, 2006, after the close of document discovery; and (3) it is well-recognized that discovery demands to produce an entire database are presumptively overbroad and improper. *See, e.g., In re Ford Motor Co.*, 345 F.3d 1315, 1316 (11th Cir. 2003) ("Rule 34 does not grant unrestricted, direct access to a respondent's database compilations"); *see also Convolve v. Compaq Computer Corp.*, 223 F.R.D. 162, 169 (S.D.N.Y. 2004) (improper to grant direct access to hard drives, servers, and databases, thus "circumventing the normal process of discovery" absent "widespread destruction or withholding of relevant information").

### 4. Defendants' New Request for LG. Philips America Documents is Unreasonable

Likewise, the Court should reject Defendants' belated attempt to seek from LPL documents in the possession of LPL's subsidiaries. In Defendants' March 29 letter, Defendants requested -- for the first time and after the close of document discovery -- copies of any documents that may belong to LPL's subsidiaries, including LG. Philips America, Inc. ("LPA"). *See* Ex. 6 at 2. LPA is a California corporation with its place of business in California. Defendants have not served any request on LPL for documents of LPA. Further, Defendants

---

[8] On March 30, Defendants' counsel asked whether LPL has any database that reflects which TCPs were used in production before March 23, 2000. LPL's counsel agreed to investigate this issue and is in the process of doing so.

have never served any subpoena on LPA, even though Defendants are aware of LPA from LPL's publicly available SEC reports. *See id.* at 2-3. Attempting an end-run around the discovery deadline, Defendants now attempt belatedly to seek from LPL documents that could and should have been pursued earlier by Defendants.[9]

The deadline for third party subpoenas has expired. The time for document requests also has expired. Recognizing this, and that LPA and LPL are separate entities, Defendants' counsel now attempts to contend that Defendants' document requests to LPL requested documents from both LPL and LPL's affiliates, including subsidiaries, including LPA. The record, however, undermines this contention. Defendants have never requested that LPL produce LPA's documents, and the Court has never ordered LPL to do so. Defendants cannot properly raise this new issue now.

Defendants requested only LPL's own documents in their document requests. Defendants' document requests include the heading "DEFINITIONS AND INSTRUCTIONS" stating: "A. 'LGL' and/or 'Plaintiff' shall mean LG.Philips LCD Co., Ltd." Defendants' First Set of Document Requests (Excerpt) at 2 (Ex. 7). The document requests do not define any other terms. Instead, the following paragraph B. incorporates by reference "definitions and meanings" set forth in Defendants' First Set of Interrogatories to Plaintiff. *See id.* Obviously, this incorporation by reference must refer to terms that are not defined in the document requests, i.e., all terms other than "Plaintiff".

---

[9] This is part of an ongoing pattern in this case to circumvent the discovery deadlines previously established and confirmed repeatedly by the Court. Defendants have filed a motion to reconsider (again) the Court's rulings enforcing the document discovery deadlines in this case, including the Court's rulings prohibiting Defendants from improperly issuing subpoenas and producing third-party documents after the deadline. *See* D.I. 134. LPL has opposed the motion. *See* D.I. 154.

Defendants unconvincingly contend that LPL should ignore the definition of "Plaintiff" as LPL in the document requests and refer instead to the more broadly framed interrogatories. Unlike the document requests, the Defendants' interrogatories define "Plaintiff" and/or "LPL" to mean "the Plaintiff in the above captioned lawsuit, LG Philips LCD Co. Ltd., *and its affiliates.*" Defendants' First Set of Interrogatories (Excerpt) at 1 (Ex. 8) (emphasis added). In turn, "Affiliate(s)" is defined to mean "any corporation or other entity that controls, is controlled by or is under common control with the identified corporation or entity, including without limitation partnerships, parents, subsidiaries and divisions." *Id.* at 2.

Defendants thus illogically argue that although they framed their document requests narrowly to <u>exclude</u> LPL's subsidiaries, the requests should be construed broadly to <u>include</u> subsidiaries based on <u>different</u> definitions in a <u>different</u> set of discovery requests (interrogatories). To the extent that these definitions conflict, LPL expressly objected in its responses and confirmed that it was responding based on "the definitions in Paragraph A of the Definitions and Instructions in Defendants' First Set of Document Requests." LPL's Objections and Responses to Defendants' First Set of Document Requests (Excerpt) at 4-5 (General Objection No. 9) (Ex. 9). The Court should reject Defendants' transparent effort to rewrite the document requests in an attempt to compensate for Defendants' failure to seek this discovery.

Further, Defendants' attempt to inject this new issue now – long after the discovery deadline has passed – is not reasonable. Moreover, if Defendants sought to obtain documents from LG.Philips America, they could have done so by subpoena. *See* Fed. R. Civ. P. 34 (c) ("A person not a party to the action may be compelled to produce documents and things or to submit to an inspection as provided in Rule 45"). No such subpoena was ever served. Even if Defendants had timely requested LPA's documents from LPL, Defendants have not provided

evidence to show that LPL actually controls any responsive documents at LPA, assuming that any such documents exist. Defendants, therefore, have not carried their burden to show any basis to deem any LPA documents discoverable from LPL. *See, e.g., Gerling Int'l Ins. Co. v. Comm'r of Internal Revenue*, 839 F.2d 131, 140 (3d Cir. 1988) ("In the absence of control by a litigating corporation over documents in the physical possession of another corporation, the litigating corporation has no duty to produce."). For all of these reasons, the Court should reject Defendants' attempt to pursue this new issue.

## II.    DEFENDANTS SHOULD BE ORDERED TO PROVIDE DISCOVERY

As set forth below, LPL seeks the Court's assistance to obtain the following basic discovery items that LPL has sought for months in this case:

- a list, in English, of which LCD modules and products use which types of TCPs;

- a list, in English, of which LCD modules and products are manufactured using ESD guard rings;

- all outstanding motherglass samples, including that correspond to the mask (or .str) files that Defendants have produced;

- a comprehensive index for Defendants' mask works files that indicates which file(s) relate to which product(s);

- all outstanding mask works files and related information, including, but not limited to, as set forth in LPL's March 16, 2006 letter (Ex. 15); and

- a list or index that cross-references the "CLAA" numbers used to identify Defendants' modules with the "LSN" numbers used on CPT's Chinese operational specifications.

### A.    Despite LPL's Repeated Requests, Defendants Have Not Provided Information Necessary to Determine Representative Products and Claims

At the scheduling conference on December 8, 2005, the Court made clear that representative products and claims would be used at trial, and that counsel should work together to reach agreement on these issues:

MS. DUDZIK: There was another issue that we haven't talked to counsel yet. If we could – both of the parties could talk about narrowing our requests for documents. Originally, your Honor had mentioned talking about representative products and representative patent claims.

THE COURT: We're definitely doing that in this case. I thought I made that real clear to both sides. If you can agree, good. If you can't, then I will impose the limits. It's probably better if you can agree.

MS. DUDZIK: Especially with the products. We can talk and maybe we'll be in a position by what was the next meeting in front of your Honor?

THE COURT: January 11th.

MR. BONO: I've been working on that. I'm not able to limit the claims today or address particular products. I understand your Honor's suggestion. I've been giving that a substantial amount of thought. I'm not in a position to make a definitive proposal.

THE COURT: That's good. Work on it and get that over. That will direct any new discovery requests that get contested. I'll need to have that by the time that I have to schedule a discovery dispute conference. We're going to have representative claims and products. . . .

Tr. of Dec. 8, 2005 Hearing at 8-9 (D.I. 55).

As instructed by the Court, shortly after the December 8 hearing, LPL's counsel discussed with Defendants' counsel the issue of representative products and claims, and requested specific product information – for both the '121 and '002 Patents – as a necessary first step in that process. LPL has requested basic information in the form of a list identifying which LCD modules and products use which types of TCPs, and a similar list regarding LCD modules and ESD guard ring information. Initially, Defendants' counsel indicated that the requested product information would be provided. In the ensuing months, LPL has repeatedly requested this information in telephone calls and letters. Defendants, however, have not provided the information. As a result, LPL has twice raised this issue with the Court. *See, e.g.,* Feb. 7, 2006

Letter from Richard D. Kirk to the Court at 3 (D.I. 110); Feb. 28, 2006 Letter from Richard D. Kirk to the Court at 2 (D.I. 128).

By letter of March 15, 2006, Defendants' counsel indicated that the summaries requested by LPL would not be provided. *See* March 15, 2006 Letter from Julie S. Gabler to Cass. W. Christenson at 2 (Ex. 10). Defendants' counsel did not state that the requested information was irrelevant, unavailable, or would be unduly burdensome to collect and produce. Rather, Defendants' counsel stated that the summaries "do not exist [and] [i]f they were created now, they would be work product." *Id.* Defendants' counsel reiterated that position during the March 28 meet and confer.[10] Defendants incorrectly contend that any factual information compiled by counsel is protected work product.

Defendants' position is legally incorrect and the Court should order Defendants to produce the information requested by LPL. Producing factual information from Defendants' computer systems or other sources, even if done at the request of an attorney, would not implicate the work product doctrine. *See, e.g., Government of the Virgin Islands v. Fahie*, 419 F.3d 249, 257 (3d Cir. 2005). In *Fahie*, the U.S. Court of Appeals for the Third Circuit rejected the government's attempt to withhold a report from a database as work product. As the Third Circuit reasoned, a computer-generated printout is not work product when it lacks "mental impressions, conclusions, opinions or legal theories concerning litigation of an attorney or other representative" and does not reveal confidential information regarding strategy. *Id.* Further, Rule 34 contemplates that "'when the data can as a practical matter be made usable by the

---

[10] During the March 30 meet and confer, Defendants' counsel stated that, under certain as yet undefined circumstances, Defendants *might* provide the requested TCP-related information, but that they would not provide the ESD-related information. Defendants might agree to provide information regarding products and TCPs, but will only consider doing so if LPL first agrees that this information will be limited to the time period since the complaint was filed.

discovering party only through respondent's devices, respondent may be required to use his devices to translate the data into usable form. In many instances, this means that respondent will have to supply a printout of computer data.'" *Macrovision Corp. v. VSA Ltd.*, CIV. No. 88-315-FR, 1989 WL 112808, at *3 (D. Or. Sept. 20, 1989) (quoting Fed. R. Civ. P. 34 Advisory Committee Notes); *see also Fahie*, 419 F.3d at 257 (computer-generated printout from a database was not work product). Indeed, as set forth above, LPL did exactly what Defendants refuse to do -- LPL created and provided several summaries and charts containing relevant product information in response to Defendants' discovery requests.

CPT does not – and could not fairly – contend that it would be unduly burdensome to produce this readily available information. CPT's counsel acknowledges that it has actual information available, but has stated repeatedly that LPL should take depositions to get this information. LPL respectfully requests that the Court order Defendants to produce the summary information set forth above, including, for example, so that the parties can work toward identifying representative products and claims for trial. In addition, these lists will allow LPL to identify any outstanding products or information that Defendants have not yet produced, including discovery addressed below. Accordingly, LPL requests that the Court order Defendants to produce:

- a list, in English, of which LCD modules and products use which types of TCPs; and

- a list, in English, of which LCD modules and products are manufactured using ESD guard rings.

### B.   Defendants Have Not Provided All Discovery Ordered by the Court

#### 1.   Defendants Have Not Produced All Motherglass Samples

During the March 1, 2006 hearing, the Court ordered Defendants to produce discovery that had previously been withheld and that LPL brought to the Court's attention in its pre-hearing

letter. *See generally* Feb. 28, 2006 Letter from Richard D. Kirk to the Court (D.I. 128).

Specifically, the Court ordered Defendants to produce "mother glass samples for each of CPT's

LCD products, and . . . the nineteen product samples that have been withheld." Ex. 1 at 5 (D.I.

131).

Despite the Court's ruling, after the March 1 hearing, Defendants continued to resist

production of motherglass samples, attempting to force LPL's counsel to travel to Taiwan to

inspect such samples. *See, e.g.*, March 7, 2006 Letter from Julie S. Gabler to Gaspare J. Bono

(Ex. 11); March 8, 2006 Letter from Julie S. Gabler to Cass W. Christenson (Ex. 12). After

LPL's counsel objected to Defendants' unreasonable tactics, Defendants finally agreed to ship

samples of motherglass to LPL's counsel. *See* March 9, 2006 Letter from Julie S. Gabler to Cass

W. Christenson (Ex. 13).

When the samples arrived, on March 24, several samples were severely damaged.[11]

Moreover, upon inspection, LPL's counsel determined that Defendants apparently did not ship

all samples as required by the Court. In some cases, Defendants have produced both mask works

files (or ".str" files) and corresponding motherglass samples that have <u>different</u> circuitry,

indicating that LPL is missing both some mask files and some motherglass samples. LPL's

counsel notified Defendants' counsel of these discrepancies and requested all withheld mask files

and samples. Defendants' counsel acknowledged this discrepancy between the produced files

and samples during the March 30 meet and confer, but would not explain the discrepancies

except to say that this is work product and LPL will have to pursue further discovery.

Accordingly, LPL requests that the Court order Defendants to produce:

---

[11] The samples are still being inspected and reviewed to assess the extent of the damage.

- all outstanding motherglass samples, including that correspond to the mask (or .str) files produced that Defendants have produced.

### 2.    Defendants' Other Discovery Deficiencies and Untimely Objections

With respect to the "Critical Discovery Related to Products and Technical Issues," that LPL requested in its February 28 letter to the Court, which entailed eleven (11) discovery issues, the Court ruled that Defendants must produce all of this technical discovery "by the March 17th, 2006 date," or file detailed objections "*before* March 17th." Ex. 1 at 6 (emphasis added); *see also* March 2, 2006 Order at 2 (granting LPL's request for "Critical Discovery Related to Products and Technical Issues," but stating that "Defendants may, **before March 17, 2006**, set forth detailed objections") (emphasis in original) (D.I. 132). The Court emphasized that Defendants should try to resolve any objections informally and in advance, explaining "I want to give you all a chance to talk more and if you can't work it out, I want to see in detail what [Defendants'] objections are . . . ." Ex. 1 at 8 (D.I. 131); *see also id.* at 15 ("So the more you talk, the more you may work towards some solutions.").

Defendants' counsel never contacted LPL's counsel to discuss any possible objections regarding these discovery issues.[12] Instead, Defendants waited until March 17 and then filed their objections and responses to the requests in LPL's February 28 letter. *See* D.I. 148. Defendants' objections are thus untimely and in disregard of the Court's expectation that counsel would attempt to resolve informally any disputed issues and objections. *See* D.I. 132 at 2 (ordering Defendants to file their objections "**before March 17, 2006**") (emphasis in original); Ex. 1 at 6 (stating that Defendants may, "before March 17th[,] set forth detailed objections"); *see also id.* at 8, 15 (urging counsel to resolve disputed issues informally) (D.I. 131).

---

[12] LPL's counsel first learned that Defendants might file some objections in a March 15 letter, two days before the production deadline. *See* March 15, 2006 Letter from Julie S. Gabler to Cass W. Christenson (Ex. 10).

Defendants' objections regarding LPL's eleven bullet points can be grouped into three areas: (i) mask files and a corresponding index showing which files relate to which products (*see, e.g.,* D.I. 148 at Objection No. 1); (ii) other discovery related to ESD guard rings and the '002 patent; and (iii) discovery related to TCPs and the '121 patent. Regarding area (i), Defendants acknowledged that there was confusion about whether all mask files had been provided and that LPL may not have received all of the mask files. On March 30, CPT's counsel assured LPL's counsel that Defendants would cure this issue by immediately producing two complete mask file disks as received from CPT, but later the *same day* refused to produce these disks and took the position that all files were already produced. In addition, Defendants have pointed to more than 2,000 pages of Chinese-language technical documents that purportedly contain the technical information that is available (*see, e.g., id.* at Objection Nos. 3, 4, 6, 7, 9, 10). LPL requests an opportunity to address in the future any deficiencies in these documents after LPL's counsel has had an opportunity to review and translate these documents.

a.    **Defendants Have Not Produced Mask Files and Related Information**

Defendants' Objection No. 1 relates to LPL's request for an index for the mask work files related to ESD guard rings and indicating which file(s) relate(s) to which products. *Id.* at Objection No. 1. LPL needs this index so that LPL can determine both (i) which mask files exist, and (ii) which mask files relate to which products.[13] On March 30, 2006, CPT's counsel informed LPL's counsel that a single mask file may correspond to more than one product.

---

[13] In general, a mask file, which relates to the '002 Patent, is a negative or positive image of the metal, insulator, or semiconductor material that indicates where to deposit or remove these materials on or from the substrate during the LCD manufacturing process. Often, these files are in the form of "str" files. As Defendants state in their objections, "[m]ask files are THE mechanical drawings of the motherglass, showing each layer in the [manufacturing] process." D.I. 148 at 3 (emphasis in original). Thus, mask files are critical to LPL's infringement analysis regarding the '002 Patent, which relates to ESD rings used in the LCD manufacturing process.

CPT's counsel would not, however, provide a list or index to show which files relate to which products. Further, CPT's counsel refused to disclose the time period for which mask files were produced, stating that LPL would have to seek that information in depositions.

LPL cannot determine whether it has all relevant mask files without the index that Defendants refuse to provide. By reviewing the Defendants' overall production and spending many hours cross-referencing pieces of information, LPL's counsel has identified dozens of mask files, and related information, that appear to be missing from CPT's production. LPL has specifically requested all of the "mask works and files for all of CPT's products." March 13, 2006 Letter from Cass W. Christenson to Christine A. Dudzik at 2 (Ex. 14). In response to a request from CPT's counsel, LPL also has identified many specific examples of mask files that appear to be missing. *See* March 16, 2006 Letter from Gaspare J. Bono to Julie S. Gabler (Ex. 15) (identifying specific mask (or ".str") files that Defendants had not produced, and reiterating LPL's need for a comprehensive listing of Defendants' mask files information, including cross-references between files and products).

Defendants do not contend that they cannot provide the index. Instead, Defendants argue that "no such index exists at CPT" and, if such an index was created, it "would be work product and would not be subject to production in any event." D.I. 148 at 2. Further, Defendants contend that LPL should have sought a mask works index by interrogatory, and that LPL now can can seek the required information only during depositions. *Id.*

Defendants' technical objections are incorrect and unconvincing. Creating and producing an index of factual information from computer files or other sources will not implicate work product concerns. *See, e.g., Fahie*, 419 F.3d at 257. Moreover, during counsel's March 28 and 30 meet and confer discussions, Defendants' counsel failed to resolve these issues. On March

28, Defendants' counsel conceded that he had not even read LPL's March 16 letter setting forth

specific mask files apparently not produced. On March 30, Defendants' counsel acknowledged

that some of the files in the March 16 letter may not have been produced and offered to produce

that day or the next day two disks with the complete set of mask work files to resolve this issue.

Later that same day, however, Defendants' counsel reversed course, stating that all files were

previously produced and that CPT would not produce the two complete disks.

In addition, on March 30, Defendants' counsel confirmed that certain mask files relate to

more than one product. However, Defendants' counsel refused repeatedly to provide an index

indicating which file(s) correlate to which product(s). Accordingly, LPL respectfully requests

that the Court order Defendants to produce:

- a comprehensive index for Defendants' mask works files that indicates which
  file(s) relate to which product(s); and

- all outstanding mask works files and related information, including, but not
  limited to, as set forth in LPL's March 16, 2006 letter (Ex. 15).

### b.     LPL Is Continuing To Analyze Defendants' Production

In LPL's February 28 letter to the Court, LPL noted that "Defendants' counsel claims to

have produced documents called 'operational specifications,' however, LPL's counsel has not

been able to locate these documents." D.I. 128 at 5 n.7. Accordingly, LPL requested that

Defendants produce their operational specifications or, if those documents already had been

produced, that Defendants' counsel identify the relevant bates ranges. *Id.* Defendants' counsel

did not identify the relevant bates ranges until March 17, when Defendants filed their objections

with the Court. *See* D.I. 148 at 3-9 (Objection Nos. 3, 4, 6, 7, 9, 10).

LPL's counsel cannot assess the extent to which Defendants' foreign-language technical

documents provide the necessary information because there are thousands of pages of Chinese

documents. Because the cost and effort that would be required to translate all of these pages on

an expedited basis is prohibitive, during the March 28 meet and confer, LPL's counsel asked Defendants' counsel to provide a list that would cross-reference Defendants' module numbers to the "LSN" numbers on the face of the Chinese operational specifications. Such a list would enable LPL's counsel to determine generally which operational specifications correspond to which of Defendants' LCD products. Defendants' counsel indicated that the list would not be provided. LPL will continue to review these documents and analyze the extent of any deficiencies. If any further deficiencies are found, LPL will attempt to resolve those deficiencies with Defendants' counsel informally, and resort to the Court only if necessary. To assist LPL's review, LPL respectfully requests that the Court order Defendants to provide an index matching the operational specifications to CPT's products.

In addition, on March 31, 2006, LPL's counsel was informed that Defendants previously produced computer-animated drawings (CAD) files related to TCPs only for the period up to 2003.[14] Defendants' counsel has stated that Defendants are in the process of supplementing the Defendants' production to include the files for the time period since 2003. This production is untimely and LPL requests that Defendants produce any and all information related to TCPs as set forth in LPL's February 28 letter to the Court.

Accordingly, LPL respectfully requests that the Court:

- require Defendants to provide a list or index that cross-references the "CLAA" numbers used to identify Defendants' modules with the "LSN" numbers used on CPT's Chinese operational specifications; and

- allow LPL to raise any other deficiencies in Defendants' production concerning technical discovery needed as to TCPs and the '121 patent, and/or ESD guard rings and the '002 patent, pending translation and analysis.

---

[14] During the March 30 teleconference, Defendants' counsel stated that Defendants already had produced all documents related to how TCPs are connected in Defendants' products.

## III.    DEFENDANTS' CONTINUED IMPROPER PRODUCTION OF DOCUMENTS

In addition to the deficiencies discussed above, Defendants' supplemental production on March 17, 2006 was improper. Defendants' March 17 production, as with previous productions, disregards the deadline for document discovery. At the March 1 hearing, the Court quashed Defendants' untimely subpoenas and excluded all documents produced by Defendants after February 21. *See* Ex. 1 at 3 ("any subpoena issued by any party for documents ... after February 21, 2006 is quashed" and "any document provided after February 21 is excluded.") (D.I. 131). Undaunted, on March 17, Defendants produced more documents that should have been produced by the Court's discovery deadline but were not, including, for example, documents subpoenaed from third-parties, prior art documents, and invoices. *See, e.g.*, SHARP-D 12-13; AR-D 1-3; CPT-D 27893-27905; CPT-D 27943-53. The Court should not allow Defendants to continuously disregard the document deadline in this case. The March 17 deadline was a deadline to produce only those documents compelled by the Court's March 1 ruling under Rule 37. Instead, Defendants treated the March 17 date like a discovery extension. Consistent with its prior rulings, the Court should respond by enforcing its repeated orders and the deadlines in this case.

## CONCLUSION

Accordingly, for all the foregoing reasons, LPL respectfully requests that the Court find that LPL has complied with the Court's discovery rulings, and further requests its reasonable expenses, including attorneys' fees. LPL also requests that the Court address deficiencies in Defendants' discovery responses and require supplemental information as requested herein.

March 31, 2006

THE BAYARD FIRM

/s/ Richard D. Kirk (rk0922)
222 Delaware Avenue, Suite 900
P.O. Box 25130
Wilmington, DE 19899-5130
(302) 655-5000
rkirk@bayardfirm.com
Counsel for Plaintiff
LG.PHILIPS LCD CO., LTD.

OF COUNSEL:
Gaspare J. Bono
Matthew T. Bailey
Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on March 31, 2006, he electronically filed

the foregoing document with the Clerk of the Court using CM/ECF, which will send

automatic notification of the filing to the following:

Robert W. Whetzel, Esq.
Matthew W. King, Esq.
Richards, Layton & Finger
One Rodney Sqare
P.O. Box 551
Wilmington. DE 19899

The undersigned counsel further certifies that copies of the foregoing document

were sent on March 31, 2006 by email and to the above counsel to the following non-

registered participants, and will be sent by hand to the above counsel and by first class

mail to the following counsel:

Christine A. Dudzik, Esq.
Thomas W. Jenkins, Esq.
Howrey LLP
321 North Clark Street
Suite 3400
Chicago, IL 60610

Teresa M. Corbin, Esq.
Glenn W. Rhodes, Esq.
Howrey LLP
525 Market Street
Suite 3600
San Francisco, CA 94105

/s/ Richard D. Kirk (rk0922)
Richard D. Kirk

# Exhibit 1

LG Philips LCD Co., LTD   v.
Tatung Company, et al.

Hearing
March 1, 2006

---

1
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
LG. PHILIPS LCD CO. LTD.,   :
        Plaintiff,   :
            :   Civil Action
            :   No. 05-292
v.   :
TATUNG COMPANY, TATUNG COMPANY OF :
AMERICA, INC., CHUNGHWA PICTURE :
TUBES LTD., and VIEWSONIC :
CORPORATION,   :
        Defendants.   :
        Wednesday, March 1, 2006
        12:30 p.m.
        Courtroom 4B
        844 King Street
        Wilmington, Delaware
BEFORE:  THE HONORABLE JOSEPH J. FARNAN, JR.
        United States District Court Judge
APPEARANCES:
        THE BAYARD FIRM
        BY:  RICHARD D. KIRK, ESQ.
            -and-
        McKENNA LONG & ALDRIDGE
        BY:  GASPARE J. BONO, ESQ.
        BY:  CASS W. CHRISTENSON, ESQ.
            Counsel for the Plaintiff
2
APPEARANCES CONTINUED:
        RICHARDS, LAYTON & FINGER
        BY:  ROBERT W. WHETZEL, ESQ.
            -and-
        HOWREY, LLP
        BY:  JULIE S. GABLER, ESQ.
            Counsel for the Defendant
3

[1] THE COURT: All right. Be seated, [2] please.

[3] Good afternoon.

[4] MR. BONO: Good afternoon.

[5] MS. GABLER: Good afternoon.

[6] THE COURT: I have taken a look at [7] the letters that were filed and we're [8] going to have to work through this quickly because I'm in [9] the middle of a trial.

[10] What I'm going to do is give you [11] some rulings and some remedies, and then in the [12] time frame I'll give you, you'll have the [13] opportunity to try to work out your differences [14] on a short time frame, but if you don't, we'll [15] have you back for the hearings.

[16] Now, what I'm going to do first is [17] any subpoena issued by any party for documents [18] that is — that was issued after February 21, [19] 2006 is quashed. And any requests for [20] production or any document provided after [21] February 21 is excluded.

[22] With regard to — we'll turn first [23] the letter from defendants, which es-sentially [24] when I read through it has a lot to do with

Page 4

[1] discovery requests largely with regard to the [2] question of damages.

[3] I'm going to stay for a short [4] period of time all damages discovery and with [5] regard to defendants' claims on the questions [6] that relate to validity, which are the questions [7] of commercial success and questions related to [8] the on sale issue, and questions related to the [9] prosecution, questions related to the public use [10] matter, all of the requests are going to on [11] those issues be granted for discovery.

[12] And the plaintiff will have until [13] March — it's a Friday, March 17, 2006 to [14] respond to that order. And the order is being [15] issued pursuant to Rule 37, but with no [16] sanctions at this time.

[17] And if there is any dispute [18] concerning the order, there will be a hearing on [19] March — this is a Wednesday, March 29th at 4:00 [20] o'clock, at which time defendants will have an [21] opportunity — and I'll set a time al-location [22] if the hearing becomes necessary, it will be [23] certain hours allocated to the prosecution of [24] the contempt, and certain time allocated to the

Page 5

[1] defense of the contempt will have an opportunity [2] to present its evidence that the Rule 37 order [3] on matters of invalidity as cited in the [4] defendants' letter in conjunction with this [5] hearing, February 28, 2006 letter, haven't [6] been [6] complied with.

[7] Now, with regard to defendants' [8] request for documents related to the dec-laration [9] of [9] William K. Bohanan, the application is denied.

[10] Now, with regard to plaintiff, the [11] request for the mother glass samples is granted [12] as requested on page four of plaintiff's letter. [13] Specifically it's gran-ted [14] that defendants can produce one, mother glass samples for each of [15] CPT's LCD products, and two, the nine-teen [16] product samples that have been withheld.

[17] Again, that order is pursuant to [18] Rule 37 and the production shall occur by [19] March [19] 17, 2006. If it isn't pro-duced, [20] there will be a [20] hearing at which plaintiff can present its [21] evid-ence. [21] The hearing will be held on March the [22] 30th. I'm trying to reduce your stress of [23] travel, so you'll be here in the afternoon on [24] the 29th, so I'm going to bring you on the

Page 6

[1] morning of the 30th at 9:30 a.m.

[2] And again, if that hearing is [3] neces-sary, [3] I'll allocate time. In each case, I [4] should interpose this, letters or what we'll [5] call prehearing briefing pre-senting [5] the proposed [6] evidence and the noncompliance facts will be due [7] on Friday, March the 24th, 2006.

[8] Again, the damages information or [9] discovery requested is separated and I'll deal [10] with that separately.

[11] The plaintiff's request for its [12]

captioned Critical Discovery Related to Products [13] and Technical Issues is granted and ordered to [14] be produced by the March 17th, 2006 date.

[15] However, on this order, the [16] defendant can rather than respond by March 17th, [17] can before March 17th set forth detailed [18] objections to each — what do you call those [19] dots? Bullets. Bullets — to the bullet items, [20] you know, you just use the language after each [21] bullet as a caption and defendant can [22] instead detailed ob-jections [23] to the requests and [23] then I'll consider those and then enter a [24] further order either granting or denying, and I

Page 7

[1] really think what I'm trying to do there is give [2] you more time to talk about that.

[3] Some of the items that are [4] detailed there appear to me simply to be [5] discoverable, I don't know why they haven't been [6] given over, and others appear to just be pushing [7] against the wall, and it's a three-layer brick [8] wall, but I don't know enough from the papers I [9] have to make a final decision, but we'll put [10] that process in place and one way or the other [11] we'll get it resolved. It's kind of on the same [12] time frame as these other issues.

[13] And I think that takes care of [14] what I'm interested in resolving that was [15] presented in the letters. And I'll give each an [16] opportunity to comment or ask me a question, and [17] you're already jumping out of your seat.

[18] MR. BONO: I just have two [19] clar-ifications, [19] Your Honor. If they do file [20] objections, would we have an op-portunity [21] to [21] respond to them before Your Honor rules?

[22] THE COURT: I'm going to read [23] their objections first and then I'll tell you [24] what we're going to do, we're either going to go

Page 8

[1] to a hearing on those objections or we're going [2] to get together again.

[3] MR. BONO: Very good.

[4] THE COURT: But I want to give you [5] all a chance to talk more and if you can't work [6] it out, I want to see in detail what their [7] objections are to those requests and then I'll [8] decide, you know, whether we ought to go [9] immediately to a hearing or we ought to have [10] some-thing [10] further such as, you know, more [11] exposition on the matter.

[12] MR. BONO: Very well. Your Honor, [13] just a clarification, Your Honor has granted our [14] request for the mother glass on each product, [15] and to clarify, there are two mother glasses for [16] each

**Hearing**
**March 1, 2006**

product, and they are different whether one [17] is called the TFT side, one is called I think [18] the CF side, and we need both. And I didn't [19] want there to be any ambiguity in the Court's [20] granting it as to the mother glass for each [21] product.

[22] THE COURT: It's granted as [23] requested.

[24] MR. BOND: All right. We had

---

Page 9

[1] specified both sides.

[2] THE COURT: Right.

[3] MR. BOND: Thank you.

[4] THE COURT: It's granted as [5] requested.

[6] MS. GABLER: Your Honor, we would [7] actually like to be heard on that issue.

[8] THE COURT: I'm not going to hear [9] anything right now on it. I'm going to put you [10] all at risk to the hearing. In other words, [11] I'll hear you at the hearing. If you don't [12] produce, we're going to have a contempt hearing [13] and you can make those presentations then. [14] That's the vehicle for it.

[15] You know, we're kind of like in an [16] a amorphous state here, one side says one thing. [17] the other side says the other, the mechanism for [18] truly getting those resolved is one of two [19] options, you go to a master, or I'm getting to [20] kind of like both sides here, so I'm going to [21] keep you with me, and I'm going to conduct the [22] hearing that the master would have conducted. [23] You'll have a chance, for instance, if you think [24] that's a nonsense request, don't produce, take

---

Page 10

[1] your chance at the hearing, it's going to be [2] ugly. If you prevail, it will be ugly.

[3] MS. GABLER: Okay.

[4] THE COURT: I think that — in [5] other words, in these discovery disputes the [6] older I get, the more I realize that we decide [7] them with no information And it's a little bit [8] of gamesmanship by the Court.

[9] So if I have the time, I'm going [10] to conduct the hearings when I get it down to [11] discernible issues, or I'm going to send folks [12] to the magistrate. We don't have a magistrate [13] judge, but if we get the second one there, or to [14] a master, which is why I have kind of carved out [15] the Grayson.

[16] What you all are talking about is [17] damages discovery. You may have to go spend [18] thirty or forty-five days with a master and make [19] a lot of hearings and exchange of papers and [20] things like that, but what I want to get settled [21] is infringement and validity discovery, to

---

the [22] extent you're engaged in it now, and put you at [23] risk for your decisions.

[24] MS. GABLER: I understand that

---

Page 11

[1] point, Your Honor. In these letter briefs [2] obviously they were only one sided, each side [3] did not have an opportunity to rebut, and so we [4] do have some concerns about that.

[5] I would like to have one point of [6] clarification in terms of production. And [7] particularly in regard to the samples and the [8] mother glass, is an offer for inspection [9] considered production by Your Honor? Because in [10] some instances, for example, within those [11] samples, there are some of them where there is [12] only one available, so if we produce it to LPL, [13] that's it, we don't have one, we can't get [14] another one, this is the one that's available, [15] those are the reasons we offer them for [16] inspection.

[17] THE COURT: If that is true — [18] well, I was going to order all produced at the [19] Washington D.C. office, but I stayed out of that [20] in the one instance where that was a discussion [21] because I can't believe the lawyers can't figure [22] that out themselves.

[23] In other words, if I'm on his side [24] and if what you just told me is correct, I got

---

Page 12

[1] to agree to go inspect, don't I?

[2] MS. GABLER: I would think so.

[3] THE COURT: Otherwise —

[4] MS. GABLER: We haven't been able [5] to reach that agreement.

[6] THE COURT: Otherwise I'm either [7] in need of serious care or, you know, I ought to [8] be — my father drove a truck, I ought to be [9] driving a truck like my dad and he didn't have [10] all that stress every day, he just made sure he [11] made his four deliveries.

[12] So that's the kind of thing I'm [13] giving you an opportunity to talk with each [14] other about. But if someone is illogical or [15] irrational and that's your defense that they [16] wouldn't accept inspection and there is only one [17] of the items, you're going to be successful at [18] the hearing.

[19] Am I making sense here?

[20] MS. GABLER: You are making sense [21] as to the samples, it does really bring me back [22] to the mother glass issue that I really would [23] like Your Honor's indulgence to be heard.

[24] THE COURT: They want it. they

---

Page 13

[1] think they're entitled to it, why would

---

I know [3] more than the both of you about what ought to be [3] produced? And I only ought to decide if it [4] should be produced or not be produced in the [5] context of a penalty if I have a full [6] evidentiary expedition and I wouldn't get that [7] listening to you today. I have read the [8] letters. How many exchanges have both of you [9] had?

[10] MS. GABLER: Several.

[11] THE COURT: So I have this silly [12] notion that you can rely on experienced lawyers [13] to do the right thing and discovery all those [14] rules was intended to be a nonjudicial [15] intervention process. Wasn't that the thought? [16] But somehow it's become the game.

[17] So I want to do it on an [18] evidentiary record, And I'm not a harsh guy, [19] but if somebody didn't produce something that it [20] becomes clear after hearing witnesses that they [21] should have produced, they're going to pay a lot [22] of money for not having done it.

[23] I ordered somebody to pay for a [24] trial because they wouldn't listen to my orders

---

Page 14

[1] during the trial. Why should I get stressed [2] during the trial? If you want to keep violating [3] my orders during evidence, you wait to the end, [4] you brief it, if the transcript shows you didn't [5] do what you were supposed to do in the context [6] of my orders, you just pay for the next trial. [7] And you go appeal and whatever they do, they do.

[8] But we got to get this system back [9] to some response from lawyers to be rationale [10] and logical.

[11] But you understand there is only [12] one, she can't give it to you, you got to go [13] inspect it.

[14] MR. BOND: I'll try to work that [15] out, Your Honor. I thought a reasonable [16] compromise on that would be they would produce [17] it in the local counsel's office so we could [18] have reasonable access to it and they would [19] maintain possession of it as a reasonable [20] compromise. That would be my thought, but I'll [21] address that with counsel.

[22] MS. GABLER: Counsel, we discussed [23] that back and forth. Part of it is they're [24] disassembled and things we had to buy on the

---

Page 15

[1] open market, we had to buy online, so it's [2] putting it back together and risking damaging it [3] and shipping it is an issue in terms of where it [4] actually sits in Chicago versus bringing it to [5] Delaware. And I don't think it helps any of us [6] to have a sample damaged.

LG Philips LCD Co., LTD  v.
Tatung Company, et al.

[7] THE COURT: Don't you all want to [8] get through this so we can get to trial? That's [9] the fun part.

[10] MR. BONO: I'll be happy to [11] discuss that. That's the first I have heard [12] that there is a damage question and they were [13] already disassembled. I was not apprised of [14] that information until a moment ago.

[15] THE COURT: So the more you talk, [16] the more you may work towards some solutions. I [17] have a feeling we're going to have a hearing at [18] least on some issues on each side and that's [19] fine, I'll allocate time, we can — you know, [20] very important people can tell you their whole [21] life in 185 pages. How long did it take for you [22] to tell me what's going on here, an [23] hour-and-a-half?

[24] So this — but what we're going to

Page 16

[1] do is we're going to get you to the trial and [2] we're going to try and be as fair as we can in [3] hearing your disputes so you have the evidence [4] that you want, but we really want to work to not [5] arguing over silly things, but to get you to a [6] trial.

[7] That takes care of your issues. [8] It doesn't take care of your issues because [9] yours are kind of reserved for the hearing if [10] it's essentially in the context of an objection, [11] which is fine.

[12] MS. GABLER: Right.

[13] THE COURT: And we'll hear them [14] then, if you don't work them out. Is there [15] anything you don't understand about the process [16] or the nature of the process, in other words, [17] what the orders are asking you to do?

[18] MR. BONO: I understand that.

[19] MS. GABLER: Yes, we understand [20] them.

[21] THE COURT: Okay. I'll put an [22] order in place that sets all these dates for [23] you. You have the transcript to refer to if [24] there is, you know, any detail you need. I'm

Page 17

[1] just going to put the dates in the order of what [2] you're supposed to do.

[3] MR. BONO: One final [4] clarification, Your Honor. There is just three [5] dates looming up in Your Honor's original [6] scheduling order that I believe are off the [7] table now in light of this ruling, which were [8] the deposition deadline that originally was [9] March 17, the expert report deadline, March 31, [10] and the expert deposition deadline of April 28. [11] I would assume that those dates are no longer [12] applicable and that we'll — there will be new [13] dates assigned at the appropriate time?

[14] THE COURT: They're going to get [15] pushed out proportionately to the M-arch 29 and [16] 30th dates, which isn't a whole lot of time. [17] It's basically about thirty days is what I [18] figured.

[19] MR. BONO: So we could assume [20] those are pushed out about thirty days at this [21] point?

[22] THE COURT: We are going to have [23] to get this discovery worked out first.

[24] MS. GABLER: The other date —

Page 18

[1] THE COURT: All the dates that [2] were key to the February 21st date essentially [3] will be pushed out to allow this process to [4] occur.

[5] MS. GABLER: Your Honor, just to [6] clarify, I believe all the dates that Mr. Bono [7] just read plus the one I raised were all [8] actually key to the February 3rd date, not the [9] February 21st date. None of the dates that [10] Mr. Bono just discussed were discussed at our [11] last hearing, instead we just indicated that [12] depositions would not begin until document [13] issues had been resolved.

[14] THE COURT: So we're not going to [15] get resolution until let's say March 30th, so [16] that's the date that will be operable to push [17] out from. And it will be about the same amount [18] of time that it took to get the resolution, [19] which is the month of March, thirty days.

[20] MS. GABLER: Okay. Is Your Honor [21] willing to hear any argument this morning on the [22] third-party subpoena issue?

[23] THE COURT: What would I want to [24] hear?

Page 19

[1] MS. GABLER: Our concern, Your [2] Honor, is that we have several issues that we're [3] concerned with in that regard.

[4] First of all, in production that [5] they completed on the 21st and the documents [6] that they actually produced on the 21st, there [7] are indications of some LPL on sale panels that [8] were not produced and that we have now been [9] able to go ahead and buy one of those online and [10] indicated that they clearly was on sale and does [11] embodiment of the '121 patent in it.

[12] Not only did they not produce [13] sufficient documents, but also we now didn't go [14] out and try to subpoena any third parties who [15] would have been involved in those transactions [16] because we didn't have that information from LPL [17] until the last day of the document discovery.

[18] Additionally, in their documents, [19] it has been indicated that Texas In-struments is [20] a TCB supplier to LPL. That was not revealed in [21] their initial

disclosures or in any other [22] location. We again discovered that on the 21st. [23] We had no reason to subpoena Texas Instruments [24] prior to receiving those documents so we never

Page 20

[1] subpoenaed them either. They lead us to believe [2] now that they would have relevant information.

[3] And finally, in terms of the [4] various other third-party subpoenas regarding [5] on sale documents, prior to our last hearing it [6] was not our understanding that the February 3rd [7] date applied to anybody but the parties, and we [8] were aggressively doing third-party discovery, [9] but I think it might have been a little unclear [10] in the various letter briefs that went back and [11] forth there that the on sale discovery that [12] we're pursuing those subpoenas is not the on [13] sale discovery that Ms. Dudzac had referenced [14] in earlier hearings, but there was an additional [15] panel, a new panel, a Sharp panel that we [16] discovered and have turned over, did turn over [17] at least one document and offered the panel for [18] inspection by February 21st.

[19] But we have received and been [20] producing many other documents that clearly [21] evidence that that panel was on sale and it does [22] appear to be the preferred embodiment of the [23] '121 that would invalidate that entire patent.

[24] The Federal Circuit is certainly

Page 21

[1] interested in prioritizing, in validating [2] a patent rather than having an invalid patent be [3] enforced in a litigation and then, you know, [4] potentially try to be enforced against others in [5] the future, so we really think there is a due [6] process here in regards to that limited area of [7] discovery.

[8] We plan to seek reconsideration of [9] Your Honor's ruling on that point, but we would [10] like you to consider not quashing those [11] subpoenas right now and letting us let those [12] subpoena productions go forward, let us be heard [13] on our motion for reconsideration, at that point [14] if you maintain your position, we can deal with [15] whatever is going to happen in terms of quashing [16] the subpoena, but in the meantime letting those [17] productions go forward so those aren't ruled on [18] and so —

[19] MR. BONO: Your Honor, just [20] briefly. Your Honor has now ruled no fewer [21] than three times on this issue. You ruled at the [22] hearing we had last time in front of Your Honor, [23] you ruled in your letter ruling last week, and [24] you ruled again this morning.

Hearing
March 1, 2006

LG Philips LCD Co., LTD   v.
Tatung Company, et al.

Page 22

[1] She's now asking for a fourth [3] reconsideration. I think it's — I think Your [3] Honor has made the position clear, especially [4] since Ms. Gabler had an understanding back in [5] February 3rd whether Your Honor's February 21 [6] deadline applied to third-party production.

[7] The only other point I would like [8] to make, Your Honor, is anytime you set a [9] deadline, there will always be documents you [10] could have achieved after that deadline, all [11] these arguments are simply the effect of [12] establishing any sort of deadline in the case, [13] so I would ask Your Honor to deny the request.

[14] THE COURT: All right. The motion [15] to quash — I mean the order to quash will [16] remain in place. Is this the three boxes that [17] you got or something? What was this, what was [18] the February 21 you got?

[19] MS. GABLER: On February 21, they [20] produced several, many, many boxes of documents, [21] but within that on February 21 there were three [22] boxes of documents that contained all of Korean [23] documents and within those documents were the [24] first indication that we had that the LPL TCP

Page 23

[1] were being provided by Texas Instruments, and of [2] the panel, the LPL panel that we now understand [3] has been — was sold prior to the critical date.

[4] THE COURT: That's what I [5] understood, it was in the three boxes.

[6] MS. GABLER: Yes, we did those [7] boxes. It's not three boxes of documents.

[8] THE COURT: No.

[9] MS. GABLER: It's more like an [10] inch-and-a-half.

[11] THE COURT: It's three boxes and [12] that's where it came from, that's what I [13] understood from reading. So the order to quash [14] will remain, and you certainly can file a formal [15] motion setting forth both why you believe [16] further discovery should be permitted and [17] specifically what discovery that is.

[18] And you can also argue, I mean. [19] any other issue you want. The due process issue [20] about if this case fails to get evidence that [21] could show a patent invalid, and it's fully [22] adjudicated and down the road there is a patent [23] running around that may be invalid for the kinds [24] of reasons you're talking about, I think that

Page 24

[1] happens a lot.

[2] I have had patent cases where two [3] other judges have heard them and then I remember [4] once I was presented with an on sale bar and [5] granted all of a sudden this patent, everybody [6] paid royalties, then you get into that whole did [7] they defraud the people or was it good faith, so [8] I'm not too interested in that for purposes of [9] your case, but I would be interested in hearing [10] your motion to reconsider and then if I agree [11] with you after hearing from the other side, [12] you'll brief it on the local rules, I will allow [13] you some limited opportunity to go get it.

[14] But you have to put it in a formal [15] motion.

[16] MS. GABLER: We will do that. [17] Thank you.

[18] THE COURT: All right. Anything [19] else?

[20] MR. BONO: No, Your Honor.

[21] THE COURT: Anything else?

[22] MS. GABLER: No, I believe that's [23] it, Your Honor.

[24] THE COURT: Okay. Thank you and

Page 25

[1] hopefully we won't see you at the end of March.

[2] By the way, the fact that I [3] separated out these disputes about damages [4] doesn't mean that I have stopped any of you from [5] talking about them to try and reach resolution, [6] but the complexity of that issue, my current [7] thinking is you may have to get more time than I [8] have available. But if you can work them out, [9] my order doesn't stop you from talking about it, [10] it just keeps them out of my purview for the [11] time being.

[12] MR. BONO: Very well, Your Honor. [13] Thank you.

[14] (Court recessed at 12:58 p.m.)

Page 26

State of Delaware      )
New Castle County      )

CERTIFICATE OF REPORTER

I, Dale C. Hawkins, Registered Merit Reporter and Notary Public, do hereby certify that the foregoing record is a true and accurate transcript of my stenographic notes taken on March 1, 2006, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 1st day of March, 2006 at Wilmington.

Dale C. Hawkins, RMR

Min-U-Script®