# EXHIBIT G

# HOWREY LLP

321 North Clark Street
Suite 3400
Chicago, IL 60610
www.howrey.com

**Christine A. Dudzik**
Partner
T 312 595 2254
F 312 595 2250
dudzikc@howrey.com
File 01450 0012 000000

March 29, 2006

Cass W. Christenson
McKenna Long & Aldridge LLP
1900 K Street, NW
Washington, DC 20006

Re: *LG. Philips LCD Co., Ltd. v. Tatung Company et al.*
    **Civil Action No. 05-292 (JJF)**

Dear Cass:

This letter summarizes the major CPT points in our discussion yesterday during our meet and confer regarding LPL's document production and the areas CPT believes documents exist and should be produced.

1. **Documents Relating to the Development of and First Sale of a LPL LCD Incorporating a TCP Falling Within the Scope of the '121 Patent**

LPL has produced no documents which evidence when the TCP referred to as Part 56 incorporated into a LPL product was first sold. Nor has LPL produced any documents evidencing when LPL first sold additional LCDs incorporating other TCP's falling within the scope of the '121 patent prior to the critical date. LPL's production of a computer print-out summary of various pre-March 23, 2000 sales information does not fulfill LPL's obligation to produce the underlying documents and information.

We believe documents evidencing LPL's formal change over to TCP Part 56 and other similar TCPs exist at LPL as part of their manufacturing protocol and must be produced. Those documents include documents such as: TCP assembly specifications; TFT Gate and Source Driver Specs and Data Sheets; Material Specifications; Package and Label Information; Approval and Data Sheets for TFTs; TFT Driver Specs; TCP purchase specifications; and TFT/LCD Operational and Manufacturing Specs. At your request, we are providing examples of

# HOWREY

Cass W. Christenson
March 29, 2006
Page 2

CPT documents showing TCP specifications and assembly information that fall within the category of documents requested by CPT. *See*, for example, CPT-D 2333-340; 23552-71; 23799-803; 23779-798; 23963-82 and 23851-902. These and other similar LPL documents should have been produced regarding the first production and sale of LP121S1-A2 incorporating TCP Part 56. CPT's request also includes documents and samples sufficient to determine the identity of the TCPs incorporated into all other LPL LCDs sold prior to the critical date identified at LPLII 102328-347. This would also include documents describing the TCP and the third-party supplier, including TCP specifications from those third parties.

2   Documents Regarding LPL's Analysis of Defendants' Accused Products

LPL has produced no documents regarding CPT, ViewSonic, Tatung, or Tatung USA or the LCD accused products. Nor is there any indication of any such analysis listed in LPL's Privilege Log. You indicated that you would check to see if the Privilege Log needed supplementation.

3.   LPL's Data Base

It became apparent during our conversation that LPL has a data base containing information regarding the identity of the LPL LCD sales and part numbers, including the TCP used in each LCD. We asked that you inquire as to whether LPL will produce that data base to CPT or provide CPT access. This data base contains relevant information and should have been produced, particularly in view of LPL's claims that no "source" documents can be located regarding the first production and sale of a TCP falling within the scope of the '121 patent.

4.   Honeywell Documents

The only document evidencing LPL's purchase of the '002 patent is the assignment found in the prosecution history. LPL did not produce the original contract and terms of the agreement; internal correspondence regarding the purchase; press releases; and Honeywell communications regarding the negotiation and purchase of the '002 patent. You indicated you would ask LPL regarding these documents and get back to us.

5   LG. Philips America

It came to our attention that LPL has not produced, nor requested LG Philips America to produce any relevant documents in this case, particularly documents regarding LPL's first sale of LP121S1-A2 incorporating TCP Part 56 and other LPL sales incorporating a TCP falling under the scope of the '121 patent before the critical date. Sales of LB121S1 to LG. Philips America were made as shown in the computer print-outs supplied by CPT. LG. Philips America falls under the definition of "LPL" and "affiliates" as defined in CPT's First Request for Interrogatories. LG Philips America is a subsidiary of LPL as indicated in LPL's recent Form 6-

# HOWREY

Cass W. Christenson
March 29, 2006
Page 3

K. LG. Philips America sales of LPL's LP121S1-A2 to entities in the U.S. are highly relevant to the issues in this case.

Relevant documents from LG Philips America and any other affiliate, subsidiary, division or other entity that controls or is under control of LPL should have been produced. We believe this request requires immediate supplementation by LPL, otherwise we intend to pursue this lack of compliance at the hearing next week.

Unless LPL can agree to supplement its production regarding the above categories, CPT requests that a LPL knowledgeable representative be present during the hearings next week to answer any questions the Court or CPT counsel may have regarding the adequacies of LPL's production and the existence of the requested documents.

We look forward to discussing the above on Thursday, March 30th at 3:00 p.m. EST during our meet and confer in an attempt to resolve our disputes with the goal of attempting to narrow the issues or eliminate the hearing altogether.

Very truly yours,

*Christine A. Dudzik*

Christine A. Dudzik

CAD:keb

cc: Glenn Rhodes
    Julie Gabler
    Richard Kirk
    Robert Whetzel

# EXHIBIT H

LG Philips LCD Co., LTD    v.
Tatung Company, et al.

Hearing
April 25, 2006

```
                    1
    IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF DELAWARE
LG. PHILIPS LCD CO. LTD.,   :
        Plaintiff,          :
                            : Civil Action
                            : No. 05-292
        v.                  :
TATUNG COMPANY, TATUNG COMPANY OF :
AMERICA, INC., CHUNGHWA PICTURE :
TUBES LTD., and VIEWSONIC  :
CORPORATION,                :
        Defendants.         :
            Wednesday, April 25, 2006
            9:00 a.m.
            Courtroom 4B
            844 King Street
            Wilmington, Delaware
BEFORE: THE HONORABLE JOSEPH J. FARNAN, JR.
    United States District Court Judge
APPEARANCES:
        THE BAYARD FIRM
        BY: RICHARD D. KIRK, ESQ
              -and-
        McKENNA LONG & ALDRIDGE
        BY: GASPARE J. BONO, ESQ.
        BY: CASS W. CHRISTENSON, ESQ.
        BY: MATT BAILEY, ESQ.
              Counsel for the Plaintiff
                    2
APPEARANCES CONTINUED:
        RICHARDS, LAYTON & FINGER
        BY: MATTHEW W. KING, ESQ.
              -and-
        HOWREY, LLP
        BY: STEVEN YOVITS, ESQ.
        BY: GLENN W. RHODES, ESQ.
        BY: JULIE S. GABLER, ESQ.
        BY: J. JAMES LI, ESQ.
              Counsel for the Defendant
                    3
```

[1] THE COURT: Good morning. Be seated, [2] please. Good morning.

[3] MR. YOVITS: Good morning, Your [4] Honor. We have some discovery issues to bring [5] to the Court's attention this morning, so if I [6] may proceed with that?

[7] THE COURT: Sure.

[8] MR. YOVITS: Your Honor, our first [9] issue concerns documents that are in the [10] possession of LPL America which is the American [11] subsidiary of LPL. As the Court will recall, [12] February 21st was the discovery cutoff for all [13] third-party discovery and it was the original [14] document discovery cutoff. But it took until [15] almost a month after that on March 17th when LPL [16] finally produced evidence that it had been [17] selling its embodiment to the '121 patent in the [18] U.S. to its U.S. subsidiary LPL America before [19] the critical date.

[20] Coincidentally, Your Honor, the [21] embodiment of the '121 patent actually has '121 [22] in its name, it's the LB121S1. For shorthand [23] just to keep it straight I have been calling it [24] the '121 product.

Page 4

[1] The documents that LPL finally [2] produced on March 17th showed that it had been [3] selling the '121 product, it actually sold [4] almost 7,000 units of the '121 product in the [5] U.S. before the critical date to LPL America, [6] it's U.S. subsidiary.

[7] These documents also showed the [8] actual prices that LPL America had to pay for [9] these, so these were not simple internal [10] shipments, they were sales. This was the first [11] confirmation of LPL pre-critical date sales that [12] we got. Before that there were some slight [13] hints and unfortunately those hints also came at [14] the very end of discovery, either right on [15] February 21st or in a couple of cases a couple [16] of days in advance of that.

[17] And those documents at the very [18] end of discovery where we first found out that [19] there was a '121 product at all, that there was [20] a '121 product that was being developed before [21] the critical date by several months and those [22] documents also told us for the first time that [23] Texas Instruments was helping to develop the [24] tape carrier package in that product and that TI

Page 5

[1] was going to be its first mass supplier of those [2] tape carrier packages.

[3] Before that, Your Honor, we had no [4] idea specifically what evidence of LPL's [5] pre-critical date sales we ought to be pursuing [6] either from LPL itself or from third parties.

[7] Incidentally we also learned on [8] the very last day on February 21st, that LPL [9] had been preparing to exhibit the '121 product [10] before the critical date at the COMDEX [11] Electronic Show, which is very big electronic [12] show. We don't know the details with it, we [13] don't know because we haven't had the [14] opportunity to follow up whether there were [15] some offers for sale in the U.S., but we do need [16] to follow up on that.

[17] At this point we do need to follow [18] up on these issues that we found out about for [19] the first time right at the end of discovery for [20] even a month later for us that involves getting [21] documents from LPL America that talk about what [22] happened to those 7,000 units of the '121 [23] product that they purchased before the critical [24] date, also if there are any other modules that

Page 6

[1] might have been embodiments of that patent we [2] just don't know.

[3] It also involves getting documents [4] regarding the particular relationship between [5] LPL and LPL America. That may turn out to be [6] quite important. And it also involves getting [7] some third-party documents, getting some [8] documents from Texas Instruments to find out [9] when exactly the tape carrier package was [10] developed, when the mass shipments started to [11] happen of the tape carrier package to LPL, and [12] finally, Your Honor, it also involves getting [13] some documents from other third parties about [14] the COMDEX show so we can see exactly what [15] happened there, what the nature of the exhibits [16] were and whether there were offers for sale.

[17] I also need to address the [18] question at this point of whether LPL even has [19] the ability to produce LPL America documents in [20] the first place.

[21] LPL has argued that it is separate [22] from LPL America, that they're completely [23] separate, that there is no control over LPL [24] America documents and that therefore they cannot

Page 7

[1] produce LPL America documents.

[2] If that is the case, I think CPT [3] still should be given the opportunity to pursue [4] those documents by a third-party subpoena. This [5] is again the direct result of LPL's having [6] withheld information regarding these sales up [7] until the very last minute.

[8] A final note, Your Honor, on this [9] issue, LPL has tried to frame the issue of [10] whether it ought to produce LPL America [11] documents in terms of CPT's document request, [12] whether CPT actually requested that LPL produce [13] LPL America documents or not, and that seems to [14] be a red herring, it doesn't seem to have any [15] bearing.

[16] When LPL gets a document request, [17] under the rules it's obligated to produce [18] responsive documents that are in its possession, [19] custody or control regardless of whether the LPL [20] was defined broadly or not. And it boils down [21] to whether LPL controls those LPL America [22] documents. If they have them, they ought to [23] produce them. If they don't have them, then [24] they can't produce them regardless of whether

Page 8

[1] CPT has asked for them or not.

[2] So Your Honor, to conclude this [3] issue, it would be unfairly prejudicial not to [4] let CPT follow up on the issues that were [5] revealed for the very first time right at the [6] end of discovery and then more clearly a month [7] after the end of discovery. LPL seems pretty [8] desperate to keep this evidence out of the case [9] and that's pretty understandable because that [10] evidence is going to show that the '121 patent [11] claim is over and it's also going to show that [12] they may be attempting to enforce a patent that [13] they ought to know is not valid.

[14] I would like to turn it over at [15] this point to my colleague, Mr. Rhodes, to deal [16] with some of the other issues that we have [17] before the Court this

morning.

[18] THE COURT: All right. Thank you.

[19] MR. RHODES: Good morning, Your [20] Honor. My name is Glenn Rhodes. This is the [21] first time we have met. [22] I'm here to address some of the [23] points that we have on CPT's documents [24] production. And I guess where I want to start

### Page 9

[1] is that we're not really here regarding a [2] document production issue. Heaven knows they [3] have freight train loads of documents that we [4] produced to them.

[5] The issue as I understand it is [6] that LPL wants us to prepare lists and indices [7] in English summarizing the documents that we [8] have produced. Now, there is one category of [9] documents that they have culled out as a [10] different example of what they would like us to [11] do. It's not exactly preparing a list, but it's [12] basically spoon feeding them about where certain [13] information is located.

[14] They have asked for documents that [15] show where the cutting and scribing is done in [16] relation to the products that are related to the [17] '121 TCP patent.

[18] And, again, it's not that they [19] don't have the document, they just want us to do [20] their homework for them and tell them where they [21] can find certain information about this. For [22] example, in a meet and confer yesterday, I asked [23] two questions about the operational [24] specification that we pointed out to them had

### Page 10

[1] information related to the cutting and scribing. [2] I said do you have it and have you read it. [3] They have it, but they are in the process of [4] reading it.

[5] Now, the other categories of [6] documents had to do with things such as mass [7] files, the SD guard rings and other similar [8] requests where they have the information in [9] their possession still they just want us to [10] summarize the document for them.

[11] So my point is very simple, I [12] don't want to do their homework for them. I [13] have my own homework to do. And the problem is [14] right now, Your Honor, I can't do my homework. [15] We have been cut off from third-party discovery [16] as Mr. Yovits was discussing, the plaintiffs [17] want us to spoon feed them information.

[18] We don't have a Markman ruling [19] yet. The expert reports are well overdue in [20] this case, they were due March 31st. We have [21] not even addressed damages discovery at this [22] point. It is now the end of April, we are less [23] than twelve weeks away from trial and [24] depositions haven't started.

### Page 11

[1] So in conclusion, I would just say [2] that we're not really being prejudiced by the [3] merits of our case, but the procedure is [4] certainly prejudicing us at this point.

[5] And Ms. Gabler is going to address [6] some of the points that we have regarding other [7] issues relating to third-party discovery and [8] some of the things that we think we should be [9] able to do in order to advance this case to [10] trial. I certainly am not afraid to go to trial [11] in this case, I want to get to trial, Your [12] Honor, that is the fun stuff, but I want to be [13] prepared to go to trial.

[14] Thank you.

[15] THE COURT: All right. Thank you.

[16] MS. GABLER: Good morning, Your [17] Honor.

[18] THE COURT: Good morning.

[19] MS. GABLER: In addition to the [20] new discovery issues that are pending before [21] Your Honor in terms of issues that remain [22] unresolved from the March 1st hearing, we also [23] have a number of other issues that were tabled [24] prior to that time. Those include defendants'

### Page 12

[1] motion for reconsideration of the third party [2] on-sale issues, depositions, a protective order [3] issue, expert dates [4] Addressing the motion — and also [5] the damages discovery issue that Mr. Rhodes [6] alluded to.

[7] For the motion for [8] reconsideration, that motion, Your Honor, was [9] filed in the beginning of March, shortly after [10] Your Honor quashed the outstanding third-party [11] subpoenas and indicated the documents from third [12] parties that were produced after February 21st [13] were going to be excluded.

[14] Obviously, Your Honor, a lot of [15] time has gone by since then. Both parties have [16] continued to produce documents to satisfy the [17] various deficiencies that the other side [18] continued to point out.

[19] The parties have been able to cure [20] while CPT has been left in a situation where it [21] was not allowed to continue to pursue discovery [22] even though that discovery could have continued [23] in the same timeline and been completed by [24] today, Your Honor, if those subpoenas had not

### Page 13

[1] been quashed. These subpoenas do not embody [2] some kind of fishing expedition where CPT is out [3] looking ad naseum for information that it thinks [4] may or may not exist with third parties. The [5] information that is sought concerns only panels [6] where CPT finally offered the panels themselves [7] for inspection to LPL and/or produced them [8] depending on whether we had one panel or more [9] than one panel.

[10] Situations where sales of these [11] panels were either produced by February 21st in [12] some instances, sometimes on one side of the [13] transaction we had the purchase order or the [14] invoice, but the subpoena going to the [15] purchasing party was the subpoena that was [16] quashed at the February 21st time period, so we [17] have transaction documents on one side of the [18] transaction but not the other.

[19] In some instances the documents on [20] both sides of the transaction were not produced [21] by February 21st, but to the extent that they [22] were acquired from third parties in the [23] meantime, they were timely produced on the 23rd, [24] the 24th, the 28th of February, so all of those

### Page 14

[1] were in by the time we had the March 1st [2] hearing and then we did get some subsequent [3] documents from Sharp and from another third [4] party that we produced on March 17th.

[5] LPL will stand up here and claim [6] that there is prejudice to them because they may [7] have to take additional third-party depositions [8] or something along those lines, or there might [9] be third-party discovery they want to do as a [10] result of this.

[11] As Mr. Yovits and Mr. Rhodes had [12] indicated and additionally as we briefed in our [13] briefs, we're in a situation here where the [14] process that's before us and the fast track has [15] not been being applied consistently towards the [16] parties. The defendants are certainly in a [17] position where they needed to do more [18] third-party discovery than LPL. This is not so [19] much as a fairness issue as a consistency issue.

[20] Party discovery has certainly [21] dragged out much beyond February 23rd. We're [22] now here at the end of April and you have heard [23] from us this morning and you will hear from LPL [24] that there are a few issues that the parties

### Page 15

[1] still have disputes about in terms of [2] additional documents and whether or not CPT has [3] to turn over, will create and then turn over an [4] attorney work product for a number of lists [5] summarizing things for LPL.

[6] The third-party discovery is ex-

tremely essential to CPT's case. Again, at [8] this point we have evidence that over 15,000 [9] sales of modules, more than one module involved [10] in that patent, happened before the critical [11] date. More than 7,000 of those sales are sales [12] of a product that LPL itself manufactured. The [13] remaining 8,000 plus sales are sales of Sharp or [14] CPT panels. [15] Back when we first brought the [16] on-sale bar issue to Your Honor's attention back [17] in November and December of last year, the only [18] on-sale issues CPT was aware of at that point [19] was the on-sale issue involving its own panels. [20] Subsequent to that, and in terms of the LPL [21] documents, not until February 21st and then [22] again on March 17th did we even know that there [23] was third-party discovery to do in relation to [24] sales of LPL panels because they had

Page 16

[1] systematically withheld that information.
[2] They held those documents, they [3] are Korean language documents evidencing those [4] sales until February 17th, and then February 21 [5] knowing at that point that it would have been [6] impossible for us to follow-up on third-party [7] discovery, and then produced a boat load of [8] other documents on this subject on March 17th, [9] again, almost a month after the point Your Honor [10] had said we could not issue another subpoena to [11] follow up on third-party discovery.
[12] Again, as Mr. Rhodes indicated, [13] while we are not in a situation where we're [14] looking to make excuses to delay the trial of [15] this matter, we should be afforded a consistent [16] opportunity to do the discovery necessary to [17] properly defendant ourselves that involves [18] third-party discovery and LPL has consistently [19] used a strategy of using fast track as both a [20] sword and a shield.
[21] They should not be allowed to [22] profit from this. They should not be allowed to [23] be in a situation where they have been able to [24] actively and purposefully defeat CPT's attempt

Page 17

[1] to defend itself by knowingly withholding [2] documents that with evidence necessitate [3] third-party discovery until a point where CPT [4] was prohibited from doing that discovery. [5] That's not justice, Your Honor. It puts us in a [6] situation here today, we are forced in addition [7] to asking Your Honor to resolve the pending [8] discovery matters, we're also in a situation [9] where we're going to ask Your Honor to remove [10] from the calendar the July 17th trial

date and [11] come up with a trial date that will allow the [12] parties to do the discovery that they need to [13] do.
[14] This also includes resolving the [15] damages issue which Your Honor tabled on March [16] 1st at that hearing, put that on the side, [17] suggested that maybe we need a special master [18] for that, but no special master has been [19] appointed, so those issues continue to be [20] pending and need to be resolved.
[21] And then we would also like to [22] discuss with Your Honor some issues in terms of [23] depositions, in terms of number of hours for [24] 30(b)(6) depositions and timing of those

Page 18

[1] depositions. I'm happy to hold those until [2] later in the hearing if Your Honor would like to [3] discuss those issues separately or I could [4] address them now.
[5] THE COURT: You can address them [6] now.
[7] MS. GABLER: Okay. In terms of [8] third party — I'm sorry, in terms of 30(b)(6) [9] and party depositions, both the personal [10] depositions of parties and then 30(b)(6), [11] originally Your Honor had indicated that we [12] would be allocated thirty hours of 30(b)(6) [13] testimony to be taken of each party.
[14] At the February 8th hearing, [15] Mr. Bono indicated that he wanted to proceed at [16] that point with the discovery against Tatung [17] America and Viewsonic telling the Court that the [18] issues there were really separate with those [19] parties, that they were really only sales [20] companies, that we were really looking only for [21] damage discovery from them and not really [22] technical discovery and, therefore, those [23] depositions maybe should be proceeding, not [24] waiting for the documents issues to be resolved.

Page 19

[1] We agree with Mr Bono that the [2] issues concerning the defendants other than CPT [3] are separate and more narrow. CPT is the only [4] manufacturer at issue in this case, and the [5] patents at issue don't have anything to do with [6] what happens after the manufacturing process, so [7] while there is discovery to be had from the [8] three other defendants concerning issues that go [9] to damages, what's coming into the U.S., things [10] like that, we don't believe that the amount of [11] time necessary to explore those issues should be [12] the same amount of time as is necessary to [13] explore the much larger range of issues that [14] impacts both CPT and LPL.
[15] So our proposal is simply this, [16] right now their thirty hours of deposition per [17] party, we believe that we need about forty hours [18] of deposition of LPL and CPT is willing to make [19] its own witnesses available for forty hours of [20] depositions as we believe the number of hours of [21] 30(b)(6) deposition to LPL and CPT should be the [22] same.
[23] However, as to the other three [24] defendants we believe that ten hours of

Page 20

[1] deposition testimony should be sufficient as [2] that only goes to damages and importation [3] issues, not the broader range of issues and that [4] those depositions to allow thirty hours for each [5] of those other three defendants would simply be [6] harassment
[7] In terms of the number of party [8] depositions, again, Your Honor allocated four [9] party depositions to be taken of each of the [10] four — of each of the five parties in addition [11] to the 30(b)(6) hours. Again, in that [12] situation, we would like to ask the Court to [13] change that order and allow six depositions of [14] LPL witnesses and six depositions of CPT [15] witnesses, but only to allow two depositions of [16] Viewsonic, Tatung and Tatung America.
[17] And, again, the justification for [18] this is the same, the issues are much narrower [19] as to the other three defendants, we're not [20] trying to have an advantage of CPT versus LPL, [21] but as to the other three defendants the issues [22] are much narrow, the discovery burden should not [23] be the same.
[24] In terms of the damages discovery,

Page 21

[1] again, those issues were postponed on March 1, [2] Your Honor at that point had suggested a [3] magistrate to resolve those issues. We don't [4] know if Your Honor would like to continue with [5] that proposal or if you would like yourself to [6] take those issues up.
[7] Counsel have not had much success [8] or really any success in any meet and confers on [9] those issues as we have been largely taken up [10] trying to resolve the issues that were put [11] before the Court and continuing on March 1 in [12] terms of the Court's order at that time.
[13] So we would like at this point [14] either to be sent to a magistrate to resolve [15] those damages issues —
[16] THE COURT: We don't have any [17] magistrates, we only have one —
[18] MS. GABLER: Or a special master.
[19] THE COURT: We only have a special [20] master, we have a —
[21] MS. GABLER: A special master, we [22] would like to proceed before some-

body or those [23] issues up before Your Honor so we can get those [24] resolved and move forward with that aspect of

Page 22

[1] the case. Your Honor had suggested on March 1 [2] that those issues sounded like they would take [3] about forty-five days. We're willing to proceed [4] on that kind of time line with the aim of [5] resolving those issues in about forty-five days.

[6] In terms of expert dates, Your [7] Honor's schedule originally had indicated that [8] you wanted to have issued your Markman ruling [9] before the expert reports were due. We believe [10] that's sound management of the schedule. We [11] haven't had any guidance from Your Honor yet in [12] terms of when he would expect his Markman [13] ruling, but obviously we would like the expert [14] dates to reflect that schedule.

[15] The final bullet on my letter from [16] yesterday is the protective order. You may [17] recall back in December Mr. Bono raised with the [18] Court that because there were other pending [19] litigations between the parties, most pointedly [20] the litigation in California that at that point [21] was set for trial in February, that he asked [22] Your Honor to rule that documents produced in [23] that case could be deemed produced in this case [24] so the parties did not have to go to the burden

Page 23

[1] and expense of reproducing documents in this [2] case. That made sense, we agreed to that, that [3] was Your Honor's order.

[4] Since that time, the California [5] case was continued as you may or may not be [6] aware and it is now set for trial October 3rd of [7] this year.

[8] There is also additional [9] litigation between the parties that has been [10] proceeding in various jurisdictions, and in the [11] California case a variety of discovery issues [12] have been reopened or are continuing to be [13] pending.

[14] At this point it makes sense, Your [15] Honor, for documents produced in Delaware to [16] also be deemed admitted and produced in these [17] other cases, not just have it be a one-way order [18] as it was when the Delaware case assumed to be [19] preceding to trial after the California case, so [20] we would like to ask Your Honor to amend his [21] order and to deem all documents produced in [22] Delaware to be produced in the other litigations [23] so we're not faced with the same inefficiency [24] that Your Honor recognized earlier of having to

Page 24

[1] reproduce documents that are being produced in [2] Delaware in either the California case or —

[3] THE COURT: Isn't that a decision [4] for the other judges if they want those [5] documents in their case? That's not my [6] decision. I can say I want documents admitted [7] in my case from other cases that the parties are [8] engaged in. I can't tell a California judge or [9] a judge in Minnesota to accept documents from my [10] case, they have to make that decision.

[11] But I would have no issue if the [12] judge wanted to accede to some request that they [13] would take into their case Delaware documents.

[14] MS. GABLER: I can understand [15] that, Your Honor. Then we would like to ask [16] that the documents produced in the other cases [17] pending between the parties are also deemed [18] admitted in Delaware, not just those documents [19] produced in the California case, and we will [20] make our other petition to the other various [21] judges.

[22] THE COURT: I would have to know [23] about that, what that boat is carrying before I [24] would allow — there were synchronization in my

Page 25

[1] mind between my case and the California case, [2] particularly since that had an earlier trial [3] date. But before I would admit wholesale [4] documents from other cases, I would have to know [5] what that universe was, what's on that load that [6] would be dropped here. But I'm not adverse to [7] it.

[8] MS. GABLER: Would you like a [9] written submission on that, Your Honor, to go [10] over that?

[11] THE COURT: I think you can [12] probably agree to it, but if you can't, yes.

[13] MS. GABLER: And then our final [14] point, Your Honor, is based on the documents [15] that LPL produced March 17th, and then some of [16] the documents that they have produced since then [17] in our ongoing meet and confer, it's now evident [18] to us in terms of the LPL panel, the '121 [19] product that Mr. Yovits referred to that LPL was [20] in a position that it knew that it had an [21] on-sale bar to its patent before it started [22] filing suit against defendants in this case on [23] that basis and knew it was asserted

[24] THE COURT: Did the attorneys for

Page 26

[1] LPL know that?

[2] MS. GABLER: An invalid patent, [3] the client knew it. I'm not addressing the [4] counsel.

[5] THE COURT: When did the attorneys [6] — you're certain that the client knew

it, that [7] there is a clear on-sale bar, and we have been [8] in litigation since the summer here.

[9] MS. GABLER: Correct.

[10] THE COURT: When would it be your [11] position the attorneys found out about it, and [12] proceeded with the case despite the fact that [13] there is at least contended to be a clear [14] on-sale bar case? We are talking about the '121 [15] patent?

[16] MS. GABLER: Right, we are talking [17] about the '121 patent. Your Honor, it's not [18] possible for me to know for sure when LPL's [19] lawyers did learn about it.

[20] THE COURT: When did you first [21] tell them?

[22] MS. GABLER: When did we first [23] tell them?

[24] THE COURT: Yes.

Page 27

[1] MS. GABLER: The first time we [2] became aware of the LPL product was in documents [3] that they produced on February 17th and 21st in [4] Korean, so at the time we translated them, which [5] was then the last week of February was the first [6] time we became aware that they appeared to have [7] themselves sold a product in terms of the meet [8] and confer that that happened between then and [9] after —

[10] THE COURT: You told them the [11] period you sold this product prior to the [12] critical date and you have an on-sale bar [13] problem?

[14] MS. GABLER: Yes.

[15] THE COURT: So at least that would [16] be sometime around the first week of March?

[17] MS. GABLER: Right, the latest [18] would be at that point. They certainly [19] indicated they were taking a lot of time [20] translating documents. You'll remember, Your [21] Honor, at the February 8th hearing Mr. Bono [22] indicated they were still in the process of [23] translating Korean documents and they would be [24] producing those as soon after that as they

Page 28

[1] could. That production he indicated at that [2] time would be rolling and would be underway [3] almost immediately.

[4] The first of those documents [5] trickled in to CPT on February 17th, so I would [6] suggest, Your Honor, that at least as of the [7] time they started reviewing those documents [8] earlier in February that counsel at that point [9] had to be aware of what was in the documents [10] that they were reviewing for relevance before [11] producing them here.

[12] But why I raise that again now is [13] because the fact that the client knew regardless [14] of when exactly the lawyers knew indicates that [15] we also have process claims that we believe [16] belong in this case, and that we are going to be [17] seeking leave to amend to add that claim in the [18] case as we believe it comes out of the same [19] nexus of facts, belongs in this case and is [20] clearly evidence by the documents that they have [21] been producing throughout late February and [22] early March.

[23] THE COURT: Who on the defendant's [24] side of the case is the lead attorney for this

Page 29

[1] litigation and who is the lead attorney for the [2] California case? I didn't know it had been [3] continued. It now has been continued into [4] October?

[5] MS. GABLER: The trial lawyers in [6] the California case are Mr. Rhodes, Ms. Corbin [7] who was here at the Markman hearing, [8] Mr. Matthews, who you have not met, and myself.

[9] THE COURT: But there is some [10] attorney that like runs it, is there a —

[11] MS. GABLER: The four of us.

[12] THE COURT: Is there a boss?

[13] MS. GABLER: Ultimately Mr. Rhodes [14] is the boss. Mr. Rhodes is the boss. And in [15] this case trial counsel is Mr. Rhodes, [16] Ms. Corbin and myself.

[17] THE COURT: Okay. Now, tell me [18] this, in defendant's view, there has been a [19] turmoil over discovery which has raised certain [20] matters that are alleged to be I think the word [21] is injustice that's been used.

[22] Now, is the client or the [23] attorneys on the other side responsible for the [24] injustices that have been endured by defendants?

Page 30

[1] MS. GABLER: Well, I think to some [2] degree both, Your Honor. You know, as Mr. Bono [3] pointed out in their opposition to our motion [4] for reconsideration, we first indicated that we [5] believed there was an on-sale bar defense in [6] this case back when we filed our answer in [7] September, and that should have put them on [8] notice at that point that they were doing their [9] own investigation in response to document [10] requests that we served in the very first round [11] of document requests seeking all of those [12] documents.

[13] Obviously it's a little bit blind [14] on our side when we're seeking documents from [15] them in that capacity, but if they had done a [16] proper investigation immediately in this case, I [17] believe that to the extent the lawyers are now [18] going to stand up and say they didn't know until [19] late January or sometime in February, I believe [20] they certainly could have known and should have [21] known earlier than that.

[22] We're also in a situation where [23] the McKenna, Long firm is actively involved in [24] prosecuting patents for this particular client

Page 31

[1] and based on their role in prosecution certainly [2] were in a situation to have known earlier. The [3] patents in this case, the '002 patent is one [4] that they purchased from somebody else, but the [5] TCP patent I believe was prosecuted by the [6] McKenna law firm so to the extent that there was [7] an on-sale issue that should have been exposed [8] and should have led to not seeking the patent in [9] the first place, that rested with the McKenna [10] firm from minute one.

[11] Now we're back in 2000 way before [12] they decided to file this case so the idea here [13] that there is a split here between client [14] responsibility and lawyer responsibility I think [15] is a little bit dressed up in this instance when [16] your prosecution firm is your same firm as your [17] litigation counsel.

[18] THE COURT: Now, both sides have [19] indicated that there were deficiencies in the [20] discovery, and if you want someone else to [21] answer these questions, whoever wants to answer [22] them, that were pointed up and cured, so [23] apparently both sides had beginning problems of [24] recognizing what was required in discovery in

Page 32

[1] this case and then there is the contention by [2] the defendant to the plaintiff that there was a [3] knowing withholding of documents until the very [4] end, and where do you place that blame for the [5] knowing, the allegation of knowing, knowingly [6] withholding documents in the discovery in this [7] litigation?

[8] MS. GABLER: I again place that in [9] both camps. We were aware from counsel —

[10] THE COURT: Both camps meaning [11] plaintiff's lawyer and —

[12] MS. GABLER: Plaintiff's lawyers [13] and the plaintiff themselves. We were aware [14] from plaintiff's counsel that they were still [15] engaged in translating Korean language documents [16] into late January and February and that they [17] claimed that was the primary reason that they [18] hadn't been able to comply with the February 3rd [19] original document discovery cutoff. I do not [20] know for sure how long those documents have been [21] in counsel's position prior to the time they [22] were produced.

[23] THE COURT: But that's ratcheted [24] up to a knowing act of withholding the

Page 33

[1] documents, is the contention by the defendant.

[2] MS. GABLER: Right.

[3] THE COURT: What is the support [4] for that contention?

[5] MS. GABLER: Well, the contention [6] is — the support for that contention is that [7] they've known that we had an on-sale bar defense [8] from the very beginning of this case, from back [9] in September when we filed this answer. And [10] they were also aware, Your Honor, of Your [11] Honor's positions taken at the February 8th [12] hearing in terms of when the third-party [13] discovery cutoff was going to be, and that that [14] was going to be February 21st along with party [15] discovery.

[16] Knowing that, they then embark, [17] even though Mr. Bono had represented to Your [18] Honor that he was going to be producing those [19] remaining documents immediately and quickly, he [20] did not indicate in any way at that point that [21] the documents that they were going to be [22] producing was going to for the first time [23] evidence that there was additional third-party [24] discovery, that hadn't been the subject of

Page 34

[1] subpoena yet because we weren't aware that LPL [2] had sold its '121 product to LG America, and was [3] not aware yet that they were purchasing their [4] TCP from Texas Instruments

[5] CPT's first awareness came of [6] those items in the first wave of production that [7] they did on February 17th and again on February [8] 21st, but again those were Korean language [9] documents we had to translate so we didn't know [10] we had those until the following week, and then [11] the actual documents evidencing the quantity of [12] sales where we could indicate that there were [13] more than 7,000 sales, those weren't produced [14] until March 17th.

[15] And again, counsel knew throughout [16] that process and has continue to simultaneously [17] oppose our motion for reconsideration to [18] third-party discovery while at the same time [19] making the problem worse by now taking the [20] position that they don't have possession, [21] custody or control of LG America documents, [22] evidencing the other side of these sales [23] between LG and LG America, so they're saying [24] now, well, we know we didn't tell you anything about that

**Page 35**

(1) until March 17th when we first produced (2) documents showing the volume of those (3) transactions and the amounts of those (4) transactions, the costs, the price of those (5) transactions, we know we didn't tell you until (6) March 17th, but we're going to continue to (7) oppose your motion, that you didn't do any (8) third-party discovery, we are going to say LG (9) America is a third party so there is no way for (10) you to get this.
(11) THE COURT: I get it. I (12) understand what the support is.
(13) Is there any other matters that (14) the defendant wants to present at this time (15) before I hear from the plaintiff.
(16) MS. GABLER: I believe that's it, (17) Your Honor.
(18) THE COURT: Thank you. Who is the (19) judge assigned in California?
(20) MS. GABLER: Judge Marshal.
(21) MR. BONO: May it please the (22) Court, Your Honor.
(23) THE COURT: Good morning.
(24) MR. BONO: Good morning. The

**Page 36**

(1) first issue I would like to address, Your Honor, (2) is our request for the summary information that (3) is at issue and I think to clarify the issue for (4) the Court, may I hand up to the Court a brief (5) summary of the four items that we have requested (6) and are seeking.
(7) THE COURT: Yes.
(8) MR. BONO: Thank you, Your Honor.
(9) THE COURT: Mr. Bono, do you have (10) a copy for my law clerk, please.
(11) MR. BONO: Yes, absolutely.
(12) THE COURT: Thank you.
(13) MR. BONO: I apologize. There is (14) one typo on it that I hand wrote in.
(15) But in the first paragraph here, (16) Your Honor, I simply summarize the four items (17) that we have been requesting from CPT that they (18) have refused to give us.
(19) The first item is a list showing (20) which modules and products, which use which (21) types of tape carrier packages. Now, as we have (22) been striving to do since the beginning of this (23) case as Your Honor instructed months ago is to (24) try to narrow the focus of this case for trial

**Page 37**

(1) and to come up with representative products and (2) claims that we can take to trial.
(3) And so we have asked CPT to give (4) us in a simple document, and we had raised this (5) several times with them now for months, of just (6) saying this model number and it uses this CPT (7) supplied by a certain supplier. And without (8) that information, we are really unable to come (9) up with representative products to narrow the (10) scope of this case.
(11) Now, on the other side CPT has (12) requested LPL to give them a list and they (13) fought very hard for it, for us to list our (14) modules with the identification of the tape (15) carrier package used in each model.
(16) Pursuant to their demand we in (17) fact produced that list to them. So in effect (18) they have asked us for the same information, we (19) gave it to them, we have asked for similar (20) information from them and they are refusing to (21) give it to us. And we would ask that they be (22) required to give us this list which is very (23) simple to put together which just identifies (24) their module numbers and then what TCP product

**Page 38**

(1) is in each of those modules. And that would be (2) with respect to the '121 patent.
(3) The second item on our list is a (4) list identifying —
(5) THE COURT: Now, with respect to (6) that request, you have heard counsel contend (7) that the '121 patent has a validity problem by (8) virtue of an on-sale bar.
(9) MR. BONO: I have heard that, Your (10) Honor, yes.
(11) THE COURT: And with all the (12) notice that they contend they have given to (13) plaintiff, your view is that that is not a (14) sustainable contention?
(15) MR. BONO: Our argument is, Your (16) Honor, that there is insufficient proof and (17) evidence showing that the product that they're (18) talking about has the particular TCP package in (19) it that they contend was sold.
(20) THE COURT: Just so I'm clear, (21) your client's position is that that's not in the (22) packet, the module —
(23) MR. BONO: Your Honor, to be (24) clear —

**Page 39**

(1) THE COURT: Right.
(2) MR. BONO: — that product which (3) they're talking about used two different TCP (4) packages, one was the TCP package that does not (5) contain the invention, and some contained the (6) invention.
(7) THE COURT: So let's focus on the (8) ones that contained the invention.
(9) MR. BONO: Yes.
(10) THE COURT: Have you learned in (11) your dealings with your client whether or not (12) the invention packet was on sale as understood (13) under the patent laws prior to the critical (14) date?
(15) MR. BONO: I have been unable to (16) ascertain that fact from the client.
(17) THE COURT: One way or the other?
(18) MR. BONO: Yes, Your Honor. We (19) know that the — both packages were in the (20) product and the client has been unable to (21) identify for us which TCP was in which of those (22) modules prior to the critical date. We know the (23) module number that's at issue was on sale prior (24) to the critical date, but we don't know whether

**Page 40**

(1) the modules that were sold prior to the date (2) contained the invention TCP. That's what they (3) don't have information on, Your Honor. I have (4) quizzed them repeatedly.
(5) THE COURT: Now, the defendants (6) contend that in addition to the client's (7) knowledge that your law firm has a relationship (8) on the prosecution side of intellectual property (9) with the client.
(10) MR. BONO: That's correct, Your (11) Honor.
(12) THE COURT: And what you're (13) telling me is even with that relationship, (14) you're unable to get this information about the (15) '121 patent products sold by the client?
(16) MR. BONO: Yes, Your Honor. We (17) did not have at the time — at the time I was (18) not involved in the patent prosecution, but at (19) the time of the patent prosecution we had no (20) knowledge about the product being sold prior to (21) the critical date.
(22) THE COURT: No, I hope you (23) wouldn't have.
(24) MR. BONO: Right. The situation

**Page 41**

(1) is —
(2) THE COURT: What I'm interested in (3) knowing is because of that relationship and (4) because of that prosecution work, you haven't (5) been able to shed any additional light on — as (6) attorneys your knowledge about the issue raised (7) by defendant for purposes of this litigation.
(8) MR. BONO: That's correct, Your (9) Honor, I have investigated this and I have (10) spoken with the client about this issue, and (11) they are unable to say whether the particular (12) TCP which contains the invention was contained (13) in the modules sold prior to March 23, that were (14) sold in the U.S.
(15) I have quizzed them repeatedly, (16) and they don't have documentation

either in [17] their manufacturing facilities or anywhere else [18] which would say that the module number sold here [19] contained the particular TCP, that contained the [20] invention as opposed to that contained in the [21] TCP prior to the invention. I have asked them [22] repeatedly.

[23] THE COURT: Now, your friends on [24] the other side say that you did know at some

Page 42

[1] point in February, or I'm sorry, I think I used [2] the date before the first week of March of this [3] year, and that after you got the knowledge, you [4] have in this case knowingly withheld it so that [5] they can't discover on it

[6] MR. BONO: Your Honor, that is [7] absolutely false. Absolutely false.

[8] THE COURT: Who would have been [9] responsible other than yourself for conducting [10] the inquiry into the '121 on-sale bar issue with [11] the client?

[12] MR. BONO: Mr. Christenson did [13] that with me as well.

[14] THE COURT: So it was the two of [15] you?

[16] MR. BONO: Yes, Your Honor.

[17] THE COURT: Now, are there other [18] lawyers in the case that have been recited to me [19] pending in other jurisdictions who have worked [20] on the client's litigation that might be [21] tangental in some measure to this case other [22] than you and Mr. Christenson?

[23] MR. BONO: I'm not sure that I [24] understand the question.

Page 43

[1] THE COURT: I asked them who works [2] on the case on the defendants for them and they [3] gave me some names, started with Mr. Rhodes, and [4] on your side, I'm trying to understand, is it [5] just the two of you or are there others like [6] some associates that have been doing [7] investigation in document production for you and [8] that type of thing?

[9] MR. BONO: In the California case, [10] Your Honor, that case is primarily being handled [11] by another law firm, Morgan, Lewis & Brokius, [12] and while our firm is co-counsel with Morgan, [13] Lewis, Morgan, Lewis is the lead counsel and our [14] activity in supporting them has been peripheral.

[15] THE COURT: Now, I know the name. [16] I know they have a Philadelphia office. Do they [17] have an office in California?

[18] MR. BONO: Yes, Your Honor, they [19] have an office in California and in Washington.

[20] THE COURT: Is their California [21] office the office that is prosecuting that [22] litigation?

[23] MR. BONO: California, Washington [24] and Philadelphia. They have lawyers from all

Page 44

[1] three offices handling that.

[2] THE COURT: Okay. In your view, [3] the same question that I asked your friends on [4] the other side, who is responsible for the state [5] of the discovery progress that we have today, is [6] it the attorneys for the client on the other [7] side?

[8] MR. BONO: On the other side? [9] Your Honor, I believe it's both, from what I [10] could tell. Obviously the clients are taking [11] certain positions from their side and so are the [12] attorneys. But I have been — we have been [13] dealing with the attorneys on that side and [14] quite frankly I can't ascertain whether the [15] positions are being dictated by the client or [16] whether the attorneys are taking certain [17] positions as being — taking the lead and taking [18] the positions in discovery.

[19] THE COURT: And do you similarly [20] believe that there is an inconsistency leading [21] or resulting in an ongoing injustice and you [22] being able to discover against the defendants?

[23] MR. BONO: Your Honor, they have [24] fought our discovery quite a bit. In looking at

Page 45

[1] the discovery we want, we have worked very, very [2] hard over the past couple of months to work out [3] our discovery disputes and have narrowed it down [4] to what you see on that one page.

[5] THE COURT: These are our —

[6] MR. BONO: The first paragraph is [7] our issues for discovery against them, and the [8] second paragraph is what the one issue that they [9] want against us which deals with LPL America.

[10] THE COURT: But the deficiencies [11] in defendant's discovery as in the letter I got [12] yesterday, are you aware that Mr. King and [13] Mr. Kirk exchanged letters?

[14] MR. BONO: Yes, Your Honor.

[15] THE COURT: That is the state of [16] deficiency that you allege against defendants, [17] and that's essentially the paragraph one.

[18] MR. BONO: Yes, Your Honor, [19] correct. Yes. We have narrowed it down, both [20] sides have done a substantial amount of work in [21] discussions in order to — pursuant to Your [22] Honor's orders to work out the discovery [23] between us and I believe we have done that, and that the [24] remaining discovery issue is contained on this

Page 46

[1] one page in both directions, yes, Your Honor.

[2] THE COURT: And you still want to [3] go to trial in July?

[4] MR. BONO: Yes, Your Honor. Yes. [5] And, you know, it's our position that the [6] posture that the defendants find themselves in [7] that they allude to in their argument is really [8] one of their own making. While they seek to [9] shift the blame to us by these wild and [10] unsubstantiated accusations that we withheld [11] document and we're doing all these nefarious [12] things, none of that is true, Your Honor.

[13] The problem they face is one of [14] their own making which goes back two or three [15] months in this matter when Your Honor set [16] certain deadlines. It's not our doing at all.

[17] Your Honor, we have cooperated and [18] gone out of our way to produce documents and [19] summaries and additional information to the [20] defendants above and beyond what we were [21] required to do. They asked us for the summary [22] information on the modules and the CPTs and the [23] TCPs that are in the product. We worked to [24] produce it. They wanted summary sales

Page 47

[1] information. They wanted it expanded during the [2] time period, we went out and we produced it to [3] them. We have given them on a timely basis all [4] the documents that they said they wanted, some [5] of which I believe they were not entitled to, [6] but to cooperate we have given it to them [7] completely.

[8] They knew about, for example, they [9] knew about LPL America before this case was even [10] filed. They received documents that were [11] produced in the California case which shows that [12] LPL Korea had a relationship with LPL America, [13] and that sales were made between the two [14] entities. They knew that information long ago, [15] even before this case was filed.

[16] Also, when we produced our first [17] set of document production, we produced the [18] — it is the Form 20(f) document which shows that [19] LPL America existed and it was operated as a [20] sales entity in the U.S. They had every — [21] they had that information, they chose not to pursue [22] it on their own. They could have when they [23] answered added LPL America to this case

[24] If you look at our caption, we had

Page 48

[1] to sue both Tatung Company and

Tatung America. [2] We had to file separate document requests and [3] interrogatories against Tatung and Tatung [4] America because that has the same relationship, [5] you have a Korean company and you have a U.S. [6] company. We had to treat them separately. They [7] had every opportunity to bring LPL America into [8] this case because they certainly knew about the [9] entity. They chose not to do it for whatever [10] reason.

[11] And the deadline for amending the [12] complaint has long expired. And the deadlines [13] that Your Honor set, which was the February 21 [14] deadline long expired, and the first time, the [15] first time they ever raised LPL America was in a [16] letter to us on March 28th, long after the [17] deadlines, and all of a sudden for the first [18] time they say we want documents from LPL [19] America.

[20] They had never raised it in the [21] hearing before Your Honor back on I think it was [22] either March 1, they never raised it in the [23] earlier hearings, none of the issues that were [24] discussed said anything about LPL America

### Page 49

[1] documents. All of a sudden at the eleventh hour [2] long after all the deadlines set by Your Honor, [3] they say they want documents from LPL America.

[4] They try to blame us for their not [5] doing it. They say we somehow held documents or [6] kept it secret. Nothing could be father from [7] the truth. The publicly available documents [8] showed LPL America. They knew about LPL America [9] long ago in the California case, which they [10] produced documents in this very argument showing [11] that sales of modules were made to LPL America

[12] What they did, Your Honor, was [13] just like with the other third parties, they [14] decided to pursue discovery against third [15] parties and after Your Honor had set the [16] deadline. Your Honor remembers at the February [17] 8 hearing, the issue of this discovery was [18] raised. And Your Honor set the deadline of [19] February 21. And Ms. Gabler even asked Your [20] Honor, does this deadline apply to third [21] parties, and Your Honor said yes, it's an [22] absolute deadline.

[23] They tried to pursue discovery [24] against these other third parties, and at this

### Page 50

[1] point, Your Honor has adhered three times to [2] Your Honor's ruling that February 21 was the [3] deadline.

[4] Now, they come in here and they [5] all of a sudden on starting on March 28 decide [6] well, now let's try to get around that ruling [7] and now let's ask for documents from LPL [8] America. Well, they never asked for it before. [9] In their document request in this case, they [10] filed two of them, they defined LPL Korea as LPL [11] Korea. They did not define LPL Korea to include [12] affiliates.

[13] They had defined it that way in [14] their interrogatories, but in two separate [15] document requests they themselves limited their [16] document requests to the Korean entity.

[17] Well, it's not our fault that they [18] didn't ask for the documents, it's not our fault [19] that they wait until March 28 to raise the [20] issue, it's not our fault that they chose not to [21] do that sooner when they knew about it, they [22] could have added LPL America to the lawsuit long [23] ago and they knew about it. There is no [24] injustice. This is just an attempt to get

### Page 51

[1] around Your Honor's deadline that you set back [2] on February 3rd.

[3] And where would this lead us, Your [4] Honor? This would lead us to as Ms. Gabler [5] said, to further third-party discovery. First [6] we produce — we're going to get LPL America's [7] documents according to them and then where is [8] that going to lead? They're going to want to [9] take more third-party discovery from the [10] ultimate customers of LPL America, because they [11] know that's what they have to show in order to [12] prove this on-sale bar.

[13] So we're now going to have more [14] third-party discovery, more subpoenas to other [15] entities, and all because they never brought [16] this issue up from the beginning when they knew [17] about this from the very beginning. And it's [18] their own fault, not us. We have fully [19] cooperated. We have more than cooperated. [20] Mr. Christenson and I have worked extremely hard [21] to give them everything they want. Even for [22] some of their most burdensome requests, we have [23] summarized information, we have gone back and [24] looked again at information, we have given them

### Page 52

[1] everything. And because of that, they have no [2] issue to bring before this Court at this hearing [3] except this brand-new one that was just raised [4] on March 28th as to LPL America.

[5] So I take offense at their [6] accusation that we're hiding the ball, that [7] we're withholding documents and somehow we came [8] up with this plan to hold everything until the [9] end so they would be precluded from seeking [10] documents from LPL America when the record [11] shows they knew about this entity a year ago, and they [12] had every opportunity to pursue discovery [13] against LPL America, they themselves did not do [14] it.

[15] And it's their own fault. There [16] is no injustice here, Your Honor. So I would [17] ask that their request to seek documents from [18] LPL America at this late date be denied. And I [19] would also state strenuously —

[20] THE COURT: You have a [21] disagreement with them about when they knew and [22] therefore could have pursued. is that — I just [23] want to be sure I'm understanding clearly the [24] reason that I should — in your view the reason

### Page 53

[1] I should deny them their pursuit of LPL and the [2] dangling third parties to the LPL document [3] production is because you contend that they knew [4] much earlier than they contend today, and no [5] fault is attributable to you for why they're in [6] the position of having to be making the request [7] to go after LPL and these dangling third [8] parties.

[9] MR. BONO: Precisely, Your Honor.

[10] THE COURT: Okay.

[11] MR. BONO: But two reasons —

[12] THE COURT: I'm sorry.

[13] MR. BONO: I agree with what Your [14] Honor just said, but it's really two parts. [15] One, let's say they didn't know until after the [16] Court's deadline. As to that, we had nothing to [17] do with that lack of knowledge. And the fact [18] that they didn't know should not change Your [19] Honor's deadline. Whenever the Court sets a [20] deadline, there is always a possibility of [21] somebody finding out something after the fact [22] and it's not a reason to undo the deadline, [23] unless we caused them not to know, and that is [24] strictly not the case. Because we produced the

### Page 54

[1] 20(f) form in our early production in this case, [2] which identified LPL America, number one.

[3] Number two, you can go and do [4] through publicly available documents, and Howrey [5] is a most sophisticated law firm to say the [6] least, and it is beyond comprehension that they [7] could not have — that they didn't know about [8] LPL America back in September when they answered [9] this complaint. [10] All you have to do is look at the [11] SEC public filings and it's there for the world [12] to see, they certainly knew about it. More so, [13] they produced a document in their argument [14] showing to have Your Honor order LPL America [15] documents produced, this is a document that they [16] were given by LG in

the California case a year [17] ago, if not earlier, and it identifies LPL [18] America as receiving products from LPL Korea. [19] They knew about it a year ago.
[20] There is no — the notion that [21] they didn't know is absurd. The notion that we [22] covered up is even more absurd. This is their [23] own fault that they're in this position because [24] they didn't choose to pursue discovery against

### Page 55

[1] LPL America. And this is all in an attempt to [2] end run Your Honor's prior ruling.
[3] So for two reasons, one they knew, [4] and two, even if they didn't know, we certainly [5] had nothing to do with that lack of knowledge, [6] and for both reasons there is no basis for this [7] Court now two months after the deadline because [8] the deadline was February 21, and Your Honor was [9] very clear, all third-party documents have to be [10] in the case by February 21 or they were out.
[11] And it's not our fault in any way, [12] shape or form that they didn't pursue discovery [13] against LPL America until March 28 when they [14] first raised the issue. And to try to blame us [15] for their lack of pursuit is very, very [16] offensive to me and simply not true.
[17] And for those reasons, I request [18] that their request for LPL America documents at [19] this late date be denied, and that the Court [20] adhere to its prior ruling because there is no [21] reason to deviate from it.
[22] Now, with respect to the documents [23] we're asking from CPT, with respect to the list [24] that I have identified, Your Honor, I covered

### Page 56

[1] the first item, and I informed the Court that we [2] have given CPT a similar list that identifies [3] our module numbers and our CPTs at their [4] request. And we are simply asking them to [5] provide us with the same information in light of [6] this expedited schedule.
[7] Mr. Rhodes says they have given [8] us, I don't know what his term was, but bushels [9] and bushels of documents, they have given us [10] upwards of 30,000 pages of documents, they have [11] buried us in paper and they say to us, you go [12] figure out which modules contained which CPTs.
[13] When I made that same argument to [14] them for the list they required of us, they said [15] no, no, no, you have to give us a list. We want [16] a list. So I gave it to them. I would like the [17] same reciprocity so we could move forward with [18] this case.
[19] The second point is the same [20] information with respect to the ESD guard rings. [21] We would like a list of modules that are made [22] using ESD guard rings. As Your Honor knows, [23] these ESD guard rings are not contained in the [24] final product because they're removed in the

### Page 57

[1] manufacturing process before the final product [2] is sold. So the first item we need which is [3] fundamental is to identify for us with this [4] module, tell us which modules have the ESD card [5] rings and which do not. If they don't have ESD [6] card rings in the manufacturing process, we can [7] put those modules aside for purposes of [8] infringement on this case.
[9] And then we can examine only those [10] modules that have the ESD guard ring and then we [11] would ask that they provide this information. [12] It is not a burden, they know which ones are [13] made using ESD guard rings.
[14] The third item is an index [15] regarding mass work files that relate to which [16] products. They have produced to us a series of [17] mass work files which are — which show the [18] electronic pattern and array that's used in the [19] process for these products. The problem is the [20] — it is unclear in the information they [21] provided to match the mass file with a [22] particular module. It is virtually an [23] impossible task to do that based upon the [24] documents they have given us. So in order to

### Page 58

[1] understand this process, we simply ask them to [2] provide us an index that says this module uses [3] these mass files in the production process. It [4] is something they can give us, they know it, and [5] it was something that would enable us to narrow [6] and focus this case and provide representative [7] products.
[8] Finally, Your Honor, as to the [9] fourth item, we asked for a list or index which [10] cross-references what we call here a CLAA [11] numbers, which will match the defendant's [12] modules with the LSN numbers on the [13] specifications. What we have been given in this [14] case is a bunch of operational specifications. [15] Those specifications use an identifier which is [16] an LSN number.
[17] Now, in terms of how CPT identify [18] their modules, they identify their modules with [19] a CLAA number and what we need from CPT is a [20] listing that matches the CLAA module number with [21] the LSN number that appears on the [22] specification, so we can tie the specification [23] they have provided us to the particular module.
[24] Otherwise, it is impossible for us

### Page 59

[1] to do that from the documents they have given [2] us. So with that, then we can tie the [3] specification to the module to figure out which [4] specifications go with which modules. And then [5] as was mentioned earlier by I think Mr. Rhodes [6] because we then have to tie the documents that [7] relate to the cutting, scribing and removing of [8] the guard rings to each module.
[9] And so we need the information we [10] have asked for in item four in order to be able [11] to do that because in order to pursue this case [12] in an efficient manner, we have to have module [13] number, specification, scribing documents, and [14] they have to be matched together. And it is [15] impossible to do that with the documents they [16] have buried us with when they themselves know [17] what that is.
[18] So we just asked them, give us the [19] information so we all know what we're talking [20] about in this case and then we can come up with [21] representative product for trial with this [22] information, and they have refused to do that.
[23] Notwithstanding that they have [24] asked us to provide lists and identification of

### Page 60

[1] the same type of information from our clients [2] which we have complied with and given them. So [3] we ask that the Court direct them to provide us [4] with those four summary lists.
[5] Their only objection, Your Honor, [6] as I understand this is they say it's work [7] product. I represent to the Court that it's not [8] work product, it doesn't reveal the mental [9] impressions or the strategy or the thinking of [10] the lawyers, it simply is a summary of the [11] information.
[12] And furthermore they have provided [13] similar type of lists and analyses in the [14] California case which ties their module numbers [15] to certain specifications and other information, [16] and I could hand Your Honor these lists that [17] they produced in the California case which [18] whereby they have done exactly in connection [19] with the California case, providing these lists [20] of matching the module numbers with these other [21] identification to specifications and they have [22] also matched products with modules in the [23] California case.
[24] And I would submit that they

### Page 61

[1] should do the same thing in this case and that [2] it's not work product. I could hand this to [3] Your Honor if Your Honor would like to see this.
[4] THE COURT: You can pass that up.

[5] MS. GABLER: Mr. Bono, may I see the list?

[7] MR. BONO: Your Honor, those are the discovery issues as I have summarized on the page that I gave you that are at issue in this hearing.

[11] Now, I would like to address some of the other items that were raised for the first time this morning very briefly, if I might.

[15] Your Honor, these items were new items that most of which were not discussed with us prior to this morning, although a letter was submitted to Your Honor yesterday by counsel for CPT listing new issues, they did not discuss any of those with anyone representing LPL prior to this hearing and we have had no opportunity to address it.

[23] But I would like to offer a few comments with respect to their requests. One,

Page 62

[1] with respect to their request to remove the trial date, we do oppose that strenuously. We have — Your Honor has made it clear many, many times that the trial date is firm in this case, and we would ask that it be maintained.

[6] With respect to the discovery and the expansion of the factual discovery for the 30(b)(6) witnesses and the fact witnesses, Your Honor, I oppose that request for several reasons. One, those items which were contained in the Court's first joint Rule 16 scheduling order were reached pursuant to an agreement of counsel. I negotiated those limitations directly with counsel for CPT. It wasn't that the parties had an argument and then we submitted it to the Court, Your Honor made a decision, this was submitted as an agreement of counsel pursuant to these limitations.

[19] And now after operating under these parameters here at the eleventh hour counsel comes in and wants to expand the limitations and change the agreement with no prior discussion with us. And I oppose that because these were hard fought negotiations, we

Page 63

[1] reached an agreement, we compromised our position, I'm sure they compromised their position, and it was submitted to the Court and the Court signed it as part of the Rule 16 scheduling order.

[6] So I would ask that the limitations set forth in the Court's scheduling order with respect to the number of fact witnesses and the 35 hour limit on 30(b)(6) depositions be maintained.

[11] I would note that with respect to some limitations that are contained in this order, when I served interrogatories that inadvertently went over the limit, I was called to task by Ms. Dudzic from the other side saying no, no. no, you're over the limit, file revised interrogatories. And I said to her, you're right, and we revised them.

[19] So they have enforced these limitations against us already in the case and I think it's unfair for them to flip flop on this and want to change at this last minute.

[23] With respect to the issue of damages, Your Honor, I oppose sending the

Page 64

[1] damages issue to a special master. There is no reason for that at all. I can't even recollect quite frankly, Your Honor, what the damage issue is in dispute was that Your Honor tabled back in I believe it was February or beginning of March, but I would like to say this, the damages discovery, we are not writing on a clean slate in this case. The California case, the damage discovery in that case has been completed as I understand.

[11] And so that I would estimate that perhaps ninety percent of damages discovery has already occurred that we can use in this case from the California case, all the sales information has been done, the distribution process has been discovered, et cetera.

[17] The only thing that would need to be done as I recollect is simply to supplement that information to bring current the sales information that's already been produced in California, that they need to bring that data current for purposes of this case.

[25] So the question is there is no need to go to a special master at this point. I

Page 65

[1] haven't even had an opportunity to discuss these issues with counsel for CPT and I would certainly think that we should be able to work that out in short order and can produce and obtain the damages discovery in fairly quick order in time for the trial in this case.

[7] As far as the last issue that was raised on the protective order, I really haven't had a chance to address the issue of now making it apply in both directions and like Your Honor, I really don't know quite frankly what's in that boat. I know about the California case, but I'm not familiar at all with these other cases that counsel mentioned and I would need time to examine that issue and have the opportunity to work with counsel to see if we could work something out.

[18] I'm not fundamentally opposed to it, I just don't know what that involves so I cannot agree with it or say I disagree with it at this point because I just don't know what's involved with that.

[23] I think I have addressed all the points that they have raised this morning. One

Page 66

[1] other thing, Your Honor, we had proposed to Your Honor yesterday a new revised discovery deadline proposal which in light of where we are today, that provides new adjusted deadlines for purposes of fact discovery, expert reports and expert depositions, and we had submitted that to Your Honor yesterday. I assume Your Honor has seen that.

[9] THE COURT: I have.

[10] MR. BONO: So we would ask that those —

[12] MS. GABLER: We were not served with that.

[14] MR. KIRK: Yes, you were.

[15] MR. BONO: I believe counsel was served with it.

[17] MR. CHRISTENSON: Just to clarify, it's the same proposal that we sent to you on April 14th.

[20] MR. BONO: Your Honor, I would ask that these new deadlines were established as part of the Court's scheduling order.

[23] Thank you, Your Honor.

[24] THE COURT: In the California

Page 67

[1] case, who is the magistrate judge handling that case out there?

[3] MS. GABLER: Magistrate Lum, I-U-M.

[5] THE COURT: Lum. And essentially Judge Lum is who you deal with out there.

[8] MS. GABLER: It depends on the issue, Your Honor, certain discovery issues are before Judge Lum, but some of them Judge Marshal has retained authority over, in particular in damages the representations made by counsel here are wholly incorrect.

[14] One of the main reasons the February trial date was lost in that case is because LPL has yet to produce a 30(b)(6) witness on damages in the California action and that continues to be true through today. There are a number of other document damage related issues that are still pending

LG Philips LCD Co., LTD v.
Tatung Company, et al.

Hearing
April 25, 2006

and still being [21] produced out of LPL in the California action and [22] CFT has had almost no damages discovery against [23] LPL and that's one of the primary reasons that [24] the trial date was delayed.

Page 68

[1] THE COURT: And what do you on a [2] scale of one to ten, one being the least [3] connected, ten being the most connected, would [4] you rate the California case to this case.

[5] MR. BONO: It's hard for me to [6] say, Your Honor. Certainly the sales [7] information that CPT produced in that case are [8] relevant to this matter. The discovery on CPT's [9] distribution network is relevant to this matter [10] because it really fundamentally talking about [11] the same LCD modules, obviously the California [12] case deals with different patents than this [13] case, but as far as the modules, the general [14] modules that we're talking about, they do [15] overlap so the sales information is related.

[16] As far as the —

[17] THE COURT: So it's four or so?

[18] MR. BONO: Yes, Your Honor, four [19] or five.

[20] THE COURT: Would that be your [21] view, also?

[22] MS. GABLER: I would say ten, Your [23] Honor.

[24] THE COURT: Ten

Page 69

[1] And those cases are '02 and '03 [2] cases, and are they all consolidated for trial [3] in October?

[4] MS. GABLER: No, Your Honor.

[5] THE COURT: Which case is going to [6] trial with Judge Marshal in October?

[7] MS. GABLER: The lead case against [8] CPT and Tatung is going to trial October 3rd.

[9] THE COURT: Is that the '02 case.

[10] MS. GABLER: That's the '02 case, [11] yes, Your Honor. And then the customer cases [12] were consolidated with that main case for [13] purposes of discovery but not for trial. But [14] those cases are also pending before Judge [15] Marshal so we do expect her to tee those up [16] fairly quickly after having a resolution in the [17] main case since the discovery was basically [18] completed in terms of the customers also, so it [19] wasn't that the discovery was trailing.

[20] THE COURT: But Judge Marshal is [21] intending to try the '02 case in October of 2006 [22] now?

[23] MS. GABLER: October 3rd, yes, [24] Your Honor.

Page 70

[1] THE COURT: Okay. I'm going to [2] recess and come back and give you my answers.

[3] MR. BONO: Can we correct one [4] thing?

[5] THE COURT: Yes.

[6] MR. BONO: Counsel was incorrect [7] on that was the reason for the postponement.

[8] THE COURT: Don't worry, whatever [9] the reason was it's an '02 case going to trial [10] in 2006 in a district with a three, four or five [11] on a plaintiff's summation and a ten on the [12] defendants, it's like when I was out there last [13] June I heard how many cases go to trial in other [14] districts, I like to fall out of my chair.

[15] We will be in recess.

[16] (A brief recess was taken.)

[17] THE COURT: All right. Be seated, [18] please. Okay. Here is how we're going to [19] proceed. Each side will designate one lawyer [20] and one lawyer only to deal with the ongoing [21] issues in this litigation.

[22] The first issue that we're going [23] to deal with presented by the parties is the [24] '121 patent. And I'm going to order that

Page 71

[1] counsel for the plaintiff make a determination [2] whether or not they want to pursue infringement [3] claims under that patent by Monday, May 1. You [4] can drop the patent from the case.

[5] If I maintain the infringement [6] claims under that patent, then I'm going to [7] allow the defendants to have discovery against [8] that patent on the issue of an on-sale bar [9] through May 12th of 2006. That discovery can [10] include document production from the subsidiary [11] of plaintiff as well as three 30(b)(6) [12] depositions of the plaintiff and one deposition [13] of counsel that prosecute the patent, [14] understanding that they're from the firm [15] involved in this litigation.

[16] If there is any additional [17] discovery to be taken, it will be discussed [18] after that discovery is complete, it will be [19] discussed at a discovery conference scheduled [20] for May 15th at 9:30 a.m. here in the courtroom.

[21] With regard to the damages [22] discovery, we're going to allow commencement of [23] that discovery immediately. Any issues [24] concerning that discovery, plaintiffs shall

Page 72

[1] provide by Wednesday, May the 3rd, and defendant [2] can provide any issues it has, this is a written [3] submission, and respond to plaintiff's [4] submission on

Monday, May the 8th.

[5] With regard to the plaintiff's [6] pending request as presented this morning and in [7] papers filed yesterday, I'm going to take that [8] up in a written order that will be entered by [9] the end of this week. There is going to be some [10] relief granted on that request and I'm just [11] going to take a look at the, a more detailed [12] look at the California dockets and take a look [13] at the papers submitted from the California case [14] and then I'll enter my order on that request.

[15] With regard to the enlargement of [16] discovery as requested by defendant, I'm going [17] to take that under advisement until the [18] completion of the discovery on the '121 on-sale [19] bar defense on May 12th.

[20] The parties should continue to [21] understand the trial in this matter is going to [22] commence on July 17th. 2006, and that all the [23] other dates that have been targeted by both [24] parties to some extent more so by defendants

Page 73

[1] including the — I don't think there is any [2] significance in the reconsideration motion, I'm [3] just holding that, and I'll certainly hold it [4] now until we get to May 12th.

[5] With regard to the claim [6] construction, depending on the resolution of the [7] '121 patent, we'll enter the claim construction [8] on whatever terms remain from the thirteen in [9] very expeditious fashion I don't think it's [10] going to have that much of an impact on the case [11] in any event, it may have some.

[12] And we'll get the — the parties [13] should be anticipating that expert reports, [14] which is a date that was targeted, are initiated [15] and completed probably at this time again [16] waiting to find out about the '121 patent, [17] Friday, June 16th, with depositions to occur the [18] week of the 19th and the 26th of June.

[19] And for present purposes, that [20] covers I think the decisions that I want to make [21] at this time. The protective order issue, I'm [22] sorry, the protective order issue, counsel can [23] be in contact with the other courts and if there [24] is any desire to move other than the Central

Page 74

[1] District of California case materials here, that [2] should be presented also by May 5th. Friday, May [3] 5th. 2006, so I'll have some understanding of [4] what's being moved into this case. And again, I [5] don't see a problem with that unless it's [6] abused, and hopefully that order

then will be [7] entered that day or early next week.

[8] Okay. Anything else from the [9] plaintiff?

[10] MR. BONO: Your Honor, the only [11] thing is I mentioned the list that we produced [12] to the other side, I didn't have it when I [13] presented it to the Court which was what we were [14] required to produce to the other side, matching [15] the model numbers with the TCPs. If the Court [16] would like, I do now have a copy of that [17] document.

[18] THE COURT: You can pass it up to [19] my law clerk.

[20] MR. BONO: Thank you, Your Honor. [21] For the record it's document number LPL 102754 [22] to 758.

[23] THE COURT: Defendants?

[24] MS. GABLER: Your Honor,

Page 75

[1] Mr. Rhodes and I have an argument scheduled in [2] California on the 15th at 10:00 a.m.

[3] THE COURT: Okay.

[4] MS. GABLER: Is it possible to [5] have a different time for the hearing here?

[6] THE COURT: Sure. Yes. You have [7] an argument on the 15th.

[8] MS. GABLER: The 15th currently [9] scheduled for 10:00 a.m., although the clerk in [10] that case has indicated it might be moved to the [11] afternoon.

[12] THE COURT: Can you come on the [13] 18th, a Thursday, that gives us a couple of days [14] to get organized to travel, May 18th, Thursday.

[15] MS. GABLER: One moment. Is Your [16] Honor available on the 17th?

[17] THE COURT: Yes.

[18] MS. GABLER: We could do it the [19] morning of the 17th.

[20] THE COURT: Wednesday, May 17th, [21] you'll be coming in on the 16th?

[22] MS. GABLER: Yes.

[23] THE COURT: So we'll make it early [24] so you can get out on the 17th, so we'll make it

Page 76

[1] 9:30 on the 17th.

[2] MS. GABLER: Thank you, Your [3] Honor.

[4] THE COURT: Okay. We'll be in [5] recess.

[6] (Court recessed at 10:52 a.m.)

Page 77

State of Delaware  )
New Castle County  )

CERTIFICATE OF REPORTER

I, Dale C. Hawkins, Registered Merit Reporter and Notary Public, do hereby certify that the foregoing record is a true and accurate transcript of my stenographic notes taken on April 25, 2006, in the above-captioned matter.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 25th day of April, 2006, at Wilmington.

Dale C. Hawkins, RMR

# EXHIBIT I

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| LG.PHILIPS LCD CO., LTD., <br><br> Plaintiff, <br><br> v. <br><br> TATUNG COMPANY; TATUNG COMPANY OF AMERICA, INC.; CHUNGHWA PICTURE TUBES, LTD.; AND VIEWSONIC CORPORATION, <br><br> Defendants. | Civil Action No. 05-292 (JJF) |

## LG.PHILIPS LCD CO., LTD'S COVENANT NOT TO SUE DEFENDANTS UNDER U.S. PATENT NO. 6,738,121

LG.Philips LCD Co., Ltd. ("LPL"), on behalf of itself and any successors-in-interest to United States Patent No. 6,738,121 (the "'121 Patent"), hereby unconditionally and irrevocably covenants not to assert any claim of patent infringement (including direct infringement, contributory infringement, and inducing infringement) against Chunghwa Picture Tubes, Ltd., Tatung Company, Tatung Company of America, and ViewSonic Corporation (collectively the "Defendants"), or any customers and distributors of Defendants, under any of the claims of the '121 Patent, but only with respect to liquid crystal display products manufactured by Chunghwa Picture Tubes, Ltd ("CPT"), including LCD panels, LCD modules, and display products containing LCD panels or modules manufactured by CPT, such as LCD televisions, LCD monitors, and notebook computers (hereinafter "Covenant").

This Covenant does not extend to any claim in any other patent, whether related or unrelated to the '121 Patent. In granting this Covenant to Defendants, LPL in no way concedes Defendants' allegations that the aforementioned claims of the '121 patent are invalid,

unenforceable, or not infringed. To the contrary, LPL categorically rejects all such claims by Defendants.

August 3, 2006

Joo Sup Kim
Head of Intellectual Property Center
LG.Philips LCD Co., Ltd.

2