# EXHIBIT J

Westlaw.

Slip Copy                                                                    Page 1
Slip Copy, 1998 WL 34382271 (S.D.N.Y.)
**(Cite as: 1998 WL 34382271 (S.D.N.Y.))**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
A1 COMPUTER SERVICES, Petitioner,
v.
STANDARD PARKING SYSTEMS and Jeffrey
Fitzwilliam, Defendant.
**No. 96 Civ. 2695(DAB).**

Nov. 3, 1998.

*ORDER*

BATTS, J.

**\*1** On September 9, 1998, Magistrate Judge Ronald
L. Ellis issued a Report and Recommendation
recommending that Defendants' Motion for
Attorney's Fees pursuant to 35 U.S.C. § 285 be
denied *See* 28 U.S.C. § 636(b)(1)(A). Defendants
have filed objections to the Report and
Recommendation. The Court has reviewed Judge
Ellis's Report and Recommendation under a clearly
erroneous standard. 28 U.S.C. § 636(b)(1)(A).
Having found no clear error on the face of the record,
the recommendations of Magistrate Judge Ellis are
hereby accepted and the Report and
Recommendation dated September 9, 1998, is hereby
adopted in its entirety.

The facts in this matter are sufficiently set forth in
Judge Ellis's Report and Recommendation and will
not be repeated here. 35 U.S.C. § 285 awards
attorney fees to the prevailing party in exceptional
patent infringement case. In denying Defendants'
Motion for Attorney's Fees, Judge Ellis found that
Defendants failed to establish by clear and
convincing evidence that this was an "exceptional"
patent infringement case. Specifically, Judge Ellis
found that Defendants failed to meet their burden of
showing that Plaintiff litigated in "bad faith". (Report
and Recommendation at 11.)

Defendants contend that Judge Ellis's Report and
Recommendation does not fully address the merits of
their motion, because Judge Ellis did not reach a

conclusion on whether Defendants' product infringes
on Plaintiff's patent (Defs.' Objections at 2.)
Defendant argues that the Court must decide the
infringement issue in order to determine whether
Plaintiff maintained an untenable claim and,
therefore, litigated in "bad faith". (Defs.' Objections
at 6.)

This Court finds that Judge Ellis fully considered
Defendants' Motion for Attorney's fees. Judge Ellis
reviewed the minimal evidence that has been
produced thus far and found that the record is
"neither 'clear' nor 'convincing' on [the infringement]
issue". (Report and Recommendation at 7).

Accordingly, the Court adopts the Report and
Recommendation signed by Magistrate Judge Ellis
on September 9, 1998. Defendants' Motion for
Attorney's Fees is hereby DENIED.

On January 30, 1997 Plaintiff notified the Court of
its intention to move for voluntary dismissal of this
action with prejudice, pursuant to Rule 41(a)(2).
Defendants stated in a letter dated January 31, 1997,
that they "[did] not wish to have counterclaims
dismissed until they [had] had an opportunity to
pursue their claim for attorney's fees under 35 U.S.C.
Section 285." Defendants have had that opportunity.
Accordingly, this action is dismissed in its entirety,
with prejudice. The Clerk of the Court is directed to
close the docket in this matter.

SO ORDERED

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

I. INTRODUCTION
This action has been referred to the undersigned for
resolution of defendants' motion to recover fees and
costs expended in defending this action under 35
U.S.C. § 285. Because this does not appear to be an
"exceptional case" within the meaning of § 285, I
recommend that defendants' motion be DENIED.

II. BACKGROUND
**\*2** Jeffrey Fitzwilliam is president and founder of
Standard Parking Systems, Inc., a two-person
business operated out of the basement of
Fitzwilliam's Cincinnati, Ohio, home. *See* Fitzwilliam

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 1998 WL 34382271 (S.D.N.Y.)
**(Cite as: 1998 WL 34382271 (S.D.N.Y.))**

Page 2

Aff. at ¶ 1. _[FN1]_ Since 1982, Standard Parking Systems has developed and sold point-of-sale revenue control systems for valet parking garages. _Id._ at ¶ 2. In its latest incarnation, the Sentry 4000, Fitzwilliam's system is essentially a software product designed to run on a standard IBM (or compatible) point-of-sale terminal. _Id._ at ¶¶ 3-4; _see also_ Def. exh. A, attach. 3. _[FN2]_ By using Fitzwilliam's system, owners of parking garages and lots can document and control their transactions, and generate a detailed report of sales at the close of a business day. Fitzwilliam Aff. at ¶ 2.

> FN1. "Fitzwilliam Aff. at ___" refers to the affidavit of Jeffrey Fitzwilliam, submitted in support of the instant motion.

> FN2. "Def. exh. ___" refers to defendant's exhibits submitted in support of the instant motion.

By letter dated August 11, 1995, plaintiff, by its president, Bernard Shapiro, notified Fitzwilliam of its belief that the Sentry 4000 infringed upon its Ticketech system, patented under U.S. Patent No. 4,720,785 ("the '785 patent"). Def. exh. A, attach. 2. Shapiro threatened legal action if Fitzwilliam did not investigate the matter and contact Shapiro within 90 days of the letter. _Id._ Apparently, Fitzwilliam, through his attorneys, wrote to Shapiro and denied infringement, but received no response. Def. exh. J.

On April 16, 1996, plaintiff filed a patent infringement complaint against Fitzwilliam; Standard Parking Systems; Square Industries, an operator of several New York City valet parking garages; 6 & 30 Garage Corporation and 206 East 59th Corporation, two Square Industries garages located in New York City; and "X," "Y," and "Z" which, respectively, represented one or more garages, management companies, and individuals owning and operating Sentry 4000 systems in this district. Def. exh. A. at pp. 1-3. Also, around the time that the complaint was filed, Shapiro sent a letter to at least one New York City garage operator, announcing that suit had been filed. Def. exh. O. It is unclear from the record whether Shapiro sent such letters to other operators, although the letter itself intimates that other letters had been sent. _See id._ ("I'm taking the liberty of notifying major operators in the valet segment of the parking industry that a patent infringement complaint has been filed ...").

After receiving the complaint, Fitzwilliam, through his attorney, suggested that plaintiff and he meet for a demonstration of the Sentry 4000, hoping to establish that the Sentry 4000 did not infringe upon the Ticketech patent. Fitzwilliam Aff. at ¶ 16. Over three hours on August 6, 1996, the parties met in a New Jersey hotel, and went over the various features of the Sentry 4000. _Id._ Although Fitzwilliam brought an officer of co-defendant Square Industries to the meeting, Shapiro refused to proceed until the officer left. Shapiro Decl. at exh. A. _[FN3]_ It does not appear that counsel for either side attended the demonstration. On August 9, 1996, Shapiro issued a report of his observations at the demonstration to his attorney, Myron Greenspan, concluding that the Sentry 4000 had features identical or equivalent to those in the '785 patent. Shapiro Decl. at exh. A.

> FN3. "Shapiro Decl. at ___" refers to the declaration of Bernard Shapiro, submitted in opposition to the instant motion.

**\*3** Meanwhile, in July and again in September of 1996, counsel for Square Industries wrote to Greenspan, demanding discovery of the nature and extent of Greenspan's pre-filing investigation of the claims made in the complaint. _See_ Def. exhs. H and I. Square Industries put forth its own belief that said investigation was inadequate, and thus sanctionable. _Id._ On October 9, 1996, plaintiff and the Square Industries defendants entered into a settlement agreement whereby the Square Industries defendants agreed not to use certain optional features of the Sentry 4000, features that they apparently did not use anyway. Def. exhs. M and N. Fitzwilliam was offered the same settlement, but was uncomfortable with its terms, and rejected it.

Over two days in November, 1996, Judge Batts held a _Markman_ hearing, which, according to the dictates of that case, requires a court to construe the claims of the patent at issue. _See Markman v. Westview Instruments,_ 116 S.Ct. 1384 (1996). Shapiro testified about his patent for both days and, at the conclusion of his testimony, the _Markman_ hearing was indefinitely suspended, so that Greenspan could take a trip to Japan for unspecified reasons. _See Markman_ Tr. at pp. 283-84; _[FN4]_ Pl. Mem. at 9 _[FN5]_

> FN4. "_Markman_ Tr. at ___" refers to the transcript of the _Markman_ hearing held in this case.

> FN5. "Pl. Mem. at ___" refers to plaintiff's memorandum of law submitted in opposition to the instant motion.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Slip Copy
Slip Copy, 1998 WL 34382271 (S.D.N.Y.)
**(Cite as: 1998 WL 34382271 (S.D.N.Y.))**

Page 3

Upon Greenspan's return, he was informed that plaintiff had retained new counsel. Def. Mem. at 9; Def. exh. B at p. 26. At some point thereafter, new counsel indicated its willingness to move for a voluntary dismissal of the action with prejudice. *See* Shapiro Decl. at ¶ ¶ 18-19. According to plaintiff, he decided to do so after re-evaluating the merits of the case with new counsel, and after considering economic and personal factors. *Id.* Nevertheless, Fitzwilliam refused to consent to such a measure, insisting upon bringing the instant motion to recover his fees. Def. Mem. at p. 9. [FN6] To date, the action has not been formally voluntarily dismissed, although plaintiff's earlier, and presumably continuing, willingness to do so is undisputed here.

> FN6. "Def. Mem. at ___" refers to defendants' memorandum of law submitted in support of the instant motion.

In furtherance of this motion, Fitzwilliam took Greenspan's deposition in February, 1997. Def. exh. C. In that deposition, Greenspan testified that, prior to filing this action, he had not personally inspected a Sentry 4000, had never seen a videotape of one in operation, but did review Sentry's sales literature describing the system, as well as the Sentry 4000 operation and programming manuals. *Id.* at pp. 16-17; Shapiro Decl. at ¶ 6.

### III. DISCUSSION

In a departure from the "American rule," [FN7] 35 U.S.C. § 285 (" § 285") authorizes a court to award reasonable attorneys' fees to the "prevailing party" in an exceptional patent case. An award of fees has been described as involving a four part standard: "(1) the case must be exceptional; (2) the district court may exercise its discretion; (3) the fees must be reasonable; and (4) the fees may be awarded only to the prevailing party." *See Machinery Corp. of America v. Gullfiber, AB,* 774 F.2d 467, 470 (Fed.Cir.1985) (citing *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.,* 407 F.2d 288, 293 (9th Cir.1969)). The relevant inquiries in the present case are: (1) whether defendants are the prevailing party; and (2) whether this case may be described as "exceptional."

> FN7. The "American rule" states that the prevailing litigant is not entitled to recover any attorneys' fees. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 386 U.S. 714, 717-718 (1967). This rule furthers a general policy against allowing costs to become a barrier to litigation. *See Larchmont*

*Engineering, Inc. v. Toggenburg Ski Center, Inc.,* 444 F.2d 490, 491 (2d Cir.1971).

A. Are defendants a "prevailing party" within the meaning of § 285?

**\*4** As noted above, the closest this action has come to dismissal has been plaintiff's counsel's oral representation that his client was willing to move for a voluntary dismissal of the action, with prejudice. Importantly, however, the action has not been dismissed, because defendants wished to bring the instant motion.

Even if the action had been voluntarily dismissed, it is unclear whether defendant would be considered a "prevailing party" under § 285. *See, e.g., Cambridge Products, Ltd. v. Penn Nutrients Inc.,* 962 F.2d 1048 (Fed.Cir.1992)) (expressly passing on the question of whether a defendant benefitting from a voluntary dismissal qualifies as a prevailing party under § 285); *see also Encomp, Inc. v. L-Com, Inc.,* 999 F.Supp. 264 (D.Conn.1998) (awarding fees under § 285 to defendant benefitting from voluntary dismissal, without expressly addressing whether defendant was a prevailing party). In any event, I do not believe this issue need be decided because, as shown below, I cannot recommend that this case be found "exceptional."

B. Is this an "exceptional" case as defined by § 285?

It has been stated that existing definitions of an "exceptional" case "could be multiplied by the hundreds, both plus and minus, depending on the facts of each case." *Hartford Nat. Bank & Trust Co. v. E.F. Drew & Co.,* 188 F.Supp. 347, 353 (D.Del.1960), *aff'd,* 290 F.2d 589 (3d Cir.1961). Even so, a finding of "exceptional" circumstances does not mandate an award of fees. *Rohm & Haas Co. v. Crystal Chemical Co.,* 736 F.2d 688, 691 (Fed.Cir.1984). Exceptional cases have generally fallen into three broad categories: (1) willful and deliberate infringement; *Rosemount, Inc. v. Beckman Instruments, Inc.,* 727 F.2d 1540 (Fed .Cir.1984); *see also* 60 AM. JUR.2d *Patents* § 1126; (2) misconduct in prosecuting the patent application; *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,* 407 F.2d 288 (9th Cir.1969); and (3) litigation in bad faith. *Kahn v. Dynamics Corp. of America,* 508 F.2d 939 (2d Cir.1974). In each of these three categories, the exceptional nature of the case must be established by clear and convincing evidence. *See Reactive Metals & Alloys Corp. v. ESM, Inc.,* 769 F.2d 1578, 1582 (Fed.Cir.1985). A

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

trial court must articulate the more particular factual findings from which the finding of "exceptional circumstances" follows. *See id.* at 1582; *Hughes v. Novi American, Inc.,* 724 F.2d 122, 124 (Fed.Cir.1984). Where the defendant is the prevailing party, the Federal Circuit has noted that awards are generally only made in two kinds of cases: "those of bad faith litigation or those involving fraud or inequitable conduct by the patentee in procuring the patent." *Cambridge Products,* 962 F.2d at 1050-51; *accord Encomp.* 999 F.Supp. at 266.

Defendants' submissions are replete with arguments addressing their contention that the Sentry 4000 clearly does not infringe upon the '785 patent, and that this suit is therefore frivolous, thus satisfying the "exceptional" criterion. Such arguments, however, are in my view inappropriate here. First, it is not altogether clear that my referral in this case, directing me to recommend a disposition of defendants' fee motion, empowers me to make a determination as to the ultimate merits of the claims in plaintiff's complaint. Moreover, even if I were empowered to do so, I do not believe that I could. As noted above, the record here is embryonic. Only a partial *Markman* hearing has been held, and the claims in the '785 patent have never been construed. There is little if any objective evidence concerning the design and operation of the Sentry 4000; less, indeed, than that which was relied upon by Greenspan in filing this suit. [FN8] It simply would be inappropriate for me to pretend to reach a reasoned conclusion on whether or not defendants have infringed here based solely on the arguments of counsel. The record is neither "clear" nor "convincing" on this issue.

> FN8. Greenspan, at least, had the benefit of an owner's manual and a programming manual. The record here includes only Sentry's sales literature.

**\*5** Therefore, viewing the submissions in terms of the arguments which I conclude are appropriate here, defendants essentially argue that Al's conduct amounts to litigation in bad faith. Defendants specifically cite Al's lack of investigation before filing the suit, and its sending of injurious trade letters as factors rendering the case "exceptional" under § 285. In order for a party to recover attorneys' fees, there must be proof of actual wrongful intent or of gross negligence. *See Reactive Metals & Alloys Corp.,* 769 F.2d at 1583. A patentee should not be penalized for simply pursuing an infringement suit, even if his patent is later found to be invalid. *Fleischmann Distilling Corp. v. Maier Brewing Co.,*

386 U.S. 714, 718 (1967); *Florida Brace Corp. v. Bartels,* 332 F.2d 337, 340 (9th Cir.1964). General litigation tactics rising to the level of "exceptional" bad faith have included: (1) a delay in instituting the suit, *Kaehni v. Diffraction Co.,* 342 F.Supp. 523 (D.Md.1972), *aff'd* 473 F.2d 908 (4th Cir.1973); (2) misrepresentation or nondisclosure of evidence, *Hughes,* 724 F.2d at 122; (3) use of dilatory tactics, *Kaehni,* 342 F.Supp. at 523; and (4) maintenance of an untenable position. *Kahn,* 508 F.2d at 939. Courts, however, have generally been reluctant to find exceptional circumstances where a plaintiff has decided to abandon a claim in the early stages of a case and seek a voluntary dismissal. *Cambridge Products,* 962 F.2d at 1048-52; *Larchmont Engineering, Inc. v. Toggenburg Ski Center,* 444 F.2d 490 (2d Cir.1971); *accord Abbott Laboratories v. Tosoh Corp.,* No. 95 C 1896, 1998 WL 173297 at *8 (N.D.Ill.1998) ("Courts have denied motions for attorneys' fees [under § 285] when the plaintiffs have voluntarily and in good faith dismissed their cases.").

In *Cambridge Products,* the court refused to allow attorneys' fees where the plaintiff brought an infringement action but later moved for a voluntary dismissal with prejudice pursuant to Rule 41(a)(2). Cambridge's motion for dismissal was partially based on an FDA proposal to ban the marketing of a chemical contained in Cambridge's patented product. *See id.* at 1049. As in the instant action, no formal conclusions concerning the validity of the patent or the alleged infringement were made. *See id.* The defendant subsequently moved for attorneys' fees under both Fed.R.Civ.P. 11 and § 285, citing the inadequacy of Cambridge's prefiling inquiry. *See id.* at 1049-51. The court refused the award under both provisions, deciding that Cambridge's prefiling inquiry was reasonable, and thus adequate to withstand Rule 11 sanctions. *See id.* at 1050. The court also stated that in order to award fees under § 285, simple inadequacy of prefiling inquiry is insufficient; the additional element of bad faith is necessary. *See id.* at 1051. Defendant had failed to establish by clear and convincing evidence that Cambridge initiated the suit in bad faith. *See id.; accord Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.,* 444 F.2d 490 (2d Cir.1971) (voluntary dismissal was evidence of plaintiff's good faith, and "should not be discouraged by the threat of imposing attorney fees."); *Kastar v. K Mart Enterprises,* 190 U.S.P.Q. 550 (E.D.N.Y.1976) (voluntary dismissal "an indication of good faith"), *aff'd,* 556 F.2d 557 (2d Cir.1977).

**\*6** In this case, Al also sent letters to defendants'

customers informing them of the suit, without first seeing defendants' product. Defendants could argue that this conduct amounts to gross negligence. Conduct short of fraud, but in excess of simple negligence is sufficient for deciding that the case is exceptional under § 285. *See Machinery Corp. of America v. Gullfiber, AB,* 774 F.2d 467, 473. This "gross negligence" standard has been defined as requiring willful, wanton, or reckless misconduct, or evidence of "utter lack of all care." *See id at 473* (citing W. PAGE KEETON, ET AL., THE LAW OF TORTS § 34 (4th Ed.1984)). The question in the present case is whether AI exhibited willful, wanton or reckless misconduct when it asserted that defendant infringed and sent infringement letters without first seeing the product.

In *Virtue v. Creamery Package Mfg. Co.,* 227 U.S. 8, 37-38 (1912), the Supreme Court observed that "[p]atents would be of little value if infringers of them could not be notified of the consequences of infringement ... [.]" Similarly, the Second Circuit has stated: "[I]t is not an actionable wrong for one in good faith to make plain to whomsoever he will that it is his purpose to insist upon what he believes to be his legal rights, even though he may misconceive what those rights are." *Kaplan et al. v. Helenhart Novelty Corp. et al.,* 182 F.2d 311, 314 (2d Cir.1950).

More recently, in *Gullfiber,* 774 F.2d at 473, the Federal Circuit stated that sending infringement letters to the trade without obtaining the advice of counsel does not conclusively establish the bad faith necessary to find a case "exceptional." The Court of Appeals stated that "ascertaining a patentee's state of mind in sending infringement letters to the trade ... requires the court to take into account the totality of the circumstances." *See id.* Circumstances weighing in favor of finding a case exceptional include: making an unreasonable assessment of infringement; failing to obtain legal advice before sending infringement letters; and vexatious conduct during litigation. *See id.* at 472-474. Circumstances weighing against allowing fees include: making a justified (though possibly erroneous) assessment of infringement; reliance on counsel in sending infringement letters; and prompt resolution of an action by seeking settlement or dismissal. *See id.* The Court warned that none of these factors considered alone conclusively establishes the exceptional nature of a case and that all facts and circumstances must be considered when evaluating each case. *See id.*

In *Coal Processing Equipment, Inc. v. Campbell,*

578 F.Supp. 445 (S.D.Oh.1981), *aff'd* 716 F.2d 902 (6th Cir.1983), the court denied attorneys' fees to a plaintiff (Coal) seeking a declaratory judgment of non-infringement, even after it found that defendant/patentee (Campbell) sent infringement letters without a good faith belief that infringement existed. The court held that an award of attorneys' fees was not appropriate because, although Campbell acted in bad faith when asserting infringement in letters to Coal's customers, he acted equitably in prosecuting the action. *See id at 467.* The court found that Campbell's actions did not rise "to the level of injustice necessary to brand [an] action 'exceptional' under 35 U.S.C. § 285." *See id.*

*7 The facts as they stand in the current case do not support a finding that it is exceptional. There is no "clear and convincing evidence" or "particular factual findings" upon which to so hold. The fact that AI perhaps too hastily initiated the suit and sent out injurious trade letters does not conclusively establish that AI litigated in bad faith. AI claims that it relied both on its own evaluation of the machines at issue, and the advice of prior counsel, in initiating its suit. A subsequent demonstration confirmed Shapiro's apparently good faith belief that the Sentry 4000 infringed on the '785 patent, as indicated in his own internal memorandum to his lawyer. After conferring with its new counsel, and re-evaluating the potential monetary and personal costs of litigation, AI sought to withdraw the suit. There is nothing in the record to suggest that AI's litigation tactics were dilatory or vexatious *Hughes,* 724 F.2d at 122; *Kaehni,* 342 F.Supp. at 523. Indeed, AI's efforts to secure a reasonably prompt resolution of this action simply seem to outweigh any bad faith indicated by its allegedly premature filing and infringement letters. Finally, an award of fees here would penalize plaintiff for seeking to voluntarily dismiss a lawsuit that it has now concluded should be dismissed. *Toggenburg,* 444 F.2d at 491.

## IV CONCLUSION

For the reasons stated above, I cannot conclude that the record is sufficient to establish by clear and convincing evidence that this is an exceptional case within the meaning of § 285. For this reason, I recommend that defendants' motion be DENIED.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all

Slip Copy
Slip Copy, 1998 WL 34382271 (S.D.N.Y.)
**(Cite as: 1998 WL 34382271 (S.D.N.Y.))**

adversaries, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

Slip Copy, 1998 WL 34382271 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1997 WL 34487263 (Trial Motion, Memorandum and Affidavit) Plaintiff's Memorandum in Opposition to Defendants7D Motion for Attorney's Fees (Mar 28, 1997)Original Image of this Document (PDF)

• 1997 WL 34482620 (Expert Report and Affidavit) Declaration of Bernard Shapiro in Opposition to Defendants' Motion for Attorney's Fees (Mar. 26, 1997)Original Image of this Document (PDF)

• 1997 WL 34482621 (Expert Report and Affidavit) Affidavit of Jeffrey Fitzwilliam (Mar. 6, 1997)Original Image of this Document (PDF)

• 1997 WL 34482622 (Partial Expert Testimony) (Partial Testimony) (Feb 27, 1997)Original Image of this Document (PDF)

• 1996 WL 34305123 (Partial Expert Testimony) (Partial Testimony) (Nov. 7, 1996)Original Image of this Document (PDF)

• 1996 WL 34305124 (Partial Expert Testimony) (Partial Testimony) (Nov. 6, 1996)Original Image of this Document (PDF)

• 1996 WL 34306844 (Trial Pleading) Complaint (Apr. 16, 1996)Original Image of this Document (PDF)

• 1:96cv02695 (Docket) (Apr. 16, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

Page 1

# H

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, N.D. Illinois.
ABBOTT LABORATORIES, an Illinois
Corporation, and Diamedix Corporation, a
Florida Corporation, Plaintiffs,
v.
TOSOH CORPORATION, a Corporation of Japan,
and Tosoh Medics, Inc., a Delaware
Corporation, Defendants.
No. 95 C 1896.

April 8, 1998.

## MEMORANDUM OPINION AND ORDER

LINDBERG, J.

*1 Plaintiffs, Abbott Laboratories (Abbott) and Abbott's licensor, Diamedix Corporation (Diamedix), brought this lawsuit against defendants Tosoh Corporation, a Japanese Corporation, and Tosoh Medics, Inc., a Delaware corporation (Tosoh), charging Tosoh with infringement of Diamedix's patented process for immunoassays, U.S.Patent No. 4,642,285 (the '285 patent). After extensive discovery, Tosoh moved for summary judgment. Several months later, plaintiffs voluntarily dismissed the suit after discovering a Japanese reference that Abbott claims constitutes prior art and invalidates Diamedix's '285 patent. [FN1] In response, Tosoh now moves for an award of attorneys' fees against both plaintiffs under 35 U.S.C. § 285, which authorizes the court "in exceptional cases" to award reasonable attorneys' fees to a prevailing party in a patent infringement action. Tosoh seeks recovery of fees and expenses of approximately $3 million.

> FN1. Abbott Laboratories subsequently sued Diamedix Corp., seeking a declaration that two of Diamedix's patents, including the '285, were invalid, therefore making its licensing agreement as to those patents void However, the district court denied Abbott's motion for summary judgment because genuine issues of material facts existed as to

anticipation and obviousness. *See Abbott Laboratories v. Diamedix Corp., 969 F.Supp. 1064 (N.D.Ill.1997)*

Plaintiffs contend that Tosoh cannot prove that an award of fees is appropriate under the standards courts must apply when interpreting § 285. They urge that they pursued this lawsuit in good faith and that the evidence still supports the conclusion that Tosoh infringes the '285 patent literally and under the doctrine of equivalents All parties have submitted numerous documents and exhibits to support their positions. For the following reasons, Tosoh's motion for attorneys' fees under 35 U.S.C. § 285 is denied.

## I. The Relevant Technology

In support of its motion, Tosoh argues that it does not infringe the '285 patent literally or under the doctrine of equivalents. Alternatively, Tosoh argues that even if it does infringe the '285 patent, Abbott and Diamedix are estopped from suing Tosoh because Diamedix disclaimed simultaneous assays, similar to the enzyme immunoassays (EIAs) Tosoh produced during the prosecution of the '285 patent. [FN2] To understand these arguments, a review of the relevant technology is necessary.

> FN2. Because plaintiffs voluntarily dismissed this action before the court ruled on defendants' motion for summary judgment, what the court essentially has before it now--in the form of a motion for attorneys' fees--is defendants' motion for summary judgment that was mooted by dismissal of the case.

The '285 patent at issue relates to "sandwich" enzyme immunoassays, which are commonly used in blood tests for detecting hepatitis. Enzyme immunoassays use antibodies to detect, tag and measure small amounts of substances, such as antigens [FN3], in human body fluids. The Federal Circuit described immunoassay technology as follows:

> FN3. An antigen is a substance to which the body reacts by producing antibodies. Examples of antigens include bacteria, hormones and viruses.

Immunoassays ... are diagnostic methods for

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

determining the presence or amount of antigen in body fluids such as blood or urine by employing the ability of an antibody to recognize and bind to an antigen. Generally, the extent to which the antibody binds to the antigen to be quantitated is an indication of the amount of antigen present in the fluid. Labeling the antibody or, in some cases, the antigen, with .. an enzyme makes possible the detection of the antibody-antigen complex. *Hybritech Inc. v. Monoclonal Antibodies, Inc., 802 F.2d 1367, 1368-69 (Fed.Cir.1986).*

The '285 patent involves immunoassays that "sandwich" molecules of interest in a patient's blood between two antibodies, thus immobilizing and tagging the molecule. One antibody (the "capture" antibody) is attached to a solid base (the "carrier") that can be manipulated during the assay. The capture antibody immobilizes the targeted antigen in the patient's blood and tags it for later use. The other antibody (the "labeled" antibody) is attached to a molecule that can be detected and binds to another site on the tagged antigen. If the antigen is present in the test sample, thus forming a "sandwich," the enzyme label will react with the substrate that is added to produce a signal, such as a color change. Claims 1 & 9 of the '285 patent, the two claims alleged to be infringed, provide the basis for the parties' arguments. They read:

*Claim 1:*

**\*2** A method for detecting an antigen in a test serum containing said antigens, comprising the steps of:

a.) providing a first quantity of an antibody associated with an antigen, said first quantity of said antibody being covalently bound to a water-insoluble, water-insuspensible, solid carrier;

b.) contacting and incubating a test serum containing said antigen with said antibody covalently bound to said water insoluble, water-insuspensible solid carrier of step (a) whereby said antigen reacts with said antibody covalently bound to said solid carrier to immobilize said antigen;

c.) providing a solution of a second quantity of said antibody, said second quantity of said antibody being covalently linked to an enzyme;

d.) contacting and incubating said immobilized antigen resulting from step (b) with said solution of enzyme-linked antibody of step © whereby said enzyme-linked antibody reacts with said immobilized antigen to immobilize said enzyme-linked antibody;

e.) separating the solid carrier from the solution of enzyme-linked antibody;

f.) contacting and incubating said immobilized enzyme-linked antibody with a substrate solution wherein said enzyme linked to said antibody catalyzes a reaction of said substrate and produces a detectable reaction product; and

g.) correlating said detectable reaction product to the presence of said antigen to be detected.

*Claim 9:*

A process for determining the presence of an antibody in a sample comprising the following steps:

a.) incubating the sample with an antibody immobilized on an insoluble member, the antibody being reactive with the antigen, the incubation enabling a bond to be formed between the antibody and the antigen present in the sample to present an insoluble member having antigen bonded thereto in the event the antigen is present in the sample;

b.) separating the insoluble member from any unbonded substances;

c.) incubating the insoluble member with a solution containing a tagged antibody reactive with the antigen, the tagged antibody being tagged with an enzyme capable of effecting a reaction of a substrate to produce a detectable reaction product, the incubation being conducted to enable the tagged antibody to bond to any antigen bonded in step (a) to the antibody on the insoluble member;

d.) separating the insoluble member from the enzyme tagged antibody solution to remove any unbonded tagged antibody therefrom;

e.) exposing the insoluble member to a substrate solution which the enzyme of the tagged antibody reacts upon to enable a chemical change in the substrate to take place and to produce a detectable reaction product; and,

f.) detecting any reaction product present in the solution to determine the presence of the antigen.

In the complaint, Abbott alleged that Tosoh's process of simultaneous EIA's infringed these two claims of the '285 patent. The parties agree that Tosoh's EIA technology employs a simultaneous incubation method that involves a single incubation of the antibody and antigen. Tosoh's EIA process begins by adding a serum sample to a test cup containing magnetic beads acting as a solid carrier, coated with one monoclonal antibody, and a quantity of a second antibody bound to an enzyme. Subsequently, a substrate is added to the separate sample and labeled antibodies, and the antigen is measured.

## II. Tosoh's Arguments

**\*3** Tosoh claims that there are numerous differences

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

between its EIAs and the '285 patent. The differences it cites between its own assays and those of the '285 patent are as follows:

**1.)** Claim 1 of the '285 immunoassay is carried out in four distinct stages: (1) the antibody is bound to a water-insoluble, water-insuspensible carrier that is incubated with blood serum to immobilize the antigen; (2) the sandwich is completed when the carrier and the attached antibody and antigen complexes are incubated with the labeled antibody, binding to the immobilized antigen; (3) antigen presence is confirmed through an enzymatic reaction; and (4) the results are quantified. Therefore, Tosoh contends that it cannot infringe the '285 patent because it uses a one-step simultaneous assay while the ' 285 patent claims a two-step sequential assay. Specifically, Tosoh argues that claim 1 of the '285 patent describes two "distinct" sequential incubations, where the first incubation creates an antibody-antigen complex to be used in the second incubation. Tosoh claims, on the other hand, that its assay employs a single, simultaneous incubation performed in a test cup in which both magnetic beads are coated with one monoclonal antibody and a quantity of second antibody is bound to an enzyme.

**2.)** Second, Tosoh argues that the '285 patent requires two quantities of the same antibody to form the immunoassay sandwich. As support, Tosoh points out that claim 1(a) describes the first step as "providing a first quantity of an antibody associated with an antigen" and that claim 1 © refers to "a second quantity of said antibody." Tosoh contends that a "second quantity of said antibody" is another quantity of the first antibody mentioned in claim 1(a). In short, Tosoh contends that the '285 patent claims "capture" and "tagged" antibodies that are prepared from the same batch of purified antibody. Tosoh claims that its own assays are "two-site" assays, utilizing capture antibodies that bind to one epitope on the antigen being detected and different tagged antibodies that bind to another site.

**3.)** Tosoh further claims that a difference exists between Tosoh's solid carrier and the solid carrier claimed by the '285 patent. Tosoh insists that while the '285 patent describes a "water-insuspensible solid carrier," it uses eight or 12 magnetic beads that remain suspended in stirred or agitated water. Furthermore, Tosoh points out that the '285 patent depicts the solid carrier as a single disk on the bottom of the test vial. Thus, Tosoh argues that the '285 patent requires a single carrier and not multiple beads.

**4.)** Next, Tosoh argues that Abbott and Diamedix ignored crucial aspects of the '285 patent prosecution history. Tosoh contends that the plaintiffs are estopped from claiming that Tosoh's EIAs infringed the '285 patent because in the file wrapper and invention disclosure statement, inventors Seymour Halbert, Milton Aakon and their patent attorneys, [FN4] allegedly disclaimed coverage of simultaneous assays, two-site assays and water-suspensible magnetic bead carriers. Tosoh contends that the plaintiffs ignored the prosecution history of the '285 patent as follows:

> FN4. For simplicity, the court will refer to the inventors or their patent attorneys as "Dr. Halbert."

**\*4 a.)** Tosoh points out that Dr. Halbert stated several times during the prosecution of the '285 patent that his application did not involve simultaneous incubation. Tosoh notes that during the prosecution of the '285 patent, the patent examiner identified U.S.Patent No. 4,016,043 (the " '043 patent") as covering the same invention as Dr. Halbert's application. Tosoh contends that the '043 patent covers a one-step, simultaneous assay (claim 1), a two-step assay with separation between the two incubations (claim 2) and a hybrid of the former two assays (claim 4). Thus, the examiner instructed Dr. Halbert to modify his claim language to correspond to the language of the '043 patent in order to trigger an interference proceeding to determine priority of the immunoassay technology covered by both the '043 patent and the '285 application. In the interference proceeding before the United States Patent & Trademark Office (the "USPTO"), Tosoh notes that Dr. Halbert distinguished his two-step assay from the assays covered by claims 1 and 4 of the '043 patent by explaining that:

> With regard to [claim 1 of the '043 patent], paragraph c requires contacting the sample with the "reagents forming a reaction mixture." One of the reagents, set forth in paragraph b, is the enzyme-tagged reagent. *In applicant's test, the enzyme tagged reagent never contacts the sample.* Similarly, claim 4, in step d, requires that the "reaction mixture" clearly includes the sample which is added and incubated in accordance with step b. Accordingly, this claim also requires contacting the enzyme-tagged substance with the sample, *a step never done in applicant's claimed process and not recited in the suggested claim.*
> (underscoring in original; italics added.)

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

Page 4

Tosoh contends that this alleged disclaimer specifically surrenders coverage of simultaneous assays. Tosoh also argues that Dr. Halbert disclaimed simultaneous assays in his Invention Disclosure Statement (IDS) by stating, "[I]n the claimed method, the sample and conjugate are not admixed during any incubation." Furthermore, Tosoh cites Dr. Halbert's deposition to prove that simultaneous assays are not covered by the '285 patent. Abbott's attorney asked Dr. Halbert during his deposition whether he intended "to limit [his] claims to just the two separation step assay," and Dr. Halbert replied, "Yes, I guess we did."

b.) Tosoh also contends that Dr. Halbert disclaimed two-site assays. It points the court to the IDS, in which Dr. Halbert stated that the capture and enzyme-tagged antibodies were identical: "In contradistinction, the solid phase species (e.g., antibody) and the labeled species (e.g., antibody) are identical in the present invention and the method does not involve any competition for binding sites." Tosoh contends that this statement disclaims two-site assays, which Tosoh uses in its EIA process, from the '285 patent.

c.) Furthermore, Tosoh argues that Dr. Halbert disclaimed a solid carrier comprising of magnetic beads suspensible by stirring. In support, it points to the prosecution history of the '285 patent, in which Dr. Halbert recommended a carrier with a specific gravity twice that of water and also reported that his attempts at using beads as carriers were unsuccessful. Tosoh notes that Abbott initiated a reexamination proceeding of the '285 patent in 1987, arguing that unless the solid carrier was water-insuspensible, the claimed method was not novel and therefore not patentable. In its reexamination decision, the USPTO agreed and concluded that a water-insuspensible carrier was essential to the patentability of the '285 patent. Tosoh further claims that the plaintiffs assumed that Tosoh's magnetic beads were insuspensible without testing or stirring them. Tosoh admits that the magnetic beads used in its EIAs are insuspensible when stationary in water but claims that its magnetic beads go into suspension when stirred and therefore cannot infringe the '285 patent.

*5 Additionally, Tosoh claims that it is entitled to attorneys' fees because Abbott acted in bad faith. It alleges that Abbott brought this infringement suit because it could save as much as $30 million if the patent were invalidated, including an estimated $15 million in royalties from the Diamedix license for one-step assays and could add almost 10% to its 65%

market share in EIA assays if Tosoh were forced out of the market. Tosoh further notes that Abbott initially challenged the validity of the '285 patent in a reexamination proceeding and claims that Abbott's negotiator for the Diamedix license, Brian Spear, thought that this proceeding was a "no lose" proposition: if the patent were invalidated, Abbott Labs would no longer have to pay royalties to Diamedix and if the patent were upheld, it would be stronger to use against third parties. Tosoh points out that Abbott did not pay royalties for the first 31 months of the license on the one-step assays Abbott used because such assays were not covered by the '285 patent. Tosoh argues that when Diamedix finally insisted that Abbott Labs pay royalties on all of its sandwich assays, both parties agreed to keep the royalties in an escrow while Abbott Labs sued a third party to determine if the '285 patent included simultaneous assays. Tosoh insists that Abbott once again found itself in a "no lose" situation: if it lost the case because the '285 patent was invalid, Abbott would no longer have to pay royalties to Diamedix, saving millions of dollars, and if Abbott won the case, not only would it receive a damage award but it would force its competitors out of the market.

Finally, Tosoh gives evidence of Abbott trying to drive it out of the market: (1) the plaintiffs charged Tosoh with intentional infringement, raising the risk of treble damages; (2) the plaintiffs sought lost profits, exposing Tosoh to a larger damage award than a reasonable royalty damage award; (3) Abbott required Tosoh to produce and ship numerous sensitive documents to the United States through discovery requests; (4) the plaintiffs did not offer license or settlement, thereby forcing Tosoh to win the case or exit the U.S. EIA market; [FN5] (5) Abbott Labs spread potentially harmful rumors that Tosoh was a foreign chemical company that would soon leave the U.S. market; and (6) even after receiving a translated Japanese reference that invalidated the '285 patent, the plaintiffs waited approximately four months before dismissing the suit. As a result, Tosoh incurred substantial additional attorneys' fees for preparing the summary judgment motion.

FN5. However, the record does not indicate if Tosoh requested a settlement or license

### III. Abbott Labs and Diamedix's Counterarguments

Abbott Labs and Diamedix stand by their contention that Tosoh's assays infringe the '285 patent for the following reasons:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F Supp.
Not Reported in F Supp., 1998 WL 173297 (N D Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

**1.)** Tosoh's argument that its products do not literally infringe the '285 patent because they employ simultaneous instead of sequential incubations would require the court to read a nonexistent limitation into the claims of the ' 285 patent. In fact, plaintiffs argue, Tosoh's EIA process includes every element of claim 1 of the '285 patent. According to plaintiffs, the language in claim 1 of "comprising the steps of," demonstrates that the claims are open-ended and that the only requirement is that the actions of each of the listed step be included, literally or equivalently, in the process. Plaintiffs further point out that no language in claim 1 of the '285 patent sets forth a required sequence of events (eg., "subsequently," "after the step of," "between steps (b) and (d)"). In plaintiffs' view, as long as each of the steps in the patent claim is included in Tosoh's process, whether in the same or different order, the process infringes the '285 patent. Plaintiffs contend that Tosoh took the language from Dr Halbert's deposition testimony out of context and ignored language that shows he did not intend to limit the '285 patent to sequential incubations.

  **\*6** Q: And did you intend to limit the scope of your patent claims to immunoassays which require nonsimultaneous incubation steps to form bonds between the antibodies and the antigen?

  A: We did not ....

  Q: So those two incubations could occur simultaneously

  A: Under the proper circumstances.

In any event, the plaintiffs insist, Dr. Halbert made it clear at his deposition that he was not qualified to interpret the claims of the '285 patent, but that he does think it is possible to practice his invention as a simultaneous sandwich, and the simultaneous incubations would practice the principles of his invention. In the alternative, the plaintiffs argue that even if the court does finds that the '285 patent does not include simultaneous assays literally, Tosoh's process is sufficiently similar or equivalent to that of the '285 and therefore infringes under the doctrine of equivalents

**2.)** Plaintiffs also argue that claim 1(c) does not encompass the language "same antibody," but that the claims, the specification and the state of the art from 1975 to today indicate that "said antibody" includes any antibody. Plaintiffs contend that the phrase "a second quantity of said antibody" could refer to the same or a different antibody Plaintiffs point to the specification of the '285 patent, which states: "In order to practice the present invention, it is necessary to provide an antibody that will react

with an antigen or antigens. It should be noted that such an antibody exists, and thus, the present invention is not intended to be limited to the use of any particular antibody." (U.S. Patent No. 4,642,285, col. 4, lines 40-46.) Plaintiffs claim that Tosoh therefore infringes the '285 patent by using two non-identical antibodies, where both antibodies react with the same antigen, to form the antibody-antigen-antibody sandwich. Plaintiffs also argue that Tosoh erroneously seeks to expand the novelty of the '110 patent, which Tosoh contends its assays follow. Plaintiffs observe that the '110 patent only uses two different monoclonal antibodies, each specific to different epitopes on the antigen. (U.S. Patent No. 4,376,110, col. 2, lines 11-14.) They argue that the '110 patent shows that one of ordinary skill in the art in 1975 would not have understood the claims of the '285 patent to be limited to the use of two identical antibodies of each sandwich layer

**3.)** The plaintiffs next address Tosoh's argument that Tosoh's EIA process does not use a water-insunsensible solid carrier as required by the '285 patent. Plaintiffs note that Tosoh's magnetic beads are "water-insuspensible," meaning objects sink or separate when placed in water due to the force of gravity. Plaintiffs point out that Tosoh admits that its magnetic beads are heavier than water, a specific gravity of approximately 1 1, and that its beads will only suspend in water when an external force is applied. Plaintiffs also discount Tosoh's argument that it uses multiple beads and therefore cannot infringe the '285 patent; they urge that the '285 patent requires only the use of a "water-insuspensible solid carrier," and does not restrict itself to single carriers. Indeed, plaintiffs point out that Tosoh itself claims that its assays follow the '110 patent; yet that patent uses the term "solid carrier," similar to that of the '285 patent. Plaintiffs explain that the specification of the '110 patent discloses the use of "multiple particles" as "solid carriers " They argue that Tosoh therefore cannot claim that its assays follow the '110 patent while at the same time argue that Tosoh's magnetic beads do not constitute a solid carrier under the '285 patent. Plaintiffs further assert that even if the '285 patent is found to literally exclude Tosoh's magnetic beads, Tosoh's magnetic beads are sufficiently similar or equivalent to the '285 patent to infringe under the doctrine of equivalents. Plaintiffs thus argue that Tosoh cannot avoid infringement of the '285 patent on this ground

**\*7** In addition, plaintiffs contend that the prosecution history of the '285 patent does not disclaim simultaneous assays, two-site assays or multiple bead

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

carriers. Plaintiffs contend that the statements Tosoh allege disclaim simultaneous assays, were not relied on for patentability and therefore do not constitute prosecution history estoppel. *See e.g.*, *SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1120 n. 13 (Fed.Cir.1985). Furthermore, plaintiffs support their position by pointing out that the statements made about simultaneous assays during the prosecution of the '285 patent were in the context of an interference action and therefore were made only in reference to the priority--and not the patentability--of the invention [FN6]. According to plaintiffs, the prosecution history proves that simultaneous assays are covered by the '285 patent. They note that during the reexamination proceeding, the examiner rejected claim 12 based on lack of support in the specification and as new matter. Dr. Halbert responded to the rejection by stating that claim 12 (eventually becoming claim 1 of the '285 patent) and claim 1 of the '110 patent (a simultaneous assay claim) "are similar in scope." The USPTO agreed and withdrew its rejections.

> FN6. The '285 patent ultimately issued because the USPTO determined that Dr. Halbert invented the subject matter first.

### IV. Attorney's Fees under 35 U.S.C. § 285

Section 285 of the Patent Act allows the court to award attorneys' fees to the prevailing party in exceptional cases. 35 U.S.C. § 285. Whether such an award is appropriate is a matter within the discretion of the court. *See Machinery Corp. of America v. Gullfiber AB*, 774 F.2d 467, 471 (Fed.Cir.1985). Determining whether fees are warranted requires a two-step analysis. First, the prevailing party must show by clear and convincing evidence that the case is "exceptional." *J.P. Stevens Co., Inc. v. Lex Tex Ltd.*, 822 F.2d 1047, 1050 (Fed.Cir.1987). If the court makes such a finding, it must them determine whether an award of fees is warranted. *National Presto Industries, Inc. v. West Bend Co.*, 76 F.3d 1185, 1197 (Fed.Cir.1996). Before awarding fees, the court must conclude that it would be a "gross injustice" not to do so. *J.P. Stevens Co.*, 822 F.2d at 1052 (citing legislative history).

The reasoning behind this theory is that the purpose of § 285 is not to reward the prevailing party, but to compensate it for the cost it incurred as a result of the losing party's misconduct. *See Larchmont Engineering*, 444 F.2d at 490. In fact, the legislative history of § 285 indicates that Congress intended that it be applied sparingly because it represents a departure from the usual rule that all parties pay their own attorneys' fees. *See id.* at 491.

> The exercise of discretion in favor of an allowance of attorneys' fees should be based upon a finding of unfairness or bad faith in the conduct of the losing party, or some other equitable consideration of equal force, which makes it grossly unjust that the prevailing party be left to bear the burden of his own counsel fees.
> **\*8** *Purer & Co. v. Aktiebolaget Addo*, 410 F.2d 871, 880 (9th Cir.1969).

For the court to award attorneys' fees in this case, Tosoh must first prove the exceptional nature of this case by clear and convincing evidence. Then the court makes the additional analysis of whether attorneys' fees are warranted. *See id.* Specifically, Tosoh must prove that the plaintiffs brought this action in bad faith or with such willful, wanton or reckless conduct as to constitute gross negligence. *See Machinery Corp.* at 473. As the plaintiffs dismissed this case prior to trial, Tosoh has an extremely heavy burden to establish a prima facie case for attorneys' fees, "in light of the extraordinary nature of the relief." *W.L. Gore*, 424 F.Supp. at 703. Courts have denied motions for attorneys' fees when the plaintiffs voluntarily and in good faith dismissed their cases. *Larchmont Engineering, Inc. v. Toggenburg Ski Center, Inc.*, 444 F.2d 490 (2d. Cir.1971); *W.L. Gore & Assoc. v. Oak Mat'l Group*, 424 F.Supp. 700, 703 (D.Del.1976).

Tosoh's assertion that it is entitled to fees under 35 U.S.C. § 285 is based on its contentions that: (1) there are numerous differences between its EIAs and the '285 patent; (2) the plaintiffs are estopped from claiming that Tosoh's EIAs infringed the '285 patent; and (3) Abbott was trying to drive it out of the immunoassay market. Together, Tosoh asserts that these actions establish that Abbott acted in bad faith in bringing this lawsuit.

The court has considered the parties' extensive exhibits, including patentability opinions, declarations, expert deposition testimony, operating manuals, prosecution history, patents claims and several other documents, to determine whether attorneys' fees are appropriate under § 285. After combing through these materials, the court finds that Tosoh has not proved by clear and convincing evidence that this is an exceptional case under § 285 or that the plaintiffs pursued this litigation in bad faith. Since the plaintiffs voluntarily dismissed this case before trial, Tosoh has an extremely heavy burden to establish that it is entitled to fees. The court also notes that Tosoh does not only have to

Not Reported in F Supp                                                      Page 7
Not Reported in F Supp , 1998 WL 173297 (N.D Ill )
(Cite as: 1998 WL 173297 (N.D.Ill.))

establish that it would have succeeded on its motion for summary judgment, it must show by clear and convincing evidence that Abbott's claims were so beyond the pale as to indicate bad faith in bringing the lawsuit at all.

First, Tosoh argues that the fact that its EIAs do not literally infringe the '285 patent demonstrate that plaintiffs brought this suit in bad faith. This is a difficult argument to make as Tosoh not only has to show that it does not infringe the '285 patent, it must establish that evidence of such is so overwhelming as to clearly and convincingly support that Abbott's lawsuit had no merit.

Tosoh contends that plaintiffs could only prevail in this suit if they convince this Court that: (1) a simultaneous incubation of capture antibody, serum sample and enzyme-tagged antibody is described by the language prescribing a first incubation followed by a "distinct" incubation involving a product "resulting from" the first incubation; (2) "a second quantity of said antibody" refers to a tagged antibody that is purposely different from the "said" capture antibody in terms of molecular structure and affinity; and (3) multiple, water-suspensible carriers are described by language that prescribes a single, "water-insuspensible" carrier. Tosoh insists that plaintiffs are in fact unable to prove any of these elements because the '285 patent does not encompass simultaneous incubations, a one-site assay or multiple magnetic beads suspensible by stirring.

*9 Plaintiffs urge that the language of claim 1 does encompass simultaneous assays because a simultaneous EIA process, like Tosoh's, literally corresponds to each step in the claim. They contend that claim 1 of the '285 patent encompasses a two-site assay because the phrase "second quantity of said antibody ..." in step 1(c) does not refer to an antibody identical to that in step 1(a). Plaintiffs argue that this language specifically includes the use of two different antibodies to form a sandwich assay. In addition, plaintiffs state that Tosoh's multiple, magnetic bead carrier literally infringes claim 1 of the '285 patent because the beads are water-insuspensible. They allege that during actual performance in the assay, the beads are not suspended but instead act as a water-insuspensible carrier. Further, the beads can only be suspended through stirring or agitation and since the specific gravity of the beads is 1 1, the beads sink when placed in water, thus constituting water-insuspensible beads. Plaintiffs also point out that the claim language of the '285 patent does not require a single

carrier, as Tosoh maintains, but instead only requires a "solid carrier," thereby encompassing multiple carriers.

These arguments and their supporting documentation have at a minimum successfully created the existence of a dispute of material fact regarding the issue of whether Tosoh infringes the '285 patent literally or by the doctrine of equivalents. In plaintiffs' view, even today, Tosoh infringes the '285 patent either literally or by the doctrine of equivalents. They contend that the only reason they dismissed their infringement claims against Tosoh was because they reviewed the Japanese reference, which Abbott claims invalidates the '285 patent, and not because they felt that their infringement claims had no merit. The court concludes that Abbott and Diamedix have created an issue of material fact as to infringement and have successfully refuted Tosoh's argument that it did not infringe the '285 patent literally or under the doctrine of equivalents.

Tosoh's second basis for claiming that it is entitled to fees is that plaintiffs ignored certain aspects of the file wrapper and information disclosure statement, which disclaim simultaneous incubations, two-site assays and multiple magnetic beads suspensible by stirring. Prosecution history estoppel precludes a patentee from prevailing in an infringement suit for subject matter which it disclaimed during the prosecution of the patent. *See Mark I Marketing Corp. v. R.R. Donnelley & Sons Co.,* 66 F.3d 285, 291 (Fed.Cir.1995). "The prosecution history must be examined as a whole in determining whether estoppel applies," *Wang Lab., Inc. v. Toshiba Corp.,* 993 F.2d 858, 867 (Fed.Cir.1993). Where a claim amendment had a purpose unrelated to patentability, the court must consider that purpose in deciding whether prosecution history estoppel applies. *See Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* --- U.S. ----, ---- - ----, 117 S.Ct. 1040, 1050-51, 137 L.Ed.2d 146 (1997). In that event, the burden is placed on the patent-holder to give a reason for an amendment required during prosecution. *See id.* at 1051.

*10 Tosoh argues that Dr. Halbert disclaimed simultaneous assays during the prosecution of the '285 patent and is therefore precluded from claiming simultaneous assays within the scope of the '285 patent. It points out that Dr Halbert distinguished his application from the '043 patent before an interference proceeding by stating that "[i]n applicants' test, the enzyme tagged reagent never contacts the sample " Tosoh claims that this fact

Not Reported in F.Supp
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
(Cite as: 1998 WL 173297 (N.D.Ill.))

alone disclaims simultaneous assays from the '285 patent. It also argues that at Dr. Halbert's deposition, Abbott's attorney asked him whether he intended "to limit [his] claims to just the two separation step assay," and Dr. Halbert replied, "Yes, I guess we did." Tosoh claims that it informed Abbott that its assays did not infringe the '285 patent and further warned Abbott that prosecution history estoppel prevented Abbott Labs from expanding the '285 patent to cover simultaneous, one-step assays.

Tosoh cites to two cases it claims are analogous to this suit. The first is *Multi-Tech, Inc. v. Components. Inc.*, in which the court granted the defendant attorneys' fees under 35 U.S.C. § 285, finding that the plaintiff was unjustified in bringing a patent infringement suit because of its knowledge of prosecution history estoppel. *Multi-Tech, Inc. v. Components, Inc.*, 708 F.Supp. 615 (D.Del.1989) The *Multi-Tech* court found the case to be exceptional because the well-documented prosecution of the patent at issue unequivocally indicated that the accused infringer's products were excluded from the scope of the patent. *Id.* at 622. Further, the defendants in *Multi-Tech* warned the plaintiffs of their prosecution history defense before the suit was brought but the plaintiffs ignored their warning. *Id.* Second, in *Nordek Corp. v. Garbe Iron Works. Inc.*, the court granted summary judgment and subsequently attorneys' fees under § 285 for the defendant. *Nordek Corp. v. Garbe Iron Works, Inc.*, 221 U.S.P.Q. 632 (N.D.Ill.1983). The *Nordek* court awarded attorneys' fees because it believed that the plaintiffs did not have a good faith belief that it could avoid the defenses of laches and estoppel. *Id.* at 635.

Plaintiffs rebut Tosoh's prosecution history estoppel arguments, however, with a plausible explanation, or at least one that prevents Tosoh from meeting its burden of clear and convincing evidence of bad faith. They claim that Dr. Halbert's statements were made to avoid an interference action by distinguishing his invention, but that the USPTO rejected Dr. Halbert's argument and continued with the interference proceeding, eventually awarding priority to Dr. Halbert. Plaintiffs claim that Dr. Halbert only made the statement, "[i]n applicants' test, the enzyme tagged reagent never contacts the sample," to distinguish his direct assays from the '043 patent's prior art competitive assays and not to distinguish direct sequential and simultaneous assays. Plaintiffs also claim that Tosoh disregards the technological context in which Dr. Halbert made these statements to the USPTO. Plaintiffs claim that at the time of the '285 patent application, if the labeled antibody

("enzyme-tagged reagent") came into "contact" with the sample, the assay would be considered a competitive assay. Plaintiffs thus argue that by pointing out that the "enzyme-tagged reagent contacts the sample" in the '043 patent, Dr. Halbert was demonstrating that the '043 patent must use a competitive technique. In other words, plaintiffs claim that Dr. Halbert's distinction was between sandwich and competitive assays rather than a between sequential and simultaneous assays.

**\*11** Plaintiffs even claim that Tosoh's attorneys' knew the context of Dr. Halbert's statements, in which the distinction being drawn was between competitive and sandwich assays. "[S]ince Tosoh is not really a competitive assay ... I do not think this point is clear and solid as [another attorney] implies & [it] would be open to argument & attack in an infringement suit." Plaintiffs continue by claiming that the prosecution history of the '285 patent proves that simultaneous assays are covered by the patent. They explain that the examiner rejected claim 12 of the '285 patent application based on lack of support in the specification and as new matter. Dr. Halbert argued that the claim and the simultaneous assay claim of the '110 patent were "substantially similar in scope," and thus the USPTO withdrew its rejection.

The cases Tosoh cites are distinguishable from the instant case. In *Multi-Tech* and *Nordek*, the patentee could not, in good faith, avoid prosecution history estoppel or a laches and estoppel defense; whereas in this suit, the documentation supports that plaintiffs had a good faith belief that they could successfully rebut Tosoh's prosecution history estoppel arguments. *Multi-Tech*, 708 F.Supp. at 622.

Tosoh further claims that plaintiffs brought this suit in bad faith because Abbott was trying to drive Tosoh out of the EIA assay market. Tosoh contends that Abbott could save as much as \$30 million if the patent were invalidated because it would not have to pay further royalties to Diamedix and could add 5% to 10% to its 65% market share by driving Tosoh out of the market. Tosoh claims that Abbott is using it as a guinea pig, to see if the '285 patent could be construed as covering simultaneous assays.

Plaintiffs offer evidence showing that they brought this suit in good faith, including: (1) pre-filing patent opinions from the law firms of Willian, Brinks, Olds, Hofer, & Leone and Jones, Day, Reavis & Pogue, obtained by Abbott, determining that the '285 patent covered simultaneous assays and the prosecution history of the '285 patent did not disclaim such

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)
**(Cite as: 1998 WL 173297 (N.D.Ill.))**

assays; (2) the opinions of two prominent experts in the field of immunoassay technology, Dr. Charles Nicholas Hales and Dr. Larry E. Kricka, concluding that Tosoh's assays infringe the '285 patent; (3) Abbott's payment of million of dollars in royalties to Diamedix under the '285 patent on EIAs similar in operation to Tosoh's process; and (4) the plaintiffs' voluntary dismissal of this and three related infringement lawsuits after discovering a previously unknown Japanese reference, constituting prior art and invalidating the '285 patent.

The motives Tosoh assigns to plaintiffs' actions all deal with the normal process of patent litigation and thus cannot be used as evidence of bad faith. *See Baxter v. McGaw, 958 F.Supp. 1313, 1319 (N.D.Ill.1997)* ("This case involved complex litigation that resulted in aggressive strategies by both parties, some of which this court admonished during trial. Nevertheless, the conduct of Baxter's counsel was not so egregious as to render the case exceptional.") These motives would only provide evidence of bad faith if the court had found that the entire action was without merit. As it has not done so, the court does not consider them evidence of bad faith.

### VI. Conclusion

**\*12** Together, these considerations convince the court that this is not an exceptional case that warrants the award of attorneys' fees. The court finds that Tosoh has not proved by clear and convincing evidence that this is an exceptional case under § 285.

ORDERED: Tosoh's motion for attorneys' fees under 35 U.S.C. § 285 is denied.

Not Reported in F.Supp., 1998 WL 173297 (N.D.Ill.)

### Motions, Pleadings and Filings (Back to top)

• 1997 WL 34590832 (Expert Report and Affidavit) Declaration of Dr. Larry J. Kricka (Feb. 19, 1997)Original Image of this Document (PDF)

• 1997 WL 34590905 (Expert Report and Affidavit) Declaration of Charles Nicholas Hales, Ph.D, M.D. (Feb. 1997)Original Image of this Document (PDF)

• 1996 WL 34097107 (Partial Expert Testimony) (Partial Testimony) (Oct. 22, 1996)Original Image of this Document (PDF)

• 1996 WL 34368998 (Trial Motion, Memorandum and Affidavit) Memorandum in Support of Tosoh's Motion for Summary Judgment (Jul. 8, 1996)Original Image of this Document (PDF)

• 1996 WL 34368359 (Expert Report and Affidavit) Declaration of Akira Kanai (Jun. 27, 1996)Original Image of this Document (PDF)

• 1996 WL 34368276 (Expert Report and Affidavit) Declaration of Noel R. Rose, M.D., Ph.D. (Jun. 18, 1996)Original Image of this Document (PDF)

• 1996 WL 34368360 (Expert Report and Affidavit) Declaration of Gary S. David, PH.D (Apr. 26, 1996)Original Image of this Document (PDF)

• 1996 WL 34368277 (Expert Report and Affidavit) D. Aration of Gary S. David, PH.D. (Jan. 18, 1996)Original Image of this Document (PDF)

• 1996 WL 34368358 (Expert Report and Affidavit) Declaration of Dr. Noel R. Rose Regarding the Interpretation of the Halbert Patent and in Support of Defendants' Motion for Summary Judgment (1996)Original Image of this Document (PDF)

• 1995 WL 17804590 (Partial Expert Testimony) Continuation of the Videotaped Deposition of Seymour P. Halbert, M.D. (Nov. 16, 1995)Original Image of this Document (PDF)

• 1995 WL 17805207 (Trial Pleading) Reply and Affirmative Defenses to Defendants' Amended Counterclaims (Oct. 19, 1995)Original Image of this Document (PDF)

• 1:95cv01896 (Docket) (Mar. 28, 1995)

• 1995 WL 17804591 (Expert Report and Affidavit) Relevant Excerpts from the Testimony of Dr. Stephen Denham Stroupe, Abbott Laboratories Inc. Scientific Expert. (1995)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Westlaw.

Not Reported in F.Supp.2d                                                           Page 1
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
(Cite as: 1998 WL 544964 (E.D.Pa.))

**H**

**Motions, Pleadings and Filings**

United States District Court, E.D. Pennsylvania.
Lena CULPEPPER-SMITH, Plaintiff,
v.
UNITED STATES OF AMERICA, Defendant.
No. CIV.A. 96-CV-5855.

Aug. 24, 1998.

*MEMORANDUM OF DECISION*

MCGLYNN, J.

**\*1** Before the court is the Rule 12(b)(1) motion of defendant United States of America ("the Government") to dismiss plaintiff's claims for injunctive relief and a tax refund. Plaintiff Lena Culpepper-Smith has responded with three reply motions: (1) a cross-motion for summary judgment which opposes the Government's motion to dismiss and demands judgment as a matter of law on plaintiff's entitlement to a permanent injunction, litigation expenses, and damages; (2) a motion to amend the complaint to include a specific demand for a tax refund under 26 U.S.C. § 7422(a); and (3) a motion to enforce the Government's concession that the IRS failed to serve plaintiff with a notice of deficiency.

For the reasons set forth below, the Government's motion to dismiss will be granted, plaintiff's motion to amend the complaint, cross-motion for summary judgment on her entitlement to a permanent injunction and damages, and motion to enforce the Government's concession will be denied, and plaintiff's motion for summary judgment on her entitlement to litigation expenses will be denied without prejudice.

I. BACKGROUND

In 1980, plaintiff invested as a sole proprietor in the lease of certain audio recordings for a 7 1/2 year period. Compl. ¶ 8. The following year, plaintiff filed a timely federal income tax return for 1980 claiming no taxes were owed for that year because her claimed deductions and investment credit eliminated any tax liability. *Id.* ¶¶ 6 & 7.

Ten years later, sometime in 1991, the IRS began sending plaintiff notices of its intent to levy on her for failure to pay taxes for 1980. *Id.* ¶ 12. On March 6, 1991, the IRS assessed plaintiff for unpaid federal income tax, interest and possible penalties for the 1980 tax year. *Id.* ¶ 7. Plaintiff claims the assessment was illegal because the IRS did not send her a notice of deficiency as required by 26 U.S.C. § 6212. On April 15, 1994, the IRS credited plaintiff's 1993 tax refund of $2,618 against the 1980 tax liability. Gov't Mem. of Law in Opp'n to Pl. 1st Summ. J. Mot, Certificate of Assessments & Payments at 2. It did the same with her 1995 tax refund of $2,640 on May 13, 1996. *Id.* Plaintiff brought this lawsuit to enjoin the Government's collection of the assessment amount and recover her 1993 and 1995 tax refunds, along with damages and litigation costs. Compl. ¶¶ 3 & 24.

The Government now concedes the IRS never sent plaintiff a statutorily-required notice of deficiency, and that the assessment for tax year 1980 was therefore illegal. Gov't Mem. of Law in Supp. of Mot. to Dismiss at 2. It has agreed to abate the assessment, but refuses to return plaintiff's 1993 and 1995 tax refunds which were applied to the 1980 tax deficiency. *See id.* & Gov't Mot. to Dismiss, Cohen Decl. Ex. A.

In light of its agreement to abate the assessment, the Government makes three arguments for dismissal under Rule 12(b)(1): (1) plaintiff's request for injunctive relief is now moot; (2) the Anti-Injunction Act, 26 U.S.C. § 7241, precludes the court from enjoining the assessment or collection of taxes and no exception applies; and (3) plaintiff has not exhausted the prerequisite administrative remedies before bringing a refund suit.

II. DISCUSSION
A. Rule 12(b)(1) Standard

**\*2** Rule 12(b)(1) provides for dismissal where the court lacks jurisdiction over the subject matter. Fed.R.Civ.P. 12(b)(1). There are two kinds of 12(b)(1) motions, both of which are implicated in this case.

The first kind attacks the legal sufficiency of the complaint on its face. *Mortensen v. First Fed. Sav. and Loan. Ass'n.* 549 F.2d 884, 891 (3d Cir.1977).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d                                                              Page 2
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
(Cite as: 1998 WL 544964 (E.D.Pa.))

When considering a facial attack, "the court must consider the allegations of the complaint as true." *Id.*; *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408-09 (3d Cir.), *cert. denied,* 501 U.S. 1222, 111 S.Ct. 2839, 115 L.Ed.2d 1007 (1991). Dismissal in such cases "is proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or ... is wholly insubstantial and frivolous.'" *Kehr Packages,* 926 F.2d at 1408-09 (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)).

The second type challenges the existence of subject matter jurisdiction on the facts. *Mortensen,* 549 F.2d at 891. "[N]o presumptive truthfulness attaches to plaintiff's allegations and the existence of disputed issues of material fact will not preclude the trial court from evaluating for itself the merits of the jurisdictional claims." *Id.* The court may consider affidavits and other relevant evidence outside the pleadings to determine whether it has the power to hear the case. *See Berardi v. Swanson Memorial Lodge No. 48 of Fraternal Order of Police,* 920 F.2d 198 (3d Cir.1990). The plaintiff bears the burden of persuading the court that the facts support a finding of subject matter jurisdiction. *Kehr Packages,* 926 F.2d at 1409.

### 1. Mootness

The Government first contends its agreement to abate the assessment of the 1980 tax deficiency makes plaintiff's request for injunctive relief moot. As a result, argues the Government, that claim should be dismissed under *Flast v. Cohen* because it is no longer a justiciable controversy. 392 U.S. 83, 95, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1967) (no justiciable controversy exists "when the question sought to be adjudicated has been mooted by subsequent developments"). Plaintiff responds that under 26 U.S.C. § 6213(a) and the Court of Appeals' decision in *Philadelphia & Reading Corp. v. United States,* 944 F.2d 1063 (3d Cir.1991), injunctive relief directing the return of her 1993 and 1995 tax refunds is still appropriate.

Plaintiff's argument fails for two reasons. First, section 6213(a) only authorizes injunctions to prevent "the making of [an illegal] assessment." 26 U.S.C. § 6213(a). It does not provide a cause of action for refund of monies which have already been applied to a tax deficiency. The exclusive remedy for the erroneous or illegal collection of taxes is a suit for refund under 26 U.S.C. § 7422(a) [FN1] *See Brennan v. Southwest Airlines Co.,* 134 F.3d 1405, 1409 (9th Cir.1998); *Sigmon v. Southwest Airlines,*

*Inc.,* 110 F.3d 1200, 1204 (5th Cir.1997); *Eisenman v. Continental Airlines, Inc.,* 974 F.Supp. 425, 430 (D.N.J.1997).

> FN1. Internal Revenue Code § 7422 is entitled, "[c]ivil actions for refund," and subsection (a) provides:
> [n]o suit or proceeding shall be maintained in any court for the recovery of any internal revenue tax alleged to have been erroneously or illegally assessed or collected, or of any penalty claimed to have been collected without authority, or of any sum alleged to have been excessive or in any manner wrongfully collected, until a claim for refund or credit has been duly filed with the Secretary, according to the provisions of law in that regard, and the regulations of the Secretary established in pursuance thereof. 26 U.S.C. § 7422(a).

**\*3** Plaintiff's contention that the *Philadelphia & Reading* case allows the court to enter an injunction directing the refund of illegally collected taxes is incorrect. *Philadelphia & Reading* involved a plaintiff corporation which had previously obtained an injunction against the illegal assessment of nearly $6 million of a $10 million tax deficiency. 944 F.2d at 1068-69. It then filed an administrative claim with the IRS for refund of the entire $10 million. *Id.* That claim was denied, and the plaintiff brought a refund action in the District of Delaware in which the court determined that equitable considerations precluded the plaintiff from obtaining a refund. *Id.* On appeal, the Third Circuit addressed only the refund suit, not the prior injunction action, [FN2] and specifically rejected consideration of the equities in a tax refund case. *Id.* at 1069, 1073-76. Although the opinion did not state which provision of the tax code supported the plaintiff's claim, the court explicitly referred to the plaintiff's suit as one for a tax refund and distinguished the case before it from the earlier injunction proceeding. *See id.* at 1069, 1073.

> FN2. The injunction action was litigated in the Northern District of Illinois. *See Philadelphia & Reading Corp. v. United States,* 738 F.Supp. 143, 144 (D.Del.1990), *rev'd,* 944 F.2d 1063 (3d Cir.1991).

The second area where plaintiff's argument falters is the basic standard for injunctive relief. Under section 6213(a) the taxpayer must still satisfy the equitable requirements for an injunction, i.e., irreparable harm and the absence of an adequate remedy at law. *See*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
(Cite as: 1998 WL 544964 (E.D.Pa.))

*Robinson v. United States*, 920 F.2d 1157, 1160 (3d Cir.1990); *Flynn v. United States*, 786 F.2d 586, 590 (3d Cir.1986). Section 7422(a) of the Internal Revenue Code provides an adequate remedy at law for obtaining a tax refund. *White v. United States Dep't of Treasury*, 969 F.Supp. 321, 324 (E.D.Pa.), aff'd, 135 F.3d 768 (3d Cir.1997); *cert. denied*,--U.S.-- , 118 S.Ct. 2385,--L.Ed.2d--(1998); *Pierchoski v. Commissioner*, NO. CIV. 87-2047, 1988 WL 95031, at *1 (W.D.Pa. Apr.19, 1988); *see also Bob Jones Univ. v. Simon*, 416 U.S. 725, 746, 94 S.Ct. 2038, 40 L.Ed.2d 496 (1974). Because she had an adequate legal remedy, an injunction ordering the refund of plaintiff's 1993 and 1995 tax overpayments is unavailable. *See Church of Scientology v. United States*, 920 F.2d 1481, 1489 (9th Cir.1990) ("courts have repeatedly held that the opportunity to sue for a refund is an adequate remedy at law which bars the granting of an injunction"), *cert. denied*, 500 U.S. 952, 111 S.Ct. 2258, 114 L.Ed.2d 711 (1991).

Given the Government's agreement to abate the assessment, there is no longer an illegal action for the court to enjoin and plaintiff's prayer for injunctive relief under section 6213(a) will be dismissed as moot, subject to the IRS actually abating the contested assessment and removing all levies against plaintiff's property and/or funds. *See Jones v. United States*, 889 F.2d 1448, 1449 n. 1 (5th Cir.1989) (request for injunction against collection of taxes moot after assessment was abated); *cf. Koger v. United States*, 755 F.2d 1094, 1097-98 (4th Cir.1985) (claim seeking to enjoin Government from collecting assessed tax deficiencies and to order release of tax lien rendered moot by payment of assessment amount).

2. Anti-Injunction Act
*4 Plaintiff's request for injunctive relief ordering the refund of her 1993 and 1995 overpayments is also barred by the Anti-Injunction Act. The act provides that

[e]xcept as provided in sections 6212(a) and (c), 6213(a), 6225(b), 6246(b), 6672(b), 6694(c), 7426(a) and (b)(1), 7429(b), and 7436, no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.
26 U.S.C. § 7421(a).

"The manifest purpose of § 7421(a) is to permit the United States to assess and collect taxes alleged to be due without judicial intervention, and to require that the legal right to disputed sums be determined in a suit for refund." *Enochs v. Williams Packing & Navigation Co.*, 370 U.S. 1, 7, 82 S.Ct. 1125, 8 L.Ed.2d 292 (1962). The Government argues the Anti-Injunction Act prevents the court from enjoining the assessment or collection of taxes and no exception applies.

Plaintiff responds that under the judicial exception to section 7421(a) enunciated by the Supreme Court in *Williams Packing*, his claim for injunctive relief may go forward. *Williams Packing* allows a taxpayer to obtain an injunction against the collection of a tax if: (1) it is "clear that under no circumstances could the Government ultimately prevail" and (2) "equity jurisdiction" exists in that the taxpayer shows that he would otherwise suffer irreparable injury. *Id.*

The *Williams Packing* exception does not apply here because to obtain an injunction the taxpayer must "still plead and prove facts establishing that his remedy in the Tax Court or in a refund suit is inadequate to repair any injury that might be caused by an erroneous assessment or collection of an asserted tax liability." *Commissioner v. Shapiro*, 424 U.S. 614, 629, 96 S.Ct. 1062, 47 L.Ed.2d 278 (1976).

Taking all the allegations of the complaint as true, plaintiff has failed to plead irreparable injury. She points once more to *Philadelphia & Reading* for the proposition that "[t]he omission to send a Notice of Deficiency is so fundamental to the tax procedures Congress has established that the affected taxpayer suffers irreparable harm because he is denied the same treatment other similarly situated taxpayers receive." Pl. Cross-Mot. for Summ. J. at 8. To the contrary, the *Philadelphia & Reading* court expressly stated, "[e]quitable considerations simply are not relevant to decisions on whether the taxpayer is entitled to a refund of illegally assessed taxes." 944 F.2d at 1075. Further, a taxpayer bringing a *Williams Packing* claim to enjoin an assessment" must still "show that equitable relief is appropriate." *Flynn v. United States*, 786 F.2d 586, 591 (3d Cir.1986). There is no authority for the proposition that an illegal assessment or collection of taxes constitutes irreparable injury *per se*.

*5 Moreover, even if equitable considerations were a factor in refund suits, plaintiff cannot establish irreparable harm under *Shapiro*, 424 U.S. at 629, because she could have sued for a refund under section 7422(a). *See supra* part II A 1. As a result, the Anti-Injunction Act also prevents the court from exercising jurisdiction over plaintiff's claim for injunctive relief.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 4
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
**(Cite as: 1998 WL 544964 (E.D.Pa.))**

3. Exhaustion of Administrative Remedies
Although plaintiff's complaint did not expressly state
a tax refund claim, the Government argues that the
court lacks subject matter jurisdiction over any such
claim because plaintiff failed to exhaust her
administrative remedies. Plaintiff responded (1) with
a motion to amend the complaint to include a specific
section 7422(a) tax refund claim, and (2) contended
in her cross-motion for summary judgment that the
Government did not affirmatively plead
administrative exhaustion in its answer and therefore
waived the defense.

i. Section 7422(a) Requirements May Not Be Waived
Plaintiff's waiver argument fails as a matter of law.
"It is fundamental that where ... the sovereign has
waived its immunity, no suit can be maintained
unless it is in exact compliance with the terms of the
statute under which the sovereign has consented to be
sued." *Bruno v. United States*, 547 F.2d 71, 73 (8th
Cir.1976). Section 7422(a) expressly prohibits suits
against the United States for tax refunds unless "a
claim for refund or credit has been duly filed with the
Secretary, according to the provisions of law in that
regard, and the regulations of the Secretary
established in pursuance thereof." 26 U.S.C. §
7422(a). Accordingly, the filing of a timely
administrative claim for refund is a jurisdictional
prerequisite to a tax refund suit and cannot be
waived. *See Essex v. Vinal*, 499 F.2d 226, 231 (8th
Cir.1974), *cert. denied*, 419 U.S. 1107, 95 S.Ct. 779,
42 L.Ed.2d 803 (1975); *see also Rosenbluth Trading,
Inc. v. United States*, 736 F.2d 43, 47 (2d Cir.1984)
("The filing of a timely refund claim is a
jurisdictional requirement, which cannot be
waived."); *Bruno*, 547 F.2d at 73; *United States v.
Rochelle*, 363 F.2d 225, 231 (5th Cir.1966).

ii. Plaintiff Failed to Exhaust Administrative
Remedies
According to the Government, plaintiff never filed
an administrative claim for refund of her 1993 and
1995 tax overpayments and the court is without
subject matter jurisdiction over her refund suit.
Plaintiff objects that under 26 C.F.R. § 301.6401-
3(a)(5) her 1993 and 1995 tax returns were
themselves claims for refund which satisfy the
administrative filing requirement.

Section 301.6401-3(a)(5) indeed provides that an
individual's original income tax return shall constitute
a claim for refund for the amount of the overpayment
disclosed by the return. 26 C.F.R § 301.6401-
3(a)(5). The Government concedes that plaintiff's

1993 and 1995 tax returns qualified as refund claims
for her 1993 and 1995 tax overpayments and were
allowed as such. Gov't Mot. to Dismiss, Cohen Decl.
Ex. A at 2. But the Government also maintains that
once those overpayments were applied to plaintiff's
1980 tax liability in accordance with 26 U.S.C. §
6402(a) [FN3], "they lost their character as
overpayments of 1993 and 1995 taxes" and plaintiff's
only recourse was to file a separate administrative
claim for refund of the 1980 tax. *Id.*

> FN3. 26 U.S.C. § 6402(a) provides:
> [i]n the case of any overpayment, the
> Secretary, within the applicable period of
> limitations, may credit the amount of such
> overpayment, including any interest allowed
> thereon, against any liability in respect of an
> internal revenue tax on the part of the person
> who made the overpayment and shall,
> subject to subsections (c) and (d), refund any
> balance to such person.

*6 That position is correct. Section 7422(d) of the
tax code provides, "[t]he credit of an overpayment of
any tax in satisfaction of any tax liability shall, for
the purpose of any suit for refund of such tax liability
so satisfied, be deemed to be a payment in respect of
such tax liability at the time such credit is allowed."
26 U.S.C. § 7422(d). Thus, when the IRS credited
plaintiff's 1993 and 1995 refunds to the 1980 tax
liability, those refunds were deemed payments under
section 7422(d). Plaintiff was consequently required
to file a separate claim for refund with respect to the
money credited against the 1980 tax liability [FN4]

> FN4. Courts generally treat a tax refund
> credited against an outstanding tax liability
> as a payment which can only be recovered
> by filing a separate refund claim. *Bazargani
> v. Commissioner*, NO. CIV. A. 91- 4709,
> 1992 WL 121607, at *2 (E.D.Pa. May 26,
> 1992) ("Following the seizure of her 1986
> overpayment to satisfy the 1982 liability, it
> was incumbent upon the plaintiff to file a
> claim for refund of the 1982 tax within the
> statutory period."); *Schick v. United States*,
> No. 97-0971, 1997 WL 732624, at *3
> (D.N.J. July 28, 1997) (plaintiff's tax return
> constituted administrative claim for refund
> of overpayment claimed on return, but not
> for refund of credit applied to outstanding
> tax liability); *see also Simmonds v. United
> States*, 29 Fed. Cl. 136 (Fed.Cl.1993)
> (plaintiff's refund claim was timely because
> credit to tax deficiency constituted payment

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 5
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
(Cite as: 1998 WL 544964 (E.D.Pa.))

under section 7422(d)); _Newman v. United States_, No. C-2-76-822, 1977 WL 1291, at *2 (S.D.Ohio Nov.16, 1977) (limitations period for tax refund suit begins running on date tax deemed paid, which was date tax overpayment was applied to prior tax liability).

Moreover, plaintiff has made no showing that her 1993 and 1995 tax returns addressed the IRS' decision to credit those overpayments against the 1980 tax liability. To satisfy the jurisdictional prerequisites for bringing a refund suit, a claim for refund filed with the IRS must detail each claimed ground for a tax refund, and provide sufficient facts to apprise the IRS of its basis. _See Chicago Milwaukee Corp. v. United States_, 40 F.3d 373, 375-74 (Fed.Cir.1994) (citing 26 C.F.R. § 301.6402-2(b)(1) (1994)). [FN5] This includes refund claims which are submitted as federal income tax returns in accordance with the regulation relied upon by plaintiff, 26 C.F.R. 301.6401- 3(a)(5). _See Hefti v. IRS_, 8 F.3d 1169, 1173 (7th Cir.1993) (amended tax return lacked statement of necessary factual basis for refund as required under 26 C.F.R. § 301.6402-2(b)(1)); _Levitsky v. United States_, 27 Fed. Cl. 235, 240 (Ct.Cl.1992) "What is essential is that the taxpayer must inform the Internal Revenue Service that a claim for a refund is being asserted, and must provide enough information so that the IRS can adequately examine the merits of the claim." _Evans v. United States_, 618 F.Supp. 621, 622-23 (E.D. Pa. Jun 28, 1985), _aff'd_, 787 F.2d 581 (3d Cir.1986).

> FN5. 26 C.F.R. 301.6402-2 details the administrative requirements for filing a claim for refund with the IRS, and subsection (b)(1) provides:
> No refund or credit will be allowed after the expiration of the statutory period of limitation applicable to the filing of a claim therefor except upon one or more of the grounds set forth in a claim filed before the expiration of such period. The claim must set forth in detail each ground upon which a credit or refund is claimed and facts sufficient to apprise the Commissioner of the exact basis thereof. The statement of the grounds and facts must be verified by a written declaration that it is made under the penalties of perjury. A claim which does not comply with this paragraph will not be considered for any purpose as a claim for refund or credit.

In this case, the court cannot determine whether plaintiff's 1993 and 1995 tax returns adequately notified the IRS of the bases plaintiff may have asserted for refund of the 1993 and 1995 overpayments credited to the 1980 tax liability, because plaintiff has not shown those tax returns to the court. "When a defendant raises a jurisdictional defense under Fed.R.Civ.P. 12(b)(1), the plaintiff bears the burden of proving that jurisdiction exists." _Ellis v. Mohenis Services, Inc._, No. Civ. A. 96-6307, 1997 WL 364468, at *2 (E.D. Pa. Jun 18, 1997) (citing _Packard v. Provident Nat'l Bank_, 994 F.2d 1039, 1045 (3d Cir.), _cert. denied_, 510 U.S. 964, 114 S.Ct. 440, 126 L.Ed.2d 373 (1993)). Without a showing that her 1993 and 1995 tax returns constituted sufficient claims for refund of the credited overpayments under 26 C.F.R. § 301.6402-2(b)(1), plaintiff has failed to establish that she properly availed herself of the IRS' administrative remedies.

*7 For the above-stated reasons, plaintiff's tax refund claim will be dismissed pursuant to Rule 12(b)(1) [FN6]

> FN6. In any event, plaintiff's claim for refund appears to be beyond the statute of limitations. In cases where no return was filed, a claim for refund of a tax overpayment must be filed "within 2 years from the time the tax was paid." 26 U.S.C. § 6511(a). "The limitations period is jurisdictional in nature and cannot be waived." _Gabelman v. Commissioner_, 86 F.3d 609, 611 (6th Cir.1996) (citing _United States v. Dalm_, 494 U.S. 596, 602, 110 S.Ct. 1361, 108 L.Ed.2d 548 (1990)); _see also Schick v. United States_, No. 97-0971, 1997 WL 732624, at *2 (D.N.J. Jul 28, 1997). The IRS credited plaintiff's 1993 refund against the 1980 tax liability on April 15, 1994, and did the same with her 1995 refund on April 15, 1996. Gov't Mem. of Law in Opp'n to Pl. 1st Summ. J. Mot., Certificate of Assessments & Payments at 2. As a result, "[a] claim for refund for the 1993 offset would have to have been filed by April 15, 1996, and the claim for refund for the 1995 offset would have to have been filed by April 15, 1998." _Id_

### B. Amending the Complaint

Turning to plaintiff's motion to amend, the court is aware that leave to amend the complaint "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). However, leave to amend should not be

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 6
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
(Cite as: 1998 WL 544964 (E.D.Pa.))

granted when amendment would be futile. *Foman v. Davis,* 371 U.S. 178, 183, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). "An amendment is futile if it ... could not withstand a motion to dismiss." 3 James W. Moore, Moore's Federal Practice § 15.15[3] (3d ed.1998). Plaintiff's failure to file a timely administrative claim with the IRS deprives the court of jurisdiction over any tax refund suit by her and compels the conclusion that amending the complaint to include a specific section 7422(a) action would be futile. Accordingly, plaintiff's motion to amend must be denied. *See Debbs v. California W.C.A.B.,* No. 95-15646, 1996 WL 328799, at * 2 (9th Cir. June 14, 1996) (amending complaint considered futile where court lacks subject matter jurisdiction); *Moore v. Indiana,* 999 F.2d 1125, 1128 (7th Cir.1993).

### C. Motion to Enforce Concession

Given the Government's concession that the IRS did not send plaintiff the required notice of deficiency before making its assessment, plaintiff moves to "force the Service's hand and order that the Service void and strike all liens and levies pertinent to the Service's assessment against [plaintiff] for 1980." Pl. Mot. to Enforce at 2.

Plaintiff's request falls under section 6213(a), which allows the court to enjoin levies which are made prior to the mailing of a notice of deficiency to the taxpayer. 26 U.S.C. § 6213(a). In opposition to plaintiff's motion, counsel for the Government has declared that, based upon her conversations with counsel for the IRS, the IRS is already in the process of abating the 1980 assessment, releasing the notice of tax lien on file, and informing Smith Barney, Inc. that it need not comply with the August 23, 1996 levy on plaintiff's account. Gov't Opp'n to Pl. Mot. to Enforce Concession, Cohen Decl. ¶ ¶ 3 & 4. Plaintiff's motion to enforce the concession will therefore be denied as moot, subject to the IRS removing all liens and levies against plaintiff's property and/or funds.

### D. Litigation Expenses

Plaintiff also seeks summary judgment on her entitlement to litigation expenses under 26 U.S.C. § 7430. The Government objects that this request is not ripe for adjudication because Rule 54(d)(2)(B) requires that motions for attorney's fees and costs must be filed after entry of judgment. Fed.R.Civ.P. 54(d)(2)(B).

Rule 54(d)(2)(B) states,

[u]nless otherwise provided by statute or order of the court, the motion [for attorney's fees and related nontaxable expenses] must be filed and served no later than 14 days after entry of judgment; must specify the judgment and the statute, rule, or other grounds entitling the moving party to the award; and must state the amount or provide a fair estimate of the amount sought.

**\*8** Fed.R.Civ.P. 54(d)(2)(B).

A judgment "includes a decree and any order from which an appeal lies." Fed.R.Civ.P. 54(a). Under Rule 54(d)(2)(B), plaintiff's motion is deficient in that it was filed before "entry of judgment," did not "specify the judgment" entitling plaintiff to litigation expenses, and failed to "provide a fair estimate of the amount sought." Plaintiff's request for summary judgment on her entitlement to litigation expenses is consequently denied without prejudice to renew the motion in accordance with the provisions of Rule 54 and 26 U.S.C. § 7430.

### E. Civil Damages for Unauthorized Collections

Plaintiff lastly moves for summary judgment on her entitlement to damages under 26 U.S.C. § 7433(a). [FN7] That section provides a civil remedy for damages against the United States "[i]f, in connection with any collection of Federal tax with respect to a taxpayer, any officer or employee of the Internal Revenue Service recklessly or intentionally disregards any provision" of the tax code, or any regulation promulgated under it. 26 U.S.C. § 7433(a)

> FN7. Summary judgment should be granted when, after consideration of the evidence in the light most favorable to the non-moving party, no genuine issue of material fact remains in dispute and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Plaintiff asserts she is entitled to judgment as a matter of law on her section 7433 claim because: (1) the IRS wrongfully levied against her IRA, which could have caused a penalty for early withdraw; (2) the IRS wrongfully levied against joint tax returns, even though her husband was not liable; (3) the IRS either knew or should have known that the tax matters partner rules could not apply to her 1980 tax return; and (4) the IRS wrongfully placed a lien against her home, preventing her from selling the home and retiring to Florida.

Summary judgment is inappropriate on this issue

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                Page 7
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
(Cite as: 1998 WL 544964 (E.D.Pa.))

because plaintiff has not provided undisputed evidence of reckless or intentional disregard of the tax laws by the IRS. Although the Government concedes that the IRS failed to send plaintiff a notice of deficiency within the statutory time period, the Government also maintains that IRS employees Robert Como and Michael T. Crutchley earlier believed plaintiff or her agent had indefinitely waived the statute of limitations on assessment. *See* Como Decl. ¶ 5; Crutchley Decl. ¶ 5. In addition, the Government expressly has not conceded "the issue of whether the assessment was timely made." Gov't Mot. to Dismiss, Cohen Decl. Ex. A. at 1. In view of the IRS' prior belief that its actions were proper, the issue of the recklessness or intentionality of the IRS' conduct remains in dispute.

Moreover, "to prove a claim for improper collection practices, the taxpayer must demonstrate that the IRS did not follow the prescribed methods of acquiring assets." *Shaw,* 20 F.3d at 184. Here, even if the underlying assessment was wrong, the IRS' collection activities against plaintiff's IRA, joint tax returns and home were not contrary to the tax code or its regulations.

First, the IRS may levy upon a taxpayer's IRA to effectuate collection under 26 U.S.C. § 6331(a), regardless of whether that action causes the taxpayer to incur a withdrawal penalty. *See Kane v. Capital Guardian Trust Co.,* 145 F.3d 1218, 1223 (10th Cir.1998) ("[The taxpayer's] right to liquidate his IRA and withdraw the funds therefrom (even if subject to some interest penalty) undoubtedly constituted a 'right to property' subject to the IRS' administrative levy power under 26 U.S.C. § 6331(a)."); *First Fed'l Sav. & Loan Ass'n of Pittsburgh v. Goldman,* 644 F.Supp. 101, 103 (W.D.Pa.1986) (IRS levy on taxpayer's IRAs was authorized by 26 U.S.C. § 6331).

*9 Second, if plaintiff and her husband filed a joint return for 1980, it was legal for the IRS to levy upon their joint tax refund--regardless of her spouse's lack of fault in the matter. *See* 26 U.S.C. § 6013(d)(3) ("[I]f a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several."). If they share joint liability for the 1980 tax deficiency under section 6013(d)(3), refunds from plaintiff's and her husband's joint tax returns could be applied to that liability under section 6402(a). *See* 26 U.S.C. § 6402(a).

However, if plaintiff and her husband filed separate

returns in 1980, or if they were not married in 1980, then plaintiff's husband would not be liable for the 1980 tax deficiency. An overpayment on a joint income tax return is apportionable to a spouse to the extent that he or she contributed to the overpaid tax. *Rosen v. United States,* 397 F.Supp. 342, 343-44 (E.D.Pa.1975). [FN8] "Accordingly, if a penalty is assessed against one spouse, either personally or in his or her business, the other spouse may nonetheless be entitled to a refund commensurate with his or her contribution to the tax paid." *Wollman v. United States,* 571 F.Supp. 824, 828 (S.D.Fla.1983). It is unclear from the record what liability, if any, plaintiff's husband had for the alleged 1980 tax deficiency. In any case, even if plaintiff's husband was not liable, plaintiff has not presented evidence of reckless or intentional disregard of the tax laws by the IRS in applying plaintiff's and her husband's joint tax refunds to the 1980 liability. Plaintiff's assertion that her spouse's innocence supports summary judgment on the issue of damages is without factual support.

> FN8. *See also United States v. Elam,* 112 F.3d 1036, 1038 (9th Cir.1997) ("A joint return does not itself create equal property interests for each party in a refund. Spouses who file a joint return have separate interests in any overpayment, the interest of each depending upon his or her relative contribution to the overpaid tax."); *Gordon v. United States,* 757 F.2d 1157, 1160 (11th Cir.1985); *Gens v. United States,* 230 Ct.Cl. 42, 673 F.2d 366 (Fed.Cir.Cir.1982), *cert. denied,* 459 U.S. 906, 103 S.Ct. 209, 74 L.Ed.2d 167 (1982); *Michelson v. Commissioner,* 73 T.C.M. (CCH) 1809 (1997) (citing *Rodney v. Commissioner,* 53 T.C. 287, 307, 1969 WL 1680 (1969)).

Third, section 7433(a) applies only to the reckless or intentional disregard of the tax laws in the *collection* of taxes, not to the improper assessment of taxes. *Miller v. United States,* 66 F.3d 220, 223 (9th Cir.1995) (claim challenging determination of tax not actionable under section 7433), *cert. denied,* 517 U.S. 1103, 116 S.Ct. 1317, 134 L.Ed.2d 471 (1996); *Shaw v. United States,* 20 F.3d 182, 184 (5th Cir.) ("[A] taxpayer cannot seek damages under § 7433 for an improper assessment of taxes."), *cert. denied,* 513 U.S. 1041, 115 S.Ct. 635, 130 L.Ed.2d 540 (1994); *cf. Gonsalves v. IRS,* 975 F.2d 13, 16 (1st Cir.1992) (taxpayer cannot circumvent refund action process by litigating merits of tax assessment in § 7433 damage claim). "Section 7433(a) was not intended to confer a

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
**(Cite as: 1998 WL 544964 (E.D.Pa.))**

Page 8

cause of action where taxes have been improperly assessed [FN9], or where collection activities have followed invalid assessments." [FN10] *Hart v. United States,* NO. CIV. A. 96-5639, 1997 WL 732466, at *1 (E.D. Pa. Nov. 21, 1997). The IRS previously believed that a tax matters partner had waived the statute of limitations for assessment on plaintiff's behalf. Pl.App. to Br. in Opp'n to Gov't Mot. to Dismiss, App. 3, Ex. B, 7/9/96 Tunnell Letter. Thus, the applicability of the tax matters partner rules to plaintiff's 1980 tax liability goes to the timeliness and validity of the underlying assessment, not to the reckless or intentional disregard of the tax laws in the collection of taxes under section 7433(a).

> FN9. Citing *Ivory v. United States,* No. C-3-94-353, 1995 WL 724522, at *4 (S.D.Ohio Sept.21 1995)

> FN10. Citing *Byrd v. United States,* No. 94-6119, 1996 WL 196705, at *3 (W.D.Ark. Feb.22. 1996)

*10 Fourth, while a taxpayer's principal residence is exempt from levy under 26 U.S.C. § 6334(a)(13), levy on principal residences is permitted if "(1) a district director or assistant district director of the Internal Revenue Service personally approves (in writing) the levy of such property, or (2) the Secretary finds the collection of tax in jeopardy." 26 U.S.C. § 6334(e). Plaintiff has not argued that the IRS violated collection procedures by levying on her home, and plaintiff has failed to make even a minimal showing that this levy was procedurally deficient. Her desire to sell the home and move to Florida notwithstanding, the IRS' house levy does not favor summary judgment on plaintiff's section 7433 claim.

Lastly, damages in section 7433 actions are limited to the lesser of either $1,000,000 or the sum of "actual, direct economic damages sustained by plaintiff as a proximate result of" the IRS' conduct plus "the costs of the action." 26 U.S.C. § 7433(b)(1) & (2). Here, plaintiff has not asserted any "actual, direct economic damages" sustained by her as a proximate result of the IRS' conduct *See* 26 U.S.C. § 7433(b)(1) The court cannot rule that plaintiff is entitled to damages where she has not demonstrated that she suffered the kind of damages available under the statute. *See Kruse v. Chevrolet Motor Div.,* NO. CIV. A. 96-1474, 1997 WL 408039, at *2-3 (E.D. Pa. Jul 17, 1997) (granting defendant summary judgment on breach of warranty claim where plaintiff did not

prove he suffered actual damages available under Magnuson-Moss Act and Uniform Commercial Code); *Protocomm Corp. v. Fluent, Inc.,* NO. CIV. A. 93-0518, 1994 WL 719674, at *7 (E.D. Pa. Dec 27, 1994) (granting summary judgment where plaintiff failed to show it suffered damages due to defendant's alleged breach of contract).

The moving party bears the burden of showing the court its basis for summary judgment, together with evidence demonstrating the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) Plaintiff has not met this burden, and her motion for summary judgment on her entitlement to damages must be denied.

### III. CONCLUSION
Because plaintiff's request for injunctive relief against the illegal assessment for the 1980 tax deficiency is moot, the Government's motion to dismiss that claim will be granted, subject to the IRS' abatement of the assessment and removal of all levies against plaintiff's property and/or funds. Plaintiff's claim for an injunction ordering the refund of her 1993 and 1995 tax overpayments and her section 7422(a) tax refund claim will be dismissed for lack of subject matter jurisdiction. Plaintiff's motion to amend the complaint must be denied as futile. Plaintiff's motion to enforce the Government's concession will be denied as moot, subject to the IRS' abatement of the assessment and removal of all levies against plaintiff's property and/or funds. Her motion for summary judgment on her entitlement to litigation expenses is denied without prejudice to renew the motion in accordance with Fed.R.Civ.P. 54 and 26 U.S.C. § 7430. And finally, plaintiff's motion for summary judgment on her 26 U.S.C. § 7433 claim for damages is denied because issues of material fact remain in dispute

### ORDER
*11 AND NOW, this day of August, 1998, upon consideration of defendant United States of America's motion to dismiss for lack of subject matter jurisdiction, plaintiff Lena Culpepper-Smith's cross-motion for summary judgment, motion to amend the complaint, and motion to enforce defendant's concession, as well as the parties respective replies thereto, it is hereby

ORDERED that:
(1) defendant's motion to dismiss plaintiff's claim for an injunction against the assessment of deficiency for the tax year 1980 is GRANTED,

Not Reported in F.Supp.2d                                                              Page 9
Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721
**(Cite as: 1998 WL 544964 (E.D.Pa.))**

subject to the IRS' abatement of the assessment and removal of all levies against plaintiff's property and/or funds;

(2) defendant's motion to dismiss plaintiff's claims for (a) injunctive relief directing the return of her 1993 and 1995 overpayment of taxes, and (b) refund of those overpayments under 26 U.S.C. § 7422(a) is GRANTED;

(3) plaintiff's motion to amend the complaint to include a specific demand for refund of her 1993 and 1995 tax overpayments pursuant to 26 U.S.C. § 7422(a) is DENIED;

(4) plaintiff's motion to enforce the IRS' concession is DENIED as moot, subject to the IRS removing all liens and levies against plaintiff's property and/or funds;

(5) plaintiff's cross-motion for summary judgment is:

(a) DENIED as to her entitlement to a permanent injunction under 26 U.S.C. § 6213 and damages under 26 U.S.C. § 7433; and

(b) DENIED without prejudice to renew the motion in accordance with Fed.R.Civ.P. 54 and 26 U.S.C. 7430 as to her entitlement to litigation expenses.

Not Reported in F.Supp.2d, 1998 WL 544964 (E.D.Pa.), 82 A.F.T.R.2d 98-6212, 98-2 USTC P 50,721.

**Motions, Pleadings and Filings (Back to top)**

• 2:96cv05855 (Docket) (Aug. 23, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                      Page 1
Not Reported in F.Supp.2d, 2002 WL 234289 (E.D.Pa.)
(Cite as: 2002 WL 234289 (E.D.Pa.))

▷

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, E.D. Pennsylvania.
GET-A-GRIP, II, INC., Plaintiff,
v.
HORNELL BREWING CO., INC., d/b/a Ferolito,
Vultaggio & Sons, Defendant.
GET-A-GRIPP, II, INC., Plaintiff,
v.
HORNELL BREWING CO., INC., d/b/a Ferolito,
Vultaggio & Sons, Defendant,
v.
Harvey BROWN, Steven Rubell, Gavin P. Lentz,
Stephen J. Springer, Ronald
Panitch, Bochetto & Lentz, P.C., and Akin, Gump,
Strauss, Hauer & Feld, LLP,
Counterclaim Defendants.
Nos. CIV.A. 99-1332, CIV.A. 00-3937.

Feb. 15, 2002.

*MEMORANDUM AND ORDER*

J.M. KELLY, J.

**\*1** Presently before the Court are the Renewed
Motion for Attorney's Fees and Expenses in Civil
Action Number 99-1332 ("No. 99-1332") and the
Motion for Attorney's Fees and Expenses in Civil
Action Number 00-3937 ("No. 00-3937") filed by the
Defendant, Hornell Brewing Co. ("Hornell"), in the
above captioned matters. In addition, Hornell has
filed a Contingent Motion for Limited Discovery.
The Motions arise from patent infringement claims
filed by the Plaintiff, Get-A-Grip, Inc. ("Get-A-
Grip"). [FN1]

> FN1. Get-A-Grip refers to itself as both
> "Get-A-Grip" and "Get-A-Gripp." In the
> interest of consistency, the Court shall refer
> to the party as "Get-A-Grip."

*BACKGROUND*

At the time these actions were filed, Get-A-Grip was
the exclusive owner of United States Patent No.
5,330,054 (the " '054 Patent"), a patent for a beverage

bottle with finger grips. Hornell's Motion for
Summary Judgment in No. 99-1332 was granted by
the Court in a Memorandum and Order dated August
15, 2000 and the decision was affirmed on June 8,
2001. Hornell's Motion for Attorney Fees and
Expenses was denied for lack of jurisdiction while
the appeal was pending. Hornell's Motion for
Summary Judgment in No. 00-3937 was granted by
the Court in a Memorandum and Order dated May 3,
2001 and Get-A-Grip's subsequent appeal was
dismissed on July 9, 2001. Hornell now seeks its
attorney fees and expenses pursuant to 35 U.S.C. §
285 (1994). [FN2]

> FN2. Claims for attorney's fees pursuant to
> Federal Rule of Civil Procedure 11 and 28
> U.S.C. § 1927 were withdrawn.

*DISCUSSION*

35 U.S.C. § 285 provides that "[t]he court in
exceptional cases may award reasonable attorney fees
to the prevailing party." Once the prevailing party is
determined upon termination of the litigation, the
decision whether or not to award attorney fees under
35 U.S.C. § 285 requires consideration of the totality
of the circumstances. See *Eltech Sys. Corp. v. PPG
Indus.*, 903 F.2d 805, 811 (Fed.Cir.1984). Section
285 requires a two step analysis. First, the Court must
determine whether the petitioning party has shown by
clear and convincing evidence that the case is
exceptional. See *Interspiro USA, Inc. v. Figgie Int'l
Inc.*, 18 F.3d 927, 933 (Fed.Cir.1994). [FN3] If a
determination is made that the case is exceptional,
then the district court must decide if an award of
attorney fees is warranted. See *id.* at 933-34.

> FN3. "The award of attorney fees to a
> prevailing party under 35 U.S.C. § 285 is a
> matter unique to patent law and thus,
> Federal Circuit precedent controls.
> *Pharmacia & Upjohn Co. v. Mylan
> Pharmaceuticals Inc.*, 182 F.3d 1356, 1359
> (Fed.Cir.1999); *see also Mars Inc. v.
> Kabushiki-Kaisha Nippon Conlux*, 24 F.3d
> 1368, 1371 (Fed.Cir.1994) (when a case
> involves substantive issues within the
> exclusive jurisdiction of the Federal Circuit,
> the law of the Federal Circuit governs)."
> *Merck & Co. v. Mylan Pharm., Inc.*, 79
> F.Supp.2d 552, 555 (E.D.Pa.2000).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 234289 (E.D.Pa.)
(Cite as: 2002 WL 234289 (E.D.Pa.))

Page 2

A. Consideration of this Case as Exceptional

Hornell alleges as grounds for a finding that the case is exceptional: (1) Get-A-Grip's bad faith in bringing and continuing baseless litigation; (2) Get-A-Grip's inadequate disclosure during discovery; and (3) fraud in front of the Patent and Trademark Office in obtaining the patent. Upon a sufficient showing, each of the grounds alleged by defendant could support a finding that the case is exceptional.

1. Bad Faith

"While bad faith and litigation misconduct certainly can supply the basis for an award, that is not to say that 'all successful defendants are entitled to attorney fees.' " _Rambus, Inc. v. Infineon Tech. AG,_ 155 F.Supp.2d 668, 674 (E.D.Va.2001) (citing _Mathis v. Spears,_ 857 F.2d 749, 753-54 (Fed.Cir.1988)). Attorney fees "should not be awarded as a matter of course, nor as a penalty against the loser who followed conventional procedure." _Jacquard Knitting Mach. Co. v. Ordnance Gauge Co.,_ 213 F.2d 503, 508-9 (3d Cir.1954). Attorney fees should be awarded "upon a finding of unfairness or bad faith in the conduct of the losing party ... which makes it grossly unjust that the winner ... be left to bear the burden of his own counsel fees which prevailing litigants normally bear." _R.M. Palmer Co. v. Luden's, Inc.,_ 236 F.2d 496, 501-2 (3d Cir.1956).

Hornell argues that Get-A-Grip failed to conduct a proper infringement analysis prior to the initiation of this action and therefore, filed a frivolous complaint. This accusation is supported by the Declarations of Alexis Barron that conclude that "it would be virtually impossible to conduct a good faith analysis of the validity of the '054 patent or of the possible infringement of the accused container without generating substantial written documentation." (Barron Decl. ¶ 9.) Further, Get-A-Grip produced no documentation that evidences any analysis or investigation of the validity or infringement prior to the commencement of the action, and Hornell's examination of files submitted by Get-a-Grip's litigation counsel, Bochetto & Lentz, found no evidence of any pre-filling investigation into the validity of the claim. On the other hand, Get-A-Grip submitted the Supplemental Affidavit of Ronald L. Panitch, Esq., the Supplemental Affidavit of Gavin P. Lentz, Esq. and the Affidavit of Albert T. Keyack, Esq., all attesting to their conducting a pre-filling infringement review.

*2 Despite the opinion of Alexis Barron that an infringement analysis must generate documents, compelling reasons exist for Get-A-Grip to have not created documents prior to the initiation of these cases. A paperless infringement analysis is a viable tactic to avoid the subsequent litigation of each and every point and conclusion contained in the analysis. Further, a paperless infringement analysis by counsel avoids the issue of claiming and litigating work product privilege. It is not for this Court to mandate trial strategy for the parties. Plaintiff has submitted affidavits from counsel attesting to several independent infringement analyses. A patent suit is frivolous if the plaintiff "conducted no investigation of the factual and legal merits." _S. Bravo Sys., Inc. v. Containment Tech. Corp.,_ 96 F.3d 1372, 1375 (Fed.Cir.1996) (finding a frivolous suit where there is no evidence that [plaintiff] or his attorneys "compared the accused devices with the patent claims" prior to filing the complaint). "Even if plaintiffs' pre-suit investigation was unreasonable, an unreasonable investigation alone does not demonstrate that the ensuing litigation was vexatious, unjustified, or brought in bad faith." _Hoffmann-La Roche, Inc. v. Invamed, Inc.,_ 213 F.3d 1359, 1362 (Fed.Cir.2000) (quoting _Hoffman-La Roche, Inc. v. Genpharm, Inc.,_ 50 F.Supp.2d 367, 373 (D.N.J.1999)). Hornell bears the burden to show by clear and convincing evidence its allegations of bad faith. Hornell has not done so on this point. Therefore, Hornell has failed to establish this case as exceptional.

Hornell claims that plaintiff was obligated to terminate the action upon warning from Hornell that invalidating prior art existed and cites _Hughes v. Novi American, Inc.,_ 724 F.2d 122 (Fed.Cir.1984) as support for this proposition. Defendant misapplies _Hughes._ In _Hughes,_ the plaintiff was warned of prior invalidating art by way of resolution of a separate litigation. Therefore the _Hughes_ plaintiff could not rely on the statutory presumption of validity. _See id._ at 125. Though Hornell may have warned plaintiff of the Quinn prior invalidating art, no judicial determination had been made prior to this action. Defendant has not shown by clear and convincing evidence that plaintiff knew or should have known of the invalidity of the patent at issue. Therefore, Hornell has failed to establish this case as exceptional.

2. Improper Behavior During Discovery

*3 Hornell argues that Get-A-Grip's failure to comply with discovery requests and an order of this court granting defendant's Motion to Compel

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 234289 (E.D.Pa.)
(Cite as: 2002 WL 234289 (E.D.Pa.))

Production make this case exceptional. Hornell requests a finding of an exceptional case based on the same discovery abuses that were previously sanctioned under Federal Rule of Civil Procedure 37, thus arguing that this single series of conduct by the Plaintiff should serve as a basis for double sanctions. This would only be appropriate if but for the discovery misconduct, previously sanctioned under Rule 37, the litigation would have promptly terminated, avoiding the defendant's need to continue expending resources in defending the action.

The proper remedy for improper conduct in the course of discovery lies under Rule 37 and not under § 285. Arbrook, Inc. v. American Hosp. Supply Corp., 645 F.2d 273, 279 (5th Cir.1981); See also Western Marien Elec., Inc. v. Furuno Elec. Co., 764 F.2d 840, 847 (Fed.Cir.1985) (affirming where appellant claimed district court's denial of attorney fees were based on the erroneous belief that § 285 sanctions were mutually exclusive from Rule 37 sanctions for discovery abuse). Hornell argues that the discovery abuses, sanctioned by Magistrate Judge Rueter on August 8, 2000 under Rule 37, are clear and convincing evidence that this is an exceptional case warranting the award of attorney fees. The abuses, however, were not of the character of litigation terminating discovery. Hornell bears the burden here and on this point has failed to show by clear and convincing evidence that this is an exceptional case.

3. Fraud in Front of the Patent and Trademark Office

Intentional misrepresentations or fraud before the Patent and Trademark Office ("P.T.O.") in order to secure the patent can support a finding that the case is exceptional. Hycor Corp. v. Schlueter Co., 740 F.2d 1529, 1538-39 (Fed.Cir.1984) Hornell alleges that Get-A-Grip misrepresented to the P.T.O. the Quinn patent, subsequently determined in this action to be prior invalidating art, was not for beverages but directed at bottles "holding hair tonic, perfume and the like" and therefore misled the P.T.O. into believing that the Quinn patent was not prior invalidating art. (Def.'s Renewed Mot. for Att'y Fees and Expenses, at 13.) Get-A-Grip claims that the distinctions presented to the P.T.O. were between the Quinn patent which was targeted at multi-use drink mix and hair tonic bottles such as are used repeatedly by bartenders and barbers and are visible to the consumer. Get-A-Grip's patent was for beverages directly consumed by consumers and the patent being applied for which was targeted at single use beverage bottles that are consumed directly by the consumer.

See (Pl.'s Resp. to Def.'s Renewed Mot. for Att'y Fees and Expenses, at 9.) There is room for honest disagreement as to what prior art is pertinent. Documentation submitted by Defendant quotes the Quinn patent in stating that the bottles of the Quinn patent are to be "used by bartenders in mixing or dispensing drinks, and such as are used by barbers in applying hair tonics," and more closely supports Plaintiff's version of events than Defendant's allegation of fraud. (Decl. of Joseph F. Posillico in Supp. of Def.'s Mot. for Summ. J., at 4.)

For fraud on the P.T.O. to make the case exceptional for the purposes of § 285, it need not rise to the level of common-law fraud, but must be shown by clear and convincing evidence that the applicant failed to disclose material facts to the P.T.O. in order to obtain the patent. See Gilbreth Int'l Corp. v. Lionel Leisure Inc., 587 F.Supp. 605, 608 (E.D.Pa.1984). Plaintiff here submits a plausible version of events. Hornell has failed to show, by clear and convincing evidence, that Get-A-Grip failed to disclose material facts to the P.T.O. in order to obtain the patent. Again here, Hornell has failed to establish that this is an exceptional case.

4. Contingent Discovery

*4 Hornell requests that the Court allow it additional discovery in order to develop its § 285 case against Get-A-Grip. In general, a request for additional discovery requires more than a showing of what the party hopes it might gain. Rather, the party seeking discovery must show with particularity what it expects to find in additional discovery. See Fed.R.Civ.P. 56(f). Here, it appears that Hornell hopes that further discovery will somehow unearth the smoking gun. Hornell's request is particularly unavailing as it has pursued a Counterclaim against Get-A-Grip for abuse of process and a third party Complaint against Get-A-Grip's attorneys. If at this late stage of the litigation Hornell has been unable to discover the evidence needed to deem this an exceptional case, it seems unlikely they will ever do so. Thus, the Motion for Additional Discovery will be denied.

CONCLUSION

While Hornell has alleged multiple grounds upon which a proper showing could establish this as an exceptional case, it has failed to show by clear and convincing evidence that this case is exceptional. Hornell has already been made whole for its losses due to Get-A-Grip's misconduct during discovery. Therefore, an award of attorney fees under § 285 is

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 234289 (E.D.Pa.)
**(Cite as: 2002 WL 234289 (E.D.Pa.))**

not appropriate in this case. Hornell's Renewed Motion for Attorney Fees and Expenses is denied, as is Hornell's Motion for Additional Discovery.

*ORDER*

AND NOW, this day of February, 2002, upon consideration of: the Renewed Motion for Attorney's Fees and Expenses in Civil Action Number 99-1332 ("No. 99- 1332") (Doc No. 71) of Defendant, Hornell Brewing Co , the Response of Plaintiff, Get-A-Grip, Inc., and the Supplement of Hornell Brewing Co.; (2) the Motion for Attorney's Fees and Expenses in Civil Action Number 00-3937 ("No. 00-3937") (Doc. No. 35) of Defendant, Hornell Brewing Co , the Response of Plaintiff, Get-A-Grip, Inc., and the Reply thereto of Defendant, Hornell Brewing Co.; and (3) the Contingent Motion for Limited Discovery in 99-1332 (Doc. No 74), Response of Plaintiff, Get-A-Grip, Inc , and the Reply thereto of Defendant, Hornell Brewing Co., it is ORDERED that the Motions are DENIED

Not Reported in F.Supp.2d, 2002 WL 234289 (E.D.Pa.)

**Motions, Pleadings and Filings (Back to top)**

• 2001 WL 34905568 (Trial Motion, Memorandum and Affidavit) Defendant's Renewed Motion for Attorney Fees and Expenses (Jul. 16, 2001)Original Image of this Document (PDF)

• 2:00CV03937 (Docket) (Aug. 03, 2000)

• 2000 WL 34627841 (Trial Motion, Memorandum and Affidavit) Defendant's Reply Memorandum in Further Support of its Motion for Summary Judgment (Jun. 30, 2000)Original Image of this Document (PDF)

• 2000 WL 34627840 (Trial Motion, Memorandum and Affidavit) Motion for Summary Judgment of Invalidity and Non-Infringement (May 5, 2000)Original Image of this Document (PDF)

• 2:99cv01332 (Docket) (Mar 15, 1999)

• 1999 WL 34475440 (Trial Pleading) Complaint (1999)Original Image of this Document (PDF)

• 1994 WL 16199680 (Expert Report and Affidavit) Declaration of Joseph F. Posillico in Support of Defendant's Motion for Summary Judgment (Jul. 19, 1994)Original Image of this Document (PDF)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.