Westlaw.

Not Reported in F.Supp.2d                                              Page 1
Not Reported in F.Supp.2d, 2006 WL 724548 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

Briefs and Other Related Documents
Rapine v. Harrah's Atlantic CityE.D.Pa.,2006.Only
the Westlaw citation is currently available.
    United States District Court,E.D. Pennsylvania.
                    Helen RAPINE
                         v.
            HARRAH'S ATLANTIC CITY
            No. Civ.A. 204CV00590LDD.

                    March 21, 2006.

Gregory J. Kowalski, Michael O. Pansini, Pansini &
Mezrow, Philadelphia, PA, for Helen Rapine.
Lawrence M. Kelly, Mintzer Sarowitz Zeris Ledva &
Meyers, Philadelphia, PA, for Harrah's Atlantic City.

            *MEMORANDUM OPINION*
DAVIS, J.
**\*1** Presently before the Court is plaintiff's amended
motion for a new trial (Doc. No. 66) and defendant's
response thereto (Doc. No. 68). For the following
reasons, this Court denies plaintiff's amended motion
for a new trial (Doc. No. 66).


            I. Factual and Procedural History

On December 7, 2005, this Court conducted a two-
day trial on plaintiff Helen Rapine's ("plaintiff")
claim of negligence against defendant Harrah's
Atlantic City ("defendant"). Plaintiff's theory of
liability was that defendant failed to protect plaintiff,
a business invitee, from a dangerous condition about
which defendant knew or should have known.

At trial, plaintiff testified that she suffered physical
injuries when she fell off of a bench seat (the
"bench") in the elevator lobby of defendant's hotel.
(*See* December 7, 2005 Transcript ("Tr."), at 92-94).
Plaintiff's liability expert, Dr. Widas, testified that the
bench was 57 inches in length, with a 7 and 1/2 inch
radius slope at its ends. (*See* December 8, 2005 Tr., at
47-62). Dr. Widas further testified that the slope of
the bench was not visible nor delineated, that it
lacked arm rests, sides, and a back, and that
defendant did warn patrons of the bench's contours.
(*Id*). Dr. Widas concluded that the location,
structure, and presentation of the bench not only
posed an unmitigated danger to patrons, but also was

the reason that plaintiff fell and suffered injuries. (*Id*,
at 55, 60-61).

The presentation of evidence concluded on December
8, 2005 [FN1] Less than two hours later, the jury
returned a verdict for defendant, finding that
defendant was not negligent in maintaining the bench
on its premises. (*See* December 8, 2005 Tr., at 216;
Verdict Sheet, Doc. No. 62). On December 16, 2005,
plaintiff filed a motion for a new trial (Doc. No. 63),
which was later amended on January 19, 2006. (Doc.
No. 66). Defendant filed a response on February 9,
2006. (Doc. No. 68).


        FN1. Defendant presented one witness, John
        Witmer, defendant's former project director
        and current director for design and
        construction. (*See* December 8, 2005 Tr., at
        125-142).


                    II. Discussion

Pursuant to Rule 59 of the Federal Rules of Civil
Procedure, a court may grant a motion for a new trial
"for any of the reasons for which new trials have
heretofore been granted in actions at law in the courts
of the United States." Fed.R.Civ.P. 59(a). A court has
the clear authority to order a new trial where, *inter
alia,* the verdict was against the weight of the
evidence, the size of the verdict was too large or too
small, new evidence has been discovered, the judge,
jury, or an attorney engaged in misconduct, or a
prejudicial error of law was made. *See* 11 Charles A.
Wright & Arthur R. Miller, *Federal Practice and
Procedure* § 2805, at 38 (1973). No error is
justification for granting a new trial unless the error is
more than harmless, "unless refusal to take such
action appears to the court inconsistent with
substantial justice." Fed.R.Civ.P. 61

Plaintiff presents five justifications for granting a
new trial. First, plaintiff argues that the Court erred
by precluding plaintiff from introducing evidence
that the bench was dangerous to all senior citizens
and that defendant solicited senior citizens to its
premises. (*See* Pl. Am. Br., at 5-7). Second, plaintiff
argues that the Court erred by submitting question
number # 1 of the verdict sheet. (*Id*, at 8-9). Third,
plaintiff argues that the Court erred by permitting the
jury to inspect the bench without supervision and that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 724548 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

this inspection led to jury misconduct in the form of unsanctioned experimentations. (*Id.*, at 9-11). Fourth, plaintiff contends that the Court, in response to a written jury question, erroneously recited its jury instruction on the duty owed to business invitees. (*Id.*, at 11). Fifth, plaintiff claims that the verdict was against the great weight of the evidence. (*Id.*, at 11-14).

A. Evidence Concerning Senior Citizens

**\*2** Plaintiff contends that this Court erred by precluding plaintiff from introducing evidence that defendant would solicit and invite senior citizens to its premises and that the bench at issue is hazardous to senior citizens, including plaintiff. (*See* Pl. Br., at 5).

This Court rejects plaintiff's argument.[FN2] First, plaintiff fails to provide any citations to the trial transcript to support her conclusion that the Court granted a motion *in limine* precluding plaintiff from introducing evidence that defendant solicits senior citizens to its premises and that the bench was hazardous to senior citizens. *See* Loc. R. Civ. P. 7.1(c) (requiring party submitting brief to provide "concise statement of the legal contentions and authorities relied upon in support of the motion"); *Disalvio v. Lower Merion School District*, 2002 WL 1335140, at \*1 (E.D.Pa. June 17, 2002) (finding that Rule 59 motion challenging preclusion of evidence must be factually and legally specific, rather than filled with general conclusions).[FN3] Second, the Court's independent review of the transcript fails to disclose such rulings. Instead, the transcript reveals that defendant specifically objected to the introduction of two exhibits,[FN4] solicitations to plaintiff to visit defendant's casino, on the ground of relevance; and that the Court ultimately permitted the introduction of these exhibits into evidence for the purpose of showing plaintiff's status as a business invitee, but not for the purpose of supporting a broader theory of liability suggesting that defendant's premises are unsafe for *all* senior citizens. (*See* December 7, 2005 Tr., at 33-38, 51-52, 87-90; December 8, 2005 Tr., at 123).[FN5] In other words, the Court's ruling did not preclude plaintiff from introducing evidence that defendant actively solicited plaintiff to visit its premises and that the bench was unsafe for *this* particular plaintiff, as a senior citizen. Finally, to the extent that plaintiff argues that it should have been entitled to introduce the two exhibits for the purpose of presenting a legal theory that defendant's premises are unsafe for *all* senior

citizens, the Court finds no error in its previous ruling, again concluding that such a broad and generalized theory is irrelevant to the particular facts of the case, unduly prejudicial to defendant, and unsupported by plaintiff's evidentiary proofs.[FN6] *See* Fed.R.Evid. 401 (court must exclude irrelevant evidence); Fed.R.Evid. 403 (relevant evidence may be excluded if probative value substantially outweighed by unfair prejudice or jury confusion).

FN2. Plaintiff also suggests that defendant's motion was untimely. However, both parties inappropriately raised issues forming the basis for motions *in limine* immediately before jury selection, in violation of the Court's November 3, 2005 Order and the Court's written protocol. (*See* December 7, 2005 Tr., at 44). The Court chose to rule on both parties' motions, rather than denying them in their entirety.

FN3. The Court notes that plaintiff failed to technically comply with Rule 7.1(e) of the Local Rules of Civil Procedure, which requires a party either to order a transcript within fourteen days after filing a post-trial motion or to file a verified motion showing good cause to be excused from this requirement. *See* Loc. R. Civ. P. 7.1(e). Indeed, plaintiff did not order a copy of the transcript until January 9, 2006, twenty-four days after the date of the filing of the original motion for a new trial, on December 16, 2005. *Id.* (court may dismiss motion for lack of prosecution if party fails to order transcript within 14 days after filing of motion or file verification). Nonetheless, because plaintiff ultimately ordered the transcript of the jury trial, and because the Court is now in possession of this transcript, the Court will reach the merits of plaintiff's arguments in its amended motion.

FN4. These exhibits were marked as P1 and P2 during trial.

FN5. It is clear that despite the Court's ruling, plaintiff's opening statement informed the jury that they would hear evidence regarding defendant's failure to provide a safe environment for "senior citizens" in general, particularly those that defendant allegedly solicits. (*See* December 7, 2005 Tr., at 66-67).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 724548 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

FN6. Plaintiff's offer of proof on this issue failed to detail evidence suggesting that defendant employed a marketing strategy targeting all senior citizens, as opposed to just plaintiff. (*See* December 6, 2005 Tr., at 32-38). Nor did plaintiff offer proof that the bench was unsafe to senior citizens as a distinct class. For instance, Dr. Widas' expert report, plaintiff's lone liability report, concluded that the structure and presentation of the bench presented a dangerous condition to plaintiff and users in general. (*See* Dr. Widas' May 11, 2005 Expert Report, at 23-25). Dr. Widas' expert report never opined that the bench was unsafe for plaintiff because of her particular age and physical characteristics; or that the bench was unsafe for all senior citizens in particular. (*Id.*).

### B. Verdict Sheet

Plaintiff argues that question # 1 of the verdict sheet deviated from the verdict sheets submitted by the parties and was legally erroneous, misleading, confusing, and ambiguous. (*See* Pl. Am. Br., at 8-9).

This Court finds that plaintiff has failed to demonstrate prejudicial error on this issue. For instance, plaintiff fails to identify the language in question # 1 of the verdict sheet that was legally erroneous, misleading, confusing, or ambiguous. Nor does plaintiff identify what language should have been included. Furthermore, it is clear that question # 1 ("Has the Plaintiff proven, by a fair preponderance of the evidence, that the Defendant was negligent?") differed in no material way from the parties' proposed question ("Was Harah's negligent?") (*See* Jury Verdict Sheet, Doc. No. 62; Pl. Am. Br., at 8). More importantly, plaintiff not only failed to lodge an objection to question # 1 when it was verbally proposed to the jury as part of the jury charge, but also to suggest that question # 1 constitutes plain or fundamental error. (*See* December 8, 2005 Tr., at 190); *see* Fed.R.Civ.P. 51(d) (party may raise error concerning jury instruction only if party makes timely objection on record to instruction (or failure to give instruction) or if jury instruction constitutes plain error affecting substantial rights of parties); *Neely v. Club Med Mgmt. Serv., Inc.,* 63 F.3d 166, 200 (3d Cir.1995) ("[W]here a defendant fails to object to the form and language of special verdict forms or to the jury charges, before closing arguments or at the close of charging before the jury

retires to deliberations, and the form has been submitted to counsel, objections are waived."); *Franklin Prescriptions Inc. v. New York Times Co.,* 2004 WL 1770296, at *6 (E.D.Pa.2004) (noting that "Rule 51 applies to verdict sheets as well as jury instructions").

### C. Unsupervised Examination of Bench

\*3 Plaintiff contends that the Court committed prejudicial error by permitting the jury to inspect the bench without supervision. (*See* Pl. Am. Br., at 9-11). Specifically, plaintiff argues that this inspection permitted the jury to perform tests and experiments not performed during trial, thereby introducing new evidence into the jury deliberations and prejudicing plaintiff. (*Id.*).

The decision to permit an exhibit admitted into evidence to reach the jury room is left to the sound discretion of the trial court, absent prejudice to either party. *See, e.g., Skaggs v. Hartford Fin. Group, Inc.,* 2001 WL 1665334, at *13 (E.D.Pa. Sept.8, 2001); *Young v. Lukens Steel Co.,* 881 F.Supp. 962, 975 (E.D.Pa.1994). Once an exhibit properly reaches the jury room, the jury may critically examine the exhibit with greater rigor than examinations made during trial. *See, e.g., Bankghart v. Origoverken,* 49 F.3d 1302, 1307 (8th Cir.1995) (permitting jury to subject allegedly defective stove, an exhibit in product liability action, to greater scrutiny in jury room by conducting experiment performed at trial). The jury may also duplicate experiments made during the trial. *See, e.g., Konkel v. Bob Evans Farms Inc.,* 165 F.3d 275, 282 (4th Cir.1999) ("jury experiments that are merely more critical examinations of exhibits than the examinations made during the trial are not objectionable"). However, experiments that put the jury in possession of evidence not offered at trial constitute jury misconduct requiring a new trial, unless no prejudice results. *Id.; McCormick on Evidence § 217 (5th ed.2003)* (noting that jury experiments that are "reruns of in-court experiments" or that constitute closer scrutiny of exhibit are permissible, but, "jury experiments utilizing techniques or equipment substantially different from any employed in court tend to be held error").

This Court finds that it appropriately permitted the jury, upon request, to examine the bench for a brief period of time in the courtroom and that no evidence of jury misconduct exists. For instance, as plaintiff concedes, the bench was an exhibit admitted into evidence and the jury requested to examine the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 724548 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

exhibit. (*See* December 8, 2005 Tr., at 198, 201-203); *see Gaskins v. Tarpley*, 456 F.2d 1149, 1152 (3d Cir.1973) (finding no reversible error when relevant exhibits are admitted into evidence and go out to jury during its deliberation); N.J. Ct. R. 1:8-8 (permitting jury to take exhibits introduced into evidence at trial into jury room); 75B Am.Jur. Trial § 1668 (2005) ("A court may in its discretion permit the jury to take to the jury room exhibits in the case which are not writings.... The rule is otherwise as to articles not admitted in, or those offered in but excluded from, evidence."). [FN7] The Court also provided a limiting instruction, expressly instructing the Court's criminal deputy to tell the jury members that they were entitled to inspect the bench, but were not entitled to conduct any "experimentation" or to "reenact" the factual predicate of the accident. (*See* December 8, 2005 Tr., at 215, 218); *see Fiorino v. Sears Roebuck and Co., Inc.,* 309 N.J.Super. 556, 707 A.2d 1053, 1058-1059 (N.J.Super.Ct.App.Div.1998) (finding under New Jersey law that trial judge can, with proper instructions, permit allegedly defective leaf shredder and blower, along with screwdriver, into jury room so that jury may reenact experiment of testifying witness during jury deliberations); *Muchell v. v. & V, Inc.,* 263 N.J.Super. 412, 622 A.2d 1365, 1367 (N.J.Super.Ct.1992) (jury's conducting of experiment on overhead aisle directory exemplar, consistent with legal proofs adduced at trial, during jury deliberation process in personal injury action did not constitute receipt of extraneous evidence triggering new trial); Annotation, Propriety of Juror's Tests or Experiments in Jury Room, 31 A.L.R.4th 566, at § 2(a) (1984) ("if the acts complained of as tests or experiments amounted merely to an examination and evaluation of such evidence, the courts have generally held that no new evidence was received and no impropriety resulted"). More importantly, plaintiff introduces no evidence, such as affidavits from the jurors,[FN8] that the jury experimented with the bench in an appropriate manner and that this experimentation, to the extent it occurred, prejudiced plaintiff in a harmful way. *See, e.g., Banghart,* 49 F.3d at 1306 (considering paralegal's affidavit detailing post-verdict discussions with jurors in determining whether jury performed improper experimentation during deliberation); *Simon v. Kuhlman,* 549 F.Supp. 1202, 1207 (S.D.N.Y.1982) (denying motion for new trial because no showing that habeas petitioner was prejudiced by jury's conducting of experiment during deliberations to determine possibility of identifying defendant's facial features through stocking mask, particularly because experiment took place in presence of all jurors). Finally, the Court finds no

error in its decision not to place a supervisor in the courtroom during the inspection process, as the presence of a court-affiliated supervisor carried the potential to influence the jury in an improper manner and to disrupt the privacy, secrecy, and confidentiality of the jury deliberation process. *See United States v. Olano,* 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (U.S.1993) (acknowledging "cardinal principal that the deliberations of the jury shall remain private and secret") (internal citations omitted); *United States v. Doherty,* 675 F.Supp. 719, 722 (D.Mass.1987) ("It is beyond peradventure that the actual deliberations of a jury are private and confidential and not subject to public access"); *State v. Jenkins,* 182 N.J. 112, 861 A.2d 827, 841 (N.J.2004) ("We cannot overemphasize the importance of maintaining the secrecy of jury deliberations for the purpose of encouragi@ng free and vigorous discourse in the jury room.").

> FN7. Plaintiff does not argue that the bench was not an "exhibit" in evidence or that it was inappropriate for the court to permit the jury to observe or view the exhibit during the deliberation process. (*See* Pl. Am. Br., at 10). Instead, plaintiff argues that it was prejudicial error to permit the jury to examine the exhibit during jury deliberations without supervision. (*Id.*).

> FN8. Pursuant to Rule 606(b) of the Federal Rules of Evidence, jurors may testify about whether "extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear on any error." Fed.R.Evid. 606(b).

D. Recitation of Jury Instruction Pertaining to Business Invitees

*4 Plaintiff argues that the Court's oral recitation of the portion of the jury instruction pertaining to business invitees, in response to a written jury question, was prejudicial and legally erroneous. (*See* Pl. Br., at 11).

This Court rejects plaintiff's argument. Initially, the Court notes that it never "re-read" any portion of the written jury charge in open court following the commencement of jury deliberations; instead, upon the jury's request, the Court submitted to the jury the entirety of the documentation forming the basis for the Court's oral jury instruction, which included a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2006 WL 724548 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.2d)

Page 5

section detailing the duty of business owners to business invitees.[FN9] Moreover, plaintiff fails to identify how the language of the written charge submitted to the jury differed from the oral jury instruction, the adequacy of which plaintiff does not challenge. (See December 8, 2005 Tr., at 179-180, 189). Nor does plaintiff provide any case law in support of her position. In fact, plaintiff fails to provide any legal or factual analysis into the erroneousness of the written instruction pertaining to the law of business invitees, and, instead, relies upon bald, unsupported conclusions that fail both to meet plaintiff's burden of proof and to comply with Local Rule of Civil Procedure 7.1(c). See Local R. Civ. P. 7.1(c) (requiring moving party to submit a brief that contains factual and legal analysis); Moore v. Vangelo, 2004 WL 292482, at *6 (E.D.Pa. Feb.12, 2004) (denying motion for failure to comply with Rule 7.1(c)'s requirement that moving party identify factual or legal basis for contentions); Purcell v. Universal Bank, N.A., 2003 U.S. Dist. LEXIS 547, at *7-8 (E.D.Pa. Jan. 3, 2003) (denying motion because moving party's brief is "purely conclusory" and "wholly inadequate" in violation of Rule 7.1(c)). Finally, the Court notes that plaintiff has failed to demonstrate that the allegedly erroneous written charge submitted to the jury was harmful or prejudicial to plaintiff. See Evans v. Fed. Reserve Bank of Philadelphia, 2005 WL 774947, at *4 (E.D.Pa. Apr.4, 2005) (noting that "error in jury instructions warrants a new trial only if the court is persuaded, based upon the record as a whole, that the error was prejudicial; if the charging error would not have changed the trial result, a new trial cannot be granted") (internal citations omitted).

FN9. The Court submitted to the jury both the Court's original written charge and plaintiff's supplemental written charge pertaining to the duty of business owners to business invitees. Plaintiff's supplemental written charge formed part of the oral jury instruction; it was read to the jury after the Court read its original written charge. (See December 8, 2005 Tr., at 189).

E. Verdict

A court should order a new trial when the verdict is contrary to the "great weight of the evidence." Roebuck v. Drexel Univ., 852 F.2d 715, 736 (3d Cir.1988). A verdict is against the great weight of the evidence "when the record shows that the jury's verdict resulted in a miscarriage of justice or where

the verdict, on the record, cries out to be overturned or shocks our conscience." Williamson v. Consol. Rail Corp., 926 F.2d 1344, 1353 (3d Cir.1991). In making this determination, a court is permitted to consider the credibility of witnesses and to weigh the evidence. See, e.g., Hayes v. Cha, 338 F.Supp.2d 470, 498 (D.N.J.2004); Blakey v. Cont'l Airlines Inc., 992 F.Supp. 731, 734 (D.N.J.1998). However, in performing this analysis, a trial court may not usurp the prime function of the jury, and thereby denigrate the jury system, by substituting its own judgment for that of the jury simply because the court might have reached a different conclusion. See, e.g., Moyer v. Southeastern Pa. Transp. Auth., 1991 WL 111092, at *2 (E.D.Pa. June 17, 1991); Grace v. Mauser-Werke Gmbh, 700 F.Supp. 1383, 1387 (E.D.Pa.1988).

*5 This Court finds that the jury's verdict in favor of defendant was not against the great weight of the evidence; nor did it result in a miscarriage of justice of shock the conscience. Specifically, the Court finds that a reasonable jury, upon weighing the testimony of plaintiff, plaintiff's expert, and defendant's project director, and upon inspecting the bench at issue, clearly could have concluded that the bench did not present a dangerous condition to business invitees, such as plaintiff, and that defendant was not negligent in using and maintaining this bench in its elevator lobby. See, e.g., Williamson, 926 F.2d at 1352 ("Where the subject matter of the litigation is simple and within a layman's understanding, the district court is given less freedom to scrutinize the jury's verdict than in a case that deals with complex factual determinations"). Although plaintiff argues that the testimony of Dr. Widas, plaintiff's lone liability expert, highlights the fundamental unfairness of the jury's verdict and the necessity of granting a new trial, the jury was free to reject this testimony in reaching its conclusions. Id. at 1353 (reversing district court decision granting Rule 59 motion for new trial because district court substituted its credibility determinations for those of jury); Consumers Power Co. v. Curtiss-Wright Corp., 780 F.2d 1093, 1097 (3d Cir.1986) ("dispute over credibility will not justify a new trial"). Accordingly, because the jury's verdict is supported by substantial evidence in the record, the Court denies plaintiff's motion for a new trial based upon the ostensible erroneousness of this verdict.

III. Conclusion

For the preceding reasons, this Court denies plaintiff's Rule 59 motion for a new trial. An

Not Reported in F.Supp.2d                                              Page 6
Not Reported in F.Supp.2d, 2006 WL 724548 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.2d)**

appropriate Order follows.

                                    END OF DOCUMENT

### ORDER

AND NOW, this 21st day of March 2006, upon
consideration of plaintiff's amended motion for a new
trial (Doc. No. 66), and defendant's response thereto
(Doc. No. 68), it is hereby ORDERED that plaintiff's
amended motion (Doc. No. 66) is DENIED.

E.D.Pa.,2006.
Rapine v. Harrah's Atlantic City
Not Reported in F.Supp.2d, 2006 WL 724548
(E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2005 WL 4044633 () (Report or Affidavit) (Nov.
21, 2005) Original Image of this Document (PDF)
• 2005 WL 3724494 (Trial Motion, Memorandum
and Affidavit) Motion in Limine to Preclude Plaintiff
from Introducing Evidence of Any Medical Bills in
Excess of Any Liens or Bills not Subject to Liens
(Nov. 14, 2005) Original Image of this Document
(PDF)
• 2005 WL 3724497 (Trial Motion, Memorandum
and Affidavit) Defendant's Motion in Limine to
Preclude Plaintiff from Introducing at Trial Evidence
of Future Surgery and Future Medical Expenses
(Nov. 14, 2005) Original Image of this Document
(PDF)
• 2005 WL 3724499 (Trial Motion, Memorandum
and Affidavit) Defendant's Motion in Limine to
Preclude the Expert Testimony of George P. Widas,
Pe, CSP (Nov. 14, 2005) Original Image of this
Document (PDF)
• 2005 WL 2150042 (Trial Pleading) Order (Jul. 1,
2005) Original Image of this Document (PDF)
• 2005 WL 3724502 (Trial Motion, Memorandum
and Affidavit) Motion (2005) Original Image of this
Document (PDF)
• 2:04cv00590 (Docket) (Feb. 11, 2004)
• 2004 WL 3682272 (Trial Motion, Memorandum
and Affidavit) Plaintiff's Pre-Trial Memorandum
(2004) Original Image of this Document (PDF)
• 2004 WL 3682273 (Trial Motion, Memorandum
and Affidavit) Motion (2004) Original Image of this
Document (PDF)
• 2004 WL 3682274 (Trial Motion, Memorandum
and Affidavit) Motion (2004) Original Image of this
Document (PDF)
• 2004 WL 3682275 (Trial Motion, Memorandum
and Affidavit) Motion (2004) Original Image of this
Document (PDF)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

**H**
Briefs and Other Related Documents
Remington Arms Co., Inc. v. Modern Muzzleloading,
Inc.M.D.N.C.,1999.Only the Westlaw citation is
currently available.
United States District Court, M.D. North Carolina.
REMINGTON ARMS COMPANY, INC., Plaintiff,
v.
MODERN MUZZLELOADING, INC., Defendant.
**No. 2:97CV00660.**

Feb. 9, 1999.

ORDER
OSTEEN, District J.
**\*1** For the reasons set forth in the memorandum
opinion filed contemporaneously herewith,

IT IS HEREBY ORDERED that Defendant's Motion
For Summary Judgment [62] is granted in part and
denied in part. Defendant's motion for summary
judgment of no literal infringement is granted;
Defendant's motion for summary judgment of non-
infringement under the doctrine of equivalents is
denied; Defendant's motion for summary judgment
for invalidity is denied; Defendant's motion for
summary judgment to limit Plaintiff's recoverable
damages for failing to comply with the statutory
notice requirement is denied. The court finds that in
no event will damages be awarded prior to March 7,
1997, the date of the second letter.

Defendant's motion for summary judgment for
inequitable conduct has been rendered moot by the
court's earlier denial of Defendant's Motion to
Amend Answer and Counterclaim.

IT IS FURTHER ORDERED that Plaintiff's Motion
For Partial Summary Judgment of Infringement [65]
is denied.

MEMORANDUM OPINION

This matter comes before the court on Plaintiff and
Defendant's cross motions for summary judgment.

For the reasons discussed herein, the court will grant
in part and deny in part motions for summary
judgment.

I. FACTUAL AND PROCEDURAL
BACKGROUND

On June 18, 1997, Plaintiff Remington Arms
Company, Inc. (Remington), filed a complaint
against Defendant Modern Muzzleloading, Inc.
(Modern), alleging infringement of its United States
Letters Patent No. 5,606,817 ('817 patent). (Compl.¶
¶ 6-7.) Defendant timely filed an answer denying
infringement and asserting the affirmative defense of
invalidity on the ground that the patent was
obvious.[FN1] (Answer & Countercl.) In addition,
Defendant filed a motion for the court to construe
disputed claim language found in the '817 patent, as
required by *Markman v. Westview Instruments, Inc.,*
*116 S.Ct. 1384 (1996).* (Def's Mot. Claim
Interpretation.) Specifically, Defendant requested that
this court interpret the meaning of "forward
longitudinal section" found in claim one. Thereafter,
pursuant to Fed.R.Civ.P. 56(a), the parties submitted
cross motions for summary judgment. Defendant
moves this court to grant summary judgment in its
favor on the issues of invalidity based upon
obviousness, non-infringement, inequitable conduct,
and limitation on recoverable damages, should this
court find that Defendant's rifle does in fact infringe
the '817 patent. (Def's Mem. Supp. Mot. Summ. J. at
1.) Plaintiff has filed a motion for partial summary
judgment on the issue of literal infringement or
infringement under the doctrine of equivalents. (Br.
Supp. Mot. Partial Summ. J. Infringement at 1.)

> FN1. Defendant also filed a motion for leave
> to amend its answer to add the affirmative
> defense of inequitable conduct, which the
> court recently denied. (Order dated
> December 17, 1998.)

On December 10, 1998, the court held a hearing in
accordance with *Markman v. Westview Instrument,*
*Inc., 116 S.Ct. 1384 (1996),* to construe disputed
claim language of the '817 patent. After reviewing the
briefs submitted by the parties in support of their
claim construction and the testimony and evidence
presented during the hearing, the court found that
"forward longitudinal section" should be construed as
requiring that the first cam cut be parallel to the long
axis of the bolt.[FN2]

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 2
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

FN2. On December 31, 1998, the parties were orally notified of the court's construction of the disputed claim language. A memorandum opinion and order have been filed.

**\*2** In light of this court's construction of the disputed claim language pursuant to *Markman*, the parties' cross motions for summary judgment are the matters now pending before this court and are ripe for decision.

## II. DISCUSSION

### A. Standard for Summary Judgment.

An issue may be decided on motion for summary judgment when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fed.R.Civ.P. 56(c)*; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505 (1986). Furthermore, it is well settled that "summary judgment ... is entirely appropriate, in a patent as in any other case." *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1116 (Fed.Cir.1985); *Barmag Barmer Maschinenfabrik AG v. Murata Mach., Ltd.*, 731 F.2d 831, 835 (Fed.Cir.1984). The movant, however, bears the burden of proving the absence of any genuine issue of material fact. *SRI Int'l*, 775 F.2d at 1116. The district court must view the evidence in the light most favorable to the non-moving party "and must resolve all doubt over factual issues in favor of the party opposing summary judgment." *Id.* Moreover, the court is cognizant of the fact that "[t]hough speedy and inexpensive, summary judgment is nonetheless a 'lethal weapon' capable of 'overkill.' " *Id.*

### 1. Legal Standards For Determining Patent Infringement.

Pursuant to *35 U.S.C. § 271(a)*, "whoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent." The patentee carries the burden of proving patent infringement by a preponderance of the evidence. *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044, 1054 (Fed.Cir.), *cert. denied*, 488 U.S. 825 (Fed.Cir.1988).

In determining patent infringement, a two-step analysis is employed. "First, the claim must be properly construed to determine its scope and meaning. Second, the claim as properly construed must be compared to the accused device or process." *Carroll Touch, Inc. v. Electro Mechanical Sys., Inc.*, 15 F.3d 1573, 1576 (Fed.Cir.1993). With regard to step one, the Supreme Court has held that claim construction is a matter of law to be decided by the court. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed.Cir.1995) (en banc), *aff'd*, 517 U.S. 370 (1996). The second step of the analysis, which requires deciding whether the accused device infringes upon a properly construed claim, is a question of fact. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569 (Fed.Cir.1983). With this framework in mind, the court now turns to the propriety of summary judgment on the issue of infringement.

### 2. Summary Judgment On the Issue of Patent Infringement.

Both Plaintiff and Defendant have independently moved this court for summary judgment on the issue of infringement. Defendant contends that as a matter of law its DISC Rifle does not infringe the '817 patent either literally or under the doctrine of equivalents.[FN3] (Def.'s Mem. Supp. Mot. Summ. J. at 2.) Plaintiff, on the other hand, alleges that as a matter of law, Defendant's accused rifle infringes Plaintiff's patent either literally or under the doctrine of equivalents. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement at 7.) In light of the fact that both parties move for summary judgment on the issue of infringement, the court will address the motions concurrently.

FN3. There are two types of infringement-literal infringement and infringement under the doctrine of equivalents. *LRC Elec., Inc. v. John Mezzalingua Assoc., Inc.*, 974 F.Supp. 171, 184 (N.D.N.Y.1997).

### a. Defendant is entitled to summary judgment for no literal infringement.

**\*3** It is well established that absent any dispute as to the relevant facts regarding the accused product, "the question of literal infringement collapses to one of claim construction and is thus amenable to summary judgment." *Athletic Alternatives, Inc. v. Prince Mfg., Inc.*, 73 F.3d 1573, 1578 (Fed.Cir.1996); *see also*

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 3

*Johnston v. IVAC Corp.*, 885 F.2d 1574, 1579 (Fed.Cir.1989) ("[A] mere dispute over the meaning of a term does not itself create an issue of fact.").[FN4]

> FN4. Since the parties dispute merely the meaning of the terms in the patent rather than the relevant facts, and in light of this court's construction of the disputed claim language, summary judgment on the issue of literal infringement is appropriate.

In order to establish literal infringement, every element of the patent claim must be met. *See Mannesmann Demag Corp. v. Engineered Metal Prods. Co.*, 793 F.2d 1279, 1282, 230 U.S.P.Q. 45, 46 (Fed.Cir.1986). Defendant argues that there can be no literal infringement as a matter of law since the DISC Rifle does not contain a first cam cut having a forward longitudinal section. [FN5] In light of the court's construction of the claim language "forward longitudinal section" as requiring that the cam cut be parallel to the axis of the bolt, the accused rifle does not literally contain a "forward longitudinal section."[FN6]

> FN5. There is evidence in the record which suggests that Defendant disputes whether 1) the DISC Rifle is attached to a receiver, and 2) whether the DISC Rifle has a firing pin head. Since Defendant has failed to raise these arguments in its motion for summary judgment or response to Plaintiff's summary judgment brief, the court shall deem these objections to have been waived. For purposes of the parties' cross motions for summary judgment, the court will assume that the only claim element in dispute is whether the DISC Rifle literally contains a forward longitudinal section or its substantial equivalent. The court, therefore, finds that the DISC Rifle contains the other claim limitations found in claim one of the '817 patent.

> FN6. Plaintiff contends that there is literal infringement as a matter of law, even under Defendant's narrow definition of forward longitudinal section since "[p]ortions of both section A and A' of the cam cut are parallel to the longitudinal axis of the bolt." (Pl.'s Resp. Def.'s Mot. Summ. J. at 6-7.) This argument is not persuasive because the '817 claim language expressly requires "a first

cam cut ... having a forward longitudinal section," and not a first cam cut having portions of its section parallel to the axis of the bolt, as Plaintiff suggests. (Def.'s Reply Pl.'s Resp. Def.'s Mot. Summ. J. at 2-4.)

Therefore, since there can be no literal infringement as a matter of law, the court shall grant Defendant's motion for summary judgment on the grounds of no literal infringement and simultaneously deny Plaintiff's motion for partial summary judgment on the grounds of literal infringement.

> b. Cross motions for summary judgment on the grounds of non-infringement and infringement under the doctrine of equivalents should be denied.

The fact that this court has found that there is no literal infringement does not end the issue of patent infringement. Under the doctrine of equivalents, "[a]n accused product that does not literally infringe a patent claim may nevertheless infringe a patent claim where differences between the accused product and the claimed invention are insubstantial." *See LRC Elec., Inc. v. John Mezzalingua Assoc., Inc.*, 974 F.Supp. 171, 184 (N.D.N.Y.1997); *see also Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, ___ U.S. ___, 117 S.Ct. 1040, 1046 (1997).[FN7]

> FN7. Although the doctrine of equivalents is generally considered to be the exception and not the rule in patent infringement cases, it "exists to prevent a fraud on a patent." *See Wilson Sporting Goods Co. v. David Geoffrey & Assoc.*, 904 F.2d 677, 684, 14 U.S.P.Q.2d 1942, 1948 (Fed.Cir.1990); *Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 857 (Fed.Cir.1988) ("[T]he doctrine ... 'temper[s] unsparing logic and prevent[s] an infringer from stealing the benefits of the invention.' ") (citations omitted); *Ethyl Molded Prod. Co. v. Betts Packaging, Inc.*, Civ. A. No. 85-111, 1988 WL 122168, *35 (E.D.Ky.1988) ("[T]he doctrine of equivalents serves a critical function of precluding an infringer from making insubstantial changes to avoid the literal claims, and still appropriate the heart of the invention.")

Despite the existence of an alternative theory of patent infringement, the doctrine of equivalency is considered to be the exception and not the rule,

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Page 4

because of its equitable nature. *See J.M. Huber Corp. v. Positive Action Tool of Ohio Co.,* 881 F.Supp. 279, 283 (S.D.Tex.1995); *Joel H. Eisenberg v. Alimed, Inc.,* Civ. A. No. 91-12413-NG, 1994 WL 568747, *5 (D.Mass. Sept. 29, 1994)* ("[B]ecause the analysis is so fact bound, summary judgment is usually inappropriate when infringement depends on [the doctrine of equivalents] theory."); *Aid Pack, Inc. v. Beecham, Inc.,* 641 F.Supp. 692, 694 (D.Mass.1986) ("Usually, when the issue of infringement depends on the doctrine of equivalence, summary judgment is inappropriate because of the factual nature of the inquiry.")

Furthermore, it is well settled that "[a] finding of equivalence is a determination of fact." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 857, 85 U.S.P.Q. 328, 330 (1950). With these caveats in mind, the court will consider a motion for summary judgment on the grounds of infringement or non-infringement with caution.

*4 The test for infringement under the doctrine of equivalents is as follows: "Infringement may be found under the doctrine of equivalents if every limitation of the asserted claim, or its 'equivalent,' is found in the accused subject matter, where an 'equivalent' differs from the claimed invention only insubstantially." *Ethicon Endo-Surgery, Inc. v. United States Surgical Corp.,* 149 F.3d 1309, 1315, 47 U.S.P.Q.2d 1272, 1276 (Fed.Cir.1998). Moreover, the Supreme Court, in a landmark decision, established a three-part test for determining infringement under the doctrine of equivalents. *Graver Tank,* 339 U.S. at 608, 70 S.Ct. at 856.

According to the Supreme Court, "an accused product infringes a claimed invention under the doctrine of equivalents when the accused product 'performs substantially the same function in substantially the same way to obtain the same result.'" *LRC Elec., Inc.,* 974 F.Supp. at 184-85 (citations omitted); *see also Ethyl Molded Prod. Co. v. Betts Packaging, Inc.,* Civ. A. No. 85-111, 1988 WL 122168, *35 (E.D.Ky.1988)* ("The doctrine protects the patentee from devices that differ in name, form or shape from the patented invention, yet perform substantially the same function in substantially the same way to obtain substantially the same result as the claimed product or process.").

According to Defendant, summary judgment for non-infringement under the doctrine of equivalents is appropriate since "[t]he DISC Rifle ... does not have a forward longitudinal section, nor is there an equivalent section which extends parallel to the long axis of the bolt." (Def.'s Reply Pl.'s Resp. Mot. Summ. J. at 5.) Plaintiff, on the other hand, contends that the DISC Rifle does have a section which is equivalent to the '817 patent's forward longitudinal section. In particular, Plaintiff alleges that infringement under the doctrine of equivalents exists as a matter of law since "the cam cut structure in the DISC Rifle is the substantial equivalent to the forward longitudinal section and rearwardly extending transverse section in the patent." (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement at 13.)

In determining whether or not the DISC Rifle infringes under the equivalency doctrine, this court must first determine whether every element of independent claim one in the '817 patent is met either literally or under the doctrine of equivalents by the DISC Rifle.

For purposes of ruling on the parties' motions for summary judgment and in the absence of any argument presented by Defendant disputing the existence of the remaining claim limitations other than a forward longitudinal section, the court finds as a matter of law that the DISC Rifle literally contains every element of claim one, except the following: The DISC Rifle does not contain a forward longitudinal section as defined by this court to require that the cam cut be parallel to the axis of the bolt.

Moreover, this court finds that Defendant is not entitled to summary judgment of non-infringement and Plaintiff is not entitled to summary judgment for infringement under the doctrine of equivalents because genuine issues of fact exist as to whether the cam cut on the side of the DISC Rifle performs the same function, in the same way, to obtain the same result as the cam cut on the element in the '817 patent.

*5 Furthermore, the Federal Circuit has held that "the traditional function, way, result tripartite test is not 'the' test for infringement under the doctrine of equivalents. Rather a finding of infringement under the doctrine 'requires proof of insubstantial differences between the claimed and accused products or processes.'" *Roton Barrier, Inc. v. Stanley Works,* 79 F.3d 1112, 1126 (Fed.Cir.1996); *see also* Robert L. Harmon, Patents and the Federal Circuit § 6.3(a)(ii) at 277 (4th ed. 1998) (Finding that the decision in *Hilton Davis Chem. Co. v. Warner-Jenkinson Co.,* "seems simply to have elevated substantiality of the differences to the focus

Not Reported in F.Supp.2d                                                                                                        Page 5
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

of the equivalency inquiry, in place of the more familiar three-part test of similarity in function, way, and result.").

Plaintiff has presented ample evidence which is sufficient to defeat Defendant's motion for summary judgment. Testimony from Plaintiff's firearms expert witness, David Byron, establishes that genuine issues of material fact exist with regard to whether the cam cut in the DISC Rifle is the substantial equivalent to the forward longitudinal section for purposes of applying the doctrine of equivalents [FN8] In Byron's expert opinion, "[t]he cam cut on the DISC Rifle guides and controls rotational and longitudinal movement of the bolt assembly" just like the first cam cut on the '817 patent. (Decl. Byron, Aug. 31, 1998 at 3.) Byron has testified that "[t]he cam cut structure in the DISC Rifle is also the substantial equivalent to the forward longitudinal section and rearwardly extending transverse section in the patent." Id. Byron's expert report further discloses that he ran tests which established that the first cam cut on the DISC Rifle performs a camming function. (Decl. Byron, Sept. 30, 1998 at 3.) [FN9] ("The facts for the function, way, and result analysis ... were verified by tests I performed on the DISC Rifle.")

FN8. In finding that genuine issues of fact exist with regard to the issue of infringement/non-infringement under the doctrine of equivalents, this court is persuaded by the fact that Defendant's original argument for non-infringement by equivalency, alleged in its first motion for summary judgment (withdrawn Apr. 15, 1998), was based on a false statement that the cam cut in the DISC Rifle did not perform a guiding function. (Def.'s Mem. Supp. Mot. Summ. J. Non-Infringement filed March 23, 1998; notice of withdrawal Apr. 15, 1998); see also Pl.'s Resp. Def.'s Summ. J., Ex. 9-Perdelwitz Dep. at 95-97 (Perdelwitz stated that the screw and slot on the DISC Rifle serve a camming function and that the interaction of the bolt-retaining screw and the slot guides the movement of the bolt. Perdelwitz's testimony shows the falsity of Knight's statement.) Defendant's present motion for summary judgment has completely abandoned this argument. (Def.'s Mem. Supp. Mot. Summ. J. at 8-9.)

FN9. According to Byron's preliminary report, for purposes of applying the doctrine

of equivalents, any arguable differences in the DISC Rifle and the '817 patent are insubstantial. (Decl. Byron, Aug. 31, 1998, Ex. A-Byron Report at 7.)

Moreover, deposition testimony from Defendant's expert, James Carlson, indicates that the cam cut on the DISC Rifle performs the same function as the cam cut in the '817 patent. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement, Ex. 7-Carlson Dep. at 63.) Carlson's admission that the purpose of the cut in the left side of the bolt of the DISC Rifle is to retain the bolt in the receiver and to serve as a camming surface for the interaction with the spring detent or bolt screw raises a genuine issue of material fact, which precludes a finding of non-infringement. Id.

Deposition testimony from other defense witnesses also raises genuine issues of fact. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 12-Hengstenberg Dep. at 119.) Eric Hengstenberg, Modern's engineering manager, conceded that while the ear was added primarily for safety purposes, there was a secondary purpose for the bolt handle to interact with the ear on the closing. Id [FN10]

FN10. Even though the DISC Rifle performs functions other than the guiding movement of the bolt, this alone does not preclude a finding of infringement. See Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 1482 (Fed.Cir.1984) ("[I]nfringement cannot be avoided by the mere fact that the accused device ... performs additional functions.") (citation omitted).

The record is replete with evidence which suggests patent infringement or, at the very minimum, raises genuine issues of fact. See Amstar Corp. v. Envirotech Corp., 730 F.2d 1476, 1482 (Fed.Cir.1984) ("[C]onsideration of the infringement issue may be benefitted by recognition of the findings made in considering the validity issue."). The court finds significant that Defendant's DISC Rifle was unlike any of Defendant's rifles before it, in that Defendant followed Plaintiff in placing a similar cam cut on the side of its firearms bolt body. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement at 3.) Furthermore, Defendant's own expert said that Plaintiff's '817 patent was revolutionary. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. 2-Carlson Dep. at 92-93); see also Amstar Corp., 730 F.2d at 1483 ("Important to determination of the infringement issue, also, are the findings establishing the pioneer nature of the

[patentee's] inventions."). In addition, Plaintiff's commercial embodiment came out in early 1996 and Defendant's employees first inspected the new Remington 700 ML in or around January 1996 at the annual shot show. Defendant then promptly began work upon a new ML rifle that would incorporate features similar to the 700 ML. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement at 3.)

*6 Perhaps most compelling of all for the court is the deposition testimony from Dale Watley, former chief executive officer of Modern, who stated he saw a prototype bolt of the DISC Rifle with a cut which was parallel to the axis of the bolt. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 14-Watley Dep. at 44.) [FN11] These additional factors are clearly relevant and further suggest that Defendant's DISC Rifle may infringe Plaintiff's patent.

> FN11. Watley testified that the prototype bolt for the DISC Rifle, which contained a cut parallel to the axis of the bolt, was designed to give consideration to making a DISC Rifle that would 1) use a percussion cap instead of a disc, and 2) produce more rearward movement of the bolt to create more space to insert a percussion cap in a DISC Rifle. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 14-Watley Dep. at 44-46.) It is interesting to note that the '817 patent calls for a percussion cap. A reasonable jury could find that Defendant infringed Plaintiff's patent, thus, the court is precluded from granting Defendant's motion for summary judgment of non-infringement.

Moreover, the physical appearance of the 700 ML and the DISC Rifle is irrelevant to the infringement analysis because the comparison of the accused device to the language of the patent claim determines if the patent has been infringed. *Amstar Corp.*, 730 F.2d at 1481. The differences in structure between Plaintiff's 700 ML and Defendant's DISC Rifle does not impede a finding of infringement under the doctrine of equivalents. *See Marvel Specialty Co. v. Bell Hosiery Hills, Inc.*, 330 F.2d 164, 176 (4th Cir.1964) (Finding that "the single blade of the Mend-More is in fact the fair equivalent of the circular series of work-engaging elements claimed in the patent" despite the structural differences of the two inventions.)

Defendant's argument that the strongest evidence of non-infringement comes from the fact that the PTO granted Defendant a patent for its DISC Rifle is not persuasive. (Def.'s Resp. Pl.'s Mot. Summ. J. at 13.) It is well settled that the issuance of a patent raises the presumption of validity, not infringement. *See Atlas Powder Co. v. E.I. DuPont De Nemours & Co.*, 750 F.2d 1569, 1581 (Fed.Cir.1984); *see also Hoechst Celanese Corp. v. BP Chem. Ltd.*, 78 F.3d 1575, 1582 (Fed.Cir.1996) ("The fact of separate patentability presents no legal or evidentiary presumption of noninfringement."); *Sure Plus Mfg. Co. v. Kobrin*, 719 F.2d 1114, 1117 (11th Cir.1983) (Defendant's receipt of a patent on its DISC Rifle "does not of itself tend to negative infringement."). The case law makes it clear that the patentability of Defendant's DISC Rifle does not foreclose a finding of infringement.

The court also finds that a genuine issue of fact exists with regard to Defendant's argument that the DISC Rifle operates in a substantially different manner because loading the DISC Rifle is different from loading the 700 ML rifle. Plaintiff's expert witness, David Byron, has testified that the bolt operation on the two rifles is equivalent and only the loading operation is different. (Reply Supp. Pl.'s Mot. Partial Summ. J., Ex. 3-Byron Dep. at 62.) Additionally, Defendant's reliance on a videotape of loading the DISC Rifle versus loading Plaintiff's commercial embodiment of the '817 patent is irrelevant. (Reply Supp. Pl.'s Mot. Partial Summ. J. Infringement at 5-6.) It is well settled that comparing the accused device to the commercial embodiment of the patent instead of the patent claim language constitutes clear error. *See Amstar Corp.*, 730 F.2d at 1481 ("The law of infringement requires that the asserted claims be compared with the products or processes accused of infringement.")

*7 Despite the fact that the loading of the two firearms differs, this court cannot say as a matter of law that the two rifles operate in a substantially different way when the depositions, pleadings, and affidavits raise genuine issues of material fact regarding whether or not infringement by equivalency exists.

Plaintiff has introduced evidence establishing that the first cam cut of the DISC Rifle, just like the '817 patent, guides and restricts the movement and location of the bolt through the physical interaction of the cam cut and the screw or spring detent, to achieve the proper functioning of the firearm. (Decl. Byron, Aug. 31, 1998 at 7.) Thus, Plaintiff has raised genuine issues of material fact as to whether the first cam cut and cam follower in the DISC Rifle have 1)

Not Reported in F.Supp.2d                                                                                      Page 7
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

substantially the same functions as those described in the patent, and 2) perform those functions in substantially the same way in order to achieve the same result.[FN12] Therefore, Defendant's motion for summary judgment of non-infringement is denied.

> FN12. The test for infringement under the doctrine of equivalents is often referred to as the means, way, result three-part test for infringement. *See Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856 (1950).*

Giving due consideration to the fact that summary judgment is rarely appropriate on the issue of infringement, particularly under the doctrine of equivalents,[FN13] and, in light of evidence introduced by Defendant indicating that the DISC Rifle and '817 patent are not substantially equivalent, Plaintiff's motion for partial summary judgment must likewise be denied.

> FN13. *See J.M. Huber Corp. v. Positive Action Tool of Ohio Co., 881 F.Supp. 279, 283 (S.D.Tex.1995).*

According to Defendant's technical expert Dr. J.W. Carlson's report, the bolt of the DISC Rifle functions differently than the '817 rifle. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement, Ex. 7-Carlson Dep. at 60-61.) Defendant has introduced evidence that a significant difference in function exists by reason of the amount of movement in the bolt in the '817 patent as compared to the DISC Rifle. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement, Ex. 4, at 4.) ("[T]he bolt in the accused rifle only moves approximately .075 inches forwardly or rearwardly while the claimed bolt moves at least 1.5 to 2 inches.") This alone raises a genuine issue of material fact as to the insubstantiality of the differences between the DISC Rifle and Plaintiff's rifle.

Defendant's evidence also suggests that the difference between the accused and patented rifle is substantial because the bolt in the DISC Rifle cannot be interchanged for the bolt in the '817 patent and still function properly. *Id.* ("[T]he accused bolt could not be substituted or interchanged for the claimed bolt."); [FN14] *see also* Robert L. Harmon, Patents and The Federal Circuit § 6.3(a)(ii) at 280 (4th ed. 1998) ("[T]he known interchangeability of substitutes ... is an important objective factor bearing on whether the accused device is substantially the same as the

patented invention.") Finally, Defendant has introduced evidence which tends to prove that unlike the DISC Rifle, the forward longitudinal section [FN15] to the cam cut in the '817 patent was added "to move the bolt back and forth and reciprocate it," because a different means of replacing the percussion cap is being used. (Reply Supp. Pl.'s Mot. Partial Summ. J., Ex. 3-Byron Dep. at 91.)

> FN14. Defendant also maintains that there can be no equivalency because the purpose of the longitudinal movement in Plaintiff's rifle is to provide space to insert a percussion cap on the nipple. (Def.'s Resp. Pl.'s Mot. Summ. J. at 10.) Moreover, Defendant points out that two inches is needed to accommodate the insertion but that the DISC Rifle eliminates the need to retract the bolt assembly to insert the percussion element. *Id.*

> FN15. "Forward longitudinal section" has been construed by the court to require that the section be parallel to the axis of the bolt.

*8 Based upon the record, the court finds that Defendant has raised a genuine issue of fact as to whether the differences between the DISC Rifle and the '817 rifle are substantial so as to preclude a finding of infringement as a matter of law under the doctrine of equivalents. Therefore, the court denies Defendant's motion for summary judgment on non-infringement and Plaintiff's motion for partial summary judgment of infringement.

### B. Summary Judgment on the Issue of Patent Invalidity Should Be Denied.

In addition to its argument for non-infringement, Defendant alleges that Plaintiff's '817 patent is invalid on the grounds of obviousness. (Def.'s Mem. Supp. Mot. Summ. J. at 9-10.) Pursuant to 35 U.S.C. § 103, "[a] patent claim is invalid ... where the subject matter of the claim would have been obvious to one of ordinary skill in the art at the time the challenged invention was made." *LRC Elec., 974 F.Supp. at 183.* It has long been recognized that the issuance of a patent raises a presumption of validity, which can only be rebutted by clear and convincing evidence. *Intel Corp. v. United States Int'l Trade Comm'n, 946 F.2d 821, 829. (Fed.Cir.1991); see also* 35 U.S.C. § 282 (codifying the statutory presumption of validity).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 8
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Although the issue of obviousness is a question of law, it is nevertheless "premised on a number of factual determinations." *LRC Elec.,* 974 F.Supp. at 183. In addressing the matter of obviousness, courts examine the following four factors:
(1) the scope and content of the prior art, (2) the differences between the claims and the prior art, (3) the level of ordinary skill in the pertinent art, and (4) secondary considerations of obviousness such as commercial success, long felt but unsolved need, and the failure of others to solve the problem at hand, and copying of the invention by others.

*Id.* Giving due consideration to the above factual inquiries, the test for obviousness is "whether the combined teachings of the prior art, taken as a whole, would have rendered the claimed invention obvious to one of ordinary skill in the art." *Id.* at 184.

In the present matter, Defendant alleges that the combination of the Rodney, Andersson, Schuerman, and two Koon patents as prior art renders the '817 patent obvious and invalid as a matter of law. (Def.'s Mem. Supp. Mot. Summ. J. At 14-15.) Having considered the alleged prior art patents cited by Defendant along with expert witness testimony, depositions, affidavits, and other evidence submitted by both parties, the court finds that genuine issues of fact exist regarding the issues of obviousness, i.e., the scope and content of the prior art, its relevancy to the '817 patent, and the secondary considerations of obviousness. Therefore, Defendant's motion for summary judgment for invalidity must be denied.

Plaintiff has introduced evidence which suggests that the alleged prior patents relied on by Defendant do not constitute relevant art. (Decl. Byron, Sept. 30, 1998 at 4.) According to Plaintiff's expert witness, "the L-shaped slots disclosed in the four patents are guide slots and thus perform a different function than the camming function performed by the first cam cut disclosed in the '817 patent." *Id.* Even Defendant's own patent expert, Dr. Carlson, concedes that these prior art patents do not relate to an ML firearm and disclose guide slots that have materially different functions than the cam cuts. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 2-Carlson Dep. at 69-86.)

**\*9** Plaintiff has introduced expert testimony that Modern's prior art is directed toward breech loading rifles and has nothing to do with ML firearms. (Decl. Byron, Sept. 30, 1998 at 4.) Defendant, on the other hand, maintains that breech loading rifles constitute prior art since the "rifle disclosed in the '817 patent

was developed from [Plaintiff's] well known Model 700 Rifle which is a breech loading firearm." ' (Reply Pl.'s Resp. Def.'s Mot. Summ. J. at 7, n. 6.)

Additionally, Plaintiff's expert has stated that "there is no evidence of any motivation or connection between the Rodney patent and the four guide slot patents to make obvious the combination of the patents by a person of ordinary skill in the art." (Decl. Byron, Sept. 30, 1998 at 5.) Defendant admits in its brief that "Remington's particular combination of elements might be considered novel in the literal sense of the term." (Def.'s Mem. Supp. Mot. Summ. J. at 14.) Finally, this court adheres to the admonition that "[c]are must be taken to avoid hindsight reconstruction by using 'the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit.' " *Grain Processing Corp. v. American Maize-Prods. Co.,* 840 F.2d 902, 907 (Fed.Cir.1988) (citations omitted)[FN16]

> FN16. In rejecting Defendant's initial request for re-examination, the PTO stated:
> [A]lmost any valid claim in a U.S. patent can be separated into a plurality of sections and have each individual element or item met by some prior art reference. To conclude that this invalidates the claim is not in any way support by 35 U.S.C. 103 or its intention to apply to what would be obvious to one of ordinary skill in the art. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 6-copy of PTO Order Denying Request For Reexamination at 11.)

In light of this disputed evidence, reasonable minds could differ as to whether there is anything in Defendant's cited art references to teach or suggest the combination of the prior art to produce Plaintiff's patented invention. *See ACS Hosp. Sys., Inc. v. Montefiore Hosp.,* 732 F.2d 1572, 1577, 221 U.S.P.Q. 929, 933 (Fed.Cir.1984) ("Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching or suggestion supporting the combination."). Thus, genuine issues of material fact exist as to whether the '817 patent would have been obvious to one of ordinary skill in the art, especially in light of the strong presumption of patent validity and the heavy burden required to overcome it.

Moreover, this court is not persuaded by Defendant's argument that the fact that the PTO granted

Not Reported in F.Supp.2d                                                                    Page 9
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

Defendant's second request for re-examination is indicative of invalidity. Courts addressing this same argument have held that "the grant by the examiner of a request for reexamination is not probative of unpatentability. The grant of a request for reexamination, although surely evidence that the criterion for reexamination has been met ..., does not establish a likelihood of patent invalidity." *Hoechst*, 78 F.3d at 1584. [FN17] Therefore, the fact that the PTO granted Defendant's request for re-examination is not dispositive and does not conclusively establish invalidity as a matter of law. [FN18]

> FN17. According to the PTO's 1994 annual report, "89% of the reexamination requests were granted that year, but only 5.6% ... were completely rejected." *Hoechst Celanese Corp. v. BP Chem. Ltd .*, 78 F.3d 1575, 1584 n. 2 (Fed.Cir.1996).

> FN18. Moreover, this court is cognizant of the fact that Defendant's initial request for re-examination was denied by the PTO because the prior art cited did not raise a substantial new question of patentability. (Pl.'s Resp. Def.'s Mot Summ. J., Ex. 6-copy of Order Denying Request For Reexamination at 12.)

Recognizing "[t]he difficulty of determining subjectively at some removed time whether a particular invention would have been obvious to a person of ordinary skill in the art," the Fourth Circuit has considered objective evidence of obviousness. *See Marvel Specialty Co.*, 330 F.2d at 172 (regarding the secondary considerations as indicia of obviousness or non-obviousness which may be relevant to the issue of invalidity); *see also Graham v. John Deere Co.*, 383 U.S. 1, 17-18, 86 S.Ct. 684, 694 (1966) (Finding that "[s]uch secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.").

*10 Additional evidence of non-obviousness found in the record consists of the following secondary factors: Commercial success,[FN19] industry acclaim, and the copying of the 700 ML embodiment of the patent. These secondary considerations of non-obviousness further reinforce that disputed issues remain which must be resolved by the trier of fact.

> FN19. *See Marvel Specialty Co. v. Bell Hosiery Hills, Inc.*, 330 F.2d 164, 172 (4th Cir.1964).

Defendant's own ML expert, Dr. Carlson, has admitted that the 700 ML achieved significant commercial success in the ML market by "start[ing] a minor revolution" in the ML industry. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 2-Carlson Dep. at 92-93.) (The 700 ML represented "a departure from tradition" and "was a revolution that broadened the scope of the muzzleloading firearms sales market."); *see also id.*, Exs. 18 & 19 (The 700 ML "is simply a stroke of genius.") ("There are some who think the definition of a primitive muzzle loader is any rifle built prior to the Remington 700 ML."). Defendant, however, maintains that Plaintiff "has failed to establish a sufficient legal relationship between the proported [sic] evidence of non-obviousness and the claimed invention." *See* Reply Pl.'s Resp. Def.'s Mot. Summ. J. at 8. Therefore, a disputable issue of fact exists which precludes a finding of invalidity as a matter of law.

There is evidence in the record of long felt need in the market. The background section of the '817 patent expressly states: "Despite the advances that have been made over the decades, a continuing need exists for a cocking and firing mechanism for muzzleloading firearms that provides a combination of ease of cocking with minimization of the lock time of the firearm upon firing." (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement; Ex. 1(copy of the '817 patent), col.1, 11.51-55.)

Moreover, the evidence raises genuine issues of fact as to whether there was any copying of the 700 ML embodiment of the patent. The record reveals that within the same time frame after seeing Remington's ML rifle, Defendant began to design its own ML rifle. *See* Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement at 3. [FN20] Of all the secondary evidence, however, the court finds it particularly noteworthy that the original prototype bolt for the DISC Rifle was parallel to the axis of the bolt. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 14-Watley Dep. at 44.); *see also General Am. Transp. Corp. v. Cryo-Trans, Inc.*, 93 F.3d 766, 774 (Fed.Cir.1996) (In finding that the patent was valid, the court heavily relied on secondary considerations of non-obviousness, with particular emphasis on the fact that the original prototype infringed the patent.).

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
(Cite as: Not Reported in F.Supp.2d)

FN20. The record indicates that Defendant inspected the 700 ML in or around January 1996 at the annual shot show and then began work on its own ML rifle. In November 1996, the DISC Rifle was marketed and achieved immediate success in the marketplace. (Br. Supp. Pl.'s Mot. Partial Summ. J. Infringement at 3-4.)

The disputed evidence submitted by the parties in conjunction with the presumption of validity afforded patents renders the issue of invalidity particularly inappropriate for summary disposition. The court finds that the issue of patent invalidity is best handled by submitting the matter to a jury. Therefore, Defendant's motion for summary judgment on invalidity is denied.

C. Summary Judgment Limiting the Amount of Damages Recoverable from Defendant.

*11 In the event the DISC Rifle is found to have infringed the '817 patent, Defendant nevertheless contends that Plaintiff's damages should be limited to those occurring after the filing of the complaint as a matter of law for failing to comply with the statutory notice requirement.

Pursuant to 35 U.S.C. § 287(a):
In the event of failure so to mark, no damages shall be recovered by the patentee in any action for infringement, except on proof that the infringer was notified of the infringement and continued to infringe thereafter, in which event damages may be recovered only for infringement occurring after such notice. Filing of an action for infringement shall constitute such notice.

The parties do not dispute that Plaintiff failed to mark its patent. (Pl.'s Resp. Def.'s Mot. Summ. J. at 18-19.) The parties, however, contest whether Plaintiff complied with the statutory notice requirement. Id. In particular, Defendant contends that the two letters sent by Plaintiff do not constitute actual notice as a matter of law rendering summary judgment appropriate.

Courts faced with the identical issue have held that "notice must be of 'the infringement,' not merely notice of the patent's existence or ownership. Actual notice requires the affirmative communication of a specific charge of infringement by a specific accused product or device." Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 187 (Fed.Cir.1994).

The courts, however, recognize that "the notice need not necessarily include the word 'infringement.' " Wokas v. Dresser Indus., Inc., 978 F.Supp. 839, 844 (N.D.Ind.1997); see also Ceeco Mach. Mfg., Ltd. v. Intercole, Inc., 817 F.Supp. 979, 987 (D.Mass.1992) ("[T]he cases do not require the charge of infringement to be direct.")

Although Plaintiff's '817 patent was not issued until March 4, 1997, Plaintiff sent Defendant a letter dated January 30, 1997, notifying Defendant of its pending patent application. Plaintiff's letter informed Defendant that it had recently developed and introduced a muzzleloading rifle. Plaintiff indicated that its two patent applications on ML rifles had been allowed and Plaintiff "expect[ed] patents to issue later this year." Copies of the allowed claims for each patent application were enclosed in the letter. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 3.)

The letter also informed Defendant that its DISC Rifle "may fall within the scope of the allowed claims of at least one of the Remington applications." Id., see also Wokas, 978 F.Supp. at 844, n. 3 (Finding that "[g]iven the right context, the words 'contained in' or similar words could be read synonymously with 'infringement.' "). Finally, Plaintiff "suggest[ed] that [Defendant] suspend [its] marketing plans for [its] muzzle loader product until evaluating the scope of the allowed claims of the Remington application" in an effort to avoid litigation for patent infringement. (Pl.'s Resp. Def.'s Mot. Summ. J., Ex. 3.)

*12 The statutory requirement for actual notice is satisfied "when the recipient is informed of the identity of the patent and the activity that is believed to be an infringement, accompanied by a proposal to abate the infringement, whether by license or otherwise." See SRI Int'l, Inc. v. Advanced Tech. Lab., Inc., 127 F.3d 1462, 1470 (Fed.Cir.1997). Moreover, it is firmly established "that there can be no infringement of a patent prior to its issuance." See Black and Decker (U.S.), Inc. v. Home Prod. Mktg., Inc., 929 F.Supp. 1114, 1120 (N.D.Ill.1996); Mixing Equip. Co. v. Innova-Tech, Inc., Civ. A No. 85-535, 1986 WL 14541, *2 (E.D.Pa. Dec. 19, 1986) (Noting that the Supreme Court has found that a patentee's right to exclude others from the use and sale of its invention for seventeen years "is created by the patent, and no suit can be maintained by the inventor against anyone for using it before the patent is issued.") (citation omitted); see also Gustafson, Inc. v. Intersystems Indus. Prod., Inc., 897 F.2d 508, 510 (Fed.Cir.1990) (Holding that "no damages are payable on products manufactured and sold before

the patent issued."); _Thomson Mach. Co. v. LaRose,_ 306 F.Supp. 681, 696 (E.D.La.1969) ("Until a patent [is] issued, the patentee has established no monopoly to an invention.").[FN21]

> FN21. _See also Thomson Mach. Co. v. LaRose,_ 306 F.Supp. 681, 697 (E.D.La.1969) ("Neither knowledge of an application for patent or of the pendency thereof can operate to accelerate the grant rights under a patent to begin before the actual grant date nor create a period of exclusive right in advance of, in addition to, or in enlargement of the period of seventeen years authorized by law.").

In light of the fact that the January 30, 1997, letter was sent prior to the issuance of the patent, the court holds as a matter of law that the letter standing alone cannot satisfy the statutory requirement for actual notice under § 287(a). Despite this finding, Defendant is still not entitled to summary judgment on its motion to limit damages to the date of the lawsuit.

Plaintiff mailed a second letter, dated March 7, 1997, which informed Defendant that the '817 patent had been issued. A copy of the patent was also enclosed.[FN22] Viewing the evidence in the light most favorable to the non-moving party, and giving due consideration to the purpose behind the actual notice requirement,[FN23] it cannot be said that as a matter of law Plaintiff's two letters fail to satisfy the statutory notice requirement. _See Maxwell v. K Mart Corp.,_ 880 F.Supp. 1323, 1339 (D.Minn.1995) (Adopting a totality of the circumstance approach to the statutory notice requirement and finding that Plaintiff's communications to the alleged infringer, when viewed collectively, raised a genuine issue as to whether actual notice was given.); _see also Wokas,_ 978 F.Supp. at 845-46 (Finding that the written statements and admissions that when viewed together raised genuine issues of fact as to whether actual notice of infringement was given.); 35 U.S.C. § 287(b)(5)(A) ("For purposes of this subsection, notice of infringement means actual knowledge, or receipt by a person of a written notification, or a combination thereof.").

> FN22. This court notes that Plaintiff's second letter was mailed to Defendant three days after the '817 patent was issued.

> FN23. _See SRI Int'l v. Advanced Tech. Lab., Inc.,_ 127 F.3d 1462, 1470 (Fed.Cir.1997) (Finding that the actual notice requirement "is designed to assure that the recipient knew of the adverse patent during the period in which liability accrues, when constructive notice by marking is absent.").

Despite Defendant's position that neither letter standing alone satisfies the actual notice requirement of the statute, the court finds that when viewed together, the two letters raise disputable issues of fact as to whether they constitute sufficient notice of a charge of infringement. _See Accuscan, Inc. v. Xerox Corp.,_ No. 96 Civ. 2579(HB) 1998 WL 603217, *11 (S.D.N.Y. Sept. 11, 1998) ("[I]t is well established that whether § 287 was complied with is an issue of fact for the jury."). There is no dispute that the second letter merely identified the patent number and provided a copy of the patent. The court nevertheless finds that the two letters read together might satisfy the actual notice requirement.[FN24] Therefore, Defendant's motion to limit damages to after the filing of the complaint is denied.[FN25]

> FN24. The court rejects Defendant's argument that its motion for summary judgment should be granted because Plaintiff failed to plead compliance with the statutory notice requirement. _See Maxwell v. Baker, Inc.,_ 805 F.Supp. 728, 732 (D.Minn.1992) (Granting Defendant's partial summary judgment to limit the recovery of damages where Plaintiff failed to plead notice of infringement to Defendant.) The court finds no support in either the statute or other case law for the _Maxwell_ court's statutory construction. Since the _Maxwell_ decision is not binding precedent, the court declines to adopt its rationale and finds that there is no technical pleading requirement in the statute. Thus, failure to plead compliance with the notice statute is not a sufficient ground for granting summary judgment. Because this court finds that there is no requirement that a party plead notice of infringement, Plaintiff's motion to amend its complaint to comply with this technical pleading requirement is rendered moot

> FN25. The court, however, finds that in no event may Plaintiff be awarded damages prior to March 7, 1997, the date of the second letter, in light of the fact that at the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                  Page 12
Not Reported in F.Supp.2d, 1999 WL 281341 (M.D.N.C.)
**(Cite as: Not Reported in F.Supp.2d)**

time of the mailing of the letter dated
January 30, 1997, <u>the '817 patent</u> had not yet
been issued.

### D. Summary Judgment on the Issue of Inequitable Conduct.

**\*13** In light of the court's order denying Defendant's
motion for leave to amend to add an inequitable
conduct defense, Defendant's motion for summary
judgment of unenforceability based upon inequitable
conduct is rendered moot.

### III. CONCLUSION

For the reasons stated above, the court grants in part
and denies in part the cross motions for summary
judgment.

Specifically, the court grants Defendant's Motion for
Summary Judgment of no literal infringement and
denies its motion for summary judgment for 1) non-
infringement under the doctrine of equivalents, 2)
invalidity, and 3) to limit the amount of Plaintiff's
recoverable damages. Defendant's Motion for
Summary Judgment based upon inequitable conduct
has been rendered moot by the court's order denying
its motion to amend the answer and counterclaim to
add the affirmative defense of inequitable conduct.

For the reasons stated above, Plaintiff's motion for
partial summary judgment of infringement is denied.

An order in accordance with this memorandum
opinion shall be filed contemporaneously herewith.

M.D.N.C.,1999.
Remington Arms Co., Inc. v. Modern Muzzleloading,
Inc.
Not Reported in F.Supp.2d, 1999 WL 281341
(M.D.N.C.)

Briefs and Other Related Documents <u>(Back to top)</u>

• <u>2:97cv00660</u> (Docket) (Jun. 18, 1997)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Briefs and Other Related Documents
Spruill    v.    National    Railroad    Passenger
Corp.E.D.Pa.,1995.Only the Westlaw citation is
currently available.
United States District Court, E.D. Pennsylvania.
Wayne SPRUILL.
v.
NATIONAL RAILROAD PASSENGER
CORPORATION.
**Civ. A. No. 93-4706.**

Sept. 5, 1995.

Marvin I. Barish, Law Offices of Marvin I. Barish,
P.C., Philadelphia PA, for plaintiff.
David E. FaustPost & Schell, P.C., Philadelphia, PA,
for defendant.

*MEMORANDUM*
SHAPIRO, District Judge.

*INTRODUCTION*

*1 Plaintiff Wayne Spruill ("Plaintiff") brought this
action under the Federal Employers' Liability Act
(FELA), 45 U.S.C. § § 51 *et seq.,* for employment
related injuries sustained on May 17, 1989 while
working for defendant National Railroad Passenger
Corporation ("Amtrak"). Following a nine day trial in
December 1994, the jury returned a verdict in
plaintiff's favor in the amount of $3,838,791.00.[FN1]
On December 22, 1994, after setting off $25,000.00
in short-term disability benefits provided plaintiff by
Amtrak, the court entered judgment in plaintiff's
favor in the amount of $3,813,791.00.

Pending before the court is Amtrak's Motion for Post
Trial Relief. Amtrak seeks a new trial and/or
remittitur on the ground that, *inter alia,* the
comments and conduct of plaintiff's counsel deprived
it of a fair trial. [FN2] The court will grant Amtrak's
motion and order a new trial for the reasons stated
herein.

*DISCUSSION*

Fed.R.Civ.P. 59 states, in relevant part:
A new trial may be granted to ... any of the parties

and on all or part of the issues ... in an action in
which there has been a trial by jury, for any of the
reasons for which new trials have heretofore been
granted in actions at law in the courts of the United
States.

The Court of Appeals for the Third Circuit has stated:
[W]e do not expect advocacy to be devoid of
passion.... But jurors must ultimately base their
judgment on the evidence presented and the rational
inferences therefrom. Thus, there must be limits to
pleas of pure passion and there must be restraints
against blatant appeals to bias and prejudice.

*Draper v. Airco, Inc.,* 580 F.2d 91, 95 (3d Cir. 1978).

The court has wide discretion to grant a new trial
based on trial counsel's improper conduct. *See Dunn
v. Hovic,* 1 F.3d 1371, 1377 (3d Cir.), *modified in
part,* 13 F.3d 58 (3d Cir.), *cert. denied,* 114 S.Ct. 650
(1993); *Fineman v. Armstrong World Industries,* 980
F.2d 171, 207 (3d Cir. 1992); *Patchell v. National
Railroad Passenger Corporation,* No. 90-4745 (E.D.
Pa. July 31, 1992) (Dubois, J.).

The test is whether the improper conduct has made it
"reasonably probable" that the verdict was influenced
by prejudicial statements. A combination of improper
remarks is often required to persuade the trial court of
prejudicial impact. *See Fineman,* 980 F.2d at 207-08
(citing *Salas v. Wang,* 846 F.2d 897 (3d Cir. 1988)
(isolated improper remark will not support grant of
new trial); *Anastasio v. Schering Corp.,* 838 F.2d 701
(3d Cir. 1988) (same)); *Draper,* 580 F.2d at 97
("[W]e do not rely on any of the individual instances
or types of impropriety. Rather, we have assessed the
argument as a whole.").

Trial transcript excerpts demonstrate the continued
inappropriate conduct of plaintiff's counsel:

*Opening*

1. The court twice interrupted counsel's opening
statement for improper argument; after the second
interruption, the court admonished counsel at sidebar:
*2 THE COURT: [Y]ou're coming closer to closing
argument than anything I've ever heard. You're
arguing the facts. You're positing your theories.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

You're saying what he felt. Don't make me cut you off in front of the jury. Have a proper opening argument....

12/5/94 Transcript, p.45.

*Trial*

1. The court had the following colloquy with counsel at sidebar regarding counsel's leading of plaintiff:
THE COURT: ... Mr. Barish's leading of this witness has been among the most egregious I've heard in a long time. And I will once more caution you. I'll strike this and please refrain from leading the witness....
MR. BARISH: I'll just rephrase the question.
THE COURT: [Y]ou can rephrase it. But you've done it over and over and over again ... [Y]ou don't put those words in the guy's mouth and you know it.

12/8/94 Transcript, p.48.

2. Despite the above colloquy, counsel continued leading the plaintiff; the court had a second colloquy on the issue with counsel at sidebar:
THE COURT: ... I can't believe you haven't reviewed [this with the] witness in a case so that he would have a better understanding of what he can--
MR. BARISH: All I do is tell them to tell the truth, your Honor.
THE COURT: I'm sure that's all you do. Is that why you have to do so much testifying in court?

MR. BARISH: You know, in your eye I'm somewhere between slick and incompetent, but I'm neither.
THE COURT: Mr. Barish, you're not incompetent by any means.
MR. BARISH: Well, thank you.
THE COURT: And slick isn't the way I would describe it exactly. But whatever you can get away with might be a way of putting it.

12/8/94 Transcript, pp.54-55.

3. The court held a third sidebar conference on counsel's leading of plaintiff:
THE COURT: Now Mr. Barish ... you asked him what he did on good days. He didn't say what you expected. You asked him again what he did on good days. I'm going to--it's now before the jury and I'm going to let you do it, but I want to tell you, I have

grave doubts about the fairness of this trial.

MR. BARISH: Fine. Your Honor, they have been keeping score. You know how many of my objections you have sustained? One. Do you know how many of his objections you have sustained and--
THE COURT: Do you know why?
MR. BARISH: It doesn't matter. It doesn't, you know, he's wonderful because he represent--
THE COURT: You keep your voice down or I'm going to call a mistrial this instant.

12/8/94 Transcript, pp.91-92.

4. Counsel signalled to plaintiff and otherwise interfered with plaintiff's cross-examination; the court had the following colloquy with counsel at sidebar:
THE COURT: You have no right to interfere with the cross-examination in this fashion. You have the right to speak to me at sidebar, but ... when he asked him is that what you said today and he said no, you shook your head, you signalled to him what he should say. You acted as if the answer was crazy. I'm observing your demeanor, you cannot coach the witness that way, Mr. Barish.

*3 MR. BARISH: If you're going to use a deposition to impeach there has to be something in the deposition that's impeachable and I think it's blatant--
THE COURT: Will you keep your voice down so the jury doesn't hear this interesting argument. Would you move over so your in front of me instead of looking at the jury and talking to them?
MR. BARISH: I wasn't looking at them, please don't set that kind of record up. I wasn't looking at them.
THE COURT: Mr. Barish, I am observing your demeanor and I'm commenting on it for the record, because it's troubling....

THE COURT: ... And I urge you to watch your body language and demeanor in the courtroom.

12/9/94 Transcript, 10-13.

5. Counsel's first question on cross-examination of Mr. Martin, Amtrak's video surveillance expert, was:
[MR. BARISH]: Sir--Mr. Martin, you've been sneaking around taking videos like this for how long?
MR. FAUST: Objection.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

THE COURT: I'm sorry, Mr. Barish. You may not voir dire him unless you do it in the way the law permits.
MR. BARISH: Okay.

12/14/94 Transcript, pp. 9-10.

6. Counsel continued his cross-examination of Mr. Martin; the court had the following colloquy with counsel at sidebar:
THE COURT: You may argue to the jury in closing that he was under pain ... [[[b]ut you cannot elicit from this witness any opinions or anything except the way in which he took the film ... and when it was taken and whether he spliced it. You've now concluded that....
MR. BARISH: I have another question.
THE COURT: Well, your questions have been so improper.
MR. BARISH: They have not.
THE COURT: I beg your pardon, Mr. Barish.

MR. BARISH: ... Now, I'm not arguing with your ruling....

THE COURT: I don't know what you're doing if you're not arguing with my ruling.
MR. BARISH: Well, I just want to show you that I'm not being totally insane when I ask these questions.
THE COURT: I'm not suggesting you're totally insane only ... [that you are] sometimes disrespectful of the rulings of the Court.

12/14/94 Transcript, pp. 13-15.

*Plaintiff's Closing*

1. Though there had been little or no evidence of difficulties between labor and management at Amtrak or between any of the witnesses and plaintiff, counsel stated:
MR. BARISH: Now, Manista, Mr. Riley, Mr. Tidwell, these are people who are enemies of Mr. Spruill. Mr. Spruill is management; they're labor.... They don't even like this guy [Spruill].

12/14/94 Transcript, pp. 159-60.

2. Despite the court's admonition about how he should address the jury, 12/14/94 Transcript, pp. 162-

63, counsel made the following comment:
MR. BARISH: Now, why did he [Mr. Butler] tell you [the jury] no walnut--why did he tell *us* no walnut shells came out? He told *us* no walnut shells came out because he was trying to make the place cleaner than it possibly could be.... You know, when you go on jury duty, you don't leave your brains at home. I mean, that--that's what--that's what *they*--that's what *they'd* like to think.

*4 12/14/94 Transcript, pp. 163-64 (emphasis added).

3. Counsel attempted to approach the jury notwithstanding a previous court directive that closing argument be made from the lectern where the microphone for electronic recording was located; Mr. Barish requested permission to approach the jury in its presence; permission was refused. 12/14/94 Transcript, p. 164.

4. Despite the above exchange and the earlier admonition against approaching the jury, shortly thereafter counsel did so without requesting permission. 12/14/94 Transcript, pp. 165-66.

5. Counsel then launched an attack against Mr. Hill, another Amtrak witness:
MR. BARISH: Then we get to Mr. Hill. Mr. Hill told you all about all the complaints he got, all of this, all of this nonsense.... And, then he told you that there was a wall between these two areas. The people working on that scaffold did not have anything to do with Mr. Hill. And, he said the only time from where he worked he could see into the scaffold area was by looking through the door. You remember that. So, they bring in Mr. Hill, *the assassin.*
MR. FAUST: Objection, Your Honor.
THE COURT: Sustained. Mr. Barish.
MR. BARISH: Okay. So, they bring--so they bring in Mr. Hill to try to tell you about a lot of things that he didn't see hoping to in some way hurt Mr. Spruill's case.... Mr. Hill trying to prove that there is some con--something going on with Mr. Fitzwater because he heard, not that he knew, because he heard that once after work I think he had a beer with Mr. Fitzwater. That's not evidence. *That was just put in there as a--to clog--to mess with your mind.*

12/14/94 Transcript, pp. 167-68 (emphasis added). *See Foster v. Crawford Shipping Co., 496 F.2d 788, 792 (3d Cir. 1974)* (district court reversed for failing to grant defendant's motion for a new trial) (similar comment by Mr. Barish held inappropriate); *Patchell v National Railroad Passenger Corporation,* No. 90-4745 (E.D. Pa. July 31, 1992) (Dubois, J.)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

(defendant's motion for a new trial granted) (similar comment by Mr. Barish held inappropriate).[FN8]

6. Continuing with the "us versus them," "management versus labor" theme, counsel stated:
MR. BARISH: And, then the expert, Alterman. ... Remember he said, oh, the OSHA regulations don't protect managers or supervisors.... *Because they're supposed to be smarter than workers.*

12/14/94 Transcript, p.168 (emphasis added).

7. Ignoring an earlier warning to "refrain from personalities," 12/14/94 Transcript, pp.162-63, counsel proceeded to mimic Mr. Alterman:
MR. BARISH: Mr. Spruill's hand slipped. He didn't overreach. His hand slipped and he went down. Then he [Mr. Alterman] talks about--oh, yeah, that demonstration of every time I said how far--how far can you bend? He started falling. I mean, it was ridiculous. It was like he had Meniere's [sic] disease, you know. He couldn't bend this much before he starts falling over the chair.

*5 12/14/94 Transcript, p.169.

8. Proceeding with the "us versus them" theme, and ignoring the court's earlier warning about making himself a member of the jury, counsel stated:
MR. BARISH: But, the best thing he [Mr. Alterman] said--I couldn't wait to talk to you about this. The best thing he said was he thinks that having nothing on the platform is better than having chains. Do you remember when he said that? *Now, what did--who did he think he was talking to? I mean, how could he insult us with that nonsense?*

12/14/94 Transcript, p.169 (emphasis added).9.
Counsel then attacked Amtrak's medical expert:
MR. BARISH: And, then we come up with the medical expert who you saw yesterday. One visit for litigation, never looked at the MRIs, never looked at the CT scans, never received the report, feels that his opinion, his opinion is as good or better than the doctors who have been treating Mr. Spruill for five years. *Could you imagine the arrogance of this guy?* That his opinion on one visit gives him the right to say that all of these doctors that Mr. Spruill has been seeing for five years, they don't know anything.... [H]e admitted that pain can keep someone from even having a sedentary job. But, he said, hey, this guy [Mr. Spruill] has three limbs. *Well, what happens when Mis--when Mr. Spruill goes to work, he leaves the bad limb home, right? He just goes with the three limbs that weren't involved in this accident.*

This guy [the medical expert] was brought in here on the basis of one visit. *He knew what he had to do and he did it.* And, this is the kind of defense that Amtrak is trying to put up to deprive Mr. Spruill of that which is entitled to him.

12/14/94 Transcript, pp.169-70 (emphasis added).

10. Once again attacking Amtrak's surveillance expert, counsel stated:
MR. BARISH: I want to talk to you a little bit about the surveillance. Mr. Spruill, five and a half years, *the guy is following him around like a Peeping Tom*.... What about the days--the five and a half years when he wasn't feeling good, when he was in pain, when he was home when he was in the hospital bed? Where are those pictures? Where are those pictures? This is their defense.

12/14/94 Transcript, p 170-71 (emphasis added).

11. Continuing with the "labor versus management" theme, counsel stated:
MR. BARISH: Now, so I guess the real question comes down is to who are you going to believe? *Are you going to believe a group of workers* who couldn't care less about Mr. Spruill, who came in here with no allegiance to Mr. Spruill, who told you--came in under subpoena, who told you exactly what they knew? They had nothing to gain. They had everything to lose....
So, these people who came in here were heroes in their own right. Because they came in and testified straight to what it was at total risk to themselves with absolutely nothing to gain, with no allegiance to Mr. Spruill. Mr. Spruill--Mr. Spruill was Jim Riley's *enemy,* for God's sake.
*6 Now, do you want to believe them ...
THE COURT: Confine yourself to the evidence, please, Mr. Barish.
MR. BARISH: ... *or do you want to believe a group of managers* all of whose jobs are at stake, all of whom can be fired at any time? All have been brought in here to tell you all the things that I told you they've told you.
Now, is that the way you treat a loyal employee, somebody who's been with you for 18 years, an unblemished record, never had a claim, didn't want to bring this one, was forced to bring this one, who worked all of his life and finally got the job of his dreams? ...

12/14/94 Transcript, pp.171-73 (emphasis added).

12. Counsel continued his *ad hominem* attack on

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 5

Amtrak's medical expert:
Is that the way to treat an employee, to bring in this type of evidence, *to bring in the phony doctor from Norristown?* Okay. Why did they go to Norristown? They--I mean, there are doctors in Philadelphia, there's doctors in Delaware, was he the only one they could find to help them? I don't know. *To bring in that expert, is that the way you treat Mr. Spruill?*

12/14/94 Transcript, pp.171-73 (emphasis added). *See Foster, 496 F.2d at 792* (similar comment by Mr. Barish held inappropriate).[FN4]

13. Counsel then addressed an individual member of the jury:
MR. BARISH: Now, we come to the discussion of the injuries and the damages. I hope--you're looking at your watch. I hope I'm not imposing.
THE COURT: You can't talk to the jurors individually, Mr. Barish.
MR. BARISH: All right....

12/14/94 Transcript, p.174.

14. Concluding, counsel delivered the following oration:
MR. BARISH: This is Mr. Spruill's one and only appearance before any court. There will be no other trial, no other tribunal to hear this case. I, therefore, ask you with full humility to reflect seriously upon what I've said to you for there will be no return by Mr. Spruill to any other jury. Your judgment is final and forever. That's why I prayed that I might have the wisdom and the eloquence to say to you the things that must be said, just as I prayed that I might find that you will find within yourself the strength to do what must be done with the knowledge that you have done--that what you have done was right and for the right reason.
A noted philosopher once said that, "Man is the only animal that laughs and weeps because he is the only animal that is struck with the difference between what things are and what they ought to be." Ladies and gentlemen, you have the power to make things what they ought to be.

12/14/94 Transcript, pp.178-79.

### Amtrak's Closing

1. After counsel's eighth objection[FN5] to Amtrak's closing, the court had the following colloquy with counsel:
THE COURT: Mr. Barish, this is Mr. Faust's turn to

argue the testimony. The jury will recall the testimony and you'll have a chance to rebut if you--*you're waving the transcript around.* Would you please let him make his argument? I didn't let him interrupt you every time he thought you said something ....
*7 MR. BARISH: Well, I'm--I-- ...
THE COURT: ... improper.
MR. BARISH: ... I'm not trying to interrupt him, Your Honor. I'm just ...
THE COURT: Well, then desist from doing so.

12/14/94 Transcript, pp.210-11 (emphasis added).

2. After counsel's eleventh objection[FN6] to the closing, the court had the following colloquy with counsel:
MR. BARISH: Your Honor, ...

MR. BARISH: ... could I approach the bench? I mean, ...
THE COURT: You may approach the bench.
(Sidebar begins)
THE COURT: Yes, Mr. Barish?
MR. BARISH: Your Honor, when I was making my speech you told me that I had ten minutes left. I think I tried to comply with that. You told him to--to get off. He's been on here now for much longer than-- ...
MR. FAUST: I'm almost finished, Your Honor.
MR. BARISH: ... much longer than--almost finished. She told you to close.
THE COURT: Mr. Barish, *part of it is your constant interruptions and your jumping up and down.*
MR. BARISH: Well, I'm not jump-- ...
THE COURT: *You spent half his speech leafing through your papers, making so much noise they [jury] couldn't hear. Now, in the last five minutes you've been jumping up and down in your chair ...*

MR. BARISH: *I'm jumping up and down in the chair* because--because you restricted me in my time and you're letting this guy just ramble on ...

12/14/94 Transcript, pp.225-26 (emphasis added).

### Rebuttal

1. Counsel then accused opposing counsel of withholding evidence:
MR. BARISH: Now, there are tons of things to talk

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

about. But, let me just say this. When Mr. Faust [Amtrak's counsel] got up in his opening speech and told you there was no accident, he knew, he knew that there was a foreman sitting at that place who ...

MR. BARISH: He [Mr. Faust] knew ...
THE COURT: It's your rebuttal but I must instruct the jury that they're not bound to accept the testimony of a witness who hasn't testified.

12/14/94 Transcript, pp.229-30. *See Draper, 580 F.2d at 95* (among inappropriate comments were counsel's reference to facts not in evidence and personal attack on opposing counsel).

2. Counsel once more approached the jury without the court's permission:
MR. BARISH: Here's a document by Mr. Hannaford that lists the dates ...

THE COURT: Will you return ...
MR. BARISH: Now, do you ...
THE COURT: ... to the podium, ...
MR. BARISH: ... believe ...
THE COURT: ... please?

12/14/94 Transcript, pp.230-31.

3. Counsel then accused Amtrak of deliberately injuring plaintiff:
MR. BARISH: The fact is--the fact is that Amtrak took an employee of 17 years who gave his whole life to this company, injured him ....
MR. FAUST: Objection.
MR. BARISH: ... and then came--pardon me--injured him and then came in here and told you ... the injury didn't occur.

**\*8** 12/14/94 Transcript, p.232. *See Reed v. Philadelphia, Bethlehem & New England R.R.,* 939 F.2d 128, 133 (3d Cir. 1991) (dicta) (similar comment by Mr. Barish found inappropriate), *cert. denied,* 113 S.Ct. 1584 (1993). [FN7]

4. Continuing with the theme that Amtrak was insulting the jury's intelligence, counsel stated:
MR. BARISH: I'm not going to go through everything. This--what happened in this last hour and a half is mind-boggling.... *I mean, people just can't get up and say things to you when they should know.*

12/14/94 Transcript, p.232 (emphasis added).

5. Counsel then accused Amtrak of being "proud" of injuring plaintiff:
MR. BARISH: And, you know what's amazing to me? The amazing thing is that they must be so proud of how they destroyed this guy that they ...
MR. FAUST: Objection.
MR. BARISH: ... actually came in to show you pictures; ... They're so proud of what they've done that they've come in here to show you pictures of it .... You see, he's just a statistic to Amtrak. But, to his family and to himself he's much more.

12/14/94 Transcript, pp.233-35.

Plaintiff's counsel's rebuttal was so outrageous that the court had the following colloquy with counsel the following morning:
THE COURT: All right. I will now--and, Mr. Barish, I will now state to you that I consider Mr. Faust's remarks [during the rebuttal] "if you don't stop I'll tell them what really happened" as improper and in anger and lack of self-control. However, I feel he was so-- he was so provoked by your rebuttal that I really didn't know how to handle the whole thing. In my view, as I told you off the record at the end of the day yesterday, you were completely out of your control in your rebuttal and I will tell you, based on my years of experience as a trial judge, I have never seen anything like it.
MR. BARISH: Well, Your Honor, ...
THE COURT: I want to put that now on the record since I think you're calmer this morning.

12/15/94 Transcript, p.12.

Defense counsel objected nine times during plaintiff's closing and rebuttal statements; not one objection was overruled. He objected six times after the court warned him to only "interrupt ... to protect important points," 12/14/94 Transcript, p.152. Amtrak preserved its right to file a post-trial motion based on plaintiff's counsel's misconduct. *See Anastasio,* 838 F.2d at 706 n.11 (failure to object only one factor in determining prejudicial effect of comments); *contrast with Kehr v. Smith Barney, Harris Upham & Co.,* 736 F.2d 1283, 1286 (9th Cir. 1984) ("[W]hile constant objections are certainly not required, as they could antagonize the jury ... we note that opposing counsel here never objected during the closing argument or moved for a mistrial ").

Following the initial jury charge, the court held a sidebar conference to allow counsel to object to the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

charge; plaintiff's counsel had nine objections to the charge; after ruling on the above objections, along with those raised by Amtrak's counsel, the court re-charged the jury on certain points. After the jury had been re-charged and dismissed to begin deliberations, plaintiff's counsel raised yet another objection to the charge, and asked that the jury be recalled. There was a colloquy with counsel; it was outside the presence of the jury, but the court also considered counsel's remarks on that occasion intemperate, inappropriate, and disrespectful.

\*9 Following the jury's return of the verdict, the court considered granting Amtrak a new trial *sua sponte* because counsel's behavior, the conduct of the trial, and then the verdict so shocked the conscience of the court.

The court concludes it was "reasonably probable" counsel's conduct had a prejudicial effect on both the issue of liability and damages. *See Draper,* 580 F.2d at 97 ("A jury which is prejudiced with respect to its finding of liability is not likely to be free from prejudice in awarding damages."). After relatively brief deliberation--despite the significant issues of credibility affecting both liability and damages--the jury returned a higher award for future wage loss than the evidence would allow. It is also evident that income taxes were not considered with regard to past or future wage loss.

The brevity of the jury's deliberations[FN8] and the jury's failure to follow the court's instructions in computing damages make clear that the court's curative instructions and charge did not mitigate the prejudice caused by counsel's conduct. *See Avoub v. Spencer,* 550 F.2d 164, 170 (3d Cir. 1977) ("[T]he [court's] comments were not sufficient to mitigate the prejudicial effect which may have resulted."), *cert. denied,* 432 U.S. 907 (1977).

Plaintiff has brought to the court's attention *Troy v. National Railroad Passenger Corporation,* 94-3943 (E.D. Pa. July 25, 1995), a recent case in which Judge VanArtsdalen refused to grant Amtrak's motion for a new trial based, among other things, on Mr. Barish's inappropriate comments at trial. *Troy* is factually distinguishable: 1) defendant failed to timely object to many of Mr. Barish's arguably prejudicial statements, *see Troy,* p 8; and 2) any potentially serious errors or misstatements by Mr. Barish during closing argument were corrected by Judge VanArtsdalen's jury charge, *see id* at 9.

In this case, Amtrak objected to most of the incidents

excerpted above; also, for the reasons discussed above, the court concludes that its jury charge and curative instructions did not mitigate the prejudice caused by plaintiff's counsel's conduct. The court remains firmly convinced the trial was not fair and the result must be vacated and set aside.

The court has considered Amtrak's alternate request for a remittitur; however, since the verdict was the result of prejudice, a new trial is warranted on both liability and damages. *See Dunn,* 1 F.3d at 1383 ("[I]f [movant] ha[s] shown that the jury verdict resulted from passion or prejudice, a new trial, rather than a remittitur, [is] the proper remedy.").

We have noted in reviewing the caselaw that this is not the first time the improper conduct of plaintiff's counsel has been the subject of judicial criticism, sufficient to set aside a verdict in favor of his client. Here, approximately two years after the complaint was filed, this case unfortunately remains unresolved. This is unfair to both parties who should have a resolution of the underlying issues; it may be especially unfair to plaintiff who has been injured and may have a meritorious claim against Amtrak. We are in this situation because of the conduct of plaintiff's counsel; not only do both parties suffer, but the administration of justice suffers when judicial resources are caused to be wasted.

\*10 An appropriate order follows.

### ORDER

AND NOW, this 5th day of September, 1995, for the reasons stated in the accompanying memorandum, it is ORDERED that:

1. Amtrak's Motion for Post Trial Relief is GRANTED and a new trial granted;

2. The Civil Judgment entered December 22, 1994, in the amount of $3,813,791.00, is VACATED.

### ORDER

AND NOW, this 5th day of September, 1995, it is ORDERED that the Memorandum and Order entered by the court on August 28, 1995 is VACATED. The attached Memorandum and Order shall be filed of record

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

FN1. The verdict consisted of $333,700.00 for past lost wages, $1,505,091.00 for future lost earning capacity, and $2,000,000.00 for pain and suffering.

FN2. The other grounds urged by Amtrak for a new trial and/or remittitur are: 1) damages for pain and suffering were excessive; 2) court made evidentiary rulings which, either singly or in combination, deprived it of a fair trial; 3) court erroneously failed to credit it for long-term disability payments it expects to make to plaintiff; 4) jury failed to deduct income taxes from damages assessed and/or it failed to reduce damages to present value; and 5) verdict was against the weight of the evidence. Because we grant Amtrak's motion for a new trial on the ground that plaintiff's counsel's remarks and conduct deprived Amtrak of a fair trial, we need not address these other issues.

FN3. "'They turned this human being into someone who acts like an animal, and the tragedy is that, after they did it, then they come in with Mr. Penn and Doctor Robinson and try to fake you out.'" *Foster,* 496 F.2d at 792.
"And if that doesn't get you, then they're going to bring in Dr. Sbarbaro to tell this jury that you're not hurt ..." *Patchell,* p.11.

FN4. "'[I]nstead of coming in and saying it was our fault, [they] bring in a phony witness like Mr. Penn instead of saying sure, this was the cause of this, [they] bring in a phony witness like Doctor Robinson.'" *Foster,* 496 F.2d at 792.

FN5. Counsel's objections were twice sustained.

FN6. By now, counsel's objections had been sustained three times.

FN7. "'[Is it] appropriate for a railroad ... to injure a man because their equipment is defective and in violation of the Safety Appliance Act and then to try to deprive him of every right that he has under the law.'" *Reed,* 939 F.2d at 133.

FN8. *See* *Segars v. Atlantic Coast Line Railroad,* 286 F.2d 767, 771 (4th Cir. 1961)

("[A] quick verdict may with other circumstances indicate passion or prejudice.") (internal quotations omitted); *cf. Paoletto v. Beech Aircraft,* 464 F.2d 976, 983 (3d Cir. 1972) ("[T]he brevity with which a jury reaches its verdict does not, *standing alone,* substantiate a claim of capriciousness") (emphasis added).

E.D.Pa.,1995.
Spruill v. National Railroad Passenger Corp.
Not Reported in F.Supp., 1995 WL 534273 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:93cv04706 (Docket) (Aug. 31, 1993)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.