## RICHARDS, LAYTON & FINGER

A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX (302) 651-7701
WWW.RLF.COM

ROBERT W WHETZEL
DIRECTOR

DIRECT DIAL NUMBER
302-651-7634
WHETZEL@RLF COM

June 26, 2007

**BY ELECTRONIC FILING AND HAND DELIVERY**

The Honorable Joseph J. Farnan, Jr.
United States District Court
District of Delaware
844 King Street
Wilmington, DE 19801

> Re:    **Citation of Subsequent Authority**
> **LG. Philips LCD Co. Ltd. v. Tatung Company, et al.**
> **Case No. 05-292 (JJF)**

Dear Judge Farnan:

Pursuant to Local Rule 7.1.2, the Defendants write to bring to the Court's attention a relevant Federal Circuit decision issued after the parties' final briefs on post-trial issues. In *DSU Medical Corp. v JMS Co , Ltd*, 471 F 3d 1293 (Fed. Cir. 2006), the Federal Circuit clarified the showing required for a finding of inducement liability, on which the jury's verdict of infringement against Defendant Chunghwa Picture Tubes, Ltd. ("CPT") was premised.[1]   The decision underscores Plaintiff LG.Philips LCD Co., Ltd.'s ("LPL") failure to meet its burden of proof on inducement.

## I.    DISCUSSION OF THE CASE

In *DSU Medical Corp.*, the Federal Circuit held *en banc* that in the context of induced infringement, in order to find against the accused inducer, the patentee must show that the accused inducer had the specific intent to induce infringement under 35 U.S.C § 271(b).[2]   In *DSU Medical Corp.*, the patentee brought an action for infringement of patents directed to medical needle guards against a foreign manufacturer and foreign distributor with a worldwide distribution agreement.   *See id* at 1298.    ITL, the manufacturer defendant, made allegedly infringing needle guards in Malaysia and Singapore.    JMS, the distributor defendant, purchased the needle guards from the manufacturer defendant in Singapore and Malaysia, assembled them around needle sets

---

[1] A copy of the case is enclosed as Attachment A.

[2] While the majority of the decision was rendered by a panel, the portion of the decision that addressed the intent required to support a finding of inducement to infringe was decided *en banc*.   *DSU Medical Corp*, 471 F 3d at 1304.

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 2

and sold the allegedly infringing needle guards to customers worldwide, including in the United States. *See id.* at 1299. The evidence also showed that, at times, ITL shipped the needle guards F.O.B. into the United States, including to the distributor's U.S. subsidiary and to one of the manufacturer's end-user customers.[3] Following a six-week trial, the jury returned a verdict of infringement against the distributor (JMS) and of *non-infringement* against the manufacturer (ITL). The district court entered final judgment pursuant to the jury's findings. The patentee moved for a new trial, *inter alia*, on the grounds that the jury instructions on inducement were erroneous.

On appeal, the court addressed the issue of the requisite intent to induce the specific acts of infringement or to cause infringement that must be shown in order to support a finding of induced infringement against a foreign manufacturer. Specifically, the court, writing *en banc*, sought to clarify conflicting precedent on the issue of whether a patentee must prove that the accused inducer *intended to induce infringement by another* or whether the patentee must only show that the accused inducer merely intended to engage in the *acts* that induced the infringement regardless of whether he knew he was causing another to infringe. *See id.* at 1305. In answering this question, the Federal Circuit held that the patentee must show more than the mere intent to engage in acts that induced direct infringement. Rather, the patentee must prove that the accused inducer had a specific intent to induce the specific infringement:

> In the words of a recent decision, inducement requires "'that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement.'" ... Accordingly, ***inducement requires evidence of culpable conduct, directed to encourage another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.***

*Id.* at 1306 (citations omitted) (emphasis added).

Having clarified the standard, the Court then examined the evidence establishing commercial transactions or sales by the manufacturer and found that, though the evidence showed that ITL had knowledge of the patent-in-suit, and knowledge that the distributor intended to sell ITL's product in the U.S., and that ITL sometimes shipped the product directly into the U.S. itself, the record supported the jury's finding of no inducement liability. *See id.* at 1307. The Court emphasized that ITL had received opinions of counsel concluding that its needle guard did not infringe and one of the owner's of the company had testified that ITL had no intent to infringe. The record thus contained evidence that ITL did not believe that its product infringed and therefore had no intent to

---

[3] ITL sold the needle guards in an open-shell configuration. During use the two halves of the needle guard close to form the closed-shell configuration. The District Court found that in the closed shell configuration, the needle guard infringed when closed over the tubing of a needle set. *Id.* at 1298, 1301-1302.

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 3

infringe. The Federal Circuit concluded that the jury was well within the law to conclude that the manufacturer did not induce infringement by "purposefully and culpably encouraging [the distributor's] infringement." *Id.* As there was a lack of specific intent to induce infringement as opposed to the intent to induce the acts which constitute infringement, there could be no inducement liability.

## II.    LPL FAILED TO CARRY ITS BURDEN OF PROOF TO SHOW THAT CPT ACTED TO "PURPOSEFULLY AND CULPABLY ENCOURAGE INFRINGEMENT"

The evidence at trial demonstrated that the overall volume of direct CPT shipments to the United States (*i.e.*, the only transactions that could form the basis of a finding for direct infringement) were miniscule. *See* Attachment B. Those sales alone would not come close to supporting the jury's damages verdict of $52,477,000 against CPT. Therefore, the jury finding in response to Question 5B on the verdict form — that CPT actively induced others to sell or import into the United States — must have been the basis for the vast majority of the damages awarded. However, based upon the evidence introduced at trial, no reasonable jury could have reached such a finding.

To establish its royalty base for inducement based infringement, LPL's damages model included revenues from (A) sales to 233 third party, non-defendants and (B) sales by Dell and HP.[4] Under *DSU Medical Corp.*, LPL must make a very specific showing as to each company included within each of these two categories in order for inducement liability against CPT to attach to the allegedly infringing sales of any of these companies. In order to make this showing and satisfy its burden of proof, LPL was required to set forth evidence proving:

(1) knowledge of the patents by CPT;
(2) specific acts of direct infringement by each and every one of these 235 companies;
(3) affirmative actions by CPT directed to encourage the acts which constitute direct infringement (e.g., the sale of product containing CPT's LCD panels into the U.S.) by each and every one of these 235 companies included in LPL's damages model; and
(4) affirmative acts undertaken with the specific intent to cause infringement. (In other words, a *direct nexus* between the culpable conduct of CPT and the specific

---

[4] LPL's damages model also includes sales to defendants Tatung Company, Tatung Co. of America and ViewSonic Corp. For the reasons discussed in the Defendants' Motion for New Trial, the damage award based on these sales also cannot stand.

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 4

act of direct infringement by the 235 companies included in LPL's damages model.) *See id.* at 1303, 1306.[5]

LPL failed to carry its burden for both categories of allegedly infringing sales.

## A.    Dell and HP Sales

LPL failed to carry its burden of proving that CPT induced Dell and HP, the two non-defendant global computer companies with headquarters in the United States that were mentioned by name during the trial, to directly infringe the '002 patent. At trial LPL presented testimony from CPT personnel about correspondence with "U.S. brand companies" HP and Dell, both of whom sell LCD products in the United States and in hundreds of other markets worldwide. Trial Tr. at 679:24-694:18. LPL argued that (1) CPT had knowledge that Dell and HP sold LCD products in the United States and that (2) CPT's acts, namely its meetings and communications with HP and Dell regarding worldwide sales, induced HP and Dell to purchase LCD modules from CPT for the purpose of selling products containing those modules in the United States (as opposed to any of the hundreds of other markets in which Dell and HP sell these products). This argument and the evidence presented in support of it does not satisfy LPL's burden of proof under *DSU Medical Corp.*

First, LPL did not offer any evidence of direct infringement by Dell or HP. The record is devoid of any evidence that even a single unit of product sold in the United States by Dell or HP contained a CPT module that infringed the '002 patent. The only evidence LPL offered on Dell's and HP's United States sales was testimony from two CPT witnesses who expressed that CPT had some level of knowledge that those two companies sold some LCD products in the United States. The Federal Circuit has made clear that CPT's knowledge that global companies such as Dell and HP sell some of their LCD products in the United States is not a sufficient basis to establish inducement liability. *DSU Medical Corp.*, 471 F.3d at 1306 ("'[K]nowledge of acts alleged to constitute infringement' is not enough.") (citations omitted). Such a showing is even more deficient in this case where LPL did not – indeed could not – establish that CPT is the only LCD supplier to Dell or HP. As such, LPL did not carry its burden on inducement by showing mere knowledge by CPT of sales in the United States by Dell and HP of LCD products generally.

Second, even assuming there was proof of direct infringement by Dell or HP, LPL failed to establish that CPT encouraged Dell or HP's infringing acts, let alone that it did so with the specific intent to cause infringement. Indeed, LPL failed to even establish

---

[5]    This statement was included in the Court's discussion of contributory infringement liability; however, because the case on which it relies discusses both contributory and inducement the position also applies with equal force to inducement liability.

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 5

that CPT sold any infringing modules to Dell or HP. Instead, the evidence showed that CPT sold modules in Taiwan to a number of OEM customers. These OEM customers, in turn, assembled the modules and numerous other parts into laptops, monitors and other LCD products on behalf of themselves and various system brand owners. These products were then shipped to various distributors worldwide at the direction of the brand owners. LPL failed to establish that CPT encouraged the sale of even a single LCD module to an OEM for the purpose of that OEM assembling that LCD module into a finished product for Dell or HP for the purpose of (or even with the knowledge that) Dell or HP selling that unit in the United States. In fact, LPL did not even offer testimony from either Dell or HP linking any purported infringement to CPT acts.

Under *DSU Medical Corp.*, LPL must also show that CPT intended to cause Dell and HP to sell infringing modules to the United States. *See id* at 1306. Yet, LPL provided no evidence of specific intent. The inescapable fact is that LPL produced no evidence of acts by CPT to urge Dell or HP to sell infringing modules in the United States. Further, CPT is a Taiwanese company, and the overwhelming majority of CPT's business (more than 99 percent of its direct sales) is conducted outside the United States and has no direct connection with the United States. LPL introduced no evidence that CPT in any way controls or even influences any decisions by Dell or HP to ship products containing CPT modules to the United States. There was no evidence, therefore, of intent by CPT to induce Dell or HP to infringe the '002 patent.

Finally, since LPL presented no evidence of direct infringement by HP and Dell, did not and could not present any evidence of a nexus between any instance of direct infringement by Dell or HP and any acts by CPT encouraging Dell or HP to infringe. Contrary to LPL's arguments, a generalized desire on the part of a manufacturer to expand sales globally (including the United States market) cannot standing alone meet the requirements to establish inducement liability under the Federal Circuit's standard in *DSU Medical Corp.* This applies with particular force to CPT's conduct carried out in Taiwan, where CPT is based. As the Supreme Court recently reinforced, extraterritorial acts alone cannot form the basis for infringement of a United States patent. *See Microsoft v. AT&T*, No. 05-1056, *15, Slip Op. (April 30, 2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law.").[6] Without evidence of specific actions intended to cause direct infringement, CPT cannot be held liable for inducement.

As set forth in Attachment B, the estimated royalty base for sales by Dell and HP is $303,061,666 from the sales of 1,707,792 units. The estimate of the associated damages award, based on the jury's presumed reasonable royalty rate of 2.4%,[7] is

---

[6] A copy of the case is enclosed as Attachment B.

[7] The presumed royalty rate of 2.4% was calculated by dividing the total damages awarded by the jury ($52,477,000) by the royalty base presented by CPT which was the revenue from the estimated United States sales ($2,215,965,954). This rate is referred to

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 6

**$7,176,900** (which was approximately 13.7% of the jury's overall damages award). Because LPL did not carry its burden of proving that any of these sales was an instance of direct infringement or that CPT took actions to induce any of these sales, the damages should be reduced by this amount.

### B. Sales By Third-Party, Non-Defendant Customers other than HP and Dell

The weakest portion of the jury's finding of inducement concerns CPT's sales to the other 233 third-party, non-defendant customers, for which no evidence of direct infringement or inducement was presented at trial. This category included over 8 million sales units, constituting over 70% of the royalty base (and thus it follows over 70% of the jury's total damage award). For its analysis, LPL relied on a royalty base derived from CPT's financial statements to calculate the damages amount. *See* Trial Tr. at 1015:4-1028:16. This royalty base included sales from the following companies:

| | | | |
|---|---|---|---|
| LITE-ON | SONY | SOTAC | INNOLUX |
| AOC | ZIRCON | SINTEK | MITAC |
| PHILIPS | DGPM LTN | HON HAI | PACIFICDAT |
| K-TRONICS | FUNAI | HUIKE | THUMB |
| SAMSUNG | CLEVO | XIAMEN | SHAMROCK |
| BENQ | CTX | BLUEWHALE | FUCHI |
| COMPAL | TOEI | ADI | MEDIA |
| DGPM | TSB IEC | LIGHTSONIC | DAEWOO |
| TECH-VIEW | JEAN | ISYSTEMS | SMARTASIC |
| YIH HSING | WISTRON | MILESTAR | MATSUNAGA |
| CPTW | APLUS | TVS | JAE |
| JEFFREY | E-GROUP | AEC | OMNI |
| QUANTA | ARIMA | YIH TEND | SITRONIX |
| FSC | ADVANTECH | D.BOSS | GENESIS |
| MITSUBISHI | DDL | AMCOM | TECO |
| EMC | PONTEX | DELTA | HING LUNG |
| TVM | SOLOMON | G-PRO | PROLINK |
| AMTRAN | GOLANA | PROTON | EUREKA |
| UNIWILL | WINMATE | FDT | AOC SONY |
| TOSHIBA | TCL | SANDSOL | HIMAX |
| IDC | ARCHTECH | G-LUXON | ENTERTEK |

as presumed because the jury verdict form does not specifically set forth the royalty rate the jury intended to apply; it simply sets forth the total damage award. LPL's damages model did not disclose an actual royalty rate to be applied to CPT sales. Instead of stating an explicit royalty rate, LPL's damages expert Arthur Cobb opined that CPT would agree to pay LPL a portion of the estimated cost savings associated with the '002 patent.

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 7

| | | | |
|---|---|---|---|
| FOXCONN | LEN CPL | FSC GUA | LASER |
| Q-RUN | TECH-PRO | VESTEL | TIUNYUAN |
| INVENTEC | TECH-YEH | CHANGHONG | LGE |
| DGPM IDC | PROVIEW | AMITEC | LITEK |
| TECH-FRONT | AUDIOVOX | 3D | SUNO |
| HAO SHENG | GBM | SOLECTRON | K-BRIDGE |
| DGPM TPV | TOPSTARS | FOXLINK | EXLAND |
| KONKA | EPSON | LANTIS | CPTUK |
| LG | HSO | CONVERTEK | JVC |
| HUI YING | QUEST NOVA | P-HARMONY | PROTOP |
| HONGYEI | GREATWALL | ESOURCE | MARUBUN |
| ELITEGROUP | KAPOK | LIVERAGE | NS |
| CAPETRONIC | TOPFLY | ACULA | TRIDENT |
| ACER | ALSTON | FVD | KYOSHIN |
| ASUS | MORE-TECH | OI FEI | MYSCN |
| SAMPO | LENOVO CPL | SONY-FOX | SIEMENS |
| FIC | SKYWORTH | GVISION | TPSONIC |
| ALLIED | HASEE | ACTION | E-BRIDGE |
| YA HSIN | YIH KTR | NETWORK | PIMEBEAM |
| TSB CPL | LITEMAX | HYUNDAI | MAINTEQ |
| ORION | LENOVO TEF | LUXEON | SVA |
| FOUNDER | TOPVISION | ABA | KANEMATSU |
| LENOVO | KTC | KEN MEC | CPTM |
| NESO | YIH TOP | HAIER | MARKETECH |
| TECH-COM | HSC | CPTF | YOSUN |
| NOVATEK | SYSTEM | ALCO | ARICIS |
| DAXON | JIM YEN | ORCOM | EPCO |
| ITAUTEC | WELLEX | ELEO | WAR-SOUND |
| VIA | TWIN BEAM | SII | BRIDGE |
| GBMRAY | ADVAN | NAKAMICHI | RMS |
| YIH LTN | MSI | MITANI | HUAJUNG |
| FORWARD | UPTRON | EMISSION | SUNNIC |
| HANYOUNG | ITE | TERAWINS | TAILON |
| JOUGE | HEDY | HUAI I | ITOCHU |
| SIRTEC | NAKANO | SANHO | REX |
| INCLINE | STRONG | SINO UNICO | |
| MAIN | KONGSONIC | MMC | |
| TJOPTO | WAHLEE | PST | |

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 8

The record is completely devoid, however, of any evidence of direct infringement by any of these 233 companies, of specific actions taken by CPT directed to encourage infringing acts by any of these companies and of any nexus between CPT actions encouraging infringement and actual direct infringement by any of these companies.

At the outset, LPL failed to establish direct infringement by any of these companies. For example, there was no testimony by representatives of any of these 233 third-party companies or CPT employees establishing that these third-parties made any sales in the United States of any products that contained CPT modules. LPL's damages expert simply estimated that *generally* the United States market for LCDs comprises approximately thirty percent of the international market and therefore that it should be assumed that 30% of CPT's modules were eventually sold in the United States. *See* Trial Tr. at 1002:21-1005:13. This generalized statement does not *as a matter of law* satisfy LPL's burden of showing each instance – or even any instance – of direct infringement by each of these companies as required by the Federal Circuit. *DSU Medical Corp* 471 F.3d at 1303, 1306.

Nor did LPL present evidence of affirmative acts, let alone culpable conduct, by CPT directed to *encourage infringement* by any of these companies. *See id* at 1306. Although there was evidence of possible communications with a handful of customers directed to global sales (such as Jean, TPV and Compal), for the vast majority of the 233 entities listed above there is no mention of the companies at all. There was certainly no evidence linking CPT with their sales decisions. Most importantly for purposes of inducement, there was no testimony provided from third-party company representatives or CPT employees establishing *any* communications between those companies and CPT *targeting United States sales*. Taking a few examples more specifically,

- There was no evidence showing *any* actions taken by CPT that urged Samsung to sell infringing products in the United States.
- There was no evidence showing *any* actions taken by CPT that urged BenQ to sell infringing products in the United States.
- There was no evidence showing *any* actions taken by CPT that urged Compal to sell infringing products in the United States.
- There was no evidence showing *any* actions taken by CPT that urged Tech-View to sell infringing products in the United States – or any of the other 229 third-party companies in this category.

In fact, there was no evidence presented whatsoever of these companies' relationships with CPT or CPT's actions with respect to these third-party companies directed to the United States. As such, LPL failed to show "evidence of culpable conduct, directed to encouraging... infringement" as to these 233 companies which account for over 70% of the royalty base presented to the jury. *See id.*

Further, LPL cannot rely on the evidence it presented concerning acts by CPT directed toward encouraging purported infringement by co-defendants Tatung, Tatung America and/or

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 9

ViewSonic to support a finding that CPT encouraged any other company to infringe. As a matter of law, CPT's actions directed toward its three co-defendants cannot satisfy the requirement for *specific* intent as to any other company. *See id.* at 1303, 1306. There must be a nexus between specific affirmative acts by CPT and each instance of direct infringement by each third-party. An award of damages premised on over 8 million units of sales made by 233 companies for which there was absolutely no evidence of direct infringement, CPT's encouragement of direct infringement, or a nexus between the direct infringement and the inducement, would be in direct conflict with the Federal Circuit's decision in *DSU Medical Corp.*

As set forth in Attachment C, the portion of LPL's royalty base that is directed to sales by these 233 third-party, non-defendant companies is $1,561,615,550.[8] The estimated damages award associated with those sales, based on the jury's presumed reasonable royalty rate of 2.4%, is **$36,981,118** (which was approximately 70.5% of the jury's damages award).[9] Because LPL did not carry its burden of proving that any of these 233 companies directly infringed the '002 patent, that CPT encouraged any of these 233 companies to infringe the '002 or that any acts of encouragement by CPT had a direct nexus to specific acts of infringement by any of these 233 companies, the damages award cannot include any sales by these 233 companies.

## III.    CONCLUSION

LPL failed to sustain its burden of proving over 84% of the jury's damage award, which consisted of the following sales:

| Sales | Estimate of Associated Damages |
|---|---|
| Dell and HP | $7,176,900 |
| Third Party Customers | $36,981,118 |
| ViewSonic and Tatung | $8,289,696 |
| CPT's Direct U.S. Sales | $29,285 |
| TOTAL | $53,477,000 |

The limited evidence presented on CPT's purported inducement of Dell and HP is insufficient because no evidence was presented establishing direct infringement by either Dell or

---

[8]    There should be no disagreement between the parties' experts as to the royalty base for direct sales. If the time periods are the same the royalty base would be essentially the same. *See* Trial Tr. at 1894:7-1895:10.

[9]    Customer specific data is obtained from the report of the Defendants' damages expert. LPL's damages model included costs in the aggregate and therefore provided no basis for the jury to identify sales by particular customers.

The Honorable Joseph J. Farnan, Jr.
June 26, 2007
Page 10

HP, encouragement by CPT of such infringement or a nexus between any encouragement by CPT and specific acts of infringement by Dell or HP. LPL's showing that CPT was aware that Dell and HP sell products in the United States as well as the rest of the worldwide market and that CPT was generally interested in increasing its worldwide market share is insufficient as a matter of law to establish inducement liability for estimated United States sales of $303,061,666, which were included in the royalty base and accounted for approximately $7,176,900 of the damages awarded by the jury.

Absolutely no evidence was presented to establish direct infringement, acts encouraging infringement, or a nexus for the remaining 233 third-party, non-defendant customers whose estimated United States sales of $1,561,615,550 were included in the royalty base and accounted for approximately $36,981,118 of the damages awarded by the jury. For these reasons, judgment should not be entered on the damages award.

Instead, any damages award should be limited to, at most, CPT's directly infringing sales ($29,285) and, to the extent the Court is inclined to find that CPT induced direct infringement by its co-defendants, sales attributable to defendants Tatung and ViewSonic ($8,289,696). Applying the presumed royalty rate of 2.4%, the maximum amount of damages supportable by the record, if any, is $8,318,981.

Respectfully,

Robert W. Whetzel

RWW:lmg

cc:    Clerk of Court (By Hand Delivery)
       Richard D. Kirk, Esquire (By Electronic Filing and Hand Delivery)
       Gaspare J. Bono, Esquire (By E-mail)

# ATTACHMENT A

Westlaw.

471 F.3d 1293                                                                                    Page 1
471 F.3d 1293, 81 U.S.P.Q.2d 1238
(Cite as: 471 F.3d 1293)

H

United States Court of Appeals,
Federal Circuit
DSU MEDICAL CORPORATION and MEDISYS-
TEMS CORPORATION, Plaintiffs-
Appellants,
v.
JMS CO., LTD and JMS NORTH AMERICA COR-
PORATION, Defendants-Cross Appellants,
and
ITL Corporation PTY, Ltd., Defendant-Cross Appel-
lant
ITL Corporation PTY, Ltd., Plaintiff-Cross Appel-
lant,
v.
DSU Medical Corporation, Defendant-Appellant.
**Nos. 04-1620, 05-1048, 04-1052.**

Dec. 13, 2006

**Background:** Owner of patents for medical needle
guards sued competitors for infringement. The United
States District Court for the Northern District of Cali-
fornia, D. Lowell Jensen, Senior District Judge,
entered judgment on jury verdict in favor of owner
against two competitors. Competitors appealed, and
patent owner cross-appealed.

**Holdings:** The Court of Appeals, Rader, Circuit
Judge, held that:
(1) term "guard slidably enclosing a sliding assembly
comprising a needle and a winged needle hub" re-
quired that the guard substantially contain the needle-
assembly at all times;
(2) word "slot" did not incorporate any thickness lim-
itation;
(3) closed-shell configuration of alleged device in-
fringed patent;
(4) the en banc Court of Appeals held that to estab-
lish inducement, owner was required to offer evid-
ence of culpable conduct, directed to encouraging an-
other's infringement;
(5) the original Court of Appeals panel further held
that jury was well within the law to conclude that
competitor that manufactured alleged device did not
induce importer-competitor to infringe by purpose-

fully and culpably encouraging importer's infringe-
ment;
(6) exclusion of expert testimony on lost profits dam-
ages was not an abuse of trial court's discretion;
(7) substantial evidence supported jury award for lost
profits due to lost sales to the infringing guard;
(8) substantial evidence supported jury verdict that
certain claims of patent were invalid as obvious; and
(9) trial court's response to a jury question was not
abuse of discretion.
Affirmed.

Michel, Chief Judge, and Mayer, Circuit Judge, filed
a concurring opinion with regard to en banc review.

West Headnotes

**[1] Patents ⬚324.5**
291k324.5 Most Cited Cases
Court of Appeals reviews patent claim construction
without deference.

**[2] Patents ⬚165(2)**
291k165(2) Most Cited Cases
The claims of a patent define the invention to which
the patentee is entitled the right to exclude.

**[3] Patents ⬚101(2)**
291k101(2) Most Cited Cases
Term "guard slidably enclosing a sliding assembly
comprising a needle and a winged needle hub" in pat-
ent for medical needle guards required that the guard
substantially contain the needle-assembly at all times.

**[4] Patents ⬚101(2)**
291k101(2) Most Cited Cases
Word "slot" in patent for medical needle guards
meant an opening in the guard capable of receiving a
wing that projects through the opening and having
both an upper edge and a lower edge that are defined
by the sidewall of the guard and did not incorporate
any thickness limitation, as long as it was capable of
receiving a wing.

**[5] Patents ⬚235(2)**
291k235(2) Most Cited Cases
Closed-shell configuration of alleged device did have

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

471 F 3d 1293                                                              Page 2
471 F 3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

a slot and, thus, infringed patent for medical needle guards; as applied to alleged device, its slot was an opening in a needle guard capable of receiving a wing that projects through the opening, the slot had both an upper edge and a lower edge defined by the sidewall of the guard, and was also sized relative to the wing and could accommodate the needle wing as it moved through the length of the slot

**[6] Federal Courts ☞825.1**
170Bk825.1 Most Cited Cases
Court of Appeals reviews a denial of a motion for a new trial after a jury trial for an abuse of discretion

**[7] Patents ☞323.3**
291k323.3 Most Cited Cases
Mere inferences that units of alleged device sold in the United States were put into the infringing closed-shell configuration did not warrant new trial on competitor's contributory infringement of patent for medical needle guards 35 U.S.C.A. § 271(c)

**[8] Patents ☞312(1.1)**
291k312(1.1) Most Cited Cases
A patentee always has the burden to show direct infringement for each instance of indirect infringement 35 U.S.C.A. § 271(c)

**[9] Patents ☞259(1)**
291k259(1) Most Cited Cases
To prevail on contributory infringement, owner of patent for medical needle guards was required to show that competitor made and sold the alleged device, that the device had no substantial non-infringing uses in its closed-shell configuration, that competitor made sales within the United States that contributed to another's direct infringement, and that competitor's associate engaged in an act of direct infringement on those sales that competitor made in the United States 35 U.S.C.A. § 271(c)

**[10] Patents ☞312(1.1)**
291k312(1.1) Most Cited Cases
The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements 35 U.S.C.A. § 271(b)

**[11] Patents ☞259(1)**

291k259(1) Most Cited Cases
The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent 35 U.S.C.A. § 271(b)

**[12] Patents ☞324.5**
291k324.5 Most Cited Cases
Court of Appeals reviews the legal sufficiency of jury instructions on an issue of patent law without deference to the district court

**[13] Federal Courts ☞763.1**
170Bk763.1 Most Cited Cases

**[13] Federal Courts ☞908.1**
170Bk908.1 Most Cited Cases
Court of Appeals reviews jury instructions in their entirety and only orders a new trial when errors in the instructions as a whole clearly mislead the jury

**[14] Patents ☞259(1)**
291k259(1) Most Cited Cases
To establish liability for inducing infringement of a patent, a patent holder must prove that once the defendants knew of the patent, they actively and knowingly aided and abetted another's direct infringement; however, knowledge of the acts alleged to constitute infringement is not enough 35 U.S.C.A. § 271(b)

**[15] Patents ☞259(1)**
291k259(1) Most Cited Cases
The mere knowledge of possible infringement of a patent by others does not amount to inducement; specific intent and action to induce infringement must be proven 35 U.S.C.A. § 271(b)

**[16] Patents ☞312(8)**
291k312(8) Most Cited Cases
To establish inducement, owner of patents for medical needle guards was required to offer evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities 35 U.S.C.A. § 271(b)

**[17] Patents ☞259(1)**
291k259(1) Most Cited Cases

© 2007 Thomson/West  No Claim to Orig  U S Govt Works

If an entity offers a product with the object of promoting its use to infringe a patent, as shown by clear expression or other affirmative steps taken to foster infringement, it is then liable for the resulting acts of infringement by third parties; the inducement rule premises liability on purposeful, culpable expression and conduct 35 U.S.C.A. § 271(b)

**[18] Patents ☞312(8)**
291k312(8) Most Cited Cases
Inducement requires that the alleged infringer knowingly induced infringement of a patent and possessed specific intent to encourage another's infringement; accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities 35 U.S.C.A. § 271(b)

**[19] Federal Courts ☞759.1**
170Bk759.1 Most Cited Cases

**[19] Federal Courts ☞825.1**
170Bk825.1 Most Cited Cases
Court of Appeals reviews a denial of a motion for a new trial after a jury trial for abuse of discretion, affirming on any basis that supports the verdict

**[20] Patents ☞312(8)**
291k312(8) Most Cited Cases
In light of evidence that manufacturer of alleged device contacted an Australian attorney, who concluded that device would not infringe patents for medical needle guards, that manufacturer and its importer obtained letters from American patent counsel advising that device did not infringe, and testimony of one of manufacturer's owners who had participated in design of device that manufacturer had no intent to infringe patent, jury was well within the law to conclude that manufacturer did not induce importer to infringe by purposefully and culpably encouraging importer's infringement 35 U.S.C.A. § 271(b)

**[21] Federal Courts ☞827**
170Bk827 Most Cited Cases
Court of Appeals reviews a district court's denial of a motion for a new trial on the amount of damages for an abuse of discretion

**[22] Patents ☞324.55(1)**
291k324.55(1) Most Cited Cases
Court of Appeals had no basis to speculate that the jury did not award price erosion damages as part of its lost profits or reasonable royalty analysis, in patent infringement action, where verdict form did not segregate the damages award into categories beyond lost profits and reasonable royalties, and jury had before it evidence of price erosion

**[23] Patents ☞215**
291k215 Most Cited Cases
**[23] Patents ☞312(10)**
291k312(10) Most Cited Cases
Substantial evidence supported jury decision to reject any contract between owner of patents for medical needle guards and licensee and its determination of date from which licensee was entitled to collect infringement damages

**[24] Evidence ☞555.2**
157k555.2 Most Cited Cases
Purported damage expert's failure to consider the effect of the availability of noninfringing device supported trial court's exclusion of his testimony about hypothetical contract theory in action alleging infringement of patents for medical needle guards

**[25] Patents ☞324.5**
291k324.5 Most Cited Cases
Although reviewing a district court's *Daubert* ruling to exclude testimony for an abuse of discretion, Court of Appeals reviews eligibility for lost profits damages without deference

**[26] Patents ☞318(4.1)**
291k318(4.1) Most Cited Cases
For purpose of claim of lost profits, to prevent the hypothetical from lapsing into pure speculation, Court of Appeals requires sound economic proof of the nature of the market and likely outcomes with patent infringement out of the picture; the concept of sound economic proof requires some grounding in sound economic and factual predicates

**[27] Evidence ☞555.9**
157k555.9 Most Cited Cases
Exclusion of expert testimony on lost profits damages

471 F 3d 1293                                                              Page 4
471 F 3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F 3d 1293)**

was not an abuse of trial court's discretion in patent infringement action; trial court perceived that expert did not ground his "accelerated market entry" theory in sound economic principle, that expert relied too heavily on hypothesized contracts in

hypothesized markets that lacked sound economic grounding, and that expert's hypothetical reconstruction of a "but for" marketplace lacked footing in economic principle

**[28] Federal Courts ☞765**
170Bk765 Most Cited Cases
Court of Appeals reviews a trial court's judgment as a matter of law (JMOL) rulings after a jury verdict by reapplying the district court's own standard

**[29] Federal Courts ☞871**
170Bk871 Most Cited Cases
Court of Appeals sustains a jury's award of damages unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork

**[30] Patents ☞319(1)**
291k319(1) Most Cited Cases
Court of Appeals will resolve any doubts about the amount of damages against the infringer of a patent

**[31] Patents ☞312(10)**
291k312(10) Most Cited Cases
Substantial evidence supported the jury award to owner of patents for medical needle guards for lost profits due to lost sales to the infringing guard; even though competitor attempted to suggest that the market included numerous other noninfringing alternatives to its device, patent owner provided evidence that no other non-infringing alternatives were acceptable during the necessary time periods

**[32] Patents ☞36(3)**
291k36(3) Most Cited Cases

**[32] Patents ☞36.1(1)**
291k36.1(1) Most Cited Cases
Substantial evidence of prior art, together with evidence of adequate motivation to combine these references and evidence on the objective indicia of nonobviousness, supported jury verdict that certain claims of patent for medical needle guards were in-

valid as obvious

**[33] Patents ☞314(1)**
291k314(1) Most Cited Cases
Trial court's response to a jury question, during deliberations, requesting a clarification on the hindsight jury instruction, was not abuse of its wide discretion, in patent infringement action, where trial court referred jury back to the jury instructions on invalidity, which both parties had earlier accepted

**Patents ☞328(2)**
291k328(2) Most Cited Cases
3,572,334, 4,170,933, 4,840,619, 4,935,012  Cited as Prior Art

**Patents ☞328(2)**
291k328(2) Most Cited Cases
5,112,311  Invalid in Part

**Patents ☞328(2)**
291k328(2) Most Cited Cases
5,266,072  Cited
**\*1297** William J. O'Brien, Alschuler Grossman Stein & Kahan LLP, of Santa Monica, California, argued for plaintiffs-appellants  Of counsel on the brief was Alan H. Blankenheimer, Heller Ehrman White & McAuliffe LLP, of San Diego, California

Richard H. Zaitlen, Pillsbury Winthrop Shaw Pittman LLP, of Los Angeles, California, argued for defendants-cross appellants JMS Co , Ltd , et al With him on the brief were Julian D. Forman; and Kevin T. Kramer, of Washington, DC  Of counsel were Ross R. Barton, of McLean, Virginia; and Blair M. Jacobs, Sutherland, Asbill & Brennan LLP, of Washington, DC

Marc N. Bernstein, The Bernstein Law Group, of San Francisco, California, argued for defendant-cross appellant, ITL Corporation PTY, Ltd  With him on the brief were Ronald P. Flynn and Sarah Botz

Before RADER, SCHALL, and LINN, Circuit Judges

Opinion for the court filed by Circuit Judge RADER

Concurring opinion filed by Chief Judge MICHEL,

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

471 F 3d 1293
471 F 3d 1293, 81 U S P Q 2d 1238
(Cite as: 471 F.3d 1293)

Page 5

and Circuit Judge <u>MAYER</u> on en banc Section III B

*1298

<u>RADER</u>, Circuit Judge

DSU Medical Corporation (DSU) and Medisystems Corporation (MDS) (collectively DSU) sued JMS Company, Limited (JMS) and JMS North America (collectively JMS) and ITL Corporation Pty, Limited (ITL) for patent infringement, inducement to infringe, and contributory infringement of <u>United States Patent Nos. 5,112,311 ('311)</u> and <u>5,266,072 ('072)</u> After a six-week jury trial produced a unanimous verdict, the United States District Court for the Northern District of California entered a final judgment finding claims 46-47, and 50-52 of <u>the '311 patent</u> invalid as obvious  The trial court also entered a final judgment, pursuant to the unanimous verdict, of infringement against JMS and JMS North American on claims 49, 53, and 54 of <u>the '311 patent</u>, and of non-infringement for ITL  *DSU Med Corp v JMS Co, JMS N Am Corp, & ITL Corp PTY.* Nos. C-00-1826-DLJ, C-99-2690-DLJ, slip op at 3-4 (N D Cal May 7, 2004) (*Judgment* )  The jury awarded total damages of $5,055,211 for infringement against JMS and JMS North America, and the trial court entered a final judgment holding both jointly and severally liable for the award  Finding no reversible error, this court affirms

I

The '311 and <u>'072 patents</u> claim a guarded, winged-needle assembly  The invention reduces the risk of accidental needle-stick injuries  Needle puncture wounds can transmit blood-borne diseases such as Hepatitis B and AIDS  The '311 and '072 patented inventions effectively guard standard winged-needle-sets to prevent needle-stick injuries

The <u>'311 patent</u> claims a "slotted, locking guard for shielding a needle, and a winged needle assembly including a needle, a winged needle hub, and a slotted, locking guard " '311, col 1, I 8-11  This invention includes both "[a] slotted guard for locking a needle in a shielded position as the needle is removed from the patient", and "a guarded winged needle assembly slidably mounted within the guard " *Id* . abstract  Figures 5-6 illustrate one embodiment of the patented invention:

© 2007 Thomson/West  No Claim to Orig  U S  Govt  Works

471 F 3d 1293                                                                    Page 6
471 F 3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**



471 F 3d 1293                                                                              Page 7
471 F 3d 1293, 81 U S P Q 2d 1238
(Cite as: 471 F.3d 1293)

Figure 5 is a side view of a needle, winged needle hub (3), and slotted needle guard (1) '311 patent, col 3, ll 4-6 In this depiction, the needle (5) remains retracted within the needle guard (1) *Id* Figure 6 shows the same needle from above '311 patent, col 3, ll 7-10

Mr David Utterberg, a co-inventor of the '311 patent, owns DSU and MDS DSU owns the '311 patent; MDS has an exclusive license to make and sell the '311 invention for large-bore needles, including Arterial-Venous Fistula (AVF) sets used for dialysis and aphaeresis MDS markets AVF needles under the brand names "MasterGuard" and "PointGuard "

The alleged infringing device, made by ITL (an Australian company) sells under the name Platypus TM Needle Guard (Platypus) ITL manufactures the Platypus in Malaysia and Singapore The Platypus needle guard is a "stand-alone" product: a small configured piece of plastic This plastic guard structure is not attached to any other device In other words, the Platypus does not include a needle, but only a sheathing structure Some claims of the '311 patent recite both a slotted guard and a guarded winged needle assembly Before use, the Platypus resembles an open clamshell (open-shell configuration) During use, the halves of the clam shell close to form the needle guard (closed-shell configuration) The following illustration shows the Platypus in open-and closed-shell configuration:

*1299

© 2007 Thomson/West No Claim to Orig U S Govt Works

471 F 3d 1293                                                                                     Page 8
471 F 3d 1293, 81 U S P Q 2d 1238
(Cite as: 471 F.3d 1293)



471 F.3d 1293                                                                    Page 9
471 F.3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

Transcript of Record at 18685, 18629, *DSU Medical Corp v JMS Co, JMS North America Corp, & ITL Corp PTY.* Nos 04-1620, 05-1048, 05-1052 (Fed Cir Sept 21, 2004) (*Transcript*) The Platypus has an upper and a lower "jaw" When closed, the upper jaw extends around and overlaps the inner, lower jaw. During use, a medical technician closes the Platypus and locks it around tubing connected to the winged needle assembly When the technician removes the needle from a patient, the worker slides the guard down the tube until the needle assembly's wings meet and pry the jaws apart The wings and their attached needle assembly slide into and through the guard, forcing the jaws ever wider as the wings make their way into a notched opening at the guard's back Ultimately the wings slide into the rear opening At that point, the jaws close around the used needle

JMS is a large Japanese medical supply business that competes with MDS in the United States market Beginning in June 1999, JMS purchased Platypus needle guards from ITL, entering into an agreement to distribute the Platypus worldwide (the Supply Agreement) Under the Supply Agreement, JMS bought open-shell configuration Platypus guard units from ITL in Singapore and Malaysia JMS generally closed the Platypus guards around needle sets before distributing them to customers

DSU alleges that the Platypus infringes the '311 patent DSU also alleges that JMS and ITL contributed to and induced each other's infringement JMS sought to sell ITL's infringing Platypus until it could produce its substitute non-infringing product, the WingEater ITL offered to supply its infringing Platypus DSU additionally seeks damages from JMS because it "stole" MDS's ability to renew a MasterGuard exclusive license with a former customer, Fresenius USA Manufacturing, Inc (Fresenius)

## II

[1][2] On February 5, 2001, the trial court entered a claim construction order *DSU Med Corp v JMS Co, JMS N Am Corp, & ITL Corp PTY,* Nos C-00-1826-DLJ, C-99-2690-DLJ (N D Cal Feb 5,

2001) (*Claim Construction Order*) This court reviews claim construction without deference *Markman v. Westview Instruments, Inc.,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996) "[T]he claims of a patent define the invention to which the *1300 patentee is entitled the right to exclude" *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312 (Fed.Cir.2005) (citing *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996) ("We look to the words of the claims themselves to define the scope of the patented invention")) This court recently enunciated predominant claim construction principles in *Phillips,* 415 F.3d at 1312-24

[3] The trial court construed "slidably enclosing" in claim 1 of the '311 patent:

1 A guard *slidably enclosing* a sliding assembly comprising a needle and a winged needle hub

'311 patent, col 15, ll 46-47 (emphasis added) The trial court concluded that this term in claim 1 "requires that the guard substantially contain the needle-assembly at all times" *Claim Construction Order,* slip op at 9 Because the Platypus is a "stand-alone guard" without a needle, the trial court granted summary judgment of non-infringement to the defendants on multiple claims [FN1] *Id,* slip op at 15-19

> FN1. The trial court granted a summary judgment of non-infringement on claims 1, 4-9, 12, 19, 20, 22-23 of the '311 patent, and on claims 1, 6, and 7 of the '072 patent

The language and context of the claims support the trial court's construction of "*slidably enclosing* a sliding assembly" Again, the trial court read the claim to require that the guard substantially contain the needle-assembly at all times *Claim Construction Order,* slip op at 9 In the first place, claim 1 expressly recites the presence of a needle as part of the sliding assembly Thus, the claimed "assembly" would not be complete without a needle The claim also uses the term "enclosing" In the context of an invention "for locking a needle in a shielded position as the needle is removed from a patient," that language suggests constant shielding or covering of the sharp '311 pat-

ent, col 2, ll 8-9 The specification reinforces that
suggestion:

> [T]he guard is folded about its hinge position and
> locked  into a generally cylindrical, folded con-
> figuration Alternatively, the guard may be molded
>   to enclose a sliding hub/needle assembly that has
> been positioned between the two pieces

'311 patent, col 2, ll 53-58 By emphasizing that the
guard is locked in a protective configuration, or mol-
ded to enclose the needle assembly, the specification
conveys the concept of a permanent cover for the
needle Indeed, the figures in the specification show a
completely enclosed, and thus guarded, needle Fig-
ures 15-19 also show the needle hub as permanently
housed in the guard '311 patent, figures 15-19 The
trial court also methodically considered and rejected
each of DSU's arguments that the term means only
generally surrounding the needle and hub Claim
Construction Order, slip op 8-15 This court con-
curs in the district court's analysis

[4] The court also construed "slot," as used in claims
1, 46, and 52 Claim Construction Order, slip op at
19-24 The relevant portion of claim 46 is:

> 46 A guard for slidably enclosing a sliding as-
> sembly   said guard comprising
> a hollow member proportioned for receiving said
> needle and winged needle hub, said hollow mem-
> ber defining at least one longitudinal *slot* propor-
> tioned to receive a wing of said needle hub project-
> ing outwardly through the *slot* when the needle hub
> resides within the hollow member in sliding rela-
> tion thereto, and means, associated with the hollow
> member, for engaging said wing *1301 projecting
> through said *slot* when the needle and hub are in a
> slidingly retracted position in which the needle is
> enclosed by the hollow member for locking said
> needle hub and needle in said retracted position

'311 patent, col 20, ll 20-39 (emphases added)
Claim 52 is:

> 52 The guard of claim 46 in which said *slot* ex-
> tends in a longitudinal direction through one end of
> said hollow member, to provide sliding access to
> said wing

'311 patent, col 20, ll 63-65 (emphasis added) The
trial court held that the term did not require "a
defined width " Claim Construction Order, slip op at

19 Later the district court, at the request of defend-
ants, clarified that " '[s]lot' shall mean 'an opening in
the guard capable of receiving a wing that projects
through the opening and having both an upper edge
and a lower edge that are defined by the sidewall of
the guard ' " DSU Med Corp v JMS Co, JMS N
Am Corp, & ITL Corp PTY, Nos C-00-1826-DLJ,
C-99-2690-DLJ (N D Cal Apr 30, 2001) (Construc-
tion Clarification Order I ) In claim 46, because "pro-
portioned to receive" modifies "slot," the trial court
explained that "slot" "shall mean 'sized relative to the
wing so that the wing extends through the slot when
the hub is within the hollow member and so said slot
can accommodate the wing's movement as it trans-
lates the length of the slot ' " Id, see also DSU Med
Corp v JMS Co, JMS N Am Corp, & ITL Corp
PTY, Nos C-00-1826-DLJ, C-99-2690-DLJ, slip op
at 29 (N D Cal Jan 16, 2002) (Construction Clarific-
ation II & SJ Order )

The trial court identified the crux of the dispute over
"slot" as "whether   the slots for the wings should
have defined widths closely approximating the wings'
thickness " Construction Clarification Order I, slip
op at 19 If "slot" limits the size of the opening to ac-
commodate the "minor" thickness of the '311 patent's
wings, the Platypus would not infringe because its
jaws accommodate any thickness Claim Construc-
tion Order, slip op at 19 On the other hand, if "slot"
contains no thickness limitation, the Platypus would
infringe because it opens to receive a wing of any
size Id, at 19

The claim language recites only "slot " Thus, the
claim itself does not incorporate any thickness limita-
tion Moreover, the specification provided no size
limitation on the opening In a tribute to its complete
analysis, the trial court went beyond those primary
sources to also consult the prosecution history Phil-
lips, 415 F.3d at 1317 (a court "should also consider
the patent's prosecution history, if it is in evidence")
The record before the Patent Office shows that the
patentees amended the claims of Application Serial
Number 252,564, which is the application from
which the '311 patent (and '072 patent) derived, to
avoid U.S. Patent No. 4,840,619 (Hughes Patent)

In amending the claims to avoid the Hughes Patent,

© 2007 Thomson/West No Claim to Orig U S Govt Works

471 F 3d 1293
471 F 3d 1293, 81 U S P Q 2d 1238
(Cite as: 471 F.3d 1293)

however, the applicant did not limit the size of the slot, as argued by JMS and ITL. The amendments concerned only the orientation of the needle wings that moved back and forth through the slot. To distinguish the Hughes Patent, the patentee did not have to, and did not actually, limit the width of the slot. Thus, the trial court correctly construed "slot" as not requiring a defined width, as long as it was capable of receiving a wing. *Construction Clarification Order I,* slip op at 14.

Under this claim construction, the trial court found that "as a matter of law, every reasonable jury would find that there is a slot in the [Platypus] closed-shell configuration." *Construction Clarification II & SJ Order,* slip op at 29. Therefore, the trial court held that when sold in the United**\*1302** States in its "closed-shell" configuration, the Platypus literally infringed claims 46-47, 49, and 52-53 of '311 patent, when closed over the tubing of a needle-set. *Id.*

[5] Viewing the evidence in the light most favorable to the nonmoving party, this court holds that the trial court correctly concluded that the closed-shell configuration of the Platypus does have a slot. As applied to the Platypus, its slot is an opening in a needle guard capable of receiving a wing that projects through the opening. Further, the slot has both an upper edge and a lower edge defined by the sidewall of the guard. The Platypus's slot is also sized relative to the wing and can accommodate the needle wing as it moves through the length of the slot. Furthermore, the Platypus contains the other limitations of claims 46-47, 49, and 52-53 of the '311 patent. Therefore, in its closed-shell configuration, the Platypus does infringe claims 46-47, 49, and 52-53 of the '311 patent. This court affirms the trial court's summary judgment ruling.

### III

[6] The jury found that JMS North America and JMS directly and contributorily infringed, and that JMS additionally induced JMS North America to infringe. *Transcript,* at 453. However, the jury returned a verdict of non-infringement in favor of ITL. *Id.* at 453-54. The jury entered a verdict finding that ITL did not engage in contributory infringement or inducement to infringe. *Id.,* at 453. The trial court

denied DSU's motion for new trial on the jury's verdict that ITL did not contributorily infringe or induce infringement. This court reviews a denial of a motion for a new trial after a jury trial for an abuse of discretion. *Chiron Corp. v. Genentech, Inc.,* 363 F.3d 1247, 1258 (Fed.Cir.2004) (citing *De Saracho v. Custom Food Mach., Inc.,* 206 F.3d 874, 880 (9th Cir.2000))

#### A

On appeal, DSU argues that ITL committed contributory infringement. According to DSU, the Platypus, which ITL sold to JMS, had no substantial noninfringing use. Therefore, DSU argues, ITL committed contributory infringement as a matter of law. ITL responds that it made and sold "most Platypus guards" outside of the United States. ITL also contends that the record contains no evidence that the Platypus was used in an infringing manner in the United States.

The Platypus sets that came into the United States fall within three categories:

(1) JMS imported into the United States approximately 30 million Platypus guards that, prior to importation into the United States, it had already assembled into the closed-shell configuration, combined with needle sets. These units accounted for the vast majority of Platypus sales in the United States

(2) Fresenius purchased approximately 3 5 million Platypus guards, in the open-shell configuration without needle sets. ITL billed JMS for the shipments and shipped them to Fresenius in the United States at JMS's request. Fresenius ultimately decided that guards without needle sets did not meet FDA regulations, and it returned about 3 million.

(3) ITL sent approximately 15,000 Platypus in the open-shell configuration to JMS in San Francisco. DSU introduced no evidence that those units were ever put into the closed-shell configuration in the United States

Additionally, the record contained evidence that when instructed to do so by JMS, ITL would ship Platypus guard units F O B into the United States. The record also shows, however, that ITL only sold the Platypus in its open-shell configuration.

[7][8][9] Therefore, this court must determine whether the jury's verdict is against **\*1303** the clear weight

of the evidence  Under § 271(c):

> [w]hoever offers to sell or sells *within the United States*  a component of a patented machine, manufacture, combination or composition    constituting a material part of the invention, *knowing* the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce *suitable for substantial noninfringing use,* shall be liable as a contributory infringer

35 U.S.C. § 271(c) (2000) (emphases added)  In discussing 35 U.S.C. § 271(c), the Supreme Court stated:

> One who makes and sells articles which are only adapted to be used in a patented combination will be presumed to intend the natural consequences of his acts; he will be presumed to intend that they shall be used in the combination of the patent

*Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.,* 545 U.S. 913, 125 S.Ct. 2764, 2777, 162 L.Ed.2d 781 (2005)  In addition, the patentee always has the burden to show direct infringement for each instance of indirect infringement *Dynacore Holdings Corp. v. U.S. Philips Corp.,* 363 F.3d 1263, 1272 (Fed.Cir.2004); *Joy Techs., Inc. v. Flakt, Inc.,* 6 F.3d 770, 774 (Fed.Cir.1993) ("Liability for either active inducement of infringement or contributory infringement is dependent upon the existence of direct infringement ")  Thus, to prevail on contributory infringement, DSU must have shown that ITL made and sold the Platypus, that the Platypus has no substantial non-infringing uses in its closed-shell configuration, that ITL engaged in conduct (made sales) within the United States that contributed to another's direct infringement, and that JMS engaged in an act of direct infringement on those sales that ITL made in the United States

The trial court properly applied these legal principles  The trial court determined that the record showed that ITL supplied the Platypus, that the Platypus had no substantial non-infringing uses in its closed-shell configuration, and that ITL intended to make the Platypus that resulted in the potential for contributory infringement as a product designed for use in the patented combination  *DSU Med Corp v  JMS Co .  JMS N  Am  Corp .  & ITL Corp  PTY,* Nos  C-

00-1826-DLJ, C-99-2690-DLJ,  slip  op  at  1-3 (N D Cal  Sept  20, 2004) (*Post Trial Motions' Order* )  In fact, even beyond the minimal intent requirement for contributory infringement, ITL acted with the knowledge of the '311 patent and knowledge that the component was especially made or adapted for use in an infringing manner  *Id ,* slip op  at 22-24  However, the district court denied the motion for a new trial because the record does not show that "the alleged contributory act ha[d] a direct nexus to a specific act of direct infringement "  *Id .* slip op  at 25  In denying the new trial, the court stated:

> And while it is true that Plaintiffs introduced evidence that "ITL sold and shipped millions of 'stand alone' guards directly to United States customers, including JMS [North America] and end-users like Fresenius," *there was no direct evidence* at trial establishing that these guards were actually closed and used as an act of direct infringement in the United States

*Id .* slip op  at 26

Upon review of the record, this court perceives, as well, an absence of evidence of direct infringement to which ITL contributed *in* the United States  Under the terms of the '311 patent, the Platypus only infringes in the closed-shell configuration  When open, the Platypus, for instance, lacks a "slot" as well as other claimed features  ITL only contributed to placing the Platypus into the closed-shell configuration **\*1304** in Malaysia (category 1, above); not in the United States  Section 271(c) has a territorial limitation requiring contributory acts to occur in the United States  Furthermore, this court cannot reverse a jury verdict of non-infringement on mere inferences that the Platypus guard units sold in the United States (i e , the open-shell configuration in categories 2 and 3, above) were put into the infringing closed-shell configuration  The record does not show that the Platypus guards ITL shipped into the United States in the open-shell configuration were ever put into an infringing configuration, i e , closed-shell  On categories 2 and 3, above, the record contains no evidence of direct infringement, i e , that the open-shell Platypus guards imported by ITL were sold or used in their closed-shell configuration  As a result, the trial court did not abuse its discretion in denying DSU's motion

471 F 3d 1293                                                                          Page 13
471 F 3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

for new trial on ITL's contributory infringement

On the issue of induced infringement, DSU argues that ITL induced infringement by inducing JMS to sell the closed-shell configuration in the United States  The district court denied DSU's motion for a new trial on the ground that, although JMS directly infringed, ITL did not intend JMS to infringe

### B
### RESOLUTION OF CONFLICTING PRECEDENT
Section III  B , only, is considered en banc

Opinion for the court filed by Circuit Judge RADER, with NEWMAN, LOURIE, SCHALL, BRYSON, GAJARSA, LINN, DYK, PROST, and MOORE, Circuit Judges, join Concurring opinion filed by MICHEL, Chief Judge, and MAYER, Circuit Judge

[10][11]  This court addresses Part III  B , of this opinion en banc  This section addresses, in the context of induced infringement, "the required intent  to induce the specific acts of [infringement] or additionally to cause an infringement " *MEMC Elec. Materials, Inc. v. Mitsubishi Materials Silicon Corp.,* 420 F.3d 1369, 1378 n. 4 (Fed.Cir.2005) (citing *MercExchange, L.L.C. v. eBay, Inc.,* 401 F.3d 1323, 1332 (Fed.Cir.2005))  This section clarifies that intent requirement by holding en banc that, as was stated in *Manville Sales Corp. v. Paramount Systems, Inc.,* 917 F.2d 544, 554 (Fed.Cir.1990), "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements "  The requirement that the alleged infringer knew or should have known his actions would induce actual infringement necessarily includes the requirement that he or she knew of the patent  *See Golden Blount, Inc. v. Robert H. Peterson Co.,* 438 F.3d 1354, 1364 n. 4 (Fed.Cir.2006) (citing *Manville* and explaining that the inducing infringement standard was satisfied "because it is undisputed that [the alleged infringer] had notice of the patent")

[12][13]  DSU claims the district court improperly instructed the jury on the state of mind necessary to prove inducement to infringe under 35 U.S.C. § 271(b)  This court reviews the legal sufficiency of

jury instructions on an issue of patent law without deference to the district court  *Advanced Display Sys., Inc. v. Kent State Univ.,* 212 F.3d 1272, 1282 (Fed.Cir.2000)  "This Court reviews jury instructions in their entirety and 'only orders a new trial when errors in the instructions as a whole clearly mislead the jury ' " *Chiron,* 363 F.3d at 1258 (quoting *Delta-X Corp. v. Baker Hughes Prod. Tools, Inc.,* 984 F.2d 410, 415 (Fed.Cir.1993))

**\*1305** [14][15] Under section 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer " 35 U.S.C. § 271(b)  To establish liability under section 271(b), a patent holder must prove that once the defendants knew of the patent, they "actively and *knowingly* aid[ed] and abett[ed] another's direct infringement " *Water Technologies Corp. v. Calco, Ltd.,* 850 F.2d 660, 668 (Fed.Cir.1988) (emphasis in original)  However, "knowledge of the acts alleged to constitute infringement" is not enough *Warner-Lambert Co. v. Apotex Corp.,* 316 F.3d 1348, 1363 (Fed.Cir.2003) (citation omitted)  The "mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven " *Id.* at 1364 (citing *Manville,* 917 F.2d at 554).

[16]  DSU asked the court to instruct the jury, purportedly in accordance with *Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464 (Fed.Cir.1990), that to induce infringement, the inducer need only intend to cause the *acts* of the third party that constitute direct infringement  The trial court gave the following instruction to the jury:

> In order to induce infringement, there must first be an act of direct infringement and proof that the defendant knowingly induced infringement with the intent to encourage the infringement  The defendant must have intended to cause the acts that constitute the direct infringement and must have known or should have known than[sic] its action would cause the direct infringement  Unlike direct infringement, which must take place within the United States, induced infringement does not require any activity by the indirect infringer in this country, as long as the direct infringement occurs here

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

*Transcript,* at 432  Thus, the court charged the jury in accordance with *Manville.*  The statute does not define whether the purported infringer must intend to induce the infringement or whether the purported infringer must merely intend to engage in the acts that induce the infringement regardless of whether it knows it is causing another to infringe  DSU complains that the instruction is incorrect because it requires that the inducer possess specific intent to encourage another's infringement, and not merely that the inducer had knowledge of the acts alleged to constitute infringement  [FN2]

> FN2.  In *Hewlett-Packard Co. v. Bausch & Lomb, Inc.,* 909 F.2d 1464, 1469 (Fed.Cir.1990), this court stated that "[p]roof of actual intent to cause the acts which constitute infringement is a necessary prerequisite to finding active infringement "  DSU reads this statement as standing for the proposition that proof of intent to cause infringing acts is all that is required in order to establish inducement of infringement

[17] In *Grokster,* which was a copyright case, the Supreme Court cited with approval this court's decision in *Water Technologies* when it discussed inducement of infringement, stating:

> The rule on inducement of infringement as developed in the early cases is no different today  Evidence of "active steps  taken to encourage direct infringement," such as advertising an infringing use or instructing how to engage in an infringing use, show an affirmative intent that the product be used to infringe, and a showing that infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some lawful use

*Grokster,* 125 S.Ct. at 2779 (citation and footnote omitted)  As a result, if an entity offers a product with the object of promoting *1306 its use to infringe, as shown by clear expression or other affirmative steps taken to foster infringement, it is then liable for the resulting acts of infringement by third parties  *Id.* at 2780  "The inducement rule  premises liability on purposeful, culpable expression and conduct  "  *Id.*

[18] *Grokster,* thus, validates this court's articulation of the state of mind requirement for inducement  *See Manville,* 917 F.2d at 544.  In *Manville,* this court held that the "alleged infringer must be shown  to have *knowingly* induced infringement," 917 F.2d at 553, not merely knowingly induced the *acts* that constitute direct infringement  This court explained its "knowing" requirement:

> It must be established that the defendant possessed specific intent to encourage another's infringement and not merely that the defendant had knowledge of the acts alleged to constitute inducement  The plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts *and* that he knew or should have known his actions would induce actual infringements

*Id.* at 553.  In *Water Technologies,* also cited with approval by the Supreme Court, 125 S.Ct. at 2779, this court clarified: "While proof of intent is necessary, direct evidence is not required; rather, circumstantial evidence may suffice "  850 F.2d at 668.  [FN3]  Although this court stated "that proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement," *Hewlett-Packard,* 909 F.2d at 1469, *Grokster* has clarified that the intent requirement for inducement requires more than just intent to cause the acts that produce direct infringement  Beyond that threshold knowledge, the inducer must have an affirmative intent to cause direct infringement  In the words of a recent decision, inducement requires " 'that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement' "  *MEMC Elec.,* 420 F.3d at 1378 (Fed.Cir.2005) (quoting *Minn. Mining & Mfg. Co. v. Chemque, Inc.,* 303 F.3d 1294, 1304-05 (Fed.Cir.2002))  Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities  *Grokster,* 125 S.Ct. at 2780; *Manville,* 917 F.2d at 553.  Accordingly, the district court correctly instructed the jury in this case

> FN3.  *See also* *nCube Corp. v. Seachange Int'l, Inc.,* 436 F.3d 1317, 1325 (Fed.Cir.2006) (This court noted that "at

471 F 3d 1293                                                                                Page 15
471 F 3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

least the alleged inducer had [to have] knowledge of the infringing acts," which included evidence of SeaChange's intent that its customers use the ITV systems it sold with Scientific-Atlanta equipment to perform the patented method )

C

[19] The district court denied DSU's motion for a new trial on the issue of inducement to infringe This court reviews a denial of a motion for a new trial after a jury trial for abuse of discretion, affirming on any basis that supports the verdict *Chiron, 363 F.3d at 1258.* In denying the motion for new trial, the trial court stated:

Fundamental principles of law hold that it is up to the jury to make determinations of witness credibility, to decide the existence of any factual inferences, and to determine the weight to be attributed to any direct or indirect evidence Although Plaintiffs introduced circumstantial evidence which permitted inferences of ITL's intentions, it is up to the Jury to decide whether or not to draw any inference and to consider the weight of any such evidence Assessing **\*1307** competing evidence is what the law asks juries to do, and the Court declines to take over this fundamental role of the Jury

*Post Trial Motions Order.* slip op at 15 The jury heard evidence about the commercial transactions between ITL and JMS, including JMS's intention to sell ITL's Platypus to Fresenius until JMS could get its own WingEater approved by the Food and Drug Administration (FDA) and ready for market The jury also heard evidence that Mr Utterberg's lawyer informed ITL in January 1997 that the Platypus infringed the '311 patent Additionally, the jury learned that ITL contacted an Australian attorney, who concluded that its Platypus would not infringe JMS and ITL then also obtained letters from U S patent counsel advising that the Platypus did not infringe Mr William Mobbs, one of the owners of ITL who had participated in the design of the Platypus, testified that ITL had no intent to infringe the '311 patent *Post Trial Motions Order.* slip op at 15

[20] Thus, on this record, the jury was well within the law to conclude that ITL did not induce JMS to infringe by purposefully and culpably encouraging

JMS's infringement To the contrary, the record contains evidence that ITL did not believe Platypus infringed Therefore, it had no intent to infringe Accordingly, the record supports the jury's verdict based on the evidence showing a lack of the necessary specific intent The trial court certainly did not abuse its discretion

IV

Based on a finding that MDS became the exclusive licensee of the '311 patent on July 17, 2001, the jury awarded MDS lost profit damages in the amount of $4,400,000 *Transcript,* at 455 It also awarded DSU a reasonably royalty for sales of the Platypus, at a rate of 5¢ per unit, totaling $655,211 *Id* at 456

[21] DSU appeals the trial court's denial of its motion for a new trial on price erosion damages and for three additional months of lost profits damages *Post Trial Motions Order.* slip op at 67 This court reviews a district court's denial of a motion for a new trial on the amount of damages for an abuse of discretion *Micro Chem., Inc. v. Lextron, Inc., 317 F.3d 1387, 1394 (Fed.Cir.2003); Unisplay, S.A. v. Am. Elec. Sign Co., 69 F.3d 512, 517 (Fed.Cir.1995)*

A

[22] DSU complains that it was entitled to a new trial because the jury did not award its requested price erosion damages On these points, the verdict form does not segregate the damages award into categories beyond lost profits and reasonable royalties However, the jury had before it evidence of price erosion Accordingly, this court has no basis to speculate that the jury did not award price erosion damages as part of its lost profits or reasonable royalty analysis *Crystal Semiconductor Corp. v. TriTech Microelecs. Int'l, Inc., 246 F.3d 1336, 1360 (Fed.Cir.2001)* The trial court properly denied DSU's motion for new trial on price erosion damages

[23] DSU also complains that it deserves a new trial because the jury should have decided that MDS was an exclusive licensee on April 5, 2001 The jury entered a verdict that the date on which MDS became an exclusive licensee of DSU, and thus, the date on which it would be entitled to collect infringement damages, was July 17, 2001 The trial court allowed

© 2007 Thomson/West No Claim to Orig U S Govt Works

471 F 3d 1293                                                                 Page 16
471 F.3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

the jury to make this determination, instructing it that MDS became an exclusive licensee of the '311 patent sometime *1308 between April 5, 2001 and July 17, 2001 Substantial evidence supports the jury's decision to reject any contract between MDS and DSU earlier than July 17, 2001 The jury was free to determine, for instance, that Mr Utterberg's testimony on this point was simply not credible Mr Utterberg testified that he "shook hands with himself" on an earlier date-as president and sole owner of both contracting parties *Post Trial Motions Order*, slip op at 56-57 At other times, however, he also contradicted himself and undermined the suggestion that a contract was entered into earlier than July 17, 2001 *Id* at 57 Thus, the trial court did not abuse its discretion in denying a new trial on the date of the contract

## B

[24] The trial court excluded testimony from DSU's expert witness, Dr Stephen A Degnan, on "the hypothetical existence or hypothetical terms of a contract between [MDS] and Fresenius     [and] as to any calculation or measure of patent infringement damages based upon any sale of the WingEater needle guard " *DSU Med. Corp. v. JMS Co.*, 296 F.Supp.2d 1140, 1159 (N.D.Cal.2003) (*In Limine Order* ) According to DSU, JMS's infringement interfered with MDS's "decade-long" contractual relationship with Fresenius Specifically, MDS contended that JMS used sales of the infringing Platypus guard to "steal" the contract with Fresenius, with the intent to later replace the infringing Platypus with its non-infringing WingEater Thus, MDS sought lost profit damages, not only for the award it received from lost sales to the infringing Platypus, but also for sales it lost to the non-infringing WingEater The trial court disallowed Dr Degnan's testimony on this subject because "sales of acceptable noninfringing substitute products [could not] be the basis of legally compensable patent damages," and the WingEater was an acceptable noninfringing substitute for the patented products *Id.*

[25] Although reviewing a district court's "*Daubert* " ruling to exclude testimony for an abuse of discretion, this court reviews eligibility for lost profits damages without deference *Micro Chem., 317 F.3d at 1391* (decision to admit expert testimony reviewed under regional circuit law); *Genentech, Inc. v. Am-*

*gen, Inc., 289 F.3d 761, 768 (Fed.Cir.2002)* (Ninth Circuit reviews evidentiary rulings for abuse of discretion); *Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1544 (Fed.Cir.1995)* (whether the lost profits are legally compensable is a question of law this court reviews de novo).

As noted above, the trial court reasoned that MDS "cannot be awarded lost profit damages based upon any sale by the defendant of the noninfringing WingEater needle guard " *In Limine Order, 296 F.Supp.2d at 1156.* It also reasoned that Dr Degnan's proffered methodology, "requiring inter alia hypothesized terms in hypothesized contracts, is not grounded on established legal principle and is far too remote factually to be within the line drawn for legally compensable patent injuries " *Id.* Specifically, the trial court faulted Dr Degnan's "accelerated market entry" notion that MDS would have captured the market in advance of the introduction of the WingEater, but for the infringing sales of the Platypus *Id. at 1151.*

MDS, however, also argues that the foreseeability principle in *Rite-Hite* supports its case for lost profits on the WingEater While it may be possible for an infringement to have a foreseeable, and therefore compensable, effect on future contracts, the trial court was correct to perceive that it could not occur when the future contract was itself for a non-infringing substitute In *1309Grain Processing Corp. v. American Maize-Prods. Co., 185 F.3d 1341 (Fed.Cir.1999)*, this court observed that "[m]arket sales of an acceptable noninfringing substitute often suffice alone to defeat a case for lost profits " *Id. at 1352.* Indeed in *Grain Processing*, as in this case, the noninfringing substitute that defeated the claim for lost profits was not yet offered for sale in the marketplace *Id. at 1354-55.* Here, Dr Degnan admitted that the WingEater was available in October 2001, and the FDA approved the WingEater for sale on June 20, 2001 Thus, Dr Degnan's failure to consider the effect of the availability of the WingEater supports the trial court's exclusion of the hypothetical contract theory

[26][27] In addition, *Grain Processing* stands for another proposition as well: "To prevent the hypothetic-

© 2007 Thomson/West No Claim to Orig U S Govt Works

471 F 3d 1293                                                                    Page 17
471 F.3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

al from lapsing into pure speculation, this court requires sound economic proof of the nature of the market and likely outcomes with infringement out of the picture " *185 F.3d at 1350.* Indeed, the concept of sound economic proof requires some grounding in "sound economic and factual predicates " *Riles v. Shell Exploration & Prod. Co.,* 298 F.3d 1302, 1311 (Fed.Cir.2002) The trial court perceived that Dr Degnan did not ground his "accelerated market entry" theory in sound economic principle  The trial court perceived that Dr Degnan relied too heavily on hypothesized contracts in hypothesized markets that lacked sound economic grounding  While damages analysis invariably involves hypothetical reconstruction of a "but for" marketplace, that reconstruction must include some footing in economic principle, which the trial court found lacking  Thus, this court detects no abuse of discretion in the trial court's exclusion of Dr Degnan's testimony on lost profits damages

### V

[28] The trial court denied JMS's and ITL's motions for Judgment as a Matter of Law (JMOL) contesting the $4 4 million award for lack of support with substantial evidence  *Post Trial Motions Order,* slip op at 55  This court reviews a trial court's JMOL rulings after a jury verdict by reapplying the district court's own standard  *Applied Med. Res. Corp. v. United States Surgical Corp.,* 147 F.3d 1374, 1376 (Fed.Cir.1998)  To prevail on appeal, JMS and ITL must show that substantial evidence does not support the jury's factual findings or that the trial court erred in applying the law on JMOL motions  *Perkin-Elmer Corp. v. Computervision Corp.,* 732 F.2d 888, 893 (Fed.Cir.1984)

[29][30] This court sustains a jury's award of damages "unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork " *Biotec Biologische Naturverpackungen GmbH & Co. v. Biocorp, Inc.,* 249 F.3d 1341, 1355 (Fed.Cir.2001)  The jury was accorded discretion to resolve conflicts in the evidence of damages  *Brooktree Corp. v. Advanced Micro Devices, Inc.,* 977 F.2d 1555, 1580 (Fed.Cir.1992)  Moreover, this court will resolve "any doubts about the amount      against the in-

fringer " *Kalman v. Berlyn Corp.,* 914 F.2d 1473, 1482 (Fed.Cir.1990) (quoting *Ryco, Inc. v. Ag-Bag Corp.,* 857 F.2d 1418, 1428 (Fed.Cir.1988))

[31] In an attempt to question the jury's lost profits verdict, JMS attempts to suggest that the market included numerous other noninfringing alternatives to the Platypus  Nevertheless, the jury awarded MDS lost profits beginning April 17, 2001  JMS acknowledged that it could not bring a guarded needle to the market by that date  JMS acknowledged that, as a result of its inability to bring its own guarded needle to market by that date, MDS could *1310 tie-up customers with multi-year MasterGuard contracts  Thus, even though the FDA approved the WingEater for sale in June 2001, it could not have replaced any sales of the patented invention, according to JMS's own admission, until its first commercial sale in October 2001  Furthermore, DSU provided evidence that no other non-infringing alternatives were acceptable during the necessary time periods  Though Nipro Medical Corporation distributed a guarded needle set called the "SafeTouch," it had design flaws that led to two FDA-published recalls, and prior to recall, it had limited geographical distribution and unsatisfactory manufacturing capacity  Though Diasol Inc distributed, in the United States, a guarded needle set called the "Shelly," an independent rating agency (Emergency Care Research Insitute) [FN4] called Diasol's "Shelly" "unacceptable " *In Limine Order,* slip op at 16  The record also shows that the "Shelly" sold only in very small quantities, and was not available to distributors like Fresenius

> FN4. Emergency Care Research Institute is a non-profit health services research agency that has been providing information and technical assistance to the healthcare community to support safe and cost-effective patient care for over 30 years  It has been called the "Consumer Reports for medical devices" and the "preeminent source for healthcare risk management information and advice "

Thus, substantial evidence supports the jury award for lost profits due to lost sales to the infringing Platypus guard  Further, this court does not perceive

© 2007 Thomson/West  No Claim to Orig  U S Govt  Works

that the jury award is grossly excessive or monstrous, or based only on speculation or guesswork

## VI

DSU also appeals the denial of all of its motions for new trial on various of the trial court's evidentiary rulings *Post Trial Motions' Order*, slip op at 3-4 DSU based its motions on a variety of alleged errors in admitting or excluding evidence For instance, DSU faults the district court for admitting the testimony of Mr Timothy Erskine on the question of obviousness of the '311 patent, for admitting evidence about the prosecution history of the related '072 patent, and for excluding evidence of ITL's patent infringement insurance from the consideration of willfulness The Ninth Circuit reviews "decisions regarding admission of evidence for abuse of discretion," *Rogers v. Raymark Indus., Inc.* 922 F.2d 1426, 1429 (9th Cir.1991) (citing *Daily Herald Co. v. Munro*, 838 F.2d 380, 388 (9th Cir.1988)) This court detects no abuse of discretion in any of these rulings

[32] DSU also asserts that the jury's verdict, finding claims 46-47 and 50- 52 obvious, is against the great weight of the evidence However, the lengthy trial record showed that the prior art contained all elements of claims 46-47, 50-52 of the '311 patent This record includes: the testimony of Mr Erskine; United States Patent No. 4,935,012 (Magre patent) and United States Patent No. 3,572,334, which disclose every element of '311 patent's claims 46, and 50-51; the Magre patent and United States Patent No. 3,463,152, which disclose every element of '311 patent's claims 46-47 and 50; the Magre patent and United States Patent No. 4,170,933, which disclose every element of claim 46; and the Magre patent and the Hughes patent, which disclose every element of claims 46-47 and 52 The record also showed evidence of adequate motivation to combine these references to reach a decision of obviousness In addition, the jury heard adequate evidence on the objective indicia of non-obviousness As a result, substantial evidence supports the obviousness verdict The trial *1311 court properly denied a new trial on this basis as well

[33] DSU also appeals the trial court's response to a question from the jury during jury deliberations During deliberations, the jury requested a clarification on

the hindsight jury instruction *Transcript*, at 14984-85, 15019, 15036 The trial court responded by referring the jury back to the jury instructions on invalidity *Id* at 14985, 15019 Both parties had earlier accepted those instructions Thus, the trial court did not abuse its "wide discretion" in responding to a jury question *Arizona v. Johnson*, 351 F.3d 988, 994 (9th Cir.2003).

## VII

In conclusion, this court affirms the trial court's grant of summary judgment of non-infringement on the combination claims (combination of guard and needle assembly) and on the open-shell configuration of the stand-alone claims This court affirms the trial court's evidentiary rulings This court also affirms the trial court's denial of all of the post-trial motions, affirming entry of the final judgment in its entirety

## COSTS
Each party shall bear its own costs

## *AFFIRMED*

MICHEL, Chief Judge, and MAYER, Circuit Judge, concurring

Although we agree with the court's analysis in Section III B, we do not consider it necessary to address this issue en banc DSU misreads *Hewlett-Packard* as if we had said "proof of actual intent to cause the acts which constitute the infringement is a necessary *and sufficient* prerequisite to finding active inducement," but we did not There is no actual conflict between *Hewlett-Packard* and *Manville* and, thus, no need for intervention by the full court Such rare intervention should be reserved for real conflicts as well as cases of exceptional importance *See* Fed. R.App. P. 35(a) In our opinion, the panel was free to conclude that the district court correctly rejected DSU's proffered jury instruction because, misunderstanding *Hewlett-Packard* DSU did not correctly state the law

Moreover, we write to make clear that we do not set forth a new standard here as to what satisfies the "knowledge of the patent" requirement in cases brought under 35 U.S.C. § 271(b) *See, e g*, *Insituform Techs., Inc. v. Cat Contr. Inc.*, 161 F.3d 688, 695 (Fed.Cir.1998) (analyzing section 271(b) liability

© 2007 Thomson/West No Claim to Orig U S Govt Works

471 F 3d 1293                                                    Page 19
471 F 3d 1293, 81 U S P Q 2d 1238
**(Cite as: 471 F.3d 1293)**

under both actual and constructive knowledge stand-
ards)  There is no dispute that ITL Corporation Pty,
Ltd , had actual knowledge of United States Patent
No. 5,112,311  Accordingly, the "knowledge of the
patent" issue is not before us

471 F 3d 1293, 81 U S P Q 2d 1238

END OF DOCUMENT

# ATTACHMENT B

(Bench Opinion)          OCTOBER TERM, 2006          1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States v. Detroit Timber & Lumber Co.*, 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## MICROSOFT CORP. *v.* AT&T CORP.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

No. 05–1056.  Argued February 21, 2007—Decided April 30, 2007

It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country. There is an exception. Section 271(f) of the Patent Act, adopted in 1984, provides that infringement does occur when one "suppl[ies] . . . from the United States," for "combination" abroad, a patented invention's "components." 35 U. S. C. §271(f)(1). This case concerns the applicability of §271(f) to computer software first sent from the United States to a foreign manufacturer on a master disk, or by electronic transmission, then copied by the foreign recipient for installation on computers made and sold abroad.

AT&T holds a patent on a computer used to digitally encode and compress recorded speech. Microsoft's Windows operating system has the potential to infringe that patent because Windows incorporates software code that, when installed, enables a computer to process speech in the manner claimed by the patent. Microsoft sells Windows to foreign manufacturers who install the software onto the computers they sell. Microsoft sends each manufacturer a master version of Windows, either on a disk or via encrypted electronic transmission, which the manufacturer uses to generate copies. Those copies, not the master version sent by Microsoft, are installed on the foreign manufacturer's computers. The foreign-made computers are then sold to users abroad.

AT&T filed an infringement suit charging Microsoft with liability for the foreign installations of Windows. By sending Windows to foreign manufacturers, AT&T contended, Microsoft "supplie[d] . . . from the United States," for "combination" abroad, "components" of AT&T's patented speech-processing computer, and, accordingly, was liable under §271(f). Microsoft responded that unincorporated soft-

Syllabus

ware, because it is intangible information, cannot be typed a "component" of an invention under §271(f). Microsoft also urged that the foreign-generated copies of Windows actually installed abroad were not "supplie[d]    from the United States." Rejecting these responses, the District Court held Microsoft liable under §271(f), and a divided Federal Circuit panel affirmed.

*Held:* Because Microsoft does not export from the United States the copies of Windows installed on the foreign-made computers in question, Microsoft does not "suppl[y]    from the United States" "components" of those computers, and therefore is not liable under §271(f) as currently written. Pp. 7–19.

(a) A copy of Windows, not Windows in the abstract, qualifies as a "component" under §271(f). Section 271(f) attaches liability to the supply abroad of the "components of a patented invention, where *such components* are uncombined in whole or in part. in such manner as to actively induce the combination of *such components* " §271(f)(1) (emphasis added). The provision thus applies only to "such components" as are combined to form the "patented invention" at issue—here, AT&T's speech-processing computer. Until expressed as a computer-readable "copy," *e.g.*, on a CD-ROM, Windows—indeed any software detached from an activating medium—remains uncombinable. It cannot be inserted into a CD-ROM drive or downloaded from the Internet; it cannot be installed or executed on a computer. Abstract software code is an idea without physical embodiment, and as such, it does not match §271(f)'s categorization: "components" amenable to "combination." Windows abstracted from a tangible copy no doubt is information—a detailed set of instructions—and thus might be compared to a blueprint (or anything else containing design information). A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component.

The fact that it is easy to encode software's instructions onto a computer-readable medium does not counsel a different answer. The copy-producing step is what renders software a usable, combinable part of a computer; easy or not, the extra step is essential. Moreover, many tools may be used easily and inexpensively to generate the parts of a device. Those tools are not, however, "components" of the devices in which the parts are incorporated, at least not under any ordinary understanding of the term "component." Congress might have included within §271(f)'s compass, for example, not only a patented invention's combinable "components," but also "information, instructions, or tools from which those components readily may be generated." It did not. Pp. 9–12.

(b) Microsoft did not "suppl[y]    from the United States" the for-

Syllabus

eign-made copies of Windows installed on the computers here in-
volved   Under a conventional reading of §271(f)'s text, those copies
were "supplie[d]" from outside the United States   The Federal Cir-
cuit majority concluded, however, that for software components, the
act of copying is subsumed in the act of supplying   A master sent
abroad, the majority observed, differs not at all from exact copies,
generated easily, inexpensively, and swiftly from the master   Hence,
sending a single copy of software abroad with the intent that it be
replicated invokes §271(f) liability for the foreign-made copies   Judge
Rader, dissenting, noted that "supplying" is ordinarily understood to
mean an activity separate and distinct from any subsequent "copy-
ing," "replicating," or "reproducing"—in effect, manufacturing   He
further observed that the only true difference between software com-
ponents and physical components of other patented inventions is that
copies of software are easier to make and transport   But nothing in
§271(f)'s text, Judge Rader maintained, renders ease of copying a
relevant, no less decisive, factor in triggering liability for infringe-
ment   The Court agrees   Under §271(f)'s text, the very components
supplied from the United States, and not foreign-made copies thereof,
trigger liability when combined abroad to form the patented inven-
tion at issue   While copying software abroad is indeed easy and in-
expensive, the same can be said of other items, such as keys copied
from a master   Section 271(f) contains no instruction to gauge when
duplication is easy and cheap enough to deem a copy in fact made
abroad nevertheless "supplie[d]    from the United States "   The ab-
sence of anything addressing copying in the statutory text weighs
against a judicial determination that replication abroad of a master
dispatched from the United States "supplies" the foreign-made copies
from this country   Pp  12–14

    (c) Any doubt that Microsoft's conduct falls outside §271(f)'s com-
pass would be resolved by the presumption against extraterritorial-
ity   Foreign conduct is generally the domain of foreign law, and in
the patent area, that law may embody different policy judgments
about the relative rights of inventors, competitors, and the public
Applied here, the presumption tugs strongly against construing
§271(f) to encompass as a "component" not only a physical copy of
software, but also software's intangible code, and to render "sup-
plie[d]    from the United States" not only exported copies of soft-
ware, but also duplicates made abroad   Foreign law alone, not
United States law, currently governs the manufacture and sale of
components of patented inventions in foreign countries   If AT&T de-
sires to prevent copying abroad, its remedy lies in obtaining and en-
forcing foreign patents   Pp  14–16

    (d) While reading §271(f) to exclude from coverage foreign-made

Syllabus

copies of software may create a "loophole" in favor of software mak-
ers, the Court is not persuaded that dynamic judicial interpretation
of §271(f) is in order; the "loophole" is properly left for Congress to
consider, and to close if it finds such action warranted  Section 271(f)
was a direct response to a gap in U S patent law revealed by *Deep-
south Packing Co* v *Laitram Corp*, 406 U S 518, where the items
exported were kits containing all the physical, readily assemblable
parts of a machine (not an intangible set of instructions), and those
parts themselves (not foreign-made copies of them) would be com-
bined abroad by foreign buyers  Having attended to that gap, Con-
gress did not address other arguable gaps, such as the loophole AT&T
describes  Given the expanded extraterritorial thrust AT&T's read-
ing of §271(f) entails, the patent-protective determination AT&T
seeks must be left to Congress  Cf *Sony Corp of America* v *Univer-
sal City Studios, Inc*, 464 U S 417, 431  Congress is doubtless
aware of the ease with which electronic media such as software can
be copied, and has not left the matter untouched  See the Digital
Millennium Copyright Act, 17 U S C §1201 *et seq*  If patent law is
to be adjusted better to account for the realities of software distribu-
tion, the alteration should be made after focused legislative consid-
eration, not by the Judiciary forecasting Congress' likely disposition
Pp 17–19

414 F 3d 1366, reversed

GINSBURG, J , delivered the opinion of the Court, except as to footnote
14  SCALIA, KENNEDY, and SOUTER, JJ , joined that opinion in full
ALITO, J , filed an opinion concurring as to all but footnote 14, in which
THOMAS and BREYER, JJ , joined  STEVENS, J , filed a dissenting opin-
ion  ROBERTS, C J , took no part in the consideration or decision of the
case

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 05–1056

## MICROSOFT CORPORATION, PETITIONER *v.* AT&T CORP.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 30. 2007]

JUSTICE GINSBURG delivered the opinion of the Court, except as to footnote 14.

It is the general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country. There is an exception. Section 271(f) of the Patent Act, adopted in 1984, provides that infringement does occur when one "supplies . . . from the United States," for "combination" abroad, a patented invention's "components." 35 U. S. C. §271(f)(1). This case concerns the applicability of §271(f) to computer software first sent from the United States to a foreign manufacturer on a master disk, or by electronic transmission, then copied by the foreign recipient for installation on computers made and sold abroad.

AT&T holds a patent on an apparatus for digitally encoding and compressing recorded speech. Microsoft's Windows operating system, it is conceded, has the potential to infringe AT&T's patent, because Windows incorporates software code that, when installed, enables a computer to process speech in the manner claimed by that patent. It bears emphasis, however, that uninstalled

Opinion of the Court

Windows software does not infringe AT&T's patent any more than a computer standing alone does; instead, the patent is infringed only when a computer is loaded with Windows and is thereby rendered capable of performing as the patented speech processor. The question before us: Does Microsoft's liability extend to computers made in another country when loaded with Windows software copied abroad from a master disk or electronic transmission dispatched by Microsoft from the United States? Our answer is "No."

The master disk or electronic transmission Microsoft sends from the United States is never installed on any of the foreign-made computers in question. Instead, copies made abroad are used for installation. Because Microsoft does not export from the United States the copies actually installed, it does not "suppl[y] . . . from the United States" "components" of the relevant computers, and therefore is not liable under §271(f) as currently written.

Plausible arguments can be made for and against extending §271(f) to the conduct charged in this case as infringing AT&T's patent. Recognizing that §271(f) is an exception to the general rule that our patent law does not apply extraterritorially, we resist giving the language in which Congress cast §271(f) an expansive interpretation. Our decision leaves to Congress' informed judgment any adjustment of §271(f) it deems necessary or proper.

I

Our decision some 35 years ago in *Deepsouth Packing Co.* v. *Laitram Corp.*, 406 U. S. 518 (1972), a case about a shrimp deveining machine, led Congress to enact §271(f). In that case, Laitram, holder of a patent on the time-and-expense-saving machine, sued Deepsouth, manufacturer of an infringing deveiner. Deepsouth conceded that the Patent Act barred it from making and selling its deveining machine in the United States, but sought to salvage a

Opinion of the Court

portion of its business: Nothing in United States patent law, Deepsouth urged, stopped it from making in the United States the *parts* of its deveiner, as opposed to the machine itself, and selling those *parts* to foreign buyers for assembly and use abroad. *Id.*, at 522–524.[1] We agreed.

Interpreting our patent law as then written, we reiterated in *Deepsouth* that it was "not an infringement to make or use a patented product outside of the United States." *Id.*, at 527; see 35 U. S. C. §271(a) (1970 ed.) ("[W]hoever without authority makes, uses or sells any patented invention, within the United States during the term of the patent therefor, infringes the patent."). Deepsouth's foreign buyers did not infringe Laitram's patent, we held, because they assembled and used the deveining machines outside the United States. Deepsouth, we therefore concluded, could not be charged with inducing or contributing to an infringement. 406 U. S., at 526–527.[2] Nor could Deepsouth be held liable as a direct infringer, for it did not make, sell, or use the patented invention— the fully assembled deveining machine—within the United States. The parts of the machine were not themselves patented, we noted, hence export of those parts, unassembled, did not rank as an infringement of Laitram's patent. *Id.*, at 527–529.

Laitram had argued in *Deepsouth* that resistance to extension of the patent privilege to cover exported parts

---

[1] Deepsouth shipped its deveining equipment "to foreign customers in three separate boxes, each containing only parts of the 1¾-ton machines, yet the whole [was] assemblable in less than one hour." *Deepsouth Packing Co.* v *Laitram Corp.*, 406 U. S. 518, 524 (1972).

[2] See 35 U. S. C. §271(b) (1970 ed.) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); §271(c) (rendering liable as a contributory infringer anyone who sells or imports a "component" of a patented invention, "knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use").

Opinion of the Court

"derived from too narrow and technical an interpretation of the [Patent Act]." *Id.*, at 529. Rejecting that argument, we referred to prior decisions holding that "a combination patent protects only against the operable assembly of the whole and not the manufacture of its parts." *Id.*, at 528. Congress' codification of patent law, we said, signaled no intention to broaden the scope of the privilege. *Id.*, at 530 ("When, as here, the Constitution is permissive, the sign of how far Congress has chosen to go can come only from Congress."). And we again emphasized that

> "[o]ur patent system makes no claim to extraterritorial effect; these acts of Congress do not, and were not intended to, operate beyond the limits of the United States; and we correspondingly reject the claims of others to such control over our markets." *Id.*, at 531 (quoting *Brown* v. *Duchesne*, 19 How. 183, 195 (1857)).

Absent "a clear congressional indication of intent," we stated, courts had no warrant to stop the manufacture and sale of the parts of patented inventions for assembly and use abroad. 406 U. S., at 532.

Focusing its attention on *Deepsouth*, Congress enacted §271(f). See Patent Law Amendments Act of 1984, §101, 98 Stat. 3383; Fisch & Allen, The Application of Domestic Patent Law to Exported Software: 35 U. S. C. §271(f), 25 U. Pa. J. Int'l Econ. L. 557, 565 (2004) ("Congress specifically intended §271(f) as a response to the Supreme Court's decision in Deepsouth").[3] The provision expands

---

[3]See also, *e.g.*, Patent Law Amendments of 1984. S Rep No 98–663, pp 2–3 (1984) (describing §271(f) as "a response to the Supreme Court's 1972 *Deepsouth* decision which interpreted the patent law not to make it infringement where the final assembly and sale is abroad"); Section-by-Section Analysis of H R 6286, 130 Cong Rec 28069 (1984) ("This proposal responds to the United States Supreme Court decision in *Deepsouth*    concerning the need for a legislative solution to close a loophole in [the] patent law ")

Opinion of the Court

the definition of infringement to include supplying from the United States a patented invention's components:

"(1) Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer.

"(2) Whoever without authority supplies or causes to be supplied in or from the United States any component of a patented invention that is especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use, where such component is uncombined in whole or in part, knowing that such component is so made or adapted and intending that such component will be combined outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer." 35 U. S. C. §271(f).

II

Windows is designed, authored, and tested at Microsoft's Redmond, Washington, headquarters. Microsoft sells Windows to end users and computer manufacturers, both foreign and domestic. Purchasing manufacturers install the software onto the computers they sell. Microsoft sends to each of the foreign manufacturers a master version of Windows, either on a disk or via encrypted electronic transmission. The manufacturer uses the master version to generate copies. Those copies, not the master sent by Microsoft, are installed on the foreign manu-

facturer's computers   Once assembly is complete, the foreign-made computers are sold to users abroad. App. to Pet. for Cert  45a–46a.[4]

AT&T's patent ('580 patent) is for an apparatus (as relevant here, a computer) capable of digitally encoding and compressing recorded speech.  Windows, the parties agree, contains software that enables a computer to process speech in the manner claimed by the '580 patent   In 2001, AT&T filed an infringement suit in the United States District Court for the Southern District of New York, charging Microsoft with liability for domestic and foreign installations of Windows.

Neither Windows software (*e.g.*, in a box on the shelf) nor a computer standing alone (*i.e.*, without Windows installed) infringes AT&T's patent.   Infringement occurs only when Windows is installed on a computer, thereby rendering it capable of performing as the patented speech processor   Microsoft stipulated that by installing Windows on its own computers during the software development process, it directly infringed the '580 patent.[5]  Microsoft further acknowledged that by licensing copies of Windows to manufacturers of computers sold in the United States, it induced infringement of AT&T's patent.[6]  *Id.*, at 42a; Brief for Petitioner 3–4; Brief for Respondent 9, 19.

Microsoft denied, however, any liability based on the master disks and electronic transmissions it dispatched to

---

[4] Microsoft also distributes Windows to foreign manufacturers indirectly, by sending a master version to an authorized foreign "replicator"; the replicator then makes copies and ships them to the manufacturers  App. to Pet. for Cert  45a–46a

[5] See 35 U S C  §271(a) ("[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent ")

[6] See §271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer ")

Opinion of the Court

foreign manufacturers, thus joining issue with AT&T. By sending Windows to foreign manufacturers, AT&T contended, Microsoft "supplie[d] … from the United States," for "combination" abroad, "components" of AT&T's patented speech processor; accordingly, AT&T urged, Microsoft was liable under §271(f). See *supra*, at 5 (reproducing text of §271(f)). Microsoft responded that unincorporated software, because it is intangible information, cannot be typed a "component" of an invention under §271(f). In any event, Microsoft urged, the foreign-generated copies of Windows actually installed abroad were not "supplie[d] … from the United States." Rejecting these responses, the District Court held Microsoft liable under §271(f). 71 USPQ 2d 1118 (SDNY 2004). On appeal, a divided panel of the Court of Appeals for the Federal Circuit affirmed. 414 F. 3d 1366 (2005). We granted certiorari, 549 U. S. ___ (2006), and now reverse.

### III

### A

This case poses two questions: First, when, or in what form, does software qualify as a "component" under §271(f)? Second, were "components" of the foreign-made computers involved in this case "supplie[d]" by Microsoft "from the United States"?[7]

As to the first question, no one in this litigation argues that software can *never* rank as a "component" under §271(f). The parties disagree, however, over the stage at which software becomes a component. Software, the "set of instructions, known as code, that directs a computer to

---

[7]The record leaves unclear which paragraph of §271(f) AT&T's claim invokes. While there are differences between §271(f)(1) and (f)(2), see, *e. g.*, *infra*, at 18, n. 18. the parties do not suggest that those differences are outcome determinative. Cf. *infra*, at 14–15, n. 16 (explaining why both paragraphs yield the same result). For clarity's sake, we focus our analysis on the text of §271(f)(1).

perform specified functions or operations," *Fantasy Sports Properties, Inc.* v. *Sportsline.com, Inc.*, 287 F. 3d 1108, 1118 (CA Fed. 2002), can be conceptualized in (at least) two ways. One can speak of software in the abstract: the instructions themselves detached from any medium. (An analogy: The notes of Beethoven's Ninth Symphony.) One can alternatively envision a tangible "copy" of software, the instructions encoded on a medium such as a CD-ROM. (Sheet music for Beethoven's Ninth.) AT&T argues that software in the abstract, not simply a particular copy of software, qualifies as a "component" under §271(f). Microsoft and the United States argue that only a copy of software, not software in the abstract, can be a component.[8]

The significance of these diverse views becomes apparent when we turn to the second question: Were components of the foreign-made computers involved in this case "supplie[d]" by Microsoft "from the United States"? If the relevant components are the copies of Windows actually installed on the foreign computers, AT&T could not persuasively argue that those components, though generated abroad, were "supplie[d] . . . from the United States" as §271(f) requires for liability to attach.[9] If, on the other

_____

[8]Microsoft and the United States stress that to count as a component, the copy of software must be expressed as "object code." "Software in the form in which it is written and understood by humans is called 'source code.' To be functional, however, software must be converted (or 'compiled') into its machine-usable version," a sequence of binary number instructions typed "object code." Brief for United States as *Amicus Curiae* 4, n 1; 71 USPQ 2d 1118, 1119, n 5 (SDNY 2004) (recounting Microsoft's description of the software development process). It is stipulated that object code was on the master disks and electronic transmissions Microsoft dispatched from the United States.

[9]On this view of "component," the copies of Windows on the master disks and electronic transmissions that Microsoft sent from the United States could not themselves serve as a basis for liability, because those copies were not installed on the foreign manufacturers' computers. See §271(f)(1) (encompassing only those components "combin[ed] . . . outside of the United States in a manner that would infringe the patent if such

Opinion of the Court

hand, Windows in the abstract qualifies as a component within §271(f)'s compass, it would not matter that the master copies of Windows software dispatched from the United States were not themselves installed abroad as working parts of the foreign computers.[10]

With this explanation of the relationship between the two questions in view, we further consider the twin inquiries.

## B

First, when, or in what form, does software become a "component" under §271(f)? We construe §271(f)'s terms "in accordance with [their] ordinary or natural meaning." *FDIC* v *Meyer*, 510 U. S. 471, 476 (1994). Section 271(f) applies to the supply abroad of the "components of a patented invention, where *such components* are uncombined in whole or in part, in such manner as to actively induce the combination of *such components*." §271(f)(1) (emphasis added). The provision thus applies only to "such components"[11] as are combined to form the "patented invention" at issue. The patented invention here is AT&T's speech-processing computer.

Until it is expressed as a computer-readable "copy," *e.g.*, on a CD-ROM, Windows software—indeed any software detached from an activating medium—remains uncombinable. It cannot be inserted into a CD-ROM drive or downloaded from the Internet; it cannot be installed or executed on a computer. Abstract software code is an idea

_____

combination occurred within the United States")

[10] The Federal Circuit panel in this case, relying on that court's prior decision in *Eolas Technologies Inc* v *Microsoft Corp.*, 399 F 3d 1325 (2005), held that software qualifies as a component under §271(f). We are unable to determine, however, whether the Federal Circuit panels regarded as a component software in the abstract, or a copy of software

[11] "Component" is commonly defined as "a constituent part," "element," or "ingredient" Webster's Third New International Dictionary of the English Language 466 (1981)

without physical embodiment, and as such, it does not match §271(f)'s categorization: "components" amenable to "combination." Windows abstracted from a tangible copy no doubt is information—a detailed set of instructions— and thus might be compared to a blueprint (or anything containing design information, *e.g.*, a schematic, template, or prototype). A blueprint may contain precise instructions for the construction and combination of the components of a patented device, but it is not itself a combinable component of that device. AT&T and its *amici* do not suggest otherwise. Cf. *Pellegrini* v. *Analog Devices, Inc.*, 375 F. 3d 1113, 1117–1119 (CA Fed. 2004) (transmission abroad of instructions for production of patented computer chips not covered by §271(f)).

AT&T urges that software, at least when expressed as machine-readable object code, is distinguishable from design information presented in a blueprint. Software, unlike a blueprint, is "modular"; it is a stand-alone product developed and marketed "for use on many different types of computer hardware and in conjunction with many other types of software." Brief for Respondent 5; Tr. of Oral Arg. 46. Software's modularity persists even after installation; it can be updated or removed (deleted) without affecting the hardware on which it is installed. *Ibid.* Software, unlike a blueprint, is also "dynamic." Tr. of Oral Arg. 46. After a device has been built according to a blueprint's instructions, the blueprint's work is done (as AT&T puts it, the blueprint's instructions have been "exhausted," *ibid.*). Software's instructions, in contrast, are contained in and continuously performed by a computer. Brief for Respondent 27–28; Tr. of Oral Arg. 46. See also *Eolas Technologies Inc.* v. *Microsoft Corp.*, 399 F. 3d 1325, 1339 (CA Fed. 2005) ("[S]oftware code . . . drives the functional nucleus of the finished computer product." (quoting *Imagexpo, L. L. C.* v. *Microsoft Corp.*, 299 F. Supp. 2d 550, 553 (ED Va. 2003))).

The distinctions advanced by AT&T do not persuade us to characterize software, uncoupled from a medium, as a combinable component. Blueprints too, or any design information for that matter, can be independently developed, bought, and sold. If the point of AT&T's argument is that we do not see blueprints lining stores' shelves, the same observation may be made about software in the abstract: What retailers sell, and consumers buy, are *copies* of software. Likewise, before software can be contained in and continuously performed by a computer, before it can be updated or deleted, an actual, physical copy of the software must be delivered by CD-ROM or some other means capable of interfacing with the computer.[12]

Because it is so easy to encode software's instructions onto a medium that can be read by a computer, AT&T intimates, that extra step should not play a decisive role under §271(f). But the extra step is what renders the software a usable, combinable part of a computer; easy or not, the copy-producing step is essential. Moreover, many tools may be used easily and inexpensively to generate the parts of a device. A machine for making sprockets might be used by a manufacturer to produce tens of thousands of sprockets an hour. That does not make the machine a "component" of the tens of thousands of devices in which the sprockets are incorporated, at least not under any ordinary understanding of the term "component." Con-

_____

[12]The dissent, embracing AT&T's argument, contends that, "unlike a blueprint that merely instructs a user how to do something, software actually causes infringing conduct to occur." *Post*, at 3 (STEVENS, J., dissenting). We have emphasized, however, that Windows can "caus[e] infringing conduct to occur"—*i e*, function as part of AT&T's speech-processing computer—only when expressed as a computer-readable copy. Abstracted from a usable copy, Windows code is intangible, uncombinable information, more like notes of music in the head of a composer than "a roller that causes a player piano to produce sound." *Ibid*

gress, of course, might have included within §271(f)'s
compass, for example, not only combinable "components"
of a patented invention, but also "information, instruc-
tions, or tools from which those components readily may
be generated." It did not. In sum, a copy of Windows, not
Windows in the abstract, qualifies as a "component" under
§271(f).[13]

C

The next question, has Microsoft "supplie[d] . . . from
the United States" components of the computers here
involved? Under a conventional reading of §271(f)'s text,
the answer would be "No," for the foreign-made copies of
Windows actually installed on the computers were "sup-
plie[d]" from places outside the United States. The Fed-
eral Circuit majority concluded, however, that "for soft-
ware 'components,' the act of copying is subsumed in the
act of 'supplying.'" 414 F. 3d, at 1370. A master sent
abroad, the majority observed, differs not at all from the
exact copies, easily, inexpensively, and swiftly generated
from the master; hence "sending a single copy abroad with
the intent that it be replicated invokes §271(f) liability for
th[e] foreign-made copies." *Ibid.*; cf. *post*, at 2 (STEVENS,
J., dissenting) ("[A] master disk is the functional equiva-
lent of a warehouse of components . . . that Microsoft fully
expects to be incorporated into foreign-manufactured
computers.").

Judge Rader, dissenting, noted that "supplying" is ordi-
narily understood to mean an activity separate and dis-

---

[13] We need not address whether software in the abstract, or any other
intangible, can *ever* be a component under §271(f). If an intangible
method or process, for instance, qualifies as a "patented invention"
under §271(f) (a question as to which we express no opinion), the
combinable components of that invention might be intangible as well.
The invention before us, however, AT&T's speech-processing computer,
is a tangible thing.

Opinion of the Court

tinct from any subsequent "copying, replicating, or repro-
ducing—in effect manufacturing." 414 F. 3d, at 1372–
1373 (internal quotation marks omitted); see *id.*, at 1373
("[C]opying and supplying are separate acts with different
consequences—particularly when the 'supplying' occurs in
the United States and the copying occurs in Düsseldorf or
Tokyo. As a matter of logic, one cannot supply one hun-
dred components of a patented invention without first
making one hundred copies of the component . . . ."). He
further observed: "The only true difference between mak-
ing and supplying software components and physical
components [of other patented inventions] is that copies of
software components are easier to make and transport."
*Id.*, at 1374. But nothing in §271(f)'s text, Judge Rader
maintained, renders ease of copying a relevant, no less
decisive, factor in triggering liability for infringement. See
*ibid.* We agree.

Section 271(f) prohibits the supply of components "from
the United States . . . in such manner as to actively induce
the combination of *such components.*" §271(f)(1) (emphasis
added). Under this formulation, the very components
supplied from the United States, and not copies thereof,
trigger §271(f) liability when combined abroad to form the
patented invention at issue. Here, as we have repeatedly
noted, see *supra*, at 1–2, 5–6, the copies of Windows actu-
ally installed on the foreign computers were not them-
selves supplied from the United States.[14] Indeed, those
copies did not exist until they were generated by third
parties outside the United States.[15] Copying software

---

[14] In a footnote, Microsoft suggests that even a disk shipped from the
United States, and used to install Windows directly on a foreign com-
puter, would not give rise to liability under §271(f) if the disk were
removed after installation. See Brief for Petitioner 37, n. 11; cf. *post*, at
2–4 (ALITO, J., concurring). We need not and do not reach that issue
here.

[15] The dissent analogizes Microsoft's supply of master versions of

abroad, all might agree, is indeed easy and inexpensive.
But the same could be said of other items: "Keys or ma-
chine parts might be copied from a master; chemical or
biological substances might be created by reproduction;
and paper products might be made by electronic copying
and printing." Brief for United States as *Amicus Curiae*
24. See also *supra*, at 11–12 (rejecting argument similarly
based on ease of copying in construing "component").
Section 271(f) contains no instruction to gauge when du-
plication is easy and cheap enough to deem a copy in fact
made abroad nevertheless "supplie[d] . . . from the United
States." The absence of anything addressing copying in
the statutory text weighs against a judicial determination
that replication abroad of a master dispatched from the
United States "supplies" the foreign-made copies from the
United States within the intendment of §271(f).[16]

_____

Windows abroad to "the export of an inventory of   knives to be
warehoused until used to complete the assembly of an infringing
machine." *Post*, at 2. But as we have underscored, foreign-made copies
of Windows, not the masters Microsoft dispatched from the United
States, were installed on the computers here involved. A more apt
analogy, therefore, would be the export of knives for *copying* abroad,
with the foreign-made *copies* "warehoused until used to complete the
assembly of an infringing machine." *Ibid.* Without stretching §271(f)
beyond the text Congress composed, a copy made entirely abroad does
not fit the description "supplie[d]   from the United States."

[16]Our analysis, while focusing on §271(f)(1), is equally applicable to
§271(f)(2). But cf *post*, at 1 (STEVENS, J., dissenting) (asserting "para-
graph (2)   best supports AT&T's position here"). While the two
paragraphs differ, among other things, on the quantity of components
that must be "supplie[d]   from the United States" for liability to
attach, see *infra*, at 18, n. 18, that distinction does not affect our
analysis. Paragraph (2), like (1), covers only a "component" amenable
to "combination." §271(f)(2); see *supra*, at 9–12 (explaining why Win-
dows in the abstract is not a combinable component). Paragraph (2),
like (1), encompasses only the "[s]uppl[y]   from the United States" of
"such [a] component" as will itself "be combined outside of the United
States." §271(f)(2); see *supra*, at 12–13 and this page (observing that
foreign-made copies of Windows installed on computers abroad were

Opinion of the Court

### D

Any doubt that Microsoft's conduct falls outside §271(f)'s compass would be resolved by the presumption against extraterritoriality, on which we have already touched. See *supra*, at 2, 4. The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law. The traditional understanding that our patent law "operate[s] only domestically and d[oes] not extend to foreign activities," Fisch & Allen, *supra*, at 559, is embedded in the Patent Act itself, which provides that a patent confers exclusive rights in an invention within the United States. 35 U. S. C. §154(a)(1) (patentee's rights over invention apply to manufacture, use, or sale "throughout the United States" and to importation "into the United States"). See *Deepsouth*, 406 U. S., at 531 ("Our patent system makes no claim to extraterritorial effect"; our legislation "d[oes] not, and [was] not intended to, operate beyond the limits of the United States, and we correspondingly reject the claims of others to such control over our markets." (quoting *Brown*, 19 How., at 195)).

As a principle of general application, moreover, we have stated that courts should "assume that legislators take account of the legitimate sovereign interests of other nations when they write American laws." *F. Hoffmann-La Roche Ltd* v. *Empagran S. A.*, 542 U. S. 155, 164 (2004); see *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248 (1991). Thus, the United States accurately conveyed in this case: "Foreign conduct is [generally] the domain of foreign law," and in the area here involved, in particular, foreign law "may embody different policy judgments about the relative rights of inventors, competitors, and the pub-

---

not "supplie[d]    from the United States") It is thus unsurprising that AT&T does not join the dissent in suggesting that the outcome might turn on whether we view the case under paragraph (1) or (2)

lic in patented inventions." Brief for United States as *Amicus Curiae* 28. Applied to this case, the presumption tugs strongly against construction of §271(f) to encompass as a "component" not only a physical copy of software, but also software's intangible code, and to render "supplie[d] ... from the United States" not only exported copies of software, but also duplicates made abroad.

AT&T argues that the presumption is inapplicable because Congress enacted §271(f) specifically to extend the reach of United States patent law to cover certain activity abroad. But as this Court has explained, "the presumption is not defeated ... just because [a statute] specifically addresses [an] issue of extraterritorial application," *Smith* v. *United States*, 507 U. S. 197, 204 (1993); it remains instructive in determining the *extent* of the statutory exception. See *Empagran*, 542 U. S., at 161–162, 164–165; *Smith*, 507 U. S., at 204.

AT&T alternately contends that the presumption holds no sway here given that §271(f), by its terms, applies only to domestic conduct, *i.e.*, to the supply of a patented invention's components "from the United States." §271(f)(1). AT&T's reading, however, "converts a single act of supply from the United States into a springboard for liability each time a copy of the software is subsequently made [abroad] and combined with computer hardware [abroad] for sale [abroad.]" Brief for United States as *Amicus Curiae* 29; see 414 F. 3d, at 1373, 1375 (Rader, J., dissenting). In short, foreign law alone, not United States law, currently governs the manufacture and sale of components of patented inventions in foreign countries. If AT&T desires to prevent copying in foreign countries, its remedy today lies in obtaining and enforcing foreign patents. See *Deepsouth*, 406 U. S., at 531.[17]

_____

[17]AT&T has secured patents for its speech processor in Canada, France, Germany, Great Britain, Japan, and Sweden. App. in No. 04–

IV

AT&T urges that reading §271(f) to cover only those copies of software actually dispatched from the United States creates a "loophole" for software makers. Liability for infringing a United States patent could be avoided, as Microsoft's practice shows, by an easily arranged circumvention: Instead of making installation copies of software in the United States, the copies can be made abroad, swiftly and at small cost, by generating them from a master supplied from the United States. The Federal Circuit majority found AT&T's plea compelling:

> "Were we to hold that Microsoft's supply by exportation of the master versions of the Windows® software—specifically for the purpose of foreign replication—avoids infringement, we would be subverting the remedial nature of §271(f), permitting a technical avoidance of the statute by ignoring the advances in a field of technology—and its associated industry practices—that developed after the enactment of §271(f). . . . Section §271(f), if it is to remain effective, must therefore be interpreted in a manner that is appropriate to the nature of the technology at issue." 414 F. 3d, at 1371.

While the majority's concern is understandable, we are not persuaded that dynamic judicial interpretation of §271(f) is in order. The "loophole," in our judgment, is properly left for Congress to consider, and to close if it finds such action warranted.

There is no dispute, we note again, that §271(f) is inapplicable to the export of design tools—blueprints, schemat-

_____

1285 (CA Fed.), p. 1477. AT&T and its *amici* do not relate what protections and remedies are, or are not, available under these foreign regimes. Cf. Brief for Respondent 46 (observing that "foreign patent protections are *sometimes* weaker than their U. S. counterparts" (emphasis added))

ics, templates, and prototypes—all of which may provide the information required to construct and combine overseas the components of inventions patented under United States law. See *supra*, at 10–12. We have no license to attribute to Congress an unstated intention to place the information Microsoft dispatched from the United States in a separate category.

Section 271(f) was a direct response to a gap in our patent law revealed by this Court's *Deepsouth* decision. See *supra*, at 4, and n. 3. The facts of that case were undeniably at the fore when §271(f) was in the congressional hopper. In *Deepsouth*, the items exported were kits containing all the physical, readily assemblable parts of a shrimp deveining machine (not an intangible set of instructions), and those parts themselves (not foreign-made copies of them) would be combined abroad by foreign buyers. Having attended to the gap made evident in *Deepsouth*, Congress did not address other arguable gaps: Section 271(f) does not identify as an infringing act conduct in the United States that facilitates making a component of a patented invention outside the United States; nor does the provision check "suppl[ying] . . . from the United States" information, instructions, or other materials needed to make copies abroad.[18] Given that Congress did not home in on the loophole AT&T describes, and in view of the expanded extraterritorial thrust AT&T's reading of §271(f) entails, our precedent leads us to leave in Congress' court the patent-protective determination AT&T

---

[18] Section 271(f)'s text does. in one respect, reach past the facts of *Deepsouth*. While Deepsouth exported kits containing *all* the parts of its deveining machines, §271(f)(1) applies to the supply abroad of "all or a substantial portion of" a patented invention's components. And §271(f)(2) applies to the export of even a single component if it is "especially made or especially adapted for use in the invention and not a staple article or commodity of commerce suitable for substantial noninfringing use."

Opinion of the Court

seeks. Cf. *Sony Corp. of America* v. *Universal City Studios, Inc.*, 464 U. S. 417, 431 (1984) ("In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never contemplated such a calculus of interests.").

Congress is doubtless aware of the ease with which software (and other electronic media) can be copied, and has not left the matter untouched. In 1998, Congress addressed "the ease with which pirates could copy and distribute a copyrightable work in digital form." *Universal City Studios, Inc.* v. *Corley*, 273 F. 3d 429, 435 (CA2 2001). The resulting measure, the Digital Millennium Copyright Act, 17 U. S. C. §1201 *et seq.*, "backed with legal sanctions the efforts of copyright owners to protect their works from piracy behind digital walls such as encryption codes or password protections." *Universal City Studios*, 273 F. 3d, at 435. If the patent law is to be adjusted better "to account for the realities of software distribution," 414 F. 3d, at 1370, the alteration should be made after focused legislative consideration, and not by the Judiciary forecasting Congress' likely disposition.

\*    \*    \*

For the reasons stated, the judgment of the Court of Appeals for the Federal Circuit is

*Reversed.*

THE CHIEF JUSTICE took no part in the consideration or decision of this case.

ALITO, J., concurring

# SUPREME COURT OF THE UNITED STATES

No. 05–1056

## MICROSOFT CORPORATION, PETITIONER v. AT&T CORP.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 30, 2007]

JUSTICE ALITO, with whom JUSTICE THOMAS and JUSTICE BREYER join, concurring as to all but footnote 14.

I agree with the Court that no "component[s]" of the foreign-made computers involved in this case were "supplie[d]" by Microsoft "from the United States." 35 U. S. C. §271(f)(1). I write separately because I reach this conclusion through somewhat different reasoning.

I

Computer programmers typically write programs in a "human readable" programming language. This "'source code'" is then generally converted by the computer into a "machine readable code" or "machine language" expressed in a binary format. Brief for Respondent 5, n. 1 (citing R. White, How Computers Work 87, 94 (8th ed. 2006)); E. Walters, Essential Guide to Computing 204–205 (2001). During the Windows writing process, the program exists in the form of machine readable code on the magnetic tape fields of Microsoft's computers' hard drives. White, *supra,* at 144–145; Walters, *supra,* at 54–55.

When Microsoft finishes writing its Windows program in the United States, it encodes Windows onto CD-ROMs known as "'golden masters'" in the form of machine readable code. App. 31, ¶4. This is done by engraving each disk in a specific way such that another computer can read

ALITO, J., concurring

the engravings, understand what they mean, and write the code onto the magnetic fields of its hard drive. *Ibid.;* Brief for Petitioner 4, n. 2.

Microsoft ships these disks (or sends the code via electronic transmission) abroad, where the code is copied onto other disks that are then placed into foreign-made computers for purposes of installing the Windows program. App. 31–32, ¶¶5–8. No physical aspect of a Windows CD-ROM—original disk or copy—is ever incorporated into the computer itself. See *Stenograph L. L. C. v. Bossard Assocs., Inc.,* 144 F. 3d 96, 100 (CADC 1998) (noting that, within the context of the Copyright Act, "installation of software onto a computer results in 'copying'"); White, *supra,* at 144–145, 172–173. The intact CD-ROM is then removed and may be discarded without affecting the computer's implementation of the code.* The parties agree for purposes of this litigation that a foreign-made computer containing the Windows code would violate AT&T's patent if present in the United States. Pet. for Cert. 42a, ¶5.

II

A

I agree with the Court that a component of a machine, whether a shrimp deveiner or a personal computer, must be something physical. *Ante,* at 9–11. This is because the word "component," when concerning a physical device, is most naturally read to mean a physical part of the device. See Webster's Third New International Dictionary 466 (1976) (component is a "constituent part: INGREDIENT"); Random House Dictionary of the English Language 301

---

*In a sense, the whole process is akin to an author living prior to the existence of the printing press, who created a story in his mind, wrote a manuscript, and sent it to a scrivener, who in turn copied the story by hand into a blank book.

(1967) (component is a "a component part; constituent"). Furthermore, §271(f) requires that the component be "combined" with other components to form the infringing device, meaning that the component must remain a part of any. Webster's, *supra,* at 452 (combine means "to join in physical or chemical union"; "to become one"; "to unite into a chemical compound"); Random House, *supra,* at 293 (combine means "to bring or join into a close union or whole"). For these reasons, I agree with the Court that a set of instructions on how to build an infringing device, or even a template of the device, does not qualify as a component. *Ante,* at 9–10.

### B

As the parties agree, an inventor can patent a machine that carries out a certain process, and a computer may constitute such a machine when it executes commands—given to it by code—that allow it to carry out that process. Such a computer would not become an infringing device until enough of the code is installed on the computer to allow it to execute the process in question. The computer would not be an infringing device prior to the installation, or even during the installation. And the computer remains an infringing device after the installation process because, even though the original installation device (such as a CD-ROM) has been removed from the computer, the code remains on the hard drive.

### III

Here, Windows software originating in the United States was sent abroad, whether on a master disk or by means of an electronic transmission, and eventually copied onto the hard drives of the foreign-made computers. Once the copying process was completed, the Windows program was recorded in a physical form, *i.e.*, in magnetic fields on the computers' hard drives. See Brief for Respondent 5. The physical form of the Windows program on

ALITO, J., concurring

the master disk, *i.e.*, the engravings on the CD-ROM, remained on the disk in a form unchanged by the copying process. See Brief for Petitioner 4, n. 2 (citing White, How Computers Work, at 144–145, 172–173). There is nothing in the record to suggest that any physical part of the disk became a physical part of the foreign-made computer, and such an occurrence would be contrary to the general workings of computers.

Because no physical object originating in the United States was combined with these computers, there was no violation of §271(f). Accordingly, it is irrelevant that the Windows software was not copied onto the foreign-made computers *directly* from the master disk or from an electronic transmission that originated in the United States. To be sure, if these computers could not run Windows without inserting and keeping a CD-ROM in the appropriate drive, then the CD-ROMs might be components of the computer. But that is not the case here.

*    *    *

Because the physical incarnation of code on the Windows CD-ROM supplied from the United States is not a "component" of an infringing device under §271(f), it logically follows that a copy of such a CD-ROM also is not a component. For this reason, I join the Court's opinion, except for footnote 14.

Cite as: 550 U. S. ____ (2007)

1

STEVENS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

———————

No. 05–1056

———————

## MICROSOFT CORPORATION, PETITIONER v. AT&T CORP.

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

[April 30, 2007]

JUSTICE STEVENS, dissenting.

As the Court acknowledges, "[p]lausible arguments can be made for and against extending §271(f) to the conduct charged in this case as infringing AT&T's patent." *Ante*, at 2. Strong policy considerations, buttressed by the presumption against the application of domestic patent law in foreign markets, support Microsoft Corporation's position. I am, however, persuaded that an affirmance of the Court of Appeals' judgment is more faithful to the intent of the Congress that enacted §271(f) than a reversal.

The provision was a response to our decision in *Deepsouth Packing Co.* v. *Laitram Corp.*, 406 U. S. 518 (1972), holding that a patent on a shrimp deveining machine had not been infringed by the export of components for assembly abroad. Paragraph (1) of §271(f) would have been sufficient on its own to overrule *Deepsouth*,* but it is paragraph (2) that best supports AT&T's position here. It

———————

*"Whoever without authority supplies or causes to be supplied in or from the United States all or a substantial portion of the components of a patented invention, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States, shall be liable as an infringer." 35 U. S. C. §271(f)(1).

STEVENS, J , dissenting

provides:

> "Whoever without authority supplies or causes to be
> supplied in or from the United States any component
> of a patented invention that is especially made or es-
> pecially adapted for use in the invention and not a
> staple article or commodity of commerce suitable for
> substantial noninfringing use, where such component
> is uncombined in whole or in part, knowing that such
> component is so made or adapted and intending that
> such component will be combined outside of the
> United States in a manner that would infringe the
> patent if such combination occurred within the United
> States, shall be liable as an infringer." §271(f)(2).

Under this provision, the export of a specially designed
knife that has no use other than as a part of a patented
deveining machine would constitute infringement.    It
follows that §271(f)(2) would cover the export of an inven-
tory of such knives to be warehoused until used to com-
plete the assembly of an infringing machine.

  The relevant component in this case is not a physical
item like a knife. Both Microsoft and the Court think that
means it cannot be a "component." See *ante*, at 10. But if
a disk with software inscribed on it is a "component," I
find it difficult to understand why the most important
ingredient of that component is not also a component.
Indeed, the master disk is the functional equivalent of a
warehouse of components—components that Microsoft
fully expects to be incorporated into foreign-manufactured
computers.   Put somewhat differently: On the Court's
view, Microsoft could be liable under §271(f) only if it
sends individual copies of its software directly from the
United States with the intent that each copy would be
incorporated into a separate infringing computer. But it
seems to me that an indirect transmission via a master
disk warehouse is likewise covered by §271(f).

STEVENS, J , dissenting

I disagree with the Court's suggestion that because software is analogous to an abstract set of instructions, it cannot be regarded as a "component" within the meaning of §271(f). See *ante*, at 9–10. Whether attached or detached from any medium, software plainly satisfies the dictionary definition of that word. See *ante*, at 9, n 11 (observing that "'[c]omponent' is commonly defined as 'a constituent part,' 'element,' or 'ingredient'") And unlike a blueprint that merely instructs a user how to do something, software actually causes infringing conduct to occur. It is more like a roller that causes a player piano to produce sound than sheet music that tells a pianist what to do. Moreover, it is surely not "a staple article or commodity of commerce suitable for substantial noninfringing use" as that term is used in §271(f)(2). On the contrary, its sole intended use is an infringing use

I would therefore affirm the judgment of the Court of Appeals

# ATTACHMENT C

## Estimated Damages

| | Units | Revenue | % of Total Royalty Base | Estimate of Associated Damage Award | Source |
|---|---|---|---|---|---|
| ViewSonic | 1,005,521 | 199,382,608 | 9.0% | 4,721,643 | Wagner supplemental schedules 6.1 (WAG 006207), 6.1.2 (WAG 006209), 7.1, (WAG 007310) 7.1.2 (WAG 007312), 7.3 (WAG 007941), 7.3.2 (WAG 007943-76), 7.2 (WAG 007861) for claims 1 |
| Tatung | 726,319 | 150,669,495 | 6.8% | 3,568,053 | Wagner supplemental schedules 6.1.14 (WAG 006223-34), 6.2.4 (WAG 006842-6854) and 7.1.14 (WAG 007328-56) for claim 1 |
| HP | 126,578 | 25,912,198 | 1.2% | 613,635 | Wagner supplemental schedules 6.1.14 (WAG 006223-34), 6.2.4 (WAG 006842-6854) and 7.1.14 (WAG 007328-56) for claim 1 |
| Dell | 1,581,214 | 277,149,468 | 12.5% | 6,563,265 | Wagner supplemental schedules 6.1.14 (WAG 006223-34), 6.2.4 (WAG 006842-6854) and 7.1.14 (WAG 007328-56) for claim 1 |
| Direct U.S. Sales | 7,827 | 1,236,635 | 0.1% | 29,285 | CPT-D 033641 to 034020, CPT-D 034089 to 034161 |
| All Others | 8,636,379 | 1,561,615,550 | 70.5% | 36,981,118 | Wagner supplemental schedules listed above less sales to ViewSonic, Tatung, HP, and Dell. |
| Total | 12,083,838 | 2,215,965,954 | 100.0% | 52,477,000 | Wagner supplemental schedules 6.1 (WAG 006207), 7.1 (WAG 007310) , 7.2 (WAG 007861), 7.3 (WAG 007941) for claims 1 |